UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | CRIMINAL NO. |
| v. ) | 3:12-CR-104 (EBB) |
| ) | |
| JEFFREY BENTON ) | JULY 30, 2013 |
| ) | |

## POST-HEARING BRIEF RE: MOTION TO SUPPRESS TANGIBLE EVIDENCE

The Defendant, JEFFREY BENTON, by and through his undersigned counsel, previously moved this Court for an order suppressing all physical evidence seized from the Defendant during his arrest on May 17, 2012. The Court (Burns, J.) held a hearing on such motion on July 23, 2013. The Defendant now submits a post-hearing brief, in lieu of oral argument, and argues that all of the evidence seized at the time of his arrest should be suppressed.

### I.     FACTS TESTIFIED TO AT THE HEARING

#### A.     Testimony of Ryan McCrea

Ryan McCrea is the brother of Kawya Cortes, who is the girlfriend of the Defendant, Jeffrey Benton. Mr. McCrea was sleeping on the floor of the living room of Ms. Cortes' apartment on the morning of May 17, 2012, where Mr. Benton was located at the time of his arrest. Mr. McCrea was spending the night at Ms. Cortes' apartment because he could not get into the home of his grandfather, where he usually slept. When the officers came to the main door to the apartment located at 719 Orchard Street in New Haven, Mr. McCrea did not hear the officers knock on the door, even though he was sleeping near that door, but he awoke when he saw the officers enter the apartment and

1

check him to make sure he was not Mr. Benton. When the officers determined that he was not Mr. Benton, the officers instructed Mr. McCrea to stay where he was, as the officers began to search the rest of the apartment for Mr. Benton.

Mr. McCrea testified that he did not open the door to the officers and did not give them consent to enter the apartment. Mr. McCrea also testified that, because everyone else in the apartment was sleeping at 5:45 a.m., he did not see anyone else open the door for the officers or give consent to the officers to enter the apartment, considering he was sleeping in the same room as the entrance.

### B.    Testimony of Kawya Cortes

Ms. Cortes is dating Mr. Benton and is the mother of his 11-month-old daughter. On the morning of May 17, 2012, Ms. Cortes was sleeping with Mr. Benton in her bedroom when they were awakened by the police knocking on the bedroom door, who were already in the apartment when she was awakened. After the two were dressed, the police entered and placed Mr. Benton into custody without incident. The police placed handcuffs on Mr. Benton and removed him to the living room. At that time, two officers went into Ms. Cortes' bedroom and closed the door behind them. When Ms. Cortes attempted to follow the officers back into her bedroom, she was physically removed to the kitchen by Officer David Rivera.

When the officers first took Mr. Benton into custody, Ms. Cortes asked about a warrant, and she was told they would get to that later. When Officer Rivera removed Ms. Cortes to the kitchen, he began speaking with her about giving her consent to search her apartment. Ms. Cortes became confused and angry at discussing this with Officer Rivera, as she believed the officers already had a warrant and she believed she had no right to

refuse the officers' entrance into her bedroom, which is where those officers remained as she had this discussion with Officer Rivera.

When Officer Rivera was explaining to Ms. Cortes that she should consent to the search of her apartment, he explained that if she did not consent, the officers would obtain a warrant and search the apartment anyway. At that time, all of the occupants of the apartment would be charged with whatever contraband that was found. Therefore, Officer Rivera stated that Ms. Cortes would be arrested and then the Department of Children and Families ("DCF") would be called. Therefore, Ms. Cortes felt as if she had no choice but to scribble her name to the consent to search form, which allowed the officers to continue the search of her apartment.

Ms. Cortes also testified that Mr. Benton did not live with her and did not pay rent on her apartment. He was an occasional overnight guest, considering the two were dating, but he did not live there and he did not keep his belongings there. He may have had a change of clothes, considering he was sleeping without any clothes at the time the officers arrived and he had been wearing clothes when he arrived the night before, but he did not have any other personal belongings there. Thus, the apartment at 719 Orchard Street was not his apartment, but he was merely an overnight guest.

Finally, Ms. Cortes testified that, in addition to her roommate and the boyfriend of her roommate, several relatives were also staying with Ms. Cortes that night. Furthermore, Ms. Cortes testified that she did not live in a safe neighborhood and has never gone to bed without locking the doors to protect her daughter. Thus, the night before Mr. Benton was arrested, her doors were locked and sleeping inside the apartment were the following people: Ms. Cortes, Mr. Benton, Mr. McCrea, Gwendolyn McCrea

(Ms. Cortes' mother), Ms. Cortes' younger brother Benjamin, Ms. Cortes' roommate and her boyfriend, and Ms. Cortes' daughter. Although the police were present in her apartment on the morning of May 17, 2012, Ms. Cortes did not consent to the police entering her apartment, she did not consent to them searching her bedroom directly after the police put Mr. Benton into custody, and she did not voluntarily consent to the police searching her apartment, as she felt she was coerced and forced into scribbling her name on the consent to search form.

### C. Testimony of Gwendolyn McCrea

Gwendolyn McCrea, the mother of Kawya Cortes, testified that she was sleeping in the room closest to the living room at 5:45 a.m. on May 17, 2012, but she did not hear the police knock on the door to the apartment and, to her knowledge, no one gave the police consent to enter.

Furthermore, Ms. McCrea was located in the kitchen with her daughter when Officer Rivera was discussing with Ms. Cortes her signing the consent to search form. Ms. McCrea confirmed that there were two officers inside Ms. Cortes' bedroom prior to Ms. Cortes signing the consent to search form. Furthermore, Ms. McCrea confirmed that Officer Rivera stated that, if Ms. Cortes did not sign the form, the officers would obtain a search warrant and search the apartment anyway. Ms. McCrea also confirmed that Officer Rivera threatened that everyone in the apartment could then be arrested and DCF would then be called.

### D. Testimony of Jeffrey Benton

Mr. Benton confirmed that he did not live with Ms. Cortes at 719 Orchard Street in New Haven, but instead he had an apartment of his own in Fair Haven. Furthermore,

4

Mr. Benton confirmed that he did not keep his personal belongings at 719 Orchard Street and only had a change of clothes there from what he wore to the apartment the night prior. Mr. Benton also confirmed that he was placed in handcuffs while in the bedroom and moved to the living room without incident. At that time, he saw two officers enter Ms. Cortes bedroom. When he protested to Ms. Cortes not to allow the officers to search the apartment, he was escorted from the apartment and brought to a waiting police car on the street.

### E. Testimony of the Agents

Officer Rivera admitted that the officers and agents entered 719 Orchard Street without anyone opening the door for them or stating that they had consent to enter the apartment, as all the occupants of the apartment were sleeping. After taking it upon themselves to enter the apartment, the officers then began to secure the apartment and found Mr. Benton in the last bedroom with his girlfriend, Ms. Cortes. Ms. Cortes eventually opened the door to her bedroom, and Mr. Benton was placed in handcuffs and taken into custody without incident.

Officer Rivera also admitted that he did not know for sure if Mr. Benton lived at the apartment, and admitted that he had no knowledge of Mr. Benton paying rent or keeping personal belongings at the apartment. Although Officer Rivera identified certain clothing that did not appear to belong to Ms. Cortes, Officer Rivera could not state that these articles of clothing definitely belonged to Mr. Benton or if it was merely clothing Mr. Benton wore the day before when he arrived at the apartment.

The report that Officer Rivera prepared following the arrest of Mr. Benton stated that the officers entered the apartment at 5:45 a.m., and at 5:50 a.m., Ms. Cortes

identified herself as the tenant and signed the consent to search form, giving the officers permission to search the apartment. In his testimony, however, Officer Rivera stated, for the first time, that Ms. Cortes provided verbal consent approximately twenty minutes[1] after the officers arrived and then signed the consent to search form after Officer Rivera had retrieved the form from his vehicle on the street. Conveniently, this twenty-minute time frame was left out of the report of investigation, as was the trip to the vehicle to retrieve the consent to search form, even though this report was prepared the day after the arrest. Instead, Officer Rivera remembered all of these details while on the stand, more than 14 months after the arrest. Furthermore, Officer Rivera admitted that Ms. Cortes signed the consent to search form and gave verbal consent to search, but he was the only officer who witnessed all of this, and he stated that this consent was given freely and voluntarily.

Officer Rivera did admit to physically moving Ms. Cortes into the kitchen and not allowing her to enter her own bedroom, all before she had provided consent to search the apartment. After twenty minutes of being in the apartment, Officer Rivera stated that Ms. Cortes was calm, even though officers had just entered her apartment, her boyfriend had just been removed from her apartment in handcuffs under a federal arrest warrant, and she was six months pregnant.

Not surprisingly, both of the agents that testified stated that none of the officers entered the bedroom and closed the door behind them prior to Ms. Cortes giving her consent to search the apartment. Also not surprisingly, both of the agents denied any

---

[1] It should be noted that five minutes' time would not be sufficient to cure the taint of an illegal entry, but twenty minutes has been held to be sufficient time. See U.S. v. Snype, 441 F.3d 119, 135 (2d Cir. 2006).

6

threats made by the officers, including the threat of arrest or the calling of DCF if consent was not given.

## II. ARGUMENT

### A. The Officers Should Have Had A Search Warrant To Enter The Apartment Or Been Given Permission By An Occupant. Because The Officers Had Neither A Search Warrant Nor Consent, Any Evidence Seized In The Apartment Should Be Suppressed Based Upon The Illegal Entry

The officers who entered Ms. Cortes' apartment should have had a search warrant to enter the apartment, even though they already had an arrest warrant for Mr. Benton, because this was not Mr. Benton's residence and because the tenants of the apartment are entitled to certain rights. Because the officers did not have a search warrant, and because none of the occupants to the apartment consented to their entry into the apartment, the officers should never have entered. Because the officers performed this illegal entry, anything seized after this illegal entry is tainted as fruit of the poisonous tree and should be suppressed.

With just a few exceptions, a warrant is required before a search may be conducted by government officials. See U.S. Constitution, Fourth Amendment. Warrantless searches are presumptively illegal. See Katz v. United States, 389 U.S. 347 (1967). The only times warrantless searches may be legal is if the search falls under specifically established and "jealously and carefully drawn" exceptions. See Jones v. United States, 357 U.S. 493, 499 (1958).

The Supreme Court has held that an arrest warrant, as opposed to a search warrant, is not adequate to protect the Fourth Amendment interests of persons not named in the warrant when their homes are searched without their consent and in the absence of

7

exigent circumstances. See Steagald v. United States, 451 U.S. 204 (1981). In Steagald, the Drug Enforcement Administration agents entered Steagald's home to search for another defendant, Lyons, for whom the DEA had an arrest warrant, without first obtaining a search warrant for Steagald's home. In the course of searching the home, the agents found cocaine and other incriminating evidence, but did not find Mr. Lyons. Steagald was then arrested and indicted on federal drug charges. His pretrial motion to suppress all evidence uncovered during the search of his home on the ground that it was illegally obtained because the agents had failed to obtain a search warrant was denied by the District Court, and Steagald was convicted. The Court of Appeals affirmed, but the United States Supreme Court reversed. The Court held that absent exigent circumstances or consent, a home may not be searched without a warrant. Two distinct interests were implicated by the search in this case: Mr. Lyons' interest in being free from an unreasonable seizure and Steagald's interest in being free from an unreasonable search of his home. Because the arrest warrant for Mr. Lyons addressed only the former interest, the search of Steagald's home was no more reasonable from Steagald's perspective than it would have been if conducted in the absence of any warrant. Therefore, the Court held that the search violated the Fourth Amendment.

In the Government's Omnibus Response to Defendants' Pretrial Motions filed January 30, 2013, the government argued that the Defendant was not reading Steagald correctly and this Court should, instead, look to the holding of U.S. v. Snype, 441 F.3d 119 (2d Cir. 2006). In that case, the authorities had an arrest warrant for Snype for robbing a bank, based upon the confession of his co-defendant. The officers found Snype at the apartment of Jennifer Bean. They entered the apartment, arrested Snype, and then

sought Bean's permission to search the apartment. At a suppression hearing in Snype's trial, Bean testified that, despite the initial forcible entry into her home, she voluntarily gave both an oral and written consent to search, although she knew she was not required to do so. She testified that Snype was an overnight guest at the apartment. The Second Circuit found that Bean's consent was voluntary. Snype then tried to argue that the voluntary consent was tainted by the illegal initial entry of the officers into the apartment. "When a consent to search follows an illegal entry, this circuit requires the government to show more than the voluntariness of the consent; it must also demonstrate that 'the taint of the initial entry has been dissipated' in order to admit evidence seized following the illegal entry." Id. at 132, *quoting* United States v. Oguns, 921 F.2d 442, 447 (2d Cir.1990). Snype raised the argument that the authorities did not have a search warrant for the apartment, basing his argument on Steagald, supra. The Second Circuit stated that

> [a]lthough this court has yet to rule on that issue, a number of our sister circuits have held that *Steagald* protection does not extend to arrestees in Snype's position. They reason that (a) Fourth Amendment rights are personal and cannot be asserted vicariously, and (b) requiring police who already hold an arrest warrant for a suspect to obtain a search warrant before they can pursue that suspect in a third party's home would grant the suspect broader rights in the third party's home than he would have in his own home under *Payton*. We need not here decide whether to adopt this reasoning because, even if we were to do so, Snype might still be entitled to a taint inquiry.

Snype, supra, at 133 (emphasis added). Thus, the Second Circuit analyzed whether or not there was an illegal entry and whether or not this illegal entry tainted the voluntary consent given by Bean, and never determined the ultimate issue for the Second Circuit of whether an arrestee can make the same argument as the property owner did in Steagald. Ultimately, the Second Circuit held in Snype that that if there was an illegal entry into Bean's apartment, intervening events severed the connection between the illegal entry

9

and the consent, permitting Bean to act of her own free will and consent to the search. Thus, the Court upheld the denial of Snype's motion to suppress.

Therefore, even though the government wishes to make the argument that Mr. Benton was the arrestee and not entitled to the same protections as the defendant in Steagald, that is simply not the law in this Circuit. According to the holding in Snype, this Circuit has not yet ruled on the issue of whether someone in Mr. Benton's position can complain that the authorities entered the residence without a search warrant. Mr. Benton would argue that this Court should follow the holding in Steagald and rule that the officers should have had a search warrant before entering the apartment of Ms. Cortes. No one in the apartment allowed their entrance into the apartment and, thus, the officers had no authority and no right to be inside the apartment. The officers only had an arrest warrant for Mr. Benton, which would have been sufficient to enter an apartment belonging to Mr. Benton, but is not enough to enter the apartment of a third party. The officers could have easily knocked on the door to the apartment, woke up the occupants by announcing their presence, and called for Mr. Benton to come to the hallway. The officers were standing at the door to the apartment and, therefore, Mr. Benton would not have gotten away from them. In the alternative, the officers could have applied for a search warrant for the apartment at the same time as they applied for an arrest warrant for Mr. Benton[2]. The officers could have done things just a little differently, which would have made all the difference, pursuant to this well-established Fourth Amendment law. However, the officers did none of this. The officers were simply looking for the easiest route in this situation. It was much easier for them to enter the apartment first, and then

---

[2] If the government claims there may not have been probable cause to apply for a search warrant for Ms. Cortes' apartment prior to the arrest, that is just further evidence to suggest the officers should never have been inside the apartment in the first place without permission from the occupants.

10

ask for consent to search. This course of action, however, is in contradiction to established Fourth Amendment law.

In its original response, the government also tried to claim that the apartment was a "flophouse" and, thus, there was a lower expectation of privacy. As the defense witnesses all testified at the hearing, however, everyone in the apartment knew each other. The apartment contained Ms. Cortes, her daughter, her family members, her roommate, and Mr. Benton. This was no flophouse, as the government would have liked to have this Court believe, and there most certainly was an expectation of privacy for those inside the apartment.

Mr. Benton also had an expectation of privacy in the apartment, as an overnight guest, but he was not a resident. Mr. Benton testified that he did not live at the apartment, did not pay rent, and did not keep his personal belongings there. The officers found a change of clothes that may or may not have belonged to Mr. Benton, but this does not mean he was a resident of the apartment. Thus, if the officers wished to enter this apartment, they should have had a search warrant, considering no occupants allowed them into the apartment. The door was locked and all of the occupants were sleeping. Because the agents did not have a search warrant and because no occupant consented to their entering the apartment, the search of the apartment was unreasonable, in violation of the Fourth Amendment to the U.S. Constitution. Because the search was unreasonable, anything seized from the apartment following the unreasonable search should be suppressed.

### B. The Authorities Entered Ms. Cortes' Bedroom Prior To Her Signing The Consent To Search Form, And, Therefore, Everything Found In The Bedroom Should Be Suppressed.

Mr. Benton was already in custody when the agents went back to the bedroom where he was sleeping and closed the door behind them. Officer Rivera would then not allow Ms. Cortes to enter her own bedroom and physically removed her to the kitchen. Because Mr. Benton was already in custody, secure in handcuffs, there was no need to go back to the bedroom prior to consent from the apartment resident. Therefore, prior to any officers entering the bedroom, the agents should have either had a search warrant or had consent to search. At that point in time, the officers had neither. Thus, anything found in the search should be suppressed as fruit of the poisonous tree.

Although the government will claim that no officers entered the bedroom prior to Ms. Cortes signing the consent to search form, that is in contradiction to the testimony of every defense witness at the suppression hearing. Therefore, either all defense witnesses are not telling the truth or Officer Rivera was not telling the truth, and this Court must decide who is more accurate. The defense would argue, however, that the authorities could be claiming *now* that they never entered the bedroom because they know that there is no exception to the warrant requirement for their entry into the bedroom.

When determining which side is more accurate, this Court should also examine the other inconsistencies in the report of Officer Rivera. In the report, Officer Rivera stated that just five minutes after the police entered her apartment, Ms. Cortes identified herself as the tenant and signed the consent to search form. On the stand, however, Officer Rivera stated that it took twenty minutes for Ms. Cortes to sign the form. Furthermore, the report mentions nothing of Ms. Cortes giving verbal consent and Officer

Rivera making a trip to his vehicle to obtain a consent to search form. On the stand, however, Officer Rivera explained all of these details, after fourteen months had passed since the arrest and did not list any of these details in the report. It should be noted that Officer Rivera would have had a better memory of the events at the time of the arrest, as opposed to fourteen months later, considering that the time of the arrest was a very busy time for Officer Rivera, as this Court knows, since the officers arrested more than one hundred people in the matter of a few days.

Thus, Mr. Benton argues that the officers entered Ms. Cortes' bedroom prior to her giving any consent for them to be there. Because the officers had no authority to be inside the bedroom, without any supervision from an occupant of the apartment, there is no telling what was found prior to Ms. Cortes signing the consent to search form and, therefore, this illegal entry tainted any consent that may have been subsequently given. Any items seized after this are also tainted, and Mr. Benton requests that this Court suppress any items later found in the bedroom as fruit of the poisonous tree.

### C. Any Consent That May Have Been Given By Kawya Cortes Was Involuntary And The Product Of Coercion From Officer Rivera, And, Thus, Any Evidence Seized As A Result Of This Involuntary Consent Should Be Suppressed.

In this case, the government claims that Ms. Cortes consented to the search. Mr. Benton claims, however, that it was not a valid consent. The government has the burden to prove that there was no coercion and that Ms. Cortes gave her consent freely and voluntarily. In this case, the government cannot sustain its burden, as the "consent" given by Ms. Cortes was fraught with coercion. Therefore, any items seized from Ms. Cortes' apartment should be suppressed.

For consent to be voluntary, it must be unequivocal, specific, intelligently given, and free from duress or coercion. See United States v. Scott, 578 F.2d 1186, 1188-89 (6th Cir. 1978). The government bears the heavier burden of establishing that law enforcement officers obtained a valid consent to search in the case of an arrestee. See United States v. DeMarco, 488 F.2d 828, n. 7 (2d Cir. 1973); see also United States v. Snype, 441 F.3d 119, 131 (2d Cir. 2006) ("when… the government relies on consent to justify a warrantless search, it bears the burden of proving by a preponderance of the evidence that the consent was voluntary."). Furthermore, "[w]hen a consent to search follows an illegal entry, this circuit requires the government to show more than the voluntariness of the consent; it must also demonstrate that 'the taint of the initial entry has been dissipated' in order to admit evidence seized following the illegal entry." United States v. Oguns, 921 F.2d 442, 447 (2d Cir.1990). The government cannot sustain its burden in this case and cannot show that any taint of the illegal entry was dissipated by the "consent" later given.

Consent was not given voluntarily in this case, if it was given at all. There are many reasons why Ms. Cortes felt forced to sign the consent to search form, and, even when she did, she merely scribbled her name on the form because she felt she had no other choice. When Ms. Cortes asked the offices about a warrant, she was told that they would get to that later. If this conversation took place, as Ms. Cortes claims it did, it is possible that the officers meant an arrest warrant while Ms. Cortes meant a search warrant. Either way, however, the officers never clarified what they meant and did not make everything clear for this woman, who was obviously upset, considering the police had just barged into her apartment and put her boyfriend in handcuffs under a federal

14

arrest warrant and considering she was six months pregnant with his child. When Ms. Cortes heard that the officers had a warrant that they would get to later, however, she did not stop the officers from entering her bedroom, as she did not know she had a choice at that time. In addition, by Officer Rivera's reaction of physically removing her from the bedroom and into the kitchen, Ms. Cortes further believed she had no choice but to allow the officers' access to her bedroom.

When Ms. Cortes showed anger, confusion, and hesitation at giving her consent for the officers to search her apartment, this is when the coercion from Officer Rivera began. He explained to Ms. Cortes that if she did not consent, the officers would be able to obtain a search warrant and then they would search the apartment anyway. If they were forced to obtain a search warrant, Officer Rivera explained that any contraband found in the apartment would be charged to all of the occupants in the apartment and, therefore, Ms. Cortes would be arrested. Although Officer Rivera denies making these statements, Officer Joseph Howard admitted on the stand that this is something, in general, that may be told to persons who refuse to give their consent. Therefore, it is perfectly understandable that Ms. Cortes would have been told this on the morning of May 17, 2012. Furthermore, Ms. Cortes also stated that Officer Rivera not only threatened her with arrest, but also threatened that DCF would be called. Officer Rivera denied making any statements about DCF and also denied knowing there were any children in the apartment, besides the child in utero. This statement, however, appears to be contradicted by Officer Rivera's own testimony, when he explained to Ms. Cortes that she should allow the search since anything hidden might be harmful to children. Officer Rivera testified that he said this because he saw children's clothing lying around, even

15

before the search. Thus, Officer Rivera obviously did know that there were children in the apartment and could very well have threatened to call DCF for any contraband found in the apartment that might have been harmful to children.

Therefore, after being threatened with arrest and with DCF, Ms. Cortes felt that she had no other choice but to sign the form. Although Officer Rivera claimed that her consent was given voluntarily, he was also the only person to witness the consent and the only person that could possible say whether or not Ms. Cortes was coerced. It is no surprise that he testified she was not coerced into giving her consent to search. Because the government cannot sustain its burden that the "consent" given by Ms. Cortes was voluntary and, further, cannot show that any taint following the illegal entry was subsequently cured, anything seized from the apartment must be suppressed.

## III.   CONCLUSION

WHEREFORE, after due consideration following the briefing and the hearing, the undersigned respectfully requests that any and all evidence obtained as a result of the illegal seizure and warrantless search of the apartment where Mr. Benton was arrested be suppressed as having been obtained in violation of his rights guaranteed by the Fourth Amendment to the Constitution of the United States of America. The officers made an illegal entry into the apartment of Ms. Cortes, as they did not have a search warrant and as they had no permission to enter. The officers further performed an illegal search of the bedroom by entering the bedroom and closing the door behind them, without a search warrant and prior to any consent to search form being signed. Finally, although the officers claim that Ms. Cortes gave her consent to search the apartment, that consent was not freely and voluntarily given and was only given following the illegal entry of the

officers, without any subsequent cure. Thus, all evidence found at 719 Orchard Street on the morning of May 17, 2012 should be suppressed and not be allowed to be used against the Defendant Jeffrey Benton at his subsequent trial.

Respectfully submitted,
DEFEDANT,
JEFFREY BENTON

By Jodi Zils Gagné (# Ct24376)
LAW OFFICES OF JODI ZILS GAGNE, LLC
P.O. Box 4023
Bristol, CT 06010
Tel: (860) 582-4495
fax: (860) 582-8397
email: jgagne@zilsgagnelaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Jodi Zils Gagné