```
 1                  UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT
 2
      * * * * * * * * * * * * *  x   Criminal Case
 3                               :      No. 3:12CR104(EBB)
      UNITED STATES OF AMERICA,
 4                  Plaintiff    :

 5           vs.                 :   August 26, 2013
                                     10:17 O'clock a.m.
 6    GILBERT GALAN, JR., and    :
      PIERRE GALAN,
 7                  Defendants   :
                                     New Haven, Connecticut
 8    * * * * * * * * * * * * *  x

 9                      SUPPRESSION HEARING

10          BEFORE THE HONORABLE ELLEN BREE BURNS
               SENIOR UNITED STATES DISTRICT JUDGE
11
      Appearances:
12      For the Plaintiff:         MARC HARRIS SILVERMAN, ESQ.
                                   Assistant U.S. Attorney
13                                 157 Church Street
                                   New Haven, CT 06510
14
                                   S DAVE VATTI, ESQ.
15                                 Assistant U.S. Attorney
                                   450 Main Street
16                                 Hartford, CT 06103

17      For the Defendant:         KURT F. ZIMMERMANN, ESQ.
        Gilbert Galan, Jr.         LEONARD ATKINSON, ESQ.
18                                 Silverstein & Osach
                                   234 Church Street, Suite 902
19                                 New Haven, CT 06510

20      For the Defendant:         NICHOLAS ADAMUCCI, ESQ.
        Pierre Galan               80 Fourth Street
21                                 Stamford, Connecticut 06905

22      For Merline Sellers:       CHARLES L. KURMAY, ESQ.
                                   1995 Main Street
23                                 Stratford, CT 06615

24      Court Reporter:            Thea Finkelstein RMR, CRR
                                   TheaFinkelstein@aol.com
25    Proceedings recorded by mechanical stenography, transcript
      produced by computer.
```

```
 1              THE COURT:  Good morning.

 2              MR. ZIMMERMANN:  Good morning, your Honor.

 3              THE COURT:  Please be seated.

 4              MR. SILVERMAN:  Good morning, your Honor.

 5              THE COURT:  Good morning, Mr. Silverman.

 6              MR. SILVERMAN:  For the record, Mark Silverman for

 7    the United States.  With me at counsel table is AUSA Dave

 8    Vatti, and also DEA Task Force Officer Joshua Cameron.  He'll

 9    be serving as case agent during this morning's proceedings.

10              THE COURT:  Motion to suppress.

11              MR. ZIMMERMANN:  Good morning, your Honor, Kurt

12    Zimmermann for Gilbert Galan.  With me at counsel table is

13    Leonard Atkinson from my office.

14              MR. ADAMUCCI:  Good morning, your Honor, Nick

15    Adamucci on behalf of Pierre Galan, who's present.

16              THE COURT:  Thank you.

17              MR. SILVERMAN:  Your Honor, before we begin, I have

18    two quick housekeeping matters I would ask the Court to

19    consider.

20              First, the government would move for sequestration

21    of the witnesses.  The witnesses would be outside of the

22    courtroom except for the defendants, should they choose to

23    testify.  I don't believe there would be any objection.

24              MR. ZIMMERMANN:  Attorney Vatti and I discussed

25    this.
```

1          THE COURT:  You have no problem with that?

2          MR. ZIMMERMANN:  I have no problem with it, as long

3   as the agents are sequestered as well.  My understanding is

4   the case agent is not going to testify.  So I think there's

5   agreement.

6          MR. SILVERMAN:  That's correct.

7          The other housekeeping matter, your Honor, the

8   government prepared a number of exhibits, as I know Attorney

9   Zimmermann has as well.  I marked them Government Exhibit 1

10  through 13, the first are photographs; 13 is a consent to

11  search form; and 14 and 15 are calls, and 14A and 15A are

12  preliminary line sheets from the date we're talking about,

13  January 3rd, 2012.

14         Copies have been provided to defense counsel of each

15  of these 15 exhibits.  The government may decide to introduce

16  physical exhibits.  We have them here, although we haven't

17  opened the bags.  That will turn on whether it becomes

18  necessary later on.

19         For the time being, I have these 15.  I have copies

20  for the Court as well.  I don't believe there's any objection

21  to the admission of these exhibits as full exhibits today.

22         THE COURT:  Without objection?

23         MR. ZIMMERMANN:  That's correct.

24         MR. SILVERMAN:  May I approach, your Honor?

25         THE COURT:  Yes.

```
 1              MR. ZIMMERMANN:  Your Honor, we have on, behalf of

 2    defendants, some exhibits, much of which is duplicative, so

 3    I'm not going to mark, for example, the consent form, you

 4    know.

 5              THE COURT:  Sure.

 6              MR. ZIMMERMANN:  We'll work with the government's

 7    markings, but Ms. Villano and I agreed that when it comes time

 8    for me to offer something new, that she would mark it.

 9              THE COURT:  All right, fine.  Thank you.

10              MR. ZIMMERMANN:  This is our motion.  Do you want me

11    to introduce it?

12              THE COURT:  Yes, please.

13              MR. ZIMMERMANN:  Your Honor, on behalf of the two

14    Galans, this is a motion to suppress concerning the events

15    that occurred on January 3rd, 2012, in sort of an adjunct to

16    an arrest of Mr. Wilson, who is the lead defendant in this

17    case, which is 3:12CR104.

18              In connection with the arrest of Mr. Wilson that

19    evening of January 3rd, 2012, the task force obtained Mr.

20    Wilson's consent to go to search his apartment, which is

21    apartment 8 at 139 Day Street.  Living in apartment 4, one

22    floor beneath Mr. Wilson, were Mrs. Sellers, who is the

23    Galans' mother, as well as both Galans were living there.

24              Then a sequence of events occurred, which I believe

25    we're going to try to get straight today, whereby the task
```

1    force agents went into apartment 4, without a warrant,

2    arrested both Galans and, for a while, Mrs. Sellers, and then

3    searched the place.

4             THE COURT:  Did they actually arrest her, sir?

5             MR. ZIMMERMANN:  For a while, yes, she was in cuffs

6    and apparently, for lack of a better word, freaking out about

7    the fact that they had come in.

8             THE COURT:  Yes.

9             MR. ZIMMERMANN:  So in order to, I guess, try to

10   maintain some order, she was handcuffed and subdued.  Both

11   Gilbert Galan and Pierre Galan were handcuffed.  Eventually

12   the cuffs were taken off Mrs. Sellers.

13            She executed a consent to search form.  The two

14   Galans, it's our position, expressed their declination of

15   consent to search.

16            And basically, what the government was able to find

17   in connection with the search -- they rummaged through the

18   clothing behind a couch, things like that -- I think we'll

19   hear the testimony, was two firearms, a bullet-proof vest and,

20   in the bathroom, some heroin packaging paraphernalia, and

21   we're seeking to suppress all those physical items, as well as

22   alleged statements made by the Galans, each of the Galans,

23   without any Miranda advice, upon inquiry from the agents as to

24   whose firearms they had found.

25            THE COURT:  Yes, sir.  Okay.

```
 1              MR. ZIMMERMANN:  I don't see this as being very

 2   adversarial.  The reports, you know, as all reports are, are

 3   not exactly consistent, and I want the Court to know what

 4   happened.  I'm not here to, you know, grill the agents --

 5              THE COURT:  Okay.

 6              MR. ZIMMERMANN:  -- I'll save that for trial.  But

 7   basically, that's where we are.

 8              We would request that the government start because

 9   this is a warrantless situation.  We intend to call, of

10   course, the mother, Mrs. Sellers, who's out in the hall.

11   She's represented, we obtained an attorney through CJA for

12   her, so she's independently been advised.

13              She wants to testify, and her attorney has said no

14   problem.  He's going to be here a little later.  He had a

15   Superior Court appointment he couldn't change.  His name is

16   Chuck Kurmay.

17              We're also going to call, probably first, an

18   investigator from Dan Markle's office -- her name is Deb

19   Curtis -- who has taken measurements, prepared a floor plan of

20   the premises, taken photographs as well, essentially

21   authenticate them, she'll be called.  That will be a quick

22   witness.  I don't see this going all day or anything like

23   that.  I hope not.

24              THE COURT:  We have the week, but you don't need it.

25              MR. ZIMMERMANN:  Again, we'll see what happens at
```

```
 1   trial.  Thank you.

 2              MR. SILVERMAN:  May I have one moment, your Honor?

 3              THE COURT:  Yes, certainly.

 4              MR. VATTI:  Your Honor, if I may, I'd like to give a

 5   brief overview of what the government intends to present and

 6   respond to couple of things mentioned by Mr. Zimmermann to

 7   provide context for what's going to occur today.

 8              Just to step back from January 3rd, 2012, I think we

 9   need to go back a little bit further.

10              In this particular case, the government was

11   wiretapping a phone used by Kevin Wilson, which we refer to as

12   target telephone 4, and you'll hear that throughout the day.

13   But the tap on target telephone 4 used by Wilson started on

14   July 29th of 2011, and continued all the way through January

15   3rd of 2012.

16              Over the course of that roughly five months of

17   tapping telephone 4, it had become apparent that 139 Day

18   Street apartment 3 was being used by Wilson as his base of

19   operations for his distribution business.  I'm sorry,

20   apartment 8, I misspoke.

21              In addition, based on the wiretap, it was also

22   apparent that Mr. Galan, Pierre Galan and Gilbert Galan who

23   resided at apartment 4, were associates of Mr. Wilson,

24   frequent callers into that phone, Wilson called his

25   frequently, and they had access to that apartment.
```

1          When he was at his day job, frequently the Galan

2    brothers would serve customers heroin, would go into Wilson's

3    apartment, get the heroin, and serve the customers.  They were

4    very key associates.  They had access to the apartment.

5          And on the particular occasion of January 3rd, 2012,

6    there had been a phone call preceding the events at the

7    apartment that night, in which it was clear that Mr. Wilson

8    had agreed to provide a co-defendant in this case, Nelson

9    Rios, with a quantity of heroin.

10         At the same time, Mr. Wilson was also making

11   arrangements to meet with another co-defendant, Johnny De Los

12   Santos to pick up a quantity of heroin, and since he was going

13   to be at that meeting, he instructed in a phone call Mr.

14   Pierre Galan to go into his apartment and get some of the

15   heroin that was going to be needed by Nelson Rios, and to

16   serve Nelson Rios while he was absent.

17         So later on that evening, there was a traffic stop

18   of Mr. Wilson following the meeting with Mr. De Los Santos, at

19   which Mr. Wilson was arrested right outside of 139 Day Street

20   and during that traffic stop a quantity of heroin was found on

21   Mr. Wilson's person.

22         And Mr. Wilson was cooperative.  Gave permission to

23   the officers to go up and search his apartment.  And at that

24   time, before they even made entry, officers could see Mr.

25   Galan looking out the window, Pierre Galan looking out the

1   window, of apartment 4.

2       So given the chaos that was occurring out on the

3   street, it was pretty apparent that the occupants of apartment

4   4 knew what was going on on the street below.

5       When officers went up the stairs, Gilbert Galan was

6   seen coming down from where Mr. Wilson's apartment was.  The

7   door to Mr. Wilson's apartment was ajar, a key was still in

8   the lock.

9       And at that point, Mr. Galan, Gilbert Galan, went

10  into apartment 4.  There was a box outside the apartment on

11  the floor that indicated that Mr. Galan was involved in heroin

12  trafficking.

13      There was an immediate sweep to prevent destruction

14  of evidence.  That once entry was made into the apartment,

15  there was consent to search that was obtained from Ms.

16  Sellers.

17      There was no question I think, your Honor, there's

18  no dispute, that there was an altercation with Ms. Sellers,

19  that she was handcuffed, and that the initial intent was that

20  she was going to be placed under arrest for interfering with

21  the investigation, interfering with officers.

22      But an officer that she knew came to the scene and

23  spoke with her, and apparently she had some previous

24  relationship with this officer, knew this officer, was

25  comfortable with this officer.  At some point, the handcuffs

1    were taken off, things seemed to settle down.  And after a

2    conversation with this officer, she signed a consent to search

3    form.  And then, during that search, the evidence was found.

4         One other issue is the issue of whether the two

5    Galan brothers objected to the search.  The testimony that the

6    government intends to offer is that there was no objection to

7    the search made.

8         I would also indicate to the Court that to the

9    extent that the brothers are going to say that they objected

10   to the search, I think they have to get on the stand and

11   testify to that.  I think if Ms. Sellers is going to attempt

12   to state that, it's going to be hearsay testimony.

13        And they didn't submit an affidavit to put that

14   issue, to put that objection to consent issue, before the

15   Court.  Since they didn't submit an affidavit, I don't think

16   they can get it in through Ms. Sellers.  I think they would

17   have to take the stand and put it in themselves.

18        MR. SILVERMAN:  Two clarifications to the remarks of

19   my colleague:  First, some of the drug evidence, heroin that

20   was seen floating in the toilet and other paraphernalia

21   located in the bathtub of the apartment, were observed in

22   plain view during the protective sweep of the apartment.  That

23   was prior to any consent to search given.

24        There were various stages of the events of January

25   3rd, 2012.  And even if the Court were to rule against the

1    government and decide to suppress certain evidence later down

2    the road, there's other evidence that preceded it that may

3    still be admissible.  In the government's view all of this

4    evidence is admissible.  During the protective sweep, all the

5    drug paraphernalia and drugs were in plain view.  It's the

6    firearms, the bulletproof vest, that followed the consent to

7    search.  So there's different stages of the events at issue

8    that the Court needs to consider.

9          The only other comment that I'd make is Ms. Sellers

10   did submit an affidavit.  In that affidavit, she makes no

11   mention of either brother affirmatively objecting to the

12   consent to search the apartment.  So as my colleague stated,

13   there's no evidence of that right now, that there's been any

14   affirmative objection by either of the brothers.

15         Although Attorney Zimmermann proffered that to the

16   Court, the law's quite clear that an attorney proffer is

17   utterly insufficient for these purposes.  So I just wanted to

18   echo the comments by my colleague.

19         Thank you, your Honor.

20         THE COURT:  Thank you.

21         MR. ZIMMERMANN:  Your Honor, procedurally, I

22   anticipate the government calling several of the participants

23   of the raid, and I intend to ask the initial cross-

24   examination, ask a few questions, and then Mr. Adamucci would

25   like the opportunity on behalf of his client to also

```
1    questions.  Is that acceptable?

2              THE COURT:  Yes.  Which of the brothers do you

3    represent?

4              MR. ZIMMERMANN:  I represent Gilbert Galan Jr.

5              THE COURT:  And you represent Pierre, is that it?

6              MR. ADAMUCCI:  Yes, your Honor.

7              THE COURT:  Thank you.

8              MR. ZIMMERMANN:  Okay?

9              MR. VATTI:  We're ready to proceed, your Honor.

10   With your permission, we would call Task Force Officer David

11   Rivera.

12                    D A V I D   R I V E R A

13        having been called as a witness, was first

14        duly sworn and testified on his oath as follows:

15             THE CLERK:  Please be seated, state your name and

16   spell your last name, and just state your address by city and

17   state only.

18             THE WITNESS:  David Rivera, R-I-V-E-R-A, and --

19             THE CLERK:  Just your city and state.

20             THE WITNESS:  One Union Avenue, New Haven,

21   Connecticut.

22   DIRECT EXAMINATION

23   BY MR. VATTI:

24   Q    Good morning, Officer Rivera.

25   A    Good morning.
```

1    Q    Could you tell us where you're currently employed?

2    A    Currently assigned to the DEA task force.

3    Q    Are you also a member of the New Haven Police Department?

4    A    Yes, I am.

5    Q    How long have you been employed by the New Haven Police

6    Department?

7    A    Approximately 15-1/2 years.

8    Q    What are your duties at NHPD?

9    A    I'm a patrol officer.

10   Q    And you also indicated that you are assigned to the DEA

11   task force currently?

12   A    Yes.

13   Q    When did you become assigned to the DEA task force?

14   A    Approximately 3-1/2 years ago.

15   Q    What are your duties with the task force?

16   A    We enforce narcotic violations in the state.

17   Q    And just briefly describe for us the training you

18   received to become an officer with the New Haven Police

19   Department.

20   A    We went through the six-month training academy.

21   Q    And is that the academy up in Meriden, Connecticut?

22   A    No, I went to the academy at, when it was in, New Haven.

23   Q    All right.  Tell us briefly what your training consisted

24   of.

25   A    We pretty much went through six months of learning the

1    Connecticut state laws, motor vehicle laws, search and seizure

2    laws, so on and so forth.

3    Q    And what training did you receive when you joined the DEA

4    task force?

5    A    We received a two-week training up in Franklin, Mass.

6         MR. ZIMMERMANN:  Excuse me, Mr. Vatti, I don't mean

7    to interrupt, but I'm having trouble hearing.

8         Can I sit over here?

9         THE COURT:  Sure, absolutely.

10        Would you talk into the microphone?

11        MR. ZIMMERMANN:  I won't interrupt again, but I

12   really couldn't hear some of that.  Thank you.

13        THE COURT:  Sure.

14   Q    Where did you indicate that training took place?

15   A    In Franklin, Mass.

16   Q    All right.  And what did that training consist of?

17   A    We went over training, as far as what types of narcotics

18   you'll be encountering in the field.  You know, basically

19   hidden compartments, search and seizure laws, stuff like that.

20   Q    And during your time as a patrol officer, did you conduct

21   any narcotics investigations?

22   A    Yes.

23   Q    And roughly how many narcotics investigations did you

24   participate in as a patrol officer with NHPD?

25   A    Thousands.

```
1    Q      Did you encounter cases involving heroin during your time

2    as a patrol officer?

3    A      Yes.

4    Q      And on roughly how many occasions did you encounter cases

5    involving heroin?

6    A      Hundreds.

7    Q      And as a result of that experience, have you become

8    familiar with street level heroin trafficking?

9    A      Yes.

10   Q      Are you familiar with the manner in which heroin is

11   packaged for sale?

12   A      Yes, I am.

13   Q      And are you also familiar with the manner in which heroin

14   is prepared for street level distribution?

15   A      Yes.

16   Q      And in your time with the DEA task force, have you also

17   participated in heroin investigations?

18   A      Yes.

19   Q      And roughly how many investigations involving heroin have

20   you participated in?

21   A      Fifty to 100.

22   Q      And again, as a result of that experience, are you

23   familiar with how heroin is packaged for street level

24   distribution and prepared for sale?

25   A      Yes.
```

1    Q    And just give us a brief overview of how heroin is

2    prepared for street level distribution.

3    A    Heroin is, it's a tan powdery substance, and sometimes

4    it'll be hard.  You know, hard formation, where they grind it

5    and it becomes a tan powdery substance which they'll package

6    in white wax paper package.

7    Q    You indicated that heroin often comes in a hard form?

8    A    Yes.

9    Q    Okay.  And grinders are used to grind it down into a

10   powder?

11   A    That's correct.

12   Q    All right.  Is heroin often cut?

13   A    Yes.

14   Q    And what do we mean by cutting?

15   A    They'll use a cutting agent to make the poet tense see

16   just a little less and they're able to get more quantity out

17   of it to make more money.

18   Q    And you indicated that heroin is often put into wax

19   packets?

20   A    Yes.

21   Q    And is that something that is unique to heroin

22   distribution?

23   A    Yes.

24   Q    And why is it unique to heroin distribution?

25   A    To avoid the moisture from contaminating the substance.

```
1    Q    And where can one obtain these wax packets?

2    A    You can buy them in the store.

3    Q    And do they come in any particular type of containers or

4    boxes or --

5    A    Usually they'll come in a tan cardboard box.

6    Q    Now, those wax packets, do they have any other typical

7    household use other than, for example, you described it as

8    being associated with heroin distribution, but are there other

9    typical household uses for those or is this unique to heroin

10   distribution?

11   A    It's unique to heroin distribution.

12   Q    Are you familiar with the term "bundles"?

13   A    Yes.

14   Q    Is that a term commonly associated with heroin

15   trafficking?

16   A    Yes.

17   Q    Tell us how so.

18   A    Bundles are normally packaged with ten per bundle and

19   they're usually wrapped ten, and they'll be wrapped with a

20   black rubber band.

21   Q    When you said that a bundle comes in ten, ten of what?

22   A    Ten white wax paper packets.

23   Q    Okay.  So ten of those wax packets together make a

24   bundle?

25   A    One bundle.
```

```
 1   Q     And is a bundle a typical unit in which heroin is sold?

 2   A     Yes.

 3   Q     Now, is heroin often stamped?

 4   A     Usually, it does have a stamp.  Basically a trademark of

 5   that group, they'll stamp the bags.

 6   Q     Okay.  So a group selling heroin may give it a typical

 7   brand stamp --

 8   A     Yes.

 9   Q     -- that is associated with that group?

10   A     Yes.

11   Q     What is the purpose of brand stamping?

12   A     It's pretty much the person buying the heroin, if it's

13   good heroin, they're going to go by the stamp that, you know,

14   that it's a good product.

15   Q     Now, is that something that always happens or is that

16   something that frequently happens?

17   A     It doesn't -- I've seen a lot of cases where it's not

18   stamped.

19   Q     Okay.  But when there is brand stamps, is that something

20   that is unique to heroin?

21   A     Yes.

22   Q     Typically, for example, powder cocaine or crack cocaine,

23   you don't run into brand stamps --

24   A     No.

25   Q     --  is that correct?
```

```
 1   A     No, no.
 2   Q     All right.  How often -- withdrawn.  Have you been
 3   involved in wiretap investigations during your tenure with the
 4   DEA?
 5   A     Yes.
 6   Q     And how many wiretap investigations have you been
 7   involved in?
 8   A     Four to five.
 9   Q     And in those four to five wiretap investigations, have
10   you served as a surveillance officer?
11   A     Yes.
12   Q     And in addition to that, have you also spent time in
13   monitoring the wire?
14   A     I've spent some time, yes.
15   Q     Let's talk about monitoring first.  Just tell us what a
16   monitor is.
17   A     The calls that come in, they pretty much come up on a
18   computer and you monitor the call, whether or not the call is
19   pertinent or not pertinent.  If there's drug talk on the call,
20   whether -- if it isn't, you don't listen to it, you minimize
21   it.  If it's pertinent, you know, you listen as such.
22   Q     Is it common where, especially in an English wiretap,
23   that agents and task force officers are in the wire room
24   monitoring wiretap calls?
25   A     Yes.
```

1   Q     And do you know if you did that in the Wilson wiretap

2   investigation?

3   A     Not so much.  It was very limited, primarily

4   surveillance.

5   Q     Have there been occasions previously where you served as

6   a monitor?

7   A     No, not so much.  I've done some, but primarily, it's

8   surveillance.

9   Q     All right.  Are you familiar with what the agents and

10   task force officers who do serve as monitors do while they're

11   in the wire room?

12   A     Yes.

13   Q     Is one of the things that they're doing in the wire room

14   coordinating surveillance that dovetails off of wiretap calls?

15   A     Yes, that's correct.

16   Q     When they are listening to those wiretap calls, are they

17   in radio communication with surveillance teams that are out on

18   the street?

19   A     Yes, they are.

20   Q     All right.  In the Wilson wiretap investigation, you were

21   serving as a surveillance officer?

22   A     Surveillance.

23   Q     During your surveillance in the Wilson case, do you

24   maintain wire or cell phone communications with monitors in

25   the wire room?

1    A    That's correct.

2    Q    And are all of the surveillance officers on the same

3    radio frequency so that everybody can hear what's occurring

4    over the wire as it's being relayed by the monitors?

5    A    Yes.

6    Q    Let's turn to the events of January 3rd, 2012.  Were you

7    involved in surveillance off of the Wilson phone in that

8    case --

9    A    Yes.

10   Q    -- on that date?

11   A    Yes.

12   Q    All right.  During the wiretap, the Wilson phone was

13   referred to as target telephone 4, correct?

14   A    I believe so, yes.

15   Q    All right.  Tell us how you came to be involved in

16   surveillance that day.

17   A    As far as the arrest?

18   Q    Yes.

19   A    I believe we followed Wilson to New York.  On the way

20   back from New York, he was taken into custody.

21   Q    All right.  On that particular day, do you recall

22   whether -- you know that Wilson was arrested that day,

23   correct?

24   A    Yes.

25   Q    Did you have involvement in that arrest?

1   A    I had involvement as far as surveillance.  I didn't

2   actually stop the car.

3   Q    Okay.  Let's talk about some of the events that occurred

4   prior to the car being stopped, okay?  Were you familiar with

5   the fact that Wilson met with Johnny De Los Santos prior to

6   that task stop?

7   A    Yes.

8   Q    Okay.  Can you tell us what you know of what Wilson and

9   De Los Santos were doing prior to the traffic stop?

10  A    Can you repeat the question?

11  Q    Sure.  Prior to the traffic stop, do you know the purpose

12  of the meeting between De Los Santos and Wilson?

13  A    Wilson went to New York to pick up heroin.

14  Q    All right.  Are you sure the meeting didn't take place in

15  Orange, Connecticut?

16          MR. ZIMMERMANN:  Objection.  It's leading.

17          THE COURT:  Sustained.

18  A    I'd have to read the report.

19          THE COURT:  Excuse me, sir, I sustained the

20  objection.

21  Q    As you sit here today, do you recall exactly where the

22  meeting took place between Mr. Wilson and Mr. De Los Santos?

23  A    Now I do.

24  Q    Okay.

25          THE COURT:  Okay.

1    Q    Were you mistaken earlier?

2    A    Yes.

3    Q    Okay.  I know it's Monday morning.  Just take your time.

4    Okay.

5    A    We, you know, previously conducted surveillances in New

6    York with De Los Santos, so it's confusing.  I would probably

7    refer to my report.

8    Q    So as you sit -- let me back up for a second and lay a

9    foundation.  As a surveillance officer in the Wilson case, you

10   were a participant in a number of surveillances, correct?

11   A    Yes.

12   Q    Did that also include surveillances of Wilson and Johnny

13   De Los Santos?

14   A    Yes.

15   Q    Did a number of those take place in New York?

16   A    Yes.

17   Q    All right.  Is it fair to say at this point that you

18   don't recollect exactly where the meeting between De Los

19   Santos and Wilson took place on January 3rd, 2012?

20   A    I'd have to refer to my report, but no, I do not.

21         MR. VATTI:  May I approach, your Honor?

22         THE COURT:  Yes, sir.

23   Q    All right.  I'm going to hand you a copy of your DEA 6

24   report.  If you could review the first few pages, and then, in

25   particular, paragraphs 14 through 21, and let us know if that

1    refreshes your recollection.

2              MR. ZIMMERMANN:  Mr. Vatti, may I see which report

3    you're talking about?

4              MR. VATTI:  Yes, we marked that report for

5    identification.  This would be --

6              MR. ZIMMERMANN:  This?

7              MR. VATTI:  Yes.  For the record, your Honor, this

8    is a DEA 6 report that was authored by Mr. Rivera dated

9    January 4th, 2012.  This is going to be Government Exhibit 16

10   for identification.

11   A    All right.

12             MR. VATTI:  May I approach, your Honor?

13             THE COURT:  Yes, sir.

14             MR. VATTI:  All right.  I'm going to take back the

15   DEA 6 report.

16   Q    Have you had a chance to review the report?

17   A    Yes.

18   Q    All right.  Does it refresh your recollection as to the

19   events occurring prior to the traffic stop of Kevin Wilson?

20   A    Yes.

21   Q    Tell us what happened.

22   A    We followed Wilson from the Walgreen's at Whalley and

23   Ellsworth, and we followed him to Orange, Connecticut, where

24   he was supposed to meet De Los Santos.

25   Q    During your surveillance of Wilson on this occasion, was

1  information being relayed from the wire room to all

2  surveillance team?

3  A    Yes.

4  Q    All right.  What was the nature of the information that

5  was being relayed?

6  A    There was a transaction that was supposed to occur at,

7  in, Orange, where there was some money that was supposed to be

8  given to De Los Santos.

9  Q    All right.  And what happened next, in your surveillance,

10  after Wilson left the Walgreen's?

11  A    We followed Wilson from the Walgreen's to Orange,

12  Connecticut, where he met with De Los Santos and from there,

13  after the meet, we followed Wilson back to New Haven,

14  Connecticut.

15  Q    And based on the wire intercepts, was there a belief that

16  a narcotics transaction had occurred between Wilson and De Los

17  Santos in Orange?

18  A    Yes.

19  Q    And what was done as a result of that?

20  A    A traffic stop was conducted after the meet.

21  Q    And where did the traffic stop occur?

22  A    It occurred at Day and George Street.

23  Q    And did it occur in the vicinity of any particular

24  building on Day Street?

25  A    It occurred two houses prior to Wilson's residence.

1   Q    All right.  By "Wilson's residence," are you referring to

2   139 Day Street?

3   A    That's correct.

4   Q    Now, at this point in time, how long had the Wilson phone

5   been being tapped for, approximately?

6   A    A year.

7   Q    Okay.

8   A    Approximately May, from May to -- to be honest with you,

9   I'm not certain of the month.

10  Q    All right.  Had it been at least a period of several

11  months, to your knowledge?

12  A    Yes.  Yes.

13  Q    Had you been part of surveillances throughout that

14  period?

15  A    Yes.

16  Q    And were you familiar with where it had been determined

17  that Wilson's base of operation was?

18  A    At 139 Day Street.

19  Q    And do you know which particular apartment?

20  A    Third floor apartment.

21  Q    And were you also familiar with Pierre and Gilbert Golan?

22  A    Yes.

23  Q    And relative to this particular wiretap investigation,

24  what was your knowledge of their role?

25  A    They would purchase heroin from Wilson.

1    Q     And do you know anything else about their role, besides

2    purchasing heroin from Kevin Wilson?

3    A     No.

4    Q     Do you have any knowledge whether they had access to

5    Wilson's apartment?

6    A     Not at that time.

7    Q     Okay.  Did there come a point when you learned that?

8    A     Yes.

9    Q     How did you learn that?

10   A     On the day of the arrest, PLO was coming from Wilson's

11   apartment.

12   Q     You used the nickname PLO.  Who are you referring to?

13   A     I'm sorry, Pierre Galan.

14   Q     Okay.  Without getting into the details, were you

15   familiar with Pierre Galan prior to this case?

16   A     Yes.

17   Q     Did you know his nickname to be PLO?

18   A     Yes.

19   Q     And how about with respect to Gilbert Galan, without

20   getting into the details, were you familiar with Gilbert Galan

21   prior to the Wilson case?

22   A     Yes.

23   Q     Now, were you also aware, from wire intercepts, that

24   while Wilson was meeting with De Los Santos in Orange, there

25   was also a transaction that was occurring, that was

1   anticipated to occur, between Pierre Galan and Nelson Rios?

2           MR. ZIMMERMANN:  I'll object again as leading.

3   Q    Do you have a recollection of any such transaction?

4           THE COURT:  Sustained.

5   A    Yes.

6   Q    You do have a recollection?

7   A    Yes.

8   Q    All right.  Can you tell us what your recollection of

9   that is?

10  A    I'm not 100 percent sure as far as exactly, but I know

11  that there was a call where I believe Wilson told PLO that

12  there were some drugs somewhere in the hallway above a door

13  jamb or something like that.  That's pretty much --

14  Q    As you sit here today, do you have a 100 percent

15  recollection of the details of that particular anticipated

16  transaction?

17  A    Not 100 percent, no.

18  Q    However, did you describe the details of that anticipated

19  transaction in your DEA 6 report?

20  A    I'd have to look at it.

21          MR. VATTI:  May I approach, your Honor?

22          THE COURT:  Yes.

23  Q    I'm again going to hand you Government Exhibit 16 for

24  identification, which is your report dated January 4th, 2012,

25  and if you could review paragraphs 1 through 9 to yourself.

```
 1   Actually, if you could read all the way through paragraph 11.

 2   A    Okay.

 3        Okay.

 4   Q    I'm going to take the report back.

 5        MR. VATTI:  May I approach, your Honor?

 6        THE COURT:  Yes.

 7   Q    All right.  Have you had a chance to review your DEA 6

 8   report?

 9   A    Yes.

10   Q    And does that refresh your recollection as to the

11   anticipated transaction involving Nelson Rios and Pierre

12   Galan?

13   A    Yes.

14   Q    First of all, was there a wiretap call that involved Mr.

15   Wilson and Mr. Rios that started that whole anticipated

16   transaction?

17   A    Yes.

18        MR. ZIMMERMANN:  Objection.  Leading.

19   Q    Why don't you just tell us what you know about the

20   anticipated transaction.

21   A    Nelson Rios called Wilson, stating that he needed more

22   drugs, and Wilson told him to get the drugs from PLO and

23   Wilson has a call to PLO and afterwards and tells him he

24   needed a bundle-and-a-half, that he would be there to pick it

25   up.
```

1   Q    Did Wilson instruct PLO where to get the drugs from?

2   A    Told him to go upstairs to his apartment and pick up the

3   drugs.

4   Q    At approximately what time did that conversation between

5   Wilson and PLO take place?

6   A    I didn't look exactly what time on the. . .

7   Q    Would your report refresh your recollection as to the

8   time?

9   A    Yes.

10        MR. VATTI:  May I approach, your Honor?

11        THE COURT:  Yes.

12  Q    I'm going to have you again review paragraph 7, and then

13  paragraph 11, of your report.

14  A    Okay.

15  Q    All right.  What, approximately what time did that all

16  take place?

17  A    The call, first call, was at 8:25.  Second call was at

18  8:36.

19  Q    All right.

20        THE COURT:  Is that a.m. or p.m., sir?

21        THE DEFENDANT:  P.m.

22  Q    By the second call, are you referring to the one where

23  Wilson said go upstairs --

24  A    Yes.

25  Q    -- to PLO?

1   A    Yes.

2   Q    And that was at 8:36 p.m.?

3   A    Correct.

4   Q    And by the first call at 8:25 p.m., which call are you

5   referring to?

6   A    That's the call with Nelson Rios.

7   Q    All right.

8         MR. VATTI:  Your Honor, we have those two calls and

9   we are going to play them for the Court.  I believe there's no

10  objection to those exhibits.  The line sheets are already in

11  evidence as -- have been marked for identification as --

12  government exhibits 14 and 15.  The audio which is on a disk,

13  your Honor, is going to be exhibits 14 and 15.  The line

14  sheets have been marked as 14A and 15A.

15        (Government's Exhibit 14, an audio recording,

16  played.)

17  Q    All right.  That was Government Exhibit 14, which is the

18  call at 8:25 p.m. that you referred to as occurring between

19  Kevin Wilson and Nelson Rios?

20  A    Yes.

21  Q    Is that the call where you indicated that Wilson told

22  Rios to get the drugs from PLO?

23  A    Yes.

24  Q    All right.

25        MR. VATTI:  For the record, that was called session

1    69417 that occurred over target telephone 4, Government 14.

2    I'm now going to have Mr. Silverman play the 8:36 p.m. call.

3    Q    This is the one that occurred between Wilson and PLO that

4    you referred to, correct?

5    A    Yes.

6              MR. VATTI:  I know that call went very quickly, your

7    Honor, so if your Honor could turn to Government Exhibit 14A,

8    which is the transcript, and then we're going to play the call

9    again, and it might be easier to actually follow the dialogue.

10             THE COURT:  Okay, I've got it.

11             (Government's Exhibit 14, an audio recording,

12   replayed.)

13   Q    Mr. Rivera, did you hear in that call where Mr. Rios

14   indicated, "I need one-and-a-half"?

15   A    Yes.

16   Q    All right.  Did you hear in that call where Mr. Wilson

17   instructed Mr. Rios to "go to PLO house"?

18   A    Yes.

19   Q    All right.  Did you also hear where Mr. Wilson indicated

20   to Mr. Rios, "Give the money to PLO"?

21   A    Yes.

22   Q    All right.  Is this information from over this wire

23   intercept being relayed to the surveillance team?

24   A    Yes.

25   Q    All right.  At this time, you are surveilling Mr. Wilson,

1    correct?

2    A    Yes.

3    Q    In anticipation of a meeting with De Los Santos?

4    A    Yes.

5    Q    Is the information regarding this wire intercept,

6    Government Exhibit 14, being relayed to the surveillance team

7    contemporaneously as it's coming in?

8    A    Yes.

9    Q    What is the purpose of that?

10   A    So we can continue monitoring the surveillance and his

11   drug transactions.

12   Q    All right.  That call occurred at 8:25 p.m. on January

13   3rd, 2012, correct?

14   A    Yes.

15        MR. VATTI:  I'm now going to have Government Exhibit

16   15 played, which is the 8:36 p.m. call.

17   Q    Who are the participants in that call?

18   A    It was Wilson and PLO, Pierre Galan.

19        MR. VATTI:  This is the transcript or the line

20   sheet, your Honor, is at Government Exhibit 15A.

21        THE COURT:  Yes, I have it.  Thank you.

22        (Government's Exhibit 15, an audio recording,

23   played.)

24   Q    Was the information from this wire intercept also being

25   relayed from the wire room to the surveillance team?

```
 1    A    Yes.

 2    Q    All right.  As a result of these wire intercepts, what

 3    did you believe was occurring between Wilson, Rios, and PLO?

 4    A    They were making a drug transaction.

 5    Q    All right.  Let's now turn to the traffic stop.  You

 6    indicated that a traffic stop was initiated on Wilson after

 7    the meeting with De Los Santos in Orange?

 8    A    Yes.

 9    Q    What occurred?

10    A    A traffic stop was conducted at, on, Day Street where

11    members of the NHPD detained a vehicle.

12    Q    Who initiated that traffic stop?

13    A    We, myself and TFO Miranda, we called it in via portable

14    radio, NHPD radio, and we had units on standby waiting to

15    effect the stop.

16    Q    Were these marked patrol cruisers?

17    A    Yes.

18    Q    And where were you when the traffic stop was actually

19    conducted?

20    A    I was still in the area of Gilbert and Waverly.

21    Q    How far from Day Street is that?

22    A    A block-and-a-half.

23    Q    What did you do next?

24    A    We proceeded to park our vehicles, about a block, a block

25    away from the actual stop, and we proceeded to the location.
```

1    Q    All right.  And what happened next?

2    A    After that, we ended up going to 139 Day Street.

3    Q    What did you see occurring at the traffic stop?

4    A    At that time, they had the occupants of the vehicle out,

5    and had Wilson detained.

6    Q    Do you know if any narcotics were recovered during that

7    traffic stop?

8    A    I believe, yeah, that the drugs were retrieved.

9    Q    From which occupant of the car?

10   A    Wilson.

11   Q    And what happened next?

12   A    From then, we proceeded to the third floor apartment,

13   Wilson's residence.

14   Q    And what prompted you to go up to the third floor

15   apartment at that point?

16   A    We believed there were more drugs inside the apartment,

17   and we went to secure the apartment.

18   Q    And you say "we."  Who's the "we" that you're referring

19   to?

20   A    Members of the task force, DEA task force.

21   Q    Roughly how many officers and agents were on the scene at

22   Day Street at this point related to the Wilson traffic stop?

23   A    Probably between 15 and 20 officers.

24   Q    Approximately what time did the traffic stop take place?

25   A    I have to refer to my report for the exact time.

1        MR. VATTI:  May I approach, your Honor?

2        THE COURT:  Yes.

3   Q    I'm going to hand you the DEA 6 report, and if you could

4   take a look at paragraph 21.

5   A    Approximately 10:01 p.m.

6   Q    All right.  Now, you said you were going up the stairs to

7   Wilson's apartment on the third floor?

8   A    Yes.

9   Q    Who else was with you going up the stairs?

10  A    TFO Dedric Jones, TFO Jose Miranda, and a few other

11  officers.  I can't recall.

12  Q    The marked New Haven units that stopped Kevin Wilson,

13  were their lights on, do you know?

14  A    Yes.

15  Q    In addition to that, you indicated there were roughly 15

16  to 20 other agents and officers that were present?

17  A    Yes, there were other patrol officers that arrived to

18  assist.

19  Q    Okay.  All right.  And did there come a point in time

20  when -- did you become aware of whether anyone in apartment 4,

21  either Gilbert or Pierre Galan, was aware that there were

22  officers outside?

23  A    Yes.

24        MR. ADAMUCCI:  Objection as to this officer

25  testifying as to what either the Galans were aware of.

1          MR. VATTI:  I'll withdraw that, your Honor.

2          THE COURT:  I'm going to overrule the objection.

3    Q    How did you become aware of whether the Galans might have

4    been aware that officers were outside?

5    A    One of the Galan brothers was looking out the window.

6    Q    Do you know which one?

7    A    It was PLO.

8    Q    All right.  You're referring to Pierre Galan?

9    A    Pierre Galan, yes.

10   Q    Do you know which apartment Pierre Galan was looking out

11   of?

12   A    I believe it was the third floor apartment.

13   Q    Are you sure?

14   A    I'd have to refer back to my report.

15         MR. VATTI:  May I approach, your Honor?

16         THE COURT:  Yes.

17   Q    I'm going to hand you your DEA 6 report, and if you could

18   review paragraph 24.  Take your time and read the entire

19   paragraph.

20   A    Okay.

21         MR. VATTI:  May I approach, your Honor?

22         THE COURT:  Yes, sir.

23   Q    Okay, I'm going to take back the report.  Does that

24   refresh your recollection as to which apartment Pierre Galan

25   was observed looking out the window?

```
 1   A    Yes.

 2   Q    Which apartment was that?

 3   A    Apartment 4.

 4   Q    And just to be clear for the record, it was not you that

 5   observed Pierre Galan looking out the window, correct?

 6   A    No.

 7   Q    Was it another officer that was involved in the

 8   investigation?

 9   A    Yes.

10   Q    Which officer was that?

11   A    Hamden Officer Helms.

12   Q    He was somebody involved not only on January 3rd, 2012,

13   but was he involved also in this particular wiretap

14   investigation?

15   A    Yes.

16             MR. ZIMMERMANN:  Your Honor, at this time, I move to

17   strike all that testimony about the identification.

18             MR. VATTI:  Your Honor, I'm going to lay a

19   foundation for it, if you'll give me a moment.

20             MR. ZIMMERMANN:  I'm sorry, but I don't see how that

21   can come in.  It's hearsay.  It's rank hearsay.

22             MR. VATTI:  If I can link it up, I think I can bring

23   it in as a hearsay exception.  If there's still a further

24   objection, we can argue it at that point.

25   Q    Was that observation -- was there an observation relayed
```

```
 1  to you regarding Pierre Galan looking out the window before

 2  you went into 139 Day Street?

 3  A    Yes.

 4  Q    All right.  Was that relayed to you immediately prior to

 5  you entering 139 Day Street?

 6  A    Yes.

 7  Q    All right.  What is the reason for that being relayed to

 8  you as you're making entry into 139 Day Street?

 9  A    We believed that --

10              MR. ZIMMERMANN:  I object, your Honor.

11              THE WITNESS:  All right.

12              THE COURT:  Who's "we"?

13              MR. ZIMMERMANN:  Yes.

14  Q    What did you believe, why was it important to you as you

15  were entering 139 Day Street?

16  A    I believed that the Galans maybe have access to that

17  apartment, to Wilson's residence.

18  Q    All right.  And why is that important to you, as you make

19  entry?

20  A    There's the destruction of possible evidence that may be

21  inside the residence.

22  Q    All right.  And was that important to you in terms of

23  making decisions as you're entering 139 Day Street?

24  A    Yes.

25              MR. VATTI:  I would claim that as a present sense
```

1    impression, your Honor.

2           MR. ZIMMERMANN:  I renew the objection.  It doesn't

3    justify that whatsoever.

4           MR. VATTI:  Your Honor, in addition to present sense

5    impression, he's relying on an observation by another officer

6    that's made contemporaneous to his entry, and he's making

7    decisions as to what might be happening upstairs, based on the

8    observations of that officer.  So therefore, that officer's

9    observations and present session impression.

10          In addition to that, it's not even being offered for

11   the truth of the matter; it's being offered for Mr. Rivera's

12   state of mind as he's going up the stairs because he's going

13   to be making decisions as to whether or not to conduct a

14   protective sweep based upon the possible destruction of

15   evidence.

16          So I don't think it's hearsay at all.  Even if it

17   is, I think he's making decisions based on what another

18   officer is relaying to him at the scene as he's making entry,

19   not only for just destruction of evidence but for officer

20   safety purposes.  That's a present sense impression.

21          THE COURT:  So it's being offered to explain what

22   this officer thought was happening and it led to his actions,

23   is that what you're saying?

24          MR. VATTI:  That's correct, your Honor.

25          MR. ZIMMERMANN:  From what I understand, we're

1  clearly limiting it for that purpose; not for the truth of

2  what Officer Helms allegedly conveyed to --

3          THE COURT:  It's not being offered for the truth;

4  it's being offered to explain what this gentleman proceeded to

5  do, what he thought at that point.

6          MR. ZIMMERMANN:  Assuming the officer will explain

7  it, instead of Mr. Vatti.

8  Q   As you're going up the steps, what did Officer Helms

9  observation impact, as you're making your decisions as you

10  went up the stairs?

11  A   When we went up the stairs, we proceeded up to the third

12  floor unit, which is Wilson's residence, we observed Pierre

13  coming downstairs.

14  Q   Are you sure it was Pierre?

15  A   Yes.  I think there's a typo in the report.

16  Q   All right.  What's the typo in the report?

17  A   I believe the typo was Pierre was coming down the stairs,

18  not Gilbert.

19          THE COURT:  The report said Gilbert, is that it?

20  That was an error?

21          THE WITNESS:  That's an error, based on the

22  similarity in the names, what have you, when I was typing the

23  report, I just seen it as a typo now.

24  Q   You think it's Pierre, as you're going up the stairs, you

25  see Pierre coming out of Wilson's apartment?

```
 1    A    Yeah, it was Pierre coming down the apartment.

 2              THE COURT:  Did you say you saw him coming out of

 3    the apartment --

 4              THE WITNESS:  No, coming down the stairs.

 5              MR. ZIMMERMANN:  Objection.

 6    Q    What happened next?

 7    A    As we're going up the staircase, TFO Jones sees the door,

 8    he sees PLO coming down the stairs with an item in his hand,

 9    as he reaches the top staircase --

10              MR. ZIMMERMANN:  Excuse me.

11              THE COURT:  You didn't see this?

12              THE WITNESS:  I didn't see that, no.

13              MR. ZIMMERMANN:  Well, here we go again.

14              THE COURT:  Are we going to hear from the gentleman

15    who made the observation himself?

16              MR. VATTI:  We do not intend to call TFO Jones, your

17    Honor.

18              MR. SILVERMAN:  May I have a moment to confer with

19    my colleague, your Honor?

20              THE COURT:  Yes.

21              MR. ADAMUCCI:  Just so I'm clear, the objections

22    made by Mr. Zimmermann are also made on behalf of Pierre Galan

23    as well, so I don't have to repeat.  I just want to be sure

24    I'm on the same page.

25              THE COURT:  Yes.
```

1          MR. ADAMUCCI:  Thank you.

2          MR. VATTI:  Your Honor, we do not intend to call TFO

3  Jones but, number one, there is the Collective Knowledge

4  Doctrine.  So in this particular set of circumstances,

5  everything that every officer knew on the scene is imputed to

6  Mr. Rivera.

7          In addition, Mr. Rivera takes certain actions based

8  on what TFO Jones told him.  So again, for that reason, it

9  goes to his state of mind.

10         MR. ZIMMERMANN:  Your Honor, there was no testimony

11  TFO Jones said anything, and --

12         MR. VATTI:  I'll lay the foundation, your Honor.

13  Q    As you're coming up the stairs, what did you see?

14  A    There was a person coming down, Pierre, coming down the

15  staircase.  And again, I was more towards the end, tail of the

16  team.  By the time it was relayed to stop that individual, he

17  was already going inside the apartment.

18  Q    All right.  And you saw Pierre Galan?

19  A    Yes.

20  Q    All right.  And did one of the officers say something to

21  you -- just answer this yes or no -- did one of the officers

22  that was going up the stairs with you say something to you

23  about observations made of a third floor apartment?

24         MR. ZIMMERMANN:  Objection.  Leading.

25         MR. VATTI:  It's a foundational question, your

1    Honor.  Leading questions are permitted on foundation.

2              MR. ZIMMERMANN:  Your Honor, wouldn't a proper

3    question be, what did you hear or what happened?

4              THE COURT:  Yes.

5              MR. ZIMMERMANN:  Instead of a dialogue followed by a

6    yes or no answer?

7    Q    What did you hear any of the officers relay to you on the

8    stairs?

9    A    To stop the individual going down the stairs.

10   Q    All right.  What happened next?

11   A    At that point, Pierre already had made it into the

12   apartment.

13   Q    What happened after that?

14   A    We proceeded to the door where I observed a tan cardboard

15   box containing a lid to a grinder, a brush, and alcohol wipes

16   that were to the left side of the door, which appeared to be,

17   have been, dropped.  We proceeded to knock on the door, and

18   the door was answered by Gilbert Galan.

19   Q    Now, you said you saw a box on the floor?

20   A    Yes.

21   Q    All right.  Did anyone look out the door before you

22   knocked on the door?

23   A    Gilbert opened up the door slightly, and was observing

24   police in the hallway.

25   Q    Then what happened?

1    A    Slammed the door, and at which point we started banging

2    on the door for him to open the door.

3    Q    All right.  I'm going to hand you a stack of photographs.

4              MR. VATTI:  May I approach, your Honor?

5    Q    Starting with Government Exhibit 1, can you tell us what

6    we're looking at?

7    A    That's unit No. 4, 139 Day Street, the Galan residence.

8    Q    And turning to Government Exhibit 2, what are we looking

9    at?

10   A    That's the box containing the cap to the grinder, some

11   white residue, a small black brush, and alcohol wipe pads.

12   Q    And when you saw these items outside the door, what did

13   you think?

14   A    I believed those items are commonly used for packaging of

15   heroin.

16   Q    How so?

17   A    That box is what usually -- the white packs, paper

18   packets, commonly used to package heroin usually come in that

19   box.

20   Q    You said there was also a small black brush?

21   A    Yes.

22   Q    Is that an item that you believed had something to do

23   with heroin trafficking?

24   A    Clean out the grinder.

25   Q    How about the alcohol wipe pads?

1    A     Just for cleaning, cleaning your hands as well as the

2    grinder.

3    Q     Are these items that you have seen in your experience as

4    being associated with heroin trafficking?

5    A     Yes.

6    Q     Were there any other observations by other members of the

7    surveillance team that were relayed to you that were important

8    to you in making a decision to enter the apartment?

9    A     Yes.

10   Q     What were those?

11   A     That the door to Wilson's residence was open, with the

12   key in the cylinder.

13   Q     And why was that important to your decision to make entry

14   into apartment 4?

15   A     I believed drugs were being disposed of.  Evidence was

16   going to be destroyed.

17   Q     Explain to us everything that you knew that led to that

18   conclusion on your part.

19   A     Based on PLO coming from the apartment, the door being

20   open with the key in it, and him carrying an item in his hand

21   leading to the fourth floor apartment.

22   Q     You said fourth floor apartment.  Did you mean to

23   apartment 4?

24   A     Apartment 4.

25   Q     How did this box that you found outside the apartment

1    factor into your decision?

2    A    That box is usually containing the white wax paper

3    packets, which are commonly used to package heroin.

4    Q    Why was that important to your decision to make entry

5    into the apartment?

6    A    Because that's what we were looking at Wilson for, for

7    distribution of heroin.

8    Q    All right.  What happened after you knocked on the

9    apartment door?

10   A    Gilbert Galan opened up the door, and we ordered him out

11   of the apartment.

12   Q    What happened next?

13   A    And we entered, went inside apartment No. 4, conducted

14   the protective sweep, and located PLO coming out of the -- in

15   between the kitchen and the bathroom area.

16   Q    What happened next?

17   A    We gave him verbal commands to come out, and he complied.

18   We brought him out to the hallway.

19   Q    I'm sorry, where was he coming from?

20   A    From the bathroom area, but a little bit closer towards

21   the kitchen, which is right next to it.

22   Q    And did you hear any toilet flushing or anything like

23   that?

24            MR. ZIMMERMANN:  Objection, your Honor.

25            MR. VATTI:  I haven't even gotten the question out.

1            THE COURT:  Excuse me?

2            MR. VATTI:  I haven't gotten the question out.

3            MR. ZIMMERMANN:  It's obvious you're suggesting the

4     answer.

5            THE COURT:  Reframe the question, please.

6     Q    Did you hear anything that indicated to you that evidence

7     was possibly being destroyed?

8     A    I heard running water.

9     Q    What did you do next?

10    A    On getting PLO out of the apartment, we proceeded towards

11    a rear bedroom, on which we made contact with Merline Sellers.

12    Q    What happened next?

13    A    And she was brought out from the bedroom area, out to the

14    living room area.

15    Q    And then what happened?

16    A    Drugs were located in the toilet by TFO Jose Miranda.

17    There was rice on top of the seat, uncooked rice; and a

18    grinder that was located right by the doorway; and a stamper;

19    and another box that was in the tub.

20    Q    Can you describe for us how a protective sweep is

21    conducted?

22    A    Officers go in, into the unit, guns drawn, and we conduct

23    a search one room at a time to make sure there's no persons in

24    each room.

25    Q    Do you conduct a full search as you would if you were

1    executing a search warrant?

2    A    Yes.

3    Q    You conduct a full search?

4    A    Not a full search.  We conduct a search for persons, the

5    same way we would do a search warrant.

6    Q    Okay.  So it's a search for persons?

7    A    Search for persons, not for evidence.

8    Q    All right.  So are you overturning dresser drawers and

9    that kind of thing?

10    A    No.

11    Q    All right.  Why was the bathroom searched?

12    A    The bathroom was not searched.  The items were in plain

13    view.

14    Q    Why was entry made into the bathroom?

15    A    There was running water.  We believed that there was

16    drugs that might have been flushed down the toilet.

17    Q    All right.  And during a protective sweep, is it common

18    to search bathrooms for persons?

19    A    Yes.

20    Q    All right.  You indicated just now that drugs were in

21    plain view.  Could you tell us again where those were seen?

22    A    The drugs were in, in the toilet bowl.

23    Q    And you also indicated that there was rice found?

24    A    Yes.

25    Q    All right.  Where was the rice found?

1    A    It was on top of the toilet seat.

2    Q    And what's the significance of the rice?

3    A    The heroin is usually stored in the rice to prevent

4    moisture from contaminating the heroin.

5    Q    Is that something that has been common, in your

6    experience?

7    A    Yes.

8    Q    You also indicated that there was something in the tub?

9    A    There was another box with a rubber stamper, commonly

10   used to stamp the white wax paper packets.

11   Q    All right.  Going to the exhibits again, just tell us

12   what is in Government Exhibit 3.

13   A    That's the kitchen.  Kitchen area.

14   Q    All right.  How about Government Exhibit 4?

15   A    That's the hallway leading to the bathroom and the rear

16   bedroom.

17   Q    And which apartment are all of these photographs of, this

18   packet?

19   A    Apartment No. 4.

20   Q    And how about Government Exhibit 5, what's in that

21   photograph?

22   A    That's the bundles of heroin inside the toilet bowl.

23   Q    Now, are those bundles packaged in the way that is

24   common, in your experience?

25   A    Yes.

1    Q    What is in Government Exhibit 6?

2    A    This is the bathtub in the bathroom containing the

3    cardboard box with the stamper.

4    Q    What's in Government Exhibit 7?

5    A    That's the grinder.

6    Q    All right.  And where was the grinder found?

7    A    Exactly where it's at.

8    Q    And where is that, as depicted in this photograph?

9    A    Yes.

10   Q    Where?

11   A    It's on the floor, as you enter the bathroom.

12   Q    All right.  What is Government Exhibit 8?  What is

13   depicted there?

14   A    This is the rear bedroom.

15   Q    And what is depicted in Government Exhibit 9?

16   A    The ballistic vest.

17   Q    All right.  Was that seized in apartment 4?

18   A    Yes.

19   Q    What is depicted in Government Exhibit 10?

20   A    The full picture of the ballistic vest.

21   Q    And what is depicted in Government Exhibit 11?

22   A    The firearm.

23   Q    All right.  How many firearms were seized in the

24   apartment?

25   A    There were two.

1    Q    All right.  And Government Exhibit 11 depicts one of

2    those firearms?

3    A    That's correct.

4    Q    And how about Government Exhibit 12?

5    A    It's a picture of another firearm and a bag of clothes.

6    Q    Government Exhibit 11 and 12, do they depict the same

7    firearm or two separate firearms?

8    A    Two separate firearms.

9    Q    Going back for a minute to Government Exhibit 5 and 6,

10   let's start with Government Exhibit 5, what's this a picture

11   of again?

12   A    Two bundles of heroin.

13   Q    All right.  Is this a toilet that we're looking at?

14   A    Yes.

15   Q    All right.  And we're looking above and down into the

16   toilet, correct?

17   A    That's correct.

18   Q    And did anyone have to lift up the seat of the toilet --

19   A    No.

20   Q    --  to make this observation?

21   A    No.

22   Q    How about with respect to Government Exhibit 6, was it

23   necessary to remove a curtain or any other type of objects in

24   order to make the observation of these items in Government

25   Exhibit 6?

1  A   No.

2  Q   All right.  Now, you indicated earlier that everyone was

3  brought into the living room?

4  A   Yes.

5  Q   All right.  And who were the occupants that were found in

6  the apartment?

7  A   Gilbert Galan, Pierre Galan, and Merline Sellers.

8  Q   What happened after they were brought into the living

9  room?

10 A   A consent to search was obtained by Merline Sellers.

11 Q   Let's talk -- that didn't occur for some period of time,

12 correct?

13 A   No.

14 Q   All right.  So what happened after Merline Sellers --

15 tell us immediately what happened that you were involved in.

16 A   Okay.  After locating drugs inside the bathroom, TFO

17 Miranda alerted officers that the drugs were found in the

18 bathroom.  Ms. Sellers couldn't believe that there was drugs

19 inside the apartment, and she believed, trying to -- she

20 attempted to get from the living room to the bathroom while

21 police were standing, protecting that area.

22         She couldn't believe that there were drugs inside of

23 her apartment, and she began to yell, become irate, and tried

24 to -- pretty much bumping us to try to get through to see what

25 was in the bathroom.

1  Q     What happened next?

2  A     After giving her numerous verbal commands to back up, you

3  know, and to go back into the living room, approximately eight

4  verbal commands were, were issued to her.  She continued to

5  try to get to the bathroom area, at which point we had to

6  physically place her under arrest.

7  Q     And did you take part in the arresting of Ms. Sellers?

8  A     Yes.

9  Q     Tell us what happened.

10 A     I grabbed Ms. Sellers by the wrist, and TFO Jose Miranda

11 grabbed the other arm and we, we kind of pressed her down onto

12 a freezer chest to try to gain control of her, and we secured

13 her in handcuffs and during the whole time, she was resisting.

14 Q     How so?  Describe that for us.

15 A     It was a struggle.  She was trying to break free.

16 Q     What happened next?

17 A     After she was handcuffed, we brought her into the living

18 room and she was sat down on the couch.

19 Q     All right.  What happened next?

20 A     From there, we just, we held the apartment.  We had other

21 things going on as far as the third floor apartment, and we

22 were just letting the air, letting everything settle, and

23 figuring out what the next step was going to be.

24 Q     What do you mean by "letting everything settle"?

25 A     There was just a lot of commotion between the hallways,

```
 1   you know, trying to get everything -- between holding the

 2   third floor apartment and conducting a protective sweep and

 3   getting -- they were just letting things just calm down.

 4   Q    Okay.  What did you do next?

 5   A    After that, I believe I had went up to the third floor

 6   and spoke to other agents and officers up there, trying to

 7   figure out what the game plan was going to be.

 8   Q    All right.  Then what did you do?

 9   A    At some point, I went back downstairs, at which time I

10   was alerted that a consent was signed to conduct a search of

11   apartment No. 4.

12   Q    How long did the protective sweep of this apartment take

13   to complete?

14   A    A few minutes.

15   Q    Prior to the consent, did you observe any officers

16   actually conducting a full scale search of the apartment?

17   A    No.

18   Q    Did you conduct any such search?

19   A    No.

20   Q    You said that Ms. Sellers was arrested?

21   A    Yes, she was.

22   Q    Did you intend to actually lodge a charge against her?

23   A    Yes.

24   Q    And what charge did you intend to lodge?

25   A    Interfering.
```

1   Q    And after you pressed her down on the freezer with

2   Officer Miranda, was she handcuffed?

3   A    Yes, she was.

4   Q    And you said you took her back into the living room?

5   A    Yes.

6   Q    And put her on the couch?

7   A    Yes.

8   Q    Did she remain handcuffed at that point?

9   A    She did, for a short period of time.

10  Q    Did there come a point where she was no longer

11  handcuffed?

12  A    Yes.

13  Q    All right.  Tell us when that occurred.

14  A    I wasn't there when she was unhandcuffed, but at some

15  point, when I went back to the room, I could see that the

16  cuffs were taken off.

17  Q    Did you actually observe the cuffs being taken off or

18  were they already off when you saw her again?

19  A    They were already off.

20  Q    And at that point, did you observe anyone talking with

21  her?

22  A    Yes.

23  Q    And who was talking with her?

24  A    NHPD Officer Anthony Maio and Resident Agent-in-Charge

25  Jason Hanson.

1  Q    And is Jason Hanson with the DEA?

2  A    Yes, he is.

3  Q    Now, how long of a period of time had passed from the

4  time that you handcuffed her until when you next saw her

5  talking with Maio and Hanson when the handcuffs were already

6  off?

7  A    Fifteen minutes.

8  Q    And what did you observe occurring between Maio, Hanson,

9  and Ms. Sellers?

10 A    They were engaged in conversation, and eventually, the

11 consent to search form was signed.

12 Q    Were you within earshot of the conversation?

13 A    I couldn't hear the conversation.

14 Q    What was Ms. Sellers' demeanor during the conversation

15 with Hanson and Maio?

16 A    She was calm, and she was, you know, engaged in

17 conversation with them.

18 Q    All right.  What did you do next?

19 A    After the consent was signed?

20 Q    Yes.

21 A    Yes, at that point, a search was conducted.

22 Q    All right.  Tell us what you did.

23 A    As far as any evidence that was located, you know, we had

24 it photographed in place, and then the evidence was seized.

25 Q    Were you present for the search that occurred after the

1   consent was signed?

2   A    Yes.

3   Q    Okay.  And were you present when the consent to search

4   form itself was signed?

5   A    Not when the consent form was signed, I was not present.

6   I was somewhere in the room, but not directly next to it.

7   Q    Did you observe the consent form as it was being signed?

8   A    No, I did not observe that.

9   Q    Okay.  So you didn't actually observe the execution of

10  the form by Ms. Sellers?

11  A    No, I didn't see that.

12  Q    At any point, did you hear either of the -- strike that,

13  please.  Were the Galan brothers present in the apartment

14  while Ms. Sellers was engaged in conversation with Maio and

15  Hanson?

16  A    Yes, I believe so.

17  Q    And did you hear either of them lodge any objection to

18  any consent to search?

19  A    No.  No.

20  Q    Were you present when the body armor depicted in

21  Government Exhibit 10, and the firearms in government exhibits

22  11 and 12, were recovered?

23  A    I was present when the body armor and the first weapon

24  was located.

25  Q    All right.  And do you know who located them?

```
 1    A     I believe it was Detective Jomo Crawford.

 2    Q     All right.  What happened after he located those two

 3    items?

 4    A     After those items were located, Gilbert Galan

 5    acknowledged that the, those, items located were his.

 6    Q     All right.  Was there any questioning of Gilbert Galan at

 7    that time?

 8    A     No, no.

 9    Q     So describe for us exactly what happened.  You said he

10    acknowledged that they were his, but tell us exactly what

11    happened.

12    A     He was sitting in a chair in the living room, and as they

13    were located, those items were located, he said, Those were

14    mine.

15    Q     Was that in response to any questioning by somebody?

16    A     No, no.

17    Q     What happened next?

18    A     There was a second gun located in the room as well.  I

19    wasn't present when that firearm was seized.

20    Q     What did you do next?

21    A     After that, we -- pictures were taken in place, and we

22    notified -- BFI.  BFI came and recovered the weapons.

23    Q     What's BFI?

24    A     Bureau of identification.

25    Q     And the photographs, were they taken of the items exactly
```

```
 1   as they were found?

 2   A     Yes.

 3             MR. VATTI:  May I have a moment, your Honor?

 4             THE COURT:  Yes.

 5             MR. VATTI:  Just a few more questions, your Honor.

 6   Q     You had indicated earlier that after Ms. Sellers had been

 7   arrested and placed on the couch in handcuffs in the living

 8   room, you then left and came back about 15 minutes later,

 9   observed her having a conversation with Maio and Hanson?

10   A     Yes.

11   Q     How much more time elapsed before the actual search

12   commenced?

13   A     From the time that entry was made?  Until when the search

14   was conducted?

15   Q     Yes, if you can give us that time frame.

16   A     About a half hour.

17   Q     All right.  Now, you indicated that Gilbert Galan

18   acknowledged that the body armor and the first gun that was

19   found belonged to him?

20   A     Yes.

21   Q     All right.  Do you recall whether in your report, you

22   indicated that Pierre Galan stated that the body armor

23   belonged to him?  Do you recall that?

24   A     I'm not -- I don't recall.

25             MR. ZIMMERMANN:  Your Honor, I believe the testimony
```

1    was that he didn't hear, he wasn't there when the other items

2    were found.

3            MR. VATTI:  I think the testimony was he wasn't

4    there when the second gun was found, but I can clarify that,

5    your Honor.

6            THE COURT:  Clarify that.

7    Q    Let's just go through those three items, okay?  Let's

8    start with Government Exhibit 10, if you have that photograph

9    in front of you.

10   A    Okay.  Okay.

11   Q    This is the body vest, correct?

12   A    Yes.

13   Q    All right.  And were you present when this item was

14   located?

15   A    Yes.

16   Q    All right.  And looking at Government Exhibit 11, do you

17   know if you were present when that firearm was located?  Well,

18   let me strike that question.  Was there a firearm located in

19   the same area as this body vest?

20   A    Yes.

21   Q    And were you present when that firearm was located as

22   well?

23   A    Yes.

24   Q    Then there was another firearm found in a different area

25   of the apartment, correct?

1    A    Yes.

2    Q    Were you present when that firearm was found?

3    A    No.

4    Q    All right.  So when the body vest and the firearm that

5    was found in the vicinity of the body vest was found, did

6    someone claim ownership of that?

7    A    Yes.

8              MR. ZIMMERMANN:  Objection to the form of the

9    question, did someone claim ownership of "that."  Well, there

10   were two items.

11   Q    Of those items?

12             THE COURT:  Of both.

13             MR. VATTI:  Both.

14   A    Yes.

15   Q    Both items?

16             MR. ZIMMERMANN:  Asked and answered, your Honor.

17             MR. VATTI:  I just want to be sure.

18             THE COURT:  I think we're asking the witness.

19             MR. VATTI:  There are two brothers and three items.

20   We just want to make sure that the witness takes his time,

21   and. . .

22             THE COURT:  Right.

23   A    There was the vest and the first firearm, Gilbert Galan

24   stated the items were his.

25   Q    Both items?

1    A    Both items.

2    Q    Okay.  Do you recall saying in your report that Pierre

3    Galan indicated that the body vest belonged to him?

4    A    I have to --

5    Q    Just answer that yes or no.  Do you recall or not?

6    A    I don't recall.

7         MR. VATTI:  May I approach, your Honor?

8    Q    I'm going to have you review paragraph 25 of your report.

9    If you could read the last half.

10   A    Okay.

11   Q    Have you had a chance to read that?

12   A    Yes.

13   Q    Does that refresh your recollection?

14   A    Yes.

15        MR. VATTI:  May I take that report back, your Honor?

16        THE COURT:  Yes.

17   Q    All right.  My question was:  In your report, did you

18   indicate that Pierre Galan said the body vest belonged to him?

19   A    Yes.

20   Q    Okay.  And your testimony here today, a few minutes ago,

21   was that Gilbert Galan indicated that both items were his, is

22   that correct?

23   A    Yes.

24   Q    I'll get back to the report in a second, but where was

25   the body vest and first gun found?  Where were they found?

1    A    In the living room, behind a sofa.

2    Q    And which is correct as to the body vest, your report

3    that it was Pierre Galan claiming that it was his or that

4    Gilbert Galan claimed both items?

5    A    That Pierre Galan said the vest was his, and Gilbert

6    Galan acknowledged that the first gun found was his.

7    Q    Okay.  You're certain?

8    A    Yes.

9    Q    Okay.

10          MR. VATTI:  I have no further questions, your Honor.

11          THE COURT:  Do you want a break before we begin the

12   cross?

13          MR. ZIMMERMANN:  No, thank you, your Honor.

14          THE COURT:  No?  Okay.

15   CROSS EXAMINATION

16   BY MR. ZIMMERMANN:

17   Q    Good afternoon, Officer --

18   A    Good afternoon.

19   Q    -- Rivera.  You stated that you had some training in

20   Massachusetts, I believe, in connection with your job with the

21   New Haven Police Department?

22   A    Yes.

23   Q    And did that -- you also indicated that it included some

24   education in the law of search and seizure, correct?

25   A    Yes.

1  Q    As well as in the law of custody of statements made by

2  potential defendants?

3  A    No.

4  Q    You didn't have any education --

5  A    We had education as far as search and seizure laws.  The

6  second part, what you're referring to is?

7  Q    Miranda warning.

8  A    Miranda warning, yes.

9  Q    You did have training?

10  A    Yes.

11  Q    As a matter of fact, there's a form, you'll recall seeing

12  the consent form, correct?

13  A    Yes.

14  Q    For the search?

15  A    Yes.

16  Q    And there's also a New Haven Police Department form for

17  advice of rights and waiver of rights by a person in custody?

18  A    Yes.  Yes.

19  Q    But that second type of form concerning a defendant's

20  Fifth Amendment rights was not utilized or presented to either

21  Galan that night?

22  A    No.

23  Q    The statement you made in your testimony, direct

24  testimony, was that someone observed one of the Galans looking

25  out a window at the action occurring on 139 Day Street during

1    the arrest of Mr. Wilson, right?

2    A    Yes.

3    Q    Which Galan was looking out the window?

4    A    It was PLO.  Pierre Galan.

5    Q    Pierre Galan.  Can you today, please, identify which

6    Galan is which for us?

7    A    Yes.

8    Q    And would you do that?

9    A    Pierre is the right defendant and Gilbert is the left.

10   Q    To your left, right?

11   A    Yes.

12   Q    And the arrest of Mr. Wilson occurred like at somewhere

13   in the evening of the 3rd of January, correct?

14   A    Yes.

15   Q    And it was dark out?

16   A    Yes.

17   Q    And how far away -- were you the person who made that

18   observation or identification of who was looking out the

19   window?

20   A    No.

21   Q    So that's, you're relying on someone else's

22   identification?

23   A    Correct.

24   Q    And you said that the person was looking out of the third

25   floor window?

```
1    A    Yes.

2    Q    Is that your recollection?

3    A    That's my recollection, yes.

4    Q    With respect to the body armor vest, you stated initially

5    in your testimony that it was Gilbert Galan who claimed the

6    vest was his, correct?

7    A    Yes.

8    Q    And then you were corrected or your report says something

9    else, correct?

10   A    Yes.

11   Q    Did you prepare for this testimony at all?

12   A    Yes.

13   Q    Did you read your report?

14   A    Yes.

15   Q    With respect to the identification of the person you said

16   was coming down the stairs that evening as the task force was

17   going up to the third floor, who do you recall was coming down

18   the stairs?

19   A    I didn't see the individual coming down the stairs.

20   Q    So when your report says it was Gilbert Galan, and Mr.

21   Vatti showed you, asked you if that was correct, you said no,

22   it was a typographical error?

23   A    Yes.

24   Q    In your training on writing reports, wasn't it emphasized

25   to you that it was absolutely important, critical, that you
```

```
1   get the right identification in your report?

2   A    It's a typo on my behalf.

3   Q    It was what?

4   A    It was a typo.

5   Q    A typo?

6   A    Yeah.

7   Q    Pierre and Gilbert is a typo?

8   A    Well, it's just -- as far as typing the report, given

9   they're both Galans, that there was a typo on my behalf.

10  Q    With respect to the -- I want to shift to the point in

11  time when everyone's in the living room.  In other words, this

12  was after the entry, you had gone upstairs and came back, I

13  think?

14  A    Yes.

15  Q    The two Galans were sitting -- were where?  Could you

16  tell us that?

17  A    Well, at one time, Gilbert was in the hallway with

18  Pierre, and then eventually they were brought all into the

19  living room.

20  Q    Okay.  And they were handcuffed, correct?

21  A    All of them, yeah, at one point were handcuffed.  Yes.

22  Q    Okay.  So Pierre and Gilbert, were they seated?  Did you

23  have them --

24  A    Yes.

25  Q    Did the task force have them sit down somewhere?
```

1   A    Yes.

2   Q    And where was that?

3   A    One was seated in a chair on the left side of the living

4   room, and the other one was more towards the back.

5   Q    And how close were they to their mother, Ms. Sellers?

6   A    Four feet.

7   Q    Who was doing the -- who was having the conversation with

8   Ms. Sellers about the consent form?

9   A    Officer Anthony Maio.

10  Q    Anybody else?

11  A    And the Resident Agent-in-Charge Jason Hanson.

12  Q    Now, have you seen that consent form?

13  A    Yes.

14  Q    And it has -- whose handwriting is that, the printing,

15  other than the signature?

16  A    It's my, I believe it's my, printing on top.

17  Q    Really?

18        MR. ZIMMERMANN:  I'd like to get a copy of that, if

19  I may.  What exhibit is that of yours?

20        MR. SILVERMAN:  13.

21        MR. ZIMMERMANN:  Your Honor, Government's 13, I'm

22  going to venture into technology here, although I don't have

23  Mr. Hillis's laser pointer to work with.  I can point with

24  this pen.

25  Q    Up here in the upper left-hand corner, is that your

```
 1   handwriting, the time given?

 2   A    No, it's not.

 3   Q    What?

 4   A    No, it's not.

 5   Q    Whose is it?

 6   A    That appears to be -- actually, I don't know.

 7   Q    Okay.

 8   A    I don't know.

 9   Q    But it says, as far as you can tell, 10:45 p.m. equals

10   sign?

11   A    Yes.

12   Q    That means signature, right?

13   A    Yes.

14   Q    Now, the handwriting, if we go down below it to here,

15   these three names, whose handwriting is that?

16   A    It's not mine.  It's not my handwriting.  I thought it

17   was -- I thought it might have been mine, but it wasn't.

18   Q    You concede that now?

19   A    I concede it's not.

20   Q    Is any of that your handwriting?

21   A    No, it's not.

22   Q    Witnessed by, witnessed by, I can't read that, who is

23   that?

24   A    That's by the RAC and the officer who signed it.

25   Q    And who --
```

1    A    Officer Maio and Resident Agent-in-Charge Jason Hanson.

2    Q    All right.  Prior to embarking on this takedown of

3    Wilson, did this team of task force members, you said 15 to

4    20, was there a meeting beforehand?

5    A    It's not all task force officers.  There's PD personnel

6    as well.

7    Q    Okay.  The group.

8    A    Yes.

9    Q    Was there a strategy meeting beforehand where someone

10   assigned functions for each person?

11   A    There was a plan to arrest Wilson on that day.

12   Q    Who was in charge assigning you, for example, to

13   surveillance and others to arresting?

14   A    Could you rephrase that?  Say that again?

15   Q    Who was the captain of the team, I think is the easiest

16   way.

17   A    The RAC, resident agent-in-charge, is Hanson.

18   Q    What's his name again?

19   A    Jason Hanson.

20   Q    And RAC means, R-A-C, resident agent-in-charge?

21   A    Resident agent-in-charge.

22   Q    When did that meeting take place?

23   A    Prior to the surveillance --

24   Q    Of --

25   A    -- of Wilson.

```
1    Q    Give me a time and day.

2    A    I can't give you the exact now.

3    Q    I'm not asking for the exact time.  Tell me approximately

4    what time.  This is the 3rd of January, correct, the same day?

5    A    Yes.

6    Q    Approximately what time did you meet with the RAC?

7    A    I'd have to see my report.

8    Q    You don't remember?

9    A    Don't remember.

10   Q    Who was in attendance?

11   A    There was -- I'd have to read my report again.

12   Q    Let me read some names that you have in your report,

13   okay?

14   A    Um hum.

15   Q    TFO Miranda, was he present?

16   A    Yes.

17   Q    Jones?

18   A    Yes.

19   Q    And that's Cedric Jones?

20   A    Dedric Jones.

21   Q    Dedric Jones, okay.  Cameron?

22   A    Yes.

23   Q    Who's he?

24   A    He's a task force officer.

25   Q    Special Agent Ndrenika, N-D-R-E-N-I-K-A, he was there?
```

```
1    A    Yes.

2    Q    And says RAC, R-A-C, Hanson?

3    A    Yes.

4    Q    New Haven Police Department Officer Maher, this is

5    M-A-H-E-R?

6    A    Maher.

7    Q    He was present.  And then it goes on, serially.  Was

8    Lopez, Halim, Senior, Maio, Conceicao, Helms, and Tyson, they

9    were all there?

10   A    Yes.

11   Q    Anybody else?

12   A    Not that I can recall.

13   Q    With respect to the statements allegedly made by Mr.

14   Gilbert Galan in which, as you put it, acknowledgment was made

15   by him that the firearm located, first firearm, was his, you

16   stated that there was no question asked by the agent when he

17   found the gun?

18   A    No.

19   Q    Who was the agent?

20   A    Who?

21   Q    Who found the gun.

22   A    I believe it was Detective, investigator, Crawford.

23   Q    Crawford.  And the firearm was located in the living

24   room, behind the couch?

25   A    Yes.
```

1   Q     In a bag of clothing?

2   A     Yes.

3   Q     Do you remember whose clothing it was?

4   A     No.

5   Q     When the gun was held up -- correct, it was held, it was

6   displayed?

7   A     I don't recall that.

8   Q     Well, how then do you think Mr. Gilbert Galan -- what was

9   he talking about when he was talking about, when you claimed

10  he was claiming ownership of the gun?

11  A     The gun, where it was located, it's going to be kept in

12  place to be photographed and to be seized by the BFI, so the

13  gun wasn't touched.

14  Q     It wasn't touched?

15  A     No.

16  Q     It wasn't pulled out of the bag?

17  A     No.

18  Q     And Officer Crawford looked down and said, "There's a gun

19  here"?

20  A     He said there was a gun.

21  Q     What did he say?

22  A     He found a gun.

23  Q     Is that what he said, "I found a gun"?

24  A     Not to those words, but he alerted that a gun was

25  located.

```
1    Q    And it's your testimony today that spontaneously, Gilbert
2    Galan said, "That's mine"?
3    A    Yes.
4    Q    There was no question asked by a police officer to the
5    effect of, "Whose is this"?
6    A    No.
7    Q    None whatsoever?
8    A    No.
9    Q    Going to the execution of the consent to search by Ms.
10   Sellers, you stated you couldn't hear the conversation between
11   Ms. Sellers and Officer Maio and the third officer, the second
12   officer who was working with her, right?  You said you
13   couldn't hear them?
14   A    No, I couldn't.
15   Q    Do you recall this consent form being presented to
16   Gilbert Galan?
17   A    No.
18   Q    Do you recall his stating, in words or substance:  I
19   ain't signing anything?
20   A    I never heard that.
21   Q    You never heard that?
22   A    No.
23   Q    You don't know whether it was said or not?
24   A    I never heard him.
25   Q    If we look at your report, you carefully -- I'm asking
```

```
 1   you if you did carefully -- note these times in front of the
 2   paragraphs of the actions taken, isn't that correct?
 3   A    Yes.
 4   Q    So if paragraph 21 says approximately 10:01 p.m., it
 5   happened then, right?
 6   A    Yes.
 7   Q    You had a watch on?
 8   A    That's the time of the stop.  We were able to obtain that
 9   through the motor vehicle stop.
10   Q    But you don't claim any authorship of the time on the
11   consent form, correct?
12   A    Do I what?
13   Q    You did not write the time of day on the consent form up
14   here, that's not your handwriting?
15   A    That's not my handwriting.
16   Q    Is that when you recall the thing was signed?
17   A    Yes.
18   Q    When you first entered the building, 139 Day Street,
19   where were you in the procession and where was Mr. Wilson?
20   A    I was towards, towards the back end of the team going up
21   the stairs.
22   Q    And how many members of the team were going up the
23   stairs?
24   A    Probably six.  Six or seven.
25   Q    And the others were outside with the other occupants of
```

```
 1    the car, is that --

 2    A    Yes.

 3    Q    -- Wilson's car?

 4    A    Yes.

 5    Q    There were four women, correct --

 6    A    Yes.

 7    Q    -- in the vehicle.

 8    A    Three.

 9    Q    Three.  But Wilson and a team of agents proceeded into

10    139 Day Street and went up the stairs, correct?

11    A    No.  You said Wilson?

12    Q    Yes.

13    A    And us?  No.

14    Q    He wasn't with you?

15    A    No.

16    Q    He was still out, detained in the street?

17    A    Correct.

18    Q    Apparently, someone had obtained a consent of Wilson to

19    search apartment 8, right?

20    A    Yes, somebody did obtain a consent.  Yeah.

21    Q    And that's a written consent like this or was it verbal?

22    A    A written consent.

23    Q    And where was that signed?

24    A    I'm not, I'm not sure.  There was two investigations

25    going on at the same time, different personnel.
```

```
1   Q    There were two investigations, there was one

2   investigation of Wilson and one investigation of the Galans?

3   A    There's two apartments being held for investigation, so

4   there was a team up on the third floor and a team on the

5   second floor.

6   Q    And apartment 4 is on the second floor, right?

7   A    Yes.

8   Q    The person coming down the stairs was which Galan?

9   A    Pierre Galan.

10  Q    And you testified that he was not detained immediately;

11  he went into the apartment?

12  A    Yes.

13  Q    And you pounded on the doors, right, on the door, and

14  said, "Open up"?

15  A    Yes.

16  Q    And what was the response?

17  A    The door was, the door was opened by Gilbert first.  When

18  he opened the door, proceeded to close the door, at which time

19  we started banging on the door, said, "Open the door."

20  Q    Then it was opened again?

21  A    Yes, Gilbert opened the door again.

22  Q    Gilbert?

23  A    Gilbert.

24  Q    And you removed him from the apartment?

25  A    We instructed him to step out of the apartment.
```

```
1    Q    And did he comply?

2    A    Yes, he did.

3    Q    Was he handcuffed?

4    A    I believe he was detained.

5    Q    Well, was he handcuffed?

6    A    Yes.

7    Q    I'm sorry if we don't share the same understanding.

8    A    Yeah.

9    Q    He was handcuffed, and he was sat down on the landing, on

10   one of the stairways?

11   A    Yes.

12   Q    And what happened then, when you went inside the

13   apartment?  And were you one of the -- excuse me, I'll strike

14   the original question, part of it.  But were you one of the

15   team members who actually went into apartment 4 --

16   A    Yes.

17   Q    -- initially?

18   A    Yes.

19   Q    What did you have on?

20   A    A police shirt, badge displayed, and gun belt.

21   Q    Was your gun drawn?

22   A    Yes.

23   Q    And did any members of the team that entered apartment 4

24   have anything to conceal their identity?

25   A    Yes, there may have.  There may have been.
```

1    Q    Masks, right?

2    A    Yes.

3    Q    Ski masks, I called it.  They weren't skiing, were they?

4    I'm sorry, strike that.  But they had guns drawn, black wool

5    masks on, right?  Some of them?

6    A    There would only have been one or two that would have

7    been hiding their identity.

8    Q    And --

9    A    In the team that went in, it would only have been one

10    that would have been hiding their identity.

11    Q    Okay.  But he was in the lead of the procession that went

12    into the apartment?

13    A    No.

14    Q    Was he in front of you?

15    A    No.

16    Q    He was behind you?

17    A    Correct.

18    Q    Were all the officers -- how many officers went in before

19    you?

20    A    We all went in at one time.

21    Q    How many?

22    A    Three.

23    Q    Pardon me?

24    A    Three.

25    Q    And all had guns drawn?

```
 1    A     Yes.

 2    Q     Who did you encounter first when you got to the door?  I

 3    mean after Gilbert was detained.

 4    A     Pierre.

 5    Q     Pierre.  What did you say to Pierre?

 6    A     We instructed him to step out.  He was in the -- between

 7    the bathroom and the kitchen area.  We instructed him to come

 8    out to the doorway.

 9    Q     Did he do that?

10    A     Yes, he did.

11    Q     Did you detain him with handcuffs?

12    A     Yes.

13    Q     And he waited.  He was then put out in the hallway?

14    A     Yes.

15    Q     And you proceeded in?

16    A     We continued our sweep.

17    Q     All right.  At what point did you hear water running?

18    A     As soon as I entered the apartment and got between the

19    hallway and the living room, I could hear water running.

20    Q     And you could tell where that was coming from?

21    A     I could tell it was coming from my left.

22    Q     And was the bathroom door closed?

23    A     It was open.

24    Q     It was open.  And who went into the bathroom to see why

25    it was running?
```

1  A    We all proceeded towards that area, and Task Force

2  Officer Jose Miranda was the one who observed the evidence.

3  Q    The report and your testimony was that rice was observed

4  on the toilet seat?

5  A    Yes.

6  Q    On top of the toilet seat?

7  A    Yes.  Uncooked rice.

8  Q    Pardon me?

9  A    Uncooked rice.

10  Q    Yes.  Yes.  Hard, white rice.  Yes.  Clarify for me how,

11  if it was the case, one could see something in the toilet bowl

12  if there was rice on top of the seat.

13  A    There was grains of rice on top of the seat.  Not a lot,

14  but there was grains of rice on top of the toilet seat.

15  Q    Oh, the round seat that sits on the bowl.

16  A    Yes.

17  Q    Not the cap that covers the seat.

18  A    Yeah, where you would sit.

19  Q    Okay.  And in your experience with all your drug

20  investigations, have you ever had another occasion where

21  someone tried to flush bundles down the toilet?

22  A    Yes.

23  Q    And as a matter of fact, they go down the toilet, don't

24  they?

25  A    Sometimes.

1    Q    And these didn't, correct?

2    A    Sometimes they don't.

3    Q    You stated that the box that we understand to be Pierre

4    Galan was carrying down the stairs, cardboard box, would you

5    describe it in terms of its dimensions?

6    A    Two-and-a-half by three-inch by a six-inch box,

7    cardboard.

8    Q    There's one more dimension.  Two-and-a-half high,

9    six-inch wide.  Six inch long?

10   A    Six inch long.

11   Q    Yes?

12   A    Two-and-a-half to three inches wide.

13   Q    Yes?

14   A    And the height would be about an inch, inch-and-a-half.

15   Q    Okay.  And it was -- it had no markings on it?

16   A    No.

17   Q    And it was closed?

18   A    It was open.

19   Q    It was open?

20   A    It was half of -- there was half of the box.

21   Q    You lost me.  Yeah, is there a picture?

22   A    It's a half a box.  The lid would go on top of it, but

23   it's just the bottom portion of the box itself.

24   Q    Okay.

25   A    Without a lid.

```
 1    Q     Okay.  So it was open.

 2    A     Yes.

 3    Q     I got you now.  Open to see the contents.

 4    A     Yes.

 5    Q     And you saw the contents were wax packets?

 6    A     I saw the top to a grinder.

 7    Q     Yes?

 8    A     Small brush, and some alcohol wipes.

 9    Q     Wipes.  But you didn't see the, any, wax paper packets?

10    A     No.

11          MR. ZIMMERMANN:  I'm going to turn this over.

12          MR. ADAMUCCI:  Judge, can we take a break?

13          THE COURT:  Yes.  Ten minutes?  All right, we'll

14    take ten minutes.

15          (Recess:  12:39 o'clock p.m. to 12:51 o'clock p.m.)

16    CROSS EXAMINATION

17    BY MR. ADAMUCCI:

18    Q     Good afternoon, sir.  I'm going to ask you some

19    questions, and I hope I'm not repetitive but if I repeat some

20    questions, I apologize in advance.

21          You testified that there was a meeting, on cross, a

22    meeting with other officers.  What was the date of that

23    meeting?

24    A     Before January 3rd, before the arrest of Mr. Wilson.

25    Q     There was a meeting, correct, with you and the other
```

```
 1   officers?

 2   A    Briefed.  We briefed as to what enforcement actions were

 3   going to be taken that day.

 4   Q    What was the date, the day?

 5   A    It would have been on the same day.

 6   Q    You testified you couldn't recall the exact time though,

 7   correct?

 8   A    Yes.

 9   Q    Okay.  Was it two hours prior to the initial stop?

10   A    I can't recall.

11   Q    Okay.  What would refresh your recollection?

12   A    It may have been, you know, prior to commencing the shift

13   or sometime in the afternoon, but I can't say exact time.

14   Q    Okay.  You testified that all the officers that Attorney

15   Zimmermann named were present at that briefing, I think there

16   were 13 officers.  You went through the list of names, they

17   were all present at that briefing, correct?

18   A    No.

19   Q    They were not?

20   A    No.

21   Q    Okay.  During your training as both a New Haven police

22   officer and as a task force officer, are you taught the

23   importance of creating an accurate report of the

24   investigation?

25   A    Yes.
```

1    Q    And you would agree, it's absolutely critical to have an

2    accurate report in writing as to what happened or occurred in

3    a certain period of time, correct?

4    A    Yes.

5    Q    What's the purpose of a report, sir?

6    A    So that you can recall what occurred on that date.

7    Q    Was the briefing that occurred on January 3rd important

8    enough to note in a report?

9    A    No.

10   Q    In fact, it was not noted in your report, the one you

11   have been using throughout this entire hearing, it was not

12   noted in the report, correct?

13   A    No.

14   Q    Okay.  Sir, have you ever obtained a search warrant

15   during your years of being a police officer and task force

16   officer?

17   A    Yes.

18   Q    Okay.  So you know the procedure for getting a search

19   warrant?

20   A    Yes.

21   Q    How long does it you usually take, based on your

22   experience, to get a search warrant?

23   A    It could take a couple of hours.

24   Q    What's the quickest you've ever obtained a search

25   warrant?

```
1    A      Probably couple hours.

2    Q      Couple hours?  One hour?

3    A      Hour-and-a-half, two hours.

4    Q      Okay.  Your position, your role, safe to say your role on

5    January 3rd was surveillance?

6    A      Yes.

7    Q      Okay.  Prior to that date, what role did you have during

8    the course of this wiretap investigation?

9    A      I was doing surveillance on that day.

10   Q      What about prior, did your role ever change prior to

11   January 3rd?

12   A      On that day, I was doing surveillance.

13   Q      Prior to that day, did your role ever change at all?

14   A      No.

15   Q      Okay.  So you've only been -- your role has only been

16   surveillance from the time you started this investigation

17   until January 3rd?

18   A      Primarily surveillance.

19   Q      Primarily?

20   A      Yes.

21   Q      Does that mean you never held any other role prior to

22   January 3rd?

23   A      Strictly surveillance.  I may have been in the wire room,

24   you know, monitoring from time to time, but strictly

25   surveillance.
```

1   Q    Did you testify, sir, in the grand jury?

2   A    What's that?

3   Q    Did you testify in the grand jury in this matter in order

4   to obtain the indictment against Mr. Wilson and Mr. Galan?

5   A    No.

6   Q    You testified that this wiretap investigation had lasted

7   how long?  Do you remember how long this wiretap investigation

8   lasted?

9   A    The whole investigation lasted --

10  Q    Mr. Wilson and Mr. Galan?

11  A    The whole investigation lasted about a year.

12  Q    A year?

13  A    Yes.

14  Q    Okay.  And during that time period, you were familiar

15  with some of the wiretaps, the intercepted phone calls, that

16  were obtained over Mr. Wilson, the Galans' and others' phones,

17  correct?

18  A    Some.

19  Q    Safe to say you're not familiar with every single

20  intercept?

21  A    No.

22  Q    Safe to say you're familiar with majority of them?

23  A    As far as?

24  Q    Majority of wiretap intercepts?

25  A    I wasn't aware of the majority.  Again, I was only in the

1   wire room briefly.  I wasn't in there all the time.

2   Q    Throughout your involvement, during the investigation,

3   were you in touch with the other officers as far as the

4   developments in a particular day, week, or month?

5   A    Yes.

6   Q    Okay.  And you developed, over the course of that

7   investigation, incriminating evidence, to say the least,

8   against Mr. Wilson, correct?

9   A    Yes.

10  Q    That he had supposedly dealt in the dealing of heroin?

11  A    Heroin, yes.

12  Q    Okay.  That investigation involved, among other things, a

13  wiretap of Mr. Wilson's phones, correct?

14  A    Yes.

15  Q    Were there also controlled buys involving Mr. Wilson?

16  A    Yes.

17  Q    Okay.  Any controlled buys of Mr. Pierre Galan?

18  A    No.

19  Q    Okay.  Were you aware of any wiretap intercepts prior to

20  January 3rd involving Mr. Galan and Mr. Wilson?  Prior to

21  January 3rd, were there any wiretap intercepts between Mr.

22  Wilson and Mr. Galan?

23  A    I'm not sure.

24  Q    I'm sorry?

25  A    I'm not sure.

```
 1   Q     Not sure, okay.  You said you were familiar with the
 2   Galans prior to January 3rd of '12, correct?
 3   A     Yes.
 4   Q     You were familiar with them, what, from your activity in
 5   the community?
 6   A     I was aware of who they were.  I didn't have any street
 7   dealings with them while I was a police officer.
 8   Q     Okay.  You were aware of who they were.  Could you
 9   identify their skin color?
10   A     What's that?
11   Q     Could you identify their skin color?  Based on your
12   familiarity with them prior to January 3rd, could you identify
13   them by their difference in skin color?
14   A     Could you?
15   Q     Could you?
16   A     Yeah, you could identify them, yes.  One's darker-skinned
17   and one's lighter-skinned.
18   Q     Fair to say Pierre is a lighter complexion than Gilbert?
19   A     Yes.
20   Q     Prior to January 3rd, any dealings at 139 Day Street?
21   A     Could you repeat the question?
22   Q     Prior to January 3rd '12, did you have any dealings with
23   139 Day Street?  Were you familiar with the building?
24   A     Yes.
25   Q     Ever been in the building before?
```

```
 1    A    No.

 2    Q    Never been in the building before?

 3    A    Never been.

 4    Q    Okay.  Prior to that day, did you know that the Galans

 5    resided in that building?

 6    A    No.

 7    Q    You had not?

 8    A    Not in unit No. 4, no.

 9    Q    Any idea that they lived in that building whatsoever?

10    A    Yes, I believe there was some knowledge that they lived

11    in the building.

12    Q    What do you mean you believe there was some knowledge?

13    Based on what?

14    A    There was information obtained that they did reside in

15    that building, yes.

16    Q    Was that brought up in the briefing on January 3rd?

17    A    I can't recall.

18    Q    You don't recall whether it was mentioned that the Galans

19    lived at 139 Day Street?

20    A    We had knowledge that they believed that they lived in

21    that building.

22    Q    I thought you testified that there was information that

23    the Galans had access to the third floor apartment, apartment

24    No. 8.

25    A    Say that again.
```

1    Q    Didn't you testify that there was a belief that the

2    Galans had access to Mr. Wilson's apartment?

3    A    Based on the calls that were received.

4    Q    Okay.  So you're saying just based off the calls on

5    January 3rd, 2012?

6    A    Based on the call, yes.

7    Q    Only that call, you're saying only on the call on January

8    3rd, the one call involving Mr. Galan and Mr. Wilson, that's

9    how you determined that Mr. Galan had access to Mr. Wilson's

10   apartment?

11   A    That's what I recall.

12   Q    Okay.  Would you agree, sir, that the decision was made

13   at the briefing to arrest Mr. Wilson?

14   A    The decision was made, yes.

15   Q    Okay.  Was the decision made to arrest Mr. Galan?

16             MR. ZIMMERMANN:  Your Honor, I would ask that --

17   Q    Mr. Pierre Galan.

18             MR. ZIMMERMANN:  Thank you.

19   Q    Was the decision made during the briefing to arrest Mr.

20   Pierre Galan?

21   A    No.

22   Q    Was not?

23   A    No.

24   Q    Was Pierre Galan mentioned during this briefing at all?

25   A    I can't recall.

1    Q    You don't recall.  Is it possible Pierre Galan was

2    mentioned at the meeting?

3    A    I can't recall.

4    Q    Now, the traffic stop, as noted in your report, occurs at

5    10:01, correct?

6    A    Correct.

7    Q    And in filling out your report, who typed the report?

8    A    I did.

9    Q    And where did you get all of this information from?  Is

10   it all from your personal observation or through discussion

11   with other officers?

12   A    From my personal observance as well as information from

13   other officers.

14   Q    This report was prepared on January 4th, 2012, correct?

15   A    Yes.

16   Q    That's a day after this, the arrest of my client,

17   correct?

18   A    Yes.

19   Q    Okay.  Fair to say that the events were fresh back on

20   January 4th, 2012, in your head?

21   A    Yes.

22   Q    Okay.  Fresher than they are now, some over a year later,

23   correct?

24   A    Yes.

25   Q    Now, the stop occurred at 10:01 of Mr. Wilson.  What

```
 1   time -- what does that mean at approximately 10:01 p.m., a

 2   motor vehicle stop occurred?  What does that mean, 10:01?

 3   A    That's when the stop was conducted.

 4   Q    Okay.  Does that mean the physical car was stopped at

 5   10:01?

 6   A    Yes.

 7   Q    Where do you get the time 10:01?

 8   A    We would have gotten that from the time the officer

 9   called it in.

10   Q    Okay.  Now, where were you at 10:01?

11   A    At 10:01, I was a block-and-a-half away.

12   Q    A block-and-a-half away?

13   A    (Nodding head.)

14   Q    And you testified that Wilson's car was stopped how far

15   away from 139 Day Street?

16   A    Two houses, a house or two, prior to 139 Day Street.

17   Q    Can you approximate how many feet that is?

18   A    Forty feet.

19   Q    Okay.  And you were behind that, you were saying, a

20   block-and-a-half from that point?

21   A    Yeah, we were a block-and-a-half from that --

22   Q    Block-and-a-half away, okay.  And how long -- what did

23   you do after you arrived at that block-and-a-half position?

24   A    When the vehicle was stopped --

25   Q    Yeah.
```

1    A    -- we ended up parking our vehicles and we walked to that

2    location.

3    Q    Okay.  Now, how long until you made entry into 139 Day

4    Street, from the time you parked your car a block-and-a-half

5    away from the stop until you got to the door of 139 Day

6    Street?

7    A    Five to ten minutes.

8    Q    Five to ten minutes?  Now, why do you remember five to

9    ten minutes?

10   A    Because it was pretty -- you know, we parked our cars and

11   we walked straight over there.

12   Q    Okay.  And that's when, you testified, that you received

13   information that one of the Galans was peeking out of the

14   third floor apartment?

15   A    I can't recall if it was the second -- the second or the

16   third, third floor, but I believe it was the third.

17   Q    Third floor?

18   A    Yes.

19   Q    Okay.  Now, again, I don't mean to be repetitive, but you

20   didn't observe this particular person yourself, correct?

21   A    No, I did not.

22   Q    Okay.  Now, as you -- and you're not alone once you enter

23   139 Day Street, correct?

24   A    Could you repeat that?

25   Q    Before you enter 139 Day Street --

1   A    Yes.

2   Q    --  is there an organization of officers before you enter

3   139 Day Street?

4   A    Yes.

5   Q    There is?

6   A    Yes.

7   Q    Who is in the lead in this entry into the initial

8   building of 139 Day Street?

9   A    Task Force Officer Jones.

10  Q    Jones?

11  A    Yes.

12  Q    He's the leader?

13  A    Yes.

14  Q    Okay.  Is he the first one to enter into 139 Day Street?

15  A    Yeah, he's the first one.

16  Q    Okay.  Now, how many persons behind Jones are you?

17  A    Either five or six.  I was towards the back of the pack.

18  Q    Okay.  I think you testified that there were close to

19  seven officers that were about to enter, if not entered, 139

20  Day Street, the initial front door?

21  A    Yes, somewhere along that.

22  Q    Okay.  Would you agree that the stairwells in this

23  apartment building are narrow?

24  A    Yes.

25  Q    They're narrow.  Okay.  Now, how did the officers proceed

```
 1   up the stairs to Wilson's apartment?

 2   A     In line formation.

 3   Q     What does that mean?

 4   A     One behind the other.

 5   Q     Right side or left side as you were walking up the

 6   stairs?

 7   A     Left side.

 8   Q     So the right side was open so someone could walk down the

 9   right side?

10   A     That's correct.

11   Q     Okay.  And what's the speed at which you were walking up

12   the steps?  Are you walking quickly to get to Wilson's

13   apartment?

14   A     We're walking at a normal pace.

15   Q     Normal pace?  There's no hurried pace here because this

16   is a search?

17   A     No, we have to make sure that the whole landing,

18   everything, is clear before we reach that third floor landing.

19   Q     Clear of what?

20   A     Clear of any danger.

21   Q     Okay.  Persons?

22   A     Persons.

23   Q     Okay.  And you testified at some point that Jones gets to

24   the -- gets to some vantage point where he sees a door,

25   Wilson's apartment door, correct?
```

1    A    Yes.

2    Q    Where were you -- do you remember the time, do you

3    remember the time that he made that observation?

4    A    As we were going up the staircase.

5    Q    Okay.  The stop occurred at 10:01 of Wilson's car.  You

6    said it took approximately five to ten minutes in order for

7    you to get to 139 Day Street.  How long was the group of

8    officers outside of 139 Day Street before they entered?

9    A    I never said it took five to ten minutes to get to 139

10   Day Street.

11   Q    To walk from where you parked your car over to 139.

12   A    Yeah.

13   Q    Okay.  I'm sorry.

14   A    It took a few minutes to get from the location from where

15   we parked our car to get to the location a half a block away

16   from the 139 Day Street.

17   Q    Okay.  And how long did the officers meet outside 139 Day

18   Street immediately prior to entering into 139 Day Street?

19   A    Within that time frame, five to ten minutes, that we

20   proceeded to go up.

21   Q    So how long would you estimate it took Officer Jones

22   after he entered to get to the point where he supposedly

23   observed the door to Wilson's apartment opened?

24   A    From the main entry door --

25   Q    Yes.

1    A    -- to the staircase, from the main entrance going up the

2    staircase probably took a minute-and-a-half.

3    Q    A minute-and-a-half, okay.  And when he made that

4    observation, where were you?

5    A    I was towards the back of the line.

6    Q    Okay.  Where, do you remember which landing?

7    A    Somewhere getting up to the second floor landing.

8    Q    Somewhere second floor landing, were you on the second

9    floor landing?

10    A    I can't recall exactly where.  I was going up the

11    staircase.

12    Q    And you testified that one of the Galans was walking down

13    the stairwell.

14    A    Yes.

15    Q    Okay.  And did he pass, as you were walking up, did he

16    pass to your right or did he pass to your left?

17    A    I couldn't see which, where he, if he actually passed me

18    or if he passed somebody on the -- all I heard was that, you

19    know, to watch that guy and -- but I was towards the back of

20    the end, so I actually didn't see him go into the unit.

21    Q    Okay.  Did anyone ask to stop him as he walked by?

22    A    TFO Jones yelled down to other officers behind him to

23    watch that guy.

24    Q    To watch him?

25    A    To watch him, because he didn't know until he got to the

```
 1   landing where he saw the door open and the. . .

 2   Q    So did this Galan walk past officers?

 3   A    Yes.

 4   Q    Okay.  Do you know how many officers he passed by on his

 5   descension?

 6   A    I'm not sure.

 7   Q    Did he pass by more than one officer?

 8   A    Yes.

 9   Q    Pass by more than two?

10   A    I believe so.

11   Q    He pass by more than three?

12   A    I can't say.

13   Q    Okay.  And was there any indication that he had anything

14   in his hands while he was descending past these at least three

15   officers?

16   A    I didn't observe him with anything in his hand, but other

17   officers did.

18   Q    Okay.  So you didn't see anything in this person's hand?

19   A    No.

20   Q    And this person, you testified, went to apartment No. 4?

21   A    Yes.

22   Q    Okay.  How long after this person entered into apartment

23   No. 4 did Officer Jones make this observation?

24   A    He made the observations when he got to the top landing,

25   as he was going up to the third floor.
```

1  Q    And at that point, was the person already in apartment

2  No. 4?

3  A    He was walking down the stairs.

4  Q    Okay.  So he walked down the stairs and entered into

5  apartment No. 4, correct?

6  A    He entered into apartment No. 4.

7  Q    Okay.  And as you walked up, or as any of the officers

8  walked up, 139 Day Street to the third -- to Wilson's

9  apartment, did anyone notice anything on the floor at any

10 point?

11 A    I noticed something on the floor.

12 Q    Okay.  Now, were you conducting a search of the floor for

13 items or were you looking for persons as you were walking up?

14 A    I looked at the door and what was in front of the door.

15 Q    Okay.  And this cardboard box that was found on the

16 landing, correct?

17 A    Yes.

18 Q    Okay.  It was between two doors, wasn't it?

19 A    No.

20 Q    No, okay.  Next to the apartment No. 4 door, there's a

21 door to the right, isn't there?

22 A    All I saw is apartment No. 4 and the box was to the left

23 on the floor, and there's no door next to that.

24 Q    There's no door next to --

25 A    To the left side, there's no door.

1   Q    If you're looking at apartment No. 4, straight ahead,

2   look to the right, is there a door there?

3   A    I'm not sure.

4   Q    You're not sure, okay.  And that's when you testified

5   that you knocked on the door?

6   A    Gilbert Galan opened the door, looked into the hallway,

7   and went to close the door.  We knocked on the door.

8   Q    How do you know it was Gilbert?

9   A    Because I recognized him.  It was Gilbert.

10   Q    I'm sorry?

11   A    The shorter of the two.

12   Q    Okay.  So what gave it away?

13   A    PLO is taller.

14   Q    Were you able to see through the door to the height of

15   the person?

16   A    I was able to see his face when we took him out.  It was

17   Gilbert Galan.

18   Q    Did you know, prior to that day, the identity of Gilbert

19   Galan and Pierre Galan?

20   A    I observed pictures of them.

21   Q    All right.  So once the door opens and then closes, you

22   knock on the door?

23   A    Yes.

24   Q    Okay.  Are we talking seconds here?

25   A    Yes.

1   Q    So it's happening quickly because you want to get inside

2   this apartment, correct?

3   A    Yes.

4   Q    And then you go inside, the door's open and you go

5   inside, and conduct so-called protective sweep, correct?

6   A    When the door's open, we instruct Gilbert to exit the

7   apartment.

8   Q    And you go inside?

9   A    And we go inside.

10  Q    Okay.  Prior to that day, did you know how many people

11  occupied that apartment?

12  A    No.

13  Q    Did you know that Wilson's apartment was also occupied by

14  another person?

15  A    No.

16  Q    Wilson's apartment was occupied by another individual,

17  correct?

18  A    I was unaware of that.

19  Q    Okay.  Do you know now that there was another occupant in

20  Wilson's apartment?

21  A    No.

22  Q    You don't know that today?

23  A    No.

24  Q    And once inside the apartment, you testified, you were

25  part of that initial team into apartment No. 4, correct?

```
 1   A    Yes.

 2   Q    Okay.  And the purpose was to conduct a protective sweep,

 3   and a protective sweep, you testified, was, the goal is, to

 4   protect the officers on the scene, is that fair to say?

 5   A    Yes.

 6   Q    Okay.  So is it fair to say you're looking for persons

 7   during this protective sweep who could potentially cause harm

 8   to an officer?

 9   A    Yes.

10   Q    Okay.  And you testified that once inside the bathroom,

11   that you didn't have to move anything in order to look to the

12   bathtub, correct?

13   A    No.

14   Q    No.  You were able to walk into the bathroom and see

15   inside the bathtub without moving a curtain, sheet, door,

16   anything, correct?

17   A    Didn't have to move nothing.

18   Q    Okay.  Now, in your experience as a police officer, have

19   you ever found a person to be hiding in a toilet?

20   A    No.

21   Q    Okay.  Did you fear that a person was hiding in a toilet

22   when you entered the bathroom?

23   A    No.

24             THE COURT:  You mean literally in a toilet, sir?

25             MR. ADAMUCCI:  I'm sorry?
```

```
 1              THE COURT:  I don't understand the question.  You
 2   mean literally in a toilet?
 3              MR. ADAMUCCI:  Yes.
 4   Q    How long did the protective sweep last?
 5   A    Couple minutes.
 6   Q    Okay.  So what time are we talking, initial stop is at
 7   10:01, what time is the protective sweep concluded?
 8   A    Fifteen minutes.
 9   Q    So now we're talking approximately 10:20?
10   A    10:15.
11   Q    10:15.  Now, when you noticed the cardboard box outside
12   apartment No. 4, you said you had found a small cardboard box,
13   correct?
14   A    Yes.
15   Q    Okay.  And there was a cap to something at that point,
16   correct?
17   A    Yes.
18   Q    Did you make the determination at that point, upon
19   looking, that that was a cap to a grinder?
20   A    At that time, no.
21   Q    You did not know that it was a cap to a grinder at your
22   initial view of this box, correct?
23   A    No.
24   Q    Okay.  And you testified that you found a white compound
25   on this cap, correct?
```

1    A    Yes.

2    Q    Okay.  Had you done a test at that point to determine

3    what that compound was?

4    A    No.

5    Q    Okay.  There are such tests that officers used, I'm sure

6    you've used in your vast experience, to test basically on the

7    scene the substance and character of a compound, especially if

8    it's a white compound, correct?

9    A    Yes.

10   Q    And that was not utilized prior to entering into

11   apartment No. 4?

12   A    No.

13   Q    Okay.  Once you entered in to conduct the protective

14   sweep, Gilbert Galan is already outside being detained,

15   correct?

16   A    Correct.

17   Q    You shortly thereafter obtained Pierre Galan, my client?

18   A    Yes.

19   Q    You eventually find Ms. Sellers, correct?

20   A    Yes.

21   Q    Do you find Ms. Sellers prior to entering the bathroom or

22   after entering the bathroom?

23   A    We found Ms. Sellers as we went to the rear bedroom, we

24   found her coming out of the bedroom.

25   Q    Okay.  So that was before you entered the bathroom?

```
1    A     We had conducted a search for any persons inside the
2    bathroom, yes.
3    Q     So when you walk in, you find Ms. Sellers first or when
4    you go into the apartment --
5    A     As we're going towards the back, we're conducting the
6    sweep, we clear the bathroom, and the bedroom door is right
7    next to it, and then we locate Ms. Sellers.
8    Q     Okay.  And that's when you ask her to --
9    A     Step out.
10   Q     Okay.  At no point did you see anyone flush the toilet,
11   correct?
12   A     No.
13   Q     You testified that you heard water running, correct?
14   A     Yes.
15   Q     You never heard anyone flush a toilet while you were
16   inside the apartment, correct?
17   A     No.
18   Q     You never heard anyone flush it while you were outside
19   the apartment, correct?
20   A     No.
21   Q     And eventually, you ask Ms. Sellers to please exit the
22   area where you were conducting the search, correct, the
23   bathroom, kitchen, hallway area?
24   A     Yes.
25   Q     And that's when she's not compliant, is that your
```

1    testimony?

2    A    No, she -- she complied, she came out.

3    Q    Okay.  But eventually, she had to be subdued, correct?

4    A    Yes.

5    Q    I won't go through that testimony again.

6              MR. ADAMUCCI:  May I have one moment, your Honor?

7    Q    Sir, you're aware that as a result of these wiretap

8    investigations, that over 100 persons were arrested, you're

9    aware of that, right?

10   A    Yes.

11   Q    Do you know how many search warrants were obtained for

12   these 105 persons?

13   A    I can't give you an exact number.

14   Q    Were any obtained?

15   A    I believe so, yes.

16   Q    Do you know for who?

17   A    No, I don't.

18   Q    One was not obtained for Mr. Wilson, the lead defendant,

19   correct?

20   A    No.

21   Q    Do you know the reason for that?

22   A    No.

23   Q    Who would know the reason for that?

24   A    The case -- case agent.

25   Q    Hanson?

```
 1    A     Special Agent Ndrenika.

 2    Q     Was he present at the briefing on January 3rd?

 3    A     I can't recall.

 4              MR. ADAMUCCI:  Thank you.  Thank you, your Honor.

 5              THE COURT:  All right, gentlemen, I didn't realize

 6    how late the time is, maybe we should take a brief recess for

 7    lunch.

 8              MR. VATTI:  I probably have 15 or 20 minutes on

 9    redirect, your Honor, based on the questions that were asked.

10              THE COURT:  Do you think we'll finish then?

11              MR. VATTI:  Lawyer estimates being what they are,

12    your Honor.  In fairness to our court reporter also, it might

13    be a good idea to take a lunch break.

14              MR. ZIMMERMANN:  Agree.

15              THE COURT:  Now?  Okay, everybody's agreed?  Half an

16    hour enough time, gentlemen?

17              MR. VATTI:  That's fine, your Honor.

18              THE COURT:  Be back here at, oh dear, it's 20 after

19    1:00.  2:00 o'clock?

20              MR. VATTI:  Yes.

21              (Luncheon recess:  1:22 o'clock p.m. to 2:03 o'clock

22    p.m.)

23              THE COURT:  Good afternoon.

24              MR. SILVERMAN:  Good afternoon, your Honor.

25              THE COURT:  Please be seated.
```

1          MR. VATTI:  Your Honor, may I have permission to ask

2    Mr. Rivera to take the stand again?

3          THE COURT:  Please.

4          MR. VATTI:  I'm told that he went to the men's room,

5    your Honor.

6          THE COURT:  That's all right.  We allow it.

7          MR. VATTI:  Your Honor, during the break,

8    Mr. Zimmermann inquired whether the government had any

9    objections to having the DEA 6 report and the New Haven Police

10   report marked as Government Exhibit 16 and 17 as full

11   exhibits, we have no objection.

12         THE COURT:  Fine, thank you.

13         MR. ZIMMERMANN:  Your Honor, I had them marked

14   during the break, Defendant's Exhibits B and D, these are the

15   ones we attached to our motion.

16         MR. VATTI:  May I resume, your Honor?

17         THE COURT:  Please.

18   REDIRECT-EXAMINATION

19   BY MR. VATTI:

20   Q    Officer Rivera, you were asked some questions about the

21   responsibilities of Resident Agent-in-Charge Jason Hanson.  I

22   just want to focus on that a little bit, okay?  First of all,

23   the resident agent in charge, is he the top agent in the DEA

24   New Haven office?

25   A    Yes, and then there's an ASAC which is the boss that

```
 1   oversees the whole office.
 2   Q    Okay.  At the scene on January 3rd, 2012, was Resident
 3   Agent-in-Charge Hanson the highest ranking DEA agent that was
 4   there?
 5   A    Yes.
 6   Q    Now, in a wiretap investigation, there are also
 7   individuals that are known as lead case agents, is that right?
 8   A    Yes.
 9   Q    And can you tell -- yes?
10   A    Yes.
11   Q    Can you tell us what a lead case agent is?
12   A    They're the ones who oversee everything that goes on in
13   the case.
14   Q    And typically, who has the most knowledge, operationally,
15   of what's going on in an operation, the lead case agent or the
16   resident agent-in-charge of the office?
17   A    The lead case agent.
18   Q    Who was involved in the investigation on a day-to-day
19   basis?
20   A    Special Agent Anastas Ndrenika.
21   Q    All right.  Was Special Agent Ndrenika one of the lead
22   case agents in the Wilson wiretap investigation?
23   A    Yes.
24   Q    And was there anyone else besides Special Agent Ndrenika
25   who was a lead case agent?
```

1    A    Yes, TFO Dedric Jones.

2    Q    In terms of the details of the wiretap investigation from

3    its inception to the end, who would have the most knowledge of

4    the day-to-day happenings on the wiretap investigation?

5    A    The case agents.

6    Q    Now, Attorney Zimmermann read off a list of officers to

7    you, and I believe he was reading from Defendant's Exhibit B,

8    which is your DEA 6 report?

9    A    Yes.

10   Q    All right.  And on that DEA 6 report, on the first page

11   near the top, there is a listing of officers on the report,

12   correct?

13   A    Yes.

14   Q    And was that the list of officers that was present at the

15   briefing that you described or was that the list of officers

16   who were present during the enforcement activity on the night

17   of January 3rd, 2012?

18   A    During the enforcement activity.

19   Q    During a wiretap investigation, are there different

20   shifts that the monitors and surveillance teams are assigned?

21   A    Yes.

22   Q    And do those teams change on a periodic basis?

23   A    Yes.

24   Q    And is it common practice, at the change of a shift, to

25   have what you described as a briefing?

1    A    Yes.

2    Q    And what is the purpose of that briefing, at a shift

3    change?

4    A    Basically to go over what occurred on the previous shift,

5    any ongoing surveillance or any calls, you would go over that.

6    Q    Is it common at these briefings to also develop a game

7    plan for the next shift?

8    A    Yes.

9    Q    All right.  You were also asked some questions about your

10   report, and I'm going to hand you up, now it's been admitted a

11   full exhibit, I'm going to hand you up a copy of Defendant's

12   Exhibit B.

13               MR. VATTI:  May I approach, your Honor?

14               THE COURT:  Yes, sir.

15   Q    All right.  This particular report, the DEA 6, is a

16   12-page report, is that correct?

17   A    Yes.

18   Q    And also, it contains, just by counting the paragraphs

19   that are numbered, in excess of 30 paragraphs?

20   A    Yes.

21   Q    You also typed up a New Haven Police Department case

22   incident report, in addition to the DEA 6, is that right?

23   A    That's correct.

24   Q    That's been admitted as Defendant's Exhibit D, I believe?

25               MR. ZIMMERMANN:  Yes.

```
1    Q     And in this DEA 6 report, in numerous places, you went

2    back and forth describing the events of the evening and

3    referring at different places to Pierre Galan and Gilbert

4    Galan, correct?

5    A     Correct.

6    Q     You typed this report on January 4th?

7    A     I typed this report not entirely on January 4th.

8    Q     Okay.  All right.  In any event, you were going back and

9    forth, typing Pierre Galan or Gilbert Galan, depending upon

10   whatever factual circumstances you were referring to?

11   A     Yes.

12   Q     And you indicated that in paragraph 24, there's a typo

13   regarding the identity of the individual that was walking down

14   the stairs?

15   A     Yes.

16   Q     You were also asked some questions about whether any

17   individuals wore ski masks on the night in question, and

18   whether any of those individuals made entry into the

19   apartment.  Without getting into the identity of any

20   individuals that were wearing the ski masks, can you just tell

21   us what the purpose of an officer wearing a ski mask is?

22   A     Pretty much to hide their identity or they're used to

23   conduct controlled buys and they want to keep their identity

24   as secret as possible.

25   Q     Are these officers who wear the masks individuals that
```

```
 1    conduct undercover operations?

 2    A    That's correct.

 3    Q    Is it standard procedure for guns to be drawn during a

 4    protective sweep?

 5    A    Yes.

 6    Q    And at some point in this particular case, were the guns

 7    holstered?

 8    A    Yes.

 9    Q    And when did that occur?

10    A    Immediately after securing all parties.

11    Q    All right.  So approximately for how long were the guns

12    drawn?

13    A    As soon as we removed everybody from the apartment, maybe

14    three minutes.

15    Q    You said from the time they were removed from the

16    apartment.

17    A    As soon as we made contact with Ms. Sellers and brought

18    her out, the guns were holstered.  We're looking at, you know,

19    a couple minutes.

20    Q    All right.  You were asked some questions about which

21    apartment Pierre Galan had been observed by an officer looking

22    out the window, and I believe I wrote down exactly what you

23    said on the cross-examination.  I believe you said you can't

24    recall whether it was the second or third floor apartment, but

25    you thought it was the third floor apartment.
```

```
 1   A     Officer Helms is the one who observed that.

 2   Q     Officer who?

 3   A     Helms.

 4   Q     Helms, okay.  And you made note of that observation in

 5   your report in paragraph 24, correct?

 6   A     Yes.

 7   Q     All right.  And in paragraph 24, in the very first

 8   sentence, you stated, "Prior to arriving at the front entrance

 9   to the residence, HPD investigator Lance Helms observed Pierre

10   Galan a.k.a. PLO looking out the window of apartment No. 4."

11   Did I read that paragraph correctly?

12   A     That's correct.

13   Q     And the very next sentence states, "Investigator Helms

14   observed Galan quickly enter the residence."  Did I read that

15   correctly?

16   A     That's correct.

17   Q     All right.  You were also asked some questions about the

18   position of the small cardboard box outside the door of

19   apartment 4?

20   A     Yes.

21   Q     All right.  And facing that door, was that small

22   cardboard box to the left or to the right?

23   A     To the left.

24   Q     Okay.  And how much of a distance was there from the box

25   to the door of apartment 4?
```

1    A    There's a wall right there, right by the door, and it was

2    couple, few inches from the door.

3    Q    Now, you were asked a number of questions about the order

4    of events as you were going up the stairs and by your own

5    words, you described it as you being at the back of the pack,

6    or at the end of the line.

7    A    Yes.

8    Q    At the point where you saw -- I wasn't clear on what was

9    your personal observation and what was being relayed by other

10   officers, so as you're looking at this small cardboard box

11   outside of unit 4, tell us what observations had been, by

12   other officers, had been relayed to you at that point, when

13   you're looking at that small box?

14           MR. ZIMMERMANN:  I'll object.  Hearsay.

15           MR. VATTI:  It goes to his state of mind on

16   conducting the need for the protective sweep, your Honor.

17           THE COURT:  Okay.  I'll overrule the objection.

18   A    The subject was observed going inside apartment No. 4,

19   which was Pierre Galan.  I observed the box with the items,

20   the brush, the cap, and the wipes which I immediately

21   recognized as being utilized for heroin distribution, and

22   that's what I saw.

23   Q    You saw the subject go inside apartment 4 being Pierre

24   Galan.  You also testified on cross that TFO Jones said

25   something about the apartment door being open and a key in the

1   lock?

2   A    Yes.

3   Q    Was that relayed to you at the time -- did you already

4   know that at the time you were looking at this box?

5   A    No, I -- after the message was sent down that, watch the

6   subject, I observed it afterwards.  I didn't observe the box

7   immediately.  He had already had made entry into the apartment

8   when I observed the box.

9   Q    Okay.  I think you may have misunderstood my question,

10  though.  You testified on cross that at some point TFO Jones

11  indicated that the door to apartment No. 8 on the third

12  floor --

13  A    Yes.

14  Q    -- was open with the key in the lock.

15  A    Yes.

16  Q    Did you know that before you made entry into apartment

17  No. 4?

18  A    Yes.

19  Q    And what did that -- withdrawn.

20       All right.  You were asked some questions about whether

21  you were familiar with the Galans prior to January 3rd, 2012.

22  What did you know about the Galans prior to January 3rd, 2012,

23  that is pertinent to this investigation?

24  A    I knew of the Galan brother from working out in the

25  field, you know, as a police officer in New Haven, you know,

1    we knew of the Galan brothers from others, information

2    observed, obtained from other officers.  I had no direct

3    contact in the field with them.

4    Q    Did you know whether they had any involvement with Kevin

5    Wilson prior to January 3rd, 2012?

6         MR. ZIMMERMANN:  I'm sorry, I didn't hear that.

7    Q    Did you know whether they had any involvement with Kevin

8    Wilson prior to January 3rd, 2012?

9    A    Prior to going up on the case?  Was that --

10   Q    No, at any point, at any point prior to January 3rd,

11   2012, did you have any knowledge of whether the Galans were

12   associated in some way with Kevin Wilson?

13   A    The only knowledge that I had was pertaining to the case.

14   Q    Yes, that's what I'm asking.

15   A    That's the only knowledge I have of the Galan brothers.

16   Q    What was that knowledge?

17   A    Just that they were involved with distributing heroin

18   along with Kevin Wilson.

19   Q    Okay.  Two more topics I want to cover with you.  First

20   of all, you were asked some questions about whether you

21   conducted a field test on any of the items in that little

22   cardboard box prior to making an entry into apartment 4?

23   A    Yes.

24   Q    Tell us what a field test is.

25   A    Basically, there's field testers, searches, you take a

```
 1    small representative sample of the powder or rock substance,

 2    put it into the ampule, you crack the reacting agent inside

 3    the capsule and upon it indicating a certain color, it would

 4    test positive for the substance.

 5    Q    And roughly how much time does it take to conduct a field

 6    test?

 7    A    It takes seconds.

 8    Q    And did you have a field test kit in your pocket?

 9    A    No.

10    Q    What would you have had to do to go get a field test kit?

11    A    We would have had to either go back to one of the cars or

12    have an NHPD unit provide a tester at that time.

13    Q    So prior to conducting the protective sweep, why didn't

14    you take the time to do the field test?

15    A    It wasn't feasible.  Basically, we believed evidence was

16    being destroyed.

17    Q    Do you still have the packet of photographs with you?

18    A    No, sir.

19            MR. VATTI:  May I approach, your Honor?

20            THE COURT:  Yes, sir.

21    Q    Just turning your attention to Government Exhibit 2, you

22    had indicated that you had observed some residue?

23    A    Yes.

24    Q    All right.  Where did you observe the residue?

25    A    On the cap.
```

1    Q    Now, at that point, I believe you were asked whether you

2    knew that was a grinder cap or not when you looked at that.

3    Prior to making entry in the apartment and seeing the items in

4    this cardboard box, did you recognize that cap to be a grinder

5    cap or was that not immediately apparent to you?

6    A    It wasn't immediately apparent.

7    Q    Okay.  But that's where you saw the residue?

8    A    Yes.

9    Q    And what did you believe it to be residue of?

10   A    Heroin.

11   Q    And what was that conclusion based on?

12   A    Based on, we were looking, we were investigating, it was

13   a heroin case.

14           MR. VATTI:  Nothing further, your Honor.

15           MR. ZIMMERMANN:  Briefly, your Honor.

16   RECROSS-EXAMINATION

17   BY MR. ZIMMERMANN:

18   Q    When Officer -- I think it's Officer Helms made the

19   observation of someone looking out the window of the apartment

20   building, where was Officer Helms, if you know?

21   A    Outside the building.

22   Q    How far?  Was he out at the sidewalk?

23   A    I believe we were on the sidewalk, yes.

24           MR. ZIMMERMANN:  One second.

25   Q    Do you recognize that picture?

1   A    Yes.

2   Q    What that's a picture of?

3   A    Yes.

4        MR. ZIMMERMANN:  Maybe we ought to mark this for

5   identification.

6        THE COURT:  Please, yes.

7        MR. ZIMMERMANN:  Whatever you'd like.

8        THE CLERK:  A.

9        MR. ZIMMERMANN:  A?  Let's make it E, E for

10  identification.

11       THE CLERK:  E?

12  Q    Now, referring again your attention to E, is this about

13  where you believe the position of Officer Helms was when he

14  made the observation of someone standing in the window,

15  looking out the window?

16  A    Yes.

17  Q    And which window?  Do you know?

18  A    It would be to the right.

19  Q    Our right, like --

20  A    Yup.

21  Q    -- here?

22  A    Somewhere in that vicinity.

23  Q    Somewhere in here, okay.  And it was dark out, right?

24  A    Yes.

25  Q    You also said you thought it was the person was looking

```
 1    out the third floor?

 2    A    No.

 3    Q    Or the second floor?

 4    A    Second floor.

 5    Q    And that's where the part of the team that stayed behind

 6    with Mr. Wilson in custody or detained, they were out there as

 7    well, right?

 8    A    Wilson was further back.

 9    Q    Okay.

10    A    At the motor vehicle stop.

11    Q    Well, what do you mean?  Which way?

12    A    To the right.

13    Q    He was over here somewhere?

14    A    Yeah, further back.

15    Q    The car was not directly in front of the building?

16    A    No, it wasn't in front of the --

17    Q    It was over here?

18    A    Further to the right.

19    Q    Okay.  At what point in time did Helms make the

20    observation in this sequence of events that evening?

21    A    He observed him as we were in front of the building.

22    Q    Before you entered the building?

23    A    Before we entered.

24    Q    Did Wilson help you with the identification?

25    A    No.
```

```
1    Q    At that point, he was not talking to your people about

2    his operation?

3    A    No.

4    Q    You stated, I believe just a second ago, that someone in

5    the front of the procession going up the stairs to apartment 8

6    said, "Watch the subject?"

7    A    "Watch that guy."

8    Q    Watch that guy?

9    A    Something along those lines.

10   Q    And that guy you think now is Pierre Galan, right?

11   A    Correct.

12   Q    "Watch that guy," did he have the box in his hand or was

13   the box already on the floor?

14   A    I didn't see him with the box in his hand, no.

15   Q    But he went right by you?

16   A    I was coming up, I was on the back end.  I didn't see

17   him.

18   Q    When did you first observe the box?

19   A    As -- while he -- when I approached the door to knock on

20   the door, we observed the box.

21   Q    But not in anybody's hands?

22   A    I didn't see him.

23   Q    No?  Who made the decision to knock on the door and

24   enter?

25   A    I made the decision.
```

1    Q    You made the decision?

2    A    Yeah.

3    Q    Earlier, you said you knew or you thought, talking about

4    your direct testimony before this little session here, you

5    said the Galans were purchasing, you thought purchasing,

6    heroin?

7    A    Dealing heroin.

8    Q    And then recently you just said distributing?

9    A    Distributing, dealing.

10        MR. ZIMMERMANN:  I have no further questions.  Thank

11   you.

12   RECROSS-EXAMINATION

13   BY MR. ADAMUCCI:

14   Q    Good afternoon again, Officer.  Officer, you testified

15   that after you entered apartment No. 4, in order to do the

16   protective sweep, you heard the water running, correct?

17   A    I heard water running, yes.

18   Q    Okay.  You testified that as you were outside the

19   apartment, you didn't hear water running, correct?

20   A    That's correct.

21   Q    And you did not see anyone drop this cardboard box on the

22   second floor landing, correct?

23   A    No, I did not.

24   Q    So you never observed any of the Galan brothers in

25   possession of this box outside of this apartment, correct?

```
 1   A     No, I did not.

 2   Q     And as you were walking -- as the officers were walking

 3   up to Wilson's apartment, was Wilson present during the

 4   ascension to Wilson's apartment?

 5   A     No.

 6   Q     He was not?

 7   A     No.

 8   Q     Do you remember noting in your report that Wilson was

 9   present during the ascension to the third floor?

10   A     No, I don't remember that.

11   Q     I'm sorry?

12   A     I don't recall that.

13   Q     How did you get through the front entry door at 139 Day

14   Street?

15   A     I can't recall if it was open or if it was -- or if a key

16   was used to get into the common hallway.

17   Q     If you look on page 5, it notes that Jones and Miranda

18   escorted Wilson up to his apartment.  Is that accurate or --

19   A     That was after the entry was made to unit No. 4.

20   Q     After?

21   A     After.

22   Q     Okay.  And you testified that how many officers were

23   present during the stop of Wilson's car?

24   A     Probably -- I'm not sure.  At least two, maybe four.

25   Q     How many officers were present on the entire scene during
```

1   the stop and afterwards of Wilson's car?

2   A    Approximately 15.  15 officers.

3   Q    Fifteen officers.  Now, is it customary for 15 officers

4   to be present during a motor vehicle stop?

5   A    Anytime you call in a motor vehicle stop, you're going to

6   get more officers that respond to the scene.

7   Q    Is your testimony that it's customary to have 15 plus

8   officers at a motor vehicle stop?  Is that customary?

9   A    No, not 15.

10  Q    Okay.  So there were a lot of officers present during the

11  stop of Wilson's vehicle?

12  A    Correct.

13  Q    Car.  Okay.  And it's your testimony that it was not

14  feasible to conduct a test of the white compound you found

15  outside apartment No. 4 prior to entering?

16  A    Yes.

17  Q    Okay.  Did you check with any of the other 15 plus

18  officers to see if anyone was immediately available to provide

19  that couple-seconds test?

20  A    No.

21  Q    Do you know if anyone who inquired of any other officers

22  who could conduct that test?

23  A    No.  At that time, we believed evidence was being

24  destroyed.

25  Q    Even though you did not hear any water running outside

```
 1    the apartment while you were outside, correct?
 2    A    Correct.
 3              MR. ADAMUCCI:  Thank you, Officer.
 4              THE WITNESS:  Thank you.
 5              MR. VATTI:  Just some brief follow-up, your Honor.
 6    FURTHER REDIRECT-EXAMINATION
 7    BY MR. VATTI:
 8    Q    Attorney Zimmermann showed you a photograph of the
 9    building at 139 Day Street.  Do you know where Officer Helms
10    was positioned relative to that building?
11    A    No, I do not.
12    Q    During the course of this wiretap investigation, was a
13    surveillance van used?
14    A    Yes.
15    Q    All right.  Does that surveillance van have night vision
16    capability?
17    A    Yes, it did.
18    Q    Do you know whether on this particular evening, Officer
19    Helms was inside the surveillance van?
20    A    I'm not 100 percent.  I can't recall.
21    Q    Turning to Defendant's Exhibit B, there's a portion of
22    paragraph 24 that states, "TFO Dedric Jones observed Gilbert
23    Galan walking down the stairs from the third floor.  TFO Jones
24    observed Galan immediately walk into unit No. 4.  TFO Jones
25    observed that the door to Wilson's apartment was ajar with the
```

```
 1  key still in the cylinder."  Did I read that correctly?
 2  A    Yes.
 3  Q    Was that information shared with you before you conducted
 4  the protective sweep?
 5  A    Yes.
 6          MR. VATTI:  Nothing further, your Honor.
 7          MR. ZIMMERMANN:  Nothing further, your Honor.
 8          THE COURT:  Thank you.
 9          MR. ADAMUCCI:  No, your Honor, thank you.
10          THE COURT:  Thank you, sir.
11          THE WITNESS:  Thank you.
12          MR. SILVERMAN:  The government calls Resident
13  Agent-in-Charge Jay Hanson.
14                  J A S O N   H A N S O N
15      having been called as a witness, was first
16      duly sworn and testified on his oath as follows:
17          THE CLERK:  Please be seated.  State your name for
18  the record, spell your last name, and the city and state only
19  that you reside in.
20          THE WITNESS:  Jason Hanson, H-A-N-S-O-N; Cromwell,
21  Connecticut.
22  DIRECT EXAMINATION
23  BY MR. SILVERMAN:
24  Q    Sir, what is your title?
25  A    Resident agent-in-charge.
```

```
1   Q     Of what?

2   A     Of the DEA New Haven district office.

3   Q     How long have you been -- is it fair to say RAC for

4   short?

5   A     Yes.

6   Q     How long have you been the RAC of the DEA New Haven

7   office?

8   A     Since January of 2011.

9   Q     What did you do -- I'm sorry, strike that.

10        What are the responsibilities of the resident agent-in-

11  charge?

12  A     I essentially oversee the entire office, both from an

13  administrative and enforcement standpoint.  I would be the

14  second in line supervisor of the enforcement activities.

15  Q     You said you would be the second line supervisor.  Is

16  there a first line supervisor?

17  A     Yes, there is, referred to as a group supervisor or GS.

18  Q     How many GSs are there in the New Haven office?

19  A     Currently there's two.

20  Q     Do the GSs report to the RAC?

21  A     One of the two does and the other does not.

22  Q     What did you do before you became the RAC of the New

23  Haven office?

24  A     Prior to reporting in New Haven, I spent approximately a

25  year-and-a-half in New York City as a DEA special agent.
```

```
1    Q    Okay.  And what did you do before your time in New York?

2    A    I was still employed with DEA as a special agent, I was

3    assigned to the San Diego field division for approximately

4    seven years.

5    Q    So when did you first join the DEA?

6    A    October of 2002.

7    Q    When you joined, did you undertake any particular

8    training?

9    A    Yes, I did.

10   Q    What did that consist of?

11   A    It consisted of approximately 16 weeks at the DEA basic

12   training academy located in Quantico, Virginia.

13   Q    What was covered during the basic training?

14   A    All standard programs, to include drug recognition, Title

15   21 enforcement, firearms, things of that nature.

16   Q    Before you -- so is it fair to say then that you were a

17   member of the DEA from 2002 until today, to the present?

18   A    That's correct.

19   Q    Before you joined the DEA, what did you do?

20   A    I was a police officer for the town of Berlin,

21   Connecticut.

22   Q    How long did you serve in that capacity?

23   A    Approximately five-and-a-half years.

24   Q    Would it be fair to say you have been a law enforcement

25   officer for more than 15 years?
```

```
1    A    Yes.

2    Q    How long have you been a law enforcement officer?

3    A    Approximately 18 years.

4    Q    During the course of your approximately 18 years as a law

5    enforcement officer, have you effected -- executed arrests?

6    A    Yes.

7    Q    Approximately how many?

8    A    Conservatively over 300.

9    Q    And during the course of the approximately 18 years that

10   you've been a law enforcement officer, have you solicited a

11   consent to search?

12   A    Yes, I have.

13   Q    Approximately how many times?

14   A    Again, conservatively, over 100 times.

15   Q    Were you involved, in your capacity as the RAC, as a

16   second line supervisor, with an investigation involving Kevin

17   Wilson's telephone?

18   A    Yes, I was.

19   Q    Was that a wiretap investigation?

20   A    It was.

21   Q    Would you consider that to be a long-term wiretap

22   investigation?

23   A    Yes.

24   Q    Were you involved in day-to-day decisions regarding that

25   investigation?
```

1    A    Yes, I was, to a degree of the -- mostly on an

2    administrative level.

3    Q    Were there other agents and task force officers in your

4    DEA field office who were more intimately involved with the

5    investigation than you were?

6    A    Yes, there are.

7    Q    Would you refer to those folks as case agents?

8    A    Yes, both case agents, primarily other agents and task

9    force officers and local police officers assigned to the

10   investigation, as well as the group supervisor, all would have

11   been more intimately involved with the day-to-day activities

12   of the investigation.

13   Q    Who were some of the folks most intimately involved with

14   the investigation?

15   A    The GS at the time was Cynthia Scott, she was the group

16   supervisor.  The primary case agent from the DEA was Special

17   Agent Anastas Ndrenika, his co-case agents were TFO Jones and

18   also assisting were TFOs Miranda and Rivera.

19   Q    Would you consider all of those people to be more

20   intimately familiar with the investigation than you were on

21   January 3rd, 2012?

22   A    Yes, sir.

23   Q    Despite that, on January 3rd, 2012, were you involved

24   with events, such as the car stop of Kevin Wilson's vehicle?

25   A    I was not involved, but I was on the street,

```
1   participating from a distance.

2   Q    So you did not effect the car stop?

3   A    That's correct.

4   Q    But you were in the vicinity?

5   A    Correct.

6   Q    And did you remain in that area for the events that

7   followed?

8   A    Yes, I did.

9   Q    This is January 3rd, 2012, right?

10  A    Yes, sir.

11  Q    Did you enter 139 Day Street, is that the residence that

12  was entered that day by the team of law enforcement officers?

13  A    Yes.

14  Q    You were a member of that team that entered the

15  residence?

16  A    Correct.

17  Q    Is that an apartment building?

18  A    Yes, it is.

19  Q    Were you -- why don't you -- withdrawn.

20       What happened after you entered the building?

21  A    We were initially entering into apartment No. 8 located

22  on the third floor.  Several officers and DEA agents and

23  police officers were in front of me.  I followed up a

24  contingent of men up the stairs who were escorting Kevin

25  Wilson at the time.  We were en route to apartment No. 8.
```

1   Subsequently, the line of gentlemen in front of me came to a

2   standstill, causing some congestion in the hallway area.

3   Ultimately, it was made known to me that another gentleman had

4   come down the stairs and entered apartment No. 4, which is

5   located on the second floor of the same apartment building.

6   Q    Was your attention then diverted from heading to unit No.

7   8 to unit No. 4?

8   A    Mine was, yes.

9   Q    So what did you do?

10  A    Ultimately, as the officers in front of me proceeded up

11  the stairway, some eventually arriving at apartment No. 8 and

12  some diverting to apartment No. 4, I ultimately entered

13  apartment No. 4 behind several other officers.

14  Q    What was happening as you entered the apartment?

15  A    As I entered the apartment, Officers Rivera and Miranda

16  were in the process of addressing Miss Sellers in a kitchen,

17  kitchen area of the same apartment.  Prior to my entering the

18  apartment, Mr. Galan -- both Gilbert and Pierre Galan had

19  exited the apartment and were in the hallway area.

20  Q    Were they secured in the hallway area?

21  A    Yes, they were.

22  Q    So were there some law enforcement officers with them in

23  the hallway area?

24  A    Yes, they were.

25  Q    When you say the hallway area, do you mean outside the

1    threshold of the apartment?

2    A    Immediately outside the door, correct.

3    Q    When you say that Officers Rivera and Miranda were

4    addressing Ms. Sellers, did you recognize Ms. Sellers?  Did

5    you know her at the time?

6    A    No, sir.

7    Q    Did you later learn that that was her name?

8    A    Yes, I did.

9    Q    Okay.  And when you say that they were addressing her,

10   what do you mean?

11   A    At the time I entered, Ms. Sellers was being very verbal.

12   She was obviously unhappy, and she was essentially yelling at

13   Officers Rivera and Miranda in particular, however, there were

14   several other officers between myself and where they were

15   actually located but I could hear her verbally yelling at

16   them.

17   Q    Was she cursing at them?

18   A    Yes.

19   Q    Was she using other strong language?

20   A    Yes.

21   Q    At any point, were you able to observe the interaction

22   between Officers Miranda and Rivera and Ms. Sellers?

23   A    Yes.

24   Q    What did you observe?

25   A    I observed them, I believe it would have been a kitchen

```
1   area, I observed them essentially warning her to please calm
2   down and stop using the language she was using and again, she
3   was very infuriated.  They gave her several warnings to change
4   her demeanor.  She was not being compliant with their
5   requests.  I believe at one time she was trying to leave the
6   area that they were asking her to go to or remain at, and they
7   ultimately warned her several times that she was going to be
8   placed under arrest.  Ultimately they attempted to handcuff
9   her.  She pulled away, somewhat resisting, and they ultimately
10  grabbed hold of her arms in order to put handcuffs on her.
11  Q    I'm also going to venture into the realm of technology as
12  my colleague did earlier, and I'm putting up what's been
13  admitted as a full exhibit as Government Exhibit 3.  Do you
14  recognize that image?
15  A    Yes.
16  Q    What is that?
17  A    The kitchen area of the apartment.
18  Q    Is that the area that you were referring to earlier in
19  which you observed Officers Miranda and Rivera, on one hand,
20  and Ms. Sellers on the other hand?
21  A    I believe so, but I would not have been looking from this
22  angle, I don't believe.
23  Q    Where were you looking from?
24  A    That door to the left of the screen, would that be
25  leading back out towards the living room area or did that go
```

1   towards the bedroom?

2   Q    I'm not in a position to testify today.

3   A    I'm sorry, I'm trying to get my bearings on where the

4   photograph's taken from.  I can't tell you but I can tell you

5   that I would have been, from the living room area, entering

6   the kitchen, I would have been positioned in that location.

7   Q    So when you were observing the interaction between

8   Officers Rivera and Miranda and Ms. Sellers, you were in the

9   living room area or approaching from the living room area?

10  A    Correct.

11  Q    Okay.  And you testified a moment ago about some

12  resistance, some pulling away.  Where were these two officers

13  and Ms. Sellers located when that was happening?  Can you see

14  that in the picture?

15  A    Not that I can recall.  There were several officers

16  obstructing my view between Officers Rivera and Miranda and

17  where I was standing.

18  Q    Was Ms. Sellers ultimately subdued?

19  A    Yes, sir, she was.

20  Q    What happened when she was subdued?

21  A    She was brought into the living room area where she was

22  seated on the couch.

23  Q    Was she handcuffed at the time?

24  A    Yes, she was.

25  Q    How would you describe her demeanor at that point in

1   time?

2   A     Initially, I would say she was still very aggravated,

3   agitated.

4   Q     Did she tell you or any other officer that you were able

5   to overhear that she had been hurt?

6   A     No, sir.

7   Q     Did you ultimately come to have some interaction with Ms.

8   Sellers the evening of January 3rd, 2012?

9   A     I did.

10  Q     How did that come about?

11  A     At some point over the, you know, over the next half hour

12  or so, I was in and out of apartment 4 at this point because

13  we also had a scene in apartment 8 so I was in and out.  I was

14  briefly interacting with Ms. Sellers during moments of that.

15  I ultimately ended up sitting at a table which would be

16  considered to be the living room area.  I ultimately ended up

17  sitting at a table alongside Ms. Sellers.

18  Q     I would like to step back for a minute and see if we can

19  tease out a time frame in which these events unfolded.  Do you

20  know approximately what time the car stop you mentioned

21  earlier, what time that occurred?

22  A     The car stop was executed approximately 10:00 p.m.

23  Q     Okay.  What -- approximately what time was it when you

24  entered apartment 4 and saw the interaction between Officers

25  Rivera and Miranda and Ms. Sellers?

```
1    A    It was within minutes.  I would estimate no more than ten

2    minutes.

3    Q    So it would have been roughly 10:10 or so?

4    A    Correct.

5    Q    Did you ultimately present Ms. Sellers with a consent to

6    search form?

7    A    Yes, I did.

8    Q    I'm going to put up Government Exhibit 13.  Do you

9    recognize Government Exhibit 13?

10   A    Yes, sir.

11   Q    What is Government Exhibit 13?

12   A    It's a consent to search form from the New Haven Police

13   Department.

14   Q    At the top left corner, where I'm pointing right now,

15   what does it say?

16   A    Says 10:45 p.m. equals sign.

17   Q    What does that note -- I'm sorry, is that your

18   handwriting?

19   A    Yes, sir.

20   Q    You recognize that as your handwriting?

21   A    I do.

22   Q    What does that note mean?

23   A    I make it a practice that anytime I have somebody sign a

24   consent form of any kind, I generally note the time.

25   Q    So would it be fair to say then that at approximately
```

1    10:45 p.m., Ms. Sellers signed this form?

2    A    Yes, sir.

3    Q    So that's about 35 minutes after you observed her

4    interacting with Officers Rivera and Miranda, is that right?

5    A    That's correct.

6    Q    How long did it take for Officers Rivera and Miranda to

7    secure her?

8    A    I would say the whole event wasn't more than a minute or

9    two.

10   Q    So shortly after 10:10 or so on the timeline that we're

11   working with right now, she would have been subdued?

12   A    Perhaps just before 10:10, but right in that time frame.

13   Q    Okay.  So there were about 35 minutes that elapsed, maybe

14   a little less, from the time that she was subdued until the

15   time that she signed the consent form?

16   A    That's correct.

17   Q    Based on your personal observation, what was she doing

18   during those 35 minutes or so?

19   A    She was not under my constant observation during that

20   time period.  I did note that she had calmed down, the whole

21   situation had deescalated, everybody was being at that point I

22   would call it cooperative.  Again, I was back and forth

23   between the apartments so she was not under my constant

24   observation.

25   Q    During the periods of time that you spent in unit No. 4

1    where Ms. Sellers was secured, did she come to interact with

2    any other law enforcement officers?

3    A    Yes, at one point, Officer Maio of the New Haven Police

4    Department interacted with Ms. Sellers.

5    Q    What was your understanding of their -- strike that.

6         Were you able to overhear any of their interaction?

7    A    Yes.

8    Q    What was your understanding, based on what you heard, of

9    their relationship?

10   A    It was evident to me that Officer Maio and Ms. Sellers

11   had certainly known each other from what was brought to my

12   attention was Officer Maio's prior service with the New Haven

13   Police Department over the years, having interactions with Ms.

14   Sellers.

15   Q    So it seemed to you, based on what you observed, and also

16   what you were told, that Officer Maio knew Ms. Sellers prior

17   to January 3rd, 2012?

18   A    Yes, sir.

19   Q    And did it seem that they had a rapport with one another?

20   A    Yes, it did.

21   Q    How long did they speak to one another?

22   A    I don't recall the exact time frame.  I would estimate it

23   to be the better part of 20 minutes.

24   Q    During that time frame, was Ms. Sellers handcuffed?

25   A    For a portion of it, she was.

1    Q     At some point, were the handcuffs removed?

2    A     Yes, at some point, Officer Maio removed the handcuffs

3    from Ms. Sellers.

4    Q     Why did Officer Maio remove the handcuffs?

5    A     He didn't say specifically why he did it.  My

6    understanding or opinion of why he did it was they clearly

7    knew each other and I believe Officer Maio just wanted to make

8    her feel comfortable and deescalate the situation, to the best

9    of his capabilities.

10   Q     Were you present when Officer Mayo removed the handcuffs?

11   A     Yes, I was.

12   Q     Did you overhear Officer Mayo say he was removing the

13   handcuffs in exchange for her signing the consent form?

14   A     No, sir.

15   Q     Did you overhear Officer Mayo telling her she would be

16   charged with an offense if she didn't sign the consent form?

17   A     No, sir.

18   Q     Did you overhear Officer Mayo make any other type of

19   threat to Ms. Sellers if she declined to provide consent?

20   A     No, sir.

21   Q     Did you make any type of threat to Ms. Sellers from the

22   time that you were with her?

23   A     No, sir.

24   Q     Did you overhear any other officer threaten her during

25   the time that you were present in the apartment with her?

1    A    No, I did not.

2    Q    What effect did her conversation with Officer Mayo have

3    on Ms. Sellers?

4            MR. ZIMMERMANN:  Object.  How would he know that?

5            MR. SILVERMAN:  I'm sorry, your Honor, withdraw the

6    question.  Rephrase it.

7    Q    Based on your observation of Ms. Sellers, what effect did

8    it appear that Officer Mayo's conversation with her had on Ms.

9    Sellers?

10   A    I would say it continued to put her mind at somewhat more

11   at ease.  She was already, to the best of my recollection,

12   calm before Officer Mayo started his interaction with her but

13   I believe that his conversation with her made her feel a

14   little bit more comfortable with the circumstances of the

15   evening.

16   Q    Is it fair to say that earlier in your testimony, you

17   testified that she seemed aggravated and unhappy with the

18   circumstances?

19   A    Extremely, yes.

20   Q    And by the time that she signed the consent form at

21   approximately 10:45 p.m., how would you describe her demeanor?

22   A    I would describe her very calm, very collected, and being

23   polite.

24   Q    Turning back to the consent form, Government Exhibit 13,

25   you testified earlier that the notation at the top, 10:45 p.m.

```
 1    equals sign, is in your handwriting.  Is the rest of the form

 2    in your handwriting?

 3    A    Other than autographs, it looks like one of the dates,

 4    the rest of it appears to be my handwriting.

 5    Q    I'm sorry, is that other than the signatures that appear

 6    on the bottom, it's your handwriting?

 7    A    And some of the dates.  For sure the bottom date is not

 8    my handwriting.

 9    Q    Okay.  That's this date, the lowest bottom right-hand

10    corner date?

11    A    Correct.

12    Q    Is the date above that one in your handwriting?

13    A    Yes, both the date above is my handwriting.

14    Q    Does your signature appear on Government Exhibit 13?

15    A    Yes, it does.

16    Q    Which one is your signature?

17    A    Alongside of witnessed by, it would be the middle line of

18    the three signatures.

19    Q    And whose signature appears immediately above yours?

20    A    Ms. Sellers.

21    Q    Do you know whose signature it is that appears

22    immediately below yours?

23    A    I believe that's Officer Maio's.

24    Q    Okay.  What date is noted on this form four different

25    times?
```

```
1   A     January 3rd, 2012.

2   Q     And in this first line, the first blank that is to be

3   filled in, you've written three names, is that right?

4   A     Yes, sir.

5   Q     What names are written there?

6   A     Merline Sellers, Pierre Galan, Gilbert Galan.

7   Q     Did all three of those individuals sign this consent

8   form?

9   A     No, sir.

10  Q     Did you ask all three of those individuals to sign this

11  consent form?

12  A     No, I did not.

13  Q     Who did you ask to sign the form?

14  A     I asked Ms. Sellers to sign the form.

15  Q     Did you ever ask Gilbert Galan to sign the form?

16  A     No, I did not.

17  Q     Did you ever ask Pierre Galan to sign the form?

18  A     No.

19  Q     To your knowledge, did any other law enforcement officer

20  present on January 3rd, 2012, ever ask Pierre Galan to sign

21  the form?

22  A     Not to my knowledge, no.

23  Q     To your knowledge, did any other law enforcement officer

24  present on January 3rd, 2012, ever ask Gilbert Galan to sign

25  the form?
```

1    A    To my knowledge, no.

2    Q    What does the form provide consent to search?

3    A    The premises of 139 Day Street, apartment No. 4, New

4    Haven, Connecticut.

5    Q    Is that the apartment that you were in?

6    A    Yes, sir.

7    Q    Who did you understand to be the resident of that

8    apartment?

9    A    Ms. Sellers.

10   Q    Why?  What was the basis of your understanding that Ms.

11   Sellers was the resident?

12   A    A couple of reasons.  Initially, she was, when she was

13   being very verbal, she expressed to all officers in the house

14   that it was her residence and we didn't have a right to be in

15   it.  Furthermore, there was only one bedroom that I observed,

16   which appeared to be inhabited by a female.  And that is

17   basically what I drew my conclusions from.  She expressed to

18   us that it was her apartment.

19   Q    When you requested her consent to search, did she ever

20   tell you she was not a resident of the apartment?

21   A    No, sir.

22   Q    Did she ever tell you that there were other people who

23   were residents of the apartment?

24   A    No, she didn't.

25   Q    I'm showing you what's been admitted as Government

```
 1    Exhibit 8.  Do you recognize that image?

 2    A    Yes.

 3    Q    What is that?

 4    A    That's what I would have referred to as Ms. Sellers'

 5    bedroom.

 6    Q    Was this the only bedroom in the apartment?

 7    A    That I recall, yes.

 8    Q    Were there other belongings that didn't appear to be Ms.

 9    Sellers' in other places in the apartment?

10    A    Yes, there were.

11    Q    Where were they?

12    A    I recall the living room area where the couch was

13    located.

14    Q    How were the items being stored or maintained in that

15    living room area?

16    A    To the best of my recollection, I would describe it as

17    strewn about, piles of clothes here or there, no real pattern

18    to it.  Some clothes were behind the couch, some on the floor.

19    Q    Was there a dresser that the clothes were in?

20    A    Not that I recall.

21    Q    Was there a bed in the living room?

22    A    No, sir.

23    Q    Did it appear to you that other people were staying

24    there?

25    A    It appeared that that could be possible that somebody had
```

1    certainly stayed there, yes.

2    Q    Did it appear that that was some sort of formal living

3    area?

4    A    I wouldn't refer to it as a formal living area, but it

5    would certainly make sense that somebody could have spent some

6    nights there.

7    Q    Turning back to Government Exhibit 13, did you review

8    this form with Ms. Sellers before she signed it?

9    A    Yes, I did.

10   Q    Did she have an opportunity to read it?

11   A    She did.

12   Q    Did she ever tell you that she couldn't read English?

13   A    No, she did not.

14   Q    Did she ever express any confusion as what the form

15   stated?

16   A    No, sir.

17   Q    Did you review it with her?

18   A    We did.

19   Q    Did she ask you any questions as you reviewed it?

20   A    Not to my recollection, no.

21   Q    Was there any hesitation on her part when it came time

22   for her to sign the bottom of the form?

23   A    No, sir.

24   Q    I'm going to read the first line and just ask you if I've

25   read it correctly.  Can you see the text from where I'm

1    sitting?

2    A    Yes, I can.

3    Q    Omitting the names of the two people that you didn't

4    request sign the form, "I, Merline Sellers, have been informed

5    of my constitutional rights not to have a search made without

6    a search warrant and my right to refuse to consent to such a

7    search."  Did I read that right?

8    A    Yes, sir.

9    Q    And at the bottom of the form, I'll ask you again if I

10   read this accurately, "This written permission is being given

11   to me, the above named members of the above named agencies

12   voluntarily and without duress, threats, or promises of any

13   kind."  Did I read that right?

14   A    Yes, sir.

15   Q    There's a space on this form to insert the names of

16   officers of the New Haven Police Department, or other officers

17   of other agencies.  Are those blanks filled in?

18   A    No, sir.

19   Q    Why not?

20   A    I don't know why they're not filled in, honestly.  I

21   would generally have filled in that.  Maybe there were so many

22   officers on the premises.  I meant to go back and fill it in

23   and it never got completed.  I don't have a recollection of

24   intentionally leaving it blank.

25           MR. SILVERMAN:  May I have a moment?

```
 1              THE COURT:  Yes, sir.

 2              MR. SILVERMAN:  Just one moment, your Honor.

 3              Thank you, your Honor.

 4   Q    Agent Hanson, at the time that Ms. Sellers signed this

 5   form, where were Pierre Galan and Gilbert Galan located?

 6   A    I believe one, one of the gentlemen was seated on the

 7   couch and I believe the other was seated just outside

 8   the -- immediately outside the door to the apartment.  I

 9   couldn't state which gentleman was in which location.

10   Q    How far away were they from Ms. Sellers when she signed

11   the form?

12   A    Approximately 12 feet maybe.

13   Q    Would they have been able to see her?

14   A    Yes.

15   Q    Based on your observation of what was going on in the

16   apartment, were they aware that she was about to sign a

17   consent to search form?

18              MR. ADAMUCCI:  Objection as to this officer

19   testifying to what my client was aware of or could have been

20   aware of.

21              MR. SILVERMAN:  I'm not asking him to speculate as

22   to what was going on in their minds; only based on what he

23   could see, as a witness standing in the apartment, whether

24   they might have known what was happening.

25              THE COURT:  Could they have observed?
```

1           MR. SILVERMAN:  Whether they could have observed

2    what was happening.

3           THE COURT:  Okay, overrule the objection.

4    Q    Were they close enough that they could have seen that Ms.

5    Sellers was prepared to sign the consent to search form?

6    A    It would have been possible.

7    Q    Did you ever hear Pierre Galan object, affirmatively

8    object, to the consent to search?

9    A    No, sir.

10   Q    Did you ever hear Gilbert Galan affirmatively object to

11   the consent to search?

12   A    No, sir.

13   Q    Did any other law enforcement officer ever inform you

14   that either brother had objected to the consent to search?

15   A    No.

16          MR. SILVERMAN:  May I have one moment, your Honor?

17   Q    Officer Hanson, can you see this document I just placed

18   on the projector?

19   A    Yes, sir.

20   Q    Does it appear to be the same document or a similar

21   document?

22   A    Similar.

23   Q    Obviously this one's not marked as a government exhibit,

24   but you'll note next to home number, there appear ten digits,

25   is that right?

1   A    That's correct.

2   Q    What is that number?

3   A    It should be the home phone number provided by Ms.

4   Sellers.

5   Q    Did you ask Ms. Sellers to provide her home phone number

6   as you completed the form with her?

7   A    I can't say I recall asking her, but if that's the number

8   indicated on there, that would have been the number I asked

9   for.

10  Q    So just for the purpose of clarification, in the version

11  that you were looking at earlier which has been marked as

12  Government Exhibit 13, is that home phone number redacted out

13  in white?

14  A    Yes.

15  Q    It doesn't appear there, does it?

16  A    Correct.

17         THE COURT:  It's redacted out?

18         MR. SILVERMAN:  Redacted out, yes.

19         THE COURT:  It was there, sir?

20         THE WITNESS:  Yes.

21         MR. SILVERMAN:  Your Honor, when we file documents

22  electronically through the ECF system, we try to take out all

23  personal identifiers so it's not publicly available.

24         THE COURT:  Good practice.

25  Q    Agent Hanson, you talked a little bit about this earlier,

1    why are the names Gilbert Galan and Pierre Galan written on

2    this consent form?

3    A    I believe I wrote it on there to note that they were

4    present in the residence.

5    Q    Did you intend to ask either of them for consent to

6    search?

7    A    No, I didn't.

8    Q    Why not?

9    A    It was my opinion that Ms. Sellers was in control of that

10   apartment.

11   Q    Did any other law enforcement officers ever give you any

12   impression as to the position of the brothers?

13   A    No.

14          MR. SILVERMAN:  May I have a moment, your Honor?

15          THE COURT:  Yes, sir.

16          MR. SILVERMAN:  No further questions at this time.

17   Thank you, your Honor.

18          THE WITNESS:  You're welcome.

19   CROSS EXAMINATION

20   BY MR. ZIMMERMANN:

21   Q    Good afternoon, Mr. Hanson.

22   A    Good afternoon, sir.

23   Q    I'm Kurt Zimmermann, I represent Gilbert Galan.  You

24   testified that you were transferred from San Diego to

25   Connecticut?

1   A    No, sir, from San Diego to New York.

2   Q    To New York.  Have you had any mental health treatment?

3   A    No, but I was asked that several times.

4   Q    Turning to serious matters, you oversee, in general, the

5   New Haven district office of the DEA?

6   A    Yes, sir.

7   Q    And who makes the decision, is it you, whether or not

8   arrest warrants will be obtained prior to an arrest?

9   A    No, sir, that generally would be the responsibility of

10   the case agent.

11   Q    Is that the same scenario, the same process, with respect

12   to search warrants?

13   A    Yes, sir.

14   Q    And there were over 100 people arrested in this case, in

15   this investigation, correct?

16   A    That's correct.

17   Q    Split into three different prosecutions, we're in the

18   U.S. v Wilson case of the three, right?

19   A    Correct.

20   Q    Do you know who made the decision not to seek any search

21   warrants in these cases?

22   A    I didn't know there were --

23        MR. SILVERMAN:  Objection, your Honor, this witness

24   has never testified that there were no search warrants

25   obtained during the course of the investigation.

```
 1              MR. ZIMMERMANN:  Well, I'm trying to trick him, your
 2   Honor.
 3   Q    Do you know whether there were any search warrants
 4   obtained or not?
 5   A    I believe there were search warrants obtained.
 6   Q    But there was none obtained for either -- apartment 8 at
 7   139 Day Street, correct?
 8   A    That's correct.
 9   Q    And there was none obtained for apartment 4 at 139 Day
10   Street?
11   A    That's also correct.
12   Q    And you noted that Officer Rivera, Miranda, Jones, and
13   Ndrenika were the case agents?
14   A    That's correct, sir.
15   Q    And they were more intimately familiar with the case than
16   perhaps you as their administrator was?
17   A    Yes, sir.
18   Q    Did you have occasion to testify at the grand jury in
19   this?
20   A    No, sir, I did not.
21   Q    Do you review the reports of the case agents?
22   A    Generally speaking, the group supervisor would review the
23   reports.  There are times that I'll review some reports, if
24   the group supervisor perhaps was not available or not in that
25   day.  I have reviewed some reports but it would not be an
```

1    every report type of instance.

2    Q    But it's a critical part of that report process that the

3    agent or officer who authors the report gets it correct, gets

4    the facts correct?

5    A    That's correct.

6    Q    And is there any excuse provided in your procedures for

7    an officer such as Officer Rivera to get the defendants

8    confused in a report?

9    A    Well, I don't know if there's an excuse for it, but in

10   certain cases such as this one where you have two brothers

11   with the same last name, we generate volumes of paperwork, I

12   can see some inadvertencies, certainly wouldn't be the first

13   time a mistake had been made on a report, but I certainly

14   wouldn't call it an acceptable practice.

15   Q    When you entered apartment 4, were you following any

16   agents into apartment 4?

17   A    Yes, sir.

18   Q    And who were they?

19   A    I don't know who all of them were.  I know Officers

20   Rivera and Miranda were in front of me.  There were several

21   other officers.  I don't recall exactly which other officers

22   entered the apartment prior to me.

23   Q    Can you estimate how many in all went through the door

24   initially?

25   A    I would estimate between four and six.

1    Q    Okay.  How many of them had their guns drawn?

2    A    I don't recall.  They were all in front of me, so I would

3    be looking at the rear of them.

4    Q    How many of them had black ski masks over their faces?

5    A    I would think one at most.

6    Q    When you observed Officer Rivera, I believe, and Miranda

7    handcuff Ms. Sellers, she was handcuffed behind her back,

8    correct?

9    A    Yes, sir.

10   Q    And when she was subdued, I think was your word, was

11   there any -- did she fall against the freezer in the kitchen?

12   A    I believe she did fall against something.  I don't recall

13   if it was a freezer or a dishwasher or washing machine, but

14   some type of appliance.

15   Q    Right.  Because her handcuffs were behind her back, she

16   couldn't break that fall, right?

17   A    I believe that fall was while she was in the process of

18   being handcuffed, not after she was actually handcuffed, sir.

19   Q    Fair enough.  The consent to search form which is

20   Government Exhibit 13, which I think we're familiar enough to

21   talk about without it being projected, the three names at the

22   top were in order, Pierre Galan, Gilbert Galan, and Sellers,

23   right?  Something like that.  Sellers was at the bottom?

24   A    No particular order, but yes, sir, Sellers was on the

25   line indicated on the form.

```
1    Q    And you testified that there was a lot of stuff strewn
2    around the apartment, meaning clothing, correct?
3    A    Yes, sir.
4    Q    And it was apparent to you that someone else had or was
5    occupying that apartment?
6    A    Yes.
7    Q    But you didn't inquire of Ms. Sellers or either Galan as
8    to whether or not they resided there, correct?
9    A    That's correct.
10   Q    And in your training, isn't it very clear that when more
11   than one person resides in an apartment like this, that
12   consent is required of everyone who's present?
13   A    Based on what I was observing, sir, I did not form the
14   conclusion that anyone else was staying there with any sense
15   of permanency.
16   Q    Right, but that isn't the question.  The question was:
17   Did you learn from your education and training as an agent,
18   that it is required by the Supreme Court of the United States
19   that you obtained the consent of everyone residing in that
20   apartment?
21        MR. SILVERMAN:  Objection.  Counsel has misstated
22   the law of the Supreme Court as cited in the government's
23   brief, that is not the law of this land.
24        MR. ZIMMERMANN:  I'm referring to *Randolph, the*
25   *Randolph* decision.
```

1    MR. SILVERMAN:  *Randolph* does not require that all

2    occupants of an apartment be requested for consent.

3    MR. ZIMMERMANN:  It does, if they're present.

4    MR. SILVERMAN:  No, it doesn't.  It simply does not.

5    MR. ZIMMERMANN:  I'm asking the witness, not Mr.

6    Silverman.

7    THE COURT:  Right, yes.

8    MR. ZIMMERMANN:  What his understanding of the law

9    was.

10   THE WITNESS:  May I answer, your Honor?

11   THE COURT:  Please.

12   A    My familiarity with regard to search in general is there

13   are certain applications or instances where that may apply and

14   some may not, in the way that you phrased it.

15   Q    But you are somewhat aware that in certain circumstances,

16   it would be better for enforcement of the search to obtain the

17   consent of everyone present?

18   MR. SILVERMAN:  Objection.  I'm not sure what

19   circumstances Attorney Zimmermann is referring to.

20   Q    The circumstances of a mother and two sons present in an

21   apartment strewn with clothing that obviously is not female

22   clothing, that it would be better to have obtained consent

23   from all the occupants, correct?

24   A    Under the circumstances of that evening in that

25   particular location, I did not feel that that was correct.  If

```
 1   the circumstances were different I perhaps would have felt

 2   differently, sir.

 3   Q    But nevertheless you listed all three occupants on the

 4   consent form?

 5   A    Yes, sir, all three had been arrested within that

 6   property, sir.

 7   Q    But this isn't a report of arrest, is it?  The consent

 8   form?

 9   A    No, sir.

10   Q    Another -- this was not an undercover operation, was it?

11   A    I don't know that I'd consider it an undercover

12   operation, but it was a sensitive operation and certain

13   aspects of the investigation would be deemed undercover.

14   Q    You testified that Pierre and Gilbert were something like

15   12 feet away from Mrs. Sellers when she was discussing and

16   executing Exhibit 13, correct?

17   A    Approximately, yes.

18   Q    And was Ms. Sellers and yourself and Officer Maio sitting

19   at a table?

20   A    Yes, sir.

21   Q    And where were the Galans, on the couch?

22   A    One of the Galans was on the couch and the other was

23   seated on the floor just outside the door to the apartment.

24   Q    The front door?

25   A    Yes, sir.
```

1    Q     He was out in the hallway?

2    A     Correct.

3    Q     Were you present when the search was conducted, the full

4    search?

5    A     I was present for portions of that.  I was on the

6    property but I was between apartment No. 8 and apartment No.

7    4.

8    Q     I see.  The discovery of the firearms and the body armor,

9    were you present when that occurred?

10   A     At the exact time they were recovered, I was upstairs,

11   sir.

12   Q     And you testified that you did not hear any verbal,

13   express declination by the Galan brothers, either one, that

14   they did not consent to a search, correct?

15   A     I did not hear anything positive or negative from them,

16   nor did I speak to either of them about the subject, sir.

17   Q     You were focused on Mrs. Sellers, correct?

18   A     Yes, sir.

19         MR. ZIMMERMANN:  I have no further questions.

20   CROSS EXAMINATION

21   BY MR. ADAMUCCI:

22   Q     Good afternoon, sir.

23   A     Good afternoon.

24   Q     Now, you testified that you were an agent that was in

25   charge, and your title was a RAC, short for resident agent-in-

1    charge, correct?

2    A    Yes, sir.

3    Q    Okay.  Fair to say that you're familiar with the

4    year-long plus wiretap investigation into Mr. Wilson, correct?

5    A    Yes, sir.

6    Q    Okay.  And during that wiretap investigation, at any

7    point, did you learn where Mr. Wilson lived?

8    A    I personally did not.  Agents that were working the

9    investigation did.

10   Q    Okay.  So they knew where Mr. Wilson lived?

11   A    I believe so.

12   Q    Prior to January 3rd of 2012?  Huh?

13   A    I believe so, yes.

14   Q    Okay.  Now, did you know where the -- where at least

15   Pierre Galan lived prior to January 3rd, 2012?

16   A    I'm sorry, could you repeat that?

17   Q    Do you know where Pierre Galan lived prior to January

18   3rd, 2012?

19   A    No, sir.

20   Q    You had no idea where he lived prior to January 3rd?

21   A    No, I didn't.

22   Q    Do you know whether any other agents within your office

23   who were participants in this wiretap investigation learned

24   where Mr. Galan lived?

25   A    I do not know.

1   Q    So as you sit here today, it's your testimony that

2   there's no evidence that Galan lived at apartment No. 4 during

3   this investigation?

4   A    If there is, it's unknown to me.

5   Q    Unknown to you?

6   A    Yes, sir.

7   Q    Even though you were supposedly in charge, you don't know

8   where the subject, Mr. Galan, is living before he's supposedly

9   arrested on January 3rd?

10  A    That's correct.

11  Q    And the decision to arrest Mr. Wilson was made by whom?

12  A    The case agents in charge of the investigation.

13  Q    There's more than one, correct?

14  A    Correct.

15  Q    So how does that work if there's more than one case

16  agent?  Who makes the decision?

17  A    It's generally a collaborative effort.  I'm assuming that

18  they would have had a discussion and based on the evidence and

19  the circumstances of the investigation, they would have drawn

20  a conclusion that they felt that the opportunity presented

21  itself, that they would have effected the arrest of Mr.

22  Wilson.

23  Q    Were you a part of this conversation?

24  A    Not any particular one, no.

25  Q    So you had no part in taking -- you took no part in the

1    decision to arrest Mr. Wilson?

2    A    That's correct.

3    Q    Absolutely none whatsoever?

4    A    Correct.

5    Q    And were you aware of the decision to arrest Pierre Galan

6    that night?

7    A    Ultimately, I was aware of it, yes.

8    Q    Okay.  Was it made prior to January 3rd, 2012?

9    A    No, sir.

10   Q    It was not.  Now, after -- strike that.

11        When you arrived at apartment No. 4, the protective sweep

12   had already been conducted, correct?

13   A    I would say it was more in the process.

14   Q    Okay.  About what time did you arrive at apartment No. 4

15   in relation to when the protective sweep began?  Was it a few

16   minutes in progress?  Seconds?

17   A    Seconds to a minute or two.  It was not much more than

18   that.  Like I said earlier, I was coming up the stairs behind

19   the gentlemen so there were people that entered before me but

20   I was very shortly thereafter, I don't think it would have

21   been more than a minute.

22   Q    And you mentioned that one of the case agents is a TFO

23   Jones, correct?

24   A    That's correct.

25   Q    Okay.  And would it be fair to say that TFO Jones was

```
 1   very familiar with this wiretap investigation?

 2   A    That would be fair to say, yes.

 3   Q    Okay.  Would it be fair to say that TFO Jones would know

 4   where Pierre Galan lived during this wiretap investigation?

 5   A    To my knowledge, I don't know any particular reason why

 6   TFO Jones would have known that, but he very well may have.

 7   Q    Okay.  Now, would you agree, sir, that the apartment No.

 8   4 is a very small apartment?

 9   A    I would.

10   Q    It's a one bedroom apartment?

11   A    Correct.

12   Q    Would you agree that the protective sweep probably lasted

13   a very short period of time?

14   A    Yes.

15   Q    Just because, sheer fact, that the premises is very

16   small?

17   A    Yes.

18   Q    Okay.  Are you aware of any personal effects, such as guy

19   shampoo or any personal effects were found in the apartment?

20   A    I'm not aware of that.

21   Q    Okay.  Did you check with any of the officers as to

22   whether any personal effects of Pierre Galan were found during

23   this protective sweep?

24   A    I was aware that clothing was found for Mr. Galan.  That

25   was about it.
```

```
 1   Q    Okay.  Where was that clothing found?

 2   A    In the living room area.

 3   Q    Okay.  And this was before you supposedly obtained this

 4   consent from Mrs. Sellers?

 5   A    Yes, sir.

 6   Q    Okay.  Any other personal effects that would belong to a

 7   male that were found prior to asking Ms. Sellers for consent?

 8   A    I don't know.

 9   Q    Huh?

10   A    I don't know.

11   Q    So how do you know there were clothes that were found?

12   A    Because it was brought to my attention by officers that

13   were inside in front of me.

14   Q    Okay.  Did you ask them?

15   A    No, it was pretty evident.  It was right there in the

16   living room where I was standing.

17   Q    Okay.  And it's your testimony that Pierre Galan was

18   never asked for consent to search the apartment, correct?

19   A    Not by me.

20   Q    Not by you.  By any officer?

21   A    None in my knowledge, no.

22   Q    Is it possible another officer did?

23   A    It's possible, but if it happened, it was not to my

24   knowledge.

25   Q    Okay.  If it was done, was it required to be reported to
```

1    you?

2    A    I believe it would have been reported to me if it was

3    done, yes.

4    Q    Okay.  Now, the form, Exhibit No. 13, the consent to

5    search, it has the three individuals' names, Gilbert Galan,

6    Pierre Galan and Mrs. Sellers?

7    A    Yes, sir.

8    Q    You filled those names in, correct?

9    A    I did.

10   Q    You started at the top writing Gilbert Galan first

11   working your way down to Merline Sellers?

12   A    I don't recall the exact order I did that.  My belief

13   would be that I would have written Ms. Sellers' name in first

14   and added the Galan brothers.

15   Q    After you had already filled in Merline Sellers' name?

16   A    Right on the top of it, yes, sir.

17   Q    Okay.  So you filled that in just to note their presence,

18   if I recall your testimony correctly, just to recall their

19   presence at the scene or apartment?

20   A    Yes, I was noting who had been at the residence that was

21   involved in the arrest, yes.

22   Q    That was involved in the what?

23   A    In the arrests, they had all been arrested, those three

24   individuals, within that property.

25   Q    So you're saying you used this form to note the presence

1    of those that were arrested?

2    A    I'm just saying that I wrote the names on the form, sir.

3    There was no specific reason that I can remember.

4    Q    Okay.  But this is titled consent to search.  The purpose

5    of this form is to obtain a written consent, correct?

6    A    That's correct.

7    Q    And the purpose of a written consent is so that you have

8    written evidence of someone agreeing to search the apartment,

9    correct?

10   A    Correct.

11   Q    Okay.  This form, if you read the form, are you saying

12   that you didn't fill this form out correctly?

13   A    No, I'm saying that I added their two names above Ms.

14   Sellers's name.  However, she was the one I was seeking

15   consent from.

16   Q    If you read the form, you start with the first name, it

17   would read I, Gilbert Galan, have been informed of my

18   constitutional rights not to have a search made without a

19   warrant.

20   A    I suppose that was, depending on how you're reading it, I

21   would have read it straight across, it would have said, I,

22   Merline Sellers.

23   Q    Okay.  Let me try to put this up.  This is just Exhibit

24   13.  It actually works.  Okay.

25            So you're just reading that straight across.  You

```
 1   wouldn't read each individual's name that you put there?  You
 2   wouldn't read I, Gilbert Galan, have been informed of my
 3   constitutional rights?  You don't read it that way?
 4   A    No, I would read it straight across, like on the line.
 5   Q    Okay.  But you're careful enough to put the home number
 6   of Ms. Sellers, but you're saying you just added these two
 7   individuals' names not related to the particular search?
 8   A    That's correct.
 9   Q    So if you read this form as is, it's not correct, right?
10   A    I wouldn't say that it's not correct, no.
11   Q    Okay.  If I read it I, Gilbert Galan, have been informed
12   of my constitutional rights not to have a search made without
13   a search warrant, that's not a correct reading, right?
14   A    In my opinion, that's not correct.
15   Q    But you filled this out that way, didn't you?
16   A    I filled it out I, Merline Sellers, have been informed.
17   Q    You never crossed out Gilbert Galan, did you?
18   A    I never asked him to sign it.
19   Q    You didn't ask for any redaction or any sort of
20   correction of this form, correct?
21   A    That's correct.
22   Q    Now, you testified that you were not present in apartment
23   No. 4 from the time Merline was placed on the sofa in
24   handcuffs, you were going back and forth between apartment 4
25   and apartment 8, correct?
```

1    A    Correct, I was back and forth.

2    Q    Okay.  Is there a big distance, is there a long distance

3    between apartment 4 and apartment 8?

4    A    No, it's a flight of stairs.

5    Q    What were you doing in apartment 8?

6    A    Overseeing what was going on with the consent search

7    going on in that apartment.

8    Q    You also had a consent search up there as well?

9    A    That's my understanding, yes.

10   Q    It's your understanding?  You were there, weren't you?

11   A    Yes, I said it's my understanding.  Yes.

12   Q    Okay.  So you weren't present throughout the entire time

13   Ms. Sellers was placed on the sofa until she signed the

14   consent form, you were not there constantly watching her,

15   correct?

16   A    That's right, yes.

17   Q    Okay.  From the time that she was placed on the sofa

18   until she signed, how much time passed?

19   A    Approximately a half hour.

20   Q    A half hour?

21   A    Approximately.

22   Q    Where do you get a half hour from?

23   A    Well, the initial motor vehicle stop in front of the

24   residence was approximately 10:00 o'clock, I'm estimating that

25   it was no more than five to ten minutes after that that Ms.

```
1    Sellers had been handcuffed and removed from the kitchen and
2    brought onto the couch.  I indicated on the form that it was
3    signed by Ms. Sellers at 10:45.  So 10:15 to 10:45 is
4    approximately a half hour.
5    Q    Okay.  You also testified that she was upset, to say the
6    least, correct?
7    A    That's correct, yes, sir.
8    Q    Okay.  How long was she upset?
9    A    I would say through the time she was handcuffed and maybe
10   the next couple minutes until -- when she was set down on the
11   couch, so I would say by 10:15, she was began to calm down.
12   Q    But you weren't constantly watching her, correct?
13   A    That's right.
14   Q    And your testimony is that around 10:15, she calmed down?
15   A    I would say she was beginning to calm down.  By the time
16   she was brought to the couch, she started to calm down, yes.
17   Q    10:15, she started to calm down and she remained on the
18   couch until 10:45?
19   A    I don't know, while I wasn't there, if she ever moved
20   from the couch but at some point, she was, she moved over to
21   the table.
22   Q    Okay.  And when was this consent initially explained to
23   her?
24   A    Just prior to 10:45.
25   Q    How soon -- what time before 10:45, was it a few minutes
```

1    before she signed?

2    A    However long it takes to read the form and sign it.  So a

3    minute, maybe.  10:44 maybe commence reading and 10:45 to sign

4    it, maybe 10:43.

5    Q    I'm sorry, what?

6    A    10:43, 10:44, the amount of time it would take to read

7    the form, add someone's signature on it.

8    Q    Okay.  Did anyone explain to her the consequences if she

9    did not sign this form?

10   A    There were no consequences, sir, if she did not sign it.

11   Q    No one explained to her if she did not sign it, there

12   would be any sort of consequences?

13   A    No, I generally explain to anybody that we're asking for

14   consent if they choose not to give their consent, that we

15   would have an officer prepare an affidavit to present it to

16   the court and seek a search warrant.

17   Q    How long would that usually take?

18   A    How long would what take, sir?

19   Q    The process you just described.

20   A    For someone to seek a search warrant and obtain one?

21   Q    Yes.

22   A    Generally speaking, that time of night, several hours.

23   Q    That was explained to her?

24   A    I don't recall that particular -- the part that was going

25   to be several hours was explained to her.  I do not recall.

```
1    Q    Okay.  Sir, is it fair to say that -- is it my

2    understanding then that you arrived into apartment No. 4 just

3    to fill out this form and have her sign it?

4    A    No, sir.

5    Q    That's not?  Just so I'm trying to understand, did you

6    explain this form to her and everything to her?

7    A    Yes.

8    Q    Okay.

9    A    That wasn't my only intention to be in the apartment,

10   though.  I'm not sure if I understood you correctly.

11   Q    Maybe I'm not understanding you.  So your purpose being

12   there wasn't to get this form signed?

13   A    No, sir.

14   Q    Was not?

15   A    My purpose was to oversee the entire evening.  At some

16   point I did read her that form and request her to sign it.

17   Q    Okay.  Did you leave and come back and you presented her

18   with this form somewhere around 10:43, 10:44?

19   A    Yes.

20   Q    Okay.  At no point did you ask Pierre Galan whether he

21   consented to a search of the apartment?

22   A    That's correct.

23   Q    Okay.  Thank you, Officer.

24   A    Thank you.

25         MR. ADAMUCCI:  Thank you, your Honor.
```

```
1              MR. SILVERMAN:  May I have a moment, your Honor?

2              THE COURT:  Yes, sir.

3              MR. SILVERMAN:  Just brief redirect, your Honor.

4              THE COURT:  Yes.

5    REDIRECT-EXAMINATION

6    BY MR. SILVERMAN:

7    Q    Agent Hanson, you've talked a lot about the three

8    signatures, I'm sorry, the three names written in the blank at

9    the top of the consent to search form, Gilbert Galan, Pierre

10   Galan, and Merline Sellers, is that right?

11   A    Yes, sir.

12   Q    I just want to be clear in your testimony, did you ever

13   solicit consent to search the residence from Gilbert Galan?

14   A    No, sir.

15   Q    Did you ever solicit consent to search the residence from

16   Pierre Galan?

17   A    No, sir.

18   Q    Did you solicit consent to search the residence from

19   Merline Sellers?

20   A    Yes, I did.

21   Q    Why did you solicit consent from Merline Sellers only?

22   A    Because in my opinion on that evening, she was the person

23   in control of that apartment and I wouldn't say owner but

24   renter, lessee.

25   Q    Why did you list the names of Gilbert Galan and Pierre
```

1   Galan on the consent to search form?

2   A    Because they were other occupants within the residence.

3   Q    But you never intended to seek consent to search from

4   either of them, is that right?

5   A    That's correct.

6          MR. SILVERMAN:  Thank you.  Nothing further.

7          MR. ZIMMERMANN:  One very quick.

8   RECROSS-EXAMINATION

9   BY MR. ZIMMERMANN:

10  Q    With respect to your discussions or what you heard being

11  discussed with Ms. Sellers, were there ever any Miranda

12  rights, Fifth Amendment rights, read to her?

13  A    Not to my knowledge.  If there were, I was not a

14  participant for them.

15  Q    Same with either Galan, nothing that you know of that was

16  executed or advised by the law enforcement officers to the

17  Galans concerning statements?

18  A    To my knowledge, no, sir.

19         MR. ZIMMERMANN:  No further questions.

20         MR. ADAMUCCI:  Nothing further.  Thank you, your

21  Honor.

22         THE COURT:  Thank you.

23         THE WITNESS:  Thank you, your Honor.

24         MR. VATTI:  Your Honor, the government's next

25  witness is Ekrem Halim.

**E K R E M   H A L I M**

having been called as a witness, was first

duly sworn and testified on his oath as follows:

THE CLERK:  Please be seated.  State your name for

the record, spell your last name, and just the city and state

you reside in.

THE WITNESS:  Ekrem Halim, H-A-L-I-M.  Wolcott,

Connecticut.

DIRECT EXAMINATION

BY MR. VATTI:

Q    Sir, good afternoon.  You spell your first name

E-K-R-E-M, correct?

A    Yes.

Q    That was just for the benefit of our court reporter.

Can you tell us where you're presently employed?

A    New Haven PD.

Q    How long have you been employed at New Haven PD?

A    Almost seven years.

Q    What are your duties at New Haven Police Department?

A    Patrol.

Q    And just give us a general overview of what you do as a

patrol officer.

A    Just routine patrols, answering calls for service.

Q    And on January 3rd, 2012, did you become involved in a

matter involving Pierre and Gilbert Galan?

```
 1   A    Yes.

 2   Q    Tell us how you came to be involved.

 3   A    I was called to the scene to conduct a search of the

 4   premise.

 5   Q    To conduct a search?

 6   A    Yes, sir.

 7   Q    And what did you do after you were called to the scene?

 8   A    After called to the scene, I entered the house, entered

 9   the living room, was told where to search, searched the room,

10   and located a firearm.

11   Q    Did you have any involvement prior to January 3rd, 2012,

12   in the investigation involving Kevin Wilson?

13   A    Yes.

14   Q    What was your involvement?

15   A    I was assigned to the Bloodline case.

16   Q    And was one of the Bloodline matters involving the Kevin

17   Wilson investigation?

18   A    Yes.

19   Q    And what was your role with respect to the Bloodline

20   case?

21   A    I was assigned to numerous amount of things.  Some

22   things -- sometimes I was assigned to surveillance, sometimes

23   I was assigned to working actually in the actual wire room

24   itself.  So on and so forth.

25   Q    And on this particular occasion, on January 3rd, 2012,
```

```
1    you were asked to assist with a search?

2    A    Correct.

3    Q    And what building did this search take place at?

4    A    I forget the address.  139 Day, I believe.

5    Q    What apartment were you asked to help search?

6    A    I do not recall the number.

7    Q    Okay.

8             MR. ZIMMERMANN:  I'm sorry, I couldn't hear that.

9    Q    What apartment were you asked to search?

10   A    I don't recall the number of the apartment.

11            MR. ZIMMERMANN:  Oh.

12   Q    Was it an apartment in which Pierre and Gilbert Galan

13   were present?

14   A    Yes.

15   Q    You just don't remember the specific unit number?

16   A    Correct.

17   Q    Tell us what you did when you arrived at that apartment.

18   A    I arrived, I went upstairs, entered the apartment, was

19   the living room area.  Once I entered the living room area

20   there was a certain area we began searching.  Searched the

21   area, my specific spot that I searched was the closet area

22   inside the living room, I searched it and located the firearm

23   inside of a bag.

24   Q    Okay.  At the point where you arrived at the apartment,

25   had a protective sweep of the apartment already been
```

1    completed?

2    A     To my knowledge.

3    Q     And did you have any participation in the protective

4    sweep at all?

5    A     No.

6    Q     And did you have any conversation with a woman in the

7    apartment by the name of Merline Sellers?

8    A     No.

9    Q     Did you observe any other officers having a conversation

10   with her in regard to obtaining consent to search?

11   A     I wasn't there for the actual consent to search, but I

12   knew that it was completed by other officers, yes.

13   Q     All right.  At anytime, did you observe her executing a

14   consent to search form?

15   A     No, I was not there during that time.

16   Q     Okay.  That had been completed by the time you arrived?

17   A     Correct.

18   Q     Where were the Galan brothers at the time that you

19   arrived at the apartment and began your portion of the search?

20   A     When I entered the room, they were sitting in the living

21   room area, on the couch.

22   Q     And what did you do next?

23   A     Began searching the actual room behind the actual couch,

24   in the corner where the closet was located.

25   Q     Was that closet in the living room?

```
 1   A    Yes, sir.

 2   Q    And how long did it take you to search that closet?

 3   A    Approximately half hour, 45 minutes possibly.

 4   Q    To search the closet?

 5   A    The area around it and then into the closet, yes.

 6   Q    What did you find during your search?

 7   A    The firearm.

 8   Q    And what happened after you found that firearm in the

 9   closet?

10   A    Once I found it, I announced that I found a firearm to

11   the surrounding officers and then from there, Pierre Galan,

12   the larger Galan brother, stated or admitted that it was his.

13   Q    And did he do that in response to any questioning by you

14   or did he just blurt that out?

15   A    No, I simply told the surrounding officers about the

16   actual firearm itself, finding the firearm.  At that point in

17   time, he admitted that it was his.

18   Q    And did you at any point observe any interrogation of Mr.

19   Galan that was occurring?

20   A    No.

21   Q    Did any other officers ask him whether it was his gun or

22   did he just blurt it out?

23   A    He just blurted it out.

24        MR. VATTI:  I have nothing further, your Honor.

25
```

CROSS EXAMINATION

BY MR. ZIMMERMANN:

Q    Officer, I'm Kurt Zimmermann, I represent Gilbert Galan.
I just have very few questions.

A    Yes, sir.

Q    Do you have a report of your activities on January 3rd,
2012, in connection with this search?

A    No.

Q    Did you note mentally what time you arrived?

A    I'm sorry?

Q    What time did you arrive at the apartment?

A    In the evening, at nighttime.

Q    But do you know in terms of hours or minutes when?

A    Approximately 8:00 p.m., I believe.

Q    You state that you searched a closet, and what else was
in the -- you had to open a door to get at it?

A    Yes, sir.

Q    And what was in there?

A    Articles of clothing, boxes.  Normal stuff you would find
in a closet, I suppose.  Bags.

Q    Plus a firearm.

A    (Nodding head.)

Q    You stated -- where was the location of the closet?

A    Once you entered the living room, you enter the living
room, you went around the actual closet I guess and the door

```
1    was on the back side after you went around, inside the living

2    room.

3    Q    You said something about it being near the couch?

4    A    Correct, behind the couch.

5    Q    Behind the couch.

6    A    Correct.

7              MR. ZIMMERMANN:  No further questions.

8    CROSS EXAMINATION

9    BY MR. ADAMUCCI:

10   Q    Good afternoon, Officer.  I represent Pierre Galan.  Now,

11   you testified that your job that night was to search the

12   premises?

13   A    Correct.

14   Q    Okay.  That was your only function, was to search?

15   A    Correct.

16   Q    Were you told where to search?

17   A    It was kind of specified in a certain direction.  There

18   was other officers actually conducting the search as well.  I

19   was in a certain section of the room.

20   Q    So you were told to search a certain section of the room?

21   A    Correct.

22   Q    Okay.  And that section involved the closet?

23   A    Yes, sir.

24   Q    Okay.  And do you remember what time you arrived at

25   apartment No. 4?
```

1   A    It was after 8:00 o'clock, I'm not exactly sure.

2   Q    You're not sure?

3   A    I'm not exactly sure of the exact time, no.

4   Q    Okay.  If I told you the stop of Mr. Wilson's vehicle was

5   at 10:00 o'clock, would that refresh your recollection in any

6   way?

7   A    I have to read the -- the report to see what time it was.

8   I don't recall.

9   Q    Which report would that be?

10  A    The report that was written by the TFO.

11  Q    TFO?  I have my copy.

12         MR. ADAMUCCI:  Your Honor, may I approach?

13         THE COURT:  Yes, sir.

14  A    Okay, in here it says at 10:01, so sometime after that.

15  Q    Sometime after 10:00 o'clock?

16  A    Yes, sir.

17  Q    And when you arrived at apartment No. 4, where was Pierre

18  Galan?

19  A    Sitting on the couch, I believe.

20  Q    Sitting on a couch?

21  A    Yes, sir.

22  Q    And from the time that you arrived until the time that

23  you searched this closet, how much time had passed?

24  A    Say it again?  I'm sorry.

25  Q    From the time you entered apartment No. 4, you arrived at

1   apartment No. 4, until you started the search of the closet,

2   how much time passed?

3   A    Several minutes.

4   Q    Several minutes?  You arrived, were given your direction

5   and started searching the closet area?

6   A    Once I got in the apartment, correct.

7   Q    Did you have your eyes on Pierre Galan the entire time

8   you were searching?

9   A    My eyes on him?  No, because I was actually searching.

10  Q    Okay.  Was Pierre Galan at that point, he was in

11  handcuffs, right?

12  A    I'm not sure.

13  Q    You didn't see handcuffs on him?

14  A    I'm not sure.

15  Q    Okay.

16  A    I don't recall.

17  Q    Was he arrested at that point?

18  A    I don't recall.  I was just assigned to actually conduct

19  a search.

20  Q    Okay.  While you were conducting the search, Pierre Galan

21  was on the couch?

22  A    Correct.

23  Q    Okay.  Did he at any point -- was he moved by Officer

24  Miranda at any point to the kitchen area in order to get

25  water?

1    A    Not while I was there.

2    Q    I'm sorry?

3    A    Not while I was there.

4    Q    You're saying while the search was conducted by you, he

5    was on the couch the entire time, even though you weren't

6    looking at him?

7    A    Correct.

8    Q    Okay.  And you testified that you looked through this

9    closet.  Did the closet have personal belongings in it?

10   A    Yes.

11   Q    Did it have guy's clothes?

12   A    Guy's clothes, yes.

13   Q    You searched for the gun, it was inside something?

14   A    A bag.

15   Q    A bag.  So you had to move things and rummage through

16   these personal belongings?

17   A    Correct.

18   Q    It wasn't just on top of anything?

19   A    Correct.

20   Q    And when you found this supposed gun, what did you do

21   then?

22   A    I announced to the other officers that were inside of the

23   room that I found a firearm.

24   Q    Okay.  And then what happened after that?

25   A    After that, once I found the firearm, it stayed there

1    until our BFI, Bureau of Identification, came out and actually

2    photographed it.

3    Q    And they took a photograph of where you had left the gun?

4    A    Where -- the actual gun and of where the gun was found,

5    correct.

6    Q    Okay.  But the gun couldn't be seen without having

7    someone rummage through a bag, correct?

8    A    Correct.

9    Q    Okay.  So it had to be -- a picture was taken of where

10   someone had put the gun, correct?  One of the officers had put

11   the gun?

12   A    Where one of the officers put the gun?

13   Q    Yes.

14   A    The picture was taken of the actual firearm itself and

15   the picture was taken from where it was removed from, yes.

16   Q    Okay.  And it's your testimony that Pierre Galan blurted

17   out that it was his?

18   A    Correct.

19   Q    Okay.  Where was he when he did this?

20   A    On the couch.

21   Q    Where?

22   A    On the couch.

23   Q    Were there more than one couch in this apartment?

24   A    I believe so.

25   Q    Okay.  So which couch was he on?

```
1   A    The couch that was facing the closet.

2   Q    Okay.  And this was in response to someone questioning

3   him?

4   A    No.

5   Q    Okay.  So no one questioned Pierre Galan as to this

6   firearm that was found?

7   A    No, sir.

8   Q    Okay.  So you're saying that you announced that the

9   firearm had been found to the other officers?

10  A    That I found the firearm, correct.

11  Q    Okay.  And what was the purpose of announcing that?

12  A    For officer safety.

13  Q    Okay.  That's all?

14  A    For officer safety and announcing that you found an item

15  like that, yes.

16  Q    Okay.  At that time, Pierre was seated on the sofa?

17  A    Yes.

18  Q    Okay.  And this was -- the firearm was found how far off

19  the ground?

20  A    How far off the ground?

21  Q    Off the ground.  It was on top of something in a bag?

22  A    Located in a closet in a bag, correct.

23  Q    Okay.  You have no idea whether one sitting on that couch

24  could see inside the closet, correct?

25  A    I'm sorry, say that again?
```

1    Q    You have no idea whether one sitting on the couch where

2    Pierre was could see inside the closet?

3    A    Not from that angle, you cannot see inside of it, no.

4    Q    Okay.  And at some point, was Pierre brought over to the

5    firearm?

6    A    No.

7    Q    It's your testimony that he just blurted it out that it

8    was his?

9    A    Correct.

10   Q    And at that time he supposedly blurted this out, was he

11   in handcuffs?

12   A    I do not recall.

13   Q    You don't remember seeing whether his hands were in front

14   of him or behind him?

15   A    I don't recall.

16        MR. ADAMUCCI:  Thank you, Officer.

17   REDIRECT-EXAMINATION

18   BY MR. VATTI:

19   Q    You indicated that there were other officers who also

20   participated in the search, correct?

21   A    Correct.

22   Q    Were you aware that a body vest and another firearm had

23   been found?

24   A    Yes.

25   Q    All right.  And was that in a location different from the

1    closet that you searched?

2    A    Similar area, but not inside of the closet.

3           MR. VATTI:  Thank you.  No further questions, your

4    Honor.

5           MR. ZIMMERMANN:  No further questions.

6           MR. ADAMUCCI:  Nothing, your Honor, thank you.

7           THE COURT:  Thank you, sir.

8           THE WITNESS:  Thank you, your Honor.

9           MR. VATTI:  Your Honor, the government has no

10   further witnesses at this time.

11          MR. ZIMMERMANN:  Your Honor, we have a very brief

12   witness and then Mrs. Sellers.  I don't know how long that

13   will take, but I think we can finish.  I don't know how long

14   you want to work today.  I don't think -- I think maybe we can

15   get through the whole thing by 5:00.

16          THE COURT:  We can try.

17          MR. ZIMMERMANN:  So let's try, okay?

18          THE COURT:  We can try.

19          MR. ZIMMERMANN:  Your Honor, the government calls

20   Deb Curtis -- wrong cable.  Defense calls Ms. Deborah Curtis.

21                    **D E B O R A H   C U R T I S**

22        having been called as a witness, was first

23        duly sworn and testified on her oath as follows:

24          THE CLERK:  Please be seated.  State your name for

25   the record, spelling your last name and just the city and

 1    state you reside in.

 2         THE WITNESS:  Deborah Curtis, C-U-R-T-I-S, North

 3    Haven, Connecticut.

 4    DIRECT EXAMINATION

 5    BY MR. ZIMMERMANN:

 6    Q    How are you employed?

 7    A    I'm employed by Markle Investigations.

 8    Q    Were you retained by my office to conduct an examination

 9    of 139 Day Street, apartment 4?

10    A    I was.

11    Q    And did you prepare a floor plan diagram of that?

12    A    I did.

13    Q    And no jury here, so do you recognize this as your work?

14    A    Yes, it is.

15         MR. ZIMMERMANN:  Do you have any objection to

16    marking that?

17         MR. VATTI:  I have no objection, but it's upside

18    down.

19         MR. ZIMMERMANN:  Here's a copy for the Court and one

20    for an exhibit.

21         THE CLERK:  What exhibit do you want this to be?

22         MR. ZIMMERMANN:  F.

23         THE CLERK:  F?

24         MR. ZIMMERMANN:  May I approach the witness, your

25    Honor?

```
 1              THE COURT:  You may.
 2   Q    This is what we're going to discuss briefly.
 3   A    All right.
 4   Q    Now, directing your attention to what's been marked I
 5   believe a full exhibit, F, Defendant's F, do you recognize
 6   this?
 7   A    I do.
 8   Q    And this is your rendering of the floor plan of apartment
 9   4, at 139 Day Street, correct?
10   A    Yes, it is.
11   Q    And I see measurements in terms of feet.  When were those
12   measurements taken?
13   A    On August 21st -- on August 20th, 2013.
14   Q    Couple weeks ago?
15   A    Yes.  Last week.
16   Q    Prior to that, you had been on a -- at the location as
17   well, correct?
18   A    Yes, I had.
19   Q    And you took some photographs of it?
20   A    Yes.
21   Q    And it was or was not occupied at that time?
22   A    It was not at the time.
23   Q    At that time.  There are 58 photographs, but I don't
24   think we need all of them.  Let's go through the floor plan
25   here and what you know about this apartment.  Where's the
```

1   front door?

2   A    Yes, that's where the front door is.

3   Q    Now, I'm going to circle mine, just for demonstrative

4   purposes.  Which way does the door swing?  Swings in, doesn't

5   it?

6   A    It does.

7   Q    And is it attached to the left-hand side of the door jamb

8   or the right-hand side?

9   A    It is attached --

10   Q    If you know.

11   A    I believe that it is attached on the right.

12   Q    On the right, so that would be near the F?

13   A    I'm having a hard time recalling which way that door is

14   opening.

15   Q    Okay.  But it opens in?

16   A    Yes.

17   Q    That we know?

18   A    Yes.

19   Q    And the closet 1 and closet 2, moving down from the front

20   door, those are -- where do they open?

21   A    They open on the sides.  If you see the open -- the open

22   spaces on each line, upper line and lower line, the closet

23   doors are on either side there.

24   Q    So they open out?

25   A    Yes.

1    Q    Where those breaks in the line are, or that side of the

2    line?

3    A    Yes.

4    Q    And there's some black markings, such as this.  What is

5    that?

6    A    That's a love seat.

7    Q    And what about --

8    A    And that's a sofa.

9    Q    That's a sofa?  What's this here, a freezer?

10   A    Yes.

11   Q    So we're in the kitchen?

12   A    Yes.

13   Q    This is the bathroom, that's what, the tub?

14   A    That would be the sink and the toilet is to the right of

15   that.

16   Q    And here's the tub?

17   A    Yes.

18   Q    Okay.  Then there's a bedroom back here?

19   A    Yes.

20   Q    Where is the door to the bathroom?

21   A    The door to the bathroom is, you'll see an opening.

22   Q    Here?

23   A    Yes, correct.

24   Q    Okay.  And that open in or out?

25   A    That, the door to the bathroom, pushes in.

1    Q     Into the bathroom?

2    A     Yes.

3    Q     All right.  And you also measured and examined the

4    stairwells between the ground floor?

5    A     Yes.

6    Q     The first floor, the second floor, and the third floor,

7    correct?

8    A     Yes.

9    Q     And let me show you -- I don't have these marked.  I

10   would like to show you for identification --

11               MR. ZIMMERMANN:  Where are we, F?

12               THE CLERK:  G.

13               MR. ZIMMERMANN:  This would be G, H, and I.

14   Q     Here, Ms. Curtis, would you identify or just describe

15   what those are?

16               MR. ZIMMERMANN:  The government doesn't object to

17   the admission.

18               THE COURT:  Thank you.

19   A     These are measurements of the stairwell.  The first page

20   is a measurement taken from the front entrance to the

21   building, to the lower staircase leading up to the second

22   floor.

23   Q     Okay.  Which one are you looking at?  I didn't mark them.

24   A     It's labeled, on the top it's labeled first floor.

25   Q     So --

```
 1    A     That's an overall diagram of the entrance.  The front

 2    door to the building.

 3    Q     This is the front door, labeled as such?

 4    A     Yes.

 5    Q     And then there's a measurement to the first set of

 6    stairs?

 7    A     Yes.

 8    Q     And those stairs take you to where?  The second story?

 9    A     Those first set of stairs take you to a long hallway that

10    I have the dimension there, from there to the middle, there's

11    a middle staircase that runs up through the center of the

12    building from the first floor, all the way to the third floor.

13    So that upper staircase that you're looking at, that's the

14    first set of stairs in that center column of the staircase

15    that leads all the way up to the third level.

16    Q     The third?

17    A     Yes.

18    Q     All right.  Just one second, this is a photograph you

19    took, correct?

20    A     Yes.

21    Q     And the black stairway here is what we're talking about,

22    that's the first floor stairway, right?

23    A     Yes, the first.

24    Q     And behind it is this long hall you described?

25    A     Yes.
```

1  Q    And these, this is the stairwell, beginning of the

2  stairwell, to the second floor, correct?

3  A    Yes.

4         MR. ZIMMERMANN:  Well, where are we, J?  J for

5  identification.  I don't think there's any need.

6         THE COURT:  Have we got H and I?

7         MR. ZIMMERMANN:  Yes.  I haven't talked about them

8  yet.

9         THE COURT:  But this is J, what you have.

10 Q    All right.  So we've been -- I think it's clear that this

11 was the set of black stairs, then the hallway, correct?

12 A    Um hum.

13 Q    And then the first set of stairs that run up to the

14 second floor.  Now, is the second floor there or is there

15 another twist?

16 A    No, that leads up to a landing.  It's a double staircase

17 that leads to the second floor and at the top of that first

18 set of stairs, there's a landing and then you proceed up the

19 second level of stairs, which brings you to the second floor.

20 Q    Okay.  And do you have a diagram that shows that?

21 A    I do, it's labeled second floor.

22 Q    Oh, okay.  That's one of the ones we just marked, I

23 believe it's I.  It's labeled second floor?

24 A    Yes.

25 Q    It's this one, right?

1   A    Correct.

2   Q    And the stairwell from the first floor, right here.  With

3   me?

4   A    That's not -- that's the staircase that comes from the

5   left side is the staircase that is coming up from the landing,

6   from the first set of stairs.  And the staircase to the right

7   is the staircase leading from the second floor up towards the

8   landing to continue on to the third floor.

9          So if you were standing on the second floor, that

10  would be the visual you would have.  The staircase to the left

11  leads down and the staircase to the left leads up.

12  Q    So if someone were to progress from the ground level,

13  they would go up those three black steps we saw in the

14  photograph?

15  A    Right.

16  Q    Down the hall, then up these?

17  A    No, it would be up, on the first floor diagram it would

18  be up this staircase, they would hit the landing and then it

19  would be to the second staircase in this photo.

20  Q    I'm sorry, they would go up this staircase?

21  A    Yes.

22  Q    And they hit the landing.  Where's the landing?

23  A    The eight-foot landing.

24  Q    Right here?

25  A    Yes, and they would come up on the left side of that

```
 1   stair.

 2   Q    Here?

 3   A    Yes, so they would come up those stairs.

 4   Q    Oh, I'm sorry, it's plainly labeled, stairwell from first

 5   floor to second floor, right?

 6   A    Right.

 7   Q    And then there's a landing, and then there's a stairway

 8   that goes up to the -- from the second to third floor, which

 9   is also --

10   A    Yes, but the route of travel would be coming this way

11   into the hallway by apartment 5 and 4 and up the stairwell

12   that's on the right side.  It's a little hard to decipher

13   because you're getting a visual of several staircases stacked

14   on top of each other.

15   Q    Right, it's a stairwell.

16   A    Right.

17   Q    Right here is apartment 4, labeled apartment 4.

18   A    Yes, it is.

19   Q    It says apartment 4 and then there's also apartment 4

20   here that says second door.

21   A    Right.

22   Q    Is that used?

23   A    No.

24   Q    Not being used?

25   A    No, it was put in my apartment diagram, there were
```

1  appliances in front of that door, there were things blocking

2  that door.  It's not an entranceway at all that was used by

3  the residents.

4  Q    If someone was to enter, they would enter this door,

5  right?

6  A    Yes.

7  Q    And then going from that diagram, once they enter, where

8  is that door, right here?

9  A    Yes.

10  Q    And they encounter the closets first, the kitchen's over

11  here?

12  A    Yes.

13  Q    And, oh, I know what they did.  Okay.  Is it possible,

14  according to your observations, to observe apartment 8 on the

15  third floor, its front door from anywhere short of being on

16  the third floor?

17  A    No.  I believe I took visual photos proceeding up the

18  staircase, and there's no clear visual of the apartment for

19  the door of apartment No. 8.

20  Q    Okay.  I have a million photographs, but I think we get

21  the idea.  I'm going to resist the temptation to go through

22  them.  And that's all the questions I have for you.  Thank

23  you.

24          MR. ZIMMERMANN:  Do you have any questions?

25          MR. SILVERMAN:  May we have one moment, your Honor?

```
 1              MR. VATTI:  I do have some questions, your Honor.

 2              THE COURT:  All right, sir.

 3              MR. VATTI:  Your Honor, can we have a minute?  We

 4  weren't provided copies of these photographs so I just want to

 5  understand.

 6              I can start the cross, your Honor.  I don't want to

 7  delay.  We want to try to finish by 5:00.

 8  CROSS-EXAMINATION

 9  BY MR. VATTI:

10  Q    All right.  Ms. Curtis, just starting with this diagram

11  that's on the ELMO here, you would agree with me that if we

12  add up just the length of this apartment, starting from the

13  back wall of the living room and we went all the way to the

14  back wall of the bedroom, we're talking about approximately 50

15  feet, correct?

16  A    Let's see.  I haven't added up those measurements but

17  I'll take a quick look.

18  Q    Let me just walk you through it so we go quickly.  It

19  looks like based on your diagram, the length of the living

20  room is about 14 feet by 13 feet?

21  A    Top to bottom?

22  Q    Right here, going this way.

23  A    That's 19.3.

24  Q    The closet is four feet?

25  A    Yes.
```

1    Q    Okay.  We've got five feet, then a closet of four feet

2    and extra wall of nine feet four inches so it's approximately

3    19?

4    A    19.3.

5    Q    Got it.  Then you've got additional space, the kitchen is

6    about 15 feet in length?

7    A    That is the hallway, that's not the -- the whole space is

8    not the kitchen.

9    Q    So if I wanted to get through the kitchen and through the

10   hallway past the bathroom, that's another 15 feet?

11   A    Yes, closer to 16, 15.11.

12   Q    Okay, 16 feet.  Then we have the bedroom, which is, if I

13   want to get all the way through the bedroom, you're talking

14   about another 11 feet or so, right?

15   A    Yes, so 45, 46 feet.  46, about.

16   Q    So roughly, we're getting close to 50 feet, for the

17   entire length of the apartment?

18   A    Yes.

19   Q    Okay.  Would you agree with me that from entering the

20   front door and then making a left turn and entering the

21   kitchen is only a matter of about six-and-a-half feet?

22   A    Yes.

23   Q    So somebody walking casually will cover that in about

24   three steps, correct, roughly?

25   A    Approximately.

1    Q    Roughly three steps?

2    A    Yeah.

3    Q    You would agree with me that covering this entire

4    apartment, back living room wall to back bedroom wall in 50

5    feet, somebody walking casually is probably going to cover

6    that in 20 steps or so, right?  You can get from one end to

7    the other?

8    A    Approximately.

9    Q    So we're talking about a really small apartment?

10   A    Yeah, it's not a large apartment.

11   Q    And officers that are in a hurry when they make entry

12   into the apartment and are moving very quickly are going to

13   cover this in a very short time, correct?

14           MR. ZIMMERMANN:  I'll object, your Honor.  This is a

15   hypothetical about the speed at which officers would progress

16   through an apartment as they were, if they were, in a hurry.

17   I don't know what that means.

18           MR. VATTI:  I'll withdraw the question, your Honor,

19   I think the question made the point.

20   Q    All right, let me go to your diagram of the stairs and

21   the landing.  You've also taken a set of photographs, correct?

22   A    Yes.

23   Q    And in these photographs, maybe if I can hand you the

24   stack, you can pull out the photographs that depict the second

25   floor landing and the third floor stairs, the stairs leading

1    from the second to the third?

2    A    Sure.

3    Q    I'm going to take a wild guess and hand you a couple and

4    see if I'm right and, if I'm not, I'll get you the full stack.

5    A    They're numbered so I should be able to get them fairly

6    quickly.

7    Q    Okay.  I'm going to hand you the rest of them as well.

8    They may be out of order.  I'm just picking up the pile as

9    it's been left here.

10              MR. VATTI:  Okay, does she have her index?

11              THE WITNESS:  I do.

12              MR. VATTI:  May I approach, your Honor?  I'm just

13   going to hand her her stack of photographs.

14   A    Okay.  So where do you want me to start?

15   Q    I was just hoping you could pull out the photographs that

16   depict the second floor landing and then the stairs leading

17   from the second floor to the third floor.

18   A    Okay.

19   Q    Apartment 4 is on the second floor, correct?

20   A    Yes, it is.

21   Q    So I'm looking for the second floor landing?

22   A    Right.  So this is a photograph of the second, taken from

23   the second floor landing looking up towards the third floor.

24   Q    What's the correct way to hold this photograph?

25   A    Like this, because you're standing -- hold on -- so this

1    is when you say the second floor landing, you need to

2    understand that the landing is obviously between two

3    stairwells, right?

4    Q    Correct.

5    A    So you're actually not on level ground with the second

6    floor; you're one-half of the staircase down, right?  From the

7    second floor, you've proceeded halfway up the staircase.  So

8    if you proceed here the person would be standing -- I was

9    standing on the second floor landing and I was looking up

10   towards the third floor.  This is the first of the stairs that

11   goes up to the third floor, the landing is just above my head,

12   and that's the stairs that proceed to the top of the third, to

13   land you onto the third floor.

14             MR. ZIMMERMANN:  What number photo is that?

15             MR. VATTI:  This is photograph 13.

16   Q    Is there a photograph here that depicts the landing on

17   the second floor and the doorway to apartment 4?

18   A    Yes.  Okay, that's from the first floor, that's the

19   second floor landing.  So you see it's all solid wall, so it's

20   nothing that can specifically -- I will show you that picture,

21   though.  This is a photograph looking from the doorway of

22   apartment 4, that's the first set of stairs going up to the

23   third floor, that's the stairs going down to the second.

24   Q    Okay.

25   A    Going down to the landing on the second floor.

1    Q    Okay.  This is Exhibit 39?

2    A    That's photograph No. 39.

3    Q    Photograph No. 39.

4    A    Yes.

5    Q    Let me put this -- I think this is going to be easier to

6    use.  All right.  You're indicating, I'll indicate with my

7    pen, is this the door to apartment 4?

8    A    No.

9    Q    Where is the door to apartment 4?

10   A    The photograph is taken from the doorway, the open

11   doorway of apartment No. 4, as if you were looking out of the

12   apartment.

13   Q    Okay.  So if we are looking out the doorway of apartment

14   4, these are the stairs going up towards the third floor?

15   A    Yes.

16   Q    And then they wrap around and go up?

17   A    Yes.

18   Q    Okay.  And somebody who wanted to go into apartment 4

19   would come down these stairs and then go directly across the

20   stairs or on a slight diagonal towards the door to apartment

21   4, correct?

22   A    Yes, this is definitely a diagonal.  It's not directly

23   across.

24   Q    When I'm using the word landing, I think you and I are

25   using it differently.

```
 1    A     Okay.

 2    Q     You're indicating that this area is the landing, correct?

 3    A     Yes.

 4    Q     I'm referring to this area where the apartment doors are

 5    as landing.

 6    A     Okay.

 7    Q     Okay.  If you don't mind, let's use that definition.

 8    A     That's fine.

 9    Q     Is it possible if you were standing on this landing right

10    here, that you would see somebody who's coming down the stairs

11    go into apartment 4?  Could you stand here and observe the

12    front door of apartment 4?

13    A     Yes.

14    Q     Okay.  So if someone was heading up these stairs towards

15    the third floor, if they get to what you're referring to as

16    the landing here, they can see the doorway of apartment 4?

17    A     Yes.

18    Q     And how about as you continue to head up the stairs

19    through these gaps in the rails on the banister, can you still

20    look down and see the doorway to apartment 4 or some portion

21    of that doorway?  Do you have a photograph that depicts that?

22    A     I would say a portion of it, depending upon where you

23    are.

24    Q     Right.

25    A     That is the staircase leading up to the third floor, yes.
```

1   Q    Okay.  And do you have any photographs that depict a view

2   of apartment 4 as one might be heading up the stairs towards

3   the third floor?

4   A    I may.

5   Q    Let me ask a question and if necessary, we'll give you

6   more time to look for the photograph.

7   A    Okay.

8   Q    Just so you understand what I'm trying to ask you, let's

9   suppose you started up these stairs going towards the third

10  floor, you turn the corner on what you're using as the

11  landing?

12  A    Right.

13  Q    And you head up?

14  A    Yes.

15  Q    These, the railings, have gaps, correct?

16  A    Yes, they do.

17  Q    As you're going up those steps --

18  A    Right.

19  Q    -- it would still be possible to look down at the doorway

20  to apartment 4?

21  A    Yes, you would be able to see part of it.  I don't think

22  you can see the entire doorway but you can see part of the

23  doorway.

24         MR. VATTI:  I would like to mark this, your Honor, I

25  don't know if you've already admitted these or I can just mark

```
 1    it as Government Exhibit 17.

 2              THE COURT:  Okay.

 3              MR. ZIMMERMANN:  No objection.  What number

 4    photograph is that?

 5              THE WITNESS:  I would have to look at his

 6    photograph.

 7              MR. ZIMMERMANN:  Oh, he's got it.

 8              THE WITNESS:  I think he said it was 39.

 9              MR. VATTI:  Yes, Government Exhibit 17 is photograph

10    No. 39.

11    Q    What was the date on which you took the photographs?

12    A    September -- give you the date -- September 25th, 2012.

13    Q    Okay.  With respect to the diagram, you drew this, it

14    looks like, on or sometime after August 20th, 2013?

15    A    Yes.

16    Q    All right.  And you've indicated in the living room here

17    a couple of couches?

18    A    Yes.

19    Q    And this is a larger couch on the right-hand side of the

20    living room?

21    A    Yes.

22    Q    And you have what I've labeled as a love seat?

23    A    It is.

24    Q    Okay.  Why did you put these items into the diagram?

25    A    I was asked to put them there, that they were pieces of
```

1    furniture that were located in the room at the time of the

2    incident, and they are just kind of markers as to how the room

3    was approximately set up.

4    Q    All right.  And --

5    A    Approximately.

6    Q    Do you know if the setup of the living room and the

7    placement of the couches on August 20th, 2013, was the same as

8    January 3rd, 2012?

9    A    Well, they weren't set up like that on August 20th when I

10   was in that apartment taking measurements.

11   Q    I see.  Okay.

12   A    When I was -- I was -- actually shown photographs, they

13   might have been the government's photographs that showed the

14   furniture in the room when I took those, these measurements,

15   there was a new tenant in the apartment on August 20th, so

16   none of that furniture was like that.  As far as the furniture

17   placement, you know, those are just put in there as

18   approximations.

19   Q    Okay.  So my question to you is:  In terms of your

20   placement for example of the freezer, the larger couch, the

21   love seat, those items, how do you know that these were the

22   positions of those items on January 3rd, 2012?

23   A    I was informed that they were there, and I also saw

24   photographs of -- I don't know if they were taken by the

25   police department or who they were taken by, closer to the

1  date of the incident.  So the photographs that were provided

2  to Attorney Zimmermann showed the furniture in the room,

3  showed the freezer right next to the entrance into the kitchen

4  area.

5  Q    And did you also see photographs that depicted the

6  positions of the couches?

7  A    The love seat, yes.  The full couch, I believe so.  Yes.

8  Also, the defense counsel speaking to witnesses had expressed

9  that there was a couch on that wall.  So as far as the couch

10  goes, that may be something I was informed.  I know that the

11  government's photographs, the police department's photographs,

12  depicted the love seat as well as the freezer, where they were

13  located.

14  Q    So you relied on information either from photographs or

15  information provided by the defense attorneys or some

16  combination of the two?

17  A    Yeah, I believe that the photographs taken by the New

18  Haven Police Department depicted the freezer, the love seat.

19  The things that are in that diagram were just approximate

20  placements based on the photographs that I had seen.

21          MR. VATTI:  I have nothing further, your Honor.

22  REDIRECT-EXAMINATION

23  BY MR. ZIMMERMANN:

24  Q    Could you pull out the picture that you've numbered 55,

25  5-5?

1   A    Sure.  Might take me a moment.  Yes, here it is.

2        MR. ZIMMERMANN:  May I approach, your Honor?  Could

3   we mark this for identification?

4        THE CLERK:  As what?

5        MR. ZIMMERMANN:  Defendant's --

6        THE CLERK:  I have to get the other ones, too.

7        K.

8   Q    All right, it's been marked as -- I think what we were

9   trying to look at, didn't necessarily find when Mr. Vatti was

10  asking you some questions, this is -- what's this a view of?

11  A    This is a view taken from the third floor of the

12  building.

13  Q    Yes?

14  A    It's looking down the staircase from the third floor

15  towards the second floor.

16  Q    And there's a door right here?

17  A    Yes.

18  Q    What door is that?

19  A    That is the second doorway to apartment No. 4 that was

20  not used as an entranceway to the apartment.

21  Q    Where is the entrance to apartment 4?

22  A    The entrance would be --

23  Q    Further over here?

24  A    No, to the right of the photograph.  It's not visual from

25  here.

1   Q    Over here somewhere?

2   A    Yes, the wall, that would be perpendicular to the wall

3   that has that one door for apartment No. 4.

4   Q    Okay.

5   A    If you come down the bottom of the staircase and move

6   diagonally to your left, you would enter apartment No. 4.

7   Q    Excuse me, it's over here?

8   A    Yes.

9   Q    And the entrance would be diagonal from the foot of those

10  stairs --

11  A    Yes.

12  Q    -- on floor 2, this is 3?

13  A    Right.

14  Q    Down here, that's the floor on floor 2?

15  A    Yes.

16  Q    And you come down the bottom of these stairs, head

17  somewhere in this direction?

18  A    No, it actually is more diagonally to the left.

19          MR. SILVERMAN:  May I approach, your Honor?  See if

20  I can help clear up the confusion.  May I approach?

21          MR. ZIMMERMANN:  We're both trying to figure this

22  out.

23          MR. SILVERMAN:  Here underneath this?

24          THE WITNESS:  Yes, around there.  Yep.

25  Q    Okay.

```
 1                MR. ZIMMERMANN:  I'd like to offer that.

 2                MR. SILVERMAN:  No objection.

 3                MR. ZIMMERMANN:  That's all the questions I have.

 4           Thank you.  I'm sorry you had to wait.

 5                THE WITNESS:  No problem.

 6                THE CLERK:  I need all the exhibits.

 7                THE COURT:  Are we finished with the witness?

 8                MR. VATTI:  I have one question, your Honor, or a

 9    couple of questions, depending on the answers.

10                THE WITNESS:  Okay.

11    RECROSS-EXAMINATION

12    BY MR. VATTI:

13    Q    I take it that somebody that is standing on what I'm

14    referring to as the third floor landing at the top of those

15    stairs in that photograph that you just saw, can see apartment

16    8 on the third floor, correct?

17    A    Yeah, if they're standing right at the top of the

18    staircase.

19    Q    Right, and somebody standing on what I'm referring to as

20    the second floor landing can see the doorway to apartment 4,

21    correct?

22    A    Yes.

23    Q    All right.  And they can certainly -- the stairs aren't

24    that long, correct?  It's not a huge distance that we're

25    talking about between -- to cover that set of stairs?
```

```
1    A    The entire flight of stairs between --

2    Q    What I'm referring to as the second floor landing to what

3    I'm referring to as the third floor landing.

4    A    I mean, it depends on what your perspective of -- it

5    doesn't take a long time.  There are one, two, three, four,

6    five, six, seven, eight steps up the landing and eight steps

7    on the second flight.

8    Q    It's certainly possible for somebody at the top of the

9    stairs in front of apartment 8 to shout down to someone on

10   the -- on the second floor?

11   A    Yes.

12        MR. ZIMMERMANN:  We'll stipulate that they can

13   shout.

14   A    They can shout.

15        MR. ZIMMERMANN:  And be heard.

16        MR. VATTI:  Thank you, that's all I have.

17        MR. ZIMMERMANN:  I would like to straighten out the

18   exhibits before we go, before I turn you loose.

19        THE WITNESS:  Okay.

20   FURTHER REDIRECT-EXAMINATION

21   BY MR. ZIMMERMANN:

22   Q    Do you have any documents there that have exhibit

23   stickers on them?

24   A    I don't believe so.

25        MR. ZIMMERMANN:  Oh.  I think I noted -- what's
```

```
1    this?

2              MR. SILVERMAN:  That's F.

3              THE CLERK:  I have F and K here.  I have those two.

4    I have K and F.

5              MR. SILVERMAN:  May I have a moment, your Honor, to

6    confer with the clerk of court as well as Attorney Zimmermann?

7              MR. ZIMMERMANN:  Now we are going to call Mrs.

8    Sellers.

9              MR. SILVERMAN:  The government has no other

10   questions for this witness.

11             THE WITNESS:  Okay, thank you.

12             M E R L I N E   S E L L E R S

13        having been called as a witness, was first

14        duly sworn and testified on her oath as follows:

15             THE CLERK:  Please be seated, state your name for

16   the record, spell your last name, and just the city and state

17   you reside in.

18   DIRECT EXAMINATION

19   BY MR. ZIMMERMANN:

20   Q    Your last name and first name.

21   A    Sellers, S-E-L-L-E-R-S.

22   Q    First name?

23   A    Merline, M-E-R-L-I-N-E.

24   Q    And you live in New Haven, Connecticut?

25   A    Yes.
```

```
 1   Q    Ms. Sellers, you're here voluntarily, correct?

 2   A    I didn't hear you.

 3   Q    You're here voluntarily, correct?

 4   A    Yes.

 5   Q    I did not issue a subpoena?

 6   A    No.

 7   Q    And you have your legal representative sitting here,

 8   Charles Kurmay?

 9   A    Yes.

10   Q    And you consulted him about today's testimony?

11   A    Yes.

12   Q    You look a little upset.

13   A    I'm just a little nervous.

14   Q    Have you ever testified before?

15   A    No, I haven't.

16   Q    I'll try to be as brief as possible.  Are you related to

17   the two Galans sitting behind me?

18   A    Yes, I am.

19   Q    You have to speak into the microphone.

20   A    Yes, I am.

21   Q    What's the relationship?

22   A    They both are my sons.

23   Q    Okay.  On January 3rd, 2012, in the evening of that day,

24   were you visited by policemen?

25   A    Yes.
```

1          MR. ZIMMERMANN:  Your Honor, may I bend the

2   microphone closer to the witness?

3   A    Should I go up a little more?

4   Q    It's your friend.  It's her friend.  Who was living in

5   the apartment 4, 139 Day Street, on the day of January 3rd,

6   2012?  Who resided there?

7   A    Myself, Gilbert Galan, and Pierre Galan.

8   Q    And how long had your sons been living there?

9   A    They only have been released from jail for six months,

10  but they had previously lived with me before they went to

11  jail, since 2006.

12  Q    Prior to -- six months --

13  A    Prior to the day?

14  Q    The day. . . So they had lived there for six months prior

15  to the day of the raid?

16  A    Yes, because they just been released.

17  Q    Did you sign, execute, and agree for us to submit an

18  affidavit concerning the events of that evening?

19  A    Yes, I did.

20          MR. ZIMMERMANN:  Can we mark this?

21          MR. SILVERMAN:  Yes.

22          MR. ZIMMERMANN:  Where are we in terms of -- O?

23          MR. SILVERMAN:  L.

24          THE CLERK:  L.

25          MR. ZIMMERMANN:  Any objection of this being

1  admitted in full?  I'm going to give one to the clerk for

2  marking, one for you.

3           THE COURT:  I think I have it.  Is this what you're

4  referring to?

5           MR. ZIMMERMANN:  Yes.

6           THE COURT:  Yes, I have one.

7           MR. ZIMMERMANN:  May I approach?  We're going to

8  call this L.

9  Q    Do you recognize your signature at the end of that?

10  A    Yes.

11  Q    Please relate to the Court what happened, from your

12  perspective, on the night or the evening of January 3rd, 2012.

13  A    Okay.

14  Q    Start from the beginning and go to the end.

15  A    All right.  I was asleep.  I usually fall asleep between

16  9:00 and 10:00, every night.  So I know I was asleep because I

17  jumped up, I heard a commotion and I wasn't sure what I heard,

18  so I kind of didn't get up right then.  Then I heard it again

19  but louder, so I got up.  I went running through my -- from my

20  bedroom through the kitchen.  There, Gilbert was in the

21  kitchen.  I ran around that corner and as soon as I got to the

22  door, police officers were with their guns drawn in my face.

23  Q    I'm going to ask you to slow down just a second.

24  A    Okay.

25  Q    And show you another exhibit that's already been marked

```
 1   into evidence, and perhaps you can describe for me where you

 2   were when you were asleep.  That's in here, right?  The

 3   bedroom?

 4   A    Yes.

 5   Q    Do you understand this is the floor plan?

 6   A    Yes, but I can't really see that well.

 7   Q    Okay.  This has been --

 8        MR. ZIMMERMANN:  May I approach the witness, your

 9   Honor, now that I'm already there?

10   Q    We're going to refer to this as F.  Can you understand

11   what that is?

12   A    Yes.

13   Q    And that's the layout of apartment 4, correct?

14   A    Yes.

15   Q    How long had you been living in apartment 4?

16   A    Since 2005, 2006.  I was there -- between 2005 and 2006.

17   I'm not sure.

18   Q    Okay.  That's close enough.  Now, you were in the

19   bedroom, you said.  What time was it you heard the commotion?

20   A    I don't know.

21   Q    Okay.  And what did you do when you heard the commotion?

22   A    When I first heard it, I didn't get up.  Then I heard it

23   louder so I got up and I ran through that hall, that hall from

24   my bedroom.

25   Q    Through here?
```

1    A    Through that hall from my bedroom, right.  I saw Gilbert

2    at the kitchen sink and I just glanced at him because he was

3    right there because I ran through the hall and I ran around

4    that corner, to the front door.

5    Q    Okay.  Front door is here.

6    A    Right.  So coming from that hallway, ran around there to

7    the front door.

8    Q    Okay.  And what happened then?

9    A    And two officers were in the doorway with their guns

10   pointed at me.  And I said, I shouted what the F is going on?

11   And he said to Gilbert -- no, he said to me, is anyone else in

12   this house?  And I said Gilbert, my son, right here.  So

13   Gilbert, they took Gilbert out into the hall and sat him on

14   the floor.  Me, I refused to go at first because I had a

15   nightgown on, a see-through nightgown, there was all men out

16   there, I was not going out there.  I decided well, I was going

17   to grab my jacket.  I was scared because they didn't know if I

18   was going to grab anything but I was just grabbing my jacket

19   to try to cover myself.

20   Q    Okay.

21   A    And so then he tells me to come into the hallway, so I

22   went into the hallway.

23   Q    Do you know the name of that officer?

24   A    No, I really don't.

25   Q    Could you tell the Judge what they had on?

1    A    They had masks.  I can't remember, both of them had

2    masks.  I know that -- well, I was so startled because I

3    didn't know, so I really can't say.  I don't know.  They had

4    on black.

5    Q    Okay, fine.  But it's your recollection one of them had a

6    mask.  I think it's in your affidavit.

7    A    Yeah, yeah.

8    Q    What happened then?

9    A    So he commanded me to come into the hallway and I did, I

10   went.  So he -- we stood there like two minutes or so and he

11   says, well, let's go back in and talk about it.  Let's go in

12   and talk about it.  So we came in.  I sat on the love seat.

13   Q    Which is where?

14   A    Which is on the other side of closet 2.

15   Q    This?

16   A    Right, I sat there.  And he said to me -- he was saying

17   to me but I noticed -- I thought I saw Officer Maio in my

18   apartment and he was one of the guys that I recognized so I

19   listened to him rather than listen to the officer.

20   Q    Right.

21   A    So he said to me, Mer, this got something to do with

22   Nature and Kevin Wilson and somehow your sons are involved.

23   Q    And this is Officer Maio talking to you?

24   A    Yes, because the other guy, I wasn't paying attention to

25   because --

```
 1   Q      Right.

 2   A      You know.  But then, as we come in, once we come in the

 3   door, I didn't know that an officer had went to the back or

 4   unless he went after I had said what I said, because he went

 5   back there to the bathroom and the other officer that was in

 6   front of me, he went running behind him and I went running

 7   behind him.  I thought I can go behind him.  So he said to me,

 8   he said -- he said -- I said what the F is going on again?  So

 9   he told me to shut up.

10          And before I can get -- I said, "What the -- before

11   I can get the F out, he said cuff her.  And the officers took

12   me and slammed me on my freezer, which the freezer is in the

13   kitchen.  They both -- the officer was at the counter next to

14   the bathroom and the other officer was there, too.  And they

15   both were at the counter.  So I was in front of my washing

16   machine that was right there in that corner right across from

17   the freezer.

18   Q      Okay.  Now, just, if you'll look up at the screen, this

19   is where the freezer was, right?

20   A      Right.

21   Q      And you said they cuffed you.

22   A      Yes.

23   Q      Where did they cuff you -- they cuffed you behind the

24   back?

25   A      Yes, they were all on my back.  They didn't know I had a
```

1  bad back, I had surgery on my back, I had a spinal fusion.  I

2  had it in 2005, but it still hurts and they were being really

3  rough with me, you know?  And that's what -- if I was

4  squirming that's why I was squirming because it was really

5  hurting me.

6  Q    Okay.  So you were pushed onto the freezer?

7  A    Yes, slammed onto the freezer.  I wasn't pushed.

8  Q    Were you cuffed at that point?

9  A    Yeah, they were cuffing me.

10  Q    They were cuffing you?

11  A    Right.

12  Q    In the process of cuffing you.  Now, your washer and

13  dryer's on this wall?

14  A    My washer and dryer is on that wall.

15  Q    Okay.

16  A    See the freezer, go to the freezer.

17  Q    Yes?

18  A    And right, go to your -- go the other way.  Yes, right

19  there.

20  Q    It's there?

21  A    Right there, it's a stackable washer and dryer.

22  Q    Okay.  What happened next?

23  A    So they let me, took me to the living room.  When --

24  before he even -- I just wanted to remind you that the officer

25  that had went to the bathroom for some reason or other he

```
 1  grabbed one of my red cups.  I don't know if it was in my
 2  bathroom or on my counter, the dish drainer, and he was
 3  supposedly showing the other officer what he got out of the
 4  bathroom, what he found, what he got out of the bathroom but I
 5  never saw what he had in the cup but he had the red cup.
 6  Q    He had a red plastic --
 7  A    A red plastic --
 8  Q    -- drinking glass?
 9  A    Solo cup.
10  Q    I see, Solo cup.
11  A    Yeah.
12  Q    And he had put something in it, you think?
13  A    He -- he -- he didn't get any further than -- he said he
14  went -- he said it's all rice and whatever in this cup.  He
15  was supposedly showing this officer or I don't know what he
16  was doing but I know he supposedly showed him something in
17  that cup.  That's how close I was to them.
18  Q    Do you remember at anytime prior to the officers running
19  down to the bathroom, that the toilet was running or had been
20  flushed?
21  A    Not while I had been -- well, I was sleep.  I don't even
22  know if I heard it, if it was running or not.
23  Q    Okay.  Was the door to the bathroom open or closed?
24  A    It was closed.
25  Q    And what happened next, after, I think you said they
```

```
 1   brought you --

 2   A    Back into the living room.

 3   Q    -- in the living room to sit on the couch or on the love

 4   seat?

 5   A    Yes.

 6   Q    That's this one?

 7   A    Actually, I was on the love seat, they put me on the love

 8   seat.  I remember it because it was a small chair and I was

 9   sitting on the front.  I was uncomfortable and Officer Maio

10   says please, he said you could take those cuffs off of her and

11   I must have asked him if I could go sit on the other side

12   because I wanted to sit and see, be more observant than just

13   sitting over there on the side where I can't see anything.

14   Q    With respect to your sons, and identifying the person

15   you're talking about by Pierre or Gilbert, what was going on

16   with the officers and them, if anything?

17   A    After they cuffed me, they brought them back in there.

18   Q    Both?

19   A    But before they brought them in there, they said, well,

20   because of the residue from the, whatever was outside my door,

21   and the drugs in the toilet, that they were going to have to

22   do -- they wanted to see if I would do a consent to search.

23   Q    Uh huh.

24   A    But then I don't know if I said to them, I believe I did,

25   like to bring my sons in here so they brought them in here.
```

1    They sat one at one end of the table, one at the other end of

2    the table, the table is small.

3    Q    Where's the table in this drawing?

4    A    The table is -- you see the wall where the freezer is?

5    There was a wall there but the table was directly behind that

6    in the living room.

7    Q    Right here where my pen is?

8    A    Yes.

9    Q    So that's where the table --

10   A    Kitchen table was.

11   Q    You were originally sitting in some small chair, where's

12   that?

13   A    The love seat, the little black mark there.

14   Q    Okay.

15   A    Right.

16   Q    And --

17   A    And then I ended up sitting.

18   Q    They brought you over to -- they took your cuffs off,

19   right?

20   A    Yes.

21   Q    And marched you over to the table?

22   A    Then they allowed me to go over to the long sofa.

23   Q    Oh, to the long sofa?

24   A    Yeah.

25   Q    You were sitting on the long sofa?

```
1    A     Yes.

2    Q     You just testified, I believe, that you asked the

3    officers to bring your kids in?

4    A     Yes.

5    Q     And did they?

6    A     Yes, they did.

7    Q     Were your sons handcuffed?

8    A     Yes, they were.

9    Q     Behind their backs?

10   A     Yes.

11   Q     And where did they end up sitting or standing or tell me?

12   A     Pierre sat on this side of the table and Gilbert sat on

13   that side of the table.  There was four chairs there.

14   Q     There were four chairs at this table?

15   A     Right.

16   Q     And Gilbert was here?

17   A     Pierre sat on that side.

18   Q     Huh?

19   A     Pierre sat on that side.

20   Q     This is where Pierre sat?

21   A     Yes.

22   Q     And over here is where Gilbert sat?

23   A     Yes.

24   Q     And you were here on the love seat -- on the couch?

25   A     Yes.
```

```
1    Q    You were about to go into a description of them asking
2    about a consent to search.
3    A    Yes.
4    Q    Did that happen next?
5    A    Yes.
6    Q    And who, do you know the names of the officers who were
7    working with you?
8    A    I don't know.  All I know is I call him the lead officer
9    because he was the one that was at the door, he was the one
10   that I went running behind, and he also was the one who told
11   me to shut up, that kept telling me to shut up, after he
12   handcuffed me.  I couldn't say anything.  Every word I said,
13   and I was in pain because they tried to break my arm, seemed
14   like, never mind my back.
15   Q    Yeah.
16   A    Yeah.
17   Q    And where was, when they brought, as you testified, your
18   two sons back into the apartment, did you observe first
19   Gilbert being dragged out of the apartment?
20   A    Yeah, I was standing right there.
21   Q    And at that time, where was Pierre?
22   A    Sitting on the steps, going up to the third floor.
23   Q    He was outside on the landing?
24   A    Yes.
25   Q    Was he handcuffed at that time?
```

```
1    A    I believe he was.

2    Q    And after they took Gilbert out also, you followed them

3    to the bathroom, right?  Or tried to?

4    A    I tried to, yes.

5    Q    And then you were -- sat down first at the table -- first

6    at the love seat?

7    A    Yes.

8    Q    And then at the couch?

9    A    Yes.

10   Q    And you asked them to bring your sons in?

11   A    Yes.

12   Q    And they did?

13   A    Yes.

14   Q    And what did they say to you next?  What happened next?

15   A    They were asking where was their belongings.

16   Q    What?

17   A    Where were their belongings?  Where did they sleep?

18   Q    Oh.  And what did you say?

19   A    I pointed to them.

20   Q    Huh?

21   A    I pointed to the belongings which were in bags all over,

22   kind of on one side of the living room.

23   Q    Okay.

24   A    And one slept on one sofa and one slept on the love seat

25   and they took turns.
```

```
1   Q    And you explained that?  Did you explain that to the
2   officers?
3   A    Yes.
4   Q    Did you explain how long they had been living there?
5   A    No.  I told them, well -- no, I didn't.  They didn't ask.
6   Q    That's fine.  But there came a time when they solicited
7   consent to search that apartment from you, correct?
8   A    Yes.
9   Q    And how did that go?
10  A    I said because they said whatever, because of the residue
11  at the door, and then what they found in the bathroom, that
12  gives them either I could -- well, they said I could either
13  sign this consent to search form or they would -- it would
14  take them three hours and they would go get a search warrant
15  because they wouldn't want me here all night, that's what they
16  said to me.
17  Q    Yeah, did they say anything about you having been charged
18  for interference?
19  A    No.  No.  As I'm sitting -- I don't even remember if it
20  was before the consent -- must have been after the consent,
21  when he was writing the information, that's the only time he
22  allowed me to talk to him was when he was asking me for my
23  information.
24  Q    Right.  And do you recall the name of the officer or
25  agent who was asking you for your information?
```

1    A    I don't know his name.  It's the lead guy.  I keep

2    calling him the lead guy.

3    Q    Yeah.  Now, did he ask you for your phone number?

4    A    I'm not sure.  He probably did, if it's on the ticket.  I

5    don't remember.

6    Q    The form, which I'd like to show you, this is

7    Government's Exhibit 13.  I'm going to put a picture of it on

8    the screen also.  Do you recognize your signature at the

9    bottom of this?

10   A    Yes.

11   Q    That's your signature?

12   A    Yes.

13   Q    And where did you sign this, in terms of where were you

14   sitting or standing?

15   A    I was sitting on the sofa.

16   Q    You were sitting on the sofa?

17   A    Yes.

18   Q    And where were the officers who were handing this to you?

19   A    He was standing in front of me.

20   Q    Standing in front of you?

21   A    To the side.  Well, the table was in front of me.  To the

22   side.

23   Q    How far away were Gilbert and Pierre sitting?  How many

24   feet?

25   A    Kind of where this lady is sitting here, compared from me

1    where I'm sitting on the sofa until about this lady sitting

2    here.

3    Q    So eight feet, something like that?  Okay.  Did you

4    discuss -- were you discussing this with the lead agent, the

5    boss, or were you discussing this consent with Officer Maio?

6    A    No, it was with the lead guy, whoever was in charge.

7    Q    Okay.  And did he fill out this form before you signed

8    it?

9    A    Yes, he did.

10   Q    Did he have a clipboard or a pad or something?

11   A    I don't know if he had a clipboard.  I know he wrote it

12   on the table, he was on, Gilbert was here, Gilbert was here

13   and I had a little space from the wall to Gilbert from the

14   chair, so he can stand, he stood right there at the table and

15   wrote it.

16   Q    Okay.  Did -- do you know who wrote the names Gilbert

17   Galan, Pierre Galan, Merline Sellers?

18   A    The man who handed this to me.

19   Q    That was the lead, boss, agent?

20   A    Yeah.

21   Q    Did he ask them what their names were?

22   A    He already knew their names.  I don't know.  I can't

23   remember.  But I'm quite sure he did, he wrote them up there.

24   Q    When you signed the form, Pierre and Gilbert were sitting

25   at the table, right?

```
 1   A    Yes.

 2   Q    Did he ask either Gilbert or Pierre or both to sign the

 3   form as well?

 4   A    I didn't hear him ask.  I know that I heard Pierre said,

 5   "nah," and I know Gilbert said, "I'm not signing that."

 6   Q    I'm not signing what?

 7   A    That S-H-I-T.

 8   Q    Oh.  Was that before you signed or after you signed?

 9   A    It had to be after I signed.

10   Q    Okay.  And what happened next?

11   A    Then I guess they looked at each other and I guess they

12   started searching.

13   Q    And did you observe what they searched through?

14   A    Yes.

15   Q    Where did it start?

16   A    I believe it started at the love seat, under the love

17   seat.

18   Q    Go back to the drawing.  How many agents or police were

19   in the apartment at that time?

20   A    I really wasn't counting, but I'm going to try to

21   assume -- one, two, three, four, five -- about five, I believe

22   if I'm correct.  I'm not sure.

23   Q    Something like a handful?

24   A    Yes.

25   Q    And they were searching over here, by the love seat?
```

```
1    A    Behind the love seat because it has a lot of their
2    clothes and some of my grandkids' toys in front of that
3    closet.  You really couldn't get through there.  That's where
4    they started, was at the love seat.
5    Q    Okay.  What did they find first, if anything?
6    A    A vest.
7    Q    A vest.  Where was that located, as far as you know?
8    A    If I'm correct, under the love seat.
9    Q    And you had no idea that was there?
10   A    No, I did not.
11   Q    And what did they find next?
12   A    After going through bags and stuff that was behind the
13   love seat, closer to the back wall, there was a bag, a paper
14   bag, had clothes in it but they said a gun was in there.
15   Q    They pulled a gun out of there?
16   A    Yes.
17   Q    And did they hold it up?
18   A    Yes.
19   Q    And did they ask whose is this?
20   A    Yes.
21   Q    And who answered and what?
22   A    I don't remember.
23   Q    Okay.  And what did they find next?
24   A    Then they went to the closet, closet 2.
25   Q    This is here, closet 2?
```

1  A     Yes.

2  Q     And that opens this way, right?

3  A     Yes.

4  Q     And was there one police officer or two?

5  A     It was, I know it was one.  It could have been two, I'm

6  not sure.  I don't remember.  I was upset.  I wasn't really

7  trying to really pay attention to.

8  Q     What was in that closet?

9  A     A lot of things.  A lot of things.  It was so full to the

10 top.  Books, steamer, a carpet steamer.  Clothes.  Clothes.

11 Clothes.  Boxes, books.  You name it, it's in there.

12 Q     There was clothes, too?

13 A     It was full.

14 Q     At some point -- what did you observe the police officer

15 who was going through that closet, what did he discover

16 besides all that stuff?

17 A     In some clothes, there was a bag, I think it was a clear

18 plastic bag I think that he got, pulled a sock out and said

19 oh, here's a gun, here's another gun.

20 Q     With respect to the two guns, did you have any idea those

21 were on the premise?

22 A     No, I did not.  I don't allow that.

23 Q     You don't tolerate that?

24 A     No.

25 Q     Same with, if there was anything in the bathroom, you

1    weren't aware of that?

2    A    No, I was not.

3    Q    The policeman who found the gun in the closet, did he

4    hold it up, like he just caught a fish or something?

5    A    Yes, he did.

6    Q    And what did he say, if anything?

7    A    Oh, we found another one.  Or something to that effect or

8    something.

9    Q    Did he ask whose it was?

10   A    Yes.

11   Q    I need to get your estimate of the time frame of this.

12   When you were handcuffed, how long were you handcuffed before

13   Officer Maio issued the instruction to uncuff you?

14   A    I wasn't -- I was probably cuffed maybe five minutes, if

15   that.

16   Q    And you were still pretty upset, right?

17   A    Oh, of course.  I was really upset then.

18   Q    Sitting on the couch, how long did you discuss the

19   consent and the situation in general, if you did, with the

20   lead agent and Officer Maio?  How long did it take before you

21   signed the consent?

22   A    That didn't take but like 15, 20 minutes.  I mean, might

23   not even that.  I wasn't even really paying attention to time.

24   Q    Right.  And after they left -- strike that.

25        At any point in time, did you express to them that they

```
 1   had hurt your back?
 2   A    Of course.  They knew, he knew from when they hurt me,
 3   because when I sat back down on the sofa, I was complaining
 4   about my arm and I was talking to myself, because I was really
 5   upset and angry.  And as I said before, when I would say
 6   something, he would say shut up or be quiet.  He told me to be
 7   quiet.  And, you know, so I just sat there.
 8   Q    And you were still, I take it from what you're saying, in
 9   pain when you were sitting on the couch?
10   A    Of course I was in pain.  Yes.
11   Q    After this, what happened next?  They finally left?
12   A    Yeah.  They left.
13   Q    And they took Gilbert and Pierre?
14   A    Took Gilbert and Pierre and left.
15   Q    What did you do?
16   A    I got myself together, got some clothes on, and I went to
17   the hospital because I wanted to be checked out for myself.  I
18   didn't have money to go in a ambulance, I didn't have medical
19   insurance so why make a bill for myself when I can walk around
20   there?
21   Q    Now, which hospital was it?
22   A    St. Raphael's.
23   Q    And how close is that to your apartment?
24   A    It's like one, two, two-and-a-half blocks.  Two blocks.
25   Q    And you were admitted to the emergency room?
```

```
 1   A    Yes.

 2   Q    And were you seen by a physician or physician's aide?

 3   A    Yes.

 4   Q    And what did they tell you?

 5   A    They told me -- well, I complained about my neck, my

 6   shoulder, my arm because I was in a lot of pain.  So they just

 7   gave me -- they checked me over and everything was okay but

 8   they gave me some -- something to relax me and they observed

 9   me for at least two hours, a hour or two.  Two hours.  And

10   then I was able to go home.

11   Q    Okay.  Do you recall obtaining a report of that visit to

12   the hospital?

13   A    Yes.

14        MR. ZIMMERMANN:  May I approach the witness, your

15   Honor?

16        THE COURT:  Yes.

17        MR. ZIMMERMANN:  Can we mark this for ID?

18   Q    All right.  We've marked this report as Defendant's

19   Exhibit M.  I'd like to show it to you and see if you

20   recognize it.

21   A    Yes.

22   Q    Where did you get that?

23   A    I went and picked it up from the hospital.

24        MR. ZIMMERMANN:  I'd offer this.

25        MR. SILVERMAN:  No objection.
```

```
 1              THE COURT:  It may be marked.
 2   Q    Now, when you were on the couch, put you back on the
 3   couch before you signed the consent, did you discuss with any
 4   agent the status of Pierre or Gilbert as to their living
 5   arrangement with you?
 6   A    Yeah, I was telling them, this is my apartment but they
 7   live there.  They both live there.
 8   Q    They asked you that or did you volunteer that?
 9   A    No, they asked, well, where do they sleep?
10   Q    You remember that quite clearly?
11   A    Yeah, where do they sleep?  I showed them where they
12   slept, both of them.
13   Q    Did they ask you how long they lived there?
14   A    I don't remember that.
15   Q    Okay.  When you signed the consent form, were you still
16   upset?
17   A    Of course I was.
18              MR. ZIMMERMANN:  I have no further questions.
19   CROSS EXAMINATION
20   BY MR. ADAMUCCI:
21   Q    Good afternoon, Ms. Sellers.  Since Pierre and Gilbert
22   lived at apartment No. 4, would you describe them as having
23   belongings in the apartment?
24   A    They had all their things there.
25   Q    Okay.  What type of things did they have at the apartment
```

1  and where?

2  A    They had clothes, they had CDs, DVDs.  All of that was in

3  one place, the living room.

4  Q    It was in the living room?

5  A    Yes.

6  Q    And where at within the living room?  If you walked in,

7  would you be able to see these items?

8  A    Oh, yes.

9  Q    Where were the DVDs, CDs?

10  A    On shelves, the table, and cabinets.

11  Q    Okay.  What other items were in the living room that the

12  two boys lived there?

13  A    Their cologne, their hair brushes, their deodorants, all

14  of that was in the baker's rack that I had there.

15  Q    That was in the living room?

16  A    Their shoes, boots, sneakers.

17  Q    That was within -- you walked in the living room, you

18  would be able to see that?

19  A    Yes.

20  Q    You wouldn't have to open up any doors --

21  A    No.

22  Q    -- or boxes or things like that?

23  A    No.

24  Q    Okay.  What about in the kitchen area, was anything

25  visible just by looking at the kitchen area that the boys

1   lived there?

2   A     Maybe a little mess, but no.

3   Q     What about in the bathroom, did they have any personal

4   belongings in the bathroom, like shampoo, body wash?

5   A     They had shavers, razors, you know, to do their little

6   faces and stuff.

7   Q     Like hair trimers?

8   A     Yeah.

9   Q     Electric hair trimmers?  Yes?

10  A     Yes.

11  Q     What about on the wall next to the kitchen, was there

12  anything on the wall that belonged to the boys?

13  A     No.

14  Q     Was there anything in the bedroom that belonged to the

15  boys?

16  A     No.

17            MR. ADAMUCCI:  Thank you, ma'am.

18            THE WITNESS:  You're welcome.

19            MR. SILVERMAN:  May I have one moment, your Honor?

20            Thank you, your Honor.  For purposes of

21  housekeeping, I note that it's 5:30.

22            THE COURT:  I noticed it, too.

23            MR. SILVERMAN:  I don't think my cross will be

24  terribly long.

25            THE COURT:  I would ask, you can stay a while longer

```
 1   rather than come back tomorrow.  Apparently, they agreed, is

 2   that right, Patty?

 3            THE CLERK:  As long as it's not too late, I'm

 4   diabetic, I have to eat.

 5            MR. ZIMMERMANN:  They have to get back to prison.

 6            THE COURT:  Where are they now?  Wyatt?

 7            Marshals, can you accommodate, stay a little longer?

 8            MR. SILVERMAN:  Your Honor, I have a family

 9   obligation around 6:00 p.m. tonight, if we're not done, my

10   colleague AUSA Vatti is happy to pick up wherever we left off.

11   CROSS EXAMINATION

12   BY MR. SILVERMAN:

13   Q    Good afternoon, Ms. Sellers.

14   A    Hello.

15   Q    My name is Marc Silverman.  I'm one of the prosecutors in

16   this case.  I have a few questions to follow up with your

17   testimony with Attorney Zimmermann and Attorney Adamucci who

18   are representing your sons.  Starting there, you testified

19   you're the mother of Pierre Galan, right?

20   A    Yes.

21   Q    And you're the mother of Gilbert Galan, right?

22   A    Yes.

23   Q    As a mother, do you love these boys?

24   A    Of course.

25   Q    You gave them a place to stay, you testified, when they
```

1    were released from prison, right?

2    A     Yes.

3    Q     And they stayed with you before they went to prison,

4    right?

5    A     Yes.

6    Q     You're aware now they were indicted in a federal case,

7    right?

8    A     I've heard.

9    Q     You're aware that certain items were found in your

10   apartment, as you testified in your direct examination, right?

11   A     Yes.

12   Q     Including two guns, right?

13   A     Yes.

14   Q     And a bullet-proof vest?

15   A     Yes.

16   Q     And maybe some drugs?

17   A     Yes.

18   Q     The things in the bathroom that Attorney Zimmermann

19   referred to, right?

20   A     Yes.

21   Q     So you know from all of that, that your boys could be in

22   a lot of trouble, right?

23   A     Yes.

24   Q     That they could go back to jail for maybe a long time,

25   right?

1    A    Yes.

2    Q    Do you have any idea how long?

3    A    No, I don't.

4    Q    Have you spoken to either of their attorneys about this

5    case?

6    A    Yes.

7    Q    And you're here to testify for them today?

8    A    Yes.

9    Q    At any point, did you meet with Attorney Zimmermann to

10   prepare for today's proceeding?

11   A    I met with him prior, yes.

12   Q    How many times did you meet with him?

13   A    Probably twice.

14   Q    The affidavit that was submitted as Defense Exhibit L,

15   that's your affidavit that was submitted, that was signed

16   December 21st, 2012, right?

17   A    Yes.

18   Q    That's your affidavit, right?

19   A    Yes.

20   Q    Did you type this up?

21   A    No.

22   Q    Who typed it?

23   A    I guess the secretary.

24   Q    Whose secretary?

25   A    Attorney Zimmermann's.

```
1    Q    Did you meet with him before his secretary typed it up?

2    A    Yes.

3    Q    To talk about what had happened, right?

4    A    Yes.

5    Q    And what was going to go in the affidavit, right?

6    A    Yes.

7    Q    So at some point, his secretary typed it up, you assume

8    his secretary typed it up.  Did you have to go back to his

9    office to sign it?

10   A    No, I signed it that day.

11   Q    You stayed there while it was being typed up?

12   A    Yes.

13   Q    And then it was presented to you?

14   A    Yes.

15   Q    You read it over?

16   A    Yes.

17   Q    Did you see anything that had to be corrected in an

18   earlier draft or version?

19   A    Yes.

20   Q    Did they make those corrections?

21   A    Yes.

22   Q    All right.  And then this final version that you have in

23   front of you, Defense Exhibit L, you signed that day at

24   Attorney Zimmermann's office?

25   A    Yes.
```

```
 1   Q    Had you met with him since you signed the affidavit,

 2   prior to today?  So from December 21st, 2012, until today,

 3   August 26, 2013, did you meet with Attorney Zimmermann?

 4   A    Yes, once.

 5   Q    One other time.  When was that?

 6   A    Was it Friday?  I think it was Friday.

 7   Q    Last week?

 8   A    Yes.

 9   Q    Okay.

10   A    Or was it Thursday?  I can't -- one of those two days.

11   Q    Do you know where your boys are being held right now

12   pending their trial?

13   A    Donald W. Wyatt.

14   Q    Have you been out there to visit them?

15   A    I went to visit Gilbert once.  Pierre just got there.

16   Q    Before that, where was Pierre being held?

17   A    In Bridgeport.

18   Q    Did you have an opportunity to visit him at the

19   Bridgeport Correctional Center?

20   A    Once.

21   Q    So you've seen them once each?

22   A    Yes.

23   Q    Okay.  Is it hard for you to see them in jail?

24   A    Yes.

25   Q    You, in your direct examination with Attorney Zimmermann,
```

```
 1   referred to an Officer Maio a few times, is that right?
 2   A    Yes.
 3   Q    Who is Officer Maio?
 4   A    He was a community police officer for our neighborhood,
 5   Dwight neighborhood, for years.
 6   Q    Do you know how many years?
 7   A    No, but I know it was a long time.
 8   Q    Did you know him from when he was working as a community
 9   officer?
10   A    Yes.
11   Q    You testified during your direct that he called you Mer
12   at some point?
13   A    Right, yes.
14   Q    That's a nickname for you?
15   A    No, because they didn't know my real name at the time,
16   they knew it was Mer something but they didn't know exactly
17   what it was.
18   Q    Prior to January 3rd, 2012, the day that your sons were
19   arrested, had you interacted with Officer Mayo before?
20   A    Like when?  I would say hi if I saw him.
21   Q    You would say hello?
22   A    Yes.
23   Q    Would he say hello back?
24   A    Of course.
25   Q    Would you say that you two got along all right?
```

```
 1   A     Yes.

 2   Q     You testified on your direct examination that you were

 3   ignoring the other officers and listening to Officer Mayo, is

 4   that right?

 5   A     Yeah, because he's the only familiar face that I knew

 6   that came into my apartment.

 7   Q     And he was telling you what this was about, you testified

 8   that he told you it has to do with Nature, Kevin Wilson, and

 9   your boys might be involved with that, right?

10   A     Somehow involved with it, yes.

11   Q     So he gave you some explanation for why the officers were

12   there, right?

13   A     Yes.

14   Q     How long did you and Officer Mayo speak on January 3rd,

15   2012?

16   A     We didn't speak like we were friends.  He was an officer.

17   Q     How long were you talking to him though?

18   A     Just long enough for him to tell me what he just said to

19   me, and another time I asked him can I smoke a cigarette,

20   because I was -- I wanted to smoke a cigarette.

21   Q     Were you able to smoke a cigarette?

22   A     Yes, they allowed me to smoke a cigarette.

23   Q     Where did you do that?

24   A     Right there on the sofa.

25   Q     Where were your cigarettes?
```

```
 1   A    On the table.

 2   Q    In the living room?

 3   A    Yes, I believe.  If I remember.  I got to smoke it,

 4   so. . .

 5   Q    Did someone bring you the cigarettes or were you

 6   permitted to go up and get them?

 7   A    I don't remember.  I know I smoked a cigarette.  I wasn't

 8   allowed to get up.

 9   Q    Okay.  At the time you smoked the cigarette, were you

10   still in handcuffs?

11   A    No.

12   Q    It was Officer Mayo that asked that your handcuffs be

13   removed, right?

14   A    Yes.

15   Q    And you testified before that you were in handcuffs for

16   five minutes or less, right?

17   A    Yes.

18   Q    At the time, January 3rd, 2012, your boys had been living

19   with you for about six months, right?

20   A    Yes.

21   Q    Were they helping you pay rent?

22   A    They didn't have any money.

23   Q    Were they working?

24   A    No.  Pierre previously had a job, but he wasn't working

25   at that time.
```

1  Q    He had a job after his release from prison?

2  A    Yes.

3  Q    But he was not working January 3rd, 2012?

4  A    No.

5  Q    What did he do after he was released from prison?

6  A    He worked for some car cleaning place or something.

7  Q    Did he contribute to the rent when he was working?

8  A    No, he was taking care of his daughter.

9  Q    Do you still have your affidavit in front of you?

10 A    Yes.

11 Q    Could you take a look at paragraph 6?

12 A    Yes.

13 Q    I'm going to read that paragraph, tell me if I read it

14 accurately.  "My son, Gilbert Galan, and I were listed as the

15 tenants on the lease for the apartment and the landlord gave

16 me a letter allowing Pierre to stay at the apartment."  Did I

17 read that right?

18 A    Yes.

19 Q    Did you receive a subpoena asking that you bring that

20 lease and that letter to court today?

21 A    Yes.

22 Q    Do you have that letter and that lease?

23 A    Yes.

24 Q    Do you have them with you right now?

25 A    Yes.

```
1    Q    May I see them?

2    A    Yes.

3              MR. SILVERMAN:  May I approach, your Honor?

4              THE COURT:  Yes.

5    A    This is my very first one, that's when Gilbert was added.

6    Q    I'm sorry, I just wanted to be sure the court reporter

7    was able to record this.  May I take these back with me to the

8    podium?

9    A    Sure, as long as you give them back.

10   Q    Thank you.

11   A    You're welcome.

12   Q    Is it accurate to say that the first document you handed

13   me, you referred to as your first lease?

14   A    Yes.

15   Q    And this starts July or August 2006, is that right?

16   A    Yes.

17   Q    And you're the only person listed as the tenant on this

18   lease, is that right?

19   A    Yes.

20   Q    Okay.  And then the second document you handed me is

21   another version of that lease, is that right?

22   A    Yes.

23   Q    And this one notes that the lease will terminate on July

24   30th, 2006, is that right?

25   A    It didn't terminate.  My lease didn't terminate.
```

1    Q     I'll get to that.

2    A     I guess for the year.

3          MR. SILVERMAN:  May I approach, your Honor?

4    Q     I would ask you to take a look at the first paragraph,

5    the second sentence, could you just read the second sentence

6    of the first paragraph aloud?

7    A     The second sentence of the first paragraph?

8    Q     Yes.

9    A     First paragraph, where?

10   Q     Marked 1.

11   A     Marked 1?  Terms, the term of this lease starts August

12   4th.  The lease will terminate on 2006, July 2006.  But it

13   didn't terminate.

14   Q     Okay.

15   A     For a year, that was for the year.

16   Q     So this was renewed at the end of that period?

17   A     Then it went on month to month.

18   Q     So after 2006, it went month to month, right?

19   A     Yes.

20   Q     This lease also notes that Gilbert Galan was added March

21   1st, 2006, son -- put it up on the screen -- in handwriting,

22   does it note Gilbert Galan added March 1st, 2006, son, then it

23   had a signature next to it?

24   A     Yes.

25   Q     Okay.  So this is the document that you were referring to

```
 1    in paragraph 6 of your affidavit which noted that Gilbert
 2    Galan was listed as a tenant for the apartment on your lease?
 3    A    Yes.
 4    Q    You said after this lease expired, it went month to
 5    month, is that right?
 6    A    Yes.
 7    Q    When was Gilbert Galan in jail?
 8    A    Let me see if I can come up with the -- they were
 9    released in June, June 21st, first day of summer.  The year
10    before -- okay, this happened in 20 --
11    Q    The events we're talking about were January 3rd, 2012, so
12    you think they were released the preceding June?
13    A    They were, they were locked up for two years.
14    Q    So during those two years, obviously Gilbert Galan was
15    not living with you?
16    A    Well, he was still on my lease.
17    Q    But he was not living with you, was the question I asked?
18    A    Right.
19    Q    Because he was incarcerated?
20    A    Right.
21    Q    Okay.  Turning to the other letter, can you read this
22    from where you're sitting?
23    A    Can I read it?
24    Q    Can you see that from where you're sitting?
25    A    I can see it.
```

1   Q    Okay.  Does this have a date of June 10th, 2012?

2   A    Yes.

3   Q    So that's approximately six months after the events we're

4   talking about on January 3rd, 2012, right?

5   A    Um hum.

6   Q    It's signed by Curtis Smart, housing chairperson?

7   A    Yes.

8   Q    It says that:  "Upon his release June 21, 2011, Pierre

9   Galan's mother asked and was granted permission to allow

10  Pierre to live with her at 139 Day Street apartment No. 4.  It

11  was with the understanding that this was a temporary

12  arrangement to allow him to find employment and lodging

13  elsewhere.  I acknowledge his presence there at that time."

14          Is that accurate, what I just read?

15  A    Yes.

16  Q    Thank you.

17          MR. SILVERMAN:  May I approach, your Honor?

18  Q    You were shown a copy of a medical report that you picked

19  up after this incident on January 3rd, 2012, I believe that's

20  Defense Exhibit M?

21  A    Yes.

22  Q    And it notes that you did go to the hospital and reported

23  your injury, right?

24  A    Yes.

25  Q    On the first page here, I'm using my pen to point to a

```
1   line.  Can you read that line?

2   A    I cannot.  I have a copy in my thing, but I can't.

3   Q    I'll hand you this one.

4   A    But I can't see that.

5   Q    That's fine.  Would you read that line that I'm pointing

6   to now, aloud?

7   A    Recent medical care.

8   Q    Underneath that.

9   A    Oh, sorry.  Review of --

10  Q    Here.  One line.

11  A    Similar symptoms previously several times.

12  Q    Thank you.  So this report notes that you presented with

13  similar symptoms previously several times, correct?

14  A    Yes.

15  Q    Okay.  You testified on your direct examination that

16  officers presented you with a choice:  You could either sign

17  the consent form or they could go get a warrant, is that

18  right?

19  A    Yes.

20  Q    And what did you choose to do?

21  A    I signed the consent.

22  Q    Why did you decide to sign the consent form?

23  A    Because he said if I signed the consent, I definitely

24  would not go to jail but if I didn't sign the consent and they

25  went and got a search warrant, I would -- whatever they find
```

1    in this apartment, everybody would go to jail.

2    Q    They said everybody would go to jail?

3    A    Everybody would go to jail, yes.

4    Q    After you signed the consent, they started searching,

5    right?

6    A    Yes, after I signed the consent, they went, he went to

7    the table and then they started searching.

8    Q    Say that again?

9    A    After I signed the consent, he signed, he went to the

10   table where Gilbert and Pierre were and then they started

11   searching.

12   Q    What did he do at the table?

13   A    I guess he was asking them to sign the consent.  I don't

14   know what they did at the table.

15   Q    In your affidavit -- do you still have that?

16   A    Yes.

17   Q    Would you take a look at paragraph 18?  Does that first

18   sentence say:  "I do not recall the officers asked my sons to

19   sign the consent to search form."  Is that what it says?

20   A    That's what it says.

21   Q    Okay.  After they started searching, you testified that

22   they found the vest and then they found two guns, right?

23   A    Yes.

24   Q    And you testified specifically where the vest was found,

25   that was underneath the love seat, right?

```
 1   A    Yes.

 2   Q    And you testified specifically as to where the first gun

 3   was found?

 4   A    Yes.

 5   Q    That was in a paper bag with some clothes near or behind

 6   the love seat, right?

 7   A    Yes.

 8   Q    And with respect to the second gun, you testified that it

 9   was in a bag in the closet, closet No. 2, per the diagram,

10   right?

11   A    Yes.

12   Q    After each gun was found, did you hear the officer -- I'm

13   sorry.  Withdrawn.

14        After the vest and each gun was found, did you hear the

15   officer who found it announce that they found the vest, the

16   first gun and the second gun?

17   A    Yes.

18   Q    And what happened after the officer announced that he

19   found the vest?

20   A    He asked whose was it.

21   Q    The officer who found it asked whose was it?

22   A    Yes, who does this belong to?

23   Q    What was the response?

24   A    I don't know which one said what to each, I don't

25   remember.
```

1    Q    Did one of your boys say that's my vest, something along

2    those lines?

3    A    Yes.

4    Q    After the first gun was found, and the officer announced

5    the gun had been found, what happened?

6    A    The same thing.

7    Q    One of your boys said that's mine?

8    A    They said who does this belong to?  They asked who does

9    this belong to?

10   Q    Did one of your boys say that's mine, something to that

11   effect?

12   A    Yes.

13   Q    And with respect to the second gun, after that was found

14   and the officer announced it had been found, did one of your

15   boys say, that's mine?

16   A    He said, he didn't remember -- well, yeah, some clothes

17   were in that closet from where he previously lived, and he

18   didn't know it was in there because it was clothes brought

19   from another apartment to be stored in that apartment.

20   Q    Do you remember which son that was?

21   A    Yeah, Pierre.

22   Q    I'm sorry, Pierre?

23   A    Yes.

24   Q    So Pierre said he didn't remember that the gun was in

25   there?

1    A    No, he didn't know, he was locked up for two years.  It's

2    been in that closet.

3    Q    For two years?

4    A    For two years or more.

5    Q    Okay.  You testified on your direct examination that you

6    didn't know there was drugs or a vest or any guns in the

7    apartment, right?

8    A    Right.

9    Q    How did those guns get there?

10   A    I didn't put them in there.  I don't know.

11   Q    Are they your guns?

12   A    No, they're not.

13   Q    You said you had some toys for your grandkids in the

14   apartment, right?

15   A    Yes.

16   Q    Did your grandkids ever come over and play?

17   A    Yes.

18   Q    Would you be upset that they were playing in an area that

19   had guns?

20   A    Yes.

21   Q    Would you be upset that they were playing in an area that

22   had drugs?

23   A    Yes.

24   Q    Do you know whose guns they were?

25   A    No, I do not.  I didn't even know they were there.

1   Q     But did you hear people claim ownership of them?

2   A     Yes, I did, but I still didn't know they were there.

3   Q     Today, as you sit here testifying, do you know whose guns

4   they were?

5   A     No, I still don't know whose guns they were.

6   Q     Okay.  But you just testified a moment ago --

7   A     Yeah, to one that was in Pierre's belongings.  I didn't

8   say it was his gun.

9   Q     Did he say it was his gun?

10  A     I don't know.  I don't remember.

11        MR. SILVERMAN:  May I have a moment, your Honor?

12        No further questions at this time.

13        MR. ZIMMERMANN:  Very brief.

14  REDIRECT-EXAMINATION

15  BY MR. ZIMMERMANN:

16  Q     You testified that you and I had met a week ago, and I

17  believe you met with Attorney Atkinson?

18  A     Yes.

19  Q     -- in preparation of the affidavit.  Did I tell you what

20  to put in that affidavit?

21  A     Did you do what?  Tell me what to say?

22  Q     Did I tell you what to put in the affidavit?

23  A     No, you did not.

24  Q     As a matter of fact, I told you to tell the truth,

25  correct?

```
1   A    You told me to tell the truth, yes, you did.

2   Q    After Gilbert was released in June of 2012, was he in a

3   car accident?

4   A    Yes.

5   Q    And he wasn't working because he was injured?

6   A    Right.

7           MR. ZIMMERMANN:  I have no further questions, your

8   Honor.

9           THE COURT:  Thank you.

10          MR. ZIMMERMANN:  Nick?

11          MR. ADAMUCCI:  No.

12          MR. ZIMMERMANN:  We are done.  You are excused.

13          THE WITNESS:  Thank you very much.  Thank you very

14  much.

15          MR. ZIMMERMANN:  Thank you for coming.  Sorry you

16  had to wait.

17          MR. KURMAY:  Take care, Judge.

18          THE COURT:  Is there going to be any further

19  evidence?

20          MR. ZIMMERMANN:  No.

21          THE COURT:  I don't want these people to stay any

22  longer than they have to.  Any more evidence?

23          MR. ZIMMERMANN:  No.

24          THE COURT:  Do you want to argue tomorrow?  I think

25  you said that you had --
```

```
 1              MR. SILVERMAN:  I have a family obligation although
 2    I'm con if I had depth that Attorney Vatti should argue the
 3    case, should everyone wish to stay.  I'm also happy -- I'm in
 4    this courtroom frequently, I'm happy to argue it at another
 5    time that's convenient for other parties.
 6              THE COURT:  I will make myself available for that.
 7    Just I hate asking the staff to stay very much longer than
 8    6:00 o'clock.
 9              MR. ZIMMERMANN:  I was going to ask that we file a
10    brief, before we argue it.
11              THE COURT:  Okay, very good.  Want to give me a date
12    for that, simultaneous briefs, do you want to give me a date
13    and then reply within ten days thereafter?
14              MR. ZIMMERMANN:  I'm sorry, did you just set a
15    schedule?
16              THE COURT:  No, I'm asking you when do you want to
17    file your simultaneous briefs.
18              MR. ZIMMERMANN:  January, 2014.
19              THE COURT:  I don't know that I'll be here.
20              MR. ZIMMERMANN:  I don't know, either.  We'll talk
21    about it somewhere else.
22              THE COURT:  How much time do you need?
23              MR. ZIMMERMANN:  Two weeks.
24              THE COURT:  Two weeks?  Simultaneous briefs then on
25    September 13th?
```

```
 1              MR. SILVERMAN:  Your Honor, before you go further
 2   with that process.
 3              THE COURT:  Yes, sir?
 4              MR. SILVERMAN:  I will defer to the Court obviously,
 5   I found that simultaneous briefing is not always the most
 6   efficient process for the parties.  If the Court prefers it to
 7   be that way, we will certainly do it.
 8              THE COURT:  I don't care.
 9              MR. SILVERMAN:  Given that it was the defendant's
10   motion, it's the government's preference that they submit the
11   first brief, government submit an opposition and they be able
12   to reply, and if I need sur-reply I can move for permission.
13              THE COURT:  Defendants' brief by --
14              MR. SILVERMAN:  Here's the other thing, Attorney
15   Vatti and I are scheduled to pick a jury September 12th before
16   Judge Chatigny and commence trial September 16th, so we have a
17   rather time consuming --
18              THE COURT:  Just suggest to me what dates you want.
19              MR. SILVERMAN:  May I have a moment to confer with
20   Attorney Zimmermann and Attorney Adamucci then?
21              THE COURT:  Certainly.
22              MR. ZIMMERMANN:  They have 60 lawyers in their law
23   firm.
24              THE COURT:  I know, how many have you got?
25              MR. VATTI:  Only two familiar with the case though.
```

1          (Counsel conferring.)

2          MR. SILVERMAN:  Your Honor, as happens quite

3    frequently, we've all got busy schedules and other obligations

4    so I think what we propose, given that jury selection in this

5    case is scheduled for early October, October 8th I believe,

6    with trial to commence thereafter, and the Court will only

7    have a limited amount of time to rule once the briefs are

8    submitted and if the Court decides arguments are warranted we

9    want to give the Court enough time to consider the issues so I

10   think we're back to simultaneous briefing.  Due to Attorney

11   Zimmermann's schedule, some issues he has, he's asking for

12   approximately September 12th, the government is scheduled both

13   Attorney Vatti and I are scheduled to pick a jury on the 10th

14   but we don't start evidence until the 16th so we'll submit a

15   brief on the 12th or earlier related to these issues and then

16   we'll reply, we'll have to reply before our trial starts.

17          THE COURT:  I hope so.

18          MR. SILVERMAN:  We'll have a reply in to you

19   probably before the 16th, it will be quick, if a reply is even

20   necessary.  So I think why don't we schedule the 12th as the

21   deadline for simultaneous filing and if Attorney Zimmermann

22   and Attorney Adamucci want another week, that would take us to

23   the 19th of September.  We'll be on trial then but we'll

24   submit a brief prior to starting trial or ask the Court for an

25   extension.

 1                THE COURT:  I'm sorry, I misunderstood you, I

 2     thought you said simultaneous briefs on September 13th.

 3                MR. SILVERMAN:  On September 12th, I don't know what

 4     day of the week that is, it might be a Saturday -- it's a

 5     Thursday.

 6                THE COURT:  September 12th is a Thursday.

 7                MR. SILVERMAN:  We'll plan to submit simultaneous

 8     briefs September 12th and if replies are necessary, I know the

 9     Court usually allows a week for that which will take us to

10     September 19th, both Attorney Vatti and I will be on trial but

11     we'll submit something sooner or we'll ask the Court for an

12     extension if one is required.

13                THE COURT:  I will assume that we're going to have

14     replies on the 19th.

15                MR. SILVERMAN:  Yes, your Honor.

16                MR. ZIMMERMANN:  That's agreeable to us.

17                THE COURT:  That's okay with you?

18                MR. ZIMMERMANN:  We've done a lot of that work in

19     our motions, I'm sure Arthur knows.

20                THE COURT:  Yes.

21                MR. ZIMMERMANN:  So this shouldn't be a nightmare.

22     I have treatment on the 5th and that means I'm a zombie.

23                THE COURT:  When are we selecting the jury?

24                MR. SILVERMAN:  October 8th is jury selection with

25     trial commencing immediately thereafter.  If the Court wanted

1    to schedule argument, we would make ourselves available as

2    soon as our trial ends for that purpose.

3            MR. ZIMMERMANN:  Or you could simply grant the

4    motion now.

5            MR. SILVERMAN:  Or you could simply deny the motion

6    today.

7            As an alternative, I don't know if this is better

8    for the Court or the parties, I'd be happy to argue the motion

9    in lieu of submitting briefs.  I don't know how efficient or

10   inefficient that is for the Court, or if that's amenable to

11   defense counsel but we largely submitted the case law relevant

12   in our prehearing briefs, the Court's now heard all the

13   testimony and seen all the exhibits.  I think our post hearing

14   briefs would largely be redundant.

15           THE COURT:  You don't have to brief it if you don't

16   want to, I think I know where I'm going.

17           MR. SILVERMAN:  We would all like a preview of that

18   destination.  If the Court would prefer and my colleagues

19   would not object, we would be happy to argue the matter citing

20   the law and the testimony the Court has heard.

21           MR. ZIMMERMANN:  I'm in a different position, I'd

22   like to take what's been said here today and craft a brief.

23           THE COURT:  Maybe you gentlemen together can work

24   out a schedule and let me know what you decided.

25           MR. ZIMMERMANN:  We'll do it as quickly as possible.

1            THE COURT:  Can you do that?  Just consult.

2            MR. SILVERMAN:  Yes, your Honor, in that scenario we

3  should stick to the dates of September 12th and September 19th.

4            MR. SILVERMAN:  Thank you, your Honor.

5            MR. ZIMMERMANN:  Thank you.

6            THE COURT:  Okay, very good.  Thank you.
             (6:02 o'clock p.m.)

7                  INDEX OF WITNESSES                  PAGE
   DAVID RIVERA
8       Direct Examination by Mr. Vatti              12
        Cross Examination by Mr. Zimmermann          64
9       Cross Examination by Mr. Adamucci            84
        Redirect Examination by Mr. Vatti            110, 128
10      Recross-Examination by Mr. Zimmermann        121
        Recross-Examination by Mr. Adamucci          125
11   JASON Hanson
        Direct Examination by Mr. Silverman          129
12      Cross Examination by Mr. Zimmermann          154
        Cross Examination by Mr. Adamucci            162
13      Redirect-Examination by Mr. Silverman        175
        Recross-Examination by Mr. Zimmermann        176
14   EKREM HALIM
        Direct Examination by Mr. Vatti              177
15      Cross Examination by Mr. Zimmermann          182
        Cross Examination by Mr. Adamucci            183
16      Redirect-Examination by Mr. Vatti            189
   DEBORAH CURTIS
17      Direct Examination by Mr. Zimmermann         191
        Cross Examination by Mr. Vatti               201
18      Redirect-Examination by Mr. Zimmermann       211, 215
        Recross-Examination by Mr. Vatti             214
19   MERLINE SELLERS
        Direct Examination by Mr. Zimmermann         216
20      Cross Examination by Mr. Adamucci            240
        Cross Examination by Mr. Silverman           243
21      Redirect-Examination by Mr. Zimmermann       261

           COURT REPORTER'S TRANSCRIPT CERTIFICATE
22           I hereby certify that the within
      and foregoing is a true and correct
23    transcript taken from the proceedings
      in the above-entitled matter.
24                    /s/ Thea Finkelstein
                      Official Court Reporter
25

   Dated: _____