```
 1                    UNITED STATES DISTRICT COURT

 2                     DISTRICT OF CONNECTICUT

 3    * * * * * * * * * * * *  x   Criminal Case
                                      No. 3:12CR104(EBB)
 4    UNITED STATES OF AMERICA,    :
                    Plaintiff
 5                                 :

 6           vs.                        July 23, 2013
                                   :    12:15 O'clock p.m.
 7    JEFFREY BENTON,
                    Defendant      :
                                        New Haven, Connecticut
 8    * * * * * * * * * * * * *  x
```

 9                ARRAIGNMENT AND SUPPRESSION HEARING

10           BEFORE THE HONORABLE ELLEN BREE BURNS
                SENIOR UNITED STATES DISTRICT JUDGE

11
     Appearances:
12     For the Plaintiff:          MARC H. SILVERMAN, ESQ.
                                    S. DAVE VATTI, ESQ.
13                                  Assistant U.S. Attorneys
                                    157 Church Street
14                                  25th Floor
                                    New Haven CT 06510
15     For the Defendant:
                                    JODI LYNN ZILS GAGNE, ESQ.
16                                  P.O. Box 4023
                                    Bristol, Connecticut 06010

17

18

19

20
       Court Reporter:             Thea Finkelstein RMR, CRR
21                                 141 Church Street
                                   New Haven, CT 06510
22                                 TheaFinkelstein@aol.com

23

24

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.

```
 1                THE COURT:  Good afternoon.

 2                MR. SILVERMAN:  Good afternoon, your Honor.

 3                MS. GAGNE:  Good afternoon, your Honor.

 4                THE COURT:  Please be seated.

 5                MR. SILVERMAN:  Marc Silverman for the United

 6   States.  Good afternoon, your Honor.

 7                THE COURT:  Good afternoon.

 8                MR. SILVERMAN:  We're here this afternoon for a

 9   suppression hearing, and a hearing on a suppression motion,

10   filed by Mr. Benton, case No. 3:12CR105, United States versus

11   Jeffrey Benton, assigned to Judge Burns.

12                I think there are some housekeeping matters that

13   might be better addressed at the outset.  The grand jury

14   returned a superseding indictment last week in this case.  The

15   defendant has not yet been arraigned on the charges against

16   him in the superseding indictment.

17                Per communication from your chambers, to both

18   defense counsel and myself, the Court wanted to start today

19   with an arraignment of the defendant on those charges.

20                THE COURT:  All right.

21                MR. SILVERMAN:  I'm happy to provide the defendant

22   with the penalties associated with each of the charges, but I

23   know the Court wants to be sure the defendant has received a

24   copy of the indictment, had an opportunity to review it with

25   his counsel.
```

```
 1          MS. GAGNE:  Your Honor, Jodi Zils Gagne for the

 2   defendant, and with me at counsel table is Jeffrey Benton.

 3          Yes, I have given, just now, Mr. Benton a copy of

 4   the indictment, and we went over it a while ago.

 5          THE COURT:  Thank you very much, ma'am.

 6          MR. SILVERMAN:  If I may go over the charges and the

 7   penalties associated with the charges.  The defendant's

 8   charged in counts One, Six, Seven, Eight, and Nine of the

 9   superseding indictment.

10          In Count One, he's charged with conspiracy to

11   distribute and to possess with intent to distribute controlled

12   substances, and paragraph 5 of Count One specifies that the

13   defendant's involved with 100 grams or more of a mixture and

14   substance containing a detectable amount of heroin.

15          So the offense charges him with a violation of Title

16   21, United States Code, sections 841(a)(1), 841(b)(1)(B), and

17   846.

18          That offense carries a mandatory minimum term of

19   imprisonment of five years, a maximum of up to 40 years, a

20   term of supervised release of at least four years and up to

21   life, a fine of up to $5 million, and the mandatory $100

22   special assessment.

23          Count Six charges the defendant with possession with

24   intent to distribute controlled substances, specifically

25   cocaine and cocaine base, in violation of Title 21, United
```

1    States Code, sections 841(a)(1) and 841(b)(1)(C).

2          That offense carries a maximum term of imprisonment

3    of 20 years, a term of supervised release of three years to

4    life, a fine of up to $1 million, and a $100 special

5    assessment.

6          Counts Seven and Eight both charge the defendant

7    with unlawful possession of a firearm or ammunition by a

8    convicted felon, in violation of Title 18, United States Code,

9    sections 922(g)(1) and 924(a)(1).

10         Those offenses each carry a maximum term of

11   imprisonment of ten years, a term of supervised release of up

12   to three years, a fine of up to $250,000, and the mandatory

13   $100 special assessment.

14         And finally, Count Nine charges the defendant with

15   possession of firearms in furtherance of a narcotics

16   trafficking crime, in violation of Title 18, United States

17   Code, sections 924(c)(1)(A), and 925(c)(2).

18         That offense carries a mandatory minimum term of

19   imprisonment of five years, a maximum of life.  In addition

20   any term of imprisonment imposed for Count Nine must run

21   consecutively to the substantive drug count to which it's

22   related.  It carries a fine of up to $250,000, up to five

23   years of supervised release, and the mandatory $100 special

24   assessment.

25         Thank you, your Honor.

1          THE COURT:  Thank you.

2          Sir, have you had an opportunity to review the

3     superseding indictment and discuss it with your attorney?

4          THE DEFENDANT:  Yeah.

5          THE COURT:  You know you have the right to plead not

6     guilty to this charge, in which case the government would have

7     the burden to prove you guilty beyond a reasonable doubt of

8     the offenses with which you are charged.

9          You have a right to have an attorney represent you

10    during the course of the proceedings, and if you cannot afford

11    the services of an attorney, the Court would provide one for

12    you.

13         Furthermore, sir, you can remain silent, you don't

14    have to testify or incriminate yourself in any way, because

15    the government has the responsibility of proving you guilty.

16    You do not have to prove you are innocent.  Do you understand

17    that, sir?

18         THE DEFENDANT:  Yes.

19         THE COURT:  Have you discussed the indictment with

20    your attorney?

21         THE DEFENDANT:  Yes.

22         THE COURT:  Are you prepared this afternoon to enter

23    a plea to this, sir?

24         THE DEFENDANT:  Yes.

25         THE COURT:  And your plea is?

```
1              THE DEFENDANT:  Not guilty.

2              THE COURT:  Thank you.

3              MS. GAGNE:  Thank you.

4              MR. SILVERMAN:  Thank you, your Honor.

5              With that matter addressed, there are a couple of

6     quick housekeeping matters before we begin the hearing.

7              First, I would ask the Court, I believe the Court's

8     already in practice, that the witnesses be sequestered.  I

9     know the defendant is entitled to remain here throughout the

10    proceeding, but I understand there are three additional

11    defense witnesses and two government witnesses prepared to

12    testify today, and I would ask that they be outside of the

13    courtroom during one another's testimony.

14             THE COURT:  Yes, that motion's granted.

15             MR. SILVERMAN:  Thank you, your Honor.

16             Third, there are a number of exhibits the government

17    will be seeking to introduce.  I don't believe there's an

18    objection to any of them.  I can specify them as we go, but I

19    would ask at this time that the exhibits be moved into

20    evidence, without any objection.

21             MS. GAGNE:  There's no objection.

22             THE COURT:  Thank you, ma'am.

23             MR. SILVERMAN:  Thank you, your Honor.  That should

24    streamline things a little bit.

25             Fourth, there's one error in the government's
```

```
 1    omnibus response that I wanted to flag for the Court, and it
 2    can be the subject of testimony later on, but I wanted to
 3    bring it out now.  The opposition, and the portion of it that
 4    I prepared, has one factual discrepancy talking about Officer
 5    Rivera's explanation of the law enforcement's ability to
 6    obtain a search warrant if the defendant's girlfriend/
 7    significant other did not provide consent.
 8         I've been informed prior to today's suppression
 9    hearing that he didn't take that approach.  He never indicated
10    to defendant's significant other that law enforcement might
11    seek a search warrant if she declined to provide consent; he
12    instead took a different approach which we'll hear testimony
13    about.
14         So there's one error that I'll talk about, bring
15    out, in the portion of the examination.  But that was not the
16    approach taken.
17         And then lastly, as a housekeeping matter, I know
18    that there were two separate motions filed by Mr. Benton that
19    relate to today's hearing:  One is a motion to suppress
20    physical evidence, and the other's a motion to suppress
21    wiretap evidence.  There are two different pieces.  The
22    testimony today is focused solely on the physical evidence.
23         THE COURT:  This was not my wiretap, was it?
24         MR. SILVERMAN:  No, it wasn't, your Honor.  Chief
25    Judge Thompson authorized the wiretap in the case.
```

```
 1              THE COURT:  We're not addressing that this

 2   afternoon?

 3              MR. SILVERMAN:  If the Court would like to hear

 4   argument on the issue, the government's prepared to argue it.

 5   I know speaking with defense counsel, the defendant's prepared

 6   to have the issue resolved on the papers, and I believe the

 7   government would be comfortable with that approach as well.

 8              AUSA Dave Vatti, who's seated to our left and came

 9   in after we entered our appearances, prepared that portion of

10   the government's omnibus.

11              THE COURT:  I'd be happy to entertain argument, but

12   if you feel it's unnecessary, that's okay, too.

13              MR. SILVERMAN:  May we have one moment to confer?

14              THE COURT:  Yes.

15              MS. GAGNE:  Your Honor, we agree that neither one

16   would add to what's already in the papers, so if your Honor

17   would take it on the papers, that would be our request.

18              THE COURT:  Thank you, ma'am.

19              MR. SILVERMAN:  We're here today on a motion to

20   suppress physical evidence that was recovered at 719 Orchard

21   Street at the time of the defendant's arrest on May 17, 2012.

22   I would like to provide the Court with a list of the physical

23   evidence which is the subject of the suppression motion:  A

24   cellular telephone was recovered; a digital scale; one gram of

25   crack cocaine and 100.1 grams of powder cocaine; approximately
```

1    $5,536 in United States currency of which three $100 bills

2    were counterfeit;

3            Four firearms, that is:  A Glock 23 serial No. NFL

4    539, a .40 caliber firearm with loaded magazine; the second is

5    a Ruger P-94 serial 34127316, a .40 caliber firearm with a

6    loaded extended magazine; the third is a Smith & Wesson with a

7    black laser 1076 serial No. TFE 0521 with a loaded magazine;

8    and the fourth is a Smith & Wesson 9 millimeter firearm 469

9    serial TBW 0314 with an empty magazine;

10            There was a DMV registration to a 2002 BMW

11   registered in the name of Jeffrey Benton; there was some

12   clothing and some sneakers and a box containing sandwich

13   Baggies.

14            That's the physical evidence that is the subject of

15   the motion to suppress today.

16            As I stated a moment ago, it's my understanding that

17   the defendant intends to call four witnesses, including the

18   defendant, and that the government has two witnesses for the

19   hearing.

20            I understand from speaking with defense counsel that

21   one of the defense witnesses has a work obligation starting at

22   1:00 o'clock, so she would like to start with that witness.

23   The government is fine with that approach.

24            THE COURT:  Very good.

25            MS. GAGNE:  Your Honor, before I call my first

1    witness, I would reiterate he does have a work obligation at

2    1:00o'clock.  When he comes off the stand, his sister, who is

3    the following witness, needs to go downstairs to get her phone

4    to call his wife.  So after my first witness gets off the

5    stand, if I could have a five-minute recess for that phone

6    call.

7            THE COURT:  All right, ma'am.

8            MS. GAGNE:  I would like to call the first witness,

9    Ryan McCrea and I ask that Kawya Cortes and Gwendolyn McCrea

10   step out into the hallway.

11                    **R Y A N   M c C R E A**

12       having been called as a witness, was first

13       duly sworn and testified on his oath as follows:

14           THE CLERK:  Please be seated.  State your name and

15   spell your last name for the record, and just state your

16   address by city and state only.

17           THE WITNESS:  Ryan McCrea, R-Y-A-N, M-c-C-R-E-A.

18   New Haven, Connecticut.

19   DIRECT EXAMINATION

20   BY MS. GAGNE:

21   Q    Good morning, Mr. McCrea.  Do you know the defendant in

22   this case, Jeffrey Benton?

23   A    Yes.

24   Q    How do you know him?

25   A    From my sister.  He's her boyfriend.

1    Q    It's your sister's boyfriend, and your sister is Kawya,

2    K-A-W-Y-A?

3    A    Yes.

4    Q    Where does your sister live?

5    A    719 Orchard Street.

6    Q    In New Haven?

7    A    Yes.

8    Q    Have you ever been to her apartment before?

9    A    Yes.

10   Q    Have you ever spent the night there?

11   A    Occasionally.

12   Q    How often would you spend the night?

13   A    Here and there.  Actually, the day I stayed over there, I

14   was -- actually had to DJ, and I kind of got locked out of

15   where I originally stay, so actually ended up going to her

16   house to stay for the night.

17   Q    Okay.  You got locked out of the place you normally stay

18   at?

19   A    Yes.

20   Q    And you spent the night at Kawya's?

21   A    Yes, ma'am.

22   Q    Now, do you remember last year when Mr. Benton was

23   arrested on the morning of May 17th, 2012?

24   A    Yes.

25   Q    You said you were spending the night there that night?

```
1    A     Yes.

2    Q     Were there other people also sleeping over at your

3    sister's apartment that night?

4    A     Yes.

5    Q     Do you remember who that was?

6    A     Yes.  Me, my mother, my little brother, my older sister,

7    and my niece.

8    Q     And so you knew everyone in the apartment that night?

9    A     Yes, ma'am.

10   Q     Was there anyone you didn't know?

11   A     No.

12   Q     So on the morning of May 17th, 2012, what were you doing

13   at 5:45 in the morning?

14   A     I was sleeping.

15   Q     Where were you sleeping?

16   A     In the living room.

17   Q     Were you on the floor?

18   A     Yes, ma'am.

19   Q     On an air mattress of some kind or just on the floor?

20   A     Just on the floor.

21   Q     Now, that living room also the room that contains the

22   main door to the apartment?

23   A     Yes, ma'am.

24   Q     So if someone enters the apartment from the outside,

25   that's where they go?
```

```
 1    A     Yes, ma'am.

 2    Q     Where you were sleeping?

 3    A     Yes, ma'am.

 4    Q     Did you hear the police knock on the main door to the

 5    apartment that day?

 6    A     No, ma'am.

 7    Q     Did you open the door for the police?

 8    A     No.

 9    Q     To your knowledge, and because you were sleeping right

10    there, did anyone open the door for the police and agents that

11    morning?

12    A     No.

13    Q     You didn't see anyone open the door?

14    A     No, I didn't.

15    Q     And to your knowledge, did anyone tell the police that

16    they could enter the apartment?

17    A     No.

18    Q     And again, you were sleeping right there?

19    A     Yes, ma'am.

20    Q     Now, did you wake up on your own that morning or did

21    something wake you up?

22    A     I woke up to flashlights in my face.

23    Q     From the police?

24    A     Yes.

25    Q     So when you woke up, the police were already in the
```

1    apartment?

2    A    Yes, ma'am.

3    Q    Do you know why the police woke you up?

4    A    No.  They asked me if I was Jeffrey Benton.

5    Q    And after the police woke you up and asked you if you

6    were Jeffrey, what happened?

7    A    They just told me to basically wait where I was at, and

8    they proceeded to go to the next room.

9    Q    To try to find him?

10   A    Yes.

11   Q    Now, were you present in the apartment the whole time the

12   police and the agents were there?

13   A    Yes, ma'am.

14   Q    So I assume the police eventually found Mr. Benton?

15   A    Yes, ma'am.

16   Q    Do you know where they found him?

17   A    I guess in the room, actually in the room.

18   Q    What room?

19   A    My sister's room.

20   Q    Her bedroom?

21   A    Yes.

22   Q    What happened after they found him?

23   A    They brung him out.

24   Q    Was he in handcuffs?

25   A    Yes, ma'am.

1    Q    So they brought him to the living room?

2    A    Yes.

3    Q    And once Jeffrey was in handcuffs in the living room,

4    what did the agents do?

5    A    I really don't know because there was so much going on,

6    it was so much police officers in there.  So it was like a

7    police officer talking to me, police officer talking to my

8    mother.  So I really, really didn't know what was going on.

9    Q    Okay.  Did you see any agents speaking with your sister?

10   A    Yes.

11   Q    Did you see any agents walk into her bedroom?

12   A    I couldn't really say, cause I was in the living room,

13   so. . .

14   Q    Do you happen to know if the agents had a search warrant

15   for the apartment that morning?

16   A    No.

17   Q    No, you don't know or --

18   A    No, I don't know.  I don't know.

19              MS. GAGNE:  No further questions.

20   CROSS-EXAMINATION

21   BY MR. SILVERMAN:

22   Q    Good afternoon, Mr. McCrea.

23   A    Good afternoon.

24   Q    My name is Mark Silverman.  I'm one of the prosecutors in

25   this case.

```
 1            Could you go through again who was staying in the
 2   apartment that night?
 3   A    It was me, my brother, my mother, my sister, and Jeffrey
 4   Benton and my niece Teyshana.
 5   Q    How old is your brother?
 6   A    My little brother is 15, 16.
 7   Q    How old is your mother?
 8   A    My mother is 46.
 9   Q    How old is your sister?
10   A    My sister is 26.
11   Q    Do you know how old Mr. Benton is?
12   A    No, I don't.
13   Q    How old is your niece?
14   A    I'm not too sure.
15   Q    Is she younger than ten?
16   A    (Nodding head.)
17   Q    You testified a moment ago that you slept in the living
18   room, right?
19   A    Yes.
20   Q    Who else was sleeping in the living room that night?
21   A    Just me and my brother.
22   Q    You testified earlier that Mr. Benton was in your
23   sister's bedroom?
24   A    Yes.
25   Q    Was anyone else in that bedroom sleeping with Mr. Benton?
```

```
 1   A     Just him and my sister.

 2   Q     Is there another bedroom in the apartment?

 3   A     Yes.

 4   Q     Are there two bedrooms in the apartment?

 5   A     Yes.

 6   Q     Who was in the second bedroom that night?

 7   A     My niece Teyshana and my mother.

 8   Q     You testified earlier that you woke up to police

 9   flashlights in your face, is that right?

10   A     Yes.

11   Q     So were you awake when the police actually first entered

12   the apartment?

13   A     Sort of.  It was like me hearing footsteps because I'm on

14   the floor, so I can basically feel someone walking in.

15   Q     Okay.  Did you stay in the living room the entire time

16   that the police officers were in the apartment?

17   A     Yes.

18   Q     Is there a long hallway that separates the living room

19   from the kitchen?

20   A     Yes.

21   Q     Can you see into the kitchen from where you were in the

22   living room?

23   A     No, not at the time, because there was a lot of officers

24   in the living room.  So I couldn't really see anything as

25   much.
```

1    Q    Was your sister in the kitchen?

2    A    Yes, she walked to the kitchen cause the officer brought

3    her there.

4    Q    You were not in the kitchen?

5    A    No, I wasn't.

6    Q    Could you overhear a conversation between your sister and

7    anyone else while she was in the kitchen?

8    A    No.

9            MR. SILVERMAN:  Thank you.  No further questions.

10   REDIRECT EXAMINATION

11   BY MS. GAGNE:

12   Q    I'm sorry, Ryan, just a quick follow-up.  Does your

13   sister have a roommate?

14   A    Yes.

15   Q    Was she there that night as well?

16   A    Yes.

17   Q    So are there two bedrooms or three bedrooms?

18   A    Three bedrooms.

19   Q    Three bedrooms?

20   A    Yes.

21   Q    So you said that Kawya was in her bedroom with Mr.

22   Benton?

23   A    Yes.

24   Q    Your niece was in her bedroom?

25   A    Yes.

```
1    Q    And the roommate was in her bedroom?

2    A    Yes.

3              MS. GAGNE:  I just wanted to clarify, thank you.

4              MR. SILVERMAN:  Just briefly, your Honor.

5    RECROSS-EXAMINATION

6    BY MR. SILVERMAN:

7    Q    Is your sister's roommate male or female?

8    A    She's a female.

9    Q    How old is she?

10   A    I don't know.

11   Q    Do you know her name?

12   A    Bianca.

13             MR. SILVERMAN:  May I have one moment, your Honor?

14             THE COURT:  Yes.

15             MR. SILVERMAN:  No further questions from the

16   government, your Honor.  Thank you.

17             MS. GAGNE:  No further questions.

18             THE COURT:  Thank you, sir.

19             THE WITNESS:  Thank you.

20             MR. SILVERMAN:  Your Honor, per defense counsel's

21   request, I think she'd like to take a break for five minutes

22   now to permit Mr. McCrea to call his ride to go to work.

23             THE COURT:  Yes, all right.  I think I'll stay on

24   the bench while you do that.

25             MR. SILVERMAN:  Thank you, your Honor.
```

1          MS. GAGNE:  Thank you, your Honor.

2          (Recess:  12:37 o'clock p.m. to 12:46 o'clock p.m.)

3          MS. GAGNE:  We're ready.

4          THE COURT:  Thank you.

5          MS. GAGNE:  Your Honor, I'd like to call Kawya

6    Cortes to the stand.

7                    **K A W Y A   C O R T E S**

8        having been called as a witness, was first

9        duly sworn and testified on her oath as follows:

10         THE CLERK:  Please be seated.  State your name and

11   spell your last name for the record, and just give us your

12   address by city and state only.

13         THE WITNESS:  My name is Kawya Cortes, last name

14   C-O-R-T-E-S.  New Haven, Connecticut.

15   DIRECT EXAMINATION

16   BY MS. GAGNE:

17   Q    Good afternoon, Ms. Cortes.  Do you know the defendant

18   Mr. Benton?

19   A    Yes.

20   Q    How do you know him?

21   A    He's my boyfriend and the father of my daughter.

22   Q    Does he live with you?

23   A    No.

24   Q    Where do you live?

25   A    719 Orchard Street.

```
 1   Q    New Haven?

 2   A    New Haven.

 3   Q    But you're dating Mr. Benton?

 4   A    Yes.

 5   Q    How often would he spend the night in your apartment?

 6   A    Not often.

 7   Q    If you had to take a guess.

 8   A    Once in a while, once in a blue.

 9   Q    Okay.  Does he keep any personal items in your apartment?

10   A    No.

11   Q    Does he ever keep several changes of clothes there?

12   A    No.

13   Q    Does he have a drawer in your dresser, for instance?

14   A    No.

15   Q    Does he have a key to your apartment?

16   A    No.

17   Q    Does his mail go to your house?

18   A    I'm sorry?

19   Q    Does his mail go to your house?

20   A    No.

21   Q    Does he keep any food there?

22   A    No.

23   Q    Does he pay rent?

24   A    No.

25   Q    Did he keep any toiletries there?
```

```
 1   A    No.

 2   Q    Razors, toothbrush?

 3   A    I just bought him a toothbrush the day that they took

 4   him.

 5   Q    So he kept a toothbrush there?

 6   A    Toothbrush.

 7   Q    Anything else?

 8   A    No.

 9   Q    Let me ask you about your neighborhood on Orchard Street.

10   In your opinion, would you say it was a safe neighborhood?

11   A    No.

12   Q    Why do you say that?

13   A    There's a lot of violence out there.  There's, I don't

14   know if I should call it crackheads or drugs -- people who do

15   drugs that walk the streets.  Alcoholics, because there's a

16   liquor store at the corner of my street.

17   Q    Okay.  So when you go to bed at night, do you leave your

18   doors unlocked?

19   A    No.

20   Q    Ever?

21   A    Never.

22   Q    Why not?

23   A    I'm scared that someone may break into my home, and I

24   have a daughter.

25   Q    And you have children, you said?
```

```
 1    A    Yes.

 2    Q    How many children do you have?

 3    A    Now?  Two.

 4    Q    At the time Mr. Benton was arrested, how many children

 5    did you have?

 6    A    One.

 7    Q    And you were still pregnant with the second one?

 8    A    Yes.

 9    Q    And how old was your oldest daughter in May 2012?

10    A    She was seven at the time.

11    Q    Have you ever, to your knowledge, left doors unlocked at

12    night when you went to sleep?

13    A    No.

14    Q    So suffice to say it is your belief that your doors were

15    locked on the night of May 16, 2012?

16    A    Yes, before I went to sleep, I checked.

17    Q    No doubt in your mind?

18    A    Before I went to sleep, I checked.

19    Q    And there's no doubt in your mind?

20    A    Right, no doubt.

21    Q    On the morning of May 17th, 2012, how many people were

22    sleeping in your apartment?

23    A    Okay.  There was my brother, Ryan McCrea, in the living

24    room; my brother, Benjamin Trannel, in the living room; my

25    mother Gwen McCrea and my daughter who were in my daughter's
```

1    room; myself, it was Jeffrey Benton in my room; and it was my

2    roommate Bianca Velazquez, and her boyfriend at the time Mike,

3    I don't know his last name, but they were in her room.

4    Q    How many bedrooms in your apartment?

5    A    There's three.

6    Q    So you had some relatives staying in your apartment that

7    night?

8    A    Yes.

9    Q    Do they normally live with you?

10   A    Live with me?  My mom was staying with me for the moment,

11   yes.  You can say she -- I don't want to say living but she

12   was staying there, helping me out.

13   Q    Does she live there now?

14   A    No.

15   Q    So your mom, you said, was helping you out.  What do you

16   mean by that?

17   A    I was pregnant, so she was helping me maintain things in

18   the household, bills and rent.

19   Q    Okay.  And why were your brothers there that night?

20   A    Well, my little brother was there because my mom was

21   there.  He's underage.  And my -- the brother that was just

22   here, he was there that night because he got locked out of his

23   grandfather's house.

24   Q    That's where he normally stays?

25   A    Yes.

```
 1   Q     He stayed there because he had no other place to go?

 2   A     Yes.

 3   Q     So they were just sleeping at your apartment temporarily

 4   then?

 5   A     Yes.

 6   Q     Who lives with you now?

 7   A     Myself, my two daughters now, my roommate, and her

 8   daughter.

 9   Q     So let me bring you back to the early morning hours of

10   May 17th, 2012.  What were you doing at 5:45 a.m.?

11   A     I was sleeping.

12   Q     Was there something that woke you up that morning?

13   A     Yes.

14   Q     What was it?

15   A     Officers knocking on my door -- my room, rather -- and

16   flashing, flashing lights and under the door, that you can see

17   lights from the flashlights.

18   Q     Did you hear the police knock on the main door to the

19   apartment in the living room?

20   A     No.

21   Q     So you just heard them knock on your bedroom door?

22   A     Yes, I heard a bang.  When, you know how when you're

23   sleeping and you can -- I don't want to say subconsciously but

24   you can kind of hear something in your sleep, I heard a bang

25   and I heard voices, but I thought I was dreaming until I heard
```

```
 1    knocking on my door, like a couple seconds right after that,

 2    and I seen the flashlights is when I really woke up.

 3    Q    Did you open your bedroom door right away when the police

 4    knocked?

 5    A    No.

 6    Q    Why not?

 7    A    I wasn't dressed.

 8    Q    So what did you do when you heard the knock?

 9    A    I asked who was at the door, and they told me it was the

10    police, or whatever they said.

11    Q    Did you get dressed at that point?

12    A    Yes.

13    Q    Did you eventually open the door?

14    A    Yes.

15    Q    And then what happened?

16    A    They took Jeffrey Benton and placed him in handcuffs and

17    they took him out the room.

18    Q    Where did they take Jeffrey once he was in handcuffs?

19    A    Into some other room.

20    Q    At that time, did the agents show you a search warrant

21    for your apartment?

22    A    No, they did not.

23    Q    Did you ask about a search warrant?

24    A    Yes, several times.

25    Q    Now, let me ask you this:  Did you ask about a warrant or
```

```
1   did you specify search warrant?

2   A    I asked for both.

3   Q    Okay.  And what happened when you asked about the

4   warrant?

5   A    One of the officers told me yes, they have a warrant, and

6   we'll get to that in a moment.

7   Q    Where, in the apartment, were you when you were asking

8   about this?  Do you remember?

9   A    As soon as we walked out of my room, we were all in the

10  living room.

11  Q    Okay.  So there were agents with you in the living room?

12  A    Yes.

13  Q    Did they stay with you in the living room?

14  A    Some did.  Some were in my room.  The moment they

15  escorted me and Jeffrey out of my room, officers were still in

16  my bedroom.

17  Q    How many?

18  A    I honestly don't know.  There were so many officers

19  throughout my apartment.

20  Q    Okay.  Did they close the door or leave the door open?

21  A    No, they closed the door.

22  Q    You're saying there were agents in your bedroom with the

23  door closed?

24  A    Yes.

25  Q    Did you try to follow them into the bedroom?
```

1   A    Yes, after I was in the living room, I like kept asking

2   questions about a search warrant.  I went towards my bedroom,

3   I wanted to get a jacket, and they wouldn't -- I turned to my

4   door.  That's how the officers -- they closed the door on me,

5   they wouldn't let me in.

6   Q    Were you able to enter the bedroom?

7   A    No.

8   Q    What happened after you were not able to enter the

9   bedroom?

10  A    Another officer came up into the hallway and he

11  physically escorted me towards my kitchen.

12  Q    Then what happened?

13  A    Escorted me towards my kitchen.  I'm sorry, I'm just

14  trying to replay exactly -- that's when he pulled out the

15  paper on me.

16  Q    What paper is that?

17  A    I guess it was the consent.  In my mind, I'm thinking

18  that's the search warrant that he's actually showing me that

19  they said that they had.

20  Q    But it was really the consent to search form?

21  A    Yes.

22  Q    Did he explain that consent to search form to you?

23  A    He said this is a -- he gave it to me.  He said this is a

24  form and we need you to sign it.  And right after that, he

25  said the name of the form, and then he went directly into, if

```
 1    I don't sign it all the things that would happen.

 2    Q    What did he say?  Do you remember?

 3    A    Yes.  He told me that I would get arrested.  He told me

 4    that DCF would get involved because my daughter was in her

 5    room.  He said that if I didn't sign it, they will have to --

 6    he said regardless, they were going to search my room anyways,

 7    but if I didn't sign it, they would get some kind of paper to

 8    come back or something, and do it anyways, and DCF would get

 9    involved, too.

10    Q    Do you remember why he said DCF would get involved?

11    A    My daughter was in her room.  I kept stressing the fact

12    that my daughter was in her room.  I didn't want her to wake

13    up through all the noise they were doing.  I didn't want to

14    scare her.

15    Q    So you told him --

16    A    Yes.

17    Q    -- "my daughter's in her room"?

18    A    Yes.

19    Q    What did you think when he showed you this consent to

20    search form?

21    A    I was confused, because they already told me that they

22    had a search warrant.

23    Q    Now, just to be clear, while you were having this

24    discussion in your kitchen, there were agents in your bedroom?

25    A    Yes.
```

1    Q    And you're sure of that timeline?

2    A    Yes.

3    Q    The agents didn't go in the bedroom after you had that

4    discussion?

5    A    No, they were there.

6    Q    Did you hear Benton trying to say anything to you as you

7    were looking at this consent to search form?

8    A    No.  Before the guy pulled out the paper on me, I heard

9    him yelling something, but I didn't know what he was yelling.

10   Q    Mr. Benton?

11   A    Yes, I couldn't hear him.  The distance between my

12   kitchen and my living room was too far.  When I tried to go

13   into my living room, they held me back.  And that's when they

14   escorted him outside.

15   Q    They escorted Jeffrey outside?

16   A    Yes.

17   Q    Did you want the agents and the officers searching your

18   apartment?

19   A    No.

20   Q    Why?

21   A    Because, one, I kept asking for a search warrant and they

22   kept telling me they had it but they will get to it.  And also

23   because my daughter's in her room.  Them searching the

24   apartment would mean they would have to go into my daughter's

25   room, it would have scared her up, she would have started

```
1    crying.

2    Q    Were you concerned at all that you would be arrested if

3    you didn't sign the form?

4    A    Absolutely.  That's what he kept stressing the most to

5    me.

6    Q    So did you end up signing the form?

7    A    I called my mother into the kitchen because I couldn't go

8    into the living room to get her, and I called her into the

9    kitchen and basically, he was talking to my mom and when he

10   started saying more so about the DCF and more about how I

11   would go to jail, I would do time, I put the date on the paper

12   and then I thought about it and I'm, like, why would I sign

13   this?  And they told me they already had a paper.

14          And my anger came back as far as them not showing me

15   a paper, and I scribbled.  At the same time I was scribbling I

16   said I'm not signing anything.

17          At that point, the officer took the paper from me,

18   another officer was coming into the kitchen and he passed it

19   to him, said, "Here, sign this."

20   Q    What was your demeanor like?

21   A    Sorry?

22   Q    What was your demeanor like during this exchange?

23   A    During?

24   Q    During the exchange with the officer about the consent to

25   search form.
```

```
 1   A    I was confused, I was worried, and then I was also, I was
 2   angry, upset, because they told me they had a warrant and all
 3   of a sudden they're trying to get me to sign a warrant.
 4   Q    Did you feel you had a choice on whether or not to sign
 5   the form?
 6   A    No.
 7   Q    Why?
 8   A    Because he told me that they were going to search
 9   regardless, and if I didn't sign right then and there, they
10   were going to come back with some paper and do it over and
11   regardless, I would still get arrested at that time as well.
12   Q    Did you feel you could have left the kitchen at anytime?
13   A    No, they wouldn't let me.
14   Q    They were stopping you from leaving the kitchen?
15   A    (Nodding head.)
16   Q    Yes?
17   A    Yes.
18            MS. GAGNE:  No further questions.
19            MR. SILVERMAN:  May I have a moment, your Honor?
20            THE COURT:  Yes, sir.
21            MR. SILVERMAN:  Thank you, your Honor.
22   CROSS-EXAMINATION
23   BY MR. SILVERMAN:
24   Q    Good afternoon, Ms. Cortes.  Turning to the evening of
25   May 16, 2012, were you home that night?
```

```
 1   A    Yes.

 2   Q    Do you remember what day of the week it was?

 3   A    I don't.  Maybe it was a Thursday.

 4   Q    Do you know if it was a weekday or weekend?

 5   A    I think it was a weekday.

 6   Q    At the time, were you working, Ms. Cortes?

 7   A    No.

 8   Q    You spent that night at home?

 9   A    Yes.

10   Q    Who else was with you before you spent that night in bed?

11   A    My mother -- do I have to state names again?

12   Q    Now, you can just state who they were, relationship.

13   A    My mother, my daughter, my roommate and her boyfriend,

14   and my brothers.

15   Q    What time did your brothers come over?

16   A    I don't know.  My younger brother was already there.  My

17   other brother came in later.

18   Q    After dinner?

19   A    Yes.

20   Q    After it got dark?

21   A    Yes.

22   Q    After 10:00 p.m.?

23   A    I believe so.

24   Q    Do you remember around what time your older brother

25   arrived?
```

```
 1   A    Specifically no, not what time.

 2   Q    Was it before midnight?

 3   A    No, I don't think it was.  He was DJ'ing that night.

 4   Q    When he finishes up DJ'ing, what time is it generally?

 5   A    I don't know.

 6   Q    Were you asleep before your older brother came home?

 7   A    No.

 8   Q    What time did you go to sleep that night?

 9   A    Maybe close to 4:00 o'clock in the morning.

10   Q    Were you the last person awake in the apartment?

11   A    Yes.

12   Q    What time did Mr. Benton come over?

13   A    I don't remember.

14   Q    Was he the last person to come over?

15   A    No.

16   Q    Did your brother come after he came?

17   A    Yes.

18   Q    To be more specific with that question, was your brother

19   in the apartment before Mr. Benton was in the apartment?

20   A    No.

21   Q    Okay.  So Mr. Benton arrived and then your brother

22   arrived after that?

23   A    Um hum.

24   Q    You said your brother arrived after midnight.  Do you

25   remember if Mr. Benton arrived before or after midnight?
```

```
 1   A     I'm not sure.

 2   Q     What time did your daughter go to bed --

 3   A     Early.

 4   Q     --  back in May 2012?

 5   A     She had school the next morning, so she was in bed by

 6   8:00.

 7   Q     What time does your mother go to sleep?

 8   A     I don't know.

 9   Q     How about your roommate?

10   A     I don't know.

11   Q     Your roommate's boyfriend?

12   A     I don't know.

13   Q     Your brothers?

14   A     I don't know.

15   Q     Okay.  So you're not sure if Mr. Benton arrived before or

16   after midnight, is that right?

17   A     Right.

18   Q     When Mr. Benton arrived, were you still awake?

19   A     Yes.

20   Q     What did Mr. Benton bring with him when he came over?

21   A     Himself.

22   Q     Was he carrying anything?

23   A     No.

24   Q     Did he have a change of clothes with him?

25   A     No.
```

```
1   Q     Did he keep a change of clothes at your house?

2   A     No.

3   Q     You testified earlier that he didn't keep anything at

4   your house, is that right?

5   A     Correct.

6   Q     Did he keep motor vehicle registration for a 2002 BMW at

7   your home?

8   A     No, that, that must have came with him.

9   Q     You testified on your direct examination that you were

10  concerned about the dangerousness of your neighborhood, is

11  that right?

12  A     Yes.

13  Q     And you specifically mentioned a number of crackheads, is

14  that right?

15  A     Yes.

16  Q     Other people who were drug users, right?

17  A     Yes.

18  Q     Would it be fair to say that you like to keep your

19  daughter away from drugs?

20  A     Yes.

21  Q     You like to stay away from drugs?

22  A     Yes.

23  Q     So whose drugs were found in your apartment?

24  A     I don't know.

25  Q     Whose guns were found in your apartment?
```

1    A     I don't know.

2    Q     Whose $5,536 was found in your apartment?

3    A     My money.

4    Q     How do you have that money?

5    A     Income tax, unemployment, and savings.

6    Q     When did you receive your income tax refund?

7    A     April.

8    Q     Approximately how much was it for?

9    A     I don't know.  4,000 and some change for the federal.

10   And also got state taxes back, which were 8 or 9.

11   Q     Hundred?

12   A     Yes.

13   Q     How much were you earning in unemployment in May 2012?

14   A     $177 a week.

15   Q     Approximately how much did you have in savings at that

16   time?

17   A     In my savings account?

18   Q     Well, you testified a moment ago that the $5,536 was

19   yours, found in the apartment was yours.

20   A     Yes.

21   Q     How much was your savings?

22   A     All of that.

23   Q     What portion of that derived from your savings?

24   A     From the income tax, the unemployment --

25   Q     From whatever source.

```
 1   A     All of that.

 2   Q     You consider all of that to be your savings?

 3   A     Yes.

 4   Q     Did you keep a savings account?

 5   A     No, I have one, but I don't put money in there.

 6   Q     So you prefer to keep your money in cash?

 7   A     Yes.

 8   Q     Do you usually put your money next to drugs in a red

 9   Baggie at night?

10   A     No.

11   Q     Do you know why they would be found next to drugs in a

12   red Baggie?

13   A     My money was under my bed.

14   Q     Did the guns belong to any of your brothers?

15   A     I don't know.

16   Q     Did the guns belong to your mother?

17   A     I don't know.

18   Q     Did they belong to your daughter?

19   A     No.

20   Q     Did they belong to you?

21   A     No.

22   Q     Did they belong to Mr. Benton?

23   A     No -- I don't know, actually.  I don't know who they

24   belong, to but they weren't mine and they couldn't be my

25   seven-year-old daughter's gun.
```

```
 1   Q    How long had you been living at the apartment?

 2   A    May 17th?

 3   Q    Yes.

 4   A    Eight months up to that point.

 5   Q    Were you upset that drugs were found in your apartment?

 6   A    Yes.

 7   Q    Were you upset that guns were found in your apartment?

 8   A    Yes.

 9   Q    Would you be mad at whoever brought the guns and drugs in

10   your apartment?

11   A    Yes.

12             MR. SILVERMAN:  May I have a moment, your Honor?

13             THE COURT:  Yes, sir.

14   Q    Did you want to find out how the drugs and the guns got

15   into your apartment?

16   A    Who wouldn't?

17   Q    Did you want to find out?

18   A    Yes.

19   Q    Did you ask your mother if they were her guns?

20   A    No.

21   Q    Did you ask if they were her drugs?

22   A    No.

23   Q    Did you ask your brothers --

24   A    No.

25   Q    -- if they were their guns?
```

```
 1   A     No.

 2   Q     Their drugs?

 3   A     No.

 4   Q     Did you ask your roommate if it was her guns or drugs?

 5   A     Yes.

 6   Q     What did she say?

 7   A     She told me she didn't know.  She told me they weren't

 8   hers.

 9   Q     Weren't hers.  Did you ask Mr. Benton if they were his

10   guns?

11   A     No.

12   Q     Did you ask him if they were his drugs?

13   A     No.

14   Q     But you wanted to find out how they got there, right?

15   A     They wouldn't let me talk to him.

16   Q     Have you visited Mr. Benton at Wyatt since he's been

17   detained?

18   A     Yes.

19   Q     How many times?

20   A     Several times.

21   Q     How many times?

22   A     I don't know.

23   Q     More than 20?

24   A     I don't know.

25   Q     Would it surprise you if the Wyatt custodian said you
```

```
 1   have been there 25 times since he was detained?

 2   A    No, it wouldn't surprise me.

 3   Q    During any of those 25 visits, did you ask him if they

 4   were his guns?

 5   A    Yes.

 6   Q    What did he say?

 7   A    No.

 8   Q    Did you ask him if they were his drugs?

 9   A    Yes.

10   Q    What did he say?

11   A    No.  I didn't ask him; he told me.

12   Q    He told you they were not his guns?

13   A    Yes.

14   Q    And not his drugs?

15   A    Yes.

16   Q    That's correct?

17   A    Um hum.

18   Q    You never asked him; he told you?

19   A    Yes.

20   Q    Did you ever find out whose guns they were?

21   A    No.

22   Q    Did you ever find out whose drugs they were?

23   A    No.

24   Q    Did you ever find out whose scale it was?

25   A    No.
```

1   Q    You testified earlier that you kept your money, more than

2   $5,000, underneath your mattress, is that right?

3   A    Yes.

4   Q    Is that where you kept important things?

5   A    Yes.

6   Q    To hide them from people?

7   A    It's a safe place.

8   Q    Okay.  Do you know where the guns were ultimately found?

9   A    Ultimately?

10  Q    Where were the guns found during the search that day?

11  A    Yes.

12  Q    Where were they found?

13  A    In my closet.

14  Q    Do you know if they were in any type of containers?

15  A    No.

16  Q    Where were the drugs, where were the drugs ultimately

17  found?

18  A    In my closet.

19  Q    So it was in your bedroom?

20  A    Yes.

21  Q    Ordinarily, when Mr. Benton wasn't staying over, were you

22  the only person who stayed in that bedroom?

23  A    No -- well, yes.

24  Q    You were the only person who stayed there if Mr. Benton

25  wasn't there?

```
 1   A     My daughter stayed in my room.

 2   Q     You didn't think it was your daughter's guns?

 3   A     No.

 4   Q     You didn't think it was your daughter's drugs?

 5   A     No.  Right.

 6         MR. SILVERMAN:  I have no further questions at this

 7   time.  Thank you, your Honor.

 8         MS. GAGNE:  Briefly, your Honor.

 9   REDIRECT EXAMINATION

10   BY MS. GAGNE:

11   Q     The U.S. attorney was asking you about whose guns and

12   drugs these might be, but you know why we're here today,

13   right?

14   A     Yes.

15   Q     Why are we here today?

16   A     To suppress.

17   Q     Did you consent to the police coming into your apartment?

18   A     No.

19   Q     Did you consent to the police entering your bedroom?

20   A     No.

21   Q     And closing the door?

22   A     No.

23   Q     Do you feel you voluntarily consented to the search of

24   your apartment after the police were already there and after

25   they already entered your bedroom?
```

```
 1   A    No.

 2          MS. GAGNE:  No further questions.

 3          MR. SILVERMAN:  Just briefly, your Honor.

 4          THE COURT:  Yes, sir.

 5   RECROSS-EXAMINATION

 6   BY MR. SILVERMAN:

 7   Q    You testified earlier that you're now dating Mr. Benton,

 8   is that right?

 9   A    Yes.

10   Q    And you were dating him on May 17, 2012?

11   A    Yes.

12   Q    When did you start dating him?

13          MS. GAGNE:  Your Honor, this is beyond the scope.

14          MR. SILVERMAN:  This all goes to the witness's

15   credibility, the heart of why we're here today.

16          MS. GAGNE:  Also object on relevance.

17          THE COURT:  Overruled.

18          Go ahead.

19   A    I've known him for a while, but we made it official that

20   we were boyfriend and girlfriend December, we were boyfriend

21   and girlfriend officially.

22   Q    December of what year?

23   A    2011.

24   Q    So you had officially been dating for about six months at

25   the time of his arrest?
```

```
 1   A    There's a difference between dating and being together,
 2   so yes, we were together officially December of 2011.
 3   Q    So you had officially been together for about six months
 4   at the time of his arrest?
 5   A    Yes.
 6   Q    But you had known each other for longer than that?
 7   A    Yes.
 8   Q    How long had you known each other?
 9   A    For a year prior.
10   Q    Prior to December 2011?
11   A    (Nodding head.)
12   Q    At the time of Mr. Benton's arrest on May 17, 2012, you
13   were pregnant, right?
14   A    Yes.
15   Q    Mr. Benton is the father of your now daughter, is that
16   right?
17   A    Yes.
18   Q    And you're still dating Mr. Benton, isn't that right?
19   A    Yes.
20   Q    And as you testified earlier, you've been out to visit
21   him at Wyatt several times?
22   A    Yes.
23   Q    Since he's been detained?
24   A    (Nodding head.)
25   Q    Do you love Mr. Benton?
```

```
 1   A     Of course.

 2   Q     And he's the father of your daughter, right?

 3   A     Yes.

 4   Q     How old is she now?

 5   A     She'll be one August 17th.

 6         MR. SILVERMAN:  Thank you, your Honor.  Thank you.

 7         MS. GAGNE:  No further questions.

 8         THE COURT:  Thank you, ma'am.

 9         THE WITNESS:  Thank you.

10         MS. GAGNE:  Your Honor, I'll get my next witness.

11         My next witness stepped into the bathroom.

12         Your Honor, I call Gwendolyn McCrea to the stand.

13              G W E N D O L Y N   M c C R E A

14      having been called as a witness, was first

15      duly sworn and testified on her oath as follows:

16         THE CLERK:  Please be seated.  State your name,

17   spell your name for the record, and the city and state you

18   reside in.

19         THE WITNESS:  My name is Gwendolyn McCrea,

20   G-W-E-N-D-O-L-Y-N; last name M-c-C-R-E-A.  And I reside in the

21   city of New Haven, Connecticut.

22

23

24   DIRECT EXAMINATION

25   BY MS. GAGNE:
```

```
 1  Q    Good afternoon, Ms. McCrea.  Do you know the defendant,
 2  Jeffrey Benton?
 3  A    Yes.
 4  Q    How do you know him?
 5  A    He is my daughter's boyfriend.
 6  Q    And where does your daughter live?
 7  A    At 719 Orchard Street.
 8  Q    Your daughter's Kawya?
 9  A    Yes.
10  Q    You've been to her apartment before?
11  A    Yes.
12  Q    Did you ever spend the night?
13  A    Yes.
14  Q    Are you staying there at this time?
15  A    No.
16  Q    But you were spending the night there on the morning that
17  Jeffrey Benton was arrested?
18  A    Yes.
19  Q    Why were you staying there?
20  A    I was there basically helping her out with her bills and
21  stuff, just on a temporary basis.
22  Q    Okay.  Who else was sleeping in the apartment on the
23  night of May 16, 2012?
24  A    It was my son, myself, my son -- my older son, and my
25  youngest son; my daughter, my youngest daughter; and my oldest
```

```
 1  daughter, which was Kawya; and my granddaughter.

 2  Q    And was Kawya's roommate also there?

 3  A    Yes.

 4  Q    Okay.  And was Mr. Benton there, too?

 5  A    Yes.

 6  Q    So you know all of these people?

 7  A    Yes.

 8  Q    So you were present at 719 Orchard Street on the early

 9  morning hours of May 17, 2012?

10  A    Yes.

11  Q    What were you doing at 5:45 a.m.?

12  A    I was sleeping.

13  Q    Where were you sleeping?

14  A    In the bedroom.

15  Q    Whose bedroom?

16  A    My granddaughter's bedroom.

17  Q    And where is that in relation to the living room?

18  A    It's the first bedroom as soon as you walk in the door.

19  Right as soon as you pass the living room, it's the first

20  bedroom.

21  Q    Okay.  Does it share a wall with the living room?

22  A    Yes, it does.

23  Q    And it's the living room that contains the main door to

24  the apartment?

25  A    Yes.
```

1    Q    So if someone enters from the outside, do they have to

2    come through the living room?

3    A    Yes.

4    Q    And that was next to where you were sleeping?

5    A    Yes.

6    Q    Did you hear the police knock on the main door to the

7    apartment?

8    A    No.

9    Q    Did you hear anything?

10   A    No.

11   Q    Did you open the door for the police?

12   A    No.

13   Q    To your knowledge, did anyone open the door for the

14   police?

15   A    No.

16   Q    So you didn't see anyone open the door?

17   A    No.

18   Q    And to your knowledge, did anyone tell the police that

19   they could enter the apartment?

20   A    No.

21   Q    Now, were you present in the apartment the whole time the

22   police and the agents were there?

23   A    Yes.

24   Q    So the police eventually found Mr. Benton.  Where did

25   they find him?

1    A    In my daughter's bedroom.

2    Q    And what happened next?

3    A    As I recall, they escorted him out of the bedroom and in

4    handcuffs.

5    Q    So you were already awake at that time?

6    A    Yes.

7    Q    What woke you up?

8    A    The loud noise and lights, flashlights.  Lot of noise.

9    Q    What noise?

10   A    Voices of the police.  They were real loud.  And they

11   were doing a lot of yelling.  A lot of yelling.  And that's

12   what woke me up.

13   Q    Okay.  So you saw the police put Jeffrey into handcuffs

14   and take him into the living room?

15   A    Yes.

16   Q    Once they had Mr. Benton in custody, what did the agents

17   do?

18   A    Once they had him in custody, they just had everybody

19   stay inside the living room.

20   Q    Okay.  And then where did the agents go?

21   A    In the bedroom.

22   Q    Whose bedroom?

23   A    My daughter's bedroom.

24   Q    So you saw them enter the bedroom?

25   A    Yes.

1   Q     Did they close the door to the bedroom?

2   A     It was closed.

3   Q     Do you happen to know if the agents had a search warrant

4   for the apartment?

5   A     No.

6   Q     No, you don't know or no, they didn't?

7   A     No, they didn't.

8   Q     Did you see an agent speaking with your daughter, Kawya?

9   A     Yes.

10  Q     Tell me about that.  What did you see?

11  A     I seen the agent speaking with my daughter, and basically

12  he was talking to her and telling her that she needed to sign

13  some paper or something like that.

14  Q     Were you standing near her at the time?

15  A     Yes, I was.

16  Q     Where were you in the apartment?

17  A     The kitchen.

18  Q     When the agent was talking to your daughter about the

19  consent to search form, had the other agents already gone into

20  the bedroom?

21  A     Yes.

22  Q     And you're sure about that timeline?

23  A     Yes.

24  Q     So you were standing near Kawya when the agents were

25  discussing the form with her?

1    A    Um hum.

2    Q    What did you hear?

3    A    I heard the agent tell her that basically if she didn't

4    sign the form, that they were going to get arrest warrants and

5    they were going to arrest everyone that was in the premises;

6    that basically she was going to lose her daughter, they were

7    going to call DCF and she was going to lose her daughter.

8    Q    Do you remember why they would bring up DCF?

9    A    No.

10   Q    But you do remember the words "DCF" being said?

11   A    Yes.

12   Q    How was your daughter reacting to this whole situation?

13   A    She was scared, she was nervous basically, because of the

14   fact that they had already told her that they were going to

15   arrest everybody and take her kid, you know, if they called

16   DCF.

17          So she was really nervous and scared and she really

18   didn't know what to do, because the only thought that was in

19   her mind was they were going to arrest everybody and take her

20   kids.

21   Q    Was Mr. Benton still in the apartment at this time?

22   A    Yes.

23   Q    Could you hear anything from him?

24   A    I didn't hear anything -- I don't recall.

25   Q    Okay.  When did they take Mr. Benton out of the

1    apartment?

2    A    They took him out the apartment after everybody was

3    cleared from the area, then that's when they escorted him

4    downstairs.

5    Q    Was that before or after Kawya signed the consent to

6    search form?

7    A    I don't recall.

8    Q    Okay.

9    A    I don't recall.

10              MS. GAGNE:   No further questions.

11   CROSS-EXAMINATION

12   BY MR. SILVERMAN:

13   Q    Good afternoon, Ms. McCrea.

14   A    Good afternoon.

15   Q    You testified that you were staying at your daughter's

16   apartment May 16th to May 17th, 2012, to help her out, right?

17   A    (Nodding head.)

18   Q    How long had you been staying with her as of May 17th,

19   2012?

20   A    I stayed with her for a little while.

21   Q    So before May 17, 2012, are we talking months, years,

22   weeks?

23   A    Months.

24   Q    Months?

25   A    Yes.

```
 1   Q     So not quite a year?

 2   A     Not quite a year.

 3   Q     About six months?

 4   A     A little over six months.

 5   Q     Okay.  So was she pregnant when you first came to the

 6   apartment to help out?

 7   A     Yes.

 8   Q     And during the course of the more than six months that

 9   you were staying there, approximately how many nights did Mr.

10   Benton stay over?

11   A     I don't recall.  I don't recall.

12   Q     I don't need a specific number from you, but an estimate

13   of how many times he stayed over.

14   A     I don't recall.

15   Q     More than five?

16   A     I don't recall.

17   Q     Is it more than ten?

18   A     I don't recall.

19   Q     So you don't know how many times he stayed over --

20   A     I don't know.  I really don't.

21   Q     -- in the six months.  During those six months, were you

22   there mostly every night?

23   A     Not all nights.

24   Q     How many nights a week did you stay there during those

25   six months?
```

1  A    Maybe three nights out of the week.

2  Q    At that point, did you know that Mr. Benton and your

3  daughter were dating?

4  A    Yes.

5  Q    Did you know when they started dating?

6  A    That, I don't know.

7  Q    When you moved in to help out, when you came over to help

8  out, did you know that your daughter was pregnant?

9  A    Yes.

10  Q    Did you know who the father was?

11  A    Yes, I do.

12  Q    Who was the father, to your understanding at that time?

13  A    Jeffrey Benton.

14  Q    How well do you know Mr. Benton?

15  A    Just as my daughter's boyfriend.

16  Q    Had you been in the same apartment as him on some

17  occasions?

18  A    Yes.

19  Q    Do you know approximately how many times you've been in

20  the same apartment as him?

21  A    During the daytime, maybe about three times maybe, at the

22  most.

23  Q    As of May 17, 2012, did you know what Mr. Benton did for

24  a living?

25  A    No.

```
1    Q    Did he sell drugs for a living?

2    A    I don't know.

3    Q    There were two sons that were staying there on the same

4    night as you May 17, 2012, is that right?

5    A    Correct.

6    Q    Are those your two sons?

7    A    Yes.

8    Q    Do you have other sons?

9    A    No.

10   Q    How old is your older son?

11   A    My older son is 23 -- actually, 24.

12   Q    Okay.  And your youngest son?

13   A    He's 17.

14   Q    That's as of today?

15   A    Yes.

16   Q    So they would have been about 23 and 16 back on May 17,

17   2012?

18   A    Yes.

19   Q    Does your older son sell drugs?

20   A    No.

21   Q    Does your younger son sell drugs?

22   A    No.

23   Q    Do you know that drugs were found in your daughter's

24   apartment?

25   A    I found that out afterwards.
```

```
 1   Q     Did you find that out on May 17, 2012?

 2   A     Yes.

 3   Q     Did you know that guns were found in the apartment?

 4   A     Yes.

 5   Q     Did you also find that out on May 17, 2012?

 6   A     Yes.

 7   Q     What was your reaction to learning that there were guns

 8   and drugs in the apartment?

 9   A     I was in shock.

10   Q     Did you want to know how they got there?

11   A     I'm sorry?

12   Q     Did you want to know how they got there?

13   A     No.

14   Q     You didn't want to know how they got there?

15   A     No, I just was in shock.  So everything was just

16   overwhelming.  I wasn't even. . .

17   Q     Since May 17, 2012, did you ever have a desire to learn

18   how the guns and the drugs got in the apartment?

19   A     Yes.

20   Q     Did you ask your daughter how the guns and the drugs got

21   there?

22   A     Yes.

23   Q     What did she say?

24   A     She didn't recall anything.  She had no recognition of

25   anything.
```

```
 1   Q    Did you ask your oldest son how the guns and drugs got
 2   there?
 3   A    No.
 4   Q    Did you ask your youngest son how the guns and drugs got
 5   there?
 6   A    No.
 7   Q    Did you ask your daughter's roommate?
 8   A    No.
 9   Q    Was your daughter's roommate's boyfriend in the apartment
10   on May 17, 2012?
11   A    Yes.
12   Q    Did you ask him?
13   A    No.
14   Q    So you just asked your daughter?
15   A    Yes.
16   Q    She told you she didn't know?
17   A    She had no recognition.
18   Q    You didn't ask anyone else?
19   A    No.
20   Q    Were they your guns?
21   A    No.
22   Q    Were they your drugs?
23   A    (Shaking head.)
24   Q    Was it your cash that was found that day?
25   A    No.
```

1    Q    Did you ask Mr. Benton where the drugs came from?

2    A    No.

3    Q    Did you ask him where the guns came from?

4    A    No.

5    Q    Are you still living with your daughter to help her out?

6    A    No.

7    Q    Am I correct from your testimony that your daughter has --

8    you have one granddaughter who's older and then you have a new

9    granddaughter, is that right?

10   A    Correct.

11   Q    How old are your granddaughters?

12   A    My -- she's 11, 11 months and something; and the other

13   one is nine.

14   Q    All right.  Those are today's ages?

15   A    Yes.

16   Q    Roughly?

17   A    Roughly around that, yeah.

18   Q    So at the time of Mr. Benton's arrest on May 17, 2012, at

19   that time, you had one granddaughter, and how old was she?

20   A    She's eight at the time.

21   Q    Is your daughter working now?

22   A    Is she working now?  I don't recall.

23   Q    Do you still watch your granddaughters?

24   A    Every once in a while.

25   Q    Does your daughter have other help with raising her two

1    daughters?

2    A    Yes.

3    Q    Who's helping her?

4    A    She has her other grandmother and she has a whole bunch

5    of aunts.

6    Q    What time did you go to bed on May 16, 2012, the night

7    before the arrest?

8    A    I don't recall.

9    Q    Was it dark?

10   A    Yes, it was.

11   Q    Was your granddaughter already sleeping?

12   A    Yes.

13   Q    What time did she go to bed?

14   A    It depends.

15   Q    Do you remember around what time she went to bed on May

16   16, 2012?

17   A    I don't recall.

18   Q    For your own bedtime, was it after or before midnight?

19   A    Before midnight.

20   Q    At that time, were you working?

21   A    Yes.

22   Q    Days, nights, weekends?

23   A    Days.

24   Q    What were your hours?

25   A    12:00 o'clock in the afternoon until 4:00 o'clock.

1   Q    Did you have a typical time that you like to go to sleep

2   around that time, May 17, 2012?

3   A    It differs.

4   Q    When you went to bed, who was already in the apartment

5   that night?

6   A    As far as I know, myself, my youngest son, my daughter,

7   and my grandchildren.

8   Q    At that time, there was only one grandchild, right?

9   A    Yes, one grandchild.

10  Q    When you went to bed, did you know if your oldest son was

11  in the apartment?

12  A    No.

13  Q    You didn't know or he was not in the apartment?

14  A    I didn't know whether he was in the apartment or not.

15  Q    When you went to bed, did you know if Mr. Benton was in

16  the apartment?

17  A    I don't recall.

18  Q    How about your daughter's roommate?

19  A    Yes.

20  Q    She was home?

21  A    Yes.

22  Q    How about her boyfriend?

23  A    I don't recall.

24         MR. SILVERMAN:  May I have a moment, your Honor?

25         THE COURT:  Yes.

```
1    Q    Would you be concerned to know that your granddaughter

2    was near guns and drugs?

3    A    Yes.

4    Q    That's not something you'd want, is it?

5    A    No.

6    Q    Would you be concerned if you knew that your daughter was

7    near drugs and guns?

8    A    Yes.

9    Q    You wouldn't want that, would you?

10   A    No.

11   Q    So to be clear, after guns and drugs were discovered,

12   which you learned on May 17, 2012, right?

13   A    Correct.

14   Q    You eventually asked your daughter where they came from?

15   A    (Nodding head.)

16   Q    She told you she didn't recall?

17   A    (Nodding head.)

18   Q    You didn't ask anyone else?

19   A    No.

20             MR. SILVERMAN:  Thank you, your Honor.  No further

21   questions.

22             MS. GAGNE:  No questions.

23             THE COURT:  Thank you, ma'am.

24             THE WITNESS:  Thank you.

25             MS. GAGNE:  Your Honor, I call Jeffrey Benton to the
```

```
 1    stand.
 2                    J E F F R E Y   B E N T O N
 3         having been called as a witness, was first
 4         duly sworn and testified on his oath as follows:
 5              THE CLERK:  Please be seated.  State your name for
 6    the record, spell your last name, and just the city and state
 7    you reside in.
 8              THE WITNESS:  My name's Jeffrey Benton, last name
 9    B-E-N-T-O-N.  New Haven, Connecticut.
10              MR. SILVERMAN:  May I have one moment, your Honor?
11              THE COURT:  Yes.
12              (Counsel conferring.)
13              MR. SILVERMAN:  Your Honor, I just conferred with my
14    colleague, and I wanted to make it very clear now on the
15    record, so we don't run into any dispute about this later:
16              Obviously, Mr. Benton is the defendant charged in
17    this case.  His testimony today, if it's found to be
18    untruthful or incredible, could subject him to the penalties
19    of perjury, obstruction of justice.  I just wanted to make
20    sure that he was aware of that, and the record was clear on
21    it, before his testimony began.
22              THE COURT:  You understand that, Mr. Benton?
23              THE WITNESS:  Yes, your Honor.
24              MR. SILVERMAN:  Thank you, your Honor.
25    DIRECT EXAMINATION
```

```
 1   BY MS. GAGNE:

 2   Q    Good afternoon, Mr. Benton.

 3   A    Good afternoon.

 4   Q    Let me bring you back to the early morning hours on May

 5   17, 2012.  What happened on that day?

 6   A    I was arrested.

 7   Q    Where were you when you were arrested?

 8   A    I was sleeping at my girlfriend's house, 719 Orchard.

 9   Q    Did you live there?

10   A    No.

11   Q    But you were sleeping there --

12   A    Yes.

13   Q    --  the night of May 16?

14   A    Yes.

15   Q    How often did you sleep there?

16   A    I'd say probably like, probably once, twice a week or

17   something like that.  Not often.

18   Q    Every once in a while?

19   A    Yes.

20   Q    Would you have considered that apartment your home, at

21   719 Orchard Street?

22   A    No.

23   Q    Did you have a home?

24   A    Yes.

25   Q    Where was that?
```

```
 1    A      I lived in Fair Haven.

 2    Q      Where did you have your mail sent to?

 3    A      To my mother's house.

 4    Q      That's on Howard Avenue?

 5    A      Yes.

 6    Q      That's different from Fair Haven, right?

 7    A      Yes.

 8    Q      Okay.  Did you ever have any mail sent to 719 Orchard

 9    Street?

10    A      No.

11    Q      Was your name on the mailbox there, at 719 Orchard

12    Street?

13    A      I didn't even have a mailbox there.

14    Q      So was your name on the mailbox?

15    A      No.

16    Q      Where did you keep your clothes?

17    A      At my apartment on Poplar Street in Fair Haven.

18    Q      Did you keep any clothes at 719 Orchard Street?

19    A      No.

20    Q      Did you have any space in the apartment that was just

21    yours?  By that I mean did you have a drawer in a dresser?

22    A      No.

23    Q      Did you have a space in the bathroom that was just yours

24    to keep your toiletries?

25    A      No.
```

```
 1   Q     Did you have any toiletries there, razor or toothbrush?

 2   A     Toothbrush.

 3   Q     Razor?

 4   A     Toothbrush and a washcloth.

 5   Q     Did you have a razor?

 6   A     No.

 7   Q     Did you have any space in the kitchen to keep food?

 8   A     No.

 9   Q     Did you pay rent?

10   A     No.

11   Q     So I take it you did not live at 719 Orchard Street then?

12   A     No.

13   Q     Where were you in the apartment at 5:45 a.m. on May 17th?

14   A     In Kawya's bedroom.

15   Q     Did you wake up on your own that day or did something

16   wake you up?

17   A     There was knocking at the door.

18   Q     The bedroom door?

19   A     Yes.

20   Q     Who was that?

21   A     Police officers.

22   Q     So they woke you up?

23   A     Yeah.

24   Q     Did you hear the police knocking on the main door to the

25   apartment?
```

```
 1   A     No.

 2   Q     When the police knocked on the bedroom door, did you

 3   answer right away?

 4   A     No.

 5   Q     Why not?

 6   A     I was, I was still waking up.

 7   Q     Did you have any clothes on?

 8   A     No.

 9   Q     So you got dressed?

10   A     Yes.

11   Q     And opened the door?

12   A     Yes.

13   Q     How long did it take you to wake up and put some clothes

14   on?

15   A     No more than two or three minutes.

16   Q     So after you were dressed, what happened?

17   A     The cops rushed in there and put me in handcuffs, took me

18   out of the room.

19   Q     So they put you in handcuffs while you were still in the

20   bedroom?

21   A     Yes.

22   Q     And they took you where?

23   A     To the living room.

24   Q     Then what happened?

25   A     They were discussing, I think the agent was telling the
```

```
 1   other guy that he search the room or something like that.

 2   Q    Did you see any officers go back into Kawya's bedroom

 3   when you were in handcuffs in the living room?

 4   A    Yes.

 5   Q    Did you see if they closed the door behind them or left

 6   it open?

 7   A    Yeah.

 8   Q    Which one?

 9   A    I seen them walk in there and close the door.

10   Q    How many?  Do you remember?

11   A    There was two of them.

12   Q    So they didn't just stand outside the bedroom door?

13   A    No.

14   Q    And do you know if this was before or after Kawya was

15   going over the consent to search form?

16   A    It was before.

17   Q    Are you sure about that?

18   A    Positive.

19   Q    Did they ever show you a warrant for the apartment?

20   A    No.

21   Q    Did you hear any mention of a warrant while the police

22   and the agents were in the apartment?

23   A    I think as they were taking me out, I asked them did they

24   have a search warrant.  I was basically telling them -- they

25   said they had a warrant for me, and I was telling them if they
```

```
 1   have a warrant for me, then I'm right here.  And they still
 2   went to search.
 3   Q    So they had an arrest warrant for you?
 4   A    Yeah, that's what they said.
 5   Q    Okay.  What happened after the agents went into the back
 6   bedroom and closed the door?
 7   A    I started telling Kawya that, "Ask do they have a search
 8   warrant?  Like what's the reason for them searching?"
 9   Q    Was she standing next to you?
10   A    She was walking towards the room, like I was telling her,
11   see what they doing.  Basically watch them.
12   Q    She was walking towards the bedroom?
13   A    Yes.
14   Q    Okay.  And then where did Kawya go after that?  Did she
15   go into the bedroom?
16   A    No, they stopped her and the agents brought her in the
17   kitchen.  Then when I was, like, talking to her, they escorted
18   me out.
19   Q    What were you saying to her?
20   A    Basically telling them, telling her, because they were
21   saying about something about signing a consent form, and I was
22   telling her that she don't have to sign the consent form if
23   she don't want to.  That's when they escorted me out.
24   Q    As you were talking, they --
25   A    Walking me.
```

```
1    Q     Where did they bring you?

2    A     To the police car, outside.

3    Q     Okay.  Do you know how long the officers or the agents

4    were inside the bedroom with the door closed?

5    A     I'd say probably like ten minutes.  I was in the living

6    room, so I'll say like five, at least five minutes.

7    Q     Did you see them come out before you were escorted --

8    A     No, they escorted me out already.

9    Q     Did you want Kawya to give the agents consent to search

10   the apartment?

11   A     No.

12   Q     And you tried to express that to her?

13   A     Yes.

14   Q     And that's when you were escorted out?

15   A     Yes.

16   Q     Before you left the apartment, did you overhear any

17   mention of DCF being called?

18   A     I heard them telling her that if she didn't sign, like I

19   heard some of it, she was saying something about she ain't

20   signing the search, or whatever.  And that was about it, I

21   heard.

22   Q     If she didn't sign, then DCF would be called?

23   A     Yes.

24   Q     Why did you have your car registration with you that day?

25   A     Two days prior, I had got in a car accident and I
```

```
 1    basically took all my information out of my car, and I had it

 2    on me.  It was basically in my pocket.

 3    Q    Did you normally keep it at Kawya's apartment?

 4    A    No.

 5    Q    Mr. Benton, I have some pictures here that the government

 6    introduced into evidence without objection from the defense,

 7    of clothes.

 8              MS. GAGNE:  If I may approach, your Honor.

 9              THE COURT:  Yes.

10    Q    Jeffrey -- I'm sorry, Mr. Benton -- can you describe the

11    first picture that's on top?

12    A    Looks like my sweater.

13              THE COURT:  Are these marked as exhibits?

14              MR. SILVERMAN:  Your Honor, they are.  I haven't

15    handed them up yet because I haven't gone through them with

16    the law enforcement witnesses, but I'm happy to identify them

17    for the Court.

18              THE COURT:  We need the number.

19              MR. SILVERMAN:  I'm happy to compare with defense

20    counsel and provide a copy to the Court as well so we're on

21    the same page as to which photos we're looking at.  Perhaps

22    the easiest way for me to do it is to give the marked exhibits

23    to defense counsel and a copy that coincides to the Court.

24              THE COURT:  Thank you.

25              MS. GAGNE:  If I may approach one more time.
```

1          MR. SILVERMAN:  With the Court's permission, I'll

2   hand a copy to your deputy.

3          THE COURT:  Thank you.

4          MR. SILVERMAN:  This is not the marked copy.  The

5   marked copy is with defense counsel right now.

6          THE COURT:  Thank you.

7          MR. SILVERMAN:  I think we'll have to describe each

8   photo so the Court can find it as we go.

9          MS. GAGNE:  Yes.

10  BY MS. GAGNE (Continued):

11  Q    Mr. Benton, I'm handing you Government Exhibit 9 and 10.

12  Can you describe Government Exhibit 9 to me?

13  A    Looks like my sweater.

14  Q    What color?

15  A    A red sweater.

16  Q    Is it a sweatshirt?

17  A    Yes.

18  Q    Does it say anything across the chest?

19  A    Champion.

20  Q    And it's your red sweatshirt?

21  A    Yes.

22  Q    Do you keep that normally at Ms. Cortes's apartment?

23          THE COURT:  What exhibit is it, for the record?  I

24  don't know what he's talking about.

25          MR. SILVERMAN:  Your Honor, it's Government's

```
 1    Exhibit 9.  The copy you have doesn't have the markings on
 2    them, it's a copy without those markings.  In the alternative,
 3    we could provide the Court with a copy with the numbers, if
 4    that's easier, and we could use the unmarked copies for
 5    purposes of testimony.  I think that given we're both familiar
 6    with the photos, that might actually be the easiest way to
 7    proceed.  Why don't we trade the Court's copy for the
 8    number-marked versions?
 9            THE COURT:  Okay, thank you.
10    Q    Mr. Benton, looking at Government Exhibit 9, you have
11    described that as a red Champion sweatshirt, is that right?
12    A    Yes.
13    Q    Is that your red sweatshirt?
14            THE COURT:  Excuse me just a moment.  These things
15    are out of order.
16            MS. GAGNE:  I apologize.
17            THE COURT:  Okay.  I think I have it now.
18            MS. GAGNE:  Okay, good.
19    Q    Did you normally keep this in Ms. Cortes's apartment?
20    A    No.
21    Q    Why was it there that morning?
22    A    Because I was wearing it the night before.
23    Q    Okay.  So you had gotten to the apartment with that --
24    A    Yes.
25    Q    -- on May 16th?
```

```
1    A     Yes.

2    Q     At some point, did you take it off?

3    A     Yes.

4    Q     Was it in the closet, was it on the floor?  Do you

5    remember?

6    A     I'm not even sure.  It might have just been on the floor

7    beside the bed or. . .

8    Q     And you had not yet put it back on when the police

9    arrived?

10   A     No.

11   Q     If you can look at Government Exhibit 10, can you

12   describe that for me?

13   A     Like a whole bunch of clothes.

14   Q     Are those your clothes?

15   A     No.

16   Q     Have you ever seen those clothes before?

17   A     No.

18   Q     So you did not bring those clothes to Ms. Cortes's

19   apartment?

20   A     No.

21   Q     You did not wear those clothes over to Ms. Cortes's

22   apartment?

23   A     No.

24   Q     And they did not belong to you?

25   A     No.
```

1    Q     None of them?

2    A     No.

3    Q     Not the two pants, not the shirts?

4    A     No.

5          MS. GAGNE:  Thank you, your Honor.  No further

6    questions.

7          THE COURT:  Thank you.

8    CROSS-EXAMINATION

9    BY MR. SILVERMAN:

10   Q     Good afternoon, Mr. Benton.

11   A     Good afternoon.

12   Q     Mr. Benton, do you have a criminal record?

13   A     Yes.

14   Q     Is that yes?

15   A     Yes.

16   Q     When was your first conviction, Mr. Benton?

17   A     As an adult?

18   Q     Yes.

19   A     2002, I'm thinking.

20   Q     What was it for?

21   A     I'm not really sure.

22   Q     Would it help if I showed you your criminal history

23   report?

24   A     Yes.

25          MR. SILVERMAN:  May I approach, your Honor?

```
 1              THE COURT:  Yes.
 2   Q    Mr. Benton, I'll direct your attention to the fourth page
 3   of the document I just handed you.  Are you on the fourth
 4   page?
 5   A    What you mean the fourth?
 6   Q    Are you on the fourth page?
 7   A    Counting them by one up to four?
 8   Q    Yes, sir.
 9   A    Yes.
10   Q    The first line, does it say arrest date 6/24/2003?
11   A    Not on the fourth page.
12              MR. SILVERMAN:  May I approach, your Honor?
13              THE COURT:  Yes, sir.
14   Q    The first line on the page you're looking at, arrest
15   date, 6/24/2003?
16   A    Yes.
17   Q    Is that accurate?
18   A    Yes.
19   Q    What were you convicted of on July 21st, 2004?
20   A    Probation violation.
21   Q    On July 21st, 2004, were you convicted of possession of
22   narcotics?
23   A    Yes.
24   Q    Did you receive a sentence of six years' jail, suspended,
25   three years probation?
```

1    A    Yes.

2    Q    On February 17, 2006, did you sustain a conviction for

3    violation of probation?

4    A    Yes.

5    Q    Were you sentenced to 66 months of imprisonment?

6    A    Yes.

7    Q    Turning to the page before that, sir, do you see the

8    entry that starts with the number 3?

9    A    Yes.

10   Q    On July 21st, 2004, were you also convicted of sale of

11   narcotics?

12   A    Yes.

13   Q    Did you receive a sentence of six years imprisonment,

14   three years probation?

15   A    Yes, suspended.

16   Q    On February 17th, 2006, did you sustain another violation

17   of probation?

18   A    Yes.

19   Q    Did you receive a sentence of 66 months of imprisonment?

20   A    Yes, that was all in the same violation.

21   Q    Same violation?

22   A    Yeah.

23   Q    Could you turn to the page before that one, sir?

24        Do you see the entry that starts with a 7?

25   A    Yes.

1    Q     February 17, 2006, were you convicted of sale of

2    narcotics again?

3    A     Possession of narcotics, yes.

4    Q     The one right underneath that, sale of narcotics?

5    A     Yes.

6    Q     Did you receive a sentence of 66 months jail?

7    A     Yes.

8    Q     Also on February 17th, 2006, were you convicted of weapon

9    in a motor vehicle?

10   A     Yes.

11   Q     Were you sentenced to five years jail, concurrent?

12   A     Yes.

13   Q     Of the 66-month and five-year jail terms that were

14   imposed on you February 7, 2006, how long did you serve?

15   A     Four-and-a-half years of it.

16   Q     So were you released sometime in late 2010?

17   A     Yes.

18   Q     Were you arrested at any point after your release?

19   A     No.

20   Q     You had no arrests after that time?

21   A     No.

22   Q     You weren't arrested on January 4th, 2011?

23   A     Oh, yeah yeah yeah.  Yes.  Sorry about that.  Yes.

24   Q     Were you arrested on February 10, 2012?

25   A     Yes.

1    Q    Mr. Benton, what time did you arrive, turning to -- I'm

2    sorry, withdrawn.

3             Turning to May 16, 2012, what time did you arrive at

4    Ms. Cortes's apartment?

5    A    Probably a little after 12:00.

6    Q    After midnight?

7    A    Yes.

8    Q    So it would have been May 17th already?

9    A    Yes.

10   Q    Who was in the apartment when you got there?

11   A    I'm not really sure.  I went straight to Kawya's bedroom

12   when I walked in the house.

13   Q    Sorry, could you say that again?

14   A    I didn't walk around the house.  I went straight to

15   Kawya's bedroom.

16   Q    Was anyone in the living room when you entered?

17   A    I didn't look.

18   Q    Who was in Kawya's bedroom?

19   A    She was.

20   Q    Was she sleeping?

21   A    No, she was woke.

22   Q    Did you wake her or was she already awake?

23   A    She was already woke.

24   Q    And you're not sure who else was in the house?

25   A    No.

1    Q    How long had your girlfriend been living in that

2    apartment prior to May 17, 2012?

3    A    I think she had moved there in October.

4    Q    Of 2011?

5    A    Yes.

6    Q    On May 17, 2012, were you and Kawya dating?

7    A    Yes.

8    Q    How long had you and Ms. Cortes been dating at that

9    point?

10   A    Couple months.

11   Q    At that time, was she pregnant?

12   A    Yes.

13   Q    You knew she was pregnant then?

14   A    Yes.

15   Q    Were you the father?

16   A    Yes.

17   Q    How far along was she in her pregnancy?

18   A    The date I got arrested?

19   Q    Yes.

20   A    She was like five months, a little over five months.

21   Q    Did you start dating after she got pregnant?

22   A    Couple weeks after.

23        THE COURT:  Excuse me, I thought he said he was the

24   father of this child.  He didn't start dating her until after

25   she got pregnant?  There's something wrong here.

1          MR. SILVERMAN:  Your Honor, I believe that's the

2    defendant's testimony, but let me see if I can clarify.

3          THE COURT:  Yes.

4    Q    You said at the time of the arrest on May 17, 2012, Ms.

5    Cortes was about five months pregnant, is that right?

6    A    Yes.

7    Q    And that you believed you were the father of the child,

8    right?

9    A    Yes.

10   Q    And that you had been dating for a couple months at that

11   point in time?

12   A    Could you ask the question again?

13   Q    Yes.  As of May 17, 2012, you said you had already been

14   dating for a couple of months?

15   A    Yes.

16   Q    Did she get pregnant before you officially started

17   dating?

18   A    Yes.

19         MR. SILVERMAN:  Does that clarify the issue, your

20   Honor?

21         THE COURT:  Not particularly.  Excuse me, it's

22   irrelevant.  Go ahead.

23         MR. SILVERMAN:  Okay.

24   Q    When you spent the night -- I'm sorry, you said that she

25   moved into the apartment about October 2011.  Did you know

```
 1   each other at that point in time?

 2   A    Yes.

 3   Q    Did you spend any nights at the apartment between October

 4   2011 and May 17, 2012?

 5   A    Yes.

 6   Q    About how many nights did you spend at the apartment

 7   during that six- or seven-month period?

 8   A    A few nights.

 9   Q    When you say a few, do you mean more than five?

10   A    Yes.

11   Q    Do you mean more than ten?

12   A    I would say like ten.  At least ten times.

13   Q    Less than 20?

14   A    Yes.

15   Q    When you would spend the night, did you typically go

16   straight to Ms. Cortes's room, as you did on May 17, 2012?

17   A    Yes.

18   Q    Did you have a key to the apartment?

19   A    No.

20   Q    How did you get in?

21   A    Kawya opened the door for me.

22   Q    You testified a moment ago that she was already in her

23   bedroom when you got there.

24   A    I mean, yes.

25   Q    Is it --
```

1    A    The door was opened.  The door was unlocked already.  She

2    opened it when I was outside, I called her.

3    Q    The door to the apartment was unlocked?

4    A    Yes.

5    Q    Because you called her from outside?

6    A    Told her I was outside.

7    Q    Approximately how long in advance did you call her before

8    you arrived at her apartment?

9    A    When I was outside, in the backyard.

10   Q    Did you park in the backyard?

11   A    Yes.

12   Q    What were you driving at the time?

13   A    Acura.

14   Q    Is that your car?

15   A    Yes.

16   Q    That's different from the registration that you were

17   carrying around, right?

18   A    Yes.

19   Q    How many cars did you have?

20   A    Two.

21   Q    The Acura and the BMW?

22   A    Yes.

23   Q    At that time, were you working?

24   A    Between jobs.

25   Q    How long were you between jobs leading up to May 17,

```
1   2012?

2   A    Say couple months.

3   Q    Were you collecting unemployment?

4   A    No.

5   Q    Did you have any income during that time?

6   A    Besides temp agencies?

7   Q    You were working at temp agencies?

8   A    Yes.

9   Q    What had you been doing before you started working with

10  temp agencies?

11  A    Construction.

12  Q    With a company?

13  A    Yes.

14  Q    What company?

15  A    Under my stepfather, working with my stepfather.

16  Q    Did he have a construction company?

17  A    Yes.

18  Q    What was the name of that business?

19  A    Magic Touch.

20  Q    Where was that located?

21  A    He didn't have his own building; he got his own truck.

22  Q    What kind of construction projects does he do?

23  A    Painting houses, roof, odd jobs.

24  Q    How did he pay you?

25  A    Under the table.
```

1    Q     Where were you coming from when you arrived at Ms.

2    Cortes's home on May 17, 2012, after midnight?

3    A     Dropping a friend off.

4    Q     Whereabouts?

5    A     The Hill section of New Haven.

6    Q     Where were you and the friend coming from?

7            MS. GAGNE:  Your Honor, I would object to this line

8    of questioning.  I think it has nothing to do with whether or

9    not the police had a search warrant to search the apartment.

10           MR. SILVERMAN:  Your Honor, I'm trying to evaluate

11   why the defendant arrived when he did, what he may have had

12   with him, why he may have had those belongings with him.  I'm

13   curious about the background leading up to his arrival at the

14   apartment.

15           THE COURT:  I'll overrule the objection.

16   Q     So where were you and the friend coming from?

17   A     My friend's apartment.

18   Q     Where was that?

19   A     Henry Street.

20   Q     What's your brother's name?

21   A     Terence Benton.

22   Q     Where was his apartment?

23   A     Henry Street.

24   Q     How far is Henry Street from Orchard Street?

25   A     Couple blocks.

```
 1   Q     Did you have anything with you when you entered Ms.
 2   Cortes's apartment?
 3   A     No.
 4   Q     Aside from the DMV registration?
 5   A     The keys to the car.
 6   Q     I think you went over this on your direct examination,
 7   but you didn't have a change of clothes with you?
 8   A     No.
 9   Q     Were you planning to spend the night there?
10   A     Yes.
11   Q     You didn't keep a change of clothes there?
12   A     No.
13   Q     After the search on May 17, 2012, did you subsequently
14   learn that guns and drugs were found in the apartment?
15   A     Yes.
16   Q     Were they Ms. Cortes's guns and drugs?
17   A     No.
18   Q     Were they her mother's guns and drugs?
19   A     No.
20   Q     Were they Ms. Cortes's daughter's guns and drugs?
21   A     No.
22   Q     Were they her brother's guns and drugs?
23   A     No.
24   Q     Her other brother's guns and drugs?
25   A     No.
```

1    Q    Were they her roommate's guns and drugs?

2    A    I don't know who guns they was.

3    Q    Were they your guns and drugs?

4    A    No.

5    Q    Were you upset that four guns and drugs were found in Ms.

6    Cortes's apartment?

7    A    Yes.

8    Q    Were you upset because you care about her?

9    A    Yes.

10   Q    And you care about her daughter?

11   A    Yes.

12   Q    And you cared about your soon-to-be daughter?

13   A    Yes.

14   Q    So you didn't want them near guns and drugs, right?

15   A    No.

16   Q    Did you ask Ms. Cortes whose guns and drugs they were?

17   A    Yes.

18   Q    What did she tell you?

19   A    She said she didn't know.

20   Q    Who else did you ask?

21   A    Nobody.

22   Q    Were you with -- at any point following your arrest, were

23   you in the kitchen in Ms. Cortes's apartment?

24   A    No.

25   Q    Were you with Ms. Cortes when she signed the consent to

```
 1    search form?

 2    A     No.

 3              MR. SILVERMAN:  No further questions, your Honor.

 4              MS. GAGNE:  No questions, your Honor.

 5              THE COURT:  Thank you, sir.

 6              MS. GAGNE:  Your Honor, the defense rests.

 7              MR. SILVERMAN:  Your Honor, did you want to plow

 8    right ahead or do you want to take a short break?

 9              THE COURT:  We'll take a short break.

10              MR. SILVERMAN:  Five, ten minutes?

11              THE COURT:  That's fine, ten minutes.

12              MR. SILVERMAN:  Thank you, your Honor.

13              (Recess:  2:10 o'clock p.m. to 2:23 o'clock p.m.)

14              MR. SILVERMAN:  Your Honor, the government calls

15    Officer David Rivera.

16              THE COURT:  Thank you.

17                     D A V I D   R I V E R A

18         having been called as a witness, was first

19         duly sworn and testified on his oath as follows:

20              THE CLERK:  Please be seated.  State your name for

21    the record, please spell your last name, and the city and

22    state you reside in.

23              THE WITNESS:  Officer David Rivera, New Haven police

24    officer, city of New Haven.

25    DIRECT EXAMINATION
```

```
 1   BY MR. SILVERMAN:

 2   Q    Officer Rivera, the deputy asked you to spell your last

 3   name, if you don't mind.

 4   A    R-I-V-E-R-A.

 5   Q    Thank you.  Officer Rivera, you noted that you work with

 6   the New Haven Police Department.  How long have you been with

 7   the New Haven Police Department?

 8   A    Approximately 15-1/2 years.

 9   Q    When you joined the police department, did you undertake

10   any particular training?

11   A    Yes, academy training.

12   Q    What did that cover?

13   A    Drug laws, motor vehicle law, domestic laws, pertaining

14   to the state of Connecticut.

15   Q    At some point in your law enforcement career, were you

16   assigned to the Drug Enforcement Administration, the DEA?

17   A    Yes.

18   Q    When was that?

19   A    Approximately three-and-a-half years ago.

20   Q    So are you now a New Haven police officer and a DEA task

21   force officer?

22   A    Yes.

23   Q    Are you a deputized DEA task force officer?

24   A    Yes.

25   Q    To join the DEA in that capacity, did you undertake any
```

1  particular training?

2  A    Yes, we had a two-week training.

3  Q    Where did that occur?

4  A    That occurred in Massachusetts.

5  Q    So you've been with the DEA in a joint role with the New

6  Haven Police Department for about two-and-a-half years, you

7  said?

8  A    Three-and-a-half.

9  Q    Three-and-a-half, I'm sorry.  Were you involved in an

10  investigation that's been dubbed Operation Bloodline?

11  A    Yes.

12  Q    In what capacity were you involved?

13  A    I was involved in primarily surveillance.

14  Q    Was this in your role as a DEA task force officer?

15  A    Yes.

16  Q    Was that a DEA case?

17  A    Yes.

18  Q    On May 17th, 2012, were you involved in the first part of

19  a takedown of that investigation?

20  A    Yes, I was.

21  Q    What does that mean, takedown?

22  A    We were assigned at least three targets, all of which had

23  federal arrest warrants, and we had the task of making the

24  apprehension.

25  Q    On May 17, 2012, where did your business day begin?

```
1    A      We set up for instruction at the location was on
2    Wintergreen Avenue, where all law enforcement arrived, and all
3    were given tasks of making apprehensions for that day.
4    Q      Approximately how many law enforcement officers were at
5    the Wintergreen location in the morning?
6    A      Hundreds of law enforcements.
7    Q      Would it be fair to say this was a large operation?
8    A      Yes, it was.
9    Q      Were the law enforcement officers assigned to teams?
10   A      Yes, they were.
11   Q      Were you on a team?
12   A      Yes, I was.
13   Q      What role did you have on the team?
14   A      I was the team leader for that team.
15   Q      What were your responsibilities as the team leader?
16   A      Pretty much to get information on the target, and the
17   location, and in charge of making the apprehension and
18   gathering any evidence.
19   Q      Approximately how many law enforcement officers were on
20   your team?
21   A      Approximately eight to ten.
22   Q      Were they all people who had worked on the underlying
23   investigation?
24   A      No.
25   Q      So some of them were new to the case?
```

1    A    Some were law enforcement that were brought in, that had

2    nothing to do with the case, that they were assisting the DEA.

3    Q    How many targets did your team have on May 17, 2012, for

4    apprehension?

5    A    Three targets.

6    Q    Was one of them Jeffrey Benton?

7    A    Yes, it was, sir.

8    Q    During the course of the -- withdrawn.  How long had the

9    underlying investigation taken place prior to May 17th, 2012?

10   A    The case from when it started?

11   Q    Yes.

12   A    About a year-long investigation.

13   Q    Had you been involved for that entire year?

14   A    Yes.

15   Q    During the course of that year, had you ever, on

16   surveillance, observed Jeffrey Benton?

17   A    Yes.

18   Q    About how many occasions?

19   A    A few.  A few occasions.

20   Q    Had you ever observed him in the area of 719 Orchard

21   Street?

22   A    Yes, I did.

23   Q    Could you describe that observation?

24   A    We observed Mr. Benton going into the driveway of 719

25   Orchard, and exiting in a BMW.

1    Q      How many times did that happen?

2    A      At least, at least two to three times.

3    Q      When you say "we observed," did you personally observe

4    Mr. Benton?

5    A      Myself and Task Force Officer Miranda.

6    Q      On May 17, 2012, did you have alternative locations for

7    Mr. Benton?

8    A      Yes.

9    Q      Where were they?

10   A      The other location, the primary residence, was located on

11   Henry Street.

12   Q      And what was the other, the second location?

13   A      Was the Orchard Street location.

14   Q      Are those locations near one another?

15   A      Yes, right around the corner.

16   Q      Could you describe that in more depth?

17   A      One, the location on Henry Street, is directly next to a

18   liquor store, and if you wrapped around the corner and came

19   onto Orchard Street, the next building would be 719, and the

20   backyards, you could easily access the Henry Street address.

21   Q      So the Henry Street address and the Orchard Street

22   address, are they adjacent to one another?

23   A      Yes.

24   Q      Which address did you and your team go to first, in an

25   attempt to apprehend Mr. Benton?

```
 1    A    My team went to 719 Orchard.

 2    Q    Did another team go to the Henry Street residence?

 3    A    Yes, the SWAT was called in to make entry into the Henry

 4    Street address.

 5    Q    Why the SWAT team?

 6    A    Due to the dangerous tendencies of the target, it was,

 7    SWAT was, called in to make that entry, due to possible -- the

 8    subject being armed.

 9    Q    Did you have information that Mr. Benton was typically

10    armed?

11    A    Yes.

12    Q    Where did that information come from?

13    A    Information came in from, you know, sources on the

14    street, as well as concerned citizens, that Mr. Benton would

15    engage in gun violence.

16    Q    Did the SWAT team locate Mr. Benton at the Henry Street

17    address?

18    A    No, they did not.

19    Q    While the SWAT team was looking for him at the Henry

20    Street address, what was your team doing?

21    A    We were standing by the Orchard Street address until the

22    Henry Street address was secure.

23    Q    For the sake of overall context, was Mr. Benton located

24    that morning?

25    A    No, he was not.
```

1  Q    Was he located anywhere that morning?

2  A    When the first, Henry Street was checked, when they

3  checked for Benton on the Henry Street address, he was not

4  found.

5  Q    Did your team later locate Mr. Benton?

6  A    We did later locate him, yes.

7  Q    Where was that?

8  A    At 719 Orchard.

9  Q    And going into the takedown that day, you had both of

10 those addresses as alternative locations for Mr. Benton, is

11 that right?

12 A    That's correct.

13 Q    That was information that was provided to you as the team

14 leader?

15 A    Yes.

16 Q    How did you learn that the SWAT team did not locate Mr.

17 Benton at the Henry Street address?

18 A    We waited for the response.

19 Q    Did they tell you personally?  Did they call you?  How

20 did they communicate that to you?

21 A    The SWAT members -- I'm not sure exactly how, but I

22 remember we were right around the corner.  So somehow, the

23 information got trickled down to us that he was not found.

24 Q    At that point, what did you do?

25 A    At that point, we conducted a check of 719 Orchard

```
1   Street.

2   Q    How did that occur?

3   A    The first, the first thing I did was I knocked on the

4   first floor resident door.

5   Q    How many floors are there in 719 Orchard Street?

6   A    There's three apartments.

7   Q    There's one unit per floor?

8   A    Correct.

9   Q    I'm sorry I interrupted you.  The first thing you did was

10  knocked on the first floor?

11  A    I knocked on the first floor.

12  Q    What happened?

13  A    And I was met by a Hispanic male.

14  Q    What happened at that point?

15  A    At which point, I asked whether or not -- who lived with

16  him and he said he lived there with his family.  And I asked

17  him who occupied the second and third floor, and he told me

18  that there were two, both floors were occupied by black

19  families.

20  Q    Did you introduce yourself as a police officer when you

21  encountered the individual who opened the door on the first

22  floor?

23  A    I was in police gear.

24  Q    So what you were wearing made it obvious that you were a

25  police officer?
```

```
 1   A     Yes.

 2   Q     What were you wearing?

 3   A     I was wearing tactical gear.

 4   Q     What does that mean?

 5   A     A vest, I was wearing a gun belt with a PD shirt that

 6   says "police."  Clearly identifiable.

 7   Q     What did you do after you received that information from

 8   the occupant of the first floor apartment?

 9   A     After that, I went to the second floor and again, I

10   knocked on the second floor and was met by a black male, and I

11   asked him if he knew the subject, and he said he lived there

12   with I believe another family member.  And he pretty much

13   asked if we wanted to check the unit, that he was fine with

14   that.  At which point I didn't feel the need to conduct a

15   search there because it looked pretty empty.

16   Q     You testified a moment ago that you asked this individual

17   if he knew the subject.  Did you use Mr. Benton's name?

18   A     I don't know if I used his whole name, but I might have

19   just used Jeff.

20   Q     So what did you do after speaking with the occupant of

21   the second floor?

22   A     Just prior to that, asking him, he kind of indicated that

23   where we needed to check was possibly the third floor.

24   Q     How did he make that indication?

25   A     He pointed up to the third floor, using his finger.
```

1    Q    What did you do in response?

2    A    After eliminating the second floor, I proceeded to the

3    third floor.

4    Q    How many law enforcement officers were with you as you

5    proceeded to the third floor?

6    A    I had at least six law enforcement officers directly

7    behind me.

8    Q    So you would be a seventh officer by that count, correct?

9    A    Yes.

10    Q    Did the officers have their weapons drawn?

11    A    I can't recall whether they did or not.

12    Q    Okay.  What happened when you got to the third floor?

13    A    When I got to the third floor, I again, I knocked on the

14    door, and the door was not locked so as I knocked on the door,

15    the door opened.

16    Q    How did the door look as you approached it on the third

17    floor landing?

18    A    The stairs, you had to walk up the stairs, and the door

19    was to my right, and it was a hollow door.  It wasn't a -- it

20    was a very light door.

21    Q    Was it wood?

22    A    Cardboard, more like.  Like it was a hollow door.  It

23    wasn't wood.

24    Q    It wasn't a heavy door?

25    A    No.

1    Q    Did the door appear to be closed to you as you approached

2    it?

3    A    The door appeared to be closed, yes.

4    Q    Was it closed?

5    A    It was not locked.

6    Q    Why do you say that?

7    A    As I knocked on the door, the door opened.

8    Q    It just swung open?

9    A    It just swung open.

10   Q    Did you announce yourself as a police officer?

11   A    Yes, I did.

12   Q    Did you do that before you knocked?

13   A    I did that -- no, I didn't do it before.  I knocked on

14   the door, the door opened, and as soon as it opened, I

15   announced myself.

16   Q    As a police officer?

17   A    As a police officer, correct.

18   Q    What did you see as the door swung open?

19   A    As the door swung open, I saw a body laying on the floor

20   to my right, and at first glance, I believed it was Mr.

21   Benton.

22   Q    So let's back up for a moment.  What time of day,

23   approximately, was it when you knocked on the third floor

24   door?

25   A    It was approximately 5:45, 6:00 p.m., somewhere around

```
 1   there.
 2               THE COURT:  P.m.?
 3               THE WITNESS:  Sorry, a.m.
 4   Q    This was early morning?
 5   A    Early morning, correct.
 6   Q    Why would you seek to apprehend targets in the early
 7   morning?
 8   A    Because most of the time, they're sleeping, and they're
 9   at the locations where, you know, they're at their home, home
10   locations.
11   Q    Is it safer for law enforcement officers if the targets
12   are asleep?
13   A    Yes, it is.
14   Q    When the door swung open, what room would someone
15   entering the apartment enter into?
16   A    The living room.
17   Q    You stated a moment ago that you saw someone sleeping on
18   the floor?
19   A    Someone was sleeping, and I saw a head pop up from the --
20   a blanket.
21   Q    And you believed you recognized that face?
22   A    I believed it was our target.
23   Q    How did you form that belief?
24   A    What's that?
25   Q    What led you to that belief?
```

```
 1   A    Based on photos I have seen, and dealings in the field

 2   with Mr. Benton.

 3   Q    Was the head that popped up of -- was it a black male?

 4   A    Yes, it was.

 5   Q    To your view at that time, did it resemble Mr. Benton?

 6   A    I had a side profile of the subject, and at that time, I

 7   believed it was Benton.

 8   Q    All right.  What did you do after observing that

 9   individual lying on the floor?

10   A    We proceeded towards that subject and he was, he was

11   secured.

12   Q    Were you able to get a better look at him as you

13   approached?

14   A    Yeah, upon getting a better glance, a better look at him,

15   it turned out it was not Jeffrey Benton.

16   Q    Okay.  So what did you do after learning that

17   information?

18   A    At that point, we already had entered the premise and for

19   law enforcement safety, we conducted a protective sweep of the

20   apartment.

21   Q    What is a protective sweep?

22   A    We're basically looking for anybody else in the apartment

23   that may also harm law enforcement.

24   Q    As part of your protective sweep, what did you do next

25   after confirming the individual on the floor was not Mr.
```

Benton?

A    There were other people in that room as well, and at that time, they were detained, and we proceeded through the rest of the house to see if, you know, there were other parties inside.

Q    Approximately how many people were in the living room?

A    At least three, possibly four.

Q    Were any of them males besides the one that you thought was Mr. Benton?

A    There was at least one male.  I'm not sure if there was another male or a female.

Q    When you said that the people in that room were detained, what do you mean by that?

A    Just, I don't think they were handcuffed; I think they were just detained at that time.  They were just -- law enforcement personnel was in the living room as well, while other members of the team proceeded through a narrow hallway, which led to a kitchen.

Q    What did you do, personally, after confirming that the person on the floor was not Mr. Benton?

A    After it was observed that it was not Benton, I proceeded through the small hallway, and while other members went by me and conducted a search of the kitchen and bathroom, I knocked on one door that was secure to my right, a bedroom door.

Q    What was the result of your knocking?

1    A    There was a Hispanic male and a female that were in that

2    room.

3    Q    Did one of them open the door for you?

4    A    One of them opened the door.

5    Q    Before they did that, did you announce or identify

6    yourself as a police officer?

7    A    Yes.

8    Q    What happened after the door was opened?

9    A    I looked inside the room, and Mr. Benton was not inside.

10   I asked the male subject if he knew Fresh, which is Jeffrey

11   Benton's street name, and he indicated that he was in the room

12   next door.

13   Q    Next door, across the hallway?

14   A    Right directly across.

15   Q    What did you do after learning that information?

16   A    I knocked on that door, identified myself as police

17   again, and requested that they open up the door.  I was met by

18   a female voice who indicated that she needed to get dressed,

19   and we allowed, you know, 30 seconds to a minute to pass until

20   the door was opened.

21   Q    After 30 or 60 seconds, did you have to force your entry

22   into that bedroom?

23   A    No, I did not.

24   Q    What happened?

25   A    The female, Ms. Cortes, opened the door.  Upon doing so,

```
 1   I immediately observed Mr. Benton lying on a mattress inside
 2   the room.
 3   Q    Did you recognize the female who opened the door at that
 4   moment?
 5   A    No, I never seen her before, other than that day.
 6   Q    Okay.  You testified a moment ago that you recognized the
 7   male in the room as Mr. Benton.
 8   A    Yes.
 9   Q    Where was Mr. Benton?
10   A    He was lying on the bed.
11   Q    Did the bed have a frame?
12   A    No, it was just a mattress that was on the floor.
13   Q    What did you do upon seeing Mr. Benton?
14   A    I instructed him show me his hands, and which he did, and
15   he was secured in handcuffs.
16   Q    In handcuffs.  Did you handcuff him?
17   A    Yes.
18   Q    Were other law enforcement officers in the room with you?
19   A    Yeah, I believe there were at least one more in the room
20   with me.
21   Q    Okay.  After Mr. Benton was secured, what happened?
22   A    I explained to him that we had a federal arrest warrant
23   for him.
24   Q    Then what?
25   A    And then we held the room, and we made sure that the
```

1    apartment was secure.  And then I spoke to Ms. Cortes, who

2    stated that she rents out the apartment.

3    Q    Was Mr. Benton dressed when you entered the apartment?

4    A    I don't think he was -- he was not fully clothed.

5    Q    Was he given an opportunity to put on more clothes?

6    A    He was given some clothes; he wasn't given the

7    opportunity to put them on himself.

8    Q    Did law enforcement officers assist him in that?

9    A    Yes.

10   Q    After he was dressed, what happened?

11   A    After he was dressed, I spoke to Ms. Cortes.

12   Q    Before you go on, what happened to Mr. Benton?

13   A    He was still in the room maybe for a little bit, you

14   know, a few minutes or what have you, until the dust settled

15   pretty much, and then he was taken from there to the living

16   room.

17   Q    Okay.  While he was still in the bedroom, you mentioned

18   that you spoke to Ms. Cortes, is that right?

19   A    Yes.

20   Q    Where was she located in the apartment when you were

21   speaking with her?  Was she still in the bedroom?

22   A    She was in the kitchen.  We had brought her to the

23   kitchen.

24   Q    At any point, was she brought to the living room?

25   A    There may have been one point that everybody was brought

```
 1    to the living room, just to have everybody in one place, but
 2    at some point, we brought her to the kitchen.
 3    Q    How many law enforcement officers were with her in the
 4    kitchen?
 5    A    Would have been myself and maybe one other officer.
 6    Q    Why was she selected to be brought to the kitchen?
 7    A    Because she indicated that she's the one who rents out
 8    the apartment.
 9    Q    And why would you want to speak to the person who rented
10    out the apartment?
11    A    Because it's her, her apartment, and we were seeking to
12    get consent to conduct a search.
13    Q    Did you explain to her you were seeking her consent to
14    search the apartment?
15    A    Yes.
16    Q    Did you explain to her anything related to a warrant?
17    A    I explained to her that Mr. Benton, we have a federal
18    arrest warrant for the arrest of Benton.
19    Q    Did you ever tell Ms. Cortes that you had a search
20    warrant for her residence?
21    A    No, I did not.
22    Q    Did you overhear any other officer tell her that there
23    was a search warrant for her residence?
24    A    No, I did not.
25    Q    Did she ever ask you to see a search warrant for the
```

1    residence?

2    A    No.

3    Q    In speaking with Ms. Cortes, did you learn her

4    relationship to Mr. Benton?

5    A    Yes.

6    Q    What was that relationship?

7    A    Her boyfriend.

8    Q    How did you explain to her that you were seeking her

9    consent to search the apartment?

10   A    I indicated that there may be weapons or drugs inside the

11   bedroom, and we pretty much asked her for consent, fearing

12   that somebody may have access, since, you know, there may be

13   kids or what have you, that may have access to those weapons

14   and may cause injury.

15   Q    Were there any minors in the apartment?

16   A    Not that I recall.

17   Q    Was there anyone who needed to go to school that day?

18   A    There may have been; I don't recall.

19   Q    Did you spend a lot of time in the living room with the

20   other occupants of the apartment?

21   A    No, I did not.

22   Q    Did you spend any time in the living room after your

23   initial entry?

24   A    No.

25   Q    Why did you think there might be guns or drugs in the

1  bedroom?

2  A    Based on his past history, based on knowledge that we've

3  obtained in the field, as well as from, you know, concerned

4  citizens, as well as sources of information, we believed there

5  were weapons possibly in the room.

6  Q    Were you aware of the charges then pending against Mr.

7  Benton that were listed out in his federal arrest warrant?

8  A    Yes.

9  Q    Were they drug charges?

10 A    Drug charges.

11 Q    How did Ms. Cortes react when you told her that you

12 thought there might be guns or drugs in the bedroom?

13 A    She, she didn't believe it, or didn't want to believe

14 that there were weapons or any drugs in the bedroom.

15 Q    Did she immediately give you consent to search the

16 bedroom?

17 A    No.

18 Q    What did she say?

19 A    Well, I think she was in doubt whether or not there were,

20 those kind of items were, in the room, and she then requested

21 to speak to her mother.

22 Q    Was her mother in the apartment?

23 A    Her mother was in the apartment.

24 Q    Did you permit Ms. Cortes an opportunity to speak with

25 her mother?

```
 1   A    Yes, we did.

 2   Q    Had her mother been speaking to another law enforcement

 3   officer prior to that time?

 4   A    Yes.

 5   Q    When Ms. Cortes was speaking with her mother, did you

 6   remain in the kitchen with them?

 7   A    I remained in the kitchen, yes.

 8   Q    By way of background, were they in the kitchen when they

 9   were having the conversation?

10   A    When?

11   Q    When Ms. Cortes and her mother were speaking with one

12   another --

13   A    Yes.

14   Q    --  were they in the kitchen?

15   A    Yes.

16   Q    You remained in the kitchen as well?

17   A    I was in the kitchen.

18   Q    How long did Ms. Cortes speak with her mother?

19   A    Briefly.

20   Q    Minutes?

21   A    Couple minutes.

22   Q    Did you interject at all in that conversation?

23   A    No, I did not.

24   Q    What was your impression of Ms. Cortes's demeanor while

25   that conversation was taking place?
```

1   A     She was calm, and she was just trying to take all the

2   information in and trying to, you know, trying to make a

3   decision on, you know, on the situation at hand.

4   Q     Did you overhear any of her mother's advice to her?

5   A     Her mother indicated to her that, you know, she should,

6   you know, provide consent and fearing that there may be

7   weapons in there, as we spoke about, and was basically telling

8   her that, "Give them consent, let them do their job, and

9   let's," you know, "let's move on."

10  Q     What happened after Ms. Cortes had an opportunity to

11  speak with her mother?

12  A     Can you repeat?

13  Q     What happened after Ms. Cortes had an opportunity to

14  speak with her mother for a couple of minutes?

15  A     At that time, she gave verbal consent to search the

16  residence.

17  Q     Was that immediately after their conversation concluded?

18  A     Yes.

19  Q     What was her demeanor at the time she provided verbal

20  consent?

21  A     She was, she was calm, and she was okay with what we were

22  asking.

23  Q     At any point, was Ms. Cortes upset, or angry, or

24  frustrated during your interaction with her?

25  A     At first, when we were taking Mr. Benton into custody,

1    yes, she was upset because she wasn't understanding that we

2    had a federal arrest warrant for him.  She didn't understand

3    why he was being placed under arrest.

4    Q    You testified earlier that when you were speaking with

5    her and when her mother was speaking with her, she seemed

6    calm?

7    A    Yes.

8    Q    Did you observe her calm down during the course of your

9    time with her in the apartment?

10   A    She calmed down from initial contact to after she -- she

11   was calm.

12   Q    When she provided you verbal consent, what did she say?

13   A    She said we can, we can go ahead and search.

14   Q    What did you do at that point?

15   A    At that point, I told her to stand by, and I went down to

16   my vehicle to get a consent to search form to have her sign it

17   as well.

18   Q    Before you left to get that form, did you speak with her

19   about signing a written form?

20   A    Yes.

21   Q    What did you say to her?

22   A    I told her that I was going to go and get a form for her

23   to sign, and I proceeded to go get that form which was in my

24   vehicle.

25   Q    Did she indicate to you whether or not she was willing to

1    sign such a form?

2    A    She didn't -- I don't think she gave any response at that

3    time.

4    Q    So you had to leave the apartment to get the written

5    consent to search form?

6    A    Yes.

7    Q    Approximately how long were you gone?

8    A    About a minute-and-a-half.

9    Q    When you returned to the apartment, was Ms. Cortes still

10   in the kitchen?

11   A    Yes, she was.

12   Q    Was her mother still with her in the kitchen?

13   A    I can't 100 percent if she was or not.

14   Q    At that point, did you show the consent to search form to

15   Ms. Cortes?

16   A    Yes.

17   Q    Did you read it to her?

18   A    I read it to her.

19   Q    Did she have an opportunity to read it to herself?

20   A    Yes, and which she did.

21   Q    Did she take her time -- withdrawn.  How long did she

22   spend looking at the form before she signed?

23   A    Thirty seconds, 45 seconds.

24   Q    Did she sign it in your presence?

25   A    Yes, she did.

1    Q    Did she ever indicate that she was not willing to sign

2    the form?

3    A    No.

4    Q    At the time that she signed it, was she crying?

5    A    No.

6    Q    At anytime while you were with her in the kitchen, was

7    she crying?

8    A    Not that I can recall.

9    Q    At anytime that you were with her in the kitchen, was she

10   yelling?

11   A    No.

12   Q    At anytime while you were with her in the kitchen, did

13   she use force against you?  Did she hit you or slap you?

14   A    No, no.

15   Q    At anytime that you were with her in the kitchen, did she

16   indicate that she felt like she was being threatened or

17   forced --

18   A    No.

19   Q    --  to sign the consent?  Approximately how much time

20   elapsed from when you made initial contact with Ms. Cortes in

21   the bedroom to the time she signed the consent form?

22   A    Twenty minutes.

23   Q    Roughly 20 minutes?

24   A    Roughly.

25   Q    What happened during those 20 minutes?  What was

1   unfolding?

2   A    We were pretty much holding, holding the residence until

3   we acquired a consent to search form signature.

4   Q    Where was Mr. Benton during that 20-minute period?

5   A    At some point, he was taken from the bedroom to the

6   living room, prior to transporting him down to the police

7   cruiser.

8   Q    Do you know if he was transported from the 719 Orchard

9   Street residence to be processed elsewhere?

10  A    Yes.

11  Q    Did you do that transporting?

12  A    No, I did not.

13           MR. SILVERMAN:  May I approach, your Honor?

14           THE COURT:  Yes, sir.

15  Q    Officer Rivera, I've handed you what's been admitted in

16  evidence as Government's Exhibit 1.  The version you have

17  doesn't have the sticker, but the Court has one with a

18  sticker.  What is that document that I've handed you?

19  A    This is a consent to search form.

20  Q    Is that a standard form?

21  A    Yes, it is.

22  Q    What agency provides that form?

23  A    The DEA.

24  Q    What does the first line of type on the form say?

25  A    It says, "I've been asked to permit special agents of the

1    DEA to search," and then it indicates "describe the person,

2    places, things to be searched."

3    Q    Did Ms. Cortes write anything underneath that line?

4    A    Under that line, no.

5    Q    Did anyone write anything underneath that line?

6    A    Yes, I did.

7    Q    What did you write?

8    A    I wrote the residence of 719 Orchard Street, New Haven,

9    Connecticut, indicated the third floor.

10   Q    What's the second line of DEA text say?

11   A    It says, "I have not been threatened nor forced in any

12   way."  Then the third line reads:  "I freely consent to this

13   search."

14   Q    What appears underneath the third line?

15   A    It's the date, 5/17/2012.

16   Q    And what appears next to the date?

17   A    Ms. Cortes's signature.

18   Q    Is there a line for a witness signature underneath that?

19   A    Yes, there is.  There's two lines.

20   Q    Is there a witness signature on the form?

21   A    Yes, there's my signature underneath Ms. Cortes.

22   Q    Is there any other signature on the form?

23   A    No, there is not.

24   Q    Why not?

25   A    It might have been something that I missed at the time.

1    I failed to have a second officer sign that form.

2    Q    Were you comfortable that Ms. Cortes had had a chance to

3    review the form?

4    A    Yes.

5    Q    Did you witness her sign it?

6    A    Yes, I did.

7    Q    And did you then sign underneath as a witness?

8    A    Yes, I did.

9         MR. SILVERMAN:  May I approach, your Honor?

10        THE COURT:  Yes, sir.

11   Q    Officer Rivera, I've handed you what's been admitted as

12   Government's Exhibit 2.  What is that document?

13   A    This is the report which I wrote, which is a DEA report

14   for the arrest of Benton.

15   Q    So it's a report related to the incident we've been

16   discussing during your testimony on May 17, 2012?

17   A    That's correct.

18   Q    And you authored it following Mr. Benton's arrest?

19   A    Yes, I did.

20   Q    Does it describe what happened on May 17, 2012, related

21   to his arrest?

22   A    Yes.

23   Q    After Ms. Cortes signed the consent to search form, what

24   happened?

25   A    After she signed the consent form, we went ahead and

conducted a search of the bedroom that Benton was located in.

Q    Prior to that time and excluding entry into the bedroom

to arrest Mr. Benton, were officers in that room searching?

A    No.

Q    To be clear, after Mr. Benton and Ms. Cortes were removed

from the bedroom until the time that consent was provided,

were any officers searching the bedroom?

A    No.

Q    Were any officers inside the bedroom?

A    There may have been, there might have been one officer

close by to make sure that nobody was to enter that bedroom.

Q    Why would you want to make sure that no one entered the

bedroom?

A    At that time, we did not know whether or not there were

any weapons inside the bedroom.

Q    So there was an officer safety concern then?

A    That's correct.

Q    Was there also a concern about destruction of evidence?

A    That, that could be the case as well.

Q    So some law enforcement officer would have been, for lack

of a better term, standing guard outside the bedroom?

A    Or in the hallway area.  It was a long hallway, which you

can actually see the living room and part of the kitchen.

Q    After Ms. Cortes had been removed from the bedroom but

before she provided consent, did she ever try to enter the

```
1   bedroom she was located in?

2   A    She tried to enter just after effecting the arrest of

3   Benton, she tried to come back to the room, at which time we

4   did not allow her access.

5   Q    She was not permitted to enter the room?

6   A    No.

7   Q    Was that because officers were inside searching the room?

8   A    No, for officer safety, because we did not know whether

9   there was any weapon in the room.

10  Q    Was Ms. Cortes upset she was not permitted to enter the

11  bedroom?

12  A    Yes, I think she was initially upset, but calmed down

13  afterwards.

14  Q    Did you participate in the search of the bedroom?

15  A    Yes, I did.

16  Q    Were there other law enforcement officers participating

17  in the search?

18  A    There was only two law enforcement officers, myself and

19  Stephen Cappolla, that were conducting the search of that

20  room.

21  Q    Were any items of evidence located in the bedroom?

22  A    Yes.

23  Q    What was located in the bedroom?

24  A    We located four handguns and crack cocaine, some Baggies,

25  cell phone, a registration for Benton's vehicle, and U.S.
```

```
 1   currency.

 2   Q    Was there also a scale?

 3   A    There was a scale as well, yes.

 4   Q    Was there any men's clothing in the bedroom?

 5   A    There was men's clothing also located inside the closet.

 6   Q    At that point, Mr. Benton had already been dressed with

 7   the assistance of officers, right?

 8   A    Yes, he was already out of the room.

 9   Q    So there was other men's clothing, aside from what he was

10   wearing when he was escorted out?

11   A    Yes, that's correct.

12   Q    Do you remember approximately how much United States

13   currency was recovered?

14            Are you referring to your report, sir?

15   A    Yes.  It was a total of $5,536 in U.S. currency.

16   Q    Where was that money located?

17   A    It was located inside a gift bag which contained the

18   drugs, the scale, and some Baggies.

19   Q    Was any of the money located underneath the mattress?

20   A    There was some also located underneath the mattress, and

21   there was some U.S. currency on the TV stand, dresser.

22   Q    Where was the bulk of the 5500-plus-dollars located?

23   A    The bulk was inside the gift bag with the drugs and the

24   scale and the Baggies.

25   Q    Was anything else under the mattress besides some United
```

1    States currency?

2    A    Underneath the mattress, there was some U.S. currency and

3    there was the registration to Mr. Benton's BMW.

4            MR. SILVERMAN:  May I approach, your Honor?

5    Q    I've just handed you what's been admitted as Government

6    Exhibit 3.

7            MR. SILVERMAN:  The Court doesn't have a copy of

8    that one, nor defense counsel.

9    Q    That's an original form, isn't it?

10   A    Yes.

11   Q    What is that?

12   A    This is exhibit which we labeled M 248, which is a

13   supplemental assignment of ownership, a bill of sale, which

14   Jeffrey Benton's name is listed as the buyer for the 2002 BMW.

15   Q    Are you looking at the form now?

16   A    Yes.

17   Q    Is it contained in an evidence bag?

18   A    Yes.

19   Q    Is that standard practice for the DEA?

20   A    Yes, it is.

21   Q    Does the form appear to be folded or creased, as though

22   it had been in someone's pocket?

23   A    No.

24   Q    Does it appear to be flat?

25   A    Yes.

1    Q    Uncreased, crisp?

2    A    Yes.

3    Q    Thank you.  You testified earlier that a scale and

4    Baggies were also found, is that right?

5    A    That's correct.

6         MR. SILVERMAN:  May I approach, your Honor?

7    Q    I've handed you what's been admitted as Government's

8    Exhibit 4.  What is that?

9    A    This is the Baggies and the scale which were located

10   inside the gift bag where the drugs and money were found as

11   well, which we labeled DEA M 249.

12   Q    Where was that gift bag found in the bedroom?

13   A    It was located in the walk-in closet, where Mr. Benton

14   was arrested.

15   Q    At some point, did you locate a firearm?

16   A    The first firearm that was located was located by

17   Inspector Cappolla.

18   Q    After locating that firearm, did you take any action?

19   A    Yes, we held that firearm and waited for everything to be

20   photographed.

21   Q    So did another law enforcement officer come to your

22   location to take photographs?

23   A    Yes, he did.

24   Q    And to handle the evidence?

25   A    That's correct.

```
 1   Q    So were a number of photographs taken on that date?

 2   A    Yes.

 3   Q    Were those photographs preserved for evidence in some

 4   manner?

 5   A    Yes.

 6   Q    How did that occur?

 7   A    The evidence was all photographed in place, and after

 8   being photographed, we placed the items in bags and got them

 9   ready to transport back to the DEA.

10        MR. SILVERMAN:  May I approach, your Honor?

11   Q    I'm handing you what's been admitted as government's

12   exhibits 5, 6, and 7.  Were those some of the photographs we

13   were just discussing?

14   A    Yes.

15   Q    Were some of the photographs digital photographs?

16   A    I believe so.

17   Q    Were they downloaded to the DEA database?

18   A    Yes.

19   Q    Were you able to access those photographs?

20   A    Yes.

21   Q    Were they also downloaded to a disk that was saved?

22   A    Yes.

23   Q    What is Government's Exhibit 5?  Would you describe it?

24   A    These are photographs of the bedroom where Ms. Cortes and

25   Benton were located.
```

```
1    Q    Is that exactly what it looked like at the time Mr.
2  Benton was arrested?
3    A    Somewhat, yes.
4    Q    Is this after some of the search had been conducted?
5    A    Yes, this is after.
6    Q    Is there a box that appears on the bed?
7    A    Yes.
8    Q    What is that?
9    A    That is the box which contained three of the firearms
10  that were located inside the closet.
11   Q    What does that box look like?
12   A    It's a cardboard box.
13   Q    Is there another box contained in it?
14   A    Yes, there is.
15   Q    What kind of box is that?
16   A    There's a sneaker, Air Jordans, black colored box that's
17  inside.
18   Q    Was anything found in that box?
19   A    There was also a handgun found inside that box.
20   Q    Could you turn to the next photograph, Government's
21  Exhibit 6?  What is that?
22   A    That's a picture of the sneaker box containing a black
23  handgun.
24   Q    Could you turn to the next photograph, Government's
25  Exhibit 7?  What is that?
```

1    A    This is the box, cardboard box, which three guns were

2    located in, all of which were located inside the closet, the

3    walk-in closet.

4         MR. SILVERMAN:  May I approach, your Honor?

5         THE COURT:  Yes.

6    Q    I've handed you Government's Exhibit 8, 9, and 10.  A

7    moment ago you referenced the walk-in closet.  What is

8    Government's Exhibit 8 a picture of?

9    A    This is a photo of the walk-in closet.

10   Q    So that's a picture of the closet of the bedroom in which

11   Mr. Benton was arrested?

12   A    That's correct.

13   Q    What do you see in that photograph?

14   A    There's clothes, boxes, inside the. . .

15   Q    Were the two boxes that contained the firearms located in

16   that closet?

17   A    Yes, they are.

18   Q    Could you turn to Government's Exhibit 9?  That's the

19   next photograph.  What do you see in that photograph?

20   A    This is a picture of a men's sweatshirt, a Champion

21   sweatshirt, color red.

22   Q    Could you turn to Government's Exhibit 10, the next

23   photograph?  What is that?

24   A    It's a photo of men's boxers, color blue, along with a

25   black T-shirt and some white shorts.

```
1    Q    Are those clothing items large in size?

2    A    They, they appear to be men's clothing, with, you know,

3    to fit a large male.

4         MR. SILVERMAN:  May I approach, your Honor?

5    Q    Officer Rivera, I've handed you Government's Exhibit 11,

6    12, 13, and 14.  Would you take a look at those photographs?

7    A    Yes.

8    Q    What are they pictures of?

9    A    This is a photo of the living room.

10   Q    Is that the first room that would be entered upon

11   entering Ms. Cortes's residence?

12   A    That's correct.

13   Q    What do you see in the first photograph?

14   A    The first photo, I see a mattress lying on the floor

15   there, a chair, a vacuum and boxes, some suitcases.

16   Q    In that photograph, can you see the entrance to the

17   hallway?

18   A    Yes.

19   Q    Where is that?

20   A    It's to the left.

21   Q    That's Government's Exhibit 11.

22        Could you turn to the next photograph, which is

23   Government's Exhibit 12?  What do you see in that photograph?

24   A    It's a photo of the door leading to the front staircase.

25   Q    That's the door that you enter or exit the apartment
```

1    itself from?

2    A    That's correct.

3    Q    Could you turn to the next photograph, Government's

4    Exhibit 13?

5    A    This, again, is a picture of the living room as you enter

6    the apartment.

7    Q    Could you turn to the next photograph, Government's

8    Exhibit 14, please?  What do you see in that photograph?

9    A    This is also a photo of the living room, from a different

10   angle.

11   Q    In those photographs, approximately how many sleeping

12   situations, mattresses or blankets, in those photographs are

13   you able to discern in the living room?

14   A    At least two.

15        MR. SILVERMAN:  May I approach, your Honor?

16        THE COURT:  Yes, sir.

17   Q    Officer Rivera, I've handed you Government's Exhibit 15,

18   16, and 17.  They're also photographs.  What do you see

19   depicted in Government's Exhibit 15, the first photograph you

20   have?

21   A    This is a photo of the hallway leading to the bedrooms,

22   bathroom, and kitchen area.

23   Q    Where is that photograph taken from?

24   A    It's, the view is from the living room.

25   Q    Would you describe that hallway as narrow?

```
1    A    Yes.

2    Q    Can you see from the living room into the kitchen?

3    A    Yes, you can, more towards the center of the kitchen.

4    Q    Can you see the entirety of the kitchen?

5    A    No, you cannot.

6    Q    Could you turn to Government's Exhibit 16, the next

7    photograph that you have?  What is that?

8    A    It's a photo taken of the right portion of the kitchen.

9    Q    And could you turn to Government's Exhibit 17?

10   A    This is a photo depicting the left portion of the

11   kitchen.

12   Q    Between Government's Exhibit 15, 16, and 17, do you see

13   any counter space in the kitchen?

14   A    Yes.

15   Q    Is that where Ms. Cortes signed the consent form?

16   A    Yes, it is.

17   Q    Where is that counter space relative to the kitchen from

18   the hallway?

19   A    It's towards the left, which you're unable to see the

20   living room from that area.

21   Q    So if you were standing in front of the counter, you

22   would not be able to see the living room, is that right?

23   A    You would not.

24   Q    If someone was in the living room looking into the

25   kitchen, would you be able to see an occupant standing at the
```

1   counter?

2   A      No.

3           MR. SILVERMAN:  May I approach, your Honor?

4           THE COURT:  Yes.

5   Q    Officer Rivera, I've just handed you Government's Exhibit

6   18 and 19, which are the last two government exhibits we'll go

7   through.  What is Government's Exhibit 18, the first

8   photograph you have?

9   A    This depicts U.S. currency that was located on the floor,

10  underneath the mattress.

11  Q    What is Government's Exhibit 19, the next photograph?

12  A    That depicts a red colored gift bag containing U.S.

13  currency, some white rock-like substance, as well as a black

14  scale.

15  Q    Did you recognize the white rock-like substance as

16  anything?

17  A    Yes.

18  Q    What did you recognize it as?

19  A    Cocaine.

20  Q    Is that based on your training and experience?

21  A    That's correct.

22  Q    Was anything taken out of or put in that bag before that

23  photograph was taken?

24  A    Could you repeat that question?

25  Q    Was any item removed from that gift bag or placed in that

1  gift bag before the photograph was taken?

2  A    I think prior to taking the photo, the glassine sandwich

3  bags were removed to show the money and the narcotic

4  substance.

5  Q    Was anything placed in the gift bag before taking the

6  photograph?

7  A    No.

8  Q    Government's Exhibit 4, which you looked at earlier --

9  and which, with the Court's permission, I'll hand to you

10  again.

11          MR. SILVERMAN:  May I approach, your Honor?

12          THE COURT:  Yes.

13          MR. SILVERMAN:  Thank you.

14  Q    Are those the bags that you referred to a moment ago in

15  your testimony that were removed from the gift bag before the

16  photograph was taken?

17  A    Yes.

18  Q    At any point during your time interacting with Ms. Cortes

19  or even in the apartment, did you ever threaten to call DCF?

20  A    No.

21  Q    Did you ever overhear any other law enforcement officer

22  threaten to call DCF?

23  A    No.

24  Q    Were you aware, prior to entering that apartment, that

25  Ms. Cortes occupied that apartment?

```
 1   A     Prior?  No.

 2   Q     Were you aware, even when you were in the apartment, that

 3   Ms. Cortes had children?

 4   A     No.

 5   Q     Were you aware that she had a child?

 6   A     Yes.

 7   Q     How did you learn that?

 8   A     We learned that after seeing some children's clothing

 9   inside the closet that she may have a child.

10   Q     Did you see the child in the apartment?

11   A     No.

12   Q     Do you remember seeing the child in the apartment?

13   A     No, I do not.

14   Q     At any point during your interaction with Ms. Cortes, did

15   you ever threaten that she would be arrested if she declined

16   to provide consent?

17   A     No.

18   Q     Did you ever overhear any other law enforcement officer

19   threaten her that she would be arrested if she declined to

20   provide consent?

21   A     No.

22   Q     Did you ever inform Ms. Cortes that if she declined to

23   provide consent, you would search anyway?

24   A     No.

25   Q     Did you ever overhear any other law enforcement officer
```

1   explain to Ms. Cortes that if she declined to provide consent,

2   law enforcement would search anyway?

3   A    No.

4   Q    Did you ever tell Ms. Cortes that if she declined to

5   provide consent, you would certainly get a search warrant?

6   A    No, I did not.

7   Q    Did you ever overhear any other law enforcement officer

8   explain to Ms. Cortes if she declined to provide consent,

9   other law enforcement officers would get a search warrant?

10  A    No.

11  Q    You wanted consent to search the apartment, is that

12  right?

13  A    That's correct.

14  Q    What approach did you take to solicit Ms. Cortes's

15  consent?

16  A    While speaking to Ms. Cortes, she was more receptive to

17  hear what I was trying to explain to her.  I indicated to her

18  that we believe that there are items in the room that may

19  cause injury to children, or the safety of occupants inside

20  that apartment.  I explained to her that we were here for Mr.

21  Benton and Mr. Benton only, and we believe that anything that

22  is in that room would belong to Mr. Benton.

23  Q    How did Ms. Cortes react when you offered that

24  explanation?

25  A    Again, she, she didn't want to believe that there were

```
1    any weapons inside the bedroom.

2    Q    During the time period after Ms. Cortes was removed from

3    the bedroom, prior to her giving consent, was the door to the

4    bedroom that Mr. Benton had been arrested in open or closed?

5    A    The bedroom where he was arrested?  That door would have

6    been open.

7    Q    You testified earlier that door would have been guarded --

8    A    It would have been guarded, yes.

9    Q    When you were interacting with Ms. Cortes in the kitchen,

10   did you ever hear Mr. Benton trying to communicate with her?

11   A    No.

12   Q    Did you overhear Mr. Benton saying anything from another

13   room?

14   A    No.

15   Q    Did Ms. Cortes ever ask to speak to Mr. Benton?

16   A    No.

17   Q    Did she ask to speak to anyone?

18   A    Her mother.

19   Q    Was she permitted to speak with her mother?

20   A    Yes, she was.

21            MR. SILVERMAN:  May I have a moment, your Honor?

22            THE COURT:  Yes, sir.

23   Q    How would you describe Ms. Cortes's demeanor at the time

24   she provided verbal consent?

25   A    She was calm and acting normal at that point.
```

1    Q    How would you describe her demeanor at the time she

2    provided written consent?

3    A    She was calm, acting normal.

4    Q    In the course of your law enforcement career,

5    approximately how many times have you executed arrest

6    warrants?

7    A    Hundreds.  Hundreds of times.

8    Q    Approximately how many times have you sought consent to

9    search?

10   A    The majority of times.

11   Q    How did the atmosphere in Ms. Cortes's apartment compare

12   with your other experiences?

13   A    Normal.

14   Q    Could you describe that in greater detail?

15   A    Again, at first, you know, when you're requesting

16   consent, the parties may be a little bit, you know -- upon

17   entry first, they're trying to get their head together as far

18   as what's going on.  But as everything, as the dust settles,

19   and you explain to them what you're trying to do, they become

20   more receptive.

21   Q    Am I recalling correctly that you testified that

22   approximately 20 minutes had elapsed from your initial contact

23   with Ms. Cortes to the time she provided written consent?

24   A    Repeat that?

25   Q    Am I correct in recalling your testimony that from the

```
 1   time you made initial contact with Ms. Cortes to the time she

 2   provided written consent, approximately 20 minutes had

 3   elapsed?

 4   A    Yes.  Yes.

 5   Q    Did the dust settle during that time?

 6   A    Yes.

 7            MR. SILVERMAN:  I have no further questions at this

 8   time, your Honor.  Thank you.

 9            THE COURT:  Thank you.

10   CROSS-EXAMINATION

11   BY MS. GAGNE:

12   Q    Good afternoon, Mr. Rivera.  My name is Jodi Zils Gagne,

13   and I represent Mr. Benton in this case.

14            So you were present on the morning of May 17, 2012,

15   at 719 Orchard Street, right?

16   A    Yes.

17   Q    How many officers and agents did you say were present

18   that morning?

19   A    Eight to ten officers.

20   Q    Eight to ten?  You did not have a search warrant for the

21   apartment, right?

22   A    No, we did not.

23   Q    But you did have an arrest warrant for Mr. Benton, right?

24   A    That's correct.

25   Q    You went to 719 Orchard Street because you knew Mr.
```

```
1   Benton's girlfriend lived there, right?

2   A    No.

3   Q    You believed that to be a secondary residence for him?

4   A    Yes.

5   Q    But you didn't know who lived there?

6   A    No, we did not.

7   Q    But you thought he might be located there?

8   A    Yes.

9   Q    So you went to Orchard Street while other officers went

10  to Henry Street?

11  A    No, the SWAT team responded to Henry Street while our

12  team, about eight to ten officers, responded to 719 Orchard.

13  Q    Okay.  So other police personnel went to Henry Street --

14  A    Went to Henry Street, correct.

15  Q    -- while you went to Orchard Street.  You'd seen him at

16  Orchard Street before?

17  A    Yes.

18  Q    There are reports of Mr. Benton being there before?

19  A    There is no report, but we, we stopped him during a motor

20  vehicle violation where he came out of that residence

21  utilizing that BMW.

22  Q    So no written reports of him being at Orchard Street?

23  A    No report; an infraction being at that residence.

24  Q    Thank you.  Did you see his name on the mailbox at

25  Orchard Street?
```

```
 1   A    No, I did not.

 2   Q    And you had no reason to believe he received any mail

 3   there, right?

 4   A    No.

 5   Q    You had no reason to believe he paid rent at 719 Orchard

 6   Street, right?

 7   A    No.

 8   Q    Now, your report, which is Government's Exhibit 2, I

 9   believe you still have that in front of you --

10   A    Yes.

11   Q    --  states that Benton had numerous personal belongings

12   in the bedroom, which appears to be his secondary residence.

13           Isn't it true that Mr. Benton was sleeping when the

14   officers came into the apartment?

15   A    If he was sleeping?

16   Q    Yes.

17   A    No, he was not sleeping.

18   Q    When you arrived at the apartment, he wasn't sleeping?

19   A    When the door opened, he was, he was laying in bed with

20   his head up.

21   Q    Okay.  When you walked into the apartment?

22   A    He may have been sleeping, yes.

23   Q    And so the clothing that you found actually comprised of

24   one set of clothes, isn't that true?

25   A    There's numerous articles of clothing there.
```

1    Q    You didn't find numerous changes of clothes, though?

2    A    There's shirts, boxers, stuff of that nature, what was

3    photographed.

4    Q    There was two shirts, a pair of shorts, and boxers?

5    A    Correct.

6    Q    So that's just one set of clothes?

7    A    Yes.

8    Q    Yes.  And those clothes didn't have Mr. Benton's name on

9    them or anything like that, right?

10   A    No.

11   Q    So you don't know actually who they technically belonged

12   to?

13   A    No.

14   Q    Now, according to the report, Government's Exhibit 2, you

15   knocked on the door to 719 Orchard Street at approximately

16   5:45 a.m., correct?

17   A    That's correct.

18   Q    And it was you who knocked on the door?

19   A    It was me.

20   Q    And the door opened?

21   A    Yes.

22   Q    Now, your report does not say someone opened the door,

23   right?

24   A    No.

25   Q    And you didn't observe any individual inside the

1   apartment who actually opened the door?

2   A    No one opened the door.

3   Q    Okay.  So it was 5:45, everyone was sleeping?

4   A    Yes.

5   Q    So at that time, you saw someone on the floor of the

6   living room who you thought might be Mr. Benton?

7   A    Correct.

8   Q    So you went into the apartment to look at him?

9   A    I went directly towards him, yes.

10  Q    And it wasn't him?

11  A    It was not him, upon getting a better look at him.

12  Q    So according to your report, you began to secure the

13  apartment?

14  A    Yes.

15  Q    And you eventually went to the rear bedroom where Mr.

16  Benton was located and knocked on the door?

17  A    Initially, no.  I went to the bedroom adjacent to where

18  Mr. Benton was found.

19  Q    Right.  Eventually, you got to Ms. Cortes's bedroom and

20  knocked on the door?

21  A    Correct.

22  Q    When that door eventually opened, you put Mr. Benton in

23  handcuffs?

24  A    Yes.

25  Q    And you arrested him without incident?

```
1    A    Yes.

2    Q    And he was then taken into the living room?

3    A    Shortly thereafter, yes.

4    Q    Okay.  Now, again, according to your report, you entered

5    at 5:45.  If we look at page 2 of Government's Exhibit 2,

6    paragraph 4, it states that, "At approximately 5:50, Kawya

7    Cortes informed you she was the tenant and you asked for her

8    consent to search the apartment, to which she agreed and

9    signed the consent to search form."

10   A    Correct.

11   Q    So if you entered at 5:45, according to your report, at

12   5:50, you spoke to Ms. Cortes about that, that was five

13   minutes later, right?

14   A    I spoke to her, about five minutes later.  Again, we

15   allowed her to speak to her mother, and eventually she gave

16   verbal consent.

17   Q    Right, but your report states, and I quote, "At

18   approximately 5:50 a.m., Kawya Cortes informed TFO Rivera that

19   she asked Cortes for consent to search the apartment and she

20   agreed and signed a DEA 88 consent to search," something's

21   blacked out, "for 719 Orchard Street New Haven Connecticut as

22   witnessed by CT DCJ investigator Stephen Cappolla."  It states

23   at 5:58, right?

24   A    It should have read "later agreed and signed consent

25   form."
```

1    Q    But it does not say that, right?

2    A    No, it doesn't.

3    Q    So all of that didn't happen in just five minutes' time,

4    all of -- I'm sorry.  You entered, you saw someone who looked

5    like Benton, you determined it wasn't him, you knocked on

6    bedroom doors, you eventually talked to Mr. Benton.  Ms.

7    Cortes opened the door, you put Benton in custody, transported

8    him into the living room.  All of that took more than five

9    minutes's time?

10   A    No.

11   Q    All of that took five minutes?

12   A    He was secured.  It didn't take five minutes to secure

13   him in handcuffs.

14   Q    Okay.

15   A    He was in custody before then.

16   Q    Then you talked to Ms. Cortes, and she signed the consent

17   form.  That didn't take five minutes?

18   A    No, she didn't -- it didn't take five minutes for her to

19   sign.  I spoke to her.  She explained to me that she was the

20   tenant who paid the rent there, and she later agreed and

21   signed the consent form.

22   Q    Okay.  When the report says at 5:50 a.m. she did all

23   these things and signed the form, it was actually a lot

24   longer?

25   A    It was longer, yes.

1    Q    So let's talk about the consent to search form.  Now, you

2    stated on your direct exam that no officers entered the

3    bedroom before the consent to search form was signed, is that

4    right?

5    A    No, we had to go inside to make sure that there was

6    nobody else inside the closet.

7    Q    Okay.

8    A    So we still, for officer safety, were conducting a search

9    to make sure there's nobody else inside the room.

10   Q    So that was before the consent to search form was signed?

11   A    Yes.

12   Q    Okay.  But you say that no one searched the bedroom

13   before the consent to search form was signed?

14   A    Nobody searched for any physical evidence.  We were

15   searching for any persons that may harm law enforcement.

16   Q    Okay.  Now, you brought Ms. Cortes to the kitchen, is

17   that right?

18   A    Yes.

19   Q    And you stated that you didn't allow her to enter the

20   bedroom?

21   A    She attempted at first to enter the bedroom.  I did not

22   allow her to go in there.

23   Q    This was for a bedroom that you at that time had no

24   search warrant to search, right?

25   A    We did not have a search warrant, correct.

1    Q    You had not yet obtained consent to search?

2    A    We did not obtain consent at that time.

3    Q    At that time.  When you were speaking with Ms. Cortes,

4    you told her that if she did not sign the form, she would be

5    arrested?

6    A    Never told her that.

7    Q    You told her DCF would be called?

8    A    Never told her that.

9    Q    And that even if she didn't sign, you would search

10   anyway?

11   A    Never told her that, either.

12   Q    Okay.  On direct, you did say, though, that you told her

13   things in the bedroom could cause injury to children, right?

14   A    Yes.

15   Q    But you also said on direct that you didn't know she had

16   any kids at that time.

17   A    She was pregnant I believe, and there was clothing that a

18   small child would wear.  Didn't know whether it was her child

19   or some children that were just staying in the apartment.

20   Q    So you saw the clothing before you searched the

21   apartment, the bedroom?

22   A    They were scattered throughout the room.  You could

23   clearly see them.

24   Q    Now, you also said on direct that Ms. Cortes was calm.

25   A    Initially, she wasn't calm while placing Benton under

```
1    arrest, which is normal.  But eventually, she calmed down.

2    Q    Within 20 minutes?

3    A    Within 20 minutes, yes.

4    Q    So officers had just stormed in her apartment, her

5    boyfriend was taken out in handcuffs, she's pregnant, and 20

6    minutes later, she was calm?

7    A    She was calm.

8    Q    You also stated that she gave verbal consent.

9    A    She gave verbal consent after speaking to her mother.

10   Q    Okay.  And I take it this wasn't on audio or videotape at

11   all?

12   A    Just verbal consent.

13   Q    So this verbal consent was not listed in the report,

14   Government's Exhibit 2, so it's actually the first I'm hearing

15   about this.  Now, you made this report, Government's Exhibit

16   2, the day after the arrest, right?

17   A    Could you repeat that question?

18   Q    You made the report, Government's Exhibit 2, the day

19   after Mr. Benton's arrest?

20   A    Yes.

21   Q    So that was obviously closer in time to the arrest than

22   today?

23   A    Yes.

24   Q    But this fact of verbal consent wasn't included in that

25   report, right?
```

```
 1   A    No.

 2   Q    But you're saying it here today now?

 3   A    Yes, I'm saying it here.

 4   Q    Fourteen months later?

 5   A    It was verbal consent, and I went to grab a form out of

 6   my car so that she can sign.

 7   Q    Okay.  Now, just to be clear, you spoke to Ms. Cortes

 8   first, right?

 9   A    Yes.

10   Q    You told her about the consent to search form?

11   A    I explained to her that we wanted consent to search her

12   apartment.

13   Q    Okay.  She signed the consent to search form?

14   A    She eventually signed the consent.

15   Q    You witnessed it?

16   A    Yes.

17   Q    No one else did?

18   A    No one else witnessed it.

19   Q    And so now you say that consent was freely and

20   voluntarily given, right?

21   A    Yes.

22   Q    Now let me ask you about the weapons that were found at

23   719 Orchard Street.  You found them in the bedroom closet,

24   right?

25   A    That's correct.
```

```
 1   Q     And three of the firearms were found at the back of the
 2   closet, right?
 3   A     Correct.
 4   Q     And they were inside a large cardboard box?
 5   A     Yes.
 6   Q     And this was a rather large walk-in closet, right?
 7   A     Yes.
 8   Q     So you had to have walked to the back of the closet.  You
 9   couldn't just reach it from the bedroom?
10   A     No, you'd have to clear a couple of items in order to get
11   to the back.
12   Q     Maybe move some items around before getting to the back?
13   A     You might have to move something, yeah, in order to get
14   to the three that were in the back.
15   Q     And to your knowledge, these guns were never
16   fingerprinted, right?
17   A     To my knowledge, no.
18   Q     Okay.  Going back to the second floor that you had gone
19   to first before going to the third floor apartment Mr. Benton
20   was located, you stated that the second floor tenant said it
21   was okay to search that apartment?
22   A     The second floor tenant, yeah, but again, we ruled him
23   out as there was nobody really inside that unit.
24   Q     Okay.  So you didn't go into the second floor?
25   A     I went into the second floor, and briefly, there was, I
```

```
 1  believe, a bedroom to the right and there was nobody there.

 2  Q    Okay.  So you did go in?

 3  A    I went in to speak to him, he allowed me --

 4  Q    But you didn't search the apartment?

 5  A    We didn't search.

 6  Q    Okay.  And finally, at the beginning, you stated that you

 7  had two weeks' training to become a DEA TFO, correct?

 8  A    It's a two-week training that they send you, Franklin

 9  Mass., where you have different courses that you attend.

10  Q    I take it some of those courses are on the Fourth

11  Amendment?

12  A    Training on everything, drugs, searches.

13  Q    So they cover a lot in those two weeks?

14  A    Yes, they do.

15  Q    There was some kind of training on search and seizure

16  law, right?

17  A    Yes.

18         MS. GAGNE:  No further questions, your Honor.

19         MR. SILVERMAN:  Just a relatively brief redirect,

20  your Honor.

21  REDIRECT EXAMINATION

22  BY MR. SILVERMAN:

23  Q    Officer Rivera, I'm going to start by asking you some

24  questions about reports that law enforcement officers write.

25  During the course of this approximately year-long
```

1   investigation, did you write a report every time you conducted

2   surveillance?

3   A    Not every time we conducted surveillance, no.

4   Q    The report that's been admitted as Government's Exhibit 2

5   today, that was authored by you?

6   A    Yes.

7   Q    And you drafted that on May 18th, 2012, is that right?

8   A    That's correct.

9   Q    That's the day following Mr. Benton's arrest?

10  A    That's correct.

11  Q    You testified on direct that on May 17th, your team was

12  assigned to apprehend three individuals, is that right?

13  A    Yes.

14  Q    So would it be fair to say that May 17th was a fairly

15  busy day for you?

16  A    Yes, it was.

17  Q    Do you try to write your reports soon after the incident

18  occurs?

19  A    We try.

20  Q    Why do you want to do them as soon as possible?

21  A    To have pretty much everything clear of what occurred

22  that day, you want to try to jot it down as quick as possible.

23  Q    Is it fair to say that things are more fresh in your own

24  mind the closer in time you're able to write the report?

25  A    Yes.

```
1   Q    Would it be fair to say that on May 18th, 2012, you were

2   a busy man?

3   A    Very.

4   Q    What happened on May 22nd, 2012?

5   A    It was a second roundup for the bloodline investigation.

6   Q    So after the May 17th roundup, were you gearing up for

7   another roundup a couple days later?

8   A    Yeah, we were still dealing with the first roundup, with

9   all the evidence involved, and then gearing up for the second

10  roundup.

11  Q    Is it possible that the report you drafted, that is

12  Government's Exhibit 2, is not perfect?

13  A    Yes.

14  Q    Do you sometimes make mistakes?

15  A    Yes, I do.

16  Q    Do you more often make mistakes when you're extremely

17  busy?

18  A    Sure.

19  Q    I want to turn your attention back to paragraph 4, which

20  was the subject of some questioning during your

21  cross-examination.  Are you looking at paragraph 4?

22  A    Yep.

23  Q    Does the first sentence indicate a time at which you

24  informed -- I'm sorry, at which Ms. Cortes informed -- you

25  that she was the tenant for 719 Orchard Street?
```

1  A    That was at 5:50.

2  Q    Is there a time listed at the start of the second

3  paragraph?

4  A    No, there isn't.

5  Q    And it's your testimony today that those other events

6  detailing the second paragraph asking her for consent, her

7  verbal consent, her written consent, all occurred later, after

8  5:50?

9  A    That's correct.

10  Q    It doesn't specify the start of the second sentence that

11  at 5:50, you also obtained her consent and she signed the

12  form, does it?

13  A    No, it does not.

14  Q    Sometimes when you look back at reports that you've

15  written, do you think there were other things that you should

16  have included?

17  A    Yes.

18  Q    And with hindsight, are there sometimes things you

19  probably didn't need to include?

20  A    Correct.

21  Q    You're the only --

22        MR. SILVERMAN:  Sorry, your Honor, may I approach?

23        THE COURT:  Yes.

24  Q    Officer Rivera, I've just handed you a copy of

25  Government's Exhibit 1.  Underneath Ms. Cortes's signature on

1    that consent to search form, are there lines for two

2    signatures?

3    A     Yes, there is.

4    Q     How many witnesses signed that form?

5    A     Two.

6    Q     There are two signatures on the form, right?

7    A     Yes.

8    Q     Whose signatures are those?

9    A     The signature of Ms. Cortes and my signature.

10   Q     There's no other law enforcement witness who signed the

11   form, is there?

12   A     No, there is not.

13   Q     Is it possible that another law enforcement officer was

14   present when Ms. Cortes signed?

15   A     Yes, I believe there was another officer present when she

16   signed.

17   Q     Are you sure who it was?

18   A     I'm not 100 percent certain of who it was.

19   Q     Would you ordinarily have asked that other officer to

20   sign as a witness?

21   A     Yes.

22   Q     Did you overlook that on May 17, 2012?

23   A     Yes, I did.

24   Q     With respect to any forensic examination of the firearms

25   or the other evidence that was obtained on May 17, 2012, from

1   Ms. Cortes's residence -- are you a forensic scientist?

2   A    No.

3   Q    Do you conduct fingerprint analyses?

4   A    No, I do not.

5   Q    Do you conduct narcotics analyses?

6   A    No.

7   Q    Would you be the one who dusted the guns for

8   fingerprints?

9   A    No, I would not.

10  Q    Are other task force officers able to access the DEA

11  evidence vault?

12  A    Yes.

13  Q    So if someone else, one of your colleagues, was bringing

14  the guns to be fingerprinted or to be swabbed, someone else

15  could access it without even telling you, is that right?

16  A    Yes.

17          MR. SILVERMAN:  May I approach, your Honor?

18  Q    Officer Rivera, I've handed you Government's Exhibit 10.

19  Could you remind us what Government's Exhibit 10 depicts?

20  A    Boxers, and appears to be a couple shirts or some

21  clothing, black shirt and maybe white pants.

22  Q    Does it appear to you that those clothes would fit Mr.

23  Benton?

24  A    These clothes would fit a tall individual.

25  Q    Does it appear to you that those clothes would be too big

1    for Ms. Cortes?

2    A    Definitely.

3    Q    At the time that that photograph was taken, had law

4    enforcement officers already assisted Mr. Benton in putting on

5    clothes before he was removed from the apartment?

6    A    Yes.

7    Q    So that's another set of clothes?

8    A    Yes.

9         MR. SILVERMAN:  Thank you.  No further questions.

10        MS. GAGNE:  Just briefly, your Honor.

11   RECROSS-EXAMINATION

12   BY MS. GAGNE:

13   Q    Officer Rivera, do you happen to know what Mr. Benton was

14   dressed in when the officers helped him get dressed?

15   A    No, I do not.

16        MS. GAGNE:  Okay.  No further questions.

17        MR. SILVERMAN:  Nothing further from the government.

18   Thank you.

19        THE COURT:  Thank you, sir.

20        MR. SILVERMAN:  Your Honor, the government has one

21   more witness, Inspector Joe Howard.  With the Court's

22   permission, I'll go get him.

23        THE COURT:  All right, thank you.

24        MR. SILVERMAN:  Thank you.

25        THE WITNESS:  Hello, your Honor.

**J O S E P H   H O W A R D**

    having been called as a witness, was first

    duly sworn and testified on his oath as follows:

        THE CLERK:  Please be seated.  State your name for

the record, spell your last name, and the city and state you

reside in.

        THE WITNESS:  My name is Joseph Howard, H-O-W-A-R-D;

I reside in Wethersfield, Connecticut.

DIRECT EXAMINATION

BY MR. SILVERMAN:

Q    How are you employed, sir?

A    I'm employed Connecticut Division of Criminal Justice.

Q    What is your title?

A    I'm a police inspector for the division.

Q    Have you been in law enforcement for most of your career?

A    Yes, sir.

Q    When did you first become involved as a law enforcement

officer?

A    In 1974.

Q    In what capacity?

A    I joined the New Haven Police Department then.

Q    How long were you with the New Haven Police Department?

A    Until 1994.

Q    Approximately 20 years?

A    Yes.

1    Q    What happened at the end of those 20 years?

2    A    I retired, and I joined the Division of Criminal Justice.

3    Q    What rank were you when you retired from the New Haven

4    Police Department?

5    A    I was a lieutenant at that time.

6    Q    How long had you been with -- I'm sorry, what is the name

7    of your current employer?

8    A    The Division of Criminal Justice.

9    Q    How long with the Division of Criminal Justice?

10   A    Since 1994.

11   Q    So it's approximately 17 years?

12   A    More like 19.

13   Q    19 years.  My math is off, I apologize.  Approximately 19

14   years.  In your approximately 20 years as a law enforcement

15   officer, approximately how many arrest warrants have you

16   executed or been part of the execution of?

17   A    Quite a few.

18   Q    Hundreds?

19   A    Possibly.

20   Q    Approximately how many times have you sought consent to

21   search, or been involved with another law enforcement officer

22   who was seeking consent to search?

23   A    A fair amount.

24   Q    Could you estimate a number?

25   A    Several dozen at least.

1   Q    Were you involved in the arrest of Mr. Benton on May

2   17th, 2012?

3   A    Somewhat, yes, sir.

4   Q    Had you been involved in the underlying investigation,

5   which has been dubbed Operation Bloodline?

6   A    No, sir.

7   Q    At that time, you were working as a police inspector with

8   the Connecticut Department of Justice?

9   A    That's correct.

10   Q    Criminal justice?

11   A    Yes, sir.

12   Q    DCJ, is that right?

13   A    Yes, sir.

14   Q    DCJ, okay.  So on May 17, 2012, were you brought in to

15   arrest with the roundup?

16   A    Yes, I was.

17   Q    What team were you assigned to on that date?

18   A    I'm not aware of any specific team number or code name or

19   anything like that.  I was added to a roster and told to

20   report to a certain van full of police officers from different

21   agencies.

22   Q    Did you remain with those police officers throughout the

23   roundup on May 17, 2012?

24   A    Sometimes yes, sometimes no.

25   Q    Approximately how many locations or how many targets did

1    your team have that day?

2    A    I knew of three specific targets, and target locations,

3    that was on our list.

4    Q    Was one of the targets Jeffrey Benton?

5    A    Yes.

6    Q    Where did your team go in order to effect Mr. Benton's

7    arrest?

8    A    Actually, the arrest of Mr. Benton was to encompass a

9    couple of teams:  One to go to a primary location, the other

10   to stabilize a secondary location if he wasn't at the first.

11   Q    Which location did your team first go to?

12   A    I went to the secondary location on Orchard Street.

13   Q    Okay.  Approximately how many law enforcement officers

14   were part of the entry team at that location?

15   A    The secondary?

16   Q    Yes.

17   A    There was at least a half a dozen or more law enforcement

18   officers that contained the address while the first house call

19   was effected.

20   Q    Was Mr. Benton located at the first house?

21   A    No, sir.

22   Q    So did your crew of law enforcement officers end up

23   entering the secondary location?

24   A    Yes, sir.

25   Q    And that's 719 Orchard Street?

```
1    A    Yep.  Yes, sir.

2    Q    What floor was Mr. Benton located on?

3    A    I believe it was the third floor.

4    Q    Were you the first officer through the door?

5    A    No, sir.

6    Q    Where were you in the line of officers entering?

7    A    Closer to the rear of the stack.

8    Q    When you entered that apartment, what was the scene?

9    What did you see?

10   A    I entered through the hallway door at the top of the

11   stairs, and the typical scene in a crowded place full of

12   residents and law enforcement officers, spread out through the

13   length of the apartment.

14   Q    What room were you in when you first entered the

15   apartment?

16   A    I found -- well, it was extremely cramped and crowded.

17   Being the last through the door, kind of had to wait for an

18   opening to insert myself in the apartment and not get in the

19   way.

20            I found myself at one point peeking into a bedroom

21   on the north side.  That was as crowded as they could get.

22   And everything seemed under control, so I gravitated toward

23   the front of the apartment overlooking Orchard Street, and

24   there were some people being detained in the front room there.

25   Q    What role were you playing in the front room?
```

1    A    When I adopted a position there, I performed some crowd

2    control on the people that were being detained.

3    Q    Were most of the occupants of the apartment taken into

4    that front room?

5    A    At some point in time, they were there to be contained.

6    Q    At some point in time, were you replaced on your crowd

7    control duty in that front room?

8    A    That's correct.

9    Q    And what did you do after that?

10   A    I gravitated toward the central area of the apartment.

11   Some questions had arisen, and I tried to answer some of those

12   questions the best I could.

13   Q    Were there occupants of the apartment had questions or

14   were law enforcement officers had questions?

15   A    One of the occupants or more raised a certain legal

16   question, if you will.

17   Q    Who was the occupant raising this question?

18   A    The one I recall and the one I addressed was the senior

19   lady, the eldest of the females living there.

20   Q    Did that individual appear to be a parent of anyone in

21   the apartment?

22   A    It was my understanding she was the parent of the young

23   lady who had been in the very first room that I looked into.

24   Q    Is that the bedroom in which Mr. Benton was arrested?

25   A    That's correct.

1    Q    So it's your understanding that the person you ended up

2    speaking with was the mother of the person in the bedroom who

3    was arrested -- when Mr. Benton was arrested?

4    A    That's correct.

5    Q    What was the question she had raised?

6    A    The question had been raised whether or not there had

7    been a warrant.

8    Q    And how did you respond to that question?

9    A    I responded that there had been a warrant, that there had

10   been a warrant issued for Mr. Benton's arrest, and the purpose

11   was to come to the apartment and serve the arrest warrant.

12   Q    What happened after that?

13   A    And then I engaged, you know, in some additional

14   conversation about what our purpose was and what we would like

15   to try and accomplish there.

16   Q    What did you tell her?

17   A    I told her that we had some good reason to believe that

18   there might be some hazardous things in Mr. Benton's bedroom,

19   for lack of a better term, or elsewhere in the apartment and

20   we wanted to make sure that, you know, we could locate those

21   things and neutralize them before anybody could get hurt with

22   them.

23   Q    What was this mother's reaction to your explanation?

24   A    I explained to her what I meant.  I asked her if there

25   were ever any little kids around the apartment or any young

1   people who could be hurt by a firearm or by dangerous drugs,

2   and she thought about it and she said, yeah, on occasion.

3           So I said if we can do those things and pretty much

4   assure that the place was safe, you can get some peace of mind

5   and everybody can leave and go about their lives.

6   Q    How did she react when you explained that to her?

7   A    She appeared to understand what I was saying and embrace

8   it and then began, attempt, to pass that along to her

9   daughter.

10  Q    Before that happened, when you first started speaking

11  with this individual, how would you describe her demeanor?

12  A    Pretty standard.  I mean, you interrupt people's sleep

13  and, you know, you have the presence of police officers and an

14  arrest is being made, they're a little disoriented at first

15  and a little upset.

16          When a little control is established and the dust

17  settles, if you will, they go back to their normal personality

18  and, you know, most rational people, like her, will just work

19  to try to bring the thing to a resolution and everybody can

20  resume life.

21  Q    Do you see the individual you were speaking with here in

22  the courtroom today?

23  A    She might be behind, might be that young lady back there

24  with the nice earrings on.

25  Q    The big earrings?

1    A     Yep.

2    Q     Sitting between a male in a white shirt and female

3    wearing glasses?

4    A     I believe so.

5          MR. SILVERMAN:  May the record reflect that that was

6    one of the witnesses called earlier, Gwendolyn McCrea.

7          THE COURT:  Yes, sir.

8          MR. SILVERMAN:  Thank you, your Honor.

9    Q     So you were speaking to that individual, and when you

10   first encountered her, you described her as being somewhat

11   upset or off-balance as a result of what was happening that

12   morning, is that fair?

13   A     Not unduly so.  It was what I would, you know, I would

14   expect under the circumstances.

15   Q     During the course of your conversation with her, did her

16   demeanor change?

17   A     Yeah, she calmed down.  She did process what I said to

18   her, and then she focused her attention on her daughter and on

19   the situation at hand.

20   Q     When you say "she focused her attention on her daughter,"

21   what happened?

22   A     She looked a little bit over my shoulder toward the rear

23   of the apartment, where her daughter was interacting with one

24   of the other police officers.

25   Q     Do you remember which officer her daughter was

1    interacting with?

2    A    Officer Rivera.

3    Q    So is it fair to say then from your description that you

4    were standing between the mother and the daughter?

5    A    Yeah.  I mean, not interposing myself, but under the

6    cramped conditions in there, that's where I found myself.  To

7    engage the daughter, she somewhat had to peek around me.

8    Q    Was she doing that peeking around you during the time you

9    were interacting with her?

10   A    Yeah.  She began to address her daughter.

11   Q    Did she say anything to her daughter while you were

12   interacting with Ms. McCrea?

13   A    She encouraged her daughter to just, you know, do the

14   right thing.  You know, let the cops look around, take

15   whatever was dangerous out of there, and basically do the

16   right thing.

17   Q    At any point, did she speak directly to her daughter?

18   A    She did address direct comments to her daughter.  I don't

19   recall exactly verbiage she used.

20            MR. SILVERMAN:  May I have one moment, your Honor?

21            May I approach, your Honor?

22            THE COURT:  Yes.

23   Q    Inspector Howard, I've handed you two photographs which

24   have been admitted I believe as Government's Exhibit 14 and

25   16.  Could you describe them so the Court or defense counsel

1    can correct me if I identified the wrong numbers?  The first

2    one, what is that?

3    A    This depicts the general hallway that ran the length of

4    the apartment in question.

5    Q    What is Government's Exhibit 16, the other photograph you

6    have?

7    A    That depicts the rear area, which would have been like a

8    kitchen and counter area.

9    Q    When you were interacting with Ms. McCrea, where were you

10   standing?

11   A    In the vicinity between these doorways here.

12   Q    That's Government's Exhibit 14, in the hallway?

13   A    That's correct.

14   Q    Okay.  And could you see, if you had been facing it,

15   could you have seen the kitchen from where you were standing?

16   A    I had my back to the kitchen.  There was an area of the

17   kitchen that I would have been able to see if I had been 180

18   degrees the opposite way.  There would have been an area of

19   the kitchen that would have been out of my sight.

20   Q    Was Ms. McCrea facing the kitchen during your interaction

21   with her?

22   A    She was facing me during some of it and then when she

23   peeked around me she could see certain areas of the hallway

24   and the kitchen.

25   Q    Would she have been able to see her daughter while you

1    were interacting with her, by peeking around you?

2    A    She accomplished it, yes.

3    Q    Very good.  Approximately how long were you speaking with

4    Ms. McCrea before she began to interact directly with her

5    daughter, Ms. Cortes?

6    A    It was a brief conversation, several sentences back and

7    forth.

8    Q    Was it a couple of minutes in length?

9    A    It may have been, yes.

10   Q    After that time, was she permitted to speak directly with

11   her daughter, Ms. Cortes?

12   A    It wouldn't have been a matter whether she was permitted

13   to or not.  I don't recall too much direct interaction.  The

14   lack of space and the amount of bodies crammed in the space

15   kind of got in the way of. . .

16   Q    Okay.  At some point, did your team leave 719 Orchard

17   Street?

18   A    At some point in time, a member of my original team came

19   upstairs and summoned me, because we had another house call to

20   make.

21   Q    Approximately how long had you been in the apartment from

22   your initial entry until that time when your team came to get

23   you?

24   A    Perhaps 15, 20 minutes.

25   Q    When you left, where did things stand in terms of the

1  consent to search that was being requested?

2  A    From what I had overheard, there was a verbal agreement

3  to allow consent to search the apartment.  Officer Rivera had

4  left the apartment to obtain a blank consent form.  That's

5  when my team came and summoned me, so that I jumped in the van

6  and I left and I never returned to the apartment.

7  Q    So at the time that you left, Ms. Cortes had provided

8  verbal consent to search?

9  A    Yes, sir.

10 Q    And Officer Rivera had gone to get a blank written

11 consent to search form?

12 A    That's the status of it when I left, yes, sir.

13 Q    Did you ever threaten Ms. Cortes, Ms. McCrea, or any

14 other individual in the apartment that DCF would be called if

15 no consent was provided?

16 A    No, sir.

17 Q    Did you ever overhear any other law enforcement officer

18 threaten that DCF would be called if consent was not provided?

19 A    I never heard the term "DCF" while I was there.

20 Q    Did you ever threaten Ms. Cortes, Ms. McCrea, or anyone

21 else in the apartment that they would be arrested if no

22 consent was provided?

23 A    No, sir.

24 Q    Did you ever overhear any other law enforcement officer

25 threaten such arrests if no consent was provided?

```
1    A    No, sir.

2    Q    Did you ever threaten Ms. Cortes, Ms. McCrea, or anyone

3    else in the apartment that if no consent was provided,

4    officers would search the apartment anyway?

5    A    No, sir.

6    Q    Did you overhear any other law enforcement officer make

7    such a threat?

8    A    No, sir.

9    Q    Did you ever explain to Ms. McCrea, Ms. Cortes, or anyone

10   else in the apartment that if they declined to provide

11   consent, a search warrant would certainly be obtained?

12   A    I never said that.

13   Q    Did you overhear any other law enforcement officer say

14   that?

15   A    I never heard that being said, either.

16   Q    During the course of time that you were in the apartment,

17   before consent had been provided -- and that would have been

18   the entire time because from your testimony, you left before

19   the consent was completed, is that right?

20   A    Before the written consent was formalized, yes, sir.

21   Q    During that time period that you were in the apartment,

22   were any officers searching the bedroom in which Mr. Benton

23   had been arrested?

24   A    No, sir, not after -- not after the arrest had been made.

25   Q    And after that arrest had been made, were the officers,
```

1    were any officers, in the room, that bedroom?

2    A    The only thing would have been maybe to post somebody at

3    the doorway to keep things stabilized until the search could

4    commence, if it was going to.

5    Q    Were you ever near that bedroom when anyone tried to

6    enter it?

7    A    I was near it in order to converse with the lady I

8    testified to.  But I didn't observe anybody attempt to enter

9    it or disturb anything in it.

10   Q    Did you ever have to turn anybody away from that bedroom?

11   A    No, sir.

12   Q    Okay.  Was the door to that bedroom open or closed while

13   you were in the hallway?

14   A    I don't specifically recall.

15   Q    Did you have an opportunity to overhear any of the

16   conversations between Officer Rivera and Ms. Cortes in the

17   kitchen?

18   A    Most of it was in very conversational tones.  There was a

19   lot being said and a lot of movement.  It was the standard,

20   you know, introduction to a plea to provide consent to search.

21   Nothing out of the ordinary, with my prior experience.

22   Q    Was Ms. Cortes crying?

23   A    I don't recall seeing her upset to that extent.

24   Q    Was she yelling?

25   A    No.

1    Q    Do you recall anyone in the apartment yelling?

2    A    After the initial entry perhaps in the crowd control part

3    where that's a necessary part of it, then things went down a

4    notch.  You want to regain a little control of the situation

5    and let people get control of themselves.

6    Q    After the protective sweep had been conducted and

7    everyone was secured, did law enforcement officers have their

8    guns out?

9    A    No, sir.

10   Q    They were holstered?

11   A    They were holstered.

12              MR. SILVERMAN:  May I have a moment, your Honor?

13   Q    Did Ms. McCrea ever appear to get upset with her daughter?

14   A    It appeared that way to me.

15   Q    Why do you say that?

16   A    When she began to bob about trying to address her

17   daughter over me, it was -- it appeared that she wanted to

18   know why there was, you know, perhaps a momentary hesitation

19   in getting this thing done and getting the cops out of her

20   place.

21   Q    So did it appear to you that Ms. McCrea was encouraging

22   her daughter to provide consent?

23   A    That was my impression.

24   Q    Relative to the other arrest warrants that you executed

25   and consents to search that you sought to obtain, how would

1   you describe the dynamics in 719 Orchard Street, apartment 3,

2   on May 17, 2012?

3   A     Pretty much within the spectrum of the norm and standard.

4   Nothing really bad happened when we were there, and it was

5   just communicating with people and getting that aspect of the

6   job accomplished.

7   Q     Did you have any direct interaction with Ms. Cortes on

8   that date?

9   A     Which person would that be?

10  Q     The daughter.

11  A     Might have addressed a sentence or two to her, but not in

12  terms of soliciting anything or ordering her to do anything.

13  Q     Which officer was primarily interacting with Ms. Cortes?

14  A     That was primarily Officer Rivera.

15         MR. SILVERMAN:  No further questions at this time.

16  Thank you.

17  CROSS-EXAMINATION

18  BY MS. GAGNE:

19  Q     Good afternoon, officer.  My name is Jodi Zils Gagne, and

20  I represent the defendant in this matter.

21         Did you overhear any of the information that Officer

22  Rivera was telling to the daughter, Kawya Cortes?

23  A     Bits and pieces of the conversation.

24  Q     But you didn't hear all of it?

25  A     No, ma'am.

1    Q    So you don't really know what he said to her?

2    A    In total, no, ma'am.

3    Q    Okay.  Did you overhear Ms. Cortes's verbal consent to

4    search?

5    A    What I overheard was the conversation between them and I

6    heard him say, "Okay, we have verbal, now I'm going to go get

7    the paper, and formalize it."

8    Q    You heard Officer Rivera state that?

9    A    That's correct, ma'am.

10   Q    To Ms. Cortes or to somebody else?

11   A    To everybody present.

12   Q    Okay.  So you never actually heard Ms. Cortes say you can

13   search; it was Mr. Rivera who --

14   A    That's when it was announced to me, yes, ma'am.

15   Q    Okay.  And you stated that you didn't overhear anyone

16   tell Ms. Cortes she would be arrested if she didn't consent to

17   search?

18   A    I never heard that.

19   Q    Okay.  Could it have been said, however, that if she

20   didn't consent to search, everything that was found in the

21   apartment would be charged to everyone in the apartment?

22   A    Could you say that again, ma'am?

23   Q    Could it have been said to her that if she did not

24   consent to search, once the search warrant was obtained,

25   everyone in the apartment would be charged with everything

1   found?

2   A     Could it have been said?  I guess so.

3   Q     Have you ever said that in past cases to people?

4   A     I try to stick with the truth.  The truth is if, you

5   know, if you got enough to get a search warrant, go get a

6   search warrant, you don't have to deal with suppression

7   hearings and stuff like that.  That's my approach.

8   Q     Right.  And if you get a search warrant and search the

9   apartment, anything found could technically be charged to

10  anybody that's there, right?

11  A     You conduct an investigation and you charge whatever,

12  whomever you got probable cause to think that the crime, that

13  you could charge.

14            MS. GAGNE:  Thank you.

15            THE WITNESS:  You're welcome.

16            MR. SILVERMAN:  No further questions from the

17  government.

18            THE COURT:  Thank you, sir.

19            THE WITNESS:  You're welcome.

20            MR. SILVERMAN:  Your Honor, nothing further from the

21  government in today's suppression hearing.

22            THE COURT:  Thank you.

23            MR. SILVERMAN:  I don't know if the Court would like

24  to hear argument on the issue now from the parties, or if the

25  Court would prefer some other approach.

```
 1                THE COURT:  If you want, or make a written
 2   submission, that's fine.  Whatever is your preference.  You
 3   have the opportunity to file a memorandum.
 4                MS. GAGNE:  Your Honor, I believe probably a
 5   memorandum would be best.
 6                MR. SILVERMAN:  Both parties obviously filed
 7   prehearing briefing, but that was before the testimony of the
 8   various witnesses, so I have no objection to proceeding
 9   through post hearing briefing.
10                THE COURT:  Okay.  How soon can I expect those?
11                MS. GAGNE:  How soon would you like them?
12                THE COURT:  A week would be fine, if that's enough
13   time.
14                MS. GAGNE:  That would be okay with me.
15                MR. SILVERMAN:  Would you like simultaneous briefs?
16                THE COURT:  Simultaneous, and then responses a week
17   after?
18                MS. GAGNE:  Yes, your Honor.
19                MR. SILVERMAN:  That's fine with the government.  So
20   today is --
21                THE COURT:  July 23rd, I believe.
22                MR. SILVERMAN:  So July 30.
23                THE COURT:  July 30, and then --
24                MS. GAGNE:  Then August 6th.
25                MR. SILVERMAN:  Okay.
```

1             THE COURT:  Yes, you are right, August 6th would be

2    the following.

3             MR. SILVERMAN:  Both parties will submit post

4    hearing briefing by July 30th and respond to each other's

5    briefing by August 6th.

6             THE COURT:  Thank you.

7             MR. SILVERMAN:  Thank you, your Honor.

8             MS. GAGNE:  Thank you, your Honor.

9             (4:11 o'clock p.m.)

                    INDEX OF WITNESSES                  PAGE
10   RYAN McCREA
          Direct Examination by Ms. Gagne           10
11        Cross-Examination by Mr. Silverman         15
          Redirect Examination by Ms. Gagne          18
12        Recross-Examination by Mr. Silverman       19
     KAWYA CORTES
13        Direct Examination by Ms. Gagne           20
          Cross-Examination by Mr. Silverman         32
14        Redirect Examination by Ms. Gagne          43
          Recross-Examination by Mr. Silverman       44
15   GWENDOLYN McCREA
          Direct Examination by Ms. Gagne           47
16        Cross-Examination by Mr. Silverman         53
     JEFFREY BENTON
17        Direct Examination by Ms. Gagne           64
          Cross-Examination by Mr. Silverman         75
18   DAVID RIVERA
          Direct Examination by Mr. Silverman        89
19        Cross-Examination by Ms. Gagne            134
          Redirect Examination by Mr. Silverman     146
20        Recross-Examination by Ms. Gagne          152
     JOSEPH HOWARD
21        Direct Examination by Mr. Silverman       153
          Cross-Examination by Ms. Gagne            169

22        COURT REPORTER'S TRANSCRIPT CERTIFICATE
          I hereby certify that the within
23   and foregoing is a true and correct
     transcript taken from the proceedings
24   in the above-entitled matter.
                    /s/ Thea Finkelstein
25                  Official Court Reporter
     Dated: _____