```
1                   UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT
2
    * * * * * * * * * * * * *  x   Criminal Case
3                                    No. 3:12CR104(EBB)
    UNITED STATES OF AMERICA,    :
4                Plaintiff
                                 :
5          vs.                       January 22, 2014
                                 :   10:10  O'clock a.m.
6   RICHARD ANDERSON, PHILIP
    BRYANT, and ROBERT SANTOS,   :
7                Defendants
                                 :
8   * * * * * * * * * * * * *  x   New Haven, Connecticut

9                       FIRST DAY OF TRIAL
                      TESTIMONY OF MICHAEL ZUK
10
                BEFORE THE HONORABLE ELLEN BREE BURNS
11              SENIOR UNITED STATES DISTRICT JUDGE
                    AND A JURY OF FIFTEEN
12  Appearances:
     For the Plaintiff:          S. DAVE VATTI, ESQ.
13                               MARC HARRIS SILVERMAN, ESQ.
                                 Assistant U.S. Attorneys
14                               157 Church Street
                                 New Haven, CT 06510
15
     For the Defendant:          NEAL PATRICK ROGAN, ESQ.
16   Richard Anderson            315 Post Road West
                                 Westport, Connecticut 06880
17
     For the Defendant:          DAVID A MORAGHAN, ESQ.
18   Philip Bryant               Smith Keefe Moraghan & Waterfall
                                 32 City Hall Center Suite C
19                               P.O. Box 1146
                                 Torrington Connecticut 06790
20
     For the Defendant:          RICHARD A REEVE, ESQ.
21   Robert Santos               Sheehan & Reeve
                                 139 Orange Street Suite 301
22                               New Haven, Connecticut 06510

23   Court Reporter:             Thea Finkelstein RMR, CRR
                                 141 Church Street
24                               New Haven, CT 06510
                                 TheaFinkelstein@aol.com
25  Proceedings recorded by mechanical stenography, transcript
    produced by computer.
```

```
 1              MR. VATTI:  Your Honor, the government calls FBI

 2   Special Agent Michael Zuk.

 3                       M I C H A E L   Z U K

 4        having been called as a witness, was first

 5        duly sworn and testified on his oath as follows:

 6              THE CLERK:  Please be seated.  State your name for

 7   the record, spell your last name, and your address by city and

 8   state only.

 9              THE WITNESS:  Okay.  My name is Michael Zuk, Z-U-K.

10   My business address is Bridgeport, Connecticut.

11   DIRECT EXAMINATION

12   BY MR. VATTI: ^

13   Q    Good afternoon, sir.

14   A    Good afternoon.

15   Q    Can you tell us where you presently work?

16   A    Yes, I'm an FBI special agent assigned as a coordinator

17   for Safe Streets gang squad in Bridgeport, Connecticut.

18   Q    How long have you been with the FBI?

19   A    Been with the FBI since 1998, so about 15 years.

20   Q    I want to take you back to your educational background.

21   Can you describe that for us?

22   A    Yeah, I pretty much went to the University of Connecticut

23   for a long time.  I got my undergraduate degree there,

24   bachelor's.  I went to a year of grad school, and then I went

25   to the university school of law and graduated from there in
```

1    1991.

2    Q    What did you do after you got out of UConn Law School?

3    A    I worked as a lawyer for six or seven years.  Started as

4    a clerk for a justice at the state Supreme Court.  I then

5    worked briefly at a law firm, and then worked for about two

6    years or so, two-and-a-half, as a state prosecutor and then

7    just about two-and-a-half or three as a federal prosecutor.

8    Q    And what kind of cases did you do at the state

9    prosecutor's office?

10   A    As a state prosecutor, I was assigned to the chief

11   state's attorney's office, which was sort of a central office,

12   so we would go out to local courthouses and help them work

13   whatever cases they had.

14          We also did some trials.  They would be basically,

15   you know, DWIs, extortion, forgeries.  Real basic state stuff.

16          We also were assigned to do more long-term

17   investigations, as that was a role of the chief's office, to

18   do things that the local courts really weren't set up to do.

19   So we did some long-term, like racketeering investigations,

20   including, you know, criminal enterprises that were involved

21   in different crimes, including narcotics.

22   Q    And you said that you joined the U.S. Attorney's Office

23   after the state's attorney's office?

24   A    Yes.

25   Q    When did you join the U.S. Attorney's Office?

```
 1   A     Joined the U.S. Attorney's Office in 1995, spring of '95.

 2   Q     How long were you there?

 3   A     Until August of '98, so a little over three years.

 4   Q     What kind of cases did you work on at the U.S. Attorney's

 5   Office?

 6   A     I was assigned to a unit called the Strike Force, which

 7   was primarily responsible for investigating organized criminal

 8   groups.  Some of those were Italian organized crime, we did

 9   some Russian organized crime cases, and we also did some of

10   the more violent drug groups or gangs.

11   Q     You said you joined the FBI in 1998?

12   A     Yes.

13   Q     And did you undergo training when you joined the FBI?

14   A     Yes, I did.

15   Q     Where did that training take place?

16   A     The training took place at Quantico Virginia at the FBI

17   academy.

18   Q     How long was that training course?

19   A     At that time, it was four months.

20   Q     Tell us what that training consisted of.

21   A     Okay.  There are different aspects of it.  Some of it is

22   academic, so it would be classroom where you would learn basic

23   violations of federal criminal law, you would also learn --

24   FBI's also responsible for terrorism stuff,

25   counterintelligence work, so you would get a little primer or
```

```
 1    little bit of, you would study that a little bit.

 2            So there was a lot of it was academic, and then

 3    beyond that there was firearms training, defensive tactics

 4    training, vehicle operation training, and some practical

 5    application training where they would put you in the role of

 6    an agent and you would work through problems in a place called

 7    Hogan's Alley, a little mock city or town they created there,

 8    and you would get training, so you would get practical hands

 9    on training in terms of arresting people and handling

10    informants and conducting investigations.

11    Q    And did you receive training at Quantico on conducting

12    narcotics investigations?

13    A    Yes.

14    Q    And describe that for us.

15    A    Yes.  So narcotics stuff was one of the blocks of the

16    academic training.  So they would teach you what federal laws

17    applied and how to go about enforcing them.  You would get an

18    idea of what kind of drugs were being sold and how and where

19    they came from.

20            They would also teach you different methods to

21    investigate those crimes:  How to use confidential informants

22    or cooperating witnesses, how to use wiretap, the wiretap

23    investigation.  It was not extremely detailed, but you got a

24    pretty good idea of generally how to work drug cases before

25    you left.
```

1   Q    And after you completed your training at Quantico, where

2   was your first posting?

3   A    I got sent to New York City.

4   Q    And was there any particular squad in New York City that

5   you were assigned to?

6   A    Yes, I was assigned to a drug and criminal enterprise

7   squad.  It was called Squad C, like Charlie, 23.  I was there

8   from 1999 about until 2011.  So 12 years on the drug squad.

9   One year of that time, I left my squad and I worked for a DEA

10  boss, they called him GS, group supervisors.  So for one year

11  of that time I worked assigned to a DEA boss in a thing they

12  also called it a strike force.

13  Q    And during your time with C-23, can you estimate for us

14  how many narcotics investigations you were part of?

15  A    I would say hundreds of narcotics investigations over the

16  course of those 11 years, or 12 years.

17  Q    And in those investigations, how many times were you part

18  of a wiretap investigation?

19  A    I would say the cases I worked on, there were probably

20  more than -- probably near a hundred of them that involved

21  wiretaps and where I was actually a part of it, but being an

22  affiant writing the wiretap, things like that, probably I

23  would say, I would estimate between 20 times where I was

24  primarily responsible for it.

25  Q    You anticipated my next question.  You indicated that you

1    worked on approximately a hundred wiretap cases?

2    A     Yes.

3    Q     There were roughly 20 or so where you were the affiant?

4    A     Yes.

5    Q     Tell us what a lead case agent, or co-lead case agent,

6    might be on a wiretap investigation.

7    A     Yes.  So a wiretap investigation has -- any investigation

8    would have -- a lead case agent, and a wiretap investigation

9    is much more involved than your typical investigation because

10   it usually spans over the course of many weeks, even months,

11   sometimes more than that, sometimes over a year or more.  So

12   there's a lot involved.

13          When you're the case agent, your first

14   responsibility is to determine, is this the sort of case that

15   you should even do a wiretap on?  So you have to analyze your

16   investigation, and you're part of the process of determining

17   is this what we want to do?

18          If it is, and that determination is made usually

19   with consultation by the U.S. Attorney's Office and your

20   bosses, then you would decide, okay, we're going to do this

21   case, you would be responsible for deciding how to set it up,

22   what preliminary investigation to do in order to make -- in

23   order to support what later will become an affidavit or, you

24   know, a legal affidavit that you'll have to write.

25          You would be responsible for gathering all your

1  evidence, doing phone analysis, basically being sort of like

2  the boss of the case.  You have a lot of people that will work

3  with you, because it's a big enterprise.

4        And you would then ultimately take all that

5  information and put it in an affidavit.  Some of them are, you

6  know, some of them are 50, 60 or more pages long.  Some of

7  them are shorter, but it's a detailed explanation of what it

8  is you've done up to that point, why it is that you need to do

9  a wiretap, why there's no other real investigative avenue that

10  you could possibly take short of a wiretap.  You do that along

11  with the U.S. Attorney's Office.  And then you bring that to a

12  judge who will decide yes or no, you have enough to listen to

13  these phones.

14        Once you start to listen to phones, then, as the

15  case agent, you're responsible for:  Number one, understanding

16  what it is that's coming in, because some wiretap cases you

17  have only one phone that you're listening to, there may be

18  audio, there may be text.  In some cases, there might be

19  multiple phones that even all at one time you're listening to.

20        As the case agent, you're the guy responsible for

21  understanding what it is that's being said or texted on all

22  these lines, and you try to make sense of it and determine

23  what the organization or what these drug subjects are doing,

24  which takes up a lot of time.  You listen to all the calls,

25  you look at all the texts, you decide which are important or

1    we say pertinent, which are relative to the criminal

2    investigation.  You organize those and you summarize them at

3    regular intervals because U.S. Attorney's Office has to update

4    the judge every ten days about what's going on with the case.

5           So it's a long answer, I know, but these are the

6    things that you would be involved in if you are the case

7    agent.

8           And ultimately, then at the end, you're involved in

9    planning how to end the case, whether there will be arrests,

10   who will be responsible for what.  And that's a long answer,

11   but it's only really a summary and short, in terms of what I

12   left out, because there's a lot more that you would do.  I

13   hope that gives a general idea.

14   Q    What is the case agent's responsibility in terms of

15   listening to the calls that are coming in over the wiretap?

16   A    As a case agent, you would want to have an understanding,

17   a very good understanding of the calls that are coming in.  So

18   if you could, you would listen to all the calls and you would

19   look at all the texts.

20          Sometimes there's tens of thousands of calls and

21   texts in one wire.  In that case, you might not be able to

22   look at every single one of them, but you would want to make

23   sure you understood what was there.  So you would, if you

24   couldn't listen to a whole call, you would read a summary of

25   it.  If you couldn't read all of the texts, you would take out

1    the ones that are classified or marked pertinent, the ones

2    that are really important, so you would take a look at those.

3            Your responsibility, you would be the one, as far as

4    the case, guide the investigation.  Responsible for knowing

5    what it is that's happening in terms of criminal conduct on

6    the wire.

7    Q    And how many times, approximately, have you been a lead

8    case agent or co-lead case agent in a wiretap that was aimed

9    at a drug investigation?

10   A    At least 20.

11   Q    And as part of being a lead case agent on approximately

12   20 occasions, estimate for us roughly how many wiretap calls

13   and text messages you've reviewed.

14   A    Tens and tens of thousands.  So it seems like a lot, but

15   the last case we did was in two months, we had near 15,000

16   calls.  So you're talking about months and months with

17   multiple phones.  It's tens and tens of thousands, probably

18   well over a hundred thousand.

19   Q    In your experience in wiretaps involving drug trafficking

20   organizations, is there frequently a code language that is

21   used to disguise narcotics trafficking?

22   A    Yes.

23   Q    Are you familiar with code language that is typically

24   used, for example, in trafficking of cocaine?

25   A    Yes.

```
1    Q    And how about with respect to trafficking of heroin?

2    A    Yes.

3    Q    How about with respect to trafficking of crack cocaine?

4    A    Yes.

5    Q    Have you also, during your time with C-23, participated

6    in controlled purchases or acquisitions of narcotics?

7    A    Yes.

8    Q    Roughly how many times -- we'll get to your experience in

9    Bridgeport in a little bit, but I want to focus first on your

10   time in New York City.

11   A    Okay.

12   Q    Approximately how many times, with your time with C-23,

13   did you participate in controlled purchases or acquisitions of

14   narcotics?

15   A    I would say hundreds.  Our cases involved hundreds of

16   them, and I was directly, like, primarily involved in at least

17   a hundred and probably more.

18   Q    Typically when you do controlled purchases and

19   acquisitions, are you using confidential informants,

20   cooperating witnesses, and undercover officers?

21   A    Yes.

22   Q    And as part of that, do you typically engage in briefings

23   and debriefings of informants and cooperating witnesses about

24   the organizations that they may be part of?

25   A    Yes.
```

1   Q     And in doing that, are you familiar with the general

2   practices that are used by drug trafficking organizations in

3   distributing cocaine, crack cocaine, and heroin?

4   A     Yes, I think so.

5   Q     Let's talk a little bit about your time in Bridgeport.

6   Did the cases that you work on in Bridgeport differ than the

7   cases that you worked on in New York City?

8   A     Yes, in some respects.

9   Q     What respects would those be?

10  A     New York, we were primarily interested in investigating

11  really large-scale drug groups, so multiple kilograms of coke

12  and heroin coming from South America into New York City, which

13  obviously is a huge metropolitan area.  So we were really

14  involved, our focus was to follow the drugs back to its source

15  of origin, and that involved, you know, huge amounts of money,

16  millions of dollars being exchanged, and kilos and kilos of

17  drugs.

18         As part of that, though, to get to that level, to

19  get to the point where we were investigating those people, we

20  also did some street-level stuff and we did buys, smaller

21  amounts of heroin, crack, and powder cocaine on the streets of

22  New York.  But that wasn't really our primary daily activity.

23         So in Bridgeport, in contrast, that's, we do more of

24  the street-type stuff there.  I'm coordinating a gang drug

25  task force, so we're interested in drugs as they relate to

```
 1   gangs.  So that puts us really close to more of the point of
 2   sale where you're selling units of drugs that people would
 3   use, much smaller level.
 4           We still have cases that lead to kilos and bigger
 5   suppliers, but in Bridgeport, more of the time was spent on
 6   the lower level stuff as in New York, much more of the time
 7   was spent on the higher level stuff.  But there's crossover.
 8   Q    How long have you been with this Safe Streets Task Force
 9   in Bridgeport?
10   A    Three years.
11   Q    And roughly how many narcotics investigations have you
12   conducted as part of Safe Streets?
13   A    Well, you know, we've had multiple -- I would say, you
14   know, it's hard to separate them, but maybe ten or 20, say,
15   separate investigations.  I've also been involved with, you
16   know, 20 or 30 more that we didn't primarily do but we were
17   doing with other agencies, either state police or the local
18   police or DEA.
19   Q    And have you participated in wiretap investigations
20   during your time in Bridgeport?
21   A    Yes.
22   Q    And roughly how many?
23   A    I would say about maybe ten or so wires.  Two or three
24   real separate cases, but ten active cases, ten active wires
25   that we really did.  There were other wires that became my
```

1  responsibility, where the listening part had already taken

2  place before I got there, but then we would go back and be

3  involved in the debriefings and the work and the prosecution

4  of the case, even though the wire phase, the listening phase,

5  was over.

6  Q    And with respect to those wiretaps that you've been

7  involved in in Bridgeport, what kind of substances were

8  involved?

9  A    Primarily cocaine, crack cocaine, and heroin.

10       MR. VATTI:  Your Honor, at this time, I would offer

11  Special Agent Zuk as an expert in general practices in drug

12  trafficking.

13       THE COURT:  Any comment, gentlemen?  Hearing no

14  objection -- yes?

15       MR. REEVE:  I think I have no objection to that, but

16  we haven't gotten to the issue of words, and I don't know if

17  he's being qualified for that as well.

18       MR. VATTI:  I can do a little bit more if you want

19  me to.

20       MR. REEVE:  All right.

21       MR. VATTI:  That's fine.

22  Q    I know we talked about this briefly before.  You said

23  that you've listened to thousands of pertinent calls during

24  your wiretap investigations that you participated in, correct?

25  A    Yes, tens of thousands.

1   Q    Tens of thousands.  Would that include both your time at

2   C-23 as well as your time here in Safe Streets in Bridgeport?

3   A    Yes.

4   Q    As a result of that, are you familiar with various street

5   terms, slang terms, and code words that are typically used in

6   crack cocaine trafficking, heroin trafficking, and cocaine

7   distribution?

8   A    Yes.

9   Q    Are you familiar with code words that might be used, for

10  example, to refer to the quantities of those substances that

11  are sold at street-level?

12  A    Yes.

13  Q    Are you familiar with code words that might be used to

14  refer to prices for those substances?

15  A    Yes.

16  Q    And are you familiar with code words that may reference

17  the manner in which those drugs are packaged and sold?

18  A    Yes.

19  Q    All right.

20            MR. VATTI:  At this time, I would offer Agent Zuk

21  again, your Honor, as an expert on general practices in drug

22  trafficking, including quantities, prices, and code words that

23  are typically used.

24            MR. REEVE:  Your Honor, if it's limited to

25  specifically in terms of code words, if it's limited to, in

1   the words of the Second Circuit, code with fixed meaning, if

2   this testimony does not in any way interpret ambiguous words

3   or phrases, then I have no objection.

4           MR. VATTI:  Maybe we should have this discussion at

5   side bar, your Honor.

6           THE COURT:  All right.

7           (At the side bar.)

8           MR. VATTI:  Your Honor, I think the Second Circuit

9   made clear in *Mejia* and the *Dukagjini* cases that the use of an

10  expert on so-called narcotics code is an appropriate way for

11  the jury to be able to then decipher the content and meaning

12  of wiretap calls, and what the Second Circuit has said is that

13  the case agent, for example Special Agent Ndrenika when he

14  gets on the stand and we play calls, cannot interpret the

15  meaning of particular phrases because the jury may attach

16  greater meaning if the case agent who conducted the

17  investigation tells them what the interpretations are.

18          So that the proper way to do this is exactly what

19  the government is proposing to do, which is have an expert

20  who's not involved in the case, who has not listened to any of

21  the calls and not actually going to interpret any of the

22  calls, testify generally about the meanings of different code

23  words.

24          So I think we had this issue come up in the Vaughn

25  trial, and this is the proper way to proceed.

1          MR. REEVE:  And, your Honor, I don't object to that

2     in principle, but I was quoting language from the cases, and

3     what the Second Circuit says in *Dukagjini*, which the

4     government just cited, which is 326 F.3d 45, at page 55, they

5     say, "You can't give expert testimony as to code words unless

6     there is 'no evidence that these phrases were drug code with

7     fixed meaning,'" okay?  Either within the narcotics world or

8     this particular conspiracy.

9          I understand the government's proffer is he's not

10    familiar with the words in this, but they would have to have

11    fixed meaning within the drug conspiracy world.

12          And the *Cruz* case, which is 363 F.3d 187 at 196,

13    there, the Second Circuit says, "Expert witness called on to

14    testify about the meaning of narcotics codes strays from the

15    scope of his expertise when he interprets ambiguous words or

16    phrases."

17          So if the government can lay a foundation that the

18    words, based on this witness's experience that there's no

19    ambiguity to the words he's testifying about, then he can

20    testify to it.

21          If they can't lay that foundation, then it's not

22    within the scope of proper expert testimony under clear Second

23    Circuit case law.  And if so, I object, if it's not limited to

24    that.

25          MR. VATTI:  For example, the words in *Dukagjini* that

1    were at issue was the use of the word "receipt" or the use of

2    the word "ticket."  That may be an ambiguous term.

3            In this particular context, I'm going to be asking

4    him questions about words like "fire."  Now, "fire" actually

5    has multiple different meanings, but "fire" in the drug

6    context is clearly reference to quality of narcotics, and

7    that's the kind of testimony that he's going to offer.

8            For example, "bundles," the word "bundles" has a

9    specific connotation in the drug world.  It obviously has

10   other meanings in other contexts, but in this particular

11   context it has a specific meaning in heroin trafficking.

12           So that's the type of testimony.  We may have to go

13   question by question.

14           MR. REEVE:  We might, and as long as it stays within

15   what I'm talking about, I know we have an objection but, for

16   example, I expect that he'll say that "bundle" can be ten

17   bags, or it can be five.  So it's ambiguous to the degree, if

18   he says ten, that leads into problems.  If it's a clear

19   meaning and there's no ambiguity in the term, then it's okay.

20           But the problem is where he's telling the jury the

21   meaning of terms that are ambiguous, it's misleading and it's

22   beyond the scope of what the Second Circuit allows, and that's

23   why I object.

24           MR. VATTI:  For example, my response to that would

25   be taking the word "bundle."  "Bundle" is definitely a unit

1   that is used in heroin trafficking.  Now, in some places it

2   might be five bags, in some places it might be ten bags.

3   Nevertheless, it's a unit used in heroin trafficking no matter

4   how many bags it might be.  I don't view that as ambiguous at

5   all.

6           MR. REEVE:  If they're going to leave it to, that's

7   a unit, that's fine, it's not ambiguous.  If he's testifying

8   to what it means, that is ambiguous, and he can't do that.

9   That's what the problem is.

10          MR. SILVERMAN:  It seems that what we ought to do is

11  when there's a specific term that Attorney Reeve believes is

12  ambiguous, he can raise an objection.

13          THE COURT:  It's difficult in the abstract to make a

14  ruling.  Why don't we wait until there is a particular phrase

15  that you want to make an objection to?

16          MR. REEVE:  Well, I think the predicate that the

17  government has to lay is they can ask about a term and they

18  can ask their witness:  "In your experience, does this have a

19  specific fixed meaning?"  If he says yes, it's okay.

20          MR. VATTI:  I'm not going to ask that question.

21          MR. REEVE:  Then I object.  They've got to lay that

22  foundation.  If there's no foundation, I object to any of this

23  testimony.  They've got to lay a foundation that shows that it

24  falls within the existing Second Circuit definition.  It's not

25  on me, it's not on me, on my knowledge; they're asking him

1    about his knowledge, and the question is, "Is this word

2    unambiguous in your experience?"  If it means many different

3    things, he can't testify about it.

4         MR. VATTI:  I will ask him whether he is familiar

5    with that term in the context of narcotics trafficking, and

6    what the meaning of that term is in that context.  I think

7    that's appropriate.

8         THE COURT:  Yes, I'm familiar with it, and I'm not

9    an agent.  But yes, I think he can answer that question.

10        MR. REEVE:  Okay, we'll take it a question at a

11   time.

12        THE COURT:  Yes.

13        (In open court.)

14        MR. VATTI:  Your Honor, based on that discussion at

15   side bar, I believe there's no objection to, at this point,

16   Mr. Zuk proceeding as an expert witness.

17        THE COURT:  Correct.

18        MR. REEVE:  I disagree.  There's a standing

19   objection, it's on the record.

20        THE COURT:  I overruled it.

21        MR. REEVE:  I understand.  Government counsel just

22   said there's no objection.

23        MR. VATTI:  I stand corrected.  Thank you.

24   BY MR. VATTI (Continued):

25   Q    Special Agent Zuk, let's talk about crack cocaine

1  distribution.  Can you tell us the process by which powder

2  cocaine is converted to crack cocaine?

3  A     Yes.  So powder cocaine is the form in which it's

4  typically originally packaged or created.  In this area, it's

5  mostly south of the border:  Colombia, Peru, Bolivia, these

6  places.

7          When the cocaine is extracted from the leaves of the

8  plant, the coca plant, it's extracted and processed down

9  there.  The cocaine that they make is what Mr. Vatti would

10  refer to as powder cocaine.  It can be hard and pressed tight

11  into a kilo, and be almost rocky, but that's the form of

12  cocaine that we're calling powder.  It's called, technically,

13  cocaine hydrochloride.  So that cocaine is powder.

14          If you were to break pieces of it off and cut it off

15  with a razor or make it soft, people would snort that.  That's

16  the kind of cocaine that you would snort in your nose.

17          It's a water-based chemical, and it's absorbed by

18  your body, if you snort it it's absorbed by the nasal lining,

19  okay?  Then the cocaine would travel through your body to your

20  brain and have whatever effect it is that people want when

21  they use cocaine.  It's a narcotic effect, but it's not

22  incredibly intense.

23          In order to intensify the effect, people try to

24  extract the base of the cocaine and to use that as the product

25  that they would get high from.  So crack cocaine is a way in

1   which to take the cocaine base and get it into your body in a

2   faster, more effective way.

3           So in order to make the crack cocaine, you would

4   take the powder cocaine and you would process it very simply

5   with baking soda, with water, and you would apply heat.

6           What would result would be a product that is no

7   longer the cocaine hydrochloride, the powder, water soluble

8   cocaine; it would be an oil-based thing, kind of rocky, and

9   solidifies into a rocky disk if it's in the bottom of a pan,

10  and people would break pieces of that away, usually with a

11  razor blade, and create little rocks.  The little rock is what

12  they would call crack cocaine.

13          Unlike the powder that you would snort and go in

14  through your nose and travel through your body that way, the

15  crack cocaine, you would typically smoke.  By smoking the

16  crack cocaine, it goes, the drug enters your lungs and then

17  goes directly to your brain.  The effect of the high is much

18  more intense.

19          MR. MORAGHAN:  Your Honor, I'm going to object to

20  him testifying about the effect.  That's far beyond the scope

21  of his expertise.

22          MR. VATTI:  That's fine, your Honor.

23  Q   Can you go over with us how, if you took, for example,

24  100 grams of powder cocaine, how you would convert that to

25  crack?

1   A    Yes.  You would mix it with baking soda and water and you

2   would heat it.  You would then sort of stir it around.

3   There's -- I'm not a chef, I've not done this, but the process

4   is you would add heat and you would stir it and mix it, and

5   people argue about how to stir it, but the idea is that the

6   baking soda, the water, and the powder cocaine will combine,

7   usually about, say, three parts cocaine to one part baking

8   soda, then add the water, heat it, and what will happen is

9   when it's heated long enough, a chemical transformation will

10  occur and what was the cocaine powder is no longer.  It then

11  becomes a different substance entirely, and that is the

12  cocaine base.

13          It will -- they refer to it as locking up.  It will

14  lock up.  It will stop being a pool of molten cocaine and lock

15  up and turn into a sort of a hard, off-white disk.  The disk

16  then will harden, and it can be broken up and sold as crack

17  cocaine and smoked.

18  Q    And just describe for us what the difference is in

19  texture of cocaine hydrochloride, the powder form, and crack

20  cocaine.

21  A    Cocaine is a sandy, soft powder, the powder form, the

22  hydrochloride.

23          The crack form is rocky.  It's like when you first --

24  if you make a lot of it, it could be almost in the shape of a

25  disk, it will take the shape of the container it's in.  If

1    it's in a pan or Pyrex, it will take the shape of the thing

2    you cooked it in.  Then you break little things off.

3            Unlike the powder, they're hard, like little

4    pebbles; whereas the powder is just sort of silty powder, like

5    sand.  Not quite as rocky as sand, but I think you get the

6    idea.

7    Q    And what does it tell you if crack cocaine comes back

8    moist or wet or sticky?

9    A    It would tell you that the conversion process didn't --

10   was unsuccessful.  It didn't work.

11   Q    Why would that be?

12   A    It could be because, it could be because the powder

13   cocaine that they used was not sufficient to make crack,

14   because not all of it is.  Some of it's not pure enough to

15   make crack, because it's been cut by all sorts of other things

16   along the path from wherever it was first processed in

17   Colombia or wherever to here.

18           It could be that it's not pure enough or it could be

19   that -- so that would be a problem with the powder.  It could

20   be that the chef just mixed it wrong or didn't put enough

21   baking soda or put too much water.  There are different things

22   the chef could do to mess it up.

23           If it didn't come back, it could be that either the

24   chemistry wasn't right, the cocaine wasn't the kind of cocaine

25   that could be cooked, or because the chef didn't do a very

1    good job of it.

2    Q    A moment ago you used a phrase called "it didn't come

3    back."  Is that a phrase that you are familiar with in the

4    context of crack distribution?

5    A    Yes.

6    Q    And what does that phrase mean?

7    A    Coming back would be sort of two variations of the term.

8    One is when you take this powder cocaine and put it in the pan

9    and cook it, what you want it to do is you want it to first

10   lock and become the crack cocaine.  For it to come back at

11   all, it would have to form the crack.

12         So once it forms the crack, yeah, did it come back?

13   Yes, it did.  The question is to what degree did it come back?

14   The crack cook or chef will say it didn't all come back.  What

15   they're striving for is to get at least as much crack back as

16   they put in in powder.

17         So your example was 100 grams of powder.  If you put

18   100 grams of powder in that pan and add the baking soda to it,

19   which is another say 30 grams, you want, as a chef, at least

20   100 grams to come back as cocaine, because that's what's sold,

21   the coke.  So you bought the powder for a certain price, you

22   want to get back what you put into it.

23         So you'll hear calls about how much came back.  Did

24   it all come back?  They'll talk about only a certain number of

25   grams came back, and that means they lost some in the cooking

```
 1   process.  Sometimes you could get more back and they may say,

 2   "Well, more came back than I put in," that would be a

 3   successful chef because they created weight and product they

 4   could sell.

 5          But so one is the reference to did it come back at

 6   all, did it form?  And second, how much of it came back, how

 7   close is it in terms of weight to the amount of powder that

 8   you put into the project.

 9   Q    All right.  And also a moment ago, in talking about this,

10   you used the phrase "cheffing."  Is that a phrase that you

11   have become familiar with in the context of crack

12   distribution?

13   A    Yes.

14   Q    And tell us what that means.

15   A    That's just a common reference to the person that cooks

16   the powder into the crack, they're called cooks or chefs.

17   Very often, more often than not in my experience, chefs.

18   Q    So when you're listening to wiretap calls, are you

19   looking for clues to differentiate whether people are talking

20   about powder cocaine or crack cocaine?

21   A    Yes, sometimes.

22   Q    And are there certain phrases that you have come across

23   that are very common in differentiating between the two?

24   A    Yes.

25   Q    And tell us those phrases.
```

1    A    Well, the primary phrase, the cocaine is powdery and the

2    crack is hard.  Very common to say, to distinguish between the

3    soft and the hard.  If somebody is ordering cocaine from

4    somebody that might have both, if they say the soft, they're

5    talking about the powder.  If they say the hard, anything

6    about hard or rock, that's typically crack cocaine.  So you

7    differentiate.

8         And there are different ways to describe it.  They

9    could refer to it as the cooked, "Do you have any that's

10   done?"  All different ways to, without saying, "Hey, do you

11   have any cocaine that's cooked into crack?"  These are ways to

12   give the seller the idea of what you want.  So the references

13   to the rockiness of it, to whether it's been cooked or done.

14        Also price, if you're listening to a wiretap, there

15   will be crack cocaine typically sells for a little bit more

16   than the powder form, so you could listen to the calls and try

17   to determine what the person is charging and if he says, "I

18   want to buy some for X amount but I need the done for a

19   different amount, it's a little bit higher," that would

20   corroborate or confirm in your mind that this is crack

21   cocaine.

22   Q    Let's talk about the units in which crack cocaine might

23   be sold.  Are you familiar with those units?

24   A    Yes.

25   Q    All right.  And let's start at the very basic units at

1    street-level.  What would those be?

2    A    Well, a typical basic unit would be a $10 rock or a $20

3    rock.  So a $10 rock of crack cocaine is sort of like you

4    could think of it as a single dosage unit.  So it's like

5    really small.  My fingers are very close together as I show

6    you.  It's just a little tiny rock that oftentimes you see

7    down in the corner of a plastic bag, which is another term,

8    plastic, paper, if somebody's selling cocaine they might refer

9    to it as "plastic" because typically it's stored in plastic

10   bags.  So this $10 dosage unit would be a little rock in maybe

11   the little corner of a plastic bag, sometimes knotted off.

12          Might be a little more in a double, $20 bag.  Might

13   be a little more than that in a $50 bag.  Those are typical

14   prices for street sale.  "I need a 10," sometimes they'll say

15   a dub or double, $20, or a 50.  Those would be typical.

16          Beyond that, very typical for crack cocaine would be

17   three-and-a-half grams, and that is an eighth of an ounce, and

18   it's commonly referred to as an eight ball.  So if you see, "I

19   need a ball," an eight ball, any kind of a ball in a drug

20   conversation, very typically they're talking about purchasing

21   an eight ball, which is a really common quantity for this

22   drug.

23          So an eight ball is three-and-a-half grams, that

24   would be typical.  Double that then is seven grams, you hear

25   people order sevens.  Double that again would be a 14.  These

1   are all typical.

2          Sometimes the 14 is just four eight balls that are

3   separately packaged, but there's four of them, so it adds up

4   to 14, three-and-a-half times four.  Sometimes you'll hear

5   conversations where they say, "I want 14."  "Do you want them

6   as singles?"  What they mean by singles, do you want them as

7   single eight balls, there would be four separate packages, and

8   that would add up to 14.  Or they could say, "No, it could be

9   all together."  Then you just see 14 grams of crack in one

10  bag, not separately split up.

11         After 14, if you double 14, that's 28, and that's an

12  ounce.  That's also a typical sale quantity for cocaine, an

13  ounce.

14         In my experience, after an ounce, the whole game

15  changes from the American system of weights and measures, the

16  ounces system, and it goes completely metric.  So you would

17  think that 28 grams, I've been doubling everything, so 28

18  doubled would be 56.  Normally they don't do that.  I'm not

19  saying it's impossible, but normally at that point they go to

20  62s or 62-1/2, sometimes call it 63s.  What that is 62-1/2.

21  Double that you get 125.  Double that, 500.

22         So now you're in the metric system because the

23  cocaine originally comes in the kilo, which is a thousand

24  grams.  So go the other way, you break a thousand grams in

25  half you have 500 grams.  Break that in half you have 250.

1   Break that in half you have 125.  Break that in half and you

2   have your 62, okay?  62-1/2.

3            So kind of right at that point, we go from the

4   American system of 28s and ounces and then it flips to 62s and

5   halves and 125s, and then you can sell it 100 grams, 200

6   grams, 250.  Anything would be possible when you get up into

7   big, you know, large amounts of grams.

8   Q    Let me go back to some of the basic units first.  You

9   indicated that a $20 bag is typically referred to as a dub?

10  A    Yes.

11  Q    Have you heard the term "dime"?

12  A    Yes.

13  Q    What's the dime?

14  A    A dime is a $10 bag.

15  Q    You also indicated that eight ball is a typical quantity,

16  correct?

17  A    Yes.

18  Q    And that's three-and-a-half grams?

19  A    Yes.

20  Q    What is the typical price for an eight ball of crack

21  cocaine, let's say in Connecticut?

22  A    Yeah, so I would say typically that's worth about $150.

23  Guys could sell it for a little more, a little less.  150 is

24  about the right number.

25  Q    Tell us what a street dealer can do with three-and-a-half

1   grams of cocaine base to make a profit.

2   A    Okay.  So if a street dealer was going to sell an eight

3   ball --

4              MR. MORAGHAN:  Your Honor, I would object.  I think

5   he's beyond what he was offered.  He's talking about general

6   terms.  He's getting into specifics of narcotics trafficking.

7   I think it's beyond the scope.

8              THE COURT:  I'm having difficulty hearing you, sir.

9   Could you keep your voice up?

10             MR. MORAGHAN:  Excuse me?

11             THE COURT:  Could you keep your voice up?

12             MR. MORAGHAN:  He's going far beyond what he's been

13   called for to discuss terms in general matters of narcotics

14   trafficking.  Now he's talking specifically about what a

15   dealer will do with an eight ball.  I think it's beyond the

16   scope of what he's been offered for.

17             MR. VATTI:  The government has to demonstrate intent

18   to distribute, and with respect to at least one of the

19   defendants in this case who we allege was selling eight balls,

20   it's important for this witness to be able to comment on

21   whether or not three-and-a-half grams is a redistribution

22   quantity or not, and this goes directly to that question.

23             THE COURT:  I'll overrule the objection.

24   Q    Do you remember the question?

25   A    Yeah.

1    Q     Okay.

2    A     So an eight ball is three-and-a-half grams, and we talked

3    about the $10 bag and the $20 bag.  Typically, a $10 bag is a

4    tenth of a gram, all right?  That would be a sale unit of

5    crack cocaine.  So if you bought an eight ball for $150,

6    right?  There would be 35, or say 30 or 35, of those little

7    $10 rocks in the eight ball, just doing the multiplication.

8          A tenth of a gram times 35 is 3.5.  So you could

9    tell what cost you 150, the eight ball, you could sell, say,

10   35, 30 or 35, doses and you could make 300 to $350 in sales,

11   subtract your cost, and you've basically doubled or more your

12   money.

13         MR. REEVE:  Your Honor, I'm going to object and ask

14   the answer be stricken.  What we're talking about, what can,

15   what could.  We're talking about possibilities.  It's not

16   material or probative to anything in this case.  I ask it be

17   stricken.

18         MR. VATTI:  I think it's entirely probative, your

19   Honor, for the reasons already set forth.

20         THE COURT:  I'll overrule the objection.

21   Q     Let's talk about the prices that might be typically

22   charged for an ounce of crack cocaine.

23   A     Okay.

24   Q     What would be a typical price for an ounce?

25   A     So an ounce of -- an ounce would be -- let me just --

1  you're talking about around $1200.

2  Q    In listening to wiretap calls, is a typical practice that

3  you are looking at prices to gauge what kind of quantities are

4  being bought?

5  A    Yes, always.

6  Q    And is there a significant difference in price between,

7  let's say, a kilogram of cocaine versus a kilogram of heroin?

8  A    Yes.

9  Q    All right.  Can you explain the difference to us?

10  A    Yeah.  Heroin's much more expensive than cocaine.  So a

11  typical price for heroin, say, might be mid 50s, 50,000,

12  55,000, 56; whereas cocaine would be substantially less, 35,

13  36, 38,000.  You know, heroin's always higher but it's much

14  higher, distinguishably higher.  You would know if somebody's

15  ordering a kilo of something, you would be able to tell by

16  what they're paying for it what it is that they're buying.

17  Q    How about the per gram price of cocaine versus a per gram

18  price for heroin, are they also different?

19        MR. REEVE:  And I object to this line of

20  questioning, unless we're talking about Connecticut.  There's

21  no foundation.  We don't know, is the price the same

22  everywhere?  He's talked about New York, Bridgeport.  We don't

23  know if it applies to New Haven, we don't know anything.

24        MR. VATTI:  I'll limit my question to Connecticut,

25  your Honor.

1  A    Yes, there's a difference between -- you're asking about

2  the gram price?

3  Q    Yes.

4  A    Between heroin --

5  Q    And cocaine.

6  A    -- and cocaine.  Similar to the kilo differential, that

7  there's grams of heroin are substantially more expensive than

8  grams of cocaine.

9  Q    What would be a typical per gram price for heroin in

10 Connecticut?

11 A    And it would depend, but typical would be, you know, if

12 it's $60 or more would be typical.  And it depends who you're

13 selling it to and, you know, the relationship you had.  It

14 could be even more than that.

15 Q    All right.  Typically, do prices, for example, per gram

16 of heroin decrease the greater quantities you buy?

17 A    Yes, they do.

18 Q    If somebody were, for example, buying 100 grams of

19 heroin, how would that affect the price?

20 A    100 grams of heroin would typically be sold as a lower

21 price per gram than, say, five grams.

22 Q    And likewise, does that work with cocaine as well?

23 A    Yes.

24 Q    So somebody buying 100 grams of cocaine might typically

25 get it for a slightly lower price than if they were buying

1    five grams?

2    A    Yes, they would refer to it as buying weight.  If you're

3    buying weight, which would be hundreds of grams or more than

4    that, your price would always be lower than if you're just

5    buying small amounts.

6    Q    So with respect to heroin prices in Connecticut, would it

7    be fair to say that a per gram price might be in the high 50s

8    to low 60s?

9    A    Yes.

10   Q    And the kilogram price would be what in Connecticut for a

11   kilogram of heroin?

12   A    It would be in the high, mid to high, 50s.  Could be,

13   depending on your source of supply, it could be 60,000 or

14   more.

15   Q    With respect to cocaine, the per gram price would be in

16   the mid 30s?

17   A    It would be up, I would say mid to upper 30s, typically

18   for powder; a little more for crack.

19   Q    Would there be a differentiation in price even between

20   crack cocaine and heroin?

21   A    Yes.

22   Q    Enough that you could tell that on a wiretap?

23   A    Yes.

24   Q    What would that difference be?

25   A    Well, typically, crack cocaine is selling for, say, 40,

1    42, 43 dollars a gram and heroin would be much more than that.

2    It would be 60, you know, high 50, 60 and up if you're just

3    buying small amounts.

4    Q    Are you familiar with the term "fronting" in the context

5    of drug distribution?

6    A    Yes.

7    Q    And what does that mean?

8    A    Fronting is just the way, a way, of saying on credit.  So

9    if somebody were to front me drugs, I would take the drugs

10   without paying them the money, and I would be obligated to pay

11   them the money whenever I could get it.  Typically the person

12   who is fronted the drugs has to sell the drugs in order to

13   make the money to pay for it.

14   Q    And is there typically a difference in price when drugs

15   are given on credit versus being paid for up front?

16   A    Yes.

17            MR. REEVE:  Again, your Honor, I object to

18   "typically."  It's not material, not probative to any issue in

19   this case.  Too vague as to have any meaning at all.

20            MR. VATTI:  I'm happy to limit that question to

21   Connecticut, your Honor.  I think the term "fronting" is

22   fairly common, pretty much anywhere.

23            MR. REEVE:  That wasn't what this question was.

24   Q    How about with respect to Connecticut, have you heard, in

25   your Connecticut-based wiretap investigations, the concept of

1   fronting?

2   A    Yes, many, many times.

3   Q    Is that a very common term?

4   A    Yes.

5   Q    Have you heard that in your 20 or so wiretap cases as

6   lead agent in C-23?

7   A    Yes.

8   Q    Is that one of the more common terms you hear in drug

9   distribution?

10  A    It is.

11  Q    What does fronting mean?

12  A    Fronting is the process of taking the drugs on credit.

13  So you would take the drugs, or a portion of the drugs,

14  without paying completely for them.  So you might have, take

15  the drugs without paying any money at all and then you have

16  been fronted the whole amount; or you might pay half of what

17  it's worth to the supplier, so you have been fronted some of

18  the drugs but you paid for other.  Basically taking some or

19  all of the drugs on credit, and it's common.

20  Q    Again in Connecticut, is it common that a price for drugs

21  that are fronted is higher than drugs that are paid for up

22  front in cash?

23  A    Yes.

24       MR. REEVE:  Same objection.

25  Q    Why is that, in your experience?

1    A    Well, part of it is because there's a risk that the drug

2    dealer takes when he gives the drugs away without taking the

3    money.  So there's some risk.  For that risk, there's a cost,

4    which is a higher price.

5          Secondly, if the person doesn't have even the money

6    to buy the drugs he's maybe a lower level or he's maybe not as

7    reliable a guy as the drug dealer would hope for, and so he

8    has to hope that that guy does his business right, gets the

9    money back and then can pay him.

10         Basically it's an assumption of risk.  The drug

11   dealer is assuming the person is going to do successfully what

12   he sets out to do and get the money back, and for that there's

13   a cost.

14         Also the person who doesn't have any money is more

15   desperate to get the drugs because they don't just have cash

16   on hand to get the drugs to buy what they want.

17         MR. MORAGHAN:  Your Honor, I would object.  This is

18   far beyond the question that was asked.  He's rambling on.

19   It's far beyond the question that was asked.

20         MR. VATTI:  I'm going to move on to a different

21   topic anyway, your Honor.

22   Q    Turning back to crack distribution, can you give us a

23   description of some of the items that are typically used in

24   the process of converting cocaine to crack cocaine?

25   A    Yes.  You would typically see baking soda, because it's a

1    necessary element of the chemical transformation.  So you

2    would see baking soda; you would see pans or Pyrex to cook it

3    in; you would see a strainer; you would see razor blades or

4    utility knives to cut it; you would often see plastic bags,

5    very typically sandwich bags; you would see elastic bands; you

6    might see a scale if they're actually weighing it there.

7            Depending on what they're doing at the location, you

8    might also see money, money counters, things like that.

9            You're referring to just the actual cooking of the

10   drug, then that would be pans, strainers, knives, plastic

11   bags, scale.

12   Q    Would you see, for example, heat-sealing devices?

13   A    And you could see heat-sealing devices as well.

14   Q    What is the strainer used for?

15   A    The strainer has multiple uses, I think.  One of them

16   that I know is it's used to take the baking powder or baking

17   soda and push it through the strainer to the cocaine.  If you

18   buy a box of baking soda, it's a lump itself, so a lot of guys

19   would take the baking soda and rub it through the strainer and

20   drop it down on top of the cocaine.

21           It's also used, in my experience, to whisk it

22   around.  There's constantly whisking the cooking crack, so it

23   comes out right.

24   Q    Let's now talk about the preparation and packaging of

25   heroin.  Can you describe for us the process in which raw

1    heroin is prepared for street-level packaging?

2    A     Yes.  So heroin, like cocaine, typically comes from down

3    south.  In this area, comes from all over the world, but in

4    this area typically down south, South America.  Comes like

5    cocaine in kilos, sometimes in smaller bundles, but it's hard

6    pressed powder in its purest form.

7          In order to package it for street sale, it has to be

8    broken down.  It's typically cut up, mixed with cutting agents

9    and other things, and then packaged.

10         Packaging for heroin is pretty consistent.  It's

11   packaged in small little glassine folds or waxed paper folds.

12   Like cocaine, we said it's plastic, heroin would stick to

13   plastic.  So in the heroin business, you would see these

14   little tiny glassine folds that would contain a dosage unit of

15   heroin, and typically those are sold individually sometimes or

16   bundled which, a bundle is a term, is a term of use, like a

17   term that is commonly used, and that would reference ten of

18   these little folds all wrapped together.

19         So it would be packaged in little bags, sometimes

20   bundled, and, you know, those bundles are also sometimes

21   grouped in things they call bricks.  Those are the dosage

22   units, or the sale units, typically of heroin.  In addition,

23   it could be sold in grams.

24         MR. REEVE:  Your Honor, I object.  As we discussed,

25   there's no foundation to show "bundle" has a fixed meaning.  I

```
 1   think the witness would testify to the contrary.  The

 2   government has not laid a foundation.  I continue to object.

 3            THE COURT:  Your objection is overruled.

 4            Gentlemen, I've just been informed that the office

 5   is closing at 3:30 p.m. because of the weather conditions.  So

 6   we have an hour.

 7            MR. VATTI:  Okay.

 8   Q    In your experience, is the term "bundle" a very common

 9   term used in the context of heroin trafficking?

10   A    It is extremely and extraordinarily common in heroin

11   trafficking.

12   Q    And why is that?

13   A    I don't know why, but it is.  In every heroin case that

14   I'm aware of that I've had experience with, when they're

15   selling it in bags, they're also referring to bundles and

16   bundle.  The bundle, of course, is a reference to the bundle

17   of the ten bags all wrapped together, typically with an

18   elastic band.  So that's descriptive of what it is.  But it's

19   so common.

20            Bundles and bricks are, you know, that's just part

21   of the heroin selling business.  You refer to bundles and

22   bricks.

23   Q    How much is a brick?

24   A    A brick is typically ten bundles, which would be 100

25   dosage units.  There are also bricks in Connecticut where they
```

1  refer to bricks as being only 50 dosage units, or five

2  bundles.  That's a little difference between New York and

3  here.  In New York, I didn't really see bricks being sold in

4  anything less than ten bundles; here, very common for guys to

5  reference to a brick, and it's only five bundles, 50 bags.

6  Q    And you said earlier that that wax fold, one wax fold, is

7  that a single dosage unit of heroin?

8  A    Yes.

9  Q    And ten of those typically in Connecticut would make a

10  bundle?

11  A    Yes.

12  Q    All right.  Either five of those in Connecticut, or

13  sometimes in New York ten, would make a brick?

14  A    Right.  Five bundles.  So either 50 or 100 bags would be

15  referred to as a brick.

16  Q    Typically in Connecticut, what's the price for a bundle

17  of heroin?

18  A    A bundle of heroin?  Well, it could sell anywhere between

19  $70.  It would depend, in large part, on the quality of the

20  heroin.  If it's really lousy, no good, a bundle might sell

21  for 45 or 50 dollars.  If it's decent and better, then 75.

22  75.  That would be typical.  You know, if somebody's

23  desperate, they might pay 80 or 90.  But a typical like

24  business relationship, 70, 75, 65, would be typical of a

25  bundle, of normal quality.

```
1    Q     You mentioned earlier that cutting agents can be added to

2    heroin?

3    A     Yes.

4    Q     What types of cutting agents can be added?

5    A     The list is really, I mean, it's extraordinary.  In terms

6    of anything that's powdery, there are things that are used

7    just to add volume to it, or weight.  They use stuff called

8    mannitol, they use lactose, they use baby formula.  They'll

9    sometimes use talcum powder just to add weight.

10             They will use, sometimes they'll grind pills,

11   Percocets, other opiates, OxyContins.  There are all sorts

12   that they'll grind up in a grinder and add to the heroin to

13   give it the right texture, taste, flavor, and impact on the

14   person that's using it, so cut it with lots of different

15   things, depending on the person who's doing the mixing.

16   Q     In your experience, is morphine sometimes added to heroin

17   as a cutting agent?

18   A     Morphine could be added to, for the same reason that

19   OxyContins or Percocets or other opiates or pain killers are

20   ground up and added.

21             MR. VATTI:  Just one moment, your Honor.

22   Q     In the context of heroin and crack distribution, are you

23   familiar with the term "dollar" or "buck"?

24   A     Yes.

25   Q     Have you seen that, in your experience?
```

```
 1   A    Yes, I've seen that many times.

 2            MR. REEVE:  I'm sorry, I hate to interrupt.  I

 3   object.  It's an ambiguous term, more than one meaning, no

 4   foundation.

 5            MR. VATTI:  I believe I was laying the foundation.

 6   May I continue?

 7            THE COURT:  Yes, sir.

 8   A    I have seen that term.

 9   Q    Have you seen that, in your experience, in wiretap cases?

10   A    Yes.

11   Q    And specifically in the context of drug investigations?

12   A    Yes.

13   Q    And does it have a particular meaning in that context?

14   A    It can, yes.

15   Q    And what is that meaning?

16            MR. REEVE:  Well, I object.  "It can."  He did not

17   say it does.

18            THE COURT:  Let's get a clarification.  Ask the

19   witness what he means.

20   Q    In the context of drug investigations, do you see

21   frequently references to quantities?

22   A    Yes.

23   Q    And are those quantities frequently referenced in coded

24   language?

25   A    Yes.
```

1  Q    Is "dollar" and "buck" a phrase that is frequently used

2  to disguise a quantity that is being suggested in drug

3  investigations?

4  A    Yes.

5  Q    And what is "dollar" and "buck" used for?

6        MR. REEVE:  Again, I object, because it hasn't been

7  established that it only has one meaning.  If it has more than

8  one meaning, can't testify to that.

9        MR. VATTI:  Well, "dollar" obviously has more than

10 one meaning since I have a bunch in my wallet.  But in the

11 drug context it has a particular meaning, and that's what his

12 testimony is limited to.

13       THE COURT:  Yes, overruled.

14 A    In the drug context, it would reference a hundred.  A

15 "dollar" or "buck" would reference a hundred of whatever it is

16 they're referring to.

17 Q    Again, in the drug context, have you heard the term

18 "fire"?

19 A    Yes.

20 Q    What does that signify?

21 A    "Fire" is one of the more common ways to describe drugs

22 that are potent or powerful or strong.  So if they say, "You

23 got the fire," "Do you have the fire," they're talking about

24 is it good?  Is it high quality?  Good heroin or cocaine.

25 Q    In the context of coded language that is being used to

1   describe drug trafficking, are there certain phrases that drug

2   dealers will use to signify that they have a lot of customers,

3   that customers are waiting on them?

4   A    Well, I mean, there are conversations about it, yeah.

5   Q    And what are some of the typical phrases that you might

6   see that suggest that someone intends to redistribute drugs?

7   A    Well, they'll reference, you know, they'll reference it

8   whether the people like it, this is selling, how it's selling,

9   whether there's high demand for it.  Lot of times, they'll say

10  especially with heroin because the quality is so different

11  depending on, you know, where it comes from.

12        And maybe the stamp is on it, you'll see lots of

13  conversations, they don't like this stamp or they like this

14  other stamp.  Stamps are sort of brands that they put on the

15  bag.

16        There are many, many conversations heard and

17  listened to that refer to how the people -- how the product's

18  selling, basically.

19  Q    And is it frequent, in your experience with heroin

20  distribution, to use individuals to test the heroin?

21  A    Yes.

22  Q    And explain that to us.

23  A    With heroin, in order to determine whether it's good,

24  because there are so many different kinds of it and so many

25  things added to it and so many different stamps put on it,

1    typically they will buy or get a sample and buy a small

2    portion and take a bag and have one or two more people test

3    it, which means they'll try it, they'll shoot it and use it.

4    Drug users, probably drug addicts, shoot it, use it, and

5    report back to the distributor whether it's good or not.

6    Q    Now, you had mentioned earlier that there are various

7    coded phrases that are used to refer to drug quantities in

8    conversations over the phone.

9    A    Yes.

10   Q    In your experience, are there phrases that are used once

11   an individual establishes a regular relationship and a regular

12   quantity that they get?

13   A    Yes.

14   Q    And what typical phrases do you see in that situation?

15   A    Almost always, you'll see people ask whether or not the

16   person is ready.  So, "Are you ready?"  Do you have the money

17   or the drugs?  "Are you ready?"  "Yes, I'm ready."  "I'm going

18   to get you right."  "Get you right" means, "I'm going to get

19   you your drugs."

20         They'll refer -- very infrequently will they ever

21   say, "I want X grams of cocaine" or "X grams of heroin."

22   They'll just say, "Yeah, I need four," or, "I want the same."

23   Very, very common to limit the conversation between the buyer

24   and the seller.  So "the same," "are you ready," "get you

25   right," "I'll see you," "can you come see me?"  "Can you come

1    see me" means "are you ready?"

2         You know, all these sort of seemingly mundane sort

3    of conversations that really are directed at whether the

4    person has drugs or money and whether they're ready to do a

5    deal.

6    Q    We talked about some of the tools of the trade of crack

7    distribution.  What are some of the things you might see in a

8    heroin operation in order to package heroin for street-level

9    distribution?

10   A    Okay.  In a heroin operation, you would likely see those

11   little glassine folds.  They sell them in little boxes, little

12   boxes of them that contain hundreds and thousands of these

13   bags.  You might see a stamp, little ink stamp.  You might see

14   an ink pad.  The stamp will have some word or stamp on it,

15   they'll stamp on the bag.  You will see a grinder or spice

16   grinder, a grinding machine.  You will see scales again.

17   You'll see elastic bands, very typically, to wrap the bundles

18   together.  See a grinder, or a little bit bigger for spice.

19   You will see cutting agents, mannitol, baby formula.  Razor

20   blades, utility knives.

21        You could see, again, if they're keeping the money

22   where they're keeping the drugs, you might see indicia of the

23   money.  Could be elastic bands, a money counting machine,

24   things like that.

25   Q    And in drug trafficking, in your experience, do you see

1    the use of multiple cell phones?

2    A    Yes.

3    Q    And why is that?

4    A    Because typically, these guys are concerned with the law

5    enforcement authorities are going to find out what phone they

6    use, and they're also concerned about cellularizing or

7    compartmentalizing their business.

8         Very often they'll use one phone to call their

9    customers, another phone to call their workers, and another

10   phone to call their suppliers.  They might have separate

11   phones for each supplier.

12        Depending on -- one guy might just have one phone

13   and call everybody on it.  That's not very typical.

14        More often, they'll have different phones for

15   different people, and they won't keep phones for very long.

16   So if they have a phone, they're using it, and for some reason

17   they feel like this is not a good reliable phone anymore,

18   "Maybe I've used it too long," "Maybe law enforcement is aware

19   of it," then they'll get rid of that phone and maybe get rid

20   of all their phones and change them all.

21        The basic reason why is so their business and their

22   work goes undetected from law enforcement, and the people in

23   their organization don't have access to their suppliers and

24   their customers.

25   Q    How about firearms, are they a tool of the drug

```
 1   trafficking trade?

 2   A     Very often, yes.

 3              MR. MORAGHAN:  Your Honor, I'm going to object.

 4              MR. VATTI:  I think this was ruled on pretrial, your

 5   Honor.

 6              THE COURT:  I think so, too.

 7              MR. MORAGHAN:  Also, your Honor, it's beyond what he

 8   has been offered for as an expert on terms.

 9              THE COURT:  I'm sorry, I couldn't hear you.

10              MR. MORAGHAN:  He's been offered as an expert on

11   drug terms and drug organizations.  Now he's beyond that.  He

12   entered a different area for which he hasn't been offered as

13   an expert.

14              MR. VATTI:  Your Honor, he was offered as an expert

15   on general practices of drug distribution, including

16   terminology that is used.

17              THE COURT:  I'll overrule the objection.

18   Q     My question was, in your experience, are firearms tools

19   of the drug trafficking trade?

20   A     Yes, they are.

21   Q     Why is that, in your experience?

22   A     That is because it is a business that involves valuable

23   substances that are illegal drugs and large amounts of cash.

24   And it's not the sort of business where, if you lose your

25   drugs or your cash, you can call the police and report it.
```

1           It's the sort of business where you have to defend

2    yourself, and the sort of business where you have to protect

3    your assets by yourself.  Some of the people that are involved

4    in the business are inclined to steal what you have, to steal

5    your money when you bring it to buy your drugs, and so guys

6    will bring guns to drug deals.  Others will have guns they use

7    to protect the places where they store their drugs and their

8    money.

9           So, you know, not everyone has a gun that's involved

10   in the drug business, but it's definitely a very typical tool

11   of the trade.

12           MR. VATTI:  Just one moment, your Honor.

13   Q    My last question is just if you can describe for us

14   common terms and phrases that you would typically hear in

15   wiretaps referring to drug proceeds.

16   A    To the proceeds?

17   Q    Yes.

18   A    I mean, can't think of a specific term, but --

19           MR. REEVE:  That's the answer, your Honor.

20           MR. MORAGHAN:  Your Honor, he answered the question.

21           MR. VATTI:  That's fine, your Honor.  No further

22   questions.

23           MR. MORAGHAN:  May I have one moment, your Honor?

24   Just cleaning up here.

25

1    CROSS-EXAMINATION

2    BY MR. MORAGHAN: ^

3    Q    Good afternoon, Agent Zuk.

4    A    Good afternoon.

5    Q    I represent Philip Bryant, sitting in the purple shirt.

6    You testified about a bundle --

7    A    Yes.

8    Q    --  being an extremely common term?

9    A    Yes.

10   Q    But it has different meanings, doesn't it?  You can have

11   a bundle that consists of five bags, you can have a bundle

12   that consists of ten bags, depending on where you are?

13   A    Well, I don't think I've ever seen a bundle of five.  I

14   guess theoretically you could have anything, but I've seen

15   bricks that are five bundles.  But a bundle, in my experience,

16   is ten bags.

17   Q    You've never seen a bundle containing five folds?

18   A    No.

19   Q    Okay.  Have you done any investigation work in New Haven?

20   A    I've been involved in cases that have relationships to

21   New Haven, but not New Haven specifically.

22   Q    Have you done narcotics cases involving New Haven?

23   A    Well, I've done search warrants in New Haven where I've

24   seized narcotics.  I've done interviews of people who sell

25   narcotics in New Haven.  I've reviewed wiretap phone calls,

```
 1    and I've worked on wires of drug cases in New Haven, yes.

 2    Q    And it's your testimony you have never seen a bundle

 3    consisting of five bags?

 4    A    Yes.

 5    Q    Okay.  Did you review any documents before you testified

 6    today?

 7    A    Only, I looked at my transcript from a different trial

 8    that I testified in.

 9    Q    Okay.  And did you listen to any wiretap sessions?

10    A    No.

11    Q    Did you review any DEA 6s?

12    A    No.

13    Q    And just so the jury will understand what we're talking

14    about, what is a DEA 6?

15    A    A DEA 6 is the investigative report that the DEA would

16    use.  So they would write whatever they did investigatively,

17    they would document that on a form that they call a DEA 6.

18    Q    And that's the equivalent of an FBI 302?

19    A    Yes.

20    Q    So it's a report that's prepared concerning the agent's

21    work in a particular matter?

22    A    Yes.

23    Q    Okay.  Did you discuss anything pertaining to this case

24    with any of the other agents?

25    A    Not in any detail, no.
```

1    Q    Okay.  When you say "not in any detail," what exactly did

2    you speak to them about?

3    A    Well, I don't want to say I didn't discuss it with them

4    at all, because part of the time you're outside and guys are

5    making reference to there's a trial this month.  So there are

6    things that I've talked to the agents that are involved and

7    have referenced this case, but I haven't talked to them about

8    their defendants, who they are, what the charges are, what the

9    wire calls said.  Nothing specific about the case.

10          Only sort of generalities about, you know, there's a

11   trial coming, and this guy's got this lawyer.  Things like

12   that.

13   Q    Thank you.  Thank you.  Now, you testified about being a

14   lead case agent.

15   A    Yes.

16   Q    And I believe you said you were lead case agent

17   approximately 20 times?

18   A    Yeah, it's an approximation because I haven't gone back

19   over 15 years to, say, to break it down.  But that's

20   approximately what I would say in terms of wire cases, yes.

21   Q    And I missed this.  How many times were you a lead case

22   agent in New York versus lead case agent in Connecticut?

23   A    Yeah, I think that was a reference to the New York work,

24   the 20.  Here, I've been involved in three or four lead cases

25   in three or four drug investigations, but those might include,

1    say, in those three cases, there might have been 15 or 20

2    wiretap orders.  So it's kind of hard to break it down.

3          Was I a lead case agent for 25 wires or 20 wires or

4    was it just for three cases because we did 20 wiretaps in the

5    three?  So it's kind of, you know, it's not a precise -- I

6    can't give a precise answer.

7    Q    All right.  Okay.  Now, as lead case agent, you are the

8    overseer of the investigation?

9    A    Yes.  Yeah.  With help from the U.S. Attorney's Office,

10   and your bosses and colleagues.  But yeah, it's your primary

11   responsibility.

12   Q    Is it fair to say you work hand-in-glove with the U.S.

13   Attorney's Office in the investigation?

14   A    Yes.

15   Q    And when an investigation starts, let's say for instance

16   you get a call from a local police department and they ask you

17   to look into it, do you immediately call the U.S. Attorney's

18   Office or do you start to do an investigation?  How do you get

19   your investigation started?

20   A    Yeah, it would depend, I guess, on how it came in.  But

21   there would be times where you may start it, you may start

22   discussions with a local department and do some things before

23   the U.S. Attorney's Office would be involved.

24          If you're using informants and cooperating witnesses

25   and things like that, much of the things, many of the things,

```
 1   that you do require their approval.  So in those cases, they

 2   would be involved earlier on.

 3   Q    Okay.  So they usually get involved fairly quickly?

 4   A    I would say that's right.  Usually they're involved

 5   fairly quickly.

 6   Q    Okay.  And as part of your duties as a lead case agent is

 7   to review the phone calls?

 8   A    Yes.

 9   Q    To listen to the sessions?

10   A    Yes.

11   Q    And just so the jury will understand what we're talking

12   about, can you describe what a session is?

13   A    Yes, a session is what we reference to either a call or a

14   text.  So if it's just phone calls, you would reference a

15   session would be one call.  You would be at a computer waiting

16   for a call to come in, the computer would light up, and you

17   would see that there's an incoming call or outgoing call, we

18   would call that a session.

19          It might be just that the person mistakenly dialed

20   his phone.  Whatever that phone did.  So it interrelated with

21   the phone system, that would be a session.  Sometimes there

22   are hang-ups.  Sometimes there are incoming calls that don't

23   get answered.  Sometimes there are texts.  There are all

24   different things.  Any thing, any activity on the phone, we

25   call it a session.
```

1    Q    So the short answer is the call is a session, or the text

2    is a session?

3    A    A call would be an example and a text would be an

4    example.

5    Q    Okay.  As the lead agent, you cannot hear every one of

6    those calls, can you?

7    A    Well, it depends.  But often, no, you can't.

8    Q    You rely on the people who are working with you?

9    A    Yes.

10   Q    Okay.  I'm going to call them underlings, but that's not

11   to demean what they do.  They are equal with you, but you're

12   in charge?

13   A    Right.

14   Q    So they work for you?

15   A    Right.  They don't work for me technically, but they're

16   assisting what they know is primarily my case.  Yeah.  Yeah,

17   we're on the same level and one day I may help them, but on

18   that day they're helping me.

19   Q    You're in charge, so they work for you; on the next day,

20   someone else is in charge and you work for him?

21   A    In a way.

22   Q    As the lead case agent, are you responsible to prepare

23   all the affidavits that are submitted in the investigation?

24   A    No, not all of them.

25   Q    Okay.  The people who are working with you, for you, also

1    can prepare affidavits?

2    A    They can.  It would depend on each case.  There are some

3    cases where the case agent may do them all; there are other

4    cases where they may say, "Let's have somebody else do this

5    one."

6    Q    But the lead case agent will review the affidavit before

7    it's finalized?

8    A    Yes.

9    Q    Okay.  Will the lead case agent meet with the U.S.

10   attorney and review the affidavit before it's finalized?

11   A    Yes.

12   Q    So before anything is finalized, it's reviewed by the

13   lead case agent, and it's reviewed by the assistant United

14   States attorney who's assisting the investigation?

15   A    Yes.

16   Q    Okay.  And you review that to make sure it's accurate?

17   A    Yes.

18   Q    Complete?

19   A    Yup.

20   Q    Truthful?

21   A    Yup.

22   Q    You wouldn't include something in the affidavit that you

23   knew was factually incorrect?

24   A    That's right.

25   Q    Because then that affidavit is eventually going to be

1    presented to a federal judge?

2    A    Right.

3    Q    You want to make sure it's complete, and as accurate as

4    possible?

5    A    Right.

6    Q    You also, as the lead case agent, have at times testified

7    in front of a grand jury?

8    A    Yes.

9    Q    Is that a common situation for a lead case agent?

10   A    Yes.

11   Q    And again, in addition to the affidavits, did you review

12   your co-agents', using FBI, do you review their 302s, make

13   sure they're accurate as the lead case agent?

14   A    I don't know if you would review them to make sure

15   they're accurate.  I would say not all the time.  There are

16   some times where they might write a report and submit it, and

17   it's filed before the case agent has seen it.

18           Typically, in my cases, I would request that before

19   anybody puts something final into my case file, to take a look

20   at it.  That doesn't happen all the time.  So much going on,

21   there are times that's just not possible.

22   Q    I understand.  If you can, would you like to see it?

23   A    Yes.

24   Q    Again, would you make sure that it's accurate and

25   complete?

```
 1   A    Yes.

 2   Q    Okay.  Would you recommend deleting something that you

 3   thought was unnecessary?

 4   A    I might.

 5   Q    And would the agent working for you then do that?

 6   A    Well, it would depend on -- it would depend on what the

 7   context was and what the thing is, but you would discuss it

 8   and if it was appropriate -- if it was inappropriate to put it

 9   in the report, you would try to come to an agreement and have

10   it taken out.  If it's appropriate that it stay, the person

11   writing the report, it's his report so he's in command, he's

12   in control of the document.

13   Q    But as the lead case agent, you are ultimately

14   responsible for everything that takes place in that

15   investigation?

16   A    I don't know if that's fair to say, "ultimately

17   responsible."  You are the person who, more than anyone else,

18   wants to make sure that everything is done right.  But if

19   there were mistakes made, if you're saying you're responsible

20   in that sense, I'm not sure that that would be true.

21   Q    You spent some time talking about different terms for

22   different types of narcotics.  You discussed a bag of heroin,

23   a bundle of heroin, a brick of heroin.  Have you ever heard of

24   a bag of heroin being described as a deck?

25   A    Yes.
```

1    Q    Okay.  So that's another term?

2    A    Yes.

3    Q    But it has a meaning of a bag?

4    A    Yeah.

5    Q    Okay.  And have you heard heroin referred to as a finger?

6    A    Yes.

7    Q    A finger of heroin?

8    A    Yes.

9    Q    And a finger of heroin would be what?

10   A    I think a finger of heroin is about ten grams.

11   Q    And a stack of heroin?

12   A    A stack, I'm not sure.  I mean, guys will use that to

13   refer to a bundle, a brick.  I'm not -- I wouldn't want to say

14   that to me, if I saw that word, I would have to look more at

15   the calls to determine what it was.  It wouldn't, like a

16   bundle, just jump out and I know it.  I would have to look at

17   that in context.

18   Q    Okay.  So there are different terms used in different

19   areas that you might not be familiar with, describing, for

20   instance, heroin packaging and distribution?

21   A    Yeah.

22   Q    Okay.  And again, have you ever heard an amount of heroin

23   being referred to as a box?

24   A    Not that I'm aware of.

25   Q    Okay.  As far as crack cocaine, you talked about an eight

```
 1    ball being the common phrase?

 2    A    Yes.

 3    Q    Have you ever heard it referred to as a busy?

 4    A    No.

 5    Q    Have you ever heard it referred to -- talking about crack

 6    cocaine now, not the amount but have you ever heard an amount

 7    of crack cocaine referred as a big eight?

 8    A    A big eight?

 9    Q    Yes.

10    A    Well, I've heard eights.  I don't know about big eight.

11    Q    How about six trey?

12    A    Six trey?

13    Q    Yes.

14    A    Yeah.

15    Q    So there are different terms, again, that are being used

16    throughout the narcotics industry, so to speak?

17    A    Yeah.

18    Q    Okay.  And is it fair to say that the larger the amount

19    of substance you're dealing with, the more likely it is that

20    the name, the code name, will change?  For instance, we're

21    always going to have a bundle?

22    A    Right.

23    Q    We're always going to have a brick.  But a kilo of heroin

24    on one day may be a shirt, correct?

25    A    Well, yeah, those are terms that, you're talking about
```

```
 1    terms that, might be specific to a particular organization,

 2    where one might say it's a shirt, one might call it, you know,

 3    there are a million different things you might call a kilo.  A

 4    bird.

 5    Q    Call them pants?

 6    A    Yeah.

 7    Q    Socks?

 8    A    You could pick any word and agree that this is going to

 9    mean kilo, if you're dealing with one person.

10    Q    Okay.  Would it be fair to say that the terms change when

11    the amounts you're dealing with are more substantial?  The

12    street-level terms usually remain the same?

13    A    I think that's generally true, yes.

14    Q    Okay.  And there are certain terms that can apply to any

15    drug, correct?  Cocaine, heroin, or marijuana?

16    A    Yes.

17    Q    Okay.  And in order to determine what substance was being

18    discussed, that's where a wiretap would come in, you would be

19    able to hear people talking?

20    A    Yes.

21    Q    And based upon the conversations, you can try and

22    determine what substance is involved?

23    A    Yeah, the conversations and other things in the case, but

24    yes.

25    Q    And the cost would also be a big factor, correct?
```

1   A    Yes.

2   Q    If you're talking about a kilo of marijuana, that's

3   significantly different than a kilo of cocaine?

4   A    Right.

5   Q    And significantly different than a kilo of heroin?

6   A    Right.

7   Q    Are you familiar with the laboratory reports that are

8   prepared as a result of seizure of narcotics?

9   A    Yes.

10  Q    Okay.  And when a narcotic is seized, okay?  You take it

11  as you find it, is that a fair statement?

12  A    Not sure quite what you mean by that.

13  Q    Okay.  If there is a confidential buy, and someone

14  receives what purports to be an ounce of cocaine, and that's

15  given to a confidential informant, that confidential informant

16  will eventually provide it to you, and you would take it in

17  the same manner in which he's received it, bagged and

18  packaged?

19  A    Yes.

20  Q    Okay.  So when you receive it, that is how it is sent to

21  the laboratory for analysis?

22  A    Not necessarily.  Sometimes you might want to photograph

23  it.  Other times you would test it.  You would open it, take a

24  portion of it to test it.  So -- but you would then send

25  typically the original packaging along with the drug in a

1    sealed envelope to the lab.

2    Q    So the original packaging, the rubber band, anything

3    associated with that packaging, would be sent to the lab?

4    A    It would depend.  If the packaging is in direct contact

5    with the drug, certainly that's going to go to the lab with

6    the drug.  Like for me as an FBI agent, I wouldn't be pouring

7    drugs out of one bag and then sending the drugs to the lab.  I

8    would leave it in the bag that it was in.

9            But if that bag was in three or four other bags, I

10   may take those bags, take them away and mark them as an

11   exhibit.  I wouldn't throw them away, but I would mark them as

12   a nondrug exhibit and keep them, but I might not necessarily

13   send them all to the lab.

14   Q    When the lab receives the substance you obtained, they

15   weigh that?

16   A    Yes.

17   Q    And there's a gross weight and a net weight?

18   A    Yes.

19   Q    And the gross weight would include what?

20   A    The gross weight would include all of the packaging.  So

21   if you sent heroin in the glassine folds, they would weigh the

22   paper, the glassine, along with the drug, and they would give

23   you a gross weight.

24   Q    And the net weight would be the substance less everything

25   else?

1   A     Right.  They would empty all the powder out and they

2   would weigh it separately.

3   Q     Now, in your experience, talking about heroin, in a bag

4   of heroin, do you know, in your experience, typically how much

5   is found in a bag of heroin?

6   A     I think my understanding is that the average, the

7   standard, is about .03 grams per bag, and that's like I say

8   you dump it all out and weigh it.  So there could be some bags

9   that have a little less or a little more, but my understanding

10  is .03 is the standard.

11  Q     Okay.  Sometimes, have you heard that dealers will

12  sometimes short a customer?

13  A     Yes.

14  Q     And what does that mean to you?

15  A     That means they would sell them less than what the

16  customer expected to get.

17  Q     Okay.  And is that common?

18  A     It's, I would say it's pretty common.

19  Q     I'm sorry?

20  A     It's pretty common in terms of it happens.  Whether it's

21  intentional sometimes or not, I'm not sure.  It's not good

22  business to consistently short a customer.  You'll lose the

23  customer.

24         But, yes, in almost every wire at some point here or

25  there, you'll hear somebody claims they didn't get what they

1   bargained for.

2   Q    Okay.  Now, you have dealt with confidential informants?

3   A    Yes.

4   Q    Okay.  And what is your understanding of a confidential

5   informant?

6   A    Well, see, we, as the bureau, we would think of it as two

7   different kinds of informants:  Those that are confidential,

8   those are guys that you wouldn't make recordings with, they're

9   guys that would give you information that you would sort of

10  hold and use on your own without disclosing the person.  So

11  I'm not certain.

12          Then we would have a second category of person that

13  we would call a cooperating witness that is still

14  confidential.  You don't tell people that he's working for

15  you, but you would use him in such a way that he might make

16  recordings, he might do drug buys, he might do things that you

17  know might result down the road in his coming here to testify.

18  He's not confidential because he's going to testify.

19          I don't know if that answers your question.  We have

20  two different categories of persons that help us.

21  Q    Okay.  Confidential informant and confidential witness?

22  A    Cooperating witness, we would say, and confidential

23  informant.

24  Q    Based on your experience, would you agree that they are

25  generally unreliable?

1   A    I would say no, I would not agree with that.

2   Q    Okay.  Would you agree that at least in the beginning

3   stages, they often lie?

4   A    I would say there are some that lie, and I don't know

5   that that has any relationship to the beginning stages.

6   Q    Okay.  And if you have a confidential informant or

7   confidential witness who is lying, what do you do to them?

8   A    Well, again, you know, it depends on what, why they're

9   cooperating.  Are they cooperating for money?  It would be a

10  lot of different circumstances.

11  Q    If someone's cooperating because he has been arrested,

12  okay?

13  A    Yeah.

14  Q    And you found, after the fact, that he had been lying to

15  you about matters.

16  A    Yeah.

17  Q    What would you do with him?

18  A    It depends.  If there's somebody that we find is lying to

19  us to the point where it's just not a person you can trust and

20  deal with, we would close them and wouldn't use them.  There

21  may be a time where a guy says something that he knows wasn't

22  true but is not so substantial, and you work it out, you talk

23  to the prosecutors and you make the determination that, if

24  he's brought in, if he's, you know, warned and advised and

25  rehabilitated to the degree that you believe that he can go on

1    and work with you without lying again, then you may use that

2    person.

3    Q    And if he is warned and rehabilitated in a situation like

4    that, would that generate an FBI 302 or a DEA 6?

5    A    Yeah.  Typically, yeah.

6    Q    Okay.  So if there is not an FBI 302 or a DEA 6, that

7    would seem to indicate that that issue has never arisen?

8    A    See, that's a complicated question.  It would either

9    indicate it hadn't arisen or there is an agent that wasn't

10   aware of it.  But for me, if I was doing something and an

11   informant or witness came back and told me something that I

12   knew wasn't true, I would document that.

13   Q    Okay.  Going to drug dealers as opposed to the informants

14   and witnesses, based upon your experience, would you agree

15   that they are generally unreliable?

16   A    No.

17   Q    Okay.  Would you agree, Agent Zuk, that drug dealers

18   often lie?

19   A    I would agree that they lie; often, I don't know.

20   Q    Agent Zuk, do you recall testifying in United States

21   versus Thompson?

22   A    I testified in several trials, and including this one.  I

23   was never aware of who it was was on trial.

24   Q    I believe it was a trial last month.

25   A    Okay.

```
1    Q    And you were asked a question, "Do drug dealers often

2    lie?"  And you said yes.

3    A    Yeah, I don't know the context.  They do lie.  I don't

4    know what you mean by "often."  But there are times when they

5    lie, and it's documented on the wire.

6            But to say that they're generally unreliable or lie

7    all the time, it would be hard to stay in business.  I guess

8    that is where I'm coming from.  But if I said that, I mean,

9    I'm agreeing that, yeah, sure, it's a business where sometimes

10   telling the truth doesn't further your business.

11   Q    Okay.  Would you also agree that drug dealers can often

12   puff?

13   A    Yeah.  Again, quibble with "often."  But do they puff?

14   Yes.

15   Q    Could you explain what you mean by "puff"?

16   A    You mean exaggerate, exaggerate their business,

17   exaggerate their ability.  "I could do this all the time," "I

18   could sell you this" or that.  There are times when it serves

19   their purposes to say things that they're capable of more than

20   they really are.

21   Q    Okay.  And they also like to exaggerate to increase their

22   street credibility, would that be a fair statement?

23   A    I don't know.  You know, a lot of these guys, they don't,

24   they don't want the street to know what they're doing.  They

25   want their customers to know and the people they work with to
```

1    know, but they don't want to go out on the street and

2    exaggerate, "Hey, I'm a huge drug dealer."  You don't want to

3    bring attention to yourself generally.

4    Q    Don't they want to get more customers?

5    A    Well, you want to get more customers.  Depends what role

6    you're in.  Is it the guy selling or the guy supplying the

7    people selling?  Knowing nothing about the case, it's hard for

8    me to put all that in context.

9    Q    What procedures do you employ to guard against a CI or CW

10   becoming unreliable?

11   A    Well, we, when we sign the person up to work with us, we

12   go over the rules and we explain to them from the very

13   beginning that the most important part of our relationship is

14   that that person has to tell the truth.  So we make that

15   clear.

16          We read specific warnings and advisements of how it

17   is they have to comport themselves.  We make them sign that

18   agreement, typically.  And then we are careful in terms of

19   what we do to watch them, to search them before they do

20   things.

21          For example, before a drug buy, we would search the

22   person to make sure they don't have drugs or money on them.

23   There are a number of things we would do that help us

24   establish that the person's doing what we expect them to do

25   without any deceit.

1  Q    Okay.  Is it fair to say you need to corroborate what

2  they're doing?

3  A    I don't think you need to corroborate it, but what you're

4  trying to do is ensure that what they're doing is not going to

5  be assailable or attackable down the line at a trial or

6  hearing in front of a judge.  All the stuff that you do,

7  keeping in mind that these are issues that could be litigated

8  and argued about in court.

9         So you want to do everything you can possibly do to

10  ensure that a jury and a judge down the road understands that

11  what happened is what you expected would happen.

12  Q    Okay.  If a confidential CI or CW tells you something, do

13  you try and corroborate what he's told you?

14  A    It would depend on what he's saying.

15  Q    Suppose he tells you that someone is selling X amount of

16  grams down the street.

17  A    Yes.

18  Q    What would you do?

19  A    Well, if that's a case that you decided to work on, you

20  would try to corroborate it in terms of asking other sources

21  about the person, and you may then use the informant himself

22  to corroborate it in terms of making phone calls or having

23  meetings with the person, that you would record and then you

24  would have, in that fashion, the witness or the informant

25  would sort of self-corroborate what he's saying by engaging in

1    a conversation and making a recording.

2    Q     Record a conversation?

3    A     Yes.

4    Q     Or in some cases, it could be a controlled buy?

5    A     Yeah, in some cases there might not be anything at all

6    except a conversation.  That's the distinction between the

7    cooperating witness and the confidential informant.  For an

8    informant, you might just have a guy who has a conversation.

9    You might not do a recording.  You might just have him talk to

10   a person.

11   Q     If it's just his word, is that sufficient for you to act

12   on?

13   A     It depends what you mean by "act on."  There are guys

14   that you work with that you've worked with for many years and

15   that you trust, and if they say something, I would believe it.

16   Q     And you would act upon it?

17   A     And I would act upon it.

18   Q     And you would take steps to make sure what you said was

19   accurate?

20   A     I may.  I may accept that it's accurate.  You know, it's

21   difficult in a vacuum to discuss it, but yeah, if I trust the

22   guy that I've worked with and call him whatever you want, CI

23   or CW, if you trust the person, generally you believe what

24   they're telling you.

25              But you do certain things to make sure that

1    everybody else believes the person, this jury believed the

2    person, and the Judge believed a person when it comes time to

3    litigate the case.

4    Q    If a CI or CW told you that somebody on the street is

5    selling 100 grams of heroin every week, you would not go and

6    arrest that person?

7    A    Right.

8    Q    You would have to corroborate what the CI or CW told you?

9    A    Right.

10   Q    You do that through recordings, wiretap, hand-to-hand

11   sales, et cetera?

12   A    Yeah, surveillances.  Right.

13   Q    Would you agree that the conversation between a target

14   and another party he's speaking with is not always necessarily

15   accurate?

16   A    Yes.

17   Q    Okay.  And again, you would take efforts to corroborate

18   the information you're hearing?

19   A    Yes.

20   Q    And you do that in every case?

21   A    I mean, we don't do it with respect to every conversation

22   in every case.  But if it's a meaningful conversation that's

23   important, you may take steps to corroborate or determine

24   whether it's in fact true, yes.

25   Q    Depending on where it is in the hierarchy of the

1    investigation?

2    A    Right.

3    Q    Okay.  Now, heroin, we talked about, sells in bags and

4    bundles and bricks.  Would you agree that that is basically

5    considered street-level sales?

6    A    Yes.  Well, bags are clearly street-level sales but

7    bricks are sold, bricks and bundles are sold, dealer to

8    dealer.  So it would depend on how many and what quantity.

9    Q    But an individual heroin user could go through a bundle

10   in a very short period of time, couldn't he or she?

11   A    A user could use multiple bags a day, so they could use a

12   bundle in a fairly short time, depending on their habit, yes.

13   Q    In the overall scheme of things, would you agree that the

14   people who are in that situation of dealing in bags and

15   bundles and bricks are basically lower level?

16   A    Well, in context of hundreds of kilos coming from South

17   America, they're lower level.  But you can make literally tens

18   of thousands of dollars in a week selling bricks, if that's

19   all you do.  So the brick itself, it's just a question of how

20   many of them you sell.

21   Q    In a wiretap that you testified about, you have an

22   investigation that's already pending, correct?

23   A    Yes.

24   Q    The wiretap is not the first part of the case?

25   A    Right.

1   Q     There's an investigation, may have been referred to you

2   by local police, you may have made an arrest, you may have

3   found something as a result of another investigation, so you

4   start a separate investigation?

5   A     Well, it would be the same investigation, but it would be

6   a new avenue in the same investigation.  If you're

7   investigating a drug group, you have information about it and

8   then you want to develop it into a wire.  It would just be a

9   continuation using a different technique.

10  Q     Okay.  As you start out, you start out on the ground

11  floor, you try and get a relationship with someone who's

12  selling on street levels?

13  A     Again, it all depends on what case you're talking about.

14  There are things, like you said, by the time you get to a

15  wire, there's a lot that's happened in the case.

16  Q     We're not at the wire, we're at the very beginning, and

17  let's talk about Bridgeport not New York.  That's basically

18  street-level investigations?

19  A     What's the question now?

20  Q     When you start your investigation, is it accurate to say

21  you start at the bottom on the street-level sellers, try to

22  make a relationship and make a purchase from street-level

23  sellers?

24  A     Many times yes, but not always.

25  Q     Many times?

1    A    You may start with an arrest of somebody who's higher up

2    in the organization, and then that person may cooperate and

3    you're starting from a much higher level and working down.  We

4    commonly do that in gang cases.

5    Q    Work at a higher level and work down?

6    A    Start with higher level guys and work downward.

7    Q    In drug cases, are you looking to get the source of

8    supply?

9    A    In drug cases, yes, you're looking for the source of

10   supply, the other way.

11   Q    In drug cases, it's common to work up?

12   A    Yes.

13   Q    Would you say it's uncommon or unusual to work down?

14   A    No, I would say it would be uncommon to only work down,

15   but it would be common to do both because you want to identify

16   the organization from top to bottom.

17   Q    You worked in the United States Attorney's Office in the

18   District of Connecticut for about three years?

19   A    Yes, sir.

20   Q    And during that time, were you familiar with the term a

21   "5K1.1"?

22   A    Yes.

23   Q    Okay.  Can you tell the jury what a 5K1.1 is?

24   A    5K1.1 is, it's a reference to -- exactly what it is, no.

25   It's -- where is it codified?  It's a reference to the process

1    of cooperating, a person with a federal case cooperating with

2    the government authorities in order to make cases against

3    other people, and the process by which they get credit for

4    that is controlled by Section 5K1.1, which requires the U.S.

5    Attorney's Office to write a letter describing what the person

6    did, and then that letter would get presented to a judge when

7    the person is sentenced.

8            It's a way in which, if you've committed a federal

9    crime, it's a way in which to reduce the potential sentence

10   you would face.  You reduce it by, number one, agreeing to be

11   truthful; number two, providing information that results in a

12   case against somebody else; and then your work is codified in

13   a letter or, you know, not codified, written in a letter and

14   presented to a judge, who then determines whether that would

15   affect the sentence that you would get.

16   Q    And depending on the type of a case, charge that the

17   person is convicted of, a 5K1.1 motion can also remove any

18   mandatory minimum periods of incarceration from the case,

19   isn't that accurate?

20   A    Yes.

21   Q    Okay.  So would you agree that for a witness who's

22   arrested in a large drug case such as this, it's in his best

23   interest to seek out a 5K1 motion?

24   A    Well, often so.  Not always, but often, yes.

25   Q    When would it not be in his interest to get a 5K1 motion?