1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF CONNECTICUT
2
     * * * * * * * * * * * * *  x   Criminal Case
3                                      No. 3:12CR104(EBB)
     UNITED STATES OF AMERICA,    :
4               Plaintiff
                                  :   January 21, 2014
5          vs.                        10:10 O'clock a.m.
                                  :
6    RICHARD ANDERSON, PHILIP
     BRYANT, and ROBERT SANTOS,   :
7               Defendants
                                  :   New Haven, Connecticut
8    * * * * * * * * * * * * *  x

9                        FIRST DAY OF TRIAL

10          BEFORE THE HONORABLE ELLEN BREE BURNS
             SENIOR UNITED STATES DISTRICT JUDGE
11                   AND A JURY OF FIFTEEN
     Appearances:
12     For the Plaintiff:          S. DAVE VATTI, ESQ.
                                   MARC HARRIS SILVERMAN, ESQ.
13                                 Assistant U.S. Attorneys
                                   157 Church Street
14                                 New Haven, CT 06510

15     For the Defendant:          NEAL PATRICK ROGAN, ESQ.
       Richard Anderson            315 Post Road West
16                                 Westport, Connecticut 06880

17     For the Defendant:          DAVID A MORAGHAN, ESQ.
       Philip Bryant               Smith Keefe Moraghan & Waterfall
18                                 32 City Hall Center Suite C
                                   P.O. Box 1146
19                                 Torrington Connecticut 06790

20     For the Defendant:          RICHARD A REEVE, ESQ.
       Robert Santos               Sheehan & Reeve
21                                 139 Orange Street Suite 301
                                   New Haven, Connecticut 06510
22

23     Court Reporter:             Thea Finkelstein RMR, CRR
                                   141 Church Street
24                                 New Haven, CT 06510
                                   TheaFinkelstein@aol.com
25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.

```
 1              (In the absence of the jury.)

 2              THE COURT:  All right, gentlemen, we have some

 3   pending issues that I'd like to address.

 4              Mr. Moraghan objected to Government's Exhibit 112A

 5   to 113A on the grounds that the type of instruments which are

 6   covered by those exhibits is more prejudicial than probative.

 7              Do you want to address that issue, sir?

 8              MR. MORAGHAN:  That's correct, your Honor.  I filed

 9   a motion earlier in the case asking that all guns and

10   testimony concerning guns be precluded, and your Honor issued

11   a ruling denying that motion.  I'm not addressing the entire

12   motion.

13              What I am addressing now is the last two exhibits

14   that the government has provided to us, and those are, as your

15   Honor noted, 112A and 113A.  And the reason is that it's my

16   belief it's significantly more prejudicial than probative on

17   the issue of whether or not Mr. Bryant and Mr. Wilson were

18   engaged in a conspiracy, and it is the content of the

19   recording that's very troubling, your Honor, because it is Mr.

20   Wilson talking about how he is planning to buy AKs, which is

21   short for AK-47, a Tec, which is a Tec-9 and a MAK, all of

22   which are machine guns, all of which are frightening to most

23   people, and I think that that will have a very significant

24   impact on a jury if they believe that Mr. Wilson and Mr.

25   Bryant are conspiring to acquire those weapons.
```

1           More so in Exhibit 113 which I believe is a call,

2    Wilson is telling Mr. Bryant that he's going to get the money

3    to buy those items and resell them in the community to people

4    in his hood for either $700 if he could or $500, if that's the

5    most he could get for them.  But he also said that he wanted

6    to keep them in the hood.

7           There are six other conversations that the

8    government plans to introduce concerning conversations between

9    Mr. Wilson and Mr. Bryant concerning guns.  Guns are not an

10   element of this offense.  He's not charged with a gun offense.

11          It may be somewhat probative as to whether there is

12   a conspiracy.  I think that they can show that, or attempt to

13   show it, through the use of six conversations.  I do not think

14   that they need to have 112 and 113 admitted.  I think it's

15   highly, highly prejudicial.

16          THE COURT:  Thank you, sir.

17          MR. SILVERMAN:  Just in a brief response, your

18   Honor.  The first call, 112, that we're talking about is the

19   one where Mr. Wilson, he basically says, and I'm quoting here,

20   "There's big shit on deck for 500."

21          Mr. Bryant asks for what?

22          Mr. Wilson says, "ARs, Teks, and MAKs."

23          Those are automatic weapons, but he doesn't explain

24   at any point these are machine guns we can use to fire rounds

25   without compressing the trigger multiple times to kill lots of

1    people with them.  I'm not sure that ARs, Teks, and MAKs

2    really carry the same prejudicial weight that Attorney

3    Moraghan seems to suggest they do.

4            But even if they do carry that kind of baggage with

5    them, at some point in the conversation, Mr. Bryant asks Mr.

6    Wilson if he's going to buy one for the -- and although the

7    transcript doesn't make it clear, I believe the testimony's

8    going to suggest for the community stash of guns, "Are you

9    going to put one in the stash that we all share, that I get to

10   share with you and with the other folks," which the Court has

11   already ruled is indicative of the existence of a conspiracy.

12           In the government's view, the call is plainly

13   probative of the existence of that conspiracy and of a certain

14   level of mutual trust between Mr. Smith -- I'm sorry, Mr.

15   Wilson and Mr. Bryant, that plainly exists when he's talking

16   about, "Hey, I might be able to get my hands on these

17   particular weapons, do you want one?  I could share this

18   exclusive deal with you," my co-conspirator.

19           In the government's view, it's plainly probative.

20   And if it's prejudicial, it doesn't meet the substantially

21   outweighs threshold set forth in Rule 403.

22           MR. MORAGHAN:  Your Honor, I think after what

23   happened in Newtown, people are well aware what automatic

24   weapons are, and there's a stigma to them.  Regardless of

25   whether it explains what exactly the gun is, that stigma is

1  with this jury, it's with all of us.  So I do think it's

2  highly prejudicial.

3          And there are six other gun conversations.  It's not

4  this conversation alone.  There are six other conversations

5  that are going to be introduced regarding guns and Wilson and

6  Mr. Bryant.

7          MR. SILVERMAN:  Very briefly, what's unique about

8  this one is this idea that Mr. Wilson now has access to these

9  particular guns and he's willing to share that deal with Mr.

10  Bryant.  This is the person he calls to say, "Hey, I can get

11  access, do you, my buddy, my co-conspirator, want to get in on

12  it?"  And that, to the government, is additional probative

13  value that the other firearm calls are lacking.

14          THE COURT:  I'll overrule the objection.

15          We also have a motion with respect to the 851 second

16  offender motion.

17          MR. REEVE:  Your Honor, first of all, would you like

18  us to identify ourselves for the record, to identify the case?

19  I just think the record perhaps should reflect that I'm

20  Richard Reeve.  I represent Robert Santos, who is present with

21  me.

22          And I want to address, before we get to the motion

23  to dismiss, I want the Court to know that as far as I know,

24  all of these calls about guns have absolutely nothing to do

25  with Robert Santos.  He is on trial, for the convenience of

1    the government and the Court, these cases are joined.

2            If it's prejudicial to the speakers, it's incredibly

3    prejudicial to Mr. Santos.  He has nothing to do with any of

4    the firearm calls that the government's going to introduce in

5    this joint trial.

6            So I am moving for severance on the basis of the

7    fact that all of these gun calls are going to come in and have

8    nothing to do with Mr. Santos at all.

9            In addition, your Honor, there's no allegation in

10   this case that Mr. Santos has anything to do with cocaine or

11   that he has anything to do with crack cocaine, none.  Most of

12   this trial, if not -- I shouldn't say most.  Much of this

13   trial is going to be devoted to presenting evidence about

14   substances which he's not involved with in any way, and the

15   government doesn't claim he's involved in it.

16           The confluence of those factors make it almost

17   impossible for Mr. Santos to get a fair trial when these calls

18   are going to come in.  And I understand, your Honor can give a

19   limiting instruction to the jury and say this doesn't apply to

20   Mr. Santos.  But it's kind of like telling a jury we know

21   there's an elephant in the closet but please disregard it when

22   you're thinking about the evidence with Mr. Santos.  It's not

23   fair, and I am moving for severance.

24           MR. SILVERMAN:  It's nice of Attorney Reeve to make

25   that motion this morning.

1          THE COURT:  Yes.

2          MR. SILVERMAN:  We picked the jury, and they're

3   ready to come in.

4          The Court's proposed charge already includes

5   instructions saying that the jury must consider the evidence

6   against each defendant individually and separately.  I'm happy

7   to have the Court give an additional limiting instruction with

8   respect to that.

9          But the jury's also going to have a verdict form,

10  and for Mr. Santos it's going to specify that he's charged

11  with conspiracy to possess with intent to distribute, and to

12  distribute, a certain quantity of heroin, and it's going to

13  specify the drug that they need to consider.  It's not going

14  to ask them about cocaine or cocaine base, or any other

15  controlled substance or matter with respect to Mr. Santos.

16  It's very, very individualized.  And that will be the form the

17  jury has to fill out as it concludes its deliberations with

18  respect to Mr. Santos.

19         There's a similarly individualized form with respect

20  to Mr. Bryant, and a similarly individualized form with

21  respect to Mr. Anderson.

22         In the government's view, there's a backdrop here

23  that prefers joint trials.  Given that no defendant filed any

24  motion in advance of today to request a severance, the

25  government's view is that we should proceed as planned with

1  the joint trial, with the appropriate instructions given to

2  the jury that they must consider the evidence against each

3  defendant individually.

4        MR. ROGAN:  Your Honor, good morning.  For the

5  record, Neil Rogan.  I represent Mr. Anderson.

6        I'd like to make my own separate motion regarding

7  severance, and again we addressed the issue particularly of

8  the prejudicial nature of the phone calls that were just

9  discussed regarding drugs.

10        Similar to Mr. Reeve's client, my client is only

11  charged in Count One with conspiracy to distribute 28 grams or

12  more of crack cocaine.  There's no allegations regarding

13  Richard Anderson's involvement with guns, and while I

14  appreciate that the Judge can give a limiting or perhaps a

15  curative instruction, there are individual verdict forms, the

16  practical reality is we are here because it's convenient for

17  the government to charge, to try all three of us together.

18        I think practically speaking, I need to make this

19  clear on the record:  I think it's going to be very difficult

20  for the jury to unring the bell and to be able to separate

21  out, okay, that evidence applies to person A but doesn't apply

22  to person B, or that evidence applies to A and B but not C.

23        The reason no motion to sever was filed early on is

24  that I think way back in October, this Court first indicated

25  that we were going to try at the time then six defendants

1   together, so it didn't seem appropriate at that time to file a

2   motion to sever.

3          But I want to make a separate objection on behalf of

4   Mr. Anderson to the prejudicial nature of those phone calls

5   coming in.  Whether they apply to Mr. Bryant or not, I think

6   it's going to be really impossible for this jury to separate

7   out, when the main cooperating witness, the snitch in this

8   case, Mr. Wilson, is involved in other phone calls with Mr.

9   Anderson or any other person to say, "Okay, but he wasn't

10  talking to him about the gun issue."

11         So again, I would make my motion to sever and again

12  object to the introduction of those records, your Honor.

13         MR. SILVERMAN:  Your Honor, it's Marc Silverman for

14  the government.  I don't have anything addition to add except

15  I fail to understand the logic when there were six defendants

16  it wouldn't have been appropriate to sever but when there are

17  three it's now appropriate to sever.

18         THE COURT:  I think it's too late for that motion,

19  and I'm going to deny it.

20         MR. REEVE:  Your Honor, I think the case law is

21  fairly clear that the Court has a continuing duty with respect

22  to severance.  I'm going to be continuing to raise the issue

23  with the Court.

24         THE COURT:  You may, Mr. Reeve.

25         MR. REEVE:  And I am going to be asking the Court to

1    give individualized instructions whenever evidence comes in

2    that's not relevant with respect to Mr. Santos, and I am going

3    to be making those specific requests.  It sounds like the

4    government joins in that.

5           MR. SILVERMAN:  The government doesn't have any

6    objection to the Court instructing the jury as to how it must

7    consider the evidence.

8           THE COURT:  Well, let's move to the second offender

9    notice, as to Mr. Santos.  Do you want to be heard on that?

10           MR. REEVE:  Your Honor, I don't think it needs to be

11   heard now, but I understand government counsel wants to

12   address it today.  I have no objection to their doing that.

13   It's not relevant to the trial.  It's simply a sentencing

14   issue, if we get there.  But I defer.

15           MR. SILVERMAN:  Your Honor, I don't know that the

16   Court needs to rule on this issue today, but I do want to set

17   the record straight on this issue.

18           As I understand it, Mr. Santos makes two arguments

19   in seeking that the Court dismiss the 851 notice that's been

20   filed against him.  The first argument is an *Alleyne* argument,

21   pursuant to a recent Supreme Court case that discusses what

22   evidence must be put before a jury.

23           As Mr. Santos puts in his motion, in *Alleyne*,

24   footnote 1 prefers refers to the *Almendarez-Torres* case, a

25   1997 case.  It notes in *Almendarez-Torres*, "We recognize the

1    narrow exception to this general rule for the fact of a prior

2    conviction.  Because the parties do not contest that

3    decision's vitality we do not revisit it for purposes of our

4    decision today."

5         The prior conviction exception is explicitly

6    preserved in the *Alleyne* decision.  That argument is without

7    merit, in the government's view.

8         The second argument that I understand Mr. Santos to

9    be making is a due process argument, alleging that the

10   government has punished Mr. Santos for electing to go to trial

11   in that it filed the 851 notice as some kind of deterrent or

12   threat that it was following through on.  That's the one that

13   I really wanted to address today for the Court's benefit.

14        I note that there's a presumption of regularity that

15   the Second Circuit has recognized over and over again to the

16   government's charging decisions, as well as its 851 filing

17   decisions, and it's against that backdrop that this Court

18   should be considering that second argument raised by Mr.

19   Santos.

20        First, to the extent that the argument is Mr. Santos

21   elected to go to trial so the government filed an 851.  In the

22   government's view, the obvious item to point to is that Mr.

23   Anderson is also eligible for the filing of an 851 notice and

24   proceeded to trial today, and the government declined to file

25   the 851 notice for him.  So by the logic that the government

1    is punishing defendants for proceeding to trial doesn't hold

2    in the same case.

3           Second, the government's perspective on all of this

4    is, in the original indictment, Mr. Santos was charged with an

5    offense that carried a ten-year mandatory minimum sentence.

6    When the grand jury returned a superseding indictment July

7    13th -- July 17th in this case, because the quantities that

8    were alleged were reduced, he's now facing a five-year

9    mandatory minimum sentence.

10          Within two weeks of the return of that superseding

11   indictment, government counsel notified counsel for Mr. Santos

12   that it intended to file the 851 notice.  The government then

13   agreed to hold off on the filing for a period of time, at

14   defense counsel's request.  We did that while he wanted to

15   talk with his client I suppose about the impact of that

16   filing, or other related matters.  But the delay was

17   occasioned at defense counsel's request and for no other

18   reason than that.

19          And then third, even if the government did file the

20   851 notice because the defendant elected to go to trial, very

21   brief research over the weekend, since this motion was filed

22   on Friday afternoon, indicated to me in two recent decisions

23   to different panels of the Second Circuit decided that's

24   perfectly acceptable, that course of conduct is

25   constitutional, does not constitute prosecutorial misconduct,

1    does not violate a defendant's due process rights.

2         In fact, they felt it was so basic and plain under

3    the Supreme Court's decision in *Bordenkircher v Hayes,* a 1978

4    decision, that they didn't feel the need to file a published

5    opinion.

6         These are both summary orders that I'll cite the

7    Court to.  The first is *United States versus Pacheco*, 512 F.

8    App'x 112.  WestLaw citation is 2013 WestLaw 656741, decided

9    February 25th, 2013, in which the Second Circuit decided the

10   government's decision at the outset to forgo filing any

11   Section 851 notice and use the threat of such a filing as a

12   bargaining chip in plea negotiations does not render

13   unconstitutional the decision to file such an 851 notice after

14   Pacheco declined to plead guilty to lesser charges.

15        In another recent Second Circuit decision, this one

16   is *United States v Barreras*, 494 F. App'x 115, 2012 WestLaw

17   3659811, Second Circuit August 28, 2012, the Second Circuit

18   reasoned:  "The government has discretion to decide whether to

19   file a prior felony information, so long as it does not base

20   its decision on an improper factor such as race, religion, or

21   another arbitrary classification."

22        There's a cite to *United States versus Sanchez:*

23   "The desire to induce a guilty plea or stipulation is not an

24   improper factor on which to decide whether to file a prior

25   felony information."  Here, there was a cite to the

1    *Bordenkircher* case.

2           In the government's view, the motion filed by Mr.

3    Santos is at best incomplete, and at worst misleading to the

4    Court.  It doesn't reflect the sequence of events, at least

5    from the government's perspective.  Even if it were accurate,

6    the Second Circuit already addressed this issue and held that

7    it's not a problem.

8           So in the government's view, the Court could decide

9    today to deny the motion outright; or could reserve decision

10   and reach the issue later, at the time of sentencing, if Mr.

11   Santos is convicted.

12          MR. REEVE:  Your Honor, I would now address the

13   government's comments.  First of all, as your Honor is aware

14   having read the motion that the government alluded to with

15   respect to the first claim, I indicated there and conceded

16   that your Honor really didn't have the authority to grant

17   that, given the existent Supreme Court precedent.  Obviously,

18   I filed that for purposes of preserving it.

19          When you look at *Alleyne*, it's very clear that when

20   the claim was made by Mr. Alleyne's counsel at the District

21   Court, there were binding Supreme Court precedent that said,

22   "You're wrong."  But that's the way law gets changed.  That's

23   the way *Alleyne* changed the law.

24          And I am preserving that issue, but I am fully aware

25   that your Honor is bound by the existing Supreme Court

1    precedent, and I thought I stated that very clearly.  If I

2    didn't, I hope I've stated it clearly now.

3            With respect to the second issue, reluctantly, I

4    thought it was unwise for the government to go forward, but

5    now we've got to put it out on the record because what's been

6    said is not the whole picture, okay?

7            So number one, Mr. Anderson is charged in this case

8    with a detectable quantity.  It's apples and oranges.  If the

9    government --

10           MR. SILVERMAN:  That's not right.  He's charged with

11   a five-year mandatory offense.

12           MR. REEVE:  I stand corrected.  In any event, the

13   fact of the situation here is Mr. Santos was arrested July of

14   2012, two months after the indictment was returned in this

15   case.

16           There were, as there always are, your Honor, in

17   cases, there are discussions between counsel in an effort to

18   resolve the case.  There were a number of conversations we

19   had.  I received a letter, it was a plea offer from the

20   government dated March of 2013, and it specifically indicated

21   if Mr. Santos wanted to accept this agreement, that there was

22   not -- this one didn't specifically say but it said what the

23   maximum penalties were, and said the mandatory minimum penalty

24   is five years.  Now, that was filed before the superseding

25   indictment was returned five months later in July.

1          In July, Attorney Silverman is correct, we had

2    discussions about this.  There's e-mail correspondence.  And

3    my effort was to avoid the government's filing the 851 so that

4    I could discuss with my client what his options are without

5    the 851 versus with the 851.

6          Now, after that letter, that e-mail correspondence

7    was sent out, the government sent me, pursuant to discussions

8    and negotiations, a second letter, plea agreement offer, dated

9    September 18th, 2013, and in that letter, the offer was a plea

10   to 100 grams and in that letter, the government specifically

11   stated, "As part of this plea agreement, to the extent the

12   defendant may have a qualified prior conviction for a felony

13   drug offense, the government has agreed not to file a second

14   offender notice."  We have had discussions about this as

15   recently as a few weeks ago.

16         So the idea that this was just delayed but it was a

17   done deal is simply not an accurate statement.  The

18   communications, and I was very explicit with Attorney

19   Silverman -- I don't think there's any real dispute about any

20   of this -- I said in response to his letter, "I want you to

21   delay" -- "and I'm requesting that you delay" -- so I can see

22   if we can resolve this case.

23         And I told him, "I am not going to make a claim

24   based on your delay between your providing me this July 2013

25   letter and the time later that you file it," and I am not

1    making that claim.

2          So I don't really understand what the government is

3    saying because the reality here is Mr. Santos, up until very,

4    very recently, had a chance to plead to a five-year count, and

5    the 851 would not be part of this case.

6          So I think it serves the government's interests much

7    better to just say what it is, you know?  It's the rough and

8    tumble of negotiation, and *Bordenkircher* said that's what it

9    is.  That's what those cases are about.  Let's not create some

10   facade here.

11         The reality is Mr. Santos had a choice, you plead

12   guilty there's no 851 and you're not subject to the mandatory

13   minimum ten.  You don't plead guilty, you go to trial, and it

14   will be there, okay?  So that's, you know, if we want to talk

15   about that, that's the reality.  That is the reality.  And I

16   don't think there's a dispute about that reality.

17         Now, the question from a legal perspective then

18   becomes, is there anything wrong with that?  Judge Gleason who

19   I cited said, "I think there's something wrong."  It doesn't

20   bind the Second Circuit.  He doesn't even say, "I find it's

21   unconstitutional."  He says, "It may be unconstitutional."

22         So I understand that the Court is bound, just as it

23   was with the *Alleyne* claim, with the two decisions that the

24   government cited, and I apologize to the Court for not citing

25   them.  I actually alluded to one of those decisions I believe

```
 1   in informal discussions with government counsel.  I wasn't

 2   hiding that.  The fact of the matter is I think both claims

 3   are preserved, because that's my job as a lawyer.

 4          But I think to create some fiction here which is

 5   somehow this case is different, and I'm not impugning the

 6   integrity of the government or anything, but let's deal with

 7   it for what it is.  You want to go to trial, the filing of the

 8   851 is going to happen.  You don't want to go to trial, you

 9   can avail yourself of the plea offer that's on the table.

10          And I think the government position, seems to me

11   they can say, you know what?  There's nothing wrong with that,

12   but let's at least talk about what the issue is and not hide.

13          MR. SILVERMAN:  Your Honor, given that the jury's

14   waiting, I don't think we need any more back and forth on this

15   issue, but I do think given Attorney Reeve's concession, the

16   Court can deny the motion now.

17          THE COURT:  Yes, I'm denying the motion.

18          Gentlemen, those of you who have had experience on

19   trial with me know that I give a preliminary instruction to

20   the jury.

21          I believe counsel requested an opportunity for

22   opening statements.  So I will be giving my preliminary

23   instruction to the jury, you're familiar with that some of you

24   who have been on trial with me, and after that, I will invite

25   respective counsel to make their opening statements to the
```

1    jury.  Okay?

2          MR. REEVE:  Yes, your Honor.  I hate to take up your

3    time, but there are a few other preliminary matters that we

4    really want to address.  We have been trying to figure out a

5    way to sit here where all counsel and all three defendants can

6    see the witness who's going to be on the stand.  It's

7    impossible with the podium there.  We've moved our table up.

8          If we peek around the corner, around the screen that

9    the court clerk has and between the video here and the podium,

10   I know the seat was raised a little bit a moment ago, it's

11   very difficult.  I don't know if there's any other solution.

12         All three defendants have a right to confrontation,

13   and that includes, under clear U.S. Supreme Court precedent,

14   the right to see and hear and literally confront.

15         THE COURT:  You're not claiming there's any

16   difficulty in hearing; just seeing?

17         MR. REEVE:  The acoustics are terrible, but if we

18   don't hear anything, that's on us to let the Court know.  It's

19   the seeing.  Mr. Santos and I, want the record to reflect,

20   can, if we peek around the corner and depending on the height

21   of the witness, probably see a face, but this is a big

22   problem.

23         I know it's not your Honor's fault.  This courtroom

24   is not conducive to a three-defendant trial, and I think

25   everybody has a right.  And I don't know what the solution is,

```
 1   but I don't think Attorney Moraghan and I don't know about his
 2   client, I won't speak for him, can see the witness because of
 3   the podium.  It's not right.
 4            MR. MORAGHAN:  Your Honor, David Moraghan for Philip
 5   Bryant.  I wrote to the Court after jury selection December
 6   16th to raise this issue.  I have the unfortunate happenstance
 7   to have been sitting where Mr. Santos is during jury
 8   selection, and I couldn't see the thing.  I don't know if it's
 9   improved since then.  I have the ability to have a better
10   seat.
11            As I sit here now, unfortunately, where the podium
12   is, it is directly between me, Mr. Bryant, and a witness box.
13   Unless someone is sitting there, until it starts, I don't know
14   if we're going to be able to see a witness at all, and we'll
15   just have to raise that when the witnesses appear.  It is a
16   problem, your Honor.  It is a significant problem.
17            I know that we're very limited in what's going to
18   take place in this room.  It is a concern.  I wrote to the
19   Court on the 16th of December, and it is still a concern.
20            MR. ROGAN:  Your Honor, for the record, Neil Rogan.
21   I will stipulate that I am a short man and I have the best
22   possible view, and I can barely see even with my seat pushed
23   back.  I can see most of the witness box, but I certainly know
24   that my client, Mr. Anderson, can't see anything.
25            So even from this perspective, and I've got the best
```

```
1    seat from the defense side, it is going to be an ongoing issue

2    to be actually able to see the demeanor of the witness, which

3    is just as important as the ability to see or hear them.

4              I just want to put that on the record.

5              THE COURT:  Well, I don't know what you want me to

6    do, gentlemen, with respect to the ability to see.  If you

7    want to stand up to watch, okay.  I will certainly accommodate

8    anything I think will be helpful to you in seeing the witness,

9    but there's nothing much I can see about the configuration of

10   the courtroom.

11             MR. MORAGHAN:  Your Honor, I assume that you will

12   allow counsel to move around so we can see the witness and see

13   the demeanor --

14             THE COURT:  Yes.

15             MR. MORAGHAN:  -- and whatnot as the witness

16   testifies.  I would ask if my client can join me in moving

17   around the courtroom.

18             THE COURT:  That might be a problem.

19             MR. MORAGHAN:  That's another problem, your Honor, I

20   agree it is a problem.  I don't know how to address it, but it

21   is a problem.

22             THE COURT:  We'll all acknowledge that there's a

23   possible problem there.

24             MR. REEVE:  I think the right is the defendants'

25   right to see and hear; it's not the lawyers' right, it's the
```

```
 1   defendants' right.  So I think there's a big problem here, and
 2   I don't have a solution.  I don't want to pass the buck, but
 3   not my job, you know?  So I think it's a problem.
 4        We can take pictures from all six and put on the
 5   record what we can see with somebody sitting in the witness
 6   seat, but it's going to vary, again, with height.
 7        There were two other issues I wanted to raise:  I am
 8   moving for sequestration of witnesses, and beyond their
 9   physical presence I am asking that the Court indicate there's
10   a sequestration order, prohibits counsel from talking to
11   future witnesses about what prior witnesses said in this case.
12   That's the sequestration rule in this circuit, and I would ask
13   the Court to apply that rule.
14        The other preliminary matter, your Honor, is that
15   the three attorneys have consulted about an order of
16   examinations, and we will be changing orders with respect to
17   who the witness is.
18        We will go in the order of the indictment for
19   purposes of opening statements today, but I just wanted your
20   Honor to be aware that we discussed it among ourselves as to
21   what we think is an appropriate order based on the witness,
22   and I assume that the Court is okay with our doing that.
23        THE COURT:  I have no problem with that.
24        MR. REEVE:  Okay, thank you.
25        Oh, and, your Honor, just one other thing, you know,
```

```
 1    we've gotten the testimony of the first government witness,

 2    Mr. Zuk, I should say Agent Zuk, before your Honor in the

 3    Morley case in December, and also in a case before Judge

 4    Bryant which I believe was last week if I'm not mistaken.  We

 5    had informal discussions with the government about the scope

 6    and extent.

 7              When I looked through, especially the Morley

 8    testimony, I do have some objections, but I think they're

 9    going to have to be -- depending on where the government goes,

10    we'll have to discuss those on an individual item rather than

11    vetting them at this point.  So the Court doesn't have

12    context, and I assume that's what your Honor wanted to do.

13              THE COURT:  Yes.

14              MR. VATTI:  Your Honor, as far as the ability to see

15    the witness box, I believe the podium is on wheels.  We can

16    move it.

17              THE COURT:  Want to try it now so we can get some --

18              MR. VATTI:  We can try that.

19              As far as the request with the sequestration orders,

20    we have no objection to that.

21              THE COURT:  The witnesses will be sequestered.

22              Do you want to see if you can move it now, see if

23    that helps the defendants?

24              Does that help?

25              MR. ROGAN:  Your Honor, I am now completely, you
```

1    know, blocked out.  And I have no problem moving around the

2    courtroom to put eyes on the witness, but now Mr. Anderson I

3    know can't see anything, if he remains seated.  It's helpful

4    to Mr. Reeve and I assume Mr. Santos but not so much for me.

5            MR. REEVE:  And, Judge, just so that the record is

6    clear, the marshals have asked us to sit over here because Mr.

7    Santos is not in custody, so that's why we're here and the

8    other people then are over there.  That's kind of a fixed

9    issue.

10           MR. VATTI:  Your Honor, as far as I know, you have

11   been trying cases in this courtroom for several decades.  I'm

12   sure many have been appealed.  I don't think they've come back

13   with this problem.

14           And I think it's time to proceed.

15           THE COURT:  Nobody's raised that before in any

16   trials I've had.  I'm hopeful that you're going to be able to

17   see the witnesses, gentlemen.  If you're not going to be able

18   to see the witnesses, you can call that to our attention at

19   that time.

20           Let's go.

21           MR. SILVERMAN:  With that, the government has

22   nothing further at this time.

23           THE COURT:  All right.  As I indicated, I'll give a

24   preliminary statement to the jurors.  After that, you can make

25   preliminary statements, okay?

Page 25

```
 1              (In the presence of the jury:  10:49 o'clock a.m.)

 2              THE COURT:  Good morning, ladies and gentlemen.

 3              May we have the jury sworn?

 4              (Oath to jurors administered.)

 5              THE COURT:  Ladies and gentlemen, what I will say

 6    now is not intended to serve as the final instructions in this

 7    case, but simply to serve as an introduction to the trial.

 8    It's not a substitute, as I say, for the detailed instructions

 9    on the law and the evidence which I will give to you at the

10    close of the case and before you retire to consider your

11    verdict.

12              As you know, this is a criminal case commenced by

13    the federal government, which I may sometimes refer to as "the

14    prosecution" and sometimes "the government," against Richard

15    Anderson, Philip Bryant, and Robert Santos.

16              The case is based on Count One of a superseding

17    indictment, which reads as follows:

18                   "From approximately 2011 to approximately" --

19              "January 2011 to approximately January 2012, the

20              exact dates being unknown to the grand jury, in the

21              District of Connecticut and elsewhere, the defendants,

22              Richard Anderson, a.k.a. Mayut and Porter; Jeffrey

23              Benton, a.k.a. Fresh; Choloe Bright, a.k.a. Chi-Chi

24              and Chello; Philip Bryant, a.k.a. Phat Phil and Fizzy;

25              Daniel Evans, a.k.a. D-Nice; Erick Evans, a.k.a. EJ
```

1    and Hoov; Gilbert Galan Jr, a.k.a. G and Skittles;

2    Pierre Galan, a.k.a. PLO; William Hines, a.k.a. Gunz;

3    Emory James, a.k.a. Emmo; Lamar Jones, a.k.a. Cream;

4    Corey Maddox, a.k.a. CL; James Moore, a.k.a. Coolie D;

5    Christina Palluoto; Roy Reid, a.k.a. Jamma; Nelson

6    Rios, a.k.a. Pito; Michael Santana; Robert Santos,

7    a.k.a. Scoot; Alexis Sutton; Jose Torres, a.k.a.

8    Lethal; and Marcus Wylie, a.k.a. Wally Don,

9    together with Kevin Wilson, a.k.a. Nature and Nate;

10   Lynwood Bacote, a.k.a. Max; Ezel Buchanan, a.k.a. EZ;

11   Raymond Carson, a.k.a. Dirt; Vincent Clark, a.k.a.

12   Nu-Nu and Duke; Frederick Cox, a.k.a. Boot; Frederick

13   Cox Sr., a.k.a. Bama-Lama, Darrell Davis, a.k.a.

14   Baller; Johnny De Los Santos, a.k.a. Na-Na; Jose

15   DeJesus, a.k.a. Flaco; Joshuwa Diaz, a.k.a. Fot;

16   Eric Durant, a.k.a. 5-8; Jermaine Galberth, a.k.a.

17   Maine; Carl Hailey a.k.a. Squirt; Jesus Morales,

18   a.k.a., Cano; Amaury P'Dilla, a.k.a. Audi; Quiyon

19   Reid, a.k.a. Gutter; Juan Vargas, a.k.a. Juan Chiefy;

20   Jacqueline Valentine; and Tyrice White, a.k.a. Ears,

21   who are not named as defendants herein but are charged

22   by a separate indictment, and others known and unknown

23   to the grand jury, did knowingly and intentionally

24   conspire to violate the narcotics laws of the United

25   States.

1              "Two.  It is a part and object of the conspiracy

2         that the defendants Anderson, Benton, Bright, Bryant,

3         Daniel Evans, Erick Evans, Gilbert Galan Jr, Pierre

4         Galan, Hines, James, Jones, Maddox, Moore, Palluoto,

5         Reid, Rios, Santana, Santos, Sutton, Torres, and Wylie,

6         together with Wilson, Bacote, Buchanan, Carson, Clark,

7         Fredrick Cox, Fredrick Cox Sr., Davis, De Los Santos,

8         DeJesus, Diaz, Durant, Galberth, Hailey, Morales,

9         P'Dilla, Reid, Vargas, Valentine, and White, and others

10        known and unknown to the grand jury, would distribute and

11        possess with intent to distribute controlled substances,

12        in violation of Title 21, United States Code, Section

13        841(a)(1)."

14         Ladies and gentlemen, today we are trying the case

15   against Mr. Anderson, Mr. Bryant, and Mr. Santos.  Not all of

16   those are the persons you've heard mentioned, and you're not

17   to speculate as to why they're not in the case and what may

18   have happened with respect to them.

19              "Anderson, Bryant, Erick Evans, and Jones knew

20        or reasonably should have foreseen from their own

21        conduct and that of other members of the conspiracy

22        that the narcotics conspiracy charged in Count One

23        involved 28 grams or more of a mixture and substance

24        containing a detectable amount of cocaine base, crack

25        cocaine, a Schedule II controlled substance, in

 1          violation of Title 21, United States Code, sections

 2          841(a)(1) and 841(b)(1)(B)(iii).

 3               "Defendants Bright, Bryant, Daniel Evans, Hines,

 4          James, Maddox, Moore, Palluoto, Reid, Sutton, Torres,

 5          and Wylie knew or reasonably should have foreseen

 6          from their own conduct and that of other members of

 7          the conspiracy that the narcotics conspiracy charged

 8          in Count One involved a mixture and substance containing

 9          a detectable amount of heroin, a Schedule I controlled

10          substance, in violation of Title 21, United States Code,

11          sections 841(a)(1) and 841(b)(1)(C); a mixture and

12          substance containing a detectable amount of cocaine, a

13          Schedule II controlled substance, in violation of Title

14          21 United States Code, sections 841(a)(1) and

15          841(b)(1)(C); and a mixture and substance containing a

16          detectable amount of cocaine base, crack cocaine, a

17          Schedule II controlled substance, in violation of Title

18          21, United States Code, sections 841(a)(1) and

19          841(b)(1)(C), all in violation of Title 21, United

20          States Code, Section 846."

21               I'm sorry, my clerk has just pointed out that I

22     missed one of the paragraphs in that count.

23               "Defendants Benton, Rios, and Santos knew or

24          reasonably should have known, should have foreseen,

25          from their own conduct and that of other members of the

1          conspiracy that the narcotics conspiracy charged in

2          Count One involved 100 grams or more of a mixture and

3          substance containing a detectable amount of heroin, a

4          Schedule I controlled substance, in violation of Title

5          21, United States Code, sections 841(a)(1) and

6          841(b)(1)(B)(i)."

7              Now, you should distinctly understand, ladies and

8     gentlemen, the superseding indictment which I just read to you

9     is simply a statement of what the government claims, and it is

10    not in any sense evidence of the allegations it contains.

11             As I said, the defendants on trial today are Richard

12    Anderson, Philip Bryant, and Robert Santos, and you're not to

13    speculate with respect to the other defendants that were

14    mentioned in that particular count.

15             You should distinctly understand that the

16    superseding indictment is simply a statement of what the

17    government claims, and it is not evidence of the allegations

18    it contains.

19             The defendants have pleaded not guilty to the

20    indictment, and the prosecution, therefore, has the burden of

21    proving each of the essential elements of the crimes charged

22    in Count One of the indictment beyond a reasonable doubt.  The

23    purpose of the trial is to provide a forum for the government

24    to attempt to meet this burden.

25             As I say, the burden is on the prosecution to prove

1    every element of the offense charged beyond a reasonable

2    doubt.  The law never imposes on a defendant in a criminal

3    case the burden of proving any evidence or calling any

4    witnesses.  A defendant in a criminal case is presumed to be

5    innocent until, if ever, the government has proved him guilty

6    to the satisfaction of the jury beyond a reasonable doubt.

7            This means the government must prove him guilty; he

8    does not have to prove his innocence.  He may remain silent,

9    and present no evidence if he elects to do so, and the jury

10   may not draw any inference from such an election.

11           The trial will proceed in the following manner:

12           First, the government will introduce evidence in

13   support of the charges contained in the indictment.

14           Second, after the government has presented its

15   evidence, the defendants may present evidence, but they are

16   not obliged to do so.  The burden is always on the government

17   to prove every element of the offense charged beyond a

18   reasonable doubt.  The law never imposes on a defendant in a

19   criminal case the burden of calling any witnesses or

20   introducing any evidence.

21           Third, at the conclusion of the evidence, each party

22   has the opportunity to present oral argument in support of its

23   case.  What is said in closing argument is not evidence.  The

24   arguments are designed to present to you the contentions of

25   the parties as to what the evidence has shown and what

1    inferences may be drawn from the evidence.  And the government

2    has the right to open and close the arguments.

3           Fourth, I will instruct you on the applicable law,

4    and you will then retire to consider your verdict.  And your

5    verdict, ladies and gentlemen, must be unanimous.

6           Your purpose as jurors is to find and determine the

7    facts.  Under our system of criminal procedure, you are the

8    sole judges of the facts.  If at anytime I should make any

9    comment regarding the facts, you are at liberty to disregard

10   it.

11          It is especially important that you perform your

12   duty of determining the facts diligently and conscientiously

13   for, ordinarily, there is no means of correcting an erroneous

14   determination of the facts by a jury.

15          On the other hand and with equal emphasis, I

16   instruct you that the law as given by the Court constitutes

17   the only law for your guidance, and it is your duty to accept

18   and follow it.  It is your duty to follow the law as I give it

19   to you, even though you may disagree with the law.

20          You are to determine the facts in the case solely

21   from the evidence in the case, which will consist of the

22   testimony of witnesses, and exhibits received in evidence, and

23   any stipulations to which the parties may agree.

24          Questions asked by lawyers are not evidence.  The

25   evidence consists of the witness's answers to questions.  As I

1    said earlier, statements and arguments of counsel are not

2    evidence.

3            It is up to you to decide what inferences are to be

4    drawn from the evidence and what facts are established by the

5    evidence.  And there are two types of evidence which you may

6    properly use in reaching your verdict in this case.

7            One type of evidence is called direct evidence.

8    Direct evidence is evidence presented by a witness who

9    testifies as to what that witness saw, heard, and observed.

10   In other words, when a witness testifies about what is known

11   to that witness by virtue of the witness's own senses, what

12   the witness sees, feels, touches, or hears, that is called

13   direct evidence.

14           Circumstantial evidence is evidence that tends to

15   prove a disputed fact by proof of other facts.  When we employ

16   circumstantial evidence to reach a conclusion, we often say

17   that we infer one fact from another, or that we draw an

18   inference.

19           And there is a simple example of circumstantial

20   evidence which is often used in this courtroom.  Assume that

21   when you came into the courthouse this morning, the sun was

22   shining and it was a nice day.  Assume that the courtroom

23   blinds were drawn and you could not look outside.  As you're

24   sitting here, someone walked in with an umbrella that was

25   dripping wet.  Somebody else then walked in with a raincoat,

1   also dripping wet.  Now, you cannot look outside of the

2   courtroom and you cannot see whether or not it is raining.  So

3   you have no direct evidence of that fact.

4          But on the combination of facts which I've asked you

5   to assume, it would be reasonable and logical for you to

6   conclude that it had been raining.  In other words, the fact

7   of rain is an inference that can be drawn from the wet

8   umbrella and raincoat.  That's all there is to circumstantial

9   evidence.  You take an established fact and conclude, on the

10  basis of reason, experience, and common sense, that another

11  fact exists or does not exist.

12         Circumstantial evidence is of no less value than

13  direct evidence.  It is a general rule that the law makes no

14  distinction between direct and circumstantial evidence.  In

15  deciding whether to draw an inference you must look at and

16  consider all the facts in light of reason, common sense, and

17  experience.  After you've done that, the question whether to

18  draw a particular inference is for you, the jury, to decide.

19         You should not be concerned with any sentence which

20  a defendant might receive should he be found guilty.  Your

21  function is solely to decide whether the defendant under

22  consideration is guilty or not guilty of the charges against

23  him.  If, and only if, you find him guilty does it become the

24  duty of the Court to pronounce sentence.

25         Until this case is submitted to you at the end of

1    all the evidence and after my charge on the applicable law,

2    you must not discuss it with anyone, even with your fellow

3    jurors.  After it is so submitted to you, you must discuss it

4    but only in the jury room with your fellow jurors.

5         It is important that you keep an open mind and not

6    decide any issue in the case until the entire case has been

7    submitted to you under instructions of the Court.

8         And it is important that you obey the following

9    instructions with reference to the adjournments of the court:

10   First, again, do not discuss the case, either among yourselves

11   or with anyone else, during the course of this trial.

12        In fairness to the parties to this lawsuit, you

13   should keep an open mind throughout the trial, reaching your

14   conclusion only during your final deliberation, after all the

15   evidence is in, and you have heard the attorneys' summations

16   and my instructions to you on the law, and then only after an

17   interchange of views with the other members of the jury.

18        Second, do not permit any third-person to discuss

19   the case in your presence and if anyone does so, despite your

20   telling him not to, report that fact to the Court as soon as

21   you are able to do so.  You should not, however, discuss with

22   your fellow jurors either that fact or any other fact that you

23   feel necessary to bring to the attention of the Court.

24        Third, though it is a normal human tendency to

25   converse with people with whom one is thrown in contact,

Page 35

1    please do not, during the time you serve on this jury,

2    converse, whether in or out of the courtroom, with any of the

3    parties or their attorneys or any witness or with me.  By this

4    I mean not only do not converse about the case, but please do

5    not converse at all, even to pass the time of day.  In no

6    other way can all parties be assured of the absolute

7    impartiality they are entitled to expect from you as jurors.

8           If, however, you have a question to pose to me or

9    any other message, please write that question or message out,

10   give it to the clerk, and she will bring it to my attention,

11   and I will attempt to respond promptly.

12          During the trial, it may be necessary for me to

13   confer with the lawyers from time to time out of your hearing

14   concerning questions of law or procedure that require

15   consideration by the Court alone.  On some occasions, you may

16   be excused from the courtroom as a convenience to you and to

17   us while I discuss such matters with the lawyers.

18          We will try to limit such interruptions as much as

19   possible, but please remember at all times the importance of

20   the matter you are here to determine and be patient, even

21   though the case may seem to be going slowly.

22          These preliminary instructions were, as I previously

23   stated, intended to simply help orient you as you hear the

24   evidence.  Later, before you begin your deliberations, I will

25   instruct you again in greater detail.  I'm sure you will bear

1    these principles in mind and that you will keep an open mind

2    until you have heard all the evidence, and my formal

3    instructions

4            And with these things in mind, I invite the parties

5    to make their opening statements.

6            Prosecution.

7            MR. VATTI:  Thank you, your Honor.

8            Good morning.  I know it's been a while since we

9    were here for jury selection, so I'm just going to reintroduce

10   you to the prosecution team in this case.  First of all,

11   sitting here at counsel table is DEA Task Force Officer Joshua

12   Cameron, and he will be here with us throughout the trial; in

13   the middle here is my colleague, Assistant U.S. Attorney Mark

14   Silverman; and my name is Dave Vatti, as I mentioned, and we

15   are the government team in this case.

16           Now, as her Honor had briefly mentioned, there are

17   three defendants in this case on trial, and one of them seated

18   here at the end of the table is Robert Santos in the navy tie,

19   in the middle in the purple shirt is Philip Bryant, and over

20   here in the lavender shirt is Richard Anderson.

21           Over the next several days, you are going to hear

22   the testimony of a number of law enforcement officers, the

23   testimony of a cooperating witness, the testimony of a DEA

24   chemist, and evidence from the Connecticut Department of Labor

25   through a custodian of records that works there.

1          All of that evidence is going to be accompanied by

2    numerous exhibits, drug evidence, physical exhibits that were

3    seized in the case, and also numerous wiretapped phone calls,

4    and all of that evidence is going to give you a lot of details

5    about what happened in this case.

6          But if I could take the big picture view, the

7    10,000-foot view, of what this case is about, it really can be

8    summarized in a single sentence:  There was an individual by

9    the name of Kevin Wilson who dealt crack cocaine and heroin,

10   and operated a drug trafficking ring in the Dwight, Chapel,

11   and Kensington streets areas of New Haven.

12         Philip Bryant, Robert Santos, and Richard Anderson

13   were all part of Mr. Wilson's operation and, in conjunction

14   with him, they distributed narcotics in that same

15   neighborhood.  And that's what the government's evidence in

16   this case is going to show.

17         What that evidence will also show is the story of

18   Mr. Wilson, Mr. Santos, Mr. Bryant, and Mr. Anderson.  And

19   that story, through the evidence, is as follows:

20         In December of 2010, the DEA studied crime

21   statistics in New Haven and were able to identify two

22   particular neighborhoods that appeared to be hot spots for

23   drug trafficking activity and other associated crimes.  One of

24   those neighborhoods was the one that I just mentioned around

25   Dwight, Chapel, and Kensington streets in New Haven that is

1    known by the nickname the Trey, and in the Trey, the DEA

2    identified a number of individuals that were potential

3    targets, and they identified a particular individual by the

4    name of Kevin Wilson who appeared to supply narcotics to a

5    number of the potential targets in the Trey.

6            And the DEA decided that the best way to clean up

7    this particular hot spot was to target Kevin Wilson's phone

8    for a wiretap because the number, a number, of the potential

9    targets in that neighborhood seemed to appear on Kevin

10   Wilson's phone from a study of telephone records.

11           So they started out in May of 2010 -- I'm sorry, May

12   2011, by doing a controlled purchase of approximately an ounce

13   of cocaine base, also known as crack cocaine, from Mr. Wilson.

14   And you will hear evidence in this case that that deal, using

15   two confidential informants, took place on Judson Avenue in

16   New Haven at a location where Philip Bryant resided.

17           And in fact, you will hear testimony that Mr. Wilson

18   obtained the ounce of cocaine base from Mr. Bryant and

19   supplied it to the two confidential informants, and that

20   testimony is going to be corroborated by phone records.

21           Again on June 29th, 2011, there was another

22   controlled purchase of crack cocaine of approximately seven

23   grams that was made from Kevin Wilson.

24           And as a result of those two controlled purchases of

25   crack cocaine, the DEA then decided to wiretap Kevin Wilson's

1    phone.  And they tapped that phone for a period of

2    approximately 120 days, beginning July 29th, 2011, and all the

3    way through January 30, 2012.

4           And they learned certain things from that wiretap,

5    and you will hear about those things from the testimony of

6    Special Agent Erik Ndrenika from the DEA, who is one of the

7    lead investigators in this case.  One of the first things they

8    learned was that Kevin Wilson in fact was supplying crack

9    cocaine and heroin in the Trey neighborhood to various

10   individuals, and that's going to be corroborated by a number

11   of things that you're going to hear about.

12          You will hear about seizures of drugs that were made

13   during the wiretap.  You will hear about a seizure of heroin

14   that was made on October 22nd, 2011, from an individual named

15   Jesus Morales, after he did a deal through Kevin Wilson.  You

16   will hear that on December 28th, 2011, heroin was seized from

17   an individual by the name of Jose Torres, again after he

18   conducted a transaction with Kevin Wilson.

19          You will hear that during the course of the wiretap,

20   a controlled purchase of crack cocaine was made on September

21   14th, 2011, from Kevin Wilson, and that on January 3rd, 2012,

22   Mr. Wilson was arrested and found in possession of nearly 150

23   grams of heroin.

24          Now, what are you going to hear about the three

25   defendants in this case?  You will hear largely in their own

1    words through wiretapped phone calls that they were

2    participants, in that they were involved with Mr. Wilson in

3    the distribution of narcotics.

4              So I'm going to start with Richard Anderson.  You're

5    going to hear in Mr. Anderson's own words that he supplied

6    crack cocaine to Jesus Morales, who is a customer of Kevin

7    Wilson's, in deals that were set up by Mr. Wilson.  You're

8    going to hear that Mr. Anderson supplied over 28 grams of

9    crack cocaine to Mr. Morales.

10             And in his own words, you will hear Mr. Anderson's

11   frustrations about collecting money owed by Mr. Morales

12   because he provided the crack cocaine on credit.  You will

13   hear him make threats against Mr. Morales and Mr. Morales's

14   girlfriend because he wants to collect the money.

15             And in addition, you're going to hear calls that

16   evidence mutual trust between Mr. Wilson and Mr. Anderson,

17   because Mr. Wilson saw Mr. Anderson as yet another person who

18   he could include in his heroin distribution network, and Mr.

19   Anderson began to acquire quantities of heroin from Mr. Wilson

20   to distribute to his own customers.

21             And when Mr. Anderson was finally arrested in this

22   case, you will hear evidence that he gave a statement after

23   being given his Miranda rights in which he admitted that he

24   was dealing crack.  And that's going to be corroborated by

25   Connecticut Department of Labor records that show that during

the relevant time period, Mr. Anderson had no legitimate W-2

earnings.

What about Robert Santos?  You're also going to hear

in his own voice that he was involved in the distribution of

heroin with Mr. Wilson.  In fact, you will hear in his own

words that between October of 2011 and December of 2011, they

were essentially partners in the acquisition and distribution

of heroin.

They had a supplier in the Bronx by the name of

Johnny De Los Santos, and they would acquire hundred-gram

quantities of heroin from Mr. De Los Santos, get it back to

New Haven, distribute it in the greater New Haven area,

collect the money and pool their money so they could get more

heroin from Mr. De Los Santos.

And Mr. Santos's involvement, you're going to see is

corroborated not only by the wiretapped phone calls but video

surveillance of Mr. Santos and Mr. Wilson.

And you'll hear evidence from the Connecticut

Department of Labor that during the last six months of 2011,

Mr. Santos had approximately $2700 in earnings.  But in

wiretapped phone calls, you're going to hear him discuss

quantities of money from drug trafficking that are much

larger.

What about Philip Bryant?  You're going to hear

wiretapped phone calls involving Philip Bryant in which Mr.

1    Bryant is also discussing with Kevin Wilson the acquisition

2    and distribution of heroin.  You're going to hear that Mr.

3    Bryant supplied customers to Mr. Wilson for the distribution

4    of heroin, assisted in collecting money, obtained heroin on

5    credit from Mr. Wilson that he then distributed to his own

6    customers.

7         You're going to hear evidence that these two guys

8    were pretty tight.  They had a supply of guns that Mr. Bryant

9    and Mr. Wilson and their close associates had access to, that

10   they shared and they could access at anytime.

11        And you will hear that distribution of narcotics is

12   what Mr. Bryant did.  He, too, according to Connecticut

13   Department of Labor records, had no legitimate W-2 earnings

14   during this time frame.

15        Now, when you listen to the wiretap calls in this

16   case, you're not going to hear Mr. Santos, Mr. Anderson, and

17   Mr. Bryant say the words "crack," say the words "cocaine," and

18   say the words "heroin."  They're too smart for that.  What you

19   will hear in the wiretap calls is narcotics code.

20        And the first witness that you're going to hear from

21   in this trial is FBI Special Agent Michael Zuk.  He had no

22   involvement in this investigation, he had no involvement in

23   the wiretaps, he's never even listened to the wiretap calls.

24        What he's going to do for you is give you a crash

25   course on drug trafficking 101.  He's going to explain to you

1    the general methods of crack distribution, heroin

2    distribution.  How those substances are packaged, the

3    quantities in which they're sold, and the prices for which

4    individuals charge for different quantities of crack and

5    heroin.

6              And after you listen to Special Agent Zuk and then

7    you hear the wiretap phone calls, you'll be able to understand

8    and decipher what these individuals are talking about on the

9    phone.  Mr. Zuk is essentially going to give you the

10    dictionary that you need when you listen to these calls.

11              Now, Kevin Wilson was arrested, as I said earlier,

12    on January 3rd, 2012, and nearly 150 grams of heroin were

13    seized from him.  And Mr. Wilson, upon his arrest, made the

14    decision to cooperate with the government.

15              And let me be up front with you.  You are not going

16    to like Kevin Wilson.  Kevin Wilson distributed large

17    quantities of narcotics, as you're going to hear.  Kevin

18    Wilson has multiple prior felony convictions, as you're going

19    to hear.  A number of years ago, he was involved in shootings.

20    He is not a likeable person, and I can guarantee you that you

21    are going to dislike him.

22              But we're not here to ask you to like him.  That, we

23    fully understand.  What we are asking you to do is consider

24    what he has to say and consider that conspiracies hatched in

25    dark places usually don't have angels for witnesses.

1    Mr. Wilson is certainly not an angel, by no stretch of the

2    imagination.

3           I have no doubt that my colleagues on the defense

4    side are going to take every opportunity to remind you of what

5    a bad person Kevin Wilson is.

6           Here are the questions that I would like you to

7    think about as you hear the evidence in the case and as you

8    listen to Kevin Wilson.  He faces, as you will hear, 20 to 24

9    years in federal prison as a result of the charges that he has

10   pled guilty to.  The terms of his plea agreement with the

11   government provide that if he lies, he cannot get any

12   reduction.

13          So here's what I want you to think about as you

14   listen to Kevin Wilson and all the evidence in this trial:

15          Number one, is Kevin Wilson's best interest at this

16   point served by telling the truth or by engaging in deceit?

17          Second, as you listen to Kevin Wilson and everything

18   else in this case, who was on the phone repeatedly with Kevin

19   Wilson?  Who, in the courtroom, was repeatedly on the phone

20   with him?  Think about that.

21          And then the third question is:  As bad of a person

22   as you might conclude Kevin Wilson is, is what he is telling

23   you about Robert Santos, Philip Bryant, and Richard Anderson

24   corroborated by the content of the wiretap calls that you are

25   going to hear?  And is it corroborated by the surveillances

1    that you're going to hear about?

2            That's what I'd like you to think about in this

3    case.  When all of that is said and done, we are going to ask

4    you to return a verdict against these three individuals.

5            And let me make one final request:  You bring a tool

6    into this courtroom that is really important to this entire

7    process, and that's your every day common sense.  And I would

8    urge you to, as you listen to all the evidence in this case,

9    apply your common sense to it.  The thing that you make

10   decisions with every day in your lives, just your every day

11   plain common sense, use that here in this courtroom as you

12   listen to all of the evidence in this case.

13           And at the end, when we get a chance to address you

14   one more time in closing arguments, based on all that

15   evidence, we are going to ask you to return a verdict of

16   guilty against Mr. Santos for conspiracy to distribute 100

17   grams or more of heroin; guilty against Mr. Bryant for

18   conspiracy to distribute 28 grams or more of crack cocaine and

19   also a quantity of heroin; and a guilty verdict against Mr.

20   Anderson for conspiracy to distribute 28 grams or more of

21   crack cocaine.

22           Thank you.

23           MR. ROGAN:  Good morning, ladies and gentlemen.  I

24   represent Richard Anderson, and my name is Neil Rogan.

25           What I would like to do in the next 15 or 20 minutes

1    is give you an alternative path through this trial.

2          Respectfully, if you listen to Mr. Vatti and

3    everything he says, assuming it's true, you would have to

4    wonder, why are we here?  Well, the reason we're here is for

5    exactly the reason Judge Burns told you this morning.  The

6    fact that Richard Anderson sits here, the fact that Richard

7    Anderson was arrested, the fact that Richard Anderson is named

8    in the superseding indictment, means at this point for you

9    absolutely nothing.

10          You have to ask yourself, wow, FBI special agents,

11   wiretaps, phone calls, video surveillance.  Mr. Anderson has

12   to have done something wrong.

13          And speaking of Mr. Anderson, I want to focus you,

14   if I could, on one thing that's particularly important.  Just

15   because Mr. Anderson is here with Mr. Santos and Mr. Bryant

16   doesn't mean anything.  And I'm going to ask you, as you

17   listen and evaluate this evidence, as you listen to it, focus

18   on what the government claims that Richard Anderson did.  It

19   has nothing to do with their claims against Mr. Bryant and it

20   has nothing to do with their claims against Mr. Santos.

21          I can tell you this beyond a reasonable doubt:  The

22   government will not be able to produce one scintilla of

23   evidence that shows Mr. Anderson making a drug transaction,

24   with Kevin Wilson or anyone else.  You will not see one piece

25   of video surveillance that shows Mr. Anderson being involved

1    in narcotics trafficking of any kind.  You will not hear

2    anything on those wiretaps which sounds, wow, that sounds

3    really compelling, okay?

4          Mr. Vatti mentioned FBI Agent Zuk.  Think about what

5    he said in his opening statement.  He said he didn't listen to

6    any of the wiretaps that are involved in this case, the ones

7    that you're going to listen to in determining certainly,

8    partially, the guilt or innocence of Mr. Anderson, but he's

9    going to give you a crash course in drug code, or drug

10   trafficking 101.  That's great, but he has nothing to do with

11   this case.

12         What the government wants you to do with all of

13   their resources, okay?  Is to come to a conclusion.  You're

14   going to be bombarded with a deluge of what they call

15   evidence, but at the end of the day, it's you that decides if

16   that evidence is believable as it relates to Richard Anderson.

17         Here's another thing the government didn't tell you

18   in their opening statement:  In order to find Richard guilty,

19   which is what they asked you to do, you have to find two

20   things first:  First, you have to find beyond a reasonable

21   doubt that in fact there was a conspiracy.  And in simple

22   nonlawyer terms, what that means is two or more people come

23   together for some unlawful purpose or act.

24         Here's the second element that you have to find in a

25   conspiracy as it relates to Richard:  He voluntarily and

1   intentionally joined into that conspiracy to be involved in

2   narcotics trafficking, and specifically 28 or more grams of

3   crack cocaine.

4          You are going to hear phone calls between Richard

5   Anderson, my client, and Kevin Wilson, who's politely

6   described as a cooperating witness.  I'll let you draw your

7   own conclusions.

8          Judge Burns will tell you at the end of this case,

9   the mere fact that Richard Anderson knows Kevin Wilson or the

10  mere fact that someone's on the phone with that individual

11  doesn't mean they're guilty of knowing about a conspiracy and

12  doesn't mean that they're guilty of actually participating in

13  that conspiracy.  There needs to be more.

14         The government has the sole burden of proof here and

15  when you step back, you have to look at it not in tiny

16  snippets, but the totality of the evidence that the government

17  does or doesn't have.

18         And how do we define -- I want to give you a roadmap

19  as you sit back and start to hear the evidence portion of this

20  thing.  There are three things that you're going to need and

21  I'm going to ask from you right now.

22         One is if I make any mistakes, don't hold it against

23  my client Mr. Anderson.

24         But more importantly, you're going to need three

25  things:  The first one is courage.  You might say why are we

1    talking about courage in a case like this?  You're going to

2    need the courage to actually make the right decision.  The

3    easy thing to do in this case is say, take a look, we have

4    three defendants from the New Haven area, they have to be

5    guilty.  We're going to hear from FBI agents, we're going to

6    hear about wire rooms and wiretaps.  The hardest thing in life

7    to do is to step back and say not today.

8            The problem with conspiracies is you're right, you

9    can't see them.  And there's a lot of conspiracy theorists,

10   and some of them are funny and some of them are not.  This is

11   not funny.  This is Richard Anderson's life, okay?

12           Just because you know a bad person, just because

13   you're on the phone with that person, is not enough.

14           Every part of your instinct is going to want to

15   believe what FBI Zuk says or what's on the wiretaps or what

16   you see on the video surveillance.

17           You have to have the courage, which links to the

18   second part, which is as Judge Burns told you today, you

19   absolutely have to keep an open mind, until you hear all of

20   the evidence.

21           Because proof beyond a reasonable doubt, what it

22   means in simple terms is this:  It's proof that gives you

23   almost the certainty that somebody did or didn't do something.

24   If, after you hear all of this evidence, you have one

25   interpretation that's consistent with guilt and one

1  interpretation of the evidence that's consistent with

2  innocence, guess what?  You have to return a verdict of not

3  guilty.  That's not my instruction; that's the instruction

4  that Judge Burns will give you at the end of this case.

5          The third thing you need to do, and this ties into

6  the courage aspect of it, is to hold the government to its

7  burden of proof as it relates to Richard Anderson, and that

8  proof is proof beyond a reasonable doubt.  And a few phone

9  calls and a few wiretaps isn't going to be enough as it

10 relates to Richard Anderson.

11         And while we're on that subject, it's going to be

12 difficult for you to do, but I'm going to ask you this as

13 well, which is to separate out what you might hear.  For

14 instance, you heard about guns.

15         I can tell you the government's going to make no

16 claim that Richard had anything to do with any guns in this

17 case.  The government's not going to make any claim that

18 Richard had anything to do with possession with intent to

19 distribute heroin in this case.  Those claims may or may not

20 fall on the other defendants, but it's important, and you'll

21 be given an individual verdict form on each one of those, that

22 you stay focused on that issue.

23         Let me talk a moment about Kevin Wilson who, by

24 anybody's definition, is going to be the star witness in this

25 case.  Mr. Vatti, with all due respect, says he's less than an

1   angel.

2          Ladies and gentlemen, the one thing you will come

3   away with at the end of this case are two things you'll know

4   to a certainty about Kevin Wilson:  He is a really bad guy.

5   He's violent, he's got a violent past, he's been involved in

6   violent crimes, and he will do or say absolutely anything

7   about Richard Anderson in order to get the best possible

8   disposition for himself.  That's what cooperating witnesses

9   do.

10          While Mr. Vatti suggests that he'll tell the truth,

11   he's going to tell the truth as he understands it that's going

12   to do the best thing he can, to put Mr. Anderson in the worst

13   possible position.  It will become very self-evident to you

14   that that's exactly what he's about, Kevin Wilson.

15          So as you step back and start to hear all of that

16   evidence, keep that in the back of your mind, because the

17   problem for the government as it relates to Richard Anderson,

18   my client, they didn't seize any drugs from him, they didn't

19   seize any money from him, they didn't seize any guns from him,

20   they got nothing from him.

21          So they're going to rely on Kevin Wilson and his

22   relationship with Kevin Wilson to have you make an incredible

23   leap of faith that somehow, Richard, go back to those two

24   elements, knew about the conspiracy and voluntarily jumped

25   into the middle of it.

1    I believe that if you follow the evidence and follow

2    Judge Burns's instruction on the law about what proof beyond a

3    reasonable doubt is, and it is a heavy burden, you will find a

4    way, and you will find the path where you can do your job as

5    jurors and return a verdict of not guilty as it relates to

6    Richard Anderson.

7    Thank you.

8    MR. MORAGHAN:  Good morning, ladies and gentlemen.

9    We met about a month ago here in this courtroom when we

10   selected the jury.  My name is David Moraghan.  I represent

11   Philip Bryant, seated to my left in the purple shirt.

12   I would like to thank you for taking time out of

13   your busy schedules, lives, to come here today.  This is an

14   enormous obligation you've undertaken to be jurors in this

15   case.  This case is of vital importance to all three of the

16   defendants, and they appreciate you taking the time out to do

17   this.

18   You've heard a story from Mr. Vatti about how his

19   case will unfold.  It's important to know, and as Judge Burns

20   has already instructed you, the arguments we make, the

21   arguments that Mr. Vatti, my argument, Mr. Rogan's argument,

22   are not evidence.  We are trying to persuade you, to sway you,

23   to illuminate some points for you, but it's not evidence.  It

24   is not evidence, you should not consider it as evidence.

25   The only evidence you're going to hear in this trial

```
 1    is going to be from the witness and the witness box.  You'll
 2    hear that evidence through the direct examination of the
 3    witnesses, the cross-examination of the witnesses.  You'll
 4    also receive evidence by way of exhibits.  You will be hearing
 5    I believe some snippets of conversations.  And there may also
 6    be some stipulations between counsel which will allow some
 7    documents and facts to be considered by you.
 8            The bottom line is what we argue, we try to convince
 9    you, we try to sway you, but it is not evidence and you should
10    not accept it as evidence.
11            There are two points that I would like to make.
12    First of all, I am not going to repeat much of what Mr. Rogan
13    has said because there's no need to repeat it.  I agree with
14    his points, and they're quite valid.
15            That being said, there are two points in this case,
16    two propositions, that are vitally important:  One is the
17    presumption of innocence, and the second is proof beyond a
18    reasonable doubt.  Judge Burns has preliminarily addressed
19    those issues, and she will do it again during the course of
20    the trial and in her closing charge.
21            If I say anything this morning that is inconsistent
22    with what you hear from Judge Burns, of course, what you hear
23    from Judge Burns controls.
24            But the presumption of innocence applies to Philip
25    Bryant as he sits here today.  It will apply to him tonight
```

1    when we're done, it will apply to him throughout the course of

2    this proceeding.  Every day he comes in here, he is presumed

3    innocent, and that is a presumption that you must abide by and

4    you must apply.

5           The only way that that presumption can be in any way

6    affected is after the case is completed, after the evidence

7    has been submitted to you, after you have heard closing

8    arguments, after you've heard Judge Burns's charge, at that

9    point in time in deliberations, you can address what has

10   happened here during the course of the trial.

11          Well, guiding that is the presumption that the

12   government has the obligation and the burden to prove its case

13   beyond a reasonable doubt.  And unless and until you reach a

14   decision that they have fulfilled that burden, the presumption

15   of innocence will still apply to Philip Bryant.

16          You've heard arguments from Mr. Vatti about the

17   three defendants, you've heard arguments about Philip Bryant.

18   What he didn't say is that Philip Bryant is not on any

19   surveillance at all.  During the entire course of this

20   investigation, there was surveillance.  You will hear and see

21   that.  Philip Bryant is not on any surveillance.  He's not on

22   any photograph, he is not involved in any of the surveillance

23   matters that the government is going to produce for you.

24          In addition, Mr. Vatti mentioned a cocaine sale that

25   occurred in May of 2011.  There is no wiretapped conversation

1    of that, there is no surveillance of Mr. Bryant being involved

2    in that.  There really is absolutely no evidence of that,

3    except for Kevin Wilson's testimony.

4            Mr. Vatti told you that Kevin Wilson is not a nice

5    person.  Well, I have never met him, I don't know him, so I

6    can't address that.

7            What I can address, and what the evidence will show,

8    that he was arrested for running a large scale narcotics

9    operation.  The evidence will show that shortly after he was

10   arrested, he entered into a cooperation agreement with the

11   government.  The evidence will show he pled guilty, and he has

12   not yet been sentenced.  He is awaiting sentencing until after

13   this trial is completed.

14           What the evidence will also show you, and which Mr.

15   Vatti alluded to, is that he is a felon.  Well, Mr. Wilson's

16   been convicted in the state of Connecticut of sale of

17   narcotics.  He's been convicted of sale of narcotics not once,

18   not twice, but three times, on three separate occasions.

19   Mr. Wilson has been convicted in the state of Connecticut for

20   possession of narcotics on a fourth separate incident.

21   Mr. Wilson also has been convicted of two felonies involving

22   his possession of firearms.  The evidence will also show that

23   Mr. Wilson possesses firearms and has used firearms.

24           Judge Burns is going to instruct you on the issue of

25   credibility of witnesses, and how that factors into your jury

1    deliberation.  She'll also address the special circumstance

2    involving a cooperator such as Kevin Wilson.  You must look at

3    his testimony extremely carefully.  You must see if there's

4    any corroboration, if there's anything that supports his

5    testimony.  And if there isn't, you must look at it very

6    carefully and question it.

7            And we are confident that after you have heard the

8    evidence, after you've heard the cross-examination, after you

9    have seen Mr. Wilson, that you will return a verdict for Mr.

10   Bryant in the matter of not guilty.

11           Thank you.

12           MR. REEVE:  Good morning.  My name is Richard Reeve.

13   It's been a while.  I hope everybody's had a nice holiday

14   break between the time we saw you last and today.  Got here

15   just in time for a snowstorm, it looks like.

16           I represent Robert Santos.  The issue you have to

17   decide in this case is whether or not Robert Santos entered

18   into the specific conspiratorial agreement that the government

19   has alleged in this indictment.  We submit that they will not.

20           You will hear evidence in this case that this was a

21   lengthy investigation.  There was a series of wiretaps in this

22   case that started on July 29th, 2011, and those wiretaps

23   continued until early May of 2012.

24           You will hear Mr. Wilson, his phone, his cell phone,

25   was wiretapped almost continuously from July 29th, 2011, to

1    January 4th, 2012, with some days omitted during that period

2    of time, but most of the time, his cell phone was being

3    constantly tapped, listened to, day after day after day.

4            You will hear in this case that this is a part of a

5    larger case.  That there were 22 separate wiretaps on

6    different cell phones involving ten different individual

7    people during that large period of time.  But all of the calls

8    that you will hear will be from Mr. Wilson's cell phone, from

9    the wiretap on his phone.

10           You will hear the investigation led to the return of

11   five separate indictments, and that 105 people were charged as

12   a result of this large investigation.

13           You will also hear that Mr. Santos's phone was never

14   tapped.  He was never the subject of any of these wiretaps,

15   but he was picked up on Mr. Wilson's phone.

16           During the trial, you will hear a very small section

17   of all of the wiretap calls.  There were over 7,000 wiretap

18   calls and text messages that were actually intercepted on

19   Mr. Wilson's phone alone.

20           Now, the Judge has read you the indictment, and the

21   only charge in which all three of these individuals are

22   charged.  They're not charged with possession with intent to

23   distribute any kind of drugs.  They're not charged with

24   possession of any kind of drugs.  They are charged with one

25   thing, and one thing only, and that is an agreement, a

1    conspiracy.  But not just any agreement; the conspiracy that's

2    alleged in this case.

3           You will hear with respect to Robert Santos that

4    while the intercepts on Mr. Wilson's phone started on July

5    29th of 2011, no calls with Mr. Santos were intercepted until

6    October 17th of 2011, and that no calls were intercepted

7    involving Mr. Santos after early December 2011.

8           And so what you're going to be deciding is whether

9    or not those phone calls and any other evidence in this case

10   that's presented to you over that five- to six-week period of

11   time establishes that Mr. Santos entered into the agreement

12   that's alleged.

13          In an effort to prove that, the government is going

14   to rely almost exclusively on the taps themselves and

15   Mr. Wilson.  Is there some surveillance?  Yes.  Does it show

16   very much?  That's up to you to decide.

17          But really, the guts, the meat, it appears

18   undisputed, is Mr. Wilson.  The government's case rests and

19   falls on him.

20          And let me just say something.  You know, the

21   government talked about Mr. Wilson being a bad guy.  That's

22   not really the issue.  This is not a case about bad people or

23   good people.  This is a case about whether Mr. Wilson is

24   telling the truth here.  Has he told the truth to the

25   government in all the times he's met with them?  Is he a truth

1   teller?  Is he someone you can rely on?  That's the issue

2   you're going to have to decide.

3          The issue isn't whether or not Mr. Santos is a good

4   guy.  That's not what we decide in criminal cases.  What we

5   decide is has the individual on trial committed the specific

6   crime that the government has charged?

7          You will not hear evidence -- you'll hear a lot of

8   evidence about cocaine and crack cocaine.  You won't hear any

9   evidence that Mr. Santos was involved in that.  All the

10  evidence about crack and cocaine has nothing to do with Robert

11  Santos.

12         You won't hear that Mr. Santos was involved in any

13  way with the other two individuals that are on trial.  You

14  won't hear in any way that Mr. Santos was involved with the

15  supply of guns that government counsel referred to, and you're

16  going to have to disregard all that evidence when you look at

17  him.

18         And that's something, yeah, we can all apply our

19  common sense, but what goes on here is a little different than

20  your every day lives and what goes on, you apply certain

21  rules.  The Judge will caution you don't consider this

22  evidence against this person.  It's not an easy thing to do.

23  We ask a lot of you, and it's not easy.

24         That's why this is so important to pay attention not

25  just to the evidence, but what Judge Burns instructs you, how

 1    you can look at certain evidence and how you can handle that

 2    evidence.

 3            With respect to the wiretap calls that you're going

 4    to hear, there are a few things that I'm going to ask you to

 5    keep in mind when you listen to them.  Number one, the fact

 6    that someone -- whether it's Kevin Wilson or someone else on a

 7    phone -- says something, does not mean what he's saying is

 8    true.  It doesn't mean what he is trying to convey is what he

 9    really believes.  So the calls don't establish their validity.

10    That's something the government has to do, and that's their

11    burden.

12            The second thing I think that's important you're

13    going to hear from Mr. Wilson at length, and I'm going to

14    cross-examine him for a long time, and I make no apology for

15    that, because there's a lot of questions that Mr. Wilson is

16    going to have to answer here, because your decision is going

17    to rely on whether or not he's someone who is reliable, who

18    you can count on, or whether you can't.

19            He can testify about what he intended to

20    communicate, and maybe he can testify about what he understood

21    someone else to be saying, but he cannot testify as to what

22    the other person on the call meant or intended.  He can't tell

23    you whether what that person said was true or was nonsense, or

24    that he was getting played, or it was straight.  He doesn't

25    know.

1          And I think common sense tells you that in your

2   every day experience, conversations with other people.  Is

3   somebody levelling with you, telling you the truth when

4   they're saying something?  Sometimes yes, maybe sometimes no.

5   And that's something you're going to have to evaluate here.

6          You've heard about some evidence and you'll hear

7   what kind of evidence the government seizes and collects

8   during the course of a drug case, and you're going to want to

9   ask yourselves, at the end of this case, what physical

10  evidence is there with respect to Mr. Santos?  Were there any

11  drugs seized?  Were there any drug-related items that were

12  seized?  Were any searches ever conducted with respect to

13  anything involving Robert Santos?  Those are but a few

14  questions that I'm going to ask you to consider at the end of

15  the case.

16         I'm not going to focus at length right now about

17  Mr. Wilson's testimony, but I am going to say that the

18  government made a claim, and the claim that they made was:  If

19  Mr. Wilson lies to the government, he doesn't get rewarded.

20  Hold them to that.

21         Ask yourselves, if, from the outset of his

22  relationship with the government in this case, he lied, and

23  ask yourselves, did he continue to lie?  And then ask

24  yourselves, did the government do anything about that?  Did

25  they pull the deal?  How did they respond?  If you find he

1    lied, what did they do?

2         Because the thing you have to really think about

3    really carefully is, who is the decision maker in this court?

4    Who is the decider with respect to Mr. Wilson?  Respectfully,

5    I would suggest to you it's not Judge Burns.  She decides what

6    sentence he gets, but the government has to decide whether or

7    not they're going to file a motion to reduce his sentence.

8    It's the government that's deciding whether he's a truth

9    teller or a liar.  And ask yourselves, when you hear the

10   evidence, if they have any special divining rod or anything

11   that makes them know at all times what the truth is.

12        So you're going to have to look at his testimony.

13   Does his testimony, what he says here, convince you that he's

14   telling the truth in this courtroom?

15        Now, the Judge has told you to wait until you hear

16   all the evidence in the case before you even begin to assess,

17   and there are a couple of very, very important reasons why

18   that's true.  One is obviously you want to understand the

19   whole picture, but there's another somewhat more complicated

20   reason, and that is that the government's asked you to apply

21   your common sense, and we all agree you should apply your

22   common sense, your experiences in life, in evaluating who's

23   telling the truth, what's true, what's not true.  That's why

24   you're here.

25        But there's another part of your responsibilities,

1   and that is once you find those facts, to apply the law that

2   Judge Burns is going to give you.  She's going to instruct you

3   about what the law is.  And you're going to find, perhaps,

4   that some of those concepts are not what common sense would

5   tell you.  That the rules you apply in this courtroom are

6   perhaps not the way that you decide things about your children

7   or about people who you work with or other things like that.

8           There's a very specific set of rules that the Judge

9   is going to give you, and so, you know, if you listen to the

10  evidence, but you don't keep an open mind and you think you

11  get it, you're going to lose important pieces of this case.

12          And I think it's for those two reasons, it's not

13  just to keep an open mind about the facts, but it's to be

14  totally open to whatever's going on in the courtroom so that

15  when you get to the end, and when the Judge says okay, here's

16  the rules you have to apply, you haven't tuned out in this

17  case.

18          And I think that's what we're all asking you to do,

19  is to tune in, despite a snowstorm, despite all your other

20  issues.  I know you're all busy people.  It's to focus here.

21  You owe it to yourselves and you owe it certainly to the three

22  men who are on trial, and I think you owe it to the

23  government.

24          So I want to tell you why that's so important.

25  There are some undisputed facts in this case with respect to

1    Mr. Santos that I want to share with you right now.

2          One is Mr. Santos bought heroin from Kevin Wilson.

3    We're not disputing that he bought heroin from Mr. Wilson.

4          The second is the quantities that he received from

5    Mr. Wilson were at least on some occasions distributable

6    quantities of heroin.  That's not disputed.  Some of you might

7    be sitting here and thinking, well, isn't our job done?  And

8    the answer is no, because what you might think about an

9    agreement is in all likelihood not what the Judge is going to

10   tell you about in terms of a conspiratorial agreement.

11         And so that's why it's so important to listen to

12   everything, to keep an open mind, and to apply your common

13   sense in evaluating the credibility of people, but understand

14   that the rules here are quite different than the rules we all

15   apply in our every day lives.  That's really, really of

16   critical importance in this case.

17         After you've heard all the evidence, after you've

18   received the instructions from the Judge, then you go through

19   the process of deliberating, and you're going to be

20   deliberating about the liberty interests of three men.  It's a

21   very, very weighty decision that each and every one of you is

22   going to be involved in.  I should say three decisions, not

23   one, because they're all separate.

24         When we reach the close of the evidence, I'm going

25   to be asking you to return the only verdict consistent with

1    the evidence you'll hear, and that is that Mr. Santos is not

2    guilty; that he did not venture into the conspiratorial

3    agreement that's alleged in Count One of the superseding

4    indictment.

5              Thank you.

6              THE COURT:  I wonder if it would be sensible, ladies

7    and gentlemen, to take a luncheon recess now and begin the

8    trial at 1:00 o'clock.

9              MR. REEVE:  Yes, your Honor.

10             MR. VATTI:  That's fine, your Honor.

11             THE COURT:  Go right through the afternoon.

12             Ladies and gentlemen, you've heard the statements of

13   counsel, you've heard my charge on the law.  You don't know

14   anything about the case.  Don't speculate about it.  Enjoy

15   your luncheon recess.

16             (Luncheon recess:  11:58 o'clock a.m. to 1:14

17   o'clock p.m., in the absence of the jury.)

18             THE COURT:  Good afternoon.

19             MR. VATTI:  Good afternoon, your Honor.

20             MR. SILVERMAN:  Good afternoon, your Honor.

21             THE COURT:  Please be seated.  I wanted to discuss

22   with you before we bring the jury in, apparently we're

23   expecting quite an accumulation of snow.  Perhaps we should

24   delay the start of court tomorrow in order to accommodate

25   people, especially jurors, who are coming from -- I don't know

1    where they may be coming from.

2              THE CLERK:  All over.

3              THE COURT:  So I don't know, maybe delay start until

4    11:00 o'clock or something like that?

5              MR. MORAGHAN:  Your Honor, if I could be so bold,

6    would it be possible to start at noontime, not have any lunch

7    but go through?  Whatever time is convenient for the Court.

8              THE COURT:  That's fine with me.  Whatever is going

9    to accommodate everyone who's going to have a problem

10   tomorrow.  1:00 o'clock?  Is that all right?  2:00 o'clock

11   tomorrow afternoon to start?  Does that make sense?

12             MR. SILVERMAN:  I think -- just trying to remember

13   myself what day we expected the jury to serve until.  Did we

14   tell them next Wednesday would be their final day of service?

15   I think given the storm, we're going to be butting up pretty

16   close against that.

17             I think that's fine.  Maybe we should remind them

18   that we hope to conclude the trial by Wednesday, and for the

19   time being, tomorrow, given the weather forecast, we expect to

20   start --

21             THE COURT:  The CSO was talking to me about it and

22   apparently believes we're going to have a problem in the

23   morning traveling, so that it seems sensible to delay the

24   opening of court.  I'm agreeable to whatever time you think is

25   appropriate.  But if we started at 1:00, we could go right

1    through to the afternoon.

2              MR. SILVERMAN:  Sounded as though you had an

3    appointment at 1:00 o'clock.

4              THE COURT:  I know who I am.  Why do I have to go

5    get identification?

6              MR. SILVERMAN:  If we were to start at 2:00 o'clock,

7    we would get in two or three hours tomorrow and hopefully get

8    back to the normal trial day on Thursday.

9              THE COURT:  Okay.

10             MR. VATTI:  Does your Honor intend to go until 4:30

11   today?

12             THE COURT:  Yes, I don't think we're going to have a

13   problem, I don't know.  I'll get word from the CSOs I suppose

14   if we're running into a real problem, but I hope to do a whole

15   day today.  Just tomorrow morning, it's going to be a problem,

16   I think.

17             MR. REEVE:  Judge, I understand the roads are

18   already quite slippery, people are slipping and sliding on the

19   sidewalks.  I'm fine, keep going, but I don't know if it's

20   going to create a problem for the people from long distance.

21             THE COURT:  Let's ask if it's going to be a problem

22   for the CSOs.  What do you think?  I'm sorry, apparently I

23   wasn't talking into the microphone.  Can you hear me?

24             What do you think?  What would you suggest?

25             THE MARSHAL:  Do you mean today or tomorrow?

```
1                    THE COURT:  For tomorrow.  What time should we

2       start?

3                    THE MARSHAL:  Depends on your schedule and everybody

4       here.

5                    THE COURT:  Are these gentlemen at Wyatt?

6                    MR. MORAGHAN:  Two of them.

7                    THE COURT:  So you're going to have to bring them

8       back and forth from Wyatt.  Suppose we start at 1:00 o'clock?

9                    MR. ROGAN:  Your Honor has that appointment.

10                   THE COURT:  Everybody knows who I am.  Why do I have

11      to get an identification thing?

12                   MR. SILVERMAN:  Might I propose then, your Honor,

13      for today, we proceed.  The government has a very short

14      witness that we would like to do right after the jury comes

15      in, then we have a slightly longer witness.  At that point, we

16      could evaluate where the roads are.  If it looks like it's

17      problematic, we could excuse the jury at that time.  I think

18      it would be earlier than we usually end for the day.

19                   THE COURT:  That's a good idea.  My concern is when

20      we start tomorrow.

21                   MR. SILVERMAN:  Tomorrow sounds like the consensus

22      is we should start late given the expected road conditions and

23      with your appointment, we should start at 2:00 and we'll plan

24      to get in three hours tomorrow.

25                   THE COURT:  2:00 o'clock tomorrow.
```

```
1              MR. SILVERMAN:  I have a short issue for the Court.

2    Attorney Moraghan started to say something similar this

3    morning.  On the way in this morning, I ran into one juror in

4    the elevator who held the elevator, who asked if I was coming

5    in with her and I said no, I would take the stairs.  And

6    another juror, I ran into on the mezzanine asked if this was

7    the floor, I said no, they should go up one more flight.  I

8    didn't recognize them without buttons from jury selection, but

9    I wanted to put that on the record.

10             THE COURT:  I don't think we'll have a problem.

11             MR. REEVE:  I ran into a juror when I entered the

12   building this morning at 9:20.  Again, I didn't realize it was

13   a juror.  I had a lot of boxes, and she urged me to go in

14   first.  I said, "No, please, after you."  I then heard that

15   she was a juror.

16             I mean, we're all going to have that kind of

17   contact, and if your Honor wants us to put on the record every

18   time, we'll do it but I think I have faith that all the

19   attorneys in this case will not have any inappropriate contact

20   with the jurors, and I'm very content with just letting each

21   of us -- obviously if someone comes up and puts any of us in a

22   situation where we feel we have to report it, we will.  But

23   for these mundane contacts, unless your Honor wants us to, I

24   don't think it's necessary.

25             THE COURT:  If you have some interaction with a
```

```
 1    juror, that's different, and that should be reported, but no.
 2            So we'll go until 4:00 o'clock or something like
 3    that, if someone can report to us what's going on outside.
 4            MR. SILVERMAN:  The government has one short witness
 5    and one slightly longer witness, and we can evaluate where we
 6    are.
 7            MR. REEVE:  We can all agree with that.  Let's see
 8    how it goes.
 9            (In the presence of the jury:  1:22 o'clock p.m.)
10            THE COURT:  Good afternoon.
11            All right.
12            MR. SILVERMAN:  The government calls John Suraci.
13                    J O N A T H A N   S U R A C I
14        having been called as a witness, was first
15        duly sworn and testified on his oath as follows:
16            THE CLERK:  Please be seated.  State your name and
17    spell your last name, and just your address by city and state
18    only.
19            THE WITNESS:  My name is Jonathan Suraci,
20    S-U-R-A-C-I; it's 200 Saw Mill Road, West Haven, Connecticut.
21    DIRECT EXAMINATION
22    BY MR. SILVERMAN:
23    Q    Good afternoon, sir.
24    A    How you doing?
25    Q    How are you employed, sir?
```

1    A    I am with the West Haven Police Department, as a

2    patrolman.

3    Q    You're an officer?

4    A    Yes.

5    Q    How long have you been an officer with the West Haven

6    Police Department?

7    A    Almost eleven years.

8    Q    What's your current assignment?

9    A    I'm with the statewide police narcotic task force.

10   Q    Have you held other assignments during your close to

11   eleven years with the West Haven PD?

12   A    Yes, I was temporarily with the DEA.

13   Q    Were you with the DEA -- that's the Drug Enforcement

14   Administration?

15   A    Correct, yes.

16   Q    -- on October 22nd, 2011?

17   A    I was.

18   Q    What was your assignment with the DEA on that particular

19   date?

20   A    I was conducting surveillance.

21   Q    What area were you set up in, in order to conduct your

22   surveillance?

23   A    I was facing 139 Day Street.

24   Q    Is that in New Haven, Connecticut?

25   A    In New Haven, correct.

1    Q    What did you observe on October 22nd, 2011, as you

2    surveyed 139 Day Street?

3    A    I observed a female by the name of Lex meet with Morales

4    and his wife.  I don't know her name off the top of my head.

5    Q    Would you take a look in the exhibit binder that you have

6    on the witness stand at Government Exhibit 214?

7    A    Okay.

8    Q    What are you looking at?

9    A    Morales.

10   Q    Is that a photograph?

11   A    That is.

12   Q    And are you familiar with Mr. Morales's appearance from

13   your involvement in this investigation?

14   A    I am.

15   Q    Is that photograph a true and accurate depiction of Mr.

16   Morales?

17   A    It is.

18        MR. SILVERMAN:  Your Honor, I move for the admission

19   of Government Exhibit 214.

20        MR. REEVE:  No objection.

21        MR. ROGAN:  No objection, your Honor.

22        MR. MORAGHAN:  No objection.

23        THE COURT:  Thank you, it may be marked.

24   Q    I've just called up Government's Exhibit 214 on the

25   screen.  Who is that?

```
1    A    Morales.

2    Q    Okay.  Could you please take a look at Government's

3    Exhibit 207 in the binder you have in front of you?

4    A    Okay.

5    Q    What are you looking at?

6    A    A picture of Morales's wife.

7    Q    At this point, do you know that individual's name?

8    A    I believe her last name is Lopez.

9    Q    Are you familiar with Ms. Lopez's, or this individual's,

10   appearance from your involvement in the investigation?

11   A    I am.

12   Q    And is the picture you're looking at a true and accurate

13   depiction of Morales's wife?

14   A    Yes, it is.

15             MR. SILVERMAN:  Your Honor, I move for the admission

16   of Government's Exhibit 207.

17             MR. REEVE:  All three of us said no objection.

18   Q    I've just pulled up Government's Exhibit 207.  Can you

19   see the image projected on the screen?

20   A    Yes.

21   Q    Who is that?

22   A    Lopez.

23   Q    Okay.  That's the person you described earlier as

24   Morales's wife?

25   A    Correct.
```

1    Q    And you mentioned earlier that you also saw someone named

2    Lex?

3    A    Yes.

4    Q    You knew as Lex?

5    A    Yes.

6    Q    Could you take a look at Government's Exhibit 205?  What

7    are you looking at?

8    A    Lex.

9    Q    Are you familiar with Lex's appearance based on your

10   involvement in this investigation?

11   A    I am.

12   Q    Is the picture you're looking at a true and accurate

13   depiction of Lex?

14   A    Yes, it is.

15            MR. SILVERMAN:  I move for the admission of

16   Government's Exhibit 205.

17            MR. REEVE:  No objection.

18            MR. MORAGHAN:  No objection.

19            MR. ROGAN:  No objection.

20            THE COURT:  Thank you, it may be marked.

21   Q    Do you see the image projected on the screen?

22   A    Yes.

23   Q    Is that Lex?

24   A    That is.

25   Q    When you're on surveillance, are you in touch with other

```
 1   law enforcement officers?

 2   A    I am.

 3   Q    How so?

 4   A    The portable radio.

 5   Q    Is that a DEA radio?

 6   A    DEA radio, correct.

 7   Q    Why do you want to stay in touch with other law

 8   enforcement officers?

 9   A    Get an idea of what I'm seeing, where people are going,

10   what they're doing, so we can corroborate what's being heard.

11   Q    On October 22nd, 2011, you were in the field conducting

12   your surveillance?

13   A    Yes.

14   Q    Were you aware that there was a wiretap investigation

15   underway at the time?

16   A    Yes.

17   Q    Were you in touch with the people in the wire room?

18   A    Yes.

19   Q    And that's via the DEA radio you were talking about?

20   A    Yes.

21   Q    And on October 22nd, 2011, did you have any recording

22   equipment with you?

23   A    I did.

24   Q    How did that work?

25   A    It was a portable, handheld portable, VCR camera, camera.
```

```
 1   Q     Video camera?

 2   A     Video camera.

 3   Q     Did you use the video camera on October 22nd, 2011, to

 4   record what you were observing on your surveillance?

 5   A     I did.

 6   Q     Have you reviewed government's exhibit for identification

 7   254?

 8   A     Yes.

 9   Q     Is it a true and accurate copy of the video recording you

10   conducted, or made, on your surveillance on October 22nd,

11   2011?

12   A     It is.

13              MR. SILVERMAN:  Your Honor, I move for the admission

14   of Government's Exhibit 254 in evidence.

15              THE COURT:  Gentlemen, any objection?

16              MR. REEVE:  No.  Could it be clarified, is this the

17   entire video that's being introduced?

18              MR. SILVERMAN:  I was planning on introducing the

19   whole one.

20              MR. REEVE:  Fine, no objection.

21              MR. ROGAN:  No objection, your Honor.

22              MR. MORAGHAN:  No objection.

23              THE COURT:  Thank you, it may be marked.

24              MR. SILVERMAN:  Thank you, your Honor.

25   Q     Approximately how long did you record on the video camera
```

1    on October 22nd, 2011?

2    A    Approximately 20 minutes, I believe.

3    Q    Okay.  This is an excerpt from the recording on that

4    date.

5              (Government's Exhibit 254, a video recording,

6    played, and paused.)

7              MR. SILVERMAN:  Your Honor, if I could ask through

8    the Court if any jurors can't see what's projected on the

9    screen or at anytime there's audio playing they can't hear it,

10   to let the Court know so we can adjust accordingly, because

11   I'm in the way.  I'll step back as I play the video.

12             (Government's Exhibit 254, a video continuing.)

13   Q    Could you just describe for the jury what we're seeing on

14   the recording?

15   A    Looking at 139 Day Street and that was Morales and his

16   wife Lopez walking into the doorway there, exterior door.

17   Q    Looks like there's a chain link fence depicted.

18   A    Yes.

19   Q    Is that because you're on the other side of that fence

20   from what you're filming?

21   A    Correct.

22   Q    At this point, could you describe what Mr. Morales is

23   doing?

24   A    He's on the telephone.

25   Q    Without getting into the substance of what other officers

1    are relaying to you over the radio, were you getting

2    information at the time of this surveillance from the officers

3    in the wire room?

4    A    Yes.

5             MR. SILVERMAN:   I'm going to stop the video for a

6    moment.

7    Q    The two people you described in the video, are those the

8    same people whose pictures you saw in government exhibits 214

9    and 207?

10   A    They are.

11   Q    After this portion of the video concluded where they were

12   outside of 139 Day Street, what did you observe happen?

13   A    I observed Lex pull up in her vehicle.

14   Q    Then what happened?

15   A    She gets out of the vehicle with the child, small child,

16   and they meet up with the wife, Lopez, and Lopez and Lex go

17   inside the house, into the apartment building.

18   Q    Did Morales go in the apartment building as well?

19   A    He did not.

20   Q    Did you observe Lex and Morales's wife exit the apartment

21   during the course of your surveillance?

22   A    I did.

23   Q    Approximately how long were they inside?

24   A    Less than five minutes.

25   Q    Could you see what they were doing while they were

1    inside?

2    A    I could not.

3    Q    You don't know, from your own observation, what happened

4    in the apartment building at 139 Day Street on October 22nd,

5    2011?

6    A    I do not.

7    Q    Did you observe these three individuals leave the area of

8    139 Day Street during your surveillance?

9    A    Yes.

10   Q    Did Mr. Morales and his wife, as you called her, leave

11   together?

12   A    Yes.

13   Q    What kind of car were they using?

14   A    They got into a black Chrysler minivan.

15   Q    And as they left, did you broadcast that out over the

16   radio to your fellow law enforcement officers?

17   A    I did.

18            MR. SILVERMAN:  May I have one moment, your Honor?

19            THE COURT:  Yes, sir.

20            MR. SILVERMAN:  No further questions at this time.

21   CROSS-EXAMINATION

22   BY MR. REEVE:

23   Q    Good afternoon, sir.

24   A    Good afternoon.

25   Q    You said, if I heard you right, you were temporarily with

1    DEA.  Did that mean you remained a West Haven officer but were

2    assigned to work with the DEA?

3    A     Correct.

4    Q     Okay.  And with respect to 139 Day Street, that's the

5    dwelling that you've been telling us about, right?

6    A     Correct.

7    Q     Okay.  Can you explain and describe what that dwelling

8    is?  Is it a single-family home?  Is it a multi-apartment?

9    What is it?

10   A     Looks like an apartment building.

11   Q     Okay.  And do you know how many residences are inside

12   that apartment building?

13   A     I do not.

14   Q     And did you, during your surveillance on this day, did

15   you have occasion to see other people at any time enter or

16   exit the building?

17   A     I did.

18   Q     Okay.  Did you observe -- this, I take it, is the front

19   door view of 139 Day?

20   A     Yes, it is.

21   Q     Did you observe that front door on other surveillances on

22   other dates, or was this your only time there, if you

23   remember?

24   A     I don't recall.

25   Q     Okay, fair enough.  And how would you describe the

1   frequency of people going in and out?

2   A    It wasn't that frequent.

3   Q    Okay.  And I think you testified that Alexis, a child,

4   and Ms. Lopez went in?

5   A    Correct.

6   Q    Is that right?

7   A    Correct.

8   Q    Okay.  Do you know, were you able to observe, how they

9   got in?  That is was the front door to this building locked or

10  were people just walking in and out without a key, if you

11  know?

12  A    I could not tell you exactly.  I do not know.

13  Q    Okay.  All right.

14          MR. REEVE:  I have no other questions.  Thank you.

15          MR. ROGAN:  I have no questions, your Honor.

16  CROSS-EXAMINATION

17  BY MR. MORAGHAN:

18  Q    Officer, do you know who Alexis Sutton is?

19  A    Yes, she was the girlfriend.

20  Q    Of who?

21  A    I believe of Kevin Wilson.

22          MR. MORAGHAN:  Thank you.  I have no other

23  questions.

24          MR. SILVERMAN:  No further questions, your Honor.

25          THE COURT:  Thank you, sir.

```
 1              THE WITNESS:  Thank you, your Honor.
 2              MR. VATTI:  Your Honor, the government calls FBI
 3    Special Agent Michael Zuk.
 4                      M I C H A E L   Z U K
 5         having been called as a witness, was first
 6         duly sworn and testified on his oath as follows:
 7              THE CLERK:  Please be seated.  State your name for
 8    the record, spell your last name, and your address by city and
 9    state only.
10              THE WITNESS:  Okay.  My name is Michael Zuk, Z-U-K.
11    My business address is Bridgeport, Connecticut.
12    DIRECT EXAMINATION
13    BY MR. VATTI:
14    Q    Good afternoon, sir.
15    A    Good afternoon.
16    Q    Can you tell us where you presently work?
17    A    Yes, I'm an FBI special agent assigned as a coordinator
18    for Safe Streets gang squad in Bridgeport, Connecticut.
19    Q    How long have you been with the FBI?
20    A    Been with the FBI since 1998, so about 15 years.
21    Q    I want to take you back to your educational background.
22    Can you describe that for us?
23    A    Yeah, I pretty much went to the University of Connecticut
24    for a long time.  I got my undergraduate degree there,
25    bachelor's.  I went to a year of grad school, and then I went
```

 1  to the university school of law and graduated from there in

 2  1991.

 3  Q    What did you do after you got out of UConn Law School?

 4  A    I worked as a lawyer for six or seven years.  Started as

 5  a clerk for a justice at the state Supreme Court.  I then

 6  worked briefly at a law firm, and then worked for about two

 7  years or so, two-and-a-half, as a state prosecutor and then

 8  just about two-and-a-half or three as a federal prosecutor.

 9  Q    And what kind of cases did you do at the state

10  prosecutor's office?

11  A    As a state prosecutor, I was assigned to the chief

12  state's attorney's office, which was sort of a central office,

13  so we would go out to local courthouses and help them work

14  whatever cases they had.

15         We also did some trials.  They would be basically,

16  you know, DWIs, extortion, forgeries.  Real basic state stuff.

17         We also were assigned to do more long-term

18  investigations, as that was a role of the chief's office, to

19  do things that the local courts really weren't set up to do.

20  So we did some long-term, like racketeering investigations,

21  including, you know, criminal enterprises that were involved

22  in different crimes, including narcotics.

23  Q    And you said that you joined the U.S. Attorney's Office

24  after the state's attorney's office?

25  A    Yes.

1    Q    When did you join the U.S. Attorney's Office?

2    A    Joined the U.S. Attorney's Office in 1995, spring of '95.

3    Q    How long were you there?

4    A    Until August of '98, so a little over three years.

5    Q    What kind of cases did you work on at the U.S. Attorney's

6    Office?

7    A    I was assigned to a unit called the Strike Force, which

8    was primarily responsible for investigating organized criminal

9    groups.  Some of those were Italian organized crime, we did

10   some Russian organized crime cases, and we also did some of

11   the more violent drug groups or gangs.

12   Q    You said you joined the FBI in 1998?

13   A    Yes.

14   Q    And did you undergo training when you joined the FBI?

15   A    Yes, I did.

16   Q    Where did that training take place?

17   A    The training took place at Quantico Virginia at the FBI

18   academy.

19   Q    How long was that training course?

20   A    At that time, it was four months.

21   Q    Tell us what that training consisted of.

22   A    Okay.  There are different aspects of it.  Some of it is

23   academic, so it would be classroom where you would learn basic

24   violations of federal criminal law, you would also learn --

25   FBI's also responsible for terrorism stuff,

1    counterintelligence work, so you would get a little primer or

2    little bit of, you would study that a little bit.

3            So there was a lot of it was academic, and then

4    beyond that there was firearms training, defensive tactics

5    training, vehicle operation training, and some practical

6    application training where they would put you in the role of

7    an agent and you would work through problems in a place called

8    Hogan's Alley, a little mock city or town they created there,

9    and you would get training, so you would get practical hands

10   on training in terms of arresting people and handling

11   informants and conducting investigations.

12   Q    And did you receive training at Quantico on conducting

13   narcotics investigations?

14   A    Yes.

15   Q    And describe that for us.

16   A    Yes.  So narcotics stuff was one of the blocks of the

17   academic training.  So they would teach you what federal laws

18   applied and how to go about enforcing them.  You would get an

19   idea of what kind of drugs were being sold and how and where

20   they came from.

21           They would also teach you different methods to

22   investigate those crimes:  How to use confidential informants

23   or cooperating witnesses, how to use wiretap, the wiretap

24   investigation.  It was not extremely detailed, but you got a

25   pretty good idea of generally how to work drug cases before

1    you left.

2    Q    And after you completed your training at Quantico, where

3    was your first posting?

4    A    I got sent to New York City.

5    Q    And was there any particular squad in New York City that

6    you were assigned to?

7    A    Yes, I was assigned to a drug and criminal enterprise

8    squad.  It was called Squad C, like Charlie, 23.  I was there

9    from 1999 about until 2011.  So 12 years on the drug squad.

10   One year of that time, I left my squad and I worked for a DEA

11   boss, they called him GS, group supervisors.  So for one year

12   of that time I worked assigned to a DEA boss in a thing they

13   also called it a strike force.

14   Q    And during your time with C-23, can you estimate for us

15   how many narcotics investigations you were part of?

16   A    I would say hundreds of narcotics investigations over the

17   course of those 11 years, or 12 years.

18   Q    And in those investigations, how many times were you part

19   of a wiretap investigation?

20   A    I would say the cases I worked on, there were probably

21   more than -- probably near a hundred of them that involved

22   wiretaps and where I was actually a part of it, but being an

23   affiant writing the wiretap, things like that, probably I

24   would say, I would estimate between 20 times where I was

25   primarily responsible for it.

```
 1   Q    You anticipated my next question.  You indicated that you

 2   worked on approximately a hundred wiretap cases?

 3   A    Yes.

 4   Q    There were roughly 20 or so where you were the affiant?

 5   A    Yes.

 6   Q    Tell us what a lead case agent, or co-lead case agent,

 7   might be on a wiretap investigation.

 8   A    Yes.  So a wiretap investigation has -- any investigation

 9   would have -- a lead case agent, and a wiretap investigation

10   is much more involved than your typical investigation because

11   it usually spans over the course of many weeks, even months,

12   sometimes more than that, sometimes over a year or more.  So

13   there's a lot involved.

14          When you're the case agent, your first

15   responsibility is to determine, is this the sort of case that

16   you should even do a wiretap on?  So you have to analyze your

17   investigation, and you're part of the process of determining

18   is this what we want to do?

19          If it is, and that determination is made usually

20   with consultation by the U.S. Attorney's Office and your

21   bosses, then you would decide, okay, we're going to do this

22   case, you would be responsible for deciding how to set it up,

23   what preliminary investigation to do in order to make -- in

24   order to support what later will become an affidavit or, you

25   know, a legal affidavit that you'll have to write.
```

1          You would be responsible for gathering all your

2    evidence, doing phone analysis, basically being sort of like

3    the boss of the case.  You have a lot of people that will work

4    with you, because it's a big enterprise.

5          And you would then ultimately take all that

6    information and put it in an affidavit.  Some of them are, you

7    know, some of them are 50, 60 or more pages long.  Some of

8    them are shorter, but it's a detailed explanation of what it

9    is you've done up to that point, why it is that you need to do

10   a wiretap, why there's no other real investigative avenue that

11   you could possibly take short of a wiretap.  You do that along

12   with the U.S. Attorney's Office.  And then you bring that to a

13   judge who will decide yes or no, you have enough to listen to

14   these phones.

15         Once you start to listen to phones, then, as the

16   case agent, you're responsible for:  Number one, understanding

17   what it is that's coming in, because some wiretap cases you

18   have only one phone that you're listening to, there may be

19   audio, there may be text.  In some cases, there might be

20   multiple phones that even all at one time you're listening to.

21         As the case agent, you're the guy responsible for

22   understanding what it is that's being said or texted on all

23   these lines, and you try to make sense of it and determine

24   what the organization or what these drug subjects are doing,

25   which takes up a lot of time.  You listen to all the calls,

1    you look at all the texts, you decide which are important or

2    we say pertinent, which are relative to the criminal

3    investigation.  You organize those and you summarize them at

4    regular intervals because U.S. Attorney's Office has to update

5    the judge every ten days about what's going on with the case.

6           So it's a long answer, I know, but these are the

7    things that you would be involved in if you are the case

8    agent.

9           And ultimately, then at the end, you're involved in

10   planning how to end the case, whether there will be arrests,

11   who will be responsible for what.  And that's a long answer,

12   but it's only really a summary and short, in terms of what I

13   left out, because there's a lot more that you would do.  I

14   hope that gives a general idea.

15   Q    What is the case agent's responsibility in terms of

16   listening to the calls that are coming in over the wiretap?

17   A    As a case agent, you would want to have an understanding,

18   a very good understanding of the calls that are coming in.  So

19   if you could, you would listen to all the calls and you would

20   look at all the texts.

21          Sometimes there's tens of thousands of calls and

22   texts in one wire.  In that case, you might not be able to

23   look at every single one of them, but you would want to make

24   sure you understood what was there.  So you would, if you

25   couldn't listen to a whole call, you would read a summary of

1    it.  If you couldn't read all of the texts, you would take out

2    the ones that are classified or marked pertinent, the ones

3    that are really important, so you would take a look at those.

4            Your responsibility, you would be the one, as far as

5    the case, guide the investigation.  Responsible for knowing

6    what it is that's happening in terms of criminal conduct on

7    the wire.

8    Q    And how many times, approximately, have you been a lead

9    case agent or co-lead case agent in a wiretap that was aimed

10   at a drug investigation?

11   A    At least 20.

12   Q    And as part of being a lead case agent on approximately

13   20 occasions, estimate for us roughly how many wiretap calls

14   and text messages you've reviewed.

15   A    Tens and tens of thousands.  So it seems like a lot, but

16   the last case we did was in two months, we had near 15,000

17   calls.  So you're talking about months and months with

18   multiple phones.  It's tens and tens of thousands, probably

19   well over a hundred thousand.

20   Q    In your experience in wiretaps involving drug trafficking

21   organizations, is there frequently a code language that is

22   used to disguise narcotics trafficking?

23   A    Yes.

24   Q    Are you familiar with code language that is typically

25   used, for example, in trafficking of cocaine?

```
1   A     Yes.

2   Q     And how about with respect to trafficking of heroin?

3   A     Yes.

4   Q     How about with respect to trafficking of crack cocaine?

5   A     Yes.

6   Q     Have you also, during your time with C-23, participated

7   in controlled purchases or acquisitions of narcotics?

8   A     Yes.

9   Q     Roughly how many times -- we'll get to your experience in

10  Bridgeport in a little bit, but I want to focus first on your

11  time in New York City.

12  A     Okay.

13  Q     Approximately how many times, with your time with C-23,

14  did you participate in controlled purchases or acquisitions of

15  narcotics?

16  A     I would say hundreds.  Our cases involved hundreds of

17  them, and I was directly, like, primarily involved in at least

18  a hundred and probably more.

19  Q     Typically when you do controlled purchases and

20  acquisitions, are you using confidential informants,

21  cooperating witnesses, and undercover officers?

22  A     Yes.

23  Q     And as part of that, do you typically engage in briefings

24  and debriefings of informants and cooperating witnesses about

25  the organizations that they may be part of?
```

1    A     Yes.

2    Q     And in doing that, are you familiar with the general

3    practices that are used by drug trafficking organizations in

4    distributing cocaine, crack cocaine, and heroin?

5    A     Yes, I think so.

6    Q     Let's talk a little bit about your time in Bridgeport.

7    Did the cases that you work on in Bridgeport differ than the

8    cases that you worked on in New York City?

9    A     Yes, in some respects.

10   Q     What respects would those be?

11   A     New York, we were primarily interested in investigating

12   really large-scale drug groups, so multiple kilograms of coke

13   and heroin coming from South America into New York City, which

14   obviously is a huge metropolitan area.  So we were really

15   involved, our focus was to follow the drugs back to its source

16   of origin, and that involved, you know, huge amounts of money,

17   millions of dollars being exchanged, and kilos and kilos of

18   drugs.

19          As part of that, though, to get to that level, to

20   get to the point where we were investigating those people, we

21   also did some street-level stuff and we did buys, smaller

22   amounts of heroin, crack, and powder cocaine on the streets of

23   New York.  But that wasn't really our primary daily activity.

24          So in Bridgeport, in contrast, that's, we do more of

25   the street-type stuff there.  I'm coordinating a gang drug

1    task force, so we're interested in drugs as they relate to

2    gangs.  So that puts us really close to more of the point of

3    sale where you're selling units of drugs that people would

4    use, much smaller level.

5             We still have cases that lead to kilos and bigger

6    suppliers, but in Bridgeport, more of the time was spent on

7    the lower level stuff as in New York, much more of the time

8    was spent on the higher level stuff.  But there's crossover.

9    Q    How long have you been with this Safe Streets Task Force

10   in Bridgeport?

11   A    Three years.

12   Q    And roughly how many narcotics investigations have you

13   conducted as part of Safe Streets?

14   A    Well, you know, we've had multiple -- I would say, you

15   know, it's hard to separate them, but maybe ten or 20, say,

16   separate investigations.  I've also been involved with, you

17   know, 20 or 30 more that we didn't primarily do but we were

18   doing with other agencies, either state police or the local

19   police or DEA.

20   Q    And have you participated in wiretap investigations

21   during your time in Bridgeport?

22   A    Yes.

23   Q    And roughly how many?

24   A    I would say about maybe ten or so wires.  Two or three

25   real separate cases, but ten active cases, ten active wires

1    that we really did.  There were other wires that became my

2    responsibility, where the listening part had already taken

3    place before I got there, but then we would go back and be

4    involved in the debriefings and the work and the prosecution

5    of the case, even though the wire phase, the listening phase,

6    was over.

7    Q    And with respect to those wiretaps that you've been

8    involved in in Bridgeport, what kind of substances were

9    involved?

10   A    Primarily cocaine, crack cocaine, and heroin.

11            MR. VATTI:  Your Honor, at this time, I would offer

12   Special Agent Zuk as an expert in general practices in drug

13   trafficking.

14            THE COURT:  Any comment, gentlemen?  Hearing no

15   objection -- yes?

16            MR. REEVE:  I think I have no objection to that, but

17   we haven't gotten to the issue of words, and I don't know if

18   he's being qualified for that as well.

19            MR. VATTI:  I can do a little bit more if you want

20   me to.

21            MR. REEVE:  All right.

22            MR. VATTI:  That's fine.

23   Q    I know we talked about this briefly before.  You said

24   that you've listened to thousands of pertinent calls during

25   your wiretap investigations that you participated in, correct?

1    A    Yes, tens of thousands.

2    Q    Tens of thousands.  Would that include both your time at

3    C-23 as well as your time here in Safe Streets in Bridgeport?

4    A    Yes.

5    Q    As a result of that, are you familiar with various street

6    terms, slang terms, and code words that are typically used in

7    crack cocaine trafficking, heroin trafficking, and cocaine

8    distribution?

9    A    Yes.

10   Q    Are you familiar with code words that might be used, for

11   example, to refer to the quantities of those substances that

12   are sold at street-level?

13   A    Yes.

14   Q    Are you familiar with code words that might be used to

15   refer to prices for those substances?

16   A    Yes.

17   Q    And are you familiar with code words that may reference

18   the manner in which those drugs are packaged and sold?

19   A    Yes.

20   Q    All right.

21        MR. VATTI:  At this time, I would offer Agent Zuk

22   again, your Honor, as an expert on general practices in drug

23   trafficking, including quantities, prices, and code words that

24   are typically used.

25        MR. REEVE:  Your Honor, if it's limited to

1    specifically in terms of code words, if it's limited to, in

2    the words of the Second Circuit, code with fixed meaning, if

3    this testimony does not in any way interpret ambiguous words

4    or phrases, then I have no objection.

5            MR. VATTI:  Maybe we should have this discussion at

6    side bar, your Honor.

7            THE COURT:  All right.

8            (At the side bar.)

9            MR. VATTI:  Your Honor, I think the Second Circuit

10   made clear in *Mejia* and the *Dukagjini* cases that the use of an

11   expert on so-called narcotics code is an appropriate way for

12   the jury to be able to then decipher the content and meaning

13   of wiretap calls, and what the Second Circuit has said is that

14   the case agent, for example Special Agent Ndrenika when he

15   gets on the stand and we play calls, cannot interpret the

16   meaning of particular phrases because the jury may attach

17   greater meaning if the case agent who conducted the

18   investigation tells them what the interpretations are.

19           So that the proper way to do this is exactly what

20   the government is proposing to do, which is have an expert

21   who's not involved in the case, who has not listened to any of

22   the calls and not actually going to interpret any of the

23   calls, testify generally about the meanings of different code

24   words.

25           So I think we had this issue come up in the Vaughn

1    trial, and this is the proper way to proceed.

2         MR. REEVE:  And, your Honor, I don't object to that

3    in principle, but I was quoting language from the cases, and

4    what the Second Circuit says in *Dukagjini*, which the

5    government just cited, which is 326 F.3d 45, at page 55, they

6    say, "You can't give expert testimony as to code words unless

7    there is 'no evidence that these phrases were drug code with

8    fixed meaning,'" okay?  Either within the narcotics world or

9    this particular conspiracy.

10        I understand the government's proffer is he's not

11   familiar with the words in this, but they would have to have

12   fixed meaning within the drug conspiracy world.

13        And the *Cruz* case, which is 363 F.3d 187 at 196,

14   there, the Second Circuit says, "Expert witness called on to

15   testify about the meaning of narcotics codes strays from the

16   scope of his expertise when he interprets ambiguous words or

17   phrases."

18        So if the government can lay a foundation that the

19   words, based on this witness's experience that there's no

20   ambiguity to the words he's testifying about, then he can

21   testify to it.

22        If they can't lay that foundation, then it's not

23   within the scope of proper expert testimony under clear Second

24   Circuit case law.  And if so, I object, if it's not limited to

25   that.

1          MR. VATTI:  For example, the words in *Dukagjini* that

2     were at issue was the use of the word "receipt" or the use of

3     the word "ticket."  That may be an ambiguous term.

4          In this particular context, I'm going to be asking

5     him questions about words like "fire."  Now, "fire" actually

6     has multiple different meanings, but "fire" in the drug

7     context is clearly reference to quality of narcotics, and

8     that's the kind of testimony that he's going to offer.

9          For example, "bundles," the word "bundles" has a

10    specific connotation in the drug world.  It obviously has

11    other meanings in other contexts, but in this particular

12    context it has a specific meaning in heroin trafficking.

13         So that's the type of testimony.  We may have to go

14    question by question.

15         MR. REEVE:  We might, and as long as it stays within

16    what I'm talking about, I know we have an objection but, for

17    example, I expect that he'll say that "bundle" can be ten

18    bags, or it can be five.  So it's ambiguous to the degree, if

19    he says ten, that leads into problems.  If it's a clear

20    meaning and there's no ambiguity in the term, then it's okay.

21         But the problem is where he's telling the jury the

22    meaning of terms that are ambiguous, it's misleading and it's

23    beyond the scope of what the Second Circuit allows, and that's

24    why I object.

25         MR. VATTI:  For example, my response to that would

1    be taking the word "bundle."  "Bundle" is definitely a unit

2    that is used in heroin trafficking.  Now, in some places it

3    might be five bags, in some places it might be ten bags.

4    Nevertheless, it's a unit used in heroin trafficking no matter

5    how many bags it might be.  I don't view that as ambiguous at

6    all.

7            MR. REEVE:  If they're going to leave it to, that's

8    a unit, that's fine, it's not ambiguous.  If he's testifying

9    to what it means, that is ambiguous, and he can't do that.

10   That's what the problem is.

11           MR. SILVERMAN:  It seems that what we ought to do is

12   when there's a specific term that Attorney Reeve believes is

13   ambiguous, he can raise an objection.

14           THE COURT:  It's difficult in the abstract to make a

15   ruling.  Why don't we wait until there is a particular phrase

16   that you want to make an objection to?

17           MR. REEVE:  Well, I think the predicate that the

18   government has to lay is they can ask about a term and they

19   can ask their witness:  "In your experience, does this have a

20   specific fixed meaning?"  If he says yes, it's okay.

21           MR. VATTI:  I'm not going to ask that question.

22           MR. REEVE:  Then I object.  They've got to lay that

23   foundation.  If there's no foundation, I object to any of this

24   testimony.  They've got to lay a foundation that shows that it

25   falls within the existing Second Circuit definition.  It's not

```
 1   on me, it's not on me, on my knowledge; they're asking him

 2   about his knowledge, and the question is, "Is this word

 3   unambiguous in your experience?"  If it means many different

 4   things, he can't testify about it.

 5             MR. VATTI:  I will ask him whether he is familiar

 6   with that term in the context of narcotics trafficking, and

 7   what the meaning of that term is in that context.  I think

 8   that's appropriate.

 9             THE COURT:  Yes, I'm familiar with it, and I'm not

10   an agent.  But yes, I think he can answer that question.

11             MR. REEVE:  Okay, we'll take it a question at a

12   time.

13             THE COURT:  Yes.

14             (In open court.)

15             MR. VATTI:  Your Honor, based on that discussion at

16   side bar, I believe there's no objection to, at this point,

17   Mr. Zuk proceeding as an expert witness.

18             THE COURT:  Correct.

19             MR. REEVE:  I disagree.  There's a standing

20   objection, it's on the record.

21             THE COURT:  I overruled it.

22             MR. REEVE:  I understand.  Government counsel just

23   said there's no objection.

24             MR. VATTI:  I stand corrected.  Thank you.

25   BY MR. VATTI (Continued):
```

1    Q    Special Agent Zuk, let's talk about crack cocaine

2    distribution.  Can you tell us the process by which powder

3    cocaine is converted to crack cocaine?

4    A    Yes.  So powder cocaine is the form in which it's

5    typically originally packaged or created.  In this area, it's

6    mostly south of the border:  Colombia, Peru, Bolivia, these

7    places.

8            When the cocaine is extracted from the leaves of the

9    plant, the coca plant, it's extracted and processed down

10   there.  The cocaine that they make is what Mr. Vatti would

11   refer to as powder cocaine.  It can be hard and pressed tight

12   into a kilo, and be almost rocky, but that's the form of

13   cocaine that we're calling powder.  It's called, technically,

14   cocaine hydrochloride.  So that cocaine is powder.

15           If you were to break pieces of it off and cut it off

16   with a razor or make it soft, people would snort that.  That's

17   the kind of cocaine that you would snort in your nose.

18           It's a water-based chemical, and it's absorbed by

19   your body, if you snort it it's absorbed by the nasal lining,

20   okay?  Then the cocaine would travel through your body to your

21   brain and have whatever effect it is that people want when

22   they use cocaine.  It's a narcotic effect, but it's not

23   incredibly intense.

24           In order to intensify the effect, people try to

25   extract the base of the cocaine and to use that as the product

1    that they would get high from.  So crack cocaine is a way in

2    which to take the cocaine base and get it into your body in a

3    faster, more effective way.

4            So in order to make the crack cocaine, you would

5    take the powder cocaine and you would process it very simply

6    with baking soda, with water, and you would apply heat.

7            What would result would be a product that is no

8    longer the cocaine hydrochloride, the powder, water soluble

9    cocaine; it would be an oil-based thing, kind of rocky, and

10   solidifies into a rocky disk if it's in the bottom of a pan,

11   and people would break pieces of that away, usually with a

12   razor blade, and create little rocks.  The little rock is what

13   they would call crack cocaine.

14           Unlike the powder that you would snort and go in

15   through your nose and travel through your body that way, the

16   crack cocaine, you would typically smoke.  By smoking the

17   crack cocaine, it goes, the drug enters your lungs and then

18   goes directly to your brain.  The effect of the high is much

19   more intense.

20           MR. MORAGHAN:  Your Honor, I'm going to object to

21   him testifying about the effect.  That's far beyond the scope

22   of his expertise.

23           MR. VATTI:  That's fine, your Honor.

24   Q    Can you go over with us how, if you took, for example,

25   100 grams of powder cocaine, how you would convert that to

1    crack?

2    A    Yes.  You would mix it with baking soda and water and you

3    would heat it.  You would then sort of stir it around.

4    There's -- I'm not a chef, I've not done this, but the process

5    is you would add heat and you would stir it and mix it, and

6    people argue about how to stir it, but the idea is that the

7    baking soda, the water, and the powder cocaine will combine,

8    usually about, say, three parts cocaine to one part baking

9    soda, then add the water, heat it, and what will happen is

10   when it's heated long enough, a chemical transformation will

11   occur and what was the cocaine powder is no longer.  It then

12   becomes a different substance entirely, and that is the

13   cocaine base.

14          It will -- they refer to it as locking up.  It will

15   lock up.  It will stop being a pool of molten cocaine and lock

16   up and turn into a sort of a hard, off-white disk.  The disk

17   then will harden, and it can be broken up and sold as crack

18   cocaine and smoked.

19   Q    And just describe for us what the difference is in

20   texture of cocaine hydrochloride, the powder form, and crack

21   cocaine.

22   A    Cocaine is a sandy, soft powder, the powder form, the

23   hydrochloride.

24          The crack form is rocky.  It's like when you first --

25   if you make a lot of it, it could be almost in the shape of a

1    disk, it will take the shape of the container it's in.  If

2    it's in a pan or Pyrex, it will take the shape of the thing

3    you cooked it in.  Then you break little things off.

4         Unlike the powder, they're hard, like little

5    pebbles; whereas the powder is just sort of silty powder, like

6    sand.  Not quite as rocky as sand, but I think you get the

7    idea.

8    Q    And what does it tell you if crack cocaine comes back

9    moist or wet or sticky?

10   A    It would tell you that the conversion process didn't --

11   was unsuccessful.  It didn't work.

12   Q    Why would that be?

13   A    It could be because, it could be because the powder

14   cocaine that they used was not sufficient to make crack,

15   because not all of it is.  Some of it's not pure enough to

16   make crack, because it's been cut by all sorts of other things

17   along the path from wherever it was first processed in

18   Colombia or wherever to here.

19        It could be that it's not pure enough or it could be

20   that -- so that would be a problem with the powder.  It could

21   be that the chef just mixed it wrong or didn't put enough

22   baking soda or put too much water.  There are different things

23   the chef could do to mess it up.

24        If it didn't come back, it could be that either the

25   chemistry wasn't right, the cocaine wasn't the kind of cocaine

1    that could be cooked, or because the chef didn't do a very

2    good job of it.

3    Q    A moment ago you used a phrase called "it didn't come

4    back."  Is that a phrase that you are familiar with in the

5    context of crack distribution?

6    A    Yes.

7    Q    And what does that phrase mean?

8    A    Coming back would be sort of two variations of the term.

9    One is when you take this powder cocaine and put it in the pan

10   and cook it, what you want it to do is you want it to first

11   lock and become the crack cocaine.  For it to come back at

12   all, it would have to form the crack.

13          So once it forms the crack, yeah, did it come back?

14   Yes, it did.  The question is to what degree did it come back?

15   The crack cook or chef will say it didn't all come back.  What

16   they're striving for is to get at least as much crack back as

17   they put in in powder.

18          So your example was 100 grams of powder.  If you put

19   100 grams of powder in that pan and add the baking soda to it,

20   which is another say 30 grams, you want, as a chef, at least

21   100 grams to come back as cocaine, because that's what's sold,

22   the coke.  So you bought the powder for a certain price, you

23   want to get back what you put into it.

24          So you'll hear calls about how much came back.  Did

25   it all come back?  They'll talk about only a certain number of

1    grams came back, and that means they lost some in the cooking

2    process.  Sometimes you could get more back and they may say,

3    "Well, more came back than I put in," that would be a

4    successful chef because they created weight and product they

5    could sell.

6                But so one is the reference to did it come back at

7    all, did it form?  And second, how much of it came back, how

8    close is it in terms of weight to the amount of powder that

9    you put into the project.

10   Q    All right.  And also a moment ago, in talking about this,

11   you used the phrase "cheffing."  Is that a phrase that you

12   have become familiar with in the context of crack

13   distribution?

14   A    Yes.

15   Q    And tell us what that means.

16   A    That's just a common reference to the person that cooks

17   the powder into the crack, they're called cooks or chefs.

18   Very often, more often than not in my experience, chefs.

19   Q    So when you're listening to wiretap calls, are you

20   looking for clues to differentiate whether people are talking

21   about powder cocaine or crack cocaine?

22   A    Yes, sometimes.

23   Q    And are there certain phrases that you have come across

24   that are very common in differentiating between the two?

25   A    Yes.

```
 1   Q    And tell us those phrases.
 2   A    Well, the primary phrase, the cocaine is powdery and the
 3   crack is hard.  Very common to say, to distinguish between the
 4   soft and the hard.  If somebody is ordering cocaine from
 5   somebody that might have both, if they say the soft, they're
 6   talking about the powder.  If they say the hard, anything
 7   about hard or rock, that's typically crack cocaine.  So you
 8   differentiate.
 9         And there are different ways to describe it.  They
10   could refer to it as the cooked, "Do you have any that's
11   done?"  All different ways to, without saying, "Hey, do you
12   have any cocaine that's cooked into crack?"  These are ways to
13   give the seller the idea of what you want.  So the references
14   to the rockiness of it, to whether it's been cooked or done.
15         Also price, if you're listening to a wiretap, there
16   will be crack cocaine typically sells for a little bit more
17   than the powder form, so you could listen to the calls and try
18   to determine what the person is charging and if he says, "I
19   want to buy some for X amount but I need the done for a
20   different amount, it's a little bit higher," that would
21   corroborate or confirm in your mind that this is crack
22   cocaine.
23   Q    Let's talk about the units in which crack cocaine might
24   be sold.  Are you familiar with those units?
25   A    Yes.
```

1    Q    All right.  And let's start at the very basic units at

2    street-level.  What would those be?

3    A    Well, a typical basic unit would be a $10 rock or a $20

4    rock.  So a $10 rock of crack cocaine is sort of like you

5    could think of it as a single dosage unit.  So it's like

6    really small.  My fingers are very close together as I show

7    you.  It's just a little tiny rock that oftentimes you see

8    down in the corner of a plastic bag, which is another term,

9    plastic, paper, if somebody's selling cocaine they might refer

10   to it as "plastic" because typically it's stored in plastic

11   bags.  So this $10 dosage unit would be a little rock in maybe

12   the little corner of a plastic bag, sometimes knotted off.

13        Might be a little more in a double, $20 bag.  Might

14   be a little more than that in a $50 bag.  Those are typical

15   prices for street sale.  "I need a 10," sometimes they'll say

16   a dub or double, $20, or a 50.  Those would be typical.

17        Beyond that, very typical for crack cocaine would be

18   three-and-a-half grams, and that is an eighth of an ounce, and

19   it's commonly referred to as an eight ball.  So if you see, "I

20   need a ball," an eight ball, any kind of a ball in a drug

21   conversation, very typically they're talking about purchasing

22   an eight ball, which is a really common quantity for this

23   drug.

24        So an eight ball is three-and-a-half grams, that

25   would be typical.  Double that then is seven grams, you hear

1   people order sevens.  Double that again would be a 14.  These

2   are all typical.

3           Sometimes the 14 is just four eight balls that are

4   separately packaged, but there's four of them, so it adds up

5   to 14, three-and-a-half times four.  Sometimes you'll hear

6   conversations where they say, "I want 14."  "Do you want them

7   as singles?"  What they mean by singles, do you want them as

8   single eight balls, there would be four separate packages, and

9   that would add up to 14.  Or they could say, "No, it could be

10  all together."  Then you just see 14 grams of crack in one

11  bag, not separately split up.

12          After 14, if you double 14, that's 28, and that's an

13  ounce.  That's also a typical sale quantity for cocaine, an

14  ounce.

15          In my experience, after an ounce, the whole game

16  changes from the American system of weights and measures, the

17  ounces system, and it goes completely metric.  So you would

18  think that 28 grams, I've been doubling everything, so 28

19  doubled would be 56.  Normally they don't do that.  I'm not

20  saying it's impossible, but normally at that point they go to

21  62s or 62-1/2, sometimes call it 63s.  What that is 62-1/2.

22  Double that you get 125.  Double that, 500.

23          So now you're in the metric system because the

24  cocaine originally comes in the kilo, which is a thousand

25  grams.  So go the other way, you break a thousand grams in

```
 1    half you have 500 grams.  Break that in half you have 250.
 2    Break that in half you have 125.  Break that in half and you
 3    have your 62, okay?  62-1/2.
 4            So kind of right at that point, we go from the
 5    American system of 28s and ounces and then it flips to 62s and
 6    halves and 125s, and then you can sell it 100 grams, 200
 7    grams, 250.  Anything would be possible when you get up into
 8    big, you know, large amounts of grams.
 9    Q    Let me go back to some of the basic units first.  You
10    indicated that a $20 bag is typically referred to as a dub?
11    A    Yes.
12    Q    Have you heard the term "dime"?
13    A    Yes.
14    Q    What's the dime?
15    A    A dime is a $10 bag.
16    Q    You also indicated that eight ball is a typical quantity,
17    correct?
18    A    Yes.
19    Q    And that's three-and-a-half grams?
20    A    Yes.
21    Q    What is the typical price for an eight ball of crack
22    cocaine, let's say in Connecticut?
23    A    Yeah, so I would say typically that's worth about $150.
24    Guys could sell it for a little more, a little less.  150 is
25    about the right number.
```

1    Q    Tell us what a street dealer can do with three-and-a-half

2    grams of cocaine base to make a profit.

3    A    Okay.  So if a street dealer was going to sell an eight

4    ball --

5         MR. MORAGHAN:  Your Honor, I would object.  I think

6    he's beyond what he was offered.  He's talking about general

7    terms.  He's getting into specifics of narcotics trafficking.

8    I think it's beyond the scope.

9         THE COURT:  I'm having difficulty hearing you, sir.

10   Could you keep your voice up?

11        MR. MORAGHAN:  Excuse me?

12        THE COURT:  Could you keep your voice up?

13        MR. MORAGHAN:  He's going far beyond what he's been

14   called for to discuss terms in general matters of narcotics

15   trafficking.  Now he's talking specifically about what a

16   dealer will do with an eight ball.  I think it's beyond the

17   scope of what he's been offered for.

18        MR. VATTI:  The government has to demonstrate intent

19   to distribute, and with respect to at least one of the

20   defendants in this case who we allege was selling eight balls,

21   it's important for this witness to be able to comment on

22   whether or not three-and-a-half grams is a redistribution

23   quantity or not, and this goes directly to that question.

24        THE COURT:  I'll overrule the objection.

25   Q    Do you remember the question?

1    A     Yeah.

2    Q     Okay.

3    A     So an eight ball is three-and-a-half grams, and we talked

4    about the $10 bag and the $20 bag.  Typically, a $10 bag is a

5    tenth of a gram, all right?  That would be a sale unit of

6    crack cocaine.  So if you bought an eight ball for $150,

7    right?  There would be 35, or say 30 or 35, of those little

8    $10 rocks in the eight ball, just doing the multiplication.

9           A tenth of a gram times 35 is 3.5.  So you could

10   tell what cost you 150, the eight ball, you could sell, say,

11   35, 30 or 35, doses and you could make 300 to $350 in sales,

12   subtract your cost, and you've basically doubled or more your

13   money.

14          MR. REEVE:  Your Honor, I'm going to object and ask

15   the answer be stricken.  What we're talking about, what can,

16   what could.  We're talking about possibilities.  It's not

17   material or probative to anything in this case.  I ask it be

18   stricken.

19          MR. VATTI:  I think it's entirely probative, your

20   Honor, for the reasons already set forth.

21          THE COURT:  I'll overrule the objection.

22   Q     Let's talk about the prices that might be typically

23   charged for an ounce of crack cocaine.

24   A     Okay.

25   Q     What would be a typical price for an ounce?

1    A    So an ounce of -- an ounce would be -- let me just --

2    you're talking about around $1200.

3    Q    In listening to wiretap calls, is a typical practice that

4    you are looking at prices to gauge what kind of quantities are

5    being bought?

6    A    Yes, always.

7    Q    And is there a significant difference in price between,

8    let's say, a kilogram of cocaine versus a kilogram of heroin?

9    A    Yes.

10   Q    All right.  Can you explain the difference to us?

11   A    Yeah.  Heroin's much more expensive than cocaine.  So a

12   typical price for heroin, say, might be mid 50s, 50,000,

13   55,000, 56; whereas cocaine would be substantially less, 35,

14   36, 38,000.  You know, heroin's always higher but it's much

15   higher, distinguishably higher.  You would know if somebody's

16   ordering a kilo of something, you would be able to tell by

17   what they're paying for it what it is that they're buying.

18   Q    How about the per gram price of cocaine versus a per gram

19   price for heroin, are they also different?

20          MR. REEVE:  And I object to this line of

21   questioning, unless we're talking about Connecticut.  There's

22   no foundation.  We don't know, is the price the same

23   everywhere?  He's talked about New York, Bridgeport.  We don't

24   know if it applies to New Haven, we don't know anything.

25          MR. VATTI:  I'll limit my question to Connecticut,

1    your Honor.

2    A    Yes, there's a difference between -- you're asking about

3    the gram price?

4    Q    Yes.

5    A    Between heroin --

6    Q    And cocaine.

7    A    -- and cocaine.  Similar to the kilo differential, that

8    there's grams of heroin are substantially more expensive than

9    grams of cocaine.

10   Q    What would be a typical per gram price for heroin in

11   Connecticut?

12   A    And it would depend, but typical would be, you know, if

13   it's $60 or more would be typical.  And it depends who you're

14   selling it to and, you know, the relationship you had.  It

15   could be even more than that.

16   Q    All right.  Typically, do prices, for example, per gram

17   of heroin decrease the greater quantities you buy?

18   A    Yes, they do.

19   Q    If somebody were, for example, buying 100 grams of

20   heroin, how would that affect the price?

21   A    100 grams of heroin would typically be sold as a lower

22   price per gram than, say, five grams.

23   Q    And likewise, does that work with cocaine as well?

24   A    Yes.

25   Q    So somebody buying 100 grams of cocaine might typically

1    get it for a slightly lower price than if they were buying

2    five grams?

3    A    Yes, they would refer to it as buying weight.  If you're

4    buying weight, which would be hundreds of grams or more than

5    that, your price would always be lower than if you're just

6    buying small amounts.

7    Q    So with respect to heroin prices in Connecticut, would it

8    be fair to say that a per gram price might be in the high 50s

9    to low 60s?

10   A    Yes.

11   Q    And the kilogram price would be what in Connecticut for a

12   kilogram of heroin?

13   A    It would be in the high, mid to high, 50s.  Could be,

14   depending on your source of supply, it could be 60,000 or

15   more.

16   Q    With respect to cocaine, the per gram price would be in

17   the mid 30s?

18   A    It would be up, I would say mid to upper 30s, typically

19   for powder; a little more for crack.

20   Q    Would there be a differentiation in price even between

21   crack cocaine and heroin?

22   A    Yes.

23   Q    Enough that you could tell that on a wiretap?

24   A    Yes.

25   Q    What would that difference be?

1    A    Well, typically, crack cocaine is selling for, say, 40,

2    42, 43 dollars a gram and heroin would be much more than that.

3    It would be 60, you know, high 50, 60 and up if you're just

4    buying small amounts.

5    Q    Are you familiar with the term "fronting" in the context

6    of drug distribution?

7    A    Yes.

8    Q    And what does that mean?

9    A    Fronting is just the way, a way, of saying on credit.  So

10   if somebody were to front me drugs, I would take the drugs

11   without paying them the money, and I would be obligated to pay

12   them the money whenever I could get it.  Typically the person

13   who is fronted the drugs has to sell the drugs in order to

14   make the money to pay for it.

15   Q    And is there typically a difference in price when drugs

16   are given on credit versus being paid for up front?

17   A    Yes.

18        MR. REEVE:  Again, your Honor, I object to

19   "typically."  It's not material, not probative to any issue in

20   this case.  Too vague as to have any meaning at all.

21        MR. VATTI:  I'm happy to limit that question to

22   Connecticut, your Honor.  I think the term "fronting" is

23   fairly common, pretty much anywhere.

24        MR. REEVE:  That wasn't what this question was.

25   Q    How about with respect to Connecticut, have you heard, in

1   your Connecticut-based wiretap investigations, the concept of

2   fronting?

3   A     Yes, many, many times.

4   Q     Is that a very common term?

5   A     Yes.

6   Q     Have you heard that in your 20 or so wiretap cases as

7   lead agent in C-23?

8   A     Yes.

9   Q     Is that one of the more common terms you hear in drug

10  distribution?

11  A     It is.

12  Q     What does fronting mean?

13  A     Fronting is the process of taking the drugs on credit.

14  So you would take the drugs, or a portion of the drugs,

15  without paying completely for them.  So you might have, take

16  the drugs without paying any money at all and then you have

17  been fronted the whole amount; or you might pay half of what

18  it's worth to the supplier, so you have been fronted some of

19  the drugs but you paid for other.  Basically taking some or

20  all of the drugs on credit, and it's common.

21  Q     Again in Connecticut, is it common that a price for drugs

22  that are fronted is higher than drugs that are paid for up

23  front in cash?

24  A     Yes.

25          MR. REEVE:  Same objection.

1    Q    Why is that, in your experience?

2    A    Well, part of it is because there's a risk that the drug

3    dealer takes when he gives the drugs away without taking the

4    money.  So there's some risk.  For that risk, there's a cost,

5    which is a higher price.

6           Secondly, if the person doesn't have even the money

7    to buy the drugs he's maybe a lower level or he's maybe not as

8    reliable a guy as the drug dealer would hope for, and so he

9    has to hope that that guy does his business right, gets the

10   money back and then can pay him.

11          Basically it's an assumption of risk.  The drug

12   dealer is assuming the person is going to do successfully what

13   he sets out to do and get the money back, and for that there's

14   a cost.

15          Also the person who doesn't have any money is more

16   desperate to get the drugs because they don't just have cash

17   on hand to get the drugs to buy what they want.

18          MR. MORAGHAN:  Your Honor, I would object.  This is

19   far beyond the question that was asked.  He's rambling on.

20   It's far beyond the question that was asked.

21          MR. VATTI:  I'm going to move on to a different

22   topic anyway, your Honor.

23   Q    Turning back to crack distribution, can you give us a

24   description of some of the items that are typically used in

25   the process of converting cocaine to crack cocaine?

```
1   A    Yes.  You would typically see baking soda, because it's a
2   necessary element of the chemical transformation.  So you
3   would see baking soda; you would see pans or Pyrex to cook it
4   in; you would see a strainer; you would see razor blades or
5   utility knives to cut it; you would often see plastic bags,
6   very typically sandwich bags; you would see elastic bands; you
7   might see a scale if they're actually weighing it there.
8            Depending on what they're doing at the location, you
9   might also see money, money counters, things like that.
10            You're referring to just the actual cooking of the
11   drug, then that would be pans, strainers, knives, plastic
12   bags, scale.
13   Q    Would you see, for example, heat-sealing devices?
14   A    And you could see heat-sealing devices as well.
15   Q    What is the strainer used for?
16   A    The strainer has multiple uses, I think.  One of them
17   that I know is it's used to take the baking powder or baking
18   soda and push it through the strainer to the cocaine.  If you
19   buy a box of baking soda, it's a lump itself, so a lot of guys
20   would take the baking soda and rub it through the strainer and
21   drop it down on top of the cocaine.
22            It's also used, in my experience, to whisk it
23   around.  There's constantly whisking the cooking crack, so it
24   comes out right.
25   Q    Let's now talk about the preparation and packaging of
```

```
 1   heroin.  Can you describe for us the process in which raw

 2   heroin is prepared for street-level packaging?

 3   A    Yes.  So heroin, like cocaine, typically comes from down

 4   south.  In this area, comes from all over the world, but in

 5   this area typically down south, South America.  Comes like

 6   cocaine in kilos, sometimes in smaller bundles, but it's hard

 7   pressed powder in its purest form.

 8            In order to package it for street sale, it has to be

 9   broken down.  It's typically cut up, mixed with cutting agents

10   and other things, and then packaged.

11            Packaging for heroin is pretty consistent.  It's

12   packaged in small little glassine folds or waxed paper folds.

13   Like cocaine, we said it's plastic, heroin would stick to

14   plastic.  So in the heroin business, you would see these

15   little tiny glassine folds that would contain a dosage unit of

16   heroin, and typically those are sold individually sometimes or

17   bundled which, a bundle is a term, is a term of use, like a

18   term that is commonly used, and that would reference ten of

19   these little folds all wrapped together.

20            So it would be packaged in little bags, sometimes

21   bundled, and, you know, those bundles are also sometimes

22   grouped in things they call bricks.  Those are the dosage

23   units, or the sale units, typically of heroin.  In addition,

24   it could be sold in grams.

25            MR. REEVE:  Your Honor, I object.  As we discussed,
```

1    there's no foundation to show "bundle" has a fixed meaning.  I

2    think the witness would testify to the contrary.  The

3    government has not laid a foundation.  I continue to object.

4              THE COURT:  Your objection is overruled.

5              Gentlemen, I've just been informed that the office

6    is closing at 3:30 p.m. because of the weather conditions.  So

7    we have an hour.

8              MR. VATTI:  Okay.

9    Q    In your experience, is the term "bundle" a very common

10   term used in the context of heroin trafficking?

11   A    It is extremely and extraordinarily common in heroin

12   trafficking.

13   Q    And why is that?

14   A    I don't know why, but it is.  In every heroin case that

15   I'm aware of that I've had experience with, when they're

16   selling it in bags, they're also referring to bundles and

17   bundle.  The bundle, of course, is a reference to the bundle

18   of the ten bags all wrapped together, typically with an

19   elastic band.  So that's descriptive of what it is.  But it's

20   so common.

21             Bundles and bricks are, you know, that's just part

22   of the heroin selling business.  You refer to bundles and

23   bricks.

24   Q    How much is a brick?

25   A    A brick is typically ten bundles, which would be 100

1    dosage units.  There are also bricks in Connecticut where they

2    refer to bricks as being only 50 dosage units, or five

3    bundles.  That's a little difference between New York and

4    here.  In New York, I didn't really see bricks being sold in

5    anything less than ten bundles; here, very common for guys to

6    reference to a brick, and it's only five bundles, 50 bags.

7    Q    And you said earlier that that wax fold, one wax fold, is

8    that a single dosage unit of heroin?

9    A    Yes.

10   Q    And ten of those typically in Connecticut would make a

11   bundle?

12   A    Yes.

13   Q    All right.  Either five of those in Connecticut, or

14   sometimes in New York ten, would make a brick?

15   A    Right.  Five bundles.  So either 50 or 100 bags would be

16   referred to as a brick.

17   Q    Typically in Connecticut, what's the price for a bundle

18   of heroin?

19   A    A bundle of heroin?  Well, it could sell anywhere between

20   $70.  It would depend, in large part, on the quality of the

21   heroin.  If it's really lousy, no good, a bundle might sell

22   for 45 or 50 dollars.  If it's decent and better, then 75.

23   75.  That would be typical.  You know, if somebody's

24   desperate, they might pay 80 or 90.  But a typical like

25   business relationship, 70, 75, 65, would be typical of a

1    bundle, of normal quality.

2    Q    You mentioned earlier that cutting agents can be added to

3    heroin?

4    A    Yes.

5    Q    What types of cutting agents can be added?

6    A    The list is really, I mean, it's extraordinary.  In terms

7    of anything that's powdery, there are things that are used

8    just to add volume to it, or weight.  They use stuff called

9    mannitol, they use lactose, they use baby formula.  They'll

10   sometimes use talcum powder just to add weight.

11         They will use, sometimes they'll grind pills,

12   Percocets, other opiates, OxyContins.  There are all sorts

13   that they'll grind up in a grinder and add to the heroin to

14   give it the right texture, taste, flavor, and impact on the

15   person that's using it, so cut it with lots of different

16   things, depending on the person who's doing the mixing.

17   Q    In your experience, is morphine sometimes added to heroin

18   as a cutting agent?

19   A    Morphine could be added to, for the same reason that

20   OxyContins or Percocets or other opiates or pain killers are

21   ground up and added.

22         MR. VATTI:  Just one moment, your Honor.

23   Q    In the context of heroin and crack distribution, are you

24   familiar with the term "dollar" or "buck"?

25   A    Yes.

```
 1   Q     Have you seen that, in your experience?

 2   A     Yes, I've seen that many times.

 3              MR. REEVE:  I'm sorry, I hate to interrupt.  I

 4   object.  It's an ambiguous term, more than one meaning, no

 5   foundation.

 6              MR. VATTI:  I believe I was laying the foundation.

 7   May I continue?

 8              THE COURT:  Yes, sir.

 9   A     I have seen that term.

10   Q     Have you seen that, in your experience, in wiretap cases?

11   A     Yes.

12   Q     And specifically in the context of drug investigations?

13   A     Yes.

14   Q     And does it have a particular meaning in that context?

15   A     It can, yes.

16   Q     And what is that meaning?

17              MR. REEVE:  Well, I object.  "It can."  He did not

18   say it does.

19              THE COURT:  Let's get a clarification.  Ask the

20   witness what he means.

21   Q      In the context of drug investigations, do you see

22   frequently references to quantities?

23   A     Yes.

24   Q     And are those quantities frequently referenced in coded

25   language?
```

1   A    Yes.

2   Q    Is "dollar" and "buck" a phrase that is frequently used

3   to disguise a quantity that is being suggested in drug

4   investigations?

5   A    Yes.

6   Q    And what is "dollar" and "buck" used for?

7         MR. REEVE:  Again, I object, because it hasn't been

8   established that it only has one meaning.  If it has more than

9   one meaning, can't testify to that.

10        MR. VATTI:  Well, "dollar" obviously has more than

11  one meaning since I have a bunch in my wallet.  But in the

12  drug context it has a particular meaning, and that's what his

13  testimony is limited to.

14        THE COURT:  Yes, overruled.

15  A    In the drug context, it would reference a hundred.  A

16  "dollar" or "buck" would reference a hundred of whatever it is

17  they're referring to.

18  Q    Again, in the drug context, have you heard the term

19  "fire"?

20  A    Yes.

21  Q    What does that signify?

22  A    "Fire" is one of the more common ways to describe drugs

23  that are potent or powerful or strong.  So if they say, "You

24  got the fire," "Do you have the fire," they're talking about

25  is it good?  Is it high quality?  Good heroin or cocaine.

Q     In the context of coded language that is being used to
describe drug trafficking, are there certain phrases that drug
dealers will use to signify that they have a lot of customers,
that customers are waiting on them?

A     Well, I mean, there are conversations about it, yeah.

Q     And what are some of the typical phrases that you might
see that suggest that someone intends to redistribute drugs?

A     Well, they'll reference, you know, they'll reference it
whether the people like it, this is selling, how it's selling,
whether there's high demand for it.  Lot of times, they'll say
especially with heroin because the quality is so different
depending on, you know, where it comes from.

          And maybe the stamp is on it, you'll see lots of
conversations, they don't like this stamp or they like this
other stamp.  Stamps are sort of brands that they put on the
bag.

          There are many, many conversations heard and
listened to that refer to how the people -- how the product's
selling, basically.

Q     And is it frequent, in your experience with heroin
distribution, to use individuals to test the heroin?

A     Yes.

Q     And explain that to us.

A     With heroin, in order to determine whether it's good,
because there are so many different kinds of it and so many

1   things added to it and so many different stamps put on it,

2   typically they will buy or get a sample and buy a small

3   portion and take a bag and have one or two more people test

4   it, which means they'll try it, they'll shoot it and use it.

5   Drug users, probably drug addicts, shoot it, use it, and

6   report back to the distributor whether it's good or not.

7   Q    Now, you had mentioned earlier that there are various

8   coded phrases that are used to refer to drug quantities in

9   conversations over the phone.

10  A    Yes.

11  Q    In your experience, are there phrases that are used once

12  an individual establishes a regular relationship and a regular

13  quantity that they get?

14  A    Yes.

15  Q    And what typical phrases do you see in that situation?

16  A    Almost always, you'll see people ask whether or not the

17  person is ready.  So, "Are you ready?"  Do you have the money

18  or the drugs?  "Are you ready?"  "Yes, I'm ready."  "I'm going

19  to get you right."  "Get you right" means, "I'm going to get

20  you your drugs."

21          They'll refer -- very infrequently will they ever

22  say, "I want X grams of cocaine" or "X grams of heroin."

23  They'll just say, "Yeah, I need four," or, "I want the same."

24  Very, very common to limit the conversation between the buyer

25  and the seller.  So "the same," "are you ready," "get you

```
 1    right," "I'll see you," "can you come see me?"  "Can you come

 2    see me" means "are you ready?"

 3            You know, all these sort of seemingly mundane sort

 4    of conversations that really are directed at whether the

 5    person has drugs or money and whether they're ready to do a

 6    deal.

 7    Q    We talked about some of the tools of the trade of crack

 8    distribution.  What are some of the things you might see in a

 9    heroin operation in order to package heroin for street-level

10    distribution?

11    A    Okay.  In a heroin operation, you would likely see those

12    little glassine folds.  They sell them in little boxes, little

13    boxes of them that contain hundreds and thousands of these

14    bags.  You might see a stamp, little ink stamp.  You might see

15    an ink pad.  The stamp will have some word or stamp on it,

16    they'll stamp on the bag.  You will see a grinder or spice

17    grinder, a grinding machine.  You will see scales again.

18    You'll see elastic bands, very typically, to wrap the bundles

19    together.  See a grinder, or a little bit bigger for spice.

20    You will see cutting agents, mannitol, baby formula.  Razor

21    blades, utility knives.

22            You could see, again, if they're keeping the money

23    where they're keeping the drugs, you might see indicia of the

24    money.  Could be elastic bands, a money counting machine,

25    things like that.
```

```
 1   Q     And in drug trafficking, in your experience, do you see

 2   the use of multiple cell phones?

 3   A     Yes.

 4   Q     And why is that?

 5   A     Because typically, these guys are concerned with the law

 6   enforcement authorities are going to find out what phone they

 7   use, and they're also concerned about cellularizing or

 8   compartmentalizing their business.

 9          Very often they'll use one phone to call their

10   customers, another phone to call their workers, and another

11   phone to call their suppliers.  They might have separate

12   phones for each supplier.

13          Depending on -- one guy might just have one phone

14   and call everybody on it.  That's not very typical.

15          More often, they'll have different phones for

16   different people, and they won't keep phones for very long.

17   So if they have a phone, they're using it, and for some reason

18   they feel like this is not a good reliable phone anymore,

19   "Maybe I've used it too long," "Maybe law enforcement is aware

20   of it," then they'll get rid of that phone and maybe get rid

21   of all their phones and change them all.

22          The basic reason why is so their business and their

23   work goes undetected from law enforcement, and the people in

24   their organization don't have access to their suppliers and

25   their customers.
```

1   Q    How about firearms, are they a tool of the drug

2   trafficking trade?

3   A    Very often, yes.

4            MR. MORAGHAN:  Your Honor, I'm going to object.

5            MR. VATTI:  I think this was ruled on pretrial, your

6   Honor.

7            THE COURT:  I think so, too.

8            MR. MORAGHAN:  Also, your Honor, it's beyond what he

9   has been offered for as an expert on terms.

10            THE COURT:  I'm sorry, I couldn't hear you.

11            MR. MORAGHAN:  He's been offered as an expert on

12   drug terms and drug organizations.  Now he's beyond that.  He

13   entered a different area for which he hasn't been offered as

14   an expert.

15            MR. VATTI:  Your Honor, he was offered as an expert

16   on general practices of drug distribution, including

17   terminology that is used.

18            THE COURT:  I'll overrule the objection.

19   Q    My question was, in your experience, are firearms tools

20   of the drug trafficking trade?

21   A    Yes, they are.

22   Q    Why is that, in your experience?

23   A    That is because it is a business that involves valuable

24   substances that are illegal drugs and large amounts of cash.

25   And it's not the sort of business where, if you lose your

1    drugs or your cash, you can call the police and report it.

2            It's the sort of business where you have to defend

3    yourself, and the sort of business where you have to protect

4    your assets by yourself.  Some of the people that are involved

5    in the business are inclined to steal what you have, to steal

6    your money when you bring it to buy your drugs, and so guys

7    will bring guns to drug deals.  Others will have guns they use

8    to protect the places where they store their drugs and their

9    money.

10           So, you know, not everyone has a gun that's involved

11   in the drug business, but it's definitely a very typical tool

12   of the trade.

13           MR. VATTI:  Just one moment, your Honor.

14   Q    My last question is just if you can describe for us

15   common terms and phrases that you would typically hear in

16   wiretaps referring to drug proceeds.

17   A    To the proceeds?

18   Q    Yes.

19   A    I mean, can't think of a specific term, but --

20           MR. REEVE:  That's the answer, your Honor.

21           MR. MORAGHAN:  Your Honor, he answered the question.

22           MR. VATTI:  That's fine, your Honor.  No further

23   questions.

24           MR. MORAGHAN:  May I have one moment, your Honor?

25   Just cleaning up here.

```
1    CROSS-EXAMINATION

2    BY MR. MORAGHAN:

3    Q     Good afternoon, Agent Zuk.

4    A     Good afternoon.

5    Q     I represent Philip Bryant, sitting in the purple shirt.

6    You testified about a bundle --

7    A     Yes.

8    Q     --  being an extremely common term?

9    A     Yes.

10   Q     But it has different meanings, doesn't it?  You can have

11   a bundle that consists of five bags, you can have a bundle

12   that consists of ten bags, depending on where you are?

13   A     Well, I don't think I've ever seen a bundle of five.  I

14   guess theoretically you could have anything, but I've seen

15   bricks that are five bundles.  But a bundle, in my experience,

16   is ten bags.

17   Q     You've never seen a bundle containing five folds?

18   A     No.

19   Q     Okay.  Have you done any investigation work in New Haven?

20   A     I've been involved in cases that have relationships to

21   New Haven, but not New Haven specifically.

22   Q     Have you done narcotics cases involving New Haven?

23   A     Well, I've done search warrants in New Haven where I've

24   seized narcotics.  I've done interviews of people who sell

25   narcotics in New Haven.  I've reviewed wiretap phone calls,
```

```
 1   and I've worked on wires of drug cases in New Haven, yes.
 2   Q    And it's your testimony you have never seen a bundle
 3   consisting of five bags?
 4   A    Yes.
 5   Q    Okay.  Did you review any documents before you testified
 6   today?
 7   A    Only, I looked at my transcript from a different trial
 8   that I testified in.
 9   Q    Okay.  And did you listen to any wiretap sessions?
10   A    No.
11   Q    Did you review any DEA 6s?
12   A    No.
13   Q    And just so the jury will understand what we're talking
14   about, what is a DEA 6?
15   A    A DEA 6 is the investigative report that the DEA would
16   use.  So they would write whatever they did investigatively,
17   they would document that on a form that they call a DEA 6.
18   Q    And that's the equivalent of an FBI 302?
19   A    Yes.
20   Q    So it's a report that's prepared concerning the agent's
21   work in a particular matter?
22   A    Yes.
23   Q    Okay.  Did you discuss anything pertaining to this case
24   with any of the other agents?
25   A    Not in any detail, no.
```

1    Q    Okay.  When you say "not in any detail," what exactly did

2    you speak to them about?

3    A    Well, I don't want to say I didn't discuss it with them

4    at all, because part of the time you're outside and guys are

5    making reference to there's a trial this month.  So there are

6    things that I've talked to the agents that are involved and

7    have referenced this case, but I haven't talked to them about

8    their defendants, who they are, what the charges are, what the

9    wire calls said.  Nothing specific about the case.

10         Only sort of generalities about, you know, there's a

11   trial coming, and this guy's got this lawyer.  Things like

12   that.

13   Q    Thank you.  Thank you.  Now, you testified about being a

14   lead case agent.

15   A    Yes.

16   Q    And I believe you said you were lead case agent

17   approximately 20 times?

18   A    Yeah, it's an approximation because I haven't gone back

19   over 15 years to, say, to break it down.  But that's

20   approximately what I would say in terms of wire cases, yes.

21   Q    And I missed this.  How many times were you a lead case

22   agent in New York versus lead case agent in Connecticut?

23   A    Yeah, I think that was a reference to the New York work,

24   the 20.  Here, I've been involved in three or four lead cases

25   in three or four drug investigations, but those might include,

1    say, in those three cases, there might have been 15 or 20

2    wiretap orders.  So it's kind of hard to break it down.

3            Was I a lead case agent for 25 wires or 20 wires or

4    was it just for three cases because we did 20 wiretaps in the

5    three?  So it's kind of, you know, it's not a precise -- I

6    can't give a precise answer.

7    Q    All right.  Okay.  Now, as lead case agent, you are the

8    overseer of the investigation?

9    A    Yes.  Yeah.  With help from the U.S. Attorney's Office,

10   and your bosses and colleagues.  But yeah, it's your primary

11   responsibility.

12   Q    Is it fair to say you work hand-in-glove with the U.S.

13   Attorney's Office in the investigation?

14   A    Yes.

15   Q    And when an investigation starts, let's say for instance

16   you get a call from a local police department and they ask you

17   to look into it, do you immediately call the U.S. Attorney's

18   Office or do you start to do an investigation?  How do you get

19   your investigation started?

20   A    Yeah, it would depend, I guess, on how it came in.  But

21   there would be times where you may start it, you may start

22   discussions with a local department and do some things before

23   the U.S. Attorney's Office would be involved.

24           If you're using informants and cooperating witnesses

25   and things like that, much of the things, many of the things,

1    that you do require their approval.  So in those cases, they

2    would be involved earlier on.

3    Q    Okay.  So they usually get involved fairly quickly?

4    A    I would say that's right.  Usually they're involved

5    fairly quickly.

6    Q    Okay.  And as part of your duties as a lead case agent is

7    to review the phone calls?

8    A    Yes.

9    Q    To listen to the sessions?

10   A    Yes.

11   Q    And just so the jury will understand what we're talking

12   about, can you describe what a session is?

13   A    Yes, a session is what we reference to either a call or a

14   text.  So if it's just phone calls, you would reference a

15   session would be one call.  You would be at a computer waiting

16   for a call to come in, the computer would light up, and you

17   would see that there's an incoming call or outgoing call, we

18   would call that a session.

19         It might be just that the person mistakenly dialed

20   his phone.  Whatever that phone did.  So it interrelated with

21   the phone system, that would be a session.  Sometimes there

22   are hang-ups.  Sometimes there are incoming calls that don't

23   get answered.  Sometimes there are texts.  There are all

24   different things.  Any thing, any activity on the phone, we

25   call it a session.

1    Q    So the short answer is the call is a session, or the text

2    is a session?

3    A    A call would be an example and a text would be an

4    example.

5    Q    Okay.  As the lead agent, you cannot hear every one of

6    those calls, can you?

7    A    Well, it depends.  But often, no, you can't.

8    Q    You rely on the people who are working with you?

9    A    Yes.

10   Q    Okay.  I'm going to call them underlings, but that's not

11   to demean what they do.  They are equal with you, but you're

12   in charge?

13   A    Right.

14   Q    So they work for you?

15   A    Right.  They don't work for me technically, but they're

16   assisting what they know is primarily my case.  Yeah.  Yeah,

17   we're on the same level and one day I may help them, but on

18   that day they're helping me.

19   Q    You're in charge, so they work for you; on the next day,

20   someone else is in charge and you work for him?

21   A    In a way.

22   Q    As the lead case agent, are you responsible to prepare

23   all the affidavits that are submitted in the investigation?

24   A    No, not all of them.

25   Q    Okay.  The people who are working with you, for you, also

1    can prepare affidavits?

2    A    They can.   It would depend on each case.   There are some

3    cases where the case agent may do them all; there are other

4    cases where they may say, "Let's have somebody else do this

5    one."

6    Q    But the lead case agent will review the affidavit before

7    it's finalized?

8    A    Yes.

9    Q    Okay.   Will the lead case agent meet with the U.S.

10   attorney and review the affidavit before it's finalized?

11   A    Yes.

12   Q    So before anything is finalized, it's reviewed by the

13   lead case agent, and it's reviewed by the assistant United

14   States attorney who's assisting the investigation?

15   A    Yes.

16   Q    Okay.   And you review that to make sure it's accurate?

17   A    Yes.

18   Q    Complete?

19   A    Yup.

20   Q    Truthful?

21   A    Yup.

22   Q    You wouldn't include something in the affidavit that you

23   knew was factually incorrect?

24   A    That's right.

25   Q    Because then that affidavit is eventually going to be

1   presented to a federal judge?

2   A    Right.

3   Q    You want to make sure it's complete, and as accurate as

4   possible?

5   A    Right.

6   Q    You also, as the lead case agent, have at times testified

7   in front of a grand jury?

8   A    Yes.

9   Q    Is that a common situation for a lead case agent?

10  A    Yes.

11  Q    And again, in addition to the affidavits, did you review

12  your co-agents', using FBI, do you review their 302s, make

13  sure they're accurate as the lead case agent?

14  A    I don't know if you would review them to make sure

15  they're accurate.  I would say not all the time.  There are

16  some times where they might write a report and submit it, and

17  it's filed before the case agent has seen it.

18         Typically, in my cases, I would request that before

19  anybody puts something final into my case file, to take a look

20  at it.  That doesn't happen all the time.  So much going on,

21  there are times that's just not possible.

22  Q    I understand.  If you can, would you like to see it?

23  A    Yes.

24  Q    Again, would you make sure that it's accurate and

25  complete?

1   A    Yes.

2   Q    Okay.  Would you recommend deleting something that you

3   thought was unnecessary?

4   A    I might.

5   Q    And would the agent working for you then do that?

6   A    Well, it would depend on -- it would depend on what the

7   context was and what the thing is, but you would discuss it

8   and if it was appropriate -- if it was inappropriate to put it

9   in the report, you would try to come to an agreement and have

10  it taken out.  If it's appropriate that it stay, the person

11  writing the report, it's his report so he's in command, he's

12  in control of the document.

13  Q    But as the lead case agent, you are ultimately

14  responsible for everything that takes place in that

15  investigation?

16  A    I don't know if that's fair to say, "ultimately

17  responsible."  You are the person who, more than anyone else,

18  wants to make sure that everything is done right.  But if

19  there were mistakes made, if you're saying you're responsible

20  in that sense, I'm not sure that that would be true.

21  Q    You spent some time talking about different terms for

22  different types of narcotics.  You discussed a bag of heroin,

23  a bundle of heroin, a brick of heroin.  Have you ever heard of

24  a bag of heroin being described as a deck?

25  A    Yes.

1    Q    Okay.  So that's another term?

2    A    Yes.

3    Q    But it has a meaning of a bag?

4    A    Yeah.

5    Q    Okay.  And have you heard heroin referred to as a finger?

6    A    Yes.

7    Q    A finger of heroin?

8    A    Yes.

9    Q    And a finger of heroin would be what?

10   A    I think a finger of heroin is about ten grams.

11   Q    And a stack of heroin?

12   A    A stack, I'm not sure.  I mean, guys will use that to

13   refer to a bundle, a brick.  I'm not -- I wouldn't want to say

14   that to me, if I saw that word, I would have to look more at

15   the calls to determine what it was.  It wouldn't, like a

16   bundle, just jump out and I know it.  I would have to look at

17   that in context.

18   Q    Okay.  So there are different terms used in different

19   areas that you might not be familiar with, describing, for

20   instance, heroin packaging and distribution?

21   A    Yeah.

22   Q    Okay.  And again, have you ever heard an amount of heroin

23   being referred to as a box?

24   A    Not that I'm aware of.

25   Q    Okay.  As far as crack cocaine, you talked about an eight

```
1    ball being the common phrase?

2    A    Yes.

3    Q    Have you ever heard it referred to as a busy?

4    A    No.

5    Q    Have you ever heard it referred to -- talking about crack

6    cocaine now, not the amount but have you ever heard an amount

7    of crack cocaine referred as a big eight?

8    A    A big eight?

9    Q    Yes.

10   A    Well, I've heard eights.  I don't know about big eight.

11   Q    How about six trey?

12   A    Six trey?

13   Q    Yes.

14   A    Yeah.

15   Q    So there are different terms, again, that are being used

16   throughout the narcotics industry, so to speak?

17   A    Yeah.

18   Q    Okay.  And is it fair to say that the larger the amount

19   of substance you're dealing with, the more likely it is that

20   the name, the code name, will change?  For instance, we're

21   always going to have a bundle?

22   A    Right.

23   Q    We're always going to have a brick.  But a kilo of heroin

24   on one day may be a shirt, correct?

25   A    Well, yeah, those are terms that, you're talking about
```

```
 1  terms that, might be specific to a particular organization,
 2  where one might say it's a shirt, one might call it, you know,
 3  there are a million different things you might call a kilo.  A
 4  bird.
 5  Q    Call them pants?
 6  A    Yeah.
 7  Q    Socks?
 8  A    You could pick any word and agree that this is going to
 9  mean kilo, if you're dealing with one person.
10  Q    Okay.  Would it be fair to say that the terms change when
11  the amounts you're dealing with are more substantial?  The
12  street-level terms usually remain the same?
13  A    I think that's generally true, yes.
14  Q    Okay.  And there are certain terms that can apply to any
15  drug, correct?  Cocaine, heroin, or marijuana?
16  A    Yes.
17  Q    Okay.  And in order to determine what substance was being
18  discussed, that's where a wiretap would come in, you would be
19  able to hear people talking?
20  A    Yes.
21  Q    And based upon the conversations, you can try and
22  determine what substance is involved?
23  A    Yeah, the conversations and other things in the case, but
24  yes.
25  Q    And the cost would also be a big factor, correct?
```

1   A    Yes.

2   Q    If you're talking about a kilo of marijuana, that's

3   significantly different than a kilo of cocaine?

4   A    Right.

5   Q    And significantly different than a kilo of heroin?

6   A    Right.

7   Q    Are you familiar with the laboratory reports that are

8   prepared as a result of seizure of narcotics?

9   A    Yes.

10  Q    Okay.  And when a narcotic is seized, okay?  You take it

11  as you find it, is that a fair statement?

12  A    Not sure quite what you mean by that.

13  Q    Okay.  If there is a confidential buy, and someone

14  receives what purports to be an ounce of cocaine, and that's

15  given to a confidential informant, that confidential informant

16  will eventually provide it to you, and you would take it in

17  the same manner in which he's received it, bagged and

18  packaged?

19  A    Yes.

20  Q    Okay.  So when you receive it, that is how it is sent to

21  the laboratory for analysis?

22  A    Not necessarily.  Sometimes you might want to photograph

23  it.  Other times you would test it.  You would open it, take a

24  portion of it to test it.  So -- but you would then send

25  typically the original packaging along with the drug in a

1   sealed envelope to the lab.

2   Q    So the original packaging, the rubber band, anything

3   associated with that packaging, would be sent to the lab?

4   A    It would depend.  If the packaging is in direct contact

5   with the drug, certainly that's going to go to the lab with

6   the drug.  Like for me as an FBI agent, I wouldn't be pouring

7   drugs out of one bag and then sending the drugs to the lab.  I

8   would leave it in the bag that it was in.

9          But if that bag was in three or four other bags, I

10  may take those bags, take them away and mark them as an

11  exhibit.  I wouldn't throw them away, but I would mark them as

12  a nondrug exhibit and keep them, but I might not necessarily

13  send them all to the lab.

14  Q    When the lab receives the substance you obtained, they

15  weigh that?

16  A    Yes.

17  Q    And there's a gross weight and a net weight?

18  A    Yes.

19  Q    And the gross weight would include what?

20  A    The gross weight would include all of the packaging.  So

21  if you sent heroin in the glassine folds, they would weigh the

22  paper, the glassine, along with the drug, and they would give

23  you a gross weight.

24  Q    And the net weight would be the substance less everything

25  else?

1    A    Right.  They would empty all the powder out and they

2    would weigh it separately.

3    Q    Now, in your experience, talking about heroin, in a bag

4    of heroin, do you know, in your experience, typically how much

5    is found in a bag of heroin?

6    A    I think my understanding is that the average, the

7    standard, is about .03 grams per bag, and that's like I say

8    you dump it all out and weigh it.  So there could be some bags

9    that have a little less or a little more, but my understanding

10   is .03 is the standard.

11   Q    Okay.  Sometimes, have you heard that dealers will

12   sometimes short a customer?

13   A    Yes.

14   Q    And what does that mean to you?

15   A    That means they would sell them less than what the

16   customer expected to get.

17   Q    Okay.  And is that common?

18   A    It's, I would say it's pretty common.

19   Q    I'm sorry?

20   A    It's pretty common in terms of it happens.  Whether it's

21   intentional sometimes or not, I'm not sure.  It's not good

22   business to consistently short a customer.  You'll lose the

23   customer.

24            But, yes, in almost every wire at some point here or

25   there, you'll hear somebody claims they didn't get what they

1    bargained for.

2    Q    Okay.  Now, you have dealt with confidential informants?

3    A    Yes.

4    Q    Okay.  And what is your understanding of a confidential

5    informant?

6    A    Well, see, we, as the bureau, we would think of it as two

7    different kinds of informants:  Those that are confidential,

8    those are guys that you wouldn't make recordings with, they're

9    guys that would give you information that you would sort of

10   hold and use on your own without disclosing the person.  So

11   I'm not certain.

12        Then we would have a second category of person that

13   we would call a cooperating witness that is still

14   confidential.  You don't tell people that he's working for

15   you, but you would use him in such a way that he might make

16   recordings, he might do drug buys, he might do things that you

17   know might result down the road in his coming here to testify.

18   He's not confidential because he's going to testify.

19        I don't know if that answers your question.  We have

20   two different categories of persons that help us.

21   Q    Okay.  Confidential informant and confidential witness?

22   A    Cooperating witness, we would say, and confidential

23   informant.

24   Q    Based on your experience, would you agree that they are

25   generally unreliable?

```
1    A     I would say no, I would not agree with that.

2    Q     Okay.  Would you agree that at least in the beginning

3    stages, they often lie?

4    A     I would say there are some that lie, and I don't know

5    that that has any relationship to the beginning stages.

6    Q     Okay.  And if you have a confidential informant or

7    confidential witness who is lying, what do you do to them?

8    A     Well, again, you know, it depends on what, why they're

9    cooperating.  Are they cooperating for money?  It would be a

10   lot of different circumstances.

11   Q     If someone's cooperating because he has been arrested,

12   okay?

13   A     Yeah.

14   Q     And you found, after the fact, that he had been lying to

15   you about matters.

16   A     Yeah.

17   Q     What would you do with him?

18   A     It depends.  If there's somebody that we find is lying to

19   us to the point where it's just not a person you can trust and

20   deal with, we would close them and wouldn't use them.  There

21   may be a time where a guy says something that he knows wasn't

22   true but is not so substantial, and you work it out, you talk

23   to the prosecutors and you make the determination that, if

24   he's brought in, if he's, you know, warned and advised and

25   rehabilitated to the degree that you believe that he can go on
```

```
 1    and work with you without lying again, then you may use that
 2    person.
 3    Q    And if he is warned and rehabilitated in a situation like
 4    that, would that generate an FBI 302 or a DEA 6?
 5    A    Yeah.  Typically, yeah.
 6    Q    Okay.  So if there is not an FBI 302 or a DEA 6, that
 7    would seem to indicate that that issue has never arisen?
 8    A    See, that's a complicated question.  It would either
 9    indicate it hadn't arisen or there is an agent that wasn't
10    aware of it.  But for me, if I was doing something and an
11    informant or witness came back and told me something that I
12    knew wasn't true, I would document that.
13    Q    Okay.  Going to drug dealers as opposed to the informants
14    and witnesses, based upon your experience, would you agree
15    that they are generally unreliable?
16    A    No.
17    Q    Okay.  Would you agree, Agent Zuk, that drug dealers
18    often lie?
19    A    I would agree that they lie; often, I don't know.
20    Q    Agent Zuk, do you recall testifying in United States
21    versus Thompson?
22    A    I testified in several trials, and including this one.  I
23    was never aware of who it was was on trial.
24    Q    I believe it was a trial last month.
25    A    Okay.
```

Q    And you were asked a question, "Do drug dealers often
lie?"  And you said yes.

A    Yeah, I don't know the context.  They do lie.  I don't
know what you mean by "often."  But there are times when they
lie, and it's documented on the wire.

        But to say that they're generally unreliable or lie
all the time, it would be hard to stay in business.  I guess
that is where I'm coming from.  But if I said that, I mean,
I'm agreeing that, yeah, sure, it's a business where sometimes
telling the truth doesn't further your business.

Q    Okay.  Would you also agree that drug dealers can often
puff?

A    Yeah.  Again, quibble with "often."  But do they puff?
Yes.

Q    Could you explain what you mean by "puff"?

A    You mean exaggerate, exaggerate their business,
exaggerate their ability.  "I could do this all the time," "I
could sell you this" or that.  There are times when it serves
their purposes to say things that they're capable of more than
they really are.

Q    Okay.  And they also like to exaggerate to increase their
street credibility, would that be a fair statement?

A    I don't know.  You know, a lot of these guys, they don't,
they don't want the street to know what they're doing.  They
want their customers to know and the people they work with to

1    know, but they don't want to go out on the street and

2    exaggerate, "Hey, I'm a huge drug dealer."  You don't want to

3    bring attention to yourself generally.

4    Q    Don't they want to get more customers?

5    A    Well, you want to get more customers.  Depends what role

6    you're in.  Is it the guy selling or the guy supplying the

7    people selling?  Knowing nothing about the case, it's hard for

8    me to put all that in context.

9    Q    What procedures do you employ to guard against a CI or CW

10   becoming unreliable?

11   A    Well, we, when we sign the person up to work with us, we

12   go over the rules and we explain to them from the very

13   beginning that the most important part of our relationship is

14   that that person has to tell the truth.  So we make that

15   clear.

16          We read specific warnings and advisements of how it

17   is they have to comport themselves.  We make them sign that

18   agreement, typically.  And then we are careful in terms of

19   what we do to watch them, to search them before they do

20   things.

21          For example, before a drug buy, we would search the

22   person to make sure they don't have drugs or money on them.

23   There are a number of things we would do that help us

24   establish that the person's doing what we expect them to do

25   without any deceit.

1    Q     Okay.  Is it fair to say you need to corroborate what

2    they're doing?

3    A     I don't think you need to corroborate it, but what you're

4    trying to do is ensure that what they're doing is not going to

5    be assailable or attackable down the line at a trial or

6    hearing in front of a judge.  All the stuff that you do,

7    keeping in mind that these are issues that could be litigated

8    and argued about in court.

9              So you want to do everything you can possibly do to

10   ensure that a jury and a judge down the road understands that

11   what happened is what you expected would happen.

12   Q     Okay.  If a confidential CI or CW tells you something, do

13   you try and corroborate what he's told you?

14   A     It would depend on what he's saying.

15   Q     Suppose he tells you that someone is selling X amount of

16   grams down the street.

17   A     Yes.

18   Q     What would you do?

19   A     Well, if that's a case that you decided to work on, you

20   would try to corroborate it in terms of asking other sources

21   about the person, and you may then use the informant himself

22   to corroborate it in terms of making phone calls or having

23   meetings with the person, that you would record and then you

24   would have, in that fashion, the witness or the informant

25   would sort of self-corroborate what he's saying by engaging in

```
 1   a conversation and making a recording.

 2   Q     Record a conversation?

 3   A     Yes.

 4   Q     Or in some cases, it could be a controlled buy?

 5   A     Yeah, in some cases there might not be anything at all

 6   except a conversation.  That's the distinction between the

 7   cooperating witness and the confidential informant.  For an

 8   informant, you might just have a guy who has a conversation.

 9   You might not do a recording.  You might just have him talk to

10   a person.

11   Q    If it's just his word, is that sufficient for you to act

12   on?

13   A    It depends what you mean by "act on."  There are guys

14   that you work with that you've worked with for many years and

15   that you trust, and if they say something, I would believe it.

16   Q     And you would act upon it?

17   A     And I would act upon it.

18   Q     And you would take steps to make sure what you said was

19   accurate?

20   A     I may.  I may accept that it's accurate.  You know, it's

21   difficult in a vacuum to discuss it, but yeah, if I trust the

22   guy that I've worked with and call him whatever you want, CI

23   or CW, if you trust the person, generally you believe what

24   they're telling you.

25               But you do certain things to make sure that
```

1    everybody else believes the person, this jury believed the

2    person, and the Judge believed a person when it comes time to

3    litigate the case.

4    Q    If a CI or CW told you that somebody on the street is

5    selling 100 grams of heroin every week, you would not go and

6    arrest that person?

7    A    Right.

8    Q    You would have to corroborate what the CI or CW told you?

9    A    Right.

10   Q    You do that through recordings, wiretap, hand-to-hand

11   sales, et cetera?

12   A    Yeah, surveillances.  Right.

13   Q    Would you agree that the conversation between a target

14   and another party he's speaking with is not always necessarily

15   accurate?

16   A    Yes.

17   Q    Okay.  And again, you would take efforts to corroborate

18   the information you're hearing?

19   A    Yes.

20   Q    And you do that in every case?

21   A    I mean, we don't do it with respect to every conversation

22   in every case.  But if it's a meaningful conversation that's

23   important, you may take steps to corroborate or determine

24   whether it's in fact true, yes.

25   Q    Depending on where it is in the hierarchy of the

1    investigation?

2    A    Right.

3    Q    Okay.  Now, heroin, we talked about, sells in bags and

4    bundles and bricks.  Would you agree that that is basically

5    considered street-level sales?

6    A    Yes.  Well, bags are clearly street-level sales but

7    bricks are sold, bricks and bundles are sold, dealer to

8    dealer.  So it would depend on how many and what quantity.

9    Q    But an individual heroin user could go through a bundle

10    in a very short period of time, couldn't he or she?

11    A    A user could use multiple bags a day, so they could use a

12    bundle in a fairly short time, depending on their habit, yes.

13    Q    In the overall scheme of things, would you agree that the

14    people who are in that situation of dealing in bags and

15    bundles and bricks are basically lower level?

16    A    Well, in context of hundreds of kilos coming from South

17    America, they're lower level.  But you can make literally tens

18    of thousands of dollars in a week selling bricks, if that's

19    all you do.  So the brick itself, it's just a question of how

20    many of them you sell.

21    Q    In a wiretap that you testified about, you have an

22    investigation that's already pending, correct?

23    A    Yes.

24    Q    The wiretap is not the first part of the case?

25    A    Right.

1   Q     There's an investigation, may have been referred to you

2   by local police, you may have made an arrest, you may have

3   found something as a result of another investigation, so you

4   start a separate investigation?

5   A     Well, it would be the same investigation, but it would be

6   a new avenue in the same investigation.  If you're

7   investigating a drug group, you have information about it and

8   then you want to develop it into a wire.  It would just be a

9   continuation using a different technique.

10   Q     Okay.  As you start out, you start out on the ground

11   floor, you try and get a relationship with someone who's

12   selling on street levels?

13   A     Again, it all depends on what case you're talking about.

14   There are things, like you said, by the time you get to a

15   wire, there's a lot that's happened in the case.

16   Q     We're not at the wire, we're at the very beginning, and

17   let's talk about Bridgeport not New York.  That's basically

18   street-level investigations?

19   A     What's the question now?

20   Q     When you start your investigation, is it accurate to say

21   you start at the bottom on the street-level sellers, try to

22   make a relationship and make a purchase from street-level

23   sellers?

24   A     Many times yes, but not always.

25   Q     Many times?

1    A    You may start with an arrest of somebody who's higher up

2    in the organization, and then that person may cooperate and

3    you're starting from a much higher level and working down.  We

4    commonly do that in gang cases.

5    Q    Work at a higher level and work down?

6    A    Start with higher level guys and work downward.

7    Q    In drug cases, are you looking to get the source of

8    supply?

9    A    In drug cases, yes, you're looking for the source of

10   supply, the other way.

11   Q    In drug cases, it's common to work up?

12   A    Yes.

13   Q    Would you say it's uncommon or unusual to work down?

14   A    No, I would say it would be uncommon to only work down,

15   but it would be common to do both because you want to identify

16   the organization from top to bottom.

17   Q    You worked in the United States Attorney's Office in the

18   District of Connecticut for about three years?

19   A    Yes, sir.

20   Q    And during that time, were you familiar with the term a

21   "5K1.1"?

22   A    Yes.

23   Q    Okay.  Can you tell the jury what a 5K1.1 is?

24   A    5K1.1 is, it's a reference to -- exactly what it is, no.

25   It's -- where is it codified?  It's a reference to the process

1    of cooperating, a person with a federal case cooperating with

2    the government authorities in order to make cases against

3    other people, and the process by which they get credit for

4    that is controlled by Section 5K1.1, which requires the U.S.

5    Attorney's Office to write a letter describing what the person

6    did, and then that letter would get presented to a judge when

7    the person is sentenced.

8          It's a way in which, if you've committed a federal

9    crime, it's a way in which to reduce the potential sentence

10   you would face.  You reduce it by, number one, agreeing to be

11   truthful; number two, providing information that results in a

12   case against somebody else; and then your work is codified in

13   a letter or, you know, not codified, written in a letter and

14   presented to a judge, who then determines whether that would

15   affect the sentence that you would get.

16   Q    And depending on the type of a case, charge that the

17   person is convicted of, a 5K1.1 motion can also remove any

18   mandatory minimum periods of incarceration from the case,

19   isn't that accurate?

20   A    Yes.

21   Q    Okay.  So would you agree that for a witness who's

22   arrested in a large drug case such as this, it's in his best

23   interest to seek out a 5K1 motion?

24   A    Well, often so.  Not always, but often, yes.

25   Q    When would it not be in his interest to get a 5K1 motion?

1   A    It's always in his interest to get his sentence reduced,

2   but there are some people, given the conduct that they've

3   committed or the exposure, sometimes, in order to get the 5K --

4            It's in the sentencing guidelines.  It's Section

5   5K1.1 of the sentencing guidelines.  In order to take

6   advantage of that, you have to be comfortable that you can

7   come in and truthfully tell this U.S. Attorney's Office about

8   everything you've ever done in your -- every crime, they're

9   going to explore it.  Things you may not even be charged with.

10            There are times a lawyer may say to his client,

11   "It's a good process but it may not work for you."  There are

12   times when, you know, even though you always want a sentence

13   reduction, the 5K1.1 process might not be appropriate.

14   Q    Only if you're concerned about your own safety or if you

15   are forced to reveal information about family members?

16   A    Yeah.  Like you said, it's a process that your own safety

17   is really important because to engage in that, to get that

18   letter, you have to -- basically, the person who you

19   cooperated against is going to find out down the road.  So

20   some people choose not to do it for that reason.

21   Q    Okay.  I believe you said one of the first things is the

22   person has to agree to be truthful?

23   A    Yeah, that's always the first thing.

24   Q    Before we get to the 5K1 motion, and again I'm referring

25   to the time you were in the United States Attorney's Office,

1    can you tell me what a cooperation agreement is?

2    A    Well, yes.  That's an agreement between somebody who's

3    charged with a federal crime.  It's an agreement between the

4    prosecutor's office and the person who's charged, and it sort

5    of sets forth the rules about how the person will conduct

6    themselves in terms of helping you make cases against others,

7    and it's the formal agreement that gets presented to the judge

8    along with the 5K1.1 letter.

9             When you're cooperating, you're striving to get a

10   cooperation agreement.  The letter is part of the cooperation

11   agreement.  It's the prosecutor's end, or the prosecutor's

12   obligation, under the agreement.  So the agreement will say

13   you be truthful, you help us, you do these things and in the

14   end, it will say, the prosecutor will then write a letter for

15   you to the judge.  So it's part of the same process.

16   Q    But again, truthfulness is the key?

17   A    It's always the first issue that's addressed, yes.

18   Q    Okay.  And finally, in the wiretaps you've listened to,

19   the conversations are not always about an illegal matter?

20   A    Correct.

21   Q    Okay.  There are numerous conversations about families?

22   A    (Nodding head.)

23   Q    About gossip in the neighborhood?  Could you answer yes

24   or no?

25   A    Yes.

```
 1   Q     And health clubs, health issues?

 2   A     Yep.

 3   Q     So there are a whole array of things that are heard on a

 4   wiretap that have nothing to do with any criminal activity

 5   whatsoever?

 6   A     Depending on the case, yes.

 7   Q     Okay.

 8              MR. MORAGHAN:  Thank you.  I have nothing further.

 9              THE WITNESS:  Thank you.

10              MR. ROGAN:  Your Honor, if I understood you

11   correctly, I thought we were going to stop at 3:30?

12              THE COURT:  3:30, yes.

13              MR. ROGAN:  I'll do whatever your Honor pleases, but

14   I'm going to be more than nine minutes.

15              THE COURT:  All right, why don't we adjourn at this

16   time then and we'll resume, ladies and gentlemen, tomorrow

17   morning at 10:00 o'clock.

18              MR. REEVE:  2:00 o'clock, isn't that what we agreed

19   to?

20              MR. VATTI:  I think, your Honor, we wanted to

21   account for issues of people having 90 minute delays, school

22   closings.

23              THE COURT:  Because of the storm.  Okay, 2:00

24   o'clock tomorrow afternoon, ladies and gentlemen.  Please

25   remember my usual caution to you not to discuss the case with
```

```
1    anyone.  Have a pleasant evening.  Get home safely.

2              (3:21 o'clock p.m.)

3
```

```
                     INDEX                      PAGE
4    Judge's Preliminary Remarks to Jury          25
     Opening Statement by Mr. Vatti               36
5    Opening Statement by Mr. Rogan               45
     Opening Statement by Mr. Moraghan            52
6    Opening Statement by Mr. Reeve               56

7
                 INDEX OF WITNESSES             PAGE
8    JONATHAN SURACI
          Direct Examination by Mr. Silverman    70
9         Cross-Examination by Mr. Reeve         79
          Cross-Examination by Mr. Moraghan      81
10
     MICHAEL ZUK
11        Direct Examination by Mr. Vatti        79
          Cross-Examination by Mr. Moraghan     129
```

```
12

13

14

15

16

17

18

19

20         COURT REPORTER'S TRANSCRIPT CERTIFICATE
21              I hereby certify that the within
           and foregoing is a true and correct
22         transcript taken from the proceedings
           in the above-entitled matter.

23
                          /s/ Thea Finkelstein
24                     Official Court Reporter

25   Dated: _____
```