```
1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF CONNECTICUT
2
   * * * * * * * * * * * * * *  x   Criminal Case
3                                     No. 3:12CR104(EBB)
   UNITED STATES OF AMERICA,    :
4                Plaintiff
                                :
5          vs.                     January 23, 2014
                                :  2:14 O'clock p.m.
6  RICHARD ANDERSON, PHILIP
   BRYANT, and ROBERT SANTOS,   :
7                Defendants
                                :
8  * * * * * * * * * * * * * *  x   New Haven, Connecticut

9                      SECOND DAY OF TRIAL
                  CONTINUED TESTIMONY OF MICHAEL ZUK
10
                  BEFORE THE HONORABLE ELLEN BREE BURNS
11              SENIOR UNITED STATES DISTRICT JUDGE
                      AND A JURY OF FIFTEEN
12 Appearances:
     For the Plaintiff:          S. DAVE VATTI, ESQ.
13                               MARC HARRIS SILVERMAN, ESQ.
                                 Assistant U.S. Attorneys
14                               157 Church Street
                                 New Haven, CT 06510
15
     For the Defendant:          NEAL PATRICK ROGAN, ESQ.
16   Richard Anderson            315 Post Road West
                                 Westport, Connecticut 06880
17
     For the Defendant:          DAVID A MORAGHAN, ESQ.
18   Philip Bryant               Smith Keefe Moraghan & Waterfall
                                 32 City Hall Center Suite C
19                               P.O. Box 1146
                                 Torrington Connecticut 06790
20
     For the Defendant:          RICHARD A REEVE, ESQ.
21   Robert Santos               Sheehan & Reeve
                                 139 Orange Street Suite 301
22                               New Haven, Connecticut 06510

23   Court Reporter:             Thea Finkelstein RMR, CRR
                                 141 Church Street
24                               New Haven, CT 06510
                                 TheaFinkelstein@aol.com
25 Proceedings recorded by mechanical stenography, transcript
   produced by computer.
```

1      **M I C H A E L   Z U K**

2          having been recalled as a witness, was previously

3          duly sworn and testified on his oath as follows:

4      CROSS-EXAMINATION

5      BY MR. ROGAN: ^

6      Q    Agent Zuk, good afternoon.

7      A    Good afternoon.

8      Q    My name is Neil Rogan.  I represent Richard Anderson.

9      I'm just going to ask you a couple of follow-up questions from

10     the testimony that you gave yesterday.

11             My first question to you is:  All of the testimony

12     you gave yesterday actually has no real application to the

13     facts in this case, correct?

14             MR. VATTI:  Objection, your Honor.  It's the entire

15     purpose of expert testimony.

16             THE COURT:  Yes.

17             I don't understand what you mean, sir.

18             MR. ROGAN:  Your Honor, if I understood the proffer

19     of him as an expert witness is he has no involvement in

20     listening to any of the wiretaps in this case.

21             THE COURT:  Yes.

22             MR. ROGAN:  He's just offering his expert opinion on

23     drug terminology and usage, but he can't tell the jury that

24     that's applicable in this case because he didn't listen to any

25     wiretaps.  So I think that's a fair basis for

```
 1    cross-examination of this witness.
 2              MR. VATTI:  And my objection to form is going to be
 3    the applicability to this case, because the very purpose of
 4    expert testimony is so that if it's warranted, the jury can
 5    apply it to the facts of this case.
 6              If he wants to ask, "You did not listen to any of
 7    the wiretaps, you did not have any involvement in the
 8    investigation," that's certainly fine.  But I object to the
 9    language about applicability to the case.
10              MR. ROGAN:  If it's an objection to the form, I can
11    reframe the question.  And I was going to ask Agent Zuk those
12    questions that Mr. Vatti cordially volunteered.
13    Q    To be clear for this jury, you have no factual knowledge
14    about anything that's alleged to have transpired in this case,
15    is that fair to say?
16    A    That's pretty much fair to say.  I testified in a couple
17    of different proceedings, and I think that through that
18    testimony, I may have learned a fact here or there, but I have
19    no detailed knowledge of really charges or anything.  Even the
20    people charged.
21    Q    Exactly.  So, for instance, I want to make sure -- if I
22    misrepresent your testimony from yesterday, you'll tell me --
23    I think you were clear you did not listen to a single wire
24    call or wire intercept, is that correct --
25    A    Yes, that's correct.
```

1  Q     -- in this case?

2  A     Right.

3  Q     And I know you have a ton of experience in New York City

4  and working Bridgeport cases, but no active involvement here,

5  correct?

6  A     That's correct.

7  Q     All right.  So you wouldn't be able to tell this jury

8  when you were referring to the coded language in regards to

9  drug transaction if any of that coded language was used in

10 this case?

11 A     That's correct, I would not be able to do that.

12 Q     Right.  And in point of fact, you also wouldn't be able

13 to tell the jury if any of the coded language that you went

14 through, for instance regarding bundles or bricks,

15 specifically were used in this particular alleged case?

16 A     Right, I wouldn't know that.

17 Q     Okay.  Let me focus a little bit on, you did talk

18 about -- and I know you've been the lead investigator I think

19 you said in at least 20 plus cases, you were primary?

20 A     Yes.

21 Q     So when I use the expression "you put up a wire room

22 before," you've done that, right?

23 A     Yes.

24 Q     Would you explain to the ladies and gentlemen of the jury

25 what you mean by that?

1    A     I put up a wire?

2    Q     Yes.

3    A     If you mean have done a wire case, is that what you're

4    getting at?

5    Q     Yes.  Let me ask you a more specific question.  As a

6    general practice and based upon your knowledge, training,

7    experience, both with the FBI and the assistant U.S.

8    Attorney's Office, when there's a wire on a particular

9    telephone, where you're listening in on a phone call, is that

10   done on a 24-hour, seven-day a week basis?

11   A     It would depend on the case.  Usually not, I think --

12   Q     Right.

13   A     -- in my experience.

14   Q     So is it fair to say based on, again, your knowledge,

15   training, experience, you might have a wiretap on a particular

16   phone call, but if another call comes in when that wire room,

17   for want of a better phrase, isn't being manned, you're not

18   allowed to record that conversation, correct?

19   A     If it's an audio call, my understanding is you are not.

20   If it's a text or a message, my understanding is that you

21   would be able to review it.

22   Q     So, for example, as an expert, I'll ask you a

23   hypothetical question.  So if you listen to one audio phone

24   call where someone appears to be wanting to engage in a drug

25   transaction, that's an audio call, you can listen to that,

1    right?

2    A    Yes.

3    Q    But afterwards, that phone call is not being monitored,

4    you wouldn't have any way of knowing whether that person

5    called back and said, "Hey, I was just playing around," or

6    "kidding," would you?

7    A    Well, you may or may not, but you wouldn't, based on the

8    wire itself.

9    Q    Right.  And I'm specifically focusing in on the wire.  So

10   because it's not a 24-hour, seven-day a week process, you

11   would have no way of knowing?

12   A    What you're saying, if you're not there and not listening

13   to the calls, you wouldn't know what's being said.  If that's

14   your question, I'd say yes.

15   Q    No, I'm asking a more specific question.  I'm going to

16   try to get you to focus in on that.

17   A    Okay.

18   Q    So if you hear what you think is coded drug language in

19   phone call number one in my hypothetical, right?

20   A    Right.

21   Q    Okay.  Then you stop listening to calls after a certain

22   period of time, you would have no way of knowing whether or

23   not someone called back to that same line and said, "Hey, I

24   was just kidding around, I really don't want to buy drugs"?

25   A    You might have toll records, you might have a reflection

1    that a call was placed, you might see a duration, but you

2    would not know what was said in that call, that's right.

3    Q    You wouldn't know the content of that call?

4    A    It wouldn't be recorded and it wouldn't be reviewable.

5    Q    Great, terrific.  What's a rip stop?

6    A    You know, I could tell you what I think you mean by that.

7    A rip would be a point in the investigation where the

8    investigators decided to take from a subject whatever it was

9    that he had.  If it's a drug case, a good example of a rip

10   would be where the investigators know that the subject has

11   drugs, say, in a car and they would have the car stopped and

12   take the drugs.  I think that's one, that's the most, to me

13   the most, common meaning of a rip stop.

14   Q    And assume that that's exactly what I was intending when

15   I asked you that question.  Based upon your 20 some, I think

16   almost 20 years of experience, have there ever been occasions

17   when you've done one of those stops, when you've known there

18   are drugs in the car and those drugs haven't been seized?

19   A    I've done very few rip stops, and I've never done one

20   where we found drugs and did not seize it.

21   Q    Great.  You also testified yesterday that about eight

22   balls, remember that testimony about -- and how much cocaine

23   is that?

24   A    An eight ball is three-and-a-half grams.

25   Q    Okay.  And you said sometimes in your experience that can

```
 1   be used for repackaging or redistribution, correct?

 2   A    Yes.

 3   Q    And I think you also told us during your testimony

 4   yesterday that you've done very high level narcotics

 5   transactions, as well as street-level stuff, correct?

 6   A    Yes.

 7   Q    Based upon your experience, have you ever seen someone

 8   purchase an eight ball not for redistribution, but for actual

 9   personal consumption, someone who has a drug habit?

10   A    You know, I don't think that I have.  It's possible that

11   somebody who purchased one that I didn't really know who it

12   is, it's possible I've even listened to that happen on a wire,

13   but I couldn't say that I could confirm that I've ever heard

14   of someone buying an eight ball to use themselves.  It's

15   possible, but I can't tell you that I've ever experienced

16   that.

17   Q    Right.  And I should have made clear, we're talking about

18   crack, right?

19   A    Yes.  Well, crack or powder.

20   Q    Let's focus in on crack.  If I understood your testimony

21   correctly in front of the jury, the difference between powder

22   cocaine and crack cocaine is that the high, I think as you

23   described, is much more intense with crack cocaine, correct?

24   A    Yes.

25   Q    And as a result, based upon your experience, do people
```

1    tend to go through crack cocaine more quickly than powder

2    cocaine?

3    A    I would say, I would say that's probably true, yeah.

4    Q    Right.  Because it's something that requires continual

5    usage?

6    A    Right.

7    Q    So therefore, you could envision a scenario,

8    hypothetically as an expert witness, where someone might

9    purchase an eight ball of crack cocaine simply for their own

10   use and not redistribution or sale?

11   A    I couldn't say that it's impossible.  It's possible.

12   Q    Okay.  Also want to clarify some testimony from

13   yesterday.  You indicated that based upon all the

14   investigations that you've done, that there is coded language

15   for drug transactions, correct?

16   A    Yes.

17   Q    And I'm not going to go through all of those, but did I

18   understand you correctly that in your experience, there's no

19   coded language where dealers talk about the buyers being

20   satisfied with the product or how the product is selling?

21   A    There may be, but I'm not familiar with, like, a specific

22   term that I could describe that would be defined as somebody

23   who's not happy.

24   Q    Right.  Based upon your knowledge, training, and

25   experience, that was gone over yesterday, do you find it odd

```
 1   that drug dealers would have figured out coded language for
 2   everything else except for customer satisfaction?
 3   A    Well, I've just never heard a call where they needed to
 4   describe customer satisfaction in any way, other than they
 5   didn't like it, it's no good.
 6          Actually, that's not true, there are terms for
 7   customer satisfaction, like "they're going sick over it,"
 8   meaning they like it, they love it.  There's a bunch of little
 9   terms.  I wouldn't be able to think of all of them, there are
10   terms that describe their satisfaction level.  I can't think
11   of one where a specific term that they would use to say they
12   absolutely hate it, it's no good.
13   Q    "Sick" is also a term in street parlance that could talk
14   about somebody, you know, is wearing a sick shirt or
15   something, means it's something that's really cool, correct?
16   A    Yes.  Yes.
17   Q    It's not necessarily unique to drug transactions?
18   A    No, it would depend on the context.
19   Q    Okay, of course.  All of it's contextual, correct?
20   A    Exactly.
21   Q    Right.  Did I understand you correctly yesterday that in
22   your experience, you think that confidential -- sorry,
23   question withdrawn.
24          Did I understand you correctly yesterday that during
25   your testimony, in your experience, cooperating witnesses are
```

1   generally truthful people?

2   A    Yes.

3   Q    Okay.  You would agree with me that by the time someone

4   has become a cooperating witness, they're already a criminal?

5   A    Yes -- well, they're already charged with a crime, yes.

6   Q    They're actually more than charged; they have been

7   arrested?

8   A    There are cooperating witnesses that haven't been

9   arrested.  There are cooperating witnesses that cooperate for

10  money and for other reasons.  But there's a subset of

11  cooperating witnesses that are those charged with crimes that

12  work with us.  Probably they constitute the majority of the

13  people that we work with.

14  Q    That's what I thought.  Let's focus on a cooperating

15  witness that's been charged with a crime, right?

16  A    Yes.

17  Q    And it's your testimony before this jury that those

18  people are generally truthful?

19  A    In their dealings with me, in my investigations, they're

20  generally truthful because if they're not truthful, we would

21  terminate our relationship with them and we wouldn't use them.

22  So I can't say they're truthful people from the time they were

23  born, but from the point that I meet them and begin to work

24  with them, they're generally truthful.

25  Q    You would agree with me, Agent Zuk, that the nature of

1  drug dealing itself involves dishonesty and untruthfulness?

2  A    This is what we got into yesterday, and I think that any

3  business involves some dishonesty.

4          MR. ROGAN:  I'm going to ask, your Honor, that was a

5  yes or no question.  I'm going to ask.

6          THE COURT:  May we have the question again?

7          (The pending question was read by the reporter.)

8  A    I would answer no, the nature of the business -- I don't

9  think there's anything about the nature of the business that

10  involves dishonesty.  Is there dishonesty?  Sure, there is,

11  there could be, it depends on who's involved.  But to say that

12  the very nature of it, there couldn't possibly be anybody in

13  the drug business who's untruthful, I wouldn't agree with

14  that.

15  Q    How about dishonest?

16  A    There are people that are dishonest and those that

17  aren't.  There's a mixture of all of that in every day life

18  and drug dealing as well.

19  Q    I'm not interested in every day life; I'm interested in

20  your testimony as an expert.  I'm asking if you're telling the

21  jury, in your expert testimony, it doesn't necessarily follow

22  that because you're a drug dealer, you're dishonest or

23  untruthful, is that true?

24  A    That's true.

25  Q    Okay.  I only have a few more questions.

```
 1              On the issue of cooperating witnesses, you didn't
 2    elaborate, but you said yesterday in response to a question
 3    that once they become a cooperator, they clearly know what's
 4    in it for them in the cooperation, correct?
 5    A    Most times, yes.
 6    Q    Well, what occasion would they not know what's in it for
 7    them if they already decided -- I think again to summarize
 8    your testimony, in the majority of cases, cooperating witness
 9    has already been charged with a crime, right?
10    A    Okay.  In that subset, yes.  Yeah.
11    Q    In that subset, they already know they're in legal
12    trouble?
13    A    Right.
14    Q    And now they said, "Okay, I'll cooperate with you,"
15    agreed?
16    A    Okay.
17    Q    At that point, they already would have had to have been
18    told by somebody what's in it for them if they continue to
19    cooperate, yes?
20    A    Yes, they're told what they can expect from the process.
21    Q    Right.  And what is it that they're told that you usually
22    can expect from the process?
23    A    They're told that if they are truthful and if they are
24    productive in terms of they actually make a case against
25    somebody else, that the prosecutor's office will write a
```

1    letter to the judge, it will be presented to the judge, and

2    the judge will be permitted to consider it to reduce their

3    sentence.

4    Q    And productive, let's be honest, means exactly this, and

5    just tell me yes or no:  Get me more defendants, correct?

6    A    Well --

7    Q    Yes or no.

8    A    Yes or no?  It may not always involve defendants, so I'm

9    going to say no.

10   Q    Okay.  What else would it involve?  When you say someone

11   needs to be productive, they've got to give you information

12   that leads to more arrests.

13   A    Well, that would be one thing they could do.  They could

14   also lead you to a cache of drugs, a cache of firearms, stolen

15   merchandise, piles of money.  These are all things that

16   cooperators have provided in the past that result in them

17   getting a letter, but not having anybody arrested.

18   Q    Or they could give you somebody higher up on the food

19   chain, correct?

20   A    Or they could do that, yes.

21   Q    Just explain, apologize for the shorthand, do you know

22   what I mean by "higher up in the food chain"?  Right?

23   A    I think so, yes.

24   Q    Tell the jury.

25   A    You're talking about somebody in a drug case that's

1   arrested as a result of their participation in drug offenses?

2   Q    Right.

3   A    So in drug offenses, unless you arrest, you know, Pablo

4   Escobar in the drug business, there's always somebody that's a

5   little bit closer to the source of supply than that person is.

6   So if you arrest somebody in New Haven, they could probably

7   lead you to somebody that is a step closer to where the drugs

8   came from, which you would consider moving up in the food

9   chain.  That person may or may not be wealthy or anything

10  else, but he may just have access.  That person in turn would

11  have access to somebody else.

12          Ultimately, if you kept doing that, you could get

13  back to really high level people in South America or wherever

14  these drugs come from.

15  Q    Right.  And to be clear, in each one of those situations

16  where you described what productivity would be which could

17  lead you to a stash of drugs, guns, money, typically, all of

18  those where your ultimate goal is going with regards to

19  production is, okay, whose stash of drugs is that, right?

20  That's the question you're trying to get to?

21  A    If that's -- if the person offers you as part of their

22  cooperation some drugs, you would definitely want to know

23  whose they were, yes.

24  Q    Right.  The same thing for any other, what I'll describe

25  as, illegal contraband or things related to drug or narcotics

1  trafficking, correct?

2  A    You would want to know that, yes.

3  Q    Okay.  And if that cooperating witness doesn't produce,

4  that cooperation agreement isn't as good for him as it would

5  be if he were fully productive, correct?

6  A    Well, if he gave you firearms and then the people who

7  stored them or illegally possessed them, that would be better

8  than just the firearms or the weapons -- or the drugs, yes.

9  Q    Is it fair to say based upon, again, your knowledge,

10  training, and experience, that the more productivity, the

11  better that letter is going to be that's directed to the

12  judge, that's going to be considered at the time of

13  sentencing?

14  A    Yes.

15  Q    Okay.  Just a couple more questions.

16        MR. ROGAN:  Your Honor, actually, if I could have a

17  moment to confer with my client.

18        THE COURT:  Yes.

19  Q    Just one more follow-up question, Agent Zuk.  I

20  appreciate your patience.

21        You've had experience with drug conspiracies at some

22  point?

23  A    Yes.

24  Q    Is it true that regular purchases from someone on

25  standard terms, not fronting as we talked about yesterday,

```
 1  wouldn't necessarily transform a retail customer into a

 2  co-conspirator?

 3          MR. VATTI:  Objection to form, your Honor.  That

 4  calls for a legal conclusion.

 5          MR. ROGAN:  No, it calls for a legal opinion.

 6          MR. VATTI:  It's for the jury to decide whether the

 7  individuals here are co-conspirators or not.

 8          MR. ROGAN:  I wasn't asking him, because he doesn't

 9  know anything about the individuals here; I was asking a

10  hypothetical question as an expert.

11          THE COURT:  I'll overrule the objection.

12  Q    Did you understand the question?

13  A    I believe so.  You're asking if an individual sold to a

14  user?

15  Q    Right.

16  A    Whether we would -- whether that would be, in my opinion,

17  evidence of a conspiracy?

18  Q    No, that that individual who's buying for retail purposes

19  for his or her own personal consumption doesn't automatically

20  transform him into a co-conspirator?

21  A    I'm not sure, honestly not sure, legally whether it

22  would.  I know in terms of investigating cases, we would not

23  very often or ever that I could think of arrest a user and

24  charge him as part of a conspiracy.

25  Q    As long as it was for his or her own personal
```

1   consumption?

2   A    Right.  Legally, I don't know if that's a conspiracy, but

3   I know that practically, those people we wouldn't arrest.

4   Q    The last question.  During the course of all of your

5   expertise and your time doing these investigations, have you

6   ever seen that situation arise, where you see somebody who

7   buys a small amount of narcotics of any kind and that's simply

8   for their own personal use, and they're not arrested or

9   dragged into a narcotics conspiracy?

10  A    I've seen people, yes, purchase small amounts of drugs

11  for their own use that we're aware of that don't get arrested.

12  Q    Including, I think -- last question I promise, including

13  I think -- what you said possibility that someone could be

14  buying an eight ball of crack for their own personal use?

15  Possibly.

16  A    Now I'm not sure what you mean by that.

17  Q    I just wanted to wrap back around.  You talked yesterday

18  about typically an -- not typically but in most cases, an --

19  eight ball of crack cocaine is sometimes broken down for

20  redistribution.

21  A    Right.

22  Q    And then I asked you the question:  Is it possible, in

23  your experience, that you could have a heavy user at the

24  retail level who's buying an eight ball of crack cocaine just

25  for his or her own personal use?

```
1    A     And it's possible.

2          MR. ROGAN:  Great.  Thank you.

3    CROSS-EXAMINATION

4    BY MR. REEVE: ^

5    Q     Good afternoon, Agent Zuk.

6    A     Good afternoon.

7    Q     My name is Richard Reeve.  I represent Robert Santos in

8    this case.  And you made it pretty clear you don't know Mr.

9    Santos?

10   A     I don't.

11   Q     Okay.  Fair to say, your testimony today and yesterday

12   covers your general experience with narcotics investigations,

13   right?

14   A     Yes.

15   Q     And then as a subset of that, code words that are used in

16   the context of cases in which you have been involved?

17   A     In which I've been involved or am aware of, yes.

18   Q     Okay.

19   A     Yeah.

20   Q     I just raise that to focus us.  I'm going to ask you

21   first some questions about code words, and then I want to ask

22   you questions more about your experience, in the context of

23   your overall experience in narcotics investigations, okay?

24   A     Sure.

25   Q     So if I understand your testimony correctly, based on
```

1  your experience as a lead agent, we know a couple of things:

2  Number one, for lead agent, wiretap investigations are very

3  time-consuming?

4  A    Yes.

5  Q    And also based on your experience, the content of the

6  words in a specific call, in a case you're involved in, is

7  critical to your conclusions about that call?

8  A    Yes.

9  Q    All right.  And you can look at the context of that call

10  with respect to other calls that you're listening to, correct?

11  A    Right.

12  Q    And I want to ask you if you agree with some statements.

13  This is focused on numbers that you might hear in a call.

14        Do you agree that when a lead agent hears numbers in

15  a call, that one of your jobs is to put the numbers in the

16  context of the calls you're listening to, and the relationship

17  that the people have, to figure out what's going on?

18  A    Yes.

19  Q    Okay.  And fair to say that it's a substantial effort for

20  a lead agent in a narcotics case that involves a wiretap to

21  just understand what you're getting on the telephone

22  intercepts?

23  A    It can be, yes.

24  Q    Okay.  And fair to say that you would want to listen to,

25  to the degree you can, to all the calls to develop your

1   understanding, as lead agent?

2   A    To the degree you can, right, depending upon the amount

3   of phones being tapped.  Yes, obviously, if you could listen

4   to everything, you would like to.

5   Q    That would be the ideal?

6   A    Yes.

7   Q    But we don't live in an ideal world?

8   A    Right, doesn't happen.

9   Q    You have multiple taps going on simultaneously and the

10  phones are very active, it's just impossible for you to do

11  that, as a lead agent?

12  A    Correct.  You would have to rely on others.

13  Q    Right, okay.  And you talked about code words.  Fair to

14  say that you can't always generalize about what a code word

15  means, in the absence of the contextual calls?

16  A    Well, it could be contextual calls or other contexts from

17  the investigation, but there are times when the call, if

18  you're saying a call completely out of any context, it would

19  not always be easy to figure out what it is they're talking

20  about.

21  Q    All right.  Just to give a few examples, yesterday you

22  testified about the term "chef"?

23  A    Yes.

24  Q    Do you recall that testimony?

25  A    Yes.

1    Q    I think you told the ladies and gentlemen of the jury

2    that that's commonly used in the context of an individual who

3    is skilled in cooking and converting the cooking process that

4    converts cocaine powder into crack, or what is called cocaine

5    base, correct?

6    A    Yes.

7    Q    And the word "crack" and the words "cocaine base," those

8    are interchangeable words, right?

9    A    I don't think so, but practically yes.  There are

10   different kinds of cocaine base, one of which is crack.

11   Q    Okay, fair enough.  Isn't it fair to say that "chef" is

12   also used in the context of people who are able to process

13   other substances?

14   A    Yes, it could be.

15   Q    Okay.  Like heroin?

16   A    Yes.

17   Q    A meth lab?

18   A    Yup.

19   Q    LSD?

20   A    Yes.

21   Q    It's not always -- and you didn't intend to tell us

22   yesterday that it's always -- used that way?

23   A    Right.

24   Q    What you were saying was, I think you used the word

25   "typically" a lot, and you were trying to be careful when you

1   did that, correct?

2   A    I'm trying to be careful with everything I say here,

3   because I don't want to mislead anybody and I want to make

4   sure it's accurate.

5   Q    Absolutely.  Okay.  So when you used the word -- "dub"

6   was another one, right?

7   A    Right.

8   Q    The word "dub," I think you indicated, correct me if I'm

9   wrong, that that's typically used in the context of heroin?

10  A    Well, no, not necessarily.

11  Q    Okay.  Could be in the context of any kind of drug?

12  A    Right.

13  Q    Okay.  All right.  And you indicated usually that it

14  means $20?

15  A    That's one common meaning of it, right.

16  Q    But it can mean different amounts?

17  A    It could mean just double.  Like dub, "I want double."

18  Q    Sure.  Sure.  And again, you would have to go back to the

19  content of the calls to assess that?

20  A    Yes.

21  Q    Okay.  And that's why you can't tell us here, because you

22  haven't listened to any of these calls so you can't tell us

23  specifics?

24  A    Right.

25  Q    Understood.  And again, same as dub, the term "buck," you

```
 1   said usually that means $100, but it could mean other things

 2   in the context of calls?

 3   A    I think I testified it usually means a hundred, more

 4   often it's a hundred of the substance, but it could also be

 5   the money.

 6   Q    Okay, right.  And that's -- I'm glad you brought that up.

 7   There's a lot of terms that sometimes are used to reference

 8   money, correct?

 9   A    Yes.

10   Q    And then that same term can also be used to reference a

11   substance?

12   A    Yes, it's possible.

13   Q    Okay.  All right.  And then in terms of numbers, you

14   know, a lot of times you might hear, I think you said

15   yesterday, a word like, "I need three," and three could be

16   three bundles, right?

17   A    Yup.

18   Q    It could be three bags?

19   A    Yes.

20   Q    It could be three grams?

21   A    Yes.

22   Q    It could be three ounces?

23   A    Yup.

24   Q    In some cases, it could be three kilograms?

25   A    Could be.
```

1    Q    Again, in the absence of a context, you can't tell us?

2    A    That's right.

3    Q    All right.  And the use of codes in calls that are

4    intercepted, in your experience as a lead agent, sometimes

5    codes that are used are confusing to the people themselves who

6    are involved in the call?

7    A    Yes.

8    Q    And sometimes, on the basis of your listening to a call,

9    it's obvious that one guy's talking in one direction and the

10   other guy's talking in another direction, and there's no

11   meeting of the minds at all.  They don't get what each other's

12   saying, right?

13   A    Yes.

14   Q    Fair to say that that kind of confusion would be very

15   typical in lots and lots of calls you've listened to?  I'm not

16   saying it's all the time, but it's a regular occurrence?

17   A    It's not a daily occurrence, but it's something you would

18   expect to see at least at some point during a wire.

19   Q    Right.  And sometimes people might think that they're

20   talking about the same thing, so the confusion wouldn't be

21   reflected in the call itself, right?

22   A    That's possible, yes.

23   Q    In other words, and this doesn't really go beyond our

24   everyday experience, sometimes you might say something to me

25   and I might misunderstand it but I think I understand what you

```
 1   said?

 2   A    Right.

 3   Q    And so I don't question you about it, right?

 4   A    That's right.

 5   Q    I mean, I'm just going to use a silly example here.  You

 6   identified yourself, for example, as a special agent.

 7   A    Right.

 8   Q    Okay?  Now, there are a lot of people in the courtroom

 9   who understand that term, but some of the members of the jury

10   might not, right?

11   A    Right.

12   Q    And they might assume that the word "special agent" makes

13   you somehow different from all agents, right?

14   A    Right.

15   Q    But the fact is, every federal agent is a special agent,

16   right?

17   A    See, I don't know that.

18   Q    Okay.

19   A    I think that there are agents and special agents.

20   Q    Didn't you become a special agent when you first got out

21   of Quantico?

22   A    I did.

23   Q    All right.  So it doesn't mean -- I'm not denigrating

24   your experience, but, you know, the word "special," people

25   might have interpreted that in a way that really, it doesn't
```

```
1   mean?

2   A    Well, I don't know.  I think there is a distinction and

3   we can get into it.  I don't think it's at all relevant to

4   this proceeding.

5   Q    No, I don't want to get into it.

6   A    But, you know, I think I know where you're going.  People

7   can misunderstand each other.

8   Q    Right.

9   A    They can in the drug context as well.

10  Q    Right.  Right.  Enough said about whether or not you're a

11  special agent.  I'm not challenging your specialness, okay?

12  A    I understand.

13  Q    Now, have you been involved, as a case agent, in

14  situations where, when you listened to certain calls, you

15  believed at that time that the calls related, for example, to

16  a certain type of drug, but subsequent calls clarified it and

17  it was clear that your initial belief was not accurate?

18  A    I would say yes.  I can't specifically recall an instance

19  to say, but I think the answer is yes, it has happened.

20  Q    All right.  The same would be true, I take it, with

21  respect to quantities.  You might listen to a call, and reach

22  certain conclusions about the numbers that are being used, but

23  subsequent calls or further investigation might establish that

24  your initial belief about it was not accurate?

25  A    Yes.
```

1    Q    All right.  And now I want to go out of code and

2    interpretation of calls, and I want to go more into your

3    general experience as a narcotics agent, okay?

4    A    Sure.

5    Q    All right.  And I want to focus on a subject of your

6    testimony yesterday on direct, which was controlled buys.

7    A    Yes.

8    Q    You recall that testimony?

9    A    Yes.

10   Q    And if I understood you correctly, you indicated to the

11   ladies and gentlemen of the jury that on some occasions, you

12   use cooperating witnesses for controlled buys, correct?

13   A    Yes.

14   Q    And on some occasions, you use what you referred to as

15   confidential informants?

16   A    I don't know if I did say that.

17   Q    Okay.

18   A    We wouldn't normally use that person to do a buy, but

19   it's possible.

20   Q    Okay.  Whether you said that or not --

21   A    Okay.

22   Q    --  also, I thought that the third category was

23   undercover officers?

24   A    Right, we talked about them.

25   Q    All right.  In the context of undercover buys, what

```
 1   you're trying to do, as lead agent or as any agent involved in

 2   a case, is to get the person to make a buy from someone that

 3   you believe is selling drugs?

 4   A    Yes.

 5   Q    Right?

 6   A    Yes.

 7   Q    And oftentimes, the person knows the person?

 8   A    Yes, almost always.

 9   Q    Okay.  And what you do before that cooperating witness

10   goes out and talks to the dealer is you prepare him or her for

11   that, right?

12   A    Yes.

13   Q    You kind of talk about, in a way, what might happen and

14   what he or she might say?

15   A    Yes.

16   Q    Right?  You're kind of developing a script, if you will?

17   A    Okay.

18   Q    Fair?

19   A    Yes, fair.

20   Q    You're kind of brainstorming with the person about what's

21   the best way for us to create a purchase, right?

22   A    Right.

23   Q    Okay.  And what you're trying to make sure is that the

24   cooperator can kind of talk the talk to come across as, this

25   is a legitimate buy, right?
```

1    A    I mean, I guess that's possible.  Normally at the point

2    where you're preparing the person, the buy's already been

3    agreed upon, usually.

4    Q    All right.  But the goal, obviously, is that in a

5    controlled buy, the law enforcement role and the purpose of

6    the cooperator is to trick the dealer into believing that it's

7    a legit deal, right?

8    A    Well, I don't know if that's the purpose.  You don't,

9    obviously you don't, want the dealer to know that the person's

10   working for the police.  So to that degree you're tricking

11   them, yes.

12   Q    Sure, because if the person came up and said, "I'm

13   working for Special Agent Zuk and can I buy a gram," well,

14   they're not going to do that, right?

15   A    Right.

16   Q    So the person is cooperating with you and is part of the

17   federal investigation at that time, correct?

18   A    Yes.

19   Q    And you're keeping that secret, right?

20   A    Yes.

21   Q    And you're keeping that hidden, right?

22   A    Yes.

23   Q    And so the goal is to pretend that this is a legitimate

24   deal?

25   A    Yes.

```
1   Q    Okay.  And when you do controlled buys, you often do them
2   in a series of transactions, correct?
3   A    Yes.
4   Q    Okay.  In other words, you might ask the cooperator to
5   start at a certain level, and then there might be repeat buys,
6   right?
7   A    Yes.
8   Q    And so the controlled buys could occur over a period of
9   time, correct?
10  A    Yes.
11  Q    And sometimes when you do that, you try to up the amount
12  that's involved in the different buys?
13  A    You might, yes.
14  Q    And sometimes you might even try to see if, after a
15  further relationship of trust is developed, that the dealer
16  might front drugs to your witness?
17  A    I mean, these are all possibilities.
18  Q    Sure.
19  A    And yes, that answer's yes.
20  Q    All right.  During the whole time that the cooperating
21  witness is dealing with the drug dealer, the person who's
22  selling drugs to him or her, it's pretend, right?
23  A    Well, it's not pretend.  The person is not telling the
24  drug dealer that he's working for the police, yes.
25  Q    Correct.  The deals are real?
```

```
 1   A    The deals are real.

 2   Q    But he's not telling the person what's really going on?

 3   A    Of course not.

 4   Q    For his own safety and for the purpose of your

 5   investigation.  It's kind of obvious, isn't it?

 6   A    Right.

 7   Q    Okay.  And it only works if the dealer believes the ruse,

 8   correct?  In other words, if the dealer thinks this smells

 9   fishy, there's something weird going on here, he's unlikely to

10   make the sale?

11   A    That's true.

12   Q    Okay.  So if you don't sell the dealer on the legitimacy,

13   you don't -- oftentimes you're not able to make the buy?

14   A    Yeah.  I don't want to quibble with you, but you're not

15   really selling the dealer on anything.  You're doing,

16   probably, you're conducting a transaction, withholding the

17   fact that the person is now working for the police.

18   Q    Right.  I accept what you're saying, okay?

19   A    Okay.

20   Q    In other words, it could be the same pattern that the

21   person has been showing to the dealer over even a longer

22   period of time?

23   A    That's possible.

24   Q    Sure.  And what you're asking them to do is to continue

25   that, right?
```

1   A    Correct.

2   Q    But the dealer thinks the person is not a government

3   agent?

4   A    Of course.

5   Q    Okay.  And that's what makes it different?

6   A    Right.

7   Q    And there's really not a meeting of the minds there,

8   right?

9   A    Well, with respect to the status and relationship --

10   Q    Right.

11   A    -- of the cooperator and the government, they wouldn't

12   have the same view of it.

13   Q    No, no.

14   A    When you say "a meeting of the minds," that suggests they

15   don't understand the transaction.

16   Q    I'm sorry, I interrupted you.  Let me just rephrase it

17   and I'll go back --

18   A    Go ahead.

19   Q    -- because that wasn't a good question.  I'm talking

20   about a meeting of the minds between the buyer and the seller,

21   if you will.  Not the government.  But the seller thinks, this

22   guy's just continuing, he's part of my operation, right?  But

23   that's not real in that sense.

24   A    See, you're asking this a lot of different ways.  Of

25   course, the drug dealer doesn't know that the cooperator's

1    working with the government.

2    Q    Right.

3    A    Beyond that, is there a meeting of the minds?  Well, one

4    guy wants to buy drugs, the other guy wants to sell it and he

5    wants money in exchange.  When you say "meeting of the minds,"

6    you know, as a lawyer, that's a term that involves, is there

7    an agreement?  Is there an understanding?  Do these people

8    have an agreement to conduct this business?  And I would say

9    in that respect, they do have a meeting of the minds.  They

10   intend to do a deal.

11   Q    I understand what you're saying.

12   A    The only thing that the drug dealer doesn't realize is

13   the customer is an agent of the government.

14   Q    Right.  But the reality is the government can't charge

15   the cooperator with conspiracy, right?

16   A    No, because he would have done it with the permission of

17   the government.

18   Q    Correct.  And there's not a conspiracy?

19   A    Correct.

20   Q    Right, okay.  And when you deal with cooperating

21   witnesses, you indicated that not always but oftentimes you

22   record the meetings they have with the seller?

23   A    Yes.

24   Q    When it's safe?

25   A    Yes.

1  Q    Okay.  Sometimes there are some circumstances where

2  you're reluctant to put a body recorder on a cooperator for

3  safety issues and other realities, right?

4  A    Yes.

5  Q    And also, you record when the cooperator, for example,

6  makes a call to set up or calls to set up the buy, typically

7  law enforcement involved, and I'm referring, based on your

8  experience here, tapes those calls, right?

9  A    Yes.

10 Q    But the one area you don't tape is the debriefings of the

11 cooperator, right?

12 A    Correct.

13 Q    Okay.  Standard operating procedure in the federal

14 government, you don't make a tape of the debriefing of a

15 cooperating witness, right?

16 A    Correct.

17 Q    And that's -- it's not because you can't; it's because

18 you make a decision not to, correct?

19 A    I've never heard of anyone that would tape that.  I don't

20 know that there's a decision-making process that occurs.

21 Q    All right.

22 A    We don't tape 99 percent of our day at work.

23 Q    Right.

24 A    You know?  You would tape a recording, a phone call, a

25 meeting with a criminal subject, but you wouldn't tape

1   yourselves in the normal course of your business.

2   Q    I understand.  But just so we're clear, in your

3   experience as a case agent, you have sat down with cooperating

4   witnesses hundreds and hundreds of times, right?

5   A    Yes.

6   Q    And those meetings can last for hours and hours and

7   hours, correct?

8   A    Yeah.  That would be unusual but yes, it certainly could.

9   Q    They can be lengthy and they can be repeated, can't they?

10  A    Yeah.  You're not talking now about a debriefing after a

11  drug buy; I think you're referring to more lengthy debriefings

12  that would occur, you know, over the course of time.  Is that

13  right?

14  Q    Yes, that's fair.

15  A    Some of those may last hours and even multiple days, yes.

16  Q    All right, fair enough.  And none of them are recorded?

17  A    No.

18  Q    All right.  Now, you testified a little bit yesterday

19  about the amount of money that can be made in the drug world,

20  correct?

21  A    Yes.

22  Q    And I think, again, you were trying to be careful, and

23  you indicated that typically, and you gave some rough ballpark

24  numbers, right?  Correct?

25  A    Probably, yes.

1  Q    But there really is no such thing as a typical.  I mean,

2  dealers, things, this is a constantly fluctuating situation,

3  would you agree?

4  A    Yeah, there are some consistencies, but yeah, every deal,

5  every relationship, is different.  Yes.

6  Q    And when you use the word "typical," it doesn't account

7  for a whole host of realistic possibilities that could impact

8  on profit, right?

9  A    Well --

10  Q    I can give you some examples.

11  A    When I say "typically," I mean to say to the jury that

12  this is generally, you know, on average, this would be normal.

13  Q    All right.

14  A    But there are always aberrations and, you know, the world

15  is full of possibilities.  When I used those words yesterday

16  and today, this would be "normal," "average," "typical," this

17  is something you would expect.

18  Q    Let's talk about some of the factors that go into

19  whether, in fact, there's typical profits or not typical

20  profits, okay?

21  A    Now we're going to talk about profits in the drug world?

22  Q    Yes, right now I'm focused on that.

23  A    Okay.

24  Q    One of the things that happens sometimes is the dealer

25  shorts the buyer, right?

1    A    Yes, that can happen.

2    Q    The dealer might go down to New York City from New Haven

3    Connecticut or Bridgeport, and he thinks he's going to get 100

4    grams but he gets 90 grams?

5    A    That can happen, yes.

6    Q    And that would cut into the profit margin, right?

7    A    Yep.

8    Q    All right.  The buyer might pay too much for the product,

9    right?

10   A    You mean he mistakenly gave too much money?

11   Q    Or he thought --

12   A    That could happen, too.

13   Q    He's not a good negotiator.

14   A    He may pay too much, correct.  He may be desperate for

15   it.  A lot of reasons he might overpay.

16   Q    Could be a bad product, too?

17   A    It could be a bad product, yes.

18   Q    And you talked about that yesterday, that depending on

19   how much cut is already in a product, right?

20   A    Yes.

21   Q    And by the way, with respect to heroin, what level of

22   purity would you expect to see in a street level bundle?

23   A    Yeah.  You know, I don't really know.  That's the stuff

24   that the lab would do, and I don't want to speak to that

25   because I'm not really --

```
1   Q    If you don't know, tell us you don't know.  That's fine.

2   A    I'm not well-versed in it.  I don't know.  To that

3   degree, I don't want to affect their decision here.

4   Q    That's fine.  The person who buys the stuff who's then

5   putting it out for street sales, that person could also, him

6   or herself, put in too much cut into the product, right?

7   A    Yes.

8   Q    And if they do that, then there might be a series of

9   calls from people from customers saying, "You know, this is

10  some pretty bad stuff, we can't sell it," or "e can't use it,"

11  depending on who they're speaking to in that chain that we're

12  talking about, right?

13  A    Yes.

14  Q    All right.  I mean, would you agree with me that there's

15  a host of factors that go into how much someone makes if they

16  buy 100 grams of -- doesn't matter what the substance is?

17  A    Yeah.

18  Q    Is it fair to say that?

19  A    Yeah, it's fair to say.

20  Q    It's really going to vary depending on all kinds of

21  things, right?

22  A    Yes.

23  Q    Okay.  Sometimes dealers get robbed --

24  A    Yes.

25  Q    --  of their product or their money?
```

1    A    Yes.

2    Q    Sometimes people they're selling to deceive the dealer.

3    For example, let me give you a specific example, the person

4    says:  "You know" -- calls the guy he buys the drugs from and

5    gets on the phone and says, "ou know, this really isn't

6    marketable stuff.  I need to return it to you."  That happens?

7    A    Yes.

8    Q    But the person who bought it himself could have cut that

9    product with any of the cutting agents you're talking about,

10   taken half for himself, and that's another way to beat the

11   dealer, right?

12   A    Yeah, these are things that are possible.  Yes.

13   Q    And in fact, in your experience, they happen?

14   A    I've seen them happen, yes.

15   Q    Okay.  All right.  And I want to ask you a hypothetical

16   question.  You're here as an expert, okay?

17   A    Sure.

18   Q    I want you to assume that we have a dealer in the New

19   Haven Connecticut area, okay?

20   A    Okay.

21   Q    I want you to assume that that person is traveling to New

22   York and buying multiple-ounce quantities of heroin, okay?

23   A    Okay.

24   Q    And I want you to assume that the person is also buying

25   multiple ounces of either cocaine powder or crack, okay?

1    A    Okay.

2    Q    And I want you to assume that it goes on for a lengthy

3    period of time, correct?

4    A    Yes.

5    Q    Now, if you were going to give the jury, based on your

6    experience, your opinion as to whether or not that person who

7    is buying multiple-ounce quantities of substances would be

8    making lots of money, what would you say?

9    A    I would say he would be making lots of money.  Whether he

10   would be retaining it and saving it and amassing wealth, I

11   don't know.  But he would be generating profit, yes.

12   Q    Okay.  Now I want you to assume something further, I want

13   you to assume that during the course of the calls, he is

14   constantly in debt with his dealers.  In other words, he can't

15   pay them.

16   A    Okay.

17   Q    Fair to say that there are at least a few different

18   conclusions that might or might not apply in that situation,

19   because we're talking about typicals and possibilities, is

20   that fair?

21   A    There are an infinite number of possibilities as to why

22   he wouldn't be able to pay his dealer.

23   Q    I'm going to give you three.

24   A    Okay.

25   Q    I just want to ask you if you agree or disagree with

```
 1   them.  Number one, he's lying to his source?

 2   A    You're saying is that a possibility?

 3   Q    Yes.

 4   A    Of course that's a possibility.

 5   Q    Sure.  He's telling the guy, "I don't have the money,"

 6   but he's got it in his back pocket.  Could happen, right?

 7   A    It could.

 8   Q    Number two, he's a bad drug dealer.  He just is a bad

 9   businessman, you know?  He does things in a way that screws up

10   his business operation.

11   A    I guess so.  You basically buy something at one price and

12   sell it at another.  If you're saying he maybe can't do the

13   math.  All these things are possible, but I don't know how

14   to -- it's really hard to answer these questions.

15   Q    I totally understand that it's hard.

16              The third one I just want to raise, and I want to

17   see if you agree or disagree, again it's a possibility, I

18   understand you can't -- you don't have the facts so you don't

19   know.

20   A    That's right.

21   Q    This is a hypothetical, okay?

22   A    Yeah.

23   Q    The third is a combination of the two, he's lying to the

24   dealers and he's a bad drug dealer.

25   A    It's possible, yup.
```

1  Q    Can you think of any other possibilities, just off the

2  top of your head?

3  A    I can think of lots of possibilities.  The police seize

4  the guy's drugs, seize his money.  There's lots of reasons why

5  somebody in the business for a long time dealing substantial

6  amounts of drugs don't seem to have the money to show for it.

7  It's very, very common for guys at that level driving from

8  Connecticut to the city, trying to sustain a business, it's a

9  fairly substantial business, but in fact don't end up having

10  any wealth or even any money for the next shipment.

11  Q    Right.  Right.  And one of the factors that might lead to

12  that, in some circumstances, and I'm away from the

13  hypothetical now but in some circumstances, is because the

14  drug dealer himself has his own drug problem, correct?

15  A    And that's possible, too.

16  Q    So, for example, with cocaine, he might be putting half

17  the product up his nose and selling the rest, so he's not

18  making as much money, right?

19  A    That's maybe more common at a lower level.  At a higher

20  level, I don't see that as very common, but certainly

21  possible.

22  Q    When you say that, it's because, on our example that we

23  just used about multiple-ounce purchases, that's an awful lot

24  of cocaine for one person to put up their nose?

25  A    Yes.

1    Q    That's fair.  And I guess, you know, to summarize what

2    you're telling us in this courtroom today, you're trying -- if

3    this is a fair and accurate summary tell me, if it's not

4    please tell us, okay?  What you're trying to do is to give the

5    jury a template, if you will, for them to evaluate the

6    evidence they're going to hear in this case?

7    A    Yeah, I can't even agree to that.

8    Q    Okay.

9    A    I'm simply here to answer the questions that you guys put

10   to me.

11   Q    All right.

12   A    I didn't volunteer to come.  I did it because I knew that

13   it was the belief of the prosecutors that I could say things

14   that would be helpful, and so that's why I'm here.

15   Q    That's a fair answer.  You're here because somebody asked

16   you to be here.

17   A    Exactly.

18          MR. REEVE:  I have no other questions.  Thank you.

19          MR. VATTI:  I have some redirect, your Honor.

20          THE COURT:  All right, sir.

21   REDIRECT EXAMINATION

22   BY MR. VATTI: ^

23   Q    I'm going to go back to some of the things that Attorney

24   Rogan asked you, and then I'll pickup with what Attorney Reeve

25   went over with you.

```
 1   A     Sure.

 2   Q     Let's start with the concept of personal use versus

 3   redistribution quantity.

 4   A     Yes.

 5   Q     You mentioned yesterday that there are certain street-

 6   level distribution quantities that are user level?

 7   A     Yes.

 8   Q     For example, a $5 bag?

 9   A     Right.

10   Q     And the typical street term for that is nickel?

11   A     Yup.

12   Q     And you mentioned yesterday dime, what's that?

13   A     That's a $10 bag.

14   Q     Yesterday you mentioned a dub.  What would that be?

15   A     A dub would be a $20 bag.

16   Q     Are those frequently used at the personal use consumption

17   level for crack cocaine?

18   A     Yes.

19   Q     And in your experience, crack addicts, what kind of

20   typical denominations do they buy in?

21   A     Crack addicts buy small denominations.  They buy, you

22   know, tens, 20s, 50s.  Tens, 20s, and 50s because it is

23   extremely addictive, and they're not the sort of people that

24   tend to have a lot of money and are capable of buying large

25   amounts of crack.  They see guys desperate to get the money
```

1    together to afford another $20 bag.

2    Q    You mentioned yesterday a typical price for an eight

3    ball, of an eight ball of crack cocaine, would be $350?

4    A    Yes.

5    Q    In your experience, do crack addicts typically accumulate

6    that kind of money to buy eight balls at a time?

7    A    In my experience, no.  It certainly is possible that they

8    could, but typically when we do a case on a crack house where

9    they're selling to users, the users are typically buying

10   smaller amounts than that.

11   Q    You were asked some questions about cooperating witnesses

12   and confidential informants.  Those terms have specific

13   meaning at the FBI, correct?

14   A    Yes.

15   Q    And those terms may have different meanings at other

16   federal investigative agencies, correct?

17   A    Absolutely, yes.

18   Q    So for example, the DEA might have different definitions

19   of those terms than the FBI does?

20   A    Yes.

21   Q    What are the different reasons that a cooperating witness

22   might decide to work for, say, the FBI?

23   A    Okay.  So the one we talked about a lot is the person

24   might have a case pending.  It might be a federal case or it

25   might be a state case.  There's some criminal prosecution

1    against them, and they realize they could conceivably go to

2    jail or there's a punishment that they don't want to face.  So

3    they'll come in and agree to help in return for, in return

4    really for an explanation down the road to a judge of what it

5    is they did.  So that's one category of folks.

6        There are other folks that are interested in making

7    money, and they'll come in and say, "I have information that

8    could help you guys, and what could you pay me for it?"  And

9    they'll do it as, you know, they'll make recordings and

10   they'll do tapes and they'll do all the things that the guy

11   with a case would do, would also do, and except they don't get

12   credit in any sentencing court; they get paid money for their

13   work.

14       There are some people that are just sick and tired

15   of a particular group in their neighborhood committing crimes,

16   and they'll say, "I'm fed up with these guys, I'm willing to

17   do whatever I need to do to help you stop them."  And they'll

18   come in, and out of a sense of frustration and duty agree to

19   cooperate.  Now, those people in the end would likely be paid

20   money because they don't have a criminal case pending, so we

21   would say, "Appreciate your help, we can also give you some

22   money."

23       Those are three pretty typical reasons why people

24   would come in and cooperate.

25   Q    And do you typically develop relationships with some of

1    these folks, and the relationship continues over time?

2    A    Yes.

3    Q    And in those instances where you develop a relationship

4    and it continues over time, is there a track record for that

5    person that you can look at?

6    A    Yes.

7    Q    And does that track record inform you whether or not you

8    can trust that person?

9    A    Well, yeah, it should.  I mean, whether I individually am

10   working with the person or other agents, there's always a

11   track record of what it is they do in terms of investigative

12   reports and other reports that indicate what it is the

13   person's done over the years, if there have been problems, if

14   there haven't.  But yeah.

15   Q    So for example, in your work at the Safe Streets Task

16   Force in Bridgeport, have you had cooperating witnesses that

17   have had drug cases pending?

18   A    Yes.

19   Q    And have they cooperated in an effort to gain some

20   consideration with respect to the disposition of those drug

21   cases?

22   A    Yes.

23   Q    And sometimes in those situations, does that relationship

24   with that cooperator continue over time?

25   A    Oh, yes.

Q    And do you then assess the track record for that

cooperator to determine whether that person has a reputation

for truthfulness in what they're telling you?

A    Yes.

Q    And would you, in that situation, continue to use that

cooperator as long as they're willing to work?

A    Yes, we've used cooperators for many years.

Q    So are there some cooperators who at some point have been

drug dealers or have had pending drug cases that, when they

come to you with information, because of a track record, you

tend to believe them?

A    Yeah, that would be a valuable cooperator.

Q    And I take it that you take some steps -- for example if

you were ever in a courtroom at a trial and needed that person

or the information they provided, that you would take steps --

to corroborate what it is they're telling you, even though you

might individually believe them?

A    Yes.

Q    What kind of steps would those be?

A    Well, we talked about recordings, a primary way in which

you would corroborate somebody's information in a drug deal or

a transaction.

        Sometimes we'll just do phone calls that don't

involve a deal at all, just to show there is in fact a

relationship between these people and that they're familiar

1   with each other and that they'll talk to each other.

2          We'll also query other informants to ask them what

3   information they have about a certain person to see that it's

4   consistent.

5          We'll look at phone records, toll records.  The

6   person says, "I talk to the guy all the time, he's a good

7   friend of mine."  Well, we'll look at his phone and we'll see,

8   are there toll records that reflect these conversations?

9          There are police reports we could look at that maybe

10  these guys were arrested together in the past.

11         There are enumerable ways to check and fact-check

12  what the informant is telling you and, you know, we don't make

13  it our career to fact-check everything, but we do it to the

14  extent that we're comfortable that this information is

15  reliable and I'm going to act on it.

16  Q    And are there situations where information from

17  cooperators and informants eventually leads you to wiretaps?

18  A    Yes.

19  Q    And are the wiretaps a way of corroborating the

20  information you're hearing?

21  A    That's another way.  You're not doing the wiretap to

22  corroborate the person.  But, in fact, it would, if the person

23  said that this guy is a big dealer in this area of town and

24  then you were to get a phone up and it would establish in fact

25  that that's the case, that would be corroborative, even though

1    the purpose of the phone would be to make a case, not to

2    corroborate the guy who started it.

3    Q     All right.  And there are also instances where

4    cooperators are developed after a case is already made,

5    correct?

6    A     Yes.

7    Q     All right.  So for example, what we were talking about

8    earlier is the use of a cooperator to start and develop an

9    investigation, correct?

10   A     Yes.

11   Q     All right.  There's also instances, as you would know at

12   the FBI, where a case is actually indicted, people are

13   arrested, and then out of the group of people arrested,

14   individuals choose to cooperate?

15   A     Yes.

16   Q     And they may not make cases against anybody else or lead

17   to any other seizures, but they cooperate against the other

18   individuals that have been arrested with them?

19   A     Yes.

20   Q     All right.  And what types of cooperation, what kind of

21   information do they typically share with the people that are

22   arrested with them, or about those people?

23   A     Yeah, they would share, they would be -- Attorney Reeve

24   talks about these long sessions with cooperators, there are

25   long sessions where, if the person in a case agrees to

1    cooperate, he would sit down with the U.S. Attorney's Office,

2    with their lawyer, and with the agents, and spend hours trying

3    to find out every detail you can about the relationship that

4    person had with the other guys in his case, what kind of drug

5    deals did you do, when did you start, how much do you charge,

6    everything.  You would try to do it as comprehensive and as

7    complete a review of his relationship with the other charged

8    people as you could.

9           You would also ask him about any other crimes he's

10   committed because you want, if this person is going to testify

11   down the road, you want to make sure you understand what it is

12   he's been involved in, and so you could make a determination

13   as to whether it would be appropriate even to give him an

14   agreement at all.

15   Q    And even in those situations, you, as an agent, are

16   making assessments of whether the information that person is

17   telling you is reliable?

18   A    Absolutely.  All the time.

19   Q    Is one of the ways you're doing that to look at other

20   information that you developed in the case?

21   A    Yes.

22   Q    And would that include, for example, controlled buys that

23   you made during the investigation?

24   A    Yes.

25   Q    Would that include wiretap phone calls that you listened

```
 1   to during the investigation?

 2   A    Yes.

 3   Q    Would that include seizures that you made during the

 4   investigation?

 5   A    Yes.

 6   Q    Would that include conversations you've had with other

 7   arrested people that have chosen to cooperate?

 8   A    Yes.

 9   Q    All right.  Attorney Reeve asked you about certain code

10   words and meanings that they might have.  Let me focus you in

11   on that a little bit.

12            In the context of a drug case, and let's take

13   particularly a wiretap, if you hear references to bundles,

14   does that tell you as a special agent with the FBI, the

15   experience you have, result in a certain meaning for you?

16   A    Yes.

17   Q    What is that?

18            MR. REEVE:  Your Honor, I'm going to object because

19   I didn't ask about bundles.  It's beyond the scope of the

20   cross.

21            MR. VATTI:  He certainly asked about code words and

22   meaning, and he certainly implied that different words have

23   different meanings.  So I'm just exploring that with the

24   agent.

25            THE COURT:  I'll overrule the objection.
```

1   A    In the context of a drug case, I've never known "bundle"

2   to mean anything other than ten bags of heroin, ten glassine

3   bags of heroin.

4   Q    And in the context of a drug case, what about the term

5   "brick"?

6   A    A brick is a number of bundles, and it's either ten

7   bundles or, in Connecticut, there are guys that refer to a

8   brick as five bundles.

9         MR. REEVE:  Your Honor, my second ground for the

10  objection, your Honor, is that this has all been reviewed, all

11  these questions were asked and answered on direct examination

12  yesterday.

13        THE WITNESS:  I don't mean to jump in, I didn't

14  complete my answer and I just want to make -- what I left

15  there is misleading a little bit.

16        MR. REEVE:  Your Honor, it's up to you.  I made an

17  objection, if you want him to continue.

18        THE COURT:  Yes.  I'll overrule the objection.

19        Go ahead.

20  Q    Do you want to clarify your last answer?

21  A    I'm referring to bricks in terms of heroin.  A brick

22  could also mean a kilo.  A brick of something could be either

23  the little bags of heroin bundled up, or it could also mean a

24  brick, a kilo of either heroin or coke.

25        MR. REEVE:  Now that it's clarified, I object again.

```
 1   All these questions were asked and answered yesterday.  Beyond
 2   the scope of cross.
 3              THE COURT:  All right, Attorney Reeve.  I've
 4   overruled your objection.
 5              Let's move on.
 6              MR. REEVE:  Thank you, your Honor.
 7   Q    In the context of a drug case, a wiretap, if you hear
 8   references to "hard stuff," does that give you a specific
 9   meaning?
10              MR. REEVE:  Objection.
11   A    Yes.
12   Q    What would that meaning be?
13   A    Generally --
14              MR. VATTI:  I assume it's the same objection.  I'll
15   stand on the same argument, claim the question.
16              THE COURT:  Overrule the objection.
17   A    If it's a case involving cocaine and they talk about the
18   hard, or the hard stuff, it is almost invariably a reference
19   to crack cocaine.
20   Q    And how about with respect to the term "eight ball," when
21   you hear that term in a drug case, does that have a specific
22   meaning?
23              MR. REEVE:  Same objection.  Asked and answered on
24   direct examination yesterday.
25              THE COURT:  Okay.  Overruled.
```

```
 1              Go ahead.
 2   A    An eight ball is three-and-a-half grams of a substance,
 3   drugs.  Cocaine, powder or crack.
 4   Q    All right.  Mr. Reeve focused in on this whole notion of
 5   cooperating witnesses engaging in some kind of pretense with
 6   the target of an investigation, and I want to talk to you a
 7   little bit about that.
 8              The specific context of his question was when
 9   somebody is working for the government, and engaging in a
10   controlled purchase, they can't be a co-conspirator with the
11   target, correct?
12   A    Correct.
13   Q    And that's because they're actually working at that point
14   with the government, with permission to engage in criminal
15   activity?
16   A    Correct.
17   Q    Are there instances where, in your experience,
18   cooperators may engage in unauthorized criminal activity?
19   A    Yes.
20   Q    In fact, they may engage in unauthorized criminal
21   activity with the very target that you're pursuing, and they
22   may not tell you about it?
23   A    Yes.
24   Q    Once they do that, can they be considered a
25   co-conspirator under certain circumstances?
```

1    A    Yes.

2              MR. VATTI:  Nothing further, your Honor.

3              THE COURT:  Thank you.

4              MR. MORAGHAN:  Your Honor, a few questions.

5    RECROSS-EXAMINATION

6    BY MR. MORAGHAN:^

7    Q    With respect to Mr. Vatti's question about costs of an

8    eight ball, the fact that someone calls someone and says he

9    has 150 does not mean he'll get an eight ball of crack

10   cocaine, correct?

11   A    Correct.

12   Q    You need to know the context of the conversation?

13   A    Yes.

14   Q    You need to know the relationship between the people?

15   A    Yes.

16   Q    If you're listening to a conversation and he says I have

17   150, you would expect it to be related to heroin and not crack

18   cocaine?

19   A    If all the other calls were related to heroin and this

20   was a drug call that related to 150, I would expect it to be

21   heroin.

22   Q    Okay.  Special Agent Zuk, you've testified at least twice

23   in cases pertaining to this indictment, correct?

24   A    Yes.

25   Q    You have been examined by Mr. Vatti on at least for two

1   cases?

2   A    Yes.

3   Q    And you were subject to cross-examination by a number of

4   lawyers?

5   A    Yes.

6   Q    And you never once, in either of those cases under any of

7   those questioning, ever referred to a brick of heroin as a

8   kilo?

9   A    That's possible.

10  Q    That's possible?

11  A    Yeah.  I don't recall specifically.  But I'm just saying,

12  "brick" is a term used to mean a physical brick is a kilo.

13  Q    All of your previous testimony regarding bricks have been

14  related to in conjunction with bundles, correct?

15  A    Yeah, I'm not sure.  I don't know what the questions

16  asked were.  I don't know.  I really don't.

17  Q    If someone asked you what a brick was, sir, you would say

18  it was ten bundles, correct?

19  A    I would, in the context of a heroin case, yes.

20  Q    In the context of this case and the other two you

21  testified in?

22  A    I just don't know the facts of these cases, so I'm trying

23  to generally say what "brick" means, and I think in those

24  other cases we were talking about street-level sales and in

25  terms of street-level heroin what would a brick be, and my

1    answer would be it would be 100 bags, ten bundles of heroin.

2    Q    If this is the same type of case, street-level case,

3    we're talking about ten bundles, we're not talking about a

4    kilo when referring to bricks, correct?

5    A    I don't mean to inject a kilo of heroin into this case at

6    all; I was just trying to answer what the word might mean, but

7    yeah.

8              MR. MORAGHAN:  Thank you.

9              MR. ROGAN:  Just briefly, your Honor.

10   RECROSS-EXAMINATION

11   BY MR. ROGAN: ^

12   Q    Did I understand you correctly when you were asked by Mr.

13   Vatti, are you trying to tell this jury that, the only people

14   that can buy eight balls are people who do it for

15   redistribution?  You've never run into someone, a wealthy

16   person for instance in your time in New York City, who was a

17   crack addict and could clearly afford to buy one, two, or

18   three eight balls at a time for personal use?

19   A    Yeah, no, I think what I said to Mr. Vatti is that in my

20   experience, I haven't really seen that, but I think I said

21   it's possible.  Certainly would be possible for somebody with

22   the money to buy it for personal use.  I'm not excluding that

23   possibility at all.

24              I'm just saying in my experience, I'm not aware of a

25   case where I know somebody bought an eight ball and it was all

1    for their own use.  I'm not personally aware of that, but it's

2    certainly possible.

3    Q    Right, because the area that you covered in New York City

4    would necessarily cover Midtown Manhattan and Wall Street,

5    right?

6    A    Mostly in the Bronx and Queens and places that weren't,

7    you know, high end.  We were not dealing with people that have

8    lots of money down there.

9    Q    Okay.  You're not trying to mislead the jury to suggest

10   that that isn't out there; that there would be people with

11   substantial crack habits that could afford to buy an eight

12   ball at one time?

13   A    There certainly is that possibility, yes.

14   Q    Okay.  In the context of drug transactions, dub or dubs

15   can also have another meaning, correct?

16   A    Another meaning?  As opposed to what meaning?

17   Q    Well, you had indicated that it was -- well, explain

18   again to the jury what you meant in the context --

19   A    Well, I think we talked about a couple of things, but

20   one, a dub typically would be a $20 bag.

21   Q    Is dub also a street slang for a kind of particular rim

22   on a tire?  Are you familiar with that in your work?  Dubs, or

23   spinners?

24   A    No.

25   Q    You've never heard that before?

1    A    No.

2    Q    Okay.  Fair enough.

3         Other question.  In Connecticut, in your work here,

4    can Ecstasy pills, or have they ever been referred to as "the

5    hard"?

6    A    I don't have a lot of experience with Ecstasy pills.

7    I've never heard of them referred to as "the hard."

8    Q    Have you ever done a narcotics investigation that

9    involved the distribution of Ecstasy pills?

10   A    Yes, I have.

11   Q    You never heard it referred to as "the hard"?

12   A    No.

13   Q    Have you ever done an Ecstasy pill investigation here in

14   Connecticut, not in New York City?

15   A    I don't believe so.

16        MR. ROGAN:  Okay, great.  Thank you.

17        THE WITNESS:  You're welcome.

18   RECROSS-EXAMINATION

19   BY MR. REEVE:^

20   Q    Agent Zuk, do you know Kevin Wilson?

21   A    No.

22   Q    Have you ever heard that name?

23   A    I may have heard the name Kevin Wilson, but it has no --

24   I would have no reason to recall it.

25   Q    I want you to assume he's the cooperating witness in this

```
1    case.  Do you have any idea what kind of background check was
2    made with respect to Kevin Wilson?
3                MR. VATTI:  Side bar, your Honor.  Objection.
4                (At the side bar.)
5                MR. VATTI:  Your Honor, I'm going to object.  I
6    don't see how that's within the scope of redirect to ask
7    specifically about the cooperator in this case.
8                MR. REEVE:  The picture they're trying to paint is
9    cooperating witnesses are generally reliable.  They're trying
10   to bootstrap the reliability of Kevin Wilson through this
11   witness.  That's the only reason for what Mr. Vatti just went
12   into.
13               He totally opened this door, and I have a right to
14   question him, to make sure that the jury's not given a totally
15   misleading picture as to why those questions were asked on
16   redirect about the reliability of cooperating witnesses in
17   general.
18               MR. SILVERMAN:  That's a lot of chutzpah.  Attorney
19   Reeve is the one on his cross-examination tried to attack the
20   reliability of cooperating witnesses in general, through this
21   witness, who is not here to testify about cooperating witness
22   but instead was qualified as an expert witness to discuss drug
23   trafficking.
24               So I think that direct, the redirect, was entirely
25   appropriate.  I don't think it opened the door to any
```

1    questions about specific individuals in this case, who this

2    witness has already said he has no knowledge of.

3         MR. REEVE:  First of all, I did not attack the

4    credibility of any cooperating witness in any way in my

5    cross-examination.  If the government makes that claim -- and

6    now we're getting argument from both lawyers, I don't think

7    it's appropriate, I think one of the government lawyers should

8    speak -- but in addition, I'll respond to both right now.

9         I would like them to put on the record what claim I

10   made as to the general unreliability of cooperating witnesses

11   in my cross-examination that then opened that door that

12   creates chutzpah on my part.

13        MR. VATTI:  Hold on.  First of all, let's all calm

14   down.

15        Not only did Mr. Reeve ask questions about the

16   reliability of cooperators and their general truthfulness; I

17   think at least one of the other lawyers did as well.  So

18   nobody asked about Kevin Wilson, which is why I didn't object

19   when Mr. Reeve did it because I did ask some questions about

20   the use of cooperating witnesses and debriefings of

21   cooperating witnesses during my direct exam.

22        But in rehabilitating Mr. Zuk, I went into again

23   general practices regarding cooperators.  I did not mention

24   Kevin Wilson in my redirect.  Everything has been within the

25   scope of redirect and recross.  But once we start asking him

```
 1   to pass on the credibility of a specific cooperator, we've

 2   crossed the line.  That's why I object to these questions.

 3          So if he wants to go ahead again and ask general

 4   questions about cooperators, that's fine, but not specifically

 5   as to Kevin Wilson.

 6          THE COURT:  Are you going into Mr. Wilson?

 7          MR. REEVE:  I asked about, does he know Mr. Wilson,

 8   he said no.  I want it clear to this jury that he has no idea

 9   about the main witness's reliability, and all of his answers

10   have nothing to do with that.  That's what I'm trying to

11   establish.

12          Now, I can change it and depersonalize it for Mr.

13   Wilson, and say, "You don't know any cooperating witnesses in

14   this case and you know nothing about the reliability of any

15   cooperating witness in this case."

16          MR. VATTI:  I don't object to that.

17          MR. REEVE:  I can take Wilson out, if that's a

18   reasonable compromise.

19          THE COURT:  Make it that question.

20          MR. REEVE:  If it's just an objection to the name, I

21   can go that way.

22          MR. VATTI:  If you want to ask if he has any

23   knowledge of any of the cooperators, that's fine.

24          MR. REEVE:  Let me do it that way.

25          (In open court.)
```

```
 1   BY MR. REEVE (Continued):

 2   Q    Agent Zuk, do you know anything about any cooperating

 3   witness in this case?

 4   A    No.

 5   Q    Do you know anything about the reliability of any

 6   cooperating witness in this case?

 7   A    No.

 8   Q    Do you know anything about what the prior record of any

 9   cooperating witness is in this case?

10   A    No.

11   Q    Do you know anything about what investigation of any

12   cooperating witness's background was done in this case?

13   A    No, I don't.

14   Q    So your personal experiences with cooperating witnesses,

15   fair to say, has no bearing on the reliability of any

16   cooperating witness in this case, is that fair?

17   A    Yes.

18             MR. REEVE:  Okay, thank you.  I have no other

19   question.

20             MR. VATTI:  No further questions, your Honor.

21             THE COURT:  Thank you, sir.

22             THE WITNESS:  Thank you, your Honor.

23

24

25
```

1                    INDEX OF WITNESSES                PAGE

2    MICHAEL ZUK

3        Cross-Examination by Mr. Rogan            16

4        Cross-Examination by Mr. Reeve            33

5        Redirect Examination by Mr. Vatti         58

6        Recross-Examination by Mr. Moraghan       71

7        Recross-Examination by Mr. Rogan          73

8        Recross-Examination by Mr. Reeve          75

9

10

11

12

13

14

15

16        COURT REPORTER'S TRANSCRIPT CERTIFICATE

17            I hereby certify that the within

18        and foregoing is a true and correct

19        transcript taken from the proceedings

20        in the above-entitled matter.

21

22                    /s/ Thea Finkelstein
                       Official Court Reporter
23

     Dated: _____
24

25