1              UNITED STATES DISTRICT COURT

2               DISTRICT OF CONNECTICUT

3    * * * * * * * * * * * * *  x  Criminal Case
                                     No. 3:12CR104(EBB)
4    UNITED STATES OF AMERICA,    :
                 Plaintiff
5                                 :
          vs.                        January 23, 2014
6                                 :  11:24 O'clock a.m.
     RICHARD ANDERSON, PHILIP
7    BRYANT, ROBERT SANTOS,       :
                 Defendants
8                                 :  New Haven, Connecticut
     * * * * * * * * * * * * *  x
9

                       THIRD DAY OF TRIAL
10
             BEFORE THE HONORABLE ELLEN BREE BURNS
11             SENIOR UNITED STATES DISTRICT JUDGE
                    AND A JURY OF FIFTEEN
12   Appearances:
       For the Plaintiff:            S. DAVE VATTI, ESQ.
13                                   MARC HARRIS SILVERMAN
                                     Assistant U.S. Attorneys
14                                   157 Church Street
                                     New Haven, CT 06510
15
       For the Defendant:           NEAL PATRICK ROGAN, ESQ.
16     Richard Anderson             315 Post Road West
                                    Westport, CT 06880
17
       For the Defendant:           DAVID A. MORAGHAN, ESQ.
18     Philip Bryant                Smith, Keefe, Moraghan &  Waterfall
                                    32 City Hall Center, Suite C
19                                  PO Box 1146
                                    Torrington, CT 06790
20
       For the Defendant:           RICHARD A. REEVE, ESQ.
21     Robert Santos                Sheehan & Reeve
                                    139 Orange Street, Suite 301
22                                  New Haven, CT 06510

23     Court Reporter:              Thea Finkelstein RMR, CRR
                                    141 Church Street
24                                  New Haven, CT 06510
                                    TheaFinkelstein@aol.com
25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.

```
1              (In the absence of the jury.)

2          MR. SILVERMAN:  I have one very quick matter for

3     your attention before the jury comes in.

4          THE COURT:  Right.

5          MR. SILVERMAN:  Yesterday, there was some discussion

6     about how to approach the fact that Mr. Bryant is charged with

7     all three controlled substances, but that Mr. Santos is only

8     charged with heroin, Mr. Anderson is charged only with crack

9     cocaine.  I've spoken with my fellow attorneys and I've

10    drafted some language that you could use as a reminder to the

11    jury.

12         Now, I understand that each defense attorney has an

13    objection to it, so let me just state it quickly and then they

14    can tell me if I've gotten it wrong.

15         I think the idea here was that Mr. Santos wants the

16    jury to be clear he's charged only with heroin; Mr. Anderson

17    wants the jury to be clear he's charged only with crack

18    cocaine; Mr. Bryant doesn't want to highlight for the jury the

19    fact that he's charged with all three substances, crack,

20    powder cocaine, and heroin.

21         So my understanding is that Mr. Santos and Mr.

22    Anderson would like a limiting instruction every time there's

23    some evidence related to the drug with which they are not

24    charged, and I think the Court yesterday indicated that that

25    was not the Court's intention.
```

1          And Mr. Bryant would prefer that there be no

2   instruction at all on this issue because it highlights the

3   fact that he's charged with multiple substances.

4          This is my understanding of the position of defense

5   counsel.

6          What I've drafted is a reminder to the jury that I

7   would request the Court give once today, before we begin

8   evidence, just highlighting again what the superseding

9   indictment charges as to each defendant.  I'll read it now,

10  the language that I've drafted, and if the Court thinks that

11  it's acceptable, each defense attorney can make their

12  objection to it, and then we can proceed with the jury.

13         This is the language that I've drafted and shown to

14  defense counsel, and it's in your voice, your Honor:

15         As I conveyed to you in my preliminary instructions

16  Tuesday, all three of the defendants are charged in Count One

17  of the superseding indictment with conspiring to distribute,

18  and possess with intent to distribute, controlled substances.

19  As the evidence is now underway, this is a brief reminder of

20  the specific drug types and quantities charged against each

21  defendant.  This reminder simplifies the language of the

22  superseding indictment.

23         The superseding indictment charges that Mr. Anderson

24  knew or reasonably should have foreseen from his own conduct

25  and that of other members of the conspiracy that the

1    conspiracy involved 28 grams or more of cocaine base, crack

2    cocaine.

3          The superseding indictment charges that Mr. Bryant

4    knew or reasonably should have foreseen from his own conduct

5    and that of other members of the conspiracy that the

6    conspiracy involved 28 grams or more of cocaine base, crack

7    cocaine; a detectable amount of cocaine; and a detectable

8    amount of heroin.

9          The superseding indictment charges that Mr. Santos

10   knew or reasonably should have foreseen from his own conduct

11   and that of other members of the conspiracy that the

12   conspiracy involved 100 grams or more of heroin.

13         You should keep the charged drug types and

14   quantities in mind as you consider the evidence presented

15   during this trial.

16         And that's it.

17         THE COURT:  And there's an objection, gentlemen, to

18   that statement?

19         MR. REEVE:  Yes, your Honor.  And I agree with the

20   government counsel's representation with one exception:  I

21   don't think the choice is between this single one, or every

22   time relevant question is whether or not the single proposed

23   charge is adequate.  I believe it's not.  I believe there

24   should be more.

25         I put all those things on the record, I'm not going

1    to repeat those arguments, and on that basis I do object.

2            I understand the government's tried to accommodate a

3    joint trial, and I appreciate that the Court is trying to do

4    that as well.  I just don't think, given the radically

5    different evidence against all three individuals, that it's

6    possible to do that, and to provide a fair trial to all three.

7    Obviously, my concern is Mr. Santos, and so I continue to seek

8    a severance in this case, and I am continuing to argue that

9    the single limiting instruction is inadequate.

10           Thank you.

11           THE COURT:  You never made a motion to sever prior

12   to the commencement of this trial, however, did you?

13           MR. REEVE:  I did not.  However -- and I think that

14   there were a number of discussions about that, we can go into

15   that, but I have always felt that until you really know who

16   the other people are, and then it gets even beyond that, which

17   is what is the evidence?

18           We received, as your Honor may be aware, in this

19   case, you know, many, many disks full of hundreds of thousands

20   of calls.  It was pretty clear to us that the Wilson calls

21   were going to be the ones relevant here, and so obviously, we

22   focused on those calls.

23           But to a certain degree, the whole case was arguably

24   relevant and necessary for defense counsel to at least have an

25   overall global understanding to put this in the context of the

1    entire investigation.

2            So as your Honor knows, on the Wilson call tap,

3    there were over 7,000 calls.  Not all of those were designated

4    as relevant calls, but there were, I believe it would be fair

5    to say that there are, thousands of calls that have been

6    designated as relevant calls on the Wilson tape.

7            Until it was clear which specific ones were going to

8    be used, and exactly what the conflicts between the people, it

9    was very hard to articulate the basis for severance.

10           Up until jury selection, very close to jury

11   selection, we thought there were going to be six defendants.

12   Now there are three.  It was the week before, and I'm not

13   faulting government counsel.

14           They were involved in a trial.  They were making

15   efforts to get us the trial notebook.  You know, I understand

16   the administrative difficulties that the government had given

17   their situation where they had two trials back to back.

18           But we got this book, your Honor, and this is the

19   government's trial notebook, and the record would reflect it's

20   about, my estimate is about, five inches thick, it's a large

21   three-ring binder.  The vast majority of that binder

22   constitutes all the calls that are being introduced here.

23           We got that book last Tuesday, a week before the

24   opening of trial.  We then got a bunch of supplemental calls,

25   which those calls are now incorporated into, you know, I

1   pulled them and I put them in this trial notebook.

2          But just so your Honor has the idea, I think I gave

3   it to Mr. Moraghan, we got these calls on Friday, when we met

4   with the government on Friday morning, to attempt to resolve

5   the issues.  And so, you know, there are going to be

6   continuing issues here.

7          Just to give your Honor an example, and I don't want

8   to take too long because the jury's here, but there's a call

9   that the government's going to introduce with respect to Mr.

10  Anderson that I believe -- first of all, there's a call where

11  Mr. Wilson gives Mr. Anderson the go ahead, the green light,

12  to commit acts of violence against someone else.  That goes to

13  the credibility, in my view, of Mr. Wilson.  So am I going to

14  raise that?

15         Then there's another call that Mr. Anderson is on

16  where -- I believe it's Mr. Anderson, I might be corrected if

17  I'm wrong, where -- there's a discussion, Mr. Santos is not

18  mentioned by name but in the context of the calls, it's very

19  clear, it's about Mr. Santos, and they're talking about steps

20  to take with respect to Mr. Santos.

21         So I just, I raise these because it's only in the

22  context of the facts that we finally got, and the specific

23  calls that are going to be introduced, that I then can see,

24  okay, here's a lot of what the problems are.  And we got these

25  calls and the government's exhibits, as I said, within just a

1    few days of trial.  So that's just the reality.

2            MR. SILVERMAN:  And, your Honor, the motions to

3    sever were made when they were made.  I do agree that the

4    Court has an obligation to ensure that each defendant has a

5    fair trial, whenever the motion is made.

6            It's the government's position that a joint trial

7    here is appropriate, and to the extent that the defendants

8    have raised concerns about the fact that there are different

9    quantities attributed to certain defendants, certain

10   substances attributed to different defendants, I think the

11   limiting instruction the Court has given, this limiting

12   instruction before we dive into the evidence today, and the

13   Court's final instructions will address those concerns.

14           I know there's a disagreement, but it's the

15   government's position that the instruction that I proposed to

16   the Court would adequately address the concerns that have been

17   raised.

18           It's the government's position that the motions for

19   severance should continue to be denied; we should proceed with

20   the joint trial; and the Court should offer an instruction

21   such as this one to the jury before we begin evidence today,

22   or if the Court wants more time to review it, perhaps after

23   the lunch break that we take.

24           THE COURT:  May I see it, please?

25           MR. SILVERMAN:  Yes, your Honor.

```
 1           MR. MORAGHAN:  Your Honor, I join in Mr. Reeve's

 2    comments, for a different reason in some ways.  I don't

 3    believe the instruction should be given at all.  I don't think

 4    it's necessary at all.  I think the jury can weigh the

 5    evidence presented.  It will be clear as to what is being

 6    offered against whom.  And this just calls undue attention to

 7    Philip Bryant.

 8           More importantly, I think we moved for severance

 9    yesterday for those reasons.  But more importantly, tomorrow

10    there's going to be another issue because my co-counsel are

11    going to want instructions on the firearms, which is again

12    going to focus directly on Philip Bryant, making him the key

13    person here.  He's going to focus the jury's attention on him,

14    to the exclusion of the other two defendants.  It's going to

15    affect his right to have a fair trial.  That is why, the

16    second reason why, yesterday I moved for severance.

17           It was also in part because your Honor originally

18    agreed that you were going to give that cautionary instruction

19    each time there was basically a conversation, and you changed

20    that to now it's just one time.  But I don't think it's

21    necessary.  I think it is prejudicial to Philip Bryant.

22           The language, if that is the language the Court is

23    going to use, then that's the language the Court is going to

24    use, but I don't think it's necessary.

25           MR. ROGAN:  Your Honor, I don't want to belabor the
```

1   point.  My objection almost exactly mirrors Mr. Reeve's

2   objection.  I also previously made an oral motion to sever.

3           The stipulation, I agree, is somewhat helpful.  It

4   does not go nearly far enough, given the conflicting position

5   of all three of these defendants.  I don't want to repeat

6   everything Mr. Reeve said, but I want to renew my objection to

7   the motion to sever.

8           MR. SILVERMAN:  It's the government's continuing

9   position that a joint trial is appropriate, and that the

10  instruction that's been proposed to the Court adequately

11  addresses these concerns, in light of how the government

12  anticipates presenting the evidence, as well as the Court's

13  preliminary instructions, the proposed charge that we've all

14  already looked at as has been circulated by chambers, and the

15  verdict form that the jury will receive at the end of their

16  deliberations.

17          We'll address the firearm issue tomorrow.

18          THE COURT:  I will give this instruction.  I think

19  it might be helpful to the jury to make those distinctions

20  between the different gentlemen's involvement.  Okay.

21          MR. SILVERMAN:  Thank you, your Honor.

22          THE COURT:  May we have the jury, please?

23          MR. VATTI:  Your Honor, while the jury's being

24  brought in, would it be okay if your Honor told the jury that

25  due to some other matters that you had this morning, that's

1    why we're getting a delayed start?  I don't want them to think

2    it's the lawyers' fault.

3              THE COURT:  Yes, I will.  It's been a very busy

4    morning, gentlemen.

5              MR. REEVE:  Yes, we understand.  Just so your Honor

6    knows, there have been ongoing discussions between counsel to

7    try to streamline things.  I think both sides are making an

8    effort to do that.  We are obviously behind schedule, but

9    we're, I think, collectively trying to find agreement where we

10   can find agreement and where we can't, we raise it with the

11   Court.

12             I think we talked about the next witness's

13   testimony.  There might be some agreement.  We're probably

14   going to have to raise issues depending on where the

15   government goes.  We'll take it on a question by question

16   basis, but we're discussing all this in an effort to assist

17   the jury, I think.

18             THE COURT:  I appreciate that.

19             MR. VATTI:  Your Honor, could we take the lunch

20   break at 1:00 o'clock and maybe shorten the lunch break to 45

21   minutes instead of an hour?

22             THE COURT:  I would think they would be happy to

23   have a shorter lunch break.

24             MR. VATTI:  And then if we can go until 5:00

25   o'clock?  We can get a good chunk of testimony today.

```
 1              THE COURT:  I think I told them not to come in until
 2   10:30, but it's now 20 minutes to 12:00.
 3              MR. VATTI:  Right.
 4              THE COURT:  Yes.
 5              MR. MORAGHAN:  Your Honor, I was having some trouble
 6   hearing you.  I don't know if you're speaking into the
 7   microphone.
 8              THE COURT:  I'll try to talk into the microphone.
 9              MR. MORAGHAN:  Thank you.
10              (In the presence of the jury:  11:40 o'clock a.m.)
11              THE COURT:  Good morning, ladies and gentlemen.  I
12   want to apologize for the delay this morning, but I had
13   several other matters to address before I could resume with
14   the trial.  Those matters had nothing to do with these
15   defendants; there were a couple of other cases that I had to
16   be involved with this morning.  I apologize for the delay in
17   starting the trial.
18              Anything further?
19              MR. VATTI:  No, your Honor.  The government plans to
20   now call DEA Special Agent Erik Ndrenika.  While he's coming
21   in, if there was an instruction that your Honor was going to
22   read.
23              THE COURT:  Yes, I would like to give this
24   instruction to the jury.
25              As I told you in my preliminary instructions, ladies
```

1    and gentlemen, all three of the defendants are charged with

2    Count One in the superseding indictment with conspiracy to

3    distribute and possess with intent to distribute controlled

4    substances.

5          Now that we've got the evidence underway, this is a

6    brief reminder of the specific drug types and quantities

7    charged against each defendant, and this simply clarifies the

8    language of the superseding indictment.

9          The superseding indictment charges that Mr. Anderson

10    knew or reasonably should have known from his own conduct and

11    that of other members of the conspiracy that the conspiracy

12    involved 28 grams or more of cocaine base, also known as crack

13    cocaine.

14          The superseding indictment charges Mr. Bryant knew

15    or reasonably should have foreseen from his own conduct and

16    that of other members of the conspiracy that the conspiracy

17    involved 28 grams or more of cocaine base, crack cocaine; a

18    detectable amount of cocaine; and a detectable amount of

19    heroin.

20          The superseding indictment charges that Mr. Santos

21    knew or reasonably should have foreseen from his own conduct

22    and that of other members of the conspiracy that the

23    conspiracy involved 100 grams or more of heroin.

24          And you should keep in mind the drug types and

25    quantities that I've discussed as you consider the evidence

1    presented during the trial, because there will be different

2    evidence obviously with respect to each defendant.  So you

3    have to be careful that you apply that evidence to the

4    respective defendant to whom it relates, okay?

5            Thank you.

6            MR. VATTI:  Lastly, your Honor, before I begin the

7    examination of Special Agent Ndrenika, the lawyers have had

8    some discussions about trying to streamline the procedure for

9    introducing exhibits.

10            THE COURT:  Yes, sir.

11            MR. VATTI:  By agreement of counsel, I'm going to

12    move at this time to admit government exhibits 1 through 137,

13    201 through 230, 240 through 249, and 300 to 309.  So at this

14    point, the only things that are not admitted are the drug

15    exhibits -- I'm sorry, the lab reports relating to the drug

16    exhibits, and the Connecticut Department of Labor records.

17            THE COURT:  Thank you.

18            MR. REEVE:  That's correct, your Honor.  I think I

19    speak for all three counsel in saying that that's right.

20            THE COURT:  That's the agreement.

21            MR. REEVE:  Yes.

22            THE COURT:  All right.  Very well then.  Exhibits 1

23    through 137, 201 through 230, 240 through 249, and 300 to 309

24    are all marked as full exhibits.

25            MR. VATTI:  That's correct, your Honor.

1          THE COURT:  Very good, thank you.

2                   **A N A S T A S     N D R E N I K A**

3          having been called as a witness, was first

4          duly sworn and testified on his oath as follows:

5          THE CLERK:  Please state your name, spell your last

6   name, and the town and state where you do business.

7          THE WITNESS:  Anastas Ndrenika, N-D-R-E-N-I-K-A; New

8   Haven, Connecticut.

9          THE CLERK:  Thank you.

10  DIRECT EXAMINATION

11  BY MR. VATTI:

12  Q    Good morning, sir.

13  A    Good morning.

14  Q    Can you tell us where you currently work?

15  A    I'm employed by the Drug Enforcement Administration, here

16  in New Haven, Connecticut.

17  Q    And how long have you been with the DEA New Haven office?

18  A    Since December of 2004.

19  Q    And tell us briefly your educational background.

20  A    I got a bachelor of science in criminology and law from

21  Suffolk University in Boston, Massachusetts, and I've attended

22  DEA Academy for 16 weeks.

23  Q    And where was that training?

24  A    Quantico Virginia.

25  Q    Give us an overview of what that training consisted of.

```
 1   A    The training which lasted for approximately 16 weeks
 2   consisted of criminal law, constitutional law, arrest
 3   procedures, firearms, defensive tactics, defensive driving,
 4   managing and handling cooperating informants, how to conduct
 5   undercover activities, identifying different types of
 6   narcotics.
 7   Q    And did you also receive instruction relative to
 8   conducting narcotics investigations generally?
 9   A    Yes.
10   Q    And give us an overview of that.
11   A    How to purchase narcotics, who to utilize, using
12   recording devices, utilizing undercover officers in general.
13   Q    And how about with respect to conducting wiretap
14   investigations, did you receive training on that?
15   A    Yes.
16   Q    And give us a description of that.
17   A    Wiretaps were sections where we're taught how to initiate
18   it, how to target certain phone numbers utilized by certain
19   individuals, and the procedures that you have to take in order
20   to receive authorization to receive, in order to intercept
21   wire communications over a phone.
22   Q    And after you finished the DEA training at Quantico,
23   where was your first posting?
24   A    I was, for a short period of time, in Boston,
25   Massachusetts, and then December of 2004, I was stationed in
```

```
 1   New Haven, Connecticut.

 2   Q    All right.  What is your job title?

 3   A    I'm a special agent.

 4   Q    What does that mean?

 5   A    That's the title they gave us.  That's the title that we

 6   are identified as.  Certain individuals are identified as

 7   police officers, state troopers; we're identified as special

 8   agents.

 9   Q    Do special agents of the DEA have arrest powers?

10   A    They do.

11   Q    And there's also something at the DEA called task force

12   officer, correct?

13   A    Yes.

14   Q    And what is a task force officer?

15   A    Task force officer is either a police officer or state

16   trooper who is assigned on a permanent basis to a drug, to a

17   DEA task force.  Police officers are deputized and they have

18   the same arrest powers as a federal agent, special agent, do.

19   Q    But they're referred to, instead of by the title special

20   agent, they're referred to by the title task force officer?

21   A    That's correct.

22   Q    They would be called TFO for short, correct?

23   A    TFO, yes.

24   Q    Those TFOs, are they housed in offices at the DEA?

25   A    Yes.
```

1    Q     So they come to work every day at the DEA as opposed to

2    going every day to their local department?

3    A     Yes, they show up to work same way as I do, and they are

4    there for eight hours, ten hours, every day.

5    Q     But they're employees of their local department; not the

6    DEA?

7    A     That's correct, they get paid, their salary's paid, by

8    the cities that they work for.

9    Q     All right.  Since you joined the New Haven DEA office,

10   what are your duties there?

11   A     My duties are various.  Is conduct investigations.

12   Identifying drug distributors who are operating in our area.

13   Initiating those investigations.  Supporting other members of

14   the office in other investigations they have.

15           I also have collateral duties, such as being the

16   technical agent in charge of all technical equipment,

17   clandestine laboratories, fugitive apprehension.

18           So I have numerous duties that I have to do on a

19   daily basis.

20   Q     Since December of 2004, roughly how many narcotics

21   investigations have you participated in?

22   A     Hundreds.

23   Q     And out of those, how many were wiretap investigations?

24   A     Fifteen to 20.

25   Q     And were you the lead case agent, or co-lead case agent,

```
 1   in any of those wiretap investigations?

 2   A     Yes, about seven.

 3   Q     And I'm not going to go through that again, because we

 4   heard all that from Special Agent Zuk, but did you become

 5   involved in a wiretap investigation in the greater New Haven

 6   area in approximately December 2010?

 7   A     Yes.

 8   Q     All right.  Did that begin immediately with a wiretap in

 9   December of 2010?

10   A     No.

11   Q     Tell us how this investigation came about.

12   A     At the request of the New Haven Police Department,

13   certain statistics of crimes taking place in their city were

14   conducted, and it was determined that two areas of the city of

15   New Haven were identified as locations where predominantly

16   these crimes were taking place.  One of those locations was

17   identified as the Trey, which is the Kensington area,

18   Kensington/George/Day, close to St. Raphe's Hospital; and the

19   other area was the Fair Haven section of New Haven.  Those

20   were the two neighborhoods identified based on those

21   statistics.

22   Q     Those would be characterized as, when you started the

23   investigation, hot spots for drug trafficking and other

24   associated crimes?

25   A     Yes.
```

1    Q    All right.  I'm going to ask you a series of yes and no

2    questions, all right?

3              So after reviewing the statistics, did DEA decide to

4    start an investigation in those two areas?

5    A    Yes.  It was not only DEA; it was conjunction with local

6    police departments and other federal agencies.

7    Q    All right.  Which other local police departments were

8    involved?

9    A    New Haven Police Department, Hamden Police Department,

10   West Haven Police Department, North Haven, as well as members

11   of the ATF, Alcohol, Tobacco & Firearms.

12   Q    All right.  At some point, did that investigation turn

13   into a wiretap?

14   A    It did.

15   Q    And what was the date that the wiretap investigation

16   actually started?

17   A    July 29th, 2011.

18   Q    All right.  I'm going to just put some of the milestone

19   dates that we're going to be talking about up on the board.

20              So as you mentioned, December of 2010 is when the

21   investigation began?

22   A    Yes.

23   Q    And the wiretap started July 29th, 2011?

24   A    Yes.

25   Q    All right.  Let's talk briefly about what happened before

1    we got to the wiretap stage of the case.  Would it be fair to

2    say that during that roughly seven months before the wiretap

3    got started, one of the things that you did, along with your

4    fellow investigators, was to interview a number of

5    confidential informants and cooperating witnesses?

6    A     Yes.

7    Q     And tell us what the DEA definition of "confidential

8    informant" is versus "cooperating witness."

9    A     Confidential informant is an individual who provides

10   information to law enforcement but is not willing to testify

11   in court.  They don't want their identity to be known to other

12   individuals.

13           Where a cooperating witness is an individual who

14   proactively works with law enforcement, and is willing to

15   testify in court if necessary.

16   Q     So during this seven month period, did you debrief a

17   number of confidential informants and cooperating witnesses?

18   A     Yes.

19   Q     And was that with respect to activities taking place in

20   the Trey and in Fair Haven?

21   A     Yes.

22   Q     And as a result of those debriefings, were a number of

23   individuals identified as potential targets of this

24   investigation?

25   A     Yes.

1    Q    Can you give us a rough estimate of approximately how

2    many individuals were identified?

3    A    Between 30 to 45.

4    Q    All right.  In addition to the debriefings of informants,

5    what else were you doing for investigative activity during the

6    seven months that led to the wiretap?

7    A    Once certain individuals were identified, with the

8    assistance of confidential informants, cooperating witnesses,

9    phone numbers were obtained, toll analysis was conducted, and

10   then subsequently controlled purchase of narcotics.

11   Q    All right.  You mentioned something called toll analysis.

12   Can you tell us what you meant by that?

13   A    Sure.  Pursuant to administrative subpoenas that we

14   submit to the phone company, we request historical information

15   pertaining to a certain phone number.  In other words, we're

16   looking for the phone bill that we used to get back in the day

17   which shows all incoming, outgoing, duration, date, and time

18   of a certain telephone call.

19           So we receive those information for a period of

20   month, two months, three months, whatever we believe is

21   necessary, to give us a clear picture of what has taken place.

22   Those are the toll records that I just referred to.

23   Q    All right.  So in your debriefings of informants and

24   cooperating witnesses, did you receive telephone numbers for

25   potential targets of the investigation?

1   A    Yes.

2          MR. REEVE:  Your Honor, I'm sorry, I don't object,

3   but I think the record should be clear, I think we're talking

4   about, this is all, all these questions relate to before the

5   wiretap?

6          MR. VATTI:  Yes.

7          MR. REEVE:  Okay, thank you.

8   Q    We're talking about just the seven months prior to July

9   29, 2011?

10  A    That's correct, sir.

11  Q    All right.  In the debriefings of informants and

12  cooperating witnesses, you received telephone numbers relating

13  to potential targets of the investigation, or used by

14  potential targets?

15  A    That's correct, sir.

16  Q    And then did you, with respect to some of those numbers,

17  request toll records?

18  A    Yes, sir.

19  Q    And those come from the phone company that provides

20  service to those phone numbers?

21  A    That's correct.

22  Q    All right.  You do that by submitting an administrative

23  subpoena --

24  A    Yes, sir.

25  Q    --  to the phone company?

```
1    A    Yes.

2    Q    What is a pen register?

3    A    A pen register is no different than a toll record.  Only

4    difference between the two is toll record is something that is

5    historical; where pen register is something that you're able

6    to view as it takes place.  A phone call is made, you're able

7    to observe the number that the target telephone is dialing,

8    and then you're able to see the direction, if it's an incoming

9    call or outgoing, and you're able to see the date and time and

10   how long the call itself, the duration of the call.  You don't

11   get the content of the call, the conversation.  Toll records,

12   historical; pen register is something that is live.

13   Q    Can you get a pen register with an administrative

14   subpoena?

15   A    No.

16   Q    What do you have to do?

17   A    Reasonable suspicion has to be shown or probable cause,

18   an affidavit has to be prepared and submitted to a federal

19   judge for review and final approval.  Once approval is

20   provided, is given by the court, then an order to service

21   provider is then submitted to the phone company providing

22   service to that specific telephone.

23   Q    Okay.  And in this particular seven-month period, did you

24   identify a particular phone number belonging to an individual

25   named Kevin Wilson?
```

```
 1    A     Yes, sir.

 2    Q     All right.  And I put up here on the chart a number of

 3    914-227-8177.  Do you recognize that number?

 4    A     Yes, it's target telephone 4.

 5    Q     Who used target telephone 4?

 6    A     I'm sorry?

 7    Q     Who used target telephone 4?

 8    A     Kevin Wilson, also known as Nature.

 9    Q     You mentioned that this phone in the investigation was

10    designated target telephone 4, and I represented that by TT 4.

11    Were there other target telephones that were a subject of this

12    investigation?

13    A     Numerous.

14    Q     And roughly how many phones were ultimately targeted for

15    wiretaps in this investigation?

16    A     Twenty-two.

17    Q     And used by how many different people?

18    A     About ten.

19    Q     All right.  So when the wiretap began on July 29th of

20    2011, how many different telephones were the subject of a

21    wiretap on that day?

22    A     Four.

23    Q     And that would be target telephones 1, 2, 3, and 4?

24    A     Correct.

25    Q     Okay.  And target telephones 1, 2, and 3 belonged to
```

1    other individuals, not Kevin Wilson, correct?

2    A    That's correct.

3    Q    All right.  Did one of those other target phones target

4    the Fair Haven neighborhood?

5    A    Yes, target telephone 3.

6    Q    And target telephone 4 was the phone that you and your

7    fellow investigators picked to target the Trey?

8    A    Yes.

9    Q    All right.  Why was that telephone number picked to

10   target the Trey?

11   A    Based on the information that we received from

12   confidential informants and cooperating witnesses, Mr. Wilson

13   was identified as a wholesale crack cocaine distributor who

14   was obtaining large quantities of crack cocaine from the city,

15   from New York City, and transporting those narcotics to New

16   Haven for further wholesale distribution.

17   Q    All right.  Was that crack cocaine that he was

18   transporting from New York City or powder cocaine?

19   A    That was powder cocaine, converted to crack upon their

20   arrival.

21   Q    All right.  I want to talk a little bit about the

22   mechanics of a wiretap and how it actually works.  So the

23   wiretap of target telephone 4 belonging to Mr. Wilson began on

24   July 29th, 2011?

25   A    Yes.

1    Q    What did you have to do to secure authorization to

2    wiretap that phone?

3    A    Sure.  First, a probable cause had to be established that

4    that phone was utilized in furtherance of drug trafficking

5    activities and other crimes.  Probable cause was established

6    by actually conducting controlled purchases.

7            MR. REEVE:  I'm sorry, your Honor, I hate to

8    interrupt the witness.  I think we all agree that there was a

9    court order on these wiretaps.  There's no objection.  There's

10   no claim that the wiretap orders weren't issued, but I object

11   to an evaluation of that process.  It's really not relevant

12   here.

13           MR. VATTI:  I think the jury's entitled to be

14   educated on what it takes to obtain a wiretap, your Honor.  I

15   don't intend to spend a lot of time on it, but I think they

16   have a right to know.

17           THE COURT:  I'll overrule the objection.

18   Q    All right.  You mentioned that controlled purchases were

19   necessary to establish probable cause that the phone is being

20   used for drug trafficking?

21   A    That's correct, sir.

22   Q    Okay.  Is there one other showing that needs to be made

23   before you can secure authorization for a wiretap?

24   A    Necessity.

25   Q    What does that mean?

1    A     Necessity means you have no other means of accomplishing

2    your investigative goals.  You have tried everything you can,

3    and that's the last resort.

4    Q     And with respect to target telephone 4, what were the

5    goals of the investigation?

6    A     Was to identify all co-conspirators, as well as the

7    sources of supply.

8    Q     And what was the date of the first controlled purchase

9    from Mr. Wilson?

10   A     May 10th, 2011.

11   Q     All right.  I'll just use CP for controlled purchase.

12   Was there a second controlled purchase that was done from

13   Mr. Wilson before the start of the wiretap?

14   A     Yes.

15   Q     What was the date of that?

16   A     June 29th, 2011.

17   Q     All right.  Now, in this time frame, you were also

18   targeting at least three other phones for a wiretap that

19   eventually began on July 29th, correct?

20   A     Yes.

21   Q     So at the time that these controlled purchases were being

22   made from Mr. Wilson, was your group also involved in

23   controlled purchases from other targets at the same time?

24   A     Yes.

25   Q     During that same time period?

```
1    A    Yes.

2    Q    Would that be multiple controlled purchases?

3    A    There were numerous, yes.

4    Q    All right.

5              MR. VATTI:  I'm going to call up...

6    Q    Let's talk about the May 10th, 2011, controlled purchase.

7    A    Okay.

8    Q    Tell us briefly what happened.

9    A    Members of the DEA and ATF, working in conjunction, were

10   able to locate two cooperating witnesses who were willing to

11   conduct a controlled purchase from Kevin Wilson.  One of the

12   individuals who knew Kevin Wilson made arrangements with

13   Mr. Wilson over the phone, and arrangements were made to

14   purchase one ounce of crack cocaine later on that day, on May

15   10th, 2011.

16             Prior to departure, both cooperating witnesses were

17   searched.  The vehicle that they were provided with was

18   searched, to make sure that they did not bring any money or

19   contraband to the deal.

20             The deal itself was videotaped.  The vehicle that

21   they were driving was equipped with cameras inside the

22   vehicle, which captured the actual transaction that

23   subsequently took place.

24             So once again, prior to departing the area, they

25   were provided with the money, they were searched, they had the
```

1    video recording was going on at all times, and they were

2    followed from the neutral location, a location where they met

3    with law enforcement, to the point where they met with

4    Mr. Wilson.

5              Surveillance was able to identify Mr. Wilson as he

6    was waiting for the two cooperating witnesses to arrive.  They

7    observed Mr. Wilson get into the vehicle with, in the front

8    passenger with, the two cooperating witnesses and travel from

9    that location to Judson Avenue, where the vehicle came to

10   complete stop in front of 27-29 Judson Avenue.

11             At that time, Kevin Wilson exited the vehicle,

12   proceeded across the street, and entered 20-24 Judson Avenue,

13   out of the vehicle.

14             Short time later, Mr. Wilson returned to the

15   vehicle, at which time he provided the cooperating witness who

16   was -- or one of the two cooperating witnesses who were -- in

17   the vehicle with an amount of crack cocaine, eight individual

18   wrapped bags containing crack cocaine, in exchange for $1200.

19             Subsequent to the buy, Mr. Wilson exited the

20   vehicle, and departed the area.

21             The vehicle with the two cooperating witnesses was

22   followed from that location, 20-24 Judson Ave to the neutral

23   location where the cooperating witnesses met with law

24   enforcement officers and turned over the purchased narcotics.

25             They were searched subsequently to the buy, they

1  were found to be free of any money or contraband, and the

2  vehicle was also searched.  The drug exhibit purchased from

3  Kevin Wilson, as well as the video recording recorded over the

4  course of the transaction, was subsequently entered into

5  evidence.

6  Q    All right.

7           MR. VATTI:  May I approach, your Honor?

8           THE COURT:  Yes, sir.

9  Q    I'm going to hand you what's been admitted as

10  Government's Exhibit 240.  Can you tell us what that is?

11  A    This is the crack cocaine that was purchased from

12  Mr. Wilson on May 10th, 2011, and it's identified as Court

13  Exhibit 240.

14  Q    How do you know that was the crack that was seized from

15  Mr. Wilson on the date of the purchase?

16  A    Sticker on the front of the bag, No. 4, that's Exhibit

17  No. 4.  That's how we identified the exhibits that we

18  purchased, and date, time, the individuals who acquired the

19  exhibit, as well as the exhibit itself.

20           I've reviewed the reports, I reviewed the

21  recordings, and this is the narcotics purchased on the day.

22           MR. VATTI:  Thank you, I'll retrieve that.

23  Q    And with respect to seized drug exhibits such as

24  Government's Exhibit 240, are they submitted to the DEA

25  laboratory?

1    A    Yes.

2    Q    And what is the purpose of doing that?

3    A    Once the exhibit is purchased, we conduct a test of the

4    narcotics.  Indicates the presence of narcotics, in this

5    instance cocaine.  Subsequently, in order to identify the

6    chemical structure of the narcotics that you purchased as well

7    as the actual weight and the purity of it, that exhibit is

8    submitted to the laboratory where certain testings are done,

9    and then a lab report is provided to us, once the testing's

10   complete.

11   Q    To your knowledge, was Government's Exhibit 240 submitted

12   to the DEA laboratory for analysis?

13   A    It was, and it was, a test was, conducted on that

14   exhibit.

15   Q    Now, you mentioned that prior to the deal and then after

16   the deal, the CIs that were utilized to conduct this purchase

17   were searched?

18   A    Yes.

19   Q    Is it standard protocol to do that in controlled

20   purchases?

21   A    Yes.

22   Q    And why is that done?

23   A    As I indicated before, it is to avoid -- to make sure

24   that no one brings any narcotics to the deal.  Make sure that

25   they don't say they purchased narcotics from somebody else,

1  where they bring it themselves and pocket the money.  We want

2  to make sure they don't have narcotics on them, they don't

3  have no money on them.  We want the deal to go as clean as

4  possible.

5          MR. REEVE:  Your Honor, I'm sorry to interrupt

6  again.  I have no objection, but I think counsel might have

7  inadvertently misidentified them as CIs, when we have been

8  talking about CWs, I thought.

9          THE COURT:  Would you clarify?

10         MR. REEVE:  It assumes facts not in evidence, and on

11  that basis I object.

12  Q    Do you know whether those two individuals were CIs or

13  CWs?

14  A    They were two CWs that I indicated before.

15  Q    Regardless, they are two individuals that were working in

16  conjunction with and under the supervision of law enforcement?

17  A    Yes.

18  Q    Let me get my train of thought back here.  All right.

19         So my next question was:  With respect to the before

20  and after searching of the cooperating witnesses, is it also

21  done to prevent or to guard against the possibility that the

22  cooperators might bring drugs to the deal and then say it was

23  sold by the target?

24  A    That's correct.

25  Q    So it's also to avoid a set-up?

```
1    A    Yes.

2    Q    All right.  You mentioned that a vehicle was used that

3    was equipped with a camera?

4    A    Yes.

5    Q    And the camera captures both audio and video of this

6    deal?

7    A    Yes.

8              MR. VATTI:  I'm going to play a clip from

9    Government's Exhibit 120.

10             (Government's Exhibit 120, a video recording,

11   playing.)

12   Q    Right there, who got into the car?

13   A    That's Kevin Wilson.

14             MR. MORAGHAN:  If you're going to be asking a

15   question --

16             MR. VATTI:  I'll pause the video, that's fine.

17             MR. MORAGHAN:   Thank you.

18   Q    In the front passenger seat, who got into that seat?

19   A    That's Kevin Wilson.

20   Q    Who are the other two individuals?  Are those the two

21   cooperators?

22   A    Yes.

23             (Government's Exhibit 120, a video recording,

24   continued, and paused.)

25             MR. REEVE:  Your Honor, again, I have no objection,
```

```
1    but I wonder if the Court could instruct, we're going to see a
2    lot of transcripts here, about what's in evidence and what's
3    not in evidence.
4              THE COURT:  The evidence is what you hear, ladies
5    and gentlemen.  The transcript is to help you.  If you hear
6    something different from that, it's what you hear that's the
7    evidence.
8              MR. REEVE:  Thank you, your Honor.
9    Q    Special Agent Ndrenika, this was the video on May 10th,
10   2011, between Kevin Wilson and the two cooperators, correct?
11   A    Yes.
12   Q    At this point in the video, where did Kevin Wilson exit
13   the vehicle?
14   A    It's in front of 27-29 Judson Avenue in New Haven.
15   Q    Can you tell us how these transcripts were prepared?
16   A    We sat down with earphones and we listened to the
17   specific recording, which was really long, for hours, to get
18   it word per word as it took place.
19   Q    And is it your belief that this is a true and accurate
20   transcript of the conversation that occurred in that portion
21   of the video?
22   A    Yes, word for word.
23   Q    And at the tail end of the video, CI No. 1 states, "You
24   about to run in and go snatch it"?  Is that correct?
25   A    That's correct.
```

```
 1    Q    Kevin Wilson, indicated by KW, says, "Yeah"?

 2    A    That's correct.

 3    Q    Kevin Wilson got out of the car?

 4    A    That's correct.

 5         MR. VATTI:  I'm now going to call up the next clip

 6    from this video.

 7         (Government's Exhibit 120, a video recording,

 8    continued, and paused.)

 9    Q    Right there, CI No. 2 said, "Oh, he going around the

10    side, okay, 20, 22, 24 Judson"?

11    A    That's correct.

12    Q    Is 22 Judson a particular building?

13    A    Yes.

14    Q    During your investigation, did you determine who at that

15    time lived at that location?

16    A    Philip Bryant.

17    Q    All right.  Is the Philip Bryant who lived there, is he

18    in the courtroom?

19    A    Yes, the individual between Attorney Moraghan and Reeve,

20    with the brown vest.

21         MR. VATTI:  May the record reflect that Special

22    Agent Ndrenika identified the defendant, Philip Bryant, your

23    Honor?

24         THE COURT:  It may.

25    Q    Now, were the CWs equipped with any transmitters or did
```

1   they have any devices able to stay in communication with the

2   surveillance team?

3   A    Yes, there was a transmitter that he was talking to.  In

4   addition to that, a phone call was made to the CW in order to

5   determine what was taking place.

6   Q    So the conversation regarding the fact that the CWs

7   pulled up on Judson, and that he's going around the side, 20,

8   22, 24 Judson, is that being relayed to the members of the

9   surveillance team?

10  A    That's correct.

11          MR. VATTI:  I'm going to pull up another clip from

12  this video.

13          (Government's Exhibit 120, a video recording,

14  continuing, and paused.)

15  Q    What was the purchase price on this occasion?

16  A    $1200.

17  Q    And I want to go through a timeline of events with you

18  during this deal.  First thing I want to ask you about is:

19  The time is not reflected properly on this particular video,

20  correct?

21  A    That's correct.

22  Q    Right.  Do you know what time Kevin Wilson first got into

23  the car with the two cooperators?  And if it would refresh

24  your recollection, I have your report.

25  A    Please.

1    Q    Let me clarify that, it's a DEA 6 report, but it wasn't

2    authored by you, correct?

3    A    That's correct, sir.

4    Q    I'm going to direct your attention to paragraph 7.

5              MR. VATTI:  May I approach, your Honor?

6              THE COURT:  You may.

7    Q    If you could just read that to yourself, and see if

8    that -- actually, why don't you take a look at paragraphs 6,

9    7, and 8?

10   A    Okay.

11   Q    Does that refresh your recollection as to what time

12   approximately Kevin Wilson first got into the car with the two

13   cooperating witnesses?

14   A    3:51.

15   Q    And approximately what time did they arrive at the Judson

16   Avenue address?

17   A    3:57, 3:58.

18   Q    All right.  And there were also phone calls between the

19   cooperating, one of the cooperating witnesses and Mr. Wilson

20   to set up the deal prior to the meeting, correct?

21   A    Yes, there were numerous phone calls.

22   Q    All right.  Let me skip ahead.  I'm going to skip ahead

23   considerably to December 21st, 2011.

24   A    Okay.

25   Q    Do you recall whether there was a traffic stop of Philip

1    Bryant on that day?

2    A    There was, yes.

3    Q    Tell us how that traffic stop came about.

4    A    At that time, we were listening to Mr. Wilson's phone

5    calls from July 29th all the way through December 21st, at the

6    time.  We had identified a phone number that we believed to be

7    utilized by Mr. Bryant, and we intercepted a call sometime in

8    the afternoon between Mr. Wilson and Mr. Bryant.

9            Over the course of the conversation, Mr. Bryant

10   asked Mr. Wilson if he was willing to exchange a gun that he

11   had for another gun.  "Let's swap the guns, just for a little

12   while.  Let me have yours, you can have mine."

13           Based on the fact that a gun was involved, we wanted

14   to do a traffic stop on the vehicle.  We had identified the

15   location where Mr. Bryant was at the time, it was a pizza

16   place on Whalley Ave, and under my directions, members of the

17   ATF, New Haven police officer assigned to the ATF, conducted a

18   stop on Mr. -- on the vehicle that Mr. Bryant was in in order

19   to retrieve that firearm that we believed was in the vehicle

20   based on the conversation between Mr. Wilson and Mr. Bryant.

21   Q    All right.  Now, were you working in the wire room that

22   day?

23   A    Yes.

24   Q    All right.  And one of the things that you were doing in

25   the wire room is staying in communication with the

```
 1   surveillance team that's out on the street?

 2   A     Yes.

 3   Q     All right.  And is it part of your duties to coordinate

 4   surveillance off of what you're hearing in the wire room?

 5   A     Surveillance and other enforcement activities, yes.

 6   Q     And on this particular date, did you actually listen to

 7   the calls that came in between Kevin Wilson and this number

 8   right here, 203-435-3420?

 9   A     Yes.

10   Q     Okay.  And in response to the calls between target

11   telephone 4 and this 3420 number, did you initiate

12   surveillance?

13   A     Yes.

14   Q     All right.  And where was the surveillance initiated?

15   A     It was a pizza place in the area of Whalley Avenue, New

16   Haven.

17   Q     Who initiated the surveillance on that day?

18   A     That was Task Force Officer Charles Tyson and Task Force

19   Officer David Zannelli, and there were other members of the

20   surveillance in the area as well, but the two individuals I

21   just identified were the individuals who made, subsequently

22   made, the observations and then made the stop.

23   Q     All right.  When they initiate surveillance, do you stay

24   in radio communication with them?

25   A     Yes.
```

1    Q    Do they report in realtime what is happening in the

2    surveillance?

3    A    Yes.

4    Q    All right.  And why is that important to you?

5    A    Because the decision I make inside the wire room is based

6    on what the surveillance teams is doing, observing out on the

7    street, even though it might have a certain goal or objective

8    at the specific time.

9              But based on the observations that the surveillance

10   officers make, that decision that I just made five minutes ago

11   all of a sudden just changed to something different.

12   Q    All right.  So you are making decisions based on the

13   realtime observations of your surveillance team members?

14   A    Correct.

15   Q    Is one of the decisions potentially whether to have it

16   remain as simply a surveillance?

17   A    Correct.

18   Q    Is another decision whether to escalate it to an actual

19   stop?

20   A    Correct.

21   Q    And is another decision whether to escalate the stop into

22   a full-blown arrest?

23   A    Yes.

24   Q    All of those decisions are informed by what your

25   surveillance team members are reporting in realtime over the

```
 1   radio?

 2   A     Yes.

 3   Q     Did a traffic stop get made on Philip Bryant?

 4   A     It was made, yes.

 5   Q     And was he in possession of a phone?

 6   A     He was.

 7   Q     And what did you do in response?

 8   A     I contacted the phone, and Task Force Officer Charles

 9   Tyson, who was next to Mr. Bryant, heard the phone ring,

10   picked up the phone, looked at the screen on the phone, and

11   observed my number on that phone.

12   Q     What number did you dial?

13   A     203-435-3420.

14   Q     Is that how you identified Philip Bryant as the user of

15   this phone?

16   A     Yes.

17   Q     All right.  And that was December 21st, 2011?

18   A     Yes.

19   Q     Right.  As of that date, had you actually confirmed,

20   prior to that date, that Philip Bryant was the user of that

21   phone, or was he known by a nickname at that point?

22   A     Nickname.

23   Q     What was the nickname by which the user of this phone,

24   3420 phone, was being identified in conversations with Kevin

25   Wilson?
```

1  A    Phizzy, Phat Phil, and sometimes Wilson would call him

2  Phatty Phat.

3  Q    There's four other numbers listed here.  There is, one of

4  the numbers is, 203-503-4947.  Was the user of that phone

5  referred to by nickname in conversations with Kevin Wilson?

6  A    Yes.

7  Q    And what was the nickname?

8  A    Phizzy or Phat Phil.

9  Q    And how about 203-589-7955, was that individual using

10 that phone referred to by nickname in conversations with Kevin

11 Wilson?

12 A    Phizzy or Phat Phil.

13 Q    And how about the user of 203-843-7249, was that

14 individual identified by nickname in conversations with Kevin

15 Wilson?

16 A    Phizzy or Phat Phil.

17 Q    How about 203-606-4469?

18 A    Phizzy or Phat Phil.

19 Q    How many different telephones did this individual

20 nicknamed Phizzy use in conversations with Kevin Wilson?

21 A    Five, that we knew of.

22 Q    All right.  On December 21st, 2011, the traffic stop

23 identified Phizzy as Philip Bryant?

24 A    Yes.

25 Q    Have you listened to calls involving all five numbers

1  that were intercepted over the Kevin Wilson phone?

2  A    Yes.

3  Q    Have you done a voice comparison of all of these

4  conversations over these five numbers?

5  A    Yes.

6  Q    And just tell us how many hours you spent listening to

7  pertinent calls in this investigation.

8  A    I can't even count.  Hundreds.

9  Q    And how about with respect to how much time you spent

10  listening to calls where these five phone numbers were

11  involved with Kevin Wilson?

12  A    A lot of hours.

13  Q    And you've in fact made transcripts of wiretap calls

14  involving these five numbers and target telephone 4?

15  A    I did not personally do the transcripts; I reviewed the

16  transcripts.  It would have been impossible for me to do all

17  the transcripts in this case.

18  Q    Certain wiretap calls have been admitted into evidence in

19  this case involving these five numbers, correct?

20  A    Yes, I reviewed every single one of them.

21  Q    Includes listening to the audio?

22  A    Yes.

23  Q    How many hours did you spend listening to the audio?

24  A    Fifteen to 20 hours.

25  Q    Did you review the transcripts of those conversations for

1    accuracy?

2    A    Yes.

3    Q    Are you satisfied that they're true and accurate?

4    A    Yes.

5    Q    By doing that, did you become familiar with the voice of

6    the person that was using these five numbers?

7    A    Yes.

8              MR. MORAGHAN:  Your Honor, I'm going to object at

9    this point.  I think he's moving into an area beyond this

10   witness's expertise.

11             THE COURT:  Sorry, I didn't hear you.

12             MR. MORAGHAN:  I think we're moving into an area

13   beyond this witness's expertise.

14             MR. VATTI:  Your Honor, under 901, lay opinion is

15   sufficient for voice I.D.

16             THE COURT:  I'll overrule the objection.

17   Q    Did you do the voice comparison on these five numbers?

18   A    Yes, it's the same voice.

19   Q    Having done that, I want to turn your attention back to

20   May 10, 2011.

21   A    Okay.

22   Q    Did you review call detail records provided by Sprint for

23   Kevin Wilson's phone for May 10th, 2011?

24   A    Yes.

25   Q    All right.  Can you tell us if, on May 10th, 2011, Kevin

1   Wilson was in contact with 203-435-3420?

2   A    He was.

3   Q    And approximately how many times on that day was he in

4   contact with that number?

5   A    I believe it was at least ten times.

6   Q    Was Kevin Wilson also in telephone contact with the two

7   cooperating witnesses who conducted the buy?

8   A    With one of them, yes.

9   Q    And do you know what the phone number was that the

10  cooperating witness was using?

11  A    My memory's good but not that good.  I believe it was

12  203-859, probably.  Started with 8.

13  Q    Would it refresh your recollection if I showed you the

14  Sprint records?

15  A    Yes.

16          MR. VATTI:  May I approach, your Honor?

17          THE COURT:  Yes, sir.

18  Q    All right.  Do you remember the number now?

19  A    859-2950.

20  Q    Area code 203?

21  A    Yes.

22  Q    Okay.  And turn your attention to the time starting

23  approximately 1:55.  Between 1:55 and 2:08 p.m. on May 10th of

24  2011, were there multiple contacts between the cooperating

25  witness's phone and Kevin Wilson?

```
1    A    From 1:55 and?

2    Q    2:08 p.m.

3    A    Yes, there were three.

4    Q    Okay.  In fact, the last one was 2:08 p.m.?

5    A    I have it at 2:06, starting at 2:06 ending at 2:08.

6    Q    Okay.  Was there then a contact with 203-435-3420 used by

7    Philip Bryant?

8    A    Yes.

9    Q    What time was that?

10   A    2:08 p.m.

11   Q    And ending at what time?

12   A    2:09 p.m.

13   Q    Were there subsequent contacts between Kevin Wilson's

14   phone and the Philip Bryant phone?

15   A    Total of five calls between 2:08 and 2:19.

16   Q    Then were there further calls between the cooperating

17   witness and Kevin Wilson between 2:32 p.m. and 3:31 -- I'm

18   sorry, 3:32?

19   A    There were six.

20   Q    And you said the deal occurred at approximately 3:51, or

21   at least Kevin Wilson got into the vehicle with the

22   cooperators at approximately 3:51?

23   A    Correct.

24   Q    Was there a call to Philip Bryant from the Kevin Wilson

25   phone at 3:38 p.m.?
```

```
 1    A    Yes.

 2    Q    And then you said the deal ended at approximately 3:57,

 3    or 3:58, when Kevin Wilson got out of the car?

 4    A    I believe it was 4:02.

 5    Q    4:02.  Was there subsequent contact, after the deal was

 6    over, between the Kevin Wilson phone and the 3420 number used

 7    by Philip Bryant?

 8    A    There was one afterwards, about 4:10.

 9    Q    All right.  Another controlled purchase took place on

10    June 29, 2011, correct?

11    A    Yes.

12    Q    And tell us what happened in that one.

13    A    Cooperating witness had obtained Mr. Wilson's telephone,

14    target telephone 4, a few days prior to that date, prior to

15    June 29th.  Attempts were made to contact Mr. Wilson on June

16    28th, to do the transaction.  There were approximately eight

17    recorded telephone calls between the cooperating witness and

18    Kevin Wilson, during which the two discussed the purchase of

19    two eight balls of crack cocaine.

20              Later on that day, Kevin Wilson put the -- his

21    source of supply or his criminal associate who indicated that

22    the crack cocaine was wet at the time and they couldn't

23    provide it to the cooperating witness.  Therefore,

24    arrangements were made to call the following day.

25              So as a result of that arrangement, plans were
```

```
 1  placed in motion to conduct the purchase of two eight balls of

 2  crack cocaine on June 29th from Kevin Wilson, using a

 3  cooperating witness.

 4  Q    All right.  There were a number of recorded calls that

 5  were made to set up this deal, correct?

 6  A    There were eight on June 28th and I believe one on the

 7  29th.

 8  Q    All right.

 9          MR. VATTI:  Let's start with Government's Exhibit

10  121.

11          (Government's Exhibit 121, an audio recording,

12  played.)

13          MR. VATTI:  Now I'm going to play Government's

14  Exhibit 122.

15          (Government's Exhibit 122, an audio recording,

16  played.)

17          MR. VATTI:  I'm now going to play Government's

18  Exhibit 123.

19          (Government's Exhibit 123, an audio recording,

20  played.)

21  Q    All the calls that we've listened to so far have taken

22  place on June 28, 2011, correct?

23  A    Yes.

24  Q    The day before the actual buy takes place?

25  A    Yes.
```

1          MR. VATTI:  Now I'm going to play Government's

2    Exhibit 124.

3          (Government's Exhibit 124, an audio recording,

4    played.)

5          MR. VATTI:  Now I'm going to play Government's

6    Exhibit 125.

7          (Government's Exhibit 125, an audio recording,

8    played.)

9    Q    Did you make a determination at this point as to who

10   Kevin Wilson was referring to when he said it had to get

11   ready?

12   A    The crack cocaine.

13   Q    And do you know who was getting that ready for him?

14   A    Vincent Clark.

15   Q    And was Vincent Clark someone that was ultimately

16   arrested and charged in this case?

17   A    He was.

18   Q    And was Vincent Clark an individual whose phone was

19   ultimately wiretapped in this case?

20   A    It was.

21   Q    Was it given a target telephone designation?

22   A    Yes.

23   Q    What was that target telephone designation?

24   A    Target telephone 7.

25          MR. VATTI:  I'm now going to play Government's

```
 1   Exhibit 126.

 2          (Government's Exhibit 126, an audio recording,

 3   played.)

 4          MR. VATTI:  I'm going to play Government's Exhibit

 5   127.

 6          (Government's Exhibit 127, an audio recording,

 7   played.)

 8   Q    All right.  Did a third-party get on the phone in that

 9   call with Kevin Wilson and the cooperating witness?

10   A    Yes, Vincent Clark.

11          MR. VATTI:  I'm now going to play Government's

12   Exhibit 128.

13   Q    In that last call, there was a reference to Vincent Clark

14   not wanting to give the CW anything wet?

15   A    Correct.

16          (Government's Exhibit 128, an audio recording,

17   played.)

18   Q    All right.  Did the deal ultimately take place the

19   following day?

20   A    It did.

21   Q    And where did it take place?

22   A    On Judson Avenue.

23   Q    Were you part of the surveillance team that day?

24   A    Yes.

25   Q    And tell us what happened.
```

1    A    Cooperating witness, we met with the cooperating witness,

2    provided the cooperating witness with money, recording device,

3    and audio transmitter.  Searched the cooperating witness prior

4    to departing the neutral location.

5         Followed the cooperating witness to 20-24 Judson Ave

6    where the cooperating witness parked inside the driveway of

7    that location.  A short time later, over the transmitter, the

8    cooperating witness was involved in a conversation with an

9    individual that was later identified as Kevin Wilson and

10   Vincent Clark.

11        A few minutes later, the cooperating witness came

12   out of the driveway of 20-24 Judson Ave.  We followed the

13   vehicle, met up with the cooperating witness, retrieved the

14   crack cocaine that he purchased, it was two eight balls of

15   crack cocaine.

16        We searched the cooperating witness as well as the

17   vehicle, didn't find anything, and then we processed the phone

18   calls, the body wire recording, as well as purchased exhibit,

19   purchased narcotics, as evidence and submitted it to our

20   nondrug evidence custodian and the drug evidence custodian.

21   The lab was subsequently -- the drugs was subsequently

22   submitted to the lab for analysis.

23   Q    What was the purchase price for two eight balls of crack

24   cocaine on this date?

25   A    It was $300.

1          MR. VATTI:  May I approach, your Honor?

2    Q    I show you what's been admitted as Government's Exhibit

3    241.  Can you identify this for us?

4    A    Sure.  It's the exhibit that was purchased on June 29,

5    2011.  It has the case number, the exhibit number, the date

6    June 29th, 2011, and has a bunch of other stickers from the

7    lab.  This was the evidence purchased on June 29, 2011, by the

8    CW from Kevin Wilson and Vincent Clark.

9    Q    All right.  After this controlled purchase, you moved

10   into the wiretap phase on Kevin Wilson, correct?

11   A    Correct, July 29, 2011.

12   Q    All right.  Tell us what the, briefly what the, process

13   was for getting the authorization.

14   A    Once the probable cause was established, then we had to

15   establish the necessity for it, as well as exhaustion.  In

16   other words, we had to show there was no other ways of

17   conducting the investigation other than listening to his phone

18   calls.

19          We utilized cooperating witnesses, we gathered

20   information, and the only thing we had done so far is

21   identified Kevin Wilson as a drug trafficker, distributor,

22   which was already known prior to even doing controlled

23   purchases.  We couldn't establish who his source of supplies

24   were, so we couldn't dismantle the whole network just by

25   arresting Mr. Wilson.  There were several other factors that

```
 1    took place, such as surveillance was --

 2              MR. REEVE:  Your Honor, I'm sorry to interrupt.  I

 3    object to all this.  It's irrelevant.  There was an order that

 4    was issued.  There's no issue, there's no dispute, about that.

 5              I also wonder if it might be a good time to take the

 6    luncheon recess.

 7              THE COURT:  I was going to break at 1:00 o'clock.

 8    Is this a convenient time?

 9              MR. VATTI:  That's fine.

10              THE COURT:  Okay.  We'll take the luncheon recess

11    right now, ladies and gentlemen, for an hour.  Please don't

12    discuss the case.

13              (Luncheon recess:  12:51 o'clock p.m. to 1:59

14    o'clock p.m., in the absence of the jury.)

15              THE COURT:  Please be seated.

16              MR. SILVERMAN:  Your Honor, while we're waiting for

17    the jury, I had one thought on scheduling.  I wonder if we

18    could start the day early tomorrow, because we got a late

19    start.

20              THE COURT:  I don't know, I'll have to see if we

21    have anything before.

22              MR. SILVERMAN:  You and I had a sentencing tomorrow

23    morning, it's been rescheduled.  If that freeze you up for the

24    hour between 9:00 and 10:00, I wonder if we can start.  I

25    think we all would like to make up for all the time that's
```

```
 1    been lost because of the storm the other day.

 2            THE COURT:  Yes, I'll be happy to try.  I'll just

 3    see what the schedule is for tomorrow morning.

 4            MR. SILVERMAN:  Very good.  There was a sentencing

 5    scheduled for tomorrow morning at 9:00 o'clock, but it's been

 6    rescheduled.

 7            THE COURT:  I think I may have had something else,

 8    I'm not sure.  I don't know where the jurors come from, if

 9    they don't come from too far away.

10            MR. SILVERMAN:  If not a 9:00 a.m. start time, maybe

11    even a 9:30 a.m. start time.

12            THE COURT:  I'll be happy, I'm here anyway, so it's

13    fine as long as I don't have anything else on the calendar.

14            MR. SILVERMAN:  Should we go get the jury?

15            THE COURT:  Can't start before 10:00 o'clock.

16            MR. SILVERMAN:  Okay.

17            THE COURT:  Thank you.  Has everyone over there been

18    able to see the witness now?  I know you had some problems.

19            MR. MORAGHAN:  Yes, we can see fine, thank you.

20            MR. REEVE:  Yes, the change makes a material

21    difference.  Thank you.

22            THE COURT:  Good.

23            (In the presence of the jury:  2:04 o'clock p.m.)

24            THE COURT:  Good afternoon.

25            MR. VATTI:  Thank you, your Honor.
```

```
1    BY MR. VATTI (Continued):

2    Q    Special Agent Ndrenika, I wanted to return and clarify a

3    couple of things from what we talked about earlier before the

4    lunch break.  Going to the December 21st, 2011, traffic stop

5    of Philip Bryant, was a gun recovered from Philip Bryant

6    during that traffic stop?

7    A    No.

8    Q    Were any drugs recovered from Philip Bryant during that

9    traffic stop?

10   A    No.

11   Q    The only thing that was found was a phone?

12   A    Yes.

13   Q    All right.  And you indicated that you dialed

14   203-435-3520?

15   A    Yes.

16   Q    All right.  And did anyone answer that phone at that

17   location at the traffic stop?

18   A    Task Force Officer Charles Tyson, yes.

19   Q    Did you have a conversation with Officer Tyson when he

20   answered the 3420 number?

21   A    Very brief conversation, during which time he indicated

22   that that phone was found on Mr. Bryant's possession, on his

23   person.

24   Q    All right.  I also wanted to clarify with you something

25   about the timeline of the phone records from May 10th, 2011.
```

1   A    Okay.

2   Q    I think you indicated earlier that starting at

3   approximately 3:15, with the first contact, and ending at

4   approximately 3:32, with the last contact, there were eight

5   total contacts between target telephone 4 used by Mr. Wilson

6   and the cooperating witness's phone?

7   A    Correct.

8   Q    And then at 3:37, a few minutes after the last contact,

9   there was an outgoing call from Mr. Wilson's phone to Philip

10  Bryant's 3420 telephone number?

11  A    Correct, 3:37.

12  Q    Approximately how long did that conversation last?

13  A    58 seconds or 61 seconds.

14  Q    Would it refresh your recollection if you looked at the

15  records?

16  A    Sure.

17       58 seconds.

18  Q    All right.  We started talking about the process for

19  getting a wiretap, and you explained that in addition to

20  probable cause to believe that the phone is being used for

21  drug trafficking, you also have to show necessity?

22  A    Yes.

23  Q    You also explained I think the goals of the

24  investigation.  An application then has to be submitted for

25  review by the Department of Justice in Washington, correct?

1   A    Yes.

2   Q    As part of that, you have to submit --

3          MR. REEVE:  Your Honor, I'm sorry, I object to all

4   this.  There's no issue about the legality of the wiretap.

5   It's just like any other warrant, an order was issued by a

6   court.  This is irrelevant to any of the issues at this trial.

7          MR. VATTI:  Your Honor, I think it's appropriate for

8   the jury to learn the brief process by which you actually get

9   the authorization.  I can do it relatively quickly.

10         THE COURT:  All right, I'll overrule the objection.

11  I don't believe the jury would know ordinarily how that

12  process goes.  I'll overrule the objection.

13  Q    The application, along with a lengthy affidavit detailing

14  the facts of the investigation, are submitted to the

15  Department of Justice in Washington?

16  A    Yes.

17  Q    And it has to be reviewed and approved by an office down

18  there, correct?

19  A    Yes.

20  Q    All right.  And then once it's approved, it is submitted

21  to a district judge here in Connecticut, correct?

22  A    Yes.

23  Q    All right.  And the judge then has to make an independent

24  review of the application?

25  A    Yes.

1    Q     And once the judge signs the order, you are then legally

2    authorized to conduct a wiretap of the particular target

3    telephone?

4    A     Yes.

5    Q     All right.  What do you do with the wiretap order that is

6    signed by the judge once you receive it?

7    A     The order is submitted to or faxed over or e-mailed to

8    the phone company through our technical division, and then

9    they make the arrangements between DEA and the phone company

10   to intercept those phone calls.

11   Q     How do you actually go about listening to the phone

12   calls?

13   A     There's a computer, sit in front of it and just listen to

14   the phone calls.  It's just a program built into the computer.

15   The phone calls are streamlined into the DEA system.  It's no

16   different than a cable company sending a movie to a customer,

17   millions of customers at the same time, in the same instance

18   they are filtering that information to our computers.

19   Q     We've heard several times over the last couple of days a

20   reference to the wire room.  What's the wire room?

21   A     Wire room is the location where the actual phone calls,

22   the computers are located and where actually the phone calls,

23   are listened to.  It's just a room.

24   Q     And are the phone calls being recorded as they're

25   listened to, to preserve them?

1   A    Yes, every call is monitored, has to be recorded; and

2   every recorded conversation has to be monitored.

3   Q    All right.  And the government exhibits 1 through 131 --

4   I'm sorry, 1 through 119 and then again 131 to 147, are those

5   all true and accurate copies of the recordings that were

6   originally made from the wire intercepts?

7   A    Yes.

8   Q    All right.  You also had -- and your investigative team --

9   prepared transcripts of those calls, correct?

10  A    Yes.

11  Q    How did you go about doing that?

12  A    Phone calls are initially intercepted, quick synopsis of

13  the conversation is written down, typed.  Then the

14  investigators, the person who actually listens to the phone

15  call if they have enough time, they go back and transcribe the

16  conversation word for word as it took place.

17        In preparation for the trial, myself and several

18  other agents and task force officers have gone back, reviewed

19  it, make sure that all the transcripts are accurate.

20  Q    You did those for the English language recordings,

21  correct?

22  A    Yes.

23  Q    There are a lot of recordings that are also in Spanish?

24  A    Yes.

25  Q    All right.  And were those Spanish recordings sent out to

```
 1   a Spanish translator to do the transcripts?

 2   A    Yes.

 3   Q    All right.  And that translator was an individual by the

 4   name of Michelle Peguerro?

 5   A    Yes.

 6   Q    Are you familiar with her?

 7   A    Yes.

 8   Q    She's fluent in Spanish, correct?

 9   A    Yes.

10        MR. VATTI:  I'm just going to offer a certification.

11   I don't know if there's any objection to it.  I don't think

12   there is.

13        MR. REEVE:  No, your Honor.

14        MR. MORAGHAN:  No, your Honor.

15        MR. VATTI:  There is a certification of Michelle

16   Peguerro regarding the accuracy of the Spanish language

17   transcripts.  I will offer this as Exhibit 310.

18        Start with Government's Exhibit 3.

19   Q    Can you tell us the date and time of this call, and who

20   the participants in this call were?

21   A    This phone call was intercepted on August 9th, 2011, at

22   2:44 in the afternoon.  Phone call between Kevin Wilson and

23   his source of supply, Johnny De Los Santos.

24   Q    What's the phone -- I have two phone numbers written down

25   here, both beginning with a 347 area code, first one is
```

1   347-767-0383.  Whose number is that?

2   A    That's the primary phone utilized at the time by Johnny

3   De Los Santos.

4   Q    I'm just going to put JD.  What about this phone,

5   347-348-7444?

6   A    That was a secondary phone primarily used by his wife,

7   but on a few occasions he used that phone to contact Kevin

8   Wilson.

9   Q    Roughly how many pertinent calls were intercepted over

10  the 0383?

11  A    614, I believe.

12  Q    And roughly how many on this secondary phone that was

13  used by De Los Santos's wife?

14  A    About 15.  14 or 15.

15  Q    All right.  This one, the 0383, was the primary?

16  A    Yes.

17  Q    But all of the Johnny De Los Santos calls that are going

18  to be played here came from one of those two numbers, correct?

19  A    Yes.

20  Q    And were all intercepted over target telephone 4?

21  A    Yes.

22          MR. VATTI:  I am now going to play Government's

23  Exhibit 3.

24  Q    You said it was August 9th, 2011?

25  A    Yes.

1              (Government's Exhibit 3, an audio recording,

2    played.)

3    Q    By the way, is Kevin Wilson Dominican?

4    A    Yes.

5    Q    And is he fluent in Spanish?

6    A    Yes.

7    Q    And English?

8    A    Yes.

9              MR. VATTI:  I'm next going to play Government's

10   Exhibit 4.

11   Q    What's the date and time of this call, and who are the

12   participants?

13   A    It's a phone call intercepted on August 9, 2011, at 8:34

14   p.m., phone call between Kevin Wilson and Johnny De Los

15   Santos.

16             (Government's Exhibit 4, an audio recording,

17   played.)

18   Q    There was a reference in the call to Mr. De Los Santos

19   coming back the next day around 2:00?

20   A    Yes.

21   Q    The following day, the 10th, did you have surveillance

22   initiated in response to these phone calls?

23   A    Yes.

24   Q    Was that the subject of video surveillance?

25   A    Yes.

```
 1              MR. VATTI:  I'm going to call up a portion of
 2   Government's Exhibit 258.  This was a video that was played
 3   yesterday afternoon.
 4              (Government's Exhibit 258, a video recording,
 5   playing.)
 6   Q    Who is that individual?
 7   A    That's Vincent Clark, a.k.a. Nu-Nu.
 8   Q    And did two other individuals meet on this occasion with
 9   Vincent Clark?
10   A    Yes, Kevin Wilson and Johnny De Los Santos.
11   Q    What kind of vehicle was De Los Santos driving?
12   A    I believe it was a minivan he had.
13   Q    All right.  Who just arrived?
14   A    That's Kevin Wilson.
15   Q    The individual with the white T-shirt and the pony tail,
16   that's Kevin Wilson?
17   A    Yes.
18   Q    And who is in the minivan that pulled in ahead of him?
19   A    Johnny De Los Santos.
20              MR. VATTI:  All right.  I'm going to go ahead and
21   stop that video.  We watched it yesterday.
22              Now I'm going to call up Government's Exhibit 8.
23   Q    I've written up two numbers up here, one is 917-603-5289.
24              MR. MORAGHAN:  I'm sorry, what was the number?
25              MR. VATTI:  917-603-5289.
```

1    A    Yes.

2    Q    The other number that I've written up there -- I think

3    I've lost my marker, doesn't matter -- is 475-227-4414.  Did

4    you identify the user of those phones during this

5    investigation?

6    A    Yes.

7    Q    And with respect to the number that ends in the four

8    digits 5289, was the person referred to in conversations that

9    were intercepted over target telephone 4 by a nickname?

10   A    Yes.

11   Q    And what were the nicknames that were used?

12   A    Mayut, Porter, cousin Porter.

13   Q    How about the individual that was using the 475 number,

14   were there nicknames by which he was identified in

15   conversations intercepted over TT 4?

16   A    That one was Porter and Mayut.  I don't remember if they

17   used cousin Porter on that as well.

18   Q    So Mayut was a nickname referred to, referring to the

19   user of these two phones?

20   A    That's how Mr. Wilson identified the user over the phone,

21   as Mayut.

22   Q    This individual was also referred to by the nickname

23   Porter?

24   A    Yes.

25   Q    And on October 25th, 2011, was surveillance initiated,

1    based on calls that were intercepted over the 5289 number?

2    A    Yes.

3    Q    And were you part of that surveillance?

4    A    Yes.

5    Q    All right.  Tell us what you observed.

6    A    We were set up in the area of Day Street.  The

7    surveillance vehicle, which had a clear view of 139 Day

8    Street, a location where Mr. Wilson resided, they had a clear

9    view of the main entrance.

10         Based on the phone calls, it was determined that the

11   individual by the nickname Mayut or Porter was arriving, and

12   that was corroborated by the phone calls.  A short time later,

13   surveillance observed the individual.  The law enforcement

14   officer who was recording the event was able to provide us

15   with a description of the individual, as well as the vehicle

16   from which this individual had exited.

17         Short time later, the individual met with

18   Mr. Wilson, and the surveillance vehicle provided us

19   information pertaining to direction of flight of travel.  At

20   the time myself and two other task force officers got behind

21   the vehicle and followed the vehicle straight from 139 Day

22   Street to the area of Winthrop Street, and Mr. Anderson, or

23   Mayut, exited the vehicle and was observed entering 23 Batter

24   Terrace.  Couple minutes later, same individual, same

25   clothing, exited 23 Batter Terrace, approached and entered the

1    front passenger of the Acura, where he was a front passenger

2    of it.

3              The vehicle then was followed as it traveled from

4    the area of Winthrop/Batter Terrace to Kimberly Avenue where

5    the vehicle was stopped at our request by members of the New

6    Haven Police Department for a traffic violation.

7    Q    Can I stop you there for one second?

8    A    Yes.

9    Q    The individual that met with, known as Mayut that met

10   with, Mr. Wilson, when he exited 139 Day Street, did he get

11   into the Acura?

12   A    That's the vehicle he got into, yes.

13   Q    And he got into the front passenger seat?

14   A    Front passenger, yes.

15   Q    And then you followed that individual to 23 Batter

16   Terrace?

17   A    Correct.  The vehicle parked on the Winthrop side, and

18   another surveillance member observed Mayut at the time, who

19   was subsequently identified as Mr. Anderson, enter 23 Batter

20   Terrace.  A few minutes later, the same individual, same

21   clothing, was observed exiting Batter Terrace and came in my

22   view as he entered the Acura, which was parked on the Winthrop

23   side.

24   Q    Then you said you continued to follow the Acura?

25   A    We followed the Acura from the area of Winthrop all the

1    way until the vehicle was stopped by the New Haven Police

2    Department.

3    Q    Was that a traffic stop you requested?

4    A    Yes.

5    Q    What was the purpose of requesting that traffic stop?

6    A    To identify the front passenger, whom we observed meet

7    with Mr. Wilson, who we knew was going by the nickname of

8    Mayut.

9    Q    At that point, you had no idea what that front seat

10   passenger's full name was?

11   A    That's correct.

12   Q    All right.  And did you observe the traffic stop take

13   place?

14   A    I was stationed probably about 300 feet back inside the

15   gas station.

16   Q    All right.  And are you familiar with who the officer was

17   that initiated the stop?

18   A    I did not personally know both officers who made the

19   stop.  I became familiar with them after the fact.  But I did

20   not know them at the time of the stop.

21   Q    All right.  And did the officer write down the name of

22   the front seat passenger?

23   A    Yes, he wrote a traffic ticket to the operator and then

24   identified the operator, as well as the front passenger.

25   Q    All right.  Who was the front passenger identified as?

1    A    Richard Anderson.

2    Q    Did the officer make note of the date of birth of Richard

3    Anderson?

4    A    Yes.

5    Q    And did the date of birth that the officer wrote down

6    match the date of birth of the Richard Anderson that's here in

7    this courtroom?

8    A    Yes.

9    Q    Did the officer also note a Social Security number?

10   A    Yes.

11   Q    And did that match the Social Security number of the

12   Richard Anderson that's here in this courtroom?

13   A    It was off by one number.  The last number was not given

14   the right number.

15   Q    The individual known as Mayut that you saw on

16   surveillance that day get into the front passenger seat, is he

17   in the courtroom?

18   A    Yes.

19   Q    Can you identify him for us?

20   A    Mr. Anderson.  Purple, wearing the purple.  Black male

21   wearing the purple shirt and purple tie.

22           MR. VATTI:  If the record can reflect that Special

23   Agent Ndrenika identified the defendant, Richard Anderson,

24   your Honor.

25           THE COURT:  Yes, sir.

1          MR. VATTI:  Thank you.

2   Q    Now, that surveillance was done off of the 5289 number,

3   correct?

4   A    Yes.

5   Q    And have you done a voice comparison between calls that

6   were intercepted with the 5289 number and the 4414 number?

7   A    Yes.

8   Q    And what was your opinion as to the similarity of the

9   voice?

10  A    Same individual, same voice, same nickname.

11         MR. VATTI:  All right.  I'm going to call up

12  Government's Exhibit -- I've called up 255.1, which we watched

13  yesterday.

14         (Government's Exhibit 255.1, a video recording,

15  playing.)

16  Q    Is this the video of the surveillance that took place on

17  the day as you described it?

18  A    Yes.

19  Q    And who is that individual that we are seeing?

20  A    Mr. Anderson.

21  Q    And what's the location that he just entered into?

22  A    139 Day Street.

23  Q    All right.  When he exited a few minutes later, as we

24  watched yesterday, is that when you picked up the

25  surveillance?

1    A    Yes.

2         MR. VATTI:  I'm now going to call up Government's

3    Exhibit 8.

4    Q    If you can tell us the date and time of the call, and who

5    the participants are.

6    A    September 11th, 2011, 2:02 in the afternoon, phone call

7    between Kevin Wilson and Jesus Morales.

8    Q    The number used by Mr. Morales on this occasion, was it

9    203-685-1409?

10   A    Yes.

11   Q    How was that identified as Jesus Morales's phone number?

12   A    Traffic stop, and subsequent arrest of Mr. Morales on

13   October 22nd, 2011.

14   Q    Was anybody else arrested with Mr. Morales that day?

15   A    Yes, his wife.

16   Q    What was her name?

17   A    Jacqueline Lopez.

18   Q    Now, Mr. Morales actually also used an additional number

19   during the course of the wiretap, correct?

20   A    Yes, he began using the number the following date, on

21   October 23rd.  Immediately after his arrest, he changed

22   numbers.

23   Q    The new number that he used after the date of his arrest

24   was 203-507-9206?

25   A    Yes.

1          MR. VATTI:  I'm now going to play Government's

2     Exhibit 8.

3          (Government's Exhibit 8, an audio recording, played,

4     and paused.)

5     Q    Mr. Morales asked, "Can you get me the hard stuff, too?"

6     A    Yes.

7     Q    Mr. Wilson indicated, "Yes"?

8     A    Yes.

9          (Government's Exhibit 8, an audio recording,

10    continued.)

11         MR. VATTI:  I'm now going to call up Government's

12    Exhibit 9.

13    Q    Can you tell us the date and time of the call, and who

14    the participants are?

15    A    September 19th, 2011, 9:05 p.m., phone call between Kevin

16    Wilson and Jesus Morales.

17         (Government's Exhibit 9, an audio recording,

18    played.)

19         MR. VATTI:  I'm now going to play Government's

20    Exhibit 10.

21    Q    Tell us the date and time of this call.

22    A    September 20th, 2011, 1:15 p.m., phone call between Jesus

23    Morales and Kevin Wilson.

24    Q    The previous call, again, Mr. Morales made a reference

25    "to the hard stuff," correct?

```
1   A    Yes.  This is a text message, not a phone call.

2   Q    All right.  Can you read the text message for us?

3   A    "Hey when you think I be back on my phone it's ringing

4   off rhe charts and I don't want to lose my peoples I'm

5   building u i u know."

6           MR. VATTI:  All right.  I'm now going to call up

7   Government's Exhibit 11.

8   Q    What's the date and time of this call?

9   A    September 21st, 2011, 4:09 p.m., phone call between Kevin

10  Wilson and Jesus Morales.

11  Q    Did you say 4:09 p.m.?  It's in military time.  Just take

12  a closer look at that.

13  A    I'm sorry, 2:09 p.m.

14          (Government's Exhibit 11, an audio recording,

15  played.)

16  Q    All right.  In that call, Mr. Morales made a reference to

17  "remember your friend that had the hard stuff"?

18  A    Yes.

19  Q    All right.  And Mr. Morales also makes a reference to

20  needing fire?

21  A    Yes.

22  Q    Because otherwise his connection is not going to take it?

23  A    Correct.

24          MR. VATTI:  I'm now going to call up Government's

25  Exhibit 12.
```

1   Q    You said that last one took place on September 21st,

2   2011, at 2:09 p.m.?

3   A    Yes, September 21st at 2:09.

4   Q    All right.  Government's Exhibit 12, which is the next

5   call I'm going to play, takes place on September 21st, 2011,

6   the same day, at 2:12 p.m., three minutes later, correct?

7   A    That's correct.

8   Q    And who are the participants in this call?

9   A    Richard Anderson and Kevin Wilson.

10          (Government's Exhibit 12, an audio recording,

11   played.)

12   Q    All right.  Which Richard Anderson phone was this

13   intercepted over?

14   A    I believe it had to be the 917, the first one.

15   Q    If you take a look at the title sheet.

16   A    917.

17   Q    Which one?

18   A    917-603-5289.

19          MR. VATTI:  The next call I'm going to play is

20   Government's Exhibit 13.

21   Q    And this takes place the same day at 2:59 p.m., correct?

22   A    Correct.

23   Q    Who are the participants in this call?

24   A    Kevin Wilson and Richard Anderson.

25          (Government's Exhibit 13, an audio recording,

1   played.)

2   Q    All right.  Did Mr. Wilson indicate there, "Just one"?

3   A    Yes.

4   Q    And in one of the previous calls we listened to with Mr.

5   Morales, had there been a discussion of one?

6   A    Yes.

7        MR. VATTI:  I'm now going to call up Government's

8   Exhibit 14.

9   Q    And who are the participants in Government's Exhibit 14?

10  A    Richard Anderson and Kevin Wilson.  It's a phone call the

11  same date.

12  Q    All right.  And what time is this taking place on

13  September 21st?

14  A    3:22 p.m.

15       (Government's Exhibit 14, an audio recording,

16  played.)

17       MR. VATTI:  I'm now going to call up Government's

18  Exhibit 15.

19  Q    What's the date and time of Government's Exhibit 15?

20  A    September 21st, 2011, 6:05 p.m., phone call between Kevin

21  Wilson and Jesus Morales.

22       (Government's Exhibit 15, an audio recording,

23  played, and paused.)

24  Q    So far, did Mr. Morales say, "Call your partner"?

25  A    Yes.

1  Q    And here, did Mr. Morales indicate, "The same thing"?

2  A    Yes.

3        (Government's Exhibit 15, an audio recording,

4  continued.)

5        MR. VATTI:  I'm now going to call up Government's

6  Exhibit 16.

7  Q    Who are the participants in this call, what's the date

8  and time?

9  A    September 21st, 2011, 6:26 p.m., phone call between Kevin

10 Wilson and Jesus Morales.

11       (Government's Exhibit 16, an audio recording,

12 played.)

13 Q    All right.  That took place at 6:26 p.m., correct, on

14 September 21st?

15 A    Yes.

16       MR. VATTI:  All right.  I'm now going to call up

17 Government's Exhibit 139.

18 Q    Can you tell us the date and time of the call, and who

19 the participants are?

20       MR. ROGAN:  I'm sorry, counsel, which exhibit?

21       MR. VATTI:  139.

22       MR. ROGAN:  Thank you.

23 A    Phone call intercepted September 21st, 2011, at 7:31

24 p.m., phone call between Mr. Richard Anderson and Kevin

25 Wilson.

1    Q    And which Anderson phone is this being intercepted on?

2    A    917-603-5289.

3            (Government's Exhibit 139, an audio recording,

4    played.)

5            MR. VATTI:  I'm next going to call up Government's

6    Exhibit 17.

7    Q    That last call between Mr. Anderson and Mr. Wilson took

8    place at 7:31 p.m., correct?

9    A    Correct, September 21st.

10   Q    This next call is taking place, Exhibit 17, at what time?

11   A    7:32, a minute after, on September 21st, on the same

12   date.  Phone call between Kevin Wilson and Jesus Morales.

13           (Government's Exhibit 17, an audio recording,

14   played.)

15   Q    All right.  In that call, did Mr. Morales reference that

16   he quote "still had crack"?

17   A    Yes.

18   Q    All right.  Right here, is Mr. Morales saying, "I'll talk

19   to you later, tell him, but tell him that, that, to save me

20   something"?

21   A    Yes.

22           MR. VATTI:  All right, I'm just going to call up

23   Government's Exhibit 18.

24   Q    When does this call take place?

25   A    September 21st, 2011, 8:30 at night, phone call between

1    Jesus Morales and Kevin Wilson.

2    Q    I misspoke.  This is actually a text message, correct?

3    A    It is a text message, yes.

4    Q    All right.  Can you read the text message for us?

5    A    "I'm ready.  Make the call."

6         MR. VATTI:  I'm now going to call up Government's

7    Exhibit 19.

8    Q    What's -- this is also a text message, correct?

9    A    Yes.

10   Q    And what time is this text message?

11   A    8:34 p.m., text message between Jesus Morales and Kevin

12   Wilson.

13   Q    This is four minutes after the previous text about being

14   ready, make the call?

15   A    Yes.

16   Q    What does this say?

17   A    "Call me" or "call.me."

18   Q    All right.  That was at 8:34 p.m.

19        MR. VATTI:  Now I'm going to call up Government's

20   Exhibit 20.

21   Q    Who's this call between?

22   A    Kevin Wilson and Richard Anderson.

23   Q    And this takes place at what time?

24   A    September 21st, 2011, 8:35 p.m.

25   Q    Just one minute after the last text message?

1   A    Correct.

2           (Government's Exhibit 20, an audio recording,

3   played.)

4           MR. VATTI:  I'm now going to call up Government's

5   Exhibit 21.

6   Q    What time does this take place on September 21st, 2011?

7   A    8:53 p.m., phone call between Jesus Morales and Kevin

8   Wilson.

9           (Government's Exhibit 21, an audio recording,

10  played.)

11  Q    All right.  In that call, did Kevin Wilson state, "Yo,

12  park where you just were, where we saw him"?

13  A    Yes.

14  Q    Mr. Morales says, "Where on her street," and Kevin Wilson

15  says, "Where we met up, where we met up with the guy"?

16  A    Yes.

17          MR. VATTI:  That was Government's Exhibit 21.  Now

18  I'm going to play Government's Exhibit 22.

19  Q    When does this take place?

20  A    September 21st, 2011, at 9:54 p.m., phone call between

21  Kevin Wilson and Jesus Morales.

22          (Government's Exhibit 22, an audio recording,

23  played.)

24          MR. VATTI:  Next I'm going to call up Government's

25  Exhibit 23.

1   Q    What's the date and time of this next call?

2   A    September 21st, 2011, at 11:07 at night, phone call

3   between Jesus Morales and Kevin Wilson -- I'm sorry, this was

4   a text message.

5   Q    What's the session number of this call, of this text

6   message?

7   A    Session number is 23305.

8   Q    Is every call and text message that comes into the wire

9   room logged with a session number?

10  A    Yes, every call has a session number, which differs from

11  one another.  It's numerical order.

12  Q    So a call and a text would all get session numbers

13  assigned?

14  A    Yes.

15  Q    And just one after the other as they come in?

16  A    Yes.

17  Q    So this session number for this text message is 23305?

18  A    Yes.

19  Q    And what does it say?

20  A    "Call your boy again."

21  Q    And that was at 11:07 p.m. on September 21st, 2011?

22  A    Yes.

23           MR. VATTI:  I'm now going to call up Government's

24  Exhibit 24.

25  Q    What's the session number on this one?

1    A    23306.

2    Q    Is that the very next session number after the text

3    message we just saw?

4    A    Yes.

5    Q    And what's the time on September 21st of this phone call?

6    A    It's 11:08 p.m.

7    Q    Who are the participants?

8    A    Kevin Wilson and Richard Anderson.

9            (Government's Exhibit 24, an audio recording,

10   played.)

11   Q    In that call, did Mr. Anderson say "same thing"?

12   A    Yes.

13   Q    And Mr. Wilson indicated, "Yo, my boy needs you again"?

14   A    Yes.

15           MR. VATTI:  Next I'm going to call up Government's

16   Exhibit 25.

17   Q    And what time on September 25th -- I'm sorry, September

18   21st, 2011, does this take place?

19   A    A minute later at 11:09 p.m., between Kevin Wilson and

20   Jesus Morales, and actually it's a text message.

21   Q    Can you read that text message for us?

22   A    He said, "He said go to the spot."

23           MR. VATTI:  Now I'm going to call up Government's

24   Exhibit 26.

25   Q    What is the time of this text message?

```
 1   A    11:10 p.m., outgoing call from Kevin Wilson to Jesus

 2   Morales.  Outgoing text, actually.

 3   Q    Can you read it for us?

 4   A    "Tell me when you close."

 5   Q    That's at 11:10?

 6   A    Yes.

 7        MR. VATTI:  All right, I'm next going to call up

 8   Government's Exhibit 27.

 9   Q    What time does this text take place?

10   A    11:11 on September 21st, 2011.

11   Q    Between whom?

12   A    Kevin Wilson and Jesus Morales.

13   Q    What does it say?

14   A    "Right now."

15        MR. VATTI:  Next going to call up Government's

16   Exhibit 28.

17   Q    When does this take place?

18   A    11:12 p.m., phone call between Kevin Wilson and Jesus

19   Morales on September 21st, 2011.

20        (Government's Exhibit 28, an audio recording,

21   played.)

22   Q    All right.  There, did Mr. Morales indicate that Kevin

23   Wilson needed to give the green light?

24   A    Yes.

25   Q    And that he would then deal with him?
```

```
 1    A    Yes.
 2          MR. VATTI:  I'm next going to call up Government's
 3    Exhibit 29.
 4    Q    What time is this text message?
 5    A    At 11:17 p.m.
 6    Q    Who is the text message between?
 7    A    It's an outgoing text message from Kevin Wilson to Jesus
 8    Morales.
 9    Q    On what date?
10    A    September 21st, 2011, at 11:17 p.m.
11          MR. VATTI:  I'm next going to call up Government's
12    Exhibit 30.
13    Q    Let me just have -- Mr. Silverman reminds me I didn't
14    actually have you read it into the record.  What did Exhibit
15    29 say?
16    A    "He coming."
17    Q    That's Kevin Wilson to Jesus Morales, correct?
18    A    Yes.
19    Q    All right.  That was at 11:17 p.m. on the 21st of
20    September?
21    A    Yes.
22    Q    All right.  Government's Exhibit 30 is another text
23    message, correct?
24    A    Yes.
25    Q    From whom?
```

1    A    On September 22nd, 2011, incoming text message from Jesus

2    Morales to Kevin Wilson, at approximately 12:28 in the

3    morning.

4    Q    All right.  What does this text say?

5    A    "I got some bread for iu."

6         MR. VATTI:  Now going to call up Government's

7    Exhibit 31.

8    Q    This is a text message, correct?

9    A    Yes.

10   Q    All right.  And at what time does this take place?

11   A    1:06 in the afternoon, 1:06 p.m.

12   Q    This is again in military time.

13   A    I'm sorry, 1:06 in the morning.

14   Q    Who's the text between?

15   A    Jesus Morales and Kevin Wilson, incoming text.

16   Q    What does it say?

17   A    "He gave me 4."

18        MR. VATTI:  Now going to call up Government's

19   Exhibit 32.

20   Q    When does this take place?

21   A    On September 22nd, 2011, 1:15 in the morning, outgoing

22   text message from Kevin Wilson to Jesus Morales.

23   Q    What does it say?

24   A    "40."

25        MR. VATTI:  Now going to call up Government's

1    Exhibit 33.

2    Q    When does this take place?

3    A    September 22nd, 2011, at 2:38 p.m., phone call between

4    Kevin Wilson and Richard Anderson.

5    Q    Which Anderson phone is being used?

6    A    917-603-5289.

7         (Government's Exhibit 33, an audio recording,

8    played.)

9    Q    In that call, did Kevin Wilson indicate, "I'm giving him

10   the green light"?

11   A    Yes.

12        MR. VATTI:  Next going to call up Government's

13   Exhibit 34.

14   Q    What's the date, the time of this call?

15   A    September 22nd, 2011, at 2:41 p.m., phone call between

16   Kevin Wilson, Richard Anderson, and Jesus Morales.

17   Q    And which Anderson phone is being used?

18   A    917-603-5289.

19        (Government's Exhibit 34, an audio recording,

20   played.)

21   Q    There was a voice in the background with Mr. Wilson.  Who

22   was that?

23   A    Jesus Morales.

24        MR. VATTI:  Next going to call up Government's

25   Exhibit 35.

1    Q    Just on the time frame, Government's Exhibit 33, which

2    was where Kevin Wilson indicated, "I'm giving him the green

3    light," that took place September 22nd, 2011, at 2:38 p.m.?

4    A    Yes.

5    Q    Exhibit 34, which we just listened to, took place the

6    same day at 2:41 p.m., correct?

7    A    Yes, three minutes later.

8    Q    Three minutes later?

9            MR. VATTI:  Going to call up Government's Exhibit

10   35.

11   Q    What's the date and time of this call?

12   A    September 23rd, 2011, at 2:19 p.m., phone call between

13   Kevin Wilson and Jesus Morales.

14   Q    So this is the next day now?

15   A    Yes.

16           (Government's Exhibit 35, an audio recording,

17   played, and paused.)

18   Q    Right there, did Mr. Morales indicate, "This guy is going

19   to give me 25 grams"?

20   A    Yes.

21           (Government's Exhibit 35, an audio recording,

22   continued, and paused.)

23   Q    Did Mr. Morales indicate there, "He's selling the ball

24   at, like, 185 a ball, right"?

25   A    Yes.

1           (Government's Exhibit 35, an audio recording,

2     continued.)

3     Q    All right.  In this call, did Mr. Wilson indicate, "What

4     he has to be saying is if you were buying it, then it could be

5     lower but if he's giving it to you, he's going to want to get

6     more for it"?

7     A    That's correct.

8           MR. VATTI:  All right.  I'm going to play

9     Government's Exhibit 131 next.

10    Q    Can you tell us the date and time of the call, who the

11    participants are?

12    A    I'm sorry, 131?

13    Q    Yes, 131.

14    A    September 24th, 2011, phone call at 10:11 p.m., phone

15    call between Kevin Wilson and Richard Anderson.

16    Q    And which Anderson phone?

17    A    917-603-5289.

18          (Government's Exhibit 131, an audio recording,

19    played.)

20    Q    In this call, there was a point where Mr. Anderson

21    indicated, "Oh oh oh, something" -- unintelligible -- "like

22    fed shit like some fucking phone tap shit, I was like shit

23    they're going to get me next, oh fuck"?

24    A    Yes.

25          MR. VATTI:  Next, I'm going to play Government's

```
 1   Exhibit 37.
 2   Q    What's the date and time of this call?
 3        MR. VATTI:  Actually, please strike that.
 4   Q    The previous call we just listened to, Mr. Wilson and Mr.
 5   Anderson are talking about someone they're referring to as
 6   Papi?
 7   A    Yes.
 8   Q    What's the date and time of Government's Exhibit 37?
 9   A    October 3rd, 2011, 8:43 p.m., phone call between Kevin
10   Wilson and Jesus Morales.
11        (Government's Exhibit 37, an audio recording,
12   played, and paused.)
13   Q    There was a reference to a Jamaican?
14   A    Yes.
15   Q    Do you know what Mayut means?
16   A    That's a term I guess that's used among Jamaicans.
17   That's how Mr. Wilson identifies --
18        MR. ROGAN:  Your Honor, I'm going to object.  That
19   calls for expert testimony on the part of this witness.
20        MR. VATTI:  I'll withdraw the question, your Honor.
21        THE COURT:  Thank you.
22   Q    All right.  Just after that reference, Mr. Morales
23   indicates there were problems with it?
24   A    Yes.
25        (Government's Exhibit 37, an audio recording,
```

1   continued.)

2   Q    All right.  That was October 3rd at 8:43 p.m.?

3   A    Yes.

4   Q    All right.

5           MR. VATTI:  Now I'm going to play Government's

6   Exhibit 132.

7   Q    What's the date and time of the call?

8   A    October 3rd, 2011, 11:07 p.m., phone call between Kevin

9   Wilson and Richard Anderson.

10  Q    All right.  This takes place over Mr. Anderson's 5289

11  number?

12  A    Yes.

13          (Government's Exhibit 132, an audio recording,

14  played.

15          MR. VATTI:  Next going to play Government's Exhibit

16  38.

17  Q    What's the date and time of this call?

18  A    October 3rd, 2011, 11:15 p.m., phone call between Richard

19  Anderson and Kevin Wilson.

20  Q    All right.  This was over Mr. Anderson's 5289 number?

21  A    Yes.

22          (Government's Exhibit 38, an audio recording,

23  played.)

24  Q    All right.  In that call, did Mr. Anderson indicate that,

25  "That nigga owe me 1240 right now, 1240, $1240, my nigga"?

```
 1   A     Yes.

 2          MR. VATTI:  Your Honor, I think this would be a good

 3   time for the afternoon break.

 4          THE COURT:  All right, we'll take the afternoon

 5   recess.

 6          (Recess:  3:22 o'clock p.m. to 3:45 o'clock p.m., in

 7   the absence of the jury.)

 8          THE COURT:  Please be seated.  Is there anything to

 9   take up before the jury comes in?

10          MR. SILVERMAN:  I think we're all set.

11          THE COURT:  By the way, I'm not asleep.  Bored,

12   maybe, but not asleep.

13          (In the presence of the jury:  3:47 o'clock p.m.)

14          THE COURT:  All right, proceed.

15          MR. VATTI:  Thank you, your Honor.

16   BY MR. VATTI (Continued):

17   Q    Turning your attention to Government's Exhibit 132, was

18   there a portion of that call where Mr. Anderson indicated,

19   "Yo, this shit wasn't good and this that and the third they

20   complaining, my nigga, I got the, I got the fucking shit,

21   nigga, there ain't nobody complaining about nothing, B,

22   nothing"?

23   A     Yes.

24          MR. VATTI:  I'm going to call up Government's

25   Exhibit 40.
```

1   Q    Can you tell us the date and time of this call?

2   A    October 4th, 2012, 2:34 p.m., phone call between Kevin

3   Wilson and Richard Anderson.  Mr. Anderson is using

4   917-603-0289.

5               (Government's Exhibit 40, an audio recording, played.)

6               MR. VATTI:  Now I'm going to call up Government's

7   Exhibit 41.

8   Q    What's the date and time of this call?

9   A    October 4th, 2011, 4:55 p.m., phone call between Kevin

10  Wilson and Richard Anderson.

11              (Government's Exhibit 41, an audio recording,

12  played, and paused.)

13  Q    In that call, did Richard Anderson indicate that he was

14  fronting?

15  A    Yes.

16              MR. VATTI:  Call up Government's Exhibit 43.

17  Q    What's the date and time of this call?

18  A    October 15th, 2011, 12:47 p.m., phone call between Kevin

19  Wilson and Jesus Morales.

20              (Government's Exhibit 43, an audio recording,

21  played.)

22  Q    All right.  Now, this was on October 15th, correct, 2011?

23  A    Yes.

24  Q    And there was enforcement activity that took place with

25  respect to Jesus Morales on October 22nd, 2011?

1    A    Yes.

2    Q    All right.  And tell us what happened.

3    A    On October 22nd, 2011, as a result of phone calls between

4    Mr. Morales and Mr. Wilson, surveillance was initiated in the

5    area of 139 Day Street.  That day was -- sometime in the

6    afternoon, Mr. Wilson was at work, he was working at Dunkin'

7    Donuts, and since he was not there, he directed his girlfriend

8    to obtain a certain amount of narcotics from his residence,

9    from the apartment, and to serve Jesus Morales.

10            Jesus Morales decided to bring his wife with him to

11   the deal, and he directed his wife to do the deal with Kevin

12   Wilson's girlfriend.  That was for six bundles of heroin.

13            Surveillance were able to capture such event on

14   video; subsequently followed the vehicle occupied by Mr.

15   Morales and his wife, Jacqueline Lopez, and then conduct a

16   stop on the vehicle as the vehicle came to complete stop

17   inside the Walgreen's parking lot at 88 York Street in New

18   Haven.

19            Subsequent to a search, six bundles of heroin were

20   retrieved from Jacqueline Lopez.  She was placed in custody,

21   and Mr. Morales was also arrested for an outstanding warrant.

22   Q    All right.

23            MR. VATTI:  I called up Government's Exhibit 141.

24   Q    What's the date and time of that call?

25   A    41 is October 4th, 2011.

1  Q    Exhibit 141.

2  A    I'm sorry.  141 is a phone call intercepted on October

3  22nd, 2011, at approximately 11:38 in the morning.  Phone call

4  between Kevin Wilson and Jesus Morales.

5        MR. VATTI:  I'm going to call up Government's

6  Exhibit 142.

7  Q    Just looking in your binder at Government's Exhibit 141,

8  which is not playing at the moment, was that the call in which

9  you initiated surveillance in response to?

10 A    Yes.

11 Q    Was there a reference in that call to Mr. Morales saying,

12 "Tell her to give me at least six"?

13 A    Yes.

14       MR. VATTI:  Called up Government's Exhibit 142.

15       It may be a welcome relief that we can't play more

16 phone calls at the moment, so let me move on to some other

17 things.

18 Q    All right.  I'm going to hand you what's been marked as

19 Government's Exhibit 243.

20       MR. VATTI:  May I approach, your Honor?

21       THE COURT:  Yes, sir.

22 Q    Can you tell us what Government's Exhibit 243 is?

23 A    This is the heroin seized from Jacqueline Lopez on

24 October the 22nd, 2011.  It's in a New Haven PD evidence bag

25 and DEA evidence bag.

1   Q    This is the six bundles of suspected heroin?

2   A    Yes.

3   Q    There was also enforcement activity that took place --

4   actually, strike that.

5         You mentioned that Mr. Morales changed his phone the

6   day after the arrest?

7   A    Yes, October 23rd, 2011.

8   Q    Is that a typical reaction after there is enforcement

9   activity?

10   A    Yes.

11         MR. REEVE:  Objection to what's typical.

12         MR. MORAGHAN:  Objection.

13         MR. VATTI:  I'll rephrase the question, your Honor.

14   Q    In your experience, do phones get changed after

15   enforcement activity?

16         MR. REEVE:  Same objection.

17         MR. MORAGHAN:  Same objection.

18         MR. VATTI:  Let me ask some more questions, your

19   Honor.

20   Q    During the course of the wiretap, do you look for

21   opportunities to initiate surveillance?

22   A    Yes.

23   Q    Do you look for opportunities to engage in rips?

24   A    Yes.

25   Q    All right.  And by rips, we mean the type of enforcement

```
 1   activity that happened with Jesus Morales and Jacqueline Lopez
 2   where, following a transaction or suspended transaction, drugs
 3   are seized?
 4   A    Yes.
 5   Q    And do you do that every single time you suspect a
 6   narcotics transaction?
 7   A    No.
 8   Q    And why not?
 9   A    Because they use all those phones, right away think that
10   law enforcement listen to their phones, and they discontinue
11   use of those phones and obtain new phones.
12   Q    Did Jesus Morales obtain a new phone?
13   A    He did.
14   Q    All right.  You mentioned that number was changed to
15   203-507-9206?
16   A    I don't know if it was changed to, but a new number was
17   utilized by Mr. Morales on October 23rd.
18   Q    On October 23rd, the day after the rip?
19   A    Yes.
20        MR. VATTI:  I think Mr. Silverman's going to try to
21   substitute his laptop for mine.
22   Q    Let's move on to talk about December 28th, 2011.  Was
23   there a rip of Jose Torres on that date?
24   A    Yes.
25   Q    Tell us what happened?
```

1   A    As a result of phone calls intercepted between an

2   individual who was known by the nickname of Lethal and Kevin

3   Wilson on October 28th -- I'm sorry, December 28th, 2011,

4   subsequent to interception of those phone calls, it was

5   determined that Lethal, who was identified as Mr. Torres after

6   his arrest, was coming to meet up with Mr. Wilson in order to

7   purchase ten bundles of heroin.  It was late at night.

8          We set up surveillance in the area.  We observed Mr.

9   Torres arrive and meet with Mr. Wilson.  As Mr. Torres

10  departed the area, surveillance units followed that vehicle

11  operated by Mr. Torres, and a traffic stop was initiated by

12  members of the New Haven Police Department Street Interdiction

13  Unit in the area of County Street.

14         Subsequent to that stop, ten bundles of heroin were

15  located inside the vehicle operated by Mr. Torres, and Mr.

16  Torres was placed in custody.

17  Q    All right.  That rip was, as you mentioned, preceded by a

18  telephone call?

19  A    Yes.

20  Q    Between Mr. Wilson and Mr. Torres?

21  A    Yes.

22  Q    And that call took place December 28th, 2011, at

23  approximately 5:34 p.m., Government's Exhibit 136?

24  A    Yes.

25  Q    And in that call, Mr. Wilson asked Mr. Torres:  "Ten,

```
 1   right?"

 2   A    Yes.

 3   Q    All right.  Mr. Torres responded, "Yeah, your shit's dead

 4   right though, right dog"?

 5   A    Yes.

 6         MR. VATTI:  May I approach, your Honor?

 7         THE COURT:  Yes, sir.

 8   Q    I've handed you what's been admitted as Government's

 9   Exhibit 245.  Can you tell us what that is?

10         THE COURT:  What was that exhibit number, sir?

11         MR. VATTI:  245.

12         THE COURT:  245, thank you.

13   A    This is the exhibit, the ten bundles of heroin seized

14   from Mr. Torres on December 28th, 2011.  It's inside a New

15   Haven PD evidence bag, which is then placed inside a DEA

16   evidence bag.

17   Q    All right.  Let's talk about, fast-forward to, January

18   3rd of 2012.

19   A    Okay.

20   Q    Tell us what enforcement activity took place on that date.

21   A    As a result of phone calls between Kevin Wilson and his

22   heroin source of supply, Johnny De Los Santos, members of the

23   New Haven district office formally planned to arrest

24   Mr. Wilson once he met with his source of supply and received

25   a large quantity of heroin.
```

```
 1              On January 3rd, 2011, approximately 9:00 o'clock,

 2    actually we started probably about 7:00 o'clock, began

 3    following Mr. Wilson because we knew he was going to meet up

 4    with his source of supply.  He was followed around for about

 5    two-and-a-half hours until 9:30, where he traveled from New

 6    Haven to Orange/Milford line and went to Marriott Courtyard

 7    where he met with Mr. De Los Santos.

 8              MR. REEVE:  Could it be clarified, I think the

 9    witness said July 3rd, 2011.

10              THE WITNESS:  I'm sorry, January 3rd, 2012.

11              MR. REEVE:  Thank you.

12    A    Surveillance units were, surveillance was, initiated

13    inside the parking lot of Marriott Courtyard, observed

14    Mr. Wilson arrive, meet with an individual working on behalf

15    of De Los Santos in the parking lot, then shortly after

16    departed the area.

17              The vehicle traveled directly from the Marriott

18    Courtyard straight to the area of Day Street, 139 Day Street,

19    where the vehicle was stopped by members of New Haven Police

20    Department.

21              Mr. Wilson was asked to exit the vehicle.  A patdown

22    was conducted, and a large bulge was found in his groin area.

23    That was the heroin that he had just received from the source

24    of supply, De Los Santos.

25              At that time, as members of the New Haven Police
```

1    Department and members of the DEA and other law enforcement

2    officers were speaking to Mr. Wilson and four other occupants

3    of the vehicle, were able to observe individual who was

4    subsequently identified as Pierre Galan peeking from inside of

5    one of the apartments, looking outside.

6         Mr. Wilson then gave a verbal consent to search his

7    apartment, apartment No. 8 inside 139 Day Street, and as law

8    enforcement began to proceed up the stairs to apartment No. 8,

9    they observed Gilbert Galan come down the stairs and enter his

10   apartment, which was apartment No. 4, one floor below.  So

11   apartment No. 8 is up on the third floor, No. 4 is on the

12   second floor.

13        At the time, they observed that the keys of that

14   apartment No. 8 were inside the cylinder and the door was

15   ajar.  At that time, law enforcement proceeded up to apartment

16   No. 8 to secure the residence, make sure there was no one else

17   inside the apartment.

18        And other members of the -- other law enforcement

19   members observed that there was a cap of a grinder, a brush,

20   and a cardboard box right by the door of apartment No. 4.

21        They knocked on the door.  They asked the Galan

22   brothers to come outside.  They did come outside.  They

23   proceeded to go inside the apartment.  They heard the bathroom

24   water, the toilet water, was running.

25        At that time, they observed there was two bundles of

1  heroin still floating inside the toilet bowl.  There was rice

2  all over the seat.  There was a cardboard box containing clear

3  glassine bags; a white pad, ink pad, that is used to stamp the

4  heroin bags.  Inside the tub, there was actually a grinder,

5  with heroin residue, on the bathroom floor.

6  Q    All right.  Now, you indicated that heroin was seized

7  from Mr. Wilson that day?

8  A    Yes.

9  Q    And approximately how much?

10  A    It was a large -- 150 or 180 grams.

11  Q    All right.  And where was that actually seized?

12  A    Was on his person, in his groin area.

13        MR. VATTI:  May I approach, your Honor?

14        THE COURT:  Yes, sir.

15  Q    I'm going to hand you what's been marked as Government's

16  Exhibit 244.  Can you tell us what that is?

17  A    Yes, this is the heroin seized from Mr. Wilson on January

18  3rd, 2012, in the area of 139 Day Street.

19  Q    All right.  The exhibits that you've mentioned which were

20  seized, the drug exhibits seized from Jacqueline Lopez on

21  January 22nd, 2011, from Jose Torres on December 28, 2011, and

22  this suspected heroin from Kevin Wilson on January 3rd, 2011,

23  were they all submitted for lab analysis at the DEA?

24  A    They were.

25        MR. VATTI:  Try to call up Government's Exhibit 133.

1    Q    Can you tell us the date and time of this call?

2    A    October 23rd, 2011, 4:57 p.m., phone call between Richard

3    Anderson and Kevin Wilson.

4    Q    All right.  This is taking place the day after the Jesus

5    Morales/Jacqueline Lopez rip?

6    A    That's correct, the day after.

7              (Government's Exhibit 133, an audio recording,

8    played.)

9    Q    Is "shorty" street slang for girlfriend or wife?

10   A    Yes.

11             MR. VATTI:  I'm now going to call up Government's

12   Exhibit 44.

13   Q    What's the date and time of this call?

14   A    October 25th, 2011, at 10:23 in the morning, phone call

15   between Kevin Wilson and Richard Anderson.

16             (Government's Exhibit 44, an audio recording,

17   played.)

18   Q    All right.  In that call, did Mr. Anderson indicate,

19   "You don't want to deal with nobody else"?

20   A    Yes.

21   Q    There was a reference to an individual by the name of

22   Skittles?

23   A    Yes.

24   Q    Was there an individual with that name who was arrested

25   and charged in connection with this case?

```
 1   A    Yes.

 2   Q    And who was that?

 3   A    Gilbert Galan.

 4   Q    All right.  You mentioned earlier in your description of

 5   the January 3rd, 2012, rip of Kevin Wilson that there had been

 6   some involvement with Pierre and Gilbert Galan that evening?

 7   A    Yes.

 8   Q    All right.  A number of items of physical evidence were

 9   seized in the Galans' apartment?

10   A    Yes.

11   Q    Which apartment was that?

12   A    Apartment No. 4.

13   Q    At what location?

14   A    139 Day Street.

15   Q    All right.  We'll get back to that in a little while.

16             MR. VATTI:  Call up Government's Exhibit 45.

17   Q    Can you tell us the date and time of the call?

18   A    October 25th, 2011, 2:31 p.m., phone call between Kevin

19   Wilson and Richard Anderson.

20             (Government's Exhibit 45, an audio recording,

21   played.)

22   Q    All right.  In that call, Mr. Wilson indicated, "You said

23   you needed a sample anyway, right"?

24   A    Yes.

25   Q    Mr. Anderson answered "Yeah, I'm trying, know what I'm
```

1   saying, yeah"?

2   A    Yes.

3   Q    All right.  That took place at 2:31 p.m. on October 25th?

4   A    That's correct.

5        MR. VATTI:  I'm now going to call up Government's

6   Exhibit 46.

7   Q    What time did this take place on October 25th, 2011?

8   A    2:48 p.m., phone call between Richard Anderson and Kevin

9   Wilson.

10       (Government's Exhibit 46, an audio recording, played.)

11  Q    All right.  In that call, Mr. Anderson asked for Papi's

12  number?

13  A    Yes.

14  Q    And was the phone number that Mr. Wilson gave in response

15  the phone that Jesus Morales started using the day after his

16  arrest?

17  A    Yes.

18       MR. VATTI:  Next I'm going to call up Government's

19  Exhibit 140.

20  Q    Can you tell us the date and time of this call?

21  A    140 is a phone call on October 25th, 2011, at 4:08 p.m.,

22  phone call between Mr. Anderson and Kevin Wilson.

23  Q    Now, when calls come in to the computers in the wire

24  room, does the computer automatically log in the time of the

25  call?

1    A    Yes, it's automatic stamp.

2    Q    So the time that's listed on this call of 4:08 p.m. on

3    October 25th, that's logged in by the computer?

4    A    Correct.

5    Q    And in response to the earlier calls this day, where Mr.

6    Anderson requested a sample, was surveillance initiated?

7    A    Yes.

8    Q    All right.  And where was it initiated?

9    A    139 Day Street.

10   Q    All right.  And was that video surveillance?

11   A    Yes.

12   Q    All right.  And the video surveillance vehicle also has a

13   camera, correct?

14   A    Yes.

15   Q    And does the camera also log times --

16   A    Yes.

17   Q    -- as events are occurring?

18   A    That's correct.

19        MR. VATTI:  All right, I'm going to go ahead and

20   play Government's Exhibit 140.

21        (Government's Exhibit 140, an audio recording,

22   played.)

23   Q    Who are the participants in this call?

24   A    Kevin Wilson and Richard Anderson.

25   Q    All right.  What was the phone number that was being used

```
1    here?

2    A    917-603-5289.

3    Q    All right.  Was this a call that resulted in the

4    surveillance you described earlier of Richard Anderson?

5    A    Yes.

6    Q    Is Mr. Anderson talking on his cell phone there in

7    Government's Exhibit 255?

8    A    Yes.

9    Q    The surveillance camera on the vehicle has logged in 4:09

10   p.m.?

11   A    Correct.

12            (Government's Exhibit 255.1, a video recording,

13   played.)

14   Q    The call where Mr. Anderson indicates he was downstairs

15   was 4:08 p.m.?

16   A    Correct.

17            MR. VATTI:  Now I'm going to call up Government's

18   Exhibit 50.

19   Q    What's the date and time of this text message?

20   A    November 10th, 2011, 12:25 p.m.  It was an incoming text

21   message from Richard Anderson's phone to Kevin Wilson's phone.

22   Q    What does the text message say?

23   A    "Shit needed that undone."

24            MR. VATTI:  Now I'm going to call up Government's

25   Exhibit 135.
```

1    Q    What's the date and time of that call?

2    A    135 was a phone call, November 23rd, 2011, at 4:07 p.m.,

3    between Richard Anderson and Kevin Wilson.

4    Q    Which phone is Mr. Anderson using?

5    A    917-603-5289.

6            (Government's Exhibit 135, an audio recording,

7    played.)

8    Q    There was a reference in that call to "cousin coming

9    through"?

10   A    Yes.

11   Q    Do you know if there is a familial relationship between

12   Kevin Wilson and Johnny De Los Santos?

13   A    He refers to them as cousins, but they're not real cousins.

14           MR. VATTI:  I'm going to call up Government's

15   Exhibit 51.

16   Q    What's the date and the time of this text message?

17   A    November 28th, 2011, 10:38 a.m.

18   Q    And --

19   A    It's a text message from a phone identified to be

20   utilized by Mr. Anderson and Kevin Wilson.

21   Q    And which Anderson phone was this?

22   A    475-227-4114.

23   Q    All right.  That's the second phone that we had on the

24   chart up there?

25   A    Correct.

1    Q    And can you read what the text message says, for the

2    record?

3    A    "I need 1 bad."

4         MR. VATTI:  Now called up Government's Exhibit 52.

5    Q    What's the date and time of this text message?

6    A    November 28th, 2011, 10:39 in the morning, outgoing text

7    from Mr. Wilson to Mr. Anderson.

8    Q    And can you read it, for the record, for us?

9    A    "I'm have PLO give it to you."

10   Q    And was there an individual arrested and charged in

11   connection with this case that had the nickname PLO?

12   A    Yes.

13   Q    And who was that?

14   A    Pierre Galan.

15   Q    Was he one of the individuals that you described having

16   interaction with on January 3rd, 2012, the date of the rip of

17   Kevin Wilson?

18   A    Yes.

19        MR. VATTI:  I call up Government's Exhibit 54.

20   Q    What's the date and time of this call?

21   A    November 30th, 2011, 7:05 p.m., phone call between Johnny

22   De Los Santos, Richard Anderson, and Kevin Wilson.

23   Q    All three were not on the phone together, correct?

24   A    No, Mr. Wilson switched over.  He was talking to De Los

25   Santos initially and switched over to incoming phone call.

```
1    Q    All right.  You said this was November 30th, 2011?

2    A    Yes.

3              (Government's Exhibit 54, an audio recording,

4    played, and paused.)

5              MR. VATTI:  I'm going to pause it briefly.

6    Q    Who's speaking in the call now?

7    A    Kevin Wilson and Richard Anderson.

8              (Government's Exhibit 54, an audio recording,

9    continued.)

10   Q    All right.  In that call, did Mr. Wilson indicate, "I

11   said I'm getting bad reviews on the other shit I got"?

12   A    Yes.

13   Q    All right.  Mr. Anderson indicated, "You getting bad

14   reviews," right?

15   A    Correct.

16   Q    And there's a portion of the conversation where

17   Mr. Wilson says, "Nah, I did that, I did that, I did, I'm

18   talking about straight, straight what I just got."

19             And Mr. Anderson says, "Oh, you did it straight?

20   A    Correct.

21   Q    Mr. Wilson says, "Yeah."

22             And Mr. Anderson says, "And they still complaining

23   about it."

24             And Mr. Wilson says, "Yeah"?

25   A    Correct.
```

```
1              MR. VATTI:  I call up Government's Exhibit 56.

2    Q    What's the date and time of this call?

3    A    December 13th, 2011, 5:04 p.m., phone call between Mr.

4    Anderson and Kevin Wilson.

5    Q    And which phone is Mr. Anderson using?

6    A    475-227-4114.

7              (Government's Exhibit 56, an audio recording,

8    played, and paused.)

9    Q    Right there, did Mr. Wilson say, "I got it in rubber

10   bands"?

11   A    Yeah.

12   Q    And Mr. Anderson said, "Yeah yeah yeah yeah rubber bands

13   good though"?

14   A    Yes.

15             (Government's Exhibit 56, an audio recording,

16   continued.)

17             MR. VATTI:  May I approach, your Honor?

18             THE COURT:  Yes.

19   Q    I'm going to hand you what's been marked as Government's

20   Exhibit 300.  Can you tell us what this is?

21   A    Yes, it's the cell phone belonging to Mr. Wilson with the

22   phone number of 914-227-8177, seized at the time of his arrest

23   on January 3rd, 2012, at 139 Day Street.

24   Q    All right.  This is target telephone 4 that was tapped,

25   correct?
```

```
1    A    That's correct.

2           MR. VATTI:  I'm going to call up Government's

3    Exhibit 228.

4    Q    What are we looking at here?

5    A    That's a screenshot of the phone that I just had in my

6    hands, Mr. Wilson's phone, and that's the phone book of that

7    phone.

8    Q    All right.  At the bottom of the screen, do you see an

9    entry with the word "Porter"?

10   A    Yes.

11          MR. VATTI:  Call up Government's Exhibit 227.

12   Q    What are we looking at now?

13   A    That's the phone number associated with the name Porter,

14   phone number 475-227-4114.

15          MR. VATTI:  Now I'm going to call up Government's

16   Exhibit 226.?

17   Q    What are we looking at there?

18   A    Another shot of Mr. Wilson's phone, on the name in his

19   contact was the name Porter with phone number 475-227-4114.

20   Q    Going back to Government's Exhibit 228, do you see a

21   reference there at the top of the screen to Phizzy?

22   A    Yes.

23   Q    If I could just direct your attention to Government's

24   Exhibit 225.

25          MR. MORAGHAN:  225?
```

1           MR. VATTI:  Yes, 225.

2    Q    What's the number underneath Phizzy in Government's

3    Exhibit 225?

4    A    203-435-3420.

5    Q    Was that one of the Philip Bryant phones?

6    A    Yes.

7    Q    Were there several numbers listed under Phizzy?

8    A    Yes.

9    Q    And is this another phone number for Phizzy that was

10   listed in the contact section of target telephone 4?

11   A    Yes.

12   Q    And what is that number?

13   A    203-843-7249.

14          MR. VATTI:  I'm now going to call up Government's

15   Exhibit 229.

16   Q    Is this a third number that was listed for Phizzy in the

17   contact section of target telephone 4?

18   A    Yes.

19   Q    And what's that number?

20   A    203-606-4469.

21          MR. VATTI:  Your Honor, I was planning on starting

22   Philip Bryant and the calls relating to Mr. Bryant, but I

23   think we're at a good stopping point.  I would rather not

24   break it up.

25          THE COURT:  Any objection, gentlemen?

1          MR. REEVE:  No, your Honor.

2          MR. MORAGHAN:  No, your Honor.

3          THE COURT:  We will adjourn for the evening, ladies

4  and gentlemen of the jury.  Please, as I usually caution you,

5  don't discuss the case with anyone overnight.  We'll start

6  again tomorrow morning at 10:00 o'clock.

7          (In the absence of the jury:  4:37 o'clock p.m.)

8          THE COURT:  Anything further, gentlemen?

9          MR. REEVE:  Your Honor, you alluded to a matter just

10  when you took the bench.

11          THE COURT:  I'm sorry, I couldn't hear you.

12          MR. REEVE:  You alluded to a matter just before you

13  took the bench.  We would request to have a short meeting with

14  all counsel in chambers.

15          THE COURT:  Sure.

16          MR. REEVE:  Thank you.

17          (4:38 o'clock p.m.)

18
                    INDEX OF WITNESSES                PAGE
19  ANASTAS NDRENIKA
        Direct Examination by Mr. Vatti            291
20

21      COURT REPORTER'S TRANSCRIPT CERTIFICATE
            I hereby certify that the within
22      and foregoing is a true and correct
        transcript taken from the proceedings
23      in the above-entitled matter.

24                      /s/ Thea Finkelstein
                        Official Court Reporter
25

    Dated: _____