1              UNITED STATES DISTRICT COURT

2               DISTRICT OF CONNECTICUT

3   * * * * * * * * * * * * *  x   Criminal Case
                                   No. 3:12CR104(EBB)
4   UNITED STATES OF AMERICA,   :
                  Plaintiff
5                              :
         vs.                       January 24, 2014
6                              :   10:13 O'clock a.m.
    RICHARD ANDERSON, PHILIP
7   BRYANT, ROBERT SANTOS,     :
                  Defendants       New Haven, Connecticut
8
    * * * * * * * * * * * * *  x
9
                FOURTH DAY OF TRIAL
10
         BEFORE THE HONORABLE ELLEN BREE BURNS
11        SENIOR UNITED STATES DISTRICT JUDGE
                AND A JURY OF FIFTEEN
12
    Appearances:
13    For the Plaintiff:          S. DAVE VATTI, ESQ.
                                  MARC HARRIS SILVERMAN
14                                Assistant U.S. Attorneys
                                  157 Church Street
15                                New Haven, CT 06510

16    For the Defendant:          NEAL PATRICK ROGAN, ESQ.
      Richard Anderson            315 Post Road West
17                                Westport, CT 06880

18    For the Defendant:          DAVID A. MORAGHAN, ESQ.
      Philip Bryant               Smith, Keefe, Moraghan &  Waterfall
19                                32 City Hall Center, Suite C
                                  PO Box 1146
20                                Torrington, CT 06790

21    For the Defendant:          RICHARD A. REEVE, ESQ.
      Robert Santos               Sheehan & Reeve
22                                139 Orange Street, Suite 301
                                  New Haven, CT 06510
23
      Court Reporter:             Thea Finkelstein RMR, CRR
24                                TheaFinkelstein@aol.com

25  Proceedings recorded by mechanical stenography, transcript
    produced by computer.

```
 1              (In the absence of the jury.)

 2         THE COURT:  Good morning.

 3         MR. VATTI:  Good morning, your Honor.

 4         MR. REEVE:  Good morning, your Honor.

 5         MR. SILVERMAN:  Good morning, your Honor.

 6         THE COURT:  Please be seated.

 7         Before we begin this morning, there was some concern

 8    expressed the other day about the fact that apparently some

 9    defendants and some of their relatives believed I was falling

10    asleep on the bench.

11         For your information, in case you're not familiar

12    with my process, I take copious notes during the testimony of

13    each witness, and I would like to place into the record my

14    personal notes of what happened that afternoon to reflect that

15    I was not asleep; indeed, I was listening very carefully to

16    what was going on and making notes of them.

17         I will confess that I was somewhat bored during the

18    course of the playing of the audio tapes, and intrigued, by

19    the way.

20         But I want to put this in the record as a Court

21    exhibit to indicate what I was doing that afternoon.  It was

22    not sleeping.  I was not sleeping.

23         So would you take and mark it as a Court exhibit,

24    please?

25         THE CLERK:  Yes, Judge.
```

```
 1              THE COURT:  Is there anything else this morning?

 2              MR. MORAGHAN:  Your Honor, one brief matter.  I

 3    spoke with Mr. Vatti about it.  We agreed to the introduction

 4    of all of the exhibits the government offered on foundational

 5    grounds; but as I understand it, we're reserving certain

 6    objections to the calls.

 7              I'm renewing my objection to all of the calls that

 8    relate to firearms, which your Honor's already ruled on.

 9    Rather than objecting each time a call comes in, in front of

10    the jury, I would ask the Court if I could have a blanket

11    objection at this time as to any of the calls that are going

12    to be introduced as to Mr. Bryant regarding firearms, and I

13    can give the Court a list of the exhibit numbers I think that

14    are applicable, if the Court would like that.

15              THE COURT:  All right.

16              MR. VATTI:  Your Honor, the government has

17    interpreted the stipulation to be only as to foundational

18    requirements.  We were not treating it as a waiver of

19    objection on 403 grounds or prejudicial grounds, so that's

20    perfectly preserved already.

21              THE COURT:  Very well.

22              MR. MORAGHAN:  Would you like the calls that I

23    believe apply, your Honor?

24              THE COURT:  Yes, please.

25              MR. MORAGHAN:  It would be Exhibit 89A, 91A, 93A,
```

1    107A.

2              THE COURT:  Excuse me, 89A?

3              MR. MORAGHAN:  A.  91, 93, 107, 108 --

4              THE CLERK:  Excuse me, are these As?  You have to

5    specify.

6              MR. SILVERMAN:  If I can clarify, the numbers

7    themselves, 91, 89, those are the exhibits.  The As are the

8    transcripts.  89 is an audio recording; 89A is the transcript

9    that corresponds to it.  89A is not an exhibit; it's only an

10   aid to the jury.  I assume the objection is to 89.

11             MR. MORAGHAN:  To the actual recording.

12             MR. SILVERMAN:  To the recording.  These are

13   objections all to the recordings.

14             MR. MORAGHAN:  To the recordings.

15             THE COURT:  Let me be sure I've got everything you

16   referred to.  89, 91, 93, 107, 108?

17             MR. MORAGHAN:  111, 112, and 113.  And finally, on

18   111, there is also a reference to the Grapes, which is a gang.

19   The government was not going to introduce any evidence about

20   gangs.

21             THE COURT:  To the Grapes, did you say?

22             MR. MORAGHAN:  The Grapes.  It's just a reference.

23   I don't know what the government wants to -- if they're going

24   to proceed with that or not.  111, on the second page.

25             MR. VATTI:  I'm not planning on asking Special Agent

```
 1   Ndrenika even what that reference means.  At this point, just
 2   the transcript, I'm just going to leave it there in the call
 3   and not ask him anything about it.  I don't think it will mean
 4   anything to them.
 5             MR. MORAGHAN:  That's fine, your Honor, thank you.
 6             THE COURT:  Anything else?
 7             Yes, Mr. Reeve?
 8             MR. REEVE:  Very briefly.  I'm just renewing my
 9   motion for severance on the grounds that the Anderson calls --
10   I'm going to being doing this repeatedly, I don't want to take
11   up more time -- on the content of the Richard Anderson calls
12   that were played yesterday, which the Court had the perception
13   I think before yesterday that the only kind of firearms/
14   violence calls in this case related to Mr. Bryant.
15             The reference is very clear that the calls with
16   respect to Mr. Anderson are directly related to violence, and
17   talks about threats, and it sounds to me like killing people
18   because of disputes over drugs.
19             None of that has anything to do with my client, so I
20   renew the motion on the basis of all of the evidence that was
21   admitted yesterday.  To save time, I also renew it because I
22   know what's coming in now with respect to Mr. Bryant, which is
23   only a part of which is the calls that Attorney Moraghan
24   referred to.  I join with him in objecting to that evidence
25   coming in.
```

```
 1              And on those grounds, I move for severance.  I don't
 2     want to go any further, but I do feel like I have to do that.
 3              Thank you.
 4              THE COURT:  Mr. Vatti, do you want to respond?
 5              MR. VATTI:  We're going to stay opposed, your Honor,
 6     for the reasons already set forth.
 7              THE COURT:  All right.  You're on the record for
 8     that, Mr. Reeve.
 9              MR. REEVE:  Thank you.
10              THE COURT:  Anything else?
11              MR. VATTI:  Your Honor, just on scheduling, I know
12     you're planning to read something that we've all agreed upon
13     to the jury.  I'm just going to suggest that maybe today we
14     shorten the lunch break to 45 minutes instead of an hour, and
15     then if we could push to 5:00 o'clock.  If there's no problem
16     starting on Monday and Tuesday at 9:00 a.m.
17              THE COURT:  I don't think there is.  Do I have
18     anything?
19              THE CLERK:  You do.
20              THE COURT:  I might have some sentencings.
21              THE CLERK:  A violation on Monday, and a sentencing
22     on Tuesday.
23              THE COURT:  Okay.  Can't help you.
24              MR. VATTI:  Okay.  I tried.
25              THE COURT:  You're bringing me too much business,
```

```
 1    that's the problem.
 2              MR. REEVE:  Judge, there's one minor matter.  Mr.
 3    Santos is home on electronic monitoring.  He's supposed to
 4    call in on Thursday.  The probation office has been giving him
 5    permission to go to church on Sunday.  They typically give him
 6    from 8:00 a.m. to 3:00 p.m.  He goes to church for many hours
 7    early in the morning with his mom, who's here in court, she's
 8    the third-party custodian.
 9              I wonder if your Honor could approve his travel.
10    I'll talk to probation and say you approve that he's been in
11    court all day, that's why he didn't call the number, and see
12    if we can work it out that way.
13              THE COURT:  Certainly.
14              MR. REEVE:  Thank you very much.
15              THE COURT:  Anything else?
16              MR. VATTI:  No, your Honor.
17              THE COURT:  You have reviewed the proposed message
18    to the jury with respect to timing?  Okay?
19              MR. ROGAN:  Yes, your Honor.
20              MR. MORAGHAN:  Yes, your Honor.
21              MR. REEVE:  Yes, your Honor.
22              MR. VATTI:  Yes, your Honor.
23              THE COURT:  Okay.
24              MR. REEVE:  Judge, we were just discussing, with
25    respect to the notes that you just filed, was it the Court's
```

1    intention to not make them part of the public record?  I mean,

2    I think -- I'm not sure that they should be publicly filed,

3    and I don't know if your Honor's thought about that.

4              THE COURT:  I hadn't thought about that one way or

5    another.  Why wouldn't they be?

6              MR. REEVE:  Well, it's up to your Honor, obviously.

7              THE COURT:  The purpose of my filing those,

8    gentlemen, is to address the issue that had been raised about

9    somebody thinking I was asleep.  This shows that I wasn't

10   asleep.

11             MR. REEVE:  Judge, I totally understand that.  I

12   guess what -- I assume that what the Court wanted to do is

13   preserve it and perhaps make it available to counsel in this

14   case, but not the general public.  I'm just raising it as a

15   courtesy to the Court.

16             MR. VATTI:  I have no objection to it being a Court

17   exhibit under seal, your Honor.

18             THE COURT:  We will so inform the clerk when she

19   returns that it's under seal.

20             MR. REEVE:  Okay.

21             (In the presence of the jury:  10:24 o'clock a.m.)

22             THE COURT:  Good morning, ladies and gentlemen.

23             At the time of jury selection, I told you that this

24   trial would run probably until Wednesday, the 29th.  However,

25   due to the delay in the trial occasioned by the storm that we

1    had last week as well as, of course, the federal holiday, I

2    anticipate now that you will not receive the case for your

3    deliberation until after next Wednesday, perhaps not until

4    Thursday or Friday of next week.

5            Thus, I'd like to know from you a show of your hands

6    as to those of you who would absolutely not be available to be

7    here on either of those days.  Anybody got a problem?  That's

8    fine then.

9            Additionally, once you receive the case for your

10   deliberation, of course, there are no time limits that the

11   Court imposes on how long you deliberate, and in order to

12   reach a unanimous verdict as to each of these three

13   defendants.  And for this reason, I would also like to know

14   whether or not there are any of you who absolutely would not

15   be available to attend for any additional days through the

16   following week, that is through February 7th, because we don't

17   want to put any pressure on you to come to a premature

18   verdict.  We want to give you the opportunity to deliberate on

19   this case as long as you feel is necessary to reach a

20   unanimous verdict.

21           So I'm giving you these cautionary instructions

22   right now simply because no one knows how long your

23   deliberations are going to take.  Is there anybody who's going

24   to have a problem with that schedule that I've just referred

25   to?  Good.  Thank you very much.  No one's indicated it was a

1    problem.  Thank you.

2            All right.  Continue, sir.

3            MR. VATTI:  Thank you, your Honor.

4            **A N A S T A S   N D R E N I K A**

5        having been recalled as a witness, was previously

6        duly sworn and testified on his oath as follows:

7    DIRECT EXAMINATION

8    BY MR. VATTI (Continued):

9    Q    Special Agent Ndrenika, I just want to talk briefly about

10   a controlled purchase that occurred on September 14th, 2011.

11   Can you tell us who that controlled purchase took place from?

12   A    Kevin Wilson.

13   Q    Can you tell us the circumstances of that controlled

14   purchase?

15   A    Based on phone calls intercepted over Kevin Wilson's

16   phone, it was determined that he had a firearm in his

17   possession that he was willing to sell.  As a result of that,

18   plans were made to have the, a, cooperating witness contact

19   Kevin Wilson in an attempt to purchase a firearm, but the

20   reason that we called was, initially we called to buy drugs,

21   but the true reason for it was to actually purchase a firearm,

22   get the firearm off the streets.

23           Plans were formulated, CI got the money, followed

24   the CI to the location, did take place for two eight balls of

25   crack cocaine.

```
 1              The CW attempted to engage Kevin Wilson in a
 2    conversation pertaining to purchase of a firearm in the hopes
 3    that he would volunteer to sell the firearm to the CW, but
 4    Kevin Wilson wanted to trade that firearm for two other
 5    firearms.  DEA's not in the position to or allowed to exchange
 6    firearms, so therefore, we couldn't buy the firearm, the
 7    firearm that Kevin Wilson was willing to sell; only the eight
 8    ball of drugs, eight balls of crack cocaine.
 9    Q    Were protocols followed in that case about searching the
10    cooperating witness before and after the deal?
11    A    Yes.
12    Q    I'm going to hand you what's been admitted as
13    Government's Exhibit 242.
14              MR. VATTI:  May I approach, your Honor?
15              THE COURT:  Yes, sir.
16              MR. VATTI:  Thank you.
17    Q    Can you tell us what we're looking at?
18    A    This is the crack cocaine that was purchased from Kevin
19    Wilson on September 14th, 2011.
20    Q    And was this exhibit, 242, submitted to the DEA
21    laboratory for analysis?
22    A    It was.
23    Q    I want to turn back to January 3rd, 2012.  There are a
24    couple of exhibits that were seized that day.  I want to talk
25    about government exhibits 246 and 247.
```

1          MR. VATTI:  May I approach, your Honor?

2          THE COURT:  Yes, sir.

3    Q    I'm going to hand you what's been admitted as government

4    exhibits 246 and 247.  Starting with 246, can you identify

5    what that is?

6    A    Yes, these are the two bundles of heroin that were

7    recovered from the toilet bowl at 139 Day Street, apartment

8    No. 4, on January 3rd, 2012.

9    Q    All right.  Is that the apartment that the Galan brothers

10   were residing in, Pierre and Gilbert?

11   A    Yes.

12   Q    Was Exhibit 246 submitted to the DEA laboratory for

13   analysis?

14   A    It was.

15   Q    And what is Exhibit 247?

16   A    This was a cutting agent located at 139 Day Street,

17   apartment No. 4, on January 3rd, 2012.

18   Q    What do you mean by "cutting agent"?

19   A    It's a substance that -- or there's a various, number of,

20   substances that drug distributors utilize in order to mix

21   heroin or cocaine, in order to increase the volume.

22   Q    All right.  Was Exhibit 247 also submitted to the lab?

23   A    It was.

24          MR. VATTI:  May I approach, your Honor, to take that

25   back?

1          THE COURT:  Yes, sir.

2   Q    Do you know where the cutting agent was found, to the

3   best of your recollection?

4   A    I have to review my report, or the report pertaining to

5   this.

6   Q    Okay.

7          MR. VATTI:  May I approach, your Honor?

8          THE COURT:  Yes, sir.

9   Q    I'm going to hand you a report that's dated January 3rd,

10  2012.  If you could review that and see if it refreshes your

11  recollection on the location of the cutting agent.

12  A    That exhibit was found inside Gilbert Galan's apartment,

13  apartment No. 4.

14  Q    Thank you.  All right.  I'd like to tie up a couple of

15  loose ends from yesterday regarding Richard Anderson.

16          First I want to start with October 25th, 2011, which

17  was the day of the surveillance of Richard Anderson.

18          MR. VATTI:  First I'm going to call up Government's

19  Exhibit 45.

20          (Government's Exhibit 45, an audio recording,

21  played.)

22  Q    All right.  In that call, Mr. Wilson inquired whether Mr.

23  Anderson needed a sample?

24  A    Yes.

25  Q    Mr. Anderson said yeah?

```
1    A    Yes.

2    Q    What time on October 25th did that call take place?

3    A    2:31 in the afternoon.

4    Q    All right.  Surveillance was initiated in response to

5    that call, correct?

6    A    Yes.

7              MR. VATTI:  Now I'm going to play Government's

8    Exhibit 140.

9              (Government's Exhibit 140, an audio recording,

10   played.)

11   Q    All right.  We watched a video yesterday of Mr. Anderson

12   walking and entering into 139 Day Street.

13   A    Yes.

14   Q    All right.  And you had said yesterday that Mr. Anderson

15   met with Mr. Wilson?

16   A    Based on the phone calls prior to Mr. Anderson arriving,

17   we believed that he met with Mr. Wilson.

18   Q    Did you actually see him meet with Mr. Wilson at that

19   moment?

20   A    Once Mr. Anderson entered the main entrance of 139 Day

21   Street, he was out of our view.  We couldn't see inside the

22   building.

23   Q    All right.  Then there was a call a couple of hours

24   later, correct?

25   A    Yes.
```

1          MR. VATTI:  I'm going to call up Government's

2    Exhibit 47.

3    Q    What's the time of this call?

4    A    6:41 p.m. on October 25th, 2011, phone call between

5    Richard Anderson and Kevin Wilson.

6    Q    And what was the time of the call about, "I'm

7    downstairs"?

8    A    I believe that was close to 4:00, 3:58.

9    Q    It was actually Government's Exhibit 140.

10   A    4:08.

11         (Government's Exhibit 47, an audio recording,

12   played, and paused.)

13   Q    Right there, did Mr. Anderson indicate, he said it wasn't

14   better than the last one?

15   A    Yes.

16         MR. VATTI:  Now I'm going to call up Government's

17   Exhibit 56.

18         (Government's Exhibit 56, an audio recording,

19   played.)

20   Q    All right.  In that call, did Mr. Anderson and Mr. Wilson

21   have a conversation about "rubber bands?

22   A    Yes.  Do you want me to identify the day and time also?

23   Q    Yes.

24   A    Phone call intercepted December 13, 2011, approximately

25   5:04 p.m., phone call between Richard Anderson and Kevin

1   Wilson.

2   Q    And Mr. Wilson also indicated, "It's good bread, it's

3   good bread"?

4   A    Yes.

5              MR. VATTI:  Now I'm going to call up Government's

6   Exhibit 134.

7   Q    If you could tell us the date and time of the call and

8   the participants.

9   A    134.  Phone call intercepted on December 26, 2011, at

10  approximately 5:31 p.m., phone call between Richard Anderson,

11  Kevin Wilson.

12             (Government's Exhibit 134, an audio recording,

13  played.)

14  Q    Was there a core group of officers that were working this

15  case?

16  A    Yes.

17  Q    All right.  And roughly how many?

18  A    Approximately six.

19  Q    And can you tell us who those officers were?

20  A    Sure.  Myself, Task Force Officer Joshua Cameron, Dedric

21  Jones, Jose Miranda, David Rivera, Special Agent Michael

22  Cogan.

23  Q    Hamden investigator Lance Helms helped out with the

24  surveillance on this case, correct?

25  A    Yes, he was strictly surveillance.

1   Q    In addition to those names that you mentioned, a number

2   of other individuals would assist, from time to time, in a

3   surveillance capacity?

4   A    There were approximately 20 other officers.

5   Q    But the individuals that you named were the ones that

6   were really involved on a full-time, day-to-day, basis?

7   A    Yes.

8   Q    All right.  Tell us how many pertinent calls were

9   intercepted on Kevin Wilson's phone during the approximately

10  five months that you were on that phone.

11  A    10,500 or 10,300.

12  Q    Is that an approximation?

13  A    Yes.

14  Q    Calls that come in on a wiretap are categorized into two

15  categories?

16  A    Yes.

17  Q    What categories are those?

18  A    Pertinent conversation and nonpertinent conversation.

19  Q    And what do you mean by pertinent conversation?

20  A    Pertinent conversation are conversations pertaining to

21  narcotics and/or any other type of criminal activities; where

22  nonpertinent conversation is just a general conversation

23  between two individuals.

24  Q    All right.  And in this particular case, you've reviewed

25  the audio recordings and the transcripts of calls that the

1  government plans to play at this trial?

2  A    Yes.

3  Q    All right.  And there are approximately 150 calls that

4  we're going to use in this trial?

5  A    Yes.

6  Q    Tell us what you do when you intercept calls that relate

7  to potential acts of violence that might occur.

8  A    You have to act on it.  Either you send patrol units in

9  the area to prevent the individuals from doing what they are

10  about to do.  You make an arrest if it's necessary.  You

11  follow individuals who are about to commit those acts of

12  violence to the point that they recognize they're being

13  followed, and they go home for the night.

14  Q    And we heard some calls yesterday involving Richard

15  Anderson and Kevin Wilson where there were some discussions

16  about, "There's going to be some problems today," "We're going

17  to seriously fuck somebody up," and I think there was one call

18  where there was a reference to tying someone to a chair.

19  A    Yes.

20  Q    What did you do in response to those situations?

21  A    In response to that, we initiated surveillance in the

22  area where Jesus Morales resided, and we remained there for

23  almost the entire night.

24  Q    Did anything happen with respect to any acts of violence

25  against Jesus Morales?

1    A    No.

2    Q    Did you continue to monitor that situation through the

3    course of the wire?

4    A    Yes.

5    Q    And did there ever come a point where you felt that there

6    was an imminent threat of bodily harm to either Jesus Morales

7    or Jacqueline Lopez?

8    A    We thought the night in question, the night that the

9    phone call was intercepted.

10   Q    But other than that night, did you continue to monitor

11   the situation?

12   A    We did.  We were careful with the phone calls pertaining

13   to Mr. Anderson and Mr. Wilson, trying to see if any phone

14   calls pertained to violence was taking place, and we were

15   ready to react if such calls were intercepted.

16   Q    All right.  And were there any further calls ever

17   intercepted that gave you reason to believe that there was any

18   imminent act of violence?

19   A    After that, no.

20   Q    And was Jesus Morales ultimately arrested and charged --

21           MR. REEVE:  Your Honor, could we have a

22   clarification on that?  Is that with respect to Morales and

23   Lopez or the entire case?  It just wasn't clear.

24           MR. VATTI:  Right now, I'm just talking about

25   Morales and Lopez.

```
1            MR. REEVE:  Okay, thank you.

2    Q    Is that how you understood my question?

3    A    That's correct, sir.

4    Q    Mr. Morales was ultimately arrested and charged in

5    connection with this case in May of 2012?

6    A    Yes.

7    Q    Did there come a point in the case where you believed

8    that an individual by the name of Michael Santana was possibly

9    the target of violence?

10   A    Yes.

11   Q    All right.  And possibly the target of violence

12   instigated by Kevin Wilson?

13   A    Yes.

14   Q    All right.  Tell us what happened.

15   A    During the month of December 2011, an individual by the

16   name of Michael Santana was dealing strictly with two sources

17   of supply out of New York City.  One of them was Amaury

18   P'Dilla, and the second one was Johnny De Los Santos.  Both

19   those individuals happened to also be Kevin Wilson's source of

20   supply for cocaine and heroin.

21            During the month of December, Michael Santana had

22   several conversations with Johnny De Los Santos during which

23   he was trying to purchase two kilograms of cocaine.  During

24   the same time, he was also in conversation with Amaury

25   P'Dilla, and he did go through the deal for kilogram of
```

cocaine with Amaury Padilla, but the deal did not go as Amaury
Padilla anticipated.

Santana traveled from New Haven to New York City,
went to Mr. P'Dilla's apartment where his mother lived as
well, robbed P'Dilla at gunpoint for a kilo of cocaine and a
firearm that P'Dilla had inside the apartment, which resulted
in Mr. P'Dilla's mother ending up in the hospital with some
heart problems.

Subsequent to that robbery that Santana committed in
New York, numerous phone calls were intercepted between Amaury
P'Dilla and Kevin Wilson, during which Amaury explained to
Wilson that he was robbed at gunpoint by Santana.  And also,
there were numerous phone calls between Johnny De Los Santos
and Kevin Wilson during which both subjects talked about the
incident.

In addition to that, both individuals, Amaury
P'Dilla and Johnny De Los Santos, several occasions asked to
locate Santana because at times, we believed they were trying
to cause him bodily harm for what he had done to Amaury
P'Dilla in New York City.

Q    What did you do in response?

A    We kept close eye on Kevin Wilson.  We monitored his
phone calls, we followed him everywhere he went.  We attempted
to locate Santana.  At the end of the day, even if that meant
would be known that a wiretap existed, we had an obligation to

```
 1   public safety to prevent any acts of violence.

 2   Q    Did it appear as if Kevin Wilson was possibly soliciting

 3   other individuals to help locate Michael Santana?

 4   A    He was.

 5   Q    Tell us about that.

 6   A    Numerous occasions, Kevin Wilson will contact other

 7   individuals, other criminal associates with whom he dealt

 8   with, and he would ask them if they would know where Santana

 9   lived, would provide them with a description.  Some did not

10   recognize the name.  He would ask them, "Well, is this

11   individual who lives in this area of town?"  And, you know,

12   "If you find him, call me."

13            And he would then speak to his source of supply in

14   New York and he would tell them that, "Listen, if anything

15   happens, this individual, don't play around, if they do

16   something they want to get paid so I don't want to be

17   responsible for any money owed to them as a result of

18   something they do on your behalf."

19   Q    All right.  Did anything ever actually -- were you ever

20   able to locate Michael Santana?

21   A    No.

22   Q    Were you able to locate him during the period of the

23   wiretap?

24   A    We did, yes.

25   Q    Okay.  And was he ultimately arrested and charged in
```

1    connection with this case in May 2012?

2    A    He was.

3    Q    And were there ever any acts of violence that actually

4    occurred against Michael Santana?

5    A    No.

6              MR. VATTI:  I'm going to call up Government's

7    Exhibit 55.

8    Q    Can you tell us the date and time of this call?

9    A    December 13th, 2011, 1:29 p.m., phone call between

10   Richard Anderson and Kevin Wilson.

11   Q    Approximately when did the incident occur in which

12   Santana robbed Amaury P'Dilla at gunpoint of the kilo of

13   cocaine?

14   A    I believe it was December 11th or 12th.  It was in the

15   beginning of December.

16   Q    This call took place on December 13th?

17   A    Yes.

18   Q    This was Richard Anderson and Kevin Wilson?

19   A    Yes.

20             (Government's Exhibit 55, an audio recording,

21   played.)

22   Q    During that call, did Mr. Wilson indicate that Santana

23   "Laid my cousin down for a whole thing"?

24   A    Yes.

25   Q    Mr. Wilson also indicated, "I got a couple drops on him

1    already"?

2    A    Yes.

3    Q    And Mr. Anderson indicated, "All right, call me when you

4    get out, man, we'll talk about that shit face-to-face"?

5    A    Yes.

6    Q    All right.  I want to talk a little bit about the Jesus

7    Morales arrest on October 22nd, 2011.  There were a couple of

8    calls that preceded the seizure of drugs that I didn't get a

9    chance to play yesterday.

10            MR. VATTI:  Let's start with Government's Exhibit

11   141.

12            MR. ROGAN:  I'm sorry, 121?

13            MR. VATTI:  141.

14            MR. ROGAN:  Thank you.

15   Q    What's the date and time of the call?

16   A    October 22nd, 2011, 11:38 in the morning, phone call

17   between Kevin Wilson and Jesus Morales.

18            (Government's Exhibit 141, an audio recording,

19   played.)

20   Q    All right.  In that call, did Mr. Morales indicate,

21   "Tell her to give me at least six"?

22   A    Yes.

23   Q    All right.  Mr. Wilson indicated, "Listen, my woman is in

24   the house, call her"?

25   A    Yes.

```
 1              MR. VATTI:  Call up Government's Exhibit 254.

 2              (Government's Exhibit 254, a video recording,

 3    playing.)

 4    Q    What are we looking at in Government's Exhibit 254?

 5    A    That's the front entrance of 139 Day Street.

 6    Q    Do you know who went into 139 Day Street there?

 7    A    I believe it was Jacqueline Lopez.

 8    Q    All right.  And momentarily, an individual is going to

 9    come out speaking on the phone.  Do you know who that is?  If

10    you don't know who that is, just tell me you don't know.

11    A    I can't tell you yes or no.

12    Q    All right.  Now I'm --

13    A    That's Jesus Morales with the pony tail.

14    Q    You just recognized Jesus Morales?

15    A    He has a long pony tail, yes.

16              MR. VATTI:  I'm now going to call up Government's

17    Exhibit 142.

18              (Government's Exhibit 142, an audio recording,

19    played.)

20    Q    And what was the time of that call?

21    A    Okay, number, was that one?

22    Q    142.

23    A    12:50 p.m., sir, October 22nd, 2011.

24    Q    And the participants were whom?

25    A    Kevin Wilson and Jesus Morales.
```

```
 1              MR. VATTI:  I'm going to call up Government's
 2    Exhibit 143.
 3              (Government's Exhibit 143, an audio recording,
 4    played.)
 5    Q    All right.  In that conversation, did Mr. Morales
 6    indicate to Mr. Wilson that he had two bundles sold already
 7    and they're waiting for it?
 8    A    Yes.
 9    Q    All right.  And those are the conversations that led to
10    the seizure of Government's Exhibit 243, the six bundles of
11    heroin that you explained about yesterday?
12    A    Yes.
13              MR. VATTI:  Let me call up Government's Exhibit 131.
14    Q    When does this call take place?
15    A    September 24th, 2011, at 10:11 p.m., phone call between
16    Kevin Wilson and Richard Anderson.
17              MR. VATTI:  I misspoke, it's actually 136.  My
18    apologies.
19    Q    And what's the date and time of the call on Exhibit 136?
20    A    December 28th, 2011, at 5:34 p.m., phone call between
21    Jose Torres and Kevin Wilson.
22              (Government's Exhibit 136, an audio recording,
23    played.)
24    Q    All right.  And was this the phone call that led to the
25    Torres rip on December 28th, 2012?
```

1    A    Yes.

2    Q    That resulted in the seizure of Government's Exhibit 254,

3    ten bundles of suspected heroin?

4    A    Yes.

5    Q    We talked about other telephones that were the subject of

6    wiretaps beginning on July 29th, 2011.

7    A    Yes, sir.

8    Q    During this time frame, October running through January

9    3rd of 2012, were there also wiretaps on other phones taking

10   place at this time?

11   A    Numerous.

12   Q    Okay.  And at approximately up to January 3rd, 2012, do

13   you know how many additional targets were being intercepted

14   during that period of time?

15   A    There was target telephone 5, 6, 7, 8, 9, 10.

16   Q    All right.  So in addition to target telephone 4, you had

17   another six phones being intercepted --

18   A    Yes, in total.

19   Q    -- during this time frame?

20   A    Yes.

21   Q    Ultimately, the investigation reached 22 different target

22   telephones, correct?

23   A    Yes.

24   Q    All right.  And during this time frame of October through

25   January 3rd of 2012, October 2011 to January of 2012, are you

```
 1   doing surveillance on other targets during other wiretaps

 2   occurring?

 3   A    Yes.

 4   Q    All right.  And were you doing enforcement activity in

 5   respect to other targets on other wiretapped telephones?

 6   A    Yes.

 7   Q    All right.  So your team of six, plus the agents that

 8   were assisting you, basically were doing enforcement not only

 9   in the Tre and surveillance in the Tre, but also in Fair Haven

10   against other targets?

11   A    We're all over New Haven County at the time, so we're

12   covering a pretty large area, covering multiple phones

13   utilized by several individuals.

14   Q    Ultimately, in May of 2012, were all of the arrests made

15   in connection with this investigation?

16   A    Yes.

17   Q    Approximately how many people were ultimately arrested in

18   connection with this investigation?

19   A    105.

20   Q    Were there other instances during the wiretap, during the

21   time frame of September 2011 through January 2012, where

22   targets of this case were changing phones?

23   A    Yes.

24   Q    All right.  Were there targets that were dropping phones?

25   A    Yes.
```

1  Q    And did those targets drop phones in response to

2  enforcement activity?

3  A    Yes.

4  Q    And is one of the things that you do when conducting

5  surveillance is try not to get made?

6  A    Yes.

7  Q    And what do I mean by that?

8  A    That means you want to make sure that they don't notice

9  that law enforcement officers are following them around.

10 Q    And what is the time period that a wiretap is good for?

11 A    Thirty days.

12 Q    And what do you have to do if you want to continue on

13 that phone beyond 30 days?

14 A    You have to show probable cause that you have not reached

15 your ultimate goal.

16 Q    And did you do that for Kevin Wilson's phone to get

17 successive 30-day periods?

18 A    We had to do several 30-day periods, yes.

19 Q    What happens if a target dumps a phone you're

20 wiretapping?

21 A    Sets back the investigation if the wiretap on that phone

22 is terminated, and it sets back the investigation.

23 Q    What do you then have to do to get back up on that

24 target's new phone?

25 A    Reestablish, identify the phone and then establish, the

```
1    probable cause that that phone is being utilized in
2    furtherance of narcotics activities.
3    Q    And how long does it take typically to get wire
4    authorization on a new phone?
5    A    It varies.  A week, two weeks.
6    Q    All right.  We went through a number of different phones
7    that belonged to Richard Anderson and also belonged to Philip
8    Bryant.
9    A    Yes.
10   Q    What were the -- what was the -- subscriber information
11   on those phones?  Were any of them in the names of Philip
12   Bryant or Richard Anderson?
13   A    No, they were prepaid phones.
14   Q    All right.  I'm going to turn to Philip Bryant.
15              MR. VATTI:  I've called up Government's Exhibit 230.
16   Q    What are we looking at there?
17   A    That's a photo of Kevin Wilson's phone.  That's actually
18   the phone book of his phone, and one of the listed names was
19   Phizzy, phone number 203-435-3420.
20   Q    All right.  There are two additional phones, correct,
21   that were listed?
22   A    Yes.
23   Q    What were those?
24   A    203-606-4469 and 203-843-7249.
25   Q    All right.  There were additional phone numbers in which
```

1    the user of the phone was referred to by the nickname Phizzy?

2    A    Yes.

3    Q    Incidentally, I've spelled it F-E-E-Z-Y.  Is that the way

4    monitors intercepting the calls phonetically spelled it?

5    A    They spelled it like that, they spelled it P-H.

6    Q    It varied?

7    A    It was different, yes.

8    Q    In Kevin Wilson's phone, it was spelled P-H-I-Z-Z-Y?

9    A    Right.

10   Q    This phone was seized on January 3rd, 2012, when he was

11   arrested?

12   A    Yes.

13          MR. VATTI:  I'm going to call up Government's

14   Exhibit 92.

15   Q    Can you tell us the date and time of the call?

16   A    October 18th, 2011, 3:04 p.m., phone call between Philip

17   Bryant, Kevin Wilson.

18   Q    All right.  Now, the two numbers that are not listed in

19   the contact section, did you do a voice comparison with the

20   other phones?

21   A    Yes.

22   Q    And are you satisfied that the voice on all five phones

23   was the same?

24   A    Yes.

25   Q    And the calls that we are going to play regarding Philip

```
 1   Bryant, were they all intercepted on one of those five phones?

 2   A    Yes.

 3              (Government's Exhibit 92, an audio recording,

 4   played.)

 5   Q    All right.

 6              MR. VATTI:  Now I'm going to call up Government's

 7   Exhibit 94.

 8   Q    What's the date and time of this call, and who are the

 9   participants?

10   A    Exhibit 94, October 20th, 2011, at 6:07 p.m., phone call

11   between Philip Bryant and Kevin Wilson.

12              (Government's Exhibit 94, an audio recording,

13   played.)

14   Q    All right.  In that call, did Mr. Bryant indicate that

15   his boy had 150?

16   A    Yes.

17              MR. VATTI:  Now I'm going to call up Government's

18   Exhibit 95.

19   Q    Incidentally, the previous call, Government's Exhibit 92,

20   did Mr. Bryant reference having a quick 300?

21   A    Yes.

22   Q    What's the date and time of Government's Exhibit 95, and

23   who are the participants?

24   A    October 23rd, 2011, 9:02 p.m., phone call between Kevin

25   Wilson and Philip Bryant.
```

1          (Government's Exhibit 95, an audio recording,

2  played.)

3  Q    All right.  In that call, did Mr. Bryant indicate that he

4  was in the yard right now?

5  A    Yes.

6  Q    All right.  And Mr. Wilson indicated that he was going to

7  put two together?

8  A    Yes.

9  Q    All right.  And then did Mr. Bryant indicate, "Yeah, but

10  just put it separate, put it like one and then one"?

11  A    Yes.

12          MR. VATTI:  I'm going to call up Government's

13  Exhibit 96.

14  Q    What's the date and time of the call?

15  A    October 27th, 2011, 5:32 p.m., phone call between Philip

16  Bryant and Kevin Wilson.

17          (Government's Exhibit 96, an audio recording,

18  played.)

19  Q    All right.  In that call, did Philip Bryant ask, "Eh, you

20  got three of them things"?

21  A    Yes.

22  Q    Did he say, "You got a way to bring it to me"?

23  A    Yes.

24          MR. VATTI:  Next I'm going to call up Government's

25  Exhibit 97.

1   Q   What's the date and time of the call?

2   A   October 30th, 2011, 1:07 p.m., phone call between Philip

3   Bryant, Kevin Wilson.

4         (Government's Exhibit 97, an audio recording,

5   played.)

6   Q   All right.  In that call, did Mr. Bryant say, "275 for

7   four"?

8   A   Yes.

9   Q   All right.  And did Mr. Wilson indicate, "They all in

10   buns, man"?

11   A   Yes.

12   Q   All right.  And did Mr. Wilson also indicate, "250 for a

13   brick"?

14   A   Yes.

15   Q   Mr. Wilson also indicated, "Tell him 250 for a brick,"

16   and Mr. Bryant said, "All Right"?

17   A   Yes.

18         MR. VATTI:  Call up Government's Exhibit 98.

19   Q   What's the date and time of the call?

20   A   November 1st, 2011, 8:47 p.m., phone call between Philip

21   Bryant and Kevin Wilson.

22         (Government's Exhibit 98, an audio recording,

23   played.)

24   Q   All right.  In that call, did Mr. Bryant ask, "50,

25   right"?

```
 1   A    Yes.

 2   Q    Mr. Wilson said, "Yeah"?

 3   A    Yes.

 4            MR. VATTI:  I'm next going to play Government's

 5   Exhibit 100.

 6   Q    What's the date and time of the call?

 7   A    November 4th, 2011, 9:22 p.m., phone call between Philip

 8   Bryant and Kevin Wilson.

 9            (Government's Exhibit 100, an audio recording,

10   played.)

11   Q    All right.  In that call, did Philip Bryant state, "I'll

12   try to help you if I could.  You sell 50s, right"?

13   A    Yes.

14   Q    Wilson indicated, "Yup yup for the rubber bands"?

15   A    Yes.

16            MR. VATTI:  I'm next going to play a clip from

17   Government's Exhibit 101, since it's a long call.

18   Q    First tell us the date and time of Exhibit 101.

19   A    November 5th, 2011, 8:25 a.m., phone call between Philip

20   Bryant and Kevin Wilson.

21   Q    All right.  This call was intercepted on 203 -- strike

22   that question, please.

23            Mr. Bryant was using 203-435-3420?

24   A    Yes.

25            (An excerpt of Government's Exhibit 101, an audio
```

1   recording, played.)

2   Q    All right.  There was a portion of the conversation where

3   Mr. Wilson said, "All you got to do is tell the D, the D

4   friends that you got the rubber bands for 75 and I'm going to

5   charge you 50"?

6   A    Yes.

7   Q    Mr. Bryant indicated, "I'm going to tell them 65"?

8   A    Yes.

9   Q    Did Mr. Wilson then respond, "Oh shit ain't nothing

10  people be selling them shits for 90, $75, 75 is like the

11  coping price, you could say 65 it don't matter, I'm a charge

12  you 50 though"?

13  A    Yes.

14  Q    Mr. Bryant said, "I'm a do it, I'm definitely gonna get

15  on that shit"?

16  A    Yes.

17         MR. VATTI:  Now I'm going to play Government's

18  Exhibit 102.

19         (Government's Exhibit 102, an audio recording,

20  played.)

21  Q    Was Rudy a nickname that was used by Kevin Wilson?

22  A    Yes.  Want me to identify the date and time of the call?

23  Q    Yes.

24  A    November 8th, 2011, approximately 5:10 p.m., phone call

25  between Philip Bryant and Kevin Wilson.  And yes, Rudy was a

1    nickname for Kevin Wilson.

2              MR. VATTI:  I'm next going to call up Government's

3    Exhibit 103.

4    Q   What's the date and time of that call?  I'm sorry, it's a

5    text message.

6    A   November 11th, 2011, at 6:59 p.m., incoming text message

7    from Philip Bryant to Kevin Wilson.

8    Q   What does the text message say?

9    A   "My nigga I'm not trying to play you.  I'm trying to see

10   you dead right.  That night I got low either lost some bread

11   or somebody stole from me.  But fuck all t."

12             MR. VATTI:  Now I'm going to call up Government's

13   Exhibit 104.  It's another text message.

14   Q   What's the date and time?

15   A   November 11th, 2011, 6:59 p.m., incoming text from Philip

16   Bryant to Kevin Wilson.

17   Q   What does it say?

18   A   "Hat you will have your bread just give me a few, my wife

19   don't even no but I got you.  My fault."

20             MR. VATTI:  Now I'm going to call up Government's

21   Exhibit 105.

22   Q   What's the date and time of this call?

23   A   November 23rd -- I'm sorry, you said 105?

24   Q   Yes.

25   A   November 23 rd, 2011, at 8:13 p.m., phone call between

1   Jackie Valentine and Kevin Wilson.

2          (Government's Exhibit 105, an audio recording,

3   played.)

4   Q   All right.  Is Jackie Valentine somebody that was

5   arrested and charged in connection with this case?

6   A   Yes.

7   Q   And there's a reference in here to an individual named

8   Gutter.

9   A   Yes.

10  Q   Is there an individual whose nickname was Gutter that was

11  arrested and charged in connection with this case?

12  A   Yes.

13  Q   And who's that?

14  A   Quiyon Reid.

15         MR. VATTI:  Going on to Government's Exhibit 110.

16  Q   What's the date and time of this call?

17  A   December 17, 2011, 8:19 p.m., phone call between Philip

18  Bryant and Kevin Wilson.

19         (Government's Exhibit 110, an audio recording,

20  played.)

21  Q   All right.  In that call, did Philip Bryant indicate,

22  "I'm gonna need you to be around, it's probably like 250 or

23  something, I'm a call you right back"?

24  A   Yes.

25  Q   There was also a discussion of, "Oh, 65 straight"?

1   A    Yes.

2   Q    Mr. Wilson indicated, "Depends on who you talking to

3   though, are you talking to a street dude or are you talking to

4   a fiend"?

5   A    Yes.

6          MR. VATTI:  Now I'm going to call up Government's

7   Exhibit 112.

8   Q    What's the date and time of the call?

9   A    December 19th, 2011, 12:39 p.m., phone call between Kevin

10  Wilson and Philip Bryant.

11         (Government's Exhibit 112, an audio recording,

12  played.)

13  Q    All right.  I want to go back to the events of January

14  3rd, 2012.

15  A    Okay.

16         MR. VATTI:  I'm going to start by playing

17  Government's Exhibit 1.

18  Q    Can you tell us the date and time of the call, and who

19  the participants are?

20  A    Exhibit 1 is a phone call intercepted on January 3rd,

21  2012, 1:46 p.m., phone call between Kevin Wilson and Johnny De

22  Los Santos.

23         (Government's Exhibit 1, an audio recording,

24  played.)

25         MR. VATTI:  I'm going to now play Government's

```
 1    Exhibit 2.

 2    Q    Can you tell us the date?

 3    A    Sure.  January 3rd, 2012, 9:41 p.m., phone call between

 4    Kevin Wilson and Johnny De Los Santos.

 5              (Government's Exhibit 2, an audio recording,

 6    played.)

 7    Q    All right.  Were these the calls that preceded the

 8    traffic stop and arrest of Kevin Wilson on January 3rd, 2012?

 9    A    Yes.

10    Q    And you indicated that approximately 150 grams of heroin

11    was seized from Kevin Wilson during that traffic stop?

12    A    Yes.

13    Q    All right.  And did Mr. Wilson subsequently give consent

14    for the search of his apartment at 139 Day Street?

15    A    Yes, apartment No. 8.

16    Q    All right.  I want to talk a little bit about Gilbert and

17    Pierre Galan.

18              MR. VATTI:  I'm going to call up Government's

19    Exhibit 212.

20    Q    Do you know who that is?

21    A    That's Gilbert Galan, also known as Skittles.

22              MR. VATTI:  Now I'm going to call up Government's

23    Exhibit 215.

24    Q    Who's that?

25    A    That's Pierre Galan, also known as PLO.
```

1          MR. VATTI:  I'm now going to call up Government's

2    Exhibit 115.

3    Q    Can you tell us the date and time of the call?

4    A    Phone call intercepted October 25th, 2011, 9:44 a.m.,

5    phone call between Gilbert Galan and Kevin Wilson.

6          (Government's Exhibit 115, an audio recording,

7    played.)

8    Q    In that call, did Mr. Wilson instruct Mr. Galan to get

9    one of the rubber bands?

10   A    Yes.

11   Q    Mr. Wilson referenced an individual named Baller.  Was

12   there an individual with that nickname that was arrested and

13   charged in connection with this case?

14   A    Yes.

15   Q    And do you remember who that was?

16   A    I believe Darrell -- I can't recall -- Davis I believe.

17   Q    Darrell Davis?

18   A    Yes.

19          MR. VATTI:  I'm going to call up Government's

20   Exhibit 118.

21   Q    What's the date and time of the call, and who was

22   involved?

23   A    November 28th, 2011, 2:16 p.m., phone call between Kevin

24   Wilson and Pierre Galan.

25          (Government's Exhibit 118, an audio recording,

1    played.)

2    Q    All right.  In that call, does Mr. Wilson indicate that

3    Pierre Galan should go upstairs and grab two bands?

4    A    Yes.

5    Q    Where was the Galans' apartment in relation to

6    Mr. Wilson's apartment?

7    A    The apartment was on the second floor, apartment No. 4;

8    and Kevin Wilson's apartment was upstairs, apartment No. 8.

9            MR. VATTI:  I'm going to call up Government's

10   Exhibit 119.

11   Q    What's the date and time of this call?

12   A    December 17th, 2011, phone call intercepted at

13   approximately 8:24 p.m., phone call between Kevin Wilson and

14   Pierre Galan.

15           (Government's Exhibit 119, an audio recording,

16   played.)

17   Q    All right.  In this call, was there a reference by Pierre

18   Galan to "four bands"?

19   A    Yes.

20   Q    All right.  Going back to the events of January 3rd,

21   after Mr. Wilson gave the consent to search his apartment at

22   139 Day Street, what happened?

23   A    As law enforcement officers proceeded inside the

24   apartment, up the stairs to go to the third floor, they

25   observed one of the Galan brothers, Gilbert Galan, come down

1    the stairs and quickly enter the apartment.

2          At that time, law enforcement officers looked up

3    above and they saw the door to the apartment No. 8, Kevin

4    Wilson apartment, was open, the keys were still in the

5    cylinder.  And right by apartment No. 4, right by the door on

6    the left-hand side, they observed a box, the cover of a

7    electric blender, some alcohol wipes, which was consistent, is

8    consistent, with distribution of narcotics.

9          As some of the officers proceeded up to the third

10   floor, apartment No. 8, they secured that location, make sure

11   no one else was in there, other officers knocked on the door

12   of Mr. Galan's apartment.

13         Subsequently, both brothers exited the apartment.

14   Law enforcement proceeded inside.  They heard the toilet water

15   running.  They went inside the bathroom.  There were two

16   bundles of heroin floating inside the toilet bowl.  There was

17   uncooked rice on the seat.  And then inside the bathtub was a

18   small box with several glassine bags which are used to package

19   heroin, as well as a white pad, ink pad, that they use to

20   stamp the bags, as well as the electric blender was found on

21   the floor of the bathroom.

22   Q    When you say blender, do you mean grinder?

23   A    Grinder, I'm sorry.

24         MR. VATTI:  I'm going to call up Government's

25   Exhibit 216.

1    Q    Was Kevin Wilson's apartment actually searched?

2    A    It was, yes.

3    Q    And tell us what we're looking at in Government's Exhibit

4    216.

5    A    That's a firearm that was located inside Kevin Wilson's

6    bedroom on top of the stereo.

7         MR. VATTI:  I'm now going to call up Government's

8    Exhibit 217.

9    Q    What are we looking at there?

10   A    That's the box containing the cap of the grinder which

11   was located right by the front door of apartment No. 4, which

12   belonged to the Galan brothers.

13   Q    And you mentioned also some alcohol wipes.  Are those in

14   that box?

15   A    Yes, and the small black brush.

16        MR. VATTI:  I'm now calling up Government's Exhibit

17   218.

18   Q    What are we looking at there?

19   A    Two bundles of heroin still floating in the water.

20        MR. VATTI:  I'm now going to call up Government's

21   Exhibit 219.

22   Q    What are we looking at there?

23   A    It was a bulletproof vest located in the living room of

24   apartment No. 4, Pierre Galan's apartment.

25        MR. VATTI:  I'm now calling up Government's Exhibit

220.

Q    What are we looking at there?

A    That's the box containing the glassine bags, a scale, as
well as the white, the small white square.  That's the ink pad
that was inside the bathroom of apartment No. 4.

         MR. VATTI:  I'm now going to call up Government's
Exhibit 221.

Q    What are we looking at there?

A    That's the grinder that I described before, located on
the bathroom floor.

Q    Were these all photographed in the locations where they
were found?

A    Yes.

         MR. VATTI:  I'm now going to call up Government's
Exhibit 222.

Q    What are we looking at there?

A    That's one of the firearms located inside the Galan
brothers' apartment.

         MR. VATTI:  I'm now going to call up Government's
Exhibit 223.

Q    And what are we looking at there?

A    That was a second firearm located inside the sock which
was inside a plastic bag located inside the closet.

Q    Of which apartment?

A    Of apartment No. 4, which belonged to the Galan brothers.

```
 1              MR. VATTI:  May I approach, your Honor?
 2              THE COURT:  Yes, sir.
 3   Q    I'm going to start with what's been marked as government
 4   exhibits 301 and 302.  Can you tell us what's inside the
 5   envelopes that are in those evidence bags?
 6   A    301 is a digital scale.  It's a digital scale.
 7              302 is the ink pad.  Ink, ink pad, that was found
 8   inside the bathtub in the Galans' apartment.
 9              MR. VATTI:  May I approach, your Honor?
10              THE COURT:  Yes, sir.
11   Q    I'm going to give you exhibits 303 and 304.  Can you tell
12   us what those are?
13   A    This is the cardboard box containing the glassine bags.
14   That's Exhibit 303.
15              And 304 is the cap of the grinder which was located
16   by the front door of apartment No. 4.
17   Q    I'm going to hand you 305, 306, and 307.  Can you tell us
18   what's in those evidence bags?
19   A    305 is the grinder.
20              306 is the consent to search form.  And then consent
21   to search for apartment No. 8, Kevin Wilson's apartment,
22   consent to search farm.
23              And 307, it's a digital scale which is missing the
24   back cover, which was also located in Kevin Wilson's
25   apartment.
```

```
 1              MR. VATTI:  Your Honor, just for the record, all of

 2    those physical exhibits are inside brown envelopes.  I'm not

 3    going to bother having the agent open them now, but if at some

 4    point the jury does want to see them, we're certainly happy to

 5    cut open the envelopes at that point.  There's no reason to

 6    take up time with that now.

 7              THE COURT:  All right.

 8              MR. VATTI:  May I approach?

 9              THE COURT:  Yes.

10         MR. VATTI:  Your Honor, I'm going to play a few more

11    calls, and then I think if you want to take the morning break,

12    we can do that.

13              THE COURT:  Fine.

14         MR. VATTI:  I'm going to call up Government's

15    Exhibit 51.

16    Q    Can you tell us the date and time of the call and who the

17    participants are?  That's 51.

18    A    51, it's a text message.

19    Q    I'm sorry.  Can you read it for us?

20    A    Sure.

21    Q    And tell us the date and time?

22    A    Text message on November 20, 2011, 10:38 a.m.  Incoming

23    text message from Richard Anderson to Kevin Wilson.  "I need 1

24    bad."

25              MR. VATTI:  I'm going to call up Government's
```

1    Exhibit 52.

2    Q    What's the date and time of that text?

3    A    November 28th, 2011, 10:39 in the morning, outgoing text

4    from Kevin Wilson to Richard Anderson.  "I'm have PLO give it

5    to you."

6           MR. VATTI:  Now I'm going to call up Government's

7    Exhibit 53.

8    Q    What's the date and time of this text?

9    A    November 28th, 2011, 10:40 a.m., incoming text from

10   Richard Anderson to Kevin Wilson, "All right, tell him 2 hit

11   me."

12          MR. VATTI:  Your Honor, I think this is a good time

13   to take our morning break, if you would like to do that.

14          THE COURT:  Be happy to, yes.

15          We'll be in recess, ladies and gentlemen, for 15

16   minutes.

17          (In the absence of the jury:  11:43 o'clock a.m.)

18          MR. SILVERMAN:  Your Honor, just very briefly, the

19   government's intention at this point would be to take a break

20   in Agent Ndrenika's testimony when the jury returns and try to

21   squeeze in two very short witnesses, or at least get through

22   one of them before the lunch break.  We discussed this

23   yesterday after the close of court for the day.

24          THE COURT:  Yes.

25          MR. SILVERMAN:  We have two short witnesses who came

```
 1   from some distance to be here, and we wanted to see if we
 2   could get through them before the lunch break if possible.
 3   Yesterday, defense counsel had no objection to proceeding out
 4   of order, and with the Court's indulgence, we would like to
 5   call those other witnesses and then resume with Agent Ndrenika
 6   when they're done.
 7             THE COURT:  No objection, gentlemen?
 8             MR. REEVE:  No objection, your Honor.  Again, more
 9   gun evidence, totally separate from Mr. Santos.  Objection,
10   move for severance.  Thank you, your Honor.
11             MR. ROGAN:  Your Honor, same thing for my client,
12   Mr. Anderson.
13             THE COURT:  Yes.
14             MR. REEVE:  I understand the Court's ruling is
15   denied as to both things.
16             THE COURT:  Yes.
17             MR. REEVE:  Just wanted to complete the loop, your
18   Honor.
19             (Recess:  11:44 o'clock a.m. to 12:12 o'clock p.m.,
20   in the absence of the jury.)
21             THE COURT:  Please be seated.  Anything before we
22   have the jury, gentlemen?  No?
23             MR. SILVERMAN:  Nothing from the government.
24             MR. REEVE:  No, your Honor.
25             MR. MORAGHAN:  No, your Honor.
```

```
 1              THE COURT:  All right.  May we have the jury then?

 2              (In the presence of the jury:  12:14 o'clock p.m.)

 3              MR. SILVERMAN:  Your Honor, having cleared this with

 4     the Court before the jury came back in, the government plans

 5     to go out of turn now.  We would like to call Brian Hall as a

 6     witness, and return to Special Agent Ndrenika during the day.

 7              THE COURT:  Very well.

 8                        B R I A N   H A L L

 9          having been called as a witness, was first

10          duly sworn and testified on his oath as follows:

11              THE CLERK:  Please be seated.  State your name for

12     the record, spell your last name, and please state your

13     address by city and state only.

14              THE WITNESS:  Brian Hall, H-A-L-L; New York, New

15     York.

16     DIRECT EXAMINATION

17     BY MR. SILVERMAN:

18     Q    Good afternoon, sir.

19     A    Good afternoon.

20     Q    Would you tell the jury how you're employed?

21     A    I'm employed with the Drug Enforcement Administration.

22     Q    And what is your title with the DEA?

23     A    Senior forensic chemist.

24     Q    How long have you been with the DEA?

25     A    Next month will be 14 years.
```

1   Q    What are your responsibilities as a senior forensic

2   chemist?

3   A    I analyze evidence for the presence or absence of drugs,

4   I write reports, and I testify when necessary.

5   Q    Let's go back to your training and your education.  Could

6   you walk the jury through your educational background?

7   A    Yes.  I have an associate's in biology from Nassau

8   Community College and I have a bachelor's and master's in

9   toxicology, with a minor in chemistry, from St. John's

10  University.

11  Q    When did you graduate with those degrees?

12  A    All of them or just the last one?

13  Q    Just the last one.

14  A    That was 1992.

15  Q    What did you do after your graduation with that master's

16  degree?

17  A    I did clinical and forensic toxicology for ten years.

18  Q    After that?

19  A    I joined the DEA.

20  Q    At the time you joined the DEA, then, was it roughly

21  2002?

22  A    2000.

23  Q    2000, okay.  At the time that you joined the DEA, did you

24  undertake any particular training?

25  A    Yes, I had a six-month training course up in the

1   Northeast Laboratory, as well as a five-month training course

2   down in Quantico, Virginia.

3   Q    What was covered at those two training courses?

4   A    The one in the Northeast Laboratory basically how to

5   analyze evidence, report it, as well as testify in court; and

6   the other was basically an introduction to the DEA, as well as

7   clandestine laboratory safety course.

8   Q    So since 2000 and undergoing those two trainings that you

9   just described, have you had refresher trainings periodically?

10  A    Yes, we do.  We've had some either from inside the DEA or

11  as well as outside vendors, such as adjunct.

12  Q    And have you testified on prior occasions in courts?

13  A    Yes, I have.

14  Q    Approximately how many times?

15  A    Around 35 times.  35, 36, somewhere in that area.

16  Q    What, roughly what, percentage of that was in federal

17  court?

18  A    I would have to say probably 80 percent.

19  Q    And on those prior occasions, have you been qualified as

20  an expert witness?

21  A    Yes, I have.

22           MR. SILVERMAN:  Your Honor, at this time, I move for

23  Mr. Hall to testify as an expert witness.

24           MR. REEVE:  No objection, your Honor.

25           MR. MORAGHAN:  No objection, your Honor.

1          MR. ROGAN:  No objection, your Honor.

2          THE COURT:  So qualified.

3          MR. SILVERMAN:   Thank you.

4    Q    I'd like to start, Mr. Hall, with what happens when

5    you're assigned an item of evidence to analyze in your

6    capacity as a forensic chemist with the DEA, just the very

7    beginning of working with a new item of evidence.

8    A    Well, it will come into the laboratory.  The evidence

9    technician will log it in, and it will be distributed to the

10   appropriate groups, based upon the last number of the case

11   number, and then the supervisor will then distribute it

12   amongst the chemists.

13          And then when you get the evidence, and you decide

14   to take it out, you'll take the DEA 7, which is the paperwork

15   that comes with the evidence, go back to the vault, and

16   retrieve it.

17   Q    So when an item of evidence comes into the lab that you

18   work at, it's logged in and it goes in a vault?

19   A    Yes.

20   Q    Is that for safe keeping?

21   A    Yes, it's a locked vault.  Yes.

22   Q    And when you have been assigned an item of evidence and

23   you're ready to start working on it, you go to that vault to

24   retrieve it?

25   A    Yes, I do.

```
1   Q    What are the first things you do after retrieving it from

2   the vault?

3   A    I will make sure that the seals are intact, as nothing's

4   been open, broken, nothing's ripped or anything.  If it has, I

5   return it to the vault and will go to my supervisor and find

6   out what to do with it then.

7   Q    Assuming that the seals are intact, what do you do with

8   the item of evidence?

9   A    I will take it and get a gross weight of the package, and

10  then begin to describe the evidence as I can see it through

11  the packaging.

12  Q    A minute ago, you used the term "gross weight."  What

13  does that mean?

14  A    A gross weight is the entire weight of the package.  It

15  includes the actual heat seal, everything.  Not just the stuff

16  that's inside, or the powder or liquid, whatever the sample

17  is.

18  Q    So after you've taken the gross weight and written down a

19  description of what you can see through the bag, what do you

20  do next?

21  A    I open it up and then I proceed to describe the evidence

22  and obtain a net weight.

23  Q    What is a net weight versus a gross weight?

24  A    A net weight is just the weight of the material, not --

25  without any packaging.
```

1    Q    This is Government's Exhibit 240.  I wonder if you might

2    demonstrate gross weight/net weight to the jury using this as

3    an example.

4    A    The gross weight would be this entire package as you see

5    right here.  The net weight would be just the material inside

6    this bag, without the weight of the bag.

7    Q    Okay.  After you've taken the net weight, what do you do

8    next?

9    A    I will begin to analyze it.

10   Q    What do you do in your analysis?

11   A    It depends, if there's multiple samples or there's a

12   single sample.

13   Q    If there's a single sample, what would you do?

14   A    Basically, I'll run it through a series of tests.  I will

15   grind it up first and run it through a series of tests.

16   Q    Why do you grind it up?

17   A    Basically, you don't want -- you want to make sure it's

18   homogeneous, so there's not a hot spot where you may be

19   getting more material or less material.  You want to make

20   it -- mix it thoroughly.  Like when you make a cake, you want

21   everything distributed, all the flour and sugar mixed

22   together.

23   Q    For a single unit you're testing, you'll grind it up so

24   it's homogeneous and run tests.  Those tests may be

25   complicated.  If you could try to describe it to the jury in

```
 1    as simple a way as possible for all of us.

 2    A    Primary test we use is gas chromatography-mass

 3    spectrometry.  It's a abbreviated GCMS, and basically, what it

 4    is you'll take a sample, a little bit of the sample, and place

 5    it in a liquid and then you inject this liquid onto this

 6    instrument called a gas chromatograph.

 7         It's basically like a race where everything starts

 8    out at the same point, but not everybody finishes at the same

 9    point.  As it passes through the end of what they call the

10    column, it will come to the mass spectrometer.  And it's like

11    a photo finish there.  As it comes through, it will take like

12    a picture of it and you'll get an I.D. of what the sample is

13    of what's coming through at that time.

14    Q    So when you have those photo finish pictures that you

15    described a moment ago, are you able to use those to identify

16    the substance that you're analyzing?

17    A    Yes, we do.  We match it up to a known standard, if we

18    can, if it does match; or, if it doesn't match, we obviously

19    don't match it.

20    Q    Go ahead, I'm sorry.

21    A    We also use something called Fourier transform infrared

22    spectroscopy is another technique, abbreviated FTIR.  And

23    basically this, you take a little bit of sample, put it on the

24    instrument, and you bombard it with infrared light, and the

25    amount of infrared light absorbed gives you a spectrum, like a
```

1    fingerprint, and you match it to a known standard or you don't

2    match it, if it doesn't match.

3    Q    In addition to the GCMS and the FTIR tests, if I got that

4    right, are there other tests you might use, depending on the

5    substance, and the results of those two first tests?

6    A    Yes, we also have something called just a gas

7    chromatograph flame ionization detector.  It's very similar as

8    the GCMS, where you put something, dissolve it in a liquid and

9    inject it on a gas chromatograph, but this does not have the

10   photo finish.  It's just like a buzzer when you walk through

11   the door, it's letting you know something's coming through.

12   Based upon the time something is coming off, that will

13   indicate what compound it is.

14   Q    So if you have a single unit, you might run it through

15   all three of these tests, or some combination of tests, and

16   hopefully at the end be able to compare it and determine what

17   substance is or is not in the sample?

18   A    Yes.

19   Q    Okay.  What if you have multiple units in the item of

20   evidence, what would you do in those circumstances?

21   A    When there's multiple items, what we will do prior to

22   making the grinding composite, we're going to have to test a

23   certain number of samples dictated by the sampling plan we

24   have at the Drug Enforcement Administration.  We'll check the

25   tables and, depending upon how many units we have, we'll have

```
 1    to sample a certain number of units and we'll screen these

 2    individually, and if they're all the same, they all come out

 3    the same, we can actually combine and we use GCMS to analyze

 4    that.

 5              Sometimes we'll use a color test where we just place

 6    some samples in a dish and add a coloring agent and if it

 7    turns a certain color, we know.  It's another test we use to

 8    confirm that it is, you know, a controlled substance that

 9    we're looking for.

10    Q    So if you had 100 units in a particular item of evidence,

11    would you necessarily test all hundred units in this composite

12    process?

13    A    No.

14    Q    You might take a subset for the test?

15    A    Definitely.  I believe it's 25.

16    Q    Okay.  Okay.  And then how do your techniques or your

17    analysis, how does it differ if all you have is a residue of a

18    suspected controlled substance?

19    A    Well, a residue is basically we only have a one-shot deal

20    to get it, so what we have to do is run what we call

21    instrumental blank and procedural blank to make sure there's

22    no contaminants at all prior to analyzing the substance, and

23    we can only proceed if both of them are clean and negative.

24    And then if it is, then we will proceed and usually use GCMS

25    to analyze it.
```

1    Q    You testified a moment ago that when you only have

2    residue, it's sort of a one-shot, you have one attempt.  Why

3    is that?

4    A    It's such a small amount.

5    Q    The process of analyzing these drugs, is it destructive

6    of the drugs that you're actually analyzing?

7    A    Yes.

8    Q    All right.  So if you started with a certain weight and

9    you did your analysis, you would end with a smaller weight?

10   A    Yes, we would.

11   Q    Okay.  When you're done analyzing a sample, what do you

12   do?

13   A    What we will do is seal it up in a substitute bag and get

14   a reserve weight, that's the amount of sample that's, that we

15   have retained after all the analysis has been complete.  Then

16   we will seal it back up in the heat seal, describe the

17   evidence, and return it to the vault, and then we'll proceed

18   to write the report from our notes.

19   Q    Do you typically write that report right after or very

20   soon after you've completed your analysis of the substance?

21   A    Yes.

22   Q    And do you write those reports in the regular course of

23   your business as a drug laboratory?

24   A    Yes, we do.

25   Q    And do you maintain those reports in the regular course

1    of your business as a drug laboratory?

2    A    Yes, we do.

3    Q    Could you take a look at government -- you have an

4    exhibit binder in front of you on the witness stand.  Could

5    you take a look at government exhibits 231 through 238?

6            What are government exhibits 231 through 238?

7    A    These are reports that I have prepared.

8    Q    Does your signature appear on each of the reports?

9    A    Yes, it does.

10           MR. SILVERMAN:  Your Honor, at this time, I move for

11   the admission of government exhibits 231 through 238.

12           MR. MORAGHAN:  No objection.

13           MR. REEVE:  No objection.

14           MR. ROGAN:  No objection.

15           THE COURT:  Thank you.  They may be marked.

16   Q    I want to start with 231 as an example, so you can sort

17   of walk the jury through what goes into one of these reports.

18   I'm going to pull it up on the screen.  You also have the

19   version in front of you.

20           But on the screen, I'm going to blow up a portion of

21   the report under the header "Results and Conclusions."  The

22   first column there is exhibit number, do you see that?

23   A    Yes.

24   Q    What is the exhibit number on this report?

25   A    That's the exhibit number that the agent assigned to the

1    case, this particular exhibit, particular substance.

2    Q    Is this Exhibit 4?

3    A    Yes.

4    Q    The report related to Exhibit 4?

5    A    Yes.

6    Q    What is the next column that appears?

7    A    That's the lab number.  That's the number that the

8    evidence technician assigns in the lab.  That's how we

9    basically go about retrieving it and keeping track of it.

10   Q    And what's the next column?

11   A    Is the active drug ingredient.

12   Q    So what is DEA Exhibit No. 4?

13   A    Cocaine base.

14   Q    Let me pause for a second on cocaine base.  Is there a

15   difference between cocaine hydrochloride and cocaine base?

16   A    Yes, there is.

17   Q    Can you briefly explain the difference between the two?

18   A    Basically, cocaine base is smoked.  It has to be smoked

19   in order to be taken into the body.  Whereas powder cocaine,

20   or cocaine hydrochloride, can be snorted.  They have the same

21   pharmacology, they do the same thing in the body, but have

22   different physical properties and therefore, they go into the

23   body in different routes.

24   Q    Okay.  Is the next column gross weight?

25   A    Yes, it is.

```
 1   Q    And that's what you told us earlier is the substance plus
 2   all of the packaging materials?
 3   A    Yes.
 4   Q    What is the gross weight for this one DEA exhibit No. 4?
 5   A    58.7 grams.
 6   Q    What's the next column?
 7   A    That's the net weight.
 8   Q    What is the net weight of DEA Exhibit 4?
 9   A    It's 26.3 grams.
10   Q    Do you see a parenthetical right underneath that?
11   A    Yes.
12   Q    What is that?
13   A    That's what they call the uncertainty statement.  Each
14   weight has a little uncertainty associated with it, based upon
15   the type of balance you use.  This balance had a plus or minus
16   uncertainty of .302 grams.
17   Q    What's the next column after net weight?
18   A    That's the concentration.
19   Q    Is that also called purity?
20   A    Yes, as well as purity.
21   Q    What does that measure?
22   A    That tells you how much a percentage of the cocaine base
23   was actually in the sample.
24   Q    In the sample, the 26.3 grams net weight, is that all
25   cocaine base?
```

```
1    A      No, it's 47.1 percent of it is cocaine base.

2    Q      Okay.  What's the other roughly 53 percent?

3    A      It could be anything.  It could be alkaloids, it could be

4    cuts, it could be diluents.

5    Q      What's the next column after concentration or purity?

6    A      That's the amount of the actual drug.

7    Q      How do you reach that number?

8    A      That is simply the net weight multiplied by the

9    concentration of purity.

10   Q      What is the last column?

11   A      Reserve weight.

12   Q      And that's what we talked about before, the amount that's

13   left after your testing is completed?

14   A      Yes.

15   Q      Okay.  And then on this particular report, there's also a

16   section for remarks.  What did you put under remarks?

17   A      It also contains a substance known as

18   phenyltetrahydroimidazothiazole.

19   Q      I'm not even going to try to pronounce that.  What is

20   that substance?

21   A      It's a common adulterant that you see in cocaine.

22   Q      Let's go through each report and do it relatively quickly

23   with your conclusions, each of the eight reports.  We just

24   went through the first one.  I'll hand you the drug exhibits,

25   and before you start, I'll ask you whether these exhibits line
```

1    up to the reports that you have in front of you.

2            These bags are marked government exhibits 240

3    through 247.  They're full exhibits.  Just take a look and see

4    if these exhibits correspond to your reports.

5    A    Yes, they do.

6            MR. SILVERMAN:  May I approach, your Honor?

7    Q    You have limited room, so I'll take these back from you.

8    I'll just ask:  Did they go in order?  In other words, did

9    your lab report, as Government's Exhibit 231, correspond to

10   Government's Exhibit 240?

11   A    Yes, they did.

12   Q    And then 232 to 241?

13   A    Yes.

14   Q    233 to 242?

15   A    Yes.

16   Q    And so on?

17   A    Yes.

18   Q    Okay.  So we already looked at Government's Exhibit 231,

19   your lab report related to Government's Exhibit 240.

20           If you would just take a look and let the jury know

21   the active drug ingredient, the net weight, and the purity for

22   each of these reports, we'll plow through this quickly.

23           So in 231, which is the report analyzing

24   Government's Exhibit 240, what is the active drug ingredient,

25   the net weight, and the purity?

1    A    It was cocaine base, net weight of 26.3 grams, and a

2    purity of 47.1 percent.

3    Q    Government's Exhibit 232, that's your lab report

4    analyzing Government's Exhibit 241, correct?

5    A    I believe so, yes.  I don't remember the numbers off the

6    top of my head.

7    Q    I took these back.  All right.  What is the active drug

8    ingredient, the net weight, and concentration of purity?

9    A    It was cocaine base, net weight was 6.5 grams, and the

10   concentration was 57.8 percent.

11   Q    This is Government's Exhibit 233, the next lab report in

12   the series.  What is the active drug ingredient, the net

13   weight, and the purity?

14   A    Cocaine base, net weight of 6.4 grams, and a

15   concentration of 50.9 percent.

16              MR. SILVERMAN:  This is Government's Exhibit 234.

17   Q    What is the active drug ingredient, the net weight, and

18   the purity?

19   A    It's heroin, net weight of 1.4 grams, and a purity of

20   38.7 percent.

21   Q    Was this one of the exhibits where you used the composite

22   approach?

23   A    Screening and then composite, yes.

24   Q    Okay.

25              MR. SILVERMAN:  This is Government's Exhibit 235.

1  Q    What was the active drug ingredient, the net weight, and

2  the concentration?

3  A    It was heroin, net weight of 148.2 grams, and a

4  concentration of 33.3 percent.

5         MR. SILVERMAN:  This is Government's Exhibit 236.

6  Q    What was the drug, the net weight, and the concentration?

7  A    Heroin, net weight of 3.4 grams, purity of 30.5 percent,

8  and the actual amount of drug is 1.0 grams.

9         MR. SILVERMAN:  This is Government's Exhibit 237.

10  Q    Was this one of the ones where you used the residue

11  approach?

12  A    The trace protocol, yes.

13  Q    What was the result of the protocol procedures that you

14  followed?

15  A    I determined that it contained 06-monoacetylmorphine and

16  heroin.

17  Q    And with this one, you said you only had a residue that

18  you were working off of?

19  A    Yes.

20  Q    What is 06-monoacetylmorphine?

21  A    It's either an uncompletely reacted product in the

22  formation of heroin, or it's a breakdown product.  It's the

23  step, it's the in between step, between morphine and heroin.

24  Q    What happens to heroin when it gets wet?

25  A    If it's prolonged, it can break down, has a possibility

1    of breaking down.  But usually it's a prolonged exposure.

2    Q    So is it possible that heroin exposed to water would

3    break down into 06-monoacetylmorphine?

4    A    That's a possibility, yes.

5    Q    Do you ever see, in your analysis, rice in samples that

6    end up being heroin?

7    A    I have, in some of my exhibits, when I open them up, I've

8    found a few grains of rice.

9    Q    And would rice play or have any effect on moisture?

10   A    Not an expert with that, but I know that rice does absorb

11   water when it's cooked, so I assume it would, you know, have

12   sort of a drying effect.

13   Q    Okay.

14            MR. SILVERMAN:  This is Government's Exhibit 238,

15   the last in the series of lab reports.

16   Q    What was the, what were your, conclusions with respect to

17   Government's Exhibit -- set forth in Government's Exhibit 238?

18   A    There was no controlled substances detected.

19   Q    Okay.  What was detected?

20   A    We detected something called mannitol.

21   Q    Have you seen mannitol before?

22   A    Yes.

23   Q    Could mannitol be used as a cutting agent?

24   A    Yes, I have seen it used as a cutting agent in the past.

25   Q    What is a cutting agent?  If you could describe it for

1    the jury.

2    A    Basically, what a cutting agent is, it will add weight to

3    the drug, but not any activity.  So basically it's like, you

4    know, watering down soup, you add a little water, stretch out

5    the soup.  That's what it is.

6              MR. SILVERMAN:  May I have one moment, your Honor?

7    Q    Earlier in your testimony, you described the difference

8    between cocaine hydrochloride and cocaine base.  Are you

9    familiar with the term crack cocaine, or crack?

10   A    I've heard it before, yes.

11   Q    If someone were using that term, based on your expertise,

12   would that be referring to cocaine hydrochloride or cocaine

13   base?

14   A    It would usually be referred to as cocaine base.

15             MR. SILVERMAN:  No further questions.

16   CROSS-EXAMINATION

17   BY MR. MORAGHAN:

18   Q    Mr. Hall, when a sample is sent to your laboratory and

19   it's assigned to a chemist such as yourself, do you continue

20   to control all of the evidence that comes in in that

21   particular case, or can it be assigned to any chemist in the

22   laboratory?

23   A    We try to keep it to one chemist, but if it's a very

24   large case, they may split it.

25   Q    In this case, are you aware of whether or not you did all

1    the testing yourself or did other chemists do any testing?

2    A    I'm not sure.  I haven't reviewed the entire case file.

3    Q    In this case, did you do any testing on powder cocaine?

4    A    On this one?

5    Q    Yes.

6    A    On these particular cases?

7    Q    Yes.

8    A    No.

9    Q    Are you aware of any powder cocaine that was submitted to

10   the laboratory in relationship to this case?

11   A    Not pertaining to these samples, no.  There were other

12   samples I think that might have had powder cocaine in it.

13   Q    But you don't know that for a fact?

14   A    I believe one of them in the previous trials I had had

15   powder cocaine.

16   Q    Previous, not this trial?

17   A    Not this trial, no.

18   Q    Okay.  Just so I'm clear, when you discussed destruction

19   of some of the substance during the testing process, that

20   destruction takes place after the gross weight and the net

21   weight?

22   A    Yes.

23   Q    So those determinations are made before you do your

24   testing?

25   A    Those, yes, they are determined before.

1   Q     And I believe you said that cocaine hydrochloride can

2   only be ingested by inhaling it?

3   A     Usually.  They might be able to inject it, but they can't

4   smoke it.

5   Q     Okay.  The scaling, the testing, do you use the same

6   scale for both determining the net weight and the gross

7   weight?

8   A     Usually not.  Usually the gross weight is a larger scale.

9   Q     So they're separate --

10  A     Separate scales, yes.

11          MR. MORAGHAN:  Okay, thank you.

12          MR. REEVE:  Your Honor, may I just have one moment

13  with government counsel?

14          THE COURT:  Yes, sir.

15  CROSS-EXAMINATION

16  BY MR. REEVE:

17  Q     Good afternoon, sir.

18  A     Good afternoon.

19  Q     You're a New Yorker?

20  A     Yes.

21  Q     We never would have known.

22  A     No?

23  Q     I have some questions for you.  I want, first of all, to

24  ask you, when you talked about mixing, am I correct that the

25  reason that you mix the substance is to get an accurate purity

```
1   level?

2   A    Yes, basically want to make sure that everything's

3   homogeneous, where it's all even throughout.

4   Q    Right, because if there's, for example, in a package of

5   heroin that you've got, if there's for whatever reason, if

6   there's a lot of heroin in one place in the package and less

7   in another, then it's not going to be an accurate reading on

8   the purity, right?

9   A    That is correct.

10  Q    Okay.  And I wanted to ask you a question.  I want you to

11  assume that you got in your lab a packet of heroin that has --

12  that is 100 percent pure.  You could get 100 percent pure

13  heroin, right?

14  A    No, I've never seen it.  No.

15  Q    What's the highest you've ever got?

16  A    Probably in the high 90s somewhere.

17  Q    Okay.  Let's take, if it's okay with you, I'm just going

18  to use 100 percent because it's going to be easier.  It's a

19  basic question.  I think you'll understand why I'm going to

20  use 100, because you're going to complicate me otherwise.

21           Let's say you take, you have 100 grams of pure

22  heroin and you take cut and you add to the heroin 100 grams of

23  cut.  Does that mean that the heroin is going to register at

24  50 percent pure?

25  A    On the quantitation, if you mix it all together?
```

1   Q    Okay.  So, for example, if we find in this case -- and I

2   think the evidence speaks for itself but let's say there's an

3   example where, I think there is one, I'm not going to take the

4   time to point it out -- but it says 30 percent heroin.

5   A    Yes.

6   Q    Okay.  Would that mean seven parts actually cut and three

7   parts heroin?

8   A    Pretty much, yes.  Simplified, yes.

9   Q    Okay.  That's an easy way to think about it when you see

10  30 percent, it's really, the purity level is at least roughly

11  equivalent to the amount of the actual drug versus the cut

12  that's added to the drug?

13  A    Yes.

14  Q    Okay.  Now, I just want to ask you, you've been in the

15  lab in New York for a number of years?

16  A    Yes.

17  Q    And just, can you just tell us, what courts, what area,

18  do you cover?

19  A    We cover all the way from Maine down to Delaware.

20  Q    Okay.  And you have urban areas within that area?

21  A    Yes.

22  Q    Large cities, middle size cities, and then rural, right?

23  A    Yes.

24  Q    Yes?

25  A    Yes, sir.

1    Q    You get substances, and I'm just going to focus on heroin

2    now but it applies to any substance, you get substances of

3    very different levels of purity, right?

4    A    Yes.

5    Q    And I think you indicated to us earlier that somewhere in

6    the 90s would be, you know, perhaps the highest purity level

7    you ever got in your lab with respect to heroin?

8    A    Me personally, yes.

9    Q    Okay.  And what's the lowest?

10   A    I've seen it down to around 3 percent, even less than 1

11   percent.

12   Q    All right.  Now, is it fair to say -- I'm asking you

13   based on your experience and if it's wrong tell me -- that

14   usually, if you receive a large package of heroin, it would

15   tend to be more pure than a smaller package?

16   A    Not necessarily.  It doesn't have to be, but it can be.

17   Q    Okay.  I understand, and I'm not asking you to say it

18   always is that way, but based on your experience, is that

19   usually your experience?

20   A    I would say most of the time, but not, you know, not all

21   of the time.

22   Q    Okay.  And if you were going to say, for example, at the

23   wholesale level -- do you understand what I mean when I say

24   wholesale?

25   A    I would say that's the person actually supplying the

1    material, the raw material, yes.

2    Q    Right.  Right.  Based on your experience, is there -- in

3    the years 2011, 2012, would there be -- a typical purity level

4    for wholesale quantities of heroin, let's say quantities above

5    ten grams, just to give an example?

6    A    I really couldn't say.

7    Q    You couldn't?

8    A    No, I couldn't say exactly what would be wholesale.

9    Q    All right.  Are you familiar with the office of National

10   Drug Control Policy, which is part of the executive office of

11   the President of the United States?

12   A    No.

13   Q    You're not?  Okay.  Are you familiar with any of the

14   statistics that they keep on different drugs and purity

15   levels?

16   A    No.

17   Q    By the way, I just threw in the President of the United

18   States.  None of these questions are political, okay?

19        I wonder, I'd like to show you an excerpt from this.

20   I don't want you to say anything about it; I just want to ask

21   you a few questions about it, okay?

22        MR. REEVE:  For the record, it's page 76 of a report

23   dated data supplement 2012, but it's not being offered as an

24   exhibit, your Honor; it's just for him to review.

25   A    Do you want me to read the whole article?

1   Q    No, just that one area, and I want you to focus just on

2   the columns that list purity levels, if you would, sir.

3            Do you find any of that illuminating?  If you don't,

4   tell us.

5   A    It appears after, I guess --

6            MR. SILVERMAN:  Your Honor, may I speak to defense

7   counsel for a moment before the witness answers the question?

8            (Mr. Silverman conferring with Mr. Reeve.)

9   Q    Let me focus you away from that document, and just ask

10  you:  In general, would it be fair to say, and if you don't

11  know tell us, that wholesale level quantities, ten grams or

12  more, on average would be somewhere around 50 to 60 percent

13  pure?

14  A    They can be.  I've also seen the retail level at that,

15  too, as well.

16  Q    Okay.  All right.  And I take it you've also seen

17  wholesale quantities at lower levels?

18  A    Yes.

19  Q    All right.  And when you go through all of the heroin

20  here in this case, we have quantities that range, I think,

21  that Exhibit -- I'm just going to reference a couple of

22  exhibits here -- Government's Exhibit 235, do you have that in

23  front of you?

24  A    Yes.

25  Q    Okay.  And on that, that's 148 grams, correct?

```
 1    A    Yes.

 2    Q    And if you look at the second page of Government's

 3    Exhibit 235, the second page, just so the jury understands,

 4    that's information that you got from the requesting agency,

 5    correct?

 6    A    Yes.

 7    Q    Okay.  And in other words, that's from the field office,

 8    the DEA field office, here in Connecticut?

 9    A    That's correct.

10    Q    And when you get the substance, you get the second page

11    of the reports, right?

12    A    Yes.

13    Q    It comes with the substance?

14    A    It comes with, yeah, the heat sealing, yes.

15    Q    We don't have to go through every one, but that's true

16    for all of these reports that have now been admitted as

17    evidence.  In other words, the jury's going to see two pages,

18    the first page typically are your conclusions based on your

19    analysis, right?

20    A    That's correct.

21    Q    And the second page is the document that you received

22    from the DEA field office with the package that they're asking

23    you to test?

24    A    Yes.

25    Q    Okay.  And so this package, which again is Government's
```

```
 1    Exhibit 235, we're referring to your report on that, and this
 2    was heroin that was seized on January 3rd.  And there's two
 3    different dates in this.  Do you see the second page of 235?
 4    A    Yes.
 5    Q    If you look at the top, it says date taken in DEA custody
 6    1/3/12.  Do you see that in the middle on the top of the
 7    report?
 8    A    Yes.
 9    Q    Right under remarks in the section labeled No. 23, it
10    says January 3rd, 2011, do you see that?
11    A    Yes.
12    Q    And would you accept my representation that that's a typo
13    on the January 3rd, 2011, like when a lot of us get to the
14    point where it's the new year, we write the wrong number on
15    our checks and don't really internalize it?
16    A    It's possible.  I didn't write that.
17              MR. REEVE:  I think government counsel and I, your
18    Honor, certainly can stipulate that this report relates to the
19    seizure that the jury's already heard about.  This would be
20    the seizure from Kevin Wilson at the time of his arrest on
21    January 3rd, 2012, in Connecticut.
22              MR. SILVERMAN:  I have no problem with that
23    stipulation.
24              MR. REEVE:  All right.
25    Q    Now, so this would be the most heroin, the biggest
```

1  package, you got in this case, right?

2  A    Yes.

3  Q    By the way, just to put this in context, what's the

4  biggest package of heroin you've ever dealt with?

5  A    Many kilos.  20, 30 kilos.

6  Q    And that actually is a thousand grams?

7  A    Yes.

8  Q    If it's five kilos, it's 5,000 grams?

9  A    Yes.

10  Q    You've gotten multikilo levels of heroin in your lab to

11  test?

12  A    Yes, I have.

13  Q    All right.  Certainly that didn't happen in this case?

14  A    No.

15  Q    All right.  And so this purity level, again referencing

16  Government's Exhibit 235, it lists 33.3 percent with a plus or

17  minus of 1.9, which you've explained is the variability, you

18  can't be 100 percent precise about the purity level?

19  A    That's correct.

20  Q    All right.  If I'm doing the math on this correctly, what

21  you're really saying in this report is the purity level of

22  this heroin could be as low as 31.4 percent, or as high as

23  35.2 percent.  I'm just adding 1.9 to the number you have

24  here.

25  A    Yes, that's basically what I'm saying.

```
1    Q    If my math is wrong, somebody smarter in math can help

2    me.  That's really what this signifies, right?

3    A    That's correct.

4    Q    All right.  And so that's the 148 grams.  And again,

5    that's net weight, right?  So I'm sure we're all clear on

6    this, it's 148.2 grams is the total weight of the substance

7    that's within the packaging that you received, right?

8    A    That is correct.

9    Q    The first number gross weight 183.3 is all the packaging

10   in which you receive the substance?

11   A    Yes, that's correct.

12   Q    All right.  And the packaging that you receive from DEA

13   is not necessarily the same packaging -- in fact it almost

14   never is the same packaging -- as the -- that's a terrible way

15   to phrase that question.  Let me withdraw that and ask it a

16   different way.

17          So when a DEA agent, based on your experience when a

18   DEA agent, seizes a package of heroin, it is typically in some

19   kind of a package, right?

20   A    Yes.

21   Q    Like let's take this one example, the 148.2, this amount

22   of heroin, it's not just sitting on the car seat; it's in a

23   bag?

24   A    Bag or something, yes.

25   Q    And then DEA takes that bag and puts it in their own
```

1   bags, correct?

2   A    They'll take the entire thing and place it inside their

3   own bags, yes.

4   Q    So the gross weight is the weight after the DEA puts the

5   bag that they seized into the bag or bags that they need to

6   use to deliver it to you in a secure way?

7   A    Yes.

8   Q    Okay.  All right.  And that purity level that you have

9   here, if you look -- take, if you want to take, a look, but

10   you might be able to just answer this -- in fact, that's very

11   consistent with all the purity levels of heroin in this case,

12   of all the substances that you seized, that you were able to

13   determine purity level?

14          MR. SILVERMAN:  I'm sorry to interrupt, I just want

15   to take up one issue before the witness answers the question.

16   The purity determinations aren't relevant to the jury's

17   ultimate quantity determinations, so I'm wondering what the

18   relevance is for this line of questioning.

19          MR. REEVE:  Obviously, the parties agree and your

20   Honor will instruct that the jury looks at the entire weight

21   of the substance, not -- and doesn't separate out the heroin

22   or the cocaine or the crack.  It doesn't relate to that at

23   all.

24          It's relevant to the drug operation in this case,

25   and I think I can wrap it up in a few questions and maybe even

```
 1   get him back to New York before the lunch break, if your Honor

 2   gives me a few minutes here.

 3              MR. SILVERMAN:  Very good.

 4   Q    All the purity levels in this case are in between 30 and

 5   35 percent?

 6   A    I'll just check.

 7   Q    Sure.

 8   A    One was a little bit higher, like 38 percent.

 9   Q    They're all under 40 percent?

10   A    Yes.

11   Q    And so the one that's the 38 actually is a much smaller

12   quantity than the one we were just talking about, the largest

13   quantity?

14   A    Yes.

15   Q    Okay.  And the final area I want to ask you about is that

16   I want you to refer to Government's Exhibit 231 for purposes

17   of this question, and again it's all the same in all these

18   reports, but I want to just run it by you one time here, okay?

19   Do you have 231 before you, your results?

20   A    Yes, I do.

21   Q    All right.  I want you to assume for purposes of my

22   question that this was an undercover purchase of what was

23   supposed to be one ounce of crack, or cocaine base, okay?

24   A    Okay.

25   Q    All right.  In fact, was what was sold in this case one
```

```
 1   ounce?

 2   A    I believe it to be a little bit less.

 3   Q    What's an ounce?  How many grams?

 4   A    Approximately 28.  I'm not sure of the exact number.

 5   Q    Okay.  And so this one is, it looks like, one-and-a-half

 6   to two grams short?

 7   A    Yes.

 8   Q    And based on your work in the lab, is finding a weight to

 9   be less than what the substance was purported to weigh a

10   common situation?

11   A    It happens.  Yeah, I would say it can be fairly common.

12   Q    All right.  And when -- are you familiar with the term

13   "short"?

14   A    No.

15   Q    Okay.  All right.

16              MR. REEVE:  May I just have one moment, your Honor?

17              Thank you.  I have no other questions.

18              Thank you, sir.

19              MR. ROGAN:  I have no questions for you, Mr. Hall,

20   thank you.

21              MR. SILVERMAN:  No further questions.  Thank you,

22   your Honor.

23              THE COURT:  Thank you, sir.

24              MR. VATTI:  Your Honor, our next witness is Stan

25   Kuligowski from the Connecticut Department of Labor.  I don't
```

```
 1   want to cut into people's lunch break, but it will be a

 2   relatively short witness.  I plan on having about ten minutes

 3   worth of questions.  I don't know what the cross-examination

 4   will look like.  Do you want to take a shorter lunch, if

 5   that's okay with the jurors?

 6         MR. REEVE:  Judge, I don't think our

 7   cross-examination is going to be long.  If your Honor wanted

 8   to just continue, finish that witness so he could be excused,

 9   and then we could take the lunch break, if it's okay with the

10   jury and you.

11         MR. VATTI:  That's fine.

12         THE COURT:  Everybody okay?  Very cooperative,

13   ladies and gentlemen, thank you.

14              S T A N L E Y   K U L I G O W S K I

15       having been called as a witness, was first

16       duly sworn and testified on his oath as follows:

17         THE CLERK:  Please be seated.  State your name for

18   the record, spell your last name, and the city and state you

19   reside in only.

20         THE WITNESS:  Stanley Kuligowski,

21   K-UL-I-G-O-W-S-K-I, Connecticut Department of Labor, 200 Folly

22   Brook Boulevard, Wethersfield.

23   DIRECT EXAMINATION

24   BY MR. VATTI:

25   Q    Good afternoon, sir.
```

```
 1   A     Good afternoon.
 2   Q     How long have you been employed at the Connecticut
 3   Department of Labor?
 4   A     Thirty-eight years.
 5   Q     What do you do there?
 6   A     I'm a program service coordinator.
 7   Q     What do you do as a program service coordinator?
 8   A     I run, for the last 20 years I've run, what's called the
 9   assistance center.  We answer general questions about the
10   Department of Labor, with special emphasis on unemployment
11   claims.  I also do record requests.  I do about 150 to 200
12   record requests for unemployment records a day.
13   Q     And as part of your duties at the Connecticut Department
14   of Labor, do you serve as the custodian of records for
15   quarterly earnings data?
16   A     That's correct.
17   Q     All right.  Do you also respond to subpoenas for those
18   records?
19   A     That's correct.
20   Q     In this particular case, were you served with a subpoena
21   for records for three individuals?
22   A     That's correct.
23   Q     All right.  And those individuals would be Robert Santos,
24   Philip Bryant, and Richard Anderson?
25   A     That's correct.
```

```
 1   Q    And along with those subpoenas, were you given the

 2   dates -- I don't want you to say what they are but were you

 3   given the dates -- of birth and Social Security numbers --

 4   A    Yes.

 5   Q    --  for all three of those individuals?

 6   A    Yes.

 7   Q    Tell us what quarterly earnings data is.

 8   A    The Department of Labor gets two kinds, we have two

 9   records:  Wage records, unemployment records.  Every employer

10   has to report everyone's wages to the Department of Labor

11   every quarter.  The reason they have to do that is if they

12   file an unemployment claim, that's the record we use to

13   calculate what they're payable for on unemployment.

14   Q    So every employer in the state of Connecticut that has

15   W-2 employees has to file a quarterly earnings report?

16   A    That's correct.

17   Q    All right.  And is there a threshold number of employees

18   that you have to have before you're required to submit such a

19   report?

20   A    Just one.

21   Q    So even if you're a business that just has one W-2

22   employee, you have to report the quarterly earnings data?

23   A    That's correct.

24   Q    That's just W-2 data, correct?

25   A    That's correct.
```

1    Q    So in the quarterly earnings, would somebody submit 1099

2    income?

3    A    No.

4    Q    That wouldn't get picked up?

5    A    No, we don't get that because that's not usable.  We only

6    get wages that are usable to calculate unemployment claims.

7    That's only W-2 wages.

8    Q    So if I'm a business and, for example, I hire a

9    landscaper and I pay that landscaper $1,000 but I don't employ

10   that person, he's working as an independent contractor, would

11   that get reported to the quarterly earnings database?

12   A    No, it would not.

13   Q    Let's say I'm a restaurant and employ a waiter and that

14   waiter's getting paid under the tables in cash.  Would that

15   get picked up in the data?

16   A    No.

17   Q    Those would be the two categories that wouldn't get

18   picked up in the data that the Department of Labor maintains?

19   A    Correct.

20   Q    Tell us how that data is catalogued at the Department of

21   Labor.

22   A    Everything comes in quarterly.  The employer has to

23   report the person's last name, first initial, and a gross pay

24   for that quarter.

25   Q    And does the employer, along with that data, submit it by

1    Social Security number for that employee?

2    A    That's correct.  All our unemployment came out of the

3    Social Security Act of 1938, so Social Security is the number

4    we use for everything.  Plus it's pretty much the only

5    identifier that's individualized, besides name or date of

6    birth.

7    Q    Is it part of the regularly conducted business of the

8    Department of Labor to maintain that data?

9    A    That's correct.

10   Q    Is it part of your regular practice that those records

11   get entered into your computers and that you can access those

12   records?

13   A    Yes.

14   Q    All right.  Did you do that for the three individuals in

15   this case?

16   A    Yes, I did.

17   Q    All right.  And can you tell us if you found any W-2

18   earnings records for Richard Anderson?

19   A    At the current time, we only keep wage records that are

20   potentially usable to calculate an unemployment claim, so we

21   don't have forever wages.  At the present time, we have from

22   the third quarter of '09 through the third quarter of 2013.

23   Of the three Social Security numbers, the only one who had a

24   record was for Robert Santos.

25   Q    What were the total earnings for Mr. Santos for the

1   period that you described?

2   A    We had two quarters:  The fourth quarter of 2011 was

3   $1,252.65.  The third quarter of 2011 was $1,504.30.

4   Q    All right.  So for the period of July 2011 through

5   December of 2011, there's approximately a little over $2700 in

6   earnings reported for Mr. Santos?

7   A    That's right.

8   Q    Otherwise, during the period you said, third quarter of

9   '09 to what period?

10  A    The third quarter of 2013.

11  Q    For that entire length of time, there's approximately

12  $2700 --

13  A    Only those two quarters reported.

14  Q    Okay.  How about with respect to -- I take it from your

15  answer for Mr. Anderson for that period of time from third

16  quarter of '09 through the end of 2013, that there were no

17  earnings recorded by the Department of Labor?

18  A    For the other two numbers -- we only get a name pops up

19  if we have a record on file.  If, when we enter a Social

20  Security number and there's no records, the only thing that

21  comes up is "SSN not found."  So under the other two numbers

22  that were on the subpoena, they both came up with no records.

23          MR. VATTI:  No further questions, your Honor.

24

25

```
 1   CROSS-EXAMINATION

 2   BY MR. ROGAN:

 3   Q    Hi, Mr. Kuligowski, how are you?  I'm going to be

 4   mercifully brief.

 5           As it relates just to my client, Richard Anderson, I

 6   think you covered this with Mr. Vatti, your data capture

 7   program only addresses W-2 employees, right?

 8   A    That's correct.

 9   Q    Everybody here knows what that is.  If someone's working

10   as an independent contractor and is getting a 1099 at the end

11   of the year, your data capture program doesn't tell you that?

12   A    That's correct.  We wouldn't have it.

13   Q    The same thing if -- I'm not suggesting it happened

14   here -- if someone for the time frame the third quarter of '09

15   through --

16   A    Third quarter of 2013.

17   Q    -- third quarter of 2013, if someone is working off the

18   books, that data capture program is also not covered by the

19   Connecticut Department of Labor?

20   A    That's correct.

21   Q    So you can't draw any inference whether or not Mr.

22   Anderson was a 1099 employee, can you?

23   A    No, I would have no idea.

24           MR. ROGAN:  Okay, great.  Thank you very much.

25
```

CROSS-EXAMINATION

BY MR. REEVE:

Q    I have a couple of very quick questions, sir.  If I
understand you correctly, there's two categories where people
who earn money above the table, if I can use that term, would
not -- you wouldn't have any data for them.  There's kind of
two separate categories there, right?

A    Well, anything other than a W-2, we wouldn't have, no.

Q    Just so we're clear, if I'm a self-employed attorney,
just hypothetically, you don't have any -- for 2012, your
records would show zero?

A    Yes, self-employed or independent contractor, those are
not --

Q    Yes.  So on the other hand, if I have a partnership and
my business is a partnership and I have two employees, and
there's two partners, you're going to have data for the two
employees but not for the two partners?

A    That's correct.

Q    All right.  The other part of the 1099 would be, for
example, if you're an independent contractor, working for a
company?

A    That's correct.

Q    Like a mortgage broker, or, I don't know, you can give us
some examples.

A    Some real estate ones, mortgage brokers, some landscapers

1    can also be 1099.

2    Q    Okay.  All right.  Then you've talked about the under the

3    table.  Now we're going under the table, we were over the

4    table, now we're going under.  Under the table would be where

5    somebody's doing a job and the employer's not paying them.

6    You go ahead, I misstated that, you correct me, because I made

7    an error.

8    A    It's that they're paying them, but they're not reporting

9    the taxes, the Social Security, the unemployment tax.  That's

10   where we get the money to pay the unemployment when they

11   report to us.

12   Q    All right.  There's actually a fourth area that you

13   didn't mention, that I can think of, and that would be where

14   an employer is withholding but not reporting to you?

15   A    That's correct.  That's a fraud area.

16           MR. REEVE:  Thanks.  I don't have any other

17   questions.

18           MR. MORAGHAN:  No questions, your Honor.

19           MR. VATTI:  Nothing further, your Honor.

20           THE COURT:  Thank you, sir.

21           THE WITNESS:  Thank you.

22           THE COURT:  We'll take the luncheon break, ladies

23   and gentlemen.

24           MR. VATTI:  That's fine, your Honor.

25           THE COURT:  It's now quarter after 1:00.  Can we

```
1    still come back at 2:00 o'clock?  Will that give you

2    sufficient time, ladies and gentlemen?  2:00 o'clock?

3              (Luncheon recess:  1:14 o'clock p.m. to 2:20 o'clock

4    p.m., in the absence of the jury.)

5              THE COURT:  Good afternoon.  Please be seated.

6              Are we ready to have the jury, gentlemen, or is

7    there anything?

8              MR. SILVERMAN:  I think we're ready, your Honor.

9              MR. MORAGHAN:  Ready, your Honor.

10             MR. REEVE:  Ready, your Honor, thank you.

11             THE COURT:  We haven't set up a time for the charge

12    conference, have we?

13             MR. SILVERMAN:  We have not formalized a time yet.

14             THE COURT:  Sometime next week, you gentlemen want

15    to stay after court?

16             MR. REEVE:  I don't know if your microphone...

17             THE COURT:  I'm sorry.  I was just talking about the

18    charge conference, when you would like to have it.  We've got

19    a while to go with the trial, of course, and you may prefer to

20    wait a little bit.

21             MR. SILVERMAN:  One of the suggestions that had been

22    floated I think by your Honor's law clerk was after the

23    government rests its case, because we'll have a clear sense of

24    what charges are required and which ones are not.

25             THE COURT:  Yes.
```

```
 1              MR. SILVERMAN:  The same could be said if the
 2    defense puts on a case.  So I think we have to sort of play it
 3    by ear a little bit.  Probably Tuesday or Wednesday evening.
 4              THE COURT:  Okay.  As far as I know, either one of
 5    those will be fine with me.
 6              MR. REEVE:  That's fine, Judge.  However we handle
 7    it, that's fine.
 8              (In the presence of the jury:  2:22 o'clock p.m.)
 9              THE COURT:  Good afternoon, ladies and gentlemen.
10    Is it still as cold as it was?  Did any of you go out for
11    lunch?
12              A JUROR:  Yes.
13              THE COURT:  It is?  I was afraid of that.
14                    A N A S T A S   N D R E N I K A
15        having been recalled as a witness, was previously
16        duly sworn and testified on his oath as follows:
17    DIRECT EXAMINATION
18    BY MR. VATTI (Continued)
19    Q    Special Agent Ndrenika, before the lunch break, we heard
20    from an individual from the Connecticut Department of Labor.
21    I wanted to talk about that with you.  Did you provide, for
22    purposes of the Connecticut Department of Labor search, the
23    names, dates of birth, and the Social Security numbers for the
24    three defendants that are on trial in this courtroom?
25    A    Yes, I did.
```

1   Q    I want to turn our attention to Robert Santos and I want

2   to start with the phone numbers.  How many different phone

3   numbers did you identify as belonging to Mr. Santos?

4           MR. REEVE:  Object to the phrasing of that.  I don't

5   object to the use; I object to the "belonging" part.  There's

6   no foundation for belonging.

7           MR. VATTI:  I'll rephrase.

8           MR. REEVE:  Okay, thank you.

9   Q    How many different phone numbers did you identify as

10  being used by Mr. Santos?

11  A    Six.

12  Q    And are those the six numbers that I've put here on the

13  chart?  I'm just going to read them in the record:

14  203-668-5201?

15  A    Yes.

16  Q    203-530-7893?

17  A    Yes.

18  Q    203-507-0616?

19  A    Yes.

20  Q    203-736-7634?

21  A    Yes.

22  Q    860-581-3603?

23  A    Yes.

24  Q    And 203-430-3845?

25  A    Yes.

```
1    Q    Did you check for any subscriber information for any of
2    these six phone numbers?
3    A    Yes.
4    Q    Were any of those subscribed in the name Robert Santos?
5    A    No.
6    Q    Were these all prepaid phones?
7    A    I believe the 668 was subscribed to an address, 441
8    Whalley Ave, to a female.
9    Q    How about the other five numbers?
10   A    Those were, as far as I recall, prepaid phones.
11   Q    All right.  And was there a nickname that was used by the
12   user of these six phones?
13   A    Yes.
14   Q    What was that nickname?
15   A    Scoot or Scooter.
16   Q    Scoot or Scooter?
17   A    Yes.
18   Q    All right.  And was there surveillance done on October
19   19th, 2011, in conjunction with calls that were intercepted
20   between target telephone 4 and the phone number ending in the
21   four digits 5201?
22   A    Yes.
23   Q    All right.  Do you know where that surveillance took
24   place?
25   A    I believe that was on Day Street, 139 Day.
```

1    Q    On October 26th, 2011, was there surveillance done in

2    conjunction with calls that were intercepted between target

3    telephone 4 and the phone number ending in digits 7893?

4    A    That was.

5    Q    And as a result of that surveillance, did surveillance

6    observe a person that they believed to be this individual,

7    Scoot or Scooter?

8    A    Yes.

9    Q    All right.  As of these two dates, was that person's full

10   name known?

11   A    No.

12   Q    And even after the surveillance on these two dates was

13   completed, was that person's full name known?

14   A    No.

15   Q    And what date did Scoot or Scooter's true identity or

16   full name become known?

17   A    It was November 9th, 2011, subsequent to a traffic stop.

18   Q    And who conducted that traffic stop?

19   A    Police officer Brian Pazsak of the New Haven Police

20   Department.

21   Q    I know I got that wrong, I'm pretty sure I got that

22   wrong.  But Brian Pazsak, correct?

23   A    Yes.

24   Q    Do you know who initiated the surveillance on that date

25   prior to the traffic stop being conducted?

```
 1   A    Yes.

 2   Q    And who was that?

 3   A    Investigator Lance Helms of the Hamden Police Department,

 4   and Task Force Officer Joshua Cameron of the DEA.

 5   Q    As a result of that traffic stop on November 9th, 2011,

 6   was Scoot and Scooter identified?

 7   A    He was.

 8   Q    And who was that?

 9   A    Robert Santos.

10   Q    All right.  And do you see Robert Santos here in the

11   courtroom?

12   A    Yes.

13   Q    And can you identify him for us?

14   A    Black male sitting at the end of the table, wearing a

15   blue jacket and a black and yellow tie and white shirt.

16        MR. VATTI:  May the record reflect that Special

17   Agent Ndrenika identified the defendant, Robert Santos, your

18   Honor?

19        THE COURT:  Yes, sir.

20        MR. VATTI:  Thank you.

21   Q    Now, we are going to play -- strike that, please.

22        Have you listened to all of the recordings for

23   Robert Santos?

24   A    Yes.

25   Q    And have you done a voice comparison for the voices on
```

```
1    all of these six phone numbers we've talked about?

2    A    Yes.

3    Q    And do you have an opinion as to whether the user of

4    these six phones is the same person?

5    A    Yes.

6    Q    What is that opinion?

7    A    There was one instance that the numbers, the 860 number,

8    581-3603, was initially intercepted or utilized by Mr. Santos,

9    and a second individual was intercepted on another occasion.

10   Q    How about with respect to the other five numbers?

11   A    It was Robert Santos, the only user.

12   Q    With respect to the transcripts prepared with respect to

13   the calls we're going to play involving Mr. Santos, did you

14   participate in the preparation of those transcripts?

15   A    Yes.

16   Q    Have you reviewed all of the transcripts?

17   A    Yes.

18   Q    Are you satisfied that they're true and accurate?

19   A    Yes.

20              MR. VATTI:  I'm going to call up Government's

21   Exhibit 56.1.

22   Q    Can you tell us the date and time of this call and also

23   who the participants are?

24   A    Sure.  Phone call intercepted on October 17th, 2011, at

25   3:46 in the afternoon, between Johnny De Los Santos and Kevin
```

```
 1   Wilson.

 2             (Government's Exhibit 56.1, an audio recording,

 3   played.)

 4   Q    There was a reference here where Kevin Wilson said Na-Na.

 5   A    Yes.

 6   Q    Do you see that?

 7   A    Yes.

 8   Q    What is that a reference to?

 9   A    That's Johnny De Los Santos's nickname.

10   Q    And there's also an indication here that Mr. De Los

11   Santos said, "I'm going to bring the 120, the kid's 20 and

12   your 100, do you hear?"  Did I read that correctly?

13   A    Yes.

14   Q    In this particular transcript, unlike previous

15   transcripts where Johnny De Los Santos is being referred to as

16   JD, here he's referred to as JS by the person preparing the

17   transcript?

18   A    Yes, same person.

19             MR. VATTI:  I'm now going to call up Government's

20   Exhibit 57.

21   Q    There was a correction I think in this transcript --

22             MR. VATTI:  Actually, we'll address the corrections

23   at a later time.  Let me move on.

24             Let's go to Exhibit 57.

25   Q    Can you tell us the date and time of this call, and who
```

1    the participants are?

2    A    October 18th, 2011, 5:33 p.m., phone call between Robert

3    Santos and Kevin Wilson.

4    Q    All right.  So the day after the call we just heard?

5    A    That's correct.

6              (Government's Exhibit 57, an audio recording,

7    played.)

8    Q    What was the number being used by Mr. Santos in this

9    call?

10   A    203-668-5201.

11   Q    All right.  Where did Mr. De Los Santos reside?

12   A    Bronx, New York.

13   Q    And do you know what street?

14   A    Lafontaine, 2110, I believe, Lafontaine.

15   Q    In this particular call, Mr. Wilson indicates, "I ended

16   up, I ended up coming out, going up there myself"?

17   A    Yes.

18   Q    He indicates, "I'm here now, like, well, like one exit

19   away"?

20   A    Yes.

21   Q    And towards the end of the call, Mr. Santos says, "So I'm

22   a line it up, so couple hours"?

23   A    Yes.

24              MR. VATTI:  Now I'm going to play Government's

25   Exhibit 57.1.

1    Q    Can you tell me the date and time of the call, and who

2    the participants are?

3    A    October 18, 2011, 5:39 in the afternoon, phone call

4    between Kevin Wilson and Johnny De Los Santos.

5              (Government's Exhibit 57.1, an audio recording,

6    played.)

7              MR. VATTI:  I'm going to move on to Government's

8    Exhibit 57.2.

9    Q    What's the date and time of this call?

10   A    October 18th, 2011, 7:47 p.m., phone call between Johnny

11   De Los Santos and Kevin Wilson.

12             (Government's Exhibit 57.2, an audio recording,

13   played.)

14   Q    All right.  In that call, did Mr. Wilson indicate, "Okay,

15   okay, 112, then I'm left with 92, it's 92"?

16   A    Yes.

17   Q    All right.  Did he also indicate:  "I got to give the 20

18   to the, to this kid"?

19   A    Yes.

20             MR. VATTI:  Now I'm going to call up 57.3.

21   Q    Can you tell us the date and time of the call, and who

22   the participants are?

23   A    October 18th, 2011, 7:49 p.m., phone call between Kevin

24   Wilson and Johnny De Los Santos.

25             (Government's Exhibit 57.3, an audio recording,

1  played, and paused.)

2       MR. VATTI:  I'm going to pause the call there.

3  Q    In that call, Mr. Wilson indicated, "57 times 112, now

4  it's 400, 4326 plus," and then Mr. De Los Santos says, "It's

5  6,384"?

6  A    That's correct.

7       (Government's Exhibit 57.3, an audio recording,

8  continued.)

9  Q    Just looking at this call, do you know if 4326 plus 6384

10  adds up to 10,710?

11  A    It does.

12  Q    I'm not going to bother to ask you to do 57 times 1120.

13       MR. VATTI:  Call up Government's Exhibit 58.

14  Q    What's the date and time of this call?

15  A    October 19th, 2011, 9:23 a.m., phone call between Robert

16  Santos and Kevin Wilson.

17  Q    And which phone is Mr. Santos using?

18  A    203-668-5201.

19  Q    Did you tell me the time?

20  A    Yes, sir, it's 9:23 in the morning.

21       (Government's Exhibit 58, an audio recording,

22  played.)

23       MR. VATTI:  All right.  I'm now going to call up

24  Government's Exhibit 137.

25  Q    Can you tell us the participants, and date and time?

```
1    A    October 19th, 2011, 1:23 p.m., phone call between Kevin
2    Wilson and Robert Santos.
3              (Government's Exhibit 137, an audio recording,
4    played.)
5    Q    Was surveillance initiated on October 19th, 2011, in
6    response to these calls intercepted over target telephone 4,
7    where Mr. Santos was using 5201?
8    A    Yes.
9    Q    And where was that surveillance initiated?
10   A    139 Day Street, Kevin Wilson's residence.
11             MR. VATTI:  I'm now going to call up Government's
12   Exhibit 138.
13   Q    Same question.  Who are the participants, and what's the
14   date and time?
15   A    October 19th, 2011, 2:54 p.m., phone call between Robert
16   Santos and Kevin Wilson.
17   Q    And what number is Mr. Santos using?
18   A    203-668-5201.
19             (Government's Exhibit 138, an audio recording,
20   played.)
21   Q    All right.  In this call, does Mr. Santos indicate, "I'm
22   outside dog"?
23   A    Yes.
24             MR. VATTI:  I'm now going to play Government's
25   Exhibit 253.1.
```

```
 1   Q    Is this the surveillance video from that day?
 2   A    Yes.
 3              (Government's Exhibit 253.1, a video recording,
 4   playing.)
 5   Q    Who just walked out of 139 Day Street?
 6   A    The first individual was Mr. Santos, the second
 7   individual was Kevin Wilson.
 8   Q    Do you know who they were talking to in that minivan?
 9   A    I believe that's a green GMC.
10              MR. REEVE:  I object.  It assumes --
11              MR. VATTI:  The form of the question was bad.
12   Q    Do you know who was in the car that they've stopped next
13   to?
14   A    We believe that was Quiyon Reid.
15   Q    What was Quiyon Reid's nickname?
16   A    Gutter.
17              MR. VATTI:  I'm now going to play Government's
18   Exhibit 59.
19   Q    Can you tell us the date and time of this call, and the
20   participants?
21   A    October 19th, 2011, 6:45 p.m., phone call between Robert
22   Santos and Kevin Wilson.
23   Q    Just for the record, what's the time of the surveillance
24   that took place on October 19th, where Mr. Wilson and Mr.
25   Santos were seen together outside of 139 Day Street?
```

```
1    A     It was, this took place about 3:15.  Surveillance started
2    probably a little bit before that.
3              (Government's Exhibit 59, an audio recording,
4    played, and paused.)
5    Q    In that call, did Mr. Santos indicate, "Niggas trying to
6    get a buck"?
7    A    Yes.
8    Q    And later on, he makes a reference to, "He trying to get
9    the number Nu-Nu was getting, do you feel me or the number
10   Nu-Nu advertised"?
11   A    Yes.
12   Q    Who is Nu-Nu?
13   A    Vincent Clark.
14             (Government's Exhibit 59, an audio recording,
15   continued.)
16   Q    All right.  That was at 6:45 p.m. on October 19th?
17   A    Yes.
18             MR. VATTI:  I'm going to play Government's Exhibit
19   60.
20   Q    Can you tell us the date and time of the call?
21   A    October 21st, 2011, 10:15 a.m., phone call between Robert
22   Santos and Kevin Wilson.
23             (Government's Exhibit 60, an audio recording,
24   played.)
25   Q    All right.  In that call, did Mr. Santos indicate, "My
```

```
 1    boy's going to be ready to get that too"?

 2    A    Yes.

 3    Q    And "he trying to spend like 60"?

 4    A    Yes.

 5    Q    And then Mr. Wilson indicated, "See if he'll spend 63 for

 6    that"?

 7    A    Yes.

 8              MR. VATTI:  Going to call up Government's Exhibit

 9    62.

10    Q    What's the date and time of the call?

11    A    October 23rd, 2011, 10:05 p.m., phone call between Robert

12    Santos and Kevin Wilson.

13              (Government's Exhibit 62, an audio recording,

14    played.)

15              MR. VATTI:  I'm going to go next to Government's

16    Exhibit 63.

17    Q    What's the date and time of this call?

18    A    October 24th, 2011, 2:27 p.m., phone call between Kevin

19    Wilson and Robert Santos.

20    Q    All right.  Which phone number is Mr. Santos using in

21    this call?

22    A    203-530-7893.

23              (Government's Exhibit 63, an audio recording,

24    played.)

25    Q    All right.  In that call, Mr. Wilson indicate that, "If
```

```
1   he like the number I say it's going to be a buck, if not it
2   will probably about 50 or less"?
3   A    Yes.
4              MR. VATTI:  Next I'm going to play Government's
5   Exhibit 65.1.
6   Q    Who are the participants in this call?
7   A    Call intercepted on October 25th, 2011, at 5:34 p.m.,
8   phone call between Johnny De Los Santos and Kevin Wilson.
9              (Government's Exhibit 65.1, an audio recording,
10  played, and paused.)
11  Q    In that call, did Mr. De Los Santos instruct Mr. Wilson,
12  "Call the guy, the one that's going to buy the hundred pesos"?
13  A    Yes.
14             MR. VATTI:  I'm next going to call up Government's
15  Exhibit 65.2.
16  Q    Can you tell us the date and time, and the participants?
17  A    October 26, 2011, 9:16 a.m., phone call between Johnny De
18  Los Santos and Kevin Wilson.
19  Q    All right.  Now, this series of calls that we're doing,
20  is this leading us to the surveillance on October 26, 2011?
21  A    Yes.
22  Q    All right.  This is at 9:16 in the morning on October 26?
23  A    Yes.
24             (Government's Exhibit 65.2, an audio recording,
25  played.)
```

```
1   Q    In that call, Mr. Wilson said, "I'm ready but my ride,
2   these people aren't ready"?
3   A    Yes.
4   Q    Mr. Wilson also indicates, "He told me he was just
5   getting up, he's going to take a shower, I give him an
6   hour-and-a-half"?
7   A    Yes.
8            MR. VATTI:  I'm going to play Government's Exhibit
9   144.
10  Q    Could you tell us the date and time of the call, and the
11  participants?
12  A    October 26, 2011, 10:22 in the morning, phone call
13  between Robert Santos and Kevin Wilson.
14           (Government's Exhibit 144, an audio recording,
15  played.)
16  Q    All right.  Did Mr. Santos indicate that Mr. Wilson
17  should come to his crib?
18  A    Yes.
19           MR. VATTI:  I'm going to now play Government's
20  Exhibit 145.
21  Q    Can you tell us the date and time, and the participants?
22  A    October 26, 2011, 10:54 in the morning, phone call
23  between Kevin Wilson and Robert Santos.
24           (Government's Exhibit 145, an audio recording,
25  played.)
```

1   Q    All right.  Now, surveillance had already been initiated

2   at this point on what turned out to be Mr. Santos's residence?

3   A    A location he was utilizing, yes.

4   Q    And in that call, there were directions being given to a

5   particular location?

6   A    Yes.

7   Q    Was that an apartment that Mr. Santos utilized?

8   A    Yes.

9          MR. VATTI:  Now I'm going to play Government's

10  Exhibit 65.3.

11  Q    And what's the date and time of this call?

12  A    October 26th, 2011, 5:21 p.m., phone call between Johnny

13  De Los Santos and Kevin Wilson.

14  Q    Can you tell me if the wiretap order that you had on

15  target telephone 4 also authorized something called precision

16  location information?

17  A    Yes.

18  Q    And can you tell the members of the jury what precision

19  location information is?

20  A    We're able to locate that phone anywhere, where the phone

21  was.

22  Q    And how do you track the phone?

23  A    GPS on the phone.  It's built in through the

24  manufacturer.

25  Q    All right.  And basically, it gives you the location of

```
 1   the phone at certain intervals of time?

 2   A    Yes.

 3   Q    And approximately what intervals?

 4   A    Every 15 minutes.

 5   Q    All right.

 6         MR. REEVE:  Your Honor, I'm sorry to interrupt.

 7   Could I just have a moment with government counsel?

 8         THE COURT:  Yes, sir.

 9         MR. REEVE:  Thank you, I appreciate it.

10         (Mr. Reeve conferring with Mr. Vatti.)

11         MR. REEVE:  Thank you, your Honor.

12   Q    And where does that data come in from?

13   A    From the phone company, through our DEA tech and

14   operation group.

15   Q    All right.  As a result of the data coming in every 15

16   minutes, are you able to track the movement of the phone?

17   A    Yes.

18   Q    All right.  And on this particular day, October 26, 2011,

19   at 5:21 p.m., were you able to figure out where the phone was?

20   A    Was in New York City.

21   Q    And do you know approximately where in New York?

22   A    Was in close proximity to where Mr. De Los Santos resided

23   on Lafontaine, I believe it was 2110, the exact address.

24         MR. VATTI:  I'm now going to play Government's

25   Exhibit 65.3.
```

```
 1              (Government's Exhibit 65.3, an audio recording,

 2    played.)

 3    Q    All right.  In that call, Mr. Wilson indicated to Mr. De

 4    Los Santos that he was there?

 5    A    Yes.

 6    Q    And the precision location information at this point was

 7    showing that he was in New York?

 8    A    Yes.

 9    Q    And given that he was in New York at approximately 7:21,

10    was surveillance reinitiated in the area of Mr. Santos's

11    apartment on Whalley Avenue?

12    A    I'm sorry, he was in New York at 5:21.

13    Q    Yes.  Was surveillance initiated in the area of Mr.

14    Santos's apartment later that evening?

15    A    Yes.

16    Q    Approximately what time?

17    A    I don't remember exact time.  It was nighttime.

18    Q    If I show you the surveillance report, will that refresh

19    your recollection?

20    A    Sure.

21    Q    I'm going to have you turn your attention to paragraph

22    12.

23    A    It was 7:15.

24              MR. VATTI:  I'm now going to play Government's

25    Exhibit 256.1.
```

```
 1              (Government's Exhibit 256.1, a video recording,
 2   playing.)
 3   Q    Did you see the second individual that went into that
 4   apartment?
 5   A    It was Kevin Wilson.
 6   Q    All right.  Is that the apartment that was utilized by
 7   Mr. Santos?
 8   A    Yes, 473 Whalley Ave, apartment H.
 9              MR. VATTI:  I'm now going to play Government's
10   Exhibit 65.4.
11              By the way, the video surveillance started at 7:30
12   p.m., so I wrote that down on the chart.
13              I'm now going to play Government's Exhibit 65.4.
14   Q    Actually, just tell us the date and time, and the
15   participants.
16   A    October 26th, 2011, 7:33 p.m., phone call between Johnny
17   De Los Santos and Kevin Wilson.
18              (Government's Exhibit 65.4, an audio recording,
19   played.)
20   Q    All right.  In that call, Mr. Wilson stated, "This isn't
21   150"?
22   A    Yes.
23   Q    All right.  Later on in the call, he said, "There is like
24   120 here"?
25   A    Yes.
```

```
 1    Q    All right.  And then Mr. De Los Santos responded, "Add it

 2    up.  If, if not, weigh it again, my brother"?

 3    A    Yes.

 4              MR. VATTI:  All right.  I'm next going to play

 5    Government's Exhibit 65.5.

 6    Q    What's the date and time of this call?

 7    A    October 26, 2011, 7:36 p.m., phone call between Johnny De

 8    Los Santos and Kevin Wilson.

 9              (Government's Exhibit 65.5, an audio recording,

10    played.)

11              MR. VATTI:  All right.  I'm now going to call up --

12    Q    Finish up here.  "120," is that what Mr. Wilson said?

13    A    Yes.

14              MR. VATTI:  I'm now going to call up Government's

15    Exhibit 256.2.  It's actually Government's Exhibit 256, but

16    this is a clip from the video.

17              (Government's Exhibit 256.2, a video recording,

18    playing.)

19    Q    Who's coming out of 473 Whalley, apartment H?

20    A    Kevin Wilson, followed by Robert Santos.

21    Q    And at what time are they exiting the apartment?

22    A    8:10.

23              MR. VATTI:  All right.  I'm now going to go to

24    Government's Exhibit 68.

25    Q    What's the date and time of the call?
```

1    A    October 31st, 2011, 8:42 p.m., phone call between Robert

2    Santos and Kevin Wilson.

3              (Government's Exhibit 68, an audio recording,

4    played.)

5    Q    All right.  Did Mr. Wilson indicate, "It's at 78, I gave

6    him 16, you heard"?

7    A    Yes.

8    Q    All right.  And later on, he said, "It's at 78 plus the

9    50, the 50 is what makes it 78"?

10   A    Yes.

11             MR. VATTI:  Call up Government's Exhibit 70.

12   Q    What's the date and time of the call?

13   A    November 1st, 2011, 12:45 p.m., phone call between Kevin

14   Wilson and Robert Santos.

15             (Government's Exhibit 70, an audio recording,

16   played.)

17   Q    All right.  In this call, Mr. Wilson said, "The morphine,

18   should I just throw it on top of it"?

19   A    Yes.

20   Q    Mr. Santos answered, "Yeah, you could"?

21   A    Yes.

22             MR. VATTI:  Going to call up Government's Exhibit

23   71.

24   Q    What's the date and time of this call?

25   A    November 2nd, 2011, 7:08 p.m., phone call between Kevin

```
 1   Wilson and Robert Santos.
 2              (Government's Exhibit 71, an audio recording,
 3   played, and paused.)
 4              MR. VATTI:  I'm going to stop that call.
 5   Q    Mr. Wilson, in this call, said, "I got some bread for
 6   him"?
 7   A    Yes.
 8   Q    Mr. Santos said in response, "So we might, I think we can
 9   clean them up Friday"?
10   A    Yes.
11              MR. VATTI:  All right.  I'm going to play
12   Government's Exhibit 72.
13   Q    What's the date and time of the call?
14   A    November 3rd, 2011, 10:11 p.m., phone call between Robert
15   Santos and Kevin Wilson.
16   Q    All right.  Now, there was surveillance that occurred of
17   Brittany Odom and Kevin Wilson on November 8th, 2011, correct?
18   A    Yes.
19   Q    These calls leading up to that surveillance?
20   A    This phone is on the 3rd; I believe surveillance was on
21   the 8th.
22   Q    That's fine.
23              (Government's Exhibit 72, an audio recording,
24   played.)
25   Q    All right.  Did Mr. Wilson tell Mr. Santos that, "He was
```

```
 1   like, he was like I'll give you, I'll give you two for right
 2   now, like I don't have it to give you"?
 3   A    Yes.
 4            MR. VATTI:  Going to play Government's Exhibit 74.1.
 5   Q    What's the date and time of the call, who's on the call?
 6   A    74.1, intercepted on November 6, 2011, at 12:47 p.m.,
 7   phone call between Johnny De Los Santos and Kevin Wilson.
 8            (Government's Exhibit 74.1, an audio recording,
 9   played.)
10   Q    All right.  In that call, did Mr. Wilson indicate, "If
11   you got two, I'll take the two"?
12   A    Yes.
13   Q    Mr. De Los Santos says, "I'll call you later tonight"?
14   A    Yes.
15   Q    Mr. Wilson again says, "But but but put it, 150 in one
16   and 50 in the other"?
17   A    Yes.
18            MR. VATTI:  Going to play Government's Exhibit 74.2.
19   Q    What's the date and time of the call?
20   A    November 7th, 2011, 8:14 p.m., phone call between Johnny
21   De Los Santos and Kevin Wilson.
22            (Government's Exhibit 74.2, an audio recording,
23   played.)
24   Q    Did Mr. Wilson indicate he was heading over there right
25   now?
```

```
 1   A    Yes.

 2            MR. VATTI:  Play Government's Exhibit 74.3.

 3   Q    What's the date and time of the call, who's on the call?

 4   A    November 7th, 2011, 9:23 p.m., phone call between Johnny

 5   De Los Santos, Kevin Wilson.

 6            (Government's Exhibit 74.3, an audio recording,

 7   played.)

 8            MR. VATTI:  Next going to play Government's Exhibit

 9   75.

10   Q    What's the date and time of this call?

11   A    November 8th, 2011, 9:46 a.m., phone call between Robert

12   Santos and Kevin Wilson.

13   Q    This is the next morning from the call that we just

14   heard?

15   A    Yes.

16            (Government's Exhibit 75, an audio recording,

17   played.)

18            MR. VATTI:  I'm now going to play Government's

19   Exhibit 146.

20   Q    What's the date and time of the call, and who are the

21   participants?

22   A    146, November 8th, 2011, 3:19 p.m., phone call between

23   Robert Santos and Kevin Wilson.

24            (Government's Exhibit 146, an audio recording,

25   played.)
```

```
 1              MR. REEVE:  Your Honor, could I have one minute
 2    again with counsel, Court please?
 3              THE COURT:  Yes.
 4              (Mr. Reeve conferring with Mr. Vatti.)
 5              MR. REEVE:  Appreciate it, your Honor.
 6    Q    All right.  This is where Mr. Santos said, "Baby girl
 7    outside"?
 8    A    Yes.
 9              MR. VATTI:  All right, I'm now going to play
10    Government's Exhibit 257, and a particular clip from it.
11              (Government's Exhibit 257, a video recording,
12    playing.)
13    Q    Whose car are we looking at?
14    A    I don't believe so.
15    Q    I'm sorry, do you know whose car that is?
16    A    I can't tell from here.
17              MR. REEVE:  Objection -- I'm sorry, I withdraw it.
18    A    All right.  Yes.
19    Q    Whose is it?
20    A    That's a vehicle operated by Brittany Odom.
21    Q    Who just came out of 139 Day Street?
22    A    Kevin Wilson.
23              MR. VATTI:  Your Honor, it's 3:30.  Would you like
24    to take the afternoon break?  It's probably time for a break
25    from the calls.
```

```
 1              THE COURT:  Yes, all right.  Fifteen minutes,
 2    please.
 3              (Recess:  3:30 o'clock p.m. to 3:50 o'clock p.m., in
 4    the absence of the jury.)
 5              THE COURT:  Please be seated.  Anything before the
 6    jury comes in or shall we go right ahead?
 7              MR. SILVERMAN:  Government's ready for the jury.
 8              MR. VATTI:  We're ready, your Honor.
 9              MR. REEVE:  We're ready, your Honor.
10              (In the presence of the jury:  3:52 o'clock p.m.)
11              THE COURT:  All right, gentlemen, proceed.
12    Q    All right.  Let's talk a little bit about Kevin Wilson's
13    employment.  Did he have a regular job?
14    A    Yes.
15              MR. MORAGHAN:  Could you keep your voice up, Mr.
16    Vatti?
17              MR. VATTI:  I'm sorry.
18    Q    Did Kevin Wilson have a regular job?
19    A    Yes.
20    Q    And where was that at?
21    A    Dunkin' Donuts.
22    Q    During the course of the investigation, did you establish
23    the hours that he typically worked at Dunkin' Donuts?
24    A    7:00, 8:00 o'clock in the morning until 2:00 o'clock in
25    the afternoon.  2:00, 2:30.
```

1    Q    We had talked a little bit earlier today about monitoring

2    acts of violence, or being alert to transactions for firearms.

3    A    Yes.

4    Q    On December 10th, 2011, was there some enforcement

5    activity relating to a firearm?

6    A    Yes.

7    Q    And can you tell us what happened?

8    A    Sure.  Kevin Wilson was having a disagreement with one of

9    his criminal associates, Chello Bright.  He subsequently

10   requested, made a phone call to one of his associates to bring

11   a firearm to his residence in order to prevent that firearm

12   from getting into Kevin Wilson's hands.

13            We initiated surveillance in the area of 139 Day

14   Street.  Subsequently, Kevin Wilson called the individual who

15   was sent, Joseph Vareen, also known as Driver, and he said he

16   was all set, he didn't need him.

17            Subsequently, the New Haven Police Department

18   attempted to make a stop on the vehicle.  The vehicle took

19   off.  Vehicle was chased into a driveway of a residence in New

20   Haven.  The driver of the vehicle exited the vehicle, ran.  In

21   the process, a firearm fell from his person and was

22   subsequently recovered.

23            MR. REEVE:  Your Honor, again, could I just have a

24   moment with counsel?

25            (Mr. Reeve conferring with Mr. Vatti.)

```
 1   Q    That particular incident had no connection to Robert
 2   Santos, correct?
 3   A    It did not, no.
 4        MR. VATTI:  I was just trying to break up the
 5   monotony of the phone calls.
 6        MR. REEVE:  Thank you.
 7        MR. VATTI:  No problem.
 8        I'm going to go ahead and play Government's Exhibit
 9   76.
10   Q    Can you tell us the date and time of the call?
11   A    November 11th, 2011, 2:39 p.m., phone call between Robert
12   Santos and Kevin Wilson.
13        (Government's Exhibit 76, an audio recording,
14   played.)
15   Q    All right.  In that call, Kevin Wilson referred to "cuz
16   coming by today"?
17   A    Yes.
18   Q    And also stated, "I'm a give him like two I think or
19   close to it, 18 or something like that"?
20   A    Yes.
21   Q    Mr. Santos indicated, "Yeah, I got something coming down
22   today"?
23   A    Yes.
24   Q    And later on, Mr. Santos inquired, "What you say with
25   baby girl that day"?
```

1    A    I believe he said "what you send."  The transcript, that

2    letter.

3    Q    Okay.  And later on in the conversation, Mr. Wilson said,

4    "Oh, 77"?

5    A    Yes.

6         MR. VATTI:  I'm going to play Government's Exhibit

7    77.2.

8         (Government's Exhibit 77.2, an audio recording,

9    played.)

10   Q    All right.  What's the date and time of that call, and

11   who was in it?

12   A    November 23rd, 2011, 9:34 p.m., phone call between Kevin

13   Wilson and Johnny De Los Santos.

14        MR. VATTI:  I'm now going to play Government's

15   Exhibit 78.

16   Q    What's the date and time of this call?

17   A    November 26, 2011, 1:33 p.m., phone call between Robert

18   Santos and Kevin Wilson.

19        (Government's Exhibit 78, an audio recording,

20   played.)

21   Q    All right.  In that call, did Mr. Santos inquire whether

22   there had been any complaints?

23   A    Should I identify the numbers?

24   Q    Yes.

25   A    203-736-7634.

```
1    Q    That was one of the Santos phones?

2    A    Yes.

3              MR. REEVE:  Well, I object to that characterization.

4    It assumes facts not in evidence.  It's a phone he used.

5              MR. VATTI:  I'll take that.  That's fine.

6    Q    All right.  I think I had asked you if Mr. Santos had

7    inquired, "You ain't get no complaints, did you"?

8    A    Yes.

9    Q    All right.  And Mr. Wilson says something like:  On a

10   previous occasion you could taste it's sweet, you could taste

11   it?

12   A    Yes.

13   Q    And Mr. Santos, later on in the conversation, says, "I'm

14   going to go tomorrow, make some moves but I wasn't sure"?

15   A    Yes.

16             MR. VATTI:  I'm going to play Government's Exhibit

17   79.

18   Q    Can you tell us the date, time, and who was involved?

19   A    November 27th, 2011, 10:40 p.m., phone call between

20   Robert Santos and Kevin Wilson.

21             (Government's Exhibit 79, an audio recording,

22   played.)

23   Q    In this call, Mr. Santos indicated, "I've been getting

24   bad reviews, bro"?

25   A    Yes.
```

```
 1   Q    Mr. Wilson later on says, "I ain't been touching it"?

 2   A    Yes.

 3   Q    Mr. Santos says, "Yeah, me neither"?

 4   A    Yes.

 5   Q    Mr. Santos said, "I already know I couldn't do that when

 6   I seen it"?

 7   A    Yes.

 8   Q    Mr. Wilson indicated, "Look real light, right"?

 9   A    Yes.

10   Q    And Mr. Santos said, "Yeah"?

11   A    Yes.

12   Q    Later on, they discuss, Mr. Wilson says, "I gave you 87

13   and I had 83"?

14   A    Yes.

15        MR. VATTI:  All right.  I'm going to play

16   Government's Exhibit 79.1.

17   Q    Can you tell us the date and time of the call?

18   A    November 27th, 2011, 10:44 p.m., phone call between Kevin

19   Wilson and Johnny De Los Santos.

20   Q    All right.  That's the same date as the call we just

21   heard, right?

22   A    Yes, sir, about four minutes later.

23        (Government's Exhibit 79.1, an audio recording,

24   played, and paused.)

25   Q    Right there, did Mr. Wilson say, "It's like really, it's
```

```
 1   really light, there's, you see there's people that like it and
 2   there's people who don't like it"?
 3   A    Yes.
 4             MR. VATTI:  I'm going to move on to Exhibit 80.
 5   Q    What's the date and time of the call?
 6   A    November 30th, 2011, 1:33 p.m., phone call between Robert
 7   Santos, Kevin Wilson.
 8             (Government's Exhibit 80, an audio recording,
 9   played.)
10   Q    All right.  In this call, did Mr. Santos say, "But if I
11   make some rounds, but three for me, that's locked in, you hear
12   me"?
13   A    Yes.
14   Q    Later on he says, "I got three, so know what I'm saying"?
15   A    Yes.
16             MR. VATTI:  Going to play Government's Exhibit 81.
17   Q    What's the date and time of the call, and who's involved?
18   A    It's November 30th, 2011, 3:43 p.m., phone call between
19   Kevin Wilson and Robert Santos.
20             (Government's Exhibit 81, an audio recording,
21   played, and paused.)
22             MR. VATTI:  I'm going to stop this call there.
23   Q    In this call, did Mr. Wilson indicate that he had a
24   problem?
25   A    Yes.
```

1   Q    All right.  And he later said, "I sent Tall Man up there

2   with 100 bands"?

3   A    Yes.

4   Q    Then he later says, "I sent him up there with 75 bands"?

5   A    Yes.

6   Q    All right.  And Mr. Wilson -- Mr. Santos says, "So let

7   him bring them back, them back, and I'll flush them"?

8   A    Yes.

9   Q    Was there an individual in this case that was arrested

10  and charged who had the nickname Tall Man?

11  A    It was a different nickname he used, but yes, there was.

12  Q    Who was that?

13  A    Jeffrey Benton.

14  Q    What was the other nickname that he used?

15  A    Fresh.

16          MR. VATTI:  I'm going to call up Government's

17  Exhibit 204.

18  Q    Who are we looking at there?

19  A    Jeffrey Benton.

20          MR. VATTI:  I'm now going to play Government's

21  Exhibit 81.1.

22  Q    What's the date and time of this call?

23  A    I'm sorry, what was the exhibit number again, sir?

24  Q    81.1.

25  A    November 30th, 2011, 7:26 p.m., phone call between Kevin

1    Wilson and Johnny De Los Santos.

2                (Government's Exhibit 81.1, an audio recording,

3    played.)

4    Q    All right.  Did Mr. Wilson indicate in that call that,

5    "He was supposed to bring me 3"?

6    A    Yes.

7                MR. VATTI:   Next is Government's Exhibit 82.

8    Q    What's the date and time of the call?

9    A    December 1st, 2011, 12:37 p.m., phone call between Kevin

10   Wilson and Robert Santos.

11               (Government's Exhibit 82, an audio recording,

12   played.)

13   Q    All right.  In that call, did they discuss an individual

14   by the name of Fresh?

15   A    Yes.

16   Q    Is that the nickname you mentioned earlier about Jeffrey

17   Benton?

18   A    Yes.

19   Q    All right.  They also discuss "Na-Na came down

20   yesterday"?

21   A    Yes.

22   Q    And whether he was bringing something?

23   A    Yes.

24   Q    All right.  Let me pause on the calls for a minute, and

25   just talk about some arrests that occurred in this case.

```
 1            First of all, Kevin Wilson you mentioned was
 2   arrested on January 3rd, 2012, correct?
 3   A    Yes.
 4   Q    And on that date, did you participate in an interview
 5   with him post arrest?
 6   A    Yes.
 7   Q    And answer, just answer my questions yes or no.  Did he
 8   answer some of your questions?
 9   A    Yes.
10   Q    All right.  And were there other questions that you
11   believed he was minimizing information?
12   A    Yes.
13   Q    Was there an individual by the name of Jameel Wilkes who
14   was a major target of this investigation when it was launched
15   in December of 2010?
16   A    Yes.
17   Q    And in that post arrest interview -- withdrawn.
18            Was one of the goals of the investigation to get a
19   wiretap going on Jameel Wilkes's phone?
20   A    Yes.
21   Q    As of January 3rd, 2012, had you been successful in
22   getting a wiretap going on Jameel Wilkes's phone?
23   A    No.
24   Q    Did Jameel Wilkes change phones frequently?
25   A    Yes.
```

1  Q    On January 3rd of 2012, did you ask Mr. Wilson whether he

2  knew Jameel Wilkes?

3  A    Yes.

4  Q    And did Mr. Wilson deny knowing Mr. Wilkes?

5  A    Yes.

6  Q    All right.  And did you believe that to be truthful?

7  A    That was not truthful.

8  Q    And why did you conclude that that was not truthful?

9  A    Because we had an intercepted call between Kevin Wilson

10  and an individual whom we identified as Jameel Wilkes over the

11  course of the wire.

12  Q    At this point on January 3rd, 2012, were you still

13  looking to get a wiretap going on Jameel Wilkes's phone?

14  A    Yes.

15  Q    And if you are applying for a wiretap, do you again have

16  to show probable cause and necessity?

17  A    Yes.

18  Q    And in evaluating whether there would be necessity for a

19  wiretap on Jameel Wilkes's phone, do you have to explain

20  whether there are any potential cooperating witnesses that

21  might be able to help you investigate Mr. Wilkes, instead of a

22  wiretap?

23  A    Yes.

24  Q    So did you make an assessment on January 3rd, 2012,

25  whether, based on the information Kevin Wilson had provided,

1    whether he was going to be a useful avenue to get to Mr.

2    Wilkes?

3    A    He wasn't at the time, no.

4    Q    Was that because he denied knowing Mr. Wilkes?

5    A    That, and other reasons.

6    Q    At that moment, did you feel, on January 3rd, 2012, that

7    he would be a reliable way of continuing the investigation

8    further, to try to get to Jameel Wilkes, as opposed to other

9    things?

10   A    No.

11   Q    Did you eventually start a wiretap on Jameel Wilkes?

12   A    Yes.

13   Q    And when did that begin?

14   A    I believe it was --

15   Q    Approximately.

16   A    -- February 14th, give or take.

17   Q    All right.  Mr. Wilkes was eventually tapped for

18   approximately how long?

19   A    Approximately three months.

20   Q    And when did the tap on Jameel Wilkes end?

21   A    Sometime in April.

22   Q    Was Mr. Wilkes eventually arrested and charged in

23   connection with this overall investigation?

24   A    Yes.

25   Q    And when was that?

```
 1   A    He was arrested on May 15th, 2012.

 2   Q    All right.  And during that entire period of time, from

 3   January 3rd, 2012, to May 2012, was Mr. Wilson in state

 4   custody as a result of the roughly 150-gram heroin seizure on

 5   January 3rd?

 6   A    He was.

 7   Q    And why did you not press Mr. Wilson on January 3rd,

 8   2012, as to whether or not he knew Mr. Wilkes?

 9            MR. REEVE:  I'm going to object to that.  It's not

10   relevant why he did what he did.  The fact is he didn't.  His

11   state of mind is meaningless at this point.

12            MR. VATTI:  He's a factual witness, your Honor, and

13   I'm anticipating a line of cross-examination that I'm almost

14   certain is going to occur during the Kevin Wilson

15   cross-examination.

16            MR. REEVE:  Then I would suggest this can be

17   deferred to when and if the cross-examination happens and it

18   can be addressed on redirect.

19            MR. VATTI:  I don't see that as being a very

20   efficient process, your Honor.

21            THE COURT:  I'll overrule the objection.

22   A    I'm sorry, sir, I forgot the question.

23   Q    So did I.

24            (The pending question was read by the reporter.)

25   A    Well, he told us that he didn't know Mr. Wilkes.  At that
```

1    point, there was no reason for us to press him that we knew

2    that he actually knew Mr. Wilkes.  We did not tell him who we

3    were, and we left it at that.

4    Q    Did you identify yourselves in that post arrest interview

5    as DEA?

6    A    No.

7    Q    And why did you not do that?

8    A    We don't want them to know that there's any type of

9    federal involvement.

10   Q    So what did you want him to think?

11   A    That he was arrested by the New Haven Police Department.

12   Q    And why did you not want him to know about federal

13   involvement?

14   A    Because common thing is that once individuals are

15   arrested, they go back and they talk to their associates,

16   pertaining to an interview with the federal government, and

17   right away they think that their phones are intercepted, are

18   being targeted for interception.  Sometimes it's the case,

19   sometimes not, but that's what they think.

20            MR. VATTI:  All right.  I'm now going to call up

21   Government's Exhibit 84.

22            Actually, going to go back to Exhibit 83 for a

23   second.

24   Q    Can you tell us the date and time of the call?

25   A    December 1st, 2011, 12:42 p.m., phone call between Kevin

1    Wilson and Robert Santos.

2              (Government's Exhibit 83, an audio recording, played

3    and paused.)

4              MR. VATTI:  I'm going to stop the call there.

5    Q    At the beginning of the call, Kevin Wilson references,

6    "Basically I feel I owe this, I owe Fresh 1500"?

7    A    Yes.

8    Q    "Basically I'm in the hole 1500, you get what I'm

9    saying"?

10   A    Yes.

11   Q    Okay.  Then later on they discuss rubber bands?

12   A    Yes.

13             MR. VATTI:  Going to move on to Government's Exhibit

14   84.

15   Q    This is a text?

16   A    Yes, it is.

17   Q    And who's it between?

18   A    This was on December 2nd, 2011, at 5:15 p.m., an outgoing

19   text message from Kevin Wilson to a phone used by Brittany

20   Odom.

21   Q    What's it say?

22   A    2007 Lafontaine Ave Bronx New York.

23   Q    Whose address is that?

24   A    That's the address of Johnny De Los Santos.

25   Q    Later on you said you thought it was 2110 Lafontaine.

```
 1   Were you mistaken?
 2   A    Correct.  I said 2110.  I wasn't sure.
 3         MR. VATTI:  I'm going to call up Government's
 4   Exhibit 85.
 5   Q    What's the date and time of this call?
 6   A    December 2nd, 2011, approximately 6:02 p.m., outgoing
 7   phone call to Robert Santos from Kevin Wilson.
 8         (Government's Exhibit 85, an audio recording,
 9   played, and paused.)
10   Q    All right.  Right there, did Kevin Wilson indicate he
11   texted to her so she could put it in her GPS?
12   A    Yes.
13   Q    The text message we saw was at 5:15 p.m. that had Johnny
14   De Los Santos's address?
15   A    Yes, sir.
16   Q    All right.  This phone call was at 6:02 p.m. the same
17   day?
18   A    About 47 minutes later.
19         MR. VATTI:  I'm now going to call up Government's
20   Exhibit 86.
21         (Government's Exhibit 86, an audio recording,
22   played, and paused.)
23   Q    What's the date and time, and who are the participants?
24   A    December 2nd, 2011, 6:51 p.m., phone call between
25   Brittany Odom and Kevin Wilson.
```

1          MR. VATTI:  I'm now going to call up Government's

2     Exhibit 87.

3     Q    What's the date and time, and who's involved?

4     A    December 2nd, 2011, 7:43 p.m., phone call between

5     Brittany Odom and Kevin Wilson.

6          (Government's Exhibit 87, an audio recording,

7     played.)

8          MR. VATTI:  I'm now going to play Government's

9     Exhibit 147.

10    Q    What's the date and time of this call, and who's

11    involved?

12    A    147, phone call intercepted on December 2nd, 2011, 7:44

13    p.m., phone call between Johnny De Los Santos, Kevin Wilson,

14    and an unknown female.

15         (Government's Exhibit 147, an audio recording,

16    played.)

17    Q    All right.  The beginning of the call, did Mr. Wilson

18    say, "She's outside"?

19    A    Yes.

20    Q    All right.  And he also asked, "So there's only 60"?

21    A    Yes.

22    Q    And Mr. De Los Santos says, "Yeah"?

23    A    Yes.

24         MR. VATTI:  I'm going to play Government's Exhibit

25    87.1.

1   Q    What's the date and time of the call, and who's involved?

2   A    December 2nd, 2011, 7:46 p.m., phone call between Kevin

3   Wilson and Johnny De Los Santos.

4         (Government's Exhibit 87.1, an audio recording,

5   played, and paused.)

6         MR. VATTI:  I'm going to stop the call there.

7   Q    Did Mr. De Los Santos say, "There were 100 pesos but I

8   wanted to give 50 to a friend of mine"?

9   A    Yes.

10        MR. VATTI:  Play Government's Exhibit 87.2.

11  Q    What's the date and time of the call, and who are the

12  participants?

13  A    December 2nd, 2011, 9:56 p.m., phone call between Johnny

14  De Los Santos and Kevin Wilson.

15        (Government's Exhibit 87.2, an audio recording,

16  played.)

17  Q    That little portion at the beginning when there was a

18  female voice, we're not claiming that that's relevant to this

19  case at all, are we?

20  A    No.

21        MR. VATTI:  I'm now going to play Government's

22  Exhibit 88.

23  Q    Can you tell us the date and time of the call, and who

24  the participants are?

25  A    December 12th, 2011, 3:24 p.m., phone call between

1    Brittany Odom and Kevin Wilson.

2            (Government's Exhibit 88, an audio recording,

3    played.)

4    Q    All right.  In that call, did Mr. Wilson ask Brittany

5    Odom to pass on a message that "Santana had taken a whole one

6    from my cousin"?

7    A    Yes.

8    Q    Did there come a point after December 2nd where Mr.

9    Santos stopped communicating with Mr. Wilson?

10   A    Yes.

11   Q    All right.  And was there a period of time for which Mr.

12   Santos was unavailable?

13   A    Yes.

14   Q    I just want to talk a little bit about the arrest of

15   these individuals that ultimately occurred.  When did Kevin

16   Wilson become aware -- well, withdrawn.

17           The federal indictment in this case was returned in

18   May of 2012?

19   A    Yes.

20   Q    All right.  And was, at that point, Kevin Wilson charged

21   with conspiracy in that indictment --

22   A    Yes.

23   Q    -- to distribute controlled substances?

24   A    Yes.

25   Q    And approximately how many other individuals were

1    arrested and charged in connection with this indictment?

2    A    I believe it was --

3    Q    Approximately.

4    A    -- 47 all together.

5    Q    And was this the first time that, to your knowledge,

6    Kevin Wilson was informed that he was being charged in a far

7    reaching conspiracy and not just the 150 grams of heroin that

8    was seized from him on January 3rd, 2012?

9    A    That's correct.

10   Q    And at some point after that, did Kevin Wilson come in

11   for what's known as a proffer?

12   A    Yes.

13   Q    And what is a proffer?

14   A    Proffer is when someone who has a pending criminal charge

15   comes and talks to the government.  Pretty much we conduct an

16   interview, where they have to tell us about their involvement

17   in criminal activities.

18   Q    All right.  And when approximately was the first proffer

19   with Kevin Wilson?

20   A    August 9th, 2012.

21   Q    All right.  And have there been additional proffers with

22   Kevin Wilson since then?

23   A    Numerous.

24   Q    Have you spent a lot of hours interviewing, you and your

25   investigative team spent a lot of hours participating in

1  interviews with, Kevin Wilson?

2  A    Yes.

3  Q    And at the time that Mr. Wilson was the subject of the

4  federal indictment in May 2012, was there also a wide ranging

5  sweep that occurred in New Haven towards the end of May, 2012?

6  A    Yes.

7  Q    All right.  And in fact, out of this investigation, there

8  were five separate indictments, correct?

9  A    Yes.

10 Q    And did all of the sweeps relative to those indictments

11 take place between approximately May 17th, 2012, and the end

12 of May, 2012?

13 A    Yes.

14 Q    And was Philip Bryant arrested and arraigned at that

15 time?

16 A    He was.

17 Q    All right.  And just tell us the circumstances of Philip

18 Bryant's arrest.

19 A    On May 25th, 2012 -- several attempts were made to locate

20 Mr. Bryant on May 17th, which failed.  Subsequently, Mr.

21 Bryant turned himself in to the United States Marshals Service

22 here in New Haven, Connecticut, on May 25th, 2012.

23 Q    All right.  He turned himself in at this building?

24 A    Yes.

25 Q    And where was he, to your knowledge, living or where did

```
1   you believe he was living as of May 2012?
2             MR. MORAGHAN:  Your Honor, I object at this point.
3             MR. VATTI:  I'll withdraw it, your Honor.  That's
4   fine.
5   Q    Let's talk about Mr. Santos.  Was an arrest warrant
6   issued for Mr. Santos on May 15th, 2012?
7   A    Yes.
8   Q    And were efforts made to locate him?
9   A    Yes.
10  Q    And were those efforts successful?
11  A    No.
12  Q    And what happened after the efforts were unsuccessful?
13  A    He was designated as a fugitive from justice, a federal
14  arrest warrant was entered into the system, and subsequently
15  he turned himself in to a local police department in Georgia.
16  Q    All right.  That was on July 25th, 2012?
17  A    Yes.
18  Q    And how about Mr. Anderson, were efforts made to locate
19  him upon the return of the federal indictment in May of 2012?
20  A    Yes, on May 17th, 2012, several locations associated with
21  Mr. Anderson were searched, and the search yielded negative
22  results for Mr. Anderson.
23            Subsequently, Mr. Anderson contacted the team leader
24  of the arrest team, and subsequently turned himself in in the
25  Fair Haven section of New Haven.
```

1    Q     And just answer this question yes or no.  Did Mr.

2    Anderson give a post arrest statement after being advised of

3    his Miranda rights?

4    A     Yes.

5    Q     And just answer this yes or no.  Have you reviewed that

6    statement?

7    A     Yes.

8    Q     And to whom did he give that statement?

9    A     New Haven Police Department David Zannelli.  At the time

10   he was a task force officer with the ATF.

11         MR. VATTI:  Your Honor, there are some things that I

12   just need to put on the record regarding three of the

13   exhibits, which by agreement with counsel I'm going to just

14   articulate myself instead of posing questions to the witness.

15         THE COURT:  All right.

16         MR. VATTI:  The first one is with respect to

17   Government's Exhibit 11.  This was a transcript that was

18   translated from Spanish to English.  There is no change in the

19   language at all, but there was a portion that was mistakenly

20   attributed to Kevin Wilson when it should have been attributed

21   to Jesus Morales.  That's now been corrected.

22         The statement that is now correctly attributed to

23   Jesus Morales is the following:  "Okay.  I need something

24   that's been on the fire.  It has to be on the fire to let fly

25   right this minute.  I need one."

1          Then in Government's Exhibit 28, there was also

2     another sentence that was attributed to Kevin Wilson when it

3     should have been attributed to Jesus Morales, and that is,

4     "But you have to talk to him and give him the green light and

5     that it's all right with you, whatever, whatever, and he'll

6     deal with me, you hear."  That's now correctly attributed to

7     Jesus Morales.

8          And lastly, in Government's Exhibit 65.5 -- I'm

9     actually going to play that one again, explain what happened.

10          (Government's Exhibit 65.5, an audio recording,

11     played.)

12          MR. VATTI:  The transcript that rolled there is

13     actually correct.  The transcript previously that had been in

14     the parties' binders had incorrectly listed Johnny De Los

15     Santos as the individual that said 120, rather than Kevin

16     Wilson.  What we see up there now is in fact correct, it was

17     Kevin Wilson that said the 120.

18          Those are the corrections, and if I just may have a

19     moment to confer with co-counsel.

20          THE COURT:  Yes.

21          MR. VATTI:  The government has no further questions,

22     your Honor.

23          MR. REEVE:  Your Honor, I know it's 4:45, and I

24     would like to start, because there are a few discrete areas,

25     if it's all right with the Court and the jury, we said we were

```
 1    going to go until 5:00, I'd like to go until 5:00 unless it's

 2    an inconvenience.

 3               THE COURT:  It's now ten of 5:00.  You want to go

 4    until 5:00?

 5               MR. REEVE:  I do, your Honor, if it's okay with the

 6    Court.

 7    CROSS-EXAMINATION

 8    BY MR. REEVE:

 9    Q    Agent Ndrenika, I want to first start with your testimony

10    a few minutes ago in which you labelled Mr. Santos -- I'm not

11    sure you meant this -- a fugitive.  That was something that

12    you put on a piece of paper at the time, correct?

13    A    He was labeled a fugitive, sir.  That was the label.

14    Q    All right.  Did you know when he left Connecticut?

15    A    I did not know when he left, sir.

16    Q    Yes.

17    A    I know communication that was taking place.

18    Q    I'm sorry, the question was:  Did you know what date it

19    was that Robert Santos left New Haven, Connecticut?

20    A    No.

21    Q    Okay.  Did you ever try to determine that?

22    A    No.

23    Q    Did you ever check airline tickets to make a

24    determination of when Mr. Santos left Connecticut?

25    A    I don't believe I had a reason to do that, sir.
```

```
1    Q    All right.  So as we sit here now, for all you know, Mr.

2    Santos was out of the District of Connecticut from sometime in

3    January 2012 until the time of his arrest, correct?

4    A    I don't know where he was, sir, during that time.

5    Q    You have no idea?

6    A    I have no idea.

7    Q    You don't know whether, what he was doing, correct, at

8    the time, between May, early May when the indictments came

9    down, and the time that he walked into a local, if I

10   understand, he walked in and said, "I'm Robert Santos, I

11   understand there's a warrant for me in Connecticut, and I'd

12   like to turn myself in."  That's what happened, right?

13   A    Based on the information that we received from the U.S.

14   Marshals Service, sir --

15   Q    No, I'm not asking you for hearsay information.  I'm

16   asking you, he walked into somewhere and he turned himself in,

17   correct?

18   A    That would be hearsay information as well, sir, something

19   that was told to me.

20   Q    All right.  Now, you don't know how long he had been in

21   that area of the country?

22   A    No, sir.

23   Q    All right.  Now, I want, if I can in the next ten

24   minutes --

25              MR. REEVE:  Your Honor, may I approach the witness?
```

```
 1              THE COURT:  Yes.
 2   Q    Did we have a discussion to try to expedite matters for
 3   purposes of my cross-examination earlier today?
 4   A    Yes, sir.
 5   Q    Okay.  And if you can't answer any question, I'll try to
 6   direct you to a document on my computer that I'm giving to you
 7   right now, okay?
 8   A    Sure.
 9   Q    What I want to do in the next ten minutes is give a more
10   detailed, general overview of the wiretaps in the
11   investigation, because I think there are some important
12   pieces, okay?
13   A    Sure.
14   Q    All right.  Overall investigation started December of
15   2010, correct?
16   A    Yes.
17   Q    All right.  And we've gone through -- and I'm not going
18   to repeat -- the July 29th, 2011, was the first wiretap
19   application that you filed, correct?
20   A    Yes, sir.
21   Q    All right.  And that was for four phones, including
22   Mr. Wilson, what we call TT 4, right?
23   A    Yes.
24   Q    Okay.  And the calls, just so it's clear to everyone,
25   when that wiretap went up, that's a term you use sometimes,
```

```
 1   when it started?

 2   A    Interception initiated.

 3   Q    Okay.  First of all, you submitted the application to a

 4   federal judge on July 29th of 2011, right?

 5   A    I don't know if it was July 29th of 2011 or July 28th,

 6   2011.  Might have been a day.

 7   Q    Okay.  In any event, the order authorizing the intercept

 8   on Mr. Wilson's phone and the three other phones was granted

 9   on July 29th of 2011, right?

10   A    Like I said, once again, the order might have been

11   granted on the 28th; the interception began on the 29th.

12   Q    Okay, all right.  So shortly after the order was signed --

13   A    Yes.

14   Q    --  and the intercept started on July 29th?

15   A    Yes.

16   Q    Okay.  And that was a 30-day order, correct?

17   A    Yes, sir.

18   Q    And it lasted from July 29th to August 27th of 2011, is

19   that right?

20   A    Yes.

21   Q    Okay.  Now, the very first call on that, that was --

22   we've seen a lot of numbers of calls, that was call No. 1,

23   correct, with respect to target telephone 4 --

24   A    Okay.

25   Q    --  the very first call that you intercepted on July
```

1   29th, 2011, was call No. 1?

2   A    Yes, it was a call.  I don't remember which one it was,

3   but yes.

4   Q    But I want to make sure we all understand.  You started

5   at No. 1?

6   A    Yes.

7   Q    Because we've started in the thousands here.  The very

8   first call that we played here for the jury was in the

9   thousands, right?

10  A    Yes.

11  Q    Okay.  All right.  And in fact, the earliest call, I

12  believe, that was introduced here is Exhibit No. 3, which was

13  call No. 5,936, on August 9, right?

14  A    Okay.

15  Q    Right?

16  A    Yes.

17  Q    You accept that representation?

18  A    Yes.  If you want me to get exact, I can look.

19  Q    It's fine.

20  A    If you say that's what it was, that's what it was.

21  Q    Okay.  That means when we look at that, that means there

22  were 5,935 calls and texts in the ten days between July 29th

23  and August 29th, right?

24  A    No, that's not correct.  There were 5,000 attempts

25  between, that includes voicemails, so it's not calls, just to

1   clarify.

2   Q    Okay.

3   A    It's not considered 5,000 communications.  It's 5,000

4   includes calls, text messages, voicemails.

5   Q    Right.

6   A    So it's a variety.

7   Q    I understand that.  But if somebody calls Mr. Wilson and

8   the call doesn't go through in any way, that's not a call?

9   A    That's a call.

10  Q    That is a call?

11  A    Yes, that's what I'm saying.

12  Q    If the number's dialed and Wilson doesn't even pick up,

13  that's registered as a call?

14  A    Absolutely, yes.

15  Q    And that would be included here?

16  A    Yes.

17  Q    Okay, thank you.  And then so at the same time all these

18  calls were coming in, Mr. Wilson, you and your team -- and is

19  it okay if I call it your team?

20  A    Sure.  It was a task force, yes.

21  Q    Just to make it easy.

22  A    Not a problem.

23  Q    Your team, you were listening to calls on three other

24  phones at the same time?

25  A    Yes, sir.

1  Q    All right.  Now I want to ask you if a lawyer told the
2  jury during opening statements that there were 6,000 calls on
3  the Wilson tap, that lawyer would have been mistaken, correct?
4  A    I don't know what the lawyer said.  I wasn't here, so...
5  Q    But there were way more than 6,000?  Again, using the
6  numbers on the Wilson tap from July 29th to the time it got
7  taken down on, immediately after or shortly after January 3rd,
8  2012, are you with me?
9  A    No, you said 6,000.  You lost me there.
10 Q    Okay.  6,000 leaves off a zero and then some, right?  In
11 other words, that lawyer should have said 60,000?
12 A    Okay.
13 Q    If the lawyer's last name was Reeve, it would have been
14 me that made that error, correct?
15 A    I don't know who made -- I wasn't here.
16 Q    But the bottom line is --
17      MR. VATTI:  Objection, your Honor.  I think we're
18 asking the witness to characterize something that was said in
19 opening statements, which is not evidence anyway.
20      MR. REEVE:  It's fine, I don't claim it.
21      THE COURT:  All right.
22 Q    The point of the matter is there were approximately
23 69,000 calls on Mr. Wilson's phone alone during the entire
24 course of the wiretap on his phone from July 29th, 2011, to on
25 or about January 3rd, 2012?

```
1   A    Yes.

2   Q    Okay.  All right.  And now what you're telling us is some

3   of those are calls that maybe never went through but they're

4   reported as a call, right?

5   A    Correct.

6   Q    When I use the term "calls," it includes calls, voice

7   messages, text messages, anything that goes through that

8   phone?

9   A    Correct, sir.

10  Q    And here, in this case, what the jury has from that

11  69,000 calls, just for lack of a better term, I think we

12  understand, the jury has here 156, or approximately 156, is

13  that right?

14  A    That's not right.  They have 156 from 10,000 pertinent

15  calls.  Not 64,000, 64,000 total calls.  There's 10,000

16  pertinent calls overall in the case, pertaining to your

17  defendant or defendants in this case.  There were about 150

18  calls that were introduced.

19  Q    All right.

20  A    So out of the 10,000, 150 were played.

21  Q    So let's make sure we're clear, and then maybe this will

22  be a good point to end for now.  We start with the universe of

23  69,000 plus calls, correct?

24  A    Yes.

25  Q    That includes what you deem pertinent, as well as what
```

1   you deem nonpertinent?

2   A    Correct.

3   Q    We then reduce that number of calls from 69,000 to, you

4   said, somewhere around a little in excess of 10,000 pertinent

5   calls?

6   A    That's correct.

7   Q    Those were calls that you believe are related to

8   Mr. Wilson's drug trafficking business, correct?

9   A    No, Mr. Wilson's criminal activity.

10  Q    All right.  I appreciate that.  Which could extend beyond

11  drug trafficking, is what you're saying?

12  A    Sure, and firearms.

13          MR. REEVE:  Okay.  All right.  Your Honor, that

14  might be a good place to end now, it please the Court.  Thank

15  you.

16          THE COURT:  All right, we will be in recess until

17  Monday morning at 10:00 o'clock, ladies and gentlemen.

18          Over the weekend, just relax, don't discuss the case

19  with anyone, don't permit anyone to discuss it with you.  Have

20  a good weekend.  I hope it will warm up.

21          (In the absence of the jury:  5:00 o'clock p.m.)

22          THE COURT:  Anything further, gentlemen?

23          MR. SILVERMAN:  The government has one matter, your

24  Honor.

25          MR. VATTI:  Your Honor, Mr. Rogan has advised that

1    he potentially intends to call as witnesses two co-defendants

2    in this matter that have already been sentenced.  Their names

3    are Juan Vargas and Jesus Morales.

4          Now, Mr. Morales was represented in this case by

5    Attorney Michael Hillis and Mr. Vargas was represented by Mr.

6    Koffsky, and I think it would be prudent -- I know these two

7    individuals are in transit on the way to New Haven, they may

8    be arriving sometime on Wednesday of next week, and I believe

9    it would be prudent -- to reappoint Mr. Koffsky and Mr. Hillis

10   to represent those individuals, because knowing what the scope

11   of the cross-examination might be if they actually were to

12   testify, I think it would be prudent that they be advised by

13   counsel.

14         THE COURT:  Has anyone contacted either of those

15   gentlemen and advised them they might be needing their

16   services?

17         MR. VATTI:  Yes, I've spoken with both Mr. Hillis

18   and Mr. Koffsky, and they are willing to serve.

19         THE COURT:  Good, that's fine.  Thank you.

20         MR. ROGAN:  Your Honor, just for the record, I spoke

21   with Mr. Koffsky directly this morning on my way to court.  It

22   was his position as stated to me that his representation was

23   concluded as it related to Mr. --

24         THE COURT:  Was concluded?

25         MR. ROGAN:  As it was related to Mr. Vargas.  I have

```
 1   not had an opportunity, despite repeated attempts, to speak
 2   with Attorney Hillis regarding Mr. Morales.  I just want the
 3   record to be --
 4            THE COURT:  We better clarify by Monday whether or
 5   not these gentlemen are continuing to represent those parties.
 6            MR. VATTI:  Yes, I believe that I will speak to Mr.
 7   Koffsky, I believe that if I were to tell him that the Court
 8   is prepared to reappoint him as CJA counsel --
 9            THE COURT:  Yes.
10            MR. VATTI:  -- I'm sure that he would get involved.
11   Likewise, I'm sure that Mr. Hillis will as well.
12            THE COURT:  I assume that these gentlemen still
13   qualify for appointed counsel.
14            MR. VATTI:  Yes, they are both incarcerated at this
15   time.
16            THE COURT:  Yes, if you get in touch with them, I'd
17   appreciate that.  Thank you.
18            Have a good weekend.
19            (5:03 o'clock p.m.)
20
21
22
23
24
25
```

```
 1              INDEX OF WITNESSES              PAGE

 2

 3   ANASTAS NDRENIKA

 4        Continued Direct Examination by Mr. Vatti   398, 481

 5        Cross-Examination by Mr. Reeve              531

 6   BRIAN HALL

 7        Direct Examination by Mr. Silverman        438

 8        Cross-Examination by Mr. Moraghan          456

 9        Cross-Examination by Mr. Reeve             458

10   STANLEY KULIGOWSKI

11        Direct Examination by Mr. Vatti            471

12        Cross-Examination by Mr. Rogan             477

13        Cross-Examination by Mr. Reeve             478

14

15

16

17

18        COURT REPORTER'S TRANSCRIPT CERTIFICATE

19            I hereby certify that the within

20        and foregoing is a true and correct

21        transcript taken from the proceedings

22        in the above-entitled matter.

23

24                  /s/ Thea Finkelstein
                    Official Court Reporter
25
     Dated: _____
```