1              UNITED STATES DISTRICT COURT

2                DISTRICT OF CONNECTICUT

3   * * * * * * * * * * * * * *  x   Criminal Case
                                     No. 3:12CR104(EBB)
4   UNITED STATES OF AMERICA,   :
                 Plaintiff
5                               :
        vs.                        January 27, 2014
6                               :  10:10 O'clock a.m.
    RICHARD ANDERSON, PHILIP
7   BRYANT, ROBERT SANTOS,      :
                 Defendants        New Haven, Connecticut
8                               :
    * * * * * * * * * * * * * *  x
9
                      FIFTH DAY OF TRIAL
10                    MORNING SESSION

11          BEFORE THE HONORABLE ELLEN BREE BURNS
            SENIOR UNITED STATES DISTRICT JUDGE
12                  AND A JURY OF FIFTEEN

13  Appearances:
      For the Plaintiff:          S. DAVE VATTI, ESQ.
14                                 MARC HARRIS SILVERMAN
                                   Assistant U.S. Attorneys
15                                 157 Church Street
                                   New Haven, CT 06510
16
      For the Defendant:          NEAL PATRICK ROGAN, ESQ.
17    Richard Anderson            315 Post Road West
                                   Westport, CT 06880
18
      For the Defendant:          DAVID A. MORAGHAN, ESQ.
19    Philip Bryant               Smith, Keefe, Moraghan & Waterfall
                                   32 City Hall Center, Suite C
20                                 PO Box 1146
                                   Torrington, CT 06790
21
      For the Defendant:          RICHARD A. REEVE, ESQ.
22    Robert Santos               Sheehan & Reeve
                                   139 Orange Street, Suite 301
23                                 New Haven, CT 06510

24    Court Reporter:             Thea Finkelstein RMR, CRR
                                   TheaFinkelstein@aol.com
25  Proceedings recorded by mechanical stenography, transcript
    produced by computer.

```
 1                (In the absence of the jury.)

 2           THE COURT:  Are we ready for the jury, gentlemen?

 3           MR. REEVE:  I believe so, your Honor.

 4           MR. ROGAN:  Yes, your Honor.

 5           MR. REEVE:  Good morning.  I think counsel agree we

 6    don't have preliminary matters to address at this point.

 7    There are matters that were raised over the weekend that can

 8    be addressed at a future time.  They're not ripe right now.

 9           THE COURT:  I have one motion here.

10           MR. REEVE:  Yes, we were thinking -- obviously

11    whatever your Honor wants -- but what we thought it might make

12    sense to bring the jury in, and then discuss that sometime not

13    on jury time, if that's acceptable to the Court.

14           THE COURT:  Sure.

15           MR. SILVERMAN:  Great.  Thank you, your Honor.

16           MR. VATTI:  Thank you, your Honor.

17           THE COURT:  I'd like to get started.  I'm sure the

18    jury would, too.

19                (In the presence of the jury:  10:13 o'clock a.m.)

20           THE COURT:  Good morning, ladies and gentlemen.

21    Hope you had a good weekend.

22                   A N A S T A S   N D R E N I K A

23        having been recalled as a witness, was previously

24        duly sworn and testified on his oath as follows:

25           MR. REEVE:  Good morning, your Honor.  May I proceed
```

```
 1   with the examination of Agent Ndrenika?

 2              THE COURT:  Yes.

 3              MR. REEVE:  Thank you.

 4   CROSS-EXAMINATION

 5   BY MR. REEVE (Continued):

 6   Q    Agent Ndrenika, I want to go back to just a couple of

 7   issues to try to clarify them from the brief time I had the

 8   opportunity to question you on Friday afternoon, at the end of

 9   the day, okay?

10   A    Okay.

11   Q    One of them is:  I used a term "calls," and you indicated

12   to me that I was wrong to use that term because it wasn't an

13   accurate description, correct?

14   A    Correct, sir.

15   Q    We talked about that after court to try to make sure that

16   we could be on the same page.  You suggested a different word,

17   and I accept your suggestion.  Could you tell us how you would

18   like me to refer, if I'm not going to refer to them as calls,

19   what would be the better term to refer?

20   A    Session.

21   Q    Okay.

22   A    68,154 session numbers.

23   Q    Okay.  And the reason for that clarification is because

24   "sessions" includes a number of things, including calls,

25   right?
```

```
 1   A     Yes.

 2   Q     But also including texts?

 3   A     Yes.

 4   Q     And also including voice messages?

 5   A     Yes.

 6   Q     And so to refer to all of those sessions as "calls" was

 7   inaccurate on my part?

 8   A     Correct.  I don't know --

 9   Q     Yes.

10   A     Yes.

11   Q     And it was my error.

12             And a second area that we discussed after court

13   ended yesterday, and the jury was excused, was:  We had a

14   difference about how many total calls there were on target

15   telephone 4.  Do you recall that?

16   A     Yes.

17   Q     I just made a mistake again, so now I'm going to have to

18   rephrase that question.  Let me withdraw that and ask it

19   properly.

20             We had a discussion about how many sessions there

21   were on target telephone 4.

22   A     Yes, sir.

23   Q     And with respect to that one, I made a mistake on the

24   first one, and you made a mistake on the second area, is that

25   fair to say?
```

```
 1    A    Yes, sir.

 2    Q    Okay.  And in your head, as you were up on the stand, you

 3    thought that there were about 75,000 nonpertinent sessions and

 4    about 10,000 pertinent sessions, am I right?

 5    A    Yes.

 6    Q    Okay.  And that was an understandable error on your part,

 7    and the reality is there were a total of 70,000 sessions that

 8    encompassed both pertinent and nonpertinent sessions.

 9    A    Pertinent, nonpertinent, and unknown, yes.

10    Q    And unknown, okay.  And the other area that I wanted to

11    just briefly go back to was:  You used the term "fugitive" on

12    Friday, correct?

13    A    Yes, sir.  Yes.

14    Q    And that was a factual statement as to what happened to

15    Mr. Santos's warrant in terms of the internal law enforcement

16    approach to locating him, fair?

17    A    Yes, sir.

18    Q    Okay.  And, you know, would you agree with me that the

19    term "fugitive" can have different meanings to different

20    people?

21    A    It only has one meaning to me, sir.

22    Q    Okay.  For example, as a defense attorney, you know, if

23    there's a charge against somebody being a fugitive from

24    justice, there are certain things that are part of that

25    charge, right?
```

1    A    Yes.

2    Q    Okay.  And it includes that the person was aware of the

3    charge against him, correct?

4    A    Yes.

5    Q    And that he, in effect, fled the jurisdiction?

6    A    Fled or refused to turn himself in.

7    Q    Okay.  And you were not saying that was the situation

8    here, because you didn't know when Mr. Santos left the

9    District of Connecticut, correct?  You told us that.

10   A    I did not know, no.

11   Q    All right.

12   A    I didn't even know he was gone, so...

13   Q    So the term "fugitive" that you used, as an accurate

14   factual matter on Friday afternoon, was we didn't locate him

15   and we put him into the NCI system and labeled him a fugitive,

16   correct?

17   A    That's what I said, correct.

18   Q    Okay.  And these are all kind of examples of how

19   communication in the courtroom can be difficult at times,

20   correct?

21   A    At times.

22   Q    All right.  Now, I want to go now and continue letting

23   you tell us more about the wiretaps on target telephone 4,

24   okay?

25   A    Okay.

1    Q    All right.  And we've established certain things.  We

2    know the time frame, July 29th through on or about January

3    3rd -- I'm going to have to give the years, I'm sorry.  July

4    29th, 2011 --

5    A    Yes.

6    Q    --  to on or about January 3rd, 2012?

7    A    Yes.

8    Q    And all of the orders you got in this case were after the

9    initial July 29th order, were what we call extension orders?

10   A    Yes, sir.

11   Q    All right.

12   A    Renewals.

13   Q    With respect to the original order and all of the

14   extension orders, all of them were 30-day orders?

15   A    Yes, sir.

16   Q    Correct?

17   A    Yes, sir.

18   Q    All right.  I just want to run quickly by the time

19   frames, so the jury has a sense of what we're talking about

20   here.  With respect to the first order, that order I think was

21   signed shortly before the tap was put up, began, on July 29th,

22   2011, right?

23   A    That's correct, sir.

24   Q    And it ran for 30 days?

25   A    Yes.

1    Q    And you mentioned in your testimony on direct examination

2    that there were -- I think you mentioned this and correct me

3    if I'm wrong, that there were -- in the affidavit, you list

4    two groups of people, is that fair to say?

5    A    I don't know if I designated as two groups.

6    Q    One is target of the investigation?

7    A    Yes, you're referring to the affidavit.  Yes.

8    Q    The other group would be interceptees, and there's a word

9    used in the affidavit which is "likely interceptees"?

10   A    Yes, sir.

11   Q    I want to just back up for a minute, take a step back.

12   Yesterday, you said -- not yesterday but Friday -- you, in

13   response to Attorney Vatti, about what the affidavit

14   contained, I think you said -- again correct me if I'm wrong --

15   that the affidavit contains the facts that you're developing

16   in the course of your investigation?

17   A    Correct.

18   Q    All right.  And when you use the term "fact," just so

19   that we're clear, much of what's in the affidavit is beliefs

20   of your team at the time, based on the developing nature of

21   the investigation?

22   A    Some are facts, some are beliefs, yes, based on your

23   experience.

24   Q    You use the term "facts" to cover everything that was in

25   the affidavit.  Fair to say that with respect to the beliefs,

1   what you were trying to explain to the jury is whenever we put

2   our beliefs in the affidavit, we represent to the court what

3   we believe are accurate beliefs that are honestly held by our

4   team?

5   A    Based on information we have at that time, yes.

6   Q    All right.  Obviously, as you've already told us,

7   investigations are fluid, right?

8   A    Yes.

9   Q    And sometimes beliefs change based on developments in the

10  investigation?

11  A    Yes.

12  Q    All right.  And with respect to the July 29th, 2011,

13  initial wiretap affidavit filed by your team in support of the

14  order that was issued, fair to say that Mr. Santos was not --

15  his name was not -- in that affidavit at all?

16  A    That's correct, sir.

17  Q    In other words, he wasn't listed as a target of the

18  investigation at that time?

19  A    That's correct.

20  Q    He was not listed as an interceptee of the investigation

21  at that time?

22  A    That's correct, sir.

23  Q    All right.  And that -- if you don't know, I have a

24  document here that would, I think, refresh your recollection,

25  I'm happy to share it with you -- but that affidavit -- I'm

1    sorry, strike that.

2            Do you know the end date of that initial order, when

3    it got taken down?

4    A    Had to be August 27th, sir.

5    Q    All right.  And so it ran from July 27th until August

6    27th, both in the year 2011?

7    A    No, July 29th, 2011, through August 27th, to be correct.

8    Q    I beg your pardon, I misspoke again, and I apologize.

9    A    That's okay.

10   Q    And there was a period of time that's not listed on

11   Attorney Vatti's chart here where the intercepts on target

12   telephone 4, Mr. Wilson's phone, there was what I would call a

13   hiatus period, is that right?

14   A    There was a time, a period of time, that were not

15   intercepted, and I believe from August 27th until September 6

16   or September 7th.

17   Q    Okay.  So there was about a ten-day period in between the

18   termination of the initial wiretap order on Mr. Wilson's cell

19   and the resumption of the intercepts, based on the first

20   extension order, is that accurate?

21   A    Yes.  Yes, sir.

22   Q    All right.  So during that approximate ten-day period of

23   time, you weren't listening to any calls --

24   A    That's correct, sir.

25   Q    --  on this phone?

1    A     That's correct.

2    Q     You had your hands full with other phones at the same

3    period of time?

4    A     That's correct, sir.

5    Q     You didn't listen to calls on that phone because you had

6    no authority from the court to do so during that period of

7    time?

8    A     That's correct, sir.

9    Q     Obviously, one of your obligations as law enforcement is

10   to follow the court orders?

11   A     Yes, sir.

12   Q     All right.  And I wanted to ask you, in the affidavit, I

13   wonder if you can clarify something for us, and I want to

14   first go back to your testimony, I think it was on Thursday

15   afternoon.  In reference to your beliefs at the time, July

16   29th, when your team filed the affidavit in support of the

17   order, I believe you said -- but again, correct me if I'm

18   wrong -- that at that time, your belief was that Mr. Wilson

19   had two sources of supply in New York, one for heroin, one for

20   cocaine or crack cocaine, is that a fair summary?

21   A     Yes, sir.  Cocaine and heroin.

22   Q     Okay.  And what I want to ask you about is a statement in

23   the affidavit, on page 12 of the July 29th -- I'll show it to

24   you if you want but I don't think it's contested -- you

25   indicated with respect to Mr. Wilson, a.k.a. Nature, and I'm

1   just going to quote the affidavit, that he was "believed to be

2   a mid level crack distributor supplied by Wilkes."  Do you

3   recall that?

4   A    No, sir.

5   Q    Okay.  All right.  I don't think I have a paper copy of

6   that affidavit here.  While I'm asking you some questions,

7   I'll hope that my computer warms up and I can find the

8   electronic version, and I'll be able to show it to you with

9   the hope that that will refresh your recollection, okay?

10  A    Okay.

11  Q    Now, just while we're talking about this, you had

12  mentioned Mr. Wilkes earlier in your testimony on direct

13  examination with Mr. Vatti, correct?

14  A    Yes, sir.

15  Q    All right.  And I think that was in the context of

16  explaining why you believed Mr. Wilson had not been truthful

17  with you and your fellow team members on January 3rd, 2012,

18  subsequent to his arrest.

19  A    Correct, sir.

20  Q    All right.  And I think what you indicated -- again

21  correct me if I'm wrong -- is that you felt he was withholding

22  his knowledge of Jameel Wilkes from your team?

23  A    That's correct, sir.

24  Q    All right.  Now, also in the affidavit -- Mr. Vatti asked

25  you some questions on it but I want to dig down a little bit --

1    you explained that you have to establish to the satisfaction

2    of an Article III federal judge that it's necessary, that is

3    that the wiretap is necessary; that alternative investigative

4    means are not likely to succeed, correct?

5    A    Correct.

6    Q    And that's a fairly, based on your experience with

7    affidavits, it's a fairly extensive recitation of the salient

8    investigative techniques you can use, and an explanation to

9    the court as to why you won't succeed in reaching your

10   ultimate goals, correct?

11   A    Correct.

12   Q    All right.  And part of that -- we can go through it --

13   you referenced searches and cooperating witnesses and a whole

14   host of options that the jury's already heard.  I don't want

15   to go through the laundry list.  I want to focus in on the

16   possible interviews of the key targets in the case, okay?

17   A    Okay.

18   Q    And with respect -- at that time, July 29, again just to

19   back up, you mentioned on your direct testimony, at that time,

20   July 29th, there were approximately 30 to 45 targets generally

21   of your investigation at that time?

22   A    Individuals who we believed were targets of the

23   investigation, yes.

24   Q    All right.  And you then kind of focused on three people

25   who were the main targets, correct, at that time, July 29th?

1  A    I would say the targets that we could most likely conduct

2  controlled purchases from.  I couldn't consider them main

3  targets.

4  Q    All right.  Okay.

5  A    Some of them, Kevin Wilson was one of them; the other two

6  were stepping stones.

7  Q    Okay.  With respect to those three people -- and the

8  other names aren't relevant, I don't want to go into, there

9  are a whole lot of other people, we got a lot of names here.

10  What I want to make sure, am I reading it correctly that you

11  rejected, your team rejected in the affidavit, the interviews

12  of Mr. Wilson or the other two people as an adequate

13  investigative tool, correct?

14  A    Correct.

15  Q    And one of the things you told the federal judge who was

16  reviewing this to see if there was sufficient information with

17  the order was if you attempted to interview these people,

18  number one, they might not talk, right?

19  A    Correct.

20  Q    Number two, if they did talk, you believed it was likely

21  that the interview would contain a significant number of

22  half-truths and untruths, diverting the investigation with

23  false leads or otherwise frustrating it, correct?

24  A    Correct.

25  Q    And that was your honestly held belief, and the belief of

1    your overall team, when that affidavit was submitted in July

2    of 2011?

3    A    Yes.

4    Q    Okay.  And that language, or similar language, was used

5    throughout the series of extension orders with respect to

6    target telephone 4, correct?

7    A    Yes.

8    Q    Okay.  And so I'm not going to review it in every

9    affidavit.

10   A    Sure.

11   Q    Now let's now go back to the -- if I can navigate quickly

12   to the -- July 29th affidavit --

13            MR. REEVE:  May I approach, your Honor?

14            THE COURT:  Yes.

15            MR. REEVE:  Thank you.

16   Q    I hope it's going to appear here.

17            MR. REEVE:  With the Court's permission, if I can

18   stand here, we can hopefully expedite this a little bit.

19   Q    If we get to page 12, I don't want you to read this, but

20   would this refresh your recollection as to what your team

21   indicated was, at that time, your team's belief, the source

22   for Mr. Wilson's drug dealing, and specifically crack --

23   A    Yes.

24   Q    -- or cocaine?

25   A    Yes.

1   Q    Okay.  And having refreshed your recollection, what is it

2   that your team told the federal judge about Mr. Wilson's

3   source of crack and cocaine, as you believed it at that time?

4   A    We believed that he was being supplied by Jameel Wilkes.

5   Q    All right.  And as you said earlier, honestly held

6   beliefs can change over time, correct?

7   A    They change based on the facts that you establish over

8   the course of the investigation, yes.

9   Q    Sure.  Okay.  All right.  Now, so I think we've gone over

10  some -- I just want to push through the rest of the extension

11  orders.  So on September 2nd, 2011, a second set of documents

12  was submitted to the federal judge, correct?

13  A    If that was the date, that's what it was.

14  Q    All right.  By the way, the judge who was involved was

15  not Judge Burns in this case, correct?

16  A    No.

17  Q    It was a judge, Judge Thompson up in the Hartford federal

18  courthouse, correct?

19  A    Yes.

20  Q    Okay.  And once, common practice, once a judge sees the

21  first affidavit, because he knows about the case, then all the

22  subsequent affidavits are usually submitted to him for his

23  review, and hopefully from your perspective approval of the

24  subsequent orders, correct?

25  A    Correct.

1   Q    All right.  And so there was, again, a minor error that

2   there was a problem with the September 2nd order, because it

3   misidentified something called ESMs, which is entirely

4   irrelevant to this case, I'm not going to belabor it, but do

5   you recall that?

6   A    I think you're talking about Mr. Wilson changing his

7   phone.

8   Q    Right.

9   A    Yes.

10  Q    Inadvertently in the affidavits, the ESM number wasn't

11  changed, and you found out?

12  A    No, that's not correct.

13  Q    Can you explain what the error was?

14  A    If I'm remembering correctly, the affidavit was

15  submitted, Mr. Wilson had a specific phone.  By the time the

16  affidavit was returned and signed, Mr. Wilson had changed the

17  phone, okay?  Which means that the order that the judge had

18  already signed pertaining to one phone with one serial number,

19  now Mr. Wilson had changed the device, now we have a different

20  serial number of the phone.  Therefore, I believe we submitted

21  a new affidavit with a new number.  I believe it was September

22  6th.

23  Q    Okay.  I'm confused now.  I didn't want confusion.  Let

24  me just make sure I understand.  From July 29th, 2011, when

25  you started the tap on Mr. Wilson's cell until January 3rd,

1   2012, it was the same cell phone number, correct?

2   A    Correct.

3   Q    It was the 914 number?

4   A    227, yes.

5   Q    Okay.  There's some kind of registration underneath the

6   cell number, is that what you're telling us?

7   A    Correct, that's how the telephone company identified the

8   phones in the network.

9   Q    All right.  As a result -- that error was totally

10   unintentional, honest mistake made by your team?

11   A    It was not a mistake.

12   Q    Okay.

13   A    It was the fact, that's what the fact was.

14   Q    All right.

15   A    By the time the affidavit came back, the device had

16   changed.  It was not an error on our part.  We documented what

17   the facts were.  By the time the affidavit came back, that

18   phone, the device, had changed, so I won't consider that an

19   error on our part.

20   Q    I accept exactly what you're saying, and I think I

21   mischaracterized it.  It was information you learned from the

22   phone company that caused you to have to go back to the

23   federal judge four days later and get, in effect, another

24   order?

25   A    Correct.  Once you submit the affidavit to the phone

1    company, they say the information provided do not match.

2    Therefore, you have to request subscriber information for the

3    phone.

4    Q    Okay.

5    A    They provide you with the subscriber information, and you

6    can see on the subscriber information that the number is the

7    same, but the device had changed.  You submit a new order to

8    the court, to the judge, for the new device.

9    Q    And that was, in part, the reason why there was a ten-day

10   delay, approximately, ballpark, between the end of the initial

11   order and intercepts and the resumption of the second

12   intercepts pursuant to the second -- to the first extension

13   order?

14   A    Yes, sir.  I believe it was September 6 or 7 by the time

15   we made the corrections.  I think it was the 6th or 7th.

16   Q    Okay.  All right.  If I represented to you that you're

17   correct when you say September 7th, that that was when the tap

18   resumed pursuant to the first extension order, would you

19   accept that representation?

20   A    Yes, sir.

21   Q    Okay.  All right.  And then -- would you also accept that

22   that order was a 30-day order, which we've already said,

23   right?

24   A    Yes, sir.

25   Q    And that that intercept process ended on October 6th, on

1    or about midnight, 11:59 p.m., right?

2    A    Yes, sir.

3    Q    Okay.  Then there was a second gap in the intercepts

4    between extension order number one and extension order number

5    two, correct?

6    A    There was a gap between August 6 and then the new

7    affidavit, yes, or the new extension order.

8    Q    Okay.  I was asking you, after the second -- it gets

9    complicated, doesn't it?

10   A    You can write it down, it would be easier.

11   Q    It's the second order that you got on Wilson's tap.  Do

12   you want me to reference that as extension order number one?

13   A    Whatever you're comfortable with, as long as you stay

14   with one term.

15   Q    Okay.  Let me reference it, so we're all on the same

16   page, as extension order number one, okay?  Extension order

17   number one ended, and the intercepts ended, on October 6,

18   2011, at 11:59 p.m., correct?

19   A    Yes, sir.

20   Q    Okay.  And then the next order that authorized you to

21   intercept communications on Mr. Wilson's phone was issued on

22   October 13th, right?

23   A    That date, I don't remember.  If you tell me the 13th,

24   I'll agree with you.

25   Q    Again, would you accept my representation that it's

1    October 13th?

2    A    Yes.

3    Q    So there was a second gap of some days there, right?

4    A    Yes.

5    Q    Okay.  And in the best of all worlds, you would want the

6    tap to be ongoing, correct?

7    A    Yes.

8    Q    And not to have gaps?

9    A    If possible.

10   Q    Right.  But the realities here are this was an

11   overwhelming investigation?

12   A    It just takes time to prepare the affidavits and review

13   and get them signed by the judge.  Takes time.

14   Q    Right.  We're just here, we're just talking about target

15   telephone number 4 and there are 10,000 pertinent calls on

16   that phone alone.  Just, do you have a ballpark sense of how

17   many pertinent calls over the 22 phones?

18   A    Thousands.

19   Q    Okay.  Hundreds of thousands?

20   A    I wouldn't say hundreds of thousands.  I would say a lot.

21   Q    Okay.  All right.  And I think, I'm just raising that to

22   show the significance, you had a lot of work to do here, you

23   and your team?

24   A    Yes, sir.

25   Q    All right.  And you put in a lot of long hours during the

1   course of this investigation?

2   A    Yes, sir.

3   Q    And that's true of your team members as well?

4   A    Yes.

5   Q    And the next time a politician in Washington, D.C., talks

6   about public employees being on the federal dole, maybe you

7   ought to talk to your team?

8   A    I probably should.

9   Q    Okay.  Because you guys were putting in a tremendous

10  amount of overtime hours, correct?

11  A    It's not considered overtime.  We're not getting paid,

12  sir.  We're salaried.

13  Q    I understand.  You're a salaried employee, but you

14  weren't working 40-hour weeks during this period of time?

15  A    No, 70- to 90-hour weeks.

16  Q    You were all trying to do the best you could to deal with

17  this very complicated web of orders and taps, and making sure

18  you got things right?

19  A    We did have things right.

20  Q    Yeah, okay.  As we discussed, from time to time, mistakes

21  were made?

22  A    Once again, it was not mistakes.  You keep referring to

23  mistakes.  That's not a mistake on my part.

24  Q    Okay.

25  A    That's, if you're referring to the phone number -- the

1    device -- that's beyond anybody's control.

2    Q    All right.  That's fair.

3    A    Talking about facts that you have no knowledge of.

4    Q    I'm going to move on, okay?

5    A    Okay.

6    Q    I totally understand what you're saying, and I accept

7    what you're saying, okay?

8    A    Okay.

9    Q    And with respect to the first extension order, once

10   again, Mr. Santos was not listed, at that time, as a target or

11   likely interceptee of your investigation?

12   A    I believe Mr. Santos was not, yes, that's correct.

13   Q    Okay.  That would be true of the second extension order

14   as well?

15   A    I don't -- he might have not been identified by name

16   Robert Santos; I don't know if he was identified by the

17   nickname of Scoot.

18   Q    All right.  Well, just to kind of pin it down a little

19   bit here, is it accurate to say that it wasn't until October

20   17th, 2011, that you and your team identified what you

21   believed and concluded -- it's undisputed -- was the first

22   telephone call between Mr. Santos and Mr. Wilson?

23   A    I believe it was October 12th.

24   Q    Okay.

25   A    I believe.  I think it was the 12th, the first intercept.

1   Q    All right.  In any event, it was mid October?

2   A    Yes, that's correct.

3   Q    And then after that, then, in subsequent affidavits, Mr.

4   Santos was indeed listed as a likely interceptee on target

5   telephone 4?

6   A    I believe he was listed as Scoot, by the nickname.  I

7   don't think he was listed by the true identity.

8   Q    Understand.  There's already been testimony about how you

9   went about connecting the nickname, Scoot, to Mr. Santos?

10  A    That's correct, sir.

11  Q    All right.  Okay.  But in any event, you didn't know

12  about Mr. Santos until -- you say October 12th, October 17th --

13  A    Give or take.

14  Q    It is what it is, mid October, is that fair?

15  A    Yes.

16  Q    All right.  Now I want to shift gears to another area,

17  and ask you:  Mr. Santos is named in this indictment only with

18  respect to heroin, is that your understanding?

19  A    That's correct.

20  Q    Okay.  And that is based on your investigation and the

21  conclusions that your team, in conjunction with the U.S.

22  Attorney's Office, developed, correct?

23  A    Based on the phone calls and overall investigation, yes.

24  Q    Right, okay.  And the U.S. Attorney's Office is really

25  part of your team, right?

1    A    Yes.

2    Q    I mean, and these guys -- I'm not going to go through the

3    Washington, D.C., politicians, but these are hard working

4    guys?

5    A    Yes, they are.

6    Q    And they put in a lot of overtime hours that they don't

7    get compensated for, either, right?

8    A    Yes, they did.

9    Q    You all put together, at the end of this case, near the

10   end of this case, the conclusion, five separate indictments,

11   and you've told us about that --

12   A    Yes, sir.

13   Q    -- right?

14   A    Yes.

15   Q    That's probably not technically accurate, either, because

16   the U.S. Attorney's Office submits an indictment to a grand

17   jury for its return, and so that's the body that ultimately

18   returns the indictment that has led us here today, right?

19   A    That is correct, sir.

20   Q    And the initial indictment that was returned in mid May

21   of 2012, and you've testified about that, I think you said

22   listed 47 people?

23   A    I believe it was about that, yes.

24   Q    Okay.  And the superseding indictment that Judge Burns

25   read during the preliminary charge, that doesn't list 47 named

1   defendants in this indictment at the present time, that is the

2   one that's now pending, right?

3   A    Correct.

4   Q    But it does -- I don't know, but I think, and you can

5   correct me if I'm wrong, the 47 or 46 or however many names

6   there were in the first, are all listed in the superseding,

7   but it's just some are not listed as charged in this

8   indictment?

9   A    Correct.

10  Q    Fair?

11  A    That's the structure of it, yes.

12  Q    And the jury is going to have that indictment with them.

13  It's not evidence, but they're going to have that charging

14  document in the deliberation room when we reach that stage in

15  this case, right?

16  A    Yes, sir, that's correct.

17  Q    Okay.  And just so that they know, and they're not

18  worried about this, all the a.k.a., the nicknames, the street

19  names, they're all listed in the affidavit for all the people

20  that you've been talking about, or at least most of the people

21  you've been talking about, right?

22  A    Yes, sir.

23  Q    That will give them a little help in sorting out who's

24  who in this complicated world, right?

25  A    Yes, sir.

1    Q    Okay.  By the way, you have -- I think you testified you

2    were a lead or co-lead case agent in a number of wiretap cases

3    before this.

4    A    Yes, sir.

5    Q    Just out of curiosity, did any of those previous cases

6    come anywhere close to the magnitude of this case?

7    A    This was pretty big, sir, yes.  It's unusual.

8    Q    Okay.  And --

9    A    Close to it.

10   Q    I'm sorry?

11   A    Close to it.

12   Q    Others were close to it?

13   A    Yes, sir.

14   Q    Okay.  All right.  And there's kind of one government

15   team in the courtroom, right, when you think about it, it's

16   you, your co-agents, and the U.S. Attorney's Office, right?

17   A    Yes.

18   Q    Just so we're all clear here, there are three separate

19   defense teams, right?

20   A    Yes.

21   Q    And I am the defense team for Mr. Santos, right?

22   A    Yes.

23   Q    Okay.  Then Attorney Moraghan is the defense team for Mr.

24   Bryant, right?

25   A    Yes.

1    Q    And Mr. Rogan is the attorney and is the defense team for

2    Mr. Anderson, right?

3    A    That's correct, sir.

4    Q    And we all, just because of the way this courtroom is set

5    up, we're all sitting at the same table, right?

6    A    Yes, sir.

7    Q    Okay.  But it doesn't mean we're all part of the same

8    team?

9    A    That's correct.

10   Q    Okay.  All right.  All right.  So there are three defense

11   teams and one government team involved in this case, right?

12   A    It's a group of people that are working together.

13   Q    Okay.  All right.  Now, I want to just go through -- I'm

14   not going to go through every extension order.  There were a

15   number of extension orders.  Fair to say that the last

16   extension order was issued on or about December 22nd, 2011?

17   A    If that's what it is, that's what it is.

18   Q    Okay.  All right.  But you made a decision to take down

19   that intercept of Mr. Wilson's cell phone on January 3rd,

20   2012, right?

21   A    Yes, sir.

22   Q    And you had authority from the court to go beyond that?

23   A    Correct, sir.

24   Q    I'm not concerned about the number of days.  That's not

25   when this order ended; that's when your team decided, "We had

```
 1   to take this order down," right?

 2   A    Correct.

 3   Q    Okay.  And I'm not going to go into it right now, but

 4   we're going to go there a little bit later, but there were a

 5   series of events in December 2011 that led you to believe you

 6   needed to take that order down in this case sooner rather than

 7   later?

 8   A    I don't believe that was the reason for it, sir.

 9   Q    Okay.  I believe you testified, it was Friday I think but

10   whatever day it was --

11   A    That's okay.

12   Q    --  that Attorney Vatti asked you a series of questions

13   related to Michael Santana, right?

14   A    Correct, yes.

15   Q    Okay.  And am I right that what you were saying is that

16   was at least one of the primary reasons that you had public

17   safety concerns that led you to close down the tap?

18   A    No, it was not.  I never said that.

19   Q    Oh.  Okay.  All right.  Was there another reason why you

20   didn't continue this wiretap until the 30-day extension order

21   expired?

22   A    We just didn't see a reason to continue it, sir.  The

23   goal was accomplished.  The two sources of supply were

24   identified.  There was a large quantity of heroin coming to

25   Connecticut, to New Haven, and we believed it was time to take
```

1   the wire down.  We couldn't just stay up just because we

2   wanted to.

3   Q    Okay.  Correct me if I'm wrong, but my recollection of

4   your testimony -- and tell us, I don't want to misstate what

5   you said --

6   A    Sure.

7   Q    -- I thought what you told us was that there were

8   concerns you had about the safety of people other than

9   Mr. Wilson that led you to arrest him.  Would that be fair?

10  A    I never said that.

11  Q    Okay.  Is that an accurate statement?

12  A    No, it's not.

13  Q    It's not?

14  A    There were events that took place which we dealt with

15  over the course of the wire.  If you're referring to Michael

16  Santana, if you're referring to Richard Anderson, if you're

17  referring to Joseph Vareen, those are incidents that happened

18  in all the cases we do, give or take.  You have to deal with

19  that, and you have to manage the best you can.

20           If there comes a point when there's public safety,

21  yes, you terminate the investigation.  That was not the case

22  on January 3rd.  Decision was made based on the goals were

23  achieved and based on the heroin coming to Connecticut.

24  Q    Have you testified before the grand jury in this case?

25  A    Have I?  Yes.

1   Q     Have you testified before the grand jury?

2   A     Yes.

3   Q     Do you recall telling the grand jurors on December 3rd,

4   at page 108, that the reason this tap was -- the reason it was

5   ended was because you had concerns about the safety of people

6   other than Kevin Wilson?

7           MR. VATTI:  I'm going to object, your Honor.  If

8   he's going to directly quote from grand jury transcript, I

9   would like to have the witness see it.

10          MR. REEVE:  May I have one moment, your Honor?

11          Let me move to another area while we're getting the

12  transcript.

13  Q    I do want to show it to you, I think that's the fair way

14  to do it.  I just don't have it physically with me right now.

15  All right.

16          Is it fair to say that in addition to the

17  complexities of, and the enormity of, this investigation,

18  there were additional concerns that you developed during the

19  course of the Kevin Wilson intercepts related to public

20  safety?

21  A    As I indicated before, Michael Santana was one of them.

22  Q    Okay.

23  A    Richard Anderson was one of them, Philip Bryant was the

24  other.

25  Q    Okay.  Were there any others?

1    A    Every day, it was something else, sir.

2    Q    Okay.  I guess that's the point I was trying to make.

3    Again, I mean, the jury has a small cross-section of the calls

4    that you all, your team, intercepted on the Wilson cell,

5    correct?

6    A    That's correct, a fraction of it, yes.

7    Q    Fair to say that during this period of time, July 29th,

8    2011, to January 3rd, 2012, you were hearing conversations

9    between lots and lots of people, okay?

10   A    Yes.

11   Q    That were related to acts of violence that had been

12   committed --

13   A    Yes.

14   Q    -- right?  That's one.  And also to acts of violence

15   that people were discussing committing?

16   A    Yes.

17   Q    All right.  And one of the things you had to do was to

18   determine what's real and what's, if you'll accept the term,

19   what's trash talk between guys, right?

20   A    Everything is considered real until determined not to be

21   accurate or fluffed up.

22   Q    Right.  So you, your team, could not assume that any --

23   and the talk about violent activity was on a daily basis

24   running through this whole period of time, right?

25   A    That was the purpose of this investigation, sir.

```
1    Q    Right.  Right.  The purpose was to focus on that, as well
2    as narcotics trafficking, and you told us that, right?
3    A    Yes.
4    Q    Okay.  And so that was a somewhat daunting task for you
5    to determine if there was meat on the bones, if you will, of a
6    threat that you picked up on a given day during the period of
7    time that Mr. Wilson's cell phone was being intercepted?
8    A    Yes, sir.
9    Q    All right.  And it wasn't always easy.
10   A    Law enforcement is not easy, sir.
11   Q    Right.  So I think, I just want to make sure that the
12   jurors understand that this is not just an administrative
13   thing about filing papers with a federal judge; this is about
14   making serious life decisions that can have an impact
15   literally on whether someone gets killed or not --
16   A    Correct.
17   Q    -- right?  And so there's a very good reason that you're
18   putting in all those overtime hours, you and your fellow
19   agents, because this is serious business.
20   A    Drug business is a serious business, sir.
21   Q    Right, okay.  Now, I want to just ask you a few
22   questions --
23              MR. REEVE:  May I have a moment, your Honor?
24              THE COURT:  Yes.
25   Q    And I apologize, Agent Ndrenika, for not having that
```

```
 1   particular page.  If we had all hard copies of all the

 2   documents in this case, they might fill up the entire jury

 3   box, right?

 4   A    You would be killing a lot of trees, yes.

 5   Q    I'm trying to avoid killing too many trees, but I must

 6   admit I've done it during the course of this case.  All right.

 7         So I want to move to Mr. Wilson's arrest and the

 8   timing of that, all right?

 9   A    Okay.

10   Q    He was arrested at about 10:00 p.m. on January 3rd?

11   A    Yes.

12   Q    2012?

13   A    Yes.

14   Q    And that was right -- I shouldn't say right -- but very

15   shortly after he met with Johnny De Los Santos?

16   A    About 20 minutes later, sir.

17   Q    Based on all your intercepts, you believed at that time

18   that Mr. De Los Santos, who resided in Queens, I think, or

19   Bronx --

20   A    Bronx, New York.

21   Q    Bronx, I apologize.  I knew he was in one of the five

22   boroughs, but he's in the Bronx.  You concluded that he was

23   coming up with some drugs?

24   A    Yes.

25   Q    You concluded that he was coming up with what was
```

1   purported to be 150 grams of heroin?

2   A    I don't remember the exact numbers on the line.  I

3   remember it was a large quantity.

4   Q    All right.  We have the lab report in the case that shows

5   the net weight, which is, again, just to make sure we're all

6   on the same page, that's the actual weight of the drugs in the

7   package?

8   A    Correct, sir.

9   Q    All right.  You were constantly surveilling -- when I say

10  you, I'm referencing your team, you were constantly

11  surveilling -- Mr. Wilson from the time of the meet with Mr.

12  De Los Santos until his arrest some 20 minutes later?

13  A    Correct.  I believe it was not the meeting with Mr. De

14  Los Santos; it was with somebody working on his behalf.  Mr.

15  De Los Santos was inside one of the hotel rooms at the time.

16  Q    I understand.  I appreciate that correction, and I think

17  I misstated that.  It was an associate of Mr. De Los Santos on

18  this particular day --

19  A    Yes, sir.

20  Q    -- correct?

21  A    Yes.

22  Q    Okay, all right.  And Mr. Wilson did not have an

23  opportunity, between the time he got the product from De Los

24  Santos's associate until the arrest, to do anything to the

25  heroin, right?

1    A    Correct, sir.

2    Q    I mean, in other words, the package he got from the De

3    Los Santos associate was the package that you ultimately sent

4    to the DEA lab as part of this case?

5    A    Yes, sir.

6    Q    All right.  And whatever purity level is shown on that

7    report, the lab report, that would be the purity level that

8    was provided by De Los Santos and his associates to Mr. Wilson

9    on that particular day in question?

10   A    That's, the substance was provided to Mr. Wilson

11   contained that purity, yes.

12   Q    I understand what you're saying.  What I think you're

13   saying is that, as we've heard through other witnesses,

14   heroin, when someone is delivering like in this situation

15   heroin from New York City to New Haven, Connecticut, it's not

16   100 percent pure heroin.

17   A    It's impossible.  No.

18   Q    Right, okay.  Is that the point you were making there,

19   that I maybe skipped over?

20   A    You were referring to the purity that was delivered.

21   What I said was the substance that contained the purity.

22   Q    Right.  Right.  Right.  And again, I accept the accuracy

23   of your correction of me, because I think we're on the same

24   page.

25   A    Yes, sir.

1    Q    That's where I want to be.

2    A    Yes, sir.

3    Q    All right.  Now, the events that unfolded after

4    approximately 10:00 p.m. -- does 10:01 p.m. sound like what

5    was stated in the report?

6    A    That's what they wrote.  They looked at their radio

7    clock.  It's approximately, give or take.

8    Q    All right.  And then Mr. Wilson, you told us, was taken

9    to the New Haven Police Department on Union Avenue here in New

10   Haven?

11   A    Yes, sir, afterwards.  Yes.

12   Q    For people who aren't totally familiar with New Haven,

13   that's right across the street from the train station, about

14   five minutes from this courthouse?

15   A    Yes, sir.

16   Q    All right.  And he was processed there?

17   A    Yes.

18   Q    And he was booked, and the usual things that happen

19   whenever someone gets arrested, right?

20   A    Yes, sir.

21   Q    All right.  And you told us about how you were pretending

22   to be New Haven police, right?

23   A    I wasn't pretending.  I was never asked.  I conducted an

24   interview.

25   Q    Okay.  Again, I withdraw the word "pretending," because I

1    think you used a different word, which was we tried to make

2    sure he knew that we were not federal agents?

3    A    That's accurate.  Correct.

4    Q    So you didn't go out on this particular night with anyone

5    equipped with a blue federal law enforcement agency coat that

6    says "DEA" on it, right?

7    A    That's correct.

8    Q    You didn't go out with anyone wearing a coat that says

9    "FBI" on it, right?

10   A    They weren't participating, so they would not even be

11   there.

12   Q    The point I'm making, there are times you make an arrest

13   where you do wear those for purposes of identifying

14   yourselves?

15   A    That's correct, sir.

16   Q    Here, you did not want to identify yourselves because of

17   the ongoing investigation, right?

18   A    Correct, yes.

19   Q    Okay.  And then at a point later on, and I'm now moving

20   to the early morning hours of January 4th, 2012, Mr. Wilson

21   was given what we commonly refer to as his Miranda warnings,

22   correct?

23   A    I believe so.  I don't know if it was after or before.

24   Q    Okay.

25   A    They were given to him, yes.

1  Q    Okay.  Even if they were given before, during the course

2  of the interview, you and/or someone else from your team again

3  advised him, if it wasn't the first time then it was the

4  second time advised him, of his rights before questioning him?

5  A    Correct.  Common practice.

6  Q    That interview began at 12:47 a.m. on January 4th, 2012,

7  does that sound right to you?

8  A    Yes, late, very early in the morning.

9  Q    That interview lasted until 1:44 a.m., correct?

10  A    Give or take.

11  Q    Okay.  I have the -- do you want to look at the arrest

12  report, just so we're sure?

13  A    Sure.

14  Q    I really don't want to put words in your mouth.

15  A    Sure.

16  Q    Okay?

17          MR. REEVE:  May I approach the witness, your Honor?

18          THE COURT:  Yes, sir.

19          MR. REEVE:  Thank you.

20  Q    If I can direct your attention to the first page of a

21  report that's dated January 7th, 2012, would you, having

22  refreshed your recollection and looked at this report, would

23  you agree that the interview started at approximately 12:47

24  a.m.?

25  A    Sure.

1    Q    Okay.  And this is not, by the way, a report that was

2    written by you?

3    A    Correct.

4    Q    Okay.  But it was written by one of your other, I think

5    you identified a group of about five or six people who were

6    part of the, really, your leading law enforcement people on

7    this case?

8    A    Correct, sir.

9    Q    Okay.  You were present during this interview?

10   A    Yes, my name's right here.

11   Q    Right, because you were all trying, hoping and trying,

12   that you would get valuable information from Mr. Wilson?

13   A    Yes.

14   Q    Sure.  And then directing your attention to the last

15   page, is it fair to say having refreshed your recollection by

16   looking at this report which was authored by one of your team

17   members that the interview ended at approximately 1:44 a.m.,

18   is that fair?

19   A    That's correct.

20   Q    Okay.  Just so we're on the same page and people

21   understand, when you don't write a report -- let me back up,

22   let me withdraw that and ask another question.  It would be

23   impossible for you to write every report in this case?

24   A    It would be impossible.

25   Q    You would still be in your office burning the midnight

1    oil?

2    A    Still there, probably.

3    Q    Right.  So you rely on fellow officers who observe

4    things, and who might or might not be present with you to

5    write reports?

6    A    Correct.

7    Q    And I'm going to ask you about report writing later, but

8    there's a general protocol used for writing reports, which is

9    standard among everybody who was involved in this case, right?

10   A    And what was that, sir?

11   Q    Well, if you're delegated, when you would delegate

12   someone, you would delegate them because you had confidence

13   that they were going to write a thorough, accurate report?

14   A    Based on information provided, yes.

15   Q    Right.  Right.  And then to make sure, you would

16   typically, if you had time and you weren't involved in another

17   thing, but you would always try to make -- you would always,

18   if you could, try to review the reports to make sure they were

19   accurate?

20   A    Correct.

21   Q    That's what I meant by a standard operating procedure in

22   terms of reports.  Nothing more than that.

23   A    Sure.

24   Q    Okay?  Now, I just want to ask, the report references

25   approximately 12:47 on the start side and 1:44 a.m., and I

1    think what that means is somebody looked at their cell phone

2    or watch and said, "I'm going to write that time down," right?

3    A    Correct.

4    Q    Because that's part of the precision that goes into

5    writing reports, right?

6    A    Yes, sir.

7    Q    All right.  And you testified -- again, I think this was

8    yesterday but if it was Thursday, correct me, but my

9    recollection is that on Friday, you testified -- about the

10   seizure of Mr. Wilson's cell phone.  Do you recall that?

11   A    Correct.

12   Q    Do you recall that the government asked you questions

13   about government exhibits 224 through 230, which were, if I'm

14   correct, photos that you would have taken with a camera or

15   cell phone, I don't care what it was taken with, of pages

16   within Mr. Wilson's cell phone, correct?

17   A    That's correct.  That's what I did.

18   Q    And the government offered pages that related to the part

19   of the cell phone contact list that started with the letter P?

20   A    Yes.

21   Q    Is that right?  But I take it that that wasn't the only

22   part of his cell phone that you took photos of?

23   A    I took photos pertaining to Philip Bryant, Phizzy; and

24   Richard Anderson, and Porter.

25   Q    Did you have an opportunity or subsequent to review all

1    of the contacts on Mr. Wilson's cell phone, the cell phone

2    used in all these calls, the cell phone seized on January 3,

3    2012?

4    A    I reviewed it probably about a week or so ago in

5    preparation to the trial.

6    Q    Did you delegate to anyone else the task of reviewing it

7    closer to the time of the arrest?

8    A    I believe they went through his phone with Mr. Wilson at

9    the time of the arrest, and he would identify who's the

10   nickname on the phone.

11   Q    I take it when you say you reviewed it about a week ago,

12   what you're saying to us is the cell phone, the 914 cell phone

13   that was the subject of these wiretap orders that we've

14   already gone over, that that phone has remained in the custody

15   of the DEA?

16   A    Correct, sir.

17   Q    Okay.  And you have been able to charge that phone up and

18   to look at the contact list as recently as about a week ago?

19   A    It had enough battery left.  I did not have a charger for

20   it, so I did not charge it, no.

21   Q    Okay.  I wish my phone had a battery like that.  The

22   question I'm going to ask you about is, when you looked at S,

23   which would be for either Santos or Scooter, did you find that

24   name, either one of those names?

25   A    Mr. Wilson indicated he had deleted that entry.

1   Q    No, that wasn't my question.  My question was did you

2   find him?

3   A    No.

4   Q    I wasn't asking you to tell us what Mr. Wilson said,

5   because that is, as you know, that's what we kind of call

6   hearsay, correct?

7   A    Correct.

8   Q    I wasn't trying to get you to answer that, but that's

9   okay.  So the number wasn't there?

10   A    Correct.

11   Q    Okay.  The name wasn't there?

12   A    Correct.

13   Q    All right.  Now, I don't want to complicate this a little

14   bit anymore than it already is, but I have to complicate it a

15   little bit just to clear up one potential issue.  There was

16   more, to make your life more difficult, there was more than

17   one Scoot or Scooter that was intercepted on the Wilson phone?

18   A    I don't remember that, sir.

19   Q    You don't?

20   A    If you can refresh my memory.

21   Q    Okay.  There was --

22   A    It might have been a younger kid.

23   Q    Yes.

24   A    Seventeen-year-old, yes, I think so.  Yes.

25   Q    Yes, he came in toward the end, like in December, if you

1   recall -- if you don't, tell me -- that he came in near the

2   end of the wiretap on Mr. Wilson's cell, do you remember?

3   A    I don't remember when he came in, if he came in.  I

4   remember there might have been a younger kid on the phone by

5   the nickname of Scoot, but I believe we knew who the person

6   was.

7   Q    Okay.  Does a name like Kenneth Follen (phonetic) or

8   Forten, something like that?  Does that jog your memory?

9            (Mr. Vatti conferring with Mr. Reeve.)

10  A    You can tell me a name, I'm not going to argue with you.

11  I just don't remember.

12  Q    You know what?  Forget I said that.  All I'm saying is

13  there was another person in the investigation who was referred

14  to as Scoot, or Little Scoot.

15  A    Like I said, I've heard of the name Scoot.  I think it

16  was part of this investigation.  He's a younger kid.  He was

17  part of this investigation.  If he was intercepted or what, I

18  can't tell you.  I just don't remember.

19  Q    The only thing I'm trying to show, and I'm not -- it was

20  clear to you, based on looking at the numbers and the calls,

21  that when this other Scoot called in, it was not Robert

22  Santos, that's all I want to make sure that we're clear on.

23  A    Like I indicated before, I don't have knowledge of him

24  being intercepted.  I've heard the nickname of Scoot.  If you

25  have a line sheet that you can show me.  I'm not arguing with

1    you.  I just don't remember.

2    Q    No, I understand.  Unfortunately, one of the trees I

3    killed, it appears not to have come to court with me today, so

4    we can move on, okay?

5            Now, what you can tell us, based on your own

6    personal observation and just putting aside what you already

7    told us about Mr. Wilson, but it's connected to that --

8    A    Okay.

9    Q    --  there's a couple of options here in terms of when, if

10   ever, Robert Santos's phone number was on Mr. Wilson's cell

11   phone, right?

12   A    If it was ever in his phone?

13   Q    Yes.  You don't have personal knowledge of whether it was

14   ever on the phone?

15   A    Like I said, I don't know.

16   Q    Okay.

17   A    I know he was intercepted.  That's all I can tell you.

18   Q    Okay.  You have information from Mr. Wilson, now that

19   we've gotten into that, that he deleted that number?

20   A    No, the exact words that he said was, "I must have

21   deleted when Mr. Santos stopped answering my phone during the

22   month of December."

23   Q    Okay.  Fair enough.  And going back to the three defense

24   teams in this courtroom who are being tried together because

25   they're all named in the same document, the indictment, right?

1   A    Right.

2   Q    Last week, through your testimony, the jury heard

3   intercepted calls with respect to Mr. Anderson, is that fair?

4   A    Correct.

5   Q    All right.  And most of those calls, not all of them but

6   most of them, occurred before the first call in mid October

7   that was intercepted from Robert Santos?

8   A    Correct.

9   Q    All right.  And I want to just make sure we're all clear

10  here.  Mr. Santos is entirely unconnected in terms -- to Mr.

11  Anderson's calls?

12  A    That's correct, sir.

13  Q    Okay.  The same would be true of Mr. Bryant, we went

14  through a series of calls with respect to Mr. Bryant.  And

15  again, Mr. Santos is not related to those calls?

16  A    That's correct, sir.

17  Q    Okay.

18          MR. REEVE:  I can change the word "related."

19          MR. VATTI:  I think there were references to Phizzy

20  in some of the calls.

21  Q    There were references to people -- when I say "related,"

22  that's a bad word and I'm going to change that word.  What I'm

23  going to say is:  You don't have any evidence that Mr. Santos

24  was next to Mr. Anderson or participated directly or

25  indirectly in any way in all of those calls, fair?

1 A  That's fair.

2 Q  Same with respect to Mr. Bryant, names might have been

3 mentioned during calls, but Mr. Santos was not directly

4 involved in any of those calls?

5 A  Not that we could tell over the phone.

6 Q  All right.  The same would be true if you told us about

7 Mr. Anderson with respect to Mr. Bryant, Mr. Santos, right?

8 A  If they were there sitting next to each other, I just

9 can't tell you.

10 Q  Right.

11 A  Did not get on the phone at the same time.

12 Q  Right.  You hear what you hear.  But what you're telling

13 us is that, no, you don't have any personal observations, and

14 you're telling us neither you nor your team, right?

15 A  That's correct.

16 Q  All right.  And you testified earlier -- toward the end

17 of your direct, I think it was on Friday, but again, if you

18 disagree, it doesn't even matter when -- at a certain point,

19 Attorney Vatti asked you a question about a term that has come

20 up in these calls, and the term was "shorty."  Do you remember

21 that?

22 A  Sure.

23 Q  What you told Attorney Vatti was that that term is used

24 to refer to wives and girlfriends, correct?

25 A  Wives, girlfriends, and then friends.

1    Q     Okay.

2    A     Close friends.

3    Q     All right.  And in fact, sometimes, this is based on your

4    experience with Mr. Wilson, Mr. Wilson used the word "shorty"

5    oftentimes in a generic way with respect to women in general,

6    correct?

7    A     He used -- he probably did.

8    Q     Yes, it was kind of interchangeable and I'm not going to

9    repeat his language, we've heard enough, kind of shorty, in

10   Mr. Wilson's lexicon, was kind of synonymous with the other

11   word he used in the very first exhibit that the jury saw,

12   right, the B word?

13   A     If that's what he used, yes.

14   Q     You know what I'm talking about, you've seen the video --

15   I'm sorry, you didn't see the video.  You saw -- yeah, you did

16   see the video, and you heard the audio of the controlled buy

17   involving Mr. Wilson on May 10th, 2011, right?

18   A     Yes.

19   Q     Okay.  And that's in the record, and the jury has it

20   before them, right?

21   A     Yes.

22   Q     Okay.  And that, just for the record, is Government's

23   Exhibit 120, right?

24   A     If that's what it is.  I'm not disputing.

25   Q     The record is what the record is.

1    A    Correct.

2    Q    In any event, you were here when we all listened to that

3    tape?

4    A    You're referring to the video between the two cooperators

5    and Mr. Wilson?

6    Q    Yes, on May 10th, 2011, the first undercover buy from

7    Mr. Wilson in this case, right?

8    A    Yes, sir.

9    Q    And actually, the jury's been here a long time, that was

10   really kind of the first real visual evidence of kind of what

11   was -- that's a misstatement.  Let me recharacterize that.

12   That was the first image we had of Mr. Wilson?

13   A    I don't know.  I was sequestered, sir, so I don't know

14   what took place --

15   Q    I understand.

16   A    I have no knowledge of what took place in the courtroom

17   prior to me testifying, since I was sequestered.

18   Q    Yes, I understand, and let me rephrase it.  You've seen

19   that video before in your capacity as the lead agent in this

20   case?

21   A    Yes, sir.

22   Q    And I'm using the term B word, because I don't want to

23   repeat all the words, okay?  But you know what I'm talking

24   about.

25   A    I think I do, but...

1   Q    Okay.  I don't want to do it again.  Didn't he use the

2   term "bitch" throughout the first part of that audio and

3   videotape?

4   A    It's language that we heard during the five months from

5   all the defendants.

6   Q    Right.  And I guess those two words were kind of

7   interchangeable for Mr. Wilson, fair to say?

8   A    Mr. Wilson, and numerous others.

9   Q    Let's talk about that for a minute.  You know, you've

10  done a lot of wiretap cases, right?

11  A    Yes, sir.

12  Q    And the language that the ladies and gentlemen of the

13  jury have heard here, unfortunately, is not unusual for you to

14  intercept in the course of wiretap investigations, is that

15  fair?

16  A    It's common.  Yes, very common.

17  Q    Right.  There's a lot of vile things that are said on

18  these calls, and the jury sat here and Judge Burns sat here

19  and listened to them all, is that fair?

20  A    Correct.

21  Q    And sadly -- sadly -- that's pretty much true of any

22  wiretap case you have?

23  A    Unfortunately, but it's the truth.

24  Q    Yes.  And all of us get a little bit, fair to say, a

25  little bit numbed, because you hear it thousands of times in

1   your work, and then I review it after you get the discovery to

2   us, and we have to go through these, and we all get a little

3   numb to that, fair?

4   A    Eventually we do, yes.

5   Q    I would venture to guess that the jurors in this case are

6   not exposed to that kind of language on an every day basis.

7   A    I don't know what they do for work, so I can't tell you.

8   Q    I withdraw it.  I withdraw the question, and again I

9   apologize for speaking at the same time as you.

10          I want to focus for a minute on questions of audio

11  recording of controlled -- let me rephrase that.  I want to

12  focus on the issue of recording procedures that you utilize in

13  your capacity as a DEA agent, and specifically as a lead agent

14  in this case, with respect to making audio recordings of

15  cooperating witnesses involved in undercover purchases, okay?

16  A    Sure.

17  Q    You understand what I'm talking about?

18  A    Yes.

19  Q    That was a long question, and it could have been phrased

20  a whole lot better, but I don't want to go backwards.

21  A    I got it.

22  Q    The standard practice, if you can, is you -- if there are

23  calls that are made before to set up the purchase --

24  A    Correct.

25  Q    -- by the cooperating witness, that's typically done from

```
1    a location where you are with the -- you, by you, I mean your

2    team, one of your team members, multiple team members, are

3    with the -- cooperating witness or witnesses, right?

4    A    Yes.

5    Q    That's what we call in courtroom a consensually monitored

6    phone call, right?

7    A    Consensually recorded phone call.

8    Q    All right.  And if it's consistent with safety, that's

9    what you try to do, right?

10   A    Yes.

11   Q    Because you try to create a record for precisely this

12   purpose here, if the case goes to trial, you want to have the

13   best record possible of what happened, right?

14   A    Phone call as pertains to the evidence, not safety.

15   Q    Okay.  How about when you wire people up and put them out

16   into the community, then there's a safety issue, right?

17   A    Of course.

18   Q    And if it's consistent with your view of safety and if

19   the cooperating witness is willing to do it, you know, you in

20   fact try to wire them up, or wire a car up, whatever you can

21   do to create an audio that shows word for word what happened

22   in the transaction, right?

23   A    Yes.

24   Q    Okay.  And as we know in this case, again with a

25   reference to Government's Exhibit 120, the audio-video of May
```

```
1    10th, 2011, which the jury will have before it, there, you

2    were able to do both audio and video?

3    A    Yes, sir.

4    Q    All right.  Now, the standard operating procedure after

5    the deal is done and the cooperating witness or witnesses give

6    you the product that they purchased from a dealer, you debrief

7    them?

8    A    Yes.

9    Q    Okay.  And standard practice for DEA, not different in

10   this case, you don't record that interview?

11   A    That's correct, sir.

12   Q    Okay.  That's a decision that somebody above your pay

13   grade level has made?

14   A    Long time ago.

15   Q    It's not your personal decision?

16   A    No, sir.

17   Q    It's just the reality of how things work within your

18   office, whether it's -- I'm not asking you whether it's a good

19   policy or bad policy, just that's what happens, right?

20   A    That's across the federal government, sir.

21   Q    Okay.  And so with respect to the cooperating witnesses

22   who are involved with the controlled buys, the record of what

23   they said during the debriefings is contained in written

24   reports?

25   A    Yes, sir.
```

1    Q    All right.  And the same is true with respect to

2    Mr. Wilson, correct?

3    A    Are you referring to report pertaining to the buy --

4    Q    I'm sorry, I interrupted you again.  I showed you a few

5    moments ago the report that was created by one of your fellow

6    team members with respect to the arrest, and the interview

7    after the arrest, of Kevin Wilson, right?

8    A    Yes, we switched gears from May 10th to January 3rd,

9    so...

10   Q    I did, and I didn't say I was, and that's again my fault.

11   All right.  But you understand what I'm saying?

12   A    Yes, sir.

13   Q    Okay.  And that makes report writing in the context of

14   individuals like Kevin Wilson very, very important as a part

15   of your investigation, would you agree?

16   A    I would think it's very important, yes.

17   Q    That's because, not a secret, everybody knows, after

18   you're done with all of the questions that all of us, probably

19   too long winded lawyers but I'll just refer to myself as too

20   long winded, when we're all done, Mr. Wilson's going to come

21   in here and he's going to testify, right?

22   A    I believe so, yes.

23   Q    All right.  And that testimony is a result -- let me

24   strike that.  That's not a good phrase.

25            You did a lot of work with Mr. Wilson before he's

```
 1    going to come in and testify before the ladies and gentlemen

 2    of the jury in this case, right?

 3    A    What do you refer to as "did a lot of work," sir?

 4    Q    What I'm referring to as did a lot of work is you and

 5    your team conducted a long series of proffer sessions with

 6    Mr. Wilson, correct?

 7    A    Yes.

 8    Q    All right.  And we're going to talk about those a little

 9    bit after the break, but maybe what I can just conclude --

10              MR. REEVE:  And if the Court thinks it's a good idea

11    to take a break after I'm done with this area, fine.  If you

12    want me to continue forward, fine.  Either way.

13    Q    The meetings with Mr. Wilson specifically -- again, no

14    different from any other cooperating witness in a situation

15    like this -- oftentimes were quite lengthy?

16    A    Yes.

17    Q    Covered a lot of subject matters?

18    A    Yes.

19    Q    Covered lots and lots of people?

20    A    Yes.

21    Q    Reviewed lots of material?

22    A    Yes.

23    Q    And in that context, you and your fellow agents knew that

24    there was at least a possibility, if not a likelihood, that

25    Mr. Wilson would, in fact, do what he's doing, hopefully later
```

1   today, that is taking the stand, going under oath, and

2   testifying, right?

3   A    That's not, that was not, established until later on,

4   sir.  Whenever he entered into the cooperation.

5   Q    Right.

6   A    At some point, he entered the cooperation agreement.

7   Whatever day that was, that the decision was made that he was

8   going to testify.

9   Q    Right.

10  A    There were numerous proffer interviews conducted prior to

11  it, and he was never designated as a potential cooperating

12  witness who was going to testify at trial.

13  Q    That's fair.  My point is, at the time of those proffers,

14  you understood it was very important to be accurate with the

15  reports?

16  A    The best you could, yes.

17  Q    Sure.  And you understood it was very important to be

18  thorough with those reports, correct?

19  A    Yes, sir.

20  Q    And you made that clear, if you weren't writing the

21  report, you didn't really have to make it clear, it was clear

22  to all your fellow agents in this case that that's what you

23  had to do, right?

24  A    That's common practice.

25  Q    Right.  Right.  That's part of the training at Quantico

1    really is how to write reports?

2    A    For the agents.  It's different for the traffic force

3    officers.

4    Q    Okay.  But you get training on this, and it's an

5    important part of your job.

6    A    Yes.

7    Q    It might not be a part that you like as much as being in

8    the field, but it's a job you do.

9    A    Has to be done.

10   Q    Yes.  And the reports would be, would you agree, the best

11   evidence of what Mr. Wilson said during these proffer

12   sessions?

13   A    It's evidence.  I wouldn't say it's the best or not.

14   It's a description of what he did, participated into, or had

15   knowledge of.

16   Q    Okay.

17   A    Coupled with our own investigation.

18   Q    And as lead case agent, you reviewed all of the proffer

19   reports related to Kevin Wilson, correct?

20   A    Yes, sir.

21   Q    And one of your jobs was to make sure that the report was

22   thorough?

23   A    Correct.

24   Q    And you were present, and we'll talk about this after the

25   break but you were present, at almost all if not all of the

1   proffer sessions involving Mr. Wilson, or am I wrong about

2   that?

3   A    You're wrong.

4   Q    Okay.  You were present at many of them, fair?

5   A    I was probably present about half of them.

6   Q    Okay.  All right.

7   A    Forty, 50 percent.

8   Q    At other times -- we'll go over who was present -- you

9   needed to be confident, in any event, no matter who was there

10  that the proffer reports -- that the reports of what was said

11  at the proffer session -- were accurate, as best people knew?

12  A    I'm going based on what the officer who wrote those

13  reports wrote in it.  I did not have knowledge of what took

14  place during the actual interview.

15  Q    Okay.

16  A    So that's the true, accurate reports submitted by those

17  officers, means that they wrote everything that they thought

18  was pertinent, and they're all inclusive of the proffer

19  interview.

20  Q    Okay.  Well, let's focus, let's change to, you said you

21  were at about half of the interviews yourself.  It's not a

22  fixed number.  Whatever it was, you were there at a percent of

23  these interviews?

24  A    Yes.

25  Q    Doesn't matter how many.  When you reviewed those

1    reports, then you could look at the reports based on your

2    personal knowledge of what transpired during the course of

3    that proffer session?

4    A    Correct.

5    Q    And you were satisfied as lead case agent that that

6    report was accurate, correct?

7    A    Was accurate.  Like I said, I didn't know what took place

8    in the interview.  So I would assume, yes, it was accurate.  I

9    had no reason to believe otherwise.

10   Q    Well, you didn't have to assume with respect to the ones

11   you were there, because you were there?

12   A    Correct, if I was there, I was there, I knew what took

13   place.

14   Q    Right.

15   A    The ones I wasn't, I read the reports and based on the

16   report, that's what took place in it.

17   Q    Right.  Okay.  And so based on your personal presence at

18   these proffer sessions, some of the ones you were there, as

19   well as your review, is it fair to say that any subject

20   discussed with Mr. Wilson was contained in some form -- not

21   word for word but in some way -- in these proffer reports?

22   A    I would think so.

23   Q    Okay.  And I am going to show you a document -- it's not

24   a full tree -- with a lot of yellow stickums and I don't care,

25   I just want to ask you if you would just skim through that

```
1   three-ring binder and tell us if, starting with the -- I'm

2   focusing now on the post arrest proffer sessions, starting

3   with -- these yellow stickums I've just labeled them 1

4   through, is everything in here -- I'm not going to ask you to

5   look through every page, okay?  Basically, all of this

6   information, I'm just skimming through some pages and I said

7   ten but it's really eleven separate proffer sessions that

8   we'll discuss in a moment, all of this material right here,

9   that the record should reflect is, I don't know, do you think

10  it's fair to say that's at least an inch or more than an inch

11  of documents?

12  A    Okay.

13  Q    I don't know, we can count the pages.  I don't care about

14  that.

15  A    Numerous reports.

16  Q    All of these reports are devoted exclusively to the

17  substance of interviews and specifically proffer sessions

18  involving Kevin Wilson?

19  A    I just saw the first page and the last page.  If you tell

20  me that these are all the reports, then I'll agree with you.

21  Q    Okay.

22  A    I don't know if those are every single one of them.  I

23  don't know what you have here.

24  Q    I understand.  I would represent to you that these are

25  all of the proffer, these are all of the DEA, reports that
```

```
1    memorialize the substance of what happened during what appears
2    to be, we'll go over it after the break, 11 proffer sessions
3    with Mr. Wilson, okay?
4    A    Sure.
5    Q    All right.
6              MR. REEVE:  Your Honor, this might be a good time to
7    break, if the Court please.
8              THE COURT:  Sure, we'll take a 15-minute break,
9    ladies and gentlemen.  Please don't discuss the case during
10   the recess.
11             (Recess:  11:36 o'clock a.m. to 11:54 o'clock a.m.,
12   in the absence of the jury.)
13             THE COURT:  Please be seated.
14             Are we ready to have the jury, gentlemen?  Is there
15   anything you want to bring up?
16             MR. REEVE:  I think we're ready, your Honor.  Thank
17   you.
18             THE COURT:  Please bring in the jury.
19             MR. VATTI:  Your Honor, during the break, one of the
20   CSOs indicated that he would check with maintenance about the
21   heat.  It is really cold in here, and I see some of the jurors
22   are appearing to be very cold.
23             THE COURT:  Are they going to do something about it?
24             MR. VATTI:  I think they're going to try.
25             THE COURT:  Okay.
```

```
 1              (In the presence of the jury:  11:56 o'clock a.m.)

 2         THE COURT:  Ladies and gentlemen, we're trying to do

 3    something about the heat in here.  Hopefully it will come up

 4    pretty soon.  I think we're all feeling uncomfortable from the

 5    cold.

 6         Proceed.

 7         MR. REEVE:  Your Honor, may I proceed?

 8         THE COURT:  Please do.

 9         MR. REEVE:  Thank you.

10    Q    Agent Ndrenika, I wanted now to move into a quick, just

11    summary of a timeline of Kevin Wilson, okay?

12    A    Sure.

13    Q    You've gone through some of this, but I want to flesh it

14    out a little bit more.  It actually kind of starts at the

15    bottom of this page.  January 3rd, 2012, is the day he got

16    arrested?

17    A    Yes.

18    Q    Okay.  Attorney Vatti wrote down May 2012, which was the

19    time the initial indictment, not the superseding indictment

20    that the jury will get, but the original indictment in this

21    case was returned?

22    A    Yes, sir.

23    Q    Okay.  And you told the jury, but just to refresh them,

24    that between January 3rd and May 2012, Mr. Wilson was in state

25    custody?
```

1    A    He was, sir.

2    Q    Okay.  And then the date of the indictment -- I was going

3    to bring a marker over.

4         MR. REEVE:  I wonder if Attorney Vatti will give me

5    a marker and a piece of paper I can use.

6         MR. VATTI:  I think it's in --

7         MR. REEVE:  They might be, and I'm blind.  I'm

8    blind.

9    Q    So we've got -- I'm just going to put at the top of this

10   page Wilson chrono, okay?  We already talked about January

11   3rd, 2012, arrest.  We talked about May -- and it was May

12   15th, right, the indictment?

13   A    Yes.

14   Q    Okay.  Indictment, and shortly after that indictment,

15   Mr. Wilson, in a process that's known as being writted out or

16   more formal he was brought in pursuant to a habeas corpus ad

17   subjiciendum?

18   A    That's what it is, yes.

19   Q    He was brought into court to make an initial appearance

20   on the charges that had now been brought against him in

21   federal court, right?

22   A    Yes, sir.

23   Q    And in fact --

24        MR. VATTI:  Your Honor, I'm sorry to interrupt Mr.

25   Reeve, but if I could have permission to move to the back just

1    so I can see?

2              THE COURT:  Yes, sir.

3              MR. VATTI:  Thank you.

4    Q    And if you know, and if you don't know tell us, is it

5    accurate to say that Mr. Wilson initially appeared in this

6    courthouse for the first time on this case on May 24th of

7    2012?

8    A    It sounds right.  About a week after everybody was

9    arrested.

10   Q    Okay.  And I think government counsel would accept my

11   representation that that's the date that appears on the docket

12   sheet for Mr. Wilson, so I'm going to put down May 24th, 2012,

13   first appearance, okay?

14   A    Sure.

15   Q    All right.  Now, that's when all of these cases, around

16   that time, the second two weeks of May, that's when these

17   cases came into not just this courthouse, but the courthouse

18   in Hartford, I think the courthouse in Hartford and this

19   courthouse, am I right?  Or is there part of it in Bridgeport?

20   A    No, two in Hartford, three in New Haven.

21   Q    That's what I thought.  And on or about this date, this

22   first appearance, based on your knowledge and experience, what

23   happens here is an attorney is appointed to represent

24   Mr. Wilson?

25   A    Correct.

```
1    Q     Just like basically with respect to all 105 people,

2    attorneys were appointed to represent them?

3    A     Yes.

4    Q     Okay.  If someone has the funds to pay for an attorney,

5    then they would not get an appointed attorney, right?

6    A     Correct.

7    Q     Okay.  I think the jury would have a sense that, you

8    know, to represent someone on a wiretap case that's this

9    complicated with so many calls and so many documents, it would

10   be an expensive task to hire private counsel, wouldn't it?

11   A     I'm not in the business --

12   Q     If you don't know, just tell us you don't know.

13   A     I don't know.

14   Q     All right.  And then once an appearance is made by an

15   attorney who is appointed to represent Mr. Wilson, then part

16   of what happens is the process of discovery, is that right?

17   A     Correct.

18   Q     And you assist Attorney Vatti and others in his office in

19   putting together what is a very voluminous package of

20   discovery for all the attorneys on behalf of all the 105

21   people, right?

22   A     I provide the U.S. Attorney's Office with the documents

23   that we gathered over the course of the investigation.  It's

24   up to them after that to provide the discovery to the

25   attorneys.
```

1    Q    The good news for you is you don't have to do the copying

2    of the disks, the copies of the documents; that's all up to

3    his office, right?

4    A    Well, I did a lot of that myself.

5    Q    Well, I'm sorry.  In any event, at some point, and it

6    doesn't matter, but at some point shortly after, what happens

7    is each attorney gets a large packet of discovery material

8    from the government?

9    A    Yes.

10   Q    Right?  And in this case, that included CDs that covered

11   all 22 telephone orders, right?

12   A    There was numerous core documents.

13   Q    And all the Title III documents, that we have been

14   talking about, right?

15   A    Everything.  Pen registers.

16   Q    And the pen registers and, in addition to that,

17   surveillance reports, things of that nature?

18   A    Everything we gathered over the course of the

19   investigation.

20   Q    Right.  Okay.  And just so that everybody understands,

21   things like the lab reports and other documents aren't

22   available at this time because there's other work that

23   continues after the indictment is returned, right?

24   A    Yes, sir.

25   Q    And so the process of discovery is an ongoing process

1    that's designed to make sure that attorneys can review the

2    materials with their respective client, correct?

3    A    Yes, sir.

4    Q    Okay.  And that was true of Mr. Wilson, it was true of

5    all three gentlemen who are on trial here, to the best of your

6    knowledge?

7    A    They were provided with the documents.  If their

8    attorneys reviewed those documents with them, I can't say

9    that.

10   Q    I get what you're saying, you know, they get the

11   documents.  What they do, they do.  You can't speak to that.

12          Now, the next date that I want to put on here is

13   August 9th, and you're nodding your head yes so I'm not even

14   going to ask you.  Tell us what August 9th is.

15   A    The first proffer interview with Mr. Wilson.

16   Q    Okay.  And on that date, if you know, was Mr. Wilson

17   provided with what we call in the system a proffer agreement?

18   If you don't know, tell us.

19   A    I don't know if he was.  I would think so because the

20   business of talking to the defendants, usually provide them

21   with proffer agreements.  We should have.

22   Q    Okay.  Now, just so that we're clear, from January 3rd,

23   2012, his arrest date, all the way down to August 9th, 2012,

24   to the best of your knowledge, there was no contact between

25   Mr. Wilson and any law enforcement agent who was connected to

1   this investigation, fair?

2   A    That's accurate.

3   Q    Okay.  And so this is the first date that there was a

4   proffer session with Mr. Wilson?

5   A    I believe that was the first date, yes.

6   Q    Okay.  And-

7          THE COURT:  Mr. Reeve, I wonder if you could explain

8   to the jury what "proffer session" means.  They may not be

9   familiar with the term.

10          MR. REEVE:  Yes, your Honor.  I'm going to let the

11   agent do that.

12   Q    Just an open-ended question.  Could you briefly explain

13   to the ladies and gentlemen of the jury in a summary way, what

14   is a proffer session?

15          MR. REEVE:  Thank you, your Honor.

16   A    A proffer session, or proffer agreement, is a document

17   generated by the United States Attorney's Office, provided to

18   the defendant in a criminal case, where the defendant comes in

19   and meets up with the government and he provides the

20   government all information that he or she knows pertaining to

21   all criminal activities in general, and they have to be

22   truthful, all the information they provide has to be truthful

23   and accurate.

24   Q    Okay.  And that's the general idea of proffer sessions,

25   right?

1  A    In general terms.

2  Q    In the shell of a nut --

3  A    Yes, it's about five pages.  But in one sentence, that

4  kind of summarizes it.

5  Q    All right.  And I want to hold off now, and I'm going to

6  bob and weave in a different direction.  I hope I don't

7  confuse anyone.  I did want to go back to another area, and

8  this is related to the investigation as it specifically

9  relates to my client, Robert Santos, okay?

10 A    Sure.

11 Q    And I'm going to ask you a series of questions and you

12 can answer these questions, I think, yes or no.

13          Were any drugs seized from Robert Santos?

14 A    No.

15 Q    Were any drug-related materials seized from Robert

16 Santos?

17 A    At the time of the arrest, sir?

18 Q    Yes.

19 A    No.

20 Q    Were any warrants requested to search any location that

21 was connected to Robert Santos, in connection with this

22 investigation?

23 A    No.

24 Q    Were there any hand-to-hand buys that were connected with

25 Robert Santos?

1   A    No.

2   Q    Were there any videos where anyone can actually observe

3   Mr. Santos in possession of any narcotics?

4   A    No.

5   Q    Were there any observations by law enforcement of Mr.

6   Santos, where law enforcement agents could actually observe

7   Mr. Santos in possession of narcotics?

8   A    No, we cannot see through walls.

9   Q    Okay.  Were there any observations by law enforcement of

10  Robert Santos, at anytime during the course of this

11  investigation, selling narcotics?

12  A    No.

13  Q    All right.  Now, I want to go to one area just to finish

14  it up, and after the lunch break, I'm going to try to go to a

15  different area that I left a thread hanging and I'm going to

16  go back there.  I just can't do it right now, okay?

17  A    Um hum.

18  Q    I'm going to review the materials and give you an

19  opportunity to respond to the question about your grand jury

20  testimony that I couldn't show you because I don't have it

21  right now, but I'll work over the lunch break and try to put

22  it together.  If I'm wrong, I'm going to tell you I'm wrong,

23  okay?

24  A    Sure.

25  Q    All right.  Now, after -- I'm not going to back up in

1  here but we all know, this is the date that the wiretap on

2  Mr. Wilson's phone stopped?

3  A    Yes.

4  Q    Correct?  But during this time, at or close to mid May,

5  other wiretaps were being conducted, right?

6  A    Wiretaps not directly connected to Mr. Wilson, yes.

7  Q    Correct.  Related to this overall broad investigation,

8  but not in this phase, or whatever you want to call it, of the

9  overall investigation?

10  A    Correct, sir.

11  Q    Okay.  You had to do the same thing during the January,

12  February, March, April, with respect to the other wiretap

13  affidavits and orders that we've already gone through with

14  respect to the Wilson documents, correct?

15  A    Same procedure, sir, yes.

16  Q    All right.  And Attorney Vatti asked you a question or

17  two, I think it was yesterday, about the interview of

18  Mr. Wilson on January 3rd, 2012, do you recall that?

19  A    Yes.

20  Q    All right.  And that was addressed in an affidavit that

21  was dated I believe on or about April 13, 2012, is that

22  correct?

23  A    Yes, sir.

24  Q    That would have been the last series of wiretap

25  affidavits in this case that was submitted by your team?

1    A     Correct, sir.

2    Q     And have I provided you with a copy of this before you on

3    the laptop of a page of the affidavit that was submitted by

4    your team in conjunction with the application for an order on

5    or about April 13th, 2012?

6    A     Yes, sir.

7    Q     And just for the record, if you can, do you see a page

8    number on the page that I asked you to refer to?

9    A     It's page 48, and I can tell you the name of the document

10   is the affidavit signed on April 13, 2012.

11   Q     All right.  And --

12   A     Pertaining to target telephone 18 and 22.

13   Q     Okay.  Other phones unrelated to this part of the

14   investigation, right?

15   A     Yes, sir.

16   Q     But again, in the part about necessity, you set forth in

17   as accurate a way as your team could why there was a necessity

18   for a tap on target phones 18 and 22, is that fair?

19   A     That's correct, sir.

20   Q     Okay.  And I directed you to some specific language, and

21   I wonder if you could -- the language I provided you with is

22   language that relates in that affidavit to Mr. Wilson, is that

23   right?

24   A     That's correct, sir.

25   Q     Okay.  And you mentioned it's on page 48, and just to

1  give the jury a sense, how long were these affidavits,

2  typically?

3  A    It was different.  It varied from 60 pages to 90 pages.

4  Q    Okay.

5  A    They were different.

6  Q    They're long documents.

7  A    Very lengthy.

8         MR. REEVE:  May I have a moment with counsel, your

9  Honor?

10        THE COURT:  Yes.

11        (Mr. Reeve conferring with Mr. Vatti.)

12  Q    I am directing your attention at this point to the April

13  12th affidavit that you have before you, okay?  It's possible

14  I misspoke, and I'm asking you to look at this language, and I

15  might have said this is the first time it appeared.  Is it

16  possible that this language also appeared in earlier

17  affidavits?  If you know, fine; I just want to make sure I'm

18  being accurate here.

19  A    If you're referring to Kevin Wilson and his arrest on

20  January 3rd?

21  Q    Right.

22  A    I would think that that same language was used on all

23  affidavits submitted after the January 3rd, 2012.

24  Q    Okay.  With that correction of the misstatement that I

25  made, could you read that portion of the affidavit, starting

1   with the two words "another consideration," and ending with

2   the three words "compromise this investigation"?

3   A    "Another consideration that weighs against such

4   interviews is that any responses the interviews would contain

5   a significant number of half-truths and untruths, diverting

6   the investigation with false leads or otherwise frustrating

7   it.  This is what occurred following the arrest of Kevin

8   Wilson on January 3rd, 2012.  A post arrest statement, Wilson

9   talked about some people but was not willing to discuss Jameel

10  Wilkes and acted as if he did not know Wilkes, although case

11  agents were aware that Wilkes and Wilson had spoken over

12  target telephone 4.  Thus, case agents could not trust Wilson

13  and did not go further with him out of fear of revealing too

14  much information that might compromise this investigation."

15  Q    Okay.  So going back to our timeline here, that was

16  submitted in April, and submitted, it sounds like, in other

17  affidavits between Mr. Wilson's post arrest statement on

18  January 3rd and April 13, right?

19  A    Yes.

20  Q    Okay.  But at least as late as April 13th, 2012, that,

21  what's stated there, was the facts with respect to Mr. Wilson

22  that the team had, your team developed?

23  A    Was what we believed at that time, yes.

24  Q    Okay.  And we talked earlier about facts and beliefs.

25  This was -- when I say a fact there, this was clearly, you're

1    telling the federal judge in a statement -- not you

2    personally, your team is telling the judge in a statement --

3    that's under oath --

4    A     Sure.

5    Q     --  that these are our honestly held beliefs with respect

6    to Mr. Wilson, right?

7    A     Yes.

8    Q     Okay.  All right.  So that brings us up to somewhere

9    around April -- I'm sorry, in April, and I think I said April

10   13th, and now having covered that, I want to continue with the

11   timeline of what happened with Mr. Wilson.

12              MR. REEVE:  I think the easiest way to do this is

13   I'm going to, with the Court's permission, I'm going to

14   approach Agent Ndrenika, I'm going to provide him with the

15   reports that we spoke about just prior to our morning break.

16   Q     And I'm just going to ask you to go through them.  If my

17   numbering and the pages are correct, you can use the numbers

18   that are marked, and it goes from number one which was on

19   January 13th, so I want to start on January 2nd -- I'm sorry,

20   I misspoke.  Let me withdraw that.

21              I want to start on August 9th, 2012, and I'm going

22   to ask you to tell us a couple of things about each interview.

23   And first of all, let me ask you:  In these reports, customary

24   standard practice of DEA, and it was done in this case, is you

25   put down the approximate start time of the interview and the

1  approximate end time of the interview, correct?

2  A    Yes, sir.

3  Q    And I'm going to ask you to give us, first of all, the

4  date of the proffer session about which the report is

5  prepared, that would be number one, okay?

6  A    Sure.

7  Q    Then on the same proffer session, I'm going to ask you

8  what the hours were that the proffer session was conducted,

9  and then finally, I'm going to ask you who all of the people

10  were who were present at the proffer session, and I want to do

11  that with respect to each --

12  A    Okay.

13  Q    --  each proffer session so we have a clear understanding

14  of what happened here in this process.  Do you understand what

15  I'm asking you to do?

16  A    I got it.

17  Q    Okay.  I am perfectly content not to ask any questions,

18  and just to let you educate the jury about this process, and

19  if you want to go through each one and review it and tell us,

20  I'm going to write down the dates here but I'm not going to

21  write down the hours, okay?

22  A    Okay.

23  Q    And all the people that were there, all right?

24  A    Okay.

25  Q    Why don't you start with the August 9th, 2012, proffer,

1   the first proffer with Mr. Wilson, which led to the drafting

2   of the report that's before you, okay?

3   A    Okay.  So August 9th, 2012, the interview was between

4   10:00 a.m. and 2:00 p.m.

5   Q    Okay.

6   A    There was several law enforcement officers present.

7   Q    Okay.

8   A    Do you want me to identify them?  There's quite a lot.

9   Q    No, I think -- what we can -- is it fair to say, in

10   general, that in all of these proffer sessions, interviews

11   with Mr. Wilson, first of all, there were a number of --

12   oftentimes more than one participant from your DEA team, I'm

13   going to refer to it as, okay?

14   A    Yes, sir.

15   Q    And you understand when I say that, it could be a task

16   force officer who's connected to West Haven or New Haven.  I'm

17   talking about everybody in your investigation, on the police

18   side of the investigation.

19   A    Okay.

20   Q    All right?

21   A    Yes.

22   Q    Is it also fair to say that on all of those occasions, at

23   least one of the two assistant United States attorneys who are

24   sitting here, Attorney Vatti and Attorney Silverman, were also

25   present?

```
 1    A    Correct.

 2    Q    And is it also fair to say that Mr. Wilson was present?

 3    A    Yes.

 4    Q    And is it also fair to say with respect to all of those

 5    interviews, with perhaps some minor times when this was not

 6    the case, that to the best of your knowledge, his attorney was

 7    also present?

 8    A    Yes.

 9    Q    Okay.  That's the attorney we talked about who was

10    appointed back on May 24th of 2012, right?

11    A    I don't know if that was his first attorney.

12    Q    About that.

13    A    I don't know if he switched.  I've seen one attorney

14    since August 9th.

15    Q    All right.  And just so we're all clear, is his attorney

16    in the courtroom right now?

17    A    Yes.

18    Q    Okay.  And that's Attorney Schwartz, right?

19    A    That's correct.

20    Q    Okay.  And Attorney Schwartz is seated on the left of the

21    courtroom, and, you know, I'm just going to move this so the

22    jury can see.  I'm not identifying him as a defendant in this

23    case, but it's the gentleman who has a little bit more hair

24    than I do, who's in a suit in the first row that people are

25    sitting in, right?
```

1    A    Yes, sir.

2    Q    This is the attorney who was present during almost all,

3    or at least the vast majority, of the portions of these

4    proffer sessions, fair?

5    A    Yes, sir.

6    Q    Okay.  Now, let me move this back to obscure Attorney

7    Schwartz just for a moment, and ask you to continue.

8         So we know this first interview, and I'm just going

9    to put down the time, four hours give or take?

10   A    Yes, sir.

11   Q    Ballpark.  I'm not asking for precise times, but what I'm

12   trying to do is get a realistic ballpark assessment of how

13   many of these things happened and how long, and let's just go

14   through those two.  We don't have to go through the people,

15   we've already done it for all of them, okay?

16   A    Okay.  August 28th, 2012.

17   Q    August 28.  Okay.  How long -- what were the hours, and

18   approximate length of that meeting?

19   A    10:00 a.m. to 3:00 p.m.

20   Q    Okay.  Five hours, ballpark?

21   A    Yes.

22   Q    Okay.  What comes next?

23   A    Proffer labeled proffer number four.

24   Q    Okay.  What was the date of that proffer?

25   A    This is January 14th, 2013.

1    Q    Okay.

2    A    From 9:50 in the morning until 12:55 p.m.

3    Q    So that sounds three hours, is that okay if I write

4    three?

5    A    Sure.

6    Q    Okay.  All right.  Three hours, okay.  Give us the next

7    proffer session attended, at which Mr. Wilson was providing

8    information to you and your fellow law enforcement

9    participants.

10   A    February 15, 2013.

11   Q    February 15?  Okay.

12   A    Between 2:10 p.m. to 2:45.

13   Q    Okay.

14   A    35 minutes.

15   Q    What's that?

16   A    35 minutes.

17   Q    35 minutes, okay.  So okay here if I put a half an hour?

18   A    Sure.

19   Q    All right.  Give us the next one.

20   A    March 19th, 2013, from 10:15 a.m., and this does not have

21   a time certain when it ended.

22   Q    Okay.  We don't know, as we look at that report, how long

23   it was.  Is there anything in the report of the length of the

24   report or anything that would indicate to you whether it was

25   like a short interview, like the half hour, or whether it was

```
 1    a little bit longer, like the ones we have been talking about,
 2    if you can?
 3    A    No, I would say this was probably an hour interview.
 4    Q    An hour?  Okay.
 5    A    It's only three pages.
 6    Q    Would it be okay if I wrote down one?
 7    A    Sure.
 8    Q    Why don't we go to the next one?
 9    A    The next one is September 19th, 2013, from 10:26 in the
10    morning until 2:59 in the afternoon.
11    Q    Okay.  So what should I write down here on that one?
12    A    Four hours?
13    Q    All right.  Four.  Okay.  What's next?
14    A    October 3rd, 2013.
15    Q    Okay.
16    A    From 2:10 in the afternoon until 4:01 in the afternoon,
17    so two hours -- three hours and 50 minutes -- I'm sorry, two
18    hours.
19    Q    Two hours, right?
20    A    Two hours, yes.
21    Q    All right, I'll write down two.  All right.  I'm going to
22    flip the page over, and we'll start with the rest on the
23    second page of the Wilson chrono, and I'm just going to put
24    here page 2.  Okay.  What's the next one?
25    A    October 8, 2013.
```

1    Q    Was that October 8?

2    A    Yes, sir.

3    Q    Okay, thank you.

4    A    10:24 in the morning until 4:45 in the afternoon.

5    Q    Okay.  Is that about six hours?

6    A    No, four hours and 20 minutes.

7    Q    Four twenty.  I'm just going to write down four, would

8    that be okay with you?

9    A    Sure.

10   Q    Okay.  What's next?

11   A    October 10th, 2013.

12   Q    Okay.

13   A    From 9:30 in the morning until 4:00 o'clock in the

14   afternoon, so six-and-a-half hours.

15        You were correct on October 8th, that was six hours.

16   Q    That was six hours on October 8?

17   A    That's correct.

18   Q    I'm going to change the four to a six, and we'll know

19   where we are.

20   A    Sure.

21   Q    All right.  What's next after October 10th?  Are there

22   any left?

23   A    October 11.

24   Q    October.

25   A    9:30 in the morning until 4:00 o'clock in the afternoon.

1    Q     That sounds like six-and-a-half again?  Is that right?

2    A     Yes, sir, six-and-a-half.

3    Q     Six-and-a-half?  Okay.  All right.  What's next?

4    A     That was the last one, sir.

5    Q     Is that the last one?  Okay.

6    A     Supplementary report, but not a proffer.

7    Q     The supplemental report, so it's clear, that's a report

8    that relates to an earlier interview, so it's not a separate

9    proffer session.  Okay.

10            And I want to go back and ask a couple more

11   questions about this.

12            MR. REEVE:  And if I understand correctly, I have

13   sources who have told me that because of a scheduling issue,

14   we're going to have to break for lunch at 12:30.  With the

15   Court's permission, I'm going to take up the next five minutes

16   to cover this area and we'll be done.

17   Q     Okay?

18   A     Sure.

19   Q     Now, is it fair to say that I asked you earlier about the

20   contacts with Mr. Wilson between January 3rd, 2012, and August

21   9th of 2012, and you said no law enforcement conduct during

22   that period of time, correct?

23   A     Correct.

24   Q     Would that also apply to all of the time periods between

25   all the dates that we've listed here?  In other words, is this

1    the universe of all the meetings with Mr. Wilson related to

2    this case that was -- that occurred, okay?

3            MR. VATTI:  May I have a moment to confer with Mr.

4    Reeve, your Honor?

5            MR. REEVE:  Yes.

6            (Mr. Vatti conferring with Mr. Reeve.)

7    Q    Let me rephrase that question, okay?  And right now, I'm

8    just focusing on the period of time -- let me see, what's the

9    best way to phrase this.  There have been other trials in this

10   case, is that right?

11   A    Yes.

12   Q    And as part of trial preparation, it's perfectly

13   appropriate and legitimate for lawyers on both sides to meet

14   with the witness, correct?

15   A    That's correct.

16   Q    All right.  And for purposes of trial preparation in

17   either this case, the Wilson and related case, the people in

18   the Wilson part, or in other cases, if you know, have there

19   been other meetings with Mr. Wilson that we could label not

20   proffer sessions, but trial preparation sessions?

21   A    Yes.

22   Q    Okay.  And again, there's nothing nefarious or wrong with

23   that process.  That's what lawyers are supposed to do, right?

24   A    That's correct.

25   Q    Okay.  And is it standard procedure when there is a trial

1    preparation meeting to prepare a report?  Let me forget about

2    standard operating procedure.

3              To the best of your knowledge in this case, were any

4    reports prepared as a result of any trial preparation meetings

5    that government counsel and law enforcement had with

6    Mr. Wilson?

7    A    No.

8    Q    Okay.  And is it fair to say that the times when a report

9    would have been written is if Mr. Wilson said something

10   different in the trial preparation meetings than he had said

11   in all of these proffer sessions?

12   A    Correct, different or additional.

13   Q    Okay.  All right.  So, and so, what I hear you saying is

14   to the best of your knowledge, that did not happen in this

15   case?

16   A    That there was no other report generated?

17   Q    No, that he didn't give any new information or

18   inconsistent information with what he had said earlier, is

19   that fair?

20   A    After August 9th, 2012, all information he provided were

21   corroborated, and have been the same information throughout.

22   Q    Okay.  I understand what you're saying, but I'm not

23   asking you that question.  I'm just asking, did you ever have,

24   you or other agents or anyone, to the best of your knowledge

25   ever have, occasion to write a report because something new

1   came up in a trial preparation meeting?

2   A    No.

3   Q    Okay.  That's really what I want to hear.  There's just

4   two other areas.

5          How did Mr. Wilson get to these meetings, if you

6   know, just so it's clear to everyone?

7   A    You just pointed from the top-bottom.  If you're

8   referring from August 9th on?

9   Q    From August 9th, 2013 -- the meetings occurred at

10   different places at different times?

11   A    That's correct.

12   Q    Forget about where they happened.  Was Mr. Wilson in

13   custody during this period of time?

14   A    He's always considered custody, either inside a facility

15   or is in custody with us, he's in our custody.

16   Q    So law enforcement had to make arrangements to get

17   Mr. Wilson to wherever the meeting sites were, and that's not

18   relevant, I'm not going to ask you where they were, but

19   someone had to go get him from whatever facility he was in and

20   bring him to this meeting and then return him to whatever

21   facility he was in, is that fair?

22   A    Yes, sir.

23   Q    Okay.

24          THE COURT:  Mr. Reeve, I wonder if we could take the

25   luncheon break now.

1          MR. REEVE:  We can, your Honor.  Again, not only did

2   I interrupt the witness; I just interrupted the Court, for

3   which I apologize.  This is a perfect time to stop.

4          THE COURT:  Good, because our court reporter has a

5   commitment.

6          (Luncheon recess:  12:32 o'clock p.m.)

7

8                  INDEX OF WITNESSES                  PAGE

9   ANASTAS NDRENIKA

10      Continued Cross-Examination by Mr. Reeve 544

11

12

13

14

15

16

17

18         COURT REPORTER'S TRANSCRIPT CERTIFICATE

19          I hereby certify that the within

20      and foregoing is a true and correct

21      transcript taken from the proceedings

22      in the above-entitled matter.

23

24               /s/ Thea Finkelstein
                 Official Court Reporter

25   Dated: _____