1              UNITED STATES DISTRICT COURT

2                DISTRICT OF CONNECTICUT

3    * * * * * * * * * * * * * *  x   Criminal Case
                                       No. 3:12CR104(EBB)
4    UNITED STATES OF AMERICA,    :
                  Plaintiff
5                                 :
         vs.                          January 29, 2014
6                                 :   10:28 O'clock a.m.
     RICHARD ANDERSON, PHILIP
7    BRYANT, ROBERT SANTOS,       :
                  Defendants          New Haven, Connecticut
8                                 :
     * * * * * * * * * * * * * *  x

9
                   SEVENTH DAY OF TRIAL
10
          BEFORE THE HONORABLE ELLEN BREE BURNS
11         SENIOR UNITED STATES DISTRICT JUDGE
                  AND A JURY OF FIFTEEN
12
     Appearances:
13     For the Plaintiff:          S. DAVE VATTI, ESQ.
                                   MARC HARRIS SILVERMAN
14                                 Assistant U.S. Attorneys
                                   157 Church Street
15                                 New Haven, CT 06510

16     For the Defendant:          NEAL PATRICK ROGAN, ESQ.
       Richard Anderson            315 Post Road West
17                                 Westport, CT 06880

18     For the Defendant:          DAVID A. MORAGHAN, ESQ.
       Philip Bryant               Smith, Keefe, Moraghan & Waterfall
19                                 32 City Hall Center, Suite C
                                   PO Box 1146
20                                 Torrington, CT 06790

21     For the Defendant:          RICHARD A. REEVE, ESQ.
       Robert Santos               Sheehan & Reeve
22                                 139 Orange Street, Suite 301
                                   New Haven, CT 06510

23
       Court Reporter:             Thea Finkelstein RMR, CRR
24                                 TheaFinkelstein@aol.com

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.

```
 1                 (In the absence of the jury.)

 2             THE COURT:  Good morning.  Please be seated.

 3             One of our jurors had an unfortunate situation.

 4   I'll have Patty explain it to you.

 5             THE CLERK:  She's fine now that the person was

 6   found, she feels she can concentrate.

 7             MR. REEVE:  Just for the record, your Honor, Patty

 8   has been kind enough to keep all counsel apprised.  There was

 9   an article, she's been given an article, that the person was

10   found, and she's okay.  I don't think anyone feels a need to

11   question her.

12             THE COURT:  The experience has been difficult for

13   her I think, and we know now that he's okay, so she has no

14   further concerns.

15             MR. REEVE:  Exactly, yes.  I think so.

16             THE COURT:  Okay, we can go ahead with the trial,

17   unless you have any other matters, gentlemen.  Do you?

18             MR. VATTI:  Not for the moment.

19             MR. REEVE:  I think we can proceed.

20             MR. VATTI:  Mr. Rogan has something.

21             MR. ROGAN:  Briefly.  Back on December 10th, you

22   issued two ex parte applications for writs to produce certain

23   individuals.  I'm asking the Court now to vacate those writs

24   of habeas corpus testificandum.  Those two individuals will

25   not be necessary during this trial.
```

1          I've also advised the marshals services, and I want

2     to thank them for locating the prisoners, and I spoke with

3     them this morning after conferring with my client, and those

4     individuals will not be appearing in court.

5          THE COURT:  Were you the attorney who asked me to do

6     that, sir?  Fine.

7          MR. ROGAN:  Yes, your Honor.  If you would vacate

8     your prior order to produce.

9          THE COURT:  Could you put the names on the record?

10          MR. ROGAN:  Certainly, your Honor.  Jesus Morales

11     and Juan Vargas.  I understand from the marshals service one

12     individual was in the building, one is en route, and we were

13     able to, with the help of the marshals service, turn that

14     other vehicle around.

15          THE COURT:  That's fine, thank you.

16          MR. ROGAN:  You're welcome.

17          THE COURT:  Okay.

18          (In the presence of the jury:  10:32 o'clock a.m.)

19          THE COURT:  Good morning, ladies and gentlemen.

20          You may be seated.

21                    K E V I N   W I L S O N

22          having been recalled as a witness, was previously

23          duly sworn and testified on his oath as follows:

24          MR. SILVERMAN:  May I resume, your Honor?

25          THE COURT:  Yes.

```
 1              MR. SILVERMAN:  Thank you.

 2    DIRECT EXAMINATION

 3    BY MR. SILVERMAN (Continued):

 4    Q    Good morning, Mr. Wilson.

 5    A    Good morning.

 6    Q    I want to tie up a couple of loose ends from your

 7    testimony yesterday, and we have to press ahead with just two

 8    more topics, and then I'll get to sit down.

 9              On May 10th, 2011, who was living on Judson Street

10    in the building that you referred to as the yard, who you

11    knew?

12    A    Phizzy and Gutter.

13    Q    Phizzy's Mr. Bryant?

14    A    Yes.

15    Q    And Gutter is Quiyon Reid?

16    A    Yes.

17    Q    Was Vincent Clark living there at that time?

18    A    He could have been, but I don't really remember if he was

19    living there.

20    Q    Okay.  I want to turn back to Mr. Anderson now for a

21    moment.  I think this is the only call that I'll be playing

22    for you today, it's Government's Exhibit 135.

23              (Government's Exhibit 135, an audio recording,

24    played, and paused.)

25    Q    Based on the voices, who are the participants in that
```

1    call?

2    A    Me and Mr. Anderson.

3    Q    In that call, when Mr. Anderson asked you, "Cousin never

4    come through," what did you understand him to mean?

5    A    Talking about the person I call my cousin, my connect.

6    Q    That's Mr. De Los Santos?

7    A    Yes, Na-Na.

8    Q    When you said, "Shit on death row," what did you mean?

9    A    I was letting him know that I had drugs.

10   Q    What drugs did you have?

11   A    I had heroin.

12   Q    And when he said, "No, I'm talking about for what I do,"

13   what did you understand him to mean?

14   A    Meaning coke or crack.

15   Q    And when you responded, "Oh Na-Na Na, I don't even know

16   if he's going to bring that to me," what did you mean?

17   A    Letting him know that I didn't think Na-Na was going to

18   be bringing me coke or crack.

19   Q    Just heroin?

20   A    Just heroin.

21        MR. SILVERMAN:   This is Government's Exhibit 227.

22   Q    Is that a picture of your cellular telephone seized on

23   January 3rd, 2012, at the time of your arrest?

24   A    Yes.

25   Q    Is that from the contacts directory in your cellular

1    telephone?

2    A    Yes.

3    Q    Is that the entry under Porter in your cellular

4    telephone?

5    A    Yes.

6    Q    Could you just read the phone number that appears in that

7    entry?

8    A    475-227-4114.

9    Q    Now just to tie things up, yesterday you testified that

10   when Mr. Morales was looking for crack cocaine, you referred

11   him to both Mr. Hines and to Mr. Anderson, is that right?

12   A    Yes.

13   Q    Why not just send him to Mr. Hines?

14   A    Because Mr. Hines used to do the same thing that Morales

15   did, as far as bagging up eight balls.  He was a lower level

16   dealer.

17          MR. MORAGHAN:  I didn't catch the end.

18          THE COURT:  Could you keep your voice up, sir?  It's

19   difficult to hear in this courtroom.

20          Do you want that repeated?

21          MR. MORAGHAN:  Yes, please.

22   A    Because Mr. Hines was a lower level dealer.

23   Q    You said earlier in your response that Mr. Hines and Mr.

24   Morales did the same thing, bagging up smaller quantities,

25   something along those lines?

1   A    Yes.

2   Q    Did you mean that they would break down eight balls into

3   smaller amounts for sale on a street corner?

4   A    Yes, that's what I meant.

5   Q    So eight balls are 3.5 grams, right?

6   A    Yes.

7   Q    So they were selling dimes and dubs?

8   A    Yes.  Well, I don't know exactly how they packaged it up.

9   They, they packaged it up how they packaged it up.

10  Q    So did it make sense then to send Mr. Morales, who in

11  your mind was a street level dealer --

12       MR. REEVE:  I'm sorry, your Honor, I'm going to

13  object to leading.

14       MR. SILVERMAN:  I'll rephrase the question.

15  Q    So why wouldn't you send one street level dealer to

16  another street level dealer?

17  A    I made a lot of phone calls to a lot of different people,

18  trying to find somebody for Mr. Morales to deal with.

19  Q    And what happened as a result of making all those phone

20  calls?

21  A    I got some people didn't have it, got turned down, until

22  I found somebody who said that they had it.

23  Q    That was Mr. Anderson?

24  A    Mr. Hines and Mr. Anderson, yeah.

25  Q    And at that point, September, from the phone calls that

```
 1   we were listening to yesterday that you made the referral for

 2   Mr. Morales to Mr. Anderson, at that point Mr. Bryant had

 3   already provided you with an ounce of cocaine, right, May

 4   10th, 2011?

 5   A    Yes.

 6   Q    Why didn't you just refer Mr. Morales to Mr. Bryant?

 7   A    Mr. Bryant didn't have any crack at that time.  If I

 8   remember correctly, he didn't have any at that time.  I might

 9   have called him already and asked him, he might have turned me

10   down.  I'm not absolutely sure I did.  For some reason, I knew

11   not to call him.

12   Q    So after making all your calls, you ended up with Mr.

13   Hines and Mr. Anderson as people to connect Mr. Morales to?

14   A    Yes.

15   Q    Okay.  I want to turn now to the extent of your drug

16   trafficking, and I want to do it over the course of your

17   lifetime.  I want to talk about the amount of drugs you've

18   moved over your lifetime, okay?

19   A    Um hum.

20   Q    So not just the time frame of the conspiracy, January

21   2011 to January 2012, but your entire life.

22            MR. REEVE:  Your Honor, I don't think there's any

23   objection; just as long as it's clear that we're going way

24   outside the scope of this case, and as long as everybody

25   understands that it's not relevant to the scope of this
```

```
 1    indictment.  With that understanding, I have no objection.

 2              THE COURT:  All right.

 3              MR. SILVERMAN:  That's a fair representation of what

 4    I was intending to proceed with.

 5              MR. REEVE:  Yes, thanks.

 6    Q    So over the scope of your entire lifetime, Mr. Wilson,

 7    how much crack did you traffic?  How much crack did you sell,

 8    participate in selling?

 9    A    I would say five keys or more, maybe.

10    Q    Five kilograms?

11    A    Yes.

12    Q    Or maybe more?

13    A    Um hum.

14    Q    I understand that you're not going to have precise

15    numbers.  I'm just going to ask you to estimate.  How about

16    heroin?

17    A    Heroin, only two keys.

18    Q    Two kilograms?

19    A    Yeah, give or take.

20    Q    How about powder cocaine?

21    A    I don't remember.  A lot.  I don't remember.  I don't

22    remember it exactly right now.

23    Q    You obtained large quantities of powder cocaine, right?

24    A    Yes, I have.

25    Q    And were you selling it as powder cocaine?
```

1  A    I've sold powder cocaine I believe once -- I mean, I

2  middled deals for large amounts of powder cocaine.  Talking

3  about my lifetime, I mean, I can't really remember everything.

4  Q    Did you typically, though, with the powder cocaine you

5  acquired, sell it as crack cocaine?

6  A    Yes.

7  Q    Generally, it got converted and then you sold it as

8  crack?

9  A    Yes.

10 Q    So with powder cocaine, the quantities you were involved

11 in were much lower --

12 A    Yes.

13 Q    -- than crack?

14 A    Yes.

15 Q    Okay.

16         MR. REEVE:  I'm sorry, I think that misstates what

17 the witness just said.  Can we clarify that?

18         MR. SILVERMAN:  Sure.

19 Q    Let's go back to powder cocaine.  How much powder cocaine

20 did you actually sell in the course of your lifetime, roughly?

21 A    I mean, me selling, myself, and middle dealing, I don't

22 know what, what the correct answer would be.

23 Q    We'll do it separately.  What you sold yourself, and then

24 what you think you middled, understanding that you're not

25 going to remember precise numbers.

```
1    A    Correct.

2    Q    How much powder cocaine do you think you personally sold

3    during the course of your lifetime?

4    A    I would say less than a key.

5    Q    How much powder cocaine do you think you arranged

6    transactions for, that you did not directly participate in?

7    A    Over five keys.

8    Q    Okay.  Let's turn to marijuana.  How much marijuana did

9    you sell or participate in transactions for over the course of

10   your lifetime?

11   A    Maybe 20 ounces or something like that.

12   Q    Okay.  How about Ecstasy pills?

13   A    A hundred maybe, give or take.

14   Q    100 pills?

15   A    Yes.

16   Q    In one of the calls, there was a reference to morphine

17   pills.  Approximately how many morphine pills do you think you

18   distributed, or took part in distributing?

19   A    Less than 20.

20   Q    Are there any other drugs that you've been involved in

21   selling that I've skipped over?

22   A    I don't, I don't believe so.

23   Q    Okay.  Then let's turn to your prior arrests and your

24   prior convictions, okay?

25   A    (Nodding head.)
```

1    Q     Were you arrested in January 2003 after law enforcement

2    officers found drugs and ammunition in your bedroom?

3    A     Yes.

4    Q     Were you a juvenile at the time?

5    A     I believe so.

6    Q     Were you arrested in May, on May 27, 2003, after a police

7    chase?

8    A     Yes.

9    Q     Could you describe that for the jury?

10   A     I was on the streets, hustling, and for some reason,

11   there was a bigger police presence.  I tried to walk away into

12   an alley, and an officer saw me and flashed his light on me.

13   He asked me what I was doing.  I told him I was trying to walk

14   home.  When he started to approach me, I ran.  I threw the gun

15   that I had, and eventually I was captured, arrested, by them.

16   Q     Did you have drugs on you?

17   A     I had drugs on me, yes, but they weren't on me when I was

18   arrested.

19   Q     What happened to the drugs?

20   A     I got caught on a fence.  My coat was caught on a fence

21   and I kept running.  They were inside my coat.

22   Q     Did the police officers recover the gun that you tossed?

23   A     Yes.

24   Q     And did they find the drugs in your coat?

25   A     Yes.

```
 1    Q     Were you ultimately then convicted of sale of narcotics

 2    and carrying a pistol without a permit?

 3    A     Yes.

 4    Q     Did you receive a sentence on the sale conviction of six

 5    years imprisonment, 30 months to serve, followed by three

 6    years' probation?

 7    A     Yes.

 8    Q     On the firearm conviction, did you receive a sentence of

 9    one year jail, concurrent?

10    A     I believe so.

11    Q     Were you arrested on October 15th, 2004, on the porch of

12    88 Kensington Street?

13    A     Yes.

14    Q     Were drugs recovered on the porch of 88 Kensington Street

15    at the time of your arrest?

16    A     Yes.

17    Q     Did you then plead guilty to possession of narcotics?

18    A     Yes.

19    Q     Did you receive a sentence of 15 months' jail?

20    A     Yes.

21    Q     On October 1st, 2006, were you arrested when police

22    officers were pursuing someone else in the building in which

23    you resided?

24    A     Yes.

25    Q     Could you describe what happened on that occasion, for
```

```
1    the jury?

2    A    The police officers were walking up my steps.  I was

3    trying to hide two handguns.  They saw me.  I ran back into my

4    house to put the two handguns, try to hide the handguns, and

5    they came in.

6    Q    To the apartment, in the building that you lived in?

7    A    Yes.

8    Q    Did they find the two handguns?

9    A    Yes, they did.

10   Q    What else did they find in the apartment?

11   A    Crack.

12   Q    So were you arrested on drug and gun charges?

13   A    Yes.

14   Q    And were you ultimately convicted of sale of narcotics

15   and criminal weapon possession?

16   A    Yes.

17   Q    On the sale conviction, did you receive a sentence of

18   twelve years' imprisonment with six years to serve, followed

19   by three years' probation?

20   A    Yes, I believe so.  Yes.

21   Q    On the gun conviction, did you receive a sentence of two

22   years' imprisonment, concurrent?

23   A    Yes.

24   Q    Did you make bond before you were sentenced in that case?

25   A    Yes, I did.
```

```
1    Q     While you were out on bond, were you arrested on January

2    9th, 2007, for drug sales?

3    A     Yes.

4    Q     What happened on that occasion?

5    A     I had drugs, I had a warrant out for me, I believe it

6    was, and when they arrested me, I had drugs in my mouth.

7    Q     Were you trying to hide the drugs in your mouth?

8    A     Yes.

9    Q     For that conviction, for that arrest, were you ultimately

10   sentenced to six years' jail time for a sale conviction?

11   A     Yes.

12   Q     And so that six-year sentence and the previous six-year

13   sentence, did those run concurrently?

14   A     Yes, they did.

15   Q     Were those the sentences that you served immediately

16   before your release in July of 2010 to the halfway house in

17   New Haven?

18   A     Yes.

19   Q     How much time did you actually serve for those

20   convictions?

21   A     About three years, eight months.

22   Q     When you were out, July 2010, until the time of your

23   arrest in this case, January 3rd, 2012, were you on parole?

24   A     Yes, I was.

25   Q     On parole, are you allowed to sell drugs?
```

```
 1    A     You're not allowed to sell drugs, period.

 2    Q     Were you in violation of your parole conditions by doing

 3    the activity you were doing?

 4    A     Yes.

 5    Q     All right.  Now I want to turn to some acts you've

 6    engaged in for which you weren't arrested or convicted.  Did

 7    you talk about prior acts of violence that you committed

 8    during your proffer sessions with the government?

 9    A     Yes.

10    Q     Including ones for which you were never arrested or

11    convicted?

12    A     Yes.

13    Q     Okay.  Did you ever engage in any shootings?

14    A     Yes.

15    Q     Let's go through them, okay?

16    A     Yeah.

17    Q     Let's talk about the shooting involving Manny O, okay?

18    What happened on that occasion?

19    A     I was having a party on Long Wharf.  When the party was

20    over, for some reason, I was stranded, me and a couple of my

21    friends were stranded, so we started to walk back to our

22    neighborhood.

23          A station wagon, like a white station wagon or

24    minivan, was following us -- well, was suspicious.  It kept

25    popping up.  We believed it was following us.  Right before we
```

1   got to what I call our side of town, the wagon like kind of

2   cut us off and when the driver went to open the door, I

3   thought he was going to fire, so I fired on him first.

4   Q    I just want to try to make this clear.  What was your

5   part of town?  What neighborhood were you walking to?

6   A    The Tre.

7   Q    What part of town did you have to walk through from Long

8   Wharf to the Tre?

9   A    The Hill.

10  Q    Had there been a rivalry between people in the Hill and

11  people in the Tre at the time?

12  A    At the time, yes.

13  Q    So you were walking through enemy territory?

14  A    You could call it, yes.

15  Q    To your knowledge, did you hit anyone in the white van or

16  station wagon on that occasion?

17  A    No.

18  Q    Did anyone get out of the car and return fire?

19  A    No.

20  Q    What happened?  Did the car drive away?

21  A    It just sped off.

22  Q    Are you familiar with someone named Derrick Brock?

23  A    Yes.

24  Q    Who is Derrick Brock?

25  A    Somebody I didn't like.

1    Q     Why not?

2    A     Just had a -- at this moment, I can't even remember

3    exactly how our arguing started, but he was from the Hill, and

4    I guess you could say it just started as simple as that, being

5    from different neighborhoods.

6    Q     Did you and Mr. Brock have a long-standing feud?

7    A     Yes, we did.

8    Q     Did you ever shoot at Mr. Brock?

9    A     Yes, I did.

10   Q     On how many occasions?

11   A     I believe it was on two occasions.

12   Q     Let's go with the occasion near Edgewood Park first.

13   Could you describe what happened on that occasion, for the

14   jury?

15   A     I was inside a party, and I was told that Brock and his

16   friends were outside the party, waiting for me to come out.

17   When I came out, I saw them in their vehicles.  They pulled

18   off.

19           I immediately ran into the bushes or trees or

20   wherever.  I had a gun hidden nearby.  I picked it up.  I

21   started walking on Whalley Avenue.  They rode, their vehicles

22   rode, by again.

23           One of my friends happened to be riding by behind

24   them.  I jumped in the vehicle with him.  We sped up, we

25   started speeding up, to try to catch them, and they had pulled

```
 1   over and started to get out of their cars, and when I seen

 2   them start to get out their cars, I got out of my friend's

 3   vehicle and started firing.

 4   Q    To your knowledge, did you hit anyone?

 5   A    I believe I grazed Slay.

 6   Q    What do you mean by grazed Slay?

 7   A    Almost shot somebody in the head, I believe it was.

 8   Q    So the bullet passed by him?

 9   A    Yeah, that was the story that I got.

10   Q    Slay is someone's nickname?

11   A    Yes.

12   Q    That's one of Derrick Brock's friends?

13   A    Yes.

14   Q    I didn't ask you this before.  The incident with the

15   white van or station wagon, around what time period was that?

16   A    I believe it was 2002, 2003.

17   Q    How about this incident with Edgewood Park involving

18   Derrick Brock?

19   A    Around the same time, 2003.

20   Q    Okay.  You said there were two occasions in which you

21   fired at Mr. Brock.  Could you describe the other incident?

22   A    I was downtown New Haven at a party.  Mr. Brock was

23   there.  First we got into, like, arguing.  He had called some

24   people from his neighborhood, some other people from the

25   neighborhood, to come I guess say help him out,
```

1    reinforcements, I don't know what you want to call it.

2            And a fight got broke out outside.  One of his

3    friends, one of his older friends, Milton, tried to approach

4    me to fight, and I fired on him.

5    Q    So not at Mr. Brock, but at this person Milton?

6    A    Well, Mr. Brock was also, was in the group.

7    Q    I see.  Who were you aiming at?

8    A    Milton.

9    Q    Where were you aiming?

10   A    Legs.

11   Q    Milton's legs?

12   A    Yes.

13   Q    Did you hit him?

14   A    Yes.

15   Q    What did you do after that happened?

16   A    I ran.

17   Q    Did you ever find out what happened to Milton?

18   A    Yes.

19   Q    What happened?

20   A    He was shot in the legs.  They said nonlife threatening

21   injuries to the legs.

22   Q    What said that?  The news?

23   A    The newspaper, when I read it.

24   Q    Okay.  Around what time period was this shooting, where

25   you shot Milton in the leg?

```
 1    A    I believe that was 2003 also.

 2    Q    Did there come a time a couple years later when you were

 3    involved in another shooting?

 4    A    Yes.

 5    Q    Could you describe that one?

 6    A    That was I believe 2006.  I was walking to my mother's

 7    store, in my neighborhood.  I saw, like, a commotion by the

 8    store.  There was a couple cars with people in it.  They

 9    started firing, I fired back.

10    Q    Is your mother's store in the Tre?

11    A    Yes, it is.

12    Q    And who are these people that were firing shots?

13    A    They were from the Hill.

14    Q    So this goes back to that same neighborhood dispute?

15    A    Yes.

16    Q    Had you been walking that way to engage in a fire fight

17    with them?

18    A    No, I was going to the store.

19    Q    And they were there, and this fight broke out?

20    A    Yes.

21    Q    To your knowledge, did you hit anyone on that occasion?

22    A    No, I did not.

23    Q    What happened after you fired shots?

24    A    I ran.  I ran, and at some point, I bumped into a police

25    officer who I guess was responding to the shots, and I pointed
```

```
 1   and told him that they were shooting in that direction.  He

 2   went that way, I went the other way.

 3   Q    When you were talking to the police officer, you didn't

 4   have your gun out?

 5   A    No, I definitely did not have my gun out.  No.

 6   Q    Okay.  Are there other shootings that we should cover?

 7   A    No.

 8   Q    Those are the shootings you've been involved in, that you

 9   remember?

10   A    Yeah.  I mean, I've been shot at numerous amount of

11   times, but I don't remember every time I've been shot at.

12   Q    On those other occasions, did you return fire?

13   A    No, no.

14   Q    Okay.  All right.  Let's talk about other assaults you

15   might have been involved in with weapons that aren't firearms.

16   Were you ever involved in a fight where you used a different

17   type of weapon?

18   A    Yes.

19   Q    Could you describe that?

20   A    I was at a party.  A fight broke out between my

21   neighborhood and the Ville neighborhood.  I pulled out a blade

22   from my mouth, and I cut somebody in the back.

23   Q    All right.  So I need to unpack that a little bit.  Your

24   neighborhood's the Tre?

25   A    Yes.
```

```
 1    Q     You said the other neighborhood was the Ville?

 2    A     Yes.

 3    Q     This time it's not the Hill?

 4    A     No.

 5    Q     And a fight broke out?

 6    A     Yes.

 7    Q     And you happened to have a blade in your mouth?

 8    A     Yes.

 9    Q     Can you explain that?

10    A     I put the blade in my mouth to get inside of the club.  I

11    concealed it.  When the fight started to break out, I pulled

12    it out because I didn't want anyone to get hit with it in my

13    mouth, and I used it.

14    Q     What kind of blade was it?

15    A     I don't know.  I paid 50 cent for it.  It's a small

16    blade.

17    Q     Like a razor blade?

18    A     Yeah, it was a razor blade.

19    Q     Who did you cut?

20    A     Mark.

21    Q     Someone named Mark?

22    A     Yes.

23    Q     Where did you cut Mark?

24    A     In the back.

25    Q     Was this some kind of life threatening injury?
```

```
1    A    No.

2    Q    And around what time period was that?

3    A    I believe 2002, 2003 also.  Could have been before then,

4    but I believe it was somewhere in that area.

5    Q    Okay.  Any other fights that you've been involved in, in

6    which you used a weapon?

7    A    No.  Not that I can remember, no.

8    Q    How about fist fights?

9    A    I had a bunch of fist fights, but I don't remember all of

10   them.  I had a bunch of fist fights.

11   Q    More than five?

12   A    I don't believe -- I don't remember it being more than

13   five.  It could be.

14   Q    Okay.  You testified a bit about your involvement with

15   firearms.  Have you ever sold guns to anybody?

16   A    Yes, I have.

17   Q    Could you describe that, please?

18   A    I don't know the whole -- I don't remember the whole

19   thing.  I just remember me giving somebody a firearm for $500.

20   Q    Do you remember who the person was?

21   A    Yes.

22   Q    Who was it?

23   A    Flip.

24   Q    That was the person's nickname?

25   A    Yes.
```

1   Q    So you sold flip a gun for $500?

2   A    Yes, during the investigation.

3   Q    So that's more recent?

4   A    Yeah.

5   Q    I didn't ask you this before, but in 2002, 2003, how old

6   were you?

7   A    Sixteen, 17 -- I think I was 17.  Seventeen, I believe.

8   Q    So the times, the bulk of the shootings and the cutting

9   incident that you described before, you were about 16 or 17

10  years old?

11  A    I believe 16, 17.  Possibly 18.  I don't remember.

12  Q    Okay.  Based on your testimony from yesterday, on the

13  subject of firearms again, I understand that you shared

14  firearms with other people?

15  A    Yes.

16  Q    And you traded firearms with other people?

17  A    Yes.

18  Q    Let's talk about other crimes that you committed for

19  which you haven't been arrested or convicted in the past.  Did

20  you ever steal any cars?

21  A    When I was a lot younger, yes.

22  Q    Younger than 16 or 17?

23  A    Yeah.

24  Q    How many cars have you stolen?

25  A    I don't remember.  Two or three, maybe.  I know I stole

```
 1   cars.  I don't have the amount.  It wasn't ten or 20.

 2   Q    Have you stolen other items?

 3   A    Possibly have, yeah, like candy bars or something like

 4   that, maybe from the store.  I can't remember all that.

 5   Q    Okay.  Have you ever paid people for stolen items?

 6   A    Yes.

 7   Q    Is that called a booster?

 8   A    Yes.

 9   Q    When did that happen?

10   A    During the investigation.

11   Q    What sort of items did you pay boosters for?

12   A    Clothes, baby clothes, clothes for myself.  That's it.

13   Q    You've engaged in a lot of criminal activity in your

14   lifetime.

15   A    Yes.

16   Q    What haven't I asked you about, what other crimes have

17   you been involved in that I have not asked you about?

18   A    I don't think there is other crimes.  I think we covered

19   a lot.  I don't know what else there could be.  There can't be

20   anything else.

21   Q    You said before that maybe you had stolen candy bars when

22   you were younger?

23   A    Yeah.

24   Q    Did you ever break any windows, paint any graffiti on a

25   building?
```

1    A    Oh, yeah, I put like my name on cement before.  I can

2    believe that I possibly could have spray painted something,

3    but I don't fully remember that.

4    Q    I just want to make sure that the jury has a full picture

5    of your criminal past.  Is there anything else that comes to

6    mind right now, any other criminal conduct that you engaged

7    in?

8    A    No, I think I talked about all of that.

9    Q    Okay.  Let's then turn to your proffer agreement.

10            MR. SILVERMAN:  This is Government's Exhibit 201.  I

11   think it's already been admitted as a full exhibit.

12            MR. REEVE:  It has.

13            MR. SILVERMAN:  I'm going to put it up on the

14   screen, and we're going to blow it up because I know that

15   might be hard to read right now.

16   Q    I just want to start with, from this list that one of the

17   defense attorneys prepared prior in the trial, was your first

18   proffer session on August 9th, 2012?

19   A    Yes.

20   Q    And on that date, did you enter into what's called a

21   proffer agreement with the government?

22   A    Yes.

23   Q    All right.

24            MR. SILVERMAN:  I'm going to turn to the second page

25   of this, and we'll start there -- I'm sorry, the third page.

```
1    Q     Is that your signature?

2    A     Yes.

3    Q     And the signature of your attorney?

4    A     Yes.

5    Q     All right.  So you entered into this agreement -- we'll

6    go back to the first page -- do you see a date on the last

7    line of text up on the screen right now?

8    A     Yes.

9    Q     Is that date August 9th, 2012?

10   A     Yes.

11   Q     All right.  So on August 9, 2012, before your proffer

12   session, your first proffer session began, did you enter into

13   a proffer agreement with the government?

14   A     You said before?

15   Q     Before we started the proffer session, did you enter into

16   this proffer agreement?

17   A     I entered into the agreement on August 9th.  Before, I

18   don't understand.

19   Q     On that date, you entered into this proffer agreement?

20   A     Yes.

21   Q     All right.

22              MR. REEVE:  If it's helpful, I think we can

23   stipulate that he signed the proffer agreement before the

24   proffer, before the questioning, actually began.  There's no

25   dispute about that issue.
```

```
 1              MR. SILVERMAN:  All right.
 2   Q    I want you to read the sentence that I've blown up on the
 3   screen right now, starting with, "It is understood."
 4   A    "It is understood that everything your client says must
 5   be truthful and accurate to the best of his ability to
 6   recall."
 7   Q    All right.  And then I'm going to blow up paragraph 2 in
 8   the proffer agreement.  Can you read that sentence?
 9   A    "Any statements made by your client at this meeting will
10   not be offered against him in the government's direct case in
11   the federal criminal case currently pending against him in
12   this district, unless he breaches this agreement as provided
13   in 8 below."
14   Q    All right.  So was it your understanding that the
15   statements you made --
16              MR. REEVE:  I'm sorry, I'm going to object to any
17   leading questions with respect to this document.
18              MR. SILVERMAN:  I'll rephrase the question, your
19   Honor.
20   Q    What was your understanding about how the statements you
21   made would be treated at that proffer session?
22   A    I was given an example, if I was charged with bank
23   robbery and I was -- and I told about the bank robbery and
24   said that I buried bags of money with a money bag sign in my
25   mother's backyard, and then turned around and said something
```

1    different, that the statements I made, the officers would not

2    be able -- could not just go -- I'm sorry, the example that I

3    was given was that they can't use, they can't use my

4    statements, but they could go to that backyard, dig up these

5    money bags, and bring them into court.

6    Q    Could your statements be used directly against you if you

7    went to trial?

8    A    No.

9            MR. MORAGHAN:  Objection.  Leading the witness, your

10   Honor.

11           MR. SILVERMAN:  I don't think that question suggests

12   an answer.  It's a yes or no question.

13           MR. REEVE:  But I think -- the problem is the

14   document speaks for itself.  It's eliciting a partial answer.

15   That's the problem.  I mean, it depends.  The answer is it

16   depends.

17           MR. SILVERMAN:  Why don't I withdraw the question,

18   and I'll just ask this:

19   Q    Under the proffer agreement, did you have to be truthful

20   in the statements you made?

21           MR. REEVE:  I object to that.  I object to any

22   question that asks about the agreement.  I have no objection

23   to questions about his belief.  The document speaks for

24   itself.

25           MR. SILVERMAN:  I'll rephrase the question, and I'll

```
 1    use the term "belief," if that will address the objection.
 2             MR. REEVE:  Thank you.
 3    Q    Under the proffer agreement, did you believe that your
 4    statements had to be truthful?
 5    A    Yes.
 6    Q    Under the proffer agreement, did you believe that your
 7    statements would receive some protection if you complied with
 8    the terms of the proffer agreement?
 9    A    Yes.
10    Q    Why did you want that protection?
11    A    I mean, so I would be able to tell the truth.  To speak
12    truthfully.  To speak truthfully.
13    Q    Okay.  And was that the only -- August 9th, 2012, was
14    that the only -- time you engaged in a proffer session?
15    A    No.
16    Q    Did you engage in multiple proffer sessions?
17    A    Yes.
18    Q    About ten of them?
19    A    Yes.
20    Q    Was it your understanding that the proffer agreement
21    covered all of those proffer sessions?
22    A    Yes.
23    Q    So did you believe that your statements would receive the
24    protections that you believe the proffer agreement provided at
25    each of those proffer sessions?
```

```
1    A    Yes.

2    Q    Okay.  Were you given reports of each of the proffer

3    sessions to review for accuracy?

4    A    No, I was not.

5    Q    All right.

6         MR. SILVERMAN:  Let's turn now to Government's

7    Exhibit 202.

8    Q    I haven't zoomed in at all.  Do you recognize this

9    document?

10   A    I believe that's my plea deal.

11   Q    That's your plea agreement?

12   A    Plea agreement.

13   Q    Okay.  I'm going to blow up a paragraph on page 1, and

14   I'll read it and ask you to tell me if I've read it

15   accurately.

16        "Kevin Wilson agrees to plead guilty to Count One of

17   the indictment.  Specifically, he agrees to plead guilty to

18   knowingly, intentionally, and unlawfully conspiring to possess

19   with intent to distribute, and to distribute, one kilogram or

20   more of a mixture and substance containing a detectable amount

21   of heroin, a Schedule I controlled substance; and 280 grams or

22   more of a mixture and substance containing a detectable amount

23   of cocaine base, a Schedule II controlled substance, in

24   violation of 21 U.S.C., sections 841(a)(1), 841(b)(1)(A), and

25   846."
```

1          Did I read that right?

2    A     Yes.

3    Q     Did you plead guilty to a conspiracy?

4    A     Yes.

5          MR. SILVERMAN:  I'm going to blow up a paragraph on

6    page 2 of the plea agreement, and I'm going to do the same

7    thing.

8    Q     I'm going to read it and ask you if I've read it

9    accurately.

10          "The offense charged in Count One of the indictment

11   carries a maximum penalty of life imprisonment, a mandatory

12   minimum penalty of ten years of imprisonment, and a maximum

13   fine of $10 million.  Moreover, any sentence of incarceration

14   under this provision must also include a term of supervised

15   release of at least five years, and as much as life.  The

16   defendant understands that should he violate any condition of

17   the supervised release during its term, he may be required to

18   serve a further term of imprisonment of up to five years, with

19   no credit for the time already spent on supervised release."

20          Did I read that correctly?

21   A     Yes.

22   Q     Have you already been sentenced for the offense to which

23   you pled guilty?

24   A     No.

25   Q     So is it your understanding that at the time you're

```
 1   sentenced, the offense to which you pled carries a term of

 2   imprisonment of at least ten years, and as much as life?

 3   A    Yes.

 4            MR. SILVERMAN:  I'm blowing up a portion from page 3

 5   of the plea agreement.

 6   Q    I'm going to read that sentence there, and I'll ask you

 7   to tell me if I've read it correctly.

 8            "The defendant agrees and acknowledges that the

 9   quantity of heroin involved in his offense was at least two

10   kilograms, and the quantity of cocaine base involved in his

11   offense was at least 280 grams."

12            Did I read that correctly?

13   A    Yes.

14   Q    You testified a few moments ago that in your lifetime,

15   you've been involved in the distribution of two kilograms or

16   so of heroin?

17   A    Yes.

18   Q    So was all of your heroin distribution during the time

19   frame of this conspiracy?

20   A    Yes.

21   Q    And you testified earlier that in your lifetime, you've

22   been involved in the distribution of about five kilograms of

23   crack.

24   A    Yes.

25   Q    So was all of that during the time frame of the
```

```
 1    conspiracy?

 2    A    I'm sorry, say that again?

 3    Q    Yes.  Was all the five kilograms that you said earlier

 4    you distributed during your lifetime of crack cocaine, was

 5    that all from January 2011 until January 2012?

 6    A    No.

 7    Q    About how much crack cocaine did you distribute between

 8    January 2011 and January 2012?

 9    A    About 500 grams.

10    Q    So is this amount slightly less than that?

11    A    Yes.

12    Q    The 280 grams is almost half of that, right?

13    A    Yes.

14    Q    Okay.

15              MR. SILVERMAN:  This is page 5 of the plea

16    agreement.

17    Q    I'm going to read another sentence, and ask you if I've

18    read it correctly:

19              "Assuming a criminal history category VI, an

20    adjusted offense level of 33 would result in an incarceration

21    range of 235 to 293 months and a fine range of $17,500 to

22    $10 million."  And I've left off the parenthetical citation.

23    Did I read that correctly?

24    A    Yes.

25    Q    Is it your understanding that you're looking at a
```

```
1   guidelines range, sentencing range, 235 to 293 months of

2   imprisonment?

3   A    Yes.

4   Q    What is that in years?

5   A    About 19-1/2 to 24, 20, 25, something like that.

6   Q    Almost 20 years to almost 25 years?

7   A    Yes.

8   Q    Do you want to go to jail for 20 to 25 years?

9   A    I don't believe anybody wants to go to jail for 20 to 25

10  years.

11  Q    This is another portion from page 5 of the plea

12  agreement:  "The defendant agrees not to appeal or

13  collaterally attack in any proceeding, including but not

14  limited to a motion under Title 28, United States Code,

15  Section 2255 and/or Section 2241, the conviction or sentence

16  imposed by the Court if that sentence does not exceed 293

17  months of incarceration, a life term of supervised release,

18  and a $10 million fine, even if the Court imposes such a

19  sentence based on an analysis different from that specified

20  above."

21           Did I read that correctly?

22  A    Yes.

23  Q    Is it your understanding that you've waived your right to

24  appeal if the sentence imposed by the Court does not exceed

25  293 months of imprisonment?
```

1   A    Yes.

2   Q    Is that more than 24 years of imprisonment?

3   A    I believe that -- I don't know the maximum.  I'm not

4   really good at math.

5   Q    If 300 months would be 25 years, is that pretty close to

6   25 years?

7   A    Yes.

8   Q    Is there something called a stipulation of offense

9   conduct attached to your plea agreement?

10  A    Yes.

11  Q    I'm going to read this paragraph:

12          "The parties stipulate that from approximately

13  January 2011 to approximately January 2012, the defendant

14  knowingly, willfully, and voluntarily participated in a

15  conspiracy to distribute and to possess with intent to

16  distribute controlled substances.  Specifically, the defendant

17  entered into an agreement with Amaury P'Dilla, Johnny De Los

18  Santos, Vincent Clark, and others to distribute and to possess

19  with intent to distribute heroin and cocaine base.

20          "The parties further stipulate that the quantity of

21  heroin involved in the defendant's offense conduct was at

22  least two kilograms, and the quantity of cocaine base involved

23  in the defendant's offense conduct was at least 280 grams.

24          "Moreover, the parties stipulate that on January

25  3rd, 2012, the defendant possessed a firearm in furtherance of

```
 1   his drug trafficking activities, and that firearm had traveled

 2   in interstate or foreign commerce.

 3          "The parties further stipulate that the defendant

 4   was an organizer, leader, manager, or supervisor of criminal

 5   activity."

 6          Did I read that paragraph correctly?

 7   A    Yes.

 8   Q    Are those all things you agreed to, at the time you pled

 9   guilty?

10   A    Yes.

11   Q    This is also from page 9 of the plea agreement:

12          "The parties further stipulate that on May 10, 2011,

13   the defendant sold 26.3 grams of cocaine base to individuals

14   cooperating with law enforcement for $1200 in U.S. currency.

15   The parties further stipulate that on June 29th, 2011, the

16   defendant sold 6.5 grams of cocaine base to an individual

17   cooperating with law enforcement for $300 in U.S. currency.

18   The parties further stipulate that on September 14, 2011, the

19   defendant sold 6.4 grams of cocaine base to an individual

20   cooperating with law enforcement for $300 in U.S. currency.

21   Finally, the parties stipulate that on January 3, 2012, a

22   motor vehicle stop revealed that the defendant possessed with

23   intent to sell more than 100 grams of heroin, and a subsequent

24   consent search of the defendant's residence led to the

25   recovery of a Cobray Enterprises model Patriot .45 caliber
```

```
 1   semiautomatic pistol bearing serial number M005307 which had
 2   traveled in interstate or foreign commerce, live rounds of
 3   ammunition for the firearm, $746 in drug proceeds, a digital
 4   scale, and cutting agent for narcotics."
 5            Did I read that correctly?
 6   A   Yes.
 7   Q   Are those all facts that you agreed to at the time of
 8   your plea?
 9   A   Yes.
10            MR. SILVERMAN:  Now I'm going to turn to
11   Government's Exhibit 203.
12   Q   The plea agreement was entered on February 15th, 2013, is
13   that right?
14   A   Yes, I believe.
15   Q   Did you enter into another agreement on that same date?
16   A   Yes, I did.
17   Q   Was that your cooperation agreement?
18   A   Yes.
19   Q   At that point, you decided to fully cooperate?
20   A   I was already fully cooperating when I signed the proffer
21   agreement.
22   Q   So did the cooperation agreement memorialize that?
23   A   Yes.
24   Q   I'm going to read this sentence:  "The defendant agrees
25   to cooperate fully with the government and law enforcement
```

```
 1   officers as may be required."

 2           And then the next sentence:  "The defendant

 3   understands that all of his cooperation, testimony,

 4   statements, information, and other assistance as provided

 5   below must be fully truthful, accurate, and complete."

 6           Did I read that correctly?

 7   A    Yes.

 8   Q    This is the first sentence of paragraph 1 on page 1.

 9           "The defendant agrees to be debriefed and to

10   disclose fully and truthfully all information concerning his

11   knowledge of and participation in criminal activities by

12   himself or others, whether or not related to the charges to

13   which he is pleading guilty."

14           Did I read that correctly?

15   A    Yes.

16   Q    Did you understand that to be one of your obligations

17   under the cooperation agreement?

18   A    Yes.

19   Q    This is from page 2, paragraph 2.  "The defendant agrees

20   to testify truthfully before a grand jury and at any trials or

21   other proceedings in the District of Connecticut or elsewhere

22   as may be required by the government."

23           Did I read that correctly?

24   A    Yes.

25   Q    Was it your understanding that you could be required,
```

1  under the cooperation agreement, to testify?

2  A    Yes.

3  Q    This is from page 2:  "The defendant expressly

4  understands that the sentence to be imposed upon him is within

5  the sole discretion of the sentencing Court.  The government

6  cannot and does not make any promise or representation as to

7  what sentence the defendant will receive, nor will it

8  recommend any specific sentence to the sentencing Court."

9           Did I read that correctly?

10 A    Yes.

11 Q    Was it your understanding under the cooperation agreement

12 that the sentence to be imposed upon you is within the sole

13 discretion of the sentencing Judge?

14 A    Yes.

15 Q    I'm going to read the next sentence:  "However, the

16 government will inform the sentencing Court and the probation

17 office of the nature and extent of the defendant's

18 cooperation, including its investigative or prosecutive value,

19 completeness, truthfulness, and accuracy, or the lack of its

20 value, completeness, truthfulness, and accuracy."

21           Did I read that correctly?

22 A    Yes.

23 Q    This is also from page 2:  "In addition, if the

24 government determines that the defendant has provided

25 substantial assistance in the investigation or prosecution of

```
 1   another person who has committed an offense, the government

 2   will file a motion pursuant to Section 5K1.1 of the sentencing

 3   guidelines and Title 18 United States Code Section 3553(e),

 4   advising the sentencing Court of all relevant facts pertaining

 5   to that determination and requesting the Court to sentence the

 6   defendant in light of the factors set forth in Section

 7   5K1.1(a)(1) through (5) and authorizing the Court to impose a

 8   sentence below the guideline range and an otherwise applicable

 9   mandatory minimum term.  The defendant understands that the

10   determination whether or not to file such a motion rests

11   solely with the government."

12              Did I read that correctly?

13   A     Yes.

14   Q     Is it your understanding under the cooperation agreement

15   that a 5K letter or motion would be helpful to you?

16   A     Yes.

17   Q     Is it your understanding that whether or not a 5K motion

18   gets filed rests with the government?

19   A     Yes.

20   Q     Do you want the government to file the 5K motion?

21   A     Yes.

22   Q     "The defendant further understands that whether or not

23   the government files a motion pursuant to 5K1.1, the Court may

24   impose a sentence it believes to be reasonable in

25   consideration of all relevant factors, including the
```

1   defendant's cooperation."  Did I read that correctly?

2   A    Yes.

3   Q    So is it your understanding that even if the government

4   files the 5K1.1, your sentence is still up to the Judge?

5   A    Yes.

6   Q    The next sentence goes over from page 2 to 3, so I'm

7   going to read it.  Follow along:  "The Court may not, however,

8   impose a sentence below a mandatory minimum term in the

9   absence of a motion by the government."  Did I read that

10  correctly?

11  A    Yes.

12  Q    This is from page 3:  "If the government determines that

13  the defendant has intentionally given false, misleading, or

14  incomplete information or testimony; has committed or

15  attempted to commit any further crimes; has failed to

16  cooperate fully; or otherwise has violated any provision of

17  this agreement, then the government may deem this agreement

18  and/or the plea agreement null and void.  However, if the

19  government voids only the cooperation agreement, the defendant

20  will not be permitted to withdraw his plea of guilty or his

21  plea agreement."  Did I read that correctly?

22  A    Yes.

23  Q    What is your understanding of what happens if you lie?

24  A    If I lie --

25          MR. REEVE:  Again, your Honor, I object to the form

1  of that question.  It is misleading and it misstates the

2  agreement.

3          MR. SILVERMAN:  Let me ask it a different way and

4  see if it addresses your objection.

5          MR. REEVE:  Thank you.

6  Q    What is your understanding of what happens if the

7  government determines that you've lied?

8  A    If the government determines that I lied, I won't get the

9  5K motion, and I'll probably be in more trouble than I already

10  am.

11  Q    Would you be allowed to withdraw your guilty plea if you

12  didn't get a 5K motion?

13  A    No, I would not.

14  Q    Would you then be subject to that range of 235 to 293

15  months?

16  A    Yes.

17  Q    Could you be sentenced to a higher term of imprisonment

18  than that range?

19  A    No.

20  Q    Could the government use your statements from the

21  proffers against you, if you violate the cooperation

22  agreement?

23  A    I believe so.

24  Q    And then is it possible that you could be subject to a

25  higher penalty than the 235 to 293 months of imprisonment?

1    A    Yes.

2    Q    What is your understanding of how the outcome of this

3    trial impacts any 5K letter that you might get?

4    A    To my understanding, it doesn't impact.

5    Q    So if the defendants at this trial are acquitted, could

6    you still get a 5K letter?

7    A    It's up to the government.  It's not up to me.

8    Q    So let me make sure I got this right.  It's your

9    understanding that the outcome of this trial doesn't matter

10   for whether you get a 5K letter?

11   A    That's my understanding, yes.

12              MR. SILVERMAN:  May I have a moment, your Honor?

13              Let me pull up Government's Exhibit 203 again.

14   Q    This is your cooperation agreement.  Is that your

15   signature?

16   A    Yes, it is.

17   Q    What is the date?

18   A    2/15/13.

19   Q    So it's February 15th, 2013?

20   A    Yes.

21   Q    On that date, did you know who would be proceeding to

22   trial out of your indictment?

23   A    I don't remember if, on that date -- I don't, I don't

24   remember.

25   Q    Okay.  What is your understanding of the only thing that

1   matters now, in terms of whether you will get a 5K?

2   A      Just tell the truth.

3             MR. SILVERMAN:  Thank you.  No further questions at

4   this time.

5             THE COURT:  Would this be an appropriate time for

6   the morning recess?

7             MR. REEVE:  It would, your Honor, thank you.

8             THE COURT:  We'll be in recess for 15 minutes,

9   ladies and gentlemen.  Please don't discuss the case, with

10  anyone else or among yourselves.

11            (Recess:  11:32 o'clock a.m. to 11:47 o'clock a.m.,

12  in the presence of the jury.)

13            MR. REEVE:  Your Honor, may I proceed?

14            THE COURT:  Please.

15            MR. REEVE:  Your Honor, with the government's

16  permission, I just wanted to advise the Court and the jury as

17  to how defense counsel are going to proceed on the

18  cross-examination, because I think it would be helpful.

19            While there are three defense teams in the

20  courtroom, and we all represent separate individuals, we are

21  trying to coordinate so that we do not repeat questions or

22  areas.

23            I am -- I also want everyone to know that I am --

24  going to be doing probably much more of the cross-examination

25  than the other two lawyers are.  I did not want your Honor, or

```
 1    the jurors, to be sitting there thinking that if each lawyer

 2    takes as much time as Attorney Reeve did, we might not be done

 3    until after the Super Bowl with the examination of Mr. Wilson.

 4            So I just thought it might be helpful for everyone

 5    to know that we will make our best efforts to coordinate.

 6    Obviously, if I cover an area and other counsel are not

 7    satisfied with the questioning that I've done, then they

 8    aren't limited.  But to the degree we can, we're trying to

 9    coordinate here to make it efficient.  But it is going to take

10    some time.

11            And with that, and with the Court's permission, I

12    would like to begin.

13            THE COURT:  Yes.

14    CROSS-EXAMINATION

15    BY MR. REEVE:

16    Q    Mr. Wilson, good morning.

17    A    Good morning.

18    Q    Have we ever met before?

19    A    No, sir.

20    Q    My name is Richard Reeve.  I represent Robert Santos in

21    this case.  Sometimes lawyers tell a Judge or a witness they

22    just have a few questions.  I'm not going to tell you that.  I

23    have a lot of questions.  All right?

24    A    Okay.

25    Q    Okay.  I'm going to try to keep my voice up, and I'm
```

```
 1   going to ask you to keep your voice up and to answer.  Try not

 2   to mix your words together, because that's when I think we're

 3   having difficulty, all right?

 4   A    I'll try to answer you as best as I can.

 5   Q    Thank you.  I also am going to be asking you some

 6   questions about your understanding of things, like Attorney

 7   Silverman did.  I want you to be clear that I do not want you

 8   to say, in response to any question, what Attorney Schwartz

 9   told you, okay?

10   A    Okay.

11   Q    That's not appropriate, and I'm not asking you that.  I

12   just want to bring these things up so we can communicate, all

13   right?

14   A    Okay.

15   Q    The other thing I'm going to ask you to do is, if you do

16   not understand a question that I've asked, I want you to tell

17   me that.  I don't want you to guess and to speculate about

18   what I'm asking.  If I use a word you don't understand, tell

19   me, okay?

20   A    Okay.

21   Q    All right.  I want to first start with what you ended

22   your testimony with just before the break, answering questions

23   of Attorney Silverman.  I am not going to go into your prior

24   criminal history, or the uncharged crimes that you have

25   admitted to.
```

```
 1              But I do want to ask you a couple of questions, and

 2    then Attorney Moraghan, later, probably tomorrow, is going to

 3    be asking you many more detailed questions about that area of

 4    your testimony.

 5              What I want to ask you is, there were a number of

 6    shootings you talked about there, when you testified.  The

 7    record reflects what it is, four, five shootings that you

 8    said, "Yeah, I did that."  Do you remember that testimony?

 9    A    Yes, I remember saying that.

10    Q    Am I correct that with the exception of the last shooting

11    that you talked about, you were the aggressor in all the other

12    shootings?  Is that fair?  In other words, nobody shot at you;

13    you saw somebody open a door, and you took preventive actions

14    and took out your gun and fired at them, is that right?

15    A    Yes.

16    Q    Okay.  Is it fair to say that your actions over the

17    course of your life have shown very little respect for human

18    life?  Is that fair?

19    A    I would say that's fair to say.

20    Q    Okay.  Now, I want to talk about the last area that you

21    talked about, which is these three agreements.  The first one

22    you talked about was the proffer agreement.  Do you remember

23    that?

24    A    Yes.

25    Q    That's the document you signed on August 9th, 2011, just
```

```
1   before the first time you sat down and spoke with the

2   government in this case.  And I'm putting aside January 3rd,

3   because you did speak to Agent Ndrenika and others that day,

4   right?

5   A    I spoke to them that day; I didn't know that they were

6   with the government.

7   Q    I understand.  I want to be clear.  This was the first

8   time you sat down, after you had been indicted in this case on

9   May 15th of 2012, correct?

10  A    I believe so.

11  Q    That August date?

12  A    Yeah.

13  Q    Okay.  Was there a judge there when you met with

14  government counsel and signed that proffer agreement and

15  talked to the government team?

16  A    I don't recall.  I don't remember there being a judge

17  there.

18  Q    Right.

19  A    It could have been.  I don't know.

20  Q    It wasn't in this courtroom, was it?

21  A    No.

22  Q    It wasn't Judge Burns, was it?

23  A    No.

24  Q    Did you see anybody there in black robes?

25  A    No.
```

```
 1   Q     Okay.  So you're pretty sure, as you sit here today,

 2   there was no judge, right?

 3   A     There was no, yeah, when you say it that way.

 4   Q     Yeah.  And there was never a judge at any of the other

 5   ten or eleven, however many there are, proffer sessions over

 6   the course of 13 or 14 months, is that correct?

 7   A     There was nobody in a black robe.

 8   Q     Okay.  And you understood, at the time that you signed

 9   that proffer agreement, that the only people who could make

10   the decision as to whether or not you told the truth was the

11   government team, right?

12   A     I believe so, yes.

13   Q     The Judge had nothing to do with it, right?

14   A     The Judge had --

15   Q     Talking about the proffer agreement now.  I want you to

16   focus on the proffer.  We'll get to the rest in a second.

17   With respect to the proffer agreement, no judicial officer was

18   involved, isn't that right?

19   A     Judicial officer or judge, I don't know the terms.

20   Q     Okay.  That's exactly what I want you to do, okay?  I

21   appreciate that.  Let's leave it at judge, all right?  There

22   was -- no judge was involved in all your meetings with the

23   government?

24   A     There was nobody in a black robe, no.

25   Q     And the only people who are going to decide whether or
```

1    not you were telling the truth during all those proffer

2    agreements was the people sitting at this table, along with

3    their colleagues, right?

4    A    If I was telling the truth, yeah, they would decide that.

5    Q    Right.  They had to assess whether you were telling the

6    truth, didn't they?  Right?

7    A    Yes.

8    Q    Okay.  And as far as you know, the government doesn't

9    have any magic serum that makes them able to divine the truth,

10   do they?

11   A    I don't know.  That stuff's like movie stuff.  I don't

12   know if the government has any of that stuff.

13   Q    Okay.  If there was any truth serum, you never saw it,

14   right?

15   A    No.

16   Q    Okay.  So, I mean, they're human beings, right?

17   A    Yeah.

18   Q    They make mistakes, just like I do, right?

19   A    I don't know if they make mistakes.

20   Q    Well, do you make mistakes?

21   A    I have made mistakes.  I've made plenty of mistakes.

22   Q    Sure.  We've all made mistakes, haven't we?  It's called

23   life, right?

24   A    Life is called life, mistakes are called mistakes.

25   Q    Right.  Let me rephrase that.  Mistakes are part of life,

1    right?

2    A     Could be.

3    Q     Sure.  And they're part of all our lives, aren't they, as

4    far as you know?  Let me rephrase it.  Have you ever met a

5    perfect human being, as far as you know?

6    A     As far as I know, I don't believe in perfect human

7    beings.

8    Q     Okay.  All right.  So fair enough.  So, and I want to, I

9    just want everyone to be clear, you knew, before you walked

10   into that meeting on August 19th (sic), that your fate was in

11   the hands of the people and their colleagues sitting at this

12   table in this courtroom right now, right?

13   A     You said before I walked in?

14   Q     Sure.  I'm sorry.  You spoke to various people, and you

15   had an understanding.  You didn't walk in blind to that

16   meeting, did you?

17   A     I have never been in a situation like this before, so --

18   Q     Okay.

19   A     -- I mean --

20   Q     I understand.  Let's talk about that.  What you're

21   telling us is you've never cooperated with law enforcement

22   ever before in your life, right?

23   A     I mean, I've talked to law enforcement before.  There was

24   a woman who was lost, and I helped her.

25   Q     I understand.

```
 1   A     That's helping law enforcement.

 2   Q     And you were trying to do a good deed that day.  But in

 3   terms of sitting down with prosecutors and police and

 4   providing them information about your own crimes and the

 5   crimes of others, you had never done that.  Is that fair to

 6   say?

 7   A     I don't know.  On January 3rd when I was arrested, I

 8   spoke to law enforcement, so I cannot --

 9   Q     Fair enough.  Fair enough.  I appreciate that.  And so in

10   the context of this case, you have spoken to law enforcement

11   officers, right?

12   A     Yes, in the context of.  Yes.

13   Q     And given them information.

14   A     Yes.

15   Q     But this is the first case in which you've done that,

16   correct?

17   A     I believe so.

18   Q     Okay.  All right.

19   A     Yeah.

20   Q     And it was a monumental decision for you to make before

21   you could walk in that door, right?

22   A     I don't know how to answer that.

23   Q     Okay.  It was a very important decision in your life,

24   wasn't it?

25   A     Yes.
```

1    Q    And you took some time giving it some hard, deep thought,

2    didn't you?

3    A    Fair to say.

4    Q    Okay.  And in fact, your first appearance in federal

5    court was on May 24th, 2012, right?

6    A    Yes.

7    Q    Okay.  And the first time you sat down with the

8    government was August 9th of 2012, correct?

9    A    Yes.

10   Q    And that period of time is in excess of three months,

11   correct?

12   A    It would have to be, 8/24.

13   Q    I appreciate the correction.  I misspoke.  It looks

14   like --

15   A    There's some days in between.

16   Q    Let's give it two-and-a-half months, is that fair?

17   A    Approximately, yeah.

18   Q    Okay.  All right.  And you had an opportunity to think

19   about this, didn't you?

20   A    Yes, I did.

21   Q    Okay.  And by the way, as part of this case, you received

22   information, and I'm going to ask you, your lawyer provided

23   you with materials in this case, is that correct?

24   A    Yes.

25   Q    Okay.  Because when you first came into federal court on

```
 1   May 24th, you didn't have any materials related to this case?
 2   A    No.
 3   Q    Okay.  And so during the course of this time, and again
 4   I'm not asking you the content of your discussions with your
 5   attorney, but you met with your lawyer?
 6   A    Yes.
 7   Q    Okay.  And you discussed the options that you had in this
 8   case, correct?
 9   A    Yes.
10   Q    Okay.  And as a result of those -- and again, without
11   getting into the content of what your attorney said -- he
12   provided you with information, correct?
13   A    Yes.
14   Q    And he provided you with advice, correct?
15   A    Yes.
16   Q    And he also provided you with discovery materials that
17   were related to this case, this federal case right now, the
18   one you're here on, right?
19   A    I'm -- I know I was given materials for this case; I
20   don't know if it was in between that time.
21   Q    All right.  Well, is it fair to say that at some point,
22   you were given what we call line sheets?  Do you understand
23   that term?
24   A    I've seen the term on the line sheets.
25   Q    Okay.  And those are -- correct me if I'm wrong, but
```

```
 1   those are -- the drafts of conversations that monitoring

 2   agents make close to the time the call comes in to the

 3   monitoring station.  Is that your understanding?

 4   A    It's the time that the call came in.

 5   Q    All right.  And there's about, in your case there's

 6   about, 7,000 pages of line sheets, solely on your telephone,

 7   isn't that right?

 8   A    It's a high number.  I'm not sure exactly.

 9   Q    Okay.  Well, you've seen them all, haven't you?

10   A    Yeah, I seen, I've seen a lot of them.  Yes.

11   Q    Okay.  Did you get them kind of in a big box like this,

12   something like this?  It was probably in better shape than my

13   box, but did you get them kind of in a box, right?

14   A    I didn't.  I didn't get them in a box, no.

15   Q    Okay.  You got them loose?

16   A    Got them in different packets by volumes.

17   Q    Okay.  And if you stacked all those up, if you put all --

18   did you have them in your cell?

19   A    Yes, I did.

20   Q    Okay.  And if you stacked all those different packets up,

21   is it fair to say that it would come from the floor and go

22   well above, or at least close to, the railing in front of the

23   jurors who are sitting here right now listening to your

24   testimony?

25   A    That's fair to say, yes.
```

1  Q    Okay.  And those were materials that were left with you

2  at whatever jail, I'm not going to ask you any questions about

3  what jails you were in, okay?  But they were left with you

4  personally, by your attorney or someone who was connected to

5  your attorney, right?

6  A    Yes.

7  Q    Okay.  Now, there were other materials that your attorney

8  could not leave with you, but which you were able to review in

9  this case, correct?

10 A    It's a possibility that there was.

11 Q    All right.  Well, it's more than a possibility.

12 A    Yeah yeah yeah.

13 Q    You saw the Title III affidavits in this case, right?

14 A    The Title III?  I'm sorry, I have no idea court terms.

15 Q    Do you know what Title III means?

16 A    No idea.

17 Q    Okay.  If I told you Title III means the exact same as a

18 wiretap on your phone, would you accept that?

19 A    I could accept that, if that's what you're telling me

20 now.

21 Q    Yeah, I'm going to call it wiretap.  I'm not going to

22 call it Title III, because it's easier.  I want to make sure

23 we all understand, and I think we do, is that right?

24 A    Yeah.

25 Q    All right.  So in order to get the wiretaps on your

```
 1   phone, the agents involved in this case had to file

 2   affidavits, right?

 3   A    I'm not a law enforcement officer to know what they got

 4   to do.

 5   Q    Whether they had to file or not, you saw, right?

 6   A    Yeah.

 7   Q    Sure.  And that gave you a bird's eye view of the

 8   government's case, didn't it?

 9   A    You talking about --

10   Q    You knew, based on those affidavits, at least some of

11   what the government believed happened in this case, correct?

12   A    I really don't understand.

13   Q    Okay.

14   A    You lost me.

15   Q    You saw the affidavits, right, with your lawyer?  Again,

16   I'm not asking you what he said to you.  I just want to make

17   sure, you saw those affidavits that were related to the

18   wiretap on your phone?

19   A    The affidavit is another -- I saw papers about wire, the

20   wire on my phone.

21   Q    All right.  Okay.  Fair enough.  And you also, through

22   your attorney, had access to other discovery materials in this

23   case, is that fair?

24   A    That is fair to say.

25   Q    Okay.  Like surveillance reports, for example?
```

```
 1    A    That's fair to say that my lawyer would probably have it.

 2    Q    Okay.  And would it be fair to say that your lawyer

 3    shared some of those documents with you?

 4    A    Yes, during the course of --

 5    Q    Sure, that's his job, right?

 6    A    Yes.

 7    Q    And --

 8    A    Um --

 9    Q    He visited you on lots of occasions at the jail, right?

10    A    He visited me.  I don't --

11    Q    Okay.  Maybe you would have liked to have seen him more,

12    but you had contact with your attorney, right?

13    A    Yes.

14    Q    And he's a good lawyer, right?

15    A    I don't know his career but to me, he seems like a good

16    lawyer.

17    Q    Right, that's what I'm asking, to you.

18    A    Yeah.

19    Q    Yes, and you have confidence in him?

20    A    Yes, I do.

21    Q    Good.  That's good.  And so before you walked in on

22    August 9th for the very first proffer session, you had

23    received a lot of information orally and in writing, right?

24    A    Before, before -- I can't remember if it's before the

25    first proffer session or not.
```

1  Q    All right.  And that was a compound question, and I'm

2  going to break it down.  I asked you whether you had received

3  information about the case orally, and again I'm not asking

4  you for the content of what was told to you, but orally by

5  your attorney, right?

6  A    Yes.

7  Q    Okay.  And you also were able to review written

8  documents, correct?

9  A    Yes.

10  Q    Okay.  All right.  Now, let's move forward from May 24th,

11  2012, that was the first time you appeared in this federal

12  courthouse here in New Haven, Connecticut, correct?

13  A    Yes.

14  Q    All right.  And you had a number of, at least -- I can't

15  remember the dates, do you remember the date on your plea

16  agreement, when you first came into court, the next time I

17  think you came into court after your initial appearance on May

18  24th?

19  A    The date on my plea agreement?

20  Q    Yes, the date you came in.  Do you remember that?

21  A    The date on the plea agreement says, I believe I signed

22  the plea agreement January 25th, I think it was.

23  Q    Right.  Right.  And that's actually the first day --

24  correct me if I'm wrong -- that you saw Judge Burns, right?

25  A    January 25th, I signed the plea agreement.

```
 1   Q     Right.  And didn't you appear in court?

 2   A     On January 25th?

 3   Q     Or around January 25th?

 4         MR. SILVERMAN:  May I have one moment to confer with

 5   defense counsel?

 6         MR. REEVE:  Yes, yes.

 7         (Mr. Silverman conferring with Mr. Reeve.)

 8         MR. REEVE:  Right, right, I'm sorry, I again

 9   misspoke.  I stand corrected, and I appreciate the correction.

10   Q     You came into court on February 15th of 2013, is that

11   your memory?

12   A     Yes.

13   Q     Okay.  And I think the parties would agree that that was

14   the date.  So are you willing to accept that the government

15   and I both agree about that?

16   A     That date is the day, yes.

17   Q     The date is what the date is, right?

18   A     Um.

19   Q     Now, that was the first date you ever laid eyes upon

20   Judge Burns, right?

21   A     I don't remember it being Judge Burns that day.

22   Q     Okay.

23   A     I'm sorry.

24   Q     Maybe it wasn't, and I'm wrong again.  So when you walked

25   in here and Judge Burns was on the bench, was that the first
```

```
 1   time you ever saw Judge Burns, to the best of your knowledge?
 2   A    I believe it was the first time.
 3   Q    Okay.  All right.  And so another judge here in this
 4   building took your plea, right?
 5   A    (Nodding head.)
 6   Q    Is that right?
 7   A    Fair to say.  I don't remember it being Judge Burns.
 8   Q    Okay.  All right.
 9   A    So it would be another judge, yes, sorry.
10   Q    So two things -- three things happened that day, right?
11   Number one, either before or after your entry of a plea, and
12   it doesn't matter to me but on that date, three events
13   happened:  One of the events is you met with the government
14   for a brief period of time, we went through this with Agent
15   Ndrenika and I think the parties agree that that date you met
16   with the government only for a half an hour, okay?
17   A    Okay.
18   Q    All right.  And then you entered a plea in a courthouse
19   in this building, is that right?  In a courtroom.  In part,
20   the plea agreement, not the cooperation agreement, but the
21   plea agreement.  Or if you didn't do it in a courtroom, but
22   you did it in chambers, tell us that.
23   A    Again, it's like too many court terms.  I came to court
24   on February 15th and I pled guilty in front of a judge, yes,
25   that happened.
```

```
1    Q    All right, that's fine.  And the third thing that
2    happened is you -- let me back up a minute.  When you enter a
3    plea in a federal court case, there is a whole bunch of
4    questions that you have to answer, right?
5    A    Yes.
6    Q    Okay.  You've been through the plea process in state
7    court, and it's a whole lot different, isn't it?
8    A    Definitely.
9    Q    I mean, in state court, you appear before the judge, it's
10   like slam, bang, and next case, right?
11   A    Yes.
12   Q    Here, the plea takes a long time, right?
13   A    Yes, it did.
14   Q    Okay.  And there were two things that you did with the
15   judge, and I don't care where it was, but it was in this
16   courthouse, okay?  That's all...
17          And the second thing was you were questioned about
18   your cooperation agreement, right?  Just like the plea
19   agreement, the judge wanted to make sure that you had a
20   complete understanding of what it was that you were doing.
21   A    Yeah, I was questioned about them.
22   Q    Okay.  And again, that's because these are very difficult
23   decisions that you had to make, fair?
24   A    Yes.
25   Q    Fair to say you wanted to help yourself, but it was a
```

```
1    difficult choice for you to make?

2    A    It was a very difficult choice for me to make.

3    Q    Okay.  And you thought long and hard about it, right?

4    A    Yeah, I fought with it.

5    Q    Okay.  And again, with respect to the plea agreement --

6    let me withdraw that.  With respect to the cooperation

7    agreement, and you were just asked a bunch of questions about

8    that agreement, and the jury's going to have that in

9    deliberations, okay?

10   A    (Nodding head.)

11   Q    But with respect to that agreement, you had an

12   understanding as to who was the decision maker with respect to

13   whether what's called a 5K motion would be filed on your

14   behalf, didn't you?

15   A    I'm sorry, can you repeat that again?

16   Q    Sure.  You know what a 5K motion is, right?

17   A    It's a motion that the government files.

18   Q    Okay.  And why don't you tell us in your words what a 5K

19   motion is, your understanding of it?  And I get that this is

20   your first time in federal court, and all the lawyers have

21   been here a lot of times.  So I'm going to work with you on

22   this, okay?  It's not a trick.  I just want to make sure we're

23   all on the same page.

24        You, when you signed that cooperation agreement, you

25   knew what a 5K, in general, was, right?
```

```
1   A    Yeah, it's another form of cooperation agreement.

2   Q    Okay.  In other words, the cooperation agreement says a

3   couple things, but I want to make sure we all have the same

4   understanding in the courtroom.

5        Isn't it your understanding that the people that

6   decide whether you get below that mandatory minimum ten-year

7   sentence that you talked about is the government team?

8   A    No.

9        MR. SILVERMAN:  May I confer with defense counsel

10  for a second?

11       MR. REEVE:  Yes.

12       (Mr. Silverman conferring with Mr. Reeve.)

13       MR. REEVE:  I said something I didn't mean to say.

14  Sometimes I need all the help I can get.

15  Q    When you signed the cooperation agreement, you

16  understood -- I'm not asking you who would sentence you

17  ultimately -- but that the people who were going to decide --

18  let's just talk honest, let's get down to it, real English,

19  the people who decide -- whether you could possibly get a

20  sentence below ten years were the people sitting right here in

21  front of me now, right?

22  A    The only person that can decide my time was the Judge.

23  Q    No, that's not my question.  My question is, at the time

24  you entered the plea, you were facing a ten-year mandatory

25  minimum sentence, correct?
```

```
1    A    Yes.

2    Q    And you understand that if there's no 5K motion, Judge

3    Burns is absolutely powerless to give you a sentence less than

4    ten years.  You know that, right?

5    A    I don't really know what Judge Burns is capable of, sir.

6    Sorry.

7    Q    Would you accept my representation that the parties agree

8    that Judge Burns would have no power to give you a sentence of

9    less than ten years, unless that motion is filed?  Is that,

10   would you accept that?

11   A    Again, I don't know what Judge Burns is capable of, sir.

12   I don't know if she has the power to do it on her own.  I

13   don't know.

14   Q    Okay.  All right.  And you knew that if the government

15   filed a 5K, that that would give the Judge the power, right,

16   to impose any kind of a sentence she wanted, right?

17   A    I would think she have the power to do that on her own.

18   Q    Okay.

19   A    I mean, the --

20   Q    Okay.  Again, I think the parties would agree that if no

21   5K motion gets filed, the Judge cannot give you a sentence of

22   less than ten years.  I don't want to go around and around.

23   We all agree.  And will you accept that?

24          MR. SILVERMAN:  The government does agree with that

25   representation.
```

```
 1              THE COURT:  Yes.

 2              MR. REEVE:  Thank you.

 3    Q    So these are the people who decide whether or not you get

 4    below the ten years, based on what I'm telling you now, what

 5    we agreed to.  Now you get it, right?

 6    A    I still don't get it, man.  I mean, I know they -- I know

 7    that they are the ones that say was I truthful or not, I know

 8    that.

 9    Q    Right.

10    A    I understand and believe that much.  I know that.

11    Q    Okay.  We're on the same page now.  That's a help.  All

12    right.

13              And it's entirely up to them to decide whether they

14    file that motion that would get you under the ten years,

15    that's the second part, and I just want to make sure we have a

16    meeting of the minds here.

17              MR. SILVERMAN:  May I have another moment to confer

18    with defense counsel?

19              THE COURT:  Please.

20              (Mr. Silverman conferring with Mr. Reeve.)

21    Q    If the motion gets filed, then you're eligible for a

22    sentence under ten years.  I'm not saying you get a sentence

23    under ten years.  If I misspoke, I apologize again.  It's just

24    that there's this, right now, without a 5K motion, there's a

25    floor that a Judge can't go below.  If the 5K motion is filed,
```

1    then the Judge can, in her discretion, either go below ten or

2    go above ten, okay?

3    A    Now, now you're helping me out.

4    Q    Good.  Good.  And then you already told me that it's up

5    to them to determine, just like it was in the proffer

6    agreement, if you told the truth.

7    A    Yes.

8    Q    They're the decision makers on that.

9    A    Yes.

10   Q    Okay.  And then kind of, after that, the ball goes in the

11   Judge's court.  I didn't mean that as a pun.  You know,

12   literally it goes within, it's within her hands, her fate

13   rests -- your fate rests in her hands, at that point.

14   A    Yeah.

15   Q    Okay?  All right.  Okay.  And so you knew that to get

16   below -- I'm sorry, let me rephrase that.  You knew that to

17   have any shot at all of getting below ten years, you needed to

18   satisfy the people here that you were telling the truth,

19   right?

20   A    I don't know if the truth satisfies them, but...

21   Q    Okay.  But the Judge doesn't have anything to do with

22   that.  That's on them, right?

23   A    Yeah.

24   Q    Will you accept my representation that Judge Burns can't

25   come into the court and say, "You know what, I disagree with

1    the government and I'm going to, on my own, file a 5K"?  She

2    can't do that, can she?

3    A    I don't believe she could file a 5K.  I don't know if she

4    could or not.

5    Q    Okay.  All right.  Okay.  All right.  Now, I want now to

6    go back to your testimony over the last -- is this your third

7    day here?  I think your third.  I think you started on Monday

8    afternoon, around 4:30 is the first time the jurors met you,

9    right?

10   A    Yes.

11   Q    Okay.  And then you were on the stand all day yesterday,

12   right?

13   A    Yes.

14   Q    With questioning by Attorney Silverman?

15   A    Yes.

16   Q    Correct?  And then the morning, more questions from

17   Attorney Silverman?

18   A    Yes.

19   Q    Okay.  You testified yesterday that you believe that you

20   have told the truth from the time you signed the proffer

21   agreement on August 9th, 2012, through all of these proffer

22   agreements, through all these and including your testimony

23   over the last three days.  That's what you said, right?

24   A    It's the truth.

25   Q    Okay.  And I want to give you an opportunity, before we

```
 1   go on, to tell us if there's anything that you said that you

 2   want to correct.

 3   A    I mean, if you ask, having reviewed everything, I mean...

 4   Q    No, you testified over the last three days on questioning

 5   by Attorney Silverman.  I want to know if you stand by all of

 6   your answers, that is that you continue to believe that what

 7   you said to him was 100 percent the truth?

 8   A    Yes.

 9   Q    Okay.  And there's nothing that you would take back?

10   A    No, it's the truth.

11   Q    And as sure as you sit here today, that's what you're

12   telling us, right?

13   A    The truth is the truth, sir.

14   Q    Okay.  And so it would be fair for the jurors in this

15   case to hold you to that standard, wouldn't it, in your

16   opinion?

17   A    I guess it would be fair.

18   Q    Okay.  Because you made that commitment.  I've given you

19   an opportunity to retract, modify, to change.  You do not want

20   to do that, right?

21   A    I mean, if you -- I mean, you're telling me to modify

22   what?  I don't understand.  What am I going to modify?

23   Q    No, sir, I'm not telling you anything.  I'm simply giving

24   you an opportunity to correct, if you feel you made any

25   misstatements at all, whether they were intentional,
```

1    unintentional, or anything else.  If, looking back, if you

2    think you made a mistake, tell us now.

3    A    I don't believe I made a mistake.

4    Q    Okay.  All right.  And you, sir, agree, do you not, that

5    there's a difference between a lie and a mistake, correct?

6    A    Yeah.  I mean, there's a difference between a lie and

7    mistake.  We had a lot of mistakes in court these last couple

8    days.

9    Q    Yeah, I think I'm probably ahead on this examination in

10   terms of who's made the most mistakes, me or you.  We all make

11   mistakes.  That's different from a lie, right?

12   A    Yes.

13   Q    So what you're telling us is, number one, "I have not

14   told any lies in this courtroom," right?

15   A    Yes.

16   Q    And number two, what you're saying is, "To the best of my

17   knowledge, I don't even think I made any mistakes in my

18   testimony."

19   A    I've made mistakes in my testimony, yes.

20   Q    You have?

21   A    I believe we corrected them.

22   Q    Okay.  I appreciate that.  Are there any mistakes that

23   you can think of right now that have not been corrected on the

24   record that you would like to correct?

25   A    I would have to -- I mean, the mistake would have to

1    happen for me to correct it.

2    Q    I'm sorry, that time, I did not hear you and it might be

3    I have bad ears.

4    A    A mistake would have to happen for me to help correct it.

5    Q    What I'm asking you is, right now as you sit here, are

6    you aware of any mistakes that you have not corrected?

7    A    No.

8    Q    All right.  Okay.  Now, in addition to these proffer

9    sessions that you've had with the government, would you accept

10    my representation that Agent Ndrenika added them up and told

11    the ladies and gentlemen of the jury that it was approximately

12    39 hours of meetings with the government in all these proffer

13    sessions?  Does that sound about right to you?  I know you

14    weren't looking at your watch and writing it all down, but

15    does that sound ballpark?

16    A    That's okay.

17    Q    Okay.  And then after this last proffer session October

18    11th, 2013, you've met with government lawyers?

19    A    Yes.

20    Q    And at times case agents -- or maybe all the time, I'm

21    not there, I don't know -- to talk about what your trial

22    testimony is going to be?

23    A    Yes, that's fair to say.

24    Q    All right.  And today is January 29th, which means there

25    have been some meetings over the last three months, or

```
 1   three-and-a-half months, again if my math is wrong --

 2   A    That's fair to say.

 3   Q    Okay.  As you sit here now, do you have any idea how many

 4   meetings there have been?

 5   A    No, I can't -- if I was to see the, like, that would be

 6   better.

 7   Q    All right.  Could you give us -- again I'm not going to

 8   hold you to anything, I just want to have a sense.  Was it

 9   less than five?

10   A    From --

11   Q    After October 11, 2013, if you recall.

12   A    I can't recall.

13   Q    Okay.  All right.  In any event, there were a number of

14   meetings in that three-and-a-half-month period, with the

15   government?

16   A    Yes, there was.

17   Q    --  to help you prepare to testify here, right?

18   A    Yes, there was.

19   Q    All right.  And there's nothing wrong with that.  That's

20   what lawyers are supposed to do, all right?  And I don't know,

21   did you meet with your lawyer to help prepare you for your

22   testimony as well?  Again, without asking anything he said to

23   you, I'm not looking for anything like that, but just yes or

24   no.  Did you talk to him to help you prepare?

25   A    Yes.
```

```
 1   Q    All right.  And I want to just go back to what's kind of
 2   a minor point, but I think it's something that you probably
 3   know, and that is that just a little bit ago, you testified
 4   about not the things you did that you have not been convicted
 5   of, but before that, you talked about the things that you have
 6   done that you were convicted on.  Do you remember that
 7   testimony?
 8   A    Yes.
 9   Q    Okay.  And two of the sentences, if I recall correctly --
10   you remember what your sentences were, right?
11   A    Roughly, yeah.
12   Q    What's that?
13   A    Yeah, I remember.
14   Q    You did the time.  Right?
15   A    Yeah.
16   Q    So you kind of know what the bids were?
17   A    Yes.
18   Q    Right?  Okay.  And one was -- again, correct me if I'm
19   wrong -- there was one that was like -- let me just pull it
20   out.  One was --
21            MR. REEVE:  If I may just have a moment.
22   Q    --  one was a sentence that was six years in jail, 30
23   months to serve, and three years probation.  Do you remember
24   that?
25   A    Yes.
```

1   Q    Okay.  And that's what's commonly referred to in state

2   court as, some people might say 6/30 months/3.  6/30/3.  Have

3   you heard that?

4   A    No, I haven't heard it like that.

5   Q    Okay.  But one of the things you do know is how prison

6   time works, right?

7   A    Yeah.

8   Q    All right.  The thing I'm kind of -- I think you can

9   clarify, I think this was a mistake, okay?  I don't think it

10  was a lie, but I think it was a mistake.  You told the jury

11  that you were facing, you believed, 12 years on the 12/6/3

12  sentence that you got that led to your getting out to the

13  halfway house and then out into the community?

14  A    That was the twelve years was my suspended sentence.

15  Q    Right.  So let's just break that down.  You got twelve

16  with six to serve, right?

17  A    Um hum.

18  Q    Now, you served that six-year sentence until the

19  Department of Corrections was satisfied that you had served

20  enough, or the parole board.  You got paroled on that case,

21  did you?

22  A    Yes.

23  Q    But before you got paroled, did you get community

24  release, like transitional?  Isn't that when got you into the

25  halfway house?

```
 1   A    After I got -- after I made parole, then I was --
 2   Q    Okay.  So they gave you a parole date that was in the
 3   future, right?
 4   A    Yes.
 5   Q    But before you got to that date, you were released to a
 6   halfway house?
 7   A    Yes.
 8   Q    Okay.  And that's a Department of Corrections facility
 9   where you're actually still serving the sentence, right?  In
10   other words, you're not on parole there; you're serving the
11   sentence that the Judge imposed, that six years?
12   A    Yes.
13   Q    Okay.  And then when you get released to the community
14   after the period of time in the halfway house, that's when the
15   parole starts, right?
16   A    Yes, after you -- certain people -- I'm not sure how it
17   ultimately works, but I had a parole officer, but I didn't see
18   him until after I got to the halfway house.
19   Q    Okay.  Just so that we're kind of as clear as we can be
20   here, is it fair that you were to say that you were
21   continuously incarcerated on that case that became the 12/6/3?
22   Are you with me so far?
23   A    I don't understand.
24   Q    The last sentence you got in state court, the twelve
25   years suspended after six with three years' probation, right?
```

```
1    A     Um hum.

2    Q     You got, there were two cases involved there, and you

3    told Attorney Silverman, you got bonded out on one and then

4    you went out and committed another drug offense while you were

5    out on bond, right?

6    A     Yes.

7    Q     And by the way, that was kind of a flagrant violation of

8    the conditions of your release, wasn't it?

9    A     Yes, it was.

10   Q     Yes.  You knew pretty darn well that when you get

11   released on bond, one of your obligations is not to commit a

12   crime, right?

13   A     Yes.

14   Q     And you make that commitment to a court, don't you?

15   A     I thought it was to a bondsman.  I'm not sure if it was

16   to a court.

17   Q     Yes, but -- okay.  You got bonded out in that case,

18   right?

19   A     Yes, I got bonded out.

20   Q     $75,000 bond, right?

21   A     I'm not sure what the bond was.

22   Q     What did people have to put up for your bond in a case?

23   A     I don't know.  I wasn't there when they put it up.

24   Q     Was it drug money that got put up for your bond?

25   A     Possibly.
```

1   Q     You didn't have any other source of income, did you?

2   A     At that time, no, I don't think I did, actually.

3   Q     Okay.  If somebody, out of the kindness of their heart,

4   posted that bond for you, it was because they were one of your

5   drug dealer friends, right?

6   A     I honestly don't even remember who posted that bond.

7   Q     Okay.  All right.  So you just went out and kept selling

8   drugs, right?

9   A     I knew I was going to go to jail, so I tried to sell

10  drugs to get my money, get my bank together.

11  Q     Right.  It's kind of like, gee, I know I'm going to go to

12  jail, so screw it, I'll just go out on the street and sell

13  drugs, right?

14  A     I guess that's fair to say.

15  Q     Okay.  You think that shows a lot of respect for the

16  court system?

17  A     I don't think that does show any respect for the court

18  system.

19  Q     You don't think it shows any?  Is that what you said?

20  A     I don't think that that action that I took, I don't think

21  that shows respect for the court system.

22  Q     Okay.  And so now let's fast-forward.  Then there's the

23  second drug arrest, and that happens in January, on January

24  10th of 2007, correct?

25  A     January 10th?

```
 1              MR. REEVE:  Your Honor, with the Court's permission,
 2    if I can approach the witness.
 3    Q    Let me ask a preliminary question.  Are you familiar with
 4    a DOC run sheet?
 5    A    Yeah, I am.
 6    Q    You've seen those when you did time, right?
 7    A    Yeah.
 8    Q    Would it help refresh your recollection if I provided you
 9    a copy of the DOC run sheet for you?
10    A    Yeah, that would help.
11    Q    I think that will speed things up.  I want to direct your
12    attention to the entry here on the sheet that says what it
13    says right here, I'm not going to ask you to read that, but
14    does that refresh your recollection as to the date that you
15    were arrested on the second case and were held because you
16    hadn't made that second bond?
17    A    Yes, it does.
18    Q    Okay.  Can you tell us now what that date was?
19    A    January 10th, 2007.
20    Q    Okay.  And does it refresh your recollection, looking at
21    that document, to tell us from January 10th, 2007, until what
22    date were you actually in a prison in the custody of DOC?  In
23    other words, what was the date that you were released to the
24    DOC halfway house?
25    A    I'm sorry, in 2007?
```

1    Q    No, I'm saying, you continued to remain incarcerated

2    until a date that you were released into the community to the

3    halfway house, correct?

4    A    Okay, I was released --

5            MR. SILVERMAN:  Your Honor, the government would be

6    willing to stipulate to the RT-60, you can move it into

7    evidence, if you like, to speed things up.

8            MR. REEVE:  Could I just have a moment?

9            Your Honor, could I submit this document as the

10    defense exhibit?

11            THE CLERK:  A.

12            MR. REEVE:  A sounds good.

13    Q    I'm going to show you what's now been marked as

14    Defendant's Exhibit A in full.  Is it correct that there are

15    two pages of this document?

16    A    Yes.

17    Q    Okay.  And if you look at the second page, it indicates,

18    on the line at the bottom of the page, "New entry accused

19    continued," right?

20    A    Yes.

21    Q    That represents the first time you were locked up in the

22    state of Connecticut correctional system, forgetting about

23    juvenile things for now, okay?  As an adult.

24    A    All right.

25    Q    And that date was January 7th, 2003, right?

1    A     Yes, it is.

2    Q     Okay.  And then the dates go from the bottom, that one we

3    just worked on the second page all the way up through February

4    15th, 2005, right?

5    A     Yes.

6    Q     And then that page, which is marked page 2, in order to

7    see the rest, you turn to page 1, and you again start at the

8    bottom of the page and work your way up to the most recent,

9    correct?

10   A     Yes.

11   Q     All right.  And so this page was the one I was asking you

12   about, which is page 1 of Defendant's Exhibit A, references

13   the dates that you served on that 12-year sentence suspended

14   after six with three years' probation, right?

15   A     I'm sorry, that shows?

16   Q     Let me just get you to where I think you'll agree with

17   me.  There are a bunch of entries here after the January 10th,

18   2007, which indicates readmission, that was the date you got

19   arrested on case number two, when you were out on bond and you

20   couldn't make the bond in the second case, right?

21   A     Okay, yes.

22   Q     And then you get transferred around, and it shows all

23   your movements, and I'm not offering it for where you were or

24   anything like that.  So then you get released to community

25   release on July 19th, 2010, correct?

```
1    A    Yes.

2    Q    And that's the halfway house, right?

3    A    Yes.

4    Q    And there's an entry here, Walter Brooks, is that the

5    name of the halfway house?

6    A    Yes.

7    Q    Okay.  You stayed at that halfway house from July 19th,

8    2010, to June 28th, 2011, right?

9    A    Yes.

10   Q    And in the halfway house, there are restrictions on your

11   movement, and your ability to do certain things, right?

12   A    Yes.

13   Q    And that's where you got your job at Dunkin' Donuts,

14   during the period of time you were at the halfway house,

15   right?

16   A    Yes.

17   Q    And you weren't, during that period of time -- and I

18   don't know if we've said, if I've already said it I'll repeat

19   it -- you were at the halfway house, the Walter Brooks halfway

20   house from July 19th, 2010, until June 28th, 2011, is that

21   right?

22   A    Until 6/28, yes.

23   Q    That's when you were released on parole?

24   A    Yes.

25   Q    And what that meant was you were still serving the
```

1    original six-year sentence, the part that was an incarceration

2    part of your sentence, right?

3    A    Yes.

4    Q    Okay.  And the only exposure you had at that point was if

5    you violated parole was whatever time was left on the six,

6    right?  Not -- because you're not on probation yet.

7    A    Okay, that's court stuff.  I don't...

8    Q    All right.  Okay.  So when you get out, you served almost

9    all of that six, and you're on parole?

10   A    Yes.

11   Q    And you never make it to probation, because you get

12   arrested in this case?

13   A    Yes.

14   Q    So they couldn't charge you with a violation of

15   probation, because you were never on probation.

16   A    I was on parole, yeah.

17   Q    You were on parole.  That sentence has entirely expired,

18   right?  You're not serving time on the parole now?

19   A    No, but I signed probation papers.

20   Q    Okay.  But you haven't been released on probation, right?

21   A    No.

22   Q    And the probation papers you signed, you signed, was that

23   when you were in jail?

24   A    Yes.

25   Q    Or at the halfway house?

1  A     I signed, I signed probation papers in jail.

2  Q     Okay.  Was that after you got arrested in this case, on

3  January 3rd, 2012?

4  A     Yes.

5  Q     So you've never been out on probation because you've been

6  locked up since then?

7  A     Yes.

8  Q     Right.  So now it's clear to you, it was just a mistake,

9  okay?  When you said you were exposed to twelve, you're really

10 not exposed to anything on the state case because you served

11 the six, you never made probation, they couldn't file a

12 violation of probation on you because that wouldn't be right

13 because you're not on it, right?

14 A     Okay, so...

15 Q     So you were exposed to nothing, not twelve years, zero

16 years, right?

17 A     Okay.

18 Q     All right.  And again, you didn't -- that wasn't a lie,

19 right?

20 A     That's what I believed.

21 Q     Okay.  Yes.  And now that we've gone through it in some

22 detail, you get what I'm saying to you, right?

23 A     Yeah.

24 Q     We're on the same page now.

25 A     Yes, we are.

```
 1   Q    So that was a mistake that you wouldn't have corrected,

 2   because you really didn't know it was a mistake, until we went

 3   through this whole thing on Defendant's Exhibit A, right?

 4   A    Yes.

 5   Q    Okay.  All right.  Now, by the way, let me go back to

 6   those meetings, however many meetings you had after October

 7   11, 2013, between October 11th, 2013, and the time you took

 8   the witness stand in this court on Monday, late in the day,

 9   around 4:30.  Are you with me?

10           In other words, there was -- I want you to focus on

11   the time period between October 11, '13, 2013, which I

12   represent to you, we agree, was your last proffer session with

13   the government, okay?

14   A    Okay.

15   Q    All right.  After that, you had a bunch of meetings and

16   we don't know how many and it doesn't matter, but you had

17   several meetings with the government?

18   A    Yes.

19   Q    And that was to help you prepare.  They gave you some

20   guidance in kind of thinking about, number one, what are the

21   questions we're likely to ask you, right?

22   A    I'm sorry?

23   Q    They gave you some guidance, and again I'm not interested

24   in getting into the substance of your discussions with

25   government counsel, but it's just, they kind of helped prepare
```

```
1   you for your testimony, that's their job, right?

2   A    Yes.

3   Q    I mean, you know, that makes sense, right?

4   A    Yeah.

5   Q    And they also might have told you, here's what you might

6   reasonably expect one or two or more lawyers might ask you on

7   cross-examination, right?

8   A    Yes.

9   Q    Okay.  And there's absolutely nothing wrong with that,

10  that's what they do, right?

11  A    Yes.

12  Q    Okay.  And you found that helpful, right?

13  A    I mean, yes.

14  Q    Okay.  And we're going to talk about this a little bit

15  after the break, but let me just ask you a few preliminary

16  questions that maybe we can wrap something up before the lunch

17  break.

18            You've been a drug dealer most of your adult life?

19  A    Yes.

20  Q    Except for when you were in jail?

21  A    (Nodding head.)

22  Q    Right?

23  A    Yes.

24  Q    Okay.  And by the way, we'll get to this a little later,

25  too, but a job at Dunkin' Donuts was a nice front for you,
```

1    wasn't it?

2    A    A nice front?

3    Q    Yes.  You weren't working there because you wanted to

4    work for minimum wage; you were making a hell of -- I'm sorry,

5    you were making a lot more money out on the streets slinging

6    drugs, right?

7    A    Actually, I valued the money that, I was working because

8    I was on parole, and I needed a job, and --

9    Q    Right, you had to have a job because your parole officer

10   was saying you had to have a job?

11   A    Yeah.

12   Q    We'll talk about that a little later, too.  That was

13   actually one of the few conditions of parole that you complied

14   with, wasn't it?

15   A    Yes.

16   Q    Yes, okay.  So let me back up a few steps.  The date that

17   you got to the halfway house, Defendant's Exhibit A, Walter

18   Brooks, July 19th, 2010, let me ask you this:  How many days

19   was it after you got to the halfway house that you went back

20   to selling drugs?

21   A    I don't remember.

22   Q    Was it days or was it weeks?

23   A    It definitely wasn't days.  It could have been weeks,

24   months.

25   Q    Okay.  And you, I think in the very early on part of your

```
 1   testimony, you indicated to us that the primary sources for

 2   you, after you got -- I'm focusing now on the time after you

 3   got out of DOC custody and into a DOC facility in the

 4   community which was the halfway house, are you with me?

 5   A    Yes.

 6   Q    That date.  There were a lot of restrictions on your life

 7   at the halfway house, right?

 8   A    Yeah, there were restrictions in the halfway house.

 9   Q    You weren't supposed to be going out to the Tre and

10   selling drugs, were you?

11   A    No, I wasn't.

12   Q    If the people at the halfway house knew that you were

13   going out to the Tre and selling drugs, what would have

14   happened?

15   A    Probably would have been sent back to jail.

16   Q    In about how long do you think that would have taken?

17   A    For them to do that process?

18   Q    Yes.

19   A    When they found out, probably be the same day maybe.

20   Q    No going to court, you don't stop at go, you don't

21   collect $200, you go right back to jail, right?

22   A    Yeah.  Yeah.

23   Q    And so you had to lie to the people there, didn't you?

24   A    I didn't have -- they didn't ask me that question.

25   Q    Okay.  Weren't you obligated to go to work and then
```

1    return to the halfway house?

2    A    Yes.

3    Q    And you didn't do that, right?

4    A    On occasion, I did not.

5    Q    Okay.  And so that's a good area to bring this question

6    up.  Sometimes lies can be what we call sins of omission,

7    right?  Do you know what that means?

8    A    No.

9    Q    Okay.  Like sometimes, I might tell a lie to your face,

10   right?  I might say to you, to take an absurd example, I'm a

11   woman.

12   A    Okay.

13   Q    I know I'm a man, and if I tell you that, it's a lie,

14   right?

15   A    Yeah.

16   Q    It's just in your face, lied, right?

17   A    Yes.

18   Q    Okay.  Then if you ask me how many brothers and sisters I

19   have -- I have two, one brother and one sister, okay?

20   A    If that's what you're telling me.

21   Q    If you asked me that question and I said I have one

22   brother, would that be true?

23   A    If I asked you that question and you said you had one

24   brother?

25   Q    And I say I have one brother, but I don't tell you, I

```
 1   withhold the information about the fact that I have a sister,

 2   have I just lied to you, in your definition of what a lie is?

 3   A    If I asked you did you have one brother and you said you

 4   have one brother, to me that's not a lie.

 5   Q    If you ask me how many brothers and sisters I have, and I

 6   tell you I have one brother, but I do not reveal the fact that

 7   I have a sister, would that be a lie?

 8   A    That would be -- I guess you're withholding.  Yeah.

 9   Q    It's kind of a half-truth, right?

10   A    Yeah.

11   Q    Do you think you would get in trouble with the government

12   for telling a half-truth about anything in this case?

13   A    I would, yes.

14   Q    You think you might?

15   A    Yeah, if I did that, if I didn't recall, if I lied to the

16   face, that would be.

17   Q    Isn't there something that would have to happen, right?

18   For you to get in trouble with the government, what would have

19   to happen if you told them a half-truth?

20   A    They would have to say that I was lying?  I don't...

21   Q    They would have to know that it was a half-truth,

22   wouldn't they?

23   A    Yeah.

24   Q    And the people at the halfway house didn't know you were

25   telling them half of the story.  "Oh, yeah, I went to work
```

```
 1    today, you know, I was there a few hours overtime, sorry I'm
 2    late."  That would be a lie, if you didn't have overtime work,
 3    you would agree with that, right?
 4    A    That would be a lie, if I was somewhere else.
 5    Q    Yeah.  Or if you lied to them about, you had a second
 6    shift at work or they made you stay at work, that would be an
 7    intentional lie on your part to people in the system, right?
 8    A    Yes.
 9    Q    Okay.  On the other hand, you kind of followed the don't
10    ask, don't tell policy at the halfway house, right?
11    A    I don't know that that's a policy at the halfway house.
12    Q    If they don't ask me where I was and I was really out
13    selling drugs in the Tre, then I'm sure not going to volunteer
14    that information to them, right?
15    A    I don't --
16    Q    That would be stupid, wouldn't it?
17    A    You keep saying about selling drugs in the Tre.  I'm
18    sorry, I don't...
19    Q    You were selling drugs when you were in the halfway
20    house, weren't you?
21    A    I did, I did sell drugs.
22    Q    Sure.  We saw you on Government's Exhibit 120, that was
23    May 10th of 2011, right?
24    A    Yes.  Yes, it was.
25    Q    You watched that, and we're going to look at it again.
```

```
1    A     Okay.

2    Q     Or a portion of it again.

3    A     All right.

4    Q     But that was May 10th, 2011, you didn't get out of the

5    halfway house until June 28 of 2011, right?

6    A     Yup.

7    Q     That was six weeks before you got out of the halfway

8    house.  Let me ask you this:  That wasn't the first time you

9    sold drugs?

10   A     The first time --

11   Q     When you dealt with the guy that you became a little

12   suspicious of, Lynnwood, the whole thing you went through, not

13   going to repeat it again, that wasn't the first time since you

14   got released to the halfway house that you were out there

15   selling drugs, right?

16   A     I believe that was the first time.

17   Q     Really?

18   A     I've middled deals.  I don't, I don't remember selling

19   drugs before that.

20   Q     Hmm.  Okay.  How many times after that, while you were at

21   the halfway house in the next six weeks did you sell drugs?

22   A     In the next six -- I don't remember.

23   Q     But you did sell drugs?

24   A     Yes, I did sell drugs.

25   Q     Yeah.
```

1    A     I don't remember if it was in that six weeks.

2    Q     Okay.  And then you get out, and now you're out on

3    parole, right?

4    A     Yes, when I get out of the halfway house, I'm on parole.

5    Q     Okay.  And you sat down with the parole officer in his

6    office, right?

7    A     Yes.

8    Q     And he asked you a lot of questions, didn't he?

9    A     Yes, he did.

10   Q     And you looked at him in the eye, just like you're

11   looking at us in the eye, and you lied, didn't you?

12   A     I'm sorry, what did I lie to my probation officer about?

13   Q     You lied about a lot, didn't you?

14   A     Yeah, eventually I did lie.

15   Q     Sure.  Some of the conditions of parole for you, in that

16   period of time, after you get out of the halfway house, you

17   couldn't travel outside the state of Connecticut, could you?

18   A     No, I could not.

19   Q     No.  But where were you going?

20   A     To New York.

21   Q     Yeah.  Every time you went to New York, that was a

22   violation of your parole, right?

23   A     Yes, it was.

24   Q     And you didn't volunteer that information to him, did

25   you?

1   A     No, I did not.

2   Q     And he would ask you sometimes, "How are things going,"

3   right?  "How you doing out there?"

4   A     Yeah, he would ask me.

5   Q     You would say, "Cool, everything's good, I'm working

6   hard," right?

7   A     I tell him I'm working hard, yeah.

8   Q     Yes, sure.  You didn't tell him what you were working at,

9   did you?

10  A     I told him, I don't know what exactly I told him, but we

11  talked, we had conversations.

12  Q     Let's just kind of cut to the chase.

13  A     Please.

14  Q     You spent most of your adult life, you already told us,

15  as a drug dealer?

16  A     Yes.

17  Q     Drug dealers lie every day of their life, right?

18  A     Kind of like, yes.  You said that drug dealers lie, it

19  would be good for them to lie.

20  Q     It would be what?

21  A     It would be a good thing for them to lie.

22  Q     It would be a good thing to lie, right?

23  A     Yeah, as drug dealers.

24  Q     You have to be a good liar to be a good drug dealer,

25  right?

```
1    A    I wasn't a good drug dealer.

2    Q    You lied to your customers, right?

3    A    Sometimes.

4    Q    You lie to your source of supply, right?

5    A    I have, yes.

6    Q    I'm asking you now.  I'm not asking the general drug

7    dealer.  I'm asking you.

8    A    Okay.

9    Q    Now we've got you lie to your source of supplies, you lie

10   to your customers, right?

11   A    Yes.

12   Q    Okay.  We've seen conversations here between you and your

13   source of supply, Na-Na, right?

14   A    Yes.

15   Q    But the ladies and gentlemen of the jury box should not

16   assume that what you said to him is true, should they?

17   A    If I said it wasn't true, then it wasn't true.

18   Q    Okay.  So now it's kind of we're left with you to tell us

19   what wasn't true?

20   A    I believe so.  I'm sorry, like that question is -- can

21   you --

22   Q    Let me rephrase it.

23   A    Yeah.

24   Q    Are you telling the ladies and gentlemen of the jury that

25   when you listened to all the conversations that they've
```

1  listened to, that there was not one time that you were playing

2  Na-Na?

3  A    No, there was times that I was playing Na-Na, yes.

4  Q    But you didn't tell us when you were playing him, right?

5  You didn't say, "Wait a minute, wait a minute, wait a minute,

6  time out, time out, that one up there, that's when I was

7  lying."  We have no way of knowing that, do we?

8  A    I don't know that I was asked that question.

9  Q    No, I don't think you were.  I think that's right.  You

10 weren't asked, you weren't given an opportunity, and what

11 we're left is, here's the calls, but how can we know what's

12 the truth and what's false?

13 A    I don't know what I'm supposed to say with that.  Is that

14 a question?

15 Q    I know you don't know what to say.

16         THE COURT:  Mr. Reeve, it's 1:00 o'clock.  I'd like

17 to take the luncheon recess.

18         MR. REEVE:  Thank you, your Honor, I appreciate it.

19         THE COURT:  Please, ladies and gentlemen, don't

20 discuss the case during the hour that you're at lunch, okay?

21         (In the absence of the jury:  12:59 o'clock p.m.)

22         MR. MORAGHAN:  Your Honor, if you could, I don't

23 know, I'm not sure if the witness or part of the staff,

24 someone's clothing --

25         THE CLERK:  I believe it's the witness, we've had

```
 1   this before, it just dawned on me, there's wires underneath

 2   the desk and I think you keep hitting them.

 3           MR. MORAGHAN:  All I can hear is static at times.  I

 4   don't know what we can do about it.

 5           THE COURT:  Well, apparently we called.

 6           (Luncheon recess:  1:00 o'clock p.m. to 2:11 o'clock

 7   p.m., in the absence of the jury.)

 8           THE COURT:  Good afternoon.  Please be seated.

 9           I want to address the spectators who are here.

10   You're here as spectators, that is to see what's going on.

11   Your conversations have been distracting to the jury.  They've

12   got to cease.  If you want to talk to each other, leave the

13   courtroom, okay?  Does everybody understand that?  We've had

14   complaints from the jury about it.

15           MR. REEVE:  Thank you, your Honor.  Your Honor --

16   please sit down, I didn't mean to interrupt you midstream.

17           I told government counsel that I'm not feeling well.

18   I'm going to continue with the first part of the afternoon.

19   If I continue to feel like I'm deteriorating, I just feel a

20   little feverish and part of it is I'm tired, exhausted, but

21   I'm not feeling well.  If I can't continue, Attorney Moraghan

22   will pick up.

23           THE COURT:  Okay.

24           MR. REEVE:  If we have to stop short today and then

25   resume tomorrow, I would just ask the Court's indulgence on
```

```
1   both of those things.  I've talked to government counsel, and

2   they have been kind enough to agree to kind of switching the

3   order.  And I will let your Honor know if I need a break.  I

4   will just indicate this might be a good time to break, even if

5   it's a little before 3:30, okay?

6            THE COURT:  Yes, sure.  I hope you'll be feeling

7   better.  I hear a number of people are coming down with the

8   flu, so be careful.

9            MR. REEVE:  I understand that, including people I'm

10  around right now.  Let's hope not.

11           THE COURT:  Okay.

12           Is there anything further before the jury comes in,

13  gentlemen?

14           MR. SILVERMAN:  Nothing from the government.

15           MR. REEVE:  No, your Honor, thank you.

16           MR. MORAGHAN:  No, your Honor.

17           THE COURT:  May we have the jury?

18           (In the presence of the jury:  2:15 o'clock p.m.)

19           THE COURT:  Good afternoon, ladies and gentlemen.

20           MR. REEVE:  May I proceed, your Honor?

21           THE COURT:  Yes.

22           MR. REEVE:  Thank you.

23  BY MR. REEVE (Continued):

24  Q    Mr. Wilson, I want to pick up where we left off just

25  before the break.  I was talking to you about whether or not,
```

1   when you're dealing with, both ways, customers going down that

2   way or sources of supply, like Na-Na, going up, sometimes,

3   depending on the situation, you're not telling the truth?

4   A    Yes.  Depend on the situation.

5   Q    And that could go in either direction, right?

6   A    That depend on the situation.

7   Q    Depending on the circumstances, you might have a reason

8   to say something to either one of those, the source of supply

9   or the customer, depending upon which way it's going, that is

10  in your interests at the time, but it's just not a true

11  statement, right?

12  A    To give you an example.

13  Q    Sure.  Sure.

14  A    Na-Na could tell me that he gave me a hundred grams of

15  heroin, and this is what he would tell me.  I could tell

16  somebody that I'm getting, that I got a hundred grams and it

17  would be 80.  I mean, that would be -- that's not -- I don't

18  know if -- that's not a blatant lie on my behalf; that's what

19  I believed.

20  Q    Right.  Right.

21  A    But there are situations where I just blatantly lie to

22  Na-Na, yes.

23  Q    Right.  Let me give you an example.  I'm not going to go

24  to the call.  Do you recall an occasion where you're speaking

25  with Nu-Nu about hooking up with Na-Na, and you've got to pay

1   some money, and you've got what you refer to in the call as

2   41, and you say to Nu-Nu, "I'm going to tell Na-Na I've got

3   45, and then when I get there, I'll tell him I miscounted."

4   Do you remember that?  If you don't, you can tell us.

5   A    I mean, I don't -- I remember something like that.

6   Q    Right.

7   A    If I saw it, or heard it, I would be able to say, okay,

8   it would refresh my memory.

9   Q    Okay.  We'll go back there.  But you wouldn't be

10  surprised if you did that?

11  A    No, I wouldn't be surprised if I did that.

12  Q    Right.  And now, going the other way, you were asked on

13  direct lots and lots of questions about what you understood

14  the other person to be saying.  Do you recall all those

15  questions?

16  A    I don't recall all the questions, but I recall questions.

17  Q    No, every time -- the question of "do you understand" and

18  then there would be a question, that first part, "what did you

19  understand the person," you remember that the question started

20  out that way, right?

21  A    Some.

22  Q    Okay.  And that's because you really never know what's

23  going on in the mind of the person you're speaking to, right?

24  A    I am not a mind reader.

25  Q    Right.  And you indicated earlier that -- and correct me

```
 1    if I'm wrong -- my recollection was a phrase like, it's good

 2    for a drug dealer to lie.  Do you remember saying something

 3    like that?  I don't want to put words in your mouth.

 4    A    I think, I believe I did say that.

 5    Q    Okay.

 6    A    I mean, it's like I don't know any honest drug dealers.

 7    Say that better.

 8    Q    All right.  Can you tell us why it's a good thing for

 9    drug dealers to lie?

10    A    To avoid police.  I mean, you're avoiding police

11    detection.

12    Q    Okay.

13    A    If you run around saying you a drug dealer, I mean,

14    blatantly to a lot of people, they could call law enforcement

15    on you.

16    Q    Okay.  And would you agree that when you do a drug

17    transaction, you are playing a role?

18    A    Yeah.  Yeah.

19    Q    Do you agree?

20    A    Yeah.

21    Q    I want to go back and show you that, just a short portion

22    of Government's Exhibit 120, which is the video of the May

23    10th, 2011, undercover buy from you.  You remember the whole

24    video, right?

25    A    I remember the video.
```

1    Q    Yes, okay.  And I'm just going to show you a short part,

2    and then I'd like to ask you a few questions about it.

3              (Government's Exhibit 120.5, a video recording,

4    played, and paused.)

5    Q    I think that gives us enough for purposes of what I want

6    to ask you about.

7              In that transaction, you use a lot of bad language,

8    right?

9    A    Um hum, yes.

10   Q    You use a lot, in not just that one but in most of the

11   conversations that we listened to, and I'm just going to refer

12   to them for example as the N word or the F word or the B word.

13   I don't want to continue with the words.  The words are what

14   the words are.

15             That's not the way, for example, that you talk to

16   your mother?

17   A    No, it's not.

18   Q    And it's not the way that you talk to your parole

19   officer?

20   A    No, it's not.

21   Q    And it's not the way, when you sat with the government in

22   the proffer sessions, that you spoke to them?

23   A    No, it's not the way I spoke to them, either.  I mean, we

24   went over calls.

25   Q    Yes.  And a lot of the time that you spent with them was

1   doing exactly what you did before the jury here, that is you

2   would listen to a call at their request, and then you would

3   talk with them about that call, right?

4   A    Yeah.

5   Q    Okay.  And can you explain to us why -- let me ask you a

6   few more questions first.  You're dressed in a certain way

7   here, right?

8   A    Yes.

9   Q    Is that the way you dress when you go to see your parole

10  officer?

11  A    I would dress that way to go see my parole officer.

12  Q    Okay.  Is that the way you dress to go to work at Dunkin'

13  Donuts?

14  A    No, it's not.

15  Q    Is that the way you talk to customers at Dunkin' Donuts?

16  A    No, that's not the way I talk to customers at Dunkin'

17  Donuts.

18  Q    All right.  And so that's what I was asking you about.

19  Is it fair to say -- I'm probably stating the obvious -- that

20  you're playing a role?

21  A    Yeah.  That's fair to say.

22  Q    All right.  In the environment in which you live and grew

23  up, the Tre section of New Haven, right?

24  A    Yes.

25  Q    If you didn't act like that, people would be suspicious

```
 1   of you?
 2   A    Suspicious?  I don't --
 3   Q    Let me rephrase that.  That's not a good question.  Let's
 4   say you're meeting a customer for the first time.  This guy
 5   you've never met before, right?
 6   A    Yes.
 7   Q    The guy in the front?
 8   A    Yes.
 9   Q    You know the guy in the back?
10   A    Yes.
11   Q    And he's doing an intro to the guy in front?
12   A    Yes.
13   Q    And you went and shook his hand.  And you're kind of, in
14   effect, trying to convince him that you're an okay guy to deal
15   with?
16   A    Convince the driver?
17   Q    The guy you've never met.
18   A    They trying to convince me, actually.
19   Q    That's what I wanted to get to next.  They're clearly,
20   and we know now, they're playing a role?
21   A    Yes, they're playing a role.
22   Q    And they're pretending that they're a real customer,
23   right?
24   A    It was a buy.  They were customers.
25   Q    At the time that you purchased this, I think -- I'm
```

```
 1   sorry, let me rephrase that.  At the time that, during this
 2   transaction, you sold, I think you indicated, eight balls of
 3   crack, eight eight balls of crack, right?
 4   A    During this --
 5   Q    Yes.
 6   A    This was eight.  It was supposed to be a ounce but it was
 7   eight eight balls.
 8   Q    Right.  Let me just make sure the record is -- we agree
 9   that eight eight balls should be somewhere in the area of an
10   ounce?
11   A    Yes.
12   Q    All right.  And now you know that your suspicions were
13   correct?
14   A    As far as him being --
15   Q    Right.  I think you said earlier you had something, I
16   think you said, "I just wasn't sure, I had kind of like a gut
17   feeling that there was something wrong with this transaction."
18   Do you remember that?
19   A    Yeah.  Yeah.
20   Q    And you're obviously trying to assess that when you're
21   doing a transaction like this, which is, are these guys for
22   real?
23   A    Yes.
24   Q    And one of the things that you have to do here in the
25   business that you conduct is, you're really selling two things
```

```
1    here, aren't you?  You're selling your product and you're

2    selling yourself as legitimate, too.

3    A    Yes.

4    Q    Right?  And at the same time, these people are pretending

5    they're a real customer, right?

6    A    So they're kind of selling theirself, too.

7    Q    They're playing a role as a customer, right?

8    A    Yes.

9    Q    Now, this time, your gut reaction was correct, right?

10   A    Yes.

11   Q    But there are lots of times when your gut reaction is --

12   you don't -- whatever sensation or feeling or whatever it is

13   that causes you to pause, that meter does not go on -- do you

14   understand what I'm saying?

15   A    Yeah, does not go on when though?  It goes off here.

16   Q    Right.  In other words, you've been -- you told us about

17   your cases, but you have sold drugs to people when they were

18   role playing as real customers but in fact, they were

19   undercover, right?

20   A    I had sales before, yeah.

21   Q    And with some of those, your antenna, we can call it,

22   your radar, whatever it is, your gut, intuitive sense, it just

23   didn't alert, right?

24   A    No, it did not.

25   Q    You read the person wrong?
```

1    A    Yeah, fair to say.

2    Q    Okay.  And in this case, there were a total of three

3    undercover transactions, is that right, if you know?

4    A    In that case --

5    Q    Not this one day -- this is one day and then there are

6    two others?

7    A    Yes.

8    Q    Okay.  Two of them were prior to the start of the wiretap

9    on your phone, which started on July 29th of 2011, correct?

10   A    It started when they put it in.

11   Q    Yes, okay.  But two of the undercover buys were prior to

12   the start of the tap, and one was after.

13   A    If that's what you telling me, then yes.

14   Q    I don't think there's a dispute on that, and I'm just

15   going to move forward.

16   A    Okay.

17   Q    Did you ever again, after the May 10th, sell anything to

18   the driver of the car?

19   A    After May 10th?

20   Q    This day, the one we're looking at.  So this day, you

21   sold them the approximate ounce, right?

22   A    Yes.

23   Q    Did you ever sell anything to him on any date after May

24   10th?

25   A    Yes, I believe I did.

1    Q    Okay.  So your kind of antenna was up, but it wasn't up

2    enough for you to say, "I'm not doing the deal," right?

3    A    Yeah, because I did it.

4    Q    Yes.  And obviously, one of the primary rules for drug

5    dealers, if you can, not to sell to an undercover agent or

6    cooperating witness or whoever is doing the pretending on the

7    other side of the deal, right?

8    A    Yes.

9    Q    All right.  And then there was the third transaction that

10   was after the tap started on your phone, okay?  And just

11   accept that it was after.

12   A    Okay, I will.

13   Q    It's not disputed.  And that was a different person, is

14   that right?

15   A    Yes.

16   Q    And that was one transaction, correct?

17   A    Yes.

18   Q    And you did not realize at the time that it was a

19   cooperating witness working with government agents in the

20   context of this investigation, fair?

21   A    That's fair to say.

22   Q    Okay.  Because you wouldn't have done it if you didn't

23   know.  And so it's a constant trying to figure out what's

24   going on with people around you in the drug world, correct?

25   A    I would say so.

1    Q    Yes.  And sometimes you're right, your gut's right, and

2    sometimes it's wrong.  Sometimes people that you believe are

3    legitimate customers, even if they're not undercover, have

4    some other goal that you don't know what's going on, right?

5    A    Yeah.

6    Q    Okay.  And, you know, let me develop that a little bit

7    more.  Sometimes, someone's setting you up for something

8    further down the road that you're not aware of, right?

9              MR. SILVERMAN:  I'm going to object.  I think that

10   calls for this witness to speculate about someone else's state

11   of mind.

12             MR. REEVE:  Let me ask it this way:

13   Q    Has it ever happened for you that -- well, let me be more

14   specific.  You testified earlier that Vincent Clark, Nu-Nu,

15   took some product from you, right?

16   A    Yes.

17   Q    And we're going to talk a little bit more later about how

18   that incident happened, but for purposes of right now, you, at

19   that time, were allowing Mr. Clark to have access to your

20   product?

21   A    He had the product.  He was allowing me to have access to

22   it, after I gave it to him, actually.

23   Q    But you -- I don't want to go into the details because we

24   are going to do that later, but if you knew he was going to

25   steal your product, it's kind of like with the undercover or

1   cooperating witness, you wouldn't have allowed him to have the

2   product?

3   A    No, I would not.

4   Q    Yes.  And so up until the point when Mr. Clark stole your

5   product, you didn't think, in my mind, "he's going to steal my

6   product"?

7   A    No, I did not.

8   Q    Right.  As far as when Mr. Clark formulated a plan in his

9   own head to steal your product, you don't know when that

10  happened, right?

11  A    I'm not a mind reader.

12  Q    And again, that's because, as you just said now for the

13  second or third time, like all of us, you're not a mind

14  reader?

15  A    Exactly.

16  Q    All right.  I started before the lunch recess to ask you

17  about lies to your parole officer, do you recall that?

18  A    Yes.

19  Q    And one of the things you said is you violated the

20  condition that you not travel outside Connecticut?

21  A    Yes.

22  Q    There was obviously a condition of parole that you not

23  violate any laws?

24  A    Yes, I believe there was.

25  Q    And you violated that condition?

```
 1   A     Yes, I did.

 2   Q     That's what brings you here today.

 3   A     Yes.

 4   Q     All right.  And that's what led to your arrest on January

 5   3rd of 2012, is that right?  Your illegal conduct?

 6   A     Oh, yes.  I'm sorry, I thought you were just -- I didn't

 7   know if it was a question or not.

 8   Q     Right.  And so there are other people, and you've alluded

 9   to them earlier some, other actors in the system, that you

10   have lied to when you need to, right?

11   A     Yeah.

12   Q     Yeah.  Like police?

13   A     Yeah, I had to lie to police.  Yeah.

14   Q     Sure.  Probation officers again?

15   A     Yeah.

16   Q     People at the halfway house?

17   A     Yes.

18   Q     A host of people that you were coming into contact with

19   that you were lying to, right?

20   A     That I've lied to, yes.

21   Q     Sure.  And sometimes, as a drug dealer, you lie to your

22   own family about what you're doing?

23   A     Oh, definitely.

24   Q     Yeah.  And you lie to your friends about what you're

25   doing?
```

```
1    A    Certain friends, yeah.

2    Q    If they're not part of your group?

3    A    Yeah.

4    Q    You know, then you kind of keep things on the QT.  Is

5    that a phrase you understand?  If it's not, I'll rephrase it.

6    A    Yeah, rephrase it, please.

7    Q    Okay.  You don't tell people outside of your inner

8    circle, the guys that you're dealing drugs with, what you're

9    doing on a day-to-day basis, in terms of your drug dealing

10   activities?

11   A    No, I don't tell -- well, no, I might say, if my sister

12   ask me, "What are you doing?"

13          I might say, "I'm going to New York," but I might

14   not tell her I'm going to New York to buy drugs.  Still lying.

15   Q    Right.

16   A    I don't know if that helps you out.  I don't know.

17   Q    No, it does.  It does.  And you have -- trying to think

18   of a way to phrase this -- there have been times, times during

19   the course of this case, in between January of 2011 and

20   January of 2012, that you have, in this case, lied to the

21   police, right?

22   A    I'm sorry?

23   Q    Let me explain, and I'm going to put it in context.

24   There was a time in this case when one of your buddies, and

25   you've testified Gutter P, also known as Quiyon Reid and
```

```
 1   you've testified about him, correct?

 2   A    Yes.

 3   Q    He's another guy from your neighborhood, right?

 4   A    Yeah, he live in the neighborhood.  Yeah.

 5   Q    And you've known him a real long time?

 6   A    No, I don't believe, no, I don't know him a long time.

 7   Q    No?  Okay.  And he got arrested, and I'm just going to

 8   make a representation to you, he got arrested on September

 9   9th, 2011.  Do you recall when he got arrested?

10   A    No, I don't recall.  Hold up.

11   Q    Let me try to refresh your recollection.

12   A    Yeah.

13           MR. REEVE:  Your Honor, I'm going to play a call, I

14   believe it's a call, it's No. 15943, on September 9th, 2011.

15   These calls are not government exhibits.  They're going to

16   have to be marked as defense exhibits.  I discussed this with

17   government counsel, and I think we're in agreement that I can

18   mark them.

19           For purposes of right now, I'm just going to orally

20   mark this as Defendant's Exhibit B and then near the

21   conclusion of the case, we'll put them on a disk and make them

22   part of the record, just as the government has with respect to

23   the calls that they introduced, if that's acceptable to the

24   Court.

25           THE COURT:  Sounds all right.
```

1         MR. REEVE:  Okay, good.

2    Q    So I am now going to play you -- I thought I had it

3    queued up here, but I don't, okay?  So it's my error.  Maybe I

4    can help refresh you.

5         MR. REEVE:  Attorney Silverman was gracious enough

6    to assist me, but it's confirmed what I thought, which is it's

7    not here, that call, unfortunately.  I have it on another

8    disk, and if your Honor would indulge me for a moment, I'll

9    get it.

10        You know what?  Let me try it this way, because I

11   don't want to take more time on this than we need to.

12   Q    Do you recall that Mr. Reid was arrested with what you

13   believed was a significant amount of drug proceeds?

14   A    I remember he was arrested; I don't believe he was

15   arrested with drug -- I don't remember.

16   Q    Okay.  Do you remember going down to the New Haven Police

17   Department here in New Haven on Union Avenue in an effort to

18   get his property in the hopes that you could pull the money

19   from out of the inside of the New Haven Police Department?

20   A    Yes, I remember going.  Yes, I remember that.

21   Q    And you remember that you were at that point speaking to

22   a number of people about how to get the property of Mr. Reid

23   and how you might approach that?  Do you recall that?

24   A    Yes, I recall that.

25   Q    All right.  And then you went down there, right?

```
 1   A    Yes.

 2   Q    And were you ultimately successful in getting his

 3   property?

 4   A    I don't recall -- I believe I did get his property.  I

 5   really don't recall.

 6   Q    But not the money?

 7   A    No, I didn't get any money.

 8   Q    All right.  And then you let people you knew know what

 9   had happened at the police station, right?

10   A    Yes, I did.

11   Q    And one of the ways you communicated was through calls,

12   right?

13   A    Yes.

14   Q    And another way was through texts, text messages?

15   A    Probably so, yeah.

16   Q    Okay.  Do you recall sending a text, saying that you had

17   lied to the police at the New Haven Police Department, and had

18   given them a fake phone number for yourself?

19   A    I don't recall saying it, but I probably did that.

20   Q    All right.  And so here you were, kind of at that point,

21   the same as you were throughout this case, kind of the head of

22   the -- of your drug dealing activity, right?  Is that fair, to

23   call you the head of it?

24   A    Is that fair to call me the head?

25   Q    Yes.  Your guys, you were the one who was kind of --
```

```
1    A    Dead smack in the middle of it.  I guess you could call
2    me the head.
3    Q    I understand that.  In other words, you're saying, when
4    you said you're in the middle, your sources of supply, if we
5    look at it in terms of the food chain, your sources of supply
6    were above you?
7    A    Yeah.
8    Q    But in terms of New Haven, you were dealing directly with
9    the source of supply, right?  Na-Na, and Amaury?
10   A    Yes.
11   Q    Okay.  And you took other people with you from time to
12   time to go see either Amaury or Na-Na, right?
13   A    Yes.
14   Q    And you introduced a number of people from -- whose names
15   have been identified here, right?
16   A    Yes.  Yes.
17   Q    All right.  And so with respect -- is it fair to say
18   that, in your mind, they were above you because they were your
19   source, right?
20   A    In my mind, yes.
21   Q    And then you would go down and/or they would come up here
22   and you'd get a quantity of drugs, you've told us all this.
23   A    Yes.  Yes.
24   Q    And then through your people, you would put the drugs on
25   the street?
```

```
 1   A    Yes.

 2   Q    All right.  And so you were willing to walk right into,

 3   if you'll accept this expression and maybe it's not the right

 4   expression, but kind of the bowels of law enforcement, walk

 5   right in, as kind of the head guy in New Haven of this, and

 6   ask for one of your guy's property, right?

 7   A    I did it.  I definitely did.

 8   Q    Looking back at that, is it fair to say that was pretty

 9   bold on your part?

10   A    Yeah.  I would say, that's bold.  Yeah.

11   Q    Yeah.  And there was at least one other time, and this --

12            MR. REEVE:  I'm just going to see if I have this one

13   here as well, and it does look like I have this one, this call

14   which I'll refer to as Defendant's Exhibit C, the date of this

15   is August 1st, 1998 -- I'm sorry, August 1st, 2011 -- and the

16   call number, the session number I should say, is session

17   number 1908.

18   Q    I'm going to play this call to put it in context for you,

19   okay?

20   A    (Nodding head.)

21            (Defendant's Exhibit C, an audio recording, played.)

22   Q    Okay.  That's you leaving a message for your parole

23   officer, correct?

24   A    Yes.

25   Q    All right.  And what you were telling him on the phone
```

1    was false, wasn't it?

2    A    I know I lied to him.  I believe that what I was telling

3    him there, I believe that was false.

4    Q    Right, because that was a day that you were traveling to

5    New York to go buy drugs.

6    A    I believe that was that day.

7    Q    Right.  And you had, one of the conditions of your

8    parole, was a curfew that required you to be in your residence

9    at 9:00, by 9:00 p.m., correct?

10   A    Yes.

11   Q    All right.  And you were worried that you were not going

12   to get back before 9:00, right?

13   A    Yes.

14   Q    But what you told your parole officer was untrue in a

15   number of ways, wasn't it?

16   A    Yes.

17   Q    I'll share it with you, if you want.

18   A    Okay.

19   Q    And I can go through line sheets, but I don't think

20   there's an issue again.  Would you accept my representations

21   that a few moments before this, you told people you were out

22   on the street in the Tre section of New Haven?

23   A    I don't know where I was when I made that call.

24   Q    Okay.  But you weren't at work?

25   A    I don't know where I was when I made that call.

1   Q   Okay.  Let me see if I have something that might refresh

2   your recollection on that matter.  I don't have it here.  I'll

3   try to tie it up later.

4         But just to try to get to the issue, there were

5   times when you would call him to try to get an extension, when

6   you lied to him and said you were -- somebody hadn't shown up

7   for work at Dunkin' Donuts and you needed to work a second

8   shift?

9   A   When I had my curfew --

10   Q   Right.

11   A   -- status.

12   Q   Right.  The curfew ended during the period of the

13   wiretap, right?  If you remember.

14   A   I know it ended.  I don't know what period, but it ended.

15   Q   Right.  I'm talking about during the period of the

16   wiretap.  And specifically, at this point, you still had your

17   curfew, because obviously you're calling him up?

18   A   Yeah.

19   Q   And what you would do is you would call him and say you

20   got hung up at work on a second shift?

21   A   Yes.

22   Q   But you were out on the streets selling drugs?

23   A   Or if I wasn't, I intended to be on the streets selling

24   drugs during that time, or obtaining drugs at that time.

25   Q   Right.  And the other reason obviously that you just

1    indicated that you would be lying to him would be because you

2    wanted to get to New York to pick up some drugs?

3    A    Yes.

4    Q    All right.  And that was a pretty -- again, would it be

5    fair to say that's a pretty bold lie?

6    A    I guess that's fair to say.

7    Q    Okay.  Because there's a whole host of things that could

8    happen, right?

9    A    Hypothetical, yeah, I guess.

10   Q    You, at the time you called the parole officer, you did

11   not know where he was, correct?

12   A    Where the parole officer was?

13   Q    Yes, your officer, the guy you called and left him a

14   message, you know, he wasn't in his office or else if he was

15   in his office, he wasn't answering his phone, right?

16   A    Yeah.

17   Q    Okay.  And he could have been on the streets right where

18   you were, for all you knew?

19   A    Yeah, he could have.

20   Q    Yeah, and in fact, sometimes the parole officer would

21   come into the area and drive through, wouldn't he?

22   A    Paroles do do that, yeah.

23   Q    So you were taking that risk, right?

24   A    Yes.

25   Q    You were also kind of taking a risk that what if your

```
 1   parole officer called Dunkin' Donuts and said, "I'm just
 2   trying to confirm that Mr. Wilson had to stay at work for the
 3   second shift," that was another risk you were taking, right?
 4   A    Yes, it was.
 5   Q    Did you have anybody at Dunkin' Donuts who was there to
 6   cover for you?
 7   A    I don't believe I did.
 8   Q    Okay.  All right.  And he could also, I suppose, ask you
 9   at some point down the road for your time sheets from Dunkin'
10   Donuts, right?
11   A    I guess he probably could.
12   Q    Yeah.  And those time sheets wouldn't reflect you were
13   there, right?
14   A    No, they wouldn't.
15   Q    Okay.  But you needed to go to New York?
16   A    Yes, I did.
17   Q    You wanted to get more drugs?
18   A    Fair to say.
19   Q    And any obligations to your parole officer and to the
20   court system were abandoned in favor of your own self-interest
21   in going to buy drugs, right?
22   A    To the parole officer.
23   Q    Sure.  He's a representative of the court, right?
24   A    Well, then, the court, too.
25   Q    Yeah.  He works, he's there to enforce the law, just like
```

```
 1   these gentlemen are, right?

 2   A    I guess.

 3   Q    And let me ask you this:  Did any of those issues that I

 4   just raised, looking back on it, did any of those things cross

 5   your mind for a second?

 6   A    Looking back -- I mean, hindsight's always 20/20, some

 7   people say.

 8   Q    Sure, that's what I'm asking.  Did you think about taking

 9   the risk or was it just second nature to you at that time?

10   A    I hadn't come up with that plan.  I just, I don't think

11   that was second nature to me.  I had to come up with a plan to

12   actually do it.

13   Q    Okay.  So you came up with that plan, and you moved

14   forward with the plan, right?

15   A    Yes.

16   Q    And you took a lot of risks?

17   A    Yes.

18   Q    By the way, one of the risks, every time you drove to New

19   York, was what happens if you get stopped for even something

20   as minor as speeding, they pull you over, ask for your

21   license, your driver's license, what would happen then?

22   A    I didn't have a driver's license, but if they -- if my

23   name came up as being in New York, my parole officer probably

24   would find out.

25   Q    Okay.  And you say you didn't have a driver's license.
```

```
 1   Does that mean you didn't drive to New York, ever?

 2   A    I didn't ever drive to New York, no.

 3   Q    You always tried to get a ride?

 4   A    Yes.

 5   Q    Was there ever a time you didn't find a ride and you just

 6   went?

 7   A    I didn't drive myself.

 8   Q    Okay.  All right.  But obviously, if you're in a car and

 9   somebody's stopped, you know, then there's a record that

10   you've been out of the state?

11   A    If my name is ran, yes.

12   Q    Sure.  And that was a risk you were willing to take?

13   A    It's a risk I took.

14   Q    So in terms of your analysis of the risk and the reward

15   in that situation, the potential rewards outweighed the risks

16   that we've just discussed?

17   A    Will the rewards outweigh the risks?

18   Q    Yes.

19   A    No, they actually don't.

20   Q    But at the time -- you're saying that now in hindsight,

21   we talked about hindsight a moment ago, right?  You're saying,

22   gee, I shouldn't have done that, right?

23   A    Yeah, that's what I'm saying.

24   Q    But that's not what you were thinking at the time you did

25   it.
```

1   A    No.

2   Q    Okay.  All right.  And then I want to talk to you a

3   little bit, and really get hopefully down to the reality here.

4   You've met with the people who are sitting at this table

5   for -- it sounds like, and they can correct me if I'm wrong, I

6   think this is an underestimate -- well over 50 hours, probably

7   going 60 towards 70, something, and it doesn't matter how many

8   hours.  Would you say that's a reasonable ballpark estimate?

9   A    I met with them on numerous occasions.

10  Q    Sure.  And as you sit here right now, do you think that

11  there's any possibility, in your mind do you think there's a

12  possibility, that they will pull your deal?

13  A    I'm sorry, I'm sorry, pull which deal?

14  Q    Yeah, all your deals.  The cooperation deal, the plea

15  agreement.  You've gone through all these things and told us

16  that, gee, the government could void, Attorney Silverman went

17  through, you know, they could void, the plea agreement if they

18  conclude that you lied.

19       Are you really worried about that at this point,

20  having spent all this time with them, that they're going to

21  all of a sudden say, "You know what?  We just, we don't think

22  you're telling the truth and so we're going to pull your

23  deal."  Is that something that you realistically are concerned

24  about as you sit here today, in this courtroom, under oath?

25  A    As I sit here, I don't know if I could just say yes or no

1    to that.

2    Q    Okay.

3    A    I don't know if I'm allowed to elaborate on why.

4    Q    I want you to answer that question in any way that you

5    feel comfortable.  Tell us what's really, honestly, what's in

6    your head now.

7    A    I don't feel that they would pull my, pull, because I was

8    truthful.

9    Q    Okay.

10   A    At the beginning, when I was speaking to them, or before

11   I even -- when, before when I was reading the proffer, it

12   wasn't like I had a list of stuff and was telling them that

13   they had to tell me the truth, so I didn't know if everything

14   that they were telling me was true.

15   Q    Right.  Right.  Kind of like -- not at all like it in

16   terms of your manner and your style and everything, but what

17   you just described with them is kind of like the dance you did

18   that was on Government's Exhibit 120, but in a very different

19   context, right?  Do you understand what I'm saying?  If you

20   don't, tell me.

21          MR. SILVERMAN:  Your Honor, I think the question is

22   somewhat argumentative.  It's suggesting an argument to the

23   defendant.

24          THE COURT:  Can you rephrase it, Mr. Reeve?

25          MR. REEVE:  Sure, I'd be happy to.

1    Q    You knew that your job here, in your cooperation, once

2    you went down that road, was to satisfy these gentlemen that

3    you were telling the truth, right?

4    A    Yes, but can I elaborate?

5    Q    Sure.

6    A    My attorney -- I don't know, I can't really say.

7    Q    You can't tell me what your attorney said or anything

8    like that.  I don't want -- that's an area we can't get into,

9    and you know why, right?

10   A    Can I tell you my belief?

11   Q    Yes.

12   A    My belief was that they, the government, the officers,

13   however you want to explain it, one, I knew they had my cell

14   phone recorded, so I knew they had a lot of information.

15        Two, I did not know who else was cooperating with

16   them, but I knew that they just weren't going to take my word

17   for, like, they weren't just going to say yes to whatever I

18   said.

19   Q    Right.

20   A    They were going to check what I said in their own way.

21   Q    Right.  And I think we all understand that.  To the

22   degree they could corroborate, we've heard a lot of testimony

23   about that, they would try to corroborate, right?

24   A    Yes.

25   Q    But, you know, there were some things that you knew from

```
 1   square one that they didn't know, right?  And let me give you

 2   a specific example.

 3           MR. REEVE:  I want to have marked as Defendant's

 4   Exhibit D on agreement, I believe, what we call as lawyers a

 5   redacted copy of the indictment.

 6   Q   I don't want to complicate this thing further, but you

 7   remember that in the -- when you were brought into court on

 8   May 15th, that was the original indictment that was returned

 9   in this case, right?

10   A   I was brung to court.  I don't know if it was May 15th.

11   I was brung to court and I was given a copy of the indictment.

12   Q   Right, okay.  And I'm going to show you this document

13   that's Defendant's Exhibit D, and up at the top of it here, it

14   has a time stamp on it.  Do you see that?

15   A   Yes, May 15th.

16   Q   May 15th of what year?

17   A   Of 2012.

18   Q   Okay.  And this was the indictment that you were brought

19   into this courthouse nine days later for your initial

20   appearance.

21   A   Okay.

22   Q   Right?

23   A   Okay.

24   Q   You'll accept my -- again, this is an undisputed issue,

25   okay?
```

1    A     Okay.

2    Q     And this is not the indictment -- again I'm going to make

3    this representation to you -- this is not the indictment that

4    the jurors have before them now, that they're going to get a

5    copy of, because a second indictment got returned, okay?

6    A     Okay.  I didn't know about that.

7    Q     But it got returned after you entered a plea, okay?

8    A     Okay.

9    Q     So this indictment here, there's a couple of things I

10   want to talk to you about there.  First of all, who's the

11   person who's named first in the indictment?

12   A     I am, sir.

13   Q     Excuse me?

14   A     I am, Kevin Wilson, myself.

15   Q     And how are all the other names arranged in the

16   indictment?  Can you tell?

17   A     How they arranged?

18   Q     Yes.

19   A     I don't.

20   Q     Is there an order to the names?  If you took your name

21   out and you looked at all the names, what would you say the

22   order is?

23   A     I don't -- just looks like a bunch of names.

24   Q     Okay.  Isn't it in alphabetical order?  Doesn't it start

25   with the letter A and then go all the way down through a list

1    of what is approximately -- I think the numbers have been

2    bandied about, I haven't counted them, 47, whatever the number

3    is, it is, okay?

4    A    Okay.  But it's not in alphabetical order, sir.

5    Q    It's not?

6    A    No.

7    Q    Okay.  You don't think that --

8             MR. SILVERMAN:  Your Honor, might I just suggest,

9    it's by last name.

10            MR. REEVE:  I'm sorry.

11   Q    If you look at the last names.

12            MR. REEVE:  I beg your pardon.

13   Q    So Anderson is listed right under you, and then it goes

14   to Bacote and Brannic.  Do you see what I'm saying?

15   A    Excluding me, Wilson.

16   Q    Excluding you, because you would be at the end of the

17   alphabet, or close.

18   A    Yes.

19   Q    If we were to put you in alphabetically here, you would

20   be just above Marcus Wylie because his name is spelled with a

21   Y, W-Y, and you're W-I.

22   A    Okay.

23   Q    Okay?  That was certainly an indication that you were

24   different from all these other people, your name is picked

25   out, and unlike all the others who are in last name

```
 1   alphabetical order, your name is at the top, right?

 2   A    I didn't know what that meant.  I knew it meant that I

 3   was in trouble, how about that, I could say that.

 4   Q    All right.  Now, I'm not going to ask you to identify the

 5   names, but is it fair to say that you realized something was

 6   wrong with respect to two individuals in that initial

 7   indictment?

 8   A    Yes.

 9   Q    Okay.  Tell us about that.

10   A    I don't understand.  Tell you what about it?

11   Q    Let me see if I can help you.  What you realized, sir, is

12   that two people had been named, but they weren't the right

13   people, right?

14   A    When I first looked at this, I didn't know, first I

15   didn't know everybody's real name.

16   Q    Correct, right.

17   A    And I didn't know everybody that was arrested.  I don't

18   know -- I knew all their nicknames -- I didn't know if I knew

19   all of their nicknames.

20   Q    Right.  Let me just say, at a certain point -- I'm going

21   to ask you a yes or no question because I think you can answer

22   it, at a certain point -- did you bring to the attention of

23   the government authorities in this case that they had -- that

24   two people there really shouldn't have been there, it should

25   be somebody else?
```

1    A    Yes.

2    Q    Okay.  And when that happened, the government immediately

3    took steps to address that problem, right?

4           MR. SILVERMAN:  I'm not sure that the witness is

5    aware of whatever steps the government would have taken.

6           MR. REEVE:  Okay, that's fair.  I just didn't want

7    the record to be -- can I make a representation or not?

8           MR. SILVERMAN:  Let me talk to you for a second.

9           Your Honor, may I have a moment to speak to defense

10   counsel?

11          THE COURT:  Yes.

12          (Mr. Silverman conferring with Mr. Reeve.)

13   Q    In any event, you brought that to the attention of

14   someone, and I don't want to know who, right?

15   A    Yes.

16   Q    Okay.  And you don't know what happened from that point

17   forward, but steps -- do you have any idea that any steps were

18   taken?  Yes or no?

19   A    No.

20   Q    Okay.  Fair enough.  But that gave you a hint that there

21   were things that you knew that perhaps other people didn't,

22   right?

23   A    Yeah, or that maybe other people screwed up.

24   Q    Yeah, sure.  And I want the record just to be clear, and

25   I think there's no -- I'm not casting aspersions on the

1  government or the investigation or anything else, it was just

2  a mistake, kind of like your mistake about the 12-year thing,

3  just an honest mistake, there's no question about that, okay?

4  A    Okay.

5  Q    I don't want the record to reflect otherwise.  But what

6  that did tell you is that, you know, the government didn't

7  know it all, they just didn't know it all, right?

8  A    Do you want me to --

9  Q    I can't -- that's not a good question because you're not

10  competent to tell us what the government knew or what they

11  didn't know, and I'm going to just end it there, and not go

12  further with that question.

13        But let me ask you now a broader question:  Is it

14  fair to say that during the course of the proffer sessions,

15  the government asked you to interpret calls?

16  A    That's fair to say.

17  Q    And the government -- let me just ask it this way and see

18  if we can get there:  Do you think the government knew -- they

19  knew a lot about you because they had your calls, right?

20  A    Yes.

21  Q    They had, you know, we've talked about the numbers,

22  somewhere around 70,000 sessions, is what we call it, which

23  would include phone calls and text messages and other calls,

24  okay?  But it was a tremendous amount of stuff, and they knew

25  that, right?

1    A     Yes.

2    Q     So you knew they knew a lot, but the question is, you

3    know, kind of, weren't you -- in your mind, wasn't it pretty

4    clear to you that it's impossible -- they weren't party to

5    some of these conversations.  In fact, they weren't party to

6    any of these conversations, it was you and somebody else,

7    right?

8    A     The conversations I had on the phone?

9    Q     Yes.

10   A     It was me, somebody else, and whoever was listening.

11   Q     Right, but the participants were you and someone else,

12   right?

13   A     Yes.

14   Q     Now I want to move to a different area, if I could, and I

15   want to ask you something about the first -- when you took the

16   stand on Monday afternoon and you only had about a half an

17   hour of testifying, do you remember that?

18   A     It felt like way longer.

19   Q     You were nervous?

20   A     Definitely.

21   Q     Yeah.  And you were asked some questions about your

22   background, do you remember that?

23   A     If it was replayed to me.  I mean, I know it happened,

24   but if it was replayed to me, I could give you --

25   Q     Let me focus you.  I'm going to ask you a question.  How

1    many apartments did you have during the course of this case?

2    A    Apartments that I paid for?

3    Q    Where you lived at.

4    A    I was --

5    Q    I'm not talking about girlfriends, okay?

6    A    Okay.

7    Q    You told us there was a certain amount of apartments and

8    then you stayed at girlfriends' houses.  Put the girlfriends'

9    houses out of the way.  How many apartments did you have?

10   A    One -- two.  Two apartments.  I was going to say the

11   addresses, but two apartments.

12   Q    Okay.  And can you give us not the number of those, but

13   the streets of those?

14   A    Day Street and Judson.

15   Q    Okay.  Now, do you recall -- and as you sit here now,

16   you're sure that there's no others?

17   A    Apartments that I paid for or --

18   Q    Right.

19   A    No, I don't...

20   Q    Do you know Choloe Bright?  You talked about him the

21   other day, right?

22   A    Chello?

23   Q    Chello.

24   A    Yes.

25   Q    Chello?

```
1   A    Yes.

2   Q    He's a guy you grew up with your whole life, right?

3   A    Yes.

4   Q    And at the very beginning of this wiretap, he was in

5   jail, if you remember?

6   A    Yeah, I believe he was in jail.  Yeah.

7   Q    And very close to the time he got out of jail, he called

8   you, do you remember that?

9   A    Yeah.

10  Q    Okay.  And I'm going to play you that, which is --

11             MR. REEVE:  Am I on --

12             THE CLERK:  E.

13             MR. REEVE:  This would be Defendant's Exhibit E, and

14  it is call number 6306, and the date on this call is August

15  10th, 2011.

16  Q    I want you to take a listen to this call, okay?

17             (Defendant's Exhibit E, an audio recording, played.)

18             MR. REEVE:  I'm sorry, that was the one we just

19  listened to.  I made a mistake.  My fault.

20             (Defendant's Exhibit E, an audio recording, played,

21  and paused.)

22  Q    Who are the people in this call?

23  A    Me and Chello Bright.

24  Q    What did you tell him about how many apartments that you

25  had?
```

1  A    Told him I had three apartments.

2  Q    But you told the jury here that you had two, and you just

3  told us that again.  What's up?

4  A    I do have, I did have, two apartments at that time.  The

5  third place I was talking about when I said apartment was a

6  girlfriend's house that I was staying at that he probably

7  could have stayed at, too, if he wanted to.  Simple as that.

8  Q    Okay.

9  A    Okay?

10  Q    Fair enough.  And then right around that time, on August

11  2nd, 2011, I want to play you --

12         MR. REEVE:  This would be Defendant's Exhibit F.

13  Q    -- a call, and the call is No. 2439.

14         MR. REEVE:  I'm going to ask for the assistance of

15  government counsel.  Your Honor, the first part of this call,

16  an individual who's not related to this case in any way

17  identifies herself, and I don't want that to be played on the

18  public record.

19         I will represent, and the jury will hear, that it's

20  someone who works with a nonprofit organization in

21  Connecticut.

22         (Mr. Reeve conferring with Mr. Silverman.)

23         (Defendant's Exhibit F, an audio recording, played,

24  and paused.)

25         MR. SILVERMAN:  May I have one moment, your Honor?

```
 1              THE COURT:  Yes, sir.
 2              (Mr. Silverman conferring with Mr. Reeve.)
 3   Q    I'm not going to ask you any questions about that
 4   address.  That's not your address, right?
 5   A    No, that's not my address.
 6   Q    You're connected to someone else who lives at that
 7   address?
 8   A    Yes.
 9   Q    And we're not talking about that address, okay?
10   A    All right.
11   Q    All right.  Do you know what the housing assistance
12   program is at Columbus House in New Haven, Connecticut?
13   A    What it is?
14   Q    Yes.
15   A    They assist you with housing, or they help you pay -- I
16   don't know, they help you pay your bills, something to that
17   effect.
18   Q    Okay.  And you told this young woman who worked for that
19   organization that's trying to help people who are in need of
20   housing that you made $250 a week, right?
21   A    That was like a rough estimate, yeah.
22   Q    Yes.  That's what you made at Dunkin' Donuts, right?
23   A    Yes.
24   Q    You didn't tell her, obviously, about all your other
25   income, did you?
```

1    A    Earlier, if you remember, you saying you don't tell

2    people outside of your clique, outside of your group.  That

3    lady wasn't in my group.

4    Q    Right.  But you could have told her a lot of things,

5    couldn't you?  You could have said, "You know what, I'm no

6    longer in need of housing assistance," right?

7    A    I could have, yes.

8    Q    Sure.  I mean, this is an organization that's trying to

9    help desperate people in New Haven, right?  Who need actual

10   assistance?

11   A    Can I tell you I never got that assistance.

12   Q    Right, but you set up an appointment.  You didn't say, "I

13   don't need it."  And you took the second step of setting up an

14   appointment for an interview with her.  Do you have any idea

15   who you were taking or could have taken those potential funds

16   from?

17   A    No, I don't have any idea who it was.  No.

18   Q    Sir, isn't it fair to say it just didn't matter to you?

19   A    I don't want to go that far.  Everybody could use some

20   help sometime.

21   Q    Sure.  But you didn't need any help then, did you?

22   A    According to you, maybe I didn't.  But I thought I needed

23   help.

24            MR. REEVE:  Your Honor, this might be a good time to

25   take the afternoon recess.  And I wonder if I could just

1    explain what's happening here.

2         I don't feel well, and --

3         THE COURT:  Would you like to adjourn for the day,

4    Mr. Reeve?

5         MR. REEVE:  I'm sorry, could you explain?

6         THE COURT:  I don't know.  It seems to me it's

7    possible that he's coming down with the flu or something.  He

8    indicated he doesn't feel well.

9         Would you like to adjourn for the day, Mr. Reeve?

10        MR. REEVE:  No, can I --

11        THE COURT:  Or turn it over to your colleagues

12   there?

13        MR. REEVE:  I'm sorry, your Honor, because the other

14   lawyers --

15        MR. SILVERMAN:  Your Honor, why don't we take the

16   break and sort it out.

17        THE COURT:  We'll be in recess for 15 minutes.

18        MR. SILVERMAN:  Thank you, your Honor.

19        (In the absence of the jury:  3:25 o'clock p.m.)

20        MR. REEVE:  I'm sorry, your Honor, I should have

21   handled that a different way.  I apologize to everybody.  I'm

22   really not feeling well.  And I asked Attorney Moraghan if he

23   could take over, but obviously, they were counting on me.  And

24   I really feel badly for everybody, because, you know, we're

25   running behind and I'm very sorry.  I just, I just don't feel

1    good.

2           THE COURT:  So I gathered from what you said before.

3           THE CLERK:  One of the other jurors, the young lady

4    sitting in the front row, is not feeling well, either.  So

5    stay away from my jury, please.  She said to me on the way

6    out, "I'm glad it's just not me."

7           MR. SILVERMAN:  Your Honor, might I suggest that you

8    give counsel a chance to speak with one another so we could

9    propose to the Court what we believe is best?

10          THE COURT:  Please do that.

11          MR. SILVERMAN:  Come back on the record in five or

12   ten minutes.

13          THE COURT:  I'm going to stay here while you're

14   doing that.

15          MR. REEVE:  Thank you, your Honor.  I appreciate the

16   Court's indulgence.

17          (Recess:  3:27 o'clock p.m. to 3:36 o'clock p.m., in

18   the absence of the jury.)

19          MR. SILVERMAN:  Your Honor, given Attorney Reeve's

20   state at this time, as well as the condition that one of the

21   jurors has reported to your clerk, it may make sense to just

22   adjourn for the day today, pick up tomorrow.

23          Given your Honor's schedule tomorrow morning with

24   the proceeding at 9:00 and another proceeding at 11:00 a.m., I

25   don't think it makes a lot of sense to try to squeeze in trial

```
 1    time between 10:00 and 11:00.  I guess my preference would be
 2    that we start at 1:00, but tell the jury there won't be a
 3    lunch break, we'll take breaks to accommodate the court
 4    reporter, maybe two afternoon breaks but ten-minute breaks or
 5    15-minute breaks.
 6              THE COURT:  So break for the day until 1:00 o'clock
 7    tomorrow.
 8              MR. SILVERMAN:  We won't take a lunch break, maybe
 9    we'll take two afternoon breaks instead of one.
10              MR. VATTI:  Go until 5:00.
11              THE COURT:  I have something at 9:00 and something
12    at 11:00 tomorrow.  Is that agreeable, gentlemen?
13              MR. MORAGHAN:  That is agreeable, your Honor.  Thank
14    you.  1:00 o'clock, no lunch.
15              THE COURT:  Is that okay?
16              MR. REEVE:  Thanks very much, your Honor:
17              THE COURT:  Feel better.
18              MR. SILVERMAN:  Do you want to bring them in or have
19    your clerk tell them?  I don't think you need to bring them in
20    as long as the Court's comfortable with your clerk explaining
21    what happened.
22              THE COURT:  As long as it's agreeable to all
23    counsel, she can tell them we're's going to adjourn for the
24    day and resume at 1:00, there will be no luncheon break, we
25    will resume at 1:00.
```

1          MR. SILVERMAN:  I think it would be helpful if your

2   clerk relates to them that this is on account of your schedule

3   tomorrow morning, that you have proceedings that you need to

4   attend to.  One of them is with Attorney Vatti and I, the

5   other one is not.

6          MR. VATTI:  I'll be here at 9:00 a.m.

7          THE COURT:  So will I, hopefully.

8          MR. SILVERMAN:  Thank you, your Honor.

9          (3:41 o'clock p.m.)

10                  INDEX OF WITNESSES                    PAGE

11   KEVIN WILSON

12      Continued Direct Examination by Mr. Silverman  963

13      Cross-Examination by Mr. Reeve                  1006

14

15

16

17

18         COURT REPORTER'S TRANSCRIPT CERTIFICATE

19          I hereby certify that the within

20       and foregoing is a true and correct

21       transcript taken from the proceedings

22       in the above-entitled matter.

23

24              /s/ Thea Finkelstein
                 Official Court Reporter

25

    Dated: _____