```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF CONNECTICUT
 2
       * * * * * * * * * * * * * x   Criminal Case
 3                                       No. 3:12CR104(EBB)
       UNITED STATES OF AMERICA,    :
 4                  Plaintiff
                                    :
 5          vs.                         January 30, 2014
                                    :   1:12 O'clock p.m.
 6     RICHARD ANDERSON, PHILIP
       BRYANT, ROBERT SANTOS,       :
 7                  Defendants          New Haven, Connecticut
                                    :
 8     * * * * * * * * * * * * * x

 9                        EIGHTH DAY OF TRIAL

10          BEFORE THE HONORABLE ELLEN BREE BURNS
              SENIOR UNITED STATES DISTRICT JUDGE
11                   AND A JURY OF FIFTEEN

12   Appearances:
       For the Plaintiff:          S. DAVE VATTI, ESQ.
13                                 MARC HARRIS SILVERMAN
                                   Assistant U.S. Attorneys
14                                 157 Church Street
                                   New Haven, CT 06510
15
       For the Defendant:          NEAL PATRICK ROGAN, ESQ.
16     Richard Anderson            315 Post Road West
                                   Westport, CT 06880
17
       For the Defendant:          DAVID A. MORAGHAN, ESQ.
18     Philip Bryant               Smith, Keefe, Moraghan & Waterfall
                                   32 City Hall Center, Suite C
19                                 PO Box 1146
                                   Torrington, CT 06790
20
       For the Defendant:          RICHARD A. REEVE, ESQ.
21     Robert Santos               ANAND BALAKRISHNAN, ESQ.
                                   Sheehan & Reeve
22                                 139 Orange Street, Suite 301
                                   New Haven, CT 06510
23
       Court Reporter:             Thea Finkelstein RMR, CRR
24                                 TheaFinkelstein@aol.com

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
```

```
1                  (In the absence of the jury.)

2             THE COURT:  Good afternoon.

3             MR. SILVERMAN:  Good afternoon.

4             MR. REEVE:  Good afternoon, your Honor.

5             THE COURT:  Please be seated.

6             Gentlemen, would it be convenient to have our jury

7    charge conference this evening, after trial?

8             How are you feeling, Mr. Reeve?

9             MR. REEVE:  Judge, thank you very much, I'm feeling

10   much better.  I really think it was a blood sugar level.  I

11   just hadn't had much food during the day, I was overtired.  I

12   got some food after I left court, I got some sleep, and I

13   really feel much better.  I appreciate the consideration that

14   the Court gave to me, and all the parties.  So thank you.

15            From my perspective, I think that it's likely that

16   we will be done with the evidence by noon tomorrow, and I

17   think if we could have the charge conference perhaps, let's

18   say, at 1:00 o'clock tomorrow, it would be better for me.  I'm

19   not prepared to do it because I've been working so hard on the

20   cross-examination.  If that's convenient to the Court and if

21   there could be agreement, that would be good.

22            I don't know that we're going to be able to get to

23   closings and the charge until Monday, and the reason I say

24   that is because if we're going to allot four hours and if the

25   charge is likely to be somewhere in the area of an hour or
```

1  give or take, that's an awful lot of listening for the jury to

2  do, especially if they're here in the morning for testimony.

3       I think it would be more orderly if we finish the

4  evidence tomorrow, we also have some motions for judgment of

5  acquittal to address at the end of the case, and then have the

6  charge conference, then when all the evidence is in, because

7  it might impact on how your Honor would look at it, then we

8  can send the jury home whenever the evidence is done, do the

9  legal work that we have to do, and start out on Monday morning

10  with a fresh slate for closings and charge.  That would be my

11  suggestion, your Honor.

12       THE COURT:  Does that timetable seem right for

13  everybody else?

14       MR. VATTI:  Your Honor, just one main concern.

15  We've kept the jury for far longer than we originally told

16  them and we've already missed some days, we've already had

17  some half days.  We're having a half day today.  To have

18  another half day tomorrow I think is just asking too much.  I

19  think they're going to get frustrated at some point with the

20  slow pace.

21       Let me suggest this:  If we can at least have a

22  preliminary conference today, I think much of what Attorney

23  Reeve has already sent through e-mail comments, we don't have

24  a disagreement with, so we can at least get those portions

25  done so that your law clerk can get close to a final charge

1    and then, if there are any major issues left over, maybe we

2    can revisit it at one of the breaks tomorrow.

3         THE COURT:  That was my suggestion that we do that

4    this evening after we adjourn.

5         MR. VATTI:  Attorney Reeve may not be fully

6    prepared, but there's a fair amount of stuff that we can agree

7    on, so that it will at least narrow what's left.

8         THE COURT:  That makes sense to me, and I'm

9    perfectly agreeable with that.

10        MR. REEVE:  The only question I have, we'll have to

11   assess it when we get done with the evidence tomorrow, what

12   makes sense.  I don't think we want to split up the closings.

13   If we had enough time to do the closings on Friday and do the

14   charge perhaps on Monday.  We just have to see where we are.

15   Let's take it a step at a time.

16        THE COURT:  I gather the expectation is that the

17   evidence will be concluded at the latest sometime tomorrow

18   morning?

19        MR. REEVE:  I think that's probably accurate.

20   That's what I think.

21        MR. VATTI:  As soon as the cross-examination of

22   Mr. Wilson is over and any redirect, we have one witness that

23   is perhaps ten, 15 minutes on direct.  I can't imagine the

24   cross is going to go significantly longer, so maybe a half

25   hour total, and then the government is prepared to rest at

1    that point.

2          MR. REEVE:  I agree, I think Attorney Rogan might

3    have a scheduling conflict for tonight, but perhaps we could

4    get started.  I don't know what his schedule is.

5          MR. ROGAN:  No, your Honor, good afternoon.  Just to

6    clarify, I don't have a scheduling conflict for tonight; it's

7    a personal family commitment that I had for tomorrow afternoon

8    at 4:00 o'clock, but I want to say this to the Court:  I would

9    really like to make that.  It involves my eldest son.

10          But if the Court's intention is to argue to the jury

11   tomorrow afternoon, I will just have to make it work.  But if

12   we determine that it wouldn't be prudent to have four hours of

13   argument and the charge, I would prefer if we're going to have

14   a supplemental charge conference tomorrow, that we be done by

15   3:00 and push all the way through without a lunch break.

16          I agree with Attorney Reeve, I think we have to

17   reassess at the end of today realistically where we're at.  I

18   never anticipated that, due to snow days and other issues,

19   that we would be, you know, this far over the schedule, and I

20   don't want to further gum up the works.

21          THE COURT:  Well, why don't we, at the conclusion of

22   today's evidence, come to some consensus as to when that

23   charge conference should be.

24          MR. MORAGHAN:  Your Honor, I can't hear a word

25   you're saying.

```
 1          THE COURT:  I said why don't we, at the conclusion
 2   of today's evidence, have a discussion about when we want to
 3   have the charge conference.
 4          MR. REEVE:  That sounds great, your Honor, and I'm
 5   not opposed at all to Attorney Vatti's suggestion.  I think
 6   that makes a lot of sense.  We'll work together to get the
 7   best we can.
 8          There were two other brief matters, your Honor, that
 9   I wanted to put on the record.
10          THE COURT:  All right.
11          MR. REEVE:  Your Honor, I first want to indicate,
12   and I don't know if your Honor knows one of my associates,
13   Anand Balakrishnan, for the record, his name is spelled
14   A-N-A-N-D B-A-L-A-K-R-I-S-H-N-A-N.  He is here, assuming the
15   Court would permit me to do so, he would be sitting here at
16   the laptop, he will have some of the exhibits and it would
17   materially assist me, and I think move things along, and I
18   will simply tell the jury who he is when the jury comes out,
19   if that's acceptable.
20          THE COURT:  I don't have a problem with that, if
21   nobody else does.
22          MR. VATTI:  That's fine.
23          MR. REEVE:  The other thing, your Honor, I wanted to
24   request, there was a matter that was addressed in chambers on
25   Thursday afternoon, I'm asking that that be placed under seal.
```

1    We had a conference in chambers, I think it would be

2    appropriate.

3              THE COURT:  On Thursday afternoon?

4              MR. REEVE:  I believe it was Thursday last week.  I

5    would request that the transcript of that proceeding be under

6    seal, and I believe that that is a request of all, that all

7    parties are making.

8              MR. MORAGHAN:  Yes, it is, your Honor.

9              MR. ROGAN:  Yes, your Honor.

10             THE COURT:  All right.

11             MR. REEVE:  Thank you, your Honor.

12             THE COURT:  We're ready for the jury, aren't we,

13   gentlemen?

14             MR. REEVE:  Yes, your Honor.  Thank you very much.

15             (In the presence of the jury:  1:21 o'clock p.m.)

16                      **K E V I N   W I L S O N**

17        having been recalled as a witness, was previously

18        duly sworn and testified on his oath as follows:

19             THE COURT:  Good afternoon, ladies and gentlemen.

20             MR. REEVE:  May I proceed, your Honor?

21             THE COURT:  Yes, Mr. Reeve.  Would you introduce

22   your colleague?

23             MR. REEVE:  I will introduce the new man in the

24   courtroom.  The defense team for Robert Santos has been

25   doubled for purposes of the rest of my examination.  This is

1    Anand Balakrishnan, he is an associate, attorney, in my

2    office.  He's here to assist me with the documents in the hope

3    that we can do this in a more efficient way today.

4            I told the Judge and my fellow attorneys that I got

5    some food and some rest, and I feel better, and I appreciate

6    everyone's consideration.  Apologize to all of you for the

7    change in schedule yesterday.

8            With that, your Honor, may I now proceed with the

9    examination?

10           THE COURT:  All right, you may proceed.

11   CROSS-EXAMINATION

12   BY MR. REEVE (Continued):

13   Q    Good afternoon, Mr. Wilson.

14   A    Good afternoon.

15   Q    I want to move to a different area, and I want to ask you

16   some questions about the overall quantities of heroin that you

17   were directly involved with during the course of the

18   conspiracy.  Are you with me so far?

19   A    Yes.

20   Q    Okay.  Let's start with, if we can lock in an estimated

21   date.  Again, I'm not asking you for a precise date.  But

22   there was a point -- let me back up a step.  You, when you got

23   out of prison in 2010 and went to the halfway house, to the

24   degree that you were dealing drugs during that period of time,

25   initially it was all cocaine, but the substances that you were

1    directly involved in were either cocaine powder or crack, is

2    that right?

3    A    From what I can recall, yes.

4    Q    Okay.  You had never distributed heroin up until a

5    certain time frame during this case, does that sound right?

6    A    Yes, that...

7    Q    Okay.  Can you tell us, as you sit here from your memory,

8    when, approximately it was, that you first got involved with

9    heroin?

10   A    Sometime after I was released from jail.

11   Q    Okay.  I am going to try to --

12              MR. REEVE:  If I may have just one moment, your

13   Honor.

14   Q    I'm going to try to refresh your memory on this issue, if

15   I can, by directing you --

16              MR. REEVE:  If we could get the line sheet for

17   17649, which is on September 13th, 2011.

18              We're just starting to dance here, your Honor, and

19   we're going to have to get to a rhythm here, and I hope we

20   can.

21              May I approach the witness, your Honor?

22              THE COURT:  Yes, you may.

23   Q    Sir, I'm going to show you the line sheet that I just

24   referenced, and this -- is this the kind of line sheet that

25   you had in your cell at some point while you've been serving

1    time in this case?

2    A    Yes.

3    Q    Okay.  And this is a call between you and whom?

4    A    I don't know.

5    Q    Okay.

6         MR. MORAGHAN:  Can he keep his voice up, please?

7         THE WITNESS:  I said I didn't know.

8    Q    I know you're looking at me, and I appreciate that, but

9    you're going to have to speak into the microphone.

10        In any event, can you just read these lines here,

11   and see if that refreshes your recollection and might give you

12   a time frame when you first began dealing heroin, an on or

13   about time?  And I don't want you to read any of that to us; I

14   just want you to refresh yourself, please.

15        Does that help you?

16   A    Yeah, refreshes a little bit.

17   Q    Okay.  So is it fair to say that -- and the date on that

18   call is what, sir?  Can you read that to us?

19   A    9/13.

20   Q    Okay.  So that's mid September of 2011, correct?

21   A    Yes.

22   Q    All right.  And we all know that the wiretap on your

23   phone started on July 29th of 2011, there's no dispute about

24   that, okay?

25   A    Okay.

1    Q     And based on that call, could you now give us a rough

2    ballpark estimate, not a date but some, an approximation as to

3    when you started receiving heroin?

4    A     Before, before 9/13.

5    Q     Okay.  So how about if we use -- would it be fair to use

6    the date of September 1st, on or about the start of September?

7              MR. SILVERMAN:  May I have a moment, your Honor?

8              (Mr. Silverman conferring with Mr. Reeve.)

9              MR. REEVE:  You know what?  I think government

10   counsel just reminded me that there are other calls in

11   evidence that relate to an earlier part of August.

12   Q     So I'll tell you what, would you be okay if we start --

13   it doesn't matter, I'm just trying to get a ballpark sense,

14   how about we start with August 1st, move back a month, okay?

15   Near the start of the wiretap, okay?

16   A     Okay.  Okay.

17   Q     All right.  And you have tried -- I'm sorry, that's not

18   the way I wanted to phrase that.  You have given at different

19   times on your testimony an estimate of how many times you

20   received drugs from -- I want to focus on Mr. De Los Santos,

21   Na-Na, okay?

22   A     Yup.

23   Q     And I believe that it was late in the day on Monday or

24   early on Tuesday that you told us that you estimated that you

25   had received approximately 50 shipments -- I'm sorry, strike

```
1    that -- 40 shipments of narcotics from Na-Na.  Do you recall
2    that?
3               MR. SILVERMAN:  Your Honor, may I have one more
4    moment?
5               (Mr. Silverman conferring with Mr. Reeve.)
6               MR. REEVE:  I stand corrected.  I agree with
7    government counsel.  My notes were not probably thorough.
8    Q    I think it was 40 or more.
9    A    Yes.
10   Q    All right.  I want to be clear.  Your only source for
11   heroin during this period of time that's involved in this case
12   was Na-Na?
13   A    My only source of heroin was Na-Na?
14   Q    Yes.
15   A    Yes.
16   Q    During this period, during -- involved from, let's say,
17   August 1 until the time of your arrest, were you getting
18   heroin from anyone else?
19   A    That I could recall, no.
20   Q    All right.  Let's focus on what you got from Johnny De
21   Los Santos but because that's a very long name, I'm just going
22   to use his nickname because we all know, Na-Na, right?
23   A    Okay, yes.
24   Q    When you said 40 or more, does that mean that each time --
25   does each one of those involve heroin or could some of those
```

```
 1    times be powder cocaine and/or heroin?  I'm just seeking

 2    clarity.

 3    A    Sometimes it was brung together.

 4    Q    Okay.  So sometimes it would be both, you would go for a

 5    trip, and I think the transcripts and the evidence show

 6    sometimes you would get both cocaine and heroin, right?

 7    A    Yes.

 8    Q    And sometimes you would just get heroin, right?

 9    A    Yes.

10    Q    And my question is:  Were there any times when you just

11    got cocaine, if you remember, or can we say fairly that all or

12    almost all -- I'm not holding you to a precise number please,

13    but is it fair to say that approximately 40, give or take,

14    times you received heroin from Na-Na?

15    A    I'm sorry, it was -- it was too much this time.

16    Q    Okay.  Let me rephrase that.  Let me ask you a different

17    way.  To the best of your recollection, were there any trips --

18    I'm sorry, not even trips -- were there any times you

19    received, so we're including trips down to New York by you as

20    well as trips by Na-Na to New Haven, think about all those

21    trips where you received drugs from him, were there any

22    situations after on or about August 1st where you only

23    received cocaine or do you think in all or almost all of those

24    you received heroin?

25    A    I recall getting cocaine from him, I don't want to say
```

1  once, but I recall a separation one time where he didn't bring

2  both every time.

3  Q    All right.  That's fine.  In terms of just getting -- I'm

4  trying to get just a ballpark sense because then I'm going to

5  have some questions for you.  But do you think it would be

6  fair if we used the 40 trips of heroin as a ballpark for the

7  approximate number of times that you received heroin from

8  Na-Na?  Let me assure you, I'm not looking for precision.  I

9  really just want a ballpark.  Whatever you say is fine, I

10  accept it.

11  A    I can't, because it's really hard to remember all -- I

12  spoke to him and he would tell me he was going to bring this

13  and then things happened.  So when I say, like, I don't know

14  exactly what it is you're looking for, what number you're

15  looking for, so...

16  Q    Let's follow up on that and then we'll get to a number.

17  It's fair to say, isn't it, that as you sit here now, you

18  can't give us a precise number?

19  A    Exactly.

20  Q    Right.

21  A    If I had papers in front of me...

22  Q    Even if you had papers, there weren't any papers, you

23  weren't keeping a ledger, you don't have a single ledger that

24  you gave to the government that would show -- I'm talking

25  about contemporaneous, I'm talking about -- I'm talking about

```
 1   records that you might have created during the course of
 2   receiving these.  You don't have, like, a list that you ever
 3   gave to the government, right?
 4   A    Do I?  I don't have a list.
 5   Q    Right.  Right.  Okay.  So what you're trying to do in
 6   terms of the number of trips is to give your best memory,
 7   you're trying to recreate, right?
 8   A    Based on the phone calls that I'm seeing --
 9   Q    Yes.
10   A    -- yes.
11   Q    Okay.  You can't give us a precise because there were
12   lots and lots of transactions, fair?
13   A    Fair to say.
14   Q    And you can't give us a precise amount for any -- you can
15   give us, all you can really do is tell us, "Well, this call
16   says I was supposed to get a hundred, and therefore, I'm
17   concluding from that call that I probably got a hundred."  Is
18   that really what's going on?  I just want to make sure.
19   A    That is fair to say.
20   Q    That's totally understandable.  You were making so many
21   transactions, how could you possibly remember now, in the
22   start of the year 2014, all the days and times, okay?  And I
23   want you to be comfortable with just we're talking estimates,
24   okay?
25   A    Um hum.
```

1    Q    All right.  So I'm going to use the number 40.  You also

2    said early on in your testimony that if you were going to

3    average them, you would say about 100 grams a trip, as again a

4    ballpark approximation.

5    A    Yeah, estimates.  Yeah.

6    Q    All right.  When you talked to the government in these

7    proffer sessions, you might have used a number like 200, and

8    again I'm not saying that it's a lie.  I want to be clear.

9    I'm saying at those times you were trying to just estimate

10   what was the best.  Should we use the 100-gram or should we

11   use a different number for the average?  And whatever number

12   you give me, that's what I want.

13   A    Again, I'm not really good with math, just say that.  So

14   I remember from calls and most of the calls were saying a

15   hundred.  So I don't know if the average, I don't know what

16   that average would be.  If the call is saying a hundred, I

17   don't get all that.

18   Q    Fair enough.  So what I'm going to do is I'm going to

19   say, I'm going to put at the top of this page Kevin Wilson,

20   I'm going to use the letter H for heroin, okay?

21   A    Okay.

22   Q    All right.  And I'm going to say first 40, is it okay if

23   I call them shipments, and we'll know what that means?

24   A    That's okay.

25   Q    Okay.  And then after that, I'm going to put plus or

```
1    minus.  It's an approximation.

2    A    Okay, that's fine.

3    Q    Then do you want me to use the number hundred or do you

4    think, thinking about it, I should use a higher number for the

5    average in these?  If you want to stick with a hundred, it's

6    fine.

7    A    Let's stick with a hundred.

8    Q    Let's stick with a hundred, because the math will be

9    easier.  That's another reason to stick with a hundred.  We've

10   got a hundred, and when we talk about a hundred, it's a

11   hundred grams, and I'm going to put a hundred grams per

12   shipment, right?

13   A    A hundred grams more or less per shipment.

14   Q    Let me put, just to be fair, I'm going to put plus or

15   minus there.  Again, we can -- just to be sure, I want

16   everybody to know, we're approximating because that's what

17   you've done in this entire case, right?

18   A    From the phone calls, yes.

19   Q    Yes.  You would never want anyone to think that you know

20   the precise quantities involved in any of this.  That's not

21   what you're saying.  You're saying you're making your best

22   estimate based on the content of the calls and your

23   recollection.

24   A    That's the best I could do.

25   Q    All right.  And so you told us, I think, that one gram
```

```
 1   equals, for you, 2.5 grams plus or minus, correct?

 2   A    No.

 3   Q    No?  Did I get that wrong?  I got it totally wrong, I put

 4   grams.  This should say bundles, right?  One gram, out of one

 5   gram of heroin, you were creating two-and-a-half bundles?

 6   A    Give or take.

 7   Q    Okay.  Now, we're missing something so far, aren't we?

 8   We're missing, you might get a hundred and add cut to it,

 9   right?

10   A    Sometimes, yes.

11   Q    Okay.  And that obviously would increase, if you add cut,

12   let's say you got a hundred grams, can you give us a ballpark

13   estimate of how much cut you would add to that?

14   A    I wouldn't do it.  I wouldn't put it with the whole

15   hundred grams.

16   Q    Okay.

17   A    Let's say I would take five out or ten.

18   Q    Okay.

19   A    And if I had five or ten grams, I would really, I really,

20   I wouldn't even weigh it out, I would just like put a little

21   bit because I didn't want people to complain that the quality

22   was messed up.

23   Q    Okay.  There's a variable in here that I'm not going to

24   take into account on this chart.  We're not going to account

25   for any cut.  We're just going to go with a hundred grams,
```

```
 1   okay?

 2   A    Okay.

 3   Q    But we're going to keep in mind that the hundred grams

 4   sometimes you pushed a little bit higher in quantity.

 5   A    Yes, give or take.

 6   Q    Obviously, if you add, let's say during that 100-gram

 7   shipment, whatever you added to whatever five or ten gram

 8   separate part of it, it would increase the amount from a

 9   hundred up to a different number?

10   A    It would, yes.

11   Q    Okay.  All right.  And I think you told us if you made

12   one gram come out to two-and-a-half bundles and you were

13   selling -- do you remember what you said?  First of all, let's

14   just say you got the hundred grams, and the price for that was

15   $57 a gram?

16   A    Yes.

17   Q    Okay.  So I'm going to put 57 per G, and the plus or

18   minus, and now my drawing is going to become messy.  You know

19   where I am.  The $57 per gram relates to the hundred?

20   A    Yes.

21   Q    Right.  The plus or minus relates to the hundred grams

22   plus or minus, but the 57 you told us is a locked in number,

23   it never changed during the period of time you were dealing

24   with Na-Na regarding heroin?

25   A    I believe that --
```

```
1    Q    Right?

2    A    Yeah.

3    Q    Now, the next thing is you told us that you were selling

4    that product, that's your wholesale price, and your retail

5    price was 70 to 80 dollars per gram, is that right?

6    A    Give or take also.

7    Q    Okay, I'm going to put plus or minus.  All right.  Now,

8    if we go from August 1st to January, okay?  Remember you got

9    arrested January 3rd of 2012, so if we count August,

10   September, October, November, December, we're talking about

11   five months, right?

12   A    Okay.

13   Q    Now let's go back to this number.  In five months, if we

14   approximate, there's about four weeks in a month, right?

15   A    Okay.

16   Q    So if we take the five months and we multiply, that would

17   be about -- again approximately -- 20 weeks, right?

18   A    Okay.

19   Q    That would mean you were getting heroin about twice a

20   week from Na-Na?

21   A    I guess that would be --

22   Q    And that's consistent with what you told the government,

23   you know, biweekly was the term, but I think twice a week is a

24   good estimate, right?

25   A    I guess you could estimate.
```

```
1    Q     So with the plus or minus, okay?

2    A     Okay.

3    Q     So now what I want to ask you is:  I'm going to use the

4    low number, okay?  The 70, the 70 per gram, but you said

5    sometimes it could be higher.  Would sometimes it be lower?

6    A     Possible, yeah.

7    Q     So it makes sense, we'll just use the 70.  Are you okay

8    with that?

9    A     Okay.

10   Q     Okay.  So if you take -- you had a $13, this was your

11   profit, 13 which was 70 minus 57 per gram, right?

12   A     My profit, I was already in debt, so I really wasn't

13   profiting.

14   Q     I don't want to complicate it anymore.  Could you put the

15   debt aside for one moment right now?  We'll get back to that,

16   but I want to get through this, okay?

17   A     Okay.

18   Q     Then we'll talk about debt.

19   A     All right.

20   Q     70 minus 57, $13 profit per gram, right?  And that's what

21   you told us, I think, the first or early in the second day of

22   your testimony here in this court, right?

23   A     Yeah.

24   Q     Okay.  If you take 13 times 100, what is the profit per

25   100?  You know what?  I have a pocket calculator I'm going to
```

```
1    give to you and I'm going to just let you feel free to do any

2    calculation you want.  It's not a fancy calculator, but it

3    will give you what you need.

4    A    13 times 100?

5    Q    13 per gram, a hundred grams, what do we come up with?

6    13 times a hundred?

7    A    1,300.

8    Q    Okay.  For each shipment, your profit is $1,300 per

9    shipment and now here, again, I'm going to put plus or minus,

10   okay?

11   A    Okay.

12   Q    And that's because this assumes you were selling all

13   bundles, and you said that was your preferred method, but

14   sometimes it would not be the actual method, right?

15   A    No, that would assume that I was selling all grams, I

16   believe.  No.

17   Q    Okay.  Well, are you telling us that you didn't sell all

18   the grams out of the hundred?

19            MR. SILVERMAN:  May I have one moment, your Honor?

20            (Mr. Silverman conferring with Mr. Reeve.

21   Q    You're selling grams?

22   A    At times.

23   Q    Let me back up.  Most of the time with the heroin you

24   were putting them in glassine, waxed paper, the small slit

25   bags, and you would put ten of those and that would be one
```

1    bundle, right?

2    A    Yes.

3    Q    Okay.  And one, and so ten bundles would be a hundred

4    small bags?

5    A    Yes.

6    Q    And the small bags are very, very small quantity when you

7    look at it, right?

8    A    Yes, it's a small quantity.

9    Q    Okay.  So again, this would be, this would end up with a

10   profit for you of $2,600 per week, correct?

11   A    Assuming that it was two weeks --

12   Q    No, assuming it's one week, two shipments in a week, I'm

13   taking --

14   A    Yeah, that's seems like a lower number.

15   Q    Seems like a what?

16   A    Seems like a lower number but give or take -- we already

17   doing give or take anyway.

18   Q    You think your profits were higher than $2600, this is an

19   underestimate?

20   A    Because you're just saying grams, if I was to sell all of

21   it into grams, if I was to get a hundred grams and just sell

22   it.  But I was putting it in bundles, so it's more profit.

23   We've been saying give or take, so it's the same thing.

24   Q    All right.  I understand.  So again, just to be sure, I'm

25   going to put plus or minus, but I'm going to circle minus,

```
 1   because what you're saying is if anything, this
 2   underrepresents your profit, your profit was probably more?
 3   A    It depends.  It also depends.
 4   Q    Right.  Right.  I get it.  All right.  So that's what
 5   you're making on heroin, right?
 6   A    Supposed to be making.
 7   Q    Okay.  And now this doesn't take into account any powder
 8   at all?
 9   A    Any powder cocaine?
10   Q    Yes.  Yes.  Any powder that's sold as powder, that's
11   cooked into crack.  You were doing that at the same time,
12   right?
13   A    Yes.
14   Q    Okay.  Now, I just, I'm not going to go through the math
15   on cocaine.  I just want you to answer, if you can, do you
16   think you were making more money per week on heroin or more
17   money per week on cocaine and/or crack cocaine?
18   A    I would have to say I believe it was heroin.
19   Q    Okay.  All right.  And just, this is a total ballpark
20   estimate, I'm not going to go through the math and cut it
21   down, but if you were going to make an estimate, a fair
22   estimate, what number should we give to your cocaine, your
23   weekly cocaine profits during this period of time?
24   A    I really --
25             MR. SILVERMAN:  May I have one moment, your Honor?
```

```
 1                THE COURT:  Yes.

 2                (Mr. Silverman conferring with Mr. Reeve.)

 3    Q    Let me rephrase that.  There came a time during the

 4    period of the conspiracy when you moved almost exclusively to

 5    heroin, right?

 6    A    Yes.

 7    Q    Early on during the course of the conspiracy, it started

 8    out as all cocaine or crack, right?

 9    A    Yes.

10    Q    As you went along, you moved into heroin, right?

11    A    Yes.

12    Q    And then there was a period of time when you were getting

13    both heroin and cocaine powder from Na-Na, and also from

14    Amaury, right?  And I don't care who the source is, that

15    doesn't matter to me.  You were getting powder cocaine, which

16    was more at the start of this than it was at the end, right?

17    A    Exactly.

18    Q    Okay.  So it wouldn't be fair to add the cocaine profits

19    and then conclude, well, you were making the 2600 plus

20    whatever the cocaine profits were through the whole course up

21    until the time of your arrest, would it?

22    A    No, it would not.

23    Q    Okay.  And I'm not asking you to do that.  But during the

24    period of time when there was an overlap, okay?  About, can

25    you give us an estimate about, how much?
```

1    A      About how much money I was making from --

2    Q      How much profit, putting aside heroin, I'm going to ask

3    you to put blinders on the heroin and now move to the

4    cocaine/crack.  Your best guess is really, I'm trying to get

5    an estimate here of what you're making.

6    A      I can't give you an estimate, sir.

7    Q      Okay.  Do you think it was half of the 26?  Do you think

8    it was 2,000?  You got to have some opinion, you're the guy

9    that did it.

10   A      Do I need to explain to you why it's hard for me to --

11   Q      Sure, explain why it's hard, and then we'll try anyway,

12   okay?

13   A      All right.  I go and get my drugs, the cocaine, from my

14   source of supply.  I bring it back.  I pass it on to someone

15   else, Mr. Nu-Nu, which we already discussed about.

16   Q      Vincent Clark?

17   A      Vincent Clark.

18   Q      Right.

19   A      He cuts it up.  When a customer calls me or I have --

20   when a customer needs the crack from me, I call him and get

21   the quantity needed or maybe a little bit more just in case

22   somebody else calls me later.  There were times where I

23   couldn't reach him or there were times where he was doing

24   something and I couldn't get to him.  So to give you like a

25   steady amount per week, I don't think it's possible.

```
1    Q     All right.  So let's leave that out of the equation.  But

2    you were making money on the cocaine, when you were dealing,

3    whenever you were dealing with the cocaine, during the course

4    of this conspiracy, you weren't losing money?

5    A     How did I get in debt?

6    Q     No, I'm not asking you that.  Were you making money on

7    cocaine?

8    A     I was making money.

9    Q     Okay.  All right.  So your profits are somewhere upwards

10   of 2600?

11   A     My profit, I had a profit.

12   Q     Right.  Okay.  All right.  So now I want to get into the

13   issue you've been raising, the debt.  You've told us, and I

14   think the calls reflect, that during the entire period of the

15   wiretap, you were in debt to your sources of supply, right?

16   A     That's fair to say, yeah.

17   Q     Now, that's what the calls say, and my question is:  Were

18   you really in debt or were you just pretending that you were

19   in debt, but you were squirrelling money away?

20   A     Oh, I owed money, but I was spending money also.  I

21   wasn't just going to be selling drugs just to pay them off,

22   sir, no, I wasn't.

23   Q     Right, you were living a good life during this period of

24   time?

25   A     I wouldn't say a good life.
```

```
 1    Q     You weren't driving a fancy car?

 2    A     I was getting by.

 3    Q     Yeah, okay.  All right.  But I guess what I'm trying to

 4    figure out here is, you had a pretty big drug business here,

 5    and I'm just trying to get a sense of why you were constantly

 6    in debt.

 7    A     I was a bad drug dealer.

 8    Q     Okay.  All right.  I accept that.  Let me ask you a few

 9    questions first.  Do you have an active Facebook page?

10    A     Active?  I don't believe it's active anymore.

11    Q     It's up.  If I'm on Facebook, can I get to your page?

12    A     Might be.  I don't believe it's up anymore right now.

13    Q     Okay.  I want to --

14               MR. REEVE:  Can I have a minute with government

15    counsel?

16               (Mr. Reeve conferring with Mr. Silverman.)

17               MR. REEVE:  I'm going to ask that a photo go up on

18    the board.

19    Q     And ask you if you can identify it.

20               MR. REEVE:  Can we bring that down a little bit?

21    Q     Can you identify that picture?

22    A     Yes, I can.

23    Q     And it's kind of hard to see.  Do you know, based on your

24    own knowledge -- first of all, let me ask you, who's that?

25    A     That is me.
```

```
1    Q    What do you have in both hands?

2    A    A lot of money.

3    Q    A lot of money?

4    A    Yes.

5    Q    A lot of money.  Do you have to look at it for me to tell

6    you or for you to tell the jury that those, you got a big

7    package of money sitting on your lap, right?

8    A    Yes.

9    Q    You got a big package of money in your left hand,

10   correct?

11   A    Yes.

12   Q    And you got another big package of money over in your

13   right hand, right?

14   A    Yes.

15   Q    Okay.  And these, a lot of these, the dollars are in

16   different denominations, correct?

17   A    Yes.

18   Q    Okay.  But there are -- it's really hard to see on this

19   picture, we'll try to blow it up and make it an exhibit for

20   the jury to see during deliberations, but a lot of these are

21   hundreds, right?

22   A    Yes.

23   Q    Okay.  Some of them are 20s?

24   A    Yes.

25   Q    Right.  It's impossible to tell how much money you have
```

1   in that photo with you right there, isn't it?

2            THE COURT:  Do you have an exhibit number for that?

3            MR. REEVE:  What number are we on now?  G?

4            THE CLERK:  G.

5            MR. REEVE:  I offer this photo, your Honor, as

6    Defendant's Exhibit G.

7            MR. SILVERMAN:  No objection.

8            THE COURT:  Thank you, it may be marked.

9            MR. REEVE:  Thank you for reminding me, your Honor.

10   Q    So is that an accurate picture of kind of how you found

11   yourself a lot of times, flush with money?

12   A    Oh, I definitely had money around me.

13   Q    So I want to ask you again, why the big debt to Na-Na and

14   to Amaury?

15   A    That money in that picture, a lot of money I found myself

16   around, went to them.  I took a picture with $10,000 in my

17   hand and it might be Na-Na's or Amaury's, give or take an

18   amount.  I could take a picture with it.  I wouldn't tell you

19   that it was theirs.

20   Q    Okay.  What you're saying is this might have been taken,

21   like, right before you took a trip down to New York to pay

22   Na-Na and/or Amaury for drugs, right?

23   A    That picture was not.

24   Q    Okay.  All right.  You remember when this picture was

25   taken?

```
1    A     That picture, I believe I was, I believe I had just got

2    out the halfway house maybe or something like that, but that

3    is, some of that money is, the money that I saved in the

4    halfway house.

5    Q    Okay.  All right.  Because you were working at the

6    Dunkin' Donuts?

7    A    Yes, and they make you have a bank account and you have

8    to put money away.

9    Q    Right, you put a certain amount of money into the savings

10   account that the halfway house sets up for you and you receive

11   that money after you get out of the halfway house, right?

12   A    Yes.

13   Q    Some of that money is your Dunkin' Donuts money, right?

14   A    Yes.

15   Q    But most of it was drug money, correct?

16   A    If it was in the bank account at the halfway house, it

17   was my job money.

18   Q    How much money -- they don't take all your money.  What

19   do they do, take 25 percent of your weekly?

20   A    I forgot the numbers.

21   Q    Okay.

22   A    But they make you put money away, and you have to ask to

23   take it out.  You can't just take it out on your own.  So

24   you're saving a good amount of money.

25   Q    Yes, that's to help you get a good start so you can
```

1    reintegrate into the community, maybe have enough money to set

2    yourself up in an apartment and get a half a shot at turning

3    your life around, right?

4    A    Yeah.

5    Q    Okay.  So as you sit here now, do you have a ballpark

6    estimate as to how much money was in your halfway house

7    account when you left the halfway house?

8    A    More than a thousand.

9    Q    Okay.  All right.  Okay.  So let's go back now, you said,

10   is your only explanation really that you were just a bad drug

11   dealer?

12   A    I mean --

13   Q    Do you want to add anything to that at all?  I want to

14   give you a chance.  If you want to expand that, go right

15   ahead.

16   A    That's kind of like a broad question.  I mean, there was

17   a lot of things that was going on with me that led me to spend

18   money.  Rent.  I mean, I don't, I don't really get the

19   question, sir.

20   Q    No, okay, no, that's fair.  You had living expenses?

21   A    Yes.

22   Q    You were -- you had two apartments that you personally

23   were paying for?

24   A    One I was sharing with someone.

25   Q    Right.

1    A    Actually, both I was sharing with someone to a certain

2    degree.

3    Q    Okay.  But in any event, you had to pay some rent on both

4    those places?

5    A    Yeah.

6    Q    Not the whole rent, but a part of that rent?

7    A    Yes, and at one point it shifted where I had to pay all

8    the rent in one place.

9    Q    I don't care about your personal finances, that's not

10   what this case is about.  But the bottom line here is you had

11   some expenses.  But in addition to that, you had some problems

12   as a drug dealer, fair?

13   A    Fair.

14   Q    Okay.  And one of the problems was a lot of your

15   customers, we talked about this a little bit yesterday, a lot

16   of customers were cheating you?

17   A    Yeah.

18   Q    They were shorting you or they weren't paying, right?

19   A    Okay.

20   Q    No -- is what I said accurate?

21   A    It's fair to say.

22   Q    Okay.  All right.  And some people, you give drugs to up

23   front?

24   A    Yes.

25   Q    And then they wouldn't pay you?

```
 1   A    Yeah, I have to try to find them or call them or --

 2   Q    And a lot of these calls, it's almost like you're a bill

 3   collector, right?

 4   A    Seems like it, yeah.

 5   Q    Yeah, geez, "I need the money, I need the money so I can

 6   go down to buy more drugs," right?

 7   A    Yeah.

 8   Q    Okay.  And so -- oh, and by the way, sometimes people

 9   would make up, on these calls, like totally outlandish

10   stories, wouldn't they, in terms of their explanations for why

11   they couldn't give you the money that they owed you?  Like for

12   example, Mr. Morales, do you remember some of the things he

13   was making up?

14   A    Yeah.

15   Q    Like one time, he called you and he said, "You know, I

16   have no idea what happened to the" -- no, he didn't say that.

17   He said, "You're not going to believe this but I was at the

18   gas station, I had $300 in my underwear, I was pumping gas and

19   all of a sudden, all the money flew out."  Do you remember

20   that?

21   A    I don't remember him saying that.  I remember him saying

22   he lost money.  I don't remember gas station.  I remember him

23   saying he lost $300 or something like that, I remember that.

24   Q    Some of the excuses to you were somewhere roughly the

25   equivalent of, "I don't have my homework, Ms. Teacher, because
```

1    the dog ate it," right?

2    A    You could say that.

3    Q    You had to put up with all that nonsense, right?

4    A    Yes.

5    Q    And then the other part is sometimes people stole drugs

6    from you?

7    A    Yes.

8    Q    And that was more than $300, right?

9    A    Yes.

10   Q    Okay.  And you told us, and I'm going to ask you a little

11   bit more, you told us about Mr. Clark and how he stole drugs

12   from you, right?

13   A    How he didn't give me the money back for drugs.

14   Basically, yeah.

15   Q    Okay.  We're going to get to this in a little bit.  I

16   want to let the jury know where we're going a little bit.

17   There was another person who stole drugs from you, wasn't

18   there?

19   A    Pretty sure --

20   Q    Somebody sitting in this courtroom who stole drugs from

21   you?

22   A    Who stole drugs?

23   Q    Yeah.  You identified Mr. Santos?

24   A    Yeah, I identified Mr. Santos.

25   Q    He stole drugs from you, right?

```
 1   A    I was under the impression that he got violated and -- I
 2   don't remember --
 3   Q    Okay.
 4   A    Let me say --
 5   Q    Go ahead.
 6   A    There was a while I couldn't get in touch with him and I
 7   thought that he had took some drugs from me, yes.
 8   Q    Right.  Okay.  We're going to talk about that later,
 9   okay?
10   A    Okay.
11   Q    All right.  So I think what you told us was Amaury and
12   Na-Na were kind to you, even though you had debt to them,
13   right?
14   A    Yes.
15   Q    They continued -- some dealers would have just said, buzz
16   off, we're not supplying you anymore, right?
17   A    Yes, a lot of people.
18   Q    Sure.  You cut customers off?
19   A    Yes, I did.
20   Q    They could have cut you off, but they didn't.
21   A    Right.
22   Q    But the terms of the way that you had to deal with them
23   changed during the course of your dealing with heroin, didn't
24   they?
25   A    What do you mean --
```

```
 1   Q    Let me be clear.  I don't want to leave you in the dark

 2   because I don't think there's a dispute about this.  They were

 3   no longer willing to front you drugs when your debt got up to

 4   a certain point?

 5   A    Amaury wasn't.

 6   Q    Right.  And Na-Na insisted that, if he gave you some new

 7   drugs, you had to pay for those drugs and hopefully put a

 8   little dent in the debt.  That's what a lot of these calls are

 9   about, right?

10   A    Yeah.

11   Q    Okay.  So they were basically saying to you, you know --

12   I'm just going to focus on Na-Na, because that's the heroin

13   side, and Mr. Santos is only charged with heroin, he's not

14   involved in other drugs in this case.  But he is involved in

15   heroin, and I want you to know, I told the jury that you

16   distributed drugs to Mr. Santos during the course of this

17   conspiracy.  They knew that before you even got on the stand,

18   and there's no dispute about that, right?

19   A    No.

20   Q    You sold drugs to Robert Santos?

21   A    I gave drugs to Robert Santos and he gave me money.

22   Q    Okay.  But now let's go back and tie that in to what you

23   just said.  No, actually, let's not do that.

24        Let's go back to Nu-Nu.  Do you remember when it was

25   that Nu-Nu ripped you off?
```

```
 1   A    Without seeing it on paper or seeing the phone call, I
 2   can't remember.
 3   Q    Okay.  And that's, that's totally understandable.  I'm
 4   just going to show you --
 5             MR. REEVE:  Do you have 40335?  This call would be
 6   on November 1st at 12:24 p.m.  I've got it.
 7             May I approach, your Honor?
 8             THE COURT:  Yes, sir.
 9             MR. REEVE:  Thank you.
10   Q    I'm going to show you session number 40335 on November
11   1st, 2011.  It appears -- the name isn't significant, there's
12   another person who's not involved right here, but you were
13   having a phone call with, doesn't matter who it is.
14             Could you just review this part here and tell me if
15   that refreshes your recollection as to the time on or about
16   that Vincent Clark, known as Nu-Nu, ripped you off?
17             MR. SILVERMAN:  Your Honor, before the witness
18   answers the question, might we approach to discuss an issue
19   with you?
20             THE COURT:  Yes.
21             (At the side bar.)
22             MR. SILVERMAN:  Your Honor, I have a concern about
23   the use of the line sheets to refresh the witness's
24   recollection.  The line sheets are preliminary drafts of the
25   calls, they're not the calls themselves.  For text messages
```

```
 1    they tend to be verbatim, I think they are verbatim, but for

 2    calls it's not -- it's the monitor sitting in the wire room

 3    who does a very quick job.

 4          The government intends to play a call for trial, we

 5    prepare a transcript that the Court instructs the jury is not

 6    the exhibit but is an aid.

 7          THE COURT:  Right.

 8          MR. SILVERMAN:  I think the problem with using the

 9    line sheets to refresh the witness's recollection is it might

10    give him a misimpression depending upon how the line sheet

11    monitor drafted the line sheet, and I'm not seeing these line

12    sheets before defense counsel shows them to the witness.

13          MR. REEVE:  I'm sorry.

14          MR. SILVERMAN:  So I don't know what he's looking at

15    and I don't know if it's something where I would be concerned

16    that it's not a good reflection of the call itself.

17          Now, obviously, there's a practical difficulty with

18    playing the call for the witness.

19          MR. REEVE:  That's what I'm trying to avoid.

20          MR. SILVERMAN:  Because they're not being published

21    to the jury, so I understand there's a practical

22    consideration.

23          MR. VATTI:  Why don't you just admit them?

24          MR. REEVE:  I'm just trying to get an on or about

25    date when he ripped him.  If you guys agree, I'll take any
```

1  date you give me.

2          MR. SILVERMAN:  It's early September.

3          MR. REEVE:  Let's just stipulate it's early

4  September.

5          MR. VATTI:  Let's see if he'll agree with that.

6          MR. REEVE:  That's fine.

7          MR. SILVERMAN:  If this is going to keep happening,

8  it's going to raise the same flags for me.

9          MR. REEVE:  Let me just address the objection, your

10  Honor.  First of all, the law is quite clear that you can

11  refresh someone's recollection with a ham sandwich, and the

12  question always is, does it actually refresh his recollection?

13  It could be a line of gibberish, and its proper to use to

14  refresh.

15          I don't think that's what the government's concern

16  is at all.  I think their concern, which is a legitimate

17  concern, is they don't want an inaccurate answer to be given

18  on the basis of arguably reading a line sheet which is not

19  accurate.

20          In this context, the government has indicated that

21  their sense is it was early September.  I'm going to ask, I

22  propose I just ask the witness, would it be fair to say that

23  it was in early September.  Now, if he says no, I don't know,

24  then the question is where do I go?  But let's cross that

25  bridge when we get there, okay?

```
 1            MR. VATTI:  If all you're going to ask him is does

 2    that refresh his recollection as to what date Vincent Clark

 3    ripped him off, that's fine.  If you're asking him does that

 4    refresh his recollection about the substance of certain

 5    discussions --

 6            MR. REEVE:  I rudely cut Attorney Vatti off and I

 7    apologize.  I'm not trying to -- I'm just trying to create a

 8    time line here.  That's all I need is a time line.

 9            MR. MORAGHAN:  I'm also looking at a time line, and

10    I would like it more specific than just an agreement it could

11    have been September.  I'm also interested in a time line, and

12    if there's going to be a stipulation as to when Clark did rip

13    him off, I would like it more specific, if it was in August,

14    because it's like do you want to agree to use September as a

15    date, which I don't think is September, I would like it close

16    to when it actually occurred.

17            If you know when it occurred or approximately when

18    it occurred, that's fine.  Just to say it might have been

19    September, it might have been October, it might have been

20    November, I don't agree to that.

21            MR. SILVERMAN:  I think he has to ask him does he

22    remember the precise date and he says no, you can ask him for

23    his recollection, you're out of luck.

24            MR. REEVE:  We can play the tape for him.  That's

25    what I'm trying to avoid, is having the jury go out while he
```

```
 1    can listen to the tape on his own.  It's just a mess.  I don't
 2    want to delay things like that.  I'm trying to avoid that.
 3              MR. VATTI:  Go with the questions and see how it
 4    goes.
 5              MR. REEVE:  That's fine.  Yes.  Thank you.
 6              (In open court.)
 7    BY MR. REEVE (Continued):
 8    Q    Mr. Wilson, I'm going to ask you another question and see
 9    if this helps.  If it doesn't help you, I want you to tell us:
10    Would it be fair to say that the theft of product by Nu-Nu
11    occurred somewhere in early September of 2011?
12    A    If I was to see the call.
13    Q    Okay.
14    A    I know it happened; I just don't know to give you a date
15    or a month.
16    Q    That's a fair answer.  I'm going to, I'm just going to,
17    leave that there for now, and we'll go back to that, okay?
18    A    Okay.
19    Q    All right.  But what I'm trying to do is to get a
20    chronology of certain events in this case.  For right now, I'm
21    going to put "Nu-Nu theft," but we're going to leave no date
22    for right now, and we'll come back to it, okay?
23    A    Okay.
24    Q    All right.  Now I want to move forward to the first time
25    that you met Robert Santos, okay?
```

1    A    Okay.

2    Q    Okay.  You testified about that a little bit yesterday,

3    but I want to just follow up.

4    A    The first time I met or saw?

5    Q    Well, okay, let me rephrase the question.  You told

6    Attorney Silverman on direct examination yesterday that you

7    had seen Robert Santos, and you knew him by face, right?

8    A    Yes.

9    Q    But -- and that would be before the time you met him.

10   There are two different things:  When you saw him and when you

11   met him, and you're right to point out that distinction, I

12   appreciate that, okay?

13           So the first time that I'm talking about, the first

14   time you actually spoke to Mr. Santos, okay?  And I think,

15   correct me if I'm wrong, that what you indicated to us was

16   that you saw him on a porch, right?

17   A    I believe it was on a porch, yes.

18   Q    And you knew him by face, but you had never previously

19   spoken to him?

20   A    Maybe I nodded my head when I saw him before.

21   Q    Yes.

22   A    I might even have said hi, but we didn't really -- I

23   would say we didn't introduce each other.

24   Q    In other words, you know hundreds of thousands of people

25   in New Haven -- I shouldn't say that.  That's an exaggeration.

```
 1    You know thousands of people in New Haven, not necessarily by

 2    name but by face, right?

 3    A    Yeah.

 4    Q    You might see somebody walking down the street or near

 5    the Green and say, "Hey, how you doing," right?

 6    A    Yes.

 7    Q    In that way, you kind of have a face-to-face memory of

 8    that person, but it's not like you really know that person?

 9    A    Yeah.

10    Q    And is that the way you knew Mr. Santos before you met

11    him that day when he was on the porch?  Is that really what

12    we're talking about here?

13    A    Besides what Nu-Nu told me.

14    Q    All right.  So now let's go back to that.  Mr. Clark,

15    Nu-Nu, the guy who stole some drugs from you, he was the guy

16    who suggested that you reach out to Robert Santos, right?

17    A    No, he did not suggest that I reach out to Robert Santos.

18    Q    I thought that's what you told us.  No?

19    A    No, I don't remember, I don't recall saying that --

20    Q    Go ahead.

21    A    What happened was Nu-Nu was happy to have Mr. Santos on

22    board when he -- as far as moving heroin.

23    Q    Right.

24    A    But Nu-Nu was the one who had the heroin at the time

25    also.
```

1    Q    Right.  Right.

2    A    So being that I saw that Nu-Nu was happy to get Mr.

3    Santos on board, I was like, okay, this guy looks like

4    somebody who's going to potentially move a lot of heroin.

5    Q    Okay.  Let's back up just a step, because I think you

6    told us in your direct testimony, you used the word "partner"

7    for all three.  You said, "My first partner in the heroin

8    business was Nu-Nu," right?

9    A    Yes.

10   Q    Now, you said your second partner in the heroin business

11   was Quiyon Reid, Gutter P, right?

12   A    Yes.

13   Q    Your third partner, we're going to talk about that term

14   in a minute but maybe not a minute because that might be

15   overstating how quickly we're going to get there, but your

16   third, you told the ladies and gentlemen of the jury, was Mr.

17   Santos?

18   A    Yes.

19   Q    Okay.  And now the reason you no longer continued with

20   Nu-Nu and moved to Quiyon Reid was because Nu-Nu had stolen

21   product from you?

22   A    Yes.

23   Q    Okay.  And that's when you went to Mr. Reid?

24   A    Yes.

25   Q    Right?  So we know that when you approached Mr. Santos on

1    the porch, Nu-Nu was out of the picture?

2    A    As far as drugs.

3    Q    Yes, you needed a new guy for heroin and you turned to

4    somebody you didn't know, Mr. Santos?

5    A    Yeah.

6    Q    Okay.  So there's no question that the Nu-Nu theft

7    occurred before you approached Mr. Santos on the porch?

8    A    Yeah, I don't believe there's any question of that.

9    Q    Okay.  Now, you don't know, as you sit here right now,

10   whether Nu-Nu -- Mr. Clark -- had any conversations with Mr.

11   Santos before that day when you approached Mr. Santos on the

12   porch, correct?

13   A    I don't know that they had any conversation?

14   Q    Right.  You don't know if Nu-Nu shared with him the fact

15   that he had ripped you off and that you're a bad drug dealer

16   and easy mark.  You don't know?

17   A    I don't know that, no.

18   Q    Could it happen?  Maybe yes, maybe no, you had no idea,

19   right?

20   A    No idea.

21   Q    Okay.  Now, and so you approach this pretty much stranger

22   and ask him if he would be interested in working with you,

23   right?

24   A    Yes.

25   Q    And you know, the only thing you really know about him is

1  you got his name from Nu-Nu, the guy who had stolen weight

2  from you?

3  A    Doesn't make any sense but yeah, that's how it happened.

4  Q    So then --

5         MR. REEVE:  May I just have a moment, your Honor?

6  May I just have a moment, your Honor?  I'm sorry.

7  Q    You don't know the exact date that you saw Mr. Santos on

8  the porch and you spoke to him, do you?

9  A    I do not remember the exact date.

10  Q    But you did tell us something yesterday about it, you

11  said, to the best of your recollection, you exchanged phone

12  numbers, right?  That's what you thought?

13  A    We would have to have some type of way to contact each

14  other.

15  Q    Right.  Right.  And do you recall that you provided your

16  cell phone to Mr. Santos during that meeting, and that he made

17  a call to somebody in order to lock your number in so he had

18  it?

19  A    Okay.  That could be --

20  Q    I'm going to show you a call, session 32243 for the

21  record, it's on October 17th of 2011, and again I'm just going

22  to ask you if this refreshes your recollection, and might give

23  us the date that you first met Robert Santos.

24  A    You want me -- I'm sorry, you want me to give you the

25  date?

1    Q    Let me just ask you a couple of questions.  I don't want

2    you to testify from that document, but I want you to tell us,

3    first of all, does that, does it appear that that's -- do you

4    think that's the call that was made when you were with -- it's

5    on your phone, right?

6    A    Yeah.

7    Q    I mean, we can play it.  Should I play it for you?  I'm

8    happy to do that.

9    A    I mean, it's refreshing my memory.

10   Q    Okay, it has.  Now having refreshed your memory, is it

11   fair that the date you first met Mr. Santos was October 17th

12   of 2011?

13   A    The day I first introduced myself to Mr. Santos was

14   10/17.

15   Q    Right.  Okay.  So I'm going to put down 10/17/11, first

16   intro to Robert Santos.  Okay?

17   A    Okay.

18   Q    All right.  Now, at that time, you told us you had a huge

19   debt from both Na-Na and -- "from" is not the right word.  You

20   owed Na-Na, as well as Amaury, a significant amount of money,

21   correct?

22   A    Yes.

23   Q    And I'm not looking for precise dollars, but can you give

24   us a range that the debt -- there was a zone in which the debt

25   kind of went up and down and around, would it be fair to say

1    that oftentimes it was around $10,000 that you owed them?

2    A    I want to say less, but --

3    Q    Okay, give us your estimate.  Again, this is a ballpark

4    thing and it's not -- I just want -- give us your number.

5    A    Okay, I want to say around that time, it was like seven,

6    seven to nine.

7    Q    Okay.  And sometimes it got up to like 12 and 13 and

8    sometimes it got lower, below seven, right?

9    A    I got to see.

10   Q    I understand, and I don't want to take up time on that

11   because again, I don't think it's a contested issue that

12   during this time you owed that money and it would go up and

13   down.  You're telling us seven to nine thousand sounds about

14   right, around that period of time, right?

15   A    Yes.

16   Q    Now, I want to be clear.  Is that seven to nine just for

17   Na-Na or is that seven to nine including Amaury?  I think it's

18   just Na-Na, right?

19   A    No, it was -- I know I owed both of them.  At that time,

20   I can't say at that time.

21   Q    Okay, that's fair.

22   A    I know I owed the debt.

23   Q    We do know as of that time, they were no longer willing

24   to front you with new product, right?

25   A    Na-Na was.

1    Q    What's that?

2    A    Na-Na was willing to.

3    Q    Sometimes.  But almost always, he said:  You know, if I'm

4    going to give you stuff, you got to give me enough to cover

5    that plus start paying down your debt.  You had hundreds of

6    conversations with him about that, right?

7    A    I had a lot of conversations with him, and I told him --

8    Q    Yeah.

9    A    -- we argued back and forth and I was trying to tell him,

10   if I don't have any drugs I'm not going to be able to pay you

11   your money.  I was working at Dunkin' Donuts.  If I didn't get

12   any drugs from him, I was --

13   Q    Right, you both -- I mean, the reality is you were trying

14   to protect your position with him.  It was a negotiation,

15   wasn't it?

16   A    Yes.

17   Q    Okay.  And what you were saying to him is:  Look, man, if

18   you don't give me any drugs, I'm not going to be able to pay

19   you the money.  So it's in your interest to give me the drugs.

20   Right?

21   A    Yes.

22   Q    And he was saying:  I need some protection here on the up

23   side, right?

24   A    Yeah.

25   Q    And so he was staking out his position and you were

1    trying to reach a middle point, a meeting of the minds, if you

2    will, as to what was comfortable for him and what you could

3    do, right?

4    A    Okay, that's fair.

5    Q    All right.  And so most of the time, what you would do

6    before you took a trip to New York, remember I talked earlier

7    about you're a bill collector, part of being a drug dealer is

8    you're a bill collector, right?

9    A    I was, because I kept fronting people.

10   Q    I understand.  If you asked everybody, "I'm not giving

11   you a drop of drugs unless you pay me up front," then you

12   would have wiped out your bill collection activities that took

13   a lot of time on top of your drug dealing activities, which

14   already took a lot of time, right?

15   A    Yeah.

16   Q    Okay.  But there was a reason you didn't do that, right?

17   From your end.  Just why wouldn't you do that?  Sounds like

18   better business to just say, "You want drugs?  Pay me up

19   front."  It's kind of what lawyers do sometimes if it's a

20   private case.  You want me to represent you, I want the money.

21   That way, we don't have to squabble about money during your

22   case, you know what I mean?  Why didn't you do that?

23   A    Networking clientele.

24   Q    Okay.  You saw it to your advantage.  I mean, if we

25   really want to talk about it, you know, you wanted somebody on

```
 1   your hook so you could reel in the money, and just like you
 2   were saying to Na-Na, "Give me the product, and I can pay
 3   you," your customers were saying, "Look, man, give me the
 4   product, and then I'll be able to pay you," right?
 5   A    Some of them, yes.
 6   Q    And so -- but then you had to go to your customers and
 7   say, "You know what?  I can't do it that way anymore.  I need
 8   some money from you, otherwise I can't get the stuff."  Those
 9   were a lot of the conversations that you had in an effort to
10   collect your bills, right?
11   A    I believe that's fair to say.
12   Q    Okay.  Now, here's what I don't understand, and I want
13   you to clarify this:  You told us that when you started
14   transactions with Robert Santos, if you gave him a hundred
15   grams, that he owed you 5700 on that.  Do you remember that?
16              MR. SILVERMAN:  Your Honor, I'm going to object.  I
17   think that mischaracterizes the witness's testimony.
18              MR. REEVE:  All right, let me rephrase the question.
19   Q    You were asked if Mr. Santos would pay extra money on top
20   of the 5700 at times, and you answered, "Yes, he would pay me
21   extra, and that helped me pay off the debt."  Do you remember
22   that testimony?
23   A    I believe that's what was said.
24   Q    Okay.  But that doesn't make any sense at all, when you
25   think about it, does it?
```

```
 1   A    The way -- the way -- I don't --

 2   Q    Let's take it through.

 3   A    Yeah, please.

 4   Q    You're sitting there.  You never talked to Mr. Santos in

 5   your life until October 17th, 2011, right?

 6   A    Fair to say.

 7   Q    Okay.  You've got a heroin business going, right?

 8   A    Fair to say.

 9   Q    And you just told us, we went through all these numbers,

10   you're making $13 a gram, right?  Ballpark, just ballpark.

11   You're making money, right?

12   A    Yes.

13   Q    So why in the world would you take a hundred of your own

14   grams, give it to Mr. Santos, and then only expect $5700 back

15   and think:  Gee, if he gives me above 57, that's going to help

16   me pay off the debt.  That's crazy.

17   A    If he give me 57, I break even.

18   Q    Right.

19   A    So at least I'm -- at least that is done.  And heroin,

20   unlike crack, goes bad.  If I don't have the clientele to move

21   the heroin that I was getting, and I kept the heroin for too

22   long, now I have another problem, now that heroin's gone bad

23   and I either have to return it and lose time --

24   Q    Right.

25   A    -- or be in debt more.
```

1   Q    But here's the thing:  You're putting the grams of heroin

2   out on the street before you met him.  You're moving the

3   product, and you're making money, right?

4   A    That --

5   Q    Yes or no?

6   A    Repeat that again.

7   Q    Yes.  Before you met Robert Santos, you were putting

8   heroin on the street, and you were making money, and you just

9   told us a ballpark figure you were making about $13 a gram.

10  A    I was putting the heroin on the street and I was making

11  money.

12  Q    Right, and that's before you met Mr. Santos.  So why

13  would you give him -- first of all, the reality is you didn't

14  front heroin to Mr. Santos; he paid you up front, because you

15  wouldn't -- you would be insane, wouldn't you, to give this

16  stranger over here a hundred grams up front.  You don't even

17  know him.  You wouldn't do that.  You're not that bad of a

18  drug dealer, come on?

19           MR. SILVERMAN:  Your Honor, this is all

20  argumentative.

21           MR. REEVE:  You know what?  I want to apologize to

22  Mr. Wilson, and to everyone in the courtroom, for the comments

23  and the noises in the back of the courtroom.  They're wrong,

24  they're disrespectful, and they shouldn't happen.

25           And I know what your Honor's going to say, but I'm

1    going to say it for you.  If there's one more sound out of the

2    spectator gallery, the marshals will remove whoever is making

3    that sound.  Are we clear?  Okay.

4    Q    Before you were so rudely interrupted, I asked you a

5    question.

6            MR. SILVERMAN:  And I answered with an objection.

7            MR. REEVE:  Okay.

8            MR. SILVERMAN:  I think the line of questioning was

9    very argumentative.

10           MR. REEVE:  I'll rephrase the question.

11   Q    You wouldn't give up $1300 in profit you were making to

12   front somebody else half of your product with the expectation

13   that he would give you $5700 back.  That does not make sense,

14   does it?

15   A    Can I try to explain that to you?

16   Q    Yes.

17   A    That's what you would like?

18   Q    Yes, I would.  I would like an explanation, and the floor

19   is yours.

20   A    First, desperate people do desperate things.  I was

21   desperate, so I was doing desperate things to try to pay off

22   the money.  Immediately as I met him, did I give him a hundred

23   grams?  I don't believe I gave him that much the first time

24   that I talked to him.  I probably started off smaller, and

25   build the trust.

```
 1    Q     Right.  Right.  So, okay, I understand.  So you didn't

 2    start at 20 grams or a hundred.  First thing you did was you

 3    gave him a sample, right?  After that meeting on October 17th,

 4    your first transaction was, "I gave him a sample," right?

 5    A     I don't recall that.

 6    Q     Okay.  Then you started at small quantities because there

 7    wasn't a relationship of trust, right?

 8    A     Yeah, that's fair to say.

 9    Q     And there were times during that period where you were

10    asking Mr. Santos for money so you could go down and buy the

11    product in New York, just like you were with everybody else,

12    because you were desperate and you were trying to make ends

13    meet and you were robbing Peter to pay Paul, right?

14    A     I don't know if -- I don't believe I robbed anybody.

15    Q     I'm sorry.  I didn't mean to suggest that.  That's just a

16    phrase, and I apologize.

17          What I'm asking you is:  You were in a jam.  I mean,

18    you had debts on the other end.  You had to figure out a way

19    to meet those debts and make money, because that's what you

20    were in the business for, was to make money, right?

21    A     Make money to survive, yes.

22    Q     It's hard enough to be -- I mean, you don't want to take

23    the risks of being a drug dealer and going back to jail if you

24    got nothing to show for it at the end, right?

25    A     Kind of what happened, but --
```

1    Q    And so Mr. Santos, you thought, might help you out with

2    your drug business, right?

3    A    Yes.

4    Q    And you were willing to take a shot -- and I don't mean a

5    shot, that's another expression, but you know what I'm saying.

6    A    I was willing to take that risk.

7    Q    Okay.  But the risk was small?

8    A    Had to be --

9    Q    Because you started low, right?

10   A    I believe so.

11   Q    And Mr. Santos, in order to make it worth your while and

12   in order for you to be able to go down and get the product,

13   was paying you at times so you could go down and get the

14   product, right?

15   A    He was helping me, was putting -- saying putting it

16   together, yeah.

17   Q    And sometimes, he was giving you the money before you

18   even gave him the product, right?

19   A    Maybe because he already had product.

20   Q    Yeah.  Maybe he made money in some other way, maybe it

21   was selling drugs, I'm not asking you about that.  What

22   happened was he would give you money and then you would use

23   that money in part to go down and see Na-Na and get more

24   product so you could put more stuff on the street, right?

25   A    He would give me money, I believe, after I gave him

1   heroin to make money.  I'm not sure exactly where you -- it

2   just seems like you might leave something out, how you might

3   have said you left the cut out of that.  Since you want to be

4   clear, I'm trying to be clear also.

5   Q    Okay.  I understand.  But what we have to keep in mind is

6   that you told us you don't even know about your transactions,

7   you can't give us -- and it's understandable that you can't

8   give us a definite number here.  What I hear you saying, and

9   you correct me if I'm wrong, is you can't really tell us

10  exactly what each transaction that involved Mr. Santos was,

11  right?  You really can't?

12  A    The phone calls.  I sat through 39 hours, if I sat

13  through 39 hours, with you going through whatever phone calls,

14  I probably would give you a way better explanation of what was

15  going on.  Right now, I can't.

16  Q    I understand.  But I'm just going to ask it again.  As

17  you sit here now, even refreshing your recollection and trying

18  to recreate your relationship with Mr. Santos, you can't tell

19  us with any certainty, for example, if I ask you this

20  question, what was the first day that Robert Santos provided

21  you any money for drugs?  Can you answer?

22  A    I cannot answer that.

23  Q    Right.  If I asked you, can you tell us if it was before

24  you gave him the drugs or after, you can't really answer that,

25  it's a guess, isn't it?

```
1    A    Yeah, I can't really answer that.

2    Q    Yes, and you're doing the best that you can to

3    reconstruct?

4    A    Yes.

5    Q    Okay.

6    A    Based on right now, based on no phone calls, based on --

7    Q    That's fair.

8              MR. REEVE:  Your Honor, if this is an appropriate

9    time to take the afternoon break.  I understand there might be

10   a need for a bathroom on the part of someone.

11             THE COURT:  All right, we'll take the afternoon

12   recess, 15 minutes, ladies and gentlemen.

13             (Recess:  2:41 o'clock p.m. to 2:56 o'clock p.m., in

14   the absence of the jury.)

15             THE COURT:  Gentlemen, the jury has inquired whether

16   or not it's possible for us to begin tomorrow morning at 9:00

17   o'clock instead of 10:00 o'clock, and take only one-half hour

18   for lunch.

19             MR. REEVE:  Yes, 9:00 tomorrow and one break until

20   lunch.

21             THE COURT:  And take only a half an hour for lunch.

22             MR. REEVE:  Let's do it.  I just need authorization

23   for Mr. Santos to leave the house before his curfew time of

24   9:00, and we'll contact probation.

25             THE COURT:  Okay.  Tell them that I would very much
```

1    appreciate giving him that permission.

2            MR. REEVE:  Yes, we will, and they accommodated last

3    time and I'm sure they will this time.  I didn't want to do it

4    without asking.

5            THE COURT:  Yes.

6            (In the presence of the jury:  2:59 o'clock p.m.)

7            THE COURT:  All right, gentlemen.

8            MR. REEVE:  Thank you, your Honor.

9    BY MR. REEVE (Continued):

10   Q    Mr. Wilson, you told us during your direct examination

11   about the theft by Mr. Clark.  Do you recall that testimony?

12   A    I know he stole.  The theft happened.  The testimony, if

13   it was read back to me, probably would refresh.

14   Q    That's okay.  Let me ask you if this is what you said,

15   and if you don't think it's what you said, tell me:  Didn't

16   you tell the jury that he stole drugs from you when -- he

17   never paid you for the drugs that he had?  Do you remember

18   that?

19   A    Yeah, he never paid me for the drugs.  That's, that's --

20   Q    But that's not really exactly how that happened, is it?

21   Why don't you tell us the details about what went down?  Let

22   me help you.  Vincent Clark had a key, or access to a key, to

23   your apartment, right?

24   A    To which apartment?

25   Q    139 Day.

```
1    A    No, he did not.

2    Q    How about the other?

3    A    I believe he might have had a key to the other apartment,

4    yes.

5    Q    Which apartment was it that he stole the drugs from?

6    A    He didn't take any drugs from any apartment, that I

7    remember.

8    Q    Are you sure about that?  Are you positive?

9    A    I mean --

10   Q    Didn't you tell people on the phone that Clark got a key,

11   and he got into your apartment, and he stole all your stuff?

12   Do you remember telling people that?

13   A    I don't remember telling people that.  If I seen the

14   phone call, then I probably would be able to --

15   Q    Didn't you take actions after Mr. Clark stole, however he

16   did it, whether it was in your apartment or whether he had it

17   by some other way, didn't you take some actions in an effort

18   to get it back?

19   A    Yeah, I talked to him.

20   Q    You talked to him.  But you also broke into his

21   apartment, right?

22   A    Broke into his --

23   Q    Don't you remember?  You tried to see if you could get

24   something to kind of get even with him.  You don't remember

25   any of this?
```

```
 1   A    That, that's a possibility.  Yeah, I probably did.
 2   Q    Do you remember talking to people about the counterfeit
 3   money that you found in Nu-Nu's apartment, right?  Don't you
 4   remember?
 5   A    I don't believe I found counterfeit money inside his
 6   apartment.
 7   Q    Okay.
 8              MR. REEVE:  May I just have a moment, your Honor?
 9   While my associate is trying to cover my convoluted
10   instructions to him, which is entirely my fault, I'm going to
11   back up to a different issue, just for clarity.
12   Q    Is it fair to say that you met Mr. Santos several months
13   before your arrest through Vincent Clark?  Is that fair?
14   A    I saw him when he was coming to see Nu-Nu, yes.
15   Q    Okay.  So Vincent Clark was the one that allowed -- it
16   was through him that you met Mr. Santos, correct?
17   A    It was through him that I saw Mr. Santos.
18   Q    Okay.  Right.  Okay.  Mr. Wilson, I'm about to show you a
19   series of text messages --
20              MR. REEVE:  May we just have a moment to review
21   these before?
22              THE COURT:  Yes.
23              MR. REEVE:  I'm sorry, your Honor.
24              Thank you, your Honor.  May I approach the witness?
25              THE COURT:  Yes.
```

1   Q    Mr. Wilson, I'm going to show you a series of text

2   messages, okay?  I do not want you to tell us what they say.

3   I want you just to review them, okay?

4   A    (Nodding head.)

5   Q    I'm trying to get it to the first one I want you to look

6   at.  Starting with session 27505 on September 28th, 2011, can

7   you just take a look at that, and then I'm going to bring the

8   screen down to other subsequent texts to give you context so

9   you can answer some questions for me, okay?

10          Mr. Wilson, having reviewed that series of text

11   messages, let me ask you first:  Does that -- you could just

12   go ahead, I don't want to be in anybody's way -- let me first

13   ask you this question:  Do you think that those texts are

14   connected to the incidents involving Nu-Nu, Vincent Clark?

15   A    I'm sorry, I don't -- I want to explain that, but --

16   Q    No, let's take it a step at a time.  I want to make sure.

17   In or about -- let me ask it this way:  In or about September

18   of 2011, were you robbed only once or were there a number of

19   people who robbed you, if you remember?

20   A    I was never robbed at gunpoint.

21   Q    No, I'm sorry, let's stick with the word "theft."  That's

22   the right word here, right?

23   A    Yes.

24   Q    Okay.  What I'm asking you is, in the month of September

25   of 2011, was there one theft from you, if you recall, or were

1    there more?

2    A    I recall there only being one theft.

3    Q    Okay.  Now, having looked at those texts, does that

4    refresh your recollection about how the theft happened?

5    A    No, it does not.

6    Q    It does not?

7    A    Do you want me to tell you what it does?

8    Q    Yes.  First I want you to tell me what it does.

9    A    It reminds me of those text messages that I was sending --

10   I don't want to say who I was sending them to.

11   Q    No, you don't have to.

12   A    But I was, I don't know, I don't know if I should keep

13   going on about the text message.

14   Q    Let me help you.  I don't want to put words in your

15   mouth.  Are you saying that those -- are you saying that for

16   whatever reasons, those -- text messages were not an accurate

17   account of what happened?

18   A    That's what I'm saying.

19   Q    Okay.  All right.  I understand what you're saying.  So

20   what you're saying is that you made up a story there for an

21   unrelated purpose to this case, is that fair?

22   A    Yes, that's fair to say.

23   Q    Okay.  And I don't want to get into the motivation or

24   anything like that.  You understand why I asked you the

25   questions about how the Clark situation happened, having seen

1    those text messages.  You see how those text messages could

2    have confused someone who read them?

3    A    Yes, I see, and now I see why you thought that he -- now

4    I get why -- your questions now.  Now I get your questions.

5    Q    Okay.  All right.  So my questions to you were based on

6    the wrong assumption that you were putting accurate

7    information into a series of text messages.  Can you see how

8    we would misunderstand each other?

9    A    If we had a chance to go over it, like we just did --

10   Q    Right.

11   A    -- I would have explained that to you.

12   Q    Okay.  I understand that, and I guess that goes back to

13   one of the things we were talking about yesterday, which is:

14   Someone could be at grave peril if they literally thought that

15   everything in a conversation or text messages that appeared on

16   this wire was true?

17   A    I'm sorry, I don't know what "peril" means.

18   Q    What you're telling us here is there's a series, there's

19   a series of text messages that I just showed you, right?

20   A    Yes.

21   Q    And will you accept -- those text messages, are they on

22   what we have been calling line sheets from this case?

23   A    Yes, they are.

24   Q    Okay.  So those are text messages that were picked up

25   during the course of the wiretap that federal law enforcement

1    authorities were able to secure on your phone?

2    A    Yes.

3    Q    Okay.  So do you agree that those, that the substance of

4    what's stated there is accurate, that is that that's an

5    accurate, and I think the government would stipulate to this,

6    that the text messages on the line sheets are word for word

7    recounts of the actual text messages that were sent?  Maybe I

8    should just have a moment, because I don't want to misstate

9    that.

10              MR. SILVERMAN:  That's fine.  Yes, your Honor, the

11   government would agree that the line sheets accurately

12   represent text messages intercepted over the phone.

13              MR. REEVE:  I'm sorry to interrupt you.  Just so

14   we're absolutely clear, what the government would not agree to

15   and I'm not asking the government to agree to, I've shown him

16   some line sheets of telephone calls, and there is no agreement

17   that those are accurate, they're not totally accurate because

18   they're created by the monitoring agents at or about the time

19   the calls come in and they don't go through the review that we

20   heard about through Special Agent Ndrenika's testimony.  I

21   just want to be clear here, okay?

22   Q    Did you understand what we just said?

23   A    I don't know that that was for me.

24   Q    We now, everybody agrees that the text messages, the

25   content of the text messages, in other words, that what you

1  just reviewed, is accurate.

2  A    What I tapped into my phone and sent out is accurate,

3  yes.

4  Q    Exactly correct, okay?  In other words, letter by letter,

5  those are an accurate picture of exactly what you put into

6  your phone, right?

7  A    Yes.

8  Q    And what the person who you were communicating with, the

9  other person, we're not going to get into that person's name,

10  it doesn't matter, okay?

11  A    (Nodding head.)

12  Q    Those are all accurate.  And what you're telling us is,

13  but what you were telling that person was a made up story, for

14  whatever purpose.  I'm not going to ask you about the purpose.

15  But it was just made up?

16  A    Yes.

17  Q    And you had your reasons to make it up?

18  A    Yes.

19  Q    Fair.

20  A    Not in my circle.  Not in my circle.  We talked about the

21  circle before, me and you.

22  Q    I don't want to get into the identity of the person, but

23  you're saying this person was outside of your circle?

24  A    Yes, this person was not -- this person wasn't a drug

25  dealer.

```
 1   Q     Okay.  Okay.  And so some of the things that you put on

 2   text messages -- in this case, all the things you put on those

 3   text messages -- the story about what happened, is simply

 4   that, it's a made up story?

 5   A     Yes.

 6   Q     Okay.  All right.  I think I get it.  Speaking about the

 7   circle --

 8           MR. REEVE:  Your Honor, may I just have a moment

 9   with the marshal?

10           THE COURT:  Yes, sir.

11           MR. REEVE:  Your Honor, at this time --

12           MR. SILVERMAN:  There's no objection.

13           MR. REEVE:  I'm going to offer this chart as the

14   next defendant's exhibit, and I must say, I have no clue as to

15   what the letter is and I'm going to leave that totally up to

16   your Honor's clerk.  I think we're on H.

17           THE CLERK:  Yes, we are on H.

18   Q     Mr. Wilson, no secrets here, I'm going to show you this

19   exhibit, which is now being marked as Defendant's Exhibit H,

20   is a blowup of a map of New Haven, all right?  Because you

21   talked, in your testimony yesterday, about neighborhoods.

22   A     Yes.

23   Q     And what I want you to do, because not all these people

24   are from New Haven and familiar with the neighborhoods, I want

25   you to identify the neighborhoods.
```

```
 1              MR. REEVE:  Let's see.  I wonder -- what I'm
 2    thinking is, your Honor, if it's okay with the Court and the
 3    government, when he tells me what a neighborhood is, I might
 4    be able to just put a yellow stickum on it with the name of
 5    that neighborhood, so the jury will have the actual area.  Is
 6    that all right with your Honor?
 7              THE COURT:  That's fine.
 8              MR. REEVE:  Thank you.
 9    Q    Mr. Wilson, I'm going to ask you to do this from where
10    you are, and now I'm going to obstruct the Court's view, again
11    asking for permission, because I think -- so I'm going to put
12    this up here.  I'm going to ask you, can you take a look at
13    this and can you see it okay from there?
14    A    Yeah, I can see it okay.
15    Q    Okay.  Can you tell us what Defendant's Exhibit H is?
16    A    Looks like a map of New Haven.
17    Q    Okay.  You spent your life in New Haven?
18    A    Yes.
19    Q    Okay.  And you're familiar with the areas that are shown
20    on this map?
21    A    Some of the areas that are shown on the map.
22    Q    Okay.  And when you say that, every marking on this,
23    you're not personally familiar with?
24    A    No, I'm not.
25    Q    Okay.  I want to direct your attention to a possible
```

```
1    landmark that might help you, and right here, in the center of

2    Defendant's Exhibit H is a, looks like -- can you see that

3    symbol there?

4    A    Looks like a cap from a cap and gown.

5    Q    Okay.  Right underneath the cap that would go with the

6    cap and gown are the words Augusta Lewis Troup School.

7    A    Yes.

8    Q    Is that the school you testified, the middle school that

9    you attended when you were younger?

10   A    Yes.

11   Q    Okay.  Is that in what you have been referring to as the

12   Tre?

13   A    Yes.

14   Q    And how would you spell the word Tre?

15   A    T-R-E.

16   Q    Okay.  And so what I'm going to do is actually, I'm going

17   to ask you, could you write the word "Tre" and then I'm going

18   to ask you to put it on Defendant's Exhibit H, and this is

19   going to allow people to know the area you're talking about,

20   okay?  I guess I'll do it.  If I put it, shall I put it above

21   or right on Troup?  There aren't any boundaries in the Tre,

22   right?

23   A    I'm not a professional map reader.

24   Q    Right.

25   A    But I believe my neighborhood is -- I don't have a
```

1    specific cut-off point.

2    Q    Okay.

3    A    I would say that, I would consider this past the Tre now.

4    Q    If I put that here, is that fair?

5    A    That's fair.

6            MR. REEVE:  Just so the record's clear, I'm going to

7    put it over the words Augusta Lewis Troup School, and I'm

8    going to leave the cap above the yellow stickum.

9    Q    And you're telling us part of that neighborhood is what

10   we call the Tre?

11   A    Yeah.

12   Q    I'll try to put a little piece of tape there so it

13   doesn't fall off, okay?

14           Actually, let me go back to the video.  Government's

15   Exhibit 120 was the video of May 10th, 2011.  That was the

16   undercover purchase involving Lynnwood Bacote and a guy he

17   identified as his cousin.  You remember looking at that, you

18   looked at it a couple of times, right?

19   A    Yes.

20   Q    During the course of that video, and we had the audio, my

21   recollection is, as you were driving, you said to them, in

22   reference to a neighborhood, "I don't like going down here,"

23   and words like "it's really wild," "people shooting people up

24   all the time."  Was that in the Tre or was that a different

25   neighborhood?

```
1    A     It's, I want to say, a lower extension of the Tre.

2    Q     Okay.  So now I have to go back.  When you said that to

3    the guy, was that true?  Was that your actual -- you know,

4    like we just went through how sometimes you say things that

5    aren't true.  I want to make sure.  When you said that, is

6    that how you really felt about that neighborhood or were you

7    just playing a role and making that up?

8    A     I really didn't like that, to go down there.

9    Q     Okay.  So that was an area that -- well, let's say this:

10   Was that an area where there were, like, other guys who kind

11   of controlled that neighborhood, not your guys?

12   A     No.  The guys, like, that hung in that area were my

13   friends, were some of my friends, were people I've associated

14   with before.

15   Q     Okay.  Fair enough.  Now, you also mentioned a bunch of

16   areas that you described as enemy territory yesterday.  Do you

17   recall that?

18   A     I remember, I remember saying that, but the enemies were

19   at that time --

20   Q     Right?

21   A     -- that we were speaking of.  That was years ago.

22   Q     I understand.  Is it fair to say that from that time

23   forward, they're in New Haven, based on your own knowledge,

24   there are conflicts between people from different

25   neighborhoods?
```

```
 1   A      From different and the same neighborhood.

 2   Q      Sure.

 3   A      There's conflict with people in New Haven all the time,

 4   yes.

 5   Q      We can agree that there's way too much conflict in New

 6   Haven, right?

 7   A      We could agree on that.

 8   Q      Way too much shootings, way too much drugs, right?

 9           MR. SILVERMAN:  Your Honor, I'm sorry to interrupt.

10   I wonder if I could speak with defense counsel and the Court

11   at side bar for a moment.

12           THE COURT:  Yes.

13           (At the side bar.)

14           MR. SILVERMAN:  Your Honor, I asked to approach at

15   side bar because I think this line of inquiry is getting very

16   close to opening a door to evidence related to gangs and gang

17   involvement, something the government has tried very hard to

18   not bring up, and has asked this witness not to bring up.

19           I just mentioned to Attorney Reeve that I'm not sure

20   he's crossed the line, but I think he's getting very, very

21   close to that line, if he hasn't toed it yet.

22           MR. REEVE:  I think I can assure government counsel

23   and your Honor, I would make an offer that Mr. Wilson will say

24   that Mr. Santos is from the Ville, and the Ville is one of the

25   enemy territories.  I am going to refer to them as different
```

```
 1   guys.  I'm not going to refer to gangs.

 2        I can refer to them as groups, that's what we

 3   discussed pretrial.  That would avoid this problem, but I need

 4   to establish that he's not only a stranger but he's an

 5   outsider, and that's why I'm doing this.

 6        I'm not going to bring in any gang information, but

 7   the fact is they introduced evidence yesterday about enemy

 8   territory, and I don't think that opened the door.  I'm not

 9   trying to open a door.  But this is important, relevant

10   evidence to my defense, and I'm happy to accommodate the

11   government in any way that I can, and I want to be sensitive

12   to their concerns because certainly, what I don't want to do,

13   because if I open that door, I don't think it's as much my

14   concern as it is the concern of, frankly, the other

15   co-defendants, and I want to be careful about that, because I

16   don't want to -- because then there's a whole can of worms

17   that gets opened up.

18        MR. VATTI:  I think the biggest thing is just, with

19   this witness up there, the more you go into it, I'm just

20   afraid that something is going to get blurted as you explore

21   these rival neighborhood disputes.

22        MR. SILVERMAN:  It might make sense to try to

23   streamline your examination.

24        MR. REEVE:  I will.  I'll ask him to identify the

25   neighborhoods, and I think that's going to be it.  Because
```

1    he's already said there are too many disputes.  I'm happy with

2    that.

3              MR. SILVERMAN:  Okay.

4              MR. REEVE:  I'll just have him identify the

5    neighborhoods.  I'm not going to go beyond that.  I think we

6    all agree, I haven't opened any doors.  I don't want to damage

7    the co-defendants that are on trial.  Okay?

8              THE COURT:  All right.

9              MR. SILVERMAN:  I just wanted to flag the issue.  I

10   think you're being sensitive to it.

11             MR. REEVE:  I appreciate it.  I want to say

12   something else for the record, which is that I appreciate the

13   fact that the way -- and I told them -- the way government

14   counsel has brought up issues, and that we've tried to bring

15   up issues, has been very helpful, and I appreciate that, and I

16   won't go beyond that.

17             THE COURT:  Okay.

18             MR. SILVERMAN:  Thank you.

19             (In open court.)

20             MR. REEVE:  Thank you.

21   BY MR. REEVE (Continued):

22   Q    Mr. Wilson, I just, having kind of talked to you a little

23   bit, you mentioned -- I'm just going to ask you certain

24   neighborhoods, and I'm going to ask you to write down their

25   names and then we can put them.  You mentioned yesterday a

```
 1   neighborhood called the Hill, would that be H-I-L-L?
 2   A    Yes.
 3   Q    Okay.  And can you write that down on a sticker, and then
 4   I'm going to let you put that sticker wherever you want --
 5   A    Right where it says the Hill.
 6   Q    That would be a good place, wouldn't it?  That's kind of
 7   like a duh question.
 8   A    Just saw it.
 9   Q    All right.  Now, you mentioned a couple other
10   neighborhoods, or maybe at least one that I remember, which
11   was, it rhymes with the Hill, what's that one?
12   A    The Ville.
13   Q    How do you spell the Ville?
14   A    V-I-L-L-E.  It's kind of a short --
15   Q    Yes.  Can you put where the Ville is?  To help you,
16   here's Goodrich, here's Edgewood Park.  You can stand up, I
17   think, if you need to.  I'm going to put it straight.
18              MR. REEVE:  Just for the record, the sticker that
19   Mr. Wilson, where he's identified the Hill is on top of the
20   words on the map the Hill.
21              The Ville sticker is just underneath a street which
22   is labeled Bassett Street.
23   Q    And again, these are the approximate areas of these three
24   neighborhoods, correct?
25   A    Yes.
```

1   Q    Okay.  Are there any other neighborhoods that you

2   mentioned in your testimony yesterday that I've forgotten?

3   A    I don't remember all the --

4   Q    Okay.  Let's leave it at that, okay?  And let me ask you

5   a couple of questions about that.  Most of -- is it fair to

6   say that when, you know, when you looked at that indictment of

7   47 named people, many of them -- I'm not going to go through

8   name by name, many of them -- were from the Tre, right?

9   A    That's fair to say.

10  Q    Did you have an understanding, when you met Mr. Santos,

11  as to where he was from?

12  A    He never told me where he was from.

13  Q    Right.  Did you have a belief, based on other information

14  that you received from others?

15  A    Yes, I had a belief.

16  Q    And what was that belief?

17  A    I believed that he was from the Ville area.

18  Q    The Ville area.  Okay.  So not only was he a guy you

19  didn't know; but he was a guy who wasn't from your

20  neighborhood, right?

21  A    Yes.

22  Q    Okay.  You didn't go to school with Robert Santos?

23  A    I don't believe we went to school together, no.

24  Q    Right.  Right.  Okay.  All right.  And I think we don't

25  have disagreement on this, but just to make sure, do you

1    recall telling the government at your first proffer on August

2    9th that you met Santos several months prior to your arrest

3    through -- through -- Vincent Clark?  Do you remember that?

4    A    That I met or I think a better word would have been

5    "saw."

6    Q    Okay.  But it's not just that you saw him; it's the

7    reason that, you had a reason to approach Mr. Santos when you

8    saw him was based on information that was provided to you by

9    Vincent Clark?

10   A    That's fair to say.

11   Q    I just want to make sure that we were clear.  All right.

12   Now, I want to get to the way things happened between you and

13   Mr. Santos.  My recollection is that the last call that was

14   introduced that you testified about before the jury was

15   Government's Exhibit 85, and I want to show you --

16            MR. REEVE:  If I might approach, your Honor.

17            MR. SILVERMAN:  Your Honor, I just want to clarify

18   one thing with defense counsel.

19            (Mr. Silverman conferring with Mr. Reeve.)

20            MR. REEVE:  Let me clarify something.

21   Q    There were calls that were played and that are part of

22   the record that were played where you identified a speaker, I

23   believe, as Brittany Odom, do you remember that?

24   A    Yes.

25   Q    Okay.  And after December 2nd of 2011, you had contact

```
 1   with Ms. Odom?

 2   A    December 2nd?  Sounds about right.

 3   Q    Okay.  And I asked you earlier a series of questions

 4   about your knowledge of what was discussed between Mr. Santos

 5   and Mr. Clark, and you said you had no idea, right?

 6   A    Yes.

 7   Q    And the same would be true with respect to any

 8   discussions Mr. Santos had with Ms. Odom, correct?

 9   A    Yes.

10   Q    Okay.  So with that clarification, and I think the

11   government has indicated to me, and I accept it, that the last

12   call chronologically that was offered when testimony by you

13   was being provided with respect to Mr. Santos is Government's

14   Exhibit 135 -- no, I got it wrong.

15             MR. REEVE:  I defer to government counsel to correct

16   me.

17             MR. SILVERMAN:  This is a very minor point.  The

18   last call that was played for the jury through Mr. Wilson by

19   the government was 135, and that was yesterday morning.

20             MR. REEVE:  Okay.  I understand.

21   Q    But I think we agree that the last call where you

22   identified Mr. Santos's voice and said, "Yes, this was a call

23   between me, Kevin Wilson, and Robert Santos," was Government's

24   Exhibit 85, which was December 2nd of 2011.  I want to make

25   sure I'm right.  Is that --
```

```
 1            MR. SILVERMAN:  I would have to look at the
 2   transcript, but I believe so.
 3            MR. REEVE:  All right.  If I'm wrong, I'm wrong.
 4   The record is what the record is and the jury has lots -- they
 5   won't have the transcripts unfortunately, but -- of those
 6   because they're not Spanish but they'll have the tapes
 7   available, okay?
 8   Q    So now I want to move through what happened after
 9   December 2nd, okay?
10   A    Okay.
11   Q    Let's frame December 2nd.  What you told the jury is
12   December 2nd, 2011, was when Brittany Odom was sent down to
13   New York to pick up product from Na-Na, correct?
14   A    If I review the call, I will tell you yes.
15   Q    Great.  Let me just show you.
16            MR. REEVE:  If I might approach, your Honor.
17            THE COURT:  Yes, sir.
18   Q    Just to frame this, Government's Exhibit 85 is on
19   December 2nd, 2011, at 6:02 p.m., right?
20   A    Okay.
21   Q    Okay.  Then there's a call, same day, December 2nd, 2011,
22   between you and Ms. Odom?
23   A    (Nodding head.)
24   Q    And this is around the time that she was asking you for
25   directions and you gave her the address of Na-Na.
```

```
 1   A    Yes.

 2   Q    Am I -- are we now where we need to be?

 3   A    Yes.

 4   Q    Okay, thank you.  That's the day Brittany Odom goes down

 5   and picks up a shipment of heroin, right, from Na-Na?  I don't

 6   care about the word "shipment," but she went down and picked

 7   up heroin?

 8   A    Yes.

 9   Q    Okay.  And you know that because she came back and you

10   received the heroin?

11   A    Yes.

12   Q    And that was later on December 2nd, on the same day of

13   these calls?

14   A    Yes, same day.

15   Q    In fact, for whatever reason, Na-Na traveled to New Haven

16   on that day later?

17   A    Yes.

18   Q    Okay.  And in fact, he got to your apartment, 139 Day I

19   think it was, correct me if I'm wrong, I think he got there

20   before Ms. Odom?

21   A    Yes.

22   Q    And there were some calls, and I don't know if they're

23   before the jury, I'm just giving you context, it doesn't

24   matter.  But there were some calls about where she was, and

25   ultimately she got there.  And she handed you the bag that
```

```
1    Na-Na had given to her?

2    A    Yes.

3    Q    Okay.  All right.  And then what happened with that

4    package is that -- let me give you another context here.  Do

5    you remember the phone calls with respect to Tall Man?  You

6    were talking with Mr. Santos about, this is the bad stuff

7    from, that Tall Man, the guy who apparently was dealing heroin

8    up in Maine, said, "I can't move this product, it's all bad."

9    Do you remember that?

10   A    Yes, I remember that.

11   Q    And that was, there were discussions you said first a

12   hundred bundles, I think it was -- correct me if I'm wrong,

13   I'm trying to focus us on where we are, okay?

14   A    That, there was heroin that was bad and he was bringing

15   it back.  Do you want to narrow the bundles down?  It was

16   heroin and he was bringing it back, that was bad.

17   Q    Right.  Then at the same time, there were discussions

18   with Mr. Santos, and they're in the record, where you two are

19   discussing what to do with that product.  Do you remember

20   that?

21   A    Yes.

22   Q    And Mr. Santos is saying, "You got to let him bring it

23   back, we'll mix it with new product and make it good."

24   A    Yes.

25   Q    Okay.  And you thought that was the right way to go?
```

1  A     Yeah, because I really didn't know.

2  Q     Yeah.  Yeah.  So what happened is after you got the

3  package from Na-Na, you gave that package a couple days later,

4  or the day later, along with the Tall Man returned product to

5  Mr. Santos, right?

6  A     I don't believe that, I don't think that's how I went,

7  no.

8  Q     Oh, you don't?  Okay.  So what I'm going to do is ask

9  you, there are some calls that I'm going to be offering, and

10 there are some texts.  I don't know that I have all the texts.

11      MR. REEVE:  May I just have a moment?  May I just

12 have a moment with the government?

13      (Mr. Reeve conferring with Mr. Vatti and Mr.

14 Silverman.)

15      MR. REEVE:  The first thing I'm going to do is I'm

16 going to play and offer as an exhibit, I guess it would be

17 Defendant's I, a December 2nd, 10:32 a.m., call.

18 Q     And I'm going to ask you if you can identify the

19 participants.  And I want to tell you that I don't have a

20 transcript for you to look at, okay?  So you're going to have

21 to listen to the call.  I also want to represent to you that I

22 am not playing the entire call.  I want to focus on the

23 relevant part of this call, okay?

24 A     Okay.

25 Q     All right.  I want you to listen to what's on that call.

```
 1            MR. REEVE:  10:32 p.m., I misspoke.

 2            (An excerpt of Defendant's Exhibit I, an audio

 3    recording, played.)

 4    Q    So you agreed with Mr. Santos at that time to meet up

 5    with him the next day, this is December 2nd, let's meet up,

 6    there's some woman drama, I want to focus you to what's going

 7    on.  There's an agreement to meet, right?

 8    A    Yes.

 9            MR. REEVE:  Now I want to go through a series of

10    text messages the next day, and these are going to be a

11    series, and I guess we'll have to mark them individually

12    starting with session 52577.  I would ask that this be marked,

13    I think it's Defendant's J.

14    Q    Showing you what's been marked as Defendant's Exhibit J,

15    I'm directing your attention to the bottom, to the second one

16    that's listed on this page, which is -- and that's the only

17    one I'm really, you know, offering here is the second, but can

18    you see, let's just focus ourselves, this is December 3nd,

19    right?

20    A    Um hum.

21    Q    It's military time, so if it says 1048, that would be

22    10:48 a.m.

23    A    10:46.

24    Q    And my eyes are bad.  1046.

25    A    Yes.
```

```
1    Q    Also just so everyone knows, if it was, let's say, it's
2    at 10:00 o'clock at night like the last call, I misstated it
3    because I converted it, it would say, if it's let's say 10:46,
4    then it would say 2246, right?  If you know.  If you don't,
5    it's fine.  It's not critical.  Okay.
6              So let me ask you there, that's a pretty short text.
7    What do you say?  Well, let me ask you first:  Can you tell if
8    that's -- there's an indication here over here, on the right.
9    Can you tell us what that word is?
10   A    It says "incoming."
11   Q    Okay.  So I just misspoke again.  Incoming would be a
12   text you're getting on your phone, correct?
13   A    I believe so, yes.
14   Q    Okay.  And what does that text -- who's that text from?
15   What number?
16   A    The phone number?
17   Q    Well, can we --
18   A    Or the session?
19              MR. REEVE:  Can we agree this is a call, a text,
20   from Robert Santos?
21              MR. SILVERMAN:  Yes, and the government has no
22   objection to the admission of any of the text messages.
23              MR. REEVE:  Fine, that's helpful.  Thank you.
24   Q    Okay, so this is a call -- I'm sorry, this is a text --
25              MR. SILVERMAN:  Could I suggest that it might be
```

1  more efficient if defense counsel just read the text to

2  Mr. Wilson?

3          MR. REEVE:  That's great.  If that's okay with you,

4  we can move through them faster if I can read them.  I don't

5  think there's any dispute.

6  Q    If I misread, these people over here have the text

7  message and they'll correct me, okay?

8  A    Got you.

9          MR. REEVE:  So these are sessions 52578 and 52579,

10  and I would offer them as Defendant's Exhibit K.

11          The next is sessions 52581 and session 52582, and

12  that would be offered as -- it's 52581 and 52582, and that

13  would be Defendant's L.

14          THE COURT:  L.

15          MR. REEVE:  And the next would be session 52686 and

16  on the upper half of the page, just to explain, and we can

17  always redact these later if you want to, I'm not offering the

18  top half.  In other words, sometimes in the line sheets there

19  are two calls.  The part that's evidence here is the bottom

20  half.  We'll discuss whether we should -- I'm not claiming it,

21  okay?  And that would be K -- I'm sorry, M.  I'm going

22  backwards.

23  Q    So that's Defendant's Exhibit J, that's an incoming from

24  Mr. Santos to you, and it says "yo," right?

25  A    Yes.

1    Q    And then the next one is K.  There are two on this, the

2    top one, 52578, same day at 10:51, five minutes later, out

3    from you, "Yo," right?

4    A    Yes.

5    Q    Then the bottom is a minute later, 10:52 a.m., "Are you

6    around," that's from Mr. Santos, right?

7    A    Yes.

8    Q    Okay.  And then the next is again these two are both

9    between you, there's an incoming at the top, this is at 10:56

10   a.m., "Was coming to grab you home," right?

11   A    Yes.

12   Q    And how did you interpret that call?  Isn't what he was

13   really saying there, I was coming to grab the stuff, are you

14   home?  There's not a question mark, but that's -- did you

15   understand it that way?

16   A    That's how I read it, yes.

17   Q    Yes.  Yes.  Okay.  And then the next one is M,

18   Defendant's Exhibit M, and this is just the bottom, Mr. Santos

19   again to you, and this now is 2:58 p.m., it says 1458, but

20   that's 2:58 if we convert it to a.m. and p.m., okay?

21   A    Okay.

22   Q    So that's 2:58 p.m., a little bit later in the day, and

23   he asked you again, "You home," right?

24   A    Okay.

25   Q    Okay.

```
 1              MR. REEVE:  So now I'm going to return these.  Thank
 2    you.  And I'm going to ask that the next two be marked.
 3              For the record, this would be both on Defendant's
 4    Exhibit N, which would be 52688 and 52689.
 5              MR. SILVERMAN:  I'm sorry, just for clarification,
 6    is each message or session a separate exhibit number?
 7              MR. REEVE:  No, the page, if that's okay.
 8              MR. VATTI:  Just give it one exhibit number, that's
 9    fine.
10              MR. REEVE:  Except we've now started down this path.
11    The next series I'll do it that way, that's going to be
12    easier, thank you.
13              And then the next would be O, this would be the top
14    only, 52693.
15    Q    So showing you N.  Now we're still on the same, I think
16    we're on the same day, right?  December 3rd at 3:00 p.m., 1500
17    hours, right?  And that one is outgoing from you and you say
18    in response, "Yeah"?
19    A    Yeah, I'm home.
20    Q    Yes, and the one underneath is only a few seconds later,
21    again right at 3:00 p.m., Santos to you, "Be there."
22    A    Yes.
23    Q    Okay.  So now the next one is a call, and it's session
24    No. 52693 at 3:24 p.m.?
25              MR. REEVE:  Would that be O?
```

```
 1            THE COURT:  P.

 2            MR. REEVE:  P.  You know what?  Time out, time out.

 3  The next one is O, I beg your pardon.

 4  Q    This is --

 5            MR. REEVE:  No, I don't want that, I'm sorry, I am

 6  at the right place.  This is a line sheet.  I'm not offering

 7  it, I'm not offering O at this time as a document.

 8            THE COURT:  Not offering O?

 9            MR. REEVE:  O is now going to become the call that

10  we are going to play now.  Defendant's O is a call on December

11  3rd, 2011, at 3:24 p.m.

12  Q    Just so we have context, this call is just a few minutes

13  after this series of texts.  I know the series start earlier

14  in the day, but now we're up to this, okay?

15  A    If that's the next call, okay.

16            (Defendant's Exhibit O, an audio recording, played.)

17  Q    So there -- could you hear the voices?

18  A    Yes.

19  Q    Can you identify the voices?

20  A    Me and Mr. Santos.

21  Q    Okay.  And he's telling you he's downstairs.

22  A    I didn't even hear that part.

23            MR. REEVE:  Try it again, try it again.

24            (Defendant's Exhibit O, an audio recording,

25  replayed.)
```

1              (Mr. Reeve conferring with Mr. Silverman and Mr.

2    Vatti.)

3    Q    Could you hear that then?

4    A    Yes.

5    Q    He said he was downstairs?

6    A    Yeah.

7    Q    This call is a follow-up of the calls -- in the context

8    of December 2nd calls and Na-Na's product getting up, he's now

9    coming to get the product, right?  Isn't that what you

10   understand here?

11   A    No, you never -- we never said anything about him coming

12   to get drugs, I don't believe, in this session.

13   Q    Okay.  You don't think he came to get drugs?

14   A    He said he's coming to grab that, I believe -- I don't

15   recall --

16   Q    You think it's something else?

17   A    I don't recall.  I don't recall.

18   Q    Okay, that's fair.  All right.  We'll leave it at that

19   right now.

20              And then I want to direct your attention to the

21   next, actually two days later, December 5th.

22              MR. REEVE:  And this -- we're going to go to

23   December 6th, and the first one we're going to do is December

24   6th, 10:20 p.m., session, No. 54239, and this is going to be,

25   we'll mark it as one exhibit which would be Defendant's

```
1    Exhibit P, and it would include 54239, 54372, and 54595, okay?
2    Q    And while those are being marked, do you have a
3    recollection that starting on after Mr. Santos was at your
4    apartment on December 3rd, you then started to have a hard
5    time getting a hold of Mr. Santos?
6    A    Sometime in December, yes.
7    Q    Yes, okay.  And these calls might help you -- I'm sorry,
8    these texts might help you.
9              MR. REEVE:  This would be Q.
10   Q    I'm going to show you what's going to be marked in a
11   moment as Defendant's Exhibit Q.  This is, again, the bottom.
12   Can you see, are you able to see, here the date on this call
13   is December 6 -- I'm sorry, the date on this text is December
14   6th, 2011?
15   A    Yes.
16   Q    Let me just -- it's a little hazy.  I want you to verify
17   so we're on the same date and time, is that right?
18   A    Yes, 12/6.
19   Q    12/6.  And on 12/6, you text Mr. Santos and you say,
20   "Talk to me."  Right?
21   A    Yes.
22   Q    Okay.  And then on the next page of Defendant's Q, and
23   again it's only part of this page, this -- let me back up.
24   The "talk to me" was sent out at 10:20 a.m. on December 6th,
25   okay?  And then the next one is 12/6 at 12:49, about
```

```
 1   two-and-a-half hours later.  This is another outgoing from

 2   you?

 3   A    Okay.

 4   Q    And here you say, "Bro, I need some soon."  Right?

 5   A    Yes, that's what it says.

 6   Q    Now, that refreshes your memory that the product you got

 7   from Na-Na, you didn't have.  You had to ask him for it,

 8   right?

 9   A    No.

10   Q    No?

11   A    That does not recall -- that --

12   Q    Why would you send a text that says, "Bro, I need some

13   soon"?

14   A    One of two things:  Either I'm asking him for some money,

15   like I need some money soon --

16   Q    Okay, that's fair.

17   A    -- or --

18   Q    Or?

19   A    That, well, it would be along the same lines, I need some

20   money to get the drugs.

21   Q    Okay.  Okay.  So then the next one, which is the third

22   page of Defendant's Exhibit Q, again it's the bottom one, same

23   day, 6:43, you sent a text to Brittany Odom and it says,

24   "When you talk to Scooter, tell him call me."  Right?

25   A    That's what that, if that's what that text message said.
```

1   Like you said, the text messages are what they are.

2   Q    Right.  Well, but I want to make sure, because you

3   already told us the one set that I looked at and relied on I

4   shouldn't have, and you corrected me.

5   A    Okay.

6   Q    Can I rely on this one, is that accurate, you wanted to

7   get a hold of him?

8   A    Yes.

9   Q    And here you say, "Tell Scooter to call me," and that's a

10  reference to Mr. Santos?

11  A    Yes.

12  Q    Okay.  And you want to see him because either you're

13  looking for money or you're looking for drugs, right?

14  A    I'm looking for drugs but not from him.  I'm looking for

15  money from him to --

16  Q    Okay.  All right.  So now we're going to move to --

17            MR. REEVE:  And this is Q.

18            THE CLERK:  All one?

19            MR. REEVE:  Yes, all one.

20  Q    To December 7th.

21            MR. REEVE:  The next I'm going to have marked as a

22  package as Defendant's Exhibit R.

23  Q    Showing you the first page of Defendant's Exhibit R, and

24  again it's the bottom, December 7th, 11:06 a.m., outgoing, and

25  you say, "Bro, we need to talk like soon."  Right?

1    A    Yes.

2    Q    Okay.  And that's all of these, I'm representing to you

3    are texts between you and Mr. Santos.

4    A    Me to him, because I don't see a text back yet.

5    Q    Yeah, right.  Right.  Right.  And do you recall that

6    that's because he wasn't texting you back?

7    A    Possibility, yeah.

8    Q    Yeah.  Yeah.  Okay.  And then the second page of

9    Defendant's R is --

10         MR. REEVE:  I beg your pardon, I'm not offering the

11   call, so that's just going to go out.  I'm just doing the

12   texts.

13   Q    I'll represent to you that what I'm not playing is not a

14   call involving Mr. Santos, and we'll leave it at that.  Okay?

15   The next one --

16         MR. REEVE:  Unless you want -- okay.

17   Q    That call, just so we're all clear, that's a call that

18   you made to Brittany Odom.

19   A    Okay.

20   Q    But I'm trying to get through this, so I'm not going to

21   play that.

22   A    All right.

23   Q    I want to make sure we all understand.  Okay.  So then,

24   now, finally, you got a text back from Mr. Santos, December

25   7th, 2011, 6:29 p.m., "Lost phone, just got it back, bro."

1    A    Yeah.

2    Q    If I just stay away from it, it will work.  If I get to

3    it, I'll gum it up.  So he says, "Lost phone just got it

4    back."

5           You sent a text saying, "Bro I need to see you

6    soon," right?  And that's a minute later?

7           MR. SILVERMAN:  It doesn't have the word "soon."

8           MR. REEVE:  I beg your pardon, I misspoke.  I

9    predicted I would read it wrong at one point and I did.

10   Q    "Bro I need to see you."  The word "soon" should not be

11   there, okay?

12          And then the fourth page of Defendant's R, incoming

13   from Mr. Santos again same day, couple minutes later, "Coming

14   in town tonight."  And I'm not claiming the bottom, okay?

15   A    Yeah.

16   Q    Okay.  And then the next page, the fifth page of

17   Defendant's R, the bottom, same day, few minutes later, 6:50,

18   you, outgoing, "Make sure."

19   A    Yeah.

20   Q    Okay.  And then the next one, incoming to you, Mr.

21   Santos, 6:52, "Got you.  I was just there but this Jack was at

22   my mother house grab and headed out."  Do you have any clue

23   what that's about?

24   A    I don't remember that message.

25   Q    Look, other than the fact that you got the text message,

```
1   I'm not going to ask you to interpret that, you got a response
2   from Mr. Santos?
3   A    Yes.
4   Q    Okay?  And then you, outgoing, not -- the same minute,
5   6:52, "Please do."
6   A    Yes.
7   Q    Okay?  And then December 7th, again -- I already did that
8   one, okay.  So let me make sure I showed you all in those
9   series.  I think I did.  There's another one I missed.  Same
10  day, this is now 8:37, outgoing by you to Mr. Santos, "What it
11  look like"?
12  A    Yes.
13  Q    So you haven't heard back from him, and you're texting
14  him and trying to see if you can kind of like smoke him out,
15  where are you, right?
16  A    What you mean, with that text message?
17  Q    The series, you're trying to meet with him and what
18  you're telling us, I accept it, you're trying to get money,
19  right?
20  A    Yeah.
21  Q    And that would be money for drugs you provided, right?
22  A    I believe so, yes, that would be.
23  Q    And we'll get to it later, but is it fair to say that the
24  money you were looking for was what you later referred to as
25  eight racks?
```

1   A     It's a possibility that that, yeah.

2   Q     And eight racks, so when we get there we'll know, is

3   $8,000?

4   A     Yes.

5   Q     And $8,000, going back to this chart, if we're down here

6   and it includes your profit, it would be a little over a

7   hundred grams of heroin, because we know that for the hundred

8   grams, at 70, it would be 7,000 and you're looking for eight.

9   Is that right?

10  A     No, it's not right, because what I'm saying -- well, what

11  we have on that chart is what we did earlier.

12  Q     Okay.

13  A     Yes.  The --

14  Q     Okay, go ahead.  I didn't mean to interrupt you.  I'm

15  sorry.  You keep going.

16  A     I gave Mr. Santos some drugs and he was supposed to give

17  me a certain amount back.  It wasn't -- he wasn't giving me

18  back -- he was giving me back more than what he should have

19  been giving me.  He gave me back more than what he should have

20  all the time.

21        So it's not -- you can't put a gram amount on the

22  8,000 and say this is what you gave him and say -- no, you

23  can't do that.

24  Q     I understand what you're saying.  I think when we get a

25  little bit later, you'll be able to show exactly what you're

1   saying, okay?

2         So now the next day, December 8th, on December 8th,

3   there are four e-mails to you -- I'm sorry, let me start that

4   over again.  There are four text messages all from you.

5         MR. REEVE:  And I'm going to have them marked as

6   Defendant's Exhibit S, and I'm going to give you R when you

7   mark S.

8         May I just have a moment with government counsel?

9         (Mr. Reeve conferring with Mr. Vatti and Mr.

10  Silverman.)

11  Q   I'm going to give you Exhibit Q, but I'm going to

12  represent to you that Exhibit -- what am I giving you?

13  Exhibit R.

14        MR. REEVE:  And Exhibit R is not complete.  I'll

15  make sure all the texts are in there, but I don't want to

16  delay things.  Okay, now I have S.

17  Q   These are December 8th, bottom of the page, 7:20, you to

18  Santos, "I'm on my way to work," right?  Yes?

19  A   Yes.

20  Q   Okay.  And then the next one, again just the bottom of

21  this page, you outgoing same day December 8th, 11:57, "We need

22  to jump on this now," right?

23  A   Yes.

24  Q   We good?  Okay.  And these are texts you're sending from

25  work?

```
1    A    On my way to work.  I was on my way to work.

2    Q    The first one went to work, but now you're at work

3    because it's 11:57.

4    A    Okay.

5    Q    And then the next is, both on this page are, related to

6    Mr. Santos.  The first one is again from you, outgoing, 3:25,

7    "Bro."  That's, you're sending that to Santos.

8              And, you know, when you're doing this in all these

9    text messages like all that day he's not responding, you're

10   saying, "Where are you?"

11   A    Yeah.

12   Q    "What's going on here?"

13   A    (Nodding head.)

14   Q    "You left me hanging," right?

15   A    I don't know if --

16   Q    "What's up?"

17   A    "What's up," yeah.  I don't know if I said you left me

18   hanging, but, "What's going on?"

19   Q    Yes.  Then the bottom one you send out, 22 minutes later,

20   so 24 minutes later, at 3:49, text to Brittany Odom out from

21   you, "You working," right?

22   A    Yes.

23   Q    And then just the bottom of this page --

24             MR. REEVE:  Your Honor, I think, we can clean this

25   up by making these one exhibit and deleting the top parts, I'm
```

```
 1    not offering that.  We'll do it to make it right for the jury.

 2    I'm not claiming parts of these pages, but to get through

 3    this, I'm doing it this way now.  Is that okay with the Court?

 4              THE COURT:  Yes.

 5              MR. REEVE:  Okay, thank you.

 6    Q    Now we're on December 8th, now at 8:17, outgoing, you to

 7    Santos, "Ayo."  I think we all know, when you say "ayo," it's

 8    kind of a different way to say what's up, right?

 9    A    Yeah.

10              MR. REEVE:  May I have a moment with government

11    counsel?

12              (Mr. Reeve conferring with Mr. Vatti and Mr.

13    Silverman.)

14              MR. REEVE:  So the next exhibit which would be

15    Defendant's Exhibit T is a phone call.  It's in Spanish.

16    Q    I'm going to play it for you, and the jury will hear it,

17    but I think it's safe for me to assume that not all of them

18    are Spanish speakers, and then I'm going to ask you to tell us

19    what's on that call.

20              MR. REEVE:  And that would be Defendant's Exhibit T,

21    is that right?

22              THE CLERK:  That's right.

23              MR. REEVE:  For the record, this is a call on

24    December 9th at 1:59 p.m., and it's session No. 56356.

25    Q    Okay?
```

```
 1              (Defendant's Exhibit T, an audio recording, played,

 2    and paused.)

 3    A     Excuse me.

 4    Q     Can you identify the voices?

 5    A     Me and Na-Na.

 6    Q     Okay.  Has this call gotten to a part -- I don't want to

 7    put words in your mouth -- you're explaining that you think

 8    somebody's ripped you off?  Had you heard that yet?

 9    A     No, what I was going to say, how much of the call, how

10    much of the call --

11    Q    I want you to hear where you're saying you think somebody

12    ripped you off.  Did you hear that yet?

13    A     Not yet.

14    Q     We'll continue to play it, and when you hear a part

15    that's talking about that, will you let me know at a point

16    when you're satisfied that you've heard all -- I want you to

17    go past that to make sure you're done with that part of the

18    call.  That's the part I want you to hear and then talk about,

19    okay?

20    A     Okay.

21    Q     Okay, thank you.

22              (Defendant's Exhibit T, an audio recording,

23    continued, and paused.)

24    A     I don't know how much more.

25    Q     Why don't we stop there?  Do you hear, do you reference
```

```
1    the name Nu-Nu on this call?

2    A    Yes, I do.

3    Q    Okay.  And did you hear yourself on this call saying

4    something to the effect of:  Listen, look, somebody did a

5    Nu-Nu on me again?

6    A    Yes, that's how I worded it.

7    Q    Okay.  And then did you hear that Na-Na says, "Tell me."

8         And you say, "Someone did a Nu-Nu on me again."

9    A    Yeah.

10   Q    Right?

11   A    That's a fair way to interpret it.

12   Q    Okay.  And then Na-Na says, "A Nu-Nu?"

13        And you say, "Like Nu-Nu, the guy went running with

14   the money."  Right?

15   A    Yeah.

16   Q    Okay.  And that's, Mr. Santos is not mentioned by name,

17   but that's who you're talking about?

18   A    Yep.

19   Q    And then did you hear, Na-Na says -- let me start that

20   again -- oh, this is Na-Na -- "Oh, and who was it who did

21   that?"  Did you hear that?

22   A    Yeah.

23   Q    Okay.  And your response is, "A dude.  You don't know

24   him."

25   A    Yeah.
```

```
 1   Q    Okay?

 2   A    Yeah, I believe.

 3   Q    Now, you've told us that you took a trip in October with

 4   Mr. Santos to New York?

 5   A    Yes.

 6   Q    Okay.  So that must mean, are you telling Nu-Nu the truth

 7   on this call?  Are you trying to be accurate here?

 8   A    Telling Na-Na.

 9   Q    I'm sorry.  Are you telling Na-Na the truth here?

10   A    On this call?  What I believe?

11   Q    Yes, you're expressing what you honestly believe, this is

12   a straight up --

13   A    Yes.

14   Q    Right?  So when you said that, "A dude you don't know," I

15   take it that means if Mr. Santos went to New York with you, he

16   didn't go up to see Na-Na?

17   A    He --

18            MR. SILVERMAN:  I think we just need to clarify the

19   question.

20            (Mr. Silverman conferring with Mr. Reeve.)

21            MR. REEVE:  I'm sorry, let me clarify that.  I just

22   got a little help.

23   Q    Did you introduce Mr. Santos on the trip to Na-Na?

24   A    No, I don't believe I did.

25   Q    Okay.  Mr. Santos, the guy you've told the jury is your
```

1    partner, he didn't even come upstairs, right?

2    A    No, he didn't.

3    Q    Okay.  And in fact, the guy you claimed was your partner,

4    when he called and the jury heard it and this was earlier on

5    and he asked if he could pick up the stuff now, he couldn't,

6    right?  Do you remember that call and you said, "My shorty is

7    working, too, and I'm at work and no, there's no way you can

8    get it," right?

9    A    Yeah.

10   Q    I'm not going to belabor this too much, but you never --

11   you had the Galan brothers working for you in the building,

12   right?

13   A    Helping me, yes.

14   Q    Okay.  And you never introduced Mr. Santos to the Galan

15   brothers, right?

16   A    No, I did not.

17   Q    Okay.  And the reason you didn't is because he was an

18   outsider from a different neighborhood, right?

19   A    Yes.

20   Q    Okay.  And, you know, that, the other people you've

21   called partners in this case, with respect to your heroin

22   business, Nu-Nu and Quiyon Reid, they had access to your

23   apartment building, right?

24   A    They had access -- they had access to one apartment, yes,

25   or could gain access to one apartment, yes.

1    Q    Okay.  And they gave you -- let's just talk about Nu-Nu.

2    You had a close relationship with Nu-Nu?

3    A    I trusted him.

4    Q    He was your friend?

5    A    Yeah.  You could say yeah.

6    Q    And he ripped you off?

7    A    Yes.

8    Q    But before that, he was -- you were sharing customers,

9    right?

10   A    Yeah.  Yeah.  Yeah.

11   Q    He was making buys for you -- I'm sorry, he was making

12   sales for you, I misspoke again.  Right?

13   A    Yeah.

14   Q    And in fact, with respect to Na-Na, Nu-Nu, your partner,

15   Na-Na knew Nu-Nu very well, didn't he?

16   A    I wouldn't say very well, but he knew who he was.

17   Q    Well, Nu-Nu went down with you to New York to see Na-Na,

18   right?

19   A    Nu-Nu never went with me.

20   Q    Okay.  We already saw Nu-Nu and you and Na-Na on the

21   video in New Haven, right?

22   A    In New Haven, yes.

23   Q    And so you guys would go together, right, on a lot of

24   occasions when Na-Na came up to New Haven, you and Nu-Nu would

25   meet him, just like you did on that video.  That's not the

```
 1    only time that happened?

 2    A    I don't believe that that was the only time that

 3    happened, no.

 4    Q    Okay.  There are other times where you thought, like

 5    there was one day where you thought, you had to be at the

 6    parole office and you weren't going to get back in time and

 7    you asked Nu-Nu, your partner, to meet Na-Na to pick up the

 8    product, do you remember that?

 9    A    Yes.

10    Q    Okay.  It didn't happen because you got out of the parole

11    office quickly enough to get there, but he was your guy,

12    right?

13    A    Until the theft.

14    Q    No, no, no, I understand that.  I'm talking about --

15    let's talk about that just for a minute.  You said to us

16    yesterday that you met Mr. Clark on social occasions, and it

17    was a little bit awkward.  That's not really the extent of the

18    relationship that you maintained after the theft with Nu-Nu,

19    is it?

20    A    Not the social -- we actually, I believe we dealt with

21    each other.

22    Q    Yeah, you hung out together, right?

23    A    Yeah, we did.

24    Q    He was talking, still talking to you about drugs, right?

25    A    Yeah, he was.  Yeah.
```

1    Q    He was trying to get you to buy some stuff from Na-Na,

2    right?

3    A    Yes.

4    Q    You were trying to push him out a little bit.  I mean,

5    the guy had stolen stuff from you, so obviously you weren't

6    welcoming him with open arms into your drug business again,

7    right?  But you had made peace with Nu-Nu and you guys were

8    friends again?

9    A    You could say so, yeah.

10   Q    And there's lots --

11   A    We talked.

12   Q    We could go through it, but the fact of the matter is,

13   would you accept my representation that if you go through

14   these line sheets and you check Mr. Clark's number after the

15   rip, there's a whole lot of calls between you guys?  Is that

16   fair?

17   A    Yes, that is fair.

18   Q    And it's not awkward.  You told the jury it was awkward.

19   I mean, it was awkward in the sense you had in the back of

20   your head, the guy ripped me off, but it was friendly?

21   A    So how, if it's awkward, how is it not awkward?  I had it

22   in the back of my head it was awkward.  It was awkward.  It's

23   not usual.

24   Q    I understand what you're saying, and I accept it.

25   Wouldn't you agree with me that your relationship with Robert

```
 1    Santos was not at all as your relationship with Nu-Nu?  Isn't
 2    that fair?
 3    A    It was in a sense of drug dealing, then it wasn't.  We
 4    weren't as close.
 5    Q    Right, he wasn't your friend, he wasn't from your
 6    neighborhood, he wasn't a trusted associate in the sense you
 7    would welcome him into your apartment, other than for getting
 8    money from him, right?
 9    A    Rephrase it.
10    Q    He wasn't one of your guys.  He was an outside guy.
11    A    He was one of my guys because I was working with him.
12    Q    I understand, but he wasn't the same as all -- he didn't
13    go to the yard, he didn't have anything to do with all that
14    stuff, you guys hanging out there?
15    A    That's where I saw him, in the yard, remember?
16    Q    Okay.  All right.  Well, I think I understand where you
17    are.  So the fact of the matter is here, on this call, you
18    said to Na-Na, "You don't know the guy," and that was true,
19    because he had never met Na-Na?
20    A    Yeah.  Yeah.
21    Q    Okay.  And so now, I want to start moving through calls
22    after that.  We're on the same date now.
23              MR. SILVERMAN:  May I have a minute, your Honor?
24              (Mr. Silverman conferring with Mr. Reeve.)
25    Q    Did you hear the part in this call, I didn't ask you
```

1    about, where you made a reference to something like, "If he's

2    not in jail"?  Did you hear that?

3    A    No, I didn't hear that.

4    Q    Okay.  But as a matter, just, the reality was, at that

5    point, you didn't know where Mr. Santos was?

6    A    Yes, that's fair.

7    Q    And it crossed your mind that he might be in jail?

8    A    Yeah.

9    Q    Okay.  And that's December 8th of 2011, right?  That's

10   the call?

11   A    That's the call.

12   Q    I'll just tell you that was December 8th.

13   A    Yeah.

14   Q    Okay.

15        MR. REEVE:  Now I want to move to session 56458

16   which is going to be the next exhibit which would be

17   Defendant's Exhibit --

18        THE COURT:  U.

19        MR. REEVE:  -- U.

20   Q    Defendant's Exhibit U, we're going to play this call.

21   I'm going to stop it near the beginning once you hear the

22   voices to identify those voices, okay?

23   A    All right.

24        (Defendant's Exhibit U, an audio recording, played,

25   and paused.)

```
 1   Q    Do you know who's on this call?

 2   A    I really, I still don't know who's on the call.

 3   Q    Okay.  Listen a little bit more.  Are you able to hear

 4   what you're talking about?

 5   A    Yeah, I heard what I was talking about; I can't hear the

 6   voices.

 7   Q    When you know who it is, let me know, we'll stop the tape

 8   and then go forward, okay?

 9   A    Yeah.

10        (Defendant's Exhibit U, an audio recording,

11   continued, and paused.)

12   A    I don't remember.  I don't remember who that is.

13   Q    Okay.  You testified earlier about Jeffrey Benton, Fresh?

14   A    Okay, yeah.

15   Q    Does it sound like him?

16   A    I can't --

17   Q    You're not sure?

18   A    I don't want to say yeah, and it's not.

19   Q    So you can't identify the other person, let's leave it at

20   that.  Can you identify the second voice?

21   A    Myself.

22   Q    Okay.  And the other guy that you can't identify, and

23   maybe we could do it through the telephone numbers but we're

24   not going to take the time to do that right now, okay?  You

25   tell him in this call, "I'm a definitely need to holler at you
```

```
1    today, man, I think this nigga ran off on me," right?

2    A    Yes.

3    Q    He asked you who, right?

4    A    Yes.

5    Q    And you say, "Nigga Scooter," right?

6    A    Yeah.  If I had the paper in front of me I would be

7    saying yes a lot faster.

8    Q    Let me just show it to you to refresh your recollection.

9    And I want, but I want to be fair here, this is a line sheet

10   of a phone call, it's not -- it's not a text message so I

11   don't want to represent to you that every single word here is

12   accurate.

13          With that in mind, does that refresh you or help you

14   clarify your understanding of that somewhat difficult call to

15   listen to?

16   A    Yes.

17   Q    Okay.  And having refreshed your recollection, is it fair

18   to say that what we just talked about is what you heard,

19   correct?

20   A    Yeah.  Yeah.

21   Q    Okay.  And then the other guy, you talked with this other

22   guy about hooking up in a few minutes?

23   A    (Nodding head.)

24   Q    That's all I really -- okay.  We're good so far?

25   A    Yeah, we good.
```

1    Q     Okay.

2          MR. REEVE:  The next call is on December 10th at

3    6:18 p.m., session No. -- I beg your pardon, let me withdraw

4    that -- December 11th, 9:29 p.m., call session No. 57590, and

5    I'm going to offer that as the next defendant's exhibit, which

6    would be V.

7          Could you play that, please?

8          (Defendant's Exhibit V, an audio recording, played,

9    and paused.)

10   Q     You heard the part of this call that I wanted you to

11   listen to, right?

12   A     Yeah.

13   Q     And this call, can you identify the other voice?

14   A     Yes.

15   Q     Okay.  Who's that?

16   A     Mellow.

17   Q     Mellow, that's Jerome Moy, right?

18   A     I believe so.

19   Q     You're telling him here --

20         MR. SILVERMAN:  I don't mean to interrupt.  I just

21   want to ask the witness to speak into the microphone.

22         THE WITNESS:  All right.

23   Q     Yes, if you would, please.  I know it's getting toward

24   the end of the day.

25         MR. REEVE:  I want to tell you, the jury, and the

```
 1   Judge that I'm going to really try to finish today.  I might

 2   run a few minutes after 5:00, if it's possible and convenient,

 3   I would really like to finish today.  So let's see how we go.

 4   Q    Okay, that's Jerome Moy, right?

 5   A    (Nodding head.)

 6   Q    You tell Mr. Moy that, "This nigga just ran off with six

 7   big ones," right?

 8   A    Yes.

 9   Q    This is where I think you were explaining earlier in

10   terms of the money, because you then, you identify "nigga

11   Scooter, man," and then you say, "It wasn't even six, it was

12   eight to tell the truth, but basically two of them was my

13   profit," right?

14   A    Yeah.

15   Q    Okay.  So now let's just deconstruct that.  You know, all

16   that stuff about you only expected what you were giving Mr.

17   Santos, you gave him a price, he was a customer, and what you

18   expected was you were going to get the cost of what you gave

19   him plus your profit from the drugs that you gave him, isn't

20   that what you're saying here?

21   A    I don't know if that's what I'm saying.  I know that I

22   said 6,000 and six and two profit.

23   Q    Right.

24   A    The profit could have been meaning that I only -- I

25   already dealt with Na-Na, gave him the money that I had and
```

1  now the six and eight, all right, maybe the debt was only

2  6,000 now and if I gave Na-Na the 6,000 now, I don't have to

3  give him that 2,000, that 2,000 could be my profit as far as

4  not excluding --

5  Q    I got you.

6  A    You got me now?

7  Q    I got you.  It doesn't matter to me.  What you're saying

8  in this conversation is, you know, he took $6,000 and that's

9  $6,000 of product you're saying there, right?  You're not

10 saying that, but that's what we're talking about?

11 A    Yeah, we're talking about product.

12 Q    It's really like $8,000 of profit but exactly what that

13 profit word meant, it's not clear, and we don't have to

14 clarify it, okay?

15 A    All right, okay.

16 Q    We're good?

17 A    We good.

18 Q    Now we've done that.

19          MR. REEVE:  And then I want to go to a text on

20 December 12th, 3:19 p.m., 58023, and that would be Defendant's

21 Exhibit W?

22          THE COURT:  Yes.

23          THE CLERK:  Yes.

24 Q    This is going to be Defendant's Exhibit W.  Do you want

25 to get up and stretch your legs?

```
 1   A     If I could.

 2   Q     I think the Court would allow you to do that, if you

 3   could.

 4              All right?

 5   A     Yeah.

 6   Q     Little better?

 7   A     Thank you, yeah.

 8   Q     Okay.  Now, on this, you say, at the top here, this is an

 9   outgoing, 12/12, 3:19 p.m., "Bro nigga," this is to Robert --

10   "Bro nigga, just laid my family down."

11   A     Yes, that's what I said.  That's my text.

12   Q     That's what you text.

13   A     Yeah.

14   Q     There's no truth to that.  Sounds to me like -- what are

15   you doing here?  What's up here?  What's going on?  Tell us.

16   A     I just sent him a text, letting him know that somebody

17   robbed my family, my source.

18   Q     I'm sorry, I didn't hear you.  Somebody robbed your

19   family?

20   A     Yeah.

21   Q     Okay.  This isn't -- you're not saying Robert Santos --

22   A     No.

23   Q     I don't get, why are you sending him this text.  You

24   haven't heard from this guy now for about ten days, you think

25   he stiffed you, and you're sending him an outgoing text that
```

1    says, "Bro, someone" --

2              MR. REEVE:  Wait a minute, I'll withdraw it, I'll

3    withdraw it, strike all that.  We'll start over again.

4    Q    Just tell -- can you give us a quick answer on, why did

5    you send that text on this date, which is now whatever day,

6    December 12th.  December 12th, why did you send it?

7    A    To make him aware that, to make him aware of what was

8    happening.

9    Q    Okay.  All right.

10             MR. REEVE:  And now before we move on, I want to

11   enter into the record a stipulation -- oh, wait a minute, and

12   I forgot, and we're going to put that in the chronology, so

13   let's do this:

14   Q    I put, while we were listening to the tape, I tried to

15   put, and this should be ignored, but I put down December 2/11,

16   plus or minus.  Based on these calls, isn't that around the

17   time that Mr. Santos stopped communicating with you and he was

18   holding the six or eight, however we want to talk about the

19   value of that, and not returning your calls?  Right?

20             MR. SILVERMAN:  Objection.  I think we just need to

21   be careful here.  I don't want to mischaracterize the

22   testimony, and I don't know the question you mean to ask.

23   There were a number of text messages exchanged December 7th.

24             MR. REEVE:  Let me rephrase it.

25   Q    From December 2nd on, you hadn't received the cash that

```
 1   you expected to receive from Mr. Santos?

 2           MR. REEVE:  Thank you.

 3   A    Plus or minus.  I like the way it looks up there with the

 4   plus or minus.

 5   Q    About that.

 6   A    Yeah.

 7   Q    Around then, right?

 8   A    Yes.

 9   Q    I'm just going to put, what's a good phrase, what would

10   you say, like, if I put "RS, no payment"?  Would that be okay?

11   A    RS.

12   Q    Give me your words.

13   A    You could say RS, that would be Robert Santos, right?

14   Q    Yes.

15   A    Robert Santos, RS -- what are you trying to say?  "No

16   payment," yeah.  "No payment," you can put that.

17   Q    Put "RS, no payment."  And then when you sent that text

18   on December 12th, something did happen on December 12th,

19   didn't it?  And I forgot.  But if I -- could I refresh your

20   recollection by saying, that's when you heard that Amaury that

21   date had been robbed at gunpoint of a kilo of, I think it was

22   cocaine, right?

23   A    Yes.

24   Q    Okay.  And you told us that story about -- story is not,

25   I'm not implying anything.  It was real that Amaury's wife had
```

1   a heart attack because of the stress?  Wasn't there stuff

2   about that or am I mistaken?  It doesn't matter.  It's okay.

3            Anyway, that's the date of the Santana robbery,

4   December 12th, and that's why you sent this text, right?

5   A    I believe it was, yeah, I think it was.  Could have been

6   the same, give or take that day.

7   Q    Now I'll put down, I didn't mean to interrupt you, sir,

8   and I'm sorry, December 12th, 2011, Santana robbery, okay?

9   A    Okay.  I'm following.

10            MR. REEVE:  Now, having said that, I want to enter

11   into the record orally, and it's going to be supplemented

12   later, a stipulation of the parties, and the parties are

13   stipulating in this case that Robert Santos was in the custody

14   of the Department of Corrections from December 12th, 2011, to

15   January 6th, 2013.

16            MR. SILVERMAN:  '12.  2012.

17            MR. REEVE:  Thank you.  What I meant to say was:

18   January 6th, 2012.  So let me just say it again.  December

19   12th, 2011, January 6th, 2012.

20            The Court is going to be giving you instructions

21   about, for what purposes you can consider that evidence, okay?

22   But that right now, that's the stipulation that we've agreed

23   to, as a matter of fact, all right?

24            Now let me move on.

25   Q    Now we're on the same date, December 12th.  By the way,

1    you don't know, December 12th, that he's in jail?

2    A    No, I do not know.

3    Q    And you don't know, as far as you knew, he might have

4    been in jail at some point in this ten-day period between

5    December 2nd and December 12th, but you didn't know?

6    A    I don't know.

7    Q    And later on, and we already heard that call where the

8    guy identified himself as Mr. Santos's brother, you don't know

9    whether he is his brother or he isn't his brother, was

10   December 24th and he told you Mr. Santos -- he didn't say Mr.,

11   I'm saying Mr. -- to summarize it, he said:  Robert's in jail,

12   it's all a big misunderstanding and he wants to see you when

13   he gets out and he'll be out soon, right?

14   A    That's what I understood from the call.

15   Q    And that's in evidence, it was offered.  I don't know the

16   exhibit number right now, forgive me, but let's move on.

17   Okay.

18            So I'm going to put down here another event on

19   December 12th, and then, which is "RS in custody," okay?

20   A    Okay.

21   Q    All right.  Something you didn't know, but which we're

22   agreeing as a matter of fact.  That's just reality, that's the

23   way it is.

24            MR. REEVE:  All right, now let's go to No. 58384 on

25   December 12th, it's at 10:59 but I don't want to -- I might

```
 1    have converted that time so I'm not sure.  Is that right?
 2    It's 10:59 p.m.  Easier for me to think about times in regular
 3    than military, so I convert sometimes military.  So now we're
 4    going to listen to that call.  This would be Defendant's
 5    Exhibit X?
 6              THE CLERK:  X.
 7              (Defendant's Exhibit X, an audio recording, played,
 8    and paused.)
 9    Q    Do you know who's talking here?  You and who else?
10    A    I don't know.
11    Q    Don't know?  No problem.  You identified your voice
12    though?
13    A    Yeah, that's my voice.
14              (Defendant's Exhibit X, an audio recording,
15    continued, and paused.)
16    Q    We're going to pause this call and try to get to the
17    relevant part, because I don't want to take the time.  There's
18    a relevant part of the call that I want you to listen to,
19    okay?
20              MR. REEVE:  I don't think I have any other text
21    messages, if I can just keep going.
22              THE COURT:  It's almost 5:00 o'clock, so don't go
23    too long.
24              MR. REEVE:  I don't have a lot.  I know lawyers
25    sometimes say that and it's not true, but we're almost there.
```

```
 1            Are you at the spot now, 2:43?
 2  Q    Just while he's finding that, part of this conversation
 3  is you're talking to this other guy about the Santana robbery.
 4  A    Okay.
 5            (Defendant's Exhibit X, an audio recording,
 6  continued, and paused.)
 7  Q    That's the part about Scooter, right?  And what you say
 8  there is, "Nigga Scooter ran off with a rack," or something
 9  like, and then you say "15."
10  A    Um hum.
11  Q    Based on the other calls, we know this isn't really
12  accurate, you're telling him that but it understates by a
13  whole lot what really happened, right?
14  A    Yes.
15  Q    Okay.  All right.  Another example of how we can't rely
16  on what you say on the calls, because you have mixed motives
17  sometimes for saying stuff on the telephone, right?
18  A    To different people, yes.
19  Q    Okay.  I'm not going to ask you what your reason is, it
20  doesn't matter, okay.
21            MR. REEVE:  Now it's December 13th, session No.
22  58758.  Would that be Defendant's Exhibit Y?
23            THE COURT:  Yes.
24            MR. REEVE:  Y.  3:58 p.m., December 13.
25  Q    Tell us if you can identify the voice.
```

```
 1              (Defendant's Exhibit Y, an audio recording, played,
 2    and paused.)
 3    Q    Do you recognize the voice?
 4    A    I recognize my voice.
 5    Q    You don't know the other guy?
 6    A    No, I can't recognize.
 7    Q    You're telling him there that you wanted to get a message
 8    to Scooter, right?
 9    A    Yes.
10    Q    Okay.
11    A    Excuse me.
12    Q    No, go ahead.
13    A    What day is this call?
14    Q    I'm sorry, let me -- December 13th, just before 4:00
15    p.m., the afternoon of December 15, okay?
16              MR. SILVERMAN:  13.
17              MR. REEVE:  I'm sorry, December 13th, 2011, my
18    apology.
19    Q    Okay, does that help you?
20    A    Yeah.
21    Q    In any event, you're saying here to some guy you want him
22    to get a message to Scooter, right?
23    A    Yes.
24    Q    And to be fair, you're not -- message really means
25    message here.  Sometimes message means something different in
```

```
1    a call, right?

2    A    It could, if you using code.

3    Q    But here, you really meant you wanted this guy, if you

4    found Santos, to give him an oral, verbal message, right?

5    A    Yeah.

6    Q    All right.  Okay.  And then now I want to show you -- I'm

7    going to show you -- I can't show you on the screen, but I'm

8    going to offer Defendant's Exhibit Z, which is a text from you

9    on December 17th at 10:51 a.m., and it's 60723.

10            I'm going to show you Defendant's Exhibit Z, and

11   it's the message on the top.  You can see the date December

12   17th, 10:51.  If I said something different this controls.

13            And just tell us what you say there, and first of

14   all who is it to?

15   A    Mr. Santos.

16   Q    What does it say?

17   A    "So you Nu-Nu now."

18   Q    And what you're saying there -- you tell us.  I think we

19   all know, but help us here.  What are you saying?

20   A    Basically, you're not going to return the money.  You

21   doing what Nu-Nu did.

22   Q    The reference to Nu-Nu -- I don't want to get stuck

23   here -- you know that he knows Nu-Nu, so now you're saying to

24   him, "So you Nu-Nu now," right?

25   A    Um hum.
```

```
1   Q    Because now you concluded this is a theft, in your mind

2   right now, you're convinced, right?

3   A    Yes.

4   Q    No more looking, maybe he's in jail, maybe he's not going

5   to do this, maybe all this stuff.  In your head, he's Nu-Nu?

6   A    I'm sorry, what date was that again?

7   Q    That is December 17th.

8   A    17th?

9   Q    2011, at 10:51 a.m.

10  A    Yes.

11  Q    Okay.

12          MR. REEVE:  I'm going to offer -- I'm going to skip

13  that one.  Okay.

14  Q    I'm going to get to a call.  Now, here's a call.  This

15  is, I want to time frame it for you, December 24.  You get the

16  call from the guy who identified himself as Scoot's little

17  brother.  Remember --

18  A    December 24th, yes.

19  Q    That's December 24th.  This call, that's the day before

20  Christmas, right?

21  A    Yeah.

22  Q    Yeah.  And this call is on December 26th, okay?  Two days

23  later.  Now, let's put this in context.  You told the jury

24  that after the December 24th call from the person who

25  identified himself as Scoot's little brother, you found out he
```

```
1    was in jail, you found out he was in jail and you were

2    satisfied.  Now it turns out he's not Nu-Nu, isn't that what

3    you're thinking after that call on December 24th?

4    A    Yeah.

5    Q    Okay.

6              MR. REEVE:  So let's play this one, this is December

7    26, 4:41 p.m., and the number is 65020.  And again I'm going

8    to play a section of this.

9    Q    And this is the last call I'm going to ask you to listen

10   to, okay?

11   A    All right.

12             MR. SILVERMAN:  What exhibit is this?

13             MR. REEVE:  This is Defendant's AA.

14             THE CLERK:  AA.

15             (Defendant's Exhibit AA, an audio recording, played,

16   and paused.)

17   Q    Who's Duke?  Is that Nu-Nu?  At the very end, he said, "I

18   saw Duke last night."  Who's Duke?

19   A    Duke is, if he said he saw Duke, Duke, I refer to Nu-Nu

20   as Duke also.

21   Q    Right.

22   A    But some people -- all right.

23   Q    It's okay.

24   A    All right.

25   Q    They're different nicknames for the same guy?  Yeah?
```

```
 1   A     Yeah.

 2   Q     You're socializing, you're seeing Duke, or Nu-Nu.  It's

 3   December 26th, the day after Christmas.  Do you know who's on

 4   this call?

 5   A     Yes.

 6   Q     Who?

 7   A     Webay and myself.

 8   Q     Webay, Webay's name has come up before.  Do you remember

 9   in the context that Webay's name came up?

10   A     No, I don't recall.

11   Q     You know Webay as a guy who's a gun guy, don't you?

12   A     Yeah.

13   Q     Yeah.  Yeah.  And tell us why you were talking about

14   Scoot on December 26th when you told the jury that on December

15   24th, you were happy, everything was resolved, you didn't have

16   any concerns about Scoot.  What is going on here?

17   A     I said I can't wait for him to come home.

18   Q     Right.

19   A     Because I would -- I'm happy, I can't wait for him to

20   come home.  I'm happy that he's coming home.

21   Q     Are you telling us -- you're the guy, you're the guy who

22   told us yesterday that you shot, I don't know how many times,

23   at five different people, right?

24   A     Yes.

25   Q     You're the guy who talked about all the guns that were
```

```
1   available to you all over, right?

2   A    Yes.

3   Q    You're the guy who told us about and identified the gun

4   that was in your apartment, "That's my gun," you're that guy,

5   right?

6   A    Yes.

7   Q    And you're the guy who now is talking to a guy who you

8   know is a shooter, you know it?

9   A    I didn't say that.

10  Q    Okay.  But you're so satisfied, you're so happy to see

11  Robert, are you telling us that you had, like, a Christmas

12  present under the tree for Robert Santos?

13            MR. SILVERMAN:  Your Honor, may I have a moment to

14  confer with defense counsel?

15            THE COURT:  Yes.

16            (Mr. Silverman conferring with Mr. Reeve.)

17  Q    Is that what you're saying?  Maybe it is.

18            MR. SILVERMAN:  Your Honor, I have to object to that

19  question.  Christmas present under the tree --

20            MR. REEVE:  I withdraw it, I withdraw it, I withdraw

21  it.  It's okay.

22  Q    The call speaks for itself, but the guy you're talking

23  to, this guy Webay, how did you interpret that laugh?  Was

24  that gee, he's agreeing?  Or was that something else, in your

25  head, your interpretation, having heard that?
```

1  A   Laugh, how me and him interact with each other, we laugh

2  all the time like that.

3  Q   Let me ask you this:  Is it a coincidence after you talk

4  about Scoot and you're happy, you're going to be happy to see

5  him, that you then talk about all the troubles you have and

6  there's going to be big troubles?

7  A   Can I --

8  Q   Yeah.

9          MR. SILVERMAN:  I think that mischaracterizes the

10  call.  I don't think that's an accurate characterization.

11          MR. REEVE:  I withdraw my characterization.

12  Q   You tell me about this call.

13  A   You stopped just -- because it would help me out, you

14  stopped writing down -- no, I'm not talking about the call.

15  You stopped writing down dates, which would really help me

16  out.

17  Q   Oh, okay, good.  What date did you want up here?  That's

18  a good idea.  Believe me, in a few minutes we'll be done.

19          MR. REEVE:  If I could finish, your Honor.  I just

20  ask leave of the Court for two more minutes.

21          THE COURT:  I'll time you, Mr. Reeve.

22          MR. REEVE:  Good, you should hold me to that.

23  Q   Okay.  I can't laugh because I only got two minutes.

24  What dates do you want?

25  A   I don't know, the dates, 12/17, 12/24 I found out.

```
 1    Q     Okay.  The 24th --

 2    A     I find out.

 3    Q     Little Scoot's bro, okay?

 4    A     Yeah.

 5    Q     Whoever that guy is.  Now we're at December 26th, okay?

 6    A     Yeah.

 7    Q     And this is the call with Webay.

 8    A     Yeah.

 9    Q     Does that help you?

10    A     A little bit.  I found out that he was in jail, so now

11    I'm excited --

12    Q     That's when you found out he was in jail, that's a

13    government exhibit.  Keep going.

14    A     Now, I don't believe he's trying to rob me anymore or

15    theft anymore, so there's no need for me to have any animosity

16    towards him.

17    Q     Okay.  What you're telling us, and there might be

18    conversation at the end, and in two minutes that I committed

19    to I can't play it, but the government will give you an

20    opportunity to listen to the whole call and I don't want to be

21    unfair to you in any way, but in this call, you're talking to

22    Webay about being glad to see Mr. Santos, and what you're

23    telling us is you really were legitimately looking forward to

24    seeing Mr. Santos?  Is that what you're saying?

25    A     Yes, because --
```

```
1   Q    Okay.

2   A    Because of the points we already made.

3   Q    Keep going.  Thirty seconds left.

4   A    Because the points that we already made.

5   Q    Okay.  All right.  Because you thought that Mr. Santos

6   was going to come see you and square things up, right?

7   A    Yes.

8   Q    But you have no idea whether the guy who said he was

9   Scoot's little brother was really telling you the truth or if

10  it was just to get you away from fears that whatever was in

11  his head, okay?  We don't know, right?

12  A    I don't know.  I just knew, I know what I was told.

13  Q    Okay.  All right.  Thank you.

14            MR. REEVE:  I went over the two minutes by 30

15  seconds.  I apologize.  I am done.

16            THE COURT:  Okay.

17            Ladies and gentlemen, we'll obviously stop for the

18  evening.  I ask you please not to discuss the case with

19  anyone.  We'll resume tomorrow morning I think --

20            MR. REEVE:  Your Honor, can I take back my comment

21  and just, my comment that I was done?  I forgot one thing,

22  it's a Colombo moment.  If you'll give me a Colombo moment.

23  Q    You said in all your proffer agreements, you have

24  consistently identified Mr. Santos in trial here as your

25  partner, right?  Right?
```

```
 1   A    Yeah.

 2   Q    Okay.  And through the proffer sessions, you were

 3   consistent all up until the very last proffer session, right?

 4   Do you remember?

 5   A    I don't have the reports.

 6   Q    Okay.  10/11, do you recall -- let me ask first a

 7   preliminary question.  Do you recall telling the government at

 8   the last proffer session --

 9        MR. SILVERMAN:  Your Honor, I'm going to object.  I

10   think I know where this is going.

11        THE COURT:  We'll continue tomorrow.  I understand

12   that you asked we begin the trial at 9:00, I'm happy to

13   accommodate you.

14        MR. SILVERMAN:  Your Honor, I just wanted to clarify

15   that we're starting at 9:00 a.m. tomorrow.

16        THE COURT:  I hope so.  Is that going to be a

17   problem?  I thought I heard somebody mention 9:30.

18        JURORS:  9:30.

19        THE COURT:  Do you want 9:30 instead of 9:00?  I

20   thought you requested 9:00 o'clock.  No?

21        MR. REEVE:  9:30, it sounds like, your Honor.

22        THE COURT:  I guess so.

23        (5:13 o'clock p.m., in the absence of the jury.)

24        THE COURT:  Gentlemen, can we have some kind of

25   prediction about how long this trial's going to be?
```

1            MR. REEVE:  I should confer with co-counsel for one

2     moment, your Honor.  Could I do that?

3            I think that the cross examinations will be done

4     sometime around noon tomorrow.

5            THE COURT:  Is that the last?

6            MR. SILVERMAN:  No, your Honor.

7            MR. REEVE:  The government has one they described as

8     approximately a 20-minute witness -- I'll let them speak for

9     themselves.

10           MR. SILVERMAN:  Your Honor, I would expect a

11    relatively brief redirect examination of this witness, and the

12    government will enter into a stipulation I think which will

13    take care of one of two remaining witnesses, and then we'll

14    have the second of those two remaining witnesses here for what

15    I think will be half an hour at the most.

16           THE COURT:  I don't think we can go to deliberations

17    tomorrow under those circumstances, do you?

18           MR. SILVERMAN:  No, your Honor.  I think the real

19    question is whether we can do the closings tomorrow with the

20    charge on Monday, or whether we can't even do that.  I think

21    we'll have to see where we are at the time we finish the

22    evidence.

23           MR. REEVE:  I agree, Judge.  I think -- let's see

24    where we are at that point.  I'm still pushing for Monday

25    because I think it would just allow for --

```
 1              THE COURT:  Pushing for Monday for what?  Final
 2    argument?
 3              MR. REEVE:  Yes.  Because I think it's going to
 4    allow more orderly presentation, and frankly it will give us a
 5    little more time and I think it will have the beneficial
 6    effect of reducing the time for closing arguments.
 7              THE COURT:  Can I gather from what you are saying
 8    there's not going to be a defense case?
 9              MR. REEVE:  I think that's correct.
10              MR. ROGAN:  At this point, that's a fair
11    characterization.
12              THE COURT:  Okay.  We'll be finished with the
13    government's case tomorrow, hopefully.
14              MR. ROGAN:  Around noon.
15              MR. REEVE:  We might be finished by 1:00 or go a
16    little into the afternoon.
17              THE COURT:  In that case, we will have to defer
18    closing arguments and charge until Monday.
19              MR. VATTI:  I'll be honest with you, Judge, I think
20    this jury is about to riot.
21              THE COURT:  I think so, too.
22              MR. VATTI:  I would strongly suggest that if we're
23    done with the cross-examination of Mr. Wilson at noon, that
24    everybody be prepared tomorrow to do their closings.  I don't
25    think this jury's going to look very kindly on anyone in this
```

1  courtroom if we push the closing arguments until Monday.

2        THE COURT:  Well, I certainly don't want to cause

3  any problems with the jury.  We don't want them to be an

4  unhappy group.

5        MR. VATTI:  There is going to be a riot in this

6  courtroom if we're done with evidence at 1:00 o'clock and tell

7  them to go home.

8        MR. SILVERMAN:  We've had so many half days in this

9  trial, short days, ending early and starting late.  If we cut

10 them early tomorrow when we're approaching the end tomorrow,

11 they're going to be an unhappy group.

12       It is the government's position we should proceed

13 apace, and if it looks like there are still several hours, we

14 should go right into closings.

15       THE COURT:  We will not be able to get into the

16 charge tomorrow, correct?

17       MR. SILVERMAN:  I agree with that.

18       MR. VATTI:  Your Honor, I feel really compelled to

19 say I don't want to interfere with anyone's ability to

20 cross-examine, but people really need to be aware with what's

21 going on with the audience right now, they're sending a clear

22 signal that they're getting fed up, and we need to move this

23 case along.

24       MR. MORAGHAN:  I think it will move well tomorrow.

25       THE COURT:  Okay, I hope so.  I hope so.

1        MR. SILVERMAN:  The question I have for the Court

2   before we lose our court reporter is whether we intend to

3   proceed with at least a preliminary charge conference this

4   evening.

5        THE COURT:  Well, I had planned to do that.  I don't

6   know whether you were.

7        MR. SILVERMAN:  I think that makes good sense.

8        MR. REEVE:  Here's what I would suggest:  That we do

9   it, government counsel -- I filed a number of requests,

10  government counsel indicated where they would be in agreement,

11  at least we could cover that which would then give me an

12  opportunity to know whether there are any other issues that I

13  need to consider, and we could wrap that up tomorrow.  If that

14  makes sense to the Court, I think we could do that.

15       THE COURT:  Go into chambers right now?

16       MR. REEVE:  Yes, that would be great.

17       MR. SILVERMAN:  Thank you, your Honor.

18       (5:18 o'clock p.m.)

19

20   <u>INDEX OF WITNESSES</u>                    PAGE
     KEVIN WILSON
21       Cross-Examination by Mr. Reeve            1110

22       <u>COURT REPORTER'S TRANSCRIPT CERTIFICATE</u>
         I hereby certify that the within
23   and foregoing is a true and correct
     transcript taken from the proceedings
24   in the above-entitled matter.

25                    <u>/s/ Thea Finkelstein</u>
                      Official Court Reporter
     Dated: _____