1              UNITED STATES DISTRICT COURT
                 DISTRICT OF CONNECTICUT
2
   * * * * * * * * * * * * * x   Criminal Case
3                                  No. 3:12CR104(EBB)
   UNITED STATES OF AMERICA,    :
4              Plaintiff
                                :
5          vs.                    January 31, 2014
                                : 10:01 O'clock a.m.
6  RICHARD ANDERSON, PHILIP
   BRYANT, ROBERT SANTOS,       :
7              Defendants        New Haven, Connecticut
                                :
8  * * * * * * * * * * * * * x

9                   NINTH DAY OF TRIAL

10      BEFORE THE HONORABLE ELLEN BREE BURNS
           SENIOR UNITED STATES DISTRICT JUDGE
11                AND A JURY OF FIFTEEN

12 Appearances:
     For the Plaintiff:          S. DAVE VATTI, ESQ.
13                               MARC HARRIS SILVERMAN
                                 Assistant U.S. Attorneys
14                               157 Church Street
                                 New Haven, CT 06510
15
     For the Defendant:          NEAL PATRICK ROGAN, ESQ.
16   Richard Anderson            315 Post Road West
                                 Westport, CT 06880
17
     For the Defendant:          DAVID A. MORAGHAN, ESQ.
18   Philip Bryant               Smith, Keefe, Moraghan & Waterfall
                                 32 City Hall Center, Suite C
19                               PO Box 1146
                                 Torrington, CT 06790
20
     For the Defendant:          RICHARD A. REEVE, ESQ.
21   Robert Santos               ANAND BALAKRISHNAN, ESQ.
                                 Sheehan & Reeve
22                               139 Orange Street, Suite 301
                                 New Haven, CT 06510
23
     Court Reporter:             Thea Finkelstein RMR, CRR
24                               TheaFinkelstein@aol.com

25 Proceedings recorded by mechanical stenography, transcript
   produced by computer.

```
 1                    (In the absence of the jury.)

 2               THE COURT:  Good morning.

 3               MR. SILVERMAN:  Good morning, your Honor.

 4               MR. REEVE:  Good morning, your Honor.

 5               MR. MORAGHAN:  Good morning, your Honor.

 6               MR. VATTI:  Good morning, your Honor.

 7               THE COURT:  You may be seated.

 8               Where are we gentlemen?  This is the last witness,

 9    is that correct?

10               MR. SILVERMAN:  No, your Honor.

11               THE COURT:  It's not?  Two short witnesses?  What's

12    the day going to be?

13               MR. SILVERMAN:  When Mr. Reeve finishes his cross,

14    which I expect is going to be very brief, Attorney Moraghan

15    and Attorney Rogan have their cross examinations of this

16    witness.  Depending where we are, there may be some redirect

17    and some recross, I don't know.

18               THE COURT:  Yes.

19               MR. SILVERMAN:  After this witness is finished, we

20    have a stipulation that I'll read into the record which

21    eliminates one witness the government was going to call, and I

22    have one other very short witness before the government will

23    rest.  We're probably looking at 30 minutes tops on the stand.

24    At that point, the government's prepared to rest its case.

25               THE COURT:  And I understand there's not going to be
```

```
 1    a defense case, is that correct?
 2         MR. REEVE:  Your Honor, I believe that is correct.
 3    We've all discussed that.  There will not be a defense case.
 4         I do just want to state that we -- first of all,
 5    Judge, my cross, Attorney Silverman's correct, it's going to
 6    be three or four minutes.  I'm going to cover two areas and
 7    when I'm done, depending on the answers, Attorney Silverman is
 8    going to stand up and stipulate to certain things.  That's to
 9    avoid calling Agent Ndrenika back to complete impeachment,
10    okay?  So then I'll be done.
11         But, you know, my sense is, Judge, I tried to rush
12    yesterday, I think you know I rushed through those calls.  And
13    I did it for intentional reason, not because I felt pressure
14    from the Court or anything else, but I wanted to get that
15    whole story out in one piece.
16         But I am very concerned, frankly, that there's the
17    sense that attorneys Rogan and Moraghan need to rush so we can
18    get to closing argument.  I want the record to be clear, all
19    three of us are very strongly opposed to doing closing
20    arguments this afternoon.  We don't have to talk about it
21    more, I don't want to take up jury time, but I would urge the
22    Court not to tell the jury that they're going to hear closing
23    arguments because I don't believe we're going to get there.
24         I think the cross-examination and the redirect and
25    recross are going to take us into the afternoon, and we can't
```

1    start closing arguments at 2:30 or 3:00 on a Friday afternoon.

2    It just does not make sense.

3           I know your Honor hasn't decided that, but I just

4    wanted to alert the Court.  My suggestion would be, I think

5    what the jury's really concerned about, I mean, we all know

6    that there's not a defense case, but they're sitting there

7    thinking, oh my gosh, this is just the government's case,

8    we're going to be here until mid February.

9           I think we can reassure them by telling them that

10   they're going to get the case on Monday so they know that.  I

11   think that will give them -- they want an end line and if they

12   could have that end line, then I think there will be a bit of

13   comfort for them because they can see what we all know but

14   they don't right now.  That's just a thought.

15          MR. MORAGHAN:  I do join in Mr. Reeve's argument,

16   your Honor.  It just makes more sense to have the argument and

17   charge on Monday.  As long as the jury knows that this case is

18   rapidly coming to an end, they will be comfortable.

19          But again, if they think three lawyers, a week each,

20   I understand why they would be upset.

21          MR. ROGAN:  Your Honor, I join in as well.  I have a

22   particular concern, that I'm going to be cross-examining

23   Mr. Wilson today, and defense has agreed that we will just go

24   in order, alphabetical order, as to closing argument so that

25   means for Mr. Anderson, I go first, and I'm not going to have

1    any reasonable time even to re-collect my thoughts after

2    finishing up with him, and then be asked to go right into

3    closing arguments.  I feel strongly that I don't want to be

4    rushed in my cross-examination.

5              I'm going to remind the jury, unless the Court

6    objects otherwise, I think this will allay some of their

7    concerns, is that Mr. Reeve necessarily, based upon the

8    division of labor between the three individual defendants, I

9    think what their main concern might be, gosh, is Mr. Rogan or

10   Mr. Moraghan's cross-examination going to be as long as Mr.

11   Reeve's, and I'm going to tell them that unless the government

12   objects, just so they know that my focus is going to be a

13   particular area.

14             I just think, as a matter of fairness to Mr.

15   Anderson, I think it would be better to defer the closing

16   arguments until Monday.  I know the government objects, I

17   understand why they object, but I think for continuity

18   purposes, for instance, if I'm to go first after the

19   government, that basically puts my client at a disadvantage,

20   if we were to do closing arguments, if we didn't get to Mr.

21   Reeve or Mr. Moraghan, because they'll have the entire weekend

22   to forget about what I had to say; whereas the government has

23   the opportunity to re-rise on Monday morning to do their

24   rebuttal.  And that really places Richard Anderson at a

25   distinct disadvantage, your Honor.

 1           MR. SILVERMAN:  I'll be very, very brief.  I think

 2    we should evaluate where we are when evidence concludes today.

 3    If there are a number of hours left in the trial day, I don't

 4    think it would be appropriate to send this jury home.  They've

 5    had a number of half days, late starts.  I think that

 6    frustration must be mounting.

 7           If we don't have a lot of time left and we're not

 8    going to be able to get through all the closings, then I think

 9    it makes sense to adjourn for the day.  I don't think this is

10    a conclusion that the Court needs to reach right now.  I don't

11    think the Court needs to say anything about it right now.  I

12    think we should get started.

13           MR. REEVE:  I agree.  One final thing, your Honor

14    will recall that Attorney Balakrishnan was here to aid me

15    yesterday, it was tremendous help to me.  I would have gotten

16    lost.  I've offered his services to co-counsel so their

17    examinations can move.  It's difficult for us to go through

18    all these tapes.

19           THE COURT:  Yes.

20           MR. REEVE:  It's not easy.  But he, with the Court's

21    permission, he will be here to help them.  I don't want to --

22    if you want me to just address it to say that, I can; or if

23    your Honor would just say, Attorney Balakrishnan will be here

24    to help the other lawyers.

25           THE COURT:  I don't think they'll even notice, to

 1   tell you the truth.

 2            MR. REEVE:  Okay.  I'll tell them, that's fine.

 3            Are we ready to go?

 4            MR. SILVERMAN:  Yes.

 5            THE COURT:  We're all ready to go, okay.

 6            Would you bring in the jury, please?

 7            (In the presence of the jury:  10:11 o'clock a.m.)

 8            THE COURT:  Good morning, ladies and gentlemen.

 9            MR. REEVE:  May I proceed, your Honor?

10            THE COURT:  Please.

11            MR. REEVE:  Thank you.

12                    **K E V I N   W I L S O N**

13       having been recalled as a witness, was previously

14       duly sworn and testified on his oath as follows:

15            MR. REEVE:  Your Honor, just so that the jury's

16   aware, Attorney Balakrishnan is here again today.  I'm not

17   going to need his help for the very few questions I have, but

18   I have offered his services to co-counsel in an effort to

19   expedite their cross examinations as well.  So he is going to

20   continue here and try to assist us in moving through.

21   CROSS-EXAMINATION

22   BY MR. REEVE (Continued):

23   Q    Mr. Wilson, I just have two areas of questions for you

24   this morning, okay?

25   A    Okay.

1    Q    First of all, there is a chart that I don't believe you

2    have seen, and this is a chart, it's actually two pages long,

3    and at the top, it's labeled "Wilson chrono," short for Wilson

4    chronology.  It's just a series of dates to help the jury,

5    okay?

6               I want to focus in on the dates starting August 9th,

7    2012, which was your first proffer session with the

8    government, the same day you signed the proffer agreement that

9    is an exhibit in this case, okay?

10   A    Okay.

11   Q    And is it fair to say that you don't remember all the

12   dates and the length of time of each proffer, because there's

13   a lot of them and they covered a huge period of time?

14   A    That is fair to say.

15   Q    Okay.  And would you accept my representation that the

16   parties agree that the dates and the hours that are listed

17   here are ballpark?  The dates are correct, and the hours have

18   been agreed to as a fair representation of the approximate

19   time that each proffer session lasted, again with a plus or

20   minus like we did on my chart, okay?

21   A    That's fair.

22   Q    Okay.  So I have two questions, two areas of questions,

23   related to these proffer sessions.

24               First, my first question is:  During all of these

25   proffers -- and I didn't show you the second page, it

1    continues with three more proffer sessions and the last

2    proffer session is October 11th of 2013, and the parties agree

3    that, again, these three entries are accurate, this might be a

4    confusing number here, that's, I put down four but then I was

5    corrected that it was six, so I corrected the number.  So this

6    is six hours, not to confuse you, okay?

7    A    Okay.

8    Q    And so my question is:  During all of those proffer

9    sessions, did you ever tell the government that, in fact,

10   Robert Santos, when you were asked to describe him, that you

11   identified him as a wholesale heroin customer?

12   A    I don't remember saying that, he was a wholesale heroin

13   customer.

14   Q    Okay.  And it's understandable that you would not

15   remember, because there were lots and lots of things you said

16   during these very lengthy sessions.

17   A    Yeah.  I don't know how you want me -- I don't get the

18   question.

19   Q    Okay.  There are lots of things you don't remember about

20   what you said during the course of the proffer sessions, fair?

21   A    Yeah.  I answered questions.

22   Q    Yes, right, and you answered a lot of questions about a

23   lot of things?

24   A    Yes.

25   Q    And you answered a lot of questions about a lot of things

1    about a lot of people?

2    A    The questions I was asked, I answered.

3    Q    I understand.  And I'm just going to --

4         MR. REEVE:  With the Court's permission, if I can

5    approach.

6         THE COURT:  Yes.

7    Q    I am going to show you a report that is related to your

8    October 11th, 2013, proffer, the last proffer, and I'm just

9    going to ask you to look at one entry here, and I don't want

10   you to read it.  All I want you to do is read the underlined

11   part there, and then tell us if that refreshes your

12   recollection as to what you said on that date with respect to

13   Mr. Santos's role, insofar as you believed.

14        If it doesn't refresh your recollection, what I want

15   you to do is tell us, "You know what, I've looked at it but I

16   just, I can't remember."  It's fair, it's okay.

17   A    I see what it says, but I don't remember.

18   Q    Okay.  That's all I wanted to ask you about that.

19        And now I'm going to move on to the final area of

20   questioning, which is:  You and I yesterday afternoon, with

21   the jury here, went through a whole bunch of phone calls and

22   text messages.  Would you agree?

23   A    Yes, I would agree.

24   Q    And my question is:  In all of those sessions, in all the

25   times you talked with the government about Robert Santos, did

```
 1   you ever, at anytime, talk about any of those calls that I

 2   reviewed with you yesterday afternoon?

 3   A    I'm sorry, the calls that you reviewed --

 4   Q    Right.

 5   A    Did we review those calls?

 6   Q    Let me back up and make it easier, because I want you to

 7   understand.  Attorney Silverman, during his direct examination

 8   of you, asked you lots and lots of questions about calls and

 9   text messages that you did review during the course of your

10   meetings with the government team.  Would you agree with that?

11   A    I can agree with that.

12   Q    Yes.

13   A    Kind of confused, but I believe, if it's anything like

14   what we did yesterday, yeah, I did that with him.  Yes.

15   Q    Right.  So with the ones that you answered questions

16   about and saw with the transcripts, do you remember, you've

17   been here a long time, but you remember that, you had

18   transcripts and Attorney Silverman was up questioning you, I

19   was sitting down.

20   A    Yes.

21   Q    You and I weren't having a dialogue, okay?

22   A    Yes.

23   Q    All of those calls that you testified about, you reviewed

24   with the government team during the course of one or more of --

25   one or more, and I'm not looking for a date, but one or more
```

```
 1    of those proffer sessions?

 2    A    Yes.

 3    Q    Okay.  Now, I'm going to ask you to turn your focus to

 4    the calls and the texts that you and I reviewed here yesterday

 5    afternoon.  Is it fair to say that none of those calls were

 6    ever the subject of any questioning by the government in any

 7    of these proffer sessions, to the best of your recollection?

 8    And if you don't remember, tell us.

 9    A    I want to say that those particular calls that you showed

10    me might have not been, but I really can't remember.  There

11    was a lot of calls.

12    Q    I totally understand, and I'm not asking you to guess,

13    okay?

14              MR. REEVE:  Your Honor, I think the parties -- I

15    have no other questions.  I believe the parties have a

16    stipulation at this time with respect to the last two areas of

17    questioning that I addressed to Mr. Wilson.

18              MR. SILVERMAN:  Your Honor, the parties do stipulate

19    that the October 11th, 2013, proffer report reflects that

20    Mr. Wilson identified Robert Santos as a wholesale heroin

21    customer.

22              THE COURT:  Wholesale customer?

23              MR. SILVERMAN:  That's what it says in the report.

24              The parties further stipulate that none of the

25    proffer reports reflect that Mr. Wilson was ever interviewed
```

1    or asked questions about the calls and text messages that

2    Attorney Reeve played for him or showed him yesterday

3    afternoon.

4              MR. REEVE:  Thank you.  With that, I have no further

5    questions at this time.

6              Thank you.

7              MR. ROGAN:  Good morning, your Honor.  May I

8    inquire?

9              THE COURT:  Yes, sir.

10             MR. ROGAN:  Ladies and gentlemen, I have good news.

11   I want to remind you what Mr. Reeve said when he began his

12   cross-examination.  Based upon the division of labor, I can

13   assure you that my cross-examination of this witness will not

14   be nearly as long.  I'm going to try and stay as focused as

15   possible, and just focus on the issues that I want to, and not

16   cover the same ground.

17   CROSS-EXAMINATION

18   BY MR. ROGAN:

19   Q    Mr. Wilson, have you and I met before?

20   A    No, sir.

21   Q    Okay.  I'll give you a couple of ground rules for

22   answering my questions.  Number one, I'm going to assume that

23   you understand my question, unless you tell me otherwise.  Are

24   we clear on that?

25   A    Okay.

1    Q    Okay.  Number two, I'm going to, as best I can, when I

2    ask you questions, I'm going to use the language that you've

3    used both in your phone calls and in your proffer sessions

4    and, most importantly, in court over the last couple of days.

5    Are we clear on that?

6    A    Okay.

7    Q    Okay.  And again, for everybody, if you could please

8    possibly keep your voice up.

9    A    Okay.

10            MR. ROGAN:  Your Honor, can I approach the witness

11   with a calculator?

12            THE COURT:  Yes.

13   Q    I just want to follow up, Mr. Wilson, on a particular

14   line of inquiry that was opened by Mr. Reeve.

15            MR. ROGAN:  I thought you told me you were going to

16   bring the chart back.

17            MR. REEVE:  I'm sorry, it's the next page.

18   Q    Just to be clear, I think you told the jury yesterday

19   that your profit per gram was about $13.  Do you remember that

20   testimony?

21   A    Yes, give or take.

22   Q    Okay.  Give or take.  But I think you also told the jury

23   that you made more money when you were selling heroin if you

24   sold it in bundles.  Do you remember that testimony?

25   A    Yes.

1    Q    Okay.  So what I'd like you to do is to use that

2    calculator again, and to calculate for the jury -- actually,

3    question withdrawn.

4          You would agree I think that you also testified that

5    the majority of your transactions were not in grams, but were

6    in bundles?

7    A    They were in grams and bundles.  Maybe the majority

8    bundles, I believe so.

9    Q    Bundles, because you were moving weight, and you

10   understand what I mean when I use that term, right?

11   A    I was moving weight, yeah, I was moving weight but like I

12   said, I believe I was moving more bundles than weight.  I'm

13   not absolutely sure exactly how to explain that, the

14   difference.

15   Q    Okay.  So take the calculator, if you will, Mr. Wilson,

16   and tell me what your profit would be on a bundle.

17   A    If I was to sell one bundle, what would I get back?

18   Q    Yes, as opposed to what you would get from selling it as

19   an individual gram where your profit was stated at $13.

20   A    I'm lost, sir.

21   Q    How are you lost?

22   A    Cause I don't understand.  I really, I just don't

23   understand the question.

24   Q    Well, you were able to use the calculator yesterday when

25   you were asked questions by Mr. Reeve, and you came up with,

1   as you said, $13, more or less, which was your profit when you

2   were selling individual bundles.  We're clear on that.

3   A    Okay.  How many, how many bundles are you asking --

4   Q    Let's take 200 bundles.

5   A    If I sold 200 bundles at the price that I wanted to sell

6   it at?

7   Q    Yes.

8   A    200 bundles at $50, 200 times 50 is 10,000.

9   Q    Equals $10,000.  Okay.  And that's a lot more profit than

10  you were making selling grams, correct?

11  A    That would be.

12  Q    Okay.  I'm going to come back to that in a minute.

13            MR. ROGAN:  If I can approach to take the calculator

14  back.

15  Q    I just want to start now and focus your attention on your

16  testimony.  You would agree with me that you've already told

17  this jury that during your lifetime, actually, just focused on

18  the time from when you were in the halfway house up until the

19  date of your arrest on January 3rd, 2012, that you repeatedly

20  lied to individuals, right?

21  A    When I was in the halfway house, yeah.

22  Q    No, what you told the jury yesterday, you didn't just lie

23  to people in the halfway house; you actually told them you

24  lied to the people in the halfway house, you lied to your

25  parole officer, right?

```
1    A    Yes.

2    Q    Okay.  You lied to your suppliers?

3    A    Yes.

4    Q    You lied to your customers?

5    A    Yes.

6    Q    Okay.  And that's part and parcel of what you do as a

7    drug dealer?

8    A    Yes.

9    Q    Okay.  And is there anybody else that you lied to during

10   the course of this operation from the time you got out of the

11   halfway house or were in the halfway house up until today's

12   date?

13   A    Lied to girlfriends during -- like --

14   Q    Not really interested in personal relationships.  I'm

15   talking about your narcotics operation.

16   A    I know I didn't lie to the government.  It's probably, it

17   could be other personal relationships or maybe other staff at

18   some place.

19   Q    I'm just talking about lies.  I don't really care about

20   your personal relationships.  I'm just talking about lies

21   related to your occupation as a narcotics trafficker, because

22   that's what your job is, right?

23   A    It's what one of my jobs was.  I was working at Dunkin'

24   Donuts also.

25   Q    Let's be clear again, the job at Dunkin' Donuts was
```

1    nothing more than a front, and was a requirement of your

2    parole, right?

3    A    I got a paycheck for it, sir.  I worked there.  So I

4    worked.

5    Q    Mr. Wilson, would you agree with this proposition:  You

6    made far more money in the sale of selling and distributing

7    narcotics in the New Haven area than you ever did at Dunkin'

8    Donuts?

9    A    That is definitely fair to say, yes.

10   Q    Right.  So your main source of income was not Dunkin'

11   Donuts; it was selling and distributing narcotics in the New

12   Haven area, yes or no?

13   A    Yes.

14   Q    Okay.  So that would be your primary occupation by any

15   definition?

16   A    Okay, now I --

17   Q    Okay, great.  And in point of fact, you tried to tell the

18   jury I think yesterday that you were "a bad drug dealer."  Do

19   you remember that testimony?

20   A    Yes.

21   Q    In point of fact, you're a very good drug dealer because

22   you make a tremendous amount of profit on the sale of drugs

23   that you distributed through the New Haven area, yes or no?

24   A    Made profit.  I don't know how I ended up in debt if I

25   made all this profit.

1  Q    Yes.  You know what?  I want to be respectful to you.  I

2  really am not going to get into this whole idea that you're

3  trying to create for the jury that you had a debt.  The debt

4  was related --

5          MR. SILVERMAN:  Your Honor, I have to object to that

6  question.  That's argument.  He's posing something that the

7  witness hasn't said.

8          THE COURT:  Would you rephrase the question?

9          MR. ROGAN:  I will, your Honor, but it is

10  cross-examination.

11          MR. SILVERMAN:  Not argument.  It's not argument.

12          MR. ROGAN:  I'm fully aware of that.

13  Q    You kept wanting to talk, and you did talk at length,

14  about this debt that you owed to these other people, and I'm

15  not going to get into a whole lot about Na-Na, Nu-Nu, and

16  grandma and grandpa.  Basically what you were conveying to the

17  jury was that you owed money to those people, right?

18  A    Yes.

19  Q    Okay.  But the money you owed to them was directly and

20  solely related to your business as a narcotics trafficker,

21  right?

22  A    Yes.

23  Q    Okay.  It wasn't because they lent you money to pay the

24  rent on any of your apartments or anything like that?

25  A    You could say that.  I'm sorry, I'm sorry, I'm confused,

```
 1   no, it wasn't because they lent me money to pay for my

 2   apartment; it was because of the narcotics activity.

 3   Q    Right.  Fronting drugs and all that stuff that I'm going

 4   to get into in a minute.  Now, this is one of the questions

 5   that I want to specifically ask you, and it was a term you

 6   used, "partners."  Do you remember talking about, here in

 7   court, about being partners with various individuals at

 8   various times through this enterprise?

 9   A    I believe, I believe so.

10   Q    Okay.  Would you agree with my representation that you

11   did testify to this jury that you were partners with some

12   individuals during the course of this alleged conspiracy?

13   A    Yes.

14   Q    Okay.  In your own words, what do you understand the word

15   "partners" to mean?

16   A    Someone who's helping me out.

17   Q    Well, is it someone who's helping you out or someone

18   who's in the business of selling or distributing narcotics

19   with you for a profit?  Would you agree with that

20   characterization?

21   A    Someone -- someone who's helping me make, someone who's

22   helping me make a profit or someone who's making a profit?

23   Q    Someone who's helping you make a profit and helping,

24   presumably, them make a profit.

25   A    That's an idea of a partner.
```

```
1    Q    And that's the idea of the partnership that you had with
2    the people you identified, correct?
3    A    I'm sorry, it's just kind of confused.  This is really,
4    this line of questioning is kind of like confusing to me.
5    Q    How is it --
6    A    I mean --
7    Q    I'm sorry, I want you to finish your answer.
8    A    Because you're trying to get me to tell you how I define
9    "partnership," right?
10   Q    Yes, because you used that word.
11   A    Yeah.  Well, I really don't know how to explain it.  I
12   mean, people that I dealt with selling drugs together with, I
13   would say that they were my partners.
14   Q    Right, and people you would sell drugs together with, the
15   idea was for them and for you to make a profit, whether it was
16   crack cocaine or heroin or powder, right?
17   A    To make a profit, yeah, and more things, exchange
18   customers, things like that.
19   Q    Well, to be clear, you were not in the business of being
20   a philanthropist and giving away your narcotics, right?  You
21   gave them away with the idea that you would make a profit?
22   A    Yeah.  Yeah, I wasn't just trying to just hand stuff out.
23   Q    Okay.
24   A    I wasn't just trying to hand stuff out, but I would
25   connect people in the hopes of getting someone else connected
```

1    to me.

2    Q    Right.  In the hopes of -- but the people that you claim

3    you actually partnered with, and I'm not going to revisit all

4    the testimony between Mr. De Los Santos and Na-Na and Nu-Nu,

5    but in all of those transactions or anyone else in this

6    courtroom, but in all of those transactions, the partnership

7    idea was:  I, Kevin Wilson, will make money together with this

8    other person that I partnered up with, correct?

9    A    Sounds like a plan.  Sounds like a fair assumption of it.

10   Q    And is it a fair assumption of what you were doing?

11   A    At the time.  At the time, at the time, a fair assumption

12   of that, I guess so.  Again, that was then, this is now, so

13   it's kind of --

14   Q    Well, again, I don't want to be argumentative, but I know

15   that was then and this is now.  But the reason we're here is

16   we're talking about what was then, right?

17   A    Yes, you're right.

18   Q    I know you're in a different position today, because

19   you're cooperating with the government.  I want to go back to

20   the charges that actually affect Richard Anderson, right?

21   A    Okay.

22   Q    So the people that you claim you partnered with, the idea

23   was that they would make money and you would make money, that

24   was what the whole idea was about, right?

25   A    Yeah, that's, I guess, a partnership.  Yeah.

```
 1    Q     Okay.  And let's be clear, do you remember testifying

 2    here, in court, that you were partners with Richard Anderson?

 3    A     I believe I did say that, yeah.

 4    Q     Yeah, you did say that, okay?  But would you agree with

 5    this statement:  That you also said in court that you and Mr.

 6    Anderson never exchanged money during the course of what you

 7    claim to be a partnership?

 8    A     We -- I believe we did exchange money, sir.

 9    Q     I think you were asked on direct examination whether or

10    not you actually made any money relative to your involvement

11    with Richard Anderson.  I believe your response was no.

12    A     I didn't make -- off of the crack that he was selling to

13    Mr. Morales, I didn't make any money.  If I said, if I said

14    that, I was mistaken because I made money, we exchanged -- he

15    gave me money from heroin.

16    Q     No, no, you know what my client is charged with in this

17    case, right?

18    A     Sir, I do not know what your client is charged with.

19    Q     I'm going to tell you.  He's charged in Count One with

20    conspiracy to distribute crack cocaine.  We're going to talk

21    about the heroin transactions that you had with Mr. Anderson,

22    but as it relates to Richard Anderson, let me make sure I

23    understand your testimony now.

24          You're telling this jury that any of what you claim

25    to have been crack transactions between Mr. Morales and Mr.
```

1   Anderson, you did not receive any money from those

2   transactions, to the extent they existed?

3   A    I do not recall any money given to me from those

4   transactions, no.

5   Q    Okay.  And then would you agree with me, based upon that

6   testimony under oath here today, that you didn't actually have

7   a partnership with Mr. Anderson to distribute crack cocaine?

8   A    One of the calls that was played here, I remember this,

9   Mr. Morales said --

10  Q    Hold on.  That's not responsive to my question.  My

11  question is this:  You told this jury under oath that you were

12  partners with my client, Richard Anderson, in the distribution

13  of crack cocaine.  Yes or no?  You did tell them that?

14  A    Okay, then if I said that, then yeah.

15  Q    Okay.  But then you just told me that in point of fact,

16  you never had any profit exchanged or money exchanged between

17  you and Mr. Anderson limited to the issue of crack cocaine, is

18  that true?

19  A    As far as the transaction between him and Mr. Morales,

20  yes.

21  Q    Okay.  So therefore, based upon that proposition, you, in

22  fact, were not partners with Mr. Anderson in the distribution

23  of crack cocaine during the time that's alleged that happened

24  in this conspiracy.

25  A    I believe you could say that, yes.  I mean --

```
 1   Q    Okay.

 2   A    Can you --

 3   Q    Basically what you just told us before, under oath here

 4   in this courtroom, you lied to the jury when you told them

 5   that you were partners with Richard Anderson in distribution

 6   of crack cocaine.  Yes or no?

 7            MR. SILVERMAN:  Your Honor, I would object to that.

 8   That's not what he testified.  He said they were partners.

 9   When he testified on direct, he didn't specify crack cocaine

10   and I think his testimony on cross has been clear that the

11   partnership as he conceived of it went beyond crack cocaine.

12            MR. ROGAN:  Your Honor, in all due respect, I claim

13   the question, and here is why:  He used the word "partner,"

14   not me.  He provided a definition of partnership, not me.  Mr.

15   Anderson is not charged with anything having to do with the

16   distribution of heroin.  It's limited to crack cocaine.

17            And he told us, he just told this jury that, three

18   days ago, he used the word "partner" to implicate Mr.

19   Anderson, and now he's saying to me, in fact, based upon his

20   own definition of a partnership, he wasn't partners with Mr.

21   Anderson in the distribution of crack cocaine.

22            MR. SILVERMAN:  Your Honor, maybe we should approach

23   and discuss this at side bar.

24            (At the side bar.)

25            MR. SILVERMAN:  I fully understand the question that
```

1   Attorney Rogan is asking the defendant.  It's my impression

2   that his testimony on direct as partners was his conception of

3   their relationship in total, not just limited to crack

4   cocaine.  I think he's been consistent in his answers with

5   that on cross.

6           So for him to now say that the defendant is lying

7   because in the sole context of crack cocaine, they were not

8   partners is misrepresenting the testimony that's been

9   presented throughout Mr. Wilson's testimony.

10          MR. ROGAN:  Your Honor, respectfully, I disagree.

11  He provided the definition of a partnership, which is two or

12  more people coming together for the purpose of making a

13  profit.  And then he just said under oath, okay?  That he

14  never made any transactions for profit with Mr. Anderson.

15          MR. SILVERMAN:  That's not what he said.  He said

16  that with respect to crack.  But he also said that in respect

17  to heroin, he made money.

18          The quantity, and the drug type that's been charged

19  to this defendant, he didn't make that decision.  The

20  government made its charging decisions.  If Mr. Wilson

21  conceives of Mr. Anderson as a partner because of their

22  relationship, Mr. Wilson referring customers for crack to Mr.

23  Anderson and Mr. Anderson buying heroin from Mr. Wilson, then

24  he's testified accurately that they're partners.

25          So to now limit Mr. Wilson to the government's

1    charging decision and force him into a box that he didn't put

2    himself in seems inappropriate to me and inconsistent and

3    mischaracterizing his testimony, from direct and this morning.

4    That's why I objected.  I think it does mischaracterize, and I

5    think it pushes him into a place that he didn't go to.

6          If you want to ask him if he was partners with Mr.

7    Anderson, I think that's appropriate, and I think he's already

8    answered that yes.  If you want to ask him if he made money

9    off crack, you can ask him that.  He answered the question, he

10   said no.  That's all fine.  If you want to ask if they were

11   partners in crack, that's fine.  But if you want to ask if

12   they were partners, that's a different answer.

13         MR. ROGAN:  Those are the questions I asked, your

14   Honor, and I need some latitude because I'll give you a

15   preview of the testimony that there were very little exchanges

16   between Mr. Anderson and Mr. Wilson, and it was Mr. Anderson

17   as a retail customer buying heroin.  That doesn't put him into

18   this conspiracy.

19         So I have to explore this area with Mr. Wilson

20   because he can't claim that he's a partner with Mr. Wilson

21   vis-a-vis the distribution of heroin.  A, he's not charged

22   with it.  More importantly, through his own testimony, he's

23   only going to tell him that he sold him three or four bundles

24   over this time frame, which is not consistent with someone

25   who's in a partnership with him in the distribution of heroin.

```
 1    That's why the question --

 2            MR. VATTI:  I don't think we're objecting to the

 3    issue of you being able to ask whether or not they were

 4    partners in the distribution of crack cocaine; what we're

 5    objecting to is the characterization that by having said it

 6    earlier in the trial that they were partners in drug

 7    distribution in general, you're now asking whether he lied

 8    earlier in the trial.  That's the part we're objecting to.

 9    It's the form of the question.

10            MR. ROGAN:  But he did, he did lie, because he

11    provided to me in the first ten minutes, he provided a

12    definition of a partnership which is two people coming

13    together for the purpose of making money, and now he tells me

14    that's not what he did relative to the crack cocaine.

15            MR. SILVERMAN:  Relative to the crack cocaine,

16    that's the key limiting thing Mr. Rogan keeps coming back to.

17    Mr. Wilson has been consistent all along.  His perception with

18    Mr. Anderson was he wanted to make money off of the heroin

19    piece of it.  His reason for sending Morales to Anderson that

20    went this way.

21            So if you want to keep asking him were you partners

22    in crack cocaine, you're limiting the definition of

23    partnership, which is different than the questions posed on

24    direct.  That's why it's a mischaracterization of his

25    testimony to call it a lie.  His definition of partnership on
```

```
 1    direct was not limited to crack cocaine; it was limited to his

 2    full distribution activities.

 3            MR. ROGAN:  I don't disagree with you, but I gave

 4    him the opportunity, I didn't put the words in his mouth, I

 5    gave Mr. Wilson, your Honor, the opportunity to tell me in his

 6    own words, if you remember I asked him:  You used the word

 7    partner, you used the word partner, what does that mean?  He

 8    said two people involved in an enterprise for the purpose of

 9    making a profit.

10            MR. SILVERMAN:  And he said connecting people.

11            MR. ROGAN:  He said that, too.

12            MR. SILVERMAN:  Yes.

13            MR. VATTI:  Let's give her Honor a chance to rule.

14            THE COURT:  I wonder if the jury's as confused about

15    this as I am now about what you're saying.  Maybe you can ask

16    a question which would clarify what he means when he refers to

17    a partnership with Mr. Anderson.

18            MR. ROGAN:  Let me try it.

19            THE COURT:  I think it would be better.

20            (In open court.)

21    BY MR. ROGAN (Continued):

22    Q    Mr. Wilson, let me try and come at this a different way,

23    and I'll be careful.  Limiting the question to the purpose of

24    whether you were actually partners for profit in the

25    distribution of crack cocaine with Mr. Anderson, your answer
```

1  today is no, correct?

2  A    Profit, as far as money?

3  Q    Correct.  Money.

4  A    Money.  So was he my partner -- so did I make money off

5  of his crack transaction, is what you're saying, right?

6  Q    Correct.

7  A    No, I did not make money, as far as -- no.

8  Q    That even assumes that those transactions that you

9  described actually took place, but we'll get to that in a

10  moment, okay?

11  A    (Nodding head.)

12  Q    So we have an agreement for the jury that to the extent

13  you believe there are any crack transactions between Mr.

14  Anderson and anyone else, you would agree that he was not

15  participating with you in that profit enterprise, relative to

16  crack cocaine only?

17  A    I believe that's fair to say.

18  Q    Okay, great.  Now, during the course of the time -- I'm

19  always going to try to keep you on a time frame so we're

20  clear -- during the course of the time when you were in the

21  halfway house up until you were arrested on January 3rd, 2012,

22  did there ever come an occasion when you sold heroin to Mr.

23  Anderson?

24  A    From the beginning of -- my, let's say, my conspiracy to

25  the end of it?

```
 1   Q    Yes.

 2   A    Yes, I sold -- heroin, you said, right?

 3   Q    Yes, now we're on heroin.

 4   A    Yes, I sold heroin to Mr. Anderson.

 5   Q    Okay.  How much do you think you sold heroin?  How much

 6   heroin?

 7   A    I wouldn't say it was -- it wasn't a lot.

 8   Q    Yeah, like maybe, do you remember telling, during the

 9   proffer session, you told three or four bundles?

10   A    I believe it was something like that.

11   Q    Okay.

12   A    Let's say give or take.

13   Q    Okay.  Would you agree with me, based upon your lifetime

14   experience as someone who's a narcotic trafficker, that

15   selling three or four individual bundles to Mr. Anderson would

16   be more consistent with someone who was buying from you for

17   their own consumption rather than for resale?

18             MR. SILVERMAN:  Your Honor, before the witness

19   answers, I'd like to talk to Attorney Rogan about the

20   question.

21             (Mr. Silverman conferring with Mr. Rogan.)

22   Q    Okay.  Trying to work as quickly as I can.  So three or

23   four bundles over-- you were released from the halfway house

24   again -- I don't want to go back to the timeline -- sometime

25   in 2010?
```

1    A    Let's say a little bit after May.

2    Q    In 2010, okay, great.  And then you got arrested on

3    January 3rd, 2012?

4    A    Yeah.

5    Q    Okay.  Maybe over that time, you're guessing that Mr.

6    Anderson purchased three or four bundles of heroin from you?

7    A    Yes.

8    Q    Did Mr. Anderson ever tell you that that was for personal

9    use or for resale?

10   A    I believe I stated I can't recall.  I'm still kind of

11   hazy on that.

12   Q    Okay.  So you don't know?

13   A    Right now, without reviewing anything or listening to any

14   calls right now, I can't say for sure.

15   Q    Okay.  One of the things I'm going to try to do is to not

16   have the jury relisten to a bunch of phone calls.  But I think

17   I can bring you back to a particular date, and the jury's seen

18   the video on a number of occasions, you saw the video as well.

19   It's a video dated October 25th, 2011, at around 4:08 p.m.  Do

20   you remember that?

21   A    I think it was the video of Mr. Anderson walking to my

22   building?

23   Q    That's the one.

24   A    Okay.

25   Q    And before that -- we don't obviously see what's going

1  on, but before that -- do you recall seeing a text message

2  from Mr. Anderson:  "I need one bad."  Do you remember that

3  text message?

4  A    I remember they put it up on the screen.

5  Q    Did you have an understanding, when you saw that text

6  message come in, when he was talking about one, what was he

7  talking about, if you know?

8  A    Well, it could have been one gram or one bundle.

9  Q    Right.  Would you agree with me that one gram or one

10 bundle --

11           MR. SILVERMAN:  I'm sorry to interrupt.

12           Can I have one second with you?

13           (Mr. Silverman conferring with Mr. Rogan.)

14 Q    Counsel correctly pointed out that that text message came

15 later on.  But that day, that October 25th, 2011, that date

16 when he walked in the building, right?

17 A    Um hum.

18 Q    He was there to purchase heroin, correct?

19 A    I believe he was.  Like we said, we didn't see what

20 happened.  We just seen him walking in the building.

21 Q    Okay.  And again, you don't know what he was going to

22 do -- you don't even know whether it was a gram or a bundle,

23 right?

24 A    I do not remember at this time.

25 Q    Okay.  By the way, I wanted to ask you just a general

```
 1    kind of a question.  When you were listening here in court to
 2    all of the phone calls, is it fair to say that in the absence
 3    of actually seeing those phone calls up on the screen, you
 4    have no independent recollection of all of those
 5    conversations?
 6    A    I don't have a photographic memory.
 7    Q    Not what I asked you, so let me try again.  In the
 8    absence of actually having the government put up there
 9    transcripts of phone calls, you don't have any independent
10    recollection of any conversations between you and Mr. Anderson
11    regarding anything?
12    A    I mean, I would have to get my memory refreshed to be
13    able to -- like if, for instance, I don't know if the day he
14    walked in the building, if something funny happened that day,
15    I fell down the stairs or something like that, oh, I remember
16    that day I fell down the stairs when he came in the building.
17    So I don't know if that answers your question or not.
18    Q    You didn't, so we'll try again.  So in the absence of
19    listening to the phone calls and then seeing the actual
20    dialogue up on, what I'll call dialogue up on the screen, you
21    don't have any independent recollection, without the
22    assistance of those wiretaps, of either the content of the
23    phone calls or what they mean, is that a fair
24    characterization?
25    A    That's fair, because they were over two years ago or so.
```

1    Q    Great.  What you're actually doing, in front of the jury,

2    is you're going, yeah, okay, that phone call, and you're

3    basically just re-reading what's up there and then you were

4    asked some questions about it, correct?

5    A    Correct.  Refreshes, though.  It refreshes my memory

6    sometimes.

7    Q    All right.  Did I understand your testimony correctly,

8    both I think it was on direct examination by Attorney

9    Silverman, that you got out of the crack cocaine selling

10   business in August of 2011?

11   A    You could give or take on that approximate date.

12   Q    Approximately August of 2011, correct?

13   A    Approximately.  I don't recall what date, what month it

14   was, but there was a point in the conspiracy when I stopped

15   selling it myself.  I believe, I think that's fair to say.

16   Q    And I think you told the reason, told the jury that at

17   least part of the reason, you got out of the crack cocaine

18   selling business was you were a little bit freaked out, for

19   want of a better term and I'm not going to again replay that

20   video, of that first undercover buy that happened where you

21   had the bad feeling, right?

22   A    No.  No, that's when I started.  I was still selling

23   crack after that undercover buy, whatever that was.

24   Q    Okay.  What caused you to exit the crack cocaine

25   distribution business and enter the heroin distribution

```
 1   business?

 2   A    I lost my, I guess you could say, permanent chef.

 3   Q    Right.

 4   A    Because he was cooking for me.

 5   Q    That was not Mr. Anderson, right?

 6   A    No, that was not Mr. Anderson.

 7   Q    Right.  By the way, at any point in time during this

 8   alleged conspiracy, did you and Mr. Anderson ever pool money

 9   together for purposes of buying narcotics for redistribution?

10   A    I can't recall.  I want to say I don't believe so.  Just

11   the money from the heroin, like from the bundles.

12   Q    Yes.  No, again, to be clear, talking about crack

13   cocaine, there was never a time from when you were in the

14   halfway house until you got punched out on January 3rd, 2012,

15   that you and Mr. Anderson ever combined monetary resources for

16   purposes of purchasing crack cocaine from anybody for

17   redistribution purposes, right?

18   A    I don't, I don't believe so, sir.

19   Q    Right, okay.  That's also another one of the elements of

20   the partnerships that you did have with other individuals

21   relative to the distribution of heroin, right?

22   A    I'm sorry, I'm lost.

23   Q    Okay.  We are switching back and forth between heroin

24   because it's necessary, right?  So I think you testified at

25   length about you putting money together from various sources
```

```
 1    to go back down to New York for purposes of buying quantities

 2    of heroin, correct?

 3    A     Yeah, that's correct.  I'm sorry, I keep -- I got a

 4    headache, man.

 5    Q     Are you okay?

 6    A     Yeah, I'm -- I just kind of like dozed off -- I don't

 7    know how to explain it.  My mind was racing just now, sir.

 8    Sorry.

 9    Q     Okay.

10              MR. ROGAN:  Could you read back the question?

11              (The requested question was read by the reporter.)

12    A     Yeah, that's fair to say.

13    Q     Okay.  Did you ever do anything like that -- now we're

14    switching to crack cocaine, which is all Mr. Anderson is

15    charged with in this alleged conspiracy -- did you ever do

16    anything like that with Mr. Anderson, relative to crack

17    cocaine?

18    A     I do not believe I did anything like that with Mr.

19    Anderson.

20    Q     In fact, you never did anything like that with Mr.

21    Anderson relative to heroin, either, correct?

22    A     I don't believe so either, no.

23    Q     No, you didn't, because all he ever bought from you was

24    three or four bundles over the course of a year-and-a-half,

25    right?
```

```
1    A    Yeah.

2    Q    Okay.  And that was one of the things you did with your

3    quote, and I never use that air quote thing, but to quote,

4    that's another way that you knew you were partners with

5    somebody, correct?

6    A    Yeah, that's a way.

7    Q    Okay.  Another way that you're partners with somebody,

8    either with heroin or crack cocaine, and you testified about

9    this, is that sometimes you would receive assistance in

10   packaging those drugs or cooking those drugs or cutting those

11   drugs, correct?

12   A    Correct.

13   Q    Did you ever have any involvement with my client, Richard

14   Anderson, regarding him repackaging drugs or cooking drugs for

15   you during the course of this alleged conspiracy?

16   A    I do not believe that I did, sir.

17   Q    Okay.  I wanted to ask you, we don't have the picture

18   now, but remember that Facebook photo of you --

19   A    The money?

20   Q    --  with the money?  And we're going to have it after

21   lunch, right?  I just want to ask you a couple of questions.

22   Let's be honest, that's what we call in the business a money

23   shot.  Do you know what I mean by that?

24   A    A money shot, it's money in the picture, yeah, a money

25   shot, yeah.
```

```
 1   Q     It's you --

 2   A     Flashing money, yeah.

 3   Q     Exactly.  I think what you tried to tell the jury was

 4   that some of that money came from your front job at Dunkin'

 5   Donuts, right?

 6   A     Yeah.  Could --

 7   Q     I think the total amount you said you put in the bank as

 8   part of your condition of your employment at Dunkin' Donuts

 9   was a total sum of $1,000, right?

10   A     I don't believe I said the total sum; I believe I said

11   over a thousand dollars.

12   Q     Okay.  How much over?

13   A     I don't have the bank statement in front of me or the

14   receipt.  I know it was over a thousand dollars.

15   Q     What would you say, about 1200?

16   A     I would say more than that.

17   Q     Really?

18   A     Yeah.

19   Q     So were you flashing your Dunkin' Donuts money?

20   A     It's a money shot.  I was putting it on Facebook.  I

21   mean, why -- I mean, even if I had a dollar bill there, I

22   probably would have stuffed it in to make it look like more

23   money.  It's a money shot.

24   Q     We're going to look at the photo after lunch, and what

25   we're going to see, Mr. Wilson, is there's three types of
```

1    money, the money that's on your lap?

2    A    Yeah.

3    Q    And those are all what we call Benjamins, right?

4    A    Those are all hundreds, I believe so.

5    Q    I'm sure the jury's familiar with that description.

6    There's 1500 in Benjamins just sitting on your lap, right?

7    A    That's fair to say, yes.

8    Q    That's fair to say?

9    A    Maybe even more.  I can't -- I didn't count it myself.

10   Q    I did.

11   A    All right.

12   Q    That was only the bills that I could see.  So the fistful

13   of money that you had in your two other hands, that would

14   represent drug proceeds, correct?

15   A    I don't know if that was drug proceeds at the time.

16   Q    Well, wait a second.  You only had two jobs, the front

17   job at Dunkin' Donuts --

18   A    Yes.

19   Q    --  as condition of your parole, and your job as a

20   narcotics distributor?

21   A    Yeah.  Yeah.

22   Q    So there weren't any other sources of money that could

23   have been in that shot?

24   A    Actually, there is.

25   Q    What's that?

```
 1   A     I was going to Gateway Community College.

 2   Q     Right.

 3   A     And I did receive a grant for my classes, and all the

 4   money that I could use on books was also -- I forgot exactly

 5   how it is -- all the money I didn't spend, some of it was

 6   returned back to me to, for me to have.

 7   Q     Really?

 8   A     Do you want -- I mean, you could check it out.  I'm not

 9   lying.

10   Q     Well --

11   A     I was in school.  I already told you that, correct?

12   Q     Right.

13   A     And I received a Pell grant.  I can't lie about that,

14   that is somewhere documented, sir.

15   Q     All right.  The jury will make the determination about

16   your credibility.

17         But are you now telling them that in addition, that

18   the money shot included Dunkin' Donuts money, Pell grant

19   money, are you now saying that none of it was drug proceeds?

20   A     I'm saying, I'm saying it could have been drug proceeds

21   and there definitely was Dunkin' Donuts money in there, and

22   like I said, I don't have, I don't have a ledger of what money

23   I had in my hand, how much it was, or where all of it came

24   from at that time.

25   Q     Oh, let's be honest.  What drug dealer would be dumb
```

```
 1   enough to keep a ledger?  You didn't do that, right?

 2   A    I don't believe I did, no.

 3   Q    Right.  Okay.  Did you ever give Mr. Anderson a job in

 4   your -- this is your word, going to get into this in some

 5   detail -- in your clique as a lookout?

 6   A    As a lookout?  I don't believe so.

 7   Q    No.  And did you ever give Mr. Anderson a job in your

 8   clique, your word, as a sergeant or captain or some

 9   responsible role in your organization?

10   A    What I asked Mr. Anderson to do for me was to look for

11   customers for me.  That's what I asked him to do.  No other,

12   no sergeant, no none of that stuff.

13   Q    Right.  And you testified at length, and you listed the

14   individuals but I want to go over it again, right?  I'm going

15   to go over, I think it's 24 Judson Street, right?  You call

16   that the yard, right?

17   A    Yeah.

18   Q    And that's where quote your clique hung out, right?

19   A    I don't want to say so much my clique.  That's where me

20   and my friends hung out.

21   Q    Actually, see, that's what you said, you called it a

22   clique.

23   A    All right.  All right.  I got you.

24   Q    Okay?  And that clique that you identified those people

25   were in the business of distributing crack cocaine and heroin
```

```
 1   in quantities, correct?  From that backyard location?

 2   A    Not all.  People hung back there sold different

 3   quantities of stuff.

 4   Q    Right.  Those people in the backyard also had access to

 5   all the firearms that you and your members of your clique were

 6   ready, willing, and able to use, correct?

 7   A    You could say that, yeah.

 8   Q    No, I'm not saying it; you testified about it.

 9   A    Yes.  Yes.  Sorry, just -- go ahead, sir.

10   Q    I want to be fair to you.  Are you having trouble with me

11   or understanding me or --

12   A    Just I've been up here for a long time, and some of the

13   questions, just like if I said that, yeah, I said that.

14   Q    Okay.  You would also agree with me that you never saw or

15   identified at anytime Richard Anderson as being part of that

16   clique in the backyard, correct?

17   A    That, that's also fair to say, yes, sir.

18   Q    Yes.  So he had nothing to do with anything that came in

19   or out of the backyard, regarding crack cocaine, heroin, guns,

20   the silver surfer gun, any of that stuff, right?

21   A    Mr. Anderson was a friend of mine --

22   Q    No, I want you to answer, sir, respectfully, my question.

23   A    Okay.

24          MR. ROGAN:  Could you read it back to him, madam

25   court reporter?
```

```
 1              (The requested question was read by the reporter.)
 2   A    Right, sir.
 3   Q    Great.  Did you ever split any of your profits with Mr.
 4   Anderson from either your crack cocaine distribution business
 5   or your heroin distribution business?  By profits, I mean
 6   money.
 7   A    I do not believe so, sir.
 8   Q    No.  Like some of your other partners who had key access
 9   to 139 Day Street, right?  And that's the place -- I'm sorry,
10   question withdrawn.
11              139 Day Street was one of the places you were living
12   during the course of this alleged conspiracy, correct?
13   A    Yes, correct.
14   Q    Okay.  And would you agree with me, during that entire
15   time, that Richard Anderson, unlike some of your other
16   partners that we'll talk about, he never had key access to
17   that property, right?
18   A    Right, he did not.
19   Q    Okay.  And that would be one of the hallmarks of the
20   people you were in the business of being partners with, as far
21   as, because some of your partners, you would trust to have
22   access to your apartment?
23   A    Yeah.
24   Q    Okay.  Where you kept your drugs and your money and your
25   guns?
```

```
 1   A     Yeah.

 2   Q     Okay.  But not Mr. Anderson?

 3   A     Mr. Anderson did not have a key, no, or access.

 4   Q     Nor did you ever offer him a key or access, correct?

 5   A     No, I don't believe I did.

 6   Q     Unlike some of your other partners, did you ever give Mr.

 7   Anderson your phone, your personal -- one of your phones for

 8   purposes of covering your calls for your customers if you were

 9   out of town or otherwise engaged?

10   A     I think we discussed it, discussed something like that,

11   but nothing like that ever actually happened.

12   Q     Did you see any phone calls between you and Mr. Anderson

13   during the course of your direct by Attorney Silverman where

14   that discussion took place?

15   A     I'm recalling from --

16   Q     Right?

17   A     -- I remember a conversation we had, something about a

18   phone, but nothing ever came of that conversation, as far as

19   him holding the phone for me or anything like that.  So that

20   answers your question, right?

21   Q     Yes, answers my question.  So the answer's no, you never

22   gave him a phone for purposes of serving your customers, as

23   you call it?

24   A     No.

25   Q     Okay.  One of your common practices in both your cocaine
```

```
 1   distribution business, as well as your heroin distribution,

 2   was what you call fronting, right?  Either money or drugs?

 3   A    Yeah.  You said a form -- I'm sorry, repeat it.  Sorry.

 4              MR. ROGAN:  Could you read it back, ma'am?

 5              (The pending question was read by the reporter.)

 6   A    Yes.

 7   Q    Okay.  And you did that, again I'm not going to go over

 8   that testimony, you did that with some other people that are

 9   alleged to be part of that conspiracy, and those are people

10   that you were partners with, either in the supply side or the

11   distribution side, fair to say?

12   A    Fair to say.

13   Q    Okay.  Did you ever do that to Mr. Anderson?

14   A    I believe I did do that with Mr. Anderson.

15   Q    Really?  And what did you do it for?  Was it cocaine base

16   or heroin?

17   A    Heroin, I believe.

18   Q    Okay.  So we're going back to the couple of bundles that

19   you sold, which you said you don't know whether that was for

20   personal use or not?

21   A    Yeah.

22   Q    Do you remember, and I know -- I won't go through these

23   flip charts but let me try, do you remember -- being asked by

24   both Mr. Silverman and Mr. Reeve that your many proffer

25   sessions covered about 39 or 40 hours?
```

1    A    I remember being told that, yes.

2    Q    Okay.  And again, not interested in the mathematics.

3    What I am interested in is:  During that, any of those proffer

4    sessions, do you have a recollection of being asked by Mr.

5    Silverman if you had ever seen Richard Anderson use drugs?

6    A    I don't remember being asked that.

7    Q    So you don't have any recollection of that?

8    A    I don't have any recollection of that, no.

9    Q    Okay.  Do you have any recollection of, during those 39

10   or 40 hours of proffer sessions, being asked that question

11   about seeing an individual who's alleged to be part of this

12   conspiracy using drugs?

13   A    Any individual?  Are you still talking about Mr.

14   Anderson?

15   Q    No, you answered the first question, you said as to Mr.

16   Anderson you don't remember.  I'm saying do you remember being

17   asked that question about anybody else that's part of this

18   conspiracy being a drug user?

19   A    I believe we might have discussed some other people that

20   were -- I can't really recall, sir.

21        MR. ROGAN:  I think, your Honor, the government and

22   myself have a stipulation.

23        MR. SILVERMAN:  Your Honor, the parties are willing

24   to stipulate that the October 10th, 2013, interview reflects

25   that AUSA Silverman asked Wilson if he ever saw Anderson use

1    any drug and he replied that he never saw Anderson use any

2    drugs.

3            The government's also willing to stipulate that the

4    rest of the proffer reports reflect that the government did

5    not ask that question about any other defendant, that specific

6    question.

7            MR. ROGAN:  Okay, great.

8    Q    You had two different levels where you started to

9    cooperate with what I'll call law enforcement and/or the

10   government team.  Do you understand what I mean by that?

11   A    Yes.

12   Q    Okay.  And the very first time you cooperated with law

13   enforcement was on January 3rd, or actually the early morning

14   hours of January 4th, when you were arrested, do you remember

15   that?

16   A    Yes.

17   Q    Okay.  And tell me if I mischaracterize this.  I believe

18   it's in as a full exhibit.

19           MR. ROGAN:  Right?  His arrest report?

20           MR. SILVERMAN:  No.

21           MR. ROGAN:  All right, then I'll get it.

22   Q    Do you recall providing the law enforcement people in

23   response to a question an entire series of names and telephone

24   numbers of individuals that you were involved in, in narcotics

25   trafficking?

```
1    A    I recall, I recall talking to law enforcement on the day
2    I got arrested.
3    Q    But do you recall giving the law enforcement people not
4    only individual names, but actual cell phone numbers that
5    those folks used?
6    A    I didn't give them the cell phone numbers.  They had,
7    they had my phone, so I didn't know the cell phone numbers
8    myself, if I'm not mistaken.
9                MR. ROGAN:  Hang on one second, your Honor.
10   Q    Can you recall -- question withdrawn.
11               And at that time, you were advised of your Miranda
12   rights, and we all know what those are, right?
13   A    Yes.
14   Q    And you waived off on those Miranda rights, correct?
15   A    Correct.
16   Q    And you said you were willing to give a statement,
17   correct?
18   A    Correct.
19   Q    And then you started to identify a bunch of individuals
20   that you were familiar with in the New Haven area that you
21   were either involved in or knew were involved in the
22   distribution of narcotics.  Do you remember that?
23   A    Yeah.
24   Q    Okay.
25   A    Remember, I remember that day, not every single second
```

1  that happened that day, but I remember that day.

2  Q    I'm really focusing in on -- again, Agent Ndrenika, he

3  was there, right?

4  A    Yes, he was.

5  Q    Okay.  You, at that very first time, that's right when it

6  happens, right?  You just get arrested and you start coughing

7  up names, right, of people you were involved with, right?

8  A    Yes, sir.

9  Q    Okay.  You did not identify Richard Anderson as a partner

10  or an associate of you, would you agree with me on that

11  statement?

12  A    On that day, I don't remember, I don't remember -- I

13  don't think I -- if I had the --

14  Q    If I might, just to refresh your recollection, by the

15  way, the way this works, I want you to take your time, look at

16  the document, and see if it refreshes your recollection and

17  then I'll take the document back, okay?  Take as much time as

18  you need.

19  A    Sorry, I don't see Richard Anderson's name.

20  Q    Okay.  Let me take that document back.  So you would

21  agree with me that immediately upon your arrest, you provided

22  a whole bunch of other names of folks that were in your

23  narcotics trafficking organization, right?

24  A    My organization, or people who sold drugs or whatever.

25  Q    Right.  But you were being truthful with law enforcement

1  that night, right?

2  A    Actually, I was holding back with law enforcement that

3  night.

4  Q    Okay.  So lying again?

5  A    Holding back information from law enforcement.

6  Q    Well, holding back, you got to agree with me, is equal to

7  lying, right?  There are two ways you can lie, you can lie by

8  omission or commission, right?  Do you know the difference?

9  A    Don't know the difference.

10  Q    Okay.  Lying by commission is if I say to you my name is

11  Bob Jones, you clearly know that that's not true, right?

12  A    Okay, that is --

13  Q    Commission, okay?

14  A    Okay.

15  Q    Omission is please tell us all of the names of the

16  individuals that you were involved in in narcotics

17  trafficking, and you give them some but not all of the names.

18  That's just a lie in a different way.

19  A    Sir, just to skip ahead a little bit, that day, I

20  probably spoke to them for maybe, like, I don't know what it

21  was, like a half an hour or something and after, we spoke

22  already that took like 40 hours or whatever the case may be to

23  get through --

24  Q    No, I want to stick with the immediacy on the night you

25  were arrested or your involvement in narcotics trafficking.

```
 1    You're now telling this jury that's another occasion when you

 2    lied, right?

 3    A    Yeah.  Omission or commission, one or the other, but it's

 4    a lie.  Yeah, I lied.

 5    Q    A lie is a lie.  So I'm not talking about what happened

 6    after -- again, you know what, we need to be clear because

 7    there was a lot of confusion, I'm not going to get into legal

 8    terminology, right?

 9    A    Um hum.

10    Q    But your deal with the government is basically this,

11    right:  You come in, tell us the entire truth during your

12    proffers, in front of the jury, depending on our view of that,

13    we may or may not file the memo which may or may not cause

14    Judge Burns to do something regarding sentencing.  Fair to

15    say?

16    A    That's fair to say.

17    Q    Okay.  So at the time those proffer sessions started,

18    okay?  That was when you knew, "I got to give them whatever I

19    can," correct?

20    A    I have to give them the truth.  Not whatever I can,

21    because whatever I can could be a lie.

22    Q    Okay.  Right.  Because if you lie, if you lie, your deal

23    goes away.

24    A    Yes.

25    Q    Right?
```

```
 1   A     Yes.
 2   Q     Okay.  Do you remember -- I'll point you to the
 3   particular proffer sessions, do you remember -- at one point
 4   identifying to the government during one of your proffer
 5   sessions, telling them about two possible individuals that you
 6   referred Mr. Morales to as a source of cocaine?  Do you
 7   remember that?
 8   A     I remember referring Mr. Morales.  I don't know if I said
 9   in the proffer or not.  If I had the paper with exactly what
10   you are talking about.
11   Q     All right.  Just give me a minute.  Let me see if I can
12   get you to agree with some things.  You had a lot of sources
13   for -- I'm only talking about crack cocaine now, all right?
14   You had a lot of sources in the fall of 2011 for getting crack
15   cocaine, right?
16   A     I called, I called a lot of sources.
17   Q     But you had a lot of sources, right?
18   A     Yes.
19   Q     Right.  For instance, I think this is a new name, but do
20   you recall telling the government team during your proffer
21   session, I think it was your very first one, August 9th, that
22   was your first proffer session?
23   A     August 9th was my first proffer session.
24   Q     That during the fall of 2011, that you had purchased --
25   you had purchased -- eight ball quantities of cocaine base
```

1    from Finn Lu (phonetic) a.k.a. Chicks Lu?

2    A    I believe I did say that.

3    Q    Do you want me to show you?

4    A    Yeah.

5    Q    Okay, I will.  Just take a look at that?

6    A    Yeah, I see it.

7    Q    Okay.  Does that refresh your recollection that at least

8    in the fall of 2011, another source of supply for you for

9    cocaine base was Chicks Lu?

10   A    Yes, that refreshes.

11   Q    Okay, great.  Do you also recall in that proffer session

12   saying that, at or around that same time, another source, fall

13   of 2011, of cocaine base for you was Mr. Quiyon Reid, who we

14   talked about and is known as Gutter?

15   A    I don't remember saying that, sir.

16   Q    Oh, I'm sorry, question withdrawn.  You had actually

17   supplied Reid with cocaine base?

18   A    That, that I believe.

19   Q    My bad.  Bad question.  Withdrawn.

20          MR. REEVE:  Your Honor, I'm sorry to interrupt.  I

21   know, I understand, that the jury had requested not to take a

22   break.  My client needs to use the bathroom.  I don't want to

23   delay things.  My suggestion is maybe anybody who needs to use

24   the bathroom --

25          THE COURT:  We'll take a 15-minute recess.

```
 1            A JUROR:  We didn't say anything about not taking
 2   breaks.
 3            (Recess:  11:27 o'clock a.m. to 11:43 o'clock a.m.,
 4   in the presence of the jury.)
 5            MR. ROGAN:  May I resume, your Honor?
 6            THE COURT:  Yes, please.
 7            MR. ROGAN:  Thanks so much.
 8   Q    So Mr. Wilson --
 9            MR. ROGAN:  Could we put up government's exhibit,
10   the Facebook?
11   Q    Just a tiny bit on this, Mr. Wilson.  Do you remember me
12   asking you questions this morning about it?
13   A    Yes.
14   Q    Without hopefully doing shadows, you would agree all of
15   this money down here, you can clearly identify, are the old
16   $100 bills, right?
17   A    They're $100 bills, yes.
18   Q    Okay.  You can't see the denominations over here, but
19   there's 20s and stuff.  So I just wanted to give you a chance
20   to add in.  So you think some of that money is Dunkin' Donuts
21   money from your savings, some of that is Pell grant money from
22   Gateway.  Anything else you want to tell the jury is in the
23   photograph related to narcotics transactions?
24   A    No, the other money could be from drug money, too.  It's
25   possible.  More than likely, some of it's from drug money,
```

```
 1   too.

 2   Q    It's more than likely.  It's a lot of money, right?

 3   A    Yeah, it's a lot of money.  It's a lot of money, yes.

 4   Q    Let's be honest, that's a form of advertising on your

 5   Facebook page that you're a player, right?

 6   A    Yeah.

 7   Q    And you're a player in the drug business?

 8   A    Yeah.

 9   Q    Right?  You're letting everybody know?

10   A    Yes.

11   Q    Okay, great.  So before the break, we were talking about

12   your sources of supply, and I'm just focusing on crack

13   cocaine, because we've already established that Mr. Anderson,

14   by your own testimony, nothing to do with anything going on at

15   24 Judson or the backyard with all of the other stuff, right?

16   A    Yeah.  Yeah.  I identified that already.

17   Q    Well, when you say not yet, you're saying no, he wasn't

18   part of that?

19   A    I'm saying no.

20   Q    I'm a little hard of hearing.  Okay.  Do you also recall

21   telling the government during one of your proffer sessions

22   that when your other sources of supply for crack cocaine dried

23   up, that you told Morales that perhaps Mr. Anderson or another

24   guy named Hines could possibly be a source for crack cocaine,

25   right?
```

1    A    To try to speed it up, could you just show me the paper

2    that you want me to talk about?

3    Q    Sure.  Am I not going fast --

4    A    It's not just about that; it's me recalling all these

5    sessions.

6    Q    Sure.  I'm showing you the first proffer session, page

7    15.

8         MR. ROGAN:  Again, your Honor, might I approach?

9    Judge?  Okay.

10   Q    So just want to look down there in the highlighted.

11   A    I see what it says, yes.  I see what it says.

12   Q    Does that refresh your recollection that at least on one

13   occasion, you purchased an eight ball of cocaine base from Mr.

14   Hines to provide to Mr. Morales?

15   A    Yes.  Well, actually, without looking at that, I remember

16   Hines -- I mean, I remember Morales getting, purchasing, a

17   eight ball from Mr. Hines.  I remember that.

18   Q    But that eight ball you purchased from Hines, which you

19   then sold to Morales?

20   A    I don't recall.

21   Q    Okay.  Let me again --

22        MR. ROGAN:  I'm drawing him back to the same page

23   and the highlighted portion.

24   Q    Just read that and see if it refreshes your recollection.

25   A    I see what it says, but it's not refreshing that.  I

```
1   mean, I already said --
2   Q    Okay, fair enough.  If it doesn't refresh your
3   recollection, it doesn't.  Let me ask you this:  Would you
4   agree with me that, during the course of your conduct from the
5   time you were in the halfway house and did that first
6   undercover buy up until your arrest on January 3rd, 2012, that
7   it's hard for you to remember all the different sources of
8   supply that you had for cocaine base?
9   A    That is fair to say, yes.
10  Q    Okay.  So, for example, and this is very specific, I
11  think you testified before, may have been on direct
12  examination but I want you to listen carefully to this
13  question, that you never witnessed any transactions between
14  Mr. Morales and my client, Richard Anderson, right?
15  A    I don't remember transactions.  I don't remember me being
16  there for transactions with them two.
17  Q    Right, because, as you said, you wouldn't be because you
18  weren't partners in the cocaine business, as you claim, with
19  Mr. Anderson, right?
20  A    Yeah, we already went through that.
21  Q    Great.  So when you told the jury that you think that Mr.
22  Morales and Mr. Anderson participated between themselves in
23  approximately 35 grams of cocaine base, that's a straight up
24  guess, right?
25  A    Yeah, you could say, yeah, because I don't remember being
```

```
 1   there.

 2   Q    Right.  So this is important.  So you don't remember

 3   being there, so when you told that jury, you're just guessing

 4   based upon --

 5   A    Phone calls.  Not just --

 6   Q    Right, and let's focus in on the phone calls.  I think

 7   you've already established quite clearly for this jury that

 8   those phone calls, you do not know who was telling the truth,

 9   who was not telling the truth, correct?

10   A    Oh, yeah.  I'm not a mind reader.  I can only go by what

11   they're telling me.

12   Q    Right.  As it relates to the phone calls between you and

13   Mr. Anderson discussing Mr. Morales, okay?  There's no

14   specific mention of 35 grams of crack cocaine, right?

15   A    No, not specific.  No.  No.

16   Q    Right.  So you were just going based upon what you think

17   Mr. Morales told you and what you think Mr. Anderson told you?

18   A    Yes.

19   Q    Okay.  So as far as you know, I just want to make sure

20   I'm being fair to you, as far as you know, if you're being

21   truthful to the jury, you don't know if, in fact, those

22   transactions happened, right?

23   A    Uh huh.

24   Q    Would you agree with me on that?

25   A    That's fair to say.
```

1    Q    Not only don't you know if the transactions happened;

2    you're just making up a number as to what you think those

3    transactions might have included as far as quantity amount?

4    A    Well, going through the phone calls and -- going through

5    the phone calls -- well, yeah, I don't know the quantity.

6    Let's just say I didn't know the quantity or how many times

7    they actually met.  No, I don't.

8    Q    Right.  Right.  Because, as you said I think in response

9    to a question from Mr. Reeve yesterday, you know, when we were

10   talking, he was talking to you about, I don't remember the

11   exact contents but he was talking about, the content of a text

12   message and basically you said the text is what it is, right?

13   A    Um hum.

14   Q    Meaning you don't know what's in the mind of Mr. Morales,

15   you don't know what's in the mind of Mr. Anderson?

16   A    No, I do not.

17   Q    And we've already clearly established that Mr. Anderson

18   was not involved with you on a for profit basis in any cocaine

19   transactions, correct?

20   A    I sold Mr. Anderson --

21   Q    Heroin.

22   A    And I sold him crack before, earlier.  I sold him

23   earlier, early on, yes.

24   Q    Okay.  And when do you claim that you sold him crack

25   cocaine?

```
 1   A    I believe it was sometime during, like, early on in the
 2   investigation.
 3   Q    Right.  Was that before the wire went up?
 4   A    I'm not absolutely sure if it was before the wire went up
 5   or not.
 6   Q    Have you ever reviewed any phone calls of the 10,000
 7   pertinent phone calls in which you discuss this claimed
 8   transaction with Mr. Anderson?
 9   A    I did not see a phone call with that, no.
10   Q    Right.  Okay.  And again, you don't have any specific
11   recollection of the date or time of that alleged transaction?
12   A    No, I do not, sir.
13   Q    You don't have any specific knowledge about -- well --
14   well, how much was it?
15   A    I believe it was ten -- I believe it was ten grams.
16   Q    So more than an eight ball?
17   A    Yeah, it was more than an eight ball.
18   Q    Okay.  But you don't know whether he was using that for
19   redistribution or personal use, you have no idea?
20   A    I don't know what was in his mind to do.
21   Q    Right.  And to be honest, that's kind of a contradiction
22   of your earlier testimony, where you said you weren't partners
23   with him for profit in cocaine base, because you would have
24   made a profit on that transaction, correct?
25   A    I said with him and Morales.  I don't know if we can
```

1   queue that up or whatever, but I remember saying with him and

2   Morales.

3   Q    Okay.  So --

4   A    I thought you said for his, his profit.  I thought you

5   said something -- I'm -- go ahead, keep going, sir.

6   Q    No, this is important.  When we were talking about

7   partnerships and we were using your word and I don't want to

8   retread this ground but I have to now, based upon your answer.

9   You understood a partner to mean, or partnership, that you

10  were hoping to make some money on the transaction, right?

11  A    I was hoping to make some money, yeah.  Or gain, gain

12  some type of profit, gain a customer, gain money.

13  Q    Let's just talk about the money aspect of it.

14  A    All right.

15  Q    Forget about your networking opportunities.  But you also

16  assumed that the person that you were reselling to, if they

17  were not using it for their own personal use, they would make

18  some profit in selling it to people on the street, right?

19  A    Right.

20  Q    Okay.  As you said, you don't have any knowledge of that

21  in regard to Mr. Anderson at all?

22  A    Like have I seen Mr. Anderson sell drugs or something

23  like that?

24  Q    No.

25  A    I was going to say I haven't.

1    Q    Based upon your conversations with him about him making

2    any particular profit on any of what you claim were drug

3    transactions now between you and him?

4    A    I don't recall.

5    Q    You don't recall.  Right.  So that would be a no?

6    A    That would be I don't recall.

7    Q    Okay.  So you don't even recall if the transaction

8    happened?

9    A    Which transaction, sir?

10   Q    The one where you claim that you sold Mr. Anderson crack.

11   A    There is no, there is no proof besides me saying it.

12   Q    Right.  Exactly.  Was that the only one where you had

13   what you now claim to be a transaction between you and Mr.

14   Anderson, unrelated to Mr. Morales?

15   A    I believe so, sir.

16   Q    Okay.  But you can't tell the jury when, where, how much,

17   fair?

18   A    That, I believe I said how much.  I just don't know what,

19   what time or when.

20   Q    But to be fair, and I understand what your job is --

21   A    I don't have a job here.  I'm just telling the truth.

22   Q    Let's assume that's your job.  To be fair, in telling,

23   doing your job, you're making guesstimates about certain

24   things?

25   A    That's fair.

1   Q    Okay.  And that's important for the jury to know.  So,

2   okay, fair enough.  So do you recall in your proffer sessions,

3   before we got off track there, that once your other sources of

4   supply dried up, I think you told the government team that you

5   identified Mr. Hines and Mr. Anderson as a potential source of

6   cocaine base for Mr. Morales, right?

7   A    Potential source is someone who can find, who would be

8   able to find, it for him.

9   Q    Okay.  Do you recall, in a later proffer session and I

10  will find it for you, that your story was different in that

11  you then said:  No, the only alternative source I identified

12  for Mr. Anderson -- or for Mr. Morales -- was Mr. Wilson, do

13  you recall that?

14  A    You just said Mr. Anderson and Mr. Wilson, you just

15  confused names.

16  Q    Sorry.  Totally terrible question.  Do you recall during

17  one of your proffer sessions that you later told the

18  government, instead of identifying for Mr. Morales two

19  alternative sources for crack cocaine as being Mr. Hines and

20  Mr. Anderson, that you later told the government in another

21  proffer session that the only source you identified for Mr.

22  Morales was Mr. Anderson?

23  A    No, I do not remember.

24  Q    Okay.

25          MR. ROGAN:  Gentlemen, this is proffer session

1    September 19, 2013, at page 3 of 22, and I'm just going to

2    show it to him to refresh his recollection.

3    Q    Again, the way this works, if you would just read the

4    highlighted portion, and then I'm going to ask you a couple of

5    questions about that.

6    A    I read it.

7    Q    Does that refresh your recollection?

8    A    Somewhat.

9    Q    Okay.  Would you agree with the representation that in

10   that proffer session, after having reviewed it, that you told

11   the government team that the only person you introduced

12   Morales to for purposes of getting cocaine base was my client,

13   Richard Anderson?

14            MR. SILVERMAN:  Before the witness answers that

15   question, I need to confer with Attorney Rogan because I

16   believe that misstates this statement.

17            MR. ROGAN:  Okay, sure.

18            (Mr. Silverman conferring with Mr. Rogan.)

19   Q    I'm just going to show you something else, just to

20   refresh your recollection.  Could you just read that?

21   A    Right here?

22   Q    No, I just want you --

23   A    Not read it out loud.

24   Q    Read it, because I want to ask you a question about it.

25   A    Just this part here?

1    Q    Right.

2    A    From right here to right here?

3    Q    Right.

4    A    Yes.

5    Q    Okay.  Having reviewed that proffer session, do you

6    recall telling the federal government team, during your

7    proffer session, that you did not receive any money and/or

8    drugs from Richard Anderson from making the introduction to

9    Morales?

10   A    I believe it said that I did not receive any money

11   from -- that's what it said.  Did it say slash drugs?

12   Q    Just take another look at that.

13   A    Sorry.

14   Q    That's okay.

15   A    Okay.

16   Q    So let me try the question again.  So do you recall

17   telling the federal government during that proffer session

18   that you did not receive any money or drugs from Richard

19   Anderson from making the introduction to Morales?

20   A    Yes, that's true.

21   Q    Okay, great.  Oh, do you remember the first time you were

22   shown, I think it's Government's Exhibit 255, which is that

23   very small clip of your apartment building on 139 Day Street,

24   where you said that that was Mr. Anderson coming in and out of

25   the building?  Do you remember seeing that in court?

1    A     I remember seeing it in court.

2    Q     Okay.  And in court, you said that you were able to

3    identify that as Richard Anderson, right?

4    A     Yes.

5    Q     Okay.  Do you recall, during one of your proffer

6    sessions, that the first time you were shown that particular

7    video, you couldn't identify that as Mr. Anderson?

8    A     At the beginning.

9    Q     Right, okay.  What helped you?

10   A     Well, at first I wasn't shown the whole video, like I was

11   shown a clip, clip of it.

12   Q     You were shown the clip of what purported to be Mr.

13   Anderson coming in and out of the building, and you said you

14   couldn't identify the black male in the white shirt, black

15   pants and --

16            MR. SILVERMAN:  Objection.  That also misstates

17   something that's not in the record.  The proffer statement, we

18   can go to it if you like, he couldn't identify him on the way

19   in, but he recognized him on the way out, immediately.

20            MR. ROGAN:  Okay.  I'll withdraw that question.

21   I'll ask it a different way.

22   Q     So when you were shown the video, you couldn't identify

23   the individual on the way into the building?

24   A     Yes.

25   Q     But you could identify him on the way out of the

1  building?

2  A    Yes.

3  Q    Okay.  And that was a day that he was there to purchase a

4  small amount of heroin from you, right?

5  A    I believe that was, yeah.  Exactly what was it that he

6  purchased, I don't, I don't know.

7  Q    You don't know?

8  A    I don't know.  Like he was there that day.

9  Q    Okay.  So that's all you know.  He was there that day.

10  A    Yes.

11  Q    So you're not even signing up that he was there that day

12  to purchase drugs from you, that's fair, right?

13  A    I don't recall.

14  Q    Okay, great.  Oh, you'll probably remember this phone

15  call, because I'm sure we're going to see it again.  Do you

16  remember a phone conversation that was played during your

17  direct examination that was between you and Mr. Anderson

18  regarding Mr. Morales?

19  A    Yeah, I remember.  I remember.  Not the whole

20  conversation, but I remember the phone call.

21  Q    And is it fair to say at least what the words said up on

22  the screen was that Mr. Anderson --

23        MR. SILVERMAN:  Objection.  If he wants to play the

24  call, he can play the call, but he can't characterize the

25  statements --

```
 1              MR. ROGAN:  Sure, I can do it a different way.
 2              While we're waiting for that, let me move into a
 3    different area of inquiry.
 4    Q    One of the other things you talked about was that at some
 5    point, you would use your partners or suppliers to provide you
 6    bond money to get you out.  Remember when you were arrested?
 7    A    I would want them, or I would call, try, yeah.
 8    Q    Right.  Did any of those suppliers ever help you?
 9    A    No, I don't think they did.
10    Q    I'm sorry?
11    A    No, I don't believe they did.
12    Q    Okay.  Did you ever place a phone call to Mr. Anderson
13    like that about helping bond you out?
14    A    I don't believe I did, no.
15    Q    Okay.  And that's something you would typically do with
16    people you were partnered up with or were your suppliers?
17    A    Yeah, could say that.
18    Q    Okay.  Do you recall, in your initial post arrest
19    interview with the police department, denying knowing Jameel
20    Wilkes?
21    A    I do not recall.
22    Q    Okay.  You didn't identify Jameel Wilkes as somebody that
23    you knew, on that night of January 3rd/4th, correct?
24    A    Like I said, I do not recall.
25    Q    Okay, I'll show you.
```

```
 1              MR. ROGAN:  I'm just showing it to him for
 2   refreshment purposes.
 3              May I approach, your Honor?
 4              THE COURT:  Yes, sir.
 5   Q    I'm just showing this to you to refresh your
 6   recollection.  I want you to look at it, and tell me if you
 7   recall identifying Jameel Wilkes.
 8   A    Where?
 9   Q    Anywhere.  You'll see the names.
10   A    Names highlighted?
11   Q    Yes.
12   A    I don't see it, no.  I don't see it.
13   Q    Okay.  Having reviewed your post arrest of January 4th,
14   2012, did you see anywhere in there where you identified
15   Jameel Wilkes as a source of supply for you during your
16   narcotics distribution business?
17   A    I didn't even see his name.
18   Q    Right.  So that was information that you withheld from
19   law enforcement, correct?
20              MR. ROGAN:  I apologize for the interruption.
21   Q    So you didn't tell the police about him, either, right?
22   A    I believe -- I didn't see it in the report, so...
23   Q    Well, you've seen it now a couple of times and I
24   represent to you, I think the government would concede, I've
25   shown you the entire report, you didn't identify him as a
```

```
1    source for your narcotics distribution business either, right?

2    A    He didn't give me anything, so why would he be a source

3    if he didn't give me anything?

4    Q    All right, got you.

5             (Government's Exhibit 41, an audio recording,

6    played, and paused.)

7    Q   I just want to ask you a couple of questions about that.

8    Any conversations between you and Mr. Anderson in that phone

9    call regarding money or quantity, you're not involved in that

10   at all, right?

11   A    That's not, not my money that we're talking about.  It

12   would be his, his dealings.

13   Q    That's right.

14   A    Yes.

15   Q    And you don't know if anything that you've heard so far

16   from Richard Anderson is true, untrue, trash talking, anything

17   like that, do you?

18   A    No, I could only believe what he's telling me.

19   Q    Well, no, you actually said you can't believe what you're

20   telling me because you said on several of these phone calls,

21   you can't actually tell the jury if the person is telling the

22   truth, you can only really read the words up there.

23   A    Yeah, I can't tell if he's telling the truth.  I'm

24   believing what he's telling me.

25   Q    Right.  And Kevin Wilson -- sorry, question withdrawn.
```

1   And Jesus Morales was not part of that phone conversation,

2   correct?

3   A    No, he was not part of that phone call.

4   Q    Right.  And this has nothing to do, you would agree with

5   me, with your heroin distribution business, correct?

6   A    This is Mr. Anderson dealing with Mr. Morales, is what

7   we're talking about.

8   Q    Which you had no part in or real knowledge of?

9   A    Besides introducing them...

10  Q    Perfect.

11        MR. ROGAN:  Just play a little bit more.

12        (Government's Exhibit 41, an audio recording,

13  continued, and paused.)

14  Q    So again, what's important for the jury is, as you're

15  looking at that, okay?  At that point, and I'll find the date

16  and time of the call, you're out of the cocaine base

17  distribution business, right?

18  A    Um hum.

19  Q    And you really can't say to any degree of certainty to

20  this jury whether or not Mr. Anderson was in that business or

21  not, correct?

22  A    I was under the belief that he was.

23  Q    You were under the impression that he was?

24  A    Yeah, impression, okay.

25  Q    That's a whole lot different from factually knowing

```
 1  whether he was or he wasn't, correct?

 2  A    I guess, yeah.

 3  Q    Well, yeah.

 4  A    Yes.  Yes.

 5  Q    Okay.  Because you had nothing to do with Richard

 6  Anderson at that point, relative to what you guys were doing

 7  over at the backyard at Judson, right?

 8  A    Yeah.

 9  Q    And you had nothing to do with him relative to what was

10  going on between him and Mr. Morales, right?

11  A    Besides talking on the phone, trying to get things --

12  Q    He's just calling to complain on the phone, right?

13  A    Yeah, basically.

14  Q    Right, okay.  Do you recall at anytime during, you know,

15  from the time you began your cooperation agreement with the

16  government and today's date, reviewing any phone calls between

17  Mr. Morales and Mr. Anderson?

18  A    Between Mr. Morales and Mr. Anderson?  No, I don't

19  recall.

20  Q    Okay.  I want to talk to you about something you -- these

21  are your words from yesterday.  You talked about your clique.

22  Remember that word you used?

23  A    Clique, or inner circle.

24  Q    Right, that was the second one I was going to ask you

25  about.  And you talked about the circle of trust, so to speak,
```

```
 1   right?

 2   A     Um hum.  Yeah.

 3   Q     And really, what that's code for is, that's the people

 4   that were in your conspiracy, right?

 5   A     I don't know if you can call it -- I wouldn't call it a

 6   conspiracy.  The federal government called it a conspiracy.  I

 7   mean, that's what I got charged with, but it's not a street

 8   term that you go around using.  How about that?

 9   Q     And that's totally fair, and I'm not trying to play

10   around with legal terms.  But that clique, and that circle of

11   trust that you talked about, all the people in that circle of

12   trust, in that clique, right?  They were working either with

13   you or for you in the distribution of narcotics, either heroin

14   or cocaine base, right?

15   A     I mean, I had a group of friends, that was my clique,

16   that we did that way, but I also had cliques that wasn't just

17   hustlers or whatever the case may be.  I had a lot of friends.

18   A lot of people.  I had a lot of friends that I trusted that

19   weren't necessarily in the clique.  Does that make sense to

20   you?

21   Q     Yes, I can work with that.  What I was talking about, and

22   I understand you have friends, and I think you told Mr. Reeve

23   fairly that, it would be obvious that you would lie to your

24   family and friends about the true nature about what you were

25   doing, right?
```

```
 1    A    Um hum.

 2    Q    What I want to focus on is the clique and the circle of

 3    trust of people that you identified yesterday as being part of

 4    your cocaine base distribution and your heroin distribution.

 5    Do you remember those names that you gave us?  It was just

 6    yesterday.

 7    A    I don't remember the names, no.

 8    Q    All right.  Let me try it this way:  You never identified

 9    Mr. Anderson as being in your clique, right?

10    A    I don't remember identifying Mr. Anderson as being in my

11    clique, no.

12    Q    I'm sorry?

13    A    I don't recall bringing up his name.

14    Q    Right, because he wasn't in that clique, right?

15    A    He was a good friend of mine, but he wasn't -- like I

16    don't have every day --

17    Q    He wasn't in that clique over on Judson Street moving

18    cocaine base and heroin in large quantities, right?

19    A    This is like the fourth time I've said --

20    Q    Hey --

21    A    I get it, but, we said it, he wasn't on Judson.  I'm

22    sorry.

23    Q    And if I'm leaning on you a little bit, and I use that

24    term advisedly, it's because it's important for the jury to

25    understand.
```

```
 1              And he also, Mr. Anderson, wasn't in -- again I'm

 2   using your words -- in that circle of trust that you had,

 3   right?

 4   A    I trusted Mr. Anderson, but I don't -- I trusted Mr.

 5   Anderson.  But did he have access to my apartment?  No.  So I

 6   don't know if you want to call it a different level of trust.

 7   Q    Well, remember when I started out with my

 8   cross-examination of you, I said I was going to use your words

 9   and not try to play games with you.

10   A    Um hum.

11   Q    And you described those people in the circle of trust as

12   being people that would have access to your apartment, right?

13   Have access to the guns and money and drugs in that apartment,

14   correct?

15   A    Correct.

16   Q    Right.  And Mr. Anderson, not only was he not in the

17   clique; he wasn't in the circle of trust either, right?

18   A    In the circle of trust, defining how you just said

19   access, no, he did not have access.  So he wasn't.

20   Q    Right.  So you might have trusted him on some level, but

21   certainly not enough to put him in that inner circle of trust?

22   A    Sir, if he were to ask me for the key to my apartment on

23   a every day basis, probably not on a every day basis.  But if

24   he asked me for a key, I would have -- he didn't have access

25   to my apartment, he didn't have -- I trusted him, but on a
```

```
 1   different level.
 2   Q    And just to follow up, and move into a different area but
 3   follow up to be fair, he never actually did ask you for keys
 4   to your apartment?
 5   A    No.  No.
 6   Q    Because that wasn't the nature of your relationship.
 7        You also said something yesterday, and I wrote it
 8   down as a direct quote, "desperate people do desperate
 9   things."  Do you remember that?
10   A    Yeah.
11   Q    And you were describing yourself, right, when you said
12   that?
13   A    I'm describing desperate people.
14   Q    Right.  And were you describing yourself as -- sorry --
15   were you describing yourself as one of those desperate people?
16   A    In the situation where I approached Mr. Santos, that was
17   out of desperation, yes.
18   Q    All right.  But you're also in a desperate situation
19   here, right?
20   A    I don't really consider it a desperate situation.  I
21   mean, I know what I signed, and I know that I have to tell the
22   truth.  Am I nervous?  Yeah, I'm nervous, because I never been
23   in a trial, sitting down, speaking to lawyers and have people
24   staring at my face all day.  Of course I'm going to be
25   nervous.  But desperate, I don't think I'm desperate.  I mean,
```

```
 1   whether -- the outcome of this case doesn't have anything to

 2   do with me.

 3   Q    Okay.  Did you say the outcome of the case has nothing to

 4   do with you?

 5   A    The outcome of this situation has nothing to do with me.

 6   Q    Okay.  I'll leave that for the jury to decide.

 7             MR. ROGAN:  Can I talk to the government?

 8             (Mr. Rogan conferring with Mr. Vatti and Mr.

 9   Silverman.)

10             (At the side bar.)

11             MR. ROGAN:  Your Honor, I apologize for not asking

12   if we could come to side bar, but Attorney Vatti and I have an

13   agreement.  There are some particular questions that I wanted

14   to ask, Mr. Wilson if he's familiar with the phrase, a K

15   Street abortion, the street slang for it is K Street abortion.

16             THE COURT:  Abortion?

17             MR. ROGAN:  Abortion, yes.  I won't get into the

18   details of it, but it basically involves how these guys would,

19   if someone got pregnant, they would basically take her to a

20   certain area and beat her up in the hope to lose the baby.

21             THE COURT:  Oh my God.

22             MR. ROGAN:  I think it goes directly to both his

23   credibility, his propensity for violence, and I would like to

24   inquire in that area.  Mr. Vatti said he had an objection, so

25   I agreed, before I pose the question.
```

1          THE COURT:  You believe Mr. Wilson was involved in

2    that activity?  Is that it?

3          MR. ROGAN:  He certainly talked about it.  Whether

4    he did it or not.

5          THE COURT:  Yes.

6          MR. VATTI:  That was a mischaracterization of what's

7    in the proffer report.  He described to us in a proffer

8    session that he had a conversation with a friend of his who

9    was a female in which they discussed whether another woman was

10   possibly pregnant by Mr. Wilson.  They then discussed the term

11   "K Street abortion."  He explained what on the street it

12   meant.  He also said it never occurred.  Now --

13         THE COURT:  You mean this particular woman, it

14   didn't happen?

15         MR. VATTI:  It didn't happen.

16         MR. ROGAN:  Oh, no.

17         MR. VATTI:  They talked about what it was, but it

18   never actually occurred.  Now, Rule 609 allows impeachment by

19   conviction, that is not this case.  And Rule 608 allows

20   cross-examination about prior bad acts that reflects on

21   credibility and character for truthfulness, that does nothing

22   of the sort.

23         This is a blatant attempt to prejudice the jury

24   against him by a very hot button topic, and I don't think it

25   has anything to do with impeachment.

         1            MR. REEVE:  Just for the record, we both object.  I

         2    don't want this coming into the record.

         3            THE COURT:  You do not want?

         4            MR. REEVE:  No, I don't.

         5            MR. ROGAN:  Okay, then I'll make it easy.  Out of

         6    respect for --

         7            MR. REEVE:  Don't do that.  You do what you want.

         8    I'm putting my position on the record.  It's up to the Judge.

         9    You keep going.  Really, don't back away.  We have different

        10    interests, but you have to assert what you think is yours.

        11            MR. ROGAN:  Okay, then I'll resume.  I think this

        12    goes to -- whether he actually went through with it or not, it

        13    goes to -- his propensity for violence.

        14            It's no different, your Honor, by example, when the

        15    government was attempting to use a phone call when my client

        16    was making what appeared to be threatening statements against

        17    Mr. Morales, and that evidence came in, okay?  Even though it

        18    was later confirmed by Mr. Ndrenika and by this witness that

        19    it never actually happened.  So I'm not sure Mr. Vatti's

        20    argument.

        21            MR. VATTI:  The threats of violence were in the

        22    context of this conspiracy to collect drug money that was

        23    owed.  That is within the scope of this charged conspiracy.

        24    The K Street abortion thing has absolutely nothing to do with

        25    this conspiracy whatsoever.  At least the shootings we brought

```
1    out, he was actually involved in and they occurred.

2         MR. PALMIERI:  You guys don't dispute that it never

3    happened?

4         MR. ROGAN:  No, I don't.  I don't mischaracterize --

5    when I stepped up here I was just, the term and his

6    familiarity with it.  I have nothing to indicate that that

7    actually...

8         MR. PALMIERI:  That woman is not involved in the

9    drug activity?

10        MR. ROGAN:  She's not.

11        MR. VATTI:  No.

12        THE COURT:  Why is this relevant?  I don't

13   understand.

14        MR. VATTI:  I would object on relevance grounds and

15   the fact it's not within 608 or 609.

16        MR. MORAGHAN:  For the record, your Honor, I am also

17   objecting as well.

18        THE COURT:  I don't see how that's relevant to our

19   case.  These things happen apparently, but he's not involved,

20   right?  The fact that he may be aware that this happens with

21   other people has nothing to do with this conspiracy, though,

22   does it?

23        MR. ROGAN:  No.  It goes to his impeachment, your

24   Honor.

25        THE COURT:  Well, if he was participating in the
```

```
 1    activity you're talking about, that might be one thing, but
 2    the fact that he knows some people do these things, I don't
 3    understand how that goes to his credibility.  Maybe I'm
 4    misunderstanding your purpose.
 5           MR. ROGAN:  No, you're absolutely not, your Honor.
 6    It's just me doing my job.
 7           THE COURT:  I want you to do your job and I don't
 8    want to interfere with you doing your job; I just don't see
 9    its relevance.
10           MR. ROGAN:  I just need a minute, your Honor, to
11    confer.
12           THE COURT:  Sure.
13           (In open court.)
14           MR. ROGAN:  Your Honor, could I have just a moment?
15    I just wanted a moment to confer with my client.
16           THE COURT:  Go ahead.
17    BY MR. ROGAN (Continued):
18    Q    Oh, actually, just one more brief line of inquiry, and
19    then I'm done.
20           The Galan brothers, you know who they are, right?
21    A    Yes.
22    Q    They occupied -- you occupied apartment 8 in 139 Day,
23    they occupied apartment 4?
24    A    Yes.
25    Q    And you were living with their dad up in 8?
```

1    A     Yes.

2    Q     Okay.  Do you remember telling the government during one

3    of your proffer sessions that the Galan brothers didn't want

4    to meet directly with your clients, your drug clients?

5    A     In the beginning, he didn't, one of them didn't want to

6    meet directly with my drug clients, but I believe eventually I

7    think they did.

8    Q     Right.  So when they -- okay, so we'll work with that.

9    So when they didn't want to meet with them, would they just

10   leave the drugs outside the door and then the customer would

11   come in and kind of like the honor system, pick the drugs up?

12   A     I believe that happened on an occasion.

13   Q     Right.  That's how you were conducting your narcotics

14   transactions at 139 Day Street?

15   A     I was not there when that situation happened.

16   Q     But they were your drugs?

17   A     Yeah, they were my drugs.  Yeah.

18   Q     Being sold to your retail customers, I assume.

19   A     My drugs being sold, yeah.

20   Q     Okay.  So you would just trust your customers that they

21   would come by, pick up the drugs, and leave the money?

22   A     I was trying to find a way to make a transaction happen

23   while I wasn't there, while I was at work, to make it work for

24   all three parties, the party coming to pick up the drugs, the

25   party that, the person that was helping me, and myself.

```
 1   Q    Okay.  Last question for you, Mr. Wilson.  Tell me if
 2   this is a fair statement from you, that the jury, in listening
 3   to you interpret what's on the wiretaps that have been played,
 4   can't believe everything they're hearing?
 5            MR. SILVERMAN:  I would ask for the question to be
 6   clarified.  Are you referring to the calls or the
 7   interpretation of the calls?
 8            MR. ROGAN:  Good point.  Bad frame.
 9   Q    This is still going to be the last question.  Would you
10   agree with me that -- actually, it is a two-part question.
11   The jury can't believe even the content of all of the calls
12   because you've already testified that sometimes, the people on
13   the phone could be lying to you, right?
14            MR. SILVERMAN:  Objection.  I think this is an
15   argumentative question.
16            MR. ROGAN:  It's cross-examination, your Honor, of
17   course it's argumentative.
18            THE COURT:  I'll overrule the objection.
19            MR. ROGAN:  Thank you.
20   Q    Go ahead.
21   A    Can you repeat it again?
22            MR. ROGAN:  Madam court reporter, would you?
23            (The pending question was read by the reporter.)
24            MR. SILVERMAN:  Before the witness answers, I'm
25   going to make another objection, which is that I think it
```

```
1    calls for the witness to make the ultimate jury credibility

2    determination.  I don't think that's appropriate on

3    cross-examination, or any other stage of the proceeding.

4              THE COURT:  I'm going to sustain the objection.

5              MR. ROGAN:  But I can ask it a different way?

6              THE COURT:  Sure.

7              MR. ROGAN:  Let me try it this way:

8    Q    Would you agree that the phone calls that have been

9    played in this courtroom, from your own testimony, just the

10   words themselves, can't necessarily be believed because

11   sometimes the participants in those phone calls are lying?

12             MR. SILVERMAN:  Your Honor, the same objection.  I

13   think it's the same question.

14             MR. ROGAN:  No, it's not.  He's already testified,

15   your Honor, that, in fact, on some of those phone calls, he

16   knows that people are lying.

17             MR. SILVERMAN:  He hasn't testified that way as to

18   all of the phone calls.

19             THE COURT:  Yes.

20             MR. SILVERMAN:  This will be an issue on which the

21   Court instructs the jury.

22             MR. ROGAN:  Sorry, I didn't mean to interrupt.  I

23   didn't frame it in a certain way.  I didn't say all of the

24   phone calls; I said some of the phone calls.  Obviously he

25   didn't testify that all of the phone calls were false, okay?
```

```
 1   It's going to be up -- that's a jury question.  I'm just
 2   getting him to recapture his earlier testimony that not all
 3   the calls can be believed because he's already said, sometimes
 4   he knows that people are lying, or he's lying, on the phone.
 5           MR. SILVERMAN:  Your Honor, I still maintain this is
 6   the jury's province.  This is what they'll be called upon to
 7   decide when they deliberate.
 8           MR. ROGAN:  But, your Honor, that came out on direct
 9   examination, that's why this witness is here, not only because
10   he's cooperating to get a better deal, but he's there to say
11   what he meant and what he thinks the other individual meant,
12   without being able to get --
13           THE COURT:  I'll overrule the objection.
14           MR. ROGAN:  Thank you.  Now could we do the question
15   again?
16           (The pending question was read by the reporter.)
17   A   Is this a yes or no question?  Sometimes people call me
18   and lie to me.
19   Q   Yes, that's all.  In a simple way, the answer to the
20   question is yes, sometimes they're lying?
21   A   Sometimes people call me and lie to me, just the same way
22   I called and lied to people.
23           MR. ROGAN:  Now I've misled the jury.  There's
24   another question that's a follow up to that.  That's just
25   about the content of what somebody is saying.
```

```
1    Q    The interpretation of what you thought somebody meant,

2    that's what you think that individual might have been speaking

3    about in some of those phone calls, right?

4    A    The interpretation of what, sir?

5    Q    Well, when you were talking about code and this means

6    that and this means that, you were not only explaining what

7    you meant, but what you thought you were hearing from the

8    other individual, right?

9    A    I guess, yeah.  Yeah.  What I believed the other

10   individual was saying.

11   Q    Right.  And the last question is:  So that's solely your

12   interpretation?

13   A    It's what I believe.

14   Q    It's your interpretation?

15   A    Yeah.

16            MR. ROGAN:  Great.  Thanks.

17            I have nothing further for this witness, your Honor.

18            MR. MORAGHAN:  May I inquire, your Honor?

19            THE COURT:  Yes.

20   CROSS-EXAMINATION

21   BY MR. MORAGHAN:

22   Q    Good afternoon, Mr. Wilson.

23   A    Good afternoon, sir.

24   Q    My name is David Moraghan.  I represent Philip Bryant,

25   who is seated in the brown suit.
```

```
 1              Do you know Philip Bryant?
 2   A    Yes, I know Philip Bryant.
 3   Q    How long have you known Philip Bryant for?
 4   A    For a long, for a long time.
 5   Q    A long time.  Since when?  When did you first meet him?
 6   A    I don't recall when I first met him, but I knew I knew
 7   him when we were in middle school.
 8   Q    Okay.  Did you first meet him in middle school?  If you
 9   know.
10   A    I was in middle school.  I don't know if we were inside
11   school together, or whatever.
12   Q    So you've had a long time friendship with Mr. Bryant, is
13   that correct?
14   A    We've been friends since we met, but we didn't hang
15   together every day since then.  We knew each other since then.
16   Q    You didn't hang together every day?
17   A    Not since middle school.
18   Q    Okay.  But there were times when you would talk, correct?
19   A    Yeah, there were times, I mean, there were a lot of times
20   when we would talk.
21   Q    Both face to face?
22   A    Yeah.
23   Q    Person to person?
24   A    Yes.
25   Q    And you would also talk on the phone?
```

```
 1   A     Yes.
 2   Q     Okay.  And that continued through the course of your
 3   friendship?
 4   A     Yeah, you could say.
 5   Q     Up until the day of your arrest?
 6   A     You could say, yeah.
 7   Q     And during that time, as I said, you would talk on the
 8   phone with him?
 9   A     Yes.
10   Q     We've heard a number of phone calls between the two of
11   you during the course of this trial.  You had both phone calls
12   regarding what the government believes were criminal acts, and
13   you also had conversations that did not involve crimes,
14   correct?
15   A     Yes.
16   Q     Okay.  And that would be nonpertinent calls?  Do you know
17   what a nonpertinent call is?
18   A     I guess not drug-related maybe?
19   Q     Correct.  Friendship.
20   A     Exactly.
21   Q     And you would talk about what was going on in the
22   neighborhood?
23   A     Probably, yeah, what was going on in our lives, what was
24   going on in the neighborhood, friendship calls.
25   Q     You talked about trading movies?
```

```
 1   A    Yeah, probably.  Yeah, trading movies, playing games,

 2   yeah.

 3   Q    2K12 man football?

 4   A    No, 2K12 basketball, we played.

 5   Q    Okay.  But you would talk about that with him, correct?

 6   A    Yes.

 7   Q    Okay.  And there were times when you would go a period of

 8   time where you wouldn't speak?

 9   A    Yeah, that, that's fair.

10   Q    And there were times when you would speak frequently?

11   A    Yes.

12   Q    Okay.  And it's not unusual to see that you may speak on

13   the phone once in a week?

14   A    I don't think that that was unusual.  Might a saw each

15   other before that.  I don't recall seeing him every day, no.

16   Q    There were times when you would call each other quite

17   frequently?

18   A    Yeah.

19   Q    And sometimes there would be three, four, five, six calls

20   in a day?

21   A    That's, yeah.

22   Q    And that wouldn't be unusual, would it?

23   A    No, that wouldn't be unusual.  No.

24   Q    Okay.

25            MR. MORAGHAN:  Your Honor, may I approach the pad?
```

```
 1              THE COURT:  Yes.
 2   Q    Mr. Wilson, we heard testimony about the cost of heroin
 3   and your profit margin and whatnot earlier in the trial,
 4   correct?
 5   A    Yeah, correct.
 6   Q    And if I understand your direct testimony, you made $13
 7   profit per gram when you sold it by way of a gram, correct?
 8   A    Give or take.  Give or take.
 9   Q    Average?
10   A    Yeah.
11   Q    On average, it was about $13 a gram?
12   A    Okay.
13   Q    We didn't hear about what you would make by way of
14   profits when you sold it in bundles, did we?
15   A    I thought we did.
16   Q    Well --
17   A    Are you talking about the heroin, right?
18   Q    Yes.
19   A    Bundles.  I thought we did.  I thought we did though.
20   Q    Okay.  Well then I'm in the dark.  I'm going to try to
21   walk through this so I can see what the money trail is, okay?
22   A    All right.
23   Q    All right.  You sold a bundle for $50?
24   A    Yes, that was the average amount.
25   Q    Right.  And on average, you would get two-and-a-half
```

```
 1   bundles from a gram of heroin?

 2   A    Give or take, yeah.  Average, yeah.

 3   Q    That would average approximately 25 bags?

 4   A    Two-and-a-half would be 25 bags.

 5   Q    Okay.  So you would get two-and-a-half bundles, you would

 6   sell that for 125, which is $50 a bundle, is that correct?

 7   A    Yes, sir.

 8   Q    Are those numbers correct?

 9             MR. MORAGHAN:  Could you call up Exhibit 236,

10   please?  Can you focus on the line with the numbers?

11   Q    Mr. Wilson, this laboratory report shows that a bundle

12   contained approximately 3.4 grams of heroin, do you agree with

13   that?

14             MR. SILVERMAN:  Before the witness answers, I think

15   that misstates -- you said a bundle has 3.4 grams?

16             MR. MORAGHAN:  Yes.

17             MR. SILVERMAN:  That's not right.

18   Q    Mr. Wilson, a bundle is the equivalent of .34 grams of

19   heroin?

20   A    A bundle?

21   Q    Plus or minus.

22   A    You don't actually measure -- I didn't actually measure --

23   each bag.

24   Q    But it would approximate .34 grams of heroin per bag, per

25   bundle?
```

```
 1   A    I didn't measure, so I wouldn't know what -- I didn't
 2   weigh it so I don't know what it would -- are you telling me
 3   that that's a fact?
 4   Q    I'm asking you.
 5   A    I don't know, because I didn't weigh it.
 6   Q    So you have no idea how much heroin was contained in a
 7   bag which you packaged and combined into a bundle?
 8   A    I have, I have an idea because I didn't just, like, have
 9   a mound of heroin.  I would separate it, like I would bag up
10   one gram.
11   Q    One gram, in your view, one gram would equate to 2.5
12   bundles?
13   A    A little more, a little less.
14   Q    A little more, a little less.  Let's use your 2.5
15   bundles.  2.5 bundles is 25 bags?
16   A    Yes, it is.
17   Q    Correct?  Okay.  And one gram of heroin divided by the 25
18   bags would be approximately .04 grams of heroin?
19   A    Okay.
20   Q    Okay?  And you would sell a bundle for $50?
21   A    Yes.
22   Q    Okay?  And you would sell it for 50.  What was your cost?
23   A    I'm sorry, you just said the cost was $50.
24   Q    Your cost.  What did you pay per gram?
25   A    $57.
```

1    Q    57.  That was fixed, correct?

2    A    I'm sorry?

3    Q    I'm sorry, the $57 was a fixed cost, that's what Johnny

4    De Los Santos was charging you?

5    A    Yes.

6    Q    Okay.  So that's $57, you were selling a bundle for 50,

7    correct?

8    A    Correct.

9    Q    So you could get, you would get, 100 grams from Mr. De

10   Los Santos, correct?

11   A    Yes.

12   Q    Okay.  So would it be fair to say that would equate to

13   approximately 250 bundles?

14   A    Assuming that it was two-and-a-half every single gram and

15   assuming that I sold that 100 in bundles, yes.

16   Q    If you sold on average -- I'm not holding you to the

17   exact number, but if you sold -- your 250 bundles, okay?  For

18   $50 a bundle, correct?  That would result in a sale price of

19   $12,500?

20   A    Okay.  Okay.

21   Q    And for that same amount, for the 100 grams, your cost is

22   57, correct?

23   A    Correct.

24   Q    So your cost was $5700?

25   A    That's what I had to pay, so if that's what you're saying

1  that was the cost, that's the cost.

2  Q    So your profit on that amount would be $6800, correct?

3  A    Correct.  If your math is correct, it's correct.

4  Q    And dividing that by a hundred, your cost per gram on a

5  bundle is $68 per gram, correct?

6        MR. SILVERMAN:  Just to clarify, I think you mean

7  the profit.  You said cost.

8        MR. MORAGHAN:  I'm sorry, I'm sorry.

9  Q    The profit would be $68 per gram?

10 A    In bundles, are you saying?

11 Q    If you bought from Mr. De Los Santos 100 grams, he

12 charged you $57 per gram, and that's $5700, if you sold 250

13 bundles for $50 a bundle, that's $12,500, your net would be

14 $6800, divided by the 100 grams, and your cost per gram would

15 then be $68?

16 A    I thought it would be per bundle.  If that's the math,

17 that's the math, sir.

18        MR. SILVERMAN:  To be clear, it's not cost you're

19 asking; you're asking about profit?

20        MR. MORAGHAN:  I apologize.  I apologize.

21 Q    The profit, the profit was $68?

22 A    If that is the math that you just did, then yeah.

23 Q    6800 divided by 100 is 68, would you agree?

24 A    Yes.

25 Q    Okay.  And you went to New York, as I understand it, to

```
 1    meet Mr. De Los Santos two times a week, roughly?

 2    A     Either he came or I go, I went.

 3    Q     Another poor question.  You would acquire product from

 4    Mr. De Los Santos one way or another about two times a week?

 5    A     Yeah.  Tried to at least two times a week.

 6    Q     And you testified, I think it was Tuesday on direct, that

 7    you did this for approximately 20 weeks?

 8    A     It wasn't every week.  I mean, it was sometimes where

 9    stuff happened, either I didn't have money on time or -- it

10    wasn't on cue every week, I don't believe that.

11    Q     But you didn't -- you testified, though, on direct

12    examination I believe, that the total amount of times you

13    either met or acquired product from Mr. De Los Santos was

14    approximately 40 times?

15    A     Yes.

16    Q     That's fair to say?

17    A     I believe I said 40 or more maybe.

18    Q     So if you met, if you obtained, the hundred grams

19    approximately 40 times, using this formula, your profit would

20    have been approximately $272,000?

21    A     That's if I sold 250 bundles, which is very exaggerated.

22    I don't know if -- it's an example.  If you're using that

23    example, yes, I would have paid that much money.

24    Q     And that doesn't include you adding cut to it?

25    A     No, that wouldn't have included that.
```

```
1    Q    Stretching it out a little bit?

2    A    Trying to stretch it out, yes.

3    Q    Making it a little bit weaker but a little bit more

4    better for you from an income point of view?

5    A    Yes.

6    Q    Now, in the exhibit, it indicates that the weight equates

7    to .34 grams of heroin per bundle.  Would you agree with me on

8    that?

9    A    I haven't seen these reports.  This report here?

10   Q    The exhibit that's -- that's in the arrest report of Jose

11   Torres.

12           MR. SILVERMAN:  It's not an arrest report; it's a

13   lab report.  Doesn't say Jose Torres.  If you want to make

14   that connection --

15           MR. MORAGHAN:  On the second page it does.  Do you

16   want to bring up the second page?

17           MR. SILVERMAN:  The government's willing to

18   stipulate that the report under 236 is a lab report of drugs

19   seized after the arrest of Jose Torres, December 28th, 2011.

20           MR. REEVE:  May we just confer, your Honor, for one

21   moment?

22           (Mr. Reeve conferring with Mr. Silverman, Mr. Vatti,

23   and Mr. Moraghan.)

24           MR. REEVE:  Thank you, your Honor.

25   Q    The bundle, per bundle, amount of grams per heroin, as a
```

```
 1    result of the seizure from Mr. Torres, is .34 grams of heroin,

 2    would you agree with me?

 3    A    That's what it says net weight up here?

 4    Q    So --

 5    A    Sir, I didn't agree.  I wasn't a part of these arrests.

 6    I don't know what this paper right here means.

 7    Q    Okay.  Would you just accept my representation that the

 8    weight was .34 grams per bundle?

 9    A    Okay.

10    Q    Okay?  So if one bundle is .34 grams of heroin, three

11    bundles would be a little over one gram of heroin?

12    A    Three bundles would be -- okay, if that's the math.

13    Q    Three bundles at .34 is 1.02, so it's a little bit over a

14    gram, would you agree with me on that?

15    A    Okay.

16    Q    Again, if you bought 100 grams of heroin, you would

17    obtain approximately 300 bundles of heroin using these

18    numbers?

19    A    Using those numbers, yeah.

20    Q    So 100 grams would equate to three bundles?

21    A    100 grams?  Three bundles would be --

22    Q    One gram, one gram equals three bundles?

23    A    Using those --

24    Q    Yes.

25    A    Okay.
```

1    Q    Again using the same numbers, you sold it for $50 a

2    bundle?

3    A    Yeah.

4    Q    And you buy it for $57 per gram?

5    A    Yes.

6    Q    Correct?  So if you sold --

7    A    Supposed to be flip-flopped.  I think you flip-flopped

8    the numbers.

9    Q    57 is your cost, that's what you say?

10   A    Yeah, but you got it under the bundle.  Okay, all right.

11   Q    It's a whole new line.  I'm sloppy.  Your cost is 57?

12   A    Yes.

13   Q    You sell for 50?

14   A    Yes.

15   Q    So if you sell 300 bundles, okay?  At $50, you come up

16   with $15,000, correct?

17   A    If your math is correct, it's correct.

18   Q    300 times 50 is 15,000?

19   A    If your math is correct, it's correct.

20   Q    Well, do you want to do the math?

21   A    No, I would like to stay away from the math.

22   Q    So would I.  If you bought 100 grams, as was your custom,

23   at $57 a gram, which was the set fee, your cost in this

24   equation is the 5700, correct?

25   A    Correct.

```
1    Q    So if you take the sales of 300 bundles at $50 a bundle,

2    less what you paid to acquire it, your profit per shipment

3    here is $9300.  Do you agree?

4    A    Okay.

5    Q    And divided by the 100 grams that you purchased, your

6    cost -- your profit per gram is now $93?

7    A    Yes.

8    Q    And again, if you work that out mathematically by the

9    number of times you acquired product from Mr. De Los Santos,

10   that would have an overall profit of $372,000, would you agree

11   with me on that?

12   A    Yes, I would agree, if your math is right again.

13   Q    That's a good question.  And the profit for sale of a

14   gram of heroin, as you testified to, is $13?

15   A    Well, if I was to sell a gram, yes.

16   Q    In your pocket is $13?

17   A    Give or take, depending upon what was the price I

18   actually sold the gram for.

19   Q    It was much more lucrative to you to actually sell in

20   bundles?

21   A    Yes, it definitely was.

22   Q    Thank you.  You were released from incarceration on your

23   last conviction on July 19th, 2010?

24   A    If I had the paper in front of me, I could tell you.  I

25   was released in 2010.
```

```
 1   Q    Okay.  And you were released from supervised parole on

 2   June 28th, 2011?

 3   A    I believe so.

 4   Q    Okay.  Would you like --

 5   A    Yeah, if it would speed it up for you.  It would help me

 6   out, I'm saying.

 7             MR. MORAGHAN:  May I approach the witness, your

 8   Honor?

 9             THE COURT:  Yes.

10   Q    You're familiar with this DOC document, Department of

11   Corrections document, correct?

12   A    I've seen it before, yes.

13   Q    Okay.  It shows that you were released to supervised

14   parole on June 28, 2011?

15   A    Yes.

16             MR. MORAGHAN:  Your Honor, the government mentioned

17   that it might be an appropriate time to take a break.

18             THE COURT:  I think so, too, it's five after 1:00.

19             Ladies and gentlemen, we'll take the luncheon recess

20   for an hour.  Please don't discuss the case.

21             MR. SILVERMAN:  Your Honor, it was my understanding

22   that the jury requested a half an hour lunch break today.

23             THE COURT:  Half an hour?  That's okay with me.

24   Half an hour would be 25 of 2:00.

25             (Luncheon recess:  1:04 o'clock p.m. to 1:47 o'clock
```

```
1    p.m., in the absence of the jury.)

2              THE COURT:  Good afternoon.

3              MR. SILVERMAN:  Good afternoon, your Honor.

4              MR. REEVE:  Good afternoon, your Honor.

5              THE COURT:  Please be seated.

6              MR. SILVERMAN:  Your Honor -- I'll wait until you

7    sit down, I'm sorry.

8              I've spoken with my fellow counsel.  The government

9    has one other witness besides Mr. Wilson, and he's outside

10   right now.  He has a family obligation that requires him to

11   leave by a certain time today, and defense counsel have been

12   gracious enough to allow me to take him out of order to sort

13   of hit the pause button on the examination of Mr. Wilson right

14   now, to bring in that witness, who will be relatively short,

15   and it will be a break for the jury and everyone else, so we

16   can get that done and then we can resume with Mr. Wilson

17   after.  I just wanted to flag that we're going to go out of

18   order.

19             THE COURT:  There's no objection?

20             MR. REEVE:  No, your Honor.

21             MR. ROGAN:  No, your Honor.

22             (In the presence of the jury:  1:50 o'clock p.m.)

23             THE COURT:  Good afternoon, ladies and gentlemen.

24             MR. SILVERMAN:  Your Honor, just to explain, we had

25   some scheduling difficulties with the government's last
```

```
 1    witness, other than Mr. Wilson, so we're going to go out of

 2    order now.

 3              THE COURT:  Yes, sir.

 4              MR. SILVERMAN:  We'll resume with Mr. Wilson right

 5    after this relatively short witness.

 6              The government calls David Zannelli at this time.

 7              THE COURT:  Thank you.

 8                    D A V I D   Z A N N E L L I

 9         having been called as a witness, was first

10         duly sworn and testified on his oath as follows:

11              THE CLERK:  Please be seated.  State your name for

12    the record, spell your last name, and just the city and state

13    you reside in.

14              THE WITNESS:  Detective Sergeant David Zannelli,

15    Z-A-N-N-E-L-L-I; New Haven, Connecticut.

16              MR. SILVERMAN:  May I proceed, your Honor?

17              THE COURT:  Please.

18    DIRECT EXAMINATION

19    BY MR. SILVERMAN:

20    Q    Sir, how are you employed?

21    A    By the City of New Haven Police Department.

22    Q    You said a moment ago that you're a detective sergeant?

23    A    That's correct.

24    Q    What are your responsibilities as a detective sergeant?

25    A    I oversee major felony investigations that occur in the
```

```
 1   city of New Haven, and I supervise a group of subordinate
 2   detectives.
 3   Q     How long have you been with the New Haven Police
 4   Department?
 5   A     Approximately six years.
 6   Q     So were you at the New Haven Police Department at the
 7   time of May 17th, 2012?
 8   A     Yes, sir.
 9   Q     What was your assignment on that date?
10   A     I was assigned to the DEA task force.
11   Q     Were you a task force officer at that time?
12   A     Yes, I was.
13   Q     Do you recall any law enforcement action that you took on
14   May 17, 2012?
15   A     Yes, I do, I was assigned a team leader for Operation
16   Bloodline, and I was assigned to effectuate two federal arrest
17   warrants in relationship to that investigation.
18   Q     Okay.  Was one of the individuals that you were assigned
19   to arrest Richard Anderson?
20   A     Yes, it was.
21   Q     How many people were on your team?
22   A     Approximately ten officers.
23   Q     Was Mr. Anderson your first target of the day?
24   A     Yes, he was.
25   Q     So would you describe for the jury what happened when you
```

```
 1   went to effect the arrest?

 2   A    We first responded to 23 Batter Terrace.  We formed a

 3   perimeter around the residence, and I knocked and announced

 4   that police officers were on the scene.  I met and spoke with

 5   Ms. Melvata (phonetic) Washington, she was at 23 Batter

 6   Terrace.  She gave us verbal consent to check the interior of

 7   the residence for Mr. Anderson.  We did not find him there.

 8   Q    Before you go on, in searching for Mr. Anderson, did you

 9   conduct a thorough search, the way you would if you had a

10   search warrant for the location?

11   A    No.

12   Q    Did you observe anything that was just lying around that

13   would have been of evidentiary value?

14   A    No, I did not.

15   Q    You didn't see any drugs in plain view?

16   A    No, sir.

17   Q    No guns in plain view?

18   A    No.

19   Q    You didn't find Richard Anderson there?

20   A    No, we did not.

21   Q    What happened next?

22   A    I asked Ms. Washington if she could call Mr. Anderson to

23   meet with me, turn himself in.  She responded that he did not

24   have a cell phone and that she would call his sister to see if

25   she could get in contact with him.  She said she hadn't been
```

1    in contact with him within a week because of an argument, but

2    he had been staying there.

3    Q    Okay.  What happened after your meeting with Ms.

4    Washington at 23 Batter Terrace?

5    A    She was unable to get in touch with his sister.  I left

6    her my name and number and asked if she were to get in touch

7    with Mr. Anderson, to have him call me.

8    Q    Then what did you do?

9    A    We left the scene at that time.

10   Q    Did you have any other locations at which you were going

11   to look for Mr. Anderson on that date?

12   A    Yes, we did.

13   Q    Did you go to those locations?

14   A    Yes, we did.

15   Q    How many?

16   A    Approximately three additional, four total.

17   Q    Was Mr. Anderson located at any of those four total

18   locations?

19   A    No, he was not.

20   Q    What happened while you were at the fourth location?

21   A    While at the fourth location, I did receive an incoming

22   call on my personal cell phone.  An unidentified male who

23   claimed to be Mr. Anderson said that he would turn himself in

24   at the intersection of Farren and Fulton in approximately 20

25   minutes.

1    Q    About what time did you receive that phone call?

2    A    Approximately 7:40 a.m.

3    Q    So the turn-in time would be approximately 8:00 o'clock?

4    A    Correct.

5    Q    Were you near this intersection of Farren and Fulton when

6    you received this call?

7    A    No, we were on the other side of the city.

8    Q    What did you do?

9    A    What I did was called into police dispatch to see if a

10   couple of uniform officers could meet Mr. Anderson should I be

11   late due to heavy morning traffic.

12   Q    Did you then travel to that intersection?

13   A    Yes, I did.

14   Q    What happened when you got there?

15   A    Mr. Anderson had already been detained in a marked police

16   cruiser, so I removed him from the marked police cruiser, I

17   informed him he was under arrest for a federal arrest warrant

18   and switched up handcuffs.  Actually, the officers on scene

19   had already detained Mr. Anderson with handcuffs so as a

20   courtesy I put mine on him, because they were detaining him

21   under my discretion.

22   Q    Then they would be able to leave the scene if you didn't

23   need them anymore?

24   A    That's accurate.

25   Q    And they would still have their handcuffs?

```
 1   A     Correct.

 2   Q     I understand.  Did you speak with Mr. Anderson?

 3   A     I did.

 4   Q     What did you tell him?

 5   A     I basically informed him that he did have a federal

 6   arrest warrant and that I wished to speak with him about the

 7   circumstances surrounding that warrant.

 8   Q     Did you advise him of what we usually refer to as Miranda

 9   rights?

10   A     Yes, I did.

11   Q     Was he willing to speak with you at that time?

12   A     Yes, he was.

13   Q     Before we go on, do you see Mr. Anderson, the person

14   you're describing, here in the courtroom?

15   A     I do, sir.

16   Q     Could you describe what he's wearing?

17   A     Pinkish shirt with a pink and black multicolored tie.

18         MR. SILVERMAN:  Your Honor, I ask the record to

19   reflect that the witness has identified the defendant, Mr.

20   Anderson.

21         THE COURT:  Yes.

22         MR. SILVERMAN:  Thank you, your Honor.

23   Q     And he was willing to speak with you after you advised

24   him of his Miranda rights?

25   A     Yes, he was.
```

```
 1   Q    What did he tell you?

 2   A    He mentioned that he had been selling small amounts of

 3   crack cocaine and marijuana through the past year, because he

 4   was unable to find employment and needed money for the family.

 5   He also mentioned that he did go by the alias name of Porter.

 6   He did not have a cell phone on his person, nor did he have

 7   any narcotics.

 8            I asked him about two cell phone numbers that I had

 9   recorded prior to the arrest date that were associated with

10   Mr. Porter from the DEA office.

11   Q    All right.  As you sit here today, do you remember those

12   two phone numbers?

13   A    No, I do not.

14   Q    Would it refresh your recollection to take a look at your

15   report of the post arrest interview?

16   A    Yes, it would.

17            MR. SILVERMAN:  May I approach, your Honor?

18            THE COURT:  Yes, sir.

19   Q    I'm going to direct your attention to paragraph 6.  When

20   you're done looking at that, please look up.

21            That was fast.  Was one of the phone numbers that

22   you asked Mr. Anderson about 917-603-5289?

23   A    Yes, sir.

24   Q    Was the other one 475-227-4414?

25   A    Yes, it was.
```

```
 1   Q    What did Mr. Anderson say when you asked him about those
 2   numbers?
 3   A    Said he was familiar with the numbers and he may have
 4   used them during the past year.
 5   Q    Did you inquire of Mr. Anderson about other areas, other
 6   topics?
 7   A    I did.
 8   Q    Was he willing to speak with you about these other areas?
 9   A    He did not want to go into detail.
10   Q    What happened when he expressed to you that he did not
11   want to go into detail?
12   A    The conversation was terminated at that time.  We
13   proceeded to gather further instructions to bring Mr. Anderson
14   to the judicial marshals.
15   Q    To be processed?
16   A    Correct, sir.
17        MR. SILVERMAN:  May I have one moment, your Honor?
18   Q    Just want to make sure I was clear with you, or that I
19   understand what you said.  When Mr. Anderson told you --
20   withdrawn.  I'll start the question over, sorry.
21        What did Mr. Anderson tell you with respect to his
22   involvement in drug trafficking?
23   A    He would not reveal his source of where he was buying
24   narcotics, but did admit to selling small amounts of crack
25   cocaine and marijuana throughout the past year.
```

```
 1                 MR. SILVERMAN:  Thank you.  I have no further
 2      questions.
 3                 MR. ROGAN:  May I, your Honor?
 4                 THE COURT:  Yes.
 5      CROSS-EXAMINATION
 6      BY MR. ROGAN:
 7      Q    Just briefly, Agent Zannelli.  You and I don't know each
 8      other, right?
 9      A    No, sir.
10      Q    Okay.  Do you still have in front of you the copy of your
11      report?
12      A    I do have page 2 of one of my reports.
13      Q    Okay.  You testified that, first of all, let's be clear,
14      Mr. Anderson voluntarily turned himself in, correct?
15      A    That's accurate.
16      Q    Okay, fair enough.  At the time he turned himself in, you
17      didn't find any contraband, correct?
18      A    No, I did not.
19      Q    And were you one of the officers that did the security
20      sweep of the first residence?
21      A    Yes, I was, sir.
22      Q    Okay.  And Mr. Anderson at that time did not know that
23      you were coming, correct?
24      A    No, he did not.
25      Q    Okay.  So to be clear, there was nothing that you could
```

```
 1    see out in the open.  Did you go through every room in the
 2    residence?
 3    A    I did go through every room.
 4    Q    Okay.  So you didn't find in any room of the residence
 5    any narcotics -- large, small amounts, nothing -- correct?
 6    A    Correct.  I was only searching for Mr. Anderson.  I
 7    wasn't looking for any evidentiary value or anything like
 8    that, no narcotics or anything like that.
 9    Q    But to be fair, you would have been obligated if you had
10    seen anything, you certainly would have bagged it, tagged it,
11    and used it as evidence, correct?
12    A    That's accurate, sir.
13    Q    Okay, great.  The very first question you were asked was
14    what did Mr. Anderson tell you, you know, when he started to
15    say that he was willing to cooperate, do you remember that,
16    from Attorney Silverman?
17    A    Yes.
18    Q    You said that he told you that he had sold small amounts
19    of marijuana and crack cocaine through the past year, correct?
20    A    Yes, sir.
21    Q    I want you to take a look at paragraph 6, and see if that
22    refreshes your recollection that he actually told you
23    something else in the first sentence.
24    A    I'm sorry, sir, I don't see the disparity here.
25    Q    Okay.
```

1           MR. ROGAN:  May I approach, your Honor?

2           THE COURT:  Yes.

3    Q    Does that refresh your recollection?

4    A    Yes, sir.

5    Q    Okay.  So does that refresh your recollection that the

6    first statement that Mr. Anderson made to you when he

7    voluntarily turned himself in was that he had purchased small

8    amounts of marijuana and crack cocaine throughout the past

9    year?

10   A    What I should have said was purchased and sold, but

11   you're right, that's different.  Different.

12   Q    Actually, to be clear, that document, which is -- that

13   document was prepared by you?

14   A    Yes, sir.

15   Q    Okay.  And that's in your words, correct?

16   A    Yes, sir.

17   Q    And actually, to be fair, it's not Mr. Anderson's

18   statement, in the sense that it's your recitation of what you

19   recall Mr. Anderson said to you back on the date he was

20   arrested?

21   A    What he told me, I wrote down, and that's what I put in

22   my report.

23   Q    Okay.  So what he told you and you put down was that he

24   had purchased small amounts of marijuana and crack cocaine

25   throughout the past year, period, correct?

```
 1   A    Correct, sir.

 2   Q    Okay.  And then take a look at that report and see if it

 3   refreshes your recollection that he then told you that he

 4   occasionally sold small amounts of marijuana and crack

 5   cocaine, without a time frame attached to it?

 6   A    Correct.

 7   Q    Right.  So when he said to you he occasionally sold small

 8   amounts of marijuana and crack cocaine, he didn't provide you

 9   a time frame, correct?

10   A    No, he did not go into detail.

11   Q    So you have no idea, when he's making that statement,

12   what he's talking about, is that fair to say?

13   A    When he said throughout the past year, that's what my

14   attention was focused on, so I assume he was talking about the

15   past year in question.

16   Q    I want to be so respectful to you, and you can't make an

17   assumption.  I think you just told this jury that you wrote

18   down what he said?

19   A    Correct.

20   Q    And in the first statement, he says he purchased small

21   amounts of marijuana and crack cocaine throughout the past

22   year, period?

23   A    Correct.

24   Q    Then there's another line that says he occasionally sold

25   small amounts of marijuana and crack cocaine without any time
```

```
 1    frame, correct?

 2    A    Correct.

 3    Q    All right?  So that's actually what he told you?

 4    A    Correct.

 5    Q    And he told you nothing else after that?

 6    A    No, he did not.

 7              MR. ROGAN:  Okay, great, no other questions.  Thank

 8    you.

 9              MR. REEVE:  Judge, this evidence is only being

10    offered against Mr. Anderson.  I don't think we even have a

11    right to question, but if we did, we have no questions.

12              MR. MORAGHAN:  That's true.

13              THE COURT:  You too?

14              MR. MORAGHAN:  Yes, your Honor.

15              THE COURT:  Okay.

16    REDIRECT EXAMINATION

17    BY MR. SILVERMAN:

18    Q    Not to parse words written some time ago, but those two

19    sentences we've been talking about, are they one right after

20    another?

21    A    Yes.

22    Q    What does the first sentence say and what does the second

23    sentence say?

24    A    "Anderson stated that he purchased small amounts of

25    marijuana and crack cocaine throughout the past year.
```

1   Anderson stated that he occasionally sold small amounts of

2   marijuana and crack cocaine because he could not find

3   employment and needed money for his family."

4   Q    Did you understand, when he told you those things --

5   A    Yes, he did.

6   Q    --  they were happening at the same time frame,

7   purchasing and selling?

8           MR. ROGAN:  I object.  That calls for him to

9   speculate.  His testimony was "I wrote down what Mr. Anderson

10  said," and so that's an improper question.

11          MR. SILVERMAN:  I can clarify the question.

12  Q    Are you a court reporter?

13  A    No, I'm not, sir.

14          MR. ROGAN:  I'll stipulate that he's not a court

15  reporter, your Honor.

16  Q    Do you take verbatim notes?

17  A    Yes.

18  Q    You try to get every word down?

19  A    Yes.

20  Q    All right.  And when Mr. Anderson told you those words,

21  and you wrote them down, what was your understanding of them?

22  A    Exactly what I wrote, that he purchased and sold --

23          MR. ROGAN:  Hold on.  Your Honor, same objection,

24  his understanding doesn't matter.  He said, he testified on

25  direct examination that those statements are what exactly that

```
 1   Mr. Anderson said.  So his understanding is of no particular

 2   import, as far as it relates to his report.

 3              MR. SILVERMAN:  He's the witness.  He was there.  He

 4   participated in the conversation.

 5              THE COURT:  I'm going to sustain the objection.

 6              MR. ROGAN:  Thank you, your Honor.

 7              MR. SILVERMAN:  All right, very good.  I understand

 8   the Court's ruling.

 9   Q    Why did Mr. Anderson tell you he was selling crack

10   cocaine?

11   A    Because I asked him.

12   Q    I understand.  What was the reason he gave for why he was

13   selling crack cocaine?

14   A    Basically, that he was unable to find employment and that

15   money for the family was scarce.

16   Q    In your experience, when people have turned themselves in

17   to you in the past, do they typically bring drugs with them?

18   A    No.

19              MR. ROGAN:  Objection, your Honor.  Outside the

20   scope of his direct examination, and also my initial

21   cross-examination.

22              THE COURT:  The question is, as I understand the

23   question Mr. Silverman asked was:  What was the reason he gave

24   for why he was selling crack cocaine.

25              MR. SILVERMAN:  No, your Honor, the next question.
```

```
 1              THE COURT:  I don't have that, I'm sorry.  Why don't
 2   you repeat it?
 3              MR. SILVERMAN:  Sure.  I'll ask that question again.
 4   Q    In your experience in the past, when people have turned
 5   themselves in, do they typically bring drugs with them?
 6   A    Never.
 7              MR. SILVERMAN:  And there was an objection, that I
 8   think it was outside the scope, but I think the
 9   cross-examination specifically asked whether Mr. Anderson had
10   any drugs on him at the time.
11              MR. ROGAN:  Your Honor, and AUSA Vatti reminded me,
12   I did ask that on cross, so I'll withdraw my objection to that
13   question.
14   Q    So the answer is never?
15   A    Correct.
16              MR. SILVERMAN:  Nothing further.  Thank you, your
17   Honor.
18              MR. ROGAN:  Nothing further.
19              THE COURT:  Nothing?
20              MR. ROGAN:  That's it.
21              THE COURT:  Either of you gentlemen wish to inquire?
22   You do not wish to inquire?
23              MR. MORAGHAN:  No, your Honor, thank you.
24              THE COURT:  We would like to take a short recess,
25   ladies and gentlemen.  Ten minutes, okay?
```

1          (Recess:  2:08 o'clock p.m. to 2:13 o'clock p.m., in

2     the presence of the jury.)

3          MR. SILVERMAN:  Your Honor, I've just spoken to

4     defense counsel and they've agreed to let me tie up one more

5     loose end.  I have a stipulation that I'm going to read into

6     the record that eliminates the need to call one additional

7     witness.

8          The parties stipulate and agree that on November

9     9th, 2011, a New Haven police officer, at the direction of the

10    DEA, conducted a lawful motor vehicle stop and identified

11    Robert Santos as the passenger of the stopped vehicle.

12         Thank you.

13         MR. REEVE:  Just for the record, your Honor, we've

14    reviewed that, Mr. Santos reviewed it, and we all agree.

15    There's no dispute about that fact.

16         THE COURT:  Thank you.

17              **K E V I N     W I L S O N**

18         having been recalled as a witness, was previously

19         duly sworn and testified on his oath as follows:

20         MR. MORAGHAN:  May I proceed, your Honor?

21         THE COURT:  Please.

22         MR. MORAGHAN:  Thank you.

23    CROSS-EXAMINATION

24    BY MR. MORAGHAN (Continued):

25    Q    Mr. Wilson, before the break, we established that you

1    were released from jail on July 19th of 2010, and released to

2    parole on June 28th, 2011, correct?

3    A    Correct.

4    Q    And on June 28th, 2011, you were residing at 20-22-24

5    Judson Street?

6    A    At some point during the investigation, I was.  I don't

7    know exactly what date was it I that I acquired that

8    apartment.

9    Q    You conducted a controlled buy, sale, on June 29th, 2011,

10   correct?

11   A    June 29th?  I believe -- if I saw it, yeah.  I have to

12   see the -- it could be that date.  I'm not sure if it was that

13   date or not.

14            MR. MORAGHAN:  Approach the witness?

15            MR. SILVERMAN:  The government would stipulate that

16   June 29th, 2011, was the date of one of the controlled

17   purchases.

18   Q    Do you agree with that?

19   A    Okay.

20   Q    Do you know where that occurred?

21   A    June 29th?

22   Q    Yes.

23   A    I don't remember where it occurred.

24   Q    Do you know who you sold to?

25   A    Right now, I don't remember.

1    Q    Do you know who provided you with the crack cocaine?

2    A    June 29th?

3    Q    Yes.

4    A    I don't recall June 29th.  I think that was just my own --

5    I don't recall June 29th.

6    Q    If I show you a DEA report, would that refresh your

7    recollection of June 29th?

8    A    It possibly would help me out.

9         Okay, I remember now.

10   Q    Does that refresh your recollection, sir?

11   A    Yes.

12   Q    Okay.  Did you engage in a controlled narcotics sale on

13   June 29th of 2011?

14   A    Yes.

15   Q    And that took place at 20-22-24 Judson Street?

16   A    I don't remember it, okay, I don't remember it being at

17   that address, sir.

18   Q    Would it refresh your recollection to continue reading

19   the report?

20   A    Yeah.

21   Q    The highlighted first two lines may, but if you want to

22   read the entire report, please do.

23   A    I see that --

24   Q    Mr. Wilson, don't read from the report.  If you're done

25   reading it, let me know, and I will start asking some

```
 1   questions.  But don't read from the report.

 2   A    Don't read it?

 3   Q    You can read it, but not out loud.

 4   A    Oh, I'm saying I see what the address says.  I just don't

 5   remember being at that address at that time.

 6   Q    Why don't you read the entire document, please?

 7   A    Okay.  I didn't read the whole thing, but...

 8   Q    Do you recall conducting a controlled narcotics sale on

 9   June 29th of 2011?

10   A    I recall what the report says, yes.

11   Q    You recall what you read in the report?

12   A    Yes.

13   Q    Do you have any independent recollection?

14   A    I don't really.

15   Q    Okay.  So you don't know who you sold to?

16   A    I believe I remember who it was.

17   Q    Who was that?

18   A    I believe it was a female, but I'm not even...

19   Q    And do you recall who arranged the sale to take place?

20   A    I believe, I believe I arranged for the sale.  I arranged

21   for the sale to take place with the person.

22   Q    You contacted the individual and said, "Let me sell you

23   some crack cocaine"?

24   A    No, the individual contacted me.

25   Q    And when did the individual contact you?
```

```
 1   A     It was, it was sometime while I was at work, from what
 2   the report says.
 3   Q     Excuse me?
 4   A     From the report it says --
 5   Q     Not from the report.  What do you recall?  If you don't
 6   recall anything --
 7   A     I don't recall.  If I ask to see the phone call, it would
 8   be better.  That's not my report.
 9   Q     This was before the July wiretap was commenced.  It was
10   on June 29th.  The wiretap was in July.
11   A     Okay.
12   Q     Do you have any recollection at all of this?
13   A     No, I really don't.
14   Q     Okay.  The report references an individual in a white
15   Nissan Altima, provided you the crack cocaine.  Do you recall
16   any individual pulling into that location and giving you any
17   crack cocaine?
18   A     I don't recall that day.
19   Q     You don't recall receiving crack cocaine from any person
20   on June 29th?
21   A     Don't recall that.
22   Q     Don't recall selling it to anyone on June 29th?
23   A     If I don't recall that day, I don't.
24   Q     Do you recall telling the person that you were residing
25   and living in the rear apartment at 20-22-24 Judson Street on
```

```
 1   that day?

 2   A    No, I do not recall that.

 3   Q    So you have absolutely no recollection, is that fair to

 4   say?

 5   A    I mean, I read it but that, that day, I really don't have

 6   any recollection, sir.

 7   Q    This was just a month or so after the May 10th sale you

 8   made, correct?

 9   A    Yes.

10   Q    And you have a crystal clear recollection of the events

11   on May 10th?

12   A    I have, I have a good recollection of that one, yes.

13   Q    You testified earlier in the week, in response to a

14   question by Mr. Silverman, that Mr. Bryant resided at Judson

15   Street in the spring/summer of 2011 -- 2010, I'm sorry --

16   2011?

17   A    Yes, I believe -- yes.  Yes.

18   Q    And Quiyon Reid was also residing there?

19   A    Yes, I believe so.

20   Q    And you said you were unsure about Vincent Clark?

21   A    Yeah, I'm unsure exactly when it was that he got an

22   apartment there.

23   Q    Vincent Clark was living at Judson Street prior to you

24   moving there on or about June 29th of 2011, wasn't he?

25   A    I believe so.
```

1    Q    He had moved in there February/March with his -- the

2    mother of his child and his child, correct?

3    A    I believe so.

4    Q    Okay.  And William Hines was also living at Judson

5    Street, at 20-22-24 Judson Street, correct?

6    A    If he had an apartment there, his apartment was with me,

7    so if he had an apartment there at that time, then I had an

8    apartment there at that time.

9    Q    In a proffer session with the government, you told them

10   that you and William Hines were living together at 20-22-24

11   Judson Street as of May of 2011, do you recall telling them

12   that?

13   A    I do not recall telling them that.

14   Q    We'll get back to that.  Between May 10th of 2011 and

15   June 29th of 2011, did you engage in any other sale of

16   narcotics?

17   A    Yeah.

18   Q    You did?

19   A    Between May and --

20   Q    Between May 10th of 2011 and June 29th of 2011, did you

21   engage in any other sales of narcotics?

22   A    I don't recall, but it's possible that I could have.

23   Q    You testified that on May 10th of 2011, that was your

24   first narcotics transaction that you conducted after release

25   from prison?

1    A    I testified that that was the first ounce, it was the

2    first and only ounce, crack transaction that I was directly

3    involved in, I believe.  That's what I said.

4    Q    Had you conducted any other narcotics transactions prior

5    to May 10th of 2011?

6    A    Middle dealings, I remember like middle dealings and

7    stuff like that before, I believe.

8    Q    When you say a middle dealing, what do you mean by that?

9    A    Like introducing, introducing, like introducing people.

10   Q    Excuse me?

11   A    Like introducing people, things like that.

12   Q    Okay.  And who were you obtaining the narcotics -- who

13   was supplying the narcotics in the deals that you were middle

14   manning?

15   A    Who was supplying?

16   Q    Yes.

17   A    I believe it was P'Dilla, I believe.  I believe it was

18   Amaury.

19   Q    Amaury?

20   A    Um hum.

21   Q    So prior to May 10th of 2011, you were receiving

22   narcotics from New York?

23   A    That's not what I said.  I said I was middle dealing.

24   That could have been on the phone, like on the phone type

25   of...

```
1    Q    So you were talking with them in New York about narcotics

2    transactions scheduled to take place in Connecticut?

3    A    I don't believe scheduling someplace in Connecticut.

4    Somebody driving to them, while I was in the halfway house.

5              THE COURT:  Could you keep your voice up, sir?

6              THE WITNESS:  All right.  I'm sorry, ma'am.

7    A    Go ahead.

8    Q    So prior to May 10th of 2011, you were in contact with

9    Amaury P'Dilla?

10   A    Amaury P'Dilla, yes, I definitely was in contact with him

11   prior.

12   Q    Were you also in contact with Johnny De Los Santos?

13   A    I don't remember if I was in contact with Johnny De Los

14   Santos.

15   Q    But you're clear it was before May 10th, you were

16   contacting them?

17   A    Contacting them?  Yeah.

18   Q    And he was your source -- I'm sorry, withdrawn.  You did

19   not actually take part in the sales, is that your testimony?

20   A    I do not remember taking part.  I don't recall taking...

21   Q    On May 10th, you testified that you were scared about

22   what took place?

23   A    Yes.

24   Q    Why were you scared?

25   A    Because I believed that, at first I believed that, the
```

```
1   people who I sold to were undercover cops or working with law
2   enforcement.
3   Q    And what led you to that belief?
4   A    Just my senses.  Just the way I felt that day.  I really
5   can't pinpoint what exactly it was.  Maybe the way they were
6   acting.  I really don't know.
7   Q    How did you get in contact or how did they get in contact
8   with you prior to the sale?
9   A    One of the gentlemen, I don't know if you want me to say
10  his name or whatever, one of the gentlemen, I knew, and I
11  believe we -- one of the gentlemen, I knew, so he had my phone
12  number.
13  Q    And he called you out of the blue?
14  A    No, I had told him that I was going to start to have
15  narcotics for sale.
16  Q    You already started your narcotics business, correct, as
17  a middle man?
18  A    Yeah, you could say.
19  Q    But you didn't middle man this deal?
20  A    I didn't middle man this deal?
21  Q    The May 10th with Mr. Bacote.
22  A    I did middle man the deal, but I was in, I was actually
23  in -- I organized, I organized and did the transaction.
24  Q    You testified Tuesday that you preferred to deal with
25  larger quantities of narcotics?  Was that your testimony?
```

```
 1   A     I don't remember.

 2   Q     Because it's harder to get caught, you're not out on the

 3   street, you're not on the police scene?

 4   A     Well, yeah, I remember saying something like that.

 5   Q     Okay.  And you were getting a significant amount of

 6   narcotics from New York, correct?

 7   A     Correct.

 8   Q     Okay.  You were getting significant amounts of heroin?

 9   A     Correct.

10   Q     And you were getting significant amounts of crack

11   cocaine?

12   A     No.

13   Q     I'm sorry, withdrawn.  You were getting significant

14   amounts of powder cocaine?

15   A     Correct.

16   Q     And the powder cocaine you received, you had Mr. Clark

17   convert into crack cocaine?

18   A     Correct.

19   Q     And you were converting more than 28 grams of crack

20   cocaine at that time?

21   A     I was not converting.  I was not cheffing.

22   Q     You were providing it to Mr. Clark?

23   A     Yes, I was.

24   Q     And you were providing him, was it 100 grams of powder?

25   A     What I got, I was giving it to him.
```

1    Q    You were getting regularly a hundred grams of powder?

2    A    Yes.  Yes.

3    Q    And he was cooking that into crack cocaine?

4    A    Yes.

5    Q    So you were getting about a hundred grams of crack

6    cocaine, between the two of you?

7    A    He had a hundred grams of crack cocaine, he gave me as,

8    as my customers called or as my clientele grew, he gave me,

9    depending on what he gave me, what I called him for, he gave

10   me.  I wouldn't say I had -- I wouldn't say it was 50/50.

11   Q    You were providing him with the powder cocaine to be

12   cooked, correct?

13   A    Yes.

14   Q    That wasn't his?

15   A    No, it was not.

16   Q    It was yours?

17   A    Yes.

18   Q    You paid for that?

19   A    I was fronted it.

20   Q    You were fronted, but you were eventually responsible to

21   pay that money?

22   A    Yes, I was.

23   Q    That was your cocaine?

24   A    Yes.

25   Q    And he cooked it for you?

```
 1    A    Yes.

 2    Q    And --

 3    A    For us.

 4    Q    For us, okay.  And in a number of your proffers, the

 5    crack cocaine was split between the two of you, correct?

 6    A    Yes, but not down the middle.  Split sounds like down the

 7    middle.

 8    Q    The bottom line, you received more than 28 grams of crack

 9    cocaine when Clark cooked it for you, correct?

10    A    Not every single time he cooked it.  Like I said, it was

11    depending on the people who were calling me or how -- depends

12    on the people who would call me.

13    Q    You're a lifelong narcotics dealer?

14    A    Since I was 12.

15    Q    That's all you've done?

16    A    It's not all I've done.

17    Q    What else have you done?

18    A    I've had jobs.

19    Q    You had a job at Dunkin' Donuts?

20    A    I had other jobs also.

21    Q    What other jobs did you have?

22    A    I worked at Shaw's before, I worked at Bruegger's Bagel,

23    I worked at a flower shop.  I had a couple of jobs.

24    Q    The Dunkin' Donuts job you had after you were released

25    from prison?
```

```
1    A    Okay.

2    Q    Correct?

3    A    Correct.

4    Q    While you were in a halfway house?

5    A    Yes.

6    Q    Okay.  And were you working -- I think the answer --

7    withdrawn.

8              Were you working at Dunkin' Donuts when the

9    photograph, the Facebook photograph of you with the money, was

10   published on your Facebook page?

11   A    Yeah.  Yeah, I had to.

12   Q    And was that real money or counterfeit money?

13   A    That was real money.

14   Q    That was real money?

15   A    If I remember, that was real money, yes.

16   Q    During this period of time, you were involved in a

17   counterfeit money operation, weren't you?

18   A    I've ran some counterfeit money, yes.

19   Q    In fact, you and Quiyon Reid were pursuing the purchase

20   of counterfeit money and then transferring it for valid

21   currency, correct?

22   A    We were trying to.

23   Q    And you took that counterfeit money to your business, to

24   your employer, Dunkin' Donuts, and tried to exchange it for

25   legitimate money, isn't that true?
```

1  A    No, that is not true.  I took it there to see if the ink,

2  to see if it would pass.  That's why I took it there.  I did

3  not switch it out.

4  Q    Okay.  And you coated it with a substance to see if it

5  would pass?

6  A    I think it was Vasoline or something.

7  Q    When Quiyon Reid got arrested, you went to try to

8  retrieve the counterfeit money, isn't that true?

9  A    Yes, that is true.

10  Q    When Mr. Silverman asked you about all of your bad acts

11  and all of your deeds on direct examination, you never

12  mentioned the counterfeiting situation, did you?

13  A    In the direct examination, no.

14  Q    No.  And when you were talking yesterday about going to

15  the New Haven Police Department to recover sums of money from

16  Quiyon Reid, you never mentioned that it was counterfeit

17  money?

18  A    No, because I believed they said it was drug money.  I

19  believe the lawyer would spoke to me said it was drug money.

20  Q    I'm talking about your testimony yesterday, Mr. Wilson.

21  When you testified yesterday about going to the New Haven

22  Police Department to obtain the money from Quiyon Reid, you

23  never said it was counterfeit money?

24  A    No, sir, I did not.  I did not say it was counterfeit

25  money.

```
 1   Q    So when Mr. Silverman asked you did you tell us all the
 2   bad things, everything bad you did in your life, you left that
 3   out.  Why?
 4   A    How I'm supposed to recall every single thing that
 5   happened in my life?
 6   Q    That counterfeit money situation took place after your
 7   release from prison, correct?
 8   A    Yes.
 9   Q    Took place while you were working in Dunkin' Donuts?
10   A    Yes.
11   Q    So it was within the last two years?
12   A    In the last two years?  I've been arrested for two years,
13   so it wasn't within the last two years, no.
14   Q    Three years?
15   A    Three years, fair to say.
16   Q    It wasn't years and years ago, was it?
17   A    Three years is years and years ago.
18   Q    You testified regarding Philip Bryant, that on occasion,
19   you went for a ride with him?
20   A    Yes.
21   Q    Okay.  And during that time, you testified that he
22   provided some type of substance to another person, is that
23   correct?
24   A    Yes.
25   Q    Okay.  And you testified that the sale took place in New
```

1   Haven?

2   A    The sale -- yes.

3   Q    And that it was a dime bag?

4   A    Dime or 20.  What he was selling at the time.

5   Q    You don't know what it was?

6   A    I know it was in -- I know he wasn't getting a hundred

7   dollars for what he sold.  I know it was a dime or 20 bag.  It

8   was a smaller portion.

9   Q    So a small amount?

10  A    Yeah.  Talking about one time, one of the rides that I

11  went with him, yes.

12  Q    Typical of a small-time street dealer?

13  A    Yeah.

14  Q    Not a large scale crack cocaine dealer?

15  A    In that, that sale that I was talking about, yes.

16  Q    Now, did you provide him with that substance?

17  A    No, I did not provide him with that substance.

18  Q    Okay.  Did you get any money that day for being with him?

19  A    No, I did not.

20  Q    Did you receive any compensation at all for being with

21  him that day?

22  A    No, that was my friend.  I wasn't looking for any

23  compensation.

24  Q    Did you have any agreement with him that he would pay you

25  any money for what, for the substances that he sold that day?

```
 1   A     That day?  No.

 2   Q     So there's no agreement about the sale between you and

 3   Philip Bryant?

 4   A     That, the day that you're talking about we rode in the

 5   car, no, just, "I'm going to take a ride with you."

 6   Q     You were just a passenger in the car?

 7   A     In his car, yeah.

 8   Q     You don't know where he obtained the substance from?

 9   A     That substance at that, that specific substance at that

10   specific time, no.

11   Q     Okay.  But you had no involvement in it, other than being

12   a passenger?

13   A     You could say that.

14   Q     And you also testified that there was a sale on Dixwell

15   Avenue?

16   A     Around Dixwell Avenue, I think I might have said.

17   Q     Do you recall what was transacted?

18   A     It was like, let me say, an eight ball or I believe, I

19   believe it was an eight ball or better.  I think it was an

20   eight ball.

21   Q     Okay.  Do you know if it was crack or powder?

22   A     I believe --

23   Q     Do you know?

24   A     No, I do not recall.  I believe it was crack.

25   Q     But you do not know that?
```

1   A    It was a long, it was a while ago, but I believe it was

2   crack.

3   Q    Okay.  But again, you had no agreement with him regarding

4   the sale?

5   A    No, besides, besides taking a ride with him.

6   Q    You weren't partners?

7   A    No, we were not partners.  We were friends.

8   Q    You didn't provide him with the substance?

9   A    No, sir.

10  Q    And you didn't receive any money from it?

11  A    Also, sir.

12  Q    And you don't know for a fact where Mr. Bryant obtained

13  that substance, if in fact he did?  You don't know where it

14  came from, do you?

15  A    That actual, that substance that day?

16  Q    Yes.

17  A    No.

18  Q    Other than what you have testified to regarding May 10th

19  of 2011, setting that aside, did you ever receive, from

20  December of 2010 through January of 2013, did you ever

21  receive, crack cocaine from Philip Bryant?

22  A    You said putting aside May --

23  Q    Setting aside the May 10th, 2011.

24  A    I really can't recall that right now.

25  Q    Okay.  In that same time period, you never provided

```
1   Philip Bryant with crack cocaine, did you?

2   A    With crack cocaine, I believe, no.

3   Q    And during that period, you never provided Philip Bryant

4   with powder cocaine, did you?

5   A    I believe that is no also, sir.  I'm not absolutely

6   certain, but I don't believe I did, sir.

7   Q    And during that same period of time, you never received

8   powder cocaine from Philip Bryant?

9   A    Powder cocaine, the time that he gave me the stuff, I

10  didn't sell it for him or anything, but I believe at the time

11  he gave me his drugs, it might have been in there.

12  Q    But you didn't sell that for him, did you?

13  A    Which drug was it that you were talking about?

14  Q    Excuse me?

15  A    Which drug was it that you were talking about?

16  Q    Powder cocaine.

17  A    No, I didn't sell powder cocaine to anyone for him.

18  Q    He left you marijuana and you sold some?

19  A    Yes, I remember selling weed for him.

20  Q    There was another time when he left you his phone, you've

21  testified he left you his phone, and you answered it because

22  he was out, I think getting food?

23  A    Both times, he would have left me his phone, if he left

24  me with his drugs also.

25  Q    At that time, in a proffer with the government, you again
```

```
 1   said that the only substance that was sold by you on behalf of

 2   Philip Bryant was marijuana, correct?

 3            MR. SILVERMAN:  Before the witness answers, may I

 4   have a moment to confer with defense counsel?

 5            MR. MORAGHAN:  After he answers?

 6            MR. SILVERMAN:  No, before he answers.

 7            (Mr. Moraghan conferring with Mr. Silverman.)

 8            MR. MORAGHAN:  May I withdraw the question, your

 9   Honor?

10            THE COURT:  Yes.

11   Q    Do you recall Philip Bryant leaving you his phone and

12   asking you to run some traps for him while he's gone?

13   A    Yes.

14   Q    Okay.  And do you recall actually making sales on behalf

15   of Philip Bryant?

16   A    Yes.

17   Q    Okay.  And do you recall that the sales involved

18   marijuana?

19   A    Marijuana and I believe a Ecstasy pill also.

20   Q    So marijuana and Ecstasy?

21   A    Yeah.

22   Q    But not crack cocaine?

23   A    In those --

24   Q    Yes.

25   A    In that incident?  No.
```

```
1    Q    And not powder cocaine?

2    A    I did not sell any powder cocaine for him.

3    Q    And do you recall that there were approximately ten calls

4    to Mr. Bryant's phone on that day?

5    A    On that day?  I don't recall how many calls were made

6    that day.

7    Q    And do you recall if there were ten sales of marijuana?

8    A    I don't remember it being that many, no.

9    Q    We'll come back to that.  After Vincent Clark and you had

10   a dispute, there were some questions yesterday as to the date

11   of that dispute.  Do you recall when it was?

12   A    I know it happened during the investigation.  The time, I

13   don't remember.

14            THE COURT:  Would you keep your voice up, please,

15   sir?

16            THE WITNESS:  Sorry, ma'am.

17   A    I said I recall it happened; I just don't remember the

18   time or the date.

19   Q    And that is when you switched to heroin?

20   A    That's when I decided to do, I decided that I would have

21   to switch to heroin.  I don't know if I was fully -- I don't

22   know that that was my last time I got cocaine from my source,

23   though, or middled a deal for cocaine from my source.

24   Q    I had asked you a few minutes ago about you conducting

25   some marijuana sales for Mr. Bryant?
```

```
 1   A     Yes.

 2   Q     And I asked you about how many calls you received.

 3   A     You did ask me how many calls.

 4   Q     And you indicated that you didn't recall?

 5   A     I didn't recall.  I know if a call was placed and I had

 6   it, I would have did it for him.

 7   Q     If I showed you a report, might that refresh your

 8   recollection as to the number of calls and what was sold?

 9   A     It might give me a estimate.

10   Q     Excuse me?

11   A     It could give me a estimate.

12             MR. MORAGHAN:  May I approach, your Honor?

13             THE COURT:  Yes, sir.

14   Q     I would ask you to read --

15             MR. MORAGHAN:  I'm sorry, this is, for the record, a

16   proffer dated March 19th, 2013.

17   Q     I would ask you to start, just read that to yourself,

18   please.

19   A     All right.

20   Q     Does that refresh your recollection as to the number of

21   customers who called that day?

22   A     What I recall from that is saying, saying that -- again,

23   I didn't write it but it says that I believe it said no more

24   than ten.

25   Q     Okay.  So no more than ten people called?
```

```
 1   A    That's a estimate, I guess.  I don't know if you can --
 2   give or take.
 3   Q    It was all for marijuana and Ecstasy?
 4   A    I don't, I don't remember being any other drug that I
 5   sold for him.
 6   Q    You did not sell powder cocaine, is that correct?
 7   A    I --
 8   Q    In the time frame of this indictment.
 9   A    I believe I did one time.
10   Q    One time?
11   A    I recall -- well, I middled a deal, I remember personally
12   selling six grams, I believe it was, or so to somebody.
13   Q    Six grams of powder?
14   A    Yes.
15   Q    But you don't know when?
16   A    During the investigation.
17   Q    Okay.  And that was the only time?
18   A    That I can recall.
19   Q    Okay.  Was Philip Bryant with you when that took place?
20   A    No, he was not with me when that took place.
21   Q    Did you call him and discuss it with him?
22   A    No, I don't believe I did.
23   Q    He had no involvement in that?
24   A    No, sir.
25   Q    Okay.  Do you recall, Mr. Wilson, telling the agents that
```

```
 1   all of the cocaine you received from P'Dilla or Johnny De Los
 2   Santos was converted into cocaine base?
 3   A    I recall something like that.
 4   Q    Would you like to -- would referring to a report refresh
 5   your recollection?
 6   A    Yes.
 7         MR. MORAGHAN:  This is the September 19th, 2013,
 8   proffer, at paragraph 6.
 9   Q    I would ask you, Mr. Wilson, to read paragraph 6 to
10   yourself, please.
11   A    I see what it says, sir.
12   Q    Do you recall -- withdrawn.  Do you recall telling the
13   agents, Mr. Wilson, that all of the cocaine acquired from
14   P'Dilla and De Los Santos was converted into crack cocaine?
15   A    I do not recall that.
16   Q    You don't recall it?
17   A    I just read it, but I do not recall it.
18   Q    Okay.  But you did just read it?
19   A    I did just read it.
20   Q    Okay.  Are you saying that this report is incorrect?
21         MR. SILVERMAN:  Your Honor --
22         MR. MORAGHAN:  Withdrawn.
23         MR. SILVERMAN:  -- the report --
24         MR. MORAGHAN:  Withdrawn.
25         Could we pull up Exhibit 120?
```

```
 1              (Mr. Silverman confering with Mr. Moraghan.)

 2              MR. SILVERMAN:  Your Honor, the government's willing

 3    to stipulate, upon discussion with Attorney Moraghan, that the

 4    proffer report from September 19, 2013, notes that, "Wilson

 5    stated that all of the cocaine that they" -- "they" is a

 6    reference to Mr. Wilson and Vincent Clark -- "received from

 7    P'Dilla and Johnny De Los Santos went to Clark and was

 8    converted from cocaine into cocaine base."

 9              MR. MORAGHAN:  Thank you.

10              Can that video be forwarded to 22:40 hours?

11              (Government's Exhibit 120, a videotape, playing.)

12    Q    I would ask you to look at this video until you exit the

13    car at Judson Street, okay?

14    A    Okay.

15              (Government's Exhibit 120, a video recording,

16    continuing, and paused.)

17    Q    Can you hear this?

18    A    Yeah, I can hear it.  I've heard it a couple of times

19    already, so I'm kind of...

20              (Government's Exhibit 120, a video recording,

21    continuing, and paused.)

22    Q    Mr. Wilson, you got out of the car on Judson Street?

23    A    Yes.

24    Q    And you took your backpack with you?

25    A    Yes.
```

1    Q    Early on in the line, you said you were waiting for

2    someone to check something out, I think regarding an

3    apartment.  Was the State of Connecticut looking for suitable

4    housing for you after you got off of your home confinement --

5    community confinement?

6    A    I forgot exactly how that deal was.  I don't know if I

7    found an apartment and they assisted me or exactly.  I think --

8    it was something to that degree.

9    Q    But that's what you were talking about?  That's what you

10   were talking about?

11   A    In there?

12   Q    When you brought it up?

13   A    No, I said I was waiting for, what I meant there, I was

14   waiting for my parole at the halfway house to check the

15   apartment I was going into.  Once they checked it, I was able

16   to leave the halfway house.  That's what I was talking about

17   there.

18   Q    That apartment was on Judson Street?

19   A    No, that apartment was on Day Street, 139 Day Street.

20   That was the apartment that I paroled to.

21   Q    You were paroled to 139 Day Street?

22   A    Yes, that's the apartment that I was waiting for them to

23   check so I could be released from the halfway house.

24   Q    But you were living at 22-24 Judson Street?

25   A    I don't believe I was living there already, sir.

1    Q    Do you remember telling Tommy Hines that -- withdrawn.

2          Is this a point in time where your antenna was up

3    and you were nervous?

4    A    I believe I was nervous when the car approached and I got

5    in, and I got in the front seat and somebody was sitting

6    behind me.  I was nervous already.

7    Q    The person sitting behind you was a person that you knew,

8    correct?

9    A    Still, just -- in any transaction, at first, I felt like

10   maybe they could have been trying to rob me at first or

11   something, just for somebody to sit behind me.  I knew this

12   person, but I didn't know him -- he wasn't a very close friend

13   of mine.

14   Q    In fact, prior to this sale, and I'm not interested in

15   the name of the person you called, okay?  But prior to the

16   events of May 10th, you called another individual you knew to

17   check out confidential informant 1, didn't you?

18   A    To check out the gentleman -- prior to this --

19   Q    To see if it was someone you could deal with.

20   A    Prior to this --

21   Q    Yes.

22   A    It's a possibility.  I don't recall.  I know after, I

23   called a lot of people, but before, I don't remember.

24          MR. MORAGHAN:  I would like to skip ahead to when he

25   returns to the car.

```
 1              (Government's Exhibit 120.7, a video recording,
 2    continued, and paused.)
 3    Q    Mr. Wilson, did anyone tell you to get into the car?
 4    A    From what I recall, the driver had told me to get into
 5    the car.  It's not shown there.
 6              MR. MORAGHAN:  Can we go to just before he gets into
 7    the car?
 8              (Government's Exhibit 120.7, a video recording,
 9    continued, and paused.)
10    Q    Mr. Wilson, that's you getting into the car, correct?
11    A    Yes, that's correct.
12    Q    Did you hear anyone tell you to get into the car?
13    A    No, I did not hear anyone.
14    Q    No one ever told you to get into the car, did they?
15    A    Based on this video, no.
16    Q    Excuse me?
17    A    Based on this video, no.  I said I recalled it.
18    Q    You actively got into that car, correct?
19    A    Yes.
20    Q    And you wanted to commit -- you wanted that sale to go
21    through?
22    A    I wouldn't have got in the car if the sale wasn't going
23    to go through.
24    Q    And you weren't scared at all?
25    A    I was scared.
```

1   Q    I asked you a few minutes ago about whether or not you

2   were moving into 20-22 Judson Street, and you couldn't recall

3   when you moved in there, or who you were residing with?

4   A    No, I knew who I resided with.  I don't think you asked

5   me who I resided.  I said it was Mr. Hines.  Didn't I say

6   that?

7   Q    I'm not sure.  Let's start anew, okay?  You moved into

8   20-24 Judson Street after you were released from the halfway

9   house, correct?

10  A    Somewhere around that time.

11  Q    But your designated residence was on Day Street?

12  A    Yes.

13  Q    But you were not living full-time on Day Street?

14  A    When I was released from the halfway house I was, because

15  I was on electronic monitoring.

16  Q    Excuse me?

17  A    I was on electronic monitoring when I got out, so I had

18  to be, I had to sleep at Day Street.

19  Q    You had to sleep at Day Street?

20  A    Yes.

21  Q    What did you do Judson Street for?

22  A    Hang out, to hang out because of my friends.  A number of

23  purpose.

24  Q    Stash your drugs there?

25  A    I stashed drugs in both places.

```
 1    Q    Okay.  And you don't recall telling the agents that you

 2    actually lived at Judson Street during May of 2011 and for the

 3    next approximately three months?  Do you recall telling them

 4    that?

 5    A    I recall telling them that I lived there.  I don't recall

 6    if I gave them a date.

 7    Q    If I show you a report, would that refresh your

 8    recollection?

 9    A    It might help, but like I said, I already don't recall

10    telling them that.

11              MR. MORAGHAN:  This is a proffer dated March 19th,

12    2013, at paragraph 3.

13    Q    If you could just read paragraph 3, the first two lines

14    in the highlighted section, please, to yourself.

15    A    I see what it says.

16    Q    Mr. Wilson, do you recall telling the agents that you and

17    William Hines were living at 22-24 Judson Street in May of

18    2011?

19    A    I do not recall telling them that.

20              MR. MORAGHAN:  May I inquire of government counsel?

21              (Mr. Moraghan conferring with Mr. Silverman.)

22              MR. MORAGHAN:  Your Honor, I'm going to go into a

23    new area.  If you want me to continue, I will.  If you want to

24    take a break...

25              THE COURT:  Are you suggesting the afternoon recess?
```

1          MR. MORAGHAN:  It's up to your Honor.

2          THE COURT:  Fine.  Yes.  Fifteen minutes, ladies and

3     gentlemen.  While you're gone, please don't talk about the

4     case.

5          (In the absence of the jury:  3:09 o'clock p.m.)

6          THE COURT:  Gentlemen, before we adjourn for the end

7     of the day, do you think it would be okay to tell the jury

8     they'll be getting the case on Monday?  Or no?

9          MR. REEVE:  Can we confer over the break and let

10    your Honor know?  Everyone would like to be able to say that.

11    We want to make sure that we can commit to that.

12         THE COURT:  Yes, we told them the evidence would be

13    concluded at the end of the day.

14         MR. REEVE:  Yes, I understand.  Thank you, your

15    Honor.

16         (Recess:  3:11 o'clock p.m. to 3:23 o'clock p.m., in

17    the absence of the jury.)

18         MR. SILVERMAN:  Your Honor, I think where we stand

19    right now is that it's almost 3:30.  I understand from

20    Attorney Moraghan that he's likely to proceed through the rest

21    of the afternoon with his cross of Mr. Wilson.  Assuming that

22    he does go until we break for the day, there will be some

23    redirect and some recross on Monday morning, at which point I

24    think we roll right into closings.

25         THE COURT:  Okay.

1          MR. SILVERMAN:  And then the charge.  So I think it

2    might be appropriate to tell the jury something along these

3    lines:  That Mr. Wilson is the last witness that any party

4    intends to put on the stand, and you expect that once his

5    examination concludes, which is looking like it will be

6    Monday, that the jury should expect to hear closings and their

7    jury charge and then take the case for deliberations.

8          THE COURT:  Okay.

9          MR. REEVE:  We all agree with that.  I think it's

10   better not to give the jury a time that that's going to

11   happen, but just to give them the assurance.

12         THE COURT:  I think they need some encouragement.

13         MR. REEVE:  Absolutely.  We all think so.  We're all

14   in agreement that words to that effect, however your Honor

15   wants to say it, would be helpful to everyone.

16         THE COURT:  So I can tell them this is the last

17   witness to be presented, to be followed by argument and

18   charge, and we expect that to take place sometime on Monday.

19         MR. MORAGHAN:  Yes, your Honor.

20         MR. VATTI:  Also, your Honor, I understand we're

21   adjourning at 4:30 today?

22         THE COURT:  At what time?

23         MR. VATTI:  Mr. Moraghan says he's not going to be

24   finished today, Mr. Rogan had an appointment he needs to leave

25   for.

```
 1                THE COURT:  What time is that?

 2                MR. ROGAN:  A while ago, your Honor, but if the

 3   Court would allow me that courtesy to adjourn at 4:30, to get

 4   to the second half of where I need to be.

 5                THE COURT:  We can adjourn at 4:30.

 6                MR. ROGAN:  I appreciate the courtesy, your Honor.

 7                (In the presence of the jury:  3:28 o'clock p.m.)

 8                THE COURT:  Ladies and gentlemen, I know I had told

 9   you that we expected the case to have been concluded today.

10   Unfortunately, as you see, that's not the case.

11                MR. REEVE:  Judge, I don't think the microphone's

12   on.

13                THE COURT:  I'm sorry.  I had told you that we

14   thought the case would be concluded today.  Obviously it will

15   not be.  However, I am authorized to tell you this is the last

16   witness, and at some point on Monday, you will be deliberating

17   on this case, we hope.  Okay?  Give you some hope.

18                MR. REEVE:  Judge, just to clarify.

19                THE COURT:  Yes?

20                MR. REEVE:  I think what the parties have agreed is

21   Mr. Wilson's the last witness, no one's calling any other

22   witness, so the government will rest, the defense will not

23   present any testimony.  But as to how long, when it will be on

24   Monday that we will be able to move to closing arguments, it

25   could, for example, be -- just so we don't create a picture
```

1    that might not be real -- it could be that we will do closing

2    arguments on Monday and then your Honor will instruct on

3    Tuesday.  We can't tell the jury a precise schedule, because I

4    don't want anybody to say, okay, this is really it.

5              THE COURT:  Yes.

6              MR. REEVE:  But we all believe we will get to

7    closing arguments and we'll be done with the evidence on

8    Monday, and then we'll figure out the schedule from there,

9    based on what time that is.  If that's helpful to people.

10             THE COURT:  I think it's of some help, yes, I think

11   it's appropriate to let the jury know how much more time it's

12   going to be.

13             MR. REEVE:  Yes.  Thank you, your Honor.

14             MR. MORAGHAN:  May I proceed, your Honor?

15             THE COURT:  Please.

16   BY MR. MORAGHAN (Continued):

17   Q    I misspoke about -- going back in another matter.  When

18   you left the car, you went somewhere.  Where did you go?

19   A    I walked the driveway of Judson and into the complex on

20   Judson.

21   Q    Into 22-24 Judson Street?

22   A    Yes.

23   Q    Okay.  Was it your testimony that you then met with

24   Philip Bryant?

25   A    Yes.

1    Q    And you then provided him with the funds you received

2    depicted in Government's 120?

3    A    I'm sorry, when I first got out the car or when I came --

4    Q    I'm sorry, when you went into the Judson Street

5    apartment, you met with Philip Bryant?

6    A    The first time that I walked in --

7    Q    The second time?

8    A    The second time?

9    Q    Let me start over because I'm rushing.  After the events

10   took place in the car --

11   A    After --

12   Q    You got out of the car?

13   A    Yes.

14   Q    You went into the Judson Street apartment?

15   A    I recall going back over there.  I'm not absolutely sure

16   if I went all the way inside or -- I believe I walked into the

17   hallway when I went back.

18   Q    Okay.  And you testified that you met Philip Bryant

19   there?

20   A    Yes.

21   Q    And you testified that you gave the money that you

22   received from CW 1 and CW 2, you gave that money to Philip

23   Bryant?

24   A    Yes.

25   Q    And you told him that you were having concerns about what

1  had just taken place?

2  A    Not in those exact words, but yeah.  He, he got -- from

3  what I said, he got the feeling I was concerned.

4  Q    You were afraid they were working for the police?

5  A    Yes, something like that.

6  Q    And you told him that?

7  A    Yes.

8  Q    And I believe you testified that he told you you didn't

9  have to do that sale?

10  A    Yeah, he told me.  He told me that.

11  Q    And then you called CW 1 and CW 2 to talk to them, didn't

12  you?

13  A    At some point after the sale, I've called them.

14  Q    Okay.  And was Philip Bryant standing with you when you

15  made the call?

16  A    I don't recall.

17  Q    Was it just after you had met with him?

18  A    I don't recall.  I know I made a call.  I don't recall

19  whether he was with me, by the side of me, or -- I don't

20  recall.

21  Q    The record --

22          MR. MORAGHAN:  The trap number, what number is that?

23  We stipulated to that?

24          (Mr. Moraghan conferring with Mr. Silverman and Mr.

25  Vatti.)

```
 1              MR. MORAGHAN:  Your Honor, I would like to offer as
 2     a defendant's exhibit --
 3              THE CLERK:  I think it's BB.
 4              MR. MORAGHAN:  BB?  The records, the trap records of
 5     the calls made, and to Kevin Wilson's phone on May 10th, 2011.
 6              MR. SILVERMAN:  Your Honor, the government has no
 7     objection, but just to be clear, I don't know about the term
 8     "trap."  These are just phone records from the day of May
 9     10th, 2011.
10              MR. MORAGHAN:  I did not mean trap in any other --
11     they're the records of Kevin Wilson's phone.
12              MR. SILVERMAN:  Okay.
13              MR. MORAGHAN:  Your Honor, I have a couple of notes
14     on mine, so I'll have to get a clean.
15              THE COURT:  Right, okay.
16     Q   Mr. Wilson, do you recall that you made a call to the
17     confidential witness at 4:10 that day?
18              THE COURT:  What was that date?
19              THE WITNESS:  I'm sorry, were you asking him
20     something?
21              THE COURT:  I was asking the attorney.
22              MR. MORAGHAN:  I didn't mean to ignore you, I didn't
23     hear you.
24              THE COURT:  I don't know what I said now.  I asked
25     you for the date, that's all.
```

```
 1          MR. MORAGHAN:  May 10th.
 2          THE COURT:  Okay.
 3   Q    Mr. Wilson, do you recall that you made a phone call to
 4   the confidential witness's telephone number at 4:10 in the
 5   afternoon?
 6   A    I do not know what time it was.  I know I called.  I know
 7   I called him.  I don't know what time it was.
 8   Q    Are you aware, Mr. Wilson, that you made a call -- you
 9   received a call from Philip Bryant from a 203-435-3420 number
10   one minute before you made the call to the confidential
11   informant?
12   A    I am not aware of that.
13   Q    Are you still -- are you aware of the number that Philip
14   Bryant used?
15   A    If I see it in my phone or in the line sheets, whatever.
16   If it's under his name, then he used it.
17          MR. MORAGHAN:  May I approach the witness, your
18   Honor?
19          THE COURT:  Yes.
20   Q    Mr. Wilson, will you agree, sir, that on 1609, which is
21   4:09, you received an inbound call from No. 203-435-3420?
22   A    Yes.
23   Q    And that call lasted somewhere between 78 and 72 seconds?
24   A    Okay, I see that there.
25   Q    And will you agree, sir, that you made an outbound call
```

```
 1   to telephone No. 203-859-2950 at 4:10?

 2   A    Yes, I agree.

 3   Q    And your prior testimony was that while you -- withdrawn.

 4   Your prior testimony was Philip Bryant was with you

 5   immediately after the sale?

 6            MR. SILVERMAN:  Objection.  I don't remember that

 7   being any prior testimony.

 8            MR. MORAGHAN:  I believe it was.  May I proceed,

 9   your Honor?  I'll withdraw the question.

10   Q    After the sale was completed, you exited the car?

11   A    Yes.

12   Q    You walked down a driveway to the Judson Street

13   apartment?

14   A    Yes.

15   Q    You went into the hallway?

16   A    That's what I recall, yes.

17   Q    You met -- your testimony is you met with Mr. Bryant?

18   A    That is what I recall, yes.

19   Q    You testified you handed him the money?

20   A    That is also, I recall.

21   Q    And you testified that you had concerns about what had

22   taken place?

23   A    I also recall that, yes.

24   Q    And you testified that he counselled you that you

25   shouldn't have done it?
```

```
1   A     In -- he said he didn't need the money, that if I was

2   nervous, I shouldn't have done it.  Yeah, something like that.

3   Q    And you called the confidential informant immediately

4   after that, because of the concerns you had.  You wanted to

5   see if they were okay, correct?

6   A    I don't know if it was right before or while I was with

7   him.  Like I said, I know I called him, but I don't know how

8   long, how long was I with him or what the case may be.

9            MR. MORAGHAN:  May I approach the witness, your

10  Honor?

11           THE COURT:  Yes, sir.

12  Q    But you do not dispute, sir, that a minute before you

13  made a call to the number I identified, which is the

14  confidential informant's number, a minute before that, you had

15  a telephone conversation with Philip Bryant?

16  A    No, I don't.  I don't contest that.  I see the phone

17  call.

18  Q    Hmm?

19  A    I saw the call, so if that's his number, yes, I called

20  him.

21  Q    Okay.  Thank you.

22           MR. MORAGHAN:  Can we pull up Exhibit 202?

23  Q    Mr. Wilson, you signed a plea agreement in this case,

24  correct?

25  A    Correct.
```

```
1    Q    Okay.  And it's on the board there.  And can you see
2    that?
3    A    I can see it.  I don't think I could read all of it, but
4    I can see.
5              MR. MORAGHAN:  May I approach the witness quickly,
6    your Honor?
7    Q    Mr. Wilson, I'm going to ask you to look at what I have
8    as your plea agreement, as an exact copy of what is shown up
9    there.
10   A    Okay.
11             MR. MORAGHAN:  May I stay here and inquire, your
12   Honor?
13             THE COURT:  Yes.
14   Q    Mr. Wilson, in the first part of the plea agreement, it
15   talks about the plea and the offense, correct?
16   A    Yes.
17   Q    And in this plea agreement, you agreed to plead guilty to
18   knowingly, intentionally, and unlawfully conspiring to possess
19   with intent to distribute heroin, a Schedule I controlled
20   substance.
21   A    Yes.
22   Q    You entered a plea to a charge involving heroin?
23   A    Yes.
24   Q    Okay.  And further, that a Schedule I controlled
25   substance -- and 280 grams or more of a mixture and substance
```

```
1    containing a detectable amount of cocaine base?

2    A    Yes.

3    Q    That is the second substance that you entered your plea

4    to?

5    A    Yes.

6    Q    You did not enter any plea at all to any charge involving

7    the knowing, intentional and unlawful conspiring to possess

8    with intent to distribute, and to distribute, cocaine?

9    A    No, it's not up here.

10   Q    You never pled to cocaine?

11   A    I did not.  If it's not up there, I didn't plead to it.

12   Q    Okay.  You only pled to matters involving heroin and

13   crack cocaine?

14   A    Yes.

15   Q    Before you entered into this plea agreement, you had read

16   it?

17   A    Yes.

18   Q    You had gone over it with your lawyer?

19   A    Yes.

20   Q    You asked questions concerning the plea agreement?

21   A    A bunch of them probably.

22   Q    A bunch of them?  And your lawyer answered all of your

23   questions?

24   A    Maybe not the way I wanted to, but he answered questions.

25   Q    I understand that.  But you knew exactly what you were
```

1    signing, correct?

2    A    Yeah, I knew what I was signing.

3    Q    And did your lawyer explain to you the different clauses

4    and paragraphs contained in this agreement?

5              MR. SILVERMAN:  Your Honor, I'm going to object that

6    this is privileged material, conversations between his lawyer

7    and him.

8              MR. MORAGHAN:  I'm not asking -- withdrawn.

9    Q    This agreement was reviewed by you with your lawyer?

10   A    Yes.

11   Q    And any questions you have were answered to your

12   satisfaction?

13   A    No, they weren't answered to my satisfaction, but they

14   were answered.

15   Q    You were not happy with what?

16   A    Just court terms.  I don't know, I wish it was simpler.

17   I really don't know exactly how to explain that to you,

18   besides saying it like that.

19   Q    Did this -- this agreement includes a guideline

20   stipulation, correct?

21   A    Yes, it does.

22   Q    And the government reviewed that stipulation with you on

23   your direct examination, correct?

24   A    Correct.

25   Q    Okay.  And the guideline is a formula by which a court

```
 1    arrives at a sentencing range, is that a fair statement?

 2    A    Is it advisory?

 3    Q    It's advisory.

 4    A    So yeah.

 5    Q    But it assists the Court in fashioning an appropriate

 6    sentence, is that fair to say?

 7    A    That's fair to say.

 8    Q    Okay.  And in the guideline stipulation, there are

 9    certain clauses and conditions that may cause your guideline

10    sentence to become higher, and there are also clauses and

11    conditions that may allow the sentencing range to be lower,

12    correct?

13    A    Yes, correct.

14    Q    And there were certain conditions and clauses included in

15    this agreement, were there not?

16    A    There were clauses in there.

17              MR. MORAGHAN:  Can you go to page 4?

18    Q    Without going into all the math and the computations,

19    because I think I showed everyone I'm not very good at math,

20    there was a base level that was determined upon the quantity

21    of crack cocaine and heroin, is that correct?

22    A    Yes, that's correct.

23    Q    Okay.  And that base offense level, in your plea

24    agreement, is a 32.

25    A    Yes, it starts off as a 32.  Yes.
```

1    Q    And it's increased two levels because you had a dangerous

2    weapon as part of this conspiracy?

3    A    Yes.

4    Q    Okay.  And that dangerous weapon was a firearm?

5    A    Yes.

6    Q    Okay.  And two other levels were added because you were

7    an organizer, leader, manager, or supervisor in criminal

8    activity?

9    A    Yes.

10   Q    Is that correct?

11   A    Yes.

12   Q    And three levels were reduced because of acceptance of

13   responsibility?

14   A    Yes.

15   Q    Okay.  And after all that math is done, you have a plea

16   agreement which has an offense level 33, with a criminal

17   history VI, and sentencing guideline range of 235 to 293

18   months, is that correct?

19   A    Yes, according to the document, according to the plea

20   agreement, that's correct.

21   Q    But you received other considerations, not contained in

22   this plea agreement, correct?

23   A    Like what?  Is there a paper?

24   Q    For instance, your two-level increase because you were an

25   organizer or leader, that certainly could have been a

```
1   four-level increase, couldn't it?

2   A    If it could, I guess it could.

3   Q    Well, let me ask you:  In your criminal group of friends,

4   Pierre Galan worked with you and for you?

5   A    Worked with me.

6   Q    Okay.  And his brother?

7   A    Worked with me.  Worked with me.  They helped me out.

8   Q    And Alexis Sutton?

9   A    That was my girlfriend.

10  Q    She serviced clients, she delivered heroin for you,

11  didn't she?

12  A    I asked her to do that, yes.

13  Q    She did that?

14  A    Yeah, she did that.

15  Q    Vincent Clark, in the beginning, you two were partners in

16  cooking the cocaine and splitting it?

17  A    Yeah.  Yeah.

18  Q    And Johnny De Los Santos was part of this group?

19  A    Yeah.

20  Q    And Amaury P'Dilla?

21  A    P'Dilla, yeah.

22  Q    So we have at least six people involved in this offense,

23  correct?

24  A    At least.

25  Q    At least?
```

```
 1   A     At least.

 2   Q     At least six participants, correct?

 3   A     Correct.

 4   Q     And under the guidelines, Mr. Wilson, if there are five

 5   or more participants, and you are an organizer, leader,

 6   manager, or supervisor, you could have gotten a four-level

 7   increase instead of a two-level increase?

 8   A     That's information to me I didn't really -- I think I

 9   might have heard levels but I'm not a court officer.  I don't

10   make -- I didn't make that rule.  I don't know.

11   Q     But given the fact of the number of people under the law,

12   you could have had a greater level increase than a two-level

13   that is included in the plea agreement?

14   A     If that is a fact, then that is a fact, sir.

15   Q     Okay.  Would you accept my word that it is a fact?

16   A     Yes, I'll accept what you said as a fact.

17   Q     And after you go through the guideline calculation, we

18   have determined that the agreement, the agreement that you

19   signed, calls for 235 to 293 months, correct?

20   A     Correct.

21   Q     Correct?  With a four-level increase for your role in the

22   offense, as opposed to a two-level increase, your guideline

23   range would be 36, criminal history VI, with a sentencing

24   range of 292 to 365 months.

25             MR. SILVERMAN:  Your Honor, may I have one moment to
```

1   confer with defense counsel, on the math?

2           (Mr. Silverman conferring with Mr. Moraghan.)

3   Q    Mr. Wilson, I misspoke when I said your range was 36.

4   With the enhancements I talked to you about, your range would

5   be 35/6 but the sentencing range would still be 292 to 365.

6   A    I accept that.

7           MR. SILVERMAN:  Your Honor, I just wondered if I

8   might be able to review a copy of the sentencing guidelines if

9   anyone has it with them, so I can check the math.

10          THE COURT:  Have you got the guidelines there?

11          MR. MORAGHAN:  Yes, I provided it to him.

12          THE COURT:  Okay, fine.

13          MR. SILVERMAN:  Very good.  Thank you.

14  Q    The difference between the two ranges has a low of 57

15  months and a high of 72 months, so as a result of this plea

16  agreement, you've already gotten a significant benefit,

17  haven't you?

18  A    I guess you can say.

19  Q    Well, your guideline range is 57 to 72 months less than

20  what it should be?

21  A    Yes, according to your math and the guideline ranges.

22  Yes, sir.

23  Q    And I don't want to know anything that your lawyer told

24  you, but you understand that before a Court imposes a

25  sentence, a Court does a guideline calculation?

1  A    The Court does, okay.

2  Q    Okay?  As far as the relief you'll get under a 5K1, the

3  lower the starting point, the better it is for you, correct?

4  A    I don't know that.

5  Q    If the Judge was going to sentence you and a starting

6  point was 235 months, that would be one thing.  If the

7  starting point was 292 months, that would be an entirely

8  different situation, correct?  Because your sentence could be

9  significantly higher?

10  A    It would be a different situation, yes, it would be a

11  different situation.  As far as how whatever's calculated or

12  taken away, I don't know, the Judge will decide.  I don't

13  know.

14  Q    In addition, in this plea agreement, you were originally

15  charged as being a felon in possession of a firearm, correct?

16  A    Yeah.

17  Q    Count Six of the original indictment?

18  A    I'm not sure what the count was.

19  Q    You know you were charged with that?

20  A    Yes.

21  Q    Do you know what the sentence is for being a felon in

22  possession of a firearm?

23  A    No, I believe they vary.

24  Q    Would you accept my representation that the sentence is

25  not more than ten years?

```
 1   A     I'll accept your...

 2   Q     Thank you.  That's not going to be called into question

 3   because of the plea agreement you entered into, correct?

 4   A     I want to say I believe so.

 5   Q     Okay.  And in another count in the original indictment,

 6   you were charged with possession of a firearm in furtherance

 7   of a narcotics trafficking crime, correct?

 8   A     Correct.

 9   Q     Okay.  And you did not plead to that as well?  You did

10   not plead to that?

11   A     No, I pled to conspiracy.

12   Q     Right, okay.  Are you aware of the penalty for possession

13   of a firearm in furtherance of narcotics, drug, crime?

14   A     I believe it's, I believe it starts at five years?  I'm

15   not -- I think it's -- I've heard it before, but it's not

16   fresh in my memory.

17   Q     I think you were in the right ballpark.

18   A     Okay.

19   Q     It starts at five years.  That's a mandatory minimum five

20   years.

21   A     Okay.

22   Q     Are you also aware that under the federal law, that that

23   sentence would have to be imposed consecutively to your drug

24   sentence?

25   A     Yeah, I've heard that.
```

1    Q    Okay.  So in a worst case scenario, if you had pled to

2    possession of a firearm in furtherance of a narcotics

3    conspiracy, and you were at 235, and the firearm, possession

4    of a firearm in furtherance of a narcotics trafficking crime

5    was also included, it would be 235 plus 60.

6    A    Yup.

7    Q    But you're not facing that, are you?

8    A    No, I don't -- I didn't plead to that.

9    Q    Okay.  And the gun that you had when you were arrested

10   that was in your apartment, it was a .45 caliber gun?

11   A    Yes.

12   Q    And in a proffer, you said that was given to you by

13   someone, I think Vincent Clark?

14   A    No, I didn't.  I don't recall saying that Vincent Clark

15   gave me that gun.

16   Q    Did someone give you that gun?

17   A    Yes.

18   Q    Okay.  And were you concerned that the gun was dirty?

19   A    I was told that the gun was dirty.

20   Q    And that means it's been used in a crime?

21   A    Yeah.

22   Q    Do you know if any ballistics testing has been done on

23   that pistol, on that gun?

24   A    I don't.  I don't know what happened to that gun.  It was

25   taken by the police officers.

```
 1   Q    Do you have any agreement with the State of Connecticut

 2   that you won't be prosecuted if it turns out that gun was used

 3   in an unsolved crime?

 4   A    I don't believe -- I don't remember having an agreement

 5   like that.

 6   Q    You also, in this plea agreement, did not receive an 851

 7   notice, did you?

 8   A    851 notice?  No, I don't believe I received a 851 notice.

 9   Q    And everyone who's incarcerated on federal charges knows

10   exactly what an 851 is, correct?

11   A    I don't think everybody does, because --

12   Q    Do you?

13   A    Something about even more time.

14   Q    Right.  And there is not an 851 notice in this plea

15   agreement, is there?

16   A    I don't remember reading -- I don't remember it being an

17   851 notice in there.

18   Q    Would you take my representation that this plea agreement

19   does not have an 851 notice?

20   A    Yes.

21   Q    But now that we have done that, if an 851 notice had been

22   filed, that would have had significant impact on your

23   sentencing range, correct?

24   A    Correct, if it's more -- more or less, it would have an

25   impact.
```

```
 1    Q    Okay.  Under the 851 notice, a person such as yourself
 2    would have to have a prior conviction for a felony drug
 3    offense, and that conviction would have to be final, which
 4    means it had been imposed, it was not appealed, it was over
 5    and done with?
 6              MR. SILVERMAN:  Your Honor, may I have a moment to
 7    confer with defense counsel in this matter?
 8              THE COURT:  Yes.
 9              (Mr. Silverman conferring with Mr. Moraghan.)
10              MR. SILVERMAN:  Your Honor, may we approach?
11              THE COURT:  Yes.
12              (At the side bar.)
13              MR. SILVERMAN:  Your Honor, I've asked to speak to
14    you at side bar.  I have a concern that this line of inquiry
15    about the 851 notice lacks foundation.  It's true that the
16    government did not file an 851 notice, but without the
17    certified copies of Mr. Wilson's convictions and really the
18    transcripts of his convictions, he may not be eligible for the
19    filing of the 851 notice.  If all the pleas were *Alford* or
20    they didn't otherwise specify a substance then he's not
21    eligible for the filing of the 851 notice.  And so without
22    those, I'm not sure that this line of inquiry is appropriate
23    because it may not be something that he's subject to.
24              MR. REEVE:  David, I'm sorry -- I have a thought, in
25    the plea agreement, the government says that at the present
```

1    time, it can't establish proof of the prior convictions

2    sufficient for the 851, and therefore they're not pursuing it,

3    and that's part of the agreement.

4            MR. MORAGHAN:  Did they say 851 or career offender?

5            MR. REEVE:  No, 851 and career offender.  It's

6    there.

7            MR. VATTI:  *Savage* applies to both.

8            MR. SILVERMAN:  I'm fine with that.  Without the

9    transcripts, I want it to be clear that I don't know if he

10   could have been a career offender or an 851-eligible

11   defendant.  I just wanted to flag you before we kept going.

12           MR. VATTI:  Not necessarily a benefit conferred upon

13   him, if he wasn't eligible.

14           MR. REEVE:  They gave him a benefit --

15           MR. SILVERMAN:  I have no problem with you going to

16   that part of the plea agreement.

17           MR. MORAGHAN:  I wasn't going to, I really was not

18   going to, because it would raise a question with the jury why

19   didn't you guys -- I can do that, I can do that.

20           MR. SILVERMAN:  Okay.

21           MR. REEVE:  Can I just -- are you good?

22           (In open court.)

23           MR. MORAGHAN:  May I continue, your Honor?

24   BY MR. MORAGHAN (Continued):

25   Q    I'm going to withdraw my prior question, Mr. Wilson, and

1    I would like to read you something from your plea agreement,

2    okay?

3    A    Okay.

4    Q    "The defendant and the government agree that pursuant to

5    *United States versus Savage*, 543 F.3d 4959 Second Circuit 2008

6    and its progeny, there is insufficient proof at this time that

7    the defendant's prior felony convictions qualify as controlled

8    substance offenses or crimes of violence under United States

9    Sentencing Guidelines Section 4.1.2.  The government has not

10   obtained transcripts underlying these prior felony

11   convictions.  And in exchange for the defendant's plea of

12   guilty at this time, the government agrees that these prior

13   convictions do not qualify at this time.  At this time, the

14   government cannot sustain its burden of establishing the

15   application of the career offender enhancement under USSG

16   Section 4B1.1."

17            And that may also apply to what you and I have just

18   been discussing.

19            But that being said, you did receive another

20   valuable benefit in this plea agreement by the government's

21   decision not to obtain your plea documentation and your

22   transcripts, will you agree with me?

23   A    Yes, I'll agree with you.

24   Q    Your sentence, again, could be significantly higher than

25   the guideline sentence that you're currently looking at?

```
1    A    Yes.

2    Q    Okay.  And in the federal system, are you aware of the

3    amount of time that an inmate actually serves after sentence

4    is imposed?

5    A    I believe it's 85 percent.

6    Q    85 percent?

7    A    I believe.

8    Q    Right.  So all of the various benefits and items that

9    were not included in this plea agreement really inure to your

10   benefit because you're going to have to serve 85 percent of

11   this, correct?  Of whatever sentence the Court imposes?

12   A    Correct.

13   Q    You testified earlier this week, I believe in response to

14   a question by Mr. Silverman, that you don't believe anyone

15   wants to go to jail for 20 or 25 years, was that your

16   testimony?

17   A    I could agree with you on that.

18   Q    And you certainly do not want to go to jail for anywhere

19   near that time, is that a fair statement?

20   A    That is a fair statement of what I would like.

21   Q    Right.  And again, in response to a question from

22   Attorney Reeve yesterday, you said desperate people do

23   desperate things?

24   A    I also recall saying that.

25   Q    Okay.  And is that kind of like the way you live your
```

1    life?  You're just going to do what has to be done and move

2    on?

3    A    I don't know if I would say that's my motto, but -- I

4    don't -- you want me -- I don't know what you want me to say

5    on that.  I think that's too open.  That supposed to be a yes

6    or no question?  I can't answer that yes or no.

7    Q    Okay.  I think you just answered it very well.  Thank

8    you.

9              MR. MORAGHAN:  May I have a minute, your Honor?

10   Q    Mr. Wilson, you were never a source of cocaine supply for

11   Philip Bryant, were you?

12   A    No, I don't believe I was a source for Philip Bryant.

13   Q    And you were never a source of cocaine, a source of

14   supply for cocaine, for Philip Bryant, were you?

15   A    Isn't that what you just said, sir?

16   Q    Excuse me?

17   A    Did you just repeat yourself?

18   Q    If I did, I apologize.  I was trying to distinguish

19   between cocaine base and cocaine.  I may have said them.  Let

20   me start again, please.

21   A    All right.

22   Q    You were never a source of supply to Philip Bryant for

23   cocaine base?

24   A    I don't believe I was, no.

25   Q    You were never a source of supply for cocaine for Philip

1    Bryant?

2    A    I don't believe I was.

3    Q    Philip Bryant was never -- other than the May 10th event

4    that we talked about, Philip Bryant was never -- a source of

5    cocaine base for you?

6    A    No, I don't believe he was.

7    Q    And Philip Bryant was never a source of cocaine powder

8    for you?

9    A    No, I didn't -- I don't remember buying any cocaine

10   powder from Mr. Bryant.

11   Q    In a number of proffers, you've told the government that

12   Deuce Mont was a source of supply of cocaine and cocaine base

13   for Philip Bryant, correct?

14   A    I believe I said that, yes.

15   Q    And you do not know who Deuce Mont is, do you?

16   A    No.

17   Q    You can't describe him?

18   A    Not right now, I can't.  I don't think I could.

19   Q    But throughout your meetings with the agents, you were

20   consistent in, you were not the source of supply to or from

21   Bryant; Deuce Mont was?

22   A    I believe I was consistent with that, that I was not his

23   supplier.

24   Q    I'm sorry, what?

25   A    I was consistent that I was not Mr. Bryant's supplier.

1    Q    And you had no relationship with Deuce Mont?

2    A    Oh, as a matter of fact, I believe I did.  So actually,

3    I'm recalling, sorry, I'm recalling, I'm recalling I knew, I

4    knew that man.

5    Q    You knew him?

6    A    Yes.  Yes.

7    Q    But you were not partners with him?

8    A    No.  No.

9    Q    He was not part of this conspiracy group alleged in the

10   superseding indictment?

11   A    No.  No.

12   Q    And even when you lost your chef, your source of -- to

13   cook the powder into crack cocaine for you, you never turned

14   to Philip Bryant and wanted to get into an agreement with

15   Bryant and Deuce Mont, did you?

16   A    I don't believe I did, sir.  I can't recall, but I know

17   it didn't happen, so...

18   Q    It didn't happen.

19            MR. MORAGHAN:  Can you bring up the cooperation

20   agreement?  It's 203.

21   Q    Mr. Wilson, that is the cooperation agreement that you

22   signed with the government?

23   A    Yes.

24   Q    And again, this is a document you reviewed with your

25   lawyer?  I don't want to know what he told you, but you

```
1    reviewed it with your lawyer?

2    A    Yes.

3    Q    Okay.  Were all your questions answered satisfactorily?

4    A    I believe so.

5    Q    And this agreement is kind of like the old time monopoly

6    get out of jail free card, isn't it?  This would allow the

7    Judge to sentence you below a mandatory minimum, it will allow

8    a Judge to sentence you below your guideline range, it gives

9    the Judge unfettered discretion to do whatever the Judge feels

10   is appropriate, correct?

11   A    It is not a get out of jail free card.

12   Q    Fine.  I agree with you, it's not.  But it allows the

13   Judge to do things that she could not have done if this

14   agreement had not been filed, correct?

15   A    I believe that's -- I believe the 5K1 motion does that,

16   not that agreement, sir.

17   Q    This will lead, you hope, to a 5K1 motion, correct?

18   A    Yeah, we could go there.

19   Q    Hmm?

20   A    Yeah.

21   Q    In fact, on page 2, in addition, if the government

22   determines that the defendant provided substantial assistance

23   in the investigation or prosecution of another person or has

24   committed an offense, the government will file a motion

25   pursuant to Section 5K1.1, correct?
```

```
 1    A     That's what it says.

 2    Q     It is your hope that a 5K motion gets filed based upon

 3    this cooperation agreement?

 4    A     It is my hope, yes.

 5    Q     Who makes the final decision as to whether or not a 5K1

 6    motion gets filed?

 7    A     I believe it's the government.

 8    Q     Going back to May 10th, Quiyon Reid lived at the Judson

 9    Street apartment?

10    A     May 10th?  I believe so.

11    Q     Hines lived at the Judson Street apartment?

12    A     I don't recall if Hines lived there in May.

13    Q     But you'll agree with me that there is a DEA report that

14    said you and Mr. Hines were living there in May of 2011?

15    A     I'll agree with you if there's a report that says that,

16    yes.

17    Q     Okay.  Mr. Clark, you've agreed today, was living at

18    Judson Street in May of 2011?

19    A     I believe he was living there.  I don't know if I said --

20    I don't remember agreeing that it was May.

21    Q     He was there before you?

22    A     Yeah, he was there before me.  Yeah.

23    Q     And all three of those individuals are crack cocaine

24    dealers, correct?

25    A     What three?
```

```
1   Q     Clark, Hines, Quiyon Reid?

2   A     They have, they have sold crack before, yes.

3   Q     And Quiyon Reid was your partner, wasn't he?

4   A     At one point, yes, he was.

5   Q     And, sir, you got cocaine from Mr. De Los Santos in New

6   York, you brought it, had it transported, arrived in

7   Connecticut?

8   A     Um hum.

9   Q     You provided it to Mr. Clark to cook it into cocaine base

10  at Judson Street?

11  A     Um hum.

12  Q     And the largest amount of crack cocaine that Clark ever

13  gave you was an ounce, correct?

14  A     I don't know if the largest amount that he ever gave me

15  was a ounce, sir.

16  Q     If I show you a proffer where it indicates you said that,

17  proffer three, January 14th, 2013, paragraph 3.  You can read

18  that to yourself.

19  A     I see what it says.

20  Q     Okay.  And it's reported that the largest amount of crack

21  cocaine that Mr. Clark gave you at one time was an ounce of

22  crack cocaine, correct?

23  A     That is what is reported, yes.

24  Q     And that was the amount that was negotiated on May 10th,

25  2011, correct?  An ounce?
```

```
 1   A     That was the...
 2   Q     But it wasn't an ounce, it was a little less than that,
 3   wasn't it?
 4   A     Yeah, turned out to be a little less than that.  Yes.
 5           MR. MORAGHAN:  I have nothing further, your Honor.
 6           MR. SILVERMAN:  Your Honor, it's my understanding
 7   that we're going to adjourn for the day at 4:30.
 8           THE COURT:  That's correct.
 9           MR. SILVERMAN:  I would be happy to get started with
10   these last 15 minutes or so on the redirect, and then resume
11   on Monday morning.
12           THE COURT:  All right.
13           MR. SILVERMAN:  Thank you, your Honor.
14   REDIRECT EXAMINATION
15   BY MR. SILVERMAN:
16   Q     Good afternoon, Mr. Wilson.
17   A     Good afternoon.
18   Q     Feeling tired?
19   A     Yeah, I'm tired.
20   Q     Any of the questions today confusing?
21   A     Yes.
22   Q     A lot of them?
23   A     Yes.
24   Q     All right.  We're going to see if we can clear up some of
25   the confusion.
```

```
1              I'm going to play for you a couple of calls that
2    you've already heard, and I'm sorry to be repetitive, but
3    we're going to go back and see if it clears anything up.
4              MR. SILVERMAN:  This is Government's Exhibit 44.
5              (Government's Exhibit 44, an audio recording,
6    played.)
7    Q    That was you and Mr. Anderson, right?
8    A    Yes.
9    Q    And at some point, were you talking about -- I'm sorry,
10   I'll withdraw that.  Did Mr. Anderson state, "I want him, I
11   want him, um, to try it out, you know what I'm saying"?
12   A    That fast, I just --
13   Q    Fair enough.  Let me play that again, just to that part.
14             (An excerpt of Government's Exhibit 44, an audio
15   recording, replayed.)
16   Q    Did you hear, Mr. Anderson said, "I want him to try it
17   out"?
18             MR. ROGAN:  I'm going to object at this point.  That
19   tape has been played twice, and it clearly speaks for itself.
20   The jury can hear it, they can see it.  Attorney Silverman
21   repeating for the witness what it is the document says or the
22   audiotape says is unnecessary.
23             MR. SILVERMAN:  I'll withdraw the question and I'll
24   move on to play Government's Exhibit 45.  These are all
25   October 25th, 2011.
```

```
 1              (Government's Exhibit 45, an audio recording,
 2   played.)
 3              MR. SILVERMAN:  This is Government's Exhibit 47,
 4   later that day.
 5              (Government's Exhibit 47, an audio recording,
 6   played, and paused.)
 7   Q    "He won't go bragging about it"?
 8   A    Yeah, I see it.
 9   Q    Do you remember the video we saw, Government's Exhibit
10   255?  I'll just show you the second clip.
11              (Government's Exhibit 255.2, a video recording,
12   playing.)
13   Q    Do you see someone walk out of 139 Day Street?
14   A    Yes.
15   Q    Who was it?
16   A    Mr. Anderson.
17   Q    The Mr. Anderson who wanted a sample?
18   A    The Mr. Anderson?
19   Q    Who wanted a sample?
20   A    Yeah.
21   Q    The Mr. Anderson who told you after he walked out that he
22   didn't like it, he won't go bragging about it?
23   A    If those calls line up to that, then yes.
24   Q    You accept my representation that that video surveillance
25   is after the call about getting a sample, and before the call
```

1   about he won't go bragging about it?

2   A    If that is your representation, then yes.

3   Q    Okay.  I'm going to play Government's Exhibit 35 for you.

4           (Government's Exhibit 35, an audio recording,

5   played, and paused.)

6   Q    Is that you and Mr. Morales talking?

7   A    Yes, it is.

8   Q    Did Mr. Morales -- because this one's in Spanish I'm

9   going to ask you -- did Mr. Morales say, "He's going to give

10  me 25 grams," right?

11  A    Yes.

12  Q    This call's on September 23rd, 2011.  Now I'm going to

13  play for you Government's Exhibit 38.  This is October 3rd,

14  2011, about ten days later.

15          (Government's Exhibit 38, an audio recording,

16  played, and paused.)

17  Q    25 grams, 28 grams, is that about $1,240?

18  A    Yeah, it's about, it's about that.

19  Q    Depends what you're charging per gram or per eight ball,

20  right?

21  A    Yeah.

22  Q    But it's about that?

23  A    Yeah, it's about that.

24  Q    When you testified in your direct examination that after

25  you connected Mr. Morales to Mr. Anderson, they exchanged

```
 1    about 35 grams of crack cocaine, you testified that way,

 2    right?

 3    A    Yeah.

 4    Q    Were you just making that number up?

 5    A    No, it was kind of, it was more like based on calls,

 6    based on the calls that, based on the calls and my knowledge.

 7    Q    Did you get calls from each of them, some calls from Mr.

 8    Morales?

 9    A    Yeah.

10    Q    Did you get some calls from Mr. Anderson?

11    A    Yes.

12    Q    Did their calls line up with each other?

13               MR. ROGAN:  Objection to the form, your Honor, as to

14    what this witness means by "line up."

15               MR. SILVERMAN:  What the attorney means by line up?

16               MR. ROGAN:  No.

17               MR. SILVERMAN:  Sure, then I'll rephrase the

18    question.

19    Q    Were the calls consistent with one another in terms of

20    quantities and prices?

21    A    Quantities and prices.  I thought they were talking about

22    each other.  The quantities.

23    Q    Okay.  Okay.  And you would get calls from Mr. Morales

24    and some from Mr. Anderson, and chronologically, did they flow

25    with one another?
```

```
1    A    Yes.

2    Q    Do you remember the need for a very small spoon that you

3    had?

4    A    Yes.

5    Q    Why do you need a very small spoon?

6    A    To -- I was going to use it to package heroin.

7    Q    Because the amounts of heroin, I don't know where the

8    chart's gone now, but the amount of heroin that goes into the

9    glassine bags are very small?

10   A    Yeah.

11   Q    For the bundles, really small amounts of heroin, right?

12   A    Yeah, each one bag.

13   Q    Right.

14   A    Yes, each that goes in one bag is a small amount.

15   Q    There are spoons that people packaging heroin typically

16   use for that, right?

17   A    Yeah, I guess the smaller the spoon, the better.

18   Q    Okay.  Did you have one of those really, really small

19   spoons when you started out packaging heroin?

20   A    No, I did not.  I didn't obtain one of those until a

21   while after I started.

22   Q    How did you get one of those really small spoons?

23   A    Mr. Anderson had brought it.

24   Q    Mr. Anderson brought it?

25   A    Yes.
```

```
 1   Q     Did you pay him for it?

 2   A     No, I didn't have to pay him for it because he owed me.

 3   Q     He owed you?

 4   A     Yes.

 5   Q     What did he owe you for?

 6   A     For a bundle -- I don't know if it was a bundle or two I

 7   fronted to him, but I think it was like $30 that he owed me

 8   for a bundle.

 9   Q     He owed you money for a bundle you had fronted to him?

10   A     Yes.

11   Q     Okay.

12            MR. SILVERMAN:  May I have one moment to confer with

13   defense counsel, your Honor?

14            (Mr. Silverman conferring with Mr. Rogan.)

15            MR. SILVERMAN:  Your Honor, I'm going to end by

16   reading a note that we have agreed I could read into the

17   record.  I just need to find it.  Give me 30 seconds.

18            Your Honor, at Mr. Wilson's proffer on October 8,

19   2013, the report of that proffer session reflects the

20   following:

21            Wilson stated that he sold Richard Anderson -- also

22   known as Porter, Mayut -- ten grams of cocaine base between

23   May 10th, 2011, and July 29th, 2011.  Wilson stated that he

24   charged him $400 for one chunk in a sandwich bag approximately

25   10.6 grams.
```

```
 1              I think it's 4:30.  That's when we said we would

 2       adjourn.  I'll be happy to pick up with my redirect

 3       examination on Monday morning.

 4              MR. ROGAN:  Your Honor, I just want it to be clear

 5       that the stipulation is only as to that's what Mr. Wilson

 6       claims that he said, and nothing more.

 7              THE COURT:  Yes.  We will be picking this up on

 8       Monday, so maybe we can reiterate that.

 9              MR. SILVERMAN:  Yes.  Thank you, your Honor.

10              THE COURT:  All right, ladies and gentlemen, we'll

11       adjourn until Monday morning at 9:00 o'clock.

12              MR. SILVERMAN:  9:00 o'clock?

13              MR. REEVE:  Could we just maybe ask the jurors if

14       they could be here at 9:00?  It's great with us, but I think

15       maybe --

16              THE COURT:  Does anybody have a problem?

17              JURORS:  9:30.

18              THE COURT:  9:30?  All right.

19              MR. REEVE:  Thank you.

20              MR. SILVERMAN:  Thank you.

21              THE COURT:  Have a good weekend, ladies and

22       gentlemen, and don't talk about the case, don't think about

23       it.

24              (In the absence of the jury:  4:31 o'clock p.m.)

25              MR. REEVE:  I'm a little bit concerned about what
```

```
 1   was just said, that I think we need to clarify.  Mr. Rogan
 2   misspoke when he made that comment, and because what he said
 3   is "I'm only stipulating that that's what Mr. Wilson said."
 4   All along, we've been stipulating that the stipulation is that
 5   that's what the report says, and I think it was just Mr. Rogan
 6   misspeaking, but I'm a little bit concerned, and I'm going to
 7   ask the Court just to tell the jury, and I'm going to remind
 8   your Honor on Monday morning just to say, to the degree
 9   there's any confusion, all of these stipulations have been
10   with respect to the proffer reports are regarding what the
11   report says Mr. Wilson said.  It's an important distinction.
12            THE COURT:  Remind me on Monday morning.
13            MR. REEVE:  I will.  I will.  And your Honor, the
14   other thing is, I haven't done this in a few days so I'm
15   renewing my motion for severance.  I know it's denied.
16            And just, it's going to take me one more second and
17   all I can do, I'm going to say two words, your Honor, okay?
18            THE COURT:  Yes.
19            MR. REEVE:  Jeremiah Donovan.  I'm moving for
20   reconsideration, your Honor.  Your Honor invited me to do it.
21   I don't think this witness can really testify to details of
22   this process because he doesn't know, and I'm just renewing
23   that motion.
24            THE COURT:  Okay.  Decision reserved.
25            MR. REEVE:  Thank you.
```

```
 1              THE COURT:  Now I want to ask you about Tuesday,
 2    because I have two matters Tuesday morning, I think I have one
 3    at 9:00 or one at 11:00, something like that.  I think perhaps
 4    I'm going to have to move them, right?
 5              MR. SILVERMAN:  I'm sorry, your Honor?
 6              THE COURT:  You can't hear me?  I said I want to
 7    talk about Tuesday.  Obviously, I think, we're still going to
 8    be involved.  I have something at 9:00 o'clock and something
 9    at 11:00, I think, I'm not certain, but I better move them,
10    right?
11              MR. SILVERMAN:  Your Honor, I know you have two
12    proceedings, one at 9:00 and one at 10:00, because I'm the
13    assistant on both of those matters.
14              THE COURT:  Okay.
15              MR. SILVERMAN:  If your Honor would like to move
16    them, I have no objection to either.  But I think you have to
17    confer with defense counsel to ensure.  It's sentencings, and
18    obviously the defendants have certain rights related to the
19    timing of sentencings.
20              THE COURT:  We'll call on Monday and inquire.  Who's
21    defense counsel?
22              MR. SILVERMAN:  The first individual is Britt Martin
23    who's represented by Chuck Kurmay.  The second is Emory James,
24    represented by Jim Swaine.  It may be at that point the jury's
25    deliberating, I just don't know, I don't expect --
```

```
 1              THE COURT:  I don't mean to move it now; I'm saying
 2    I probably will have to move it on Monday.
 3              MR. SILVERMAN:  You may.  It may be that the
 4    redirect and the recross is done with sufficient time for us
 5    to close and for you to charge this jury on Monday.  But we
 6    won't know that until we get there.  So if you want to reach
 7    out to those defense attorneys and see if they would be
 8    amenable, I think that's fine.
 9              THE COURT:  I think maybe I'll push it over to
10    Wednesday if I can, and I won't have a problem.
11              MR. REEVE:  Thank you, your Honor.  Have a nice
12    weekend.
13              THE COURT:  Thank you, I hope you all do, too.
14    Let's hope the weather improves, gets nice weather.  I don't
15    know what it's going to be.  I hope it's warm.
16              MR. REEVE:  I don't know.
17              THE COURT:  We don't know.  We never know.  It's not
18    in our hands.
19              MR. REEVE:  Exactly.  Thank you.
20              MR. SILVERMAN:  Thank you.
21              (4:35 o'clock p.m.)
22
23
24
25
```

Page 1

1                    INDEX OF WITNESSES                  PAGE

2    KEVIN WILSON
          Continued Cross-Examination by Mr. Reeve     1244
3         Cross-Examination by Mr. Rogan               1250
          Cross-Examination by Mr. Moraghan            1324, 1356
4         Redirect Examination by Mr. Silverman        1352

5    DAVID ZANNELLI
          Direct Examination by Mr. Silverman          1340
6         Cross-Examination by Mr. Rogan               1348
          Redirect Examination by Mr. Silverman        1352

7

8

9

10

11

12

13

14

15

16

17

18          COURT REPORTER'S TRANSCRIPT CERTIFICATE

19          I hereby certify that the within

20      and foregoing is a true and correct

21      transcript taken from the proceedings

22      in the above-entitled matter.

23

24               /s/ Thea Finkelstein
                 Official Court Reporter
25
     Dated: _____