1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
2
     * * * * * * * * * * * * * x   Criminal Case
3                                     No. 3:12CR104(EBB)
     UNITED STATES OF AMERICA,    :
4                 Plaintiff
                                  :
5           vs.                   February 3, 2014
                                  : 10:06 O'clock a.m.
6    RICHARD ANDERSON, PHILIP
     BRYANT, ROBERT SANTOS,       :
7                 Defendants         New Haven, Connecticut
                                  :
8    * * * * * * * * * * * * * x

9                   TENTH DAY OF TRIAL

10       BEFORE THE HONORABLE ELLEN BREE BURNS
            SENIOR UNITED STATES DISTRICT JUDGE
11                AND A JURY OF FIFTEEN

12   Appearances:
      For the Plaintiff:          S. DAVE VATTI, ESQ.
13                                MARC HARRIS SILVERMAN
                                  Assistant U.S. Attorneys
14                                157 Church Street
                                  New Haven, CT 06510
15
      For the Defendant:          NEAL PATRICK ROGAN, ESQ.
16    Richard Anderson            315 Post Road West
                                  Westport, CT 06880
17
      For the Defendant:          DAVID A. MORAGHAN, ESQ.
18    Philip Bryant               Smith, Keefe, Moraghan & Waterfall
                                  32 City Hall Center, Suite C
19                                PO Box 1146
                                  Torrington, CT 06790
20
      For the Defendant:          RICHARD A. REEVE, ESQ.
21    Robert Santos               ANAND BALAKRISHNAN, ESQ.
                                  Sheehan & Reeve
22                                139 Orange Street, Suite 301
                                  New Haven, CT 06510
23
      Court Reporter:             Thea Finkelstein RMR, CRR
24                                TheaFinkelstein@aol.com

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.

```
 1              (In the absence of the jury.)

 2         THE COURT:  Good morning.

 3         MR. SILVERMAN:  Good morning, your Honor.

 4         MR. MORAGHAN:  Good morning, your Honor.

 5         THE COURT:  I understand we're going to be finished

 6  with the evidence around noon today, is that correct?

 7         MR. SILVERMAN:  That's our aspiration, your Honor.

 8         THE COURT:  Yes.  And you wanted to do closing

 9  arguments thereafter.  The only thing I have some problem

10  about, I don't know how this storm is going to develop and

11  whether or not -- I know we have one juror who comes from New

12  London and whether -- the jury is going to be anxious about

13  the weather.

14         MR. MORAGHAN:  Last I heard, your Honor, this was

15  going to tail off around 3:00 o'clock, so by 5:00 o'clock, the

16  road should be clean.  If we leave early, they might not be

17  clean.

18         THE COURT:  It's difficult to know.  I guess they

19  say -- they haven't -- if they begin to express an interest in

20  leaving early because of the storm, I just wonder what you

21  think about that.

22         MR. REEVE:  Judge, I think we should check the

23  weather forecast.  I think it would be better for people to

24  leave at 5:00 o'clock instead of during the eye of the storm.

25  If they ask, we can say we've checked the weather and the
```

1    forecast indicates you're better going at 5:00.  That's my

2    thought.

3              THE COURT:  It's going to ease around 3:00 o'clock?

4              MR. REEVE:  This might be the best place for them to

5    stay all day.  I know I'm exaggerating a little bit.

6              THE COURT:  Have they raised any concern about it?

7              THE CLERK:  A few jurors did, yes.  They were just

8    concerned.

9              THE COURT:  I think we're going to be finished with

10   the evidence, as I say, about 12:00 o'clock, that's my

11   understanding, and take the lunch recess then and have closing

12   arguments at 1:00 o'clock, right?

13             MR. SILVERMAN:  Your Honor.

14             MR. REEVE:  Yes, your Honor.  That way we can

15   address the motions for judgment of acquittal while the jury

16   goes to lunch.  We don't want to cut into your lunch break.

17   We don't need much of a lunch break.  We want to start the

18   closing arguments at 1:00 so we'll be done.

19             I started the cross-examination of Mr. Wilson, but

20   I'm going to go last on the recross, and I'll just, I have

21   some things that frankly, your Honor, I want to get done this

22   morning, it's important that we get done, and I'll just act

23   accordingly because I think there's a time we need to get

24   finished by.  If that's all right with the Court, we're going

25   to switch the argument on recross.

1        MR. SILVERMAN:  We have no objection.

2        THE COURT:  Okay, good.  Everybody ready for the

3    jury then?

4        MR. VATTI:  Yes, your Honor.

5        MR. REEVE:  Yes, your Honor.

6        MR. MORAGHAN:  Yes, your Honor.

7        MR. ROGAN:  Yes, your Honor.

8        (In the presence of the jury:  10:12 o'clock a.m.)

9        THE COURT:  Good morning, ladies and gentlemen.

10        MR. SILVERMAN:  May I resume, your Honor?

11        THE COURT:  Yes, please.

12                    **K E V I N   W I L S O N**

13        having been recalled as a witness, was previously

14        duly sworn and testified on his oath as follows:

15    REDIRECT EXAMINATION

16    BY MR. SILVERMAN:

17    Q    Good morning, Mr. Wilson.

18    A    Good morning.

19    Q    Was Jesus Morales one of your drug customers?

20    A    Yeah, he was a drug -- yeah, he was a drug customer of

21    mine.

22    Q    What controlled substance, what drug, did you sell him?

23    A    Heroin.

24    Q    When he came to you asking for the hard stuff, and you

25    connected him to Mr. Anderson, how did you know that Mr.

```
 1    Anderson could supply the hard stuff?

 2    A    Through conversations with him.

 3    Q    I'm sorry, through conversations with who?

 4    A    Mr. Anderson.

 5    Q    So Mr. Anderson told you?

 6    A    Yes.

 7    Q    What was in it for you?  In other words, how did you

 8    benefit from connecting Mr. Morales to Mr. Anderson?

 9    A    Well, the idea for me was I sent him crack customers and

10    he would send me heroin customers.

11    Q    That was the arrangement?

12    A    That was my idea, I guess you could say arrangement.

13    Q    Okay.

14              MR. SILVERMAN:  Your Honor, I don't believe there's

15    any objection to the admissions of government exhibits 149

16    through 153.

17              MR. REEVE:  That's correct, your Honor, we've

18    reviewed this, so there's no objection to any of those.  They

19    could be admitted in full.

20              THE COURT:  Very well.  149 through --

21              MR. SILVERMAN:  153.

22              THE COURT:  Thank you.

23    Q    This is a series of five text messages, Mr. Wilson, on

24    December 8th, 2011, between you and Brittany Odom.  I'm going

25    to ask you to read the content of the text messages.
```

```
 1              Can you read this part where my finger is?

 2   A    Yes.

 3   Q    What does it say?

 4   A    "I talk to Scooter."

 5   Q    That's a message from you to Ms. Odom.

 6              Government's Exhibit 150, can you read this part?

 7   A    "Is he okay?"

 8   Q    That's from Ms. Odom to you, one minute later, 4:34.

 9              4:37, you wrote back?

10   A    "Jail."

11   Q    4:38, she responded?

12   A    "OMG, are you serious.  WTF he do now."

13   Q    At 4:41, you wrote back?

14   A    "VOP."

15   Q    That was on December 28th, 2011.

16              I want to turn back to the date of June 28th, 2011.

17   In one of your cross-examinations, defense counsel showed you

18   Defense Exhibit AA, your DOC custody sheet, when you were in

19   and out of the DOC custody.  Do you remember that?

20   A    Yes, I remember that.

21   Q    On the sheet, the date you were released from your

22   halfway house was June 28th, 2011.  Do you remember that?

23   A    Yes.

24   Q    All right.  Where did you live after your release from

25   the halfway house?
```

```
 1   A     I lived on 139 Day.

 2   Q     And when you were released, you said you were on a

 3   bracelet?

 4   A     Yes, I was on a bracelet, a curfew.

 5   Q     What does that mean?

 6   A     I would have to -- I was on a bracelet.  I had a curfew

 7   that I had to be back inside my apartment on 139 Day by 9:00

 8   o'clock.

 9   Q     So Connecticut parole could monitor your location?

10   A     Yes.

11   Q     Through this bracelet?

12   A     Yes.

13             MR. SILVERMAN:  This is Government's Exhibit 127.

14   It also occurs on June 28th.

15             (Government's Exhibit 127, an audio recording,

16   played.)

17   Q     That call takes place on June 28th.  The next day, June

18   29th, you sold 6.5 grams of crack cocaine to someone

19   cooperating with law enforcement.  Who gave you the crack

20   cocaine that you sold the next day, June 29th?

21   A     Vincent Clark.

22   Q     That's his reference, "I don't want to give you nothing

23   wet"?

24   A     Yes.

25   Q     You testified -- that buy was June 29th, 2011.  You've
```

1    testified that on May 10th, 2011, when you sold the ounce of

2    crack cocaine, that that ounce came from Philip Bryant, right?

3    A    Yes.

4    Q    So at what point did you partner up with Vincent Clark?

5    A    Sometime in between, in between then.

6    Q    You weren't partners yet on May 10th?

7    A    No, we could have discussed it, but I don't believe we

8    were partners yet.

9    Q    You were partners by June 29th?

10   A    Yes.

11   Q    Sometime in the span of a month-and-a-half that you guys

12   formalized your partnership?

13   A    Yes.

14   Q    Okay.  Let's go back to May 10th, 2011, this buy, the

15   ounce buy.  You testified previously that you felt funny about

16   that transaction, right?

17   A    Yes.

18          MR. SILVERMAN:  This is another clip from

19   Government's Exhibit 120.

20          (Government's Exhibit 120.9, a video recording,

21   played.)

22   Q    During that clip, did one of the cooperators get out of

23   the front seat and move into the back seat?

24   A    Yes, they did.

25   Q    Did that same cooperator roll down the window and gesture

1    to you to get in the front seat?

2    A    I believe he did.  I believe he did.

3    Q    Okay.

4         MR. SILVERMAN:  This is another clip from that same

5    government exhibit, 120.

6         (Government's Exhibit 120.10, a video recording,

7    played, and paused.)

8    Q    Did you hear that cooperator just say 20-22-24 Judson?

9    A    Yes.

10   Q    Do you see which way the cooperator is looking out of the

11   car?

12   A    He's looking, he's looking to the -- if he's on Judson,

13   he's looking to which way I went to the driveway.

14   Q    So let's try to get this geography run down.  Is that car

15   parked on the right-hand side of the street?

16   A    I believe it was on the right-hand side.

17   Q    And so from where the car is parked, where is 20-22-24

18   Judson?

19   A    It's on the left.

20   Q    So it's across the street over here?

21   A    Yes.

22   Q    So he would be looking in the direction of the yard?

23   A    Yes.

24        (Government's Exhibit 120.10, a video recording,

25   continued, and paused.)

1    Q     Did the driver just say something?

2    A     He did.  I don't --

3    Q     Could you understand what he said?

4    A     No.

5    Q     Okay.

6          (Government's Exhibit 120.10, a video recording,

7    continued, and paused.)

8    Q     Did you just walk around the car to get in it?

9    A     Yes.

10   Q     Okay.  I'm not going to play this clip again.  When you

11   first get in the car, cut it off in the last clip I showed

12   you, you direct them to Scranton and Winthrop, do you remember

13   that intersection?

14   A     Yes.

15   Q     Is that close to the yard?

16   A     Yes.

17   Q     How far is it from the yard?

18   A     It's around the corner from it.

19   Q     Around the corner, you said?

20   A     Around the corner, yes.

21   Q     Do you remember on Friday afternoon when Attorney

22   Moraghan showed you some call detail records, some phone

23   records?

24   A     I'm sure it happened, but I don't remember it.

25          MR. SILVERMAN:  I think it's Defense Exhibit EE, is

```
 1   that right?
 2            MR. MORAGHAN:  I believe so, yes.
 3            MR. SILVERMAN:  May I approach, your Honor?
 4            THE COURT:  Yes, sir.
 5   Q    Looked like this?
 6   A    Okay, yeah.
 7   Q    Do you remember he showed you that?
 8   A    Yeah.
 9   Q    Had you ever seen those phone records before Attorney
10   Moraghan showed them to you on Friday?
11   A    I do not recall seeing those phone records before Friday.
12   Q    This is Government's Exhibit 202, it's your plea
13   agreement.  Going to page 3, where there's a provision
14   entitled "determination of quantity."  I'm blowing up the last
15   sentence, which I'll read again:  "The defendant agrees and
16   acknowledges that the quantity of heroin involved in his
17   offense was at least two kilograms, and the quantity of
18   cocaine base involved in his offense was at least 280 grams."
19   Did I read that right?
20   A    Yes.
21   Q    Is that what you stipulated to in your plea agreement?
22   A    Yes.
23   Q    Why did you stipulate to those quantities?
24   A    Because I sold that amount.
25   Q    That's not imaginary heroin, is it?
```

```
 1   A      No.

 2   Q      It's not make believe cocaine base, is it?

 3   A      No.

 4   Q      That's what you distributed?

 5   A      Yes.

 6              MR. SILVERMAN:  May I have one moment, your Honor?

 7              THE COURT:  Yes, sir.

 8              MR. SILVERMAN:  No further questions.  Thank you.

 9              MR. ROGAN:  Just briefly redirect (sic), your Honor.

10              THE COURT:  Yes.

11   RECROSS-EXAMINATION

12   BY MR. ROGAN:

13   Q    Good morning, Mr. Wilson.  I'm going to be very brief

14   with you.

15              I want to see if you can remember back to your

16   testimony at the end of Friday, before we broke for the

17   weekend.  Attorney Silverman played a phone call that was

18   translated from Spanish into English between you and Mr.

19   Morales.  Do you remember that phone call?

20   A    I remember him playing; I don't remember the whole phone

21   call, but I remember him playing a call between him, me, and

22   Mr. Morales, yes.

23   Q    Okay.  I just want to test your memory, then we'll play

24   the tape, or play the audio.  Basically, it seems --

25              MR. ROGAN:  You know what?  Let's go ahead and play
```

```
1    it because I don't want to mischaracterize it.

2              (Government's Exhibit 135, an audio recording,

3    played, and paused.)

4              MR. ROGAN:  Sorry, I may have -- I'm sorry, I

5    misspoke.  35.

6    Q    I apologize, Mr. Wilson, I misspoke about the exhibit.

7              THE COURT:  What exhibit is this?

8              MR. ROGAN:  This is 35A, your Honor.

9              (An excerpt of Government's Exhibit 35, an audio

10   recording, played, and paused.)

11   Q    All right.  Mr. Wilson, you can see the screen, right?

12   A    Yes, I can.

13   Q    So this is what I'm talking about.  This is a

14   conversation between you and Mr. Morales, right?

15   A    Yes.

16   Q    And it appears to be, based upon -- I know you don't know

17   what's in Mr. Morales's head but it appears to be -- that he's

18   complaining about somebody or something.  Would you agree with

19   me?

20   A    Yes.

21   Q    Okay.  And can you see right here, where you say --

22   you're KW.  Can you read that out loud?

23   A    "This, this is his shit, bro.  I can't tell him how to

24   run his business."

25   Q    Okay.  So what you're basically saying is, whoever
```

```
 1    they're discussing, whatever you're saying is:  I, Kevin
 2    Wilson, I'm not a part of whatever's going on between Mr.
 3    Morales and this other guy that you're talking about on the
 4    phone, right?
 5    A    That was the reason I gave him the green light, so they
 6    could deal with each other.
 7    Q    By that time, let's be clear, you told us on multiple
 8    occasions, by August of 2011, you're out of the crack cocaine
 9    business, right?
10    A    That was like give or take, yeah.
11    Q    Plus or minus.  This call is well after that.  Can you
12    also see up on the screen where Mr. Morales, whoever he is, is
13    trying to do some math, about pricing and stuff, right?
14    A    Yes.
15    Q    And I think you've told this jury yourself on multiple
16    occasions, math is not your thing, right?
17    A    No.
18    Q    Right, okay.  So when Mr. Silverman was asking you late
19    in the day on Friday on redirect to try and translate those
20    numbers that you just saw up on the screen into grams of
21    cocaine, you're not really capable of doing that, right?
22    A    Only by what it says up there.
23    Q    Right.  Only by what it says up there.  You and I can
24    agree that, because you had no partnership with Mr. Anderson,
25    right?  You talked about that, right?
```

```
1    A    Um hum.

2    Q    You and I can agree that all you're really doing is

3    reading that transcript of your phone call between you and Mr.

4    Morales?

5    A    Reading it and -- yeah, reading it.  That's what I'm

6    doing, reading it.

7    Q    And you're trying to interpret it, but you're also

8    telling us at the same time that you're not very good at math,

9    right?

10   A    I mean, the call speaks for itself.  As far as the math,

11   the call speaks for itself.

12   Q    That's right, but what you also don't know and couldn't

13   tell us, and you've been honest about that, you don't know if

14   this phone call, whatever transaction that's being spoken

15   about here, you don't know if it ever actually took place,

16   right?

17   A    I didn't see, but from -- I didn't see it take place, but

18   from the call, I thought that I knew.  If that's fair to say.

19   Q    I'm sorry, I didn't hear the last part.

20   A    I didn't see it take place but from the calls, I thought

21   that I knew it took place, if that's fair to say.

22   Q    That's fair to say.  So it's a guess based upon what

23   you're seeing up on the screen, is that fair to say?

24   A    Yeah, I believe it's fair to say.

25   Q    A guess, great.  Also, you said that Mr. Morales -- I'm
```

```
 1   going to this morning -- that Mr. Morales was a heroin

 2   customer of yours, correct?

 3   A    Yes.

 4   Q    Okay.  And that you had this idea in your head, that was

 5   actually your words, that somehow if you put Mr. Morales

 6   together with Mr. Anderson, that Mr. Anderson would do

 7   something in turn for you, which was refer heroin customers?

 8   A    To me, yes.

 9   Q    Okay.  But that never actually happened, right?

10   A    No, he never sent anybody else to me.  No, he didn't.

11   Q    Not only he never sent anybody else to you; he never sent

12   anybody to you, right?

13   A    No.

14            MR. ROGAN:  Thanks.  Nothing else.

15   RECROSS-EXAMINATION

16   BY MR. MORAGHAN:

17   Q    Good morning, Mr. Wilson.

18   A    Morning.

19   Q    You testified, just briefly, that you knew Vincent Clark

20   and you had discussions with him in the area of May 10th, but

21   you didn't have a relationship with him until sometime

22   afterwards?

23   A    I believe, I believe that's, yes.

24   Q    Did you have a relationship with him prior to May 10th?

25   A    As far as, like --
```

1   Q    Obtaining and selling crack cocaine?

2   A    I don't believe we had, we didn't have a relationship at

3   that time.

4   Q    Okay.  But you testified last week that although you did

5   not actually do your own personal hand-to-hand sales during

6   the time, that you were released to the community halfway

7   house on July 19th of 2010 through May 10th of 2011, you did

8   middle man deals?

9   A    Yes.

10  Q    Okay.  And a middle man deal is you put a buyer and a

11  seller together, correct?

12  A    Yes.

13  Q    Okay.  So between July 19th of 2010 and May 10th of 2011,

14  you were aware of individuals who were supplying crack

15  cocaine, correct?

16  A    Correct.

17  Q    And you had conversations with them?

18  A    Correct.

19  Q    And you put deals together with them, correct?

20  A    Correct.

21  Q    Okay.  The May 10th transaction, where you sold the 26

22  grams of crack cocaine to the confidential informant, that all

23  didn't take place on May 10th, did it?

24  A    I'm sorry, I don't see how it didn't.

25  Q    You had discussed this, you ran into Mr. -- confidential

```
 1   witness 1 -- sometime prior to May 10th, correct?

 2   A    Yes.

 3   Q    At a market?

 4   A    At a store, yes.

 5   Q    Yes, I think you were selling him cigarettes or something

 6   like that?

 7   A    Yes.

 8   Q    Okay.  That's when this discussion you had with him took

 9   place, correct, on getting him a quantity of crack cocaine?

10   A    I told him I was going to --

11   Q    How many days before May 10th did you have this meeting

12   or conversation --

13            MR. SILVERMAN:  Your Honor, I'm sorry, I don't think

14   the witness was able to complete his answer to the last

15   question.

16            MR. MORAGHAN:  I'm sorry.

17   A    When I met him, I told him that I was going to start to

18   have crack.

19   Q    And he wanted to purchase from you?

20   A    I don't believe he wanted to purchase right on the spot,

21   no.

22   Q    Okay.

23   A    But eventually, he wanted to purchase.

24   Q    So you had conversations leading up to the sale on May

25   10th, correct?
```

```
 1   A    We had conversations, but I don't know, I don't know if

 2   they were all about crack.  I don't know if that was the first

 3   time it was brought up or not, when he called.

 4   Q    What I'm asking you is, was the first time that you

 5   discussed the sale of crack cocaine to confidential witness 1,

 6   did that take place on May 10th or did that take place some

 7   day prior to May 10th?

 8   A    I don't recall.

 9   Q    You don't recall.  Okay.  On January 3rd and 4th --

10   January 4th of 2012, you did meet with the police, correct?

11   A    Correct.

12   Q    Okay.  And you did discuss some issues involving the

13   narcotics business that you were involved in, correct?

14   A    Correct.

15   Q    And you talked about certain people?

16   A    Correct.

17   Q    Okay.  And at that meeting, you did not mention Philip

18   Bryant at all, is that correct?

19   A    I don't believe I did.  I don't really recall.  I don't

20   think I did though.

21   Q    Okay.  I could show you the report, if it would refresh

22   your recollection.

23   A    If, I mean, if it's already up there that I didn't, then

24   I didn't.  To recall it, you know, it's kind of far.  If his

25   name is not up there, I did not mention his name.
```

1    Q    Will you take my representation that Mr. Bryant is not

2    mentioned in that report?

3    A    That, I can do.

4    Q    All right.  Mr. Wilson, you then entered into a proffer

5    agreement with the government, correct?

6    A    Yes.

7    Q    And that was on August 19th of 2012?

8    A    August 9th.  August 9th.

9    Q    August 9th?

10   A    I think you said 19th.

11   Q    I'm sorry, August 9th of 2012.

12   A    Um hum.

13   Q    Correct?  And at that time, you knew it was not in your

14   interest to hold anything back, correct?

15   A    Correct.

16   Q    Okay.  You were going to be as cooperative and provide as

17   much information as you possibly could, is that fair to say?

18   A    I was going to answer the questions that they asked me.

19   Q    Okay.

20   A    That's fair to say.

21   Q    Okay.  And you spoke about dozens and dozens of people,

22   is that fair to say?

23   A    What they asked me, I answered.

24   Q    They asked you about Philip Bryant, didn't they?

25   A    I believe they did.

1    Q    Okay.  And the only thing you said about Philip Bryant on

2    August 9th of 2012, after you signed your proffer agreement,

3    was that you and he shared guns that were stored at 22 Judson

4    Street in New Haven?

5    A    If that's what it says on the proffer, then that's what I

6    said.

7    Q    Just so there's no misunderstanding.

8            MR. MORAGHAN:  I'm looking at the proffer -- I'm

9    sorry, the DEA report of the proffer -- of August 9, 2012,

10   paragraph 21.

11   Q    Would you please read paragraph 21, sir?

12   A    To myself?

13   Q    Sure.

14   A    All right.

15   Q    Would you agree with me, Mr. Wilson, that on that date,

16   you did discuss Philip Bryant with the agents?

17   A    Yes.

18   Q    And would you agree with me, sir, that on that date, the

19   only thing -- the only thing -- you said about Philip Bryant

20   was that you shared several firearms with Philip Bryant,

21   a.k.a. Phat Phil, which they stored in the backyard of 22

22   Judson Street, New Haven, Connecticut?

23   A    Yes.

24   Q    You never mentioned the May 10th sale, did you?

25   A    I believe I did, sir.

1    Q    In this proffer?

2    A    No.  At that proffer?  No, sir.

3    Q    On the proffer of August 9th, you never mentioned the May

4    10th sale, did you?

5    A    No, sir.

6    Q    You never mentioned anything about Philip Bryant being

7    involved in cocaine?

8    A    In that proffer?

9    Q    In that proffer.

10   A    No, sir.

11   Q    You never mentioned anything about Philip Bryant being

12   involved in crack cocaine at that proffer?

13   A    No, sir, I didn't see that written down there.

14   Q    Okay.  And you have testified that that May 10th, 2011,

15   sale was the largest single crack cocaine sale you had ever

16   made, is that what your testimony was last week?

17   A    I believe it was during that, I want to say during -- I

18   believe I said something to that effect, but it was during

19   that investigation or something like that.  That's how I

20   knew -- yeah, I believe I said something like that.

21   Q    Okay.  Prior to that proffer, you had met with your

22   lawyer, correct?

23   A    Yes.

24   Q    Okay.  And you had seen the discovery that the government

25   provided to the lawyers in this case?

1    A    I don't remember if it was prior.  I know I've seen the

2    discovery.

3    Q    Okay.  And you knew about the videotape, Government's

4    Exhibit 120, didn't you?

5    A    I believe I knew there was a videotape, or wire or

6    something.  I'm not sure I saw the video then.

7    Q    Okay.  But knowing that it existed, you still did not say

8    anything about your alleged source of supply on May 10th,

9    2011, did you, in the August 9th proffer?

10   A    If I wasn't asked, why would I say?  I mean, I said I

11   answered the questions they asked me.

12   Q    You were asked about Philip Bryant, correct?

13   A    Yeah, I was asked about Philip Bryant.

14   Q    What did they say, did they say, "Tell us about Philip

15   Bryant"?

16   A    How can I recall exactly what they said?

17   Q    All you told them was you were involved with guns with

18   him, is that correct?

19   A    That's what it says on the paper, yes.

20          MR. MORAGHAN:  Thank you.  Nothing further.

21   RECROSS-EXAMINATION

22   BY MR. REEVE:

23   Q    Mr. Wilson, good morning.

24   A    Good morning, sir.

25   Q    There's a few things I need to clarify with you, okay?

```
1    A    Okay.

2    Q    First, you were asked by Attorney Silverman one of the

3    first few questions, he showed you a series of text messages

4    between you and Brittany Odom, do you remember that?

5    A    Yes, I do remember that.

6    Q    Okay.  Just to refresh you, to make sure we're all on the

7    same page, Government's Exhibit -- you know what?  It's okay,

8    I'm going to show you a copy --

9              MR. REEVE:  With the Court's permission, may I

10   approach?  May I approach the witness, your Honor?

11             THE COURT:  Yes, I'm sorry.

12             MR. REEVE:  Sorry to interrupt.

13   Q    The first one, Government's Exhibit 149, this is the one

14   where it's an outgoing text from your phone and you say, in

15   that text, "I talked to Scooter," right?

16   A    Yes.

17   Q    What's the date on that?

18   A    12/28.

19   Q    Okay.  So that's three days after Christmas, right, of

20   the year 2011?

21   A    Yes.

22   Q    Okay.  And --

23             MR. REEVE:  May I just have one moment with counsel?

24             (Mr. Reeve conferring with Mr. Silverman.)

25   Q    Now, do you recall, the government had you listen to a
```

1    tape with a person who identified themselves as Scoot's little

2    brother.

3    A    Yes, I remember.

4    Q    Okay.

5              MR. REEVE:  And for the record, I believe that is

6    Government's Exhibit 148.

7    Q    And I think there's no dispute that that call was on

8    December 24th, four days before this text, okay?

9    A    Yup.

10   Q    Just for the record, that's session 64125, right?  You

11   wouldn't know that, but that's what it is, okay?

12   A    Um hum.

13   Q    Just to bring everybody, so we remember, that's the time

14   when the person who identified himself as Scoot's little

15   brother said, "He's in jail."

16   A    Correct.

17   Q    Okay.  So now let's go forward to what was introduced

18   today as Government's Exhibit 149, and that is now four days

19   later, and you're saying to Ms. Odom in that text, "I talked

20   to Scoot."  Right?

21   A    Yes.

22   Q    Now, that's not a lie, but it was just a shorthand way of

23   saying in a text, you know, you could have written it to be

24   really accurate, you could have said, "I talked to somebody

25   who identified himself as Scoot's little brother who told me

1   that Scoot is in jail," right?

2   A    I wouldn't want to text all that, so I just text what I

3   text.

4   Q    Right, you weren't trying to mislead Ms. Odom but in

5   fact, you never talked to Scoot on, you know -- let me back

6   up.  Obviously you talked to Scoot.  But we know, and there's

7   a stipulation, that Mr. Santos was in jail from December 12th

8   of 2011 to January 6th, 2012.  Now, during that period of

9   time, you didn't get a call from Mr. Santos?

10  A    No, I don't believe I did.

11  Q    Right.  One of the ways you'd remember that was you

12  can't -- when you're locked up, you can't just pick up the

13  phone and call anybody, right?

14  A    Correct.

15  Q    You have to have, that person has to be approved, has to

16  be on your authorized phone list, right?

17  A    Correct.

18  Q    And you knew at that time that, you know, you hadn't

19  received any inquiry from the Department of Corrections about

20  whether or not it was okay if your number was on Mr. Santos's

21  phone list, right?

22  A    No, I do not.

23  Q    In fact, you did get some calls during this wiretap from

24  another individual who was calling you from jail, do you

25  remember that?

```
 1   A     Yes.

 2   Q     I'm not going to go into it, but you remember, right?

 3   A     Yes.

 4   Q     And there's a message on it, and it says, "This is from a

 5   Department of Corrections facility," all that stuff?

 6   A     Yup.

 7   Q     So you never talked to Scoot in December, after December

 8   12th, 2011; you just talked to Scoot's little brother?

 9   A     I believe that's correct.

10   Q     All right.  And so this is once again a time when -- I'm

11   not suggesting for a second this is a lie, but if anybody

12   relied on, "I talked" -- I misspoke.  "I talk to Scooter,"

13   they would get a misimpression as to what really happened

14   here, correct?

15   A     Yeah.  Yeah, they would.

16   Q     And again, you weren't trying to deceive her; it was just

17   a quick way to say what you were trying to communicate in a

18   text, right?

19   A     Yes.

20   Q     Okay.  Fair enough.

21           Now, Mr. Clark, we've heard about the theft by Mr.

22   Clark, you've testified to that on several times before this

23   jury, correct?

24   A     Yes.

25   Q     All right.  And do you remember we went through a series
```

```
1   of texts where you were saying to somebody else, a female,

2   unidentified female not relevant to this case, some things

3   that you've told us were not true, right?

4   A    Yes.

5   Q    And what you've told us is that what Mr. Clark did is

6   that he simply had some product and he never paid you for that

7   product, fair?

8   A    Fair.

9   Q    Okay.  I want to direct your attention to a short series

10  of sessions, three actually.  The first one is on September

11  8th, 2011, it's session No. 15399, and this is a text.

12           MR. REEVE:  Your Honor, I believe there's no

13  objection.  I'm going to offer this.  I believe we're now at

14  Defendant's CC.

15           THE CLERK:  Yes.

16           MR. REEVE:  I would offer it in full.  Again, it's

17  the top half of this page of line sheets.  And then if I could

18  get some help.

19           MR. SILVERMAN:  Sure.  The government has no

20  objection.

21           MR. REEVE:  Thank you.

22           THE COURT:  It may be marked.

23  Q    I'm just going to show you what's been marked as

24  Defendant's Exhibit CC, and let's bring it down.  Okay.  Now

25  let's set the context for this.  We know at the top we have,
```

```
 1    what the jury's seen many times in this case, the date, which
 2    is September 8th, right, 2011?  You have to answer so there's
 3    something on the record.
 4    A    Yes.
 5    Q    Can you see that?
 6    A    Yes.
 7    Q    And up here, it tells us the parties, and it lists in the
 8    right, on the top heading, "LNU/NYC SOS Amaury."  Do you see
 9    that?
10    A    Yes.
11    Q    That's kind of -- what's the word -- nothing sinister but
12    those are government terms.  "LNU" is last name unknown, and
13    you've become familiar with some of this jargon in meeting
14    with the government during the course of your proffer
15    sessions, right?
16    A    Yes.
17    Q    Okay.  And SOS means source of supply, right?
18    A    Yes.
19    Q    Okay.  I only ask you that because I don't think the
20    jurors know some of these things, but you've become familiar
21    in your hours and hours of meeting with the government, right?
22    A    Yes.
23    Q    Okay.  Now, in this text that you send to him on
24    September 8th, you sent to Amaury, and that by the way is
25    Amaury P'Dilla?
```

```
1    A    Yes.

2    Q    Okay.  You say, this is in response to earlier, I don't

3    want to go through the whole series, but, "I did but when I

4    went to work niggas cleaned me out."

5    A    Yes, I did text that to him.

6    Q    All right.  Now, was that true?

7    A    No, it was not true.

8    Q    Okay.  All right.  So this is, you're saying here you

9    went to work and the niggas here, just to be clear, you're

10   referring to Mr. Clark now?

11   A    Yes.

12   Q    Okay.  And so now looking at this, we know that the

13   Vincent Clark theft happened somewhere around September 8th of

14   2011, give or take a day or two?

15   A    Yes, that's fair to say.

16   Q    All right.  On that same day -- and I'm not -- on or

17   about the same day, you, in fact, had a couple of

18   conversations with your other New York source, Na-Na?

19   A    Yes.

20   Q    And Na-Na is Johnny De Los Santos, we all know that,

21   right?

22   A    Yes.

23   Q    And you told him a bunch of things, and I'm just going to

24   see if I can refresh your recollection without going to the

25   tape, okay?  You said that Nu-Nu had stolen some stuff from
```

```
 1   you, right?

 2   A    Okay.  That sounds all right.

 3   Q    You told him that Nu-Nu had gotten a key from your

 4   brother, and had gotten into your apartment on Judson Street.

 5   Do you remember that?

 6   A    It's a possibility that's what I told him.

 7   Q    You also told him that you had broken into Mr. Clark's

 8   house and taken a big screen TV, a gun, and a lot of

 9   counterfeit money, do you remember that?

10   A    I believe I could have told Na-Na that, yes.

11   Q    Was any of that true or was all of that lies that you

12   were telling to Na-Na?

13   A    I think some of it was like half-truths --

14   Q    Okay.

15   A    -- really because I couldn't just tell my source of

16   supply that the stuff that he gave me, I just gave to somebody

17   else and trusted them.

18   Q    Okay.  All right.  So you were, in effect, you're caught

19   in the middle now, right?

20   A    Yes.

21   Q    And you're kind of playing off your sources, trying to

22   cover yourself, and in trying to make, you know, trying to

23   make it look better than what it really was?

24   A    Trying to make -- trying to let them know that I'm not --

25   well, I don't know how to say it -- that I didn't make the
```

```
 1  dumb move that I did by giving what they gave me to somebody
 2  else to trust.
 3  Q    Okay.  I don't know that everybody sitting in this box
 4  knows what you meant when you said that.  Something about
 5  doing the double?
 6  A    No, I said doing the dumb move.
 7  Q    Okay, because I didn't know what doing the double was,
 8  either.  Doing the dumb move.  In other words, you kind of
 9  felt like you got caught with your pants down?
10  A    I was embarrassed, yeah.
11  Q    You were telling a tall tale to your source of supply
12  during this wiretap to protect yourself, make it sound a
13  little bit better, right?
14  A    Yeah.
15  Q    All right.  Okay.  The other area is, we've talked about
16  the sequence of events in December of 2011.  I'm not going to
17  repeat, I'm not going to walk through all that stuff again.
18          But is it fair to say that -- let me just, again,
19  kind of put this in a time perspective.  You told us that, I
20  think it was early December -- again, the date is not
21  important to me -- you had, you were having, a beef with your
22  friend Choloe Bright?
23  A    Chello, yeah.
24  Q    And you told us that you felt you needed a gun because
25  you thought he had a gun and you didn't know what was going to
```

1  happen?

2  A    Yes.

3  Q    And that was when Mr. Vareen, also known as Driver, was

4  bringing a gun to you, right?

5  A    Yes.

6  Q    And then you kind of changed your mind and you said, you

7  know, "It's cool, I've kind of resolved the stuff with

8  Chello" --

9  A    It's cool, because we was already, we were already

10  talking, and I seen that he wasn't taking it to an extreme

11  level.

12  Q    Okay.  All right.  And so that's when Mr. Vareen was

13  chased by the police, dumped the gun, was talking to you a lot

14  of times about, you know, turning himself in once there's a

15  warrant on this, because they found the gun, not in his car

16  but somewhere else but they didn't find him, right?

17  A    Yes.

18  Q    Okay.  All right.  And so he was one of your guys that

19  was involved in getting you guns when you needed guns, one of

20  many, right?

21  A    You could say, yes.

22  Q    Okay.  And Mr. Benton, he was a guy that you contacted to

23  get guns?

24  A    Yes.

25  Q    And Mr. Reid, you knew that Mr. Reid was a guy who almost

```
 1   always had a gun or two or three, right?

 2   A    Mr. Reid?

 3   Q    Yes, Quiyon, Gutter P.

 4   A    Right, yeah.

 5   Q    Right?

 6   A    Yeah.

 7   Q    And you knew that Jerome Moy, a.k.a. Mellow, he was a gun

 8   guy, too, right?

 9   A    I believe I contacted him to try to get a gun.

10   Q    Yeah, sure you did.  That's all in evidence here, I'm not

11   going to review it again.  But this was after the situation

12   with Chello, but you were still looking for guns, fair?  In

13   December?

14   A    Fair.

15   Q    Because stuff was happening to you right and left?

16   A    Fair to say.

17   Q    You know?  Mr. Santos is nowhere to be found, right?

18   A    Um hum.

19   Q    Right?

20   A    Right.

21   Q    He's not returning your texts, right?

22   A    Right.

23   Q    And we now know, during the period of time when he wasn't

24   returning your texts, we know now -- you didn't know at the

25   time but we know now -- it wasn't because he was in jail,
```

1    because all that series of texts that we went through, that

2    was -- again, the record is what the record is, but it was

3    from somewhere around December 4th or 5th up through about

4    December 11th, fair?

5    A    Fair, yeah.

6    Q    During that time, he wasn't in jail at all.

7    A    Wasn't, no.

8    Q    We know now; you didn't know then, right?

9    A    Yeah.

10   Q    He was blowing you off?

11   A    Seems like, yes.

12   Q    Yes.  But after that time, right around December 12th,

13   that's when Mr. Santana did the one kilo gunpoint robbery of

14   Mr. P'Dilla, the guy we just saw that you had texted to,

15   right?

16   A    Yes.

17   Q    Okay.  And that was, those were, two things that were

18   having a serious impact on your business right before

19   Christmastime?

20   A    Well, Mr. Santos was impacting on my business.  The

21   Santana robbery was more of an impact on Mr. P'Dilla's

22   business.

23   Q    Well, sure, but you felt, I think you've said honestly

24   you felt, a little bit of a sense of responsibility because

25   you're the guy who hooked Santana up with Amaury?

```
 1   A    I did not.  I did not hook them up together.  Amaury
 2   introduced -- well, led Santana to talk to me.
 3   Q    In any event, the other guys -- let me make sure I have
 4   them -- Webay, Duane Spence, he was a gun guy?
 5   A    He was caught with one, yes.
 6   Q    He was a guy you looked to to get guns?
 7   A    I don't -- that was my friend, so if I needed one, I'd
 8   probably ask him for one, yeah.
 9   Q    You were very close to Duane Spence, Webay, weren't you?
10   A    Yes, I was.
11   Q    You guys were so close that he would feel totally
12   comfortable with saying to you:  "Would you go to Troup School
13   and pick up my mom and the kids," and you would do that to
14   help out a friend, right?
15   A    Yes.
16   Q    It was that kind of relationship, you guys were tight?
17   A    Yes.
18   Q    Okay.  And these are the guys, by the way, these guys
19   plus there was another guy, Chewy, right?
20   A    Chewy, I knew.
21   Q    Chewy's another gun guy?
22   A    I believe so.  I don't know if he ever got caught with
23   it.
24   Q    Sure.  All those guys, right around the Santana thing,
25   those are the guys that you started calling up and telling
```

them what happened with Santana, right?

A    Yes.

Q    And when you lost contact with Mr. Santos around, on or about, December 4th of 2011, you were talking to the same guys about that, weren't you?

A    Yeah.

Q    And we listened to all those, right?

A    Um hum, yes.

Q    And, you know, we're not going to go over them again. But you were looking for guns at that point in December?

A    I was looking for guns in December.

Q    And you were looking for guns because you needed guns then, right?  You felt like you needed to arm yourself, right?

A    Yes, because I didn't want nobody to harm me.

Q    I'm sorry, I cut you off.  I wanted to let you finish that answer.

A    I would a had a better chance to defend myself with somebody who was coming at me with a gun, with another gun, than rather not have one.

Q    To be fair, you've told us, kind of at the risk of using a football term, I suppose it applies to the Denver Broncos, sometimes team thinks, the best defense is a good offense. Didn't work so well for them last night, but you wanted to proactively put yourself in a situation where you could move in whatever angle you wanted to, right?  Depending on the

1   situation.

2   A    Yes.

3   Q    All right.  Okay.  Now, there's one final area that I

4   want to ask you about.  Attorney Moraghan spent quite a bit of

5   time on Friday afternoon talking to you about the plea

6   agreement and your cooperation agreement, and we all remember

7   that, I'm not going to repeat it, okay?

8   A    (Nodding head.)

9   Q    And we looked at the time frame, and if I can easily find

10  it, I will, but the time frame of how you had -- I'm not going

11  to find it easily so I'm not going to take more time.  You

12  come into federal court on or about May 24th, 2011, right?

13  A    Okay.

14  Q    That's when you see there's a 47-person indictment,

15  there's a copy of the first two pages, not the charges but the

16  list of names in the first indictment that you got, and on or

17  about May 24th of -- now we're talking 2012, okay?

18  A    Okay.

19  Q    All right.  And remember, you're Kevin Wilson, you're at

20  the top, but all the other names were in alphabetical order

21  based on their last names?

22  A    Okay, yeah.

23  Q    Right.  So Anderson's up at the top.  If you were in

24  alphabetical order, you would be at the bottom?

25  A    Yes.

```
 1   Q    And that gave you, to the degree you needed a clue, a

 2   pretty good idea that the government's view was you were the

 3   head of a large scale drug trafficking operation, right?

 4   There's no question in your mind.

 5   A    Actually, I didn't know that it was alphabetical order or

 6   whatever the case may be.

 7   Q    All right.

 8   A    I saw my name first, so I figured I was in a lot of

 9   trouble, yeah.

10   Q    Okay.  That's fine.  But the one thing you knew that was

11   clear in your mind is you were in a lot of trouble, right?

12   A    Yes.

13   Q    And in fact, there's conversations during the course of

14   this wiretap -- we're not going to get into them -- where you

15   guys, you're talking about not messing with the feds, right?

16   A    Yup.

17   Q    That's something that people talk about all the time on

18   the street, don't mess with the feds, they're tough, right?

19   A    Yes.

20   Q    You pick up a federal indictment, you do heavy time,

21   right?

22   A    Yes.

23   Q    You do lots and lots and lots of years, right?

24   A    You could.

25   Q    And there's no parole?
```

1    A    No parole.

2    Q    No.  You do 85 percent, if you get credit for

3    satisfactory behavior in prison.  You're not entitled to the

4    15.  That's the best you can do, right?

5    A    Correct.

6    Q    You get a 20-year bid, you're going to do 17 years flat

7    time, 17, right?

8    A    If that's the math, I would believe so.

9    Q    Well, 15 percent of ten would be eight-and-a-half years,

10    I just multiplied the eight-and-a-half by two.  If my math is

11    right, it's 17.  It is what it is.  You know, that's where

12    we're at, right?

13    A    All right.

14    Q    Okay.  All right.  And so, you know, and you, I think,

15    already told us based on information that you've gotten, you

16    might well have been looking at 30?

17    A    Yes.

18    Q    Without cooperation?

19    A    Yes.

20    Q    All right.  And 30, 10 percent of 30 is three, if we take

21    half of three, we get one-and-a-half, that means

22    four-and-a-half years off for good time, if you earn it, which

23    means you're going to serve flat time, 25-1/2 years, okay?

24    A    Um hum.

25    Q    You took a deep breath right then.

```
1    A    It's a lot of time.

2    Q    It's scary.  Those are scary numbers, aren't they?

3    A    Yes.

4    Q    All right.  And so you, in making this very difficult

5    decision in your life, which was, "Do I join," in effect --

6    and I'm not demeaning it in any way, believe me, the question

7    you faced was, "Do I join the government team or do I not join

8    the government team."  That's really the choice that you had.

9    It's the choice everybody has in the situation they find

10   yourself in.  And I overstated that.  Some people might not

11   get that choice, but you got that choice, right?

12   A    Yes.

13   Q    Okay.  And so you obviously -- look, the reality is the

14   federal system is a little bit like whatever choice you make,

15   they're telling you:  Get out on the end of this diving board,

16   we're going to blindfold you, on the count of ten we're going

17   to tell you to jump into the pool and you don't know if

18   there's any water in the pool.  Isn't that fair?

19            MR. SILVERMAN:  Your Honor, I'm going to object to

20   that question.

21            MR. REEVE:  I'll withdraw it.

22   Q    The reality is, as you sit here now, you have no idea

23   what Judge Burns is going to do come time for sentencing?

24   A    That is absolutely true.

25   Q    Right.  You're taking a leap of faith?
```

1    A    Yes, you could say that.

2    Q    You're taking a leap of faith that these gentlemen here

3    will file a 5K motion for you that says things that are very

4    positive about what you've done here, right?

5    A    Not only that, but that Judge Burns will take it into

6    consideration also.

7    Q    Absolutely.  And -- but the first step is they got to

8    give her the information.  She's seen you now.  Sometimes

9    people don't take the stand when they're cooperating.  She's

10   seen you now, and I hesitate to say this, but --

11   A    Seven days.  I know, I'll tell you.  From Monday to

12   Monday.

13   Q    I think today is about the eighth day she's seen you,

14   much to the chagrin of some people in the courtroom.  I get

15   it, I understand.  But we've all heard from you and seen you a

16   lot, fair?

17   A    Fair.

18   Q    Okay.  And the reality is, in terms of making that

19   decision, you tried to get as much information as you possibly

20   could from as many sources about, "If I go down this road,

21   what's" -- nobody has a crystal ball, but "Can you give me a

22   range, how beneficial would this be to me?"  You had to do

23   that?

24   A    I definitely tried to figure out what would be, like,

25   some type of, some type of number, something.

1    Q    Sure.  Sure you did.  I mean, you told us you're not good

2    in math, but you're not going to cooperate with the government

3    and give them information about 50 plus people, lots of them

4    involved with guns, unless you think there's some kind of pot

5    at the end of that rainbow, right?  That would be kind of

6    crazy, let's just talk up front.

7    A    Yeah, I guess that would be kind of crazy.

8    Q    Sure.  And so after you talked -- and you're a Facebook

9    guy, we saw your picture on Facebook, you have friends that

10   can access the computer, right?

11   A    Yeah.

12   Q    You were trying to gather as much information, not just

13   from your lawyer but from as many sources as you could to help

14   inform you about risk versus reward, because that's what we do

15   when we make decisions, right?

16   A    I guess you can say everybody acts differently.

17   Q    Sure.  Sure.  Everybody has a different equation, but

18   we're all looking at, if I do this, how is it likely to turn

19   out?  If I do this other thing, how is that likely to turn

20   out?  Nobody has a crystal ball, but you're trying to get the

21   best picture you can, right?

22   A    The more information you have, the better you can make

23   your choice.

24   Q    Absolutely.  And when all was said and done, what you

25   understood, at the time you made your decision, was, just

```
 1    ballpark, ballpark, if the government files a 5K, the ballpark
 2    is about 50 percent from the bottom number in the guideline
 3    range.  You were aware of that --
 4              MR. SILVERMAN:  Objection, your Honor.
 5    Q    --  basic structure?
 6              MR. SILVERMAN:  This assumes the witness has had
 7    knowledge.  He never testified that he has.
 8              MR. REEVE:  I'm asking him, I'm asking him what his
 9    understanding was.  If he doesn't have one, he can tell us.
10    Q    If you don't know, tell us you don't know.
11    A    I didn't.  I've heard all types of numbers.
12    Q    Sure.
13    A    But I don't have anything like in front of me, no.
14    Q    Right.  But you took this leap off the end of the diving
15    board because you hoped that, at the end of the day, you would
16    get a very, very substantial break?  That was your hope?
17    A    Well, yeah.  You can say that.
18    Q    Sure.
19    A    I guess that's fair to say.
20    Q    Sure.  Otherwise --
21    A    Why do it.
22    Q    -- why go through 40 hours of meeting with them and eight
23    days on the witness stand here and all the troubles that are
24    created for you as a result of the decision you made.  It's
25    not an easy decision, right?
```

1  A      Right.

2  Q      Okay.  And so as you sit here now, you have -- we've

3  already said you don't know what Judge Burns is going to do,

4  nobody knows, right?

5  A      Correct.

6  Q      Okay.  But your hope is that you will get a very, very

7  significant reduction from the guideline range that the jury

8  knows about in the plea agreement to the sentence that's

9  ultimately imposed?

10  A      You could say that would be my hope.

11  Q      And when you're most optimistic, what you're hoping for

12  is a sentence of somewhere between five and ten years, right?

13  That's what you would like?

14  A      Actually, I would like to go home, to tell you the truth.

15  Q      You know, wouldn't we all.  Wouldn't we all.  But, you

16  know, realistically, you know you've already done some time

17  and you know you're likely to have to do a little bit more

18  time, right?

19  A      I can't -- I don't know.  Like I said, I don't know what

20  Judge Burns can do.  What I want to do, I want to go home.  I

21  don't want any time, but it's not up to me.

22  Q      Sure you do.  Sure you do.  All right.

23          MR. REEVE:  Thank you.  I have no other questions.

24          MR. SILVERMAN:  May I have one moment, your Honor?

25

```
 1  REDIRECT EXAMINATION

 2  BY MR. SILVERMAN:

 3  Q    All right.  It's my turn again, Mr. Wilson.  I'm going to

 4  play Government's Exhibit 36 for you.

 5            (Government's Exhibit 36, an audio recording,

 6  played, and paused.)

 7  Q    This call is on September 23rd, 2011, at 2:14 p.m.  did

 8  you hear Mr. Anderson state he was at the dealership?

 9  A    Yes.

10            MR. SILVERMAN:  This is Government's Exhibit 35.

11            (Government's Exhibit 35, an audio recording,

12  played, and paused.)

13  Q    Did you hear Mr. Morales ask if he was at the dealership?

14            MR. ROGAN:  Your Honor, I'm going to object.  The

15  document, or the audio, speaks for itself.  What Attorney

16  Silverman is simply re-asking him again what clearly the jury

17  can see and hear on the screen.

18            MR. SILVERMAN:  Your Honor, I'm entitled to rebut

19  the impressions that were given on cross-examination, that

20  this call might be about someone other than Mr. Anderson.

21            THE COURT:  All right, I'll overrule the objection.

22            MR. SILVERMAN:  Thank you, your Honor.

23  Q    This call, same date, September 23rd, 2:19 p.m., five

24  minutes later, this is the call that Attorney Rogan was asking

25  you about on cross-examination.  Did Mr. Anderson ever acquire
```

1    heroin from you?

2    A     He got heroin from me.

3          MR. SILVERMAN:  Your Honor, the parties -- well, two

4    of the parties have entered into a stipulation that I'd like

5    to read into the record now, and then hand up to the clerk of

6    court, if that's acceptable.

7          THE COURT:  All right.

8          MR. SILVERMAN:  This relates to Philip Bryant, so

9    it's signed by his counsel, and counsel for the government.

10         "The United States, by and through the undersigned

11   assistant United States attorney, and defendant Philip Bryant,

12   through his undersigned counsel, hereby enter into the

13   following stipulation of facts:

14         "During the wiretap investigation which began July

15   29th, 2011, Vincent Clark utilized 203-444-8645, 203-444-4845,

16   and 203-361-6356; Quiyon Reid used 203-887-0282 and

17   203-999-1489; William Hines utilized telephone numbers

18   203-308-8213, 203-500-9574, and 203-508-4692.

19         "The call detail records for May 10th, 2011, for

20   target telephone 4 utilized by Kevin Wilson indicate that

21   there was no contact on that date between target telephone 4

22   and numbers utilized by Vincent Clark and Quiyon Reid during

23   the wiretap investigation.

24         "The call detail records indicate that there was one

25   outgoing call at 2:09 p.m. from target telephone 4 to

```
 1   203-500-9574 utilized by William Hines that had a duration of
 2   eight seconds.  This was the only contact on that date between
 3   target telephone 4 and any of the telephone numbers utilized
 4   by William Hines during the wiretap investigation.
 5           "This does not preclude the possibility that Clark,
 6   Reid, and Hines may have utilized or had access to other
 7   phones or phone numbers as of May 10th, 2011, prior to the
 8   wiretap phase of the investigation."
 9           May I hand this up, your Honor?
10   Q   Mr. Wilson, you've looked at this chronology a couple of
11   times now, right?
12   A   Yes.
13   Q   And August 9th, 2012, was your first proffer date, and
14   the chronology goes through two pages for about ten proffer
15   sessions, is that right?
16   A   Yes.
17   Q   On August 9, 2012, did you cover everything the
18   government wanted to cover with you?
19   A   It would be impossible.
20   Q   That's why there's all these other dates, right?
21   A   Yes.
22   Q   All right.  On August 28th, 2012, do you recall answering
23   questions about Philip Bryant?
24   A   I'm sorry, when?
25   Q   August 28, 2012, so the second proffer session.  The one
```

1   after the one that Attorney Moraghan was asking you about.

2   A    I don't really recall.

3        MR. ROGAN:  Your Honor, excuse me, may I approach

4   government counsel?

5        (Mr. Rogan conferring with Mr. Silverman.)

6   Q    You don't have a specific recollection of that right now,

7   that date, do you?

8   A    No.

9   Q    I'm going to approach, with the Court's permission, and

10  ask you to look at the proffer report for that date, paragraph

11  41, to see if it refreshes your recollection about speaking

12  about Mr. Bryant with the government on that date.

13       Just look up when you're done, Mr. Wilson.

14       MR. SILVERMAN:  May I approach, your Honor?

15       THE COURT:  Yes.

16  Q    Looking at that report, does it refresh your recollection

17  that you spoke about Mr. Bryant at the second proffer session?

18  A    Yes.

19  Q    Does it refresh your recollection that you informed law

20  enforcement that he was involved in the distribution of large

21  quantities of crack cocaine, cocaine, marijuana, and

22  OxyContin, and also had access to firearms on that occasion?

23  A    Yes.

24  Q    All right.  As you sit on the witness stand today, do you

25  recall talking with the government on 3/19/13?

1    A    No.

2    Q    I'm approaching with the proffer session on that date,

3    and ask you to take a look at paragraph 7 to see if it

4    refreshes your recollection about discussing Mr. Bryant on

5    that date.

6    A    I see what it says.

7    Q    Okay.

8              MR. SILVERMAN:  May I approach, your Honor?

9              THE COURT:  Yes, you may.

10             MR. SILVERMAN:  Thank you.

11   Q    Does it refresh your recollection, having reviewed that

12   report, that you discussed the ounce buy from May --

13             MR. MORAGHAN:  Your Honor, can he answer the first

14   part, answer the first part first?

15   Q    Does it refresh your recollection that you discussed Mr.

16   Bryant on that occasion?

17   A    Yes, I see where we talked about Mr. Bryant.

18   Q    Does it refresh your recollection that you discussed the

19   May 10, 2011, purchase, one-ounce purchase, of crack cocaine

20   on that date?

21   A    I don't know.  Did it say May 10th?  I don't know if it

22   said May 10th.

23             MR. MORAGHAN:  Your Honor, his memory has obviously

24   not been refreshed.

25             MR. SILVERMAN:  Your Honor, may I have one moment to

1    confer with defense counsel?

2              THE COURT:  Yes.

3              (Mr. Silverman conferring with Mr. Moraghan.)

4              MR. SILVERMAN:  Your Honor, I consulted with defense

5    counsel.  He tells me he has no objection to me reading what

6    the proffer report states, with the stipulation this is what

7    the proffer statement memorializes what Mr. Wilson said; it's

8    not a verbatim transcript of what he said.

9              "Wilson stated that he arranged a transaction

10   between an unnamed male and Bryant during which unnamed

11   purchased 28 grams of cocaine base from Bryant at 24 Judson

12   Avenue in exchange for $1200."

13             May I have one more minute to confer with defense

14   counsel?

15             THE COURT:  Yes.

16             (Mr. Silverman conferring with Mr. Moraghan.)

17   Q    That last statement that I just read to you about the

18   unnamed male for an ounce of crack cocaine for $1200, was that

19   a reference to the May 10th, 2011, purchase?

20   A    I didn't, I didn't recall it when I read it, so I don't

21   know.

22   Q    Were there any other occasions in which Mr. Bryant

23   supplied you an ounce of crack cocaine that you sold for

24   $1200?

25   A    There was no other occasion, no.

1    Q    Just that one occasion?

2    A    Yeah.

3    Q    Okay.  Did you speak about the May 10th, 2011, purchase

4    at your 9/19/13 proffer session?

5    A    I don't know.

6         MR. SILVERMAN:  May I approach, your Honor?

7         THE COURT:  Yes, you may.

8    Q    Take a look at paragraph 7.

9    A    I see.

10   Q    Do you have a fresh recollection now, independent of that

11   report, of what you said to the government on September 19,

12   2013?

13   A    Yes.

14   Q    You do?  What did you tell the government regarding Mr.

15   Bryant on that occasion?

16   A    That he supplied me with the, he supplied me with the,

17   ounce that I sold on that day.

18   Q    On May 10, 2011?

19   A    Yes.

20   Q    Okay.  Attorney --

21        MR. SILVERMAN:  May I approach, your Honor?

22        THE COURT:  Yes.

23        MR. SILVERMAN:  Just take the binder back.

24   Q    Attorney Reeve asked you about some names, and I'm just

25   going to list them.  Joseph Vareen, Jeffrey Benton, Quiyon

```
 1   Reid, Jerome Moy, Spence, and Chewy.  Those are all names he

 2   asked you about a few minutes ago, right?

 3   A    Yes.

 4   Q    He asked you about those people in respect to firearms,

 5   right?

 6   A    Yes.

 7   Q    Are any of those people involved in drug distribution?

 8   A    Some of them are involved in drug distribution.

 9   Q    I'm going to turn to where Attorney Reeve closed with you

10   regarding your cooperation agreement.  What sentence do you

11   hope you'll get at the end of everything?

12   A    I thought I said I hope to go home.

13   Q    Time served?

14   A    That's what I would like.  I don't know who's asking.

15   Q    That's what you want?

16   A    That's what I want, yeah.

17   Q    Has the government told you what sentence you're going to

18   get?

19   A    No.

20   Q    Has the government agreed that they'll recommend a

21   particular sentence for you?

22   A    No.

23   Q    Has the government made any prediction to you as to what

24   your sentence will be?

25   A    No.
```

```
 1              MR. SILVERMAN:  May I have one moment, your Honor?

 2              THE COURT:  Yes, sir.

 3              MR. SILVERMAN:  No further questions.  Thank you.

 4              THE COURT:  Shall we take the morning recess,

 5    gentlemen?

 6              Ladies and gentlemen, please don't discuss the case

 7    during the recess.

 8              MR. REEVE:  Judge, I'm sorry, that was a

 9    re-redirect.  I don't have any other questions but maybe we

10    should -- I don't know if anybody else has any other

11    questions.

12              THE COURT:  All right.

13              MR. REEVE:  Maybe we should finish with the witness.

14              THE COURT:  Okay.  All right.

15              MR. ROGAN:  I have nothing more for Mr. Wilson, your

16    Honor.

17              MR. MORAGHAN:  Neither do I, your Honor.

18              MR. REEVE:  I have no further questions.

19              MR. SILVERMAN:  Your Honor, then the government

20    rests.

21              THE COURT:  Government rests?  Very well.

22              MR. REEVE:  Now it would be, I think, your Honor, a

23    very good time to take the morning break.

24              (In the absence of the jury:  11:28 o'clock a.m.)

25              THE COURT:  All right, gentlemen.
```

```
 1              MR. SILVERMAN:  Your Honor, could the witness be

 2   excused, now that he's done?

 3              THE COURT:  Yes, of course.

 4              MR. REEVE:  May I proceed, your Honor?

 5              THE COURT:  Please.

 6              MR. REEVE:  Your Honor, at this time, on behalf of

 7   Mr. Santos, and I believe that many of these arguments apply

 8   in various ways to both Mr. Anderson and Mr. Bryant, and I

 9   think if the Court would permit us, if I could just represent

10   that to the degree they apply to them, they are adopting my

11   claims so they don't have to repeat what I'm about to say, if

12   that's acceptable to the Court and the government.

13              THE COURT:  And to them.

14              MR. REEVE:  And to them.

15              MR. MORAGHAN:  It is, your Honor, thank you.

16              MR. ROGAN:  It is, your Honor.

17              MR. REEVE:  If they want to part ways with me, I

18   know that neither one of them will be bashful in doing that.

19              THE COURT:  Yes.

20              MR. REEVE:  Judge, you know, I told you, I think we

21   had an in chambers conference on the jury charge, and I

22   referred your Honor to *Alleyne*, and how sometimes, arguments

23   are made even though they're not necessarily consistent with

24   the precedent as it exists at the present time, and many of

25   these arguments are in that context.
```

 1            THE COURT:  So you want to make new law.

 2            MR. REEVE:  I always want to make new law, your

 3     Honor.  So the first issue is:  I believe that the government,

 4     in its indictment, set forth a very specific conspiracy.  It

 5     was a conspiracy to distribute three discrete substances.  All

 6     three men were charged with it.  Although it itemized the

 7     quantities within, in a subset, they were all charged with a

 8     single conspiracy charging an agreement to possess with intent

 9     to distribute, and to distribute, cocaine base, cocaine, and

10     heroin.

11            I understand that the present status of the law in

12     the Second Circuit is that the government can charge in the

13     conjunctive and submit it to the jury in the disjunctive.

14            I believe that is no longer good law, and I believe

15     it's no longer good law under the case of *Descamps* --

16     D-E-S-C-A-M-P-S, *versus United States*, 133 Supreme Court 2276,

17     it's a decision last year, 2013.

18            I'm not going to go through the facts of that case,

19     it's a complicated case.  It deals with firearms and it deals

20     with how to plead in an indictment.  I believe it totally

21     renders meaningless, and no longer good precedent, the

22     conjunctive versus disjunctive.

23            I think the government has made a specific

24     allegation, and my position is they have not proved the

25     conspiracy that they've alleged.  With specific reference to

1    Mr. Santos, they've indicated to the Court that they have no

2    evidence that he was involved in crack, they have no evidence

3    that he was involved in powder.  That does not meet their

4    burden under *Descamps* of establishing a unitary conspiracy.

5         That's different from the multiple versus single

6    conspiracy charge that your Honor gives.  I understand the

7    jury is told they can find there's multiple conspiracies, you

8    should find not guilty, I get that.  This is a different

9    issue.

10        This is a should, under *Descamps*, the government be

11   held to its burden of establishing with respect to all these

12   men the commission of the conspiracy that's alleged.  That's

13   number one.

14        The second argument that I want to make is that I

15   think, respectfully, the federal courts have gotten totally

16   off track on federal drug conspiracies, and I'm going to give

17   you an example to explain what I'm saying.

18        In this case, for example, all three men are charged

19   with engaging in a conspiracy to possess with intent to

20   distribute, or to distribute, a specific quantity which sets

21   the mandatory minimum floors, those quantities.

22        The gist of a conspiracy, your Honor, is the

23   agreement.  As your Honor knows, there need not be an overt

24   act in a federal drug conspiracy case.  The government need

25   not show that anyone ever touched any substance.

1           What the government does need to show, when they

2     allege an agreement that an individual is part of a conspiracy

3     to distribute in excess, is at some point during that

4     conspiracy, in fact, that was the agreement that was entered

5     into.  That is that, for example, if you take Mr. Anderson

6     just to pick somebody out of the hat because he's the one

7     that's closest to me right now, that he had to agree with one

8     other person, in this case the government's argument is he

9     agreed with Mr. Wilson.  The agreement has to be for the

10    quantity that's alleged.

11          And this is why I think we've gone so far astray.

12    Take a case where the government has not, unlike this case,

13    where the government has a long, long, wiretap and you have an

14    individual and he buys, with regularity, every Friday

15    afternoon, for 50 weeks in a row, he buys one gram of crack.

16    So during that period of time, he has, in the overall course

17    of that business, purchased 50 grams.

18          But has he ever entered into an agreement to possess

19    with intent to distribute more than 28?  I don't think so.

20    But we glom it all together.  We don't look at the agreement;

21    we just say you can aggregate.

22          I know there are cases in the Second Circuit on

23    aggregation.  Most of them, most of them predate the *Thomas*

24    decision of the Second Circuit when quantity became an

25    essential element of the offense.

1          And the government says really there are two

2    elements, and then there's enhancement.  I respectfully

3    disagree.  There are three elements of a mandatory minimum

4    conspiracy that's been alleged here:  The existence of the

5    conspiracy, membership in that conspiracy, and the quantity

6    that's alleged.

7          And so I think that the government's burden is to

8    establish, and they can argue it, they can argue it, that you

9    can infer that at one point during the course of this

10   conspiracy, there was an agreement to distribute over this,

11   based on the purchases.  But that's what they have to prove.

12   We don't say that.

13         So what we do is we suggest the lowest level drug

14   involvement, the one I just gave you an example of, once a

15   week, one gram.  That person is subject to a mandatory minimum

16   of five years.  Now, if the government charged that person

17   with 50 counts of possession with intent to distribute, he

18   would not be looking at a mandatory.

19         And the sentencing structure says a person who

20   commits a federal drug conspiracy is subject to the same

21   penalties as if you commit the substantive offense.  So the

22   only way that person is the same as the person who committed a

23   substantive offense is if that person entered into an

24   agreement to distribute that quantity.

25         Now, it's different from, let's say, the person

comes and says, "I want to buy, and I'm good for a gram a

week," and the government records it, says, "I want to buy

this in perpetuity."  Then I think the government can argue,

the agreement is for excess of 28 grams, as opposed to a

transaction by transaction by transaction basis, where then we

just ratchet it up.

        And the other problem with that has always been the

problem in the federal court system which gives absolute total

power to law enforcement to decide what's a mandatory minimum

and what's not, because you just make the wiretap longer.

"We're not at the moment, we'll ratchet it up."

        That's not what Congress intended in these statutes.

I have no case saying this, okay?  None.  None.  But I'm

preserving that claim now, because I think it just makes

sense.

        And it's for that reason that I said in chambers, I

don't think there's a lesser included offense in conspiracy

cases.  I think it's improper to charge the jury that if you

don't find 28, there's a default less.  Either there's an

agreement to distribute that quantity or it's a different

agreement.  It's not like possession with intent.

        Let's say Mr. Anderson was charged with possession

with intent to distribute in excess of 28 grams and it comes

back that the lab report is 26, which is, I think that's what

it is in this case, maybe it's Bryant, it's one, I'm sorry,

1    but, you know, then you have a lesser included because if you

2    possess, if the government alleges you possessed in excess of

3    28, but you're in actual possession of less than 28, that's a

4    lesser.  But in the context of an agreement where there's no

5    need for an overt act, it's not a lesser.

6            I hope your Honor understands.

7            THE COURT:  I'm trying to.

8            MR. REEVE:  Okay.  All right.  The other, the more

9    focused, argument that I want to make with respect to my

10   client is that I'm moving for judgment of acquittal on the

11   basis of the evidence as it now stands in the light most

12   favorable to the government, as obviously we all know is the

13   standard, and I'm making that argument because of this:

14           It's undisputed that Mr. Santos stole, according to

15   this man's words, eight racks.  It's also undisputed that

16   eight racks is $8,000.  The government's case from their own

17   witness is that Mr. Santos stole $8,000 worth of product from

18   the lead defendant, the hub of the conspiracy.

19           Now, the government's argument is, well, there was

20   an agreement, we can prove there was an agreement beyond a

21   reasonable doubt.  And we're going to have a disagreement, if

22   your Honor denies this claim, in the course of closing

23   arguments that the attorneys for the government, they're going

24   to stand up and say, "Well, you know, maybe at some point, Mr.

25   Santos decided to take advantage of an opportunity."

1          But their own witness has said, with respect to

2     every time somebody rips him off:  "I have no idea when that

3     plan was formulated, I'm not a mind reader, I can't figure

4     this out, I have no idea.  I'm simply looking at these and

5     piecing everything back together.  I can't possibly know

6     what's in Mr. Santos's mind."

7          So the government's argument is really one to ask

8     the jury to speculate and rely on conjecture to determine that

9     at some point, Mr. Santos was engaged in a meeting of the

10    minds as opposed to from day one, he saw an easy mark, which

11    is our position.  That he saw an easy mark.

12         I mean, you know, according to the government's

13    witness, he meets Mr. Santos and in the very first meeting, he

14    says, you know, "I'm way over my head, I'm in all this debt,

15    can you please, please help me?"

16         Now, does Robert Santos deserve a medal, for

17    stealing product from Mr. Wilson?  He does not.  But how can a

18    jury find beyond a reasonable doubt on the basis of the

19    evidence and the record here other than by speculating?

20         Can the government stand up and tell you right now,

21    or tell the jury during their closing argument, when it was

22    that the plan was formulated to steal product?  When did that

23    happen?  The witness never told us.  He can't, he told us he

24    can't.

25         So, you know, I just don't think the government can

1    show the agreement, which is the gist of the offense here.   I

2    think that they're going to require, and it is the only way

3    the jury can get there is to say:   You know what?   There must

4    have been an agreement at some point, and maybe Mr. Santos

5    changed his mind.   But at some point, there had to be a

6    meeting of the minds.

7         And that's exactly the kind of evidence that is

8    inadequate for a jury to base a conviction on a charge of

9    conspiracy, which is the only charge we have here.

10        So for all those reasons, I'm moving for judgment of

11   acquittal.   Thank you, your Honor.

12        THE COURT:   Thank you, sir.

13        Does any other defendant have a motion?

14        MR. MORAGHAN:   Yes, your Honor.   On behalf of Mr.

15   Bryant, I also make a motion under Rule 29 for judgment of

16   acquittal.   With respect to the allegations of crack cocaine,

17   your Honor, Mr. Wilson testified over the course of days, he

18   was clear there was no agreement with Mr. Bryant regarding

19   crack cocaine, except for the May 10th transaction.

20        Other than that, he agreed that Mr. Bryant had a

21   separate agreement with another person, he had a separate

22   source of supply, he had a separate business on both crack and

23   powder cocaine.   Mr. Wilson testified that at no time other

24   than May 10th was there any involvement with Mr. Bryant in the

25   crack cocaine business or in the powder cocaine business.   He

1   was never supplied by Bryant, he never supplied either cocaine

2   or crack cocaine.

3          Secondly, your Honor, this is clearly a buyer/seller

4   relationship, one time on May 10th.  There was no relationship

5   prior to that regarding narcotics.  Wilson testified he was

6   just beginning his operation.

7          And when you look through the factors in determining

8   whether the buyer/seller agreement -- and your Honor's going

9   to charge the jury on that:  Was there a continuing

10  relationship?  No, there was not, as far as crack cocaine and

11  powder cocaine, and Mr. Wilson testified to that.  In fact,

12  when he lost his chef, when he lost Mr. Clark, he was asked,

13  why didn't you contact Bryant?  Why didn't you join up with

14  Bryant?  All I could bring them, according to Wilson, was a

15  source of supply.  They had the source of supply, they didn't

16  need me.  Separate, separate event, separate business, not

17  connected at all.

18         Was there a common goal to advance the conspiracy?

19  No.  In fact, one could say that by assisting him, Mr. Bryant

20  was effecting his own business.  There was no common goal to

21  see Mr. Wilson get up running and succeed.

22         Was there a method of payment?  Yeah, he paid him

23  immediately.  Nothing was fronted, nothing was given on

24  credit, nothing was shared.  It was immediate payment on the

25  same day that the sale took place.

1           Was there a standard way of doing business?  The

2     answer to that is no, because they didn't do business other

3     than one time on May 10th.

4           Finally, did Mr. Bryant have a stake in the sale on

5     May 10th?  Did he have a financial interest in the outcome of

6     that sale?  No, he got paid up front -- well, he got paid

7     immediately after the transaction took place, but he didn't

8     care what happened with the cocaine after it went to Mr.

9     Bacote, he got his money, it was done.

10          We have a clear one time buyer/seller relationship

11    between Mr. Bryant and Mr. Wilson, and that is contrary to

12    what the government's alleged in the indictment, and he should

13    have judgment of acquittal on that issue.

14          THE COURT:  Thank you.

15          MR. ROGAN:  Your Honor, I want to specifically join

16    in those aspects of the argument advanced by Attorney Reeve,

17    and adopt those as they relate to Mr. Anderson.

18          But specifically, my Rule 29 motion for judgment of

19    acquittal is simply based, your Honor, upon even when you view

20    that evidence in the light most favorable to the government,

21    Mr. Wilson, by his own testimony, just take what he said in

22    court here, he clearly indicated that he had no agreement at

23    anytime with Mr. Anderson to distribute crack cocaine.

24          Your Honor recalls, I asked him a series of

25    questions, whether or not they shared profits, all the things

that would go into having a meeting of the minds as to the

actual conspiracy.  There's quite unequivocal on several

occasions that they didn't have the meeting of the minds, and

all that he basically is claiming that his relationship with

Mr. Anderson revolved around was the issue of he may have

introduced him to this gentleman, Mr. Morales, and there may

or may not have been transactions which he didn't witness.

I'm aware, your Honor, obviously, that witnessing a

transaction or actually touching drugs isn't an element of the

conspiracy, but I think here, your Honor, and remember,

Richard Anderson's only charged with the 28 grams or more of

crack cocaine, so all this testimony that you heard regarding

him perhaps buying heroin for personal use or whatever, I

think clearly, this is, as it relates to the crack cocaine, a

buyer/seller defense.

And I think here, even though normally we leave the

issue of credibility to the province of the jury, here given

the contradictions of the testimony of Mr. Wilson just in

court, I think the only way they can do their job, to borrow a

phrase from Mr. Reeve, is they're going to have to make leaps

of faith and they 're going to have to speculate, which is

what the Court is clearly going to instruct them not to do.

Mr. Wilson was unequivocal, he's not good at math.

When asked on, as importantly though on cross-examination, he

flat out said, "I'm guessing if it was 35 grams," not only

```
 1    involving him but between Mr. Anderson and Mr. Morales.  And

 2    if he's guessing, that leaves the jury in the impossible

 3    position of them having to guess or speculate.

 4            On that basis, your Honor, I would ask for judgment

 5    of acquittal.

 6            MR. REEVE:  Before the government stands up, I

 7    apologize, I forgot to turn to my fourth argument, and if I

 8    could just put it on the record briefly.

 9            THE COURT:  Has he finished?

10            MR. REEVE:  I apologize.

11            MR. ROGAN:  Your Honor, I have concluded my

12    argument.

13            THE COURT:  All right.

14            MR. REEVE:  Mea culpa.

15            THE COURT:  You're too eager, sir.

16            MR. REEVE:  Absolutely, your Honor, because I think

17    your Honor's really going to appreciate this argument.  I

18    really do.

19            The government concedes in this case that this is

20    what we call, what the courts have called, in narcotics cases

21    and I concede the courts have said this is a legitimate

22    conspiracy in the context of narcotics cases, what we would

23    call a hub and spoke conspiracy, what the Fourth Circuit

24    referred to as a rimless wheel conspiracy, if you will.

25            In this case, there's no allegation -- the three
```

1    gentlemen here are very good examples of this, Judge.  Mr.

2    Anderson, Mr. Bryant, and Mr. Santos would all be considered

3    out on, they're three discrete independent spokes on the

4    wheel.  There's no rim, there's nothing that connects them.

5          I don't think the government's evidence in this case

6    establishes any connection, that is I think the government's

7    argument with respect to Mr. Anderson is, he entered into an

8    agreement with Mr. Wilson.  I think with respect to Mr.

9    Bryant, the government's position is he entered into a

10   conspiracy with Mr. Wilson.  I think with respect to Mr.

11   Santos's position, their claim is he entered into a conspiracy

12   with Mr. Wilson.

13         And I'm going to cite the Court to a case, it's

14   *Dixon versus Microsoft Corporation*, 309 F.3d 193, at 203

15   through 205, it's a Fourth Circuit decision in 2002.  In that

16   case -- I'm not going to go through all the details, but it

17   interprets the well-known case *Kotteakos versus United States*,

18   328 U.S. 750, and that decision was in 1946.  And what the

19   Fourth Circuit concludes from applying *Kotteakos* to the case

20   before them was, and they say, "it's clear" -- this is

21   language from the Fourth Circuit, clear -- "that a rimless

22   wheel conspiracy is not a single general conspiracy but

23   instead amounts to multiple conspiracies between the common

24   defendant and each of the other defendants."  And it goes on

25   to cite authority, I'm not going to go through the authority.

1          The bottom line of my argument, your Honor, is if

2   it's good enough for Microsoft, it's good enough for us.

3          MR. VATTI:  Your Honor, in law school, I was very

4   familiar with LaFave on search and seizure, and now this

5   morning, respectfully, I mean this, we got Reeve on federal

6   narcotics law.

7          Unfortunately, it's much of a wish list of what

8   federal narcotics law is as opposed to what the present state

9   of the law actually is.  And this question of whether the

10  government can allege a single conspiracy to distribute

11  controlled substances exactly in the manner that it did in the

12  Wilson case was addressed by Judge Chatigny in the companion

13  case that also arose out of this wiretap investigation in

14  United States versus Michael Smith, and he did write a

15  memorandum.

16         THE COURT:  What was the name of the case, please?

17         MR. VATTI:  *United States versus Michael Smith*,

18  3:12CR112(RNC).  In that particular case, Judge Chatigny has

19  upheld the very form of indictment that the government has put

20  forth here in which it alleged a single conspiracy to

21  distribute controlled substances, and then for *Apprendi*

22  penalty purposes, has put the defendants into different

23  categories of drug quantities and types.

24         So in this particular case, the evidence here has

25  shown the existence of a conspiracy that has centered around

1    Kevin Wilson that has, as its objective, the distribution of

2    controlled substances, specifically cocaine, crack cocaine,

3    and heroin.

4         And in this particular case, Mr. Wilson's testimony

5    supports the existence of that conspiracy and is corroborated

6    by the various wiretap calls.  He has testified that he

7    middled deals prior to May 10th, 2011, but at approximately

8    that time, he got into direct selling.  He established sources

9    of supply in Amaury P'Dilla and Johnny De Los Santos.  He

10   received quantities of cocaine.

11        He then partnered up with Vincent Clark to have that

12   cocaine cooked into crack cocaine for further distribution.

13   He later partnered with Mr. Santos in distributing quantities

14   of heroin that were received from Mr. De Los Santos.

15        So throughout starting May 2011 through January 3rd,

16   2012, the evidence is very clear that he was acquiring

17   quantities of cocaine, that for some period of time he was

18   distributing both crack and heroin and switched his focus

19   entirely to heroin after the incident with Mr. Clark in

20   approximately September of 2011.

21        So there's ample evidence right now from which the

22   jury can conclude this conspiracy to distribute controlled

23   substances which centered on Kevin Wilson as the hub and

24   centerpiece of it actually existed.

25        So the next question is, is there sufficient

1   evidence for the jury to conclude that Robert Santos, Richard

2   Anderson, and Philip Bryant all at some point became members

3   of the conspiracy.

4          As your Honor knows and is going to be instructing

5   the jury, even a single act can bring somebody within the

6   scope of a conspiracy.  They don't all have to know each

7   other.  They don't all have to participate for the same amount

8   of time or the entire length of the conspiracy; they can join

9   at different times.

10          In this particular case, let's start with Mr.

11   Santos.  The evidence shows that in mid-October, based on the

12   wiretap calls and also the testimony of Mr. Wilson, that

13   Mr. Wilson approached Mr. Santos because he knew that Mr.

14   Santos had worked with Vincent Clark, also known as Nu-Nu, in

15   moving quantities of heroin.  Mr. Wilson approached Mr. Santos

16   because he had the falling out with Mr. Clark.  He still had a

17   source in New York that could provide 100-gram quantities of

18   heroin, but he needed somebody to move that heroin through a

19   customer base.  And because he knew that Mr. Santos had worked

20   with Mr. Clark, that was the perfect opportunity.  That's why

21   he hooked up with Mr. Santos.

22          And then the video surveillance and the wiretap

23   calls show at least four discrete episodes between October,

24   mid October through early December of 2012, in which the

25   quantity of heroin that they acquired together totaled over

1    400 grams.

2            In a number of the calls, Mr. Santos is giving

3    Mr. Wilson advice on how to prepare the heroin for

4    distribution, giving him advice about the quality of the

5    heroin that is being reported by customers who it had been

6    distributed to.  They're talking about the collection of

7    money, they're talking about pooling their money together to

8    go get more heroin.  All of the hallmarks of a conspiratorial

9    agreement are present in the wiretap calls and through the

10   testimony of Mr. Wilson.

11           So now we come to this issue of the defense.  The

12   defense, as I understand it, is that at some point in

13   December, and the dates are about somewhere between December

14   4th and December 10th or 11th, Mr. Santos stopped returning

15   Mr. Wilson's phone calls about money that was owed.

16   Mr. Wilson then began to assume that another Vincent Clark

17   episode occurred where somebody was ripping him off of drug

18   proceeds that were owed.  It later turned out that his fears

19   were unfounded because Mr. Santos got a message to Mr. Wilson

20   through Mr. Santos's younger brother that he's in jail,

21   everything's going to be all right, chill out, and he will be

22   returning at some point in the near future.

23           Well, that never happened because Mr. Santos was in

24   jail from December 12th of 2011 to January 6th of 2012, and

25   Mr. Wilson is arrested on January 3rd, three days before Mr.

1    Santos actually gets out of jail.  They never have the

2    opportunity to resume their relationship.

3           But the bottom line is from the events in December,

4    prior to Mr. Wilson's arrest, he concludes that:  This

5    gentleman is not trying to rip me off; he just happens to be

6    in jail and that's why things have come to a standstill, but

7    we're going to resume things, as he mentioned in the telephone

8    message to me, when he gets out of jail.

9           Now, Mr. Reeve would like to take all of those facts

10   in December and argue that somehow, that tells us what Mr.

11   Santos's state of mind was in mid October, nearly two months

12   earlier, in entering into the heroin distribution with

13   Mr. Wilson.

14          I don't think there's any evidence at all, and

15   certainly Mr. Santos does not appear to intend to testify in

16   this case as to what his state of mind was.

17          So Mr. Reeve is absolutely right, we cannot read

18   minds.  We don't know what was in Mr. Santos's mind, and

19   that's exactly why your Honor's jury instructions are going to

20   say to the jurors, since we don't read minds, actions speak

21   louder -- we judge from actions and words, and the actions and

22   words that we have are throughout the testimony of Mr. Wilson,

23   and we have the content of the words on the wiretap calls from

24   Mr. Santos, and those actions and words show that Mr. Santos

25   voluntarily acquired quantities of heroin, distributed

quantities of heroin, collected money for those quantities of

heroin, and then went down in fact with Mr. Wilson on one

occasion to obtain further quantities of heroin.

Regardless of what Mr. Santos intended at some point

in December, which we really don't know because of the

circumstances, he participated to a significant degree in the

conspiracy to distribute drugs, based on his participation in

the episodes in mid October, November, and the one on December

2nd as well.

For those reasons, I would ask that the motion for

judgment of acquittal be denied.

With respect to Philip Bryant, we know from all the

wiretap phone calls that Mr. Bryant and Mr. Wilson discussed

the acquisition of heroin.  Mr. Bryant referred customers for

heroin to Mr. Wilson, and hooked him up with some heroin

deals.  There's also the phone call in which Mr. Bryant

indicates he wants to sell bundles of heroin that he gets from

Mr. Wilson for $50, and he's going to sell them for either 65

or 75 dollars, and he says, "I'm definitely going to get on

that."  That is right there, the meeting of the minds, for

conspiracy to distribute heroin.

With respect to the crack cocaine, as I mentioned

earlier, a single event can bring someone within the scope of

the conspiracy.  This is an individual that Mr. Wilson was

very tight with.  They shared guns, they engaged in the

distribution of heroin together.  Mr. Wilson served Mr.

Bryant's customers.  There was clearly that relationship of

trust because Mr. Bryant trusted Mr. Wilson enough to give him

his drug customer phone and to have Mr. Wilson serve, hang out

in Bryant's apartment, play PlayStation, and serve Mr.

Bryant's customers in Mr. Bryant's absence.

         And when Mr. Wilson was trying to get back in the

game of directly selling rather than middle manning deals, he

was approached by an individual who wants an ounce of crack

cocaine for $1200, who does Mr. Wilson turn to?  He turns to

Mr. Bryant.  Mr. Bryant supplied that ounce of cocaine.  How

do we know that, in addition to the words of Mr. Wilson?  He's

corroborated by the phone records.  He has never seen the

phone records, and miraculously he tells us that the ounce of

crack cocaine came from Mr. Bryant, and it just turns out that

the phone records show ten calls that day between Mr. Wilson

and Mr. Bryant, including one that occurs 13 minutes before

the two cooperators pick up Mr. Wilson outside of his mother's

store.

         So between both Mr. Wilson's testimony and the

corroboration by the phone records, there's ample evidence not

only to conclude that Mr. Bryant was involved in the heroin

aspect of the conspiracy, but also conspired with Mr. Wilson

to distribute 28 grams or more of crack cocaine.

         Finally, with respect to Mr. Anderson, his

1   involvement on the crack end depends in large part upon the

2   interplay of his phone calls, with the phone calls involving

3   Jesus Morales.

4          Mr. Rogan would like to make this all about profit,

5   but I would like to point out to your Honor that nowhere in

6   the indictment does the government allege that this is about

7   anything other than to distribute drugs.  There is no mention

8   of the word "profit."  So Mr. Rogan would like to argue to the

9   Court and I'm sure to the jury, this is all about whether or

10  not Kevin Wilson made some profit off of his relationship with

11  Mr. Anderson, and I'll give him credit, he did a nice job on

12  his cross-examination putting those words into Kevin Wilson's

13  mouth.

14         But what Mr. Wilson intended here was a mutually

15  beneficial relationship with Mr. Anderson, not necessarily

16  about making money off of the Morales/Anderson deals but he

17  viewed Mr. Anderson, as he testified, as somebody that, if he

18  hooked him up with Mr. Morales for crack cocaine deals, then

19  Mr. Anderson would be able to hook him up with heroin deals.

20         And in fact, while Mr. Anderson didn't necessarily

21  refer customers directly to Mr. Wilson, Mr. Wilson began to

22  provide heroin to Mr. Anderson who, in turn, obviously was

23  giving it, based on the tenor of the phone calls, to other

24  customers.

25         So there are mutually beneficial aspects of the

1   relationship that did develop, and it started by Mr. Wilson

2   hooking up Morales and Anderson for the purpose of crack

3   cocaine.

4   Secondly, Mr. Morales's phone calls even says:

5   "Hey, look, if I'm getting involved in crack with this guy, it

6   will allow me to pay you, Mr. Wilson, the debt that I owe to

7   you as well."

8   So it had two beneficial aspects to it:  The mutual

9   distribution of crack and then heroin, but also an avenue for

10  Mr. Morales to sell crack that would enable him to pay money

11  that he also owed to Mr. Wilson.  That's enough for a

12  conspiratorial agreement.  Mr. Wilson does not need to have

13  shared the profits that Mr. Anderson derived from his sales of

14  crack to Jesus Morales.  The calls on September 21st, 22nd,

15  and 23rd all line up perfectly.

16  I have no doubt Mr. Silverman will be going through

17  that in closing arguments.  But even if you disregard

18  Mr. Wilson entirely on the quantities, the calls themselves,

19  with the reference to $1240 being equivalent, as Special Agent

20  Zuk testified, to an ounce of crack cocaine, plus the discrete

21  transactions, it looks very much like three eight ball

22  transactions took place on September 21st at different times

23  of the day, and then there was a later transaction where we

24  played the call this morning about Morales saying that

25  Anderson was going to give him 25 grams.  That right there is

```
 1   going to add up to at least 35 grams of crack, which is

 2   consistent with what Mr. Wilson said.

 3           In addition, you have Mr. Anderson's own words

 4   saying, "I sold crack cocaine in order to raise money for my

 5   family because I didn't have employment," and that's also

 6   corroborated by what he says in one of the wiretap calls where

 7   he references "having the shit everywhere."  That's a direct

 8   quote, I apologize for the language.  I think he also makes a

 9   reference to, "I've got it all flooded."

10           So given that, I think there's ample evidence both

11   on his membership in the conspiracy as well as the quantity

12   that is attributed to him.

13           THE COURT:  Thank you, Mr. Vatti.

14           Anything further, gentlemen?

15           MR. REEVE:  I'm sorry, your Honor?

16           THE COURT:  Anything further you want to add?

17           MR. REEVE:  No, your Honor, thank you.

18           THE COURT:  I'm going to reserve decision on the

19   motions, gentlemen.

20           MR. MORAGHAN:  Your Honor, just so the record is

21   complete, I did join in with Mr. Reeve in his argument before

22   he made his argument.  I did not do that when I started my

23   argument.  So just so the record is clear, I did join in, with

24   the Court's permission, I join in Mr. Reeve in his argument.

25           MR. REEVE:  And, Judge, there's something else that
```

1    I want to talk about that I hope we agree on, I alluded to it

2    in my e-mail last night.  Some of the -- as my brother counsel

3    referred to Reeve on, it was a wish list I think, your Honor,

4    and you know, frankly, I don't dispute that, okay?

5         I understand, and I started out by saying there's no

6    federal law that supports many of the arguments I'm making,

7    even though I cited some things, we're on uncharted path, I

8    agree, I accept.

9         I have not filed requests to charge that mirror the

10   arguments that I just made.  Your Honor has reserved decision.

11   I can file requests to preserve the record, but I think we can

12   agree that by making the motion for judgment...

13        I assume, your Honor, for example, is not going to

14   change the jury charge, and change it to, you know, there has

15   to be an agreement to distribute over the quantity, that has

16   to be established and you can infer, all the arguments that I

17   made.  I'll submit them if I need to preserve that, but I

18   don't think I need to do both, as long as we have agreement

19   that I haven't waived something.  Otherwise I'll do them

20   tonight, I'll submit all the charges under the drug conspiracy

21   law according to Reeve.

22        MR. VATTI:  I have no problem, your Honor, with the

23   fact that by making the arguments on the motion for judgment

24   of acquittal, that it's adequately preserved, without the need

25   to then put in requests to charge.

 1          MR. REEVE:  I appreciate the government's agreement

 2     on that, and it saves me more work tonight, which would be

 3     very nice.  Thank you.

 4          MR. VATTI:  The only argument that I'm not going to

 5     waive, because I believe my appeals chief would probably have

 6     my head, is whether or not arguments addressed to the validity

 7     of the indictment should have been raised pretrial.  I'm not

 8     waiving that argument.

 9          MR. REEVE:  No, and I accept that.  And my position,

10     just so we're clear on that issue, is the insufficiency of the

11     government's evidence under the rules, and under federal Rule

12     12 and whatever, is something that can be raised at any time.

13     It's their burden, that's what they alleged, prove it.

14          I don't have to raise those issues on a pretrial

15     basis, just like every court in the country says to a

16     defendant who is pleading guilty, you know, just because you

17     might be factually guilty doesn't mean you have to plead

18     guilty.  You can stand up and say to the government, prove it.

19     That's what we've done.  I don't think I have to raise any of

20     those claims.

21          I raised claims earlier, and the government, in

22     response, partly to the claims that I raised, the motion to

23     dismiss, filed a superseding indictment.

24          But I don't think I'm required to say, hey, hey, you

25     know, you've charged something you might not be able to prove.

1    My position is they didn't prove it.

2            THE COURT:  Okay.

3            MR. REEVE:  And I understand the government's

4    preserved the claim in the record that my failure to raise

5    that on a pretrial basis constitutes a waiver, and I accept

6    that.  I accept that that's the government's position.

7    There's no dispute, they made that clear.

8            MR. SILVERMAN:  Your Honor, I just wanted to point

9    out that I think when the jury was excused this morning it was

10   with the understanding that it was their morning break.  We've

11   obviously gone for about 30 minutes now, which is twice as

12   long as the morning break usually goes.  It seems that given

13   it's 12:10 and I don't know what time their lunch was ordered,

14   we should make this their extended lunch break and when they

15   come back, we'll resume with closing arguments.

16           THE COURT:  Let me check when their lunch is

17   arriving.

18           THE CLERK:  12:45.

19           THE COURT:  It won't be here for another 35 minutes

20   at least.

21           MR. SILVERMAN:  I don't think it makes sense to

22   start closings with 30 minutes to go.  I don't know if maybe

23   the place delivering lunch can bring it earlier.

24           THE CLERK:  They can't.

25           MR. VATTI:  Can we have closings starting at 1:45?

```
 1              MR. REEVE:  Or 1:15?

 2              THE COURT:  Suppose they deliver at 12:45, there's

 3    no guarantee apparently.

 4              MR. VATTI:  Counsel wanted to build in some time for

 5    them for any delays because of the weather in getting their

 6    lunch here, and the one day we're paying for lunch, we don't

 7    want to rush their lunch.

 8              MR. REEVE:  Can I make a suggestion?  We don't know

 9    when the lunch is going to come in.  The clerk can find out

10    when they're prepared to begin, and we'll be ready to go

11    whenever they're done with lunch.  Rather than us dictating,

12    let them tell us.

13              THE COURT:  Let's see when it arrives and give them

14    sufficient time to eat it.

15              MR. VATTI:  I assume we'll let them know that that's

16    the plan.

17              THE COURT:  Yes.  Would it be agreeable to all

18    counsel if the clerk so informs them instead of bringing them

19    back?

20              MR. VATTI:  That would be fine.

21              MR. REEVE:  Yes, your Honor.

22              MR. ROGAN:  And they know that once they come into

23    the courtroom, they're going to be hearing closing arguments.

24              THE COURT:  Right.

25              MR. REEVE:  That's perfect.
```

```
 1            THE COURT:  With respect to your motion, as you
 2    might have expected, I'm reserving decision on your motion.
 3            MR. REEVE:  Yes, I understood your Honor to say
 4    that.  It used to be that you couldn't do that, but now under
 5    the rules you can.
 6            THE COURT:  I'm going to do it.
 7            Gentlemen, my clerk has raised a question.  Is it
 8    undisputed that Mr. Santos was in jail for the period of time
 9    that was claimed?
10            MR. REEVE:  Yes, we entered into a stipulation that
11    I believe Attorney Silverman announced orally.
12            THE COURT:  Did you put that on the record?
13            MR. REEVE:  Yes, we did, and the stipulation says
14    that Mr. Santos was in the custody of the Department of
15    Corrections from December 12th, 2011, until January 6th, 2012.
16    We've stipulated to that.
17            THE COURT:  Okay, fine.
18            MR. REEVE:  Thank you for that.  I appreciate the
19    opportunity to clarify, to make sure we're all on the same
20    page.
21            The court:  Gentlemen, the earliest the jury will be
22    getting its lunch is 12:45.
23            MR. REEVE:  Hopefully we can start not too long
24    after 1:00, hopefully 1:15, we'll be good to go through.  I
25    think the parties have agreed, if it's acceptable to the
```

```
 1    Court, that the way we'll do the closings is Attorney
 2    Silverman is going to open for the government, whenever they
 3    begin.  Then Attorney Rogan is going to go second.  I think we
 4    all have agreed -- subject, obviously, to the Court's
 5    approval -- after those two arguments, we'll let the jury take
 6    a ten-minute break, stretch their legs, use the bathroom and
 7    then the final three arguments, which would be Mr. Moraghan
 8    will go next, then I'll go, just doing it by alphabetical
 9    order, government counsel will do rebuttal, and we think we
10    can do all three of those without any breaks.  If that's
11    acceptable to the Court, that's what we would like to do.
12              THE COURT:  If that's an agreement among all of you,
13    that's acceptable to me.
14              Can we have the clerk simply inform the jury?
15              MR. VATTI:  Yes, your Honor.
16              THE COURT:  And she'll remind them not to talk about
17    the case, just to enjoy their lunch.
18              MR. REEVE:  We'll let her put on the black robes.
19              (Luncheon recess:  12:14 o'clock p.m. to 1:48
20    o'clock p.m., in the absence of the jury.)
21              THE COURT:  Good afternoon.  Please be seated.
22              Has the jury raised concern about the weather?
23              THE CLERK:  Before lunch, they did.
24              THE COURT:  I don't want them worried about getting
25    home.  Maybe when we take the afternoon recess, if they
```

```
 1   continue to be concerned, we better think about deferring it

 2   further until tomorrow, I don't know.

 3            MR. MORAGHAN:  Your Honor, were you speaking?  I'm

 4   sorry, I can't hear you.

 5            THE COURT:  I was wondering if the jury is concerned

 6   about the weather.  We have one juror who comes from New

 7   London, she might have been concerned about getting home.  You

 8   said somebody expressed some concern?

 9            THE CLERK:  Yes, they did, right before the lunch

10   break.  Actually two jurors, one is Norwich/Griswold and the

11   other is New London.

12            THE COURT:  Maybe when we have the afternoon break,

13   we can see how things are weather-wise.  I don't like the idea

14   of them worried about the weather instead of worrying about

15   the case.  We'll see, find out from them at the afternoon

16   break, okay?

17            Are we all ready to go, gentlemen?

18            MR. ROGAN:  Yes, your Honor.

19            MR. REEVE:  Yes, your Honor.

20            THE COURT:  All right, let's have the jury.

21            (In the presence of the jury:  1:51 o'clock p.m.)

22            THE COURT:  Good afternoon.

23            Ladies and gentlemen, we have concluded the

24   presentation of evidence in this case, and it is now the

25   opportunity for the attorneys to argue their cases to you.
```

```
 1              Because the government has the burden of proof, it
 2   will open and close the arguments.
 3              MR. REEVE:  Your Honor, I think just before we get
 4   to that, I think we need to formally put on the record that
 5   the defense rests.
 6              THE COURT:  Oh, I thought you had.
 7              MR. REEVE:  No, your Honor.
 8              THE COURT:  I'm sorry.
 9              MR. REEVE:  That's fine, that's fine.  I just think
10   we need to put on the record that, on behalf of Mr. Santos,
11   the defense rests.  We will not be calling any witnesses.
12              THE COURT:  I understand that's the case with both
13   of the other two defendants?
14              MR. ROGAN:  Yes, your Honor, I thought we had done
15   that before the break, but to formalize, the defense rests for
16   Mr. Anderson.
17              MR. MORAGHAN:  Defense rests as to Mr. Bryant, your
18   Honor, thank you.
19              MR. REEVE:  All the legal issues we talked about are
20   again being raised on behalf of all three.
21              THE COURT:  You know that, of course, I reserve
22   decision, as you know.
23              MR. REEVE:  Thank you, your Honor.
24              MR. SILVERMAN:  Without any further ado.
25              THE COURT:  Yes.
```

1              MR. SILVERMAN:  Good afternoon.

2              JURORS:  Good afternoon.

3              MR. SILVERMAN:  I want to start by thanking all of

4    you for your service.  This trial went on for longer than we

5    anticipated, but you've been attentive, you've been patient,

6    and you've been flexible.  So on behalf of the government,

7    thank you.

8              When my colleague addressed you almost two weeks ago

9    for his opening remarks, he started by trying to reduce this

10   case to one sentence, and I'll try to do the same:

11             This is a case about three drug dealers:  Richard

12   Anderson, Philip Bryant, and Robert Santos, who joined in and

13   participated in a large-scale drug trafficking conspiracy that

14   centered around Kevin Wilson.  One sentence.  But it's a long

15   sentence, so I'm going to unpack it a little bit now, and I'm

16   going to offer you some preliminary remarks on conspiracy so

17   you have some background for where I'm going.

18             Then I'm going to talk for a moment about Kevin

19   Wilson, who you've heard from for the last six days of trial,

20   and then I'm going to pose for you seven questions that I

21   think are the questions you'll have to address in your

22   deliberations.  And I'll try to tie together all of the

23   strands of evidence in this case, in answering those

24   questions.

25             All right.  So let me begin by unpacking the

1   sentence.  Kevin Wilson told you about his conspiracy.  He

2   told you how it worked.  When he got out of jail in July 2010,

3   he wanted to get back into the drug trade.  The only thing

4   that he could bring to the table was his connect.  He had a

5   childhood friend in Amaury P'Dilla, and through P'Dilla, he

6   met Johnny De Los Santos.  So he had sources of supply for

7   cocaine and heroin in New York, but that's about it.

8          He didn't know how to cook cocaine into crack

9   cocaine, he didn't know how to bag up heroin, he's not

10  particularly good at math, and he had no customer base right

11  when he got out of jail.  So he needed help.

12         We heard about Alexis Sutton, the role she played.

13  Valentine, the Galan brothers, people who helped Mr. Wilson.

14  And we also heard about his partners.  He started with Vincent

15  Clark.  After that falling out, he turned to Quiyon Reid for a

16  short period, and then Mr. Santos.  Those were his partners.

17         So what about the three defendants in this case?

18  Richard Anderson was the guy he went to after his falling out

19  with Vincent Clark, when his customer Jesus Morales said, "I

20  need the hard stuff," and Wilson couldn't get it anywhere

21  else.  He sent Morales to Richard Anderson, and we'll talk

22  about the benefits to Mr. Wilson from that.

23         Philip Bryant was his life-long friend, at least

24  from middle school, his friend.  And they helped one another

25  sell the drugs that each of them acquired.  They assisted each

other in their drug distribution activities.

And Robert Santos was his heroin distribution partner.  He knew how to bag it up, he gave Mr. Wilson advice, they pooled their money to go get the heroin, to buy it, they split it, they sold it, they pooled their money again and acquired more heroin.  Over and over again.

So in a nutshell, that's the role each of these three defendants played.

Before I pose my seven questions to you, I want to provide some background on the law of conspiracy.  Each of them is charged with conspiracy, that's the offense you'll be deliberating on.

And I want to start with the caveat that if anything I say is different from the instructions that Judge Burns gives you, you must follow her instructions.  That's what controls.

But so you understand and have some backdrop for the rest of my remarks, the law, the offense of conspiracy, involves two elements:  First, that there's an agreement, the existence of an agreement between two or more people to achieve some unlawful objective, the agreement.  Second, that the defendant joined the agreement.  Sometimes we call it membership.  Those are the two elements.  That's it.

But a couple of points for you to keep in mind as you consider this case:  First, the unlawful objective need

1    not be achieved.  It's the agreement that matters for the

2    offense of conspiracy.  Two people could conspire to sell

3    drugs and never sell any drugs, but they could still be guilty

4    of conspiracy.

5            A couple of other points for you to keep in mind.

6    One conspirator doesn't need to know all of the other

7    conspirators involved.  One person doesn't need to join for

8    the entire duration of the conspiracy.  Someone could join

9    late and leave early, and still be a conspirator.  A single

10   act can bring someone within the scope of a conspiracy.

11           Someone doesn't need to have a financial stake in

12   the outcome of the conspiracy to become a conspirator.  And if

13   the conspiracy has multiple unlawful objectives, a person can

14   become a conspirator even if they know of only one of the

15   unlawful objectives and they participate in pursuing.

16           That was a mouthful, and Judge Burns will go over

17   all of that again in her instructions, which again will be the

18   controlling instructions.  That's some backdrop for you to

19   consider the rest of my comments.

20           And again, before I pose my seven questions, I want

21   to offer a comment on Kevin Wilson, who you've heard so much

22   from during the course of this trial.  When my colleague stood

23   before you almost two weeks ago, he gave you a phrase that

24   often gets repeated:  Conspiracies hatched in dark places

25   aren't witnessed by angels.

1          Mr. Wilson is no angel.  We told you that at the

2     outset, and I'll reiterate it now.  He is no angel.  You know

3     what he pled guilty to based on his involvement in this case.

4     You heard about his past arrests, his past convictions, and he

5     also told you about uncharged criminal conduct, the shootings

6     that he had done that he had never been arrested for, that he

7     had never been convicted for.  He's no angel.

8          And I don't expect that any of you like Mr. Wilson,

9     but no one's asking you to like Mr. Wilson.  What we're asking

10    is that you carefully consider his testimony, that you

11    evaluate it yourselves.  And as you do that, there are three

12    other things that I would ask you to keep in mind:

13         First, Agent Ndrenika testified that during the five

14    months when Mr. Wilson's phone was wiretapped, he had close to

15    70,000 sessions, communications, over his phone.  More than

16    10,000 of them were deemed pertinent, meaning they related to

17    criminal activity.

18         Mr. Wilson couldn't recall the detail of every drug

19    transaction that he engaged in during the time frame of the

20    conspiracy.  But if he could, if he could tell you every

21    detail, wouldn't that cause you to question his credibility?

22    Wouldn't that leave you to wonder about his apparently

23    photographic memory?  He doesn't have that.

24         What he could provide you with was the broad brush

25    strokes of what happened and the interpretation of the phone

1    calls in which he participated.

2         Second, keep in mind, what happens to Mr. Wilson if

3    he lies?  Or if the government determines that he was lying on

4    the stand?  You know from his plea agreement that he's looking

5    at a guidelines range of 20 to 25 years or so.  And you know

6    that if the government determines he lies, he gets no 5K,

7    that's his range.

8         And third, as you're evaluating Mr. Wilson's

9    credibility, think about the other independent corroborating

10   evidence in this case.  I'll go through that in a lot more

11   detail in a moment.  The controlled buys from Mr. Wilson, the

12   rips from Mr. Wilson and his co-defendants, and then the

13   wiretap calls.  Mr. Wilson's own words, his co-conspirators'

14   own words, and these three defendants' own words during the

15   time frame of the conspiracy.  As you're evaluating

16   Mr. Wilson's credibility, keep those things in mind.  All

17   right.

18        Now for my seven questions that I've alluded to so

19   many times.  Here they are.  I think these are the seven

20   questions you'll be thinking about during your deliberations

21   as you look at the verdict forms you'll have to consider:

22        One, was there a conspiracy to possess with intent

23   to distribute and to distribute controlled substances that

24   revolved around Kevin Wilson in 2011?

25        Two.  Was Richard Anderson a member of that

1    conspiracy?

2         If so, what drug types and quantities are

3    attributable to Mr. Anderson based on his participation in the

4    conspiracy?

5         Four.  Was Phil Bryant a member of that Wilson

6    conspiracy?

7         If so, what drug types and quantities are

8    attributable to Mr. Bryant based on his participation in the

9    conspiracy?

10        Six, was Robert Santos a member of the conspiracy?

11        And seven, what drug types and quantities are

12   attributable to Mr. Santos based on his participation in the

13   conspiracy?

14        Those are the seven questions that I'm going to try

15   to answer now.  Obviously, after the first, it's a pair of

16   questions for each defendant.

17        All right.  Question number one, was there a

18   conspiracy, a drug conspiracy, centered around Kevin Wilson

19   from January 2011 to January 2012?  The evidence establishes

20   that there was.  Not only Mr. Wilson's testimony, but law

21   enforcement took a number of steps to flush out the details of

22   that conspiracy.

23        So on August 9th, 2011, there are two phone calls

24   intercepted between Mr. Wilson and Johnny De Los Santos, and

25   in one of them, Government's Exhibit 4, Mr. De Los Santos

talks about bringing 200 pesos and 100 of the other.  And he
says, "You need to stop playing me off of P'Dilla.  You're
never going to make any money that way."

Corroborating that they were fronting the drugs to
Mr. Wilson, he was getting drugs from one, using the money to
pay the other, and on and on.

The next day, you saw the surveillance that took
place at Vincent Clark's home, August 10th, 2011, when Mr.
Clark, Mr. De Los Santos, and Mr. Wilson all met for the
exchange of drugs.

There were three controlled purchases of crack
cocaine from Mr. Wilson during this investigation:  May 10th,
2011, that came back as 26.3 grams of crack; June 29th, 2011,
6.5 grams of crack; and September 14th, 2011, 6.4 grams of
crack.  He was selling crack cocaine.

There were three rips, by which I mean motor vehicle
stops, aimed at recovering evidence from Mr. Wilson or his
drug customers, his drug co-conspirators, during the course of
this investigation:  October 22nd, 2011, you heard the
testimony of Officer John Suraci almost two weeks ago about
the surveillance at 139 Day Street.  He saw Alexis Sutton meet
with Jesus Morales and Jacqueline Lopez.  Right after that
surveillance, law enforcement officers stopped Mr. Morales and
Ms. Lopez and recovered six bundles of heroin from Ms. Lopez,
1.4 grams of heroin.

1          December 28th, 2011, Jose Torres asked Mr. Wilson

2     for ten, and after they were observed meeting, car stop was

3     conducted and then in Mr. Torres's pick-up truck they found

4     ten bundles of heroin, 3.4 grams of heroin.

5          On January 12th, 2012, after Mr. Wilson met with

6     Johnny De Los Santos's associate in a hotel parking lot, law

7     enforcement officers stopped his car and found 148.2 grams of

8     heroin hidden in what Mr. Wilson described as his groin area.

9          He was moving large quantities of heroin during the

10    time frame of this conspiracy.

11          After his arrest on January 3rd, 2012, you saw the

12    pictures and you heard the testimony about the items that were

13    recovered from Mr. Wilson's apartment and the apartment of the

14    Galan brothers, and those items are consistent with Special

15    Agent Zuk's testimony about the items you would find

16    associated with a heroin trafficker:  A grinder, a scale, an

17    ink pad, glassine bags, firearms.  That's what was found.

18          And then you have the wiretap calls.  Again, that's

19    Mr. Wilson's own words, his co-conspirators' own words and the

20    words of Mr. Anderson, Mr. Bryant, and Mr. Santos during the

21    time frame of the conspiracy.  That could be your best

22    evidence as to what was going on at that time.

23          So yes, the evidence establishes that Mr. Wilson was

24    at the center of a large scale drug trafficking conspiracy.

25          So question number two:  Was Mr. Anderson a member

1    of that conspiracy?  Did he join it?  There was a lot of

2    testimony about what happened on September 21st, 2011, the day

3    that Mr. Wilson introduced Mr. Morales to Mr. Anderson, and

4    we're going to walk through that in a moment.

5         But before I do that, the evidence supports three

6    different reasons why it was in Mr. Wilson's interests to make

7    that introduction.  First, Mr. Morales was Mr. Wilson's heroin

8    customer, and in Government's Exhibit 8, Mr. Morales says the

9    one goes with the other.  He wants the hard stuff, and what

10   he's communicating to Mr. Wilson is, hey, I need to get heroin

11   and crack cocaine.  I need both.

12        Mr. Wilson can't provide him with crack at that

13   time.  His relationship with Vincent Clark has already broken

14   off.  The danger is that if Mr. Wilson can't keep Mr. Morales

15   happy, can't find him a source of crack cocaine, then he'll

16   find another source, and that person might start serving Mr.

17   Morales heroin.  Mr. Wilson could lose his customer.  So

18   that's the first benefit to Mr. Wilson from the introduction.

19        Second, by connecting Mr. Morales to Mr. Anderson,

20   it facilitates Mr. Wilson getting paid for the heroin he's

21   given Mr. Morales.  Now, that also might be tough to follow,

22   but I'm going to point you to Government's Exhibit 15.  In

23   that call, Mr. Morales says to Mr. Wilson, "This is good for

24   both of us.  I'm calling you because I want to pay you."  And

25   I want to point you to Government's Exhibit 30, 12:28 a.m.,

September 22nd, after the dealings that day between Mr.
Morales and Mr. Anderson have concluded, Mr. Anderson sends a
text to Wilson, and it says:  "I got some bread for you."  Now
he's ready to pay Mr. Wilson.  So that's a second benefit to
Mr. Wilson from the referral, from the introduction of Morales
and Anderson.

        And a third which Mr. Wilson testified to was that
he hoped Mr. Anderson would send him heroin customers in
exchange for Mr. Wilson's referral of a crack customer.  Now,
he testified that that didn't happen, but that was the
arrangement.  And more than that, even though no other heroin
customers were referred by Mr. Anderson, Mr. Anderson himself
started to acquire heroin from Mr. Wilson.

        I'll ask you to think back to October 25th, 2011.
We watched it a bunch of times, and I'm not going to show it
again.  There's a video surveillance that day at 139 Day
Street, Mr. Anderson wearing a white shirt and black du-rag.
He's inside for about ten minutes.

        Right before that happens, about an hour-and-a-half
earlier, there's a call between Wilson and Anderson in which
Wilson says, "You want to pick up that sample?"  About an
hour-and-a-half after Mr. Anderson leaves, there's a call in
which Mr. Anderson reports to Mr. Wilson, he said that was
nothing to brag about.  He said that was nothing to brag
about.  That's a sample of heroin that Mr. Anderson had his

1    tester test to determine whether to go forward with heroin

2    distribution with Mr. Wilson.  And then he does.

3              Government exhibits 51, 52, and 53 are a series of

4    text messages between Anderson and Mr. Wilson, talking about

5    PLO, Pierre Galan, serving Mr. Anderson more heroin.

6    Government's Exhibit 56 is another heroin call between

7    Anderson and Wilson.

8              They specifically reference rubber bands, and

9    Mr. Wilson wanting to make the sale says it's good bread.

10   It's good bread.  It's good money, come get this, you're going

11   to make money off of it.  So although Mr. Anderson never sent

12   any other heroin customers, he himself started to acquire

13   heroin from Mr. Wilson.

14             So, yes, the evidence establishes that it was in

15   Mr. Wilson's self-interest to connect them, Anderson and

16   Morales, for their crack cocaine transactions.

17             Based on that participation in the conspiracy, the

18   next question is what drug types and quantities are

19   attributable to Mr. Anderson?

20             Now, the government has focused its charging

21   decision on the drug that Mr. Anderson was focused on, that's

22   crack cocaine.  As I just pointed out, he was involved in

23   heroin, he's not charged with heroin.  We focused on the

24   crack.  And I want to point you to Government's Exhibit 135.

25   I'm going to play a portion of it right now.

1              (Government's Exhibit 135, an audio recording,

2      played, and paused.)

3              MR. SILVERMAN:  Mr. Anderson knows that "cousin" is

4      Mr. Wilson's source of supply.  He's asking if he's coming

5      through.

6              Mr. Wilson says, "Yeah, shit on deck," I'm going to

7      have heroin.

8              And then Mr. Anderson specifies, "No, I'm talking

9      about for what I do," crack.  He wants to know if Mr. De Los

10     Santos is going to bring any cocaine or crack cocaine so Mr.

11     Anderson can keep doing what he does.  As we keep going, there

12     will be other examples how Mr. Anderson was focused on crack.

13             You're going to have two choices as you deliberate

14     about quantities of crack cocaine to be attributed to Mr.

15     Anderson based on his participation in the conspiracy.  The

16     choices will be 28 grams or more, cocaine base, or less than

17     28 grams.  That's what you'll be deciding on, between those

18     two.

19             The government's requesting that you find 28 grams

20     or more of cocaine base attributable to Mr. Anderson, and to

21     get there, I'm going to walk you through the calls that take

22     place on September 21st, 2011, again.

23             I'm going to ask for Agent Ndrenika's assistance

24     with this so that I can speak with you rather than play with

25     the buttons.

1          The first -- let's go back, transaction one.  There

2    you go.  September 21st, 2011, this is the first transaction.

3    2:09 p.m., Jesus Morales says to Mr. Wilson, "I need the hard

4    stuff, it has to be on the fire, I need one."

5          Mr. Wilson told you that's one eight ball, but you

6    also know that because in the same series of calls, Mr.

7    Morales is talking about how he packages it, and he's made 20.

8    That's consistent with what Agent Zuk told you how eight balls

9    can be broken down into dimes and dubs for resale.

10         Next call, 2:12 p.m., three minutes later,

11   Mr. Wilson calls Mr. Anderson, "My boy wanted to see you."

12         The next one, 2:59 p.m., almost 50 minutes later,

13   "Just one," Mr. Wilson reports to Mr. Anderson, one eight

14   ball.

15         3:22 p.m., Mr. Anderson tells Mr. Wilson where to

16   tell Jesus Morales to meet him, Winthrop and Gilbert.  So

17   that's the first transaction that takes place, the first eight

18   ball exchanged between Anderson and Morales.

19         Transaction number two starts later that day.  The

20   last call is at 3:22, now it's 6:05 p.m., Jesus Morales tells

21   Kevin Wilson, "Call your partner," "this is good for both of

22   us, that's why I'm calling you, to pay you."  Mr. Morales

23   specifies he wants the same thing, he wants another eight

24   ball.

25         6:26 p.m., 20 minutes later, Jesus Morales says:

1   Cancel the order for now, man, I just lost $300.

2          7:31 p.m., about an hour later, Mr. Anderson wants

3   to know, "Was it same thing or he left"?

4          7:32 p.m., Jesus Morales tells Kevin Wilson, "I

5   still have work, I still have crack."  Now he's explicit about

6   what he's doing.

7          8:30 p.m., one hour later, Jesus Morales sends a

8   text message to Kevin Wilson, "I'm ready, make the call.

9          Four minutes later, another text message from

10  Morales to Wilson, "Call me."

11         8:35 p.m., right after getting that text, Mr. Wilson

12  calls Mr. Anderson.  Mr. Anderson wants to know, "You want the

13  same thing?"

14         Mr. Wilson confirms, "Yeah."  He wants another eight

15  ball.

16         8:53 p.m., Mr. Wilson tells Mr. Morales, "Park where

17  you just went, where we saw him."  Go to the same spot from

18  transaction one to complete transaction two.

19         All right.  Now beginning at 11:07 p.m., another

20  text from Morales to Wilson:  "Call your boy again," for the

21  third time.

22         One minute later, Kevin Wilson to Anderson:  "Yo my

23  boy needs you again."

24         The response, "For the same thing?"

25         Wilson:  "I'm pretty sure."

1          Mr. Anderson:  "All right, I'm in the same spot, I'm

2    right here."

3          And Wilson:  "I'm a tell him to just go there."

4          Next minute, Wilson sends a text message to Morales,

5    "He said go to the spot."

6          Three minutes later, Morales tells Wilson, "I'm here

7    in the same spot where I saw him the first time."

8          And then later, Mr. Morales asks to Mr. Wilson,

9    "Talk to him and give him the green light and he'll deal with

10   me."  Now Mr. Morales wants to deal directly with Mr.

11   Anderson.

12         Five minutes later, text message from Wilson to

13   Morales, "He coming."

14         Then what I was talking about before, after the

15   stroke of midnight, 12:28 a.m., text message from Morales to

16   Wilson after the third transaction, Morales says, "I got some

17   bread for you."

18         All right.  After those three eight ball

19   transactions on September 21st, 2011, the relationship between

20   all three of them continues.  On September 22nd, 2011,

21   Mr. Wilson follows up on a request to give a green light.  He

22   calls Mr. Anderson, uses the term papi, Mr. Wilson explained

23   was a name for Morales:  "Yo Papi told me um he talked to you,

24   and says as long as I get a green light he'll be good."

25         Next call, three minutes later, Mr. Wilson wants to

1   know if Mr. Anderson will see him, same place.  Anderson wants

2   clarification, "You want me to just deal with this dude?"

3   "Tell him I got him, all right."  I'm going to supply him

4   again.

5          Next day, September 23rd, 2011, you heard these

6   calls this morning in the re-redirect of Kevin Wilson, at 2:14

7   p.m., Mr. Anderson tells Mr. Wilson, "I'm at the damn

8   dealership, man."

9          The very next call, 2:19 p.m., five minutes later,

10  Mr. Wilson reports to Mr. Morales:  "I talked to him.  He told

11  me that he's at the dealership."

12          They're talking about this guy, Mr. Anderson.

13  Morales says, "He does, he's gonna give me 25 grams, right?"

14  Then "he's selling the ball at, like, 185 a ball, right?"

15  That's the math Mr. Morales did.

16          He explains at the end, what he has to be saying if

17  you're buying it it could be lower but if he's giving it to

18  you, if he's fronting it to you, he's going to charge you for

19  the privilege.  If you pay him up front, he'll probably charge

20  you less.  That's September 23rd.

21          Jump ahead ten days to October 3 and 4, I'm going to

22  play you some of these calls because I want you to hear how

23  angry Mr. Anderson is in these calls.

24          Government's Exhibit 37, October 3rd, 8:43 p.m., Mr.

25  Morales asks Wilson, "Did you call the Jamaican?"  You know

the Jamaican through Kevin Wilson's testimony is a reference

to Mr. Anderson.

Mr. Morales reports, "I told him there were problems

with it." And tells him, "It has to be good, I can't have

crap, dude." He wants quality crack cocaine.

Now the series of calls Mr. Anderson is so upset

that he doesn't have his money. 11:07 p.m. the same day, Mr.

Anderson: "What's up with your boy, man? I want my fucking

money or else I'm a fuck this nigga up." His words. "I got

the fucking shit everywhere nigga. I got the shit flooded my

nigga. There ain't nobody complaining about nothing, B,

nothing." This is how you know he's selling crack. "I've got

it flooded, I've got it everywhere." Morales is the only

person complaining.

Next call. 11:15 p.m., eight minutes later. Mr.

Anderson again: "I'm not taking no losses. I told this nigga

I'm not taking no losses, son, so he need to handle that

shit." Then he specifies what he's owed, "1240 right now,

$1240." Which Agent Zuk told you is just about right for an

ounce of crack.

Then at 6:55 p.m. the next day, Mr. Anderson is

still seething. He's talking about what he's going to do,

"I'll tie that motherfucking bitch up nigga. That was all my

profit right there."

I'm going to play some of those calls for you.

1              (Government's Exhibit 132.1, an audio recording,

2     played.)

3              MR. SILVERMAN:  That was Government's Exhibit 132.

4              Here's a portion of Government's Exhibit 38.

5              (Government's Exhibit 38.1, an audio recording,

6     played.)

7              MR. SILVERMAN:  Another portion of that same

8     exhibit, Government's Exhibit 38.

9              (Government's Exhibit 38.2, an audio recording,

10    played.)

11             MR. SILVERMAN:  Government's Exhibit 41.

12             (Government's Exhibit 41.1, an audio recording,

13    played.)

14             MR. SILVERMAN:  One more excerpt from 41.

15             (Government's Exhibit 41.2, an audio recording,

16    played.)

17             MR. SILVERMAN:  You can hear how angry Mr. Anderson

18    is in those calls on October 3rd and 4th, and he tells you, he

19    wants the money, he wants the money for the ounce plus of

20    crack cocaine that he gave to Mr. Morales.

21             So as you're thinking about the drug type and

22    quantity attributable to Mr. Anderson based on his

23    participation in the conspiracy, the government urges you to

24    find a quantity of 28 grams or more of crack cocaine.

25             All right, so we've done questions one through

```
 1    three.  Let's move to question four.
 2         Before I do that, actually, there's one more thing I
 3    want you to consider with respect to Mr. Anderson as you're
 4    thinking about the pair of questions for Mr. Anderson.
 5         Detective Sergeant Zannelli testified Friday about
 6    what happened when Mr. Anderson turned himself in on May 17th,
 7    2012.  He gave a post arrest statement.  He admitted selling
 8    crack.  That was his admission.  And he said why.  He said,
 9    "To make money to support my family."  And that's corroborated
10    from the testimony of Department of Labor representative
11    Stanley Kuligowski who testified that when he searched the
12    Connecticut Department of Labor records for any reported W-2
13    earnings for Mr. Anderson, he found none during the time
14    period of the conspiracy.  So as you're considering the pair
15    of questions for Mr. Anderson, keep in mind his post arrest
16    statement and the testimony of Mr. Kuligowski.
17         With that, let's turn to questions four and five,
18    the pair of questions for Philip Bryant.  For this one, I want
19    you to keep in mind the following:  Just like with Mr.
20    Anderson, Mr. Kuligowski testified Mr. Bryant had no reported
21    W-2 earnings during the time frame of this conspiracy.  None.
22         And the testimony of Special Agent Ndrenika that Mr.
23    Bryant used six different cell phone numbers that were
24    identified during the course of the wiretap investigation.
25    That's six cell numbers over five months.  Agent Zuk told you
```

why drug dealers switch up phones and change their numbers, to
avoid law enforcement detection.

And in Mr. Wilson's phone seized on January 3rd,
2012, three of those numbers were entered under Phizzy in that
directory.

So I urge you to keep those things in mind as a
backdrop as you consider the pair of questions as to Mr.
Bryant:

First, was he a member of the Wilson conspiracy?
Mr. Bryant assisted Mr. Wilson, with his drug trafficking, and
in return, Mr. Wilson assisted Mr. Bryant with his drug
trafficking.  It went both ways.

With respect to Mr. Wilson's assistance to Mr.
Bryant, there was a call that you heard when Ms. Valentine
called Mr. Wilson asking about paying, and Mr. Wilson referred
her to Phizzy.  There was another call that you heard when
Mr. Wilson himself called up Mr. Bryant asking for balls of
ping.

Then there were two calls, Government's 109 and 114,
in which it was clear that Mr. Wilson was covering Mr.
Bryant's trap phone.  When you think about the level of trust
that that involves, Mr. Wilson wanted to play video games so
Mr. Bryant left his apartment open; Mr. Bryant left his bag of
drugs -- cocaine, marijuana, and Ecstasy -- for Mr. Wilson;
and Mr. Bryant left his trap phone, the phone with all the

numbers of his customers, the phone that his customers

contacted, all with the understanding that Mr. Wilson would

serve those customers for him while he was out to eat.  That's

the kind of trust you see between co-conspirators, that level

of trust.  That covers cocaine in part.

With respect to heroin, you heard all those calls in

which Mr. Bryant asked Mr. Wilson, "Hey, is that boy around?"

"You got that boy?"  And Mr. Wilson told you that "boy" was a

reference to heroin.

You have Government's Exhibit 100.

(Government's Exhibit 100, an audio recording,

played.)

MR. SILVERMAN:  "I'm a see if I can help you out.

You sell 50s, right?  Yup, for the rubber bands."

From Government's Exhibit 101.

(Government's Exhibit 101.2, an audio recording,

played.)

MR. SILVERMAN:  They're talking about the prices per

bundle, how much profit Mr. Bryant can make, and he ends with,

"I'm a definitely get on that shit."  That's a conspiratorial

agreement.  It's not just an agreement; at this point you know

Mr. Bryant was referring heroin customers to Mr. Wilson.

The pair of calls in Government's Exhibit 110 and

111.  In 110, Mr. Bryant places the order with Mr. Wilson.

The next day, he calls back and he says, his words, "I fucked

1    up the order.  The customer wanted Gs," meaning grams, "we

2    gave him Bs," meaning bundles.  Customer was upset.  That's

3    Mr. Bryant's involvement in the heroin aspect of the

4    conspiracy.

5            Before I move on to crack cocaine, I want to pause

6    for a minute and talk about the sharing of firearms.  Special

7    Agent Zuk told you why firearms are important to drug

8    traffickers.  They can't go to the police when something goes

9    wrong because what they're doing is by its very nature

10   illegal.  So they have guns to protect themselves, to protect

11   their drugs, and to protect their drug proceeds.  That's why

12   they have guns.

13           And you heard all those calls between Mr. Bryant and

14   Mr. Wilson talking about firearms.  The silver surfer.  The

15   Ruge.  And then the series of calls or texts on December 10,

16   2011, when Mr. Vareen, who's bringing Mr. Wilson one of the

17   swammies, and the police recovered it, and Mr. Bryant being

18   upset about it, "The swammy gone now?"

19           Mr. Wilson texting thereafter, "I'm going to replace

20   it."

21           These are guns they share in furtherance of their

22   drug trafficking.

23           All right.  Now crack cocaine.  Mr. Wilson testified

24   that he saw Mr. Bryant in possession of eight balls of crack

25   cocaine on multiple occasions.  Mr. Wilson testified that he

accompanied Mr. Bryant to serve his crack customers on at

least two occasions, once for a dime or a dub, $10 or $20 bag,

and once for an eight ball.

And Mr. Wilson testified about May 10th, 2011, the

controlled purchase that day for an ounce of crack cocaine,

which the lab report came back as 26.3 grams.  But the

agreement that day was that Mr. Wilson and Mr. Bryant would

sell an ounce for $1200.  DEA chemist Brian Hall testified

that an ounce is about 28.3 grams.

And Mr. Wilson's testimony about what happened on

May 10th, 2011, is corroborated.  You've seen Government's

Exhibit 120 ten times in the course of this trial, and I'm not

going to play it again, but you've seen it, the two

cooperators.

They pick up Mr. Wilson, they drive to Judson

Avenue.  You hear them saying in the course of the video, "He

just went in the backyard of 20-22-24 Judson."  You see

Mr. Wilson come back to the car and provide the drugs in

exchange for money.

The testimony of Special Agent Ndrenika about the

surveillance on that day and how the deal went down that day

in the vicinity of 20-22-24 Judson, and then you have the call

records from that day, May 10th, 2011, provided by the carrier

of Mr. Wilson's phone.

Of the 40 plus people charged in this case, of all

Mr. Wilson's co-conspirators, of all the people he could have

told the government gave him the drugs that day, not having

ever seen the call records before, the first time he saw them

he testified was Friday afternoon when Attorney Moraghan

showed them to him, he picked the person he had ten

communications with on May 10th, 2011, Philip Bryant.  That's

the person he picked.

          And not only are those multiple contacts; but they

align with the phone calls with the cooperator and the timing

of the buy.  It all matches up.  Those call detail records are

now in evidence, I think they're Defendant's Exhibit BB, maybe

CC, but they're in evidence.  You'll be able to look at them.

The calls all line up.  That 28 grams, that agreement to sell

28 grams, is with Wilson and Bryant.

          And so when you're considering the drug types and

quantities attributable to Philip Bryant, with respect to

crack, you'll have two choices, same two choices for Mr.

Anderson:  28 grams or more, less than 28 grams.  The

government is requesting a finding of 28 grams or more crack

cocaine with respect to Mr. Bryant.

          For cocaine and heroin, the other two substances

charged against Mr. Bryant, you won't be asked to make any

quantity determination, just whether he was involved in, based

on his participation in the conspiracy, heroin and cocaine

powder.

1          All right.  Moving on now to Mr. Santos, the last

2   questions, numbers six and seven.  As you consider Mr. Santos,

3   in the background, I want you to keep in mind the concession

4   that his defense attorney made in his opening remarks to you,

5   that he acquired distribution-level quantities of heroin with

6   Kevin Wilson during the time frame of the conspiracy.  That

7   concession gets you most of the way there.

8          In addition to that, keep in mind the testimony of

9   Mr. Kuligowski, that during the second half of 2011, those

10  last six months, Mr. Santos had about $2700 in reported W-2

11  earnings.  Mr. Santos talks about more money than that in one

12  phone call, how he's going to give Mr. Wilson the three.  One

13  phone call.

14         Mr. Wilson testified that Mr. Santos became his

15  partner, and I'm going to conceive of three different ways

16  that they were in a partnership:

17         First, Mr. Santos gave Mr. Wilson advice on how to

18  sell heroin.  He told him that he needed to boil or broil the

19  cutting agent so that it would match the color of the heroin.

20  That was one piece of advice.

21         Second was he told him that he could add the crushed

22  up morphine pills to heroin that had already been cut, when

23  Mr. Wilson specifically inquired.

24         And third, he coached him through what to do when

25  Jeffrey Benton's batch of heroin turned out to be bad, he was

1     bringing it back.  Mr. Santos told him, mix it with the new

2     stuff three to two, gave him the ratios, proportions.  Mr.

3     Santos gave Mr. Wilson advice.

4            What else did he do?  Well, they treated the heroin

5     sometimes as a pool of heroin from which they could serve

6     their customers.

7            This is Government's Exhibit 57.1.

8            (Government's Exhibit 57.1, an audio recording,

9     played.)

10           MR. SILVERMAN:  "Somebody going to take something

11    from us."  The two of us, our heroin.

12           This is Government's Exhibit 63.1.

13           (Government's Exhibit 63.1, an audio recording,

14    played.)

15           MR. SILVERMAN:  The number is the amount of money

16    they're going to have for Na-Na.  If it's enough, Na-Na will

17    give them 100 grams.  If it's not enough, Na-Na is going to

18    give them 50 grams or less.  They pooled their money together

19    to pick up new quantities of heroin from Na-Na.

20           And then perhaps most importantly, Mr. Santos takes

21    on Mr. Wilson's drug debt.  It becomes their drug debt.  He

22    helps Mr. Wilson pay it off, but he also talks about it in the

23    sense of "we," "our."

24           This is Government's Exhibit 71.

25           (Government's Exhibit 71.1, an audio recording,

1    played.)

2         MR. SILVERMAN:  "I thought we was going to clean 'em

3    up Friday."  I thought we were going to wipe our debt clean

4    Friday.

5         Government's Exhibit 77.

6         (Government's Exhibit 77, an audio recording,

7    played.)

8         MR. SILVERMAN:  "Bring us what we had, what we got

9    last time."  What "we" got.  Have Na-Na bring us the same

10   quantity we got last time.  "We should be able to clean 'em"

11   up by then.  "We."

12        Then Government's Exhibit 82.

13        (Government's Exhibit 82.1, an audio recording,

14   played.)

15        MR. SILVERMAN:  "What is our tab?"  Not what's your

16   tab, not what's Wilson's tab, not what do you owe him?  "What

17   is our tab."  Think about the way Mr. Santos talks about his

18   relationship with Mr. Wilson.  It's always in the first person

19   plural.  It's "ours."  "We" got to do this, "we" got to do

20   that.  That's a partnership.  That's a conspiracy.

21        All right.  So then the seventh question, the last

22   one, what drug types and quantities are attributable to Mr.

23   Santos based on his participation in the conspiracy?  He's

24   only charged with heroin.  Mr. Wilson testified he was only

25   involved in heroin.  For him, like Mr. Anderson and Mr. Bryant

1    with respect to crack, you'll have two choices with respect to

2    heroin:  100 grams or more, less than 100 grams.  Those will

3    be the two choices presented to you on Mr. Santos's verdict

4    form.

5          You heard about this a while ago, so we're going to

6    walk through this again quickly.  We went through four

7    different transactions.  When Mr. Wilson and Mr. Santos picked

8    up heroin from Na-Na, each time, each of these four times was

9    more than 100 grams.

10          So from October 17th to 19th, 2011, this ended up

11   being for 112 grams.  October 17, 3:46 p.m., Johnny De Los

12   Santos says to Mr. Wilson, "I'm gonna bring the 120, the kid's

13   20 and the, the your 100."  This is right around the time they

14   start working together, they partner up.  By "they," I'm

15   referring to Mr. Wilson and Mr. Santos.

16          5:33 p.m., the next day, Mr. Wilson tells Mr.

17   Santos:  "I ended up, ended up coming out, going up there

18   myself."  That's a call, you heard it earlier, "Somebody gonna

19   take from us probably like 20."  Mr. Wilson's going to get the

20   drugs from Na-Na in New York.

21          5:39 p.m., Mr. Wilson's there, De Los Santos tells

22   him to come up.

23          About two hours later, Mr. Wilson's back in New

24   Haven, he's weighed it out, "112, then I'm left with 92,"

25   after he gives 20 to Mr. Santos, "But I gotta give the 20 to

1   the, to this kid," Mr. Santos.

2          Two minutes later, they're talking about the amount

3   Mr. Wilson's going to owe, 57 times 112.  We know he was

4   paying $57 a gram.

5          Then 9:23 a.m., Mr. Santos wants to know, "Any way I

6   can get to it"?  He can't, Mr. Wilson's at work.

7          Later that day, 3:14 p.m., you saw the video

8   surveillance, that's Government's Exhibit 253, of Mr. Santos

9   and Mr. Wilson at 139 Day Street, they met.

10         And then three-and-a-half hours later, Mr. Santos

11  says, "Now I'm trying to take everything off your hands."  I

12  want the rest of it.  You gave me 20 before, I want the rest

13  of it.  Because "niggas trying to get a buck."  They want a

14  hundred, his customers want 100 grams.

15         October 26, 2011, this transaction was for 120

16  grams.  10:22 a.m., Mr. Santos tells Mr. Wilson to come to his

17  crib, they'll leave from there.  Half hour later, Mr. Santos

18  provides directions for Mr. Wilson to get to apartment H.

19         At 5:21 p.m., Mr. Wilson gets to De Los Santos's, to

20  Na-Na's, in New York and says, "I'm at the door."

21         7:30 p.m., they're back in New Haven.  You see the

22  surveillance, it's dark, it's night, you see them walk into

23  apartment H.

24         Three minutes later, they weighed up the heroin and

25  Mr. Wilson calls Na-Na, "This isn't 150."

1        "Well, how much is there?"

2        "Like 120 if that."

3        Na-Na says, "Weigh it again my brother."

4        Three minutes later, Wilson calls back to Na-Na,

5   "It's 120."

6        And Na-Na says he'll call his friend.

7        At 8:10, you see Mr. Santos and Mr. Wilson leave

8   apartment H.  120 grams that day.

9        November 6 through 8, 2011, 150 grams.  November 6,

10   12:26 p.m., Mr. Wilson says to Mr. De Los Santos, "I'm going

11   to give him 37."  It's about Mr. De Los Santos's associate.

12        Twenty minutes later, Wilson calls Santos, who never

13   gave him his money drop.  "I gave him 37 and he just tell me

14   when you get the rest of the bread, and I'll tell you when I'm

15   going to bring you."  Na-Na wouldn't give him any drugs that

16   day because the $3700 that Wilson provided wasn't sufficient.

17   So Wilson got no drugs.

18        But Santos says, "Man, all right, we'll bring it out

19   there to him my nigga, that nigga ain't, it ain't that

20   serious."

21        Two minutes later, "That guy called me right now and

22   if you want, we can bring it to you."

23        Then Na-Na wants to know, "How much you gonna do

24   with him, the two or one-and-a-half?"

25        9:23 p.m. the next day, Mr. Wilson does go to visit

1    Na-Na, and he says, "Yo, I'm here downstairs, bro."

2          The next morning, Mr. Wilson's back in New Haven.

3    "I broke it 77, 73."  77 plus 73 is 150.  150 grams got split

4    roughly in half.

5          And later that afternoon, Mr. Santos tells

6    Mr. Wilson, "Baby girl outside," which matches up with the

7    surveillance five minutes later of Brittany Odom in her dark

8    colored minivan outside of 139 Day Street.  We saw that video,

9    Government's Exhibit 257.  150 grams for that transaction.

10          And the last one, November 27, 2011, 170 grams.

11    10:40 p.m., they complain about getting bad reviews and how

12    the heroin is very light in color.  Mr. Santos wants to know

13    "What's the tab?  A buck fifty?"

14          Mr. Wilson explains, "I gave what 87 I had, I had.

15    If I gave you 87 I think I had 83 so I think that was like

16    170."

17          Mr. Santos says he still has 30 grams of it that he

18    didn't touch, that he wants to return to Na-Na.

19          Four minutes later, Mr. Wilson calls Na-Na, "You

20    remember how it was coming in before, more brown?  Now it's

21    really light."

22          And then he says, "My partner," Mr. Santos, "was

23    supposed to bring 52 but now he tells me he still has some."

24    $5200, instead he's going to bring me back 30 grams and I

25    don't know how much money he's going to bring me.

1            This transaction, 170 grams.

2            So each of these four transactions that we just went

3     through, from mid October to late November, was more than 100

4     grams.

5            So when you're thinking about the quantity

6     attribution for Mr. Santos based on his participation in the

7     conspiracy, the government urges you to find 100 grams or more

8     of heroin.

9            Now I've answered the seven questions that I posed,

10    and I'm going to have very brief concluding remarks.

11            I'm going to ask you that you do four things in the

12    remainder of your time as jurors:

13            You have already carefully considered the evidence.

14    I ask that you continue to do that during your deliberations.

15            Second, that you pay close attention to, and you

16    follow, Judge Burns's instructions when she gives you the jury

17    charge.

18            Third, that you use your common sense.  The same

19    common sense you brought with you the day you were picked to

20    sit on this jury, same common sense you brought with you every

21    day in this courtroom as you listened to evidence over the

22    past two weeks, use that common sense during your

23    deliberations.  Use it as you think about these phone calls

24    that were intercepted, about all the testimony you heard, and

25    all of the other evidence before you.

1          And third, when you do those three things, I ask

2     that you return the only verdict consistent with all the

3     evidence in this case:

4          A verdict of guilty with respect to Count One for

5     each of the three defendants:  28 grams or more of crack

6     cocaine for Mr. Anderson; 28 grams or more of crack cocaine

7     for Mr. Bryant, as well as heroin and cocaine; and 100 grams

8     or more of heroin with respect to Mr. Santos.

9          Thank you.

10         MR. ROGAN:  Your Honor, I'm ready to proceed with

11    one small caveat, I don't need a ten-minute recess, I don't

12    need a five-minute recess, could I have a one-minute recess,

13    your Honor?

14         THE COURT:  We'll give you ten minutes, sir.  We'll

15    give the jury ten minutes, okay?

16              (In the absence of the jury:  2:50 o'clock p.m.)

17         MR. REEVE:  Judge, there are a couple of things I

18    wanted to put on the record.  Number one, I didn't want to

19    interrupt the argument which is in fact consistent with the

20    charge as it stands right now, but the reality is the

21    government is wrong, and the instructions are wrong, when they

22    said there are two elements to this offense.

23         It's been clear in this circuit since *United States*

24    *versus Thomas* that quantity is an essential element of the

25    offense.  If that wasn't clear enough, it's now the law of all

1    the circuits because of *Alleyne*, and it's a misstatement of

2    the law and it dilutes the quantity element to say, it's not

3    an element.

4         There are three elements.  I said this in chambers,

5    I said it last week.  I know the government clings to the idea

6    that there's a sentence enhancement; there's no longer any

7    sentence enhancement.

8         Any issue that the jury has to decide is an

9    essential element of the offense, and by diminishing that,

10   what happens is they're diluting their burden of proof, and

11   your Honor has to correct that.  It's not right.  It is an

12   essential element.  There are three elements now.  In the old

13   days there were two, but now there's three.

14        So I object to that.  I ask that the Court change

15   its instructions, and I ask that the instructions make it very

16   clear that there are three elements of this offense.  That's

17   number one.

18        Number two, your Honor, that argument took 56

19   minutes.  We all agreed to one-hour arguments.  We've tried,

20   all the defense counsel have tried, very carefully to

21   structure their arguments so we wouldn't take time.  We

22   started later.

23        And I hope that your Honor holds the government to

24   that, because I think Mr. Vatti has four minutes now.

25        MR. MORAGHAN:  For the record, your Honor, I agree

1   with Mr. Reeve's argument that the quantity is clearly an

2   element of the offense, and it was diluted by Mr. Silverman in

3   his argument.

4        THE COURT:  You gentlemen are suggesting there has

5   to be some correction to the instructions to the jury, are

6   you?

7        MR. REEVE:  Absolutely, your Honor, just like we

8   said last week in chambers, it's not right to instruct the

9   jury there are two elements of this offense.  I know the

10  government might have relied on that, but it's an error, and

11  we objected to it.  It's not on the record, but we objected to

12  it informally at our chambers conference.

13       THE COURT:  What's the citation?

14       MR. REEVE:  *United States versus Thomas*, I don't

15  have the cite, but we all agree it's an essential element,

16  it's undisputed it's an essential element, and if there's any

17  question, *Alleyne*, the decision of the Supreme Court, that

18  says any fact, any fact, that changes --

19       THE COURT:  The sentence?

20       MR. REEVE:  No, any fact that changes the offense.

21  In the drug statutes, there's a (b)(1)(A) offense, that's a

22  separate offense.  There's a (b)(1)(B), that's a separate

23  offense.  There's a (b)(1)(C).  In this case, all these men

24  are charged with (b)(1)(B), not a detectable quantity.  So

25  because of that, it's an essential element, and you have to

```
 1   instruct that this is an essential element.  It's just the law
 2   is crystal clear.  No question.
 3            MR. VATTI:  Do you want to join in?
 4            MR. ROGAN:  I stepped out of the room, your Honor,
 5   but to the extent I missed anything, I'll join in Mr. Reeve's
 6   argument.
 7            THE COURT:  Sure.
 8            MR. VATTI:  May I be heard?
 9            THE COURT:  Yes, please.
10            MR. VATTI:  With all due respect to my colleagues on
11   the other side of the aisle, we're making much ado about
12   anything.
13            Your Honor's instructions say first, the jury has to
14   find the existence of a conspiracy, that's question number
15   one.
16            The second element that they need to reach is
17   membership in the conspiracy, and that's exactly how your
18   Honor's jury instructions are set up.  In fact, your verdict
19   form is set up in exactly that way, when the jury first makes
20   a guilty finding on whether or not the defendants are liable
21   for Section 846 conspiracy.  After the guilty finding, they
22   then address for penalty purposes the quantity attributions
23   with respect to each defendant separately.
24            Mr. Silverman did absolutely nothing more than track
25   exactly what your jury instructions do and what your verdict
```

form does.

        In addition to that, he gave the jury the caveat
that to the extent that anything he says contradicts what
legal instructions your Honor gives, your Honor's instructions
control.  So they're going to hear your jury instructions
tomorrow in exactly the way they need to proceed in assessing
the facts and law of this case.

        So the argument was entirely proper.  I don't see
any need for any curative instructions at this point.  Your
Honor is going to comprehensively instruct the jury tomorrow
morning on exactly what the elements are, and what findings
they need to make.

        And one place that we do part company is, I agree
that quantity is an element of the offense, but it's for
*Apprendi* purposes in determining the penalties that apply,
which mandatory minimum is applicable to the offense.

        THE COURT:  Yes.

        MR. VATTI:  So first, you can be liable for Section
846 conspiracy regardless of any quantity attribution.  If I
charge someone with 846 and I prove up five kilograms of
cocaine, that's fine.  If I charge the person with (b)(1)(C),
it's not an element of the offense.  I can prove whatever
quantity I want, if I charge (b)(1)(C), I don't get to invoke
the mandatory minimum.  That's why we always take the position
that the penalty is for *Apprendi* purposes, and that requires a

1    quantity determination.  It is not, in and of itself, an

2    element of Section 846 conspiracy.

3            MR. REEVE:  Just so that we're crystal clear, the

4    language I'm talking about is page 36 of your Honor's draft

5    charge, and it says the following:

6            "In order for you to find a defendant guilty of the

7    drug conspiracy charged in Count One, the government must

8    prove beyond a reasonable doubt each of the following two

9    elements."

10           Attorney Vatti is correct, if the government charges

11   (b)(1)(C), quantity's not an element.  But they didn't do

12   that.  They chose to charge (b)(1)(B).  Quantity is an

13   element, it's the third element.  I'm not necessarily saying

14   there has to be a correcting instruction now; what I'm saying

15   is your Honor has to change your instructions to say three

16   elements.

17           MR. VATTI:  And I think, aren't we having a charge

18   conference this evening, your Honor, where we can hash out

19   whatever remaining details?  I'm not sure why we're doing that

20   right now.

21           THE COURT:  Yes, perhaps we can talk about it later.

22   Also the case that you cited, Mr. Reeve, that was United

23   States against what?

24           MR. REEVE:  *Thomas*.  I can give your Honor the cite

25   later.  We might have it with us on our laptop, I'll try to

1    pull it out during the recess and give it to your Honor.

2         THE COURT:  Okay.  We had another question with

3    respect to the effect of the storm on the jury.  Apparently,

4    they are concerned, there's a concern by some juror's husband

5    who wants to pick his wife up and bring her home before the

6    storm gets worse.  What do we do?

7         MR. SILVERMAN:  Your Honor, it's my understanding

8    that the storm is still forecast to taper off and stop later

9    this afternoon.

10        THE COURT:  Is it moving from the west to the east?

11        THE CLERK:  Yes, it will end in New London later

12   than it will here.

13        THE COURT:  That's where she's from, isn't it?

14        MR. MORAGHAN:  Your Honor, we're not forecasters.  I

15   want to get it done today, but I don't want to hear that the

16   jury's worried about getting to New London tonight.  If this

17   is what the jury has asked for, then what I would suggest is

18   Mr. Rogan finishes his argument and we stop, we continue with

19   Mr. Reeve and myself and whatever time you allow to Mr. Vatti

20   tomorrow, and then we go into your charge.

21        I know we've had concerns about dead time and

22   upsetting the jury, but if they 're concerned, and that's

23   legitimate, we do one more argument now, we do the other two

24   and four minutes tomorrow, and then you charge and they can

25   still get the case by noontime if we start at 9:00 o'clock

```
1    tomorrow.
2            I don't want to be arguing if you're telling us
3    jurors don't want to be here because of the weather.
4            THE COURT:  Well, I'm not sure about that.  It says
5    I have a juror's husband calling, to pick up his wife, would
6    like to know when because he's concerned about the storm.
7    That's all I've got.
8            MR. SILVERMAN:  Why don't we ask your clerk to ask
9    the jury to decide collectively whether they would like to
10   leave after the next argument, Attorney Rogan's argument, or
11   whether they would like to stay for the remainder of the
12   arguments today, and if they can reach a collective decision,
13   we can defer to that decision.
14           MR. MORAGHAN:  Your Honor, I don't want a collective
15   decision because if one juror wants to leave, she or he is
16   going to be upset.  Either they all agree -- it should not be
17   collective.
18           THE CLERK:  There is one juror that's very
19   concerned.  She's been concerned since she got here.  But I
20   don't know --
21           THE COURT:  Is that the one with the husband?
22           THE CLERK:  I'm not sure.
23           THE COURT:  None of us wants a jury thinking about
24   the weather rather than what you gentlemen are saying or what
25   I'm going to be saying.
```

```
 1          MR. VATTI:  Your Honor, could we just address the
 2   issue of the time available to the government for rebuttal?
 3   Frankly I thought Mr. Silverman moved through the evidence,
 4   given there are three defendants, in as quick a time frame as
 5   he possibly could have under the circumstances.  There are
 6   going to be three defense closing arguments that may take an
 7   hour each.  I think 15 minutes for the government on rebuttal
 8   is quite reasonable.
 9          THE COURT:  Well, if they're going to take an hour
10   each, it's now 3:00 o'clock, and there are three defendants.
11          MR. ROGAN:  Right, your Honor.  Mr. Vatti was
12   raising a separate issue.  I think we're going to have a
13   consensus in a minute that as far as we're going to get today
14   is for me to conclude my closing argument.
15          The issue being raised is given the hour allotment
16   for each people, and Mr. Silverman spoke for 56 minutes, does
17   he have four minutes left, and I don't want to characterize
18   Attorney Reeve's argument, but does he have four minutes left
19   or does he have an additional 15 minutes.
20          THE COURT:  Let's find out first of all what the
21   consensus of the jury is.  If they are sufficiently concerned
22   about the weather, I think that any argument you're going to
23   make, they're not going to pay that much attention to; they're
24   going to be concerned about the weather.  Let's find out what
25   they say.  We want them to concentrate on your remarks, and
```

```
 1    not to be distracted by any other concerns they might have.

 2    Let's see what they say, okay?

 3              MR. REEVE:  Yes, your Honor.

 4              MR. ROGAN:  Thank you, your Honor.

 5              THE COURT:  The report is, gentlemen, that the jury

 6    has voted, and they want to hear from one more attorney and

 7    then they want to go home.

 8              MR. VATTI:  Okay.

 9              MR. ROGAN:  Okay.

10              MR. REEVE:  Okay.

11              THE COURT:  Is it okay to accommodate them?

12              MR. REEVE:  Yes, your Honor.

13              THE COURT:  Then I'll see you when we adjourn, on

14    the charge.

15              MR. REEVE:  Yes, your Honor.  Thank you.

16              (In the presence of the jury:  3:08 o'clock p.m.)

17              THE COURT:  I understand, ladies and gentlemen, you

18    want to hear from one more attorney and adjourn for the

19    evening and continue tomorrow morning, is that correct?

20              JURORS:  Yes.

21              THE COURT:  All right, thank you.

22              MR. ROGAN:  May I?

23              THE COURT:  Yes, sir.

24              MR. ROGAN:  Good afternoon, ladies and gentlemen.

25    Normally, I would thank you for your patience, but really what
```

```
1   I'm thanking you for is letting me take that five-minute
2   break.  I will try to stick to that one-hour time frame, and
3   I'm going to ask a couple of things of you about that.
4           First, I want to bring you back to when I first met
5   you on January 21st and I gave you an opening statement.  If
6   you remember, I asked you or told you there were three things
7   that I was going to ask of you in order to come to a fair
8   decision in this case:
9           Number one was courage; number two was to keep an
10  open mind about all of the evidence; and the third issue which
11  I asked you to keep in mind was that together, if you follow
12  Judge Burns's instruction on the law and fairly evaluate the
13  evidence, together I think in the next hour, we'll find a
14  pathway for you to do your duty as jurors and to be able to
15  find Mr. Anderson not guilty of the crime that he's been
16  charged with in this case, because that's what this, at the
17  end of the day, is about.
18          The one other thing I'm going to ask for you in the
19  next hour or so, and Judge Burns will tell you this tomorrow
20  when she gives you her charge on the law, is that you are to
21  consider each individual defendant individually.  And by that,
22  I mean you've seen me sit here for the last two weeks with my
23  colleagues and the two other defendants, but each one of us
24  has to be considered individually, and I'm going to ask you to
25  do that as it relates to Richard alone.
```

```
 1              And during the course of the next hour, I'm also

 2    going to be able to answer I think the questions that were

 3    posed by Mr. Silverman, certainly as it relates to Richard

 4    Anderson.  Okay?

 5              And let's go back to the beginning.  And I'm going

 6    to use a lot of the words that Kevin Wilson used during what

 7    must have seemed like a lifetime of testimony to you all,

 8    okay?

 9              And the very first thing I want to remind you of is

10    his demeanor and his appearance on the stand.  And I will tell

11    you, I'm not going to insult your intelligence to suggest that

12    Kevin Wilson was affirmatively lying to you when he was on

13    this witness stand.

14              What I am going to tell you and suggest to you, and

15    again this is what Judge Burns's instruction on the law is

16    going to be, is that when you consider the standard of proof

17    that you have to apply here, proof beyond a reasonable doubt,

18    and think about this question, right?  Reasonable doubt, or

19    proof beyond a reasonable doubt, is:  Is the testimony of such

20    a reliable nature that in matters of great importance to you

21    personally, would you rely on that, would you rely on that

22    testimony?

23              And I think we can all fairly agree that whatever

24    else was going on, Mr. Wilson's testimony was not reliable.

25    And I'm not even talking about him trying to remember phone
```

1    calls or proffer sessions.  That's not fair.  I think he told

2    us all, he was just reading from the script, right?  He's

3    trying to go back to a phone call he might have made between

4    however many people, okay?  And come up with what his

5    recollection, what he thinks that means.

6         But when he was in court, his testimony was

7    unreliable on a matter of great importance, and I'll take you

8    back to my cross-examination of him just a couple of days ago,

9    okay?

10        The very first thing he told you, with no prompting

11   from me, is that he was never partners with Richard Anderson

12   in the drug distribution business.  Those aren't Neal Rogan's

13   words, those aren't Richard Anderson's words; those are Kevin

14   Wilson's words.

15        And yes, the government's going to get up here on

16   rebuttal and what they're going to tell you is partnership as

17   Mr. Wilson defined it doesn't equal a conspiracy.  But in a

18   large part, it does, because Mr. Silverman, during the course

19   of his closing statement, talked about the people that Kevin

20   Wilson was partners with, and he never suggested to you that

21   Richard Anderson and Kevin Wilson were partners.  And you know

22   why?  There's no evidence to suggest that that's actually

23   true.

24        And let's talk about the phone calls.  And again,

25   the one thing I'm going to spare you, I'm not playing any

1   phone calls.  I'm also not going to make any apologies or

2   excuses for what we can all agree was the appalling language

3   used by every single individual in this case.  There is no

4   excuse for it.  It's offensive to people of color, it's

5   offensive to anybody.  But it is the reality of what we deal

6   with.

7          But when you parse away that language, okay?  What

8   you come down to, as it relates to Richard Anderson, is that

9   he did not join in this conspiracy.  And how do we know that?

10  As recently as late yesterday afternoon, on redirect

11  examination, and I have to look at just one note, it was

12  Government's Exhibit 35A, right?  And it was a phone call that

13  went back and forth between Mr. Wilson and this mysterious Mr.

14  Morales, right?  And in which Mr. Wilson says, directly in

15  response to questions from Mr. Morales -- and I do have to use

16  one piece of profanity because this is a quote, "This is his

17  shit, bro, I can't tell him how to run his business."

18         What Mr. Wilson is saying in very plain terms is,

19  hey, whatever you got going on with Mr. Morales, I'm not in

20  that.  And he's very noncommittal when it appears that Mr.

21  Morales is complaining about what may or may not have

22  transpired between Mr. Anderson and Mr. Morales.  And that's

23  also entirely consistent with no one else's testimony but

24  Kevin Wilson.

25         Because what does Kevin Wilson say?  By August of

1   2011, and this doesn't have anything to do with proffer

2   statements, this is from his own memory, by August of 2011,

3   "I'm out of the crack cocaine business.  I'm out."

4          Because of this bad experience he had with being

5   ripped off by other people, not Mr. Anderson, he's out of the

6   crack cocaine business because of his source of supply going

7   away, and because he's freaked out by that undisputed buy that

8   we all saw back in early May, which Mr. Anderson had

9   absolutely nothing to do with.

10          And I'm going to be as direct as I can with you.

11   I'm okay if you don't like Mr. Anderson.  I'm okay with the

12   idea that you don't like his language.  I'm okay with the idea

13   that you may have a hunch that somehow he was involved with

14   someone else, not related to this conspiracy.

15          But guess what?  Judge Burns is going to tell you

16   something that's going to surprise you, and the surprise is

17   that you can come to a conclusion -- and I'm not suggesting

18   that you do, but you can come to a conclusion -- that Mr.

19   Anderson was entering into another arrangement with this

20   mysterious Mr. Morales.

21          But if you don't find that he was part of the Wilson

22   conspiracy, you have to find him not guilty, and that's just

23   the way the law works, because he's charged with being guilty

24   and participating in, being a member of, this conspiracy.  And

25   there simply isn't enough evidence as it came through from

1    Mr. Wilson and some of the other witnesses.

2            And let me go directly into some of the key facts

3    that came out, and these are basically facts that aren't in

4    dispute.

5            And let me ask you this question, and I'll ask for a

6    mental show of hands, because we can't actually ask you to

7    raise your hands now:

8            Are you honestly confused about the testimony

9    offered by Kevin Wilson?  You have to be.  Do you remember,

10   during my cross-examination of him, he actually contradicted

11   himself right within my own cross-examination, where he first

12   said he never did any, any, cocaine base transactions with

13   Richard, right?  Then he says later on he did.  Okay?  That's

14   unreliable testimony.  I don't know what's in Mr. Wilson's

15   mind.

16           I know what his motive is.  Again, let's be clear.

17   His motive is, "I got to do the best thing I can for me."

18   Desperate times call for desperate measures.

19           And I walked him through all of the hallmarks of a

20   conspiracy.  Did you have an agreement with Mr. Anderson?

21   Answer is no.  Did you pool money with Mr. Anderson to buy

22   drugs or front drugs?  Answer:  No.  Didn't fight me on it.

23   Was Mr. Anderson part of the clique, as Mr. Wilson described

24   it?  Answer:  No.  Was Mr. Anderson part of the trusted

25   circle?  Again, these are all Kevin Wilson's words here in

1    court.  Answer:  No.  Okay?  Because that's the truth.

2         But the problem, the jam that Mr. Wilson finds

3    himself in is, hey, I'm part of the government team now,

4    right?  So as part of the government team, "what I got to do

5    is not necessarily" -- I'm going to leave it to you to

6    determine his credibility -- "I've got to stretch and somehow

7    find a way, even if it's in direct contradiction to what you

8    see on the screen, I got to find a way to drag Richard

9    Anderson straight into the middle of it."

10        And when a guy says -- and he also says, Mr. Wilson,

11   by August of 2011, "I'm out of the crack cocaine business, I'm

12   into heroin."  And let me talk to you about that.  I asked

13   some very specific questions of, about Mr. Wilson and Mr.

14   Anderson and the heroin.

15        And I understand the government's got to do a job,

16   and they haven't done anything that they shouldn't be doing,

17   but here's the part that's not there, okay?  We had a

18   stipulation, remember I asked Mr. Wilson this, I couldn't

19   expect him to remember all 40 hours of his proffer that he

20   did.  Who could?  It would be unrealistic.

21        I agree with Mr. Silverman, it would be unrealistic

22   for him to say, "Oh, yeah, I remember that, remember that,

23   remember that."  But we actually read all the documents, and

24   the only person that's reported in those documents where

25   Mr. Wilson is asked, "Did you ever see Richard Anderson, ever

see anyone, use drugs?"  It was in relation to Richard

Anderson.  You know why?  Because again, Mr. Wilson said it

directly.  Over the course of the term of this conspiracy, Mr.

Anderson was buying heroin maybe three or four bundles for

personal use.  There's not one phone call that came into

evidence that talked about Mr. Anderson buying heroin for

resale purposes.

         Here's another thing that's going to surprise you.

Judge Burns is going to tell you tomorrow, the mere fact that

somebody's in what we call a buyer/seller relationship, buying

or selling drugs, doesn't necessarily, as a matter of law,

make him part of this conspiracy.  Okay?

         And that's important for you to know, and that's the

instruction that the Judge is going to give you on the law,

and it may seem unusual, but in the context of Richard

Anderson, it certainly makes sense.

         Think about this, too:  Throughout the trial, what

you heard day after day after day was all of the accoutrement

or evidence that was seized in this, consistent with drug

trafficking, right?  And everything that was grabbed up out of

Kevin Wilson's apartment on January 3rd, 2012, and everything

that was grabbed up out of the Galan brothers' apartment over

on 139 Day Street, do you remember that testimony?  Okay?

         During the course of this investigation, Mr.

Anderson had two direct touches with the law, and by that I

1    mean two encounters with law enforcement, where he's supposed

2    to be this big time cocaine base dealer and both times,

3    nothing is found.  And I'll give you the exact dates, for

4    reminder.

5         The first one is the famous videotape, which I'm not

6    going to play again, of October 25, 2011.  All we see is Mr.

7    Anderson approaching 139 Day Street, coming out, getting into

8    a car.  And then if you remember, and I believe it was Agent

9    Ndrenika and if it wasn't I apologize but I think it was him,

10   who said they were conducting surveillance, and then they

11   ordered a stop on the Anderson vehicle for purposes of

12   identification.

13        But he also told -- so he called someone in the New

14   Haven Police Department who came in here and testified, right?

15   And they said they didn't see any contraband associated with

16   anything having to do with narcotics trafficking related to

17   Richard Anderson.

18        And, ladies and gentlemen, while that witness said,

19   "Well, we weren't going to stop him if he had a dime bag of

20   heroin," you got to know, if there's a half a pound of

21   marijuana on the floor or cocaine base, they're not going to

22   let him drive off.  You know why?  It's that other element I

23   talked about, common sense.  It wouldn't make sense.

24        If Mr. Anderson had a ton of cocaine or anything

25   else on him, and the police let him go, what do you think the

1    first thing that will cross Mr. Anderson's mind?  Something's

2    up.  That doesn't happen.  Because trust me, they said they

3    stopped him for a tail light.  Let's be honest, in New Haven,

4    the law enforcement has enough to do, they're not stopping

5    people for tail lights, right?  Unless you're really involved

6    in something bad.

7         So what's clear is that even though he comes out of

8    139 Day Street where the cooperating witness lives and

9    everything is found from guns and drugs and all the things

10   necessary to cook and do all those things, it doesn't happen.

11   That's consistent with someone who's not a part of this

12   conspiracy.

13        Here's another thing, factual issue not in dispute

14   that would be consistent with Richard not being part of the

15   conspiracy:  On the morning that the federal search warrant,

16   the federal warrant comes down for him, right?  I think they

17   surrounded his house, Agent Zannelli told us full bore, they

18   surround his house, it's about 7:00 o'clock in the morning.

19   The one thing he agreed with me on was that Richard Anderson

20   didn't know that he was coming, right?  Mrs. Anderson, mom,

21   lets him into the house, Richard's not there.

22        Agent Zannelli goes to every single room in the

23   house, and this evidence isn't in dispute, factually, he tells

24   me on the witness stand:  "If I'd have found so much as a

25   scintilla of evidence relating to drugs, drug trafficking,

narcotics, I'd have bagged it, tagged it, and it would be
evidence sitting in this courtroom today," and it's not
because it wasn't there.  And Richard Anderson had no idea
that it was coming.  And that doesn't make sense.

What does make sense is exactly what Kevin Wilson
said, that he and Richard Anderson were friends.  He made this
introduction to Mr. Morales for whatever reason, and walked
away from it.  Okay?

Do you remember on cross-examination, when I asked
about whether or not he had had any prior transactions with
Mr. Anderson?  He first said no and then he said, in answer to
a question from Mr. Silverman on direct, that he guessed or he
thought that he was involved in approximately 35 grams.  When
I pressed him on that question and not very hard, I was trying
to be respectful of him, he said, "I'm guessing."  "I'm
guessing."

Ladies and gentlemen, this is way too important.
Think about that standard of proof that the government's held
to, you can't rely on someone who's guessing about what he
thinks Richard Anderson was involved in, particularly when he
wasn't a party to the transactions.

He's looking up at a screen, right?  He said, if
there was a significant event he would remember it, but he
doesn't, okay?

And did you notice this, when Mr. Wilson was on

1   direct examination and being led through every single one of

2   these phone calls, his testimony crisp, right on point,

3   remember this, remember this, remember this?  He wasn't on the

4   stand for 15 minutes before the first, and he went to the

5   default position, "I can't recall," "I don't remember," "I got

6   to look at the document to refresh my recollection," okay?

7        Because he knew once he got off message, that's when

8   the question about the partner thing, he started to realize,

9   oops, that's a problem, right?  "Richard didn't package drugs

10  with me, we didn't pool money together, right?  We weren't

11  sharing profits together."

12       I don't care what the government tells you, anybody

13  here -- again mentally raise your hand -- think that these

14  guys weren't in the business of making money, okay?  And if

15  Kevin Wilson could make money, he was going to make money.

16  That's not what he was doing with Richard Anderson, okay?

17  Wasn't what he was doing at all.

18       And here's another thing, it actually came up during

19  Mr. Silverman's closing argument, and the date of the call was

20  September 22nd, 2011, and it's a phone call between Richard

21  Anderson and Kevin Wilson where Wilson says "he," referencing

22  Morales, "talked to you," meaning Richard Anderson.  Here's

23  the problem:  Where's that phone call?

24       Here's another question, okay?  Apparently, the only

25  thing Mr. Morales speaks is Spanish, okay?  You've heard

```
 1   evidence that my client is Jamaican.  You haven't heard any

 2   evidence that he speaks any Spanish, okay?

 3          So you can start to see, while it seems to be easy

 4   to look at those phone calls and assume the worst, when you

 5   start to actually drill down into the evidence, what you see

 6   is not necessarily what's up on the screen, or what you hear

 7   on the audiotape.

 8          Look, I guarantee it, and I could be wrong, but when

 9   Mr. Vatti gets up here and does his rebuttal sometime

10   tomorrow, he's going to play the tape where my guy is

11   screaming and yelling and he's using the N word -- I don't

12   think he missed a profanity -- and he's going to beat up

13   somebody, Mr. Morales or whatever.

14          Ladies and gentlemen, that's garden variety trash

15   talking, okay?  How do we know that?  Don't rely on me, rely

16   on Agent Ndrenika, who said, as a result of that trash talking

17   phone call, he testified to this and Wilson confirmed it, what

18   does he do, but they want to make sure public safety's an

19   important issue, they go put surveillance over on Mr. Morales

20   's house, right then and there.  Smart thing to do, the good

21   thing to do, the right thing to do.

22          What the agent confirmed is absolutely Mr. Anderson

23   never got near that house.  You know why?  There never was any

24   intention to do any harm, okay?  That's just somebody who's

25   upset, for want of a better term, and Mr. Wilson confirms that
```

```
 1   they were just talking, and there is never any further

 2   discussion between them and -- between Kevin Wilson and

 3   Richard Anderson -- about doing any harm to Mr. Morales or any

 4   member of his family.

 5          Here's another thing, and we brought this out:  The

 6   very day that Kevin Wilson was arrested, January 3rd, and it

 7   rolled into the morning hours of January 4th, he could not

 8   give up names fast enough of people that were part of the

 9   conspiracy, okay?

10          And it was the defense that brought forward the post

11   arrest statement made by Mr. Wilson, and he identifies a ton

12   of people as being part of his narcotic and trafficking

13   network.  That's as close in time as you can get, because your

14   memory hasn't failed, the government hasn't gotten to him,

15   nothing's happened.

16          And who doesn't he identify?  He absolutely doesn't

17   identify Richard Anderson.  Don't take my word for it, don't

18   take Richard's word for it.  Mr. Wilson said he didn't

19   identify Richard Anderson.

20          It was only later on, when he realized how jammed he

21   was and he saw Mr. Anderson's name on the indictment, that he

22   realized this is somebody I've got to help the government go

23   get.  That's exactly what happened, okay?

24          And I'm going to correct the government again, as I

25   had to do yesterday, with Agent Zannelli.  Remember the guy
```

 1    who did the post arrest statement of Mr. Anderson, and this is

 2    where people don't entirely play fair.  I actually read the

 3    post arrest statement of Mr. Anderson, and two times, Agent

 4    Zannelli specifically misrepresented to you what was in the

 5    statement where he said the first sentence was that Richard

 6    Anderson sold small amounts of crack cocaine and weed in the

 7    last year, right?  He did it once, he did it twice on direct

 8    examination from Mr. Silverman.

 9           Then when I showed him the document, he did it the

10    third time until I said, no, read what's actually written on

11    the page.  And what Mr. Anderson said in that post arrest

12    statement was that he had purchased small amounts of weed and

13    crack in the last year; not that he had sold it.  And Agent

14    Zannelli was the one who said, "I take down everything

15    verbatim," right?

16           And then Mr. Silverman gets up and tries to fix him

17    up, as that's his job, and says, "Well, you're not a court

18    reporter."

19           The problem with this, folks, again, I come back to

20    the importance of this case as it relates to Richard Anderson.

21    It counts, okay?  When an agent comes in here and says, "I

22    wrote down everything verbatim" and then misreads it, I'm

23    going to give him the benefit of the doubt, it's a mistake.

24    But it misled you, okay?

25           We brought out the fact that the statement where he

said he sold crack cocaine in the past has no time frame on

it, okay?

So that doesn't tie him into the conspiracy.  The

government wants to tie him into the conspiracy because that's

in their best interest.  That's in Mr. Wilson's best interest

to do that, okay?  But they don't have the evidence.

And let's talk about these wiretap phone calls.

I'll agree, and have no reason to argue, some of them are

horrifying, okay?  They sound terrible, okay?

But you're relying on Kevin Wilson to interpret

calls to which, some of which, he's not even a party to, okay?

That simply doesn't make any sense.

And again, think of that standard of proof that the

Judge is going to say that the government has to be held to.

Would it give you pause in important affairs of your life to

rely on that type of testimony?  I'll tell you, you simply

can't.  It's too important.

And Mr. Wilson has every reason to want to expand

and stretch around the truth.

Here's another fact that's not in dispute, okay?  Do

you remember all of the testimony about the backyard, what

I'll refer to as the backyard, 22-24 Judson Street?  Everybody

agrees, the government team and Mr. Wilson, Richard Anderson,

not a part of that group.  Never went near 24 Judson Street,

had nothing to do, if there was crack coming out of Judson

1    Street, if there were weapons being stored at Judson Street,

2    if there was other narcotics being stored at Judson Street,

3    everybody's agreement, is in agreement, that Richard Anderson

4    had nothing to do with it.

5           And Mr. Wilson described that as a clique, that

6    group down on Judson Street.  And what's code for a clique?

7    It's a conspiracy.  It's a bunch of guys getting together for

8    the purposes of distributing narcotics.

9           I don't know the truth or untruth of what happened

10   over on Judson Street.  That's not for me.  What I'm concerned

11   about is what the government's lack of evidence is regarding

12   Richard Anderson, and what he's charged with.  And again, what

13   he's charged with is joining Mr. Wilson's conspiracy.

14          And bear in mind, you saw the plea agreement.

15   However Mr. Wilson was trying to portray himself and for

16   whatever reason, hey, look, I will tell you, I don't care if

17   he was a good drug dealer, a bad drug dealer, an indifferent

18   drug dealer.

19          What we do know, because he pled to it, he was the

20   leader and the organizer and the manager of that conspiracy.

21   That's why his name's at the top of the indictment, and

22   everybody else, just so we're clear, even though Richard is

23   the first one there, it's just because his name starts with an

24   A and Santos and Bryant, it goes like that.

25          So Kevin Wilson was the organizer, so if he says,

1    "I'm not in the crack cocaine business with Richard Anderson,

2    not my shit, bro, it's not my business," that means that

3    Richard couldn't have been part of that conspiracy.

4         So what the government is going to tell you on

5    rebuttal -- and by the way, before I forget and run out of

6    time, don't think for a moment that just because I don't get

7    back up here, that I agree with anything that the government

8    has to say in rebuttal.  It's just the way the rules work.

9    This is my last opportunity to talk to you before you begin

10   your deliberations.

11        What the government is going to try and tell you as

12   it relates to Richard Anderson is two things:  One, forget

13   about Mr. Wilson's definition of a partnership, that's not

14   what a conspiracy is.  I'll leave that for you to decide.  I

15   haven't seen any not-for-profit conspiracies, okay?

16        Number two, what they're going to try to tell you is

17   that Mr. Anderson joined that conspiracy, became a member.

18        Here's something else that Judge Burns is going to

19   tell you when she gives you the instructions tomorrow:  You

20   can't join a conspiracy by accident.  You have to do it

21   knowingly, willfully -- sorry, knowingly, and intentionally.

22        When did you join?  Here's a question for you, when

23   did he join?  And did he join?  And I think every information

24   and all the evidence points to the fact that he didn't join,

25   okay?

1          Another surprise, may surprise you, Judge Burns is

2    going to tell you that just because Richard Anderson knew

3    Kevin Wilson, just because he knew Jesus Morales, if he did --

4    and by the way, not a single phone call between Jesus Morales

5    and Richard Anderson.  What's that about?  Not there.

6          But just because Kevin Wilson and Richard Anderson

7    spoke on the phone doesn't make Richard a co-conspirator.

8    Just because Kevin Wilson and Richard Anderson knew each other

9    doesn't make him a co-conspirator, okay?

10         You look at certain factors in order to determine

11   that, and it's the factors that on the one hand the government

12   wants to argue are consistent with partners as it relates to

13   these other defendants, but they don't like how it went in for

14   Mr. Anderson, right?  Because they talked about pooling money,

15   pooling drugs.

16         And did you see at the end of the day on Friday,

17   before we left, right?  Mr. Wilson changed his story again on

18   redirect by Mr. Silverman to suggest -- first of all, on

19   Thursday, he flat out says, Mr. Wilson, "I never fronted drugs

20   to Richard Anderson.  Never happened."

21         Then they realize, well, wait a minute, he's just

22   told us I'm not a partner, we didn't share drugs, we didn't

23   share profit, we didn't share anything.

24         Then he comes back on Friday on re-redirect, I

25   forget at that point, I'm sure you did, too, that, oh, yeah,

1    there was this transaction where Richard bought a spoon, for

2    what I don't know, and that somehow makes him part of the

3    conspiracy.

4           What happens in these conspiracy cases, ladies and

5    gentlemen, and it's not the government's fault, is that when

6    you charge 47 people in one conspiracy, right?  And then ask

7    you guys to sort it out, it's fundamentally unfair.

8           It's actually unfair to Kevin Wilson.  I don't

9    necessarily like Kevin Wilson, dislike him.  He did what he

10   had to do, and we all know why he did what he had to do,

11   right?  He's trying to better deal himself.  I can't say if I

12   weren't in the same position, I wouldn't do the same thing.

13          But the problem is when you start cherry picking out

14   of the air, as the government has done, certain phone calls,

15   right?  It becomes impossible for you, as the fact finders,

16   because it doesn't matter, you're the ones who are going to

17   decide the facts, it becomes impossible for you to do your

18   job, because you don't have the complete picture.

19          The defense tried to give you as much of the

20   complete picture as they could, but that's an impossible task,

21   when you have over 10,000 pertinent phone calls, and you get a

22   handful of them, well, guess what, the government wasn't

23   picking the ones that were helpful to the defendants.  That's

24   their job, right?  We can try to pick other ones, but you

25   literally can't wade through it.

```
1              And you also know from the testimony of Agent Zuk
2    and Agent Ndrenika that those wire rooms aren't up 24 hours a
3    day, seven days a week, so you don't know what other calls
4    happened that changed things.
5              The government tried to talk about, and Mr. Vatti
6    will talk about, sequencing and lining up phone calls as
7    though that is the be all and end all to determine whether or
8    not a conspiracy exists.  It's not.  What it shows is people
9    talking in sequence, okay?
10             Just because somebody appears someplace, then they
11   want you to make that leap of faith over to say, whoops,
12   Richard's a part of the conspiracy.  It's not the way the law
13   works, okay?
14             You need proof beyond a reasonable doubt, and at
15   this point, you have to have a real doubt and an honest doubt,
16   and it's a doubt that's rooted not only in the evidence
17   against Richard, but in the lack of evidence, and in the
18   inconsistent and unreliable testimony of Kevin Wilson.  That's
19   not what you convict someone on.  Not in this country, not in
20   this courtroom, not of this man.
21             We waited so long, and sometimes it's only at the
22   very end of a trial that you finally get the words that make
23   sense.
24             What was the last piece of testimony we heard today?
25   It will stick with me for the rest of my life.  Kevin Wilson:
```

1    "I want to go home."

2           Even when he was asked again by Mr. Silverman,

3    "Well, what do you really expect for a sentence?"

4           "I want to go home."  Kevin Wilson's told you he's a

5    desperate man, that calls for desperate measures.  You do what

6    you got to do.

7           That's not the way you convict Richard Anderson.

8    And as I said, you cannot like him, you can have a hunch he's

9    a bad guy.  I'm even okay if you find out he entered into a

10   separate conspiracy with this Mr. Morales, okay?

11          But it's not the Wilson conspiracy, and that's the

12   one you got to find him guilty of here, and you can't.

13   Because when you have somebody reading from a script, and then

14   testifying in court inconsistent with the script, you have

15   actually come to the conclusion that I told you that you

16   would, which is I have a real doubt.  I wouldn't rely on Kevin

17   Wilson about an unimportant matter in my life, let alone a

18   matter of this grave importance for Richard Anderson.

19          I'm telling you, ladies and gentlemen, I'm going to

20   keep my time commitment so that we can all get home.

21          I have questions for the government, too, and you

22   should have questions regarding the evidence that was

23   presented here.

24          It is true, that conspiracies, you don't write down

25   agreements.  It's based on actions and it's based on words,

1    okay?

2            And what you can find truthfully, if you sit back,

3    take the emotion out of it, take back your natural gut

4    instinct, and it's there, it has to be:  Look, they're sitting

5    here, they had to have, Richard had to have, done it.  He got

6    indicted.

7            Well, guess what?  You can indict anybody.  But

8    that's not the way it works.

9            So here's the question:  Has the government

10   satisfied you beyond a reasonable doubt, based upon the

11   evidence they presented here, that Richard Anderson is guilty

12   of joining Kevin Wilson's conspiracy?

13           And I have to tell you, if you look at the evidence

14   objectively and apply the law as Judge Burns gives it to you,

15   you're going to check that first box that says Richard

16   Anderson is not guilty of being a member of this conspiracy.

17           I have to address with you very quickly the quantity

18   issue, okay?  I don't think you'll get to that question,

19   because if you don't find him to be a member of the Wilson

20   conspiracy, you don't even need to consider the quantity

21   issue.

22           But it actually ties back, and this is the last

23   thing I'll say to you, it actually ties back to the

24   unreliability of the evidence, and the evidence is basically

25   Kevin Wilson.

1       If a guy says to you, "I'm guessing that it was 35

2   grams or more of crack cocaine," "I'm guessing" equals "I

3   don't know."  "I don't know" equals reasonable doubt.  And "I

4   don't know" and "I'm guessing" and reasonable doubt equals not

5   guilty on the quantity issue, too.

6       And those are not my words, those aren't words on a

7   wiretap; that's Mr. Wilson here in court, testifying, and

8   telling you.  I asked him.  It's a flat out guess.  He was

9   guessing about a lot of stuff, ladies and gentlemen, and this

10  is way too important for that.

11      Thank you very much.

12      THE COURT:  Thank you.  I think we had agreed that

13  we would adjourn for the day after this argument, and we'll

14  resume tomorrow morning at 9:00 o'clock.

15      MR. REEVE:  Can we ask the jury for when they would

16  like to start?

17      THE COURT:  Is 9:00 o'clock okay, ladies and

18  gentlemen?

19      JURORS:  9:30.

20      THE COURT:  Somebody comes from New London, would

21  you like to say 9:30?

22      JURORS:  9:30.

23      THE COURT:  Whatever time you say.  What time do you

24  say?

25      JURORS:  9:30.

```
 1              THE COURT:  9:30 it is.

 2              MR. REEVE:  Thank you, your Honor.

 3              MR. MORAGHAN:  Thank you.

 4              THE COURT:  Please, overnight, don't discuss the

 5    case with anyone, don't permit anyone to discuss it with you.

 6              Have a safe ride home.

 7              (In the absence of the jury:  3:48 o'clock p.m.)

 8              THE COURT:  Shall we continue our charge discussion,

 9    gentlemen, in chambers?

10              MR. REEVE:  Yes, your Honor, thank you very much.

11              (3:49 o'clock p.m.)

12

13                 INDEX OF WITNESSES              PAGE

14    KEVIN WILSON
          Redirect Examination by Mr. Silverman     1433, 1475
15        Recross-Examination by Mr. Rogan          1441
          Recross-Examination by Mr. Moraghan       1445
16        Recross-Examination by Mr. Reeve          1452

17    Closing Argument by Mr. Silverman             1516

18    Closing Argument by Mr. Rogan                 1558

19

20
          COURT REPORTER'S TRANSCRIPT CERTIFICATE
21            I hereby certify that the within
          and foregoing is a true and correct
22        transcript taken from the proceedings
          in the above-entitled matter.
23
                          /s/ Thea Finkelstein
24                        Official Court Reporter

25    Dated: _____
```