```
  1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF CONNECTICUT
  2
        * * * * * * * * * * * * * *  x   Criminal Case
  3                                          No. 3:12CR104(EBB)
        UNITED STATES OF AMERICA,     :
  4                 Plaintiff
                                      :
  5          vs.                          February 4, 2014
                                      :  10:05 O'clock a.m.
  6     RICHARD ANDERSON, PHILIP
        BRYANT, ROBERT SANTOS,        :
  7                 Defendants          New Haven, Connecticut
                                      :
  8     * * * * * * * * * * * * * *  x

  9                     ELEVENTH DAY OF TRIAL

 10         BEFORE THE HONORABLE ELLEN BREE BURNS
            SENIOR UNITED STATES DISTRICT JUDGE
 11                 AND A JURY OF FIFTEEN

 12   Appearances:
        For the Plaintiff:          S. DAVE VATTI, ESQ.
 13                                  MARC HARRIS SILVERMAN
                                     Assistant U.S. Attorneys
 14                                  157 Church Street
                                     New Haven, CT 06510
 15
        For the Defendant:          NEAL PATRICK ROGAN, ESQ.
 16     Richard Anderson            315 Post Road West
                                     Westport, CT 06880
 17
        For the Defendant:          DAVID A. MORAGHAN, ESQ.
 18     Philip Bryant               Smith, Keefe, Moraghan & Waterfall
                                     32 City Hall Center, Suite C
 19                                  PO Box 1146
                                     Torrington, CT 06790
 20
        For the Defendant:          RICHARD A. REEVE, ESQ.
 21     Robert Santos               Sheehan & Reeve
                                     139 Orange Street, Suite 301
 22                                  New Haven, CT 06510

 23

        Court Reporter:             Thea Finkelstein RMR, CRR
 24                                 TheaFinkelstein@aol.com

 25   Proceedings recorded by mechanical stenography, transcript
      produced by computer.
```

```
 1              (In the absence of the jury.)

 2              THE COURT:  Good morning.

 3              MR. SILVERMAN:  Good morning, your Honor.

 4              MR. REEVE:  Good morning, your Honor.

 5              MR. VATTI:  Good morning, your Honor.

 6              MR. ROGAN:  Good morning.

 7              THE COURT:  Please be seated.

 8              We have a couple more arguments to make, right,

 9    gentlemen?

10              MR. REEVE:  I don't think the mic's on yet.

11              THE COURT:  Is that better?

12              MR. REEVE:  Much better, your Honor, thank you.

13              THE COURT:  Two more arguments by defense counsel?

14              MR. MORAGHAN:  Yes, your Honor.

15              MR. REEVE:  Yes, your Honor.

16              THE COURT:  Then response from the government.

17              MR. VATTI:  Yes, your Honor.

18              MR. REEVE:  And, your Honor, yesterday, I said Mr.

19    Vatti has four minutes.  I was being a little bit facetious.

20    I understand that Mr. Vatti's going to do what he needs to do.

21    He's told us he thinks it's going to be around 20 minutes.

22    But since the government has an hour and 20, I think we all

23    do, too.

24              I'm not going to try to go, but I'm giving them a

25    courtesy, and I hope your Honor will give us a little
```

1   flexibility because we have tried to keep it within an hour,

2   but I think we don't know.  We'll do the best we can.  I don't

3   think -- we don't want to rush government counsel.

4           THE COURT:  I don't want to rush anybody.

5           MR. REEVE:  I'll withdraw my claim that Mr. Vatti

6   only has four minutes to go.

7           THE COURT:  Okay.  Where are we now?  It's Mr.

8   Rogan, is it?

9           MR. MORAGHAN:  It will be Mr. Bryant.

10          MR. REEVE:  Attorney Moraghan will go next and then

11  I'll go third, and then Attorney Vatti will go for the

12  government.

13          I don't know, Judge, if the jury's going to want to

14  have a break.  We're all amenable to that.  I don't know,

15  we'll have to call it as we go along, I think.

16          THE COURT:  Yes.  What time is lunch?  1:00 o'clock,

17  their lunch is arriving.

18          MR. REEVE:  We'll be done before 1:00.

19          THE COURT:  Good.

20          MR. REEVE:  Let's see how we go.  We might want to

21  take a break at some point.  I'll let -- we should just -- I

22  don't know, we'll give you a signal or something.

23          THE COURT:  Okay.

24          THE CLERK:  Ready for the jury?

25          THE COURT:  Yes, I am.

1              (In the presence of the jury:  10:10 o'clock a.m.)

2          THE COURT:  Good morning, ladies and gentlemen.  I

3  trust you had no difficulty getting home last night, right?  I

4  hope.

5          Okay, we're going to continue with the final

6  arguments of counsel this morning, and later on I'll be

7  charging you on the law, and you're going to be deliberating

8  today, as I told you.

9          MR. MORAGHAN:  May I proceed, your Honor?

10          THE COURT:  Yes, please.

11          MR. MORAGHAN:  Thank you.

12          Good morning, ladies and gentlemen.

13          JURORS:  Good morning.

14          MR. MORAGHAN:  This long, strange trip is coming to

15  an end.  This case took significantly longer than any of us

16  anticipated, and I'm sure that that caused some issues for all

17  of you, and so on behalf of Mr. Bryant, we thank you for your

18  dedication, for your willingness to serve, to put up with the

19  delays and the inconveniences that we have caused you.

20          Now we're at the point in the case where you will be

21  asked to render a decision.  The Judge is going to instruct

22  you on the law, and you are the finders of the facts, and it's

23  your responsibility and obligation to apply the facts and the

24  laws to reach a decision in this case.

25          I'm not going to address a number of legal concepts.

1    The Judge is going to instruct you on that.  But I would ask

2    you to pay close attention to her instructions, and apply

3    those concepts to these facts.

4          In addition, this is an argument.  This is my chance

5    to speak with you.  If I say something that you don't believe

6    was in the testimony or that you don't agree with, it's your

7    recollection of what was testified to that controls, not mine.

8    So if I say something that you don't agree with or you don't

9    think is necessarily accurate, it is your recollection, and

10   your collective group recollection, that controls.  And if you

11   have questions about that, you can always ask the Court, by

12   way of a note, to have testimony clarified.

13         That being said, I'd like to bring you back to May

14   10th, 2011.  It appears that that was the beginning of this

15   case.  You've seen the video too many times, I think.  I'm not

16   going to play it for you this morning.  You certainly can have

17   it in the jury room, you can watch it if you have any

18   questions, but I think we've seen it enough that it's not

19   necessary to replay it today.

20         But the case didn't start on May 10th.  It did not

21   start on May 10th.  It started sometime prior to May 10th.

22   You heard the testimony of Kevin Wilson, I believe it was

23   yesterday, and he testified that he ran into confidential

24   witness 1 in a market some days before May 10th.  It was then,

25   at that time, that there was a discussion between them as to

1    securing an amount of crack cocaine.

2           So I don't want you to think that everything

3    occurred on May 10th, that there was a meeting in the market,

4    that calls were made, that cocaine was acquired, all within

5    that short period of time, because that's not accurate.  It

6    was over a period of days that this event on May 10th came

7    together.

8           You did see the video of the May 10th transaction,

9    and in that video was the first time that you were able to see

10   Kevin Wilson.  You've heard testimony that he was nervous,

11   that he was concerned, that he thought that he had made a

12   mistake.  That is really not portrayed in the video.

13          When he got into the car, first of all when he got

14   into the car, he got into the front seat.  Unfortunately,

15   that's a very common occurrence.  Why?  Because when a

16   transaction is going to take place, you don't want to call

17   attention to yourself.  So confidential informant 1 got out of

18   the front seat and got into the back seat.

19          Kevin Wilson got into the front seat.  Why?  You

20   don't want to be sitting in a car and handing things forward

21   to someone, or having the driver turn -- and the driver turn

22   around to receive the object.  The driver, the cousin of

23   confidential informant 1, was the person who was going to

24   receive the quantity of cocaine.

25          If they're turning around, if they're passing things

1   over the seat, that is an indication to a police officer that

2   something illegal is taking place, and that could have been

3   cause to call attention to what was taking place.

4          So the fact that Kevin Wilson got into the front

5   seat, there is nothing suspicious about that.  There is

6   nothing to indicate that that caused him to hesitate.  That

7   was a way of life for drug dealers because it's much easier to

8   pass things back and forth from one passenger to another

9   rather than reaching over the seat and calling attention to

10  yourself.

11         But you saw the videotape, you saw them driving.

12  Was Kevin Wilson nervous?  Was he concerned?  I don't think

13  it's depicted at all, either on the videotape or on the audio.

14  He was calm, he was cool, he was collected.

15         He talked about certain events when they drove by

16  the Dunkin' Donuts, he pointed out that was a place where a

17  young man had been shot in the head.  They talked among

18  themselves about mutual friends, people they knew, associates.

19  When they drove by I believe it was a park, they were talking

20  about the girls who were there, that's my word, that's not

21  Kevin Wilson's.  There is nothing at all to indicate that

22  there was anything out of the ordinary with regard to Kevin

23  Wilson.

24         Now, if I can backtrack for one second, this is more

25  of a housekeeping detail, if you want to look at the

1    videotape, unfortunately, as you know, the clock on the video

2    was not working.  We know from the audio portion of the tape

3    that it started at approximately 3:30.  An agent said that it

4    was 3:30, and that was the beginning of the tape.  So if you

5    have questions about various areas of the tape, you have to

6    look at the bottom of the computer screen, that will show how

7    long the tape ran, and you can put it together that way.

8         But Kevin Wilson got into the car.  They drove to

9    Judson Street.  If my recollection is correct, when Mr. Wilson

10   first testified concerning Judson Street, he said they went a

11   little bit past Judson Street.  They didn't stop in front of

12   Judson Street, they went by a little bit and passed by it a

13   bit, and then they parked.

14        He then got out of the car.  You see him getting out

15   of the car, and he left the video.  So we don't know what

16   happened by way of what was on the video.

17        Approximately four minutes later, Kevin Wilson

18   returned to the car.  He got into the car.  Now, he testified

19   that someone told him to get into the car.  That was his

20   testimony.  "Someone told me to get into the car."  You can

21   listen to the audio as many times as you want.  That is not on

22   the audio.  No one told him to get into the car.

23        You see both confidential 1 and confidential 2 on

24   the video.  You can see that neither one of them told him to

25   do anything.  I think that that was his way of trying to say

1    that made him nervous, but in fact that never occurred.

2         Yesterday, for the first time, the government showed

3    the video to Mr. Wilson and said, "Did someone wave you into

4    the car?"  And he didn't see it.  I didn't see it.  I don't

5    think it happened.  But again, you can look at the video and

6    see if anyone waved him into the car.  But I don't believe

7    that that is supported in any way on the video.  But that's

8    your determination.

9         He was in the car for a period of time, and again,

10   he was calm, he was cool, he was collected, he was in control.

11   What did he do?  He provided a bag of crack cocaine to the

12   driver of the car.  The driver of the car, being I think an

13   experienced drug person himself, started to handle it, started

14   to check it, wanted to make sure what he was paying for was

15   actually crack cocaine.

16        Now, confidential informant or witness, whatever you

17   want to call him, No. 1 in the back seat started to give him a

18   hard time, "Come on, come on, let's get going, let's get

19   going."

20        Who calmed that situation down?  Kevin Wilson.  He

21   said, "Wait a minute, he can do this.  One time I got stiffed,

22   I bought," I believe it was, "sheetrock.  He can check it out,

23   there's nothing wrong with that."  Kevin Wilson was in

24   control.

25        After that, he obtained the money and he exited the

```
 1    car.  Confidential witnesses drove off.  So we don't have any
 2    further knowledge of what happened with Kevin Wilson by way of
 3    the videotape.
 4         Kevin Wilson told two stories.  On his direct
 5    examination on day one, Kevin Wilson said he crossed the
 6    street, went down the driveway at Judson Street and met Philip
 7    Bryant in the backyard.  In the backyard, he provided Philip
 8    Bryant with the money for the crack cocaine, and they talked.
 9         On cross-examination a number of days later, he
10    changed his story.  And it may be a slight change, but it's a
11    significant change.  Now he said he got out of the car,
12    crossed the street, went to the backyard of Judson Street, and
13    went into the apartment building.  And inside the apartment
14    building, he met Philip Bryant, and it was there that the
15    exchange of money took place.
16         Now, you may think that that's a small detail.  It's
17    a significant detail.  Was this alleged meeting outside in the
18    backyard, as he originally testified to?  Or why was it, a
19    couple of days later in his testimony, inside the apartment in
20    a hallway?  That should raise a question to you about Kevin
21    Wilson and his recollection of the events.
22         Now, the government has attempted to show that
23    Philip Bryant was involved, because there were a number of
24    telephone calls between Philip Bryant, a phone subscribed to
25    Philip Bryant, that Philip Bryant used, and Kevin Wilson.
```

1   You'll see on those records, which I think are Defendant's

2   Exhibit BB, during the course of May 10th, there were, I

3   believe, approximately 370 calls made to Kevin Wilson's phone.

4   If you look at the phone, Philip Bryant was not the only

5   number, the 3420 number of Philip Bryant was not the only

6   number, to repeatedly call Kevin Wilson.  There are a number

7   of other calls both to Kevin Wilson and from Kevin Wilson on

8   that day.

9        The fact that there are a number of calls does not

10  corroborate or support anything that Kevin Wilson said

11  concerning that event.  In his cross-examination, Kevin Wilson

12  admitted that he and Philip Bryant had been friends, had been

13  friends since middle school, a number of years.

14        He testified that there could be a day they talked

15  once, there were days they wouldn't talk at all, there were

16  days there were multiple phone calls.  It was not out of the

17  ordinary for them to have multiple phone conversations in a

18  day.  And they would talk about food, they would talk about

19  family, they would talk about events in the neighborhood,

20  they'd talk about video games, they would talk about sharing

21  movies.  All conversations that friends would have with

22  friends.

23        So we have nothing to support Kevin Wilson's version

24  of Philip Bryant's involvement, other than Kevin Wilson

25  himself.

1          Now, Special Agent Zuk of the Federal Bureau of

2     Investigation was called as an expert witness in this case,

3     and he talked about the necessity of corroboration.  That

4     corroboration is so vitally important in an investigation.  If

5     they can't corroborate something, it's of dubious value.

6          The only corroboration in this case is Kevin Wilson

7     telling you that something occurred.  How do you know that it

8     occurred?  Because Kevin Wilson has told you.  It's

9     self-corroboration.  It is of absolutely limited or no value,

10    given what you know about Kevin Wilson.

11         Kevin Wilson testified that the May 10th event was

12    his first personal drug transaction, the first transaction

13    that he was personally involved with, since he had been

14    released from prison in June the previous year.  He did

15    testify that he middle manned some deals, that he had sources

16    of supply that were not Philip Bryant, but that he was getting

17    back in the game.

18         You're going to make decisions based upon Kevin

19    Wilson and what he has testified to.  If I can go back to his

20    State of Connecticut problems, you know he was convicted of

21    multiple felonies.  You know that he was on release during the

22    pendency of this whole May 10th endeavor.  When he was

23    arrested by the State of Connecticut for sale of narcotics, he

24    was brought into the state court, he was released on bond, and

25    what did he do?  He went right back to selling crack cocaine.

1           But he wants you to believe that from June of 2010

2    to May of 2011, he didn't do any of that.  I don't think

3    that's consistent with the Kevin Wilson that we got to know on

4    the witness stand.  But again, that is something that you will

5    consider when you are determining what credence at all to give

6    to Mr. Wilson.

7           He had sources of supply prior to May 10th.  He

8    testified to that.  He testified that his source of supplies

9    from New York, which were Mr. De Los Santos and P'Dilla, would

10   not do this transaction.  He didn't know why.

11          You also heard testimony that when the wiretap was

12   up in July of 2011, that Mr. Wilson was off already seriously

13   in debt to De Los Santos and P'Dilla.  Clearly it's an

14   indication that Kevin Wilson did not change his way of living,

15   that he was involved in narcotics transactions, and that he

16   had sources of supply, other than Philip Bryant.

17          Now, I raised issues relative to other individuals

18   who were living at the Judson Street apartment, and I talked

19   to him about Vincent Clark.  You know that Vincent Clark was

20   his partner later on, that Vincent Clark was the individual

21   who cooked his cocaine for him.  There is also Mr. Hines who

22   was a crack dealer, Quiyon Reid who was a drug dealer, any one

23   of which could have provided him with the substance that was

24   sold on that day.  And it could have been someone entirely

25   separate.  It could have been a source of supply that to this

1    day, he's still trying to protect.  I don't know, that's

2    something for you to think about in your deliberations.

3         The fact that there is only one telephone call from

4    Mr. Hines on May 10th and no telephone calls from either Mr.

5    Clark or Mr. Reid really is meaningless.  They were there,

6    they were living there.

7         There's no reason to conclude that every transaction

8    is based upon a telephone call.  There can be face-to-face

9    conversations, there can be face-to-face meetings.  If there

10   is a joint place where people are gathering, you can just talk

11   there.  It does not have to be done through a telephone call.

12   So the fact that there's no call from Clark or no call from

13   Reid really is something to consider, but I don't think that

14   it is at all significant.

15        After that date, we have another sale that was done

16   by Kevin Wilson.  It was another sale that was conducted at

17   Judson Street.  It was a June 29th sale.  That sale was one of

18   the events that Mr. Wilson stipulated to in his plea

19   agreement, I believe it's Exhibit 202 but you'll have a list

20   of it.

21        At the end of the plea agreement, there's a

22   stipulation, and he agrees that he sold crack cocaine on May

23   10th, he agrees that he sold crack cocaine on June 29th, but

24   he had absolutely no recollection of anything concerning June

25   29th.  He didn't know if he sold to a man or a woman, he

1   didn't know anything about the details.  In fact, he didn't

2   even know where he got his crack cocaine from.

3        When I showed him the police report, when it

4   indicates that an individual in a white Nissan Altima pulled

5   up to Judson Street, got out of the car and gave him the crack

6   cocaine, he still had no recollection of it.

7        How can someone have absolutely no recollection of

8   an event on June 29th, have such clear recollection of what

9   happened a month before on May 10th?  Again, I think that that

10  raises significant questions about Mr. Wilson and his

11  testimony to you.

12       The Judge, during the course of her instructions, is

13  going to instruct you on a buyer/seller situation and will

14  instruct you that a single sale does not constitute an

15  agreement to enter into a conspiracy.

16       Now, without conceding that Philip Bryant had any

17  part in that May 10th sale, I'm now going to ask you, what if

18  he did?  Because if he did, it is clear that it's a one-time

19  event, and it was a complete buyer/seller arrangement.

20       I think that -- and the Judge will instruct you on

21  factors to consider when dealing with a buyer/seller

22  situation:  Whether the parties had a continuing relationship;

23  whether there was a common goal among the parties to advance a

24  conspiracy's interests; the established method of payment;

25  whether they had a standardized way of doing business; whether

1    the seller had a financial stake in the sale to the buyer.

2          Kevin Wilson and Philip Bryant had no continuing

3    relationship with regard to crack cocaine or powder cocaine.

4    They had no relationship whatsoever regarding crack cocaine or

5    powder cocaine.  How do we know this?  Kevin Wilson testified

6    to that.  Kevin Wilson testified that Philip Bryant had his

7    own separate business; that his source of supply was an uncle

8    known as Deuce Mont.  Deuce Mont was in no way involved with

9    Kevin Wilson, Kevin Wilson does not really know him, does not

10   know his true name, does not know where he lives, knows

11   absolutely nothing about him.

12         What did Kevin Wilson testify to?  He never supplied

13   Philip Bryant with crack cocaine or powder cocaine in May,

14   June, July, August, September, October, November, December, up

15   until the time he was arrested.  Kevin Wilson never supplied

16   Philip Bryant with crack cocaine.

17         He also testified he never supplied Philip Bryant

18   with powder cocaine during that same time frame.  He never had

19   a single transaction involving cocaine or crack cocaine

20   involving Philip Bryant.

21         He also testified that Philip Bryant never provided

22   him with crack cocaine during that lengthy period of time,

23   from May 11th -- May 2011 through January of 2012.  He never

24   received crack cocaine from Philip Bryant.  He never received

25   crack cocaine -- powder cocaine from Philip Bryant.  He never

received crack cocaine from Deuce Mont, he never received

powder cocaine from Deuce Mont.  They're a separate, distinct

operation.  Separate, distinct, and apart from Kevin Wilson.

They were friends.  That friendship continued.  But

there's a difference between a continuing relationship of

friendship and a continuing relationship concerning the sale

and distribution of narcotics.  And during this time, there

was no continuing relationship between Wilson and Philip

Bryant concerning the distribution of narcotics.

Was there a common goal among the parties to advance

a conspiracy?  Absolutely not.  It was a one-shot, one-deal

situation.  Philip Bryant had his own business.  It was

separate and apart.  The businesses never merged.  They never

came together.  They never agreed to do anything, other than

this May 10th event.

In fact, some could argue that Philip Bryant helping

a friend, in effect, long-term damaged his own business,

because now he's helping a competitor get started.  That is

adverse to Philip Bryant's interest.  But he did it to assist

a friend.  But there was no common goal among them.

As far as the established method of payment, were

the drugs fronted?  Were they delivered on credit?  Or was

payment made immediately?  If you're going to front the drugs,

then you have an interest in that situation.  You have to make

sure that that situation's working because you want to make

 1   sure you're being paid.  Fronting, or crediting, would

 2   certainly be an example of a continuing interest in a

 3   transaction.

 4          In this case, Kevin Wilson immediately turned the

 5   money over to Philip Bryant.  Immediately turned the money

 6   over to Philip Bryant.  He didn't get anything on credit.  He

 7   didn't get anything fronted to him.  It was an immediate

 8   payment.  Again, clearly an indication of a one-time

 9   buyer/seller relationship.

10          Did they have a standardized method of business, a

11   standardized way of doing business over time?  No, because, as

12   Kevin Wilson testified, there was no business relationship.

13   They never worked together, as far as crack cocaine or powder

14   cocaine.  So there was no standardized way of doing business,

15   because this was the only time they did transact business

16   concerning crack cocaine and powder cocaine.

17          And finally, did the seller have a financial stake

18   in the resales by the buyer?  No.  No, he didn't.  All he

19   wanted was a one-time payment of the money due for the ounce

20   that was transacted.  He had no interest down the road in what

21   it was sold for, what it was done, on how it was distributed.

22   He had no interest at all in what happened to that substance

23   after this took place.  So again, the Judge is going to

24   instruct you on this issue.

25          You know the facts of this case.  You can apply the

1   facts of this case, and I think that if you do, you will have

2   to conclude that that May 10th, 2011, transaction was a

3   one-time buyer/seller relationship and is outside of the

4   charge of conspiracy that has been levied against Mr. Bryant.

5          There's another issue that I want to go back to, and

6   quite honestly I missed it.  We talked about the phone

7   records, and what they show.  Again, Wilson changed his story

8   about where the sale -- where the meeting took place, in the

9   yard, in the hallway.

10          What he was sure of was he was with Philip Bryant

11  and he was talking to Philip Bryant and that he called the

12  confidential witness.  I'm not sure what the purpose of that

13  call was, if he's going to ask him if he was a snitch or a

14  police informant, I don't think the cooperator would tell him

15  that.  But he did in fact make a call, and I believe he

16  testified that it was when he was with Philip Bryant.

17          The problem is that call was made at 4:10.  At 4:09,

18  Kevin Wilson received a phone call from the 3420 number

19  attributed to Philip Bryant.  So at 4:09, he's getting a call

20  from Philip Bryant.  And you can see the records, the call is

21  about 150 seconds, so as you saw from the chart, I'm very bad

22  at math, it's two minutes and 30 seconds.  If Philip Bryant is

23  with him, why this phone call?

24          I've seen a cellular phone commercial where you have

25  a family of four sitting at the dining room table and they're

1    all talking to each other on a cell phone.  That's pretty

2    funny.  That's not what happened here.

3            I think that's clear evidence that Philip Bryant was

4    not at Judson Street.  He was not outside in the yard.  He was

5    not in the hallway.  He was not there.  But it's also an

6    indication of how you have to evaluate the testimony of Kevin

7    Wilson.

8            Another indication that there was no conspiracy

9    agreement between Philip Bryant and Kevin Wilson can be found

10   in what happened after Vincent Clark robbed -- stole -- from

11   Kevin Wilson.  He didn't rob, I apologize, he stole from Kevin

12   Wilson.

13           Vincent Clark was his chef.  He was the guy that

14   cooked the crack cocaine.  Kevin Wilson testified on many

15   occasions in this trial, I think he was consistent, that all

16   of the powder cocaine that he got from New York, all the

17   powder cocaine he got from De Los Santos and P'Dilla, was

18   converted into crack cocaine, and that was his business.

19           When he and Clark split, he could no longer

20   distribute crack cocaine.  He didn't know how to cook it.  He

21   didn't know what to do.  He contacted a couple of people to

22   try and keep that situation going.

23           Who didn't he call?  He didn't call Philip Bryant.

24   He didn't talk to Philip Bryant.  He didn't say to Philip

25   Bryant:  "Listen, I lost my cook.  I've got sources of supply,

1    can we meet?  Can we get together?  Can we work together?  Can

2    you bring me in with Deuce Mont?"

3          He never did.  And why not?  He testified that the

4    only thing he could bring to the table was a source of supply,

5    and he testified that Philip Bryant already had a source of

6    supply, that Philip Bryant didn't need him.  So he didn't even

7    call him.

8          Clearly, there was no agreement between Bryant and

9    Wilson regarding the distribution of crack cocaine or powder

10   cocaine, and I think you can make that finding based entirely

11   on the testimony of Kevin Wilson.

12         The Court is also going to instruct you on multiple

13   conspiracies, and this is a textbook example of multiple

14   conspiracies.  You have Kevin Wilson, Johnny De Los Santos,

15   P'Dilla, Clark, and they have a large cocaine distribution

16   network.

17         By his own testimony, by his statements to law

18   enforcement, there were four separate proffers when Kevin

19   Wilson said, "Deuce Mont was the source of supply for Philip

20   Bryant, I didn't supply him."

21         So you have the Wilson conspiracy here, you have

22   Philip Bryant and Deuce Mont here.  Two separate, distinct

23   conspiracies, both selling crack cocaine, but there's no

24   union.  There's no commonality.  There's no midpoint.  They

25   are not aligned together.  They are separate and distinct

```
 1   conspiracies.

 2          And the Court will instruct you on multiple

 3   conspiracies and how you should handle that, but it's very

 4   important to remember there were two separate conspiracies.

 5          Now, after Clark left, or after Clark and Mr. Wilson

 6   separated, Wilson testified he could no longer do the crack

 7   cocaine.  It just wasn't working out.  So at some point, his

 8   conspiracy changed.  He became a different entity.  He focused

 9   entirely on heroin.

10          I would submit to you, ladies and gentlemen, that is

11   a third conspiracy in this case:  One involving crack cocaine

12   with Wilson, Clark, and that group; one involving Philip

13   Bryant and Deuce Mont; and a third new conspiracy involving

14   heroin, a separate and distinct conspiracy, involving Wilson,

15   involving heroin.

16          And it's important to keep that in mind, because

17   it's an issue that you're going to have to ask is:  Do these

18   conspiracies exist?  Who was a member of them?  And most

19   importantly, when did an individual join the conspiracy?  And

20   we'll talk about that in a bit.

21          Before we get to that, the government yesterday

22   talked about the 28-gram threshold.  They're asking you to

23   make a finding that Philip Bryant was involved in 28 grams or

24   more of crack cocaine.

25          Well, the May 10th sale did not rise to the level of
```

1    28 grams.  You heard the testimony of the chemist.  You have

2    the exhibit.  I think it's Exhibit 231, I could be wrong, but

3    you have a laboratory exhibit which clearly shows the amount,

4    it was 26.2 grams, less than the 28-gram amount that the

5    government is trying to reach.  And they're racing to get to

6    that and they're presenting arguments to you on how you can

7    find 28 grams.

8           First of all, it has to be proven beyond a

9    reasonable doubt, okay?  But let's look at what they offered

10   you yesterday.  Kevin Wilson testified that Philip Bryant was

11   a crack cocaine dealer.  He testified to that, because Philip

12   had money, he had clothes.  And Wilson testified, "I saw him

13   with a number of eight balls."  And because of that, Wilson

14   decided to ask Philip Bryant to assist him on May 10th.

15          Well, if that is true, all that predates any

16   agreement between Philip Bryant and Kevin Wilson.  It's

17   outside of any agreement that Kevin Wilson and Philip Bryant

18   allegedly made.  Because it's outside of the time frame of the

19   agreement, you cannot consider that.

20          Even if it's true, and I am not in any way conceding

21   that it is true, it is outside the time frame.  Wilson says he

22   saw that, and he used that as his basis to go and talk to

23   Philip Bryant about doing the event on May 10th.  So it was

24   not part of their agreement.  If it's not part of their

25   agreement, you can't use that.

1          Secondly, Kevin Wilson testified that there was,

2    there were, two separate sales that Philip Bryant conducted:

3    One was, I believe he said it was, a dime or dub sale to

4    someone on the street.  Kevin Wilson testified he was just in

5    the car.  It was fortuitous he was in the car.  He had no part

6    in it.  He didn't provide any substance or money to Philip

7    Bryant.  He didn't receive anything from the sale.  He simply

8    was there as a friend in the car who happened to see something

9    take place.

10          So if a dime, which is a $10 bag as I understand it,

11    or a dub, which is a $20 bag, was exchanged, what does that

12    tell you?  It tells you nothing, because there was no

13    testimony or evidence introduced to tell you what the weight

14    is of a dime or a dub.

15          Now, we went through weights, and I made a mess of

16    it with that board.  We went through weights on heroin, okay?

17    We know that a bag of heroin is approximately .003 percent

18    heroin.  We know that a bundle, using Special Agent Zuk's

19    numbers, a bundle is approximately a third of a gram of

20    heroin.  We know from Agent Zuk that three bundles is a little

21    over a gram of heroin.

22          Using Kevin Wilson's number it's a little bit less,

23    but we went through that meticulously, and, you know, as best

24    you can, what is contained in a bag of heroin, in a bundle of

25    heroin, and a brick of heroin.

1          We did not do that with cocaine.  There was no

2     evidence produced concerning the weight of the small street-

3     level amounts of cocaine.  There was a lot of discussion about

4     eight balls.  We know an eight ball is 3.5 grams.  We know if

5     someone is ordering a seven, they're asking for seven grams.

6     They went up in the numbers.  They told you about an ounce, I

7     believe there was evidence about a ten or a twelve, but they

8     started with the eight ball and they never went down.

9          So even if you believe Kevin Wilson when he

10    testified that he observed a sale from Philip Bryant to

11    another person, we don't know the weight.  We don't know the

12    quantity.  We don't know what was inside of that bag.  And you

13    cannot use that to reach the 28-gram threshold.

14         There was a second sale that Kevin Wilson testified

15    to, and again, he was a passenger in a car, no interest in

16    this.  Again, he was just there and observed it, but it was

17    not anything to do with him or his business.  He thought that

18    there was a transaction of an eight ball, but he wasn't sure.

19         Now, he did testify that an eight ball can be crack

20    cocaine or an eight ball can be powder cocaine.  He thought

21    that this may have been crack cocaine, but he was not sure.

22    He could not say it was not powder cocaine.  He never touched

23    it, he never saw it, he never looked inside the bag.  So he's

24    guessing.  "I think it was crack, but I'm not sure."

25         Well, you have to make findings based upon

1    reasonable doubt, beyond a reasonable doubt.  And if Kevin

2    Wilson was not sure what was in that bag -- whether it was an

3    eight ball, whether it was crack, whether it was powder -- you

4    cannot make the necessary findings to get to the 28-gram

5    limit.

6           So for those reasons alone, if you make a decision

7    concerning the quantity in this case, the answer must be no.

8           And if you find that it was a separate conspiracy

9    involving Deuce Mont and Philip Bryant, with no connection to

10   Kevin Wilson's crack conspiracy, again, you would have to

11   answer no, because they're separate and distinct conspiracies.

12          When you receive the exhibits in this case, you will

13   see that there are -- I believe the list has been pared down.

14   I think there are roughly 153 telephone calls that have been

15   submitted by the government as evidence in this case.

16          Of those telephone calls, approximately 25 are

17   attributed to Philip Bryant, Exhibit 89 through Exhibit 114.

18   Of those 25 calls, I believe nine, which is about 40 percent,

19   are related to firearms.  Why do we have phone calls between

20   Kevin Wilson and Philip Bryant relating to firearms?  Philip

21   Bryant is not charged as a felon in possession.  Philip Bryant

22   is not charged with possessing a weapon to facilitate a drug

23   transaction.

24          The government claims that because of the

25   relationship at Judson Street, because guns were shared, that

that is an indication that there was such a close, personal

bond that that supports a finding that Kevin Wilson and Philip

Bryant entered into a conspiracy.  I strongly disagree with

that.

I don't think any of us know what it is like to have

been living in the inner city of New Haven in 2010 or 2011 or

even today.  It's a different environment than what I know.

Guns are a way of life.  Everyone seems to have a gun.  Things

happen so cavalierly there.  People are shot, move on to the

next day.

Kevin Wilson always had a gun.  Kevin Wilson would

shoot first and ask questions later.  It was not a good place,

and everyone had to have a gun.  That was their tool.  That's

what they used.  That was in their every day, common life.

It's as in my life, my neighbor borrows a saw or

sporting goods, that doesn't mean I have a close personal

intimate relationship with that person.  It's just neighborly.

Unfortunately, in that environment, in that

location, that's what guns were.  That is absolutely no proof

whatsoever that those firearms were in any way indicative of a

conspiracy agreement between Mr. Bryant and Mr. Wilson.

With regard to conversations that the government has

played concerning Philip Bryant and heroin, first of all, I

just want to emphasize again, I think the evidence is

absolutely crystal clear that Kevin Wilson started out as a

1    crack dealer.  After the incident with Clark, he changed his

2    operation to strictly heroin.  So that is conspiracy number

3    three.

4            What you have is a limited number of conversations

5    between Kevin Wilson and Philip Bryant concerning heroin.

6    They're limited in number, they're irregular, there's a lot of

7    confusion.  Orders are confused and misplaced.

8            It's clear I think, if you listen to the calls, that

9    Philip Bryant was acting as a middle man to assist a friend.

10   Didn't appear that he was recruiting people or assisting

11   people.  He was just, as Kevin Wilson was before May 10th, he

12   was a middle man.

13           I don't believe that those calls show that Philip

14   Bryant joined Kevin Wilson's heroin conspiracy.  But again, if

15   he did, I think that that precludes any findings relative to

16   the crack cocaine and the powder cocaine that we've already

17   discussed.

18           And finally, with respect to the issue of powder

19   cocaine --

20           Am I getting close to time?

21           With respect to powder cocaine, Kevin Wilson

22   testified he was not involved in powder cocaine.  What he did

23   was convert it into crack.

24           The government, I believe, played you Exhibit 100,

25   which is a conversation between Philip Bryant and Kevin

1    Wilson.  And what are the contents of that conversation?

2    Philip Bryant says, "We were talking about ping."  Kevin

3    Wilson told you ping is powder cocaine.  He said, "This shit

4    is wild, this stuff is going through the neighborhood, it's

5    going outside the neighborhood."  He was doing very well

6    selling powder cocaine.

7         Just because he discussed it with Kevin Wilson

8    doesn't mean they were in an agreement.  There was no

9    agreement.  They were two rival businessmen talking about

10   their respective products, and that does not cause or complete

11   the government's burden of proving that there was a conspiracy

12   involving powder cocaine.

13        Kevin Wilson had nothing to do with powder cocaine.

14   Kevin Wilson didn't plead to powder cocaine.  Powder cocaine

15   should not be in this case at all.

16        The Judge is going to instruct you on reasonable

17   doubt, and basically, what the Court tells you is what you

18   should rely on, but I think it would be something along the

19   lines of:  It is a doubt that would cause a reasonable person

20   to hesitate to act in a matter of importance in his or her

21   personal life.

22        There are so many questions in this case.  What

23   happened on May 10th?  How many conspiracies are there?  What

24   was being sold?  Was it a buyer/seller?  Were there multiple

25   conspiracies?  You can reach those answers from the evidence

1   you've heard from the witnesses, and from the exhibits, and

2   I'm confident that after you do that, you will enter a verdict

3   of not guilty for Philip Bryant.

4         Thank you very much.

5         MR. REEVE:  This is a case in which the government

6   charged Robert Santos with the wrong crime.  They charged him

7   with one crime, and it was the wrong one.

8         I told you when I first spoke to you on opening

9   statement, there was no dispute that Robert Santos received

10  drugs from Kevin Wilson.  I told you that there was no dispute

11  that Robert Santos received distributable quantities of heroin

12  from Kevin Wilson.  He committed crimes in doing that.

13        He possessed heroin, and the government could have

14  charged him with that.  He possessed enough that they could

15  have charged him with possession with intent to distribute

16  heroin.  But they chose not to do that.

17        What really happened in this case, and this is what

18  we're going to talk about for the next hour or so, is that

19  Robert Santos saw an easy mark.  He knew the game.  He knew

20  the business.  He saw somebody who was easy to take advantage

21  of, and he did it.

22        There was no relationship of trust to begin.  He had

23  to play him.  He had to set him up for the sting, and that's

24  what he did.  Does he deserve a medal for that?  Absolutely

25  not.  Is it something that any of us think is good?  No, it's

1    not.  But it does not make him guilty of a conspiracy.

2          You already know, but you will hear it again in Mr.

3    Vatti's closing, we are ships passing in the night.  The

4    government has a version of this case.

5          And you know what?  I want to just say from the

6    outset what I said from day one, these are honorable men.  All

7    three of these people, hard working, honorable men.  They're

8    wrong, but they're honorable.

9          I'm going to back up just for a minute, too, and

10   tell you, I know you have been here a long time.  You don't

11   know this, but I'm going to tell you:  You are privileged,

12   despite all the hardships in this case, to have had five very,

13   very good attorneys try this case before you.

14         And I know we have tried the patience of some of you

15   sometimes.  I know that there are some of you who thought, why

16   do we have to go through a week of hearing testimony from

17   Kevin Wilson?  Well, you know what?  I'm not going to

18   apologize for that in any way, because they diligently tried

19   to tell their story.

20         They only told half of it, and we're going to get to

21   the second half, but they tried hard to present their story in

22   a complete and a thorough and a convincing way, and that's

23   their job, and they're good at their job.

24         And my job is to fight them every inch of the way,

25   and I try to be good at that job.  And if we don't have that

1    in this courtroom, there cannot be justice.  If it's not a

2    fair fight, what happens?  We all know.  These three men here,

3    they all have the right to present fully their defense to you,

4    and that's what happened in this courtroom.  And just take it

5    on faith, it doesn't happen every day in every courtroom in

6    this country, or even in this courtroom.

7          And so I know this has been a burden, but I'm asking

8    you to count your blessings in terms of what's happened in

9    this courtroom.

10         And you know what?  I'm just going to say this at

11   the outset.  I really wanted to get up and not come up with a

12   piece of paper, but I can't do it.  It's too important.  I

13   applaud Attorney Silverman for his ability to come up here

14   without a piece of paper and go through all this.  Maybe it's

15   because I'm old.  I can't, I can't do what he did.  So yes,

16   I'm going to rely on my notes, because what we're talking

17   about is serious, serious business.

18         And if there's one thing that is crystal clear in

19   this case it's that people's liberties and lives are on the

20   line.  We ask an extraordinary amount of every single one of

21   you, and I'm going to talk about that a little bit more at

22   length.

23         But you know what?  Let me just say, what you are

24   deciding is not easy.  You might have thought when you heard

25   the government's evidence, huh, well, drugs, guns -- which, by

1   the way, have nothing to do with my client who has to sit here

2   through all that evidence, doesn't have anything to do with

3   him.  Cocaine doesn't have anything to do with him.  All this

4   evidence comes in.  You know, you might well have thought, and

5   based on some of the expressions, why in the world are we

6   here?  What in God's name is going on?  And we're telling you

7   why you're here.

8           So let's go a bit further.  So the ships pass in the

9   night.  The government's going to tell you when they stand up

10  that I'm speculating.  That there's not sufficient evidence in

11  this case to establish the version that we're about to talk

12  about.  But you know what?  They're actually the ones who are

13  speculating.

14          They're the ones who are saying:  Well, you know

15  what?  It's true that Mr. Wilson doesn't have any memory and

16  can't really tell you what the quantities.  But yes, it's

17  okay, yes, you can guess.  You can just kind of, you know,

18  throw it all together, come up in a mix, tie it up in a bow,

19  and say guilty.  You could do that.  But they're the

20  speculators, not me.  Them.

21          My position is you heard what happened in this case

22  from the mouth of Kevin Wilson, and it was corroborated on the

23  tapes.

24          Their version is:  Come on, we don't even really

25  know if there was a rip off, and they were all going to sail

1    off into the sunset right around, right after, Christmas.

2              Well, if you believe that, I have a bridge for sale.

3              There is a fatal flaw in the government's case, and

4    you all know what it is.  It's all, it's percolating in the

5    back of your heads.  You all know what it is, and Mr. Wilson

6    told you.

7              This is a case where the government says:  Well, you

8    know what?  What's the corroboration of Kevin Wilson?  Okay,

9    we understand, he comes in with a boatload of baggage and

10   problems, and he's not the most credible person in the world.

11             I'm not going to talk to you about Kevin Wilson.  We

12   know Kevin Wilson.  Is he somebody you would rely on in your

13   every day affairs?  No.  Okay, so now let's move on behind

14   that.

15             They say aha, but look at the tapes, listen to the

16   calls.  See?  See what we got here?  Listen to these calls.

17             Well, there's four things that Kevin Wilson told

18   you, and you all remember what they were:  Number one, I lied

19   to my customers.  Number two, I lied to my sources of supply.

20   Number three, my customers lied to me.  Number four, my

21   sources of supply lied to me.

22             And we had a great example of that yesterday.  Do

23   you remember I asked about the Nu-Nu story, we had so many

24   versions, and I thought maybe, finally, at last, at long last,

25   we've gotten to the real story about him breaking in and, you

1    know, Mr. Clark had gotten in his apartment, he had gotten

2    keys and Mr. Wilson, you know, he broke into Mr. Clark's

3    apartment and he stole a gun and counterfeit money and a great

4    big large-screen TV.  That's what he said.  That's what he

5    told Na-Na, his source.  That's what he told him.  And you

6    know what?  What does he tell us yesterday?  He stands here

7    and he says that was all BS.  "I was just making that up so I

8    didn't look dumb."  What does that tell you about what you can

9    rely on these calls?  Who are the speculators in this case?

10        Let's talk for a minute about why this case is here

11   as a conspiracy case.  Government says you should apply your

12   common sense, and I agree.  I agree.  Think about this case.

13   There's at least three very, very good reasons why, with

14   respect to Robert Santos, they charged him with a conspiracy:

15   Number one, because they don't have any other evidence.

16        Do they have hand-to-hand sales, like they do with

17   Mr. Wilson?  No.  Do they have any observations that he

18   actually was selling drugs at anytime?  No.  Did they ever

19   seize anything from Robert Santos that was in any way

20   drug-related?  No.  So that's reason number one.

21        The second reason is, this won't come as a surprise

22   to you, it's easy.  It's easy.  What do they have to prove?

23   An agreement.  They don't even have to prove an overt act.

24   They don't have to prove that anybody did anything.  That's

25   what the Judge is going to tell you.  She's going to say that

 1    there are two elements, one is the existence of a conspiracy

 2    and the second is membership, the entry of these individuals,

 3    and you have to consider their cases separately, I'm begging

 4    you consider the cases separately.  You got to consider

 5    whether they ever became a member of the conspiracy.  That's

 6    it.

 7            And the third, if you conclude -- but only if you

 8    conclude -- those two beyond a reasonable doubt, then and only

 9    then do you consider the quantity issue, okay?  So that's what

10    you're going to find out.  So it's easy.  That's why it's

11    referred to in the cases as the darling of prosecutors, or

12    sometimes it's referred to as the quiver -- I've forgotten the

13    term -- the nest of the government's power, okay?  It's easy.

14            But in this case, it was essential, and that's the

15    most important thing that I want to talk to you about.  They

16    had to do it.  Think about this.  You all have heard a sliver

17    of, 120th of, the phone calls in this case.  Do you remember?

18    There's 20 phone taps on a total of ten different people.  20

19    different cell phones that were tapped over this period of

20    time.  In this case, we have 10,000 sessions.

21            Remember we had those conversations about sessions,

22    and I think we all get that.  And we had -- I'm sorry, I might

23    have misspoke then.  7,000 I think is the right word.  And out

24    of those, my recollection, I think Agent Ndrenika said over a

25    thousand, what they labeled, pertinent calls.  So if you

1    multiply that by 20, you're at millions of calls that the

2    government intercepted.  Millions.  Literally, millions.

3         You heard Agent Zuk say, "Well, in the best of all

4    worlds, I like to listen to every single call."  Well, you

5    know what?  Agent Ndrenika put in a lot of hours, a lot of

6    overtime, but I'm guaranteeing you he didn't listen to a

7    million calls.

8         And how many of those are pertinent?  If you

9    multiply what was pertinent here times 20, an astronomical

10   amount.  These guys, in five indictments, this is a massive

11   case.  You've only got three people here, but this case is

12   huge.

13        What do you do as a prosecutor?  You wrap it up, you

14   tie it up, you put a little ribbon around it, you put the bow

15   on top.  You put it in a nice little gift wrapped package

16   before the grand jury, and you call it a conspiracy.  That's

17   what you do.  Because they don't just have this case; they got

18   the four others.  They're hard working, but they're not

19   supermen.

20        What can you do?  If we brought individual charges,

21   if we went out and developed the evidence like we did against

22   Mr. Wilson with respect to everybody, you know, with 105

23   people, how many undisputed buys would they have to make?

24   What would the cost of that be?  How much government money?

25        So aha, we'll just call it an agreement and in this

case, we'll say there are 47 people and they were all part of the same agreement, they all were on the same page, they all did the same thing.  It's one, it's one little nice, happy, family package.  One agreement, 47 people.

It's kind of like, that's a little bit of a reverse of Heinz 59 varieties or whatever it is.  You understand what I'm saying.  You guys get it.  You get it.  They had to do it this way because they didn't have any other way out.  Because they would be spending the next ten years in courtrooms in this federal system, trying people one by one by one.  So we lump them all together.

Let's throw them all in a heap.  We'll throw all these people in a heap and we'll say, you know, this is fair, and we'll ask the jury, we'll introduce evidence of guns and we'll say:  Ladies and gentlemen, you know, you know all that gun stuff you heard, well, don't consider that against Mr. Santos.

Well, you know what?  We expect a lot from you, but we don't have any illusions that every one of you is like mentally Houdini.  How can you do that?  That would be like me asking you to forget that the video screen -- you remember that big video screen that came down, and it fell on Mr. Santos's head, that would be like, that would be like me saying to you, you know, it would be like me expecting all of you not to have even noticed that.  Just to have, just your

1    focus on the evidence.  You can't.  You can't do that.

2         So obviously, we don't expect that.  You're not

3    super human, we're not super human.  What we ask you is if

4    you're talking about things -- this is a silly example but

5    you're going to be in the jury room.  Let's say someone on the

6    jury says, "You know what?  I think the fact that Mr. Santos

7    got hit with that screen, that's enough punishment.  Let's

8    find him not guilty."  Now, we'd never know if you did that.

9    I think we have a fairly safe feeling that you're not going to

10   do that, but you could do that.  You could do that.

11        But would it be applying the law?  No.  So if

12   somebody raises, "Well, geez, look it, all these guns, this

13   terrible picture, we can't let anybody be found not guilty,

14   because this is a mess."  And it is a mess, what's gone in

15   this case is terrible.  The language is terrible, the actions

16   are terrible.  I make no apologies for any of that, because

17   there's no apology for it.  It's wrong.  It's wrong.  It's

18   totally wrong.  But that's not the issue.

19        So when you go back in the jury room, what we're

20   really saying to you is if somebody says, "Well, gee, I know

21   what the Judge said, I know the Judge told us that we're not

22   supposed to hold it against Mr. Santos that he didn't

23   testify," what we're hoping, what we're begging, what we're

24   asking, what we're pleading with you, is that the other people

25   in that room say:  "We can't do that, because that would be

1    wrong.  That would be violating our oath as jurors and we're

2    not going to do that."

3            So now let's get back on point.  That's what we're

4    trying to get you to do.  You know what?  If you don't share

5    in the jury room your honest concerns about this case,

6    everybody loses.  Everybody.  You have got, you have got to

7    raise everything that's on your mind.  Take what I'm saying

8    apart.  Take what the government says apart.

9            And you know what?  I know there's a storm coming

10   tomorrow, and I know that you've been here a long time, and I

11   know, if I were in your position, I might be just saying,

12   "Let's just get this done and get out of here."

13           I can't urge you enough, don't leave stones

14   unturned.  You owe it to the government, you owe it to the

15   Judge, and from my perspective representing individuals for

16   all my life, this is what I've done, representing individuals

17   against the forces of government, which I also, by the way, I

18   know defense lawyers are maligned and how can you represent

19   people and all that stuff, I'm proud of what I do, and I make

20   no apologies for what I do.

21           And you know what?  I have always felt when I

22   represent an individual here, I represent any, every,

23   individual in this courtroom, and I represent every individual

24   that's part of our society, and what I do for them, I do for

25   you.

1          And so I'm begging you, no rushes to judgment.  Too

2    serious.  Too important.  If you don't get done today, and

3    there's a terrible storm, come back the day after.  If you

4    can't get here -- we made you travel through the snow.  If

5    it's a terrible day tomorrow, we're not going to do that.  We

6    so much appreciate all the sacrifices you make, but now you

7    owe it to yourselves to finish the job.

8          So what do we really know in this case?  What we

9    know is that Kevin Wilson, beyond a shadow of a doubt, was in

10   way over his head.  You know, he profiles on the Facebook he's

11   a big time drug dealer.  He didn't have a clue.

12         I mean, you know, you've got the numbers.  If he did

13   what he was supposed to do, he would be making hundreds of

14   thousands of dollars.  Is there any evidence that that's what

15   he did?  None.  He's living in a raggedy apartment with a

16   roommate.  He's got no car.  What's he doing out there, you

17   know?  Where did all the money go?  I have no idea.  We heard

18   from him for six days.  I don't know what he did.  He's the

19   world's worst drug dealer.  That's what we know about Kevin

20   Wilson.

21         He's in trouble the entire length of the case.  "I'm

22   in debt," "I'm in debt," "I'm in debt," "I'm in debt."

23         "Oh, was it 10,000?"

24         "No, it might have been 7, I might have got it

25   lower."

1        But he's constantly in debt.  If he's doing what

2   he's supposed to be doing, he's bringing in hundreds of

3   thousands of dollars on the heroin alone.  So what's going on

4   here?  I don't know.  He's just a bad dealer.  He squanders

5   it, he loses it.  Who knows?  We didn't hear here.

6        I mean, maybe, maybe, maybe he's sly like a fox.

7   Maybe he played stupid here, and maybe he sent all his money

8   back to the DR.  I doubt it personally, but that's a

9   possibility.  But we don't know.  We don't know.  They didn't

10   tell you, and he sure didn't tell you on the witness stand.

11        Is he lying to you on the witness stand?  I guess

12   the answer to that is yes and no.  And to a certain level,

13   does it really matter whether it's a lie or he just doesn't

14   know?  There's so much he couldn't tell us.  This case is not

15   about whether, if he's a truth teller, then that saves the day

16   for the government.  That's not what this case is about.

17        This case is about, when you look at all the

18   evidence in this case, is it enough?  Is it strong?  Is it so

19   weighty that you all, every one of you, can walk out of this

20   courtroom and say:

21        You know what?  We're satisfied, each and every one

22   of us, beyond a reasonable doubt that the government met their

23   burden of proof against Robert Santos, looking at him as an

24   individual; against Philip Bryant, looking at him as an

25   individual; against Richard Anderson.  Looking at each one of

1    these men, flawed as they are, as we all are.  Looking at them

2    and saying:  "We are satisfied, the government has connected

3    all the dots.  Their evidence was compelling.  It established

4    beyond any reasonable doubt the guilt on the one charge that

5    they brought here, conspiracy."

6              What else do we know about Kevin Wilson?  We know he

7    walked into this courtroom -- not this courtroom, different --

8    I should say this courthouse -- on May 24th and he saw an

9    indictment, and the indictment, the redacted indictment --

10   "redacted" is a fancy lawyer word just means you only see the

11   names, but you remember I showed him the redacted indictment

12   which had the names of all 47 people, that was the original

13   indictment back in May, that indictment was in effect when he

14   began to cooperate with the government.

15             Now, Kevin Wilson, in my opinion, is not a genius,

16   but he does have one thing:  He's got some street smarts.  I

17   mean, you saw him profiling in Government's Exhibit 120, the

18   video.  And he talked about the roles he plays and it's

19   obvious, he knows how to play a role.  He knows how to talk to

20   different people.

21             And, you know, one of the things that he develops,

22   what is he, really?  What is his life?  How does he spend his

23   life?  He's in sales.  He's a salesman.  What do sales people

24   need to know?  They need to know how to read people.

25   Sometimes he reads them right, sometimes he reads them wrong.

1    But he's got to know how to read people.

2            He sees this situation and he says, probably not in

3    the words I'm going to use right now, but he says:  "Oh my

4    God, I am in terrible, terrible trouble.  What do I do?"

5            And because we know Kevin Wilson has one rule in his

6    life, look out for number one.  "Me, look out for me, Kevin

7    Wilson.  Somebody comes at me with a gun, I think they might

8    have a gun, I'm going to shoot them.  I'm going to shoot them.

9    Somebody steals stuff from me" -- and we'll get to this a

10   little bit later -- "somebody steals stuff from me, somebody

11   takes my product, I'm going to get my gunners out there and go

12   after them.  It's all about me."

13           So it's understandable, he's looking at 30 years, he

14   rolls.  He rolls over.  And what does he have to do?  Out on

15   the street, he was a salesman.  He was selling himself as a

16   drug dealer, and he was selling his product.  But now, there's

17   no product to sell.  He's selling himself.  And he's trying to

18   read these people.  He's trying to figure out, what do they

19   want to hear?  How can I please them?

20           And you know what?  If you were in that position, if

21   I was in that position, that's exactly what we'd be thinking,

22   because these guys have all the power, and we know that.  And

23   that's the way it works.  Is it wrong?  Is it right?

24           I mean, there was a juror over here in jury

25   selection, do you remember?  And she said, "You know what?  I

1    don't think I could listen to the testimony of a snitch."  Do

2    you remember that?  I mean, it was chaotic when we picked a

3    jury, I know that was long, too, and it tried your patience as

4    well.

5           But you know what?  The point is, is it a perfect

6    system?  No.  Is the cooperation system maybe the best that

7    we've created in this system, in this failed criminal justice

8    system that's still the best system in the world?  Yeah, it

9    probably is.

10          Are these guys telling Kevin Wilson what to say?

11   Absolutely not.  No doubt about it.  They're not going in

12   there.

13          But you know what?  He's reading them.  He's reading

14   them, and they're busy guys, and they're not just preparing

15   this case, they're preparing the other however many other, 105

16   minus 47, you do the math, 58 I think.  All right.  So they're

17   preparing for the other guys.

18          So now what they're doing is what happened in this

19   courtroom.  You know, Attorney Silverman is a good lawyer, and

20   he asked some questions.  Do you remember on redirect, like I

21   remember one part, he asked what we call leading questions,

22   okay?  Now, direct, you're not supposed to ask leading

23   questions.  Cross-examination, totally appropriate to say,

24   isn't it true X.  But on direct, you're not supposed to ask

25   questions like that.  It's supposed to be open ended so you're

1    not leading the witness.

2         But do you remember -- and nothing wrong with this,

3    there was no objection, we all knew what was happening --

4    Attorney Silverman said --  well, you know, he played a series

5    of calls involving I think it was Mr. Morales and then he

6    said:  Well, would you say these calls all kind of pieced

7    together, they all kind of come together, they're all

8    consistent?

9         So you're Kevin Wilson, you're up on the witness

10   stand.  What message do you hear?  The message you hear is,

11   geez, that's what the government is looking for, and so that's

12   what I'll give them.  Yeah, they're all consistent.

13        Well, now let's go back to the proffers, let's go

14   back there.  What happens?  Busy guys.  Thousands and

15   thousands of cases.  Don't you think sometimes they asked

16   questions that are a little bit leading?  Don't you think they

17   focus him on stuff?  Isn't that just possible?

18        Let me give you an example.  And again, I'm not

19   challenging their integrity in any way; it's what we all do.

20   It's natural.  In fact, my observation, which doesn't have to

21   be yours, is that Mr. Wilson's lawyer was in the back, and he

22   was shaking his head yes and shaking his head no.  Was it

23   secret signals?  No.  Did he care about Mr. Wilson?  Yes.  Did

24   he want him to do well on the stand?  Of course he did,

25   because Judge Burns is going to be sentencing him.  He wants

 1    him to do well.  Was he coaching him?  No.  But it's just,

 2    it's just human nature to support the people that we're

 3    aligned with.  It happens, okay?  Nothing nefarious went on in

 4    this case, nothing nefarious went on in this courtroom.

 5            But, you know, he knows.  He's reading them.  So

 6    let's take an example through.  He testified here, he was

 7    partners with Robert Santos.  Partners.  Now, that, we've

 8    heard about code words, that's a legal code word because the

 9    Judge is going to talk about partners in her charge to you.

10    Partners is a good thing, if you can get somebody -- if you

11    can show that somebody's a partner, well, you know, you're

12    almost all the way home.

13            Well, let's think about what happened.  I asked him,

14    you might recall, I asked him to look at the last proffer

15    session.  Do you remember, I made that long list of proffer

16    sessions with him?  It was actually with Agent Ndrenika that

17    we went through to kind of give you the background.  There's a

18    big book of all the proffer reports.  And they aren't word for

19    word, I get it.

20            But what he was -- what I asked him was:  "Isn't it

21    true that on that very last proffer session, you were asked

22    who was Robert Santos?"

23            And maybe you remember his answer.  He said, "I

24    don't recall," which we heard a lot of, and that's totally

25    understandable.  I have no quarrel with it.

1           So then Attorney Silverman stood up and said, the

2   proffer report, we stipulate, the government stipulates and

3   agrees that the proffer report, indicates that on October

4   12th, 2013, Mr. Wilson said that Mr. Santos was a wholesale

5   heroin customer.

6           Now, I want to go back to Attorney Silverman's a

7   very smart capable guy.  You heard him sometimes when there

8   were questions about what was in a proffer statement.  Well,

9   let's look at this one, let's look at this one, let's look at

10  this one, did you talk about A, B, or C in this one?  But

11  here, he didn't.  The only evidence we have of any

12  characterization of Robert Santos, in all those proffer

13  sessions, is he's a customer.

14          But how did it go from being a customer to being a

15  partner?  Well, you know, there's no reports on the witness

16  preparation meetings.  Remember, we agreed that there were 20

17  to 30 hours or something like that of preparation.  The

18  government spent over 70 hours with Mr. Wilson to prepare him

19  for his testimony in this case alone.  In this case alone,

20  okay?

21          Now, don't you think that what really happened here

22  is that they were trying to get through these interviews that

23  went on for hours and hours and hours?  Busy guys, lots of

24  stuff to do, places to go, families to take care of, other

25  cases to work on.

```
 1              So they said, you know:  You've talked to us about

 2   your heroin partners.  We just want to go over, can you give

 3   us all the people who were your heroin partners?  And what

 4   does Mr. -- is that wrong?  No, it's not wrong.

 5              But what happens there?  Wilson's reading them.

 6   Well, they think I had a bunch of heroin partners.  So, okay,

 7   I guess, well, maybe, who knows, maybe Mr. Santos was my

 8   partner.  Okay, we'll go with that.  Santos was my partner.

 9              Well, let's look at the evidence.  If this is a

10   partnership, this is the weirdest partnership ever.  Ever.

11   Okay.

12              So he doesn't know the guy.  Never talked to him.

13   Different neighborhood.  Stranger.  Different neighborhood in

14   New Haven means antenna up.

15              October 17th, somewhere around there, first time he

16   ever meets him, has a discussion.  They exchange telephone

17   numbers.  And then, according to Mr. Wilson, in this partner

18   world, by October 19th, they're partners.  Well, how could

19   that be?  That's crazy.  That, it didn't happen like that.

20   That's just not real.

21              Let's keep going on the partner issue.  You heard

22   testimony from Mr. Wilson, heard testimony about search of

23   Mr. Wilson's residence on Judson Street on January 3rd, 2013 --

24   2012, excuse me.  We know lots of people had access to that

25   address.  They were invited in.
```

1          Mr. Wilson had an open door policy to the people who

2     were in his inner circle.  Did Mr. Santos, did he have a key,

3     his partner?  Did he have access to that Judson Street

4     apartment?  No.  He didn't.  Not at all.  And you heard it on

5     the tapes.  He was saying:  "Well, can I go get some product?

6     Oh, no, not you, not you, you can't get any product.  My

7     shorty's out to work."

8          You know, it's interesting.  He didn't tell him

9     about his guys in the building.  He didn't say, "Oh, yeah,

10    PLO, Galan, you know, he'll let you in."  He didn't say that.

11    He kept him out.  He's an outsider.  Don't trust him, don't

12    know what he's going to do.

13         Then we come to October 26th, the claimed trip to

14    New York City.  And, you know, one thing we learn is he

15    doesn't even know where Mr. Santos lives.  He has to ask for

16    directions.  Okay.  Well, all right.

17         And then according to Mr. Wilson, along with

18    Brittany Odom, they all three, one big happy family, they all

19    drive down to New York.  Maybe yes, maybe no.  Let's assume

20    they did all go to New York.

21         But what do we know?  We know Mr. Santos -- we know

22    that Na-Na, never laid eyes on Mr. Santos.  How do we know

23    that?  Well, we know that, and the rest of the story I have to

24    get to.

25         And you know what?  I know I'm supposed to keep this

an hour.  I can tell you right now, I'm going to go longer

than an hour, and again I make no apologies for that.  I'm

going to say what I have to say here because it's important,

and I hope you'll forgive me for doing that, and I hope you

will trust that I'm not trying to waste your time.  There are

important issues here that we got to get to.

So what happens is that on December 9th -- and this

call, I asked Mr. Wilson about.  Now, it's in evidence, but

it's in Spanish, but you're going to remember what Mr. Wilson

said.  This was the time when Mr. Wilson said to Na-Na:

"Somebody just pulled a Nu-Nu on me."  And that was code for

somebody just stole some product from me.

And the reference was to Robert Santos, and we all

know the reference was to Robert Santos.  And what Na-Na said

is:  "Well, who is it?"

And do you remember, do you remember what

Mr. Wilson's response was?  "You don't know the dude."  "You

don't know the guy."  That's what he told us.

He listened.  I gave him an opportunity to listen to

the call, he listened to, and that's what he told us.  If you

have any doubt about that, ask that the transcript reference

be read back.  So what kind of a partnership is that?

And, you know, then, the weirdest part of all is he

comes up with this crazy, crazy story about the financial

arrangements between himself and Robert Santos.  Do you

1  remember that?  He said:  "Oh, yeah, I was giving him 100

2  grams" -- I think I was because that's what the tape, that's

3  what the call says, I don't really remember, but must have

4  been because I'm interpreting the call, I don't care about the

5  quantity.

6          But what he said is, you know:  "I was giving him

7  that product at $57 and he was helping me with my debt because

8  he would give me a little bit more money."

9          Well, that's crazy, you know?  Why would this guy go

10 through all the hassle and all the expense of traveling down

11 to New York, exposing himself, violating his conditions of

12 parole, risking getting locked up, going through all the crazy

13 business he had throughout this entire case, frenetic pace,

14 hundreds of calls a day, you know, lying to the parole

15 officer, lying to these people.

16         Why would he go through all that, to give drugs to

17 somebody he barely knows and not ask for anything in return,

18 and then tell us that whatever money he gave above that was

19 profit that "let me pay down the debt"?  I mean, that's kind

20 of insane.  And it didn't happen.  It just didn't happen.

21 That's not the way this relationship played.  It didn't happen

22 in this case.

23         So I just have two words to say in concluding about

24 partner.  Partner shmartner.  There was no partnership.  It's

25 a fiction.  It's an absolute fiction.

```
 1          So now finally, we're at what happened, in terms of

 2    the relationship between Robert Santos and Kevin Wilson, and

 3    you know they met because Mr. Wilson told you, and the calls

 4    support it, on or about October 18th of 2011.

 5          And you know, this was a different Kevin Wilson than

 6    you saw in Government's Exhibit 120.  You know, 120 was the

 7    profiler.  He was the guy who was kind of like a hard guy, you

 8    know, proving his mettle as a drug dealer.

 9          But according to Mr. Wilson, he now approaches this

10    guy that he doesn't even know.  He knows him by face, like he

11    knows thousands of people, like we all know thousands of

12    people by face, but he doesn't know him.  He doesn't know him.

13          And he goes up to him, and here's what he says, he

14    says basically:  You know what?  I heard from my friend Nu-Nu,

15    the guy who ripped me off -- about six weeks earlier by the

16    way -- you know, I got the word that you might be able to help

17    me out with my heroin business.  I got to tell you, I'm a

18    terrible heroin dealer.  I don't know what I'm doing.  I'm

19    constantly in debt.  I got huge debts right now.  Can you help

20    me?

21          Well you know what?  Agent Ndrenika told you that on

22    January 3rd, when they arrested Mr. Wilson, usually federal

23    agents wear those, you know, blue, kind of like blue

24    overcoats, jackets, with big letters DEA or FBI, that's to

25    make sure that people know who they are to avoid danger, and
```

```
 1    to protect themselves, it makes sense.  And it made perfect

 2    sense that they did not do that in this situation, and he told

 3    you why.  You know, it made sense.

 4          Well, you know what?  Don't you think, if Mr. Wilson

 5    was wearing one of those coats, what would it say on the

 6    front?  It would say "play me."  And what would it say on the

 7    back?  It would say "sucker."  That's what Mr. Wilson was

 8    communicating at that point.

 9          And you know what?  This guy's no dummy.  He did a

10    lot of things that are stupid and illegal and reckless and

11    kind of crazy, but he's not stupid.  And he saw what it was.

12    And he saw an opportunity, and he took advantage of it.

13          And so then there was the courtship, and, you know,

14    Mr. Wilson said, "Well, at first I didn't trust him, it was

15    small quantities.  I had to kind of see."

16          And you know, the government says, and this is in

17    the irony of ironies, Attorney Silverman stands up before you

18    and says, "Well, how do we know they were partners?  Because

19    Robert Santos used words like 'us,' 'our,' and 'we.'"

20          Well, you know, it's curious why the government

21    wants you to rely on words in tape-recorded interviews when it

22    suits their purposes, but then they walk away from them when

23    it's lies, you know?  They want you to believe that that was

24    really sincere.  They want you to kind of try to get into Mr.

25    Santos's head and say, oh, this is all on the up and up.  This
```

1    is all legit.  This is all for real.  You can listen to these

2    words and take it to the bank, when he says "our," "we," that

3    means partnership.

4              Well, we know it doesn't.  We know it doesn't.

5    Because we know those are exactly the words that somebody

6    would use if they wanted to play an inept drug dealer like

7    Kevin Wilson.

8              And so that courtship went on.  There wasn't trust

9    there.  He wasn't giving him money, he wasn't letting him in.

10   And so what happens when you're trying to build trust up, you

11   move it up.  You move it up a notch.  You know, you're looking

12   to get some drugs fronted to you.  You're trying to build

13   confidence.  You're trying to build the guy up, to make you

14   believe, just like Mr. Wilson told you, what do you do out

15   there?  I try to make people believe in what I am, even if

16   it's not really what I am because I'm a chameleon.  Mr. Santos

17   did the same thing back and he played him.  And he played him

18   like a violin.

19             And the government wants you to listen to that music

20   and say, you know what?  That violin you're hearing, that's

21   proof of the agreement.

22             I'm saying to you that's exactly the opposite of

23   what it means, and that's why I'm telling you we're ships

24   passing in the night.

25             But let me tell you one thing here that's so

```
 1   important that I forgot to say, and there's going to be a lot

 2   of things I forgot to say even though I'm going to take more

 3   of your time than even I wanted to, okay?

 4        But this is not about who has the better story.

 5   That's not what happens in a criminal case.  I don't have to

 6   prove anything.  Nothing.  That's what this system is built

 7   on.  They have the burden of proof.  They have to present

 8   convincing evidence.  I have to present nothing.  Zero.  Nada.

 9   Zilch.  And then you have to evaluate, have they met their

10   burden?

11        So, you know, they're going to tell you I'm

12   speculating, and I'm going to tell you they're wrong.  They're

13   wrong.  But don't go in and say which story is more

14   believable?

15        The question you have to decide, with respect to

16   Robert Santos, is:  Do we have a doubt as to whether, from

17   square one, from jump street, he was out to scam this guy?  If

18   we have a doubt about that, he was never in this conspiracy

19   because he never entered into an unlawful agreement, because

20   there was never a meeting of the minds between him and

21   Mr. Wilson.  And so that's what you have to think about.

22        But it's entirely, the burden's entirely, on them.

23   Not my burden.  If you weigh them up, you're not following

24   what the Judge is going to tell you your obligations are as a

25   jury, and I don't think you're going to do that.  I have
```

confidence that you won't.  But you have to keep that in mind.
So important.

So then -- oh, and by the way, where does the
government's evidence stop?  Right there.  Right there.  Did
you hear the end story from the government?  No.  You didn't.
They ended their whole story with Mr. Santos on December 2nd.
Was that nefarious?  Were they hiding evidence from you?  Were
they evading?  No, they weren't.  They weren't.

Hard working, honest guys who really looked at this
and said:  Aha, these calls are so obvious, it's so obvious
that they're talking about drugs, we don't have to do anything
more.  It doesn't matter.  Because these conversations are
about drugs.  And that shows an agreement, we've done our job,
wrapped it up in a nice bow.

And you know what?  It's not a mistake, it's not a
mistake that they only spent about five minutes on their
direct argument, Attorney Silverman, on Robert Santos.  You
heard very little about him.  And that's why, they think, they
think they've got Robert Santos in the bag.  They don't think
they have to talk to you about Robert Santos.  That's how
convinced they are.  Respectfully, that's how wrong they are.
That's how wrong they are.

So now let's go on.  The story that the government
did not tell you.  They didn't tell you the story.  That's the
part where this case really begins.  It begins at the start

1  when Wilson is on the street saying sucker, but it progresses

2  and it progresses through that mating game, that ritualistic

3  process to get to a point where now Mr. Wilson finally trusts

4  him enough to front him $8,000 worth of product.  That's a lot

5  of product.

6          If you do the math, that's over a hundred grams,

7  okay?  So now Mr. Santos has a hundred grams fronted -- more

8  than a hundred grams fronted -- to him, fronted to him, by

9  Kevin Wilson.  And what does he do?  He takes the money and

10 runs.  They don't want you to think about that, so we're going

11 to go through that right now.

12          And these -- I'm just going to run by you a series

13 of these text messages that start.  What we know is there's a

14 call on December 3rd, it's the last time they ever get

15 together.  And remember, I introduced that call, and I think

16 that call is session No. 52693.

17          By the way, you're going to have lists of all the

18 evidence, so just because there's no way you can remember all

19 these and put them in your head, it's impossible, that gives

20 you some sense of the job that we have.  You only have a

21 little sliver.  But you don't know when the calls are, so

22 you're going to get lists on all the evidence, and it's going

23 to say, the list is going to say, exhibit number, it's going

24 to give you a date and time of the call, it's going to give

25 you a session number, and it's going to give you the

1    participants in that call, to the degree that those

2    participants are agreed to and they're known, okay?

3           And you need that kind of a, if you'll forgive me

4    calling it a cheat sheet, but you need some help, because how

5    do you begin to unravel this unless you can say, "I want to

6    listen to this call" or "that call."

7           Let me say one thing about this:  Some of the calls,

8    the government only played snippets and I played only

9    snippets, and that makes sense because otherwise we would have

10   been here another two weeks.  We're trying to help, believe

11   me.  We're trying to help.

12          You can ask us to listen to the whole conversation,

13   because I don't really know, I'm not sure about this, I'm not

14   sure you're going to have an audio device that allows you, you

15   might have to ask, "We want to listen."  Whatever the system

16   is, if you have the recording ability out there, you can

17   listen in the jury room.  You might have to come out here to

18   listen.

19          If you have to come out here and you just want to

20   hear the snippet that you heard during the testimony, tell us

21   and that way we'll know and we can queue it up so we can

22   respond to the question.  The Judge is going to tell you how

23   you can communicate with the Court.  You can be very specific,

24   and that would be helpful to you and helpful to us, okay?  All

25   right.

1          Now let's go on.  That's the last meeting, December

2    3rd.  Nothing happens on December 4th.

3          Now we get to December 5th, which is about two days

4    after the rip.  They use the term "rip" in one way, I use it

5    in a different way.  It's a rip-off, okay?  Simple.  Robert

6    Santos ripped him off, okay?  I don't think, by the way,

7    that's a federal crime, ripping off a drug dealer.  Just about

8    everything is a federal crime, but that's not one.  If you do

9    it with a gun, arguably it's a federal offense.  But just to

10   play somebody, it's not a federal offense, okay?

11         So now let's go back there.  Here's what happens.

12   6:17 p.m., Robert Santos text:  "Leaving Danbury now, be there

13   hour-and-a-half."

14         Well, okay, we all know it doesn't take an

15   hour-and-a-half to get here from Danbury, but okay.  Wilson,

16   and he uses the term, but I'm going to say "all right," the

17   term is "aight," A-I-G-H-T, all right, it's kind of slang for

18   all right, okay?

19         Santos:  "7:44, on way."  That's an hour-and-a-half

20   later, he's telling him, "I'm on the road."

21         "All right," Wilson says two minutes later.

22         Then ten minutes later, Wilson:  "I'm on Winthrop."

23         Then 13 minutes later, Wilson:  "About to go home."

24   "Where are you?"  "Where you been?"

25         No response from Mr. Santos.  None.  Zero.

1          Okay, now let's move on to the next day, December 6.

2     10:20 p.m., Kevin Wilson, text:  "Talk to me."

3          12:49.  You know, I just misspoke, that's 10:20

4     a.m., my notes are wrong.  That's 10:20 in the morning.  Now

5     we're at 12:49 p.m., two-and-a-half hours later, Kevin Wilson,

6     again no response in between:  "Bro, I need some soon."

7          I don't know what "some" is.  Is it drugs?  Is it

8     money?  I don't know.  But he needs something.  He's reaching

9     out to Mr. Santos.  No response.

10         Six hours later, 6:43 p.m.  Wilson, again:  "When

11    you talk to Scooter" -- this is one to Brittany Odom now,

12    okay?  All these are in evidence, you can see them, you have

13    the text messages, the hard copies.  You don't have the

14    transcripts, they're not evidence except with respect to the

15    Spanish conversations with Na-Na, okay?

16         And I'm sorry, but with all the work we had to do in

17    this case, I did not prepare transcripts of the Na-Na calls

18    that I asked Mr. Wilson to testify.  So the best evidence of

19    those is the record when he testified.

20         And that goes back to that December 9th call that

21    we're going to get to in a minute that I just talked to you

22    about.  Okay.

23         So now he says:  "When you talk to Scooter, call

24    me."

25         All right?  Now we get to December 7th.  Wilson,

1    11:06 a.m.:  "Bro, we need to talk, like soon."  Okay?

2    Nothing.  No response.

3           12:27, Wilson -- I'm going to move on because I'm

4    not honestly sure that that one was admitted.

5           There was a call to Brittany Odom.  If I say

6    something you don't remember, it's your recollection that

7    controls, okay?  I know the other ones.  This is the one that

8    the government referred to yesterday, okay?

9           Santos, 6:29, that's what, seven-and-a-half hours

10   after the text, 11:06 a.m. text:  "Lost phone.  Just got it

11   back, bro."

12           Okay.  Now, you know, we know the government in all

13   its resources gets toll records, so they've got to be

14   corroborated, we can find out.  Do they do that?  Do we have

15   any evidence that what he was saying was true?  No, we don't

16   have any evidence of that.  And doesn't it strike you, in the

17   context of all these calls, that this is a little bit like Mr.

18   Morales saying, "Oh, I don't know where the $300 went, the

19   money flew out of my underwear?"  This is the underwear tale

20   now by Robert Santos.  He's playing the guy.  It's still

21   playing, and it becomes clear that he's playing.

22           Wilson:  "Bro, I need to see you."

23           Santos:  "Coming in town tonight."

24           These calls are all between 6:30 and 6:52.

25           Wilson:  "Make sure."

1          Santos:  "Got you."

2          This, I can't make heads nor tails of this, maybe

3     you can:  "I was just there but this Jack was at my mother

4     house grab ya and headed out."

5          I don't have a clue.  I think it's gibberish, and

6     that's what's going on.  We're way beyond any pretense here

7     that he has any intent to give Mr. Wilson back the money he

8     stole from him.  None.  It's gone.  He knows it, Wilson knows

9     it.

10         But Wilson, the eternity optimist, "please do."

11         8:57 p.m., no Santos, no response.

12         Wilson:  "What it look like?"

13         Now we go on to December 8th, okay?  Wilson, on

14    December 8th, they're all Wilson, I'm going to give you the

15    times, I'll read them.

16         7:20 a.m.:  "I'm on my way to work."

17         11:57 a.m.:  "We need to jump on this now."

18         3:25 p.m.:  "Bro."

19         8:17 p.m.:  "Ayo."

20         Nothing, no response.  Santos has his phone back

21    now, even if what he said was true.  It probably wasn't, but I

22    don't know.  Even if he did get his phone back, he's blowing

23    the guy off every day.  Why is he doing that?  Because he

24    scammed the guy.

25         How do we know that?  Well, because Wilson knows it

by the next day, 12/9, that's the Nu-Nu call.

"The guy went running with the money."

"Who was it who did that?"

"A dude, you don't know him, he did a Nu-Nu on me."

He said it three times, and Mr. Wilson confirmed
that in his testimony.

So now the cat's out of the bag.  Wilson knows, no
question, and he starts talking to his guys.  But they're not
just any guys.  They're not just any guys, they're his gun
guys.

It starts after the Nu-Nu call on December 9th.  He
calls Benton.  He told you yesterday, Benton's a gun guy.  You
know he's a gun guy.  You've got that call.  I'm not going to
go over it.  If you want to listen to them, listen to them.
You can hear, "Nigga Scooter ran off with eight racks."

And the evidence from Special Agent Zuk was a rack
was a thousand dollars.  $8,000, that's why I'm talking about
$8,000 worth of product, okay?

So it keeps going on.  There's calls, you know, text
messages with Brittany.  You've got some of those, and the
government gave you some texts yesterday.  We'll talk about
those in a minute.

Now, during this period of time, December 9th,
December 11th, December 11th he's calling Mello, Jerome Moy,
another gun guy, "Scoot ran off with six big ones."  You've

1   got that in evidence before you.

2        By the way, when he tells Benton, you know what

3   Benton says to him?  He tells him, "I think the nigga Scoot

4   ran off on me," in this call.  Again, you can listen to it.

5        What Benton says is -- well, who he is is

6   irrelevant.  I think we all know what he's saying there.

7   Somebody ran off with your product, I got your back.  I don't

8   care who it was.

9        So then we go on.  We got the Moy call on December

10  11th, then we got the Wilson call on December 12th, and we now

11  know that's the Santana, that's when he learned about the

12  Santana robbery.

13       Totally doesn't have anything to do with this

14  situation, but it was an ugly situation in New York, where

15  Amaury was robbed of a kilo at gunpoint and it sounds like

16  Amaury's wife had some kind of a heart problem and had to be

17  taken to the hospital.  These are not nice things going on.

18  Nobody would pretend otherwise.

19       Then there's talk with Nu-Nu about both, about

20  Santos and Santana.  Santos and Santana.  Listen to the tapes.

21  It keeps going that way, Santos and Santana.  Santos and

22  Santana.  Guns, guns, guns.  Santos, Santana.  And it keeps

23  going on like that.

24       And by the way, there's a stipulation, so we know,

25  Robert Santos was not in jail from December 3rd, when he

1   started blowing off Mr. Wilson, when he had already done the

2   sting, okay?  He wasn't in jail.  Because the stipulation

3   between the parties, and you can accept it as fact, is he went

4   to jail on December 12th and he was in jail until January 6th,

5   okay?  So all this stuff happened when Robert Santos was out

6   on the street, and the government wants you to ignore it.

7   Well, you could.  You could.  It wouldn't be fair, but you

8   could.

9          So now there's other calls, same day, Quiyon Reid,

10  another gun guy, talking about Santos and Santana.  Another

11  call with Benton, December 13th, Santos and Santana.

12         December 14.  It goes on and on and on.  I'm not

13  going to go through it all except to say on December 17th,

14  Mr. Wilson sends a text.  Now, he doesn't know at this time

15  that Mr. Santos has been in jail for five days, so he sends

16  him a text, and he says:  "So you Nu-Nu now."

17         Okay, so he's saying, I get you, I get what you did,

18  you set me up, you SOB, you did it, you won, you got me, and

19  now I know, another time I look stupid, I'm an easy mark.

20  That's what he's saying there.  That's what he's telling him.

21         And you know, I'm not going to go through more,

22  because you know the story after then.  You know what happens

23  after that.  You know that somebody who identifies himself as

24  Scoot's little brother says to him, says to Wilson, you know

25  what?  "Scoot's in jail, it's a technical, he's going to be

```
1    out soon."  Everything is copacetic.  They don't use words

2    like that, that's too big of a word.  Everything's cool, we

3    want to get together.

4          Again, what the government wants you to believe is

5    that's true.  First of all, we don't know who the person is

6    who identifies himself as Scoot's little brother.  Is it his

7    brother?  Maybe.  Is it somebody else?  Maybe.  We don't know.

8          But what we do know is that's exactly what somebody

9    would say if they had any sense that this guy's gunners were

10   out for them.  They would say that to get them off the scent,

11   to get them off the trail.

12         The government wants to say, that's true, you can

13   accept that as the gospel.  That means everything's cool,

14   everything's all right.

15         It wasn't.  It wasn't.  And we know -- and how do we

16   know ultimately that it wasn't okay?  The reason we know it

17   wasn't okay is the last call I played you -- do you remember

18   when I was trying to get done, I was like begging, just give

19   me three minutes, I want to get done, I want to finish the

20   story.  I can't remember what day it was.

21         And the last tape I played to you, okay?  Was a

22   conversation with a guy named Webay, Duane Spence.  If you

23   have any doubt in your mind, listen to that call.  Ask us for

24   that snippet.  What you'll hear, if you listen to it really

25   carefully, you'll hear Wilson is super angry.  He's desperate.
```

1   Remember he says desperate people do desperate things.  This

2   is a desperate time for Mr. Wilson.

3          Just like he was desperate back on October, mid

4   October when he met Santos, which he set himself up as a

5   target because he was so desperate, now he's desperate to get

6   back.

7          And what he says there is, he says, do you remember

8   this?  He says:  "I can't way for Scoot to get out of jail."

9          And Webay has this, what I would suggest to you is,

10  a demonic laugh.  Maybe they thought that was funny, but I

11  don't think so.  I think when you listen to the conversation

12  that follows immediately thereafter, Wilson says to Webay,

13  "I'm getting ready.  People are going, people are going to get

14  hurt.  People are going to get seriously hurt here."

15         Was it talk?  Maybe it was talk.  In his mind,

16  that's what he wanted to do.  That's what he wanted to do.

17  And that was on December 26th, two days after he got this

18  call.  So he knew, he knew.  The government wants to pretend

19  that everything was all right, but Wilson knew, and the call

20  says he knew.

21         I mean, if he really thought everything was good and

22  he was going to get his stash back and everything was going to

23  be cool and everybody was going to sail off into the sunset,

24  ask yourselves, why in God's name would he have made that

25  conversation with Webay two days later?  That would be crazy.

1   And it would be crazy because it's not what happened.

2          So that's the story that the government didn't tell

3   you.  That's the story that we had to tell you, and you got to

4   consider the whole story to put all the pieces together.

5          And now you can go back, and now you can look at,

6   you know, what does it really mean when he says "we" and

7   "our"?  What does all that really mean?

8          And again, I'm begging you, the issue is not whether

9   you conclude that this was a rip off from day one; the issue

10  is whether you have a reasonable doubt about that.  If you

11  have a reasonable doubt about that, the only correct thing for

12  you to do is find Robert Santos not guilty.  That's what the

13  Judge is going to tell you.

14         So I have some other things that I want to talk to

15  you about, but they're not about the evidence in this case.

16         I said a few minutes ago we ask an awful lot of you.

17  We ask you to travel through snow and ice and rain, and travel

18  here, and put up with all this legal stuff that happens, and

19  you get shepherded out and there are conferences on side bar

20  and, you know, sometimes you don't know what's going on and

21  it's frustrating, and it's frustrating for all of us at times.

22         It's not, by no means our system of justice is not,

23  perfect, but it's the best system in the world.  It's the one

24  that the brightest people have created over time.

25         Are there things that could be improved?  You bet.

Are there people working on improving them?  You bet, there

are.  But we ask an extraordinary amount.  We ask you to

follow all these rules.

Like, you know, just forget about the screen falling

down on Robert Santos's head.  Forget about the elephant in

the side room, it's not there.  It's there, we know you'll

know it's there.  We're asking you not to put it in your

equation when you think about the evidence and when you

evaluate the evidence in the case.  So that's an extraordinary

thing we're asking you to do.

And the other thing that's extraordinary is we're

asking you to apply rules, and I said this in my opening to

you, we ask you to apply rules you never apply in your every

day life.  You don't ever give your children the presumption

of innocence.  I never did.

You know, you don't apply a standard of proof beyond

a reasonable doubt in making decisions that are important in

your own life, because we all take leaps of faith in life.

Whatever those decisions are, it's monumental, significant,

they always involve leaps of faith.

There are no leaps of faith here, and there's very

good reasons for that.  And the reasons are clear to anybody

who reads a newspaper over the last ten years, because despite

all the protections we have in our system, innocent people are

wrongly convicted.  Sometimes they're convicted of things as

1   serious as murder where they're on death row, and it's only

2   through later evidence that we find out -- everybody in this

3   room, everyone, everyone, the people in the jury box, you, the

4   Judge, the people back here...

5          And I got short with the people during my

6   examination in the back, they're not bad people, okay?  I

7   understand, I get it.  This is a very wrenching human process

8   for them.  These are their loved ones, and they made an

9   outburst and it was inappropriate and it was rude.  Doesn't

10  make them bad people.  It means they did something that was

11  wrong.

12         And I think if they could, each one of you would

13  look at them and say:  I'm sorry I did that, that was wrong,

14  it was disrespectful to you, it was disrespectful to the Judge

15  and it was inappropriate.

16         But you know, every single person in this room wants

17  the same thing, wants you to apply the rules absolutely to the

18  best you can, 100 percent.  Everybody wants you to look at all

19  of the evidence.

20         They have a job to do, they want you to convict, and

21  they've told you that.  My job, I've got a job to do, and I

22  want you to find Robert Santos not guilty.  And we would be

23  deluding you if we didn't say that.  This is a competitive

24  situation.

25         I mean, we're friends.  We socialize, we get along --

1    we don't socialize actually, I overstated it a little bit, you

2    know.  But we try to work issues out, believe me.  We spent

3    lots of time before court and after court working things out

4    so that it goes smoothly.  It never goes smoothly.  Trust me,

5    we spent a lot of time sometimes when you're in the back room

6    trying to make it easier for you, not harder.  But it's hard,

7    hard work.

8             My experience with juries, and I've been doing this

9    work since 1978, okay?  A long time.  My experience is

10   sometimes people look back and say, "Jury service was one of

11   the most important experiences of my life.  It was incredible.

12   It was amazing."  But it's hard.  It's hard work.  You have a

13   very, very difficult job ahead of you.

14            And, you know, I'm being straight.  I was as honest

15   as I could with you from the beginning.  I really kind of laid

16   it out for you in the beginning, and you probably thought

17   what's going on here?

18            I told you that Robert Santos was in possession of

19   distributable quantities of heroin.  Is that a good thing?

20   It's a terrible thing.  Heroin's poison.  It's not good.  But

21   it doesn't make him guilty of this crime.

22            And so some people would look at that and say, well,

23   that's a technicality.  Rough justice says he was involved in

24   some way.  We can't let him walk out the room.  We can't let

25   him walk out the door and get away with it.  I would suspect

1    lots of you are perhaps in the back of your mind feeling that

2    right now.  It's human.  It's human.

3            But let me tell you, these guys are smart.  This

4    isn't the end of this case.  This is the end of the case here,

5    with this charge.  There are other charges, other days.

6            You don't have that burden.  You have a lot of

7    burdens, but don't put that burden on yourself.  Don't think

8    that this is the end.  It's not.  Trust me.  It's not.  Okay?

9            So your job is to look at the evidence and to apply

10   those rules.

11           And what I want to tell you is a story about

12   something that happened to my dad, and what I learned from it.

13   When I was about ten years old growing up in Syracuse, New

14   York -- where there's an awful lot more snow than there is

15   here, and we get used to it, because it snows every day -- my

16   dad was on jury duty.  And he followed the rules, and I

17   thought it was kind of weird.

18           I said, "Dad, dad, what did you do today?"

19           He said, "I can't talk to you, I can't talk, I can't

20   talk about it.  The judge told me I can't talk and I'm going

21   to follow that."

22           At the end of the case, he came home and we sat down

23   and we said, "What happened?  What happened?  What was it

24   about?  What did you do?"  Like kids do.

25           And my dad said, "Well, the person was charged with

driving under the influence, drunk driving.  We went back in

the jury room and everybody was convinced as a matter of fact

that he did it.  But we found him not guilty."

        And I said, "You what?  You what?  I don't get it.

A drunk driver, you know, he could have killed us.  What are

you talking about?"

        Because when I was ten years old, I wanted the world

to be black and white.  I wanted the answers to be simple.  I

wanted everything to be clearcut, like we all do, even when

we're adults.  But we learn, life is more complicated, things

are more subtle, the rules are different here.

        And he explained to me, he explained to me why they

did that, and he told me that the reason that the jury finally

reached that is because he said, "The judge told us that we

had to find that the prosecutor's evidence established the

guy's proof beyond a reasonable doubt.  We had reasonable

doubts and we found him not guilty."

        And I was furious.  I was furious.  I was ten years

old.  I said, "That's not right.  That's wrong, you're letting

this drunk guy drive on the streets, how could you do that?"

        Like most lessons we learn from our parents, we

don't learn them at the time that the lesson is given.  It

took me a long time to understand, and not only to understand,

but to value the integrity and the honesty and the hard work

that my dad and his fellow workers did, jurors did, in that

 1    case to really struggle with those issues.

 2          And that's what I'm asking you to do here.  Do

 3    something where, no matter what people say that you see, you

 4    can explain it and you can be proud and you can say, "You know

 5    what?  I did my very best, I did my absolute best, to follow

 6    the instructions, to apply the law to the facts of this case,

 7    and the verdict we reached was a verdict that I'm proud of."

 8          And you can explain to any important people in your

 9    life what my dad explained to me.  It's a heavy burden.

10          I want to tell you one other personal story, and

11    then I'm going to stop.

12          I had the blessing of having my older daughter get

13    married, and being someone, and you know me well enough now to

14    know, unfortunately, I'm not a man of few words.  I felt like

15    I had to give some fatherly advice, even though they didn't

16    want to hear it.

17          So I sat down with my future son-in-law and my

18    daughter, and I said:  You know what?  I know I'm a little bit

19    bald -- a lot bald.  I know I'm gray.  I know I'm old.  I just

20    have one piece of advice for you, that's all I'm going to say

21    today.

22          I said to them:  I know, based on my own life, that

23    any marriage has problems.  Any relationship, any intimate

24    relationship, has problems.  You're going to have

25    disagreements, you're going to have arguments.  Not everything

```
 1    is going to be peaches and cream.  I just have one piece of
 2    advice for you.  When, when you find yourself in the middle of
 3    an argument, think about the nature of your relationship like
 4    that old game we all used to play as school kids, the
 5    three-legged race, when you have an egg on the spoon.  Think
 6    about that, but back then, they're hard boiled eggs.  But if
 7    you can keep in your head that that egg, that relationship, is
 8    very, very fragile, treat it with care and treat it with love.
 9           I'm handing you Robert Santos's life.  The Judge is
10    going to instruct you, and it's going to be in your hands.
11    I'm asking you to treat it like that very fragile egg, and do
12    the right thing.  I'm asking you to make a tough choice, to
13    stand up for what's right, and to find him not guilty.
14           Thank you.
15           MR. VATTI:  Your Honor, if I could inquire through
16    the Court, does the jury wish to take a short break before we
17    resume with my rebuttal?
18           THE COURT:  Do you, ladies and gentlemen?  Do you
19    want a break now?  About ten minutes?
20           (In the absence of the jury:  12:18 o'clock p.m.)
21           THE COURT:  I think, I'm not sure but I think, the
22    jury's lunch may be here.  I would suggest, Mr. Vatti, how
23    much time do you think you need, sir?
24           MR. VATTI:  Half hour.
25           MR. SILVERMAN:  Your Honor, it's my understanding
```

1    their lunch was ordered for 1:00 o'clock.

2          THE COURT:  Did you hear what happened yesterday?

3    It was awful.  When they come back, Mr. Vatti, you're up.

4          MR. VATTI:  Okay.  That's fine, your Honor.  Thank

5    you.

6          THE COURT:  And then we'll take a luncheon break and

7    I will charge after lunch.  Is that agreeable with everybody?

8          MR. VATTI:  It is.

9          MR. SILVERMAN:  Yes, your Honor.

10          MR. REEVE:  Yes, thank you.

11          (Recess:  12:20 o'clock p.m. to 12:30 o'clock p.m.,

12    in the presence of the jury.)

13          THE COURT:  I think we're missing one of the

14    defendants, Mr. Santos, and Mr. Reeve.

15          MR. REEVE:  My apologies, your Honor.

16          THE COURT:  All right, Mr. Vatti.

17          MR. VATTI:  Thank you, your Honor.

18          I want to echo my colleagues' apology to you for the

19    length of this case.  I know that as attorneys, we try to

20    repeat things a lot in the hopes that wow, this time they're

21    really, really going to get it, even though you probably

22    already did.

23          This case went on for a lot longer than any of us

24    had anticipated, and I thank you for your patience.  I know it

25    was a slow grind of phone calls, long testimony from Kevin

1    Wilson, and the case is important to everyone.  There are

2    serious issues here.  And as a result, I do thank you for all

3    of the attention that you have paid and that I'm sure you'll

4    continue to pay to it.

5           I'm going to start with Attorney Reeve's argument,

6    and then I'm going to work my way backwards, Mr. Bryant's case

7    next, and then finally I'll finish with Mr. Anderson's

8    arguments from yesterday afternoon.

9           With respect to the defense that has been raised by

10   Mr. Reeve on behalf of Mr. Santos, there are three flaws to

11   it, okay?

12          Number one, there is no evidence in this case

13   whatsoever as to what Robert Santos's state of mind was in

14   mid-October of 2011 when he was first approached by Kevin

15   Wilson.  There's zero evidence at all that at that time, when

16   the agreement was conceived, as to what his intention was.

17          Mr. Reeve invites you to get into Robert Santos's

18   head and speculate about what that intent was, but that's the

19   one thing I would urge you to decline, speculation.  That just

20   has no place in the courtroom.  None of us knows what was

21   going on in Robert Santos's head in mid October of 2011.

22          So what are we left with?  The only thing that we

23   can gauge his state of mind from are his actions and his

24   words.  And what were those actions?  I'm not going to go

25   through all of the phone calls and all of the episodes, but

1    you know from the chronology that Mr. Silverman showed you

2    yesterday that the actions and words were:  Multiple episodes

3    of acquiring hundred gram quantities of heroin in conjunction

4    with Kevin Wilson, distributing those quantities of heroin,

5    giving advice to Kevin Wilson about how to package up, cut the

6    heroin, and distribute the heroin; pooling money together;

7    accompanying Mr. Wilson down to New York City, for example, on

8    October 26th of 2011, getting more heroin and bringing it

9    back.  Those are the actions and words of Robert Santos.

10        As Mr. Reeve concedes, he got redistributable

11   quantities with Kevin Wilson, and we know, based on his

12   actions, his words, and the testimony of Kevin Wilson, that

13   together, they acquired more heroin after pooling their money

14   together.

15        How do we know that?  Because there's that one phone

16   call between Mr. De Los Santos and Mr. Wilson about, depending

17   on how much money you give, that's how I'm going to determine

18   how much heroin you get.  And that's the message that

19   Mr. Wilson also gave to Mr. Santos.  If he likes the number we

20   bring down, he'll give us a buck, 100 grams of heroin.  If he

21   doesn't like the number, he's going to give us 50 grams of

22   heroin or less.

23        On those episodes that Mr. Silverman showed you

24   yesterday, how much heroin did they get at a time, the four

25   episodes that Mr. Silverman went through?  112 grams, 120

1    grams, 150 grams, and 170 grams.

2         Mr. De Los Santos liked the numbers that they were

3    coming back with in terms of the money.  How was that money

4    being raised?  By both of them pooling their money together.

5         So that's what we're left with, the actions and

6    words.  We don't have any other evidence in this case about

7    what Mr. Santos's state of mind was.

8         Mr. Reeve would like you to go to events occurring

9    in December, after all of Mr. Silverman's episodes that he

10   described, and speculate from text messages and phone calls in

11   December as to what Mr. Santos's state of mind was, two months

12   earlier, in mid October.

13        And here's why that's flawed:  Let's assume for a

14   second that at that point, in early December, that Mr. Santos

15   had a pile of money, $8,000, that he owed and that he actually

16   had it and he decided at that point to rip off Kevin Wilson.

17   Here's all we know.  For some period of time, he didn't return

18   the text messages and the phone calls, but on December 7th, he

19   calls back, he texts back and says, "I lost my phone."  Why

20   would you do that if your intent is to rip the guy off?

21   Because you fear retribution?  Seriously?

22        If his theory holds, why would Mr. Santos have

23   anything to fear from Kevin Wilson?  Kevin Wilson didn't do

24   anything to Nu-Nu.  He got ripped off of $15,000, did he

25   retaliate?  There are probably guys in the drug business that

```
 1    would have put a bullet into Nu-Nu's head.  If you're not
 2    going to get the money, at least you've got to show that
 3    you're tough.  Did Kevin Wilson do that?  There was no
 4    retaliation whatsoever.
 5          Mr. Santos is the guy that worked with Nu-Nu.  He
 6    knew that there was no retaliation.  Nu-Nu was arrested and
 7    charged in connection with this case in May of 2012.  So why,
 8    if you're Mr. Santos, knowing that Kevin Wilson didn't do
 9    anything to Nu-Nu and was this easy mark, a sucker, do you
10    even fear retribution from the guy?  Why would you even
11    bother?  He doesn't know where you are.  Why would you even
12    bother sending him a text message, "I lost my phone"?
13          What about when you go to jail?  Kevin Wilson still
14    doesn't know where you are.  Not only do you not need to fear
15    retribution because Wilson didn't do anything before, but
16    Wilson doesn't even know where you are, and you're in jail.
17    Who's going to shoot you while you're in jail?
18          So why on earth, if you are trying to do a scam and
19    take off with the money, would you then have somebody call
20    Kevin Wilson and tell him exactly where you are?  Does that
21    make any sense to you?
22          I've asked you not to check your common sense at the
23    door at the beginning of this case, to bring it into the jury
24    box with you.  Does it make any sense at all, from a common
25    sense perspective, if you're trying to scam a guy and he
```

 1   doesn't know where you are, that you then have somebody reach

 2   out to him and tell him exactly where you are and that you'll

 3   be back shortly?  Is that something that somebody does, if

 4   you're trying to scam someone?  Or is that something that you

 5   do if you are intent in continuing in the drug business with

 6   that person when you get out of jail?

 7           And what makes it even more flawed is the fact that

 8   Mr. Santos went to Georgia.  He had a place to go, right?  He

 9   could have disappeared.  We didn't know where he was when we

10   took down this case in May of 2012.  It wasn't until he turned

11   himself in in Georgia two months later that he was eventually

12   brought back to Connecticut.

13           So he had it set up perfectly.  He had somewhere to

14   go, he was in jail, Kevin Wilson didn't know where he was.  So

15   why reveal your whereabouts, if your intent was to scam him?

16   It just doesn't square with common sense.

17           Here's another fact.  We didn't talk about one of

18   the episodes, it was the December 2nd episode, where Brittany

19   Odom is given the address of Johnny De Los Santos, and she

20   goes down, picks up somewhere between 60 to 80 grams of

21   heroin, and brings it back.

22           If you're intent on ripping off Kevin Wilson, why

23   does she go and deliver that heroin to him?  Why not take it

24   right back to Mr. Santos?  She's his cousin.  Does that square

25   with common sense, that you're going to set up your mark by

1    doing the big heroin transactions up front so you can rip off

2    the smaller ones at the end?  Does that make any sense

3    whatsoever?  So that's why the facts just don't square with

4    the theory that Mr. Reeve wants you to buy.

5          Third flaw in this is that even if you assume that

6    sometime in December, Mr. Santos formed the intent to rip off

7    money, he still participated in an agreement and a mutual

8    understanding to distribute heroin back on October 19th,

9    October 26th, November 6th, and November 27th.

10         And here's why I say that.  Just take the example of

11   a bank robbery, all right?  Two hypothetical people, Mr. Smith

12   and Mr. Jones.  Mr. Smith comes up with the idea that, hey,

13   you know what?  We're going to rob a series of banks.  We're

14   going to do six bank robberies and you know what?  The sixth

15   bank robbery is the really big score, but we're going to do

16   some smaller scores first.

17         And the other guy decides, you know what?  At the

18   end of the big score, I'm going to keep it all to myself, I'm

19   going to shoot my partner.

20         So they do the series of bank robberies.  Can we

21   seriously argue that if you do those bank robberies, that just

22   because your intent was to scam the money at the end, that you

23   did not conspire to commit the bank robberies?  That's exactly

24   what happened in this case.

25         Even if, in December, Mr. Santos formed the intent

1    to rip off the money, he still necessarily had to engage in

2    all of those transactions and participate in the conspiracy in

3    order to make that happen in December.  So even in that sense,

4    this is just not a defense.  It makes no sense whatsoever.

5         At the end of the day, the bottom line is Mr.

6    Santos, from the phone calls -- you don't even need the

7    testimony of Kevin Wilson.  Let's just put that aside for a

8    second.

9         From the education that you received from Michael

10   Zuk, and when the calls were played through Special Agent

11   Ndrenika, before you ever even laid eyes on Kevin Wilson, I'm

12   willing to bet that based on that education you received, that

13   you knew exactly what was going on in those phone calls.  I

14   don't think you needed Kevin Wilson to tell you what was going

15   on in those phone calls.

16        I think Kevin Wilson is important for only one

17   reason in this case:  And that's the May 10th, 2011,

18   transaction with Philip Bryant.  If we had never called Kevin

19   Wilson as a witness, I think the only thing that disappears

20   from this case is the government's proof that Philip Bryant

21   was the individual that sold the crack, or gave the crack, to

22   Kevin Wilson on May 10th, 2011.  On everything, every other

23   issue in this case, you don't even need Kevin Wilson.

24        So I would submit to you that with respect to Robert

25   Santos, based on what I've said, if you reject that defense,

1    it is fair for you to conclude beyond a reasonable doubt that

2    he engaged in an agreement and understanding with Kevin Wilson

3    to distribute over a hundred grams of heroin.

4            So with that, I'm going to turn to Philip Bryant.

5    So the issue with Philip Bryant is the May 10th transaction.

6    I think that's where the battle lines are really being drawn

7    here.  Mr. Moraghan really didn't spend a lot of time

8    cross-examining Kevin Wilson on the calls that involve heroin,

9    where Mr. Bryant is saying, you know, "I'll get the bundles

10   for $50, I'm going to try to sell it for 65 and I'm definitely

11   going to get on that shit."  That's clear intent right there,

12   a meeting of the minds to distribute heroin.

13           The success of that doesn't matter.  We know that

14   Philip Bryant did set up some heroin deals based on the phone

15   calls, but the success really doesn't matter.  As soon as he

16   says, "I'm going to definitely get on that shit, I'm going to

17   get bundles for $50, I'm going to sell it for 65 and that's

18   going to be my profit, I'm going to definitely help you out,"

19   that is the meeting of the minds that is necessary for the

20   crime of conspiracy.  Right there, it ends, guilty.

21           But I don't think Attorney Moraghan really spent a

22   lot of time on that issue.  He didn't really cross-examine

23   Kevin Wilson on the whole, you know, holding the bag of drugs

24   and the trap phone and all that.

25           The battle lines for Mr. Bryant are on that May

1    10th, 2011, transaction, so let's talk about that.

2           The only evidence that we have are the phone records

3    and Kevin Wilson's testimony that the ounce of crack cocaine

4    that he sold on May 10th of 2011 came from Philip Bryant.

5           Now, we can get into the weeds of the phone calls

6    and the weeds of the video and what it shows, and I'll talk

7    about that for a minute, but I want to step back for a minute

8    and focus on a big picture issue.

9           Number one, Mr. Moraghan says there was no mention

10   of Philip Bryant in the post arrest statement.  True.  But

11   I'll ask you to consider this:  That post arrest statement on

12   January 3rd, 2012, took place at 1:00 a.m. in the morning,

13   lasted approximately an hour.  Do you seriously think that at

14   1:00 a.m. in a 60-minute interview, that all of the

15   transactions and all of the players in five months' worth of

16   wiretaps, 10,000 pertinent calls and everything Kevin Wilson

17   had knowledge of, really came out in 60 minutes at 1:00 a.m.

18   in the morning following his arrest?

19          Look at the number of hours that the government

20   spent with Kevin Wilson, trying to get everything that he

21   knew.  Hours and hours and hours spread over months and

22   months.

23          Think about this:  It took six days of testimony

24   from Kevin Wilson, just to talk about what he was involved in

25   with these three guys.  Does your common sense really tell you

that Kevin Wilson possibly could have talked about every

single thing he was involved in in 60 minutes at 1:00 a.m. in

the morning on January 3rd, 2012?

Another common sense point.  Mr. Wilson is indicted

in May of 2012.  He sees that he's the top name on an

indictment that lists 40 plus other individuals.  He decides

he wants to cooperate and help himself.  And in March of 2013,

out of all of the individuals on that list, when the

government asked, "Who gave you that ounce of crack on May

10th, 2011, where did you get it?"

Of all of the individuals in the case that he could

have selected, he picks the guy that he is tightest with, the

guy whose house he goes to play PlayStation, the guy he hangs

out in the backyard with, right?  One of the guys that is in

his tight, inner circle.  The guy that he shares guns with.

We know from Mr. Moraghan's cross-examination that

Vincent Clark lived there, same location, the 20-24 Judson.

We know that William Hines lived there.  We know that Quiyon

Reid lives there.

Why not pick Vincent Clark if you're going to lie?

I mean, wouldn't that be great payback?  Vincent Clark ripped

you off of 15,000 bucks.  He's the guy who gave you the crack

for the June 29th deal.

How are we ever going to know who was in that

apartment building that day?  The surveillance officers didn't

1    see the deal go down, so why not pick Vincent Clark?  I mean,

2    talk about, if you want to lie, there's your perfect target

3    right there.  He was the guy that cooked crack for you, he's

4    the guy that ripped you off of $15,000, he lives in that

5    building, gave you the June 29th crack, wouldn't it be

6    perfectly believable to just say that to the government?

7    Really, could we have disputed it?  How could we?

8           But miraculously, he names the guy who trusts him

9    enough to give him his drug phone and his bag of drugs.  "Hey,

10   here's my apartment, go ahead play video games, handle my

11   drugs for me."  The guy that he went to middle school with is

12   the one guy he tells us, "That's who I got the drugs from."

13          So that's the big picture issue I want you to think

14   about when you assess whether or not he's credible on that

15   score.

16          The other thing I want you to think about when you

17   assess his testimony is it's almost more important how Kevin

18   Wilson says things and what his appearance was like on the

19   witness stand.  There was a point in his testimony that I

20   thought, you know, he is resigned to whatever is going to

21   happen to him.  He's defeated, he's deflated.  There's nothing

22   he wants more than to go home.

23          Of all of the hours that he has spent with us -- and

24   I will agree that individuals like Kevin Wilson are motivated

25   by one thing, and that is self-interest.  He is not here

1    because he wants to be a good citizen.  He is here purely out

2    of self-interest.

3          And the question I asked you back in my opening

4    statement was, no matter how bad of a person you think he is,

5    what is his self-interest in this case?  Yeah, he lied in

6    phone calls.  It was in his self-interest to lie to Johnny De

7    Los Santos and Amaury P'Dilla, because he didn't want them to

8    think he was dumb.  Sure, I get that.

9          What is his self-interest in this case, a guy who

10   just desperately wants to go home, a guy who wants his 5K?

11   Out of all of the hours that he has spent with us, is he going

12   to go all in on lying about Philip Bryant?  One transaction?

13         Is he going to risk it all?  So, if you play poker,

14   is he all in?  Is he going to risk it all on the May 10th,

15   2011, transaction by lying and pinning it on his middle school

16   friend?  Think about that when you assess the big picture of

17   his testimony.

18         Now I want to talk about some of the details.  Let

19   me start with the video.  There are two parts to the video

20   that I think are important:

21         The first is when you see the two cooperators, both

22   in the front seats and they pull up to the store where Kevin

23   Wilson is, and you see one of the cooperators get out and get

24   in the back and then they're waiting for Kevin Wilson.

25         Mr. Moraghan gave some explanations about maybe it's

1    easier, you don't want to attract attention in the back seat.

2           I would submit to you that in the drug business,

3    it's going to raise your hackles when you get into a seat,

4    into a car, and there's a guy sitting behind you and they've

5    left the front passenger seat open, all right?  If you've ever

6    seen *The Godfather*, not a good idea to get in the front room

7    when there's a guy sitting in the back, and they leave that

8    seat for you.

9           So I would submit to you that when Kevin Wilson

10   says, yeah, he went through the deal, no question about that,

11   but when he says that his hackles were up a little bit because

12   the front seat was open and "the guy was sitting behind me and

13   he had put his hoodie on," you can see that in the video, I

14   would submit to you that in the drug business, yeah, that's

15   going to raise your hackles a little bit.

16          And you do see -- Kevin Wilson didn't see it when we

17   played the video for him, but when those two guys do pull up

18   to the store to pick him up, you will see -- the guy in the

19   back, if you watch the video, actually make a gesture of get

20   in the front.  It's there.

21          The next part of the video that's really important

22   is when they pull up to 20-24 Judson.  And when you're looking

23   at that video, he actually goes across the street this way on

24   the video, not towards where you see the sidewalk.  And you

25   see that the cooperating witness says, "20-24 Judson is where

1    we are."

2            They ask, "Hey, you have to go in and snatch it?"

3            He says, "Yes."

4            And you can see, as the cooperating witness is

5    giving the address to the officers, he's looking out the

6    window this way, and he's craning his neck so that he can give

7    the address of the building.

8            So Kevin Wilson actually gets out of the car, goes

9    around the car and across the street this way on the video as

10   you're looking at it from your jury box.  He's gone for a few

11   minutes and then he comes back.

12           And again, when he comes back, you can see the two

13   cooperators look in that direction, and then one of them says

14   "Nature straight."  In other words, Nature's got the drugs.

15           And you see the cooperator who's driving look out

16   the window and it appears like he makes a gesture with one of

17   his arms and he also says something, and it comes out on the

18   tape as unintelligible because the officers couldn't make it

19   out.

20           I would submit to you that Kevin Wilson went to that

21   window because it would be natural for a drug dealer to try to

22   do a hand-to-hand right at the window, and that then you see

23   him go around the car, all the way to the other side, and get

24   in the car.

25           So when he says, "I was instructed to get back in

1    the car," that would also seem odd to a drug dealer, because

2    why wouldn't you just do the hand-to-hand at the window?

3            So something raised his suspicions about this deal.

4    Not enough for him not to go through with it.  Sometimes greed

5    trumps wisdom.

6            So he gets back in the car, does the deal, and he

7    says he went back in and gave the money to Philip Bryant.  And

8    that brings me to my third point.

9            By the way, he was very consistent.  I disagree with

10   the characterization that he said it happened in the backyard

11   versus the hallway.  I think if you look at the testimony, he

12   was very consistent both on direct and cross about where the

13   deal took place.

14           Mr. Moraghan wants to say:  Well, listen, that

15   single act does not bring him within the scope of the

16   conspiracy.  And you're going to hear from her Honor that a

17   single act absolutely can bring you into a conspiracy.  That's

18   all that's required.  As long as there was a mutual

19   understanding to distribute drugs, and in this particular

20   case, doesn't matter how immediate the payment was.

21           Philip Bryant gave the drugs to Kevin Wilson, he got

22   in the car, he had to collect the money.  So Philip Bryant had

23   a financial stake in the successful completion of that sale.

24           You don't know the drug business, if Kevin Wilson's

25   not about to get robbed, you don't know if all the money's

1  going to be there.  So it doesn't matter that the payment

2  might have come several minutes later.  The drugs were given

3  on credit with the expectation that the sale was going to

4  occur, and it's got to get successfully completed in order to

5  get the money.  It's a credit transaction regardless of how

6  quickly it might have happened.

7         And that is enough to have launched Kevin Wilson

8  back into the drug trade where he was directly starting to

9  sell drugs.  It was an ounce of crack cocaine, and because of

10  the episode with the two cooperators that gave him the

11  willies, that's why he remembers it.

12         But I wouldn't ask you to rely on Kevin Wilson's

13  word alone.  Take a look at the phone records.  Mr. Moraghan

14  suggested the names of other people that could have done it.

15  Of those -- there were no calls to Vincent Clark that day.

16         These two cooperators picked him up at the store

17  that his mother ran, and he's just going to randomly drive to

18  22-24 Judson hoping there was going to be an ounce there?

19  Wouldn't it be more logical to make a phone call to make sure

20  somebody had an ounce?

21         Didn't call Vincent Clark that day.  Didn't call

22  Quiyon Reid that day.  He made one outgoing phone call to

23  William Hines that lasted eight seconds, there's no return

24  phone call.

25         The guy he called ten times that day, including 13

1  minutes before he gets picked up at the store, is Philip

2  Bryant.

3          Now, for whatever reason Kevin Wilson chose to call

4  the cooperators afterwards.  Maybe he wanted to talk to them

5  and see if he could fish out some details of what they were

6  really up to.  Who does he call right before and have nearly --

7  he calls twice, and has a total of roughly two minutes of

8  conversation with?  Philip Bryant, right before he calls the

9  cooperating witness.  He said he told Philip Bryant that he

10 was concerned right when he handed Philip Bryant the money.

11         I would submit to you that the reason he called was

12 because there was enough time where either one of them left

13 and was no longer there at the point where Kevin Wilson

14 decided to make the phone call.  He said he couldn't remember

15 whether Philip Bryant was in his presence or not at that

16 point, when he decided to make the call to the CWs.

17         But who are you going to call if you're concerned

18 that the ounce of crack that you just gave someone was maybe

19 an undisputed law enforcement sale?  Who's going to be the

20 most empathetic at that point?  The guy who gave you the

21 crack, who might also be in trouble.

22         That brings me to Mr. Anderson.  With all due

23 respect to Attorney Rogan, I think that a lot of the argument

24 made with respect to Richard Anderson was, throw enough stuff

25 out there and hope that something sticks.  I was waiting to

1    hear Attorney Rogan's explanation for what those phone calls

2    were, and I think what he told you was, they were just a

3    sequence of calls.  They're a sequence of calls that tell a

4    pretty big story of what Richard Anderson was up to.

5          Now, let me step back for a second and talk about

6    Mr. Anderson's notion of a partnership.  Mr. Rogan argues to

7    you that because Mr. Anderson and Mr. Wilson did not split the

8    proceeds or Mr. Wilson didn't get some share of the proceeds

9    of the crack sales to Jesus Morales, that's not a partnership,

10   therefore no conspiracy, and therefore you have to let Mr.

11   Anderson walk in this case.

12         Nothing could be further from the truth.  There is

13   absolutely zero requirement in the law that in order to hold

14   Mr. Anderson liable for conspiracy with those crack sales that

15   somehow Mr. Wilson had to get a cut.  That is absolutely not

16   the law.

17         Her Honor is going to instruct you in a little while

18   that the only thing required for a conspiracy is a mutual

19   understanding to distribute drugs.  Nothing more, nothing

20   less.

21         And I'll give you an example of what I'm talking

22   about when I say a meeting of the minds.  If I call up someone

23   on the phone and I say, "Hey, can you get me a kilo of cocaine

24   for $35,000, because we can flip that kilo for 38," and the

25   person on the other end of the phone, my buddy, says to me

"I'll get right on it, I'll find that kilo," and hangs up the phone, that is a violation of federal conspiracy law.  We have agreed to obtain drugs with the intent to distribute, because of the quantity that's involved.  Doesn't matter if you never find a kilo or that if we never end up with a kilo of cocaine; we have committed the crime of conspiracy.

All that is needed is a mutual understanding to distribute drugs, and that's exactly what Richard Anderson and Kevin Wilson had with respect to Jesus Morales.

Her Honor is also going to instruct you that everyone does not have to have an equal role in a conspiracy. Some people play minor roles, some people play major roles. Think about all the individuals we talked about in this case.

Alexis Sutton, what was her role?  She drove Kevin Wilson around to various drug transactions and she delivered drugs to some of his customers.

Think about the Galan brothers.  When Kevin Wilson wasn't around and he was at work at Dunkin' Donuts, they delivered drugs.  On the day of his arrest, one of them tried to go in his apartment and flush drugs down the toilet of their apartment, to help him out.

So everyone doesn't have to have equal roles, right? Look at the roles of these guys, they're all different.  Mr. Anderson's role wasn't the same as Robert Santos's.  Philip Bryant's wasn't the same as the other two guys.  So there is

1    absolutely no requirement at all that Mr. Wilson had to derive

2    some profit directly from the sales of crack between Mr.

3    Anderson and Mr. Morales.

4           What did occur?  What was the mutual arrangement?

5    From Mr. Wilson's perspective, he was going to keep Mr.

6    Morales happy, a heroin customer, by hooking him up with a

7    crack supplier.  From Mr. Wilson's perspective, he was also

8    going to gain another person who had a network of customers

9    that he could then sell heroin to.

10          And what was the benefit to Mr. Anderson?  He gained

11   yet another crack customer, and in Mr. Wilson, he found a

12   connection for heroin.  And for Mr. Morales's part, he could

13   also sell the additional crack and get money in order to pay

14   down his debt to Mr. Wilson.  So this was a mutually

15   beneficial arrangement for all of them.

16          As Kevin Wilson said, in this conspiracy, he was

17   dead smack in the middle of it.  Those were his words.  And

18   every one of these individuals attached themselves to it in a

19   different way.

20          Now, Attorney Rogan threw out a few more other

21   things, and I just want to hit them quickly.

22          Number one, he said that Mr. Morales didn't speak

23   Spanish (sic).  That's absolutely dead wrong.  If you listen

24   to the calls, take a look at government exhibits 141 and 142,

25   Mr. Morales clearly speaks English.  He bounces back and forth

between Spanish and English.  He sends text messages in

English.  If he didn't speak English, why did he ask for the

telephone number of Mr. Wilson?  Why did he ask, "You want me

to deal directly with this dude?  You have to give me the

green light," and he gives him the green light.

It's clear from government exhibits 132 and 38 where

Mr. Anderson imitates Mr. Morales, in his explanation about

the drugs being of bad quality.  That they were clearly able

to communicate in English.

Number two, Mr. Rogan said that Mr. Anderson is a

heroin user.  There is absolutely zero evidence in this case

that Mr. Anderson was either a heroin addict or a crack

addict.  We know from the statement that he gave Officer

Zanelli that he dealt crack, and we know from Mr. Anderson's

own words that he dealt crack.  "I've got stuff everywhere,

I've got the stuff flooded, no one's complaining about my

product."

There's that one phone call where Mr. Anderson and

Mr. Wilson discuss the arrest of one of their colleagues, a

guy named Chiefy who was also arrested and charged in

connection with this case.  Mr. Anderson is relieved to find

out that Chiefy was only arrested for a stolen dirt bike.  And

what does Mr. Anderson say in response?  "Man, I thought it

was going to be a fed phone tap and that they were going to

get me next."

1          Ask yourselves this:  Who worries about a federal

2    phone tap?  An addict or drug dealers?  I think that tells you

3    all you need to know about whether he was a user or whether he

4    was a dealer.

5          Two last points.

6          Quantity.  Again, this is an issue where you don't

7    need Mr. Wilson.  I don't want you to guess.  I don't want you

8    to speculate on what the quantities were that Mr. Anderson was

9    involved.  That has no place in the courtroom.  But you don't

10   need Mr. Wilson to tell you what the quantities were.

11         I'm pretty sure you knew what the quantities were on

12   Friday of last week -- of the previous week before Mr. Wilson

13   ever took the stand.  If you go through those calls, you will

14   see that there are three eight ball transactions, that's 10.5

15   grams, and they have a further agreement where Mr. Morales is

16   going to get 25 grams.

17         And you also know from the subsequent phone call

18   where Mr. Anderson's really angry about being owed $1240 by

19   Mr. Morales; that based on what Mr. Zuk told you, that's

20   equivalent to an ounce of crack, 28 grams.

21         So if you do the math, you are at 35.  You are above

22   28 grams beyond a reasonable doubt, without ever even worrying

23   about what Kevin Wilson says.  And that would be sufficient

24   for beyond a reasonable doubt.  We don't want you to guess, we

25   don't want you to speculate.  But you can comfortably get

1   there and know that you're doing the right thing.

2          The last point that I want to hit, something that

3   Mr. Moraghan said and I think Mr. Reeve built on a little bit.

4   Mr. Moraghan said that about the guns, that this is a way of

5   life, that he doesn't know what that environment is like.

6          And I don't accept that.  And the reason why I don't

7   accept that is this:  This is not a way of life.  99.9 percent

8   of the residents in the Tre are honest, hard working citizens.

9   But it is a very small subset of individuals that are out

10  there slinging heroin, that are slinging crack and heroin and

11  slinging crack that are destroying these neighborhoods.  So I

12  don't accept that at all.

13         And I will tell you this:  I make no apologies of

14  using whatever lawful tools are in our arsenal to make these

15  neighborhoods safe for the residents that live there.

16         And with that, I'm going to ask you to return a

17  verdict of guilty as to all three of these individuals.

18         Thank you.

19         THE COURT:  Thank you, gentlemen.

20         Ladies and gentlemen, I believe your lunch is here

21  now.  Yes, it is.  So why don't we take the luncheon recess

22  for half an hour, and when you come back, I'm going to be

23  charging you on the law that you apply to this case, okay?

24         (In the absence of the jury:  1:09 p.m.)

25         MR. SILVERMAN:  Your Honor, before you leave the

1   bench, I have two brief issues I want to bring up on behalf of

2   the government.

3          THE COURT:  Yes.

4          MR. SILVERMAN:  The first is we would ask you to

5   make the *Geaney* findings with respect to co-conspirator

6   statements contained in the phone calls admitted into

7   evidence.  Most of the calls were from Kevin Wilson and one of

8   the three defendants, but there were a handful that were not,

9   that were between Mr. Wilson and someone else who's an alleged

10  co-conspirator in the case.

11         The government asks you at this point under *United*

12  *States v Geaney* to make the findings required such that they

13  would be admissible as an exception to the hearsay rule

14  pursuant to Rule 801(d)(2)(E), I believe.

15         THE COURT:  I think they're clearly admissible.

16         MR. SILVERMAN:  Thank you, your Honor.

17         The other issue is one I just want to flag for the

18  Court.  The government, without objection from the defendants,

19  admitted a number of exhibits into evidence early on.  They

20  came in as a group.  Some of them were never published to the

21  jury, we never played the call, or used the Department of

22  Labor records.

23         What I would like to do to address that housekeeping

24  matter is just explain, when the jury comes back in, either

25  probably right before your charge, that we're withdrawing

```
 1   about 20 of them that were never published to them, and that's

 2   why there are going to be some gaps in the list of exhibits

 3   that they receive when they go back to deliberate.  It would

 4   take me just a minute to put that on the record.

 5            THE COURT:  Okay, that seems appropriate.

 6            MR. SILVERMAN:  Thank you, your Honor.

 7            MR. REEVE:  And, your Honor, I have two matters,

 8   brief.

 9            THE COURT:  Yes?

10            MR. REEVE:  As your Honor will recall, we had

11   extensive discussions about my theory of defense request.  I

12   would ask your Honor to reconsider that in light of all the

13   arguments that have been made here, and I'm renewing my

14   request that the theory defense instruction be given.  That's

15   number one.

16            Number two --

17            THE COURT:  We have that request in writing from

18   you.

19            MR. REEVE:  Yes, your Honor.

20            THE COURT:  Okay.

21            MR. REEVE:  Number two, in the event -- I guess a

22   better way of saying assuming arguendo that the Court declines

23   my request, I am requesting that the language in that

24   instruction -- that is one who merely pretends, is not a

25   co-conspirator, there's not an agreement, when two people --
```

I'm not quoting it exactly right, but I'm requesting that that

be placed in the charge as under the agreement section, the

second element, because I think it's a proper statement of the

law.

Even if you're not going to give it in the theory

defense, I rely on language, and your Honor, I wish -- I don't

have it at my fingertips but when I filed my memo in support,

in that memo, I also cited the explicit language of the Second

Circuit, it was two sentences, I synthesized it to one, I'm

requesting either one in the alternative.  The language in my

theory defense, the one sentence about one who merely

pretends; or alternatively, precisely the language that's

taken out of the Second Circuit case, which, in my view, is an

accurate statement of the law.

And without speaking for the government, I will say

they believe it is not an accurate statement of the law as it

applies to this case.

MR. VATTI:  Your Honor, I'm going to object to the

inclusion of that language at this point.  The instruction

that has been finalized by your Honor is very consistent with

Second Circuit case law on conspiracy and the existence of a

conspiracy and what the definitions are and what the jury has

to find.

And in this particular case, putting the pretend to

agree language is really the theory of defense for which we

```
 1    have already discussed there is absolutely no evidence in the

 2    record that Mr. Santos ever pretended to agree.

 3              THE COURT:  Okay.  It's on the record.

 4              MR. REEVE:  Thank you, your Honor.

 5              MR. MORAGHAN:  Thank you.

 6              MR. VATTI:  Your Honor, I suppose we can do this

 7    after the charge.

 8              THE COURT:  That's all right.

 9              MR. VATTI:  I just wanted to make sure that your

10    Honor puts on the record your ruling that there was no

11    foundation in the evidence whatsoever for the defense theory

12    of, the defense request on, its theory of defense.

13              THE COURT:  Well, I think I made that finding before

14    in discussions with counsel, but it's not on the record.

15              MR. REEVE:  Yes, your Honor, that was not on the

16    record, it was in chambers.  I think we can raise this after

17    your Honor gives the charge, when we make exceptions to the

18    charge.

19              MR. VATTI:  That's fine.

20              MR. REEVE:  Obviously, I understand what the

21    government's request is.

22              MR. SILVERMAN:  Thank you, your Honor.  We'll see

23    you shortly.

24              THE COURT:  Enjoy your lunch.

25              (Luncheon recess:  1:15 o'clock p.m. to 2:08 o'clock
```

```
 1    p.m., in the absence of the jury.)

 2              THE COURT:  Good afternoon.

 3              MR. SILVERMAN:  Good afternoon, your Honor.

 4              MR. VATTI:  Good afternoon, your Honor.

 5              MR. REEVE:  Good afternoon, your Honor.

 6              MR. ROGAN:  Good afternoon.

 7              MR. MORAGHAN:  Good afternoon, your Honor.

 8              MR. SILVERMAN:  Your Honor, just as a reminder,

 9    after they come in but before you start the charge, there's

10    one housekeeping matter that the parties need to take care of,

11    in terms of the exhibits.

12              THE COURT:  Yes.

13              MR. SILVERMAN:  I'm going to withdraw some of the

14    government exhibits.

15              THE COURT:  All right.

16              MR. SILVERMAN:  And then I have a list, sort of a

17    table of contents for them, that I'm going to move into

18    evidence.  I understand it won't be with any objection.  I

19    think the defense also has a list that they'll be moving into

20    evidence.

21              MR. MORAGHAN:  Correct, your Honor.

22              MR. SILVERMAN:  That shouldn't take long, and then I

23    think we can go right into the charge.

24              THE COURT:  I think the jury's prepared to continue

25    on beyond 5:00 o'clock tonight.  A couple of them had
```

1    something -- I'm sorry.  I always project my voice.  I used to

2    do some acting.  I was considerably younger then.

3              MR. REEVE:  I know the feeling, your Honor.

4              THE COURT:  Some of the jurors were concerned about

5    the weather possibilities for tomorrow, and they have

6    accordingly canceled some appointments they had after 5:00

7    o'clock tonight.  So I gather from that that they are prepared

8    to stay as long as they have to to resolve this case, and I'm

9    delighted to hear that, actually.  I don't know if you are or

10   not.  I think that would be good because we don't know what

11   the weather will be tomorrow.

12             MR. REEVE:  As long as they want to stay, I think

13   we're here.

14             MR. SILVERMAN:  That's right.

15             THE COURT:  You want to put something on the record.

16             MR. SILVERMAN:  It will be very brief, two or three

17   minutes when they come in, and then you can roll right into

18   your charge.

19             THE COURT:  Very good, okay.

20             I'll try to remember to talk into the microphone.

21             MR. REEVE:  Thank you.

22             THE COURT:  When I graduated from college, I was

23   trying to decide what I wanted to do with my life, whether to

24   go to the Yale Law School or Yale Drama School.  Decided the

25   practical thing to do was to go to the law school.  I gave

1    serious consideration between the two careers.

2              MR. REEVE:  You made the right choice, Judge.

3              MR. MORAGHAN:  Yes.

4              THE COURT:  I think I did.

5              MR. REEVE:  I think so, too.

6              THE COURT:  Thank you.

7              MR. REEVE:  I counted up my years, but it doesn't

8    add up to 41.  I don't know how many years you practiced

9    before you became a Judge.

10             THE COURT:  I graduated from law school in '47, then

11   I became a judge first of all in '73.

12             MR. REEVE:  How many women were in your graduating

13   class of 1947, your Honor?

14             THE COURT:  There were five in the whole law school.

15   In my particular class, I think I was one of two.

16             (In the presence of the jury:  2:12 o'clock p.m.)

17             THE COURT:  Good afternoon, ladies and gentlemen.

18             MR. SILVERMAN:  Your Honor, if I may, over the lunch

19   break, the parties took care of one housekeeping matter that I

20   just want to put on the record, before you provide your

21   instructions to the jury.

22             The government admitted a number of exhibits in

23   evidence, and some of them were never published to the jury,

24   so I need to withdraw those exhibits.

25             THE COURT:  All right.  Sure.  Would you indicate

1    which they are?

2         MR. SILVERMAN:  Yes, your Honor, it's a list.  So

3    it's 5, 6, 7, 39, 42, 48, 61, 64, 65, 66, 67, 67.1, 69, 73,

4    77.1, 93, 113, 116, 117, 129, 130, 211, 239, 248, 249, 250,

5    251, 252, 308, and 309.  The government's withdrawing those

6    exhibits, and seeking to add one final exhibit to the list,

7    which is just sort of a table of contents of the government

8    exhibits.  It's all of the exhibits in evidence for the jury's

9    consideration.  I've marked it as Government's Exhibit 311.  I

10   understand that there's no objection to it becoming a full

11   exhibit.

12        MR. REEVE:  That's correct, your Honor.  And in like

13   kind, we have prepared an exhibit list that has the

14   information that we discussed, and it has been marked as

15   Defendant's Exhibit DD, and I would move it in full, just as

16   the government's exhibit is, as an aid to the jury.

17        MR. SILVERMAN:  No objection.

18        THE COURT:  All right.

19        Ladies and gentlemen, if any of you are planning to

20   leave the courtroom before I complete my charge, I'm telling

21   you now you're not going to be able to do so.  So if you want

22   to go, go now.  Otherwise, we're going to seal the courtroom

23   while I read the charge to the jury.  Anybody want to leave?

24   I'm talking to the people in the gallery.  No?  You're all

25   enthusiastic about hearing me?  Okay.

1      Ladies and gentlemen, you are about to begin your

2    final duty.  In order for you to do that, I will now instruct

3    you on the law that is applicable to this case, and to the

4    indictment.

5      As in all cases, you, the jury, and I, the Court,

6    have separate functions.  It's my duty to tell you the law as

7    it pertains to this case, and it is your duty to find the

8    facts.

9      I told you at the start of the trial that your

10   principal function during the taking of testimony would be to

11   listen carefully and to observe each witness who testified.  I

12   ask you to give me that attention now as I instruct you on the

13   law.

14     You are charged with passing upon and deciding the

15   factual issues that are in this case.  You, the members of the

16   jury, are the sole judges of what the facts are.  You decide

17   the weight of the evidence, you determine the credibility of

18   the witnesses, you resolve such conflicts as there may be in

19   the testimony, and you draw whatever reasonable conclusions

20   you decide to draw from the facts as you have determined them.

21   I shall later discuss with you how to pass upon the

22   credibility, or believability, of the witnesses.  In

23   determining the facts, you must rely upon your own

24   recollection of the evidence.

25     What the lawyers have said in their closing

1    arguments, in their objections, or in their questions is not

2    evidence.  Likewise, you should bear in mind that although a

3    witness's answer, in the context of the specific question, is

4    evidence, the question itself is not evidence.

5         Nor is anything I may have said during the trial, or

6    may say during these instructions with respect to a factual

7    matter, to be taken in substitution for your own independent

8    recollection.  What I say is not evidence.

9         The evidence in the case consists of the sworn

10   testimony of the witnesses, all exhibits received in evidence,

11   and all facts that were admitted or stipulated to by the

12   parties.  And later, I will tell you more about the different

13   types of evidence and conclusions you may draw from such

14   evidence.

15        During the trial, I may have directed you to

16   disregard an answer given by a witness.  I don't recall that

17   that really happened, but if it did, you must not consider any

18   answer that I directed you to disregard, or that I directed

19   struck from the record.  Do not consider such answers.  You

20   shall also disregard evidence to which an objection was

21   sustained.

22        Because you are the sole and exclusive judges of the

23   facts, I do not mean to indicate any opinion as to the facts

24   or as to what your verdict should be.  The rulings I made

25   during the trial should not be used by you as any indication

1    of my views concerning the guilt or innocence of a defendant,

2    nor should you infer that I have such an opinion from anything

3    I may have said.

4          Remember, as to the facts, ladies and gentlemen, you

5    are the exclusive judges.  You must perform the duty of

6    finding the facts without bias or prejudice as to any party.

7          Insofar as I state the law to you, what I say is

8    binding upon you, and it is your duty to follow my

9    instructions and apply the law to the facts as you find them.

10   You may not single out one instruction of the Court alone as

11   stating the law; rather, you must consider the instructions as

12   a whole.

13         If, by chance, you have a different idea of what the

14   law is or what it should be, you must disregard your own

15   notion, and conscientiously apply the law as I give it to you.

16   Regardless of what you think the law ought to be, it would be

17   a violation of your sworn duty to base a verdict upon any view

18   of the law other than that stated in the instructions of the

19   Court.

20         In addition, if any lawyer has stated a legal

21   principle different from what I say in my instructions, it is

22   my instructions that you must follow.  Furthermore, you should

23   not consider, during your deliberations, any statements made

24   by counsel that are not supported by the evidence in the case.

25         During the course of this trial, there have been

occasions for the attorneys to confer with me out of your

hearing.  In the interest of justice and in order to expedite

trial, it is perfectly proper that any such conference be held

here at the bench.  This avoids the inconvenience of having

you, the jury, file out and back in again.  It also serves to

prevent the jury from being excused for technical legal

matters.

In such situations, you should not feel slighted.

You are not to guess or predict what may have been discussed

between the attorneys and me here at the bench.  Likewise, you

should not resent any attorney who requested the bench

conference out of your hearing.

During the trial, you have also heard objections

made by the attorneys.  It is the duty of every attorney to

object when another attorney offers testimony or other

evidence that the objecting attorney believes is not properly

admissible.  You should not show prejudice against any

attorney or his client because that attorney has made

objections.

If the Court decides to permit the introduction of

evidence over the objection of an attorney, this does not,

unless expressly stated, indicate any opinion on my part as to

the weight or effect of such evidence.  The Court has no

opinion about the verdict you should render in this case.  As

stated before, you are the sole judges of the credibility of

all the witnesses and the weight and effect of all evidence.

It is for you alone to decide whether the government has proved a defendant guilty beyond a reasonable doubt of the crimes charged as to him, based solely on the evidence and subject to the law as I charge you.

You are to be guided solely by the evidence in the case, and the crucial, central question that you must ask yourselves as you sift through the evidence is:  Has the government proved the guilt of a defendant beyond a reasonable doubt as to the offense charged?

Under your oath as jurors, you are not to be swayed by prejudice, bias, or sympathy.  If you have reasonable doubt as to the guilt of a defendant as to any offense with which he is charged, you should not hesitate for any reason to return a verdict of not guilty.

On the other hand, if you find that the government has sustained its burden of proving, beyond a reasonable doubt, the guilt of a defendant as to the charged crime, you should not hesitate because of sympathy or any other reason to render a verdict of guilty.

In reaching a verdict, you must bear in mind that guilt is individual.  Your verdict with regard to each defendant must be determined separately, solely on the evidence, or lack of evidence, presented against him, without regard to the guilt or innocence of anyone else.

1    You may not infer guilt merely from the fact that a

2  defendant associated with other persons who were engaged in

3  wrongdoing.

4    In addition, some of the evidence in this case

5  pertained only to one or some of the defendants.  Let me

6  emphasize that any evidence admitted solely against one

7  defendant may be considered only as against that defendant,

8  and may not in any respect enter into your deliberations on

9  another defendant.

10    You are to perform the duty of finding the facts

11  without bias or prejudice as to any party, and with an

12  attitude of complete fairness and impartiality.

13    This case is important to the government, for the

14  enforcement of criminal laws is a matter of prime concern to

15  the community.  It is equally important to the defendants, who

16  are charged with serious crimes.

17    The fact that the prosecution is brought in the name

18  of the United States of America entitles the government to no

19  greater consideration than that accorded to any other party in

20  the litigation.  By the same token, it is entitled to no less

21  consideration.  All parties, whether the government or a

22  defendant, stand as equals before the law.

23    Although the defendants have been indicted, you must

24  remember that the indictment is only an accusation.  It is not

25  evidence.  The defendants have pleaded not guilty to the

1    indictment.  As a result of each defendant's plea of not

2    guilty, the burden is on the government to prove such

3    defendant's guilt beyond a reasonable doubt.  This burden

4    never shifts to a defendant for the simple reason that the law

5    never imposes upon a defendant in a criminal case the burden

6    or duty of calling any witnesses or producing any evidence.

7           The law presumes each defendant to be innocent of

8    the charges against him.  I therefore instruct you that each

9    of the defendants is to be presumed by you to be innocent

10   throughout your deliberations until such time, if ever, you,

11   as a jury, are satisfied that the government has proved, as to

12   a defendant, guilt beyond a reasonable doubt as to the charged

13   crime.

14          Again, each of the defendants begins the trial here

15   with a clean slate.  This presumption of innocence alone is

16   sufficient to acquit each defendant, unless you as jurors are

17   reasonably satisfied beyond a reasonable doubt of a

18   defendant's guilt as to a charged crime, after a careful and

19   impartial consideration of all of the evidence in this case.

20   If the government fails to sustain its burden, you must return

21   a verdict of not guilty.

22          This presumption of innocence was with each

23   defendant when the trial began, remains with each of the

24   defendants even now as I speak to you, and will continue with

25   each of the defendants into your deliberations unless and

1  until you are convinced that the government has proved a

2  defendant's guilt beyond a reasonable doubt.

3        I have said that the government must prove each

4  defendant guilty beyond a reasonable doubt.  The question

5  naturally is:  What is a reasonable doubt?  The words almost

6  define themselves.  It is a doubt based on reason and common

7  sense.  It is a doubt that a reasonable person has, after

8  carefully weighing all of the evidence.  It is a doubt which

9  would cause a reasonable person to hesitate to act in a matter

10 of importance in his or her personal life.

11       Proof beyond a reasonable doubt, therefore, must be

12 proof of such a convincing character that a reasonable person

13 would not hesitate to rely and act upon it in the most

14 important of his own affairs.

15       A reasonable doubt is not a caprice or a whim; it is

16 not a speculation or suspicion; it is not an excuse to avoid

17 the performance of an unpleasant duty; and it is not sympathy.

18       In a criminal case, the burden is at all times upon

19 the government to prove guilt beyond a reasonable doubt.  The

20 law does not require the government to prove guilt beyond all

21 possible doubt.  Proof beyond a reasonable doubt is sufficient

22 to convict.

23       This burden of proof never shifts to a defendant,

24 which means that it is always the government's burden to prove

25 each of the elements of a crime charged beyond a reasonable

1    doubt as to each defendant.

2         If, after fair and impartial consideration of all

3    the evidence, you have a reasonable doubt as to a defendant --

4    that is, if you view the evidence as to him as permitting

5    either of two reasonable conclusions, guilty or not guilty, it

6    is your duty to acquit that defendant.

7         On the other hand, if, after fair and impartial

8    consideration of all the evidence, you are satisfied of a

9    defendant's guilt beyond a reasonable doubt as to the charged

10   crime, you should vote to convict that defendant.

11        In order for the government to prove that a

12   defendant is guilty of a charged offense, it must prove all

13   elements of that offense.  Unless the government proves beyond

14   a reasonable doubt that a defendant has committed each and

15   every element of the offense, you must find the defendant not

16   guilty of that offense.

17        You should understand that whenever I say the

18   government has to prove a fact to you, I mean that it has to

19   prove that fact to you beyond a reasonable doubt, as I just

20   explained to you.

21        Thus, you are to understand my use of the word

22   "prove" to mean prove beyond a reasonable doubt, even if I do

23   not always repeat those exact words.

24        Similarly, when I say that you must "find" a fact in

25   order to return a guilty verdict, you must find that fact to

1   have been proved by the government beyond a reasonable doubt,

2   even if I simply use the word "find."

3            Our courts operate under an adversary system in

4   which we hope that the truth will emerge through the competing

5   arguments of adverse parties.  It is the role of the attorneys

6   to press as hard as they can for their respective positions.

7   In fulfilling that role, they have not only the right, but the

8   obligation, to make objections to the introduction of evidence

9   they feel is improper.

10            The application of the rules of evidence is not

11   always clear, and lawyers often disagree.  It has been my job

12   as the Judge to resolve any such disputes.  It is important

13   for you to realize that my rulings on evidentiary matters have

14   nothing to do with the ultimate merits of the case, and are

15   not to be considered as points scored for one side or the

16   other.

17            Similarly, one cannot help becoming involved with

18   the personalities and styles of the attorneys, but it is

19   important for you as jurors to recognize that this is not a

20   contest among attorneys.  You are to decide this case solely

21   on the basis of the evidence.

22            Remember, statements and characteristics of the

23   evidence by the attorneys is not the evidence.  Insofar as you

24   find their closing arguments helpful, take advantage of them.

25   But it is your memory and your evaluation of the evidence in

the case that counts.

The evidence in this case is the sworn testimony of the witnesses, regardless of who may have called them; and all exhibits received in evidence, regardless of who may have produced them.

It is the witness's answers and not the lawyer's questions that are evidence.  At times, a lawyer may have incorporated into a question a statement that assumed certain facts to be true, and then asked the witness if the statement was true.  If the witness denied the truth of a statement and there is no direct evidence in the record proving that assumed fact to be true, then you may not consider it to be true simply because it was contained in the lawyer's question.

Similarly, if an attorney described a witness's testimony, you should not accept that description as to the witness's testimony.  It is your recollection of the witness's testimony that controls.  The lawyers are not witnesses.  And again, what the lawyers have said in their closing arguments or in their questions is not evidence.  What they have said in their closing arguments is intended to help you understand the evidence and to reach your verdict.  However, if your recollection of the facts differs from what a lawyer may have said, it is your recollection that controls.

Materials brought forth only to refresh a witness's recollection also is not evidence.  And anything I may have

1    said during the trial, or that I may convey in these

2    instructions, is not evidence, either.

3            Finally, anything you may have seen or heard outside

4    the courtroom or while the court was not in session is not

5    evidence and must be entirely disregarded.  You are to decide

6    the case solely on the evidence received at trial.

7            There are two types of evidence that you may

8    properly use in deciding whether a defendant is guilty or not

9    guilty.

10           One type of evidence is called direct evidence.

11   Direct evidence is evidence presented by a witness who

12   testified as to what that witness saw, heard, or observed.  In

13   other words, when a witness testifies about what is known to

14   that witness by virtue of his or her own senses -- what the

15   witness sees, feels, touches, or hears -- that is called

16   direct evidence.

17           The second type of evidence is circumstantial

18   evidence.  Circumstantial evidence is evidence that tends to

19   prove a disputed fact by proof of other facts.  When we employ

20   circumstantial evidence to reach a conclusion, we often say

21   that we infer one fact from another, or that we draw an

22   inference.

23           There is a simple example of circumstantial evidence

24   that is often used in this courthouse.  Assume that when you

25   came into the courthouse this morning, the sun was shining and

it was a nice day.  Assume further that the drapes are drawn
and you cannot see outside.  As you were sitting in the
courtroom, someone walked in with an umbrella that was
dripping wet.  Somebody then walked in with a raincoat also
dripping wet.

Now, you cannot look outside of the courtroom and
you cannot see whether or not it is raining, so you have no
direct evidence of that fact.  But based on the combination of
facts which I have asked you to assume, it would be reasonable
and logical for you to conclude that it had been raining.

And that's all there is to circumstantial evidence.
You take an established fact and conclude, on the basis of
reason, experience, and common sense, that another fact exists
or does not exist.

Circumstantial evidence is of no less value than
direct evidence.  It is a general rule that the law makes no
distinction between direct and circumstantial evidence, but
simply requires that, before convicting a defendant, the jury
must be satisfied of that defendant's guilt beyond a
reasonable doubt from all of the evidence in the case.

In their arguments, the attorneys may have asked you
to reach a conclusion on the basis of your reason, experience,
and common sense, from one or more established facts, the
existence of some other fact.  Again, this is called an
inference.  An inference is not a suspicion or a guess.  It is

1    a reasonable, logical decision to conclude that a disputed

2    fact exists on the basis of another fact or facts that you

3    know exist.

4          There are times when different inferences may be

5    drawn from facts, whether proved by direct or circumstantial

6    evidence.  The government asks you to draw one set of

7    inferences, while each of the defendants asks you to draw

8    another.  It is for you, and you alone, to decide what

9    inferences you will draw.

10          The process of drawing inferences from facts in

11   evidence is not a matter of guesswork or speculation.  An

12   inference is a deduction or conclusion which you, the jury,

13   are permitted, but not required, to draw from the facts that

14   have been established by either direct or circumstantial

15   evidence.  In drawing inferences, you should exercise your

16   common sense.

17          So while you are considering the evidence presented

18   to you, you are permitted to draw from the facts that you find

19   to be proved such reasonable inferences as would be justified

20   in light of your experience.

21          You may not infer, however, that a defendant is

22   guilty of participating in criminal conduct merely from the

23   fact that he was present at the time a criminal act was

24   committed, even if he had knowledge that it was being

25   committed.

 1              Here again, let me remind you that, whether based

 2      upon direct or circumstantial evidence or upon the logical,

 3      reasonable inferences drawn from such evidence, you must be

 4      satisfied of the guilt of a defendant beyond a reasonable

 5      doubt before you may convict that defendant of a charged

 6      crime.

 7              You, as jurors, are the sole judges of the

 8      credibility of the witnesses and of the weight their testimony

 9      deserves.  No fact, of course, may be determined merely by the

10      number of witnesses presented to you, or by the volume of the

11      evidence.  Instead, your primary interest should be the

12      quality of the testimony and evidence offered, not the

13      quantity.

14              There is no magic formula by which one may evaluate

15      testimony.  You bring with you to the courtroom all of the

16      experiences and background of your lives.  In your every day

17      affairs, you determine for yourselves the reliability or

18      unreliability of statements made to you by others.  The same

19      tests that you use in your every day dealings are the tests

20      you should apply in your deliberations as jurors.

21              You should carefully scrutinize all the testimony

22      given, the circumstances under which each witness has

23      testified, and every matter in evidence that tends to show

24      whether a witness is worthy of belief.  Consider each

25      witness's intelligence, motive, state of mind, demeanor, and

1   manner while on the stand.  Consider the witness's ability to

2   observe the matters to which the witness has testified, and

3   whether the witness impresses you as having an accurate

4   recollection of these matters.

5          Consider also any possible bias or hostility which

6   the witness might have, either for or against the government,

7   or for or against a defendant; the manner in which each

8   witness might be affected by the verdict; and the extent to

9   which, if at all, a witness's testimony is either supported or

10  contradicted by other evidence in the case.  In short, you

11  should test the evidence by your own knowledge of human nature

12  and the motives that influence and control human beings.

13         In deciding whether or not to believe a witness,

14  keep in mind that people sometimes forget things.  A witness's

15  direct testimony may be contradicted by the witness's

16  testimony on cross-examination.

17         Inconsistencies or discrepancies in the testimony of

18  a witness, or between the testimony of different witnesses,

19  may, or may not, cause you to discredit such testimony.  Two

20  or more persons witnessing an incident or transaction may see

21  or hear it differently.

22         You need to consider, therefore, whether a

23  contradiction is an innocent lapse of memory or an intentional

24  falsehood, and that may depend on whether it has to do with an

25  important fact or with only a small detail.

1          Where a witness testifies inaccurately and you do

2     not think that the inaccuracy was consciously dishonest, you

3     should bear that in mind when scrutinizing the entire

4     testimony of that witness.

5          If, however, you conclude that a witness has not

6     only testified falsely, but has done so intentionally, that

7     fact casts a very serious doubt about all of that witness's

8     testimony, and you might well conclude that you cannot accept

9     any of it.

10          The significance that you attach to an inaccuracy

11     may vary more or less due to the particular fact as to which

12     the inaccuracy existed or to the surrounding circumstances

13     which, in your mind, should have impressed it upon the memory

14     of the witness and caused a correct retention of it to be

15     made.

16          A witness may be discredited or impeached by

17     contradictory evidence, by showing that the witness testified

18     falsely concerning a material matter, or by evidence that at

19     some other time, the witness said or did something or failed

20     to say or do something which is inconsistent with the

21     witness's present testimony.

22          If you believe that any witness has been discredited

23     or impeached, then it is your exclusive province to give the

24     testimony of that witness such credibility or weight, if any,

25     as you think it deserves.

1             But you are not required to accept testimony, even

2    though the testimony was not contradicted and the witness was

3    not impeached.  You may decide, due to the witness's bearing

4    and demeanor, or due to the inherent improbability of the

5    witness's testimony, or for other reasons sufficient to you,

6    that such testimony is not worthy of belief.

7             On the other hand, the testimony of a single witness

8    may be sufficient to convince you beyond a reasonable doubt of

9    the existence, or the absence, of an essential element or

10   elements of the charged offense.

11            In short, in deciding the question of credibility,

12   remember that you should use your own common sense, good

13   judgment, and experience.

14            There has been testimony from a witness who has

15   pleaded guilty to crimes and has entered into an agreement

16   with the government to testify.  Copies of these agreements

17   have been offered as evidence.

18            Am I correct in that, gentlemen?

19            MR. SILVERMAN:  Yes, your Honor.

20            MR. REEVE:  Yes, your Honor.

21            THE COURT:  You have also heard that the government

22   promised to bring the cooperation of the witness to the

23   attention of the sentencing Court and to file a 5K motion on

24   the witness's behalf, if the government determines that the

25   witness provided truthful and complete cooperation, which

1    substantially assisted the government in the investigation or

2    prosecution of another person.  The government is permitted to

3    enter into this kind of agreement.

4           You, in turn, may accept the testimony of such a

5    witness and convict a defendant of a charged crime on the

6    basis of this testimony alone, if it convinces you of a

7    defendant's guilt beyond a reasonable doubt as to the crime

8    charged.

9           It is your duty to evaluate such witness's

10   credibility, taking into consideration any motivation

11   evidenced by the agreement.  You should bear in mind that a

12   witness who has entered into such an agreement has an interest

13   in the case different from an ordinary witness.  A witness who

14   realizes that he may be able to obtain his own freedom or

15   receive a lighter sentence by giving testimony favorable to

16   the government has a motive to testify falsely or, on the

17   other hand, to testify truthfully.

18          Therefore, you must examine his testimony with

19   caution, and weigh it with great care.  If, after scrutinizing

20   the witness's testimony, you decide to accept all or part of

21   it, you may give it whatever weight, if any, you find it

22   deserves.

23          Additionally, you are instructed to draw no

24   conclusions or inferences of any kind about the guilt of any

25   of the defendants on trial from the fact that a prosecution

1   witness has pleaded guilty to similar charges.  The witness's

2   decision to plead guilty was a personal decision about his own

3   guilt.  It may not be used by you in any way as evidence

4   against or unfavorable to any of the defendants on trial.

5          You may consider the fact of that witness's guilt as

6   it relates to that witness's credibility.  However, the simple

7   fact of the witness's guilt may not be used by you in any way

8   as evidence against or unfavorable to any of the defendants on

9   trial here.

10          But remember that for purposes of evaluating a

11   witness's credibility, and deciding how much of their

12   testimony to accept and what weight, if any, of the witness's

13   testimony should be given, you may consider the fact that a

14   witness was previously convicted of a crime, punishable by

15   more than one year in jail.  These prior convictions were put

16   into evidence for you to consider for that purpose.

17          Finally, there are other persons named in the

18   indictment not presently on trial, and as to whom you are not

19   being asked to reach a verdict.  You are not to speculate

20   about the reasons why any such individuals are not part of

21   this trial, and this fact should not affect or influence your

22   verdict with respect to the defendants who are on trial.

23          You must base your verdict as to each defendant

24   solely on the basis of the evidence or lack of evidence

25   against him.

1          In this case, I have permitted FBI Special Agent

2    Michael Zuk and DEA forensic chemist Brian Hall to express

3    their opinions about matters that are in issue.  Those

4    witnesses were permitted to testify to provide an opinion on

5    certain matters based on his particular special knowledge,

6    skill, training, and experience.

7          Such testimony is presented to you on the theory

8    that someone who is experienced and knowledgeable in a field

9    can assist you in understanding the evidence or in reaching an

10   independent decision on the facts.

11         In weighing this opinion testimony, you may consider

12   the witness's qualifications, his opinions, the reasons for

13   testifying, as well as all of the other considerations that

14   ordinarily apply when you are deciding whether or not to

15   believe a witness's testimony.

16         You may give the opinion testimony whatever weight,

17   if any, you find it deserves in light of all the evidence in

18   the case.  You should not, however, accept opinion testimony

19   merely because I allowed the witness to testify concerning his

20   opinion; nor should you substitute it for your own reason,

21   judgment, and common sense.  The determination of the facts in

22   this case rests solely with you.

23         As I stated to you, in evaluating the credibility of

24   witnesses, you should take into account any evidence that a

25   witness who testified might benefit in some way from the

outcome of this case.  Such an interest in the outcome creates

a motive to testify falsely, and may sway the witness to

testify in a way that advances his or her own personal

interests.

Therefore, if you find that any witness whose

testimony you are considering may have an interest in the

outcome of this trial, you should bear that fact in mind when

evaluating the credibility of his or her testimony, and

scrutinize and view the testimony with caution and great care.

This is not to suggest that every witness who has an

interest in the outcome of a case will testify falsely.  It is

for you to decide what to what extent, if at all, a witness's

interest affected or colored his or her testimony.

The decision of a defendant not to testify on his

own behalf does not create any presumption against that

defendant.  Under our Constitution, a defendant has no

obligation to testify or to present any evidence, because it

is the government's sole burden to prove a defendant guilty

beyond a reasonable doubt.  That burden rests with the

government throughout the course of the trial and never shifts

to a defendant.  A defendant is never required to prove that

he is innocent.

Therefore, you may not attach any significance to

the fact that a defendant in this case did not testify, and

you may not consider this in any way in your deliberations.

1    Accordingly, you may not draw an adverse inference against a

2    defendant in this case simply because he did not take the

3    witness stand.  Nor may you speculate about why he chose not

4    to testify.

5            Further, during your deliberations, you may not

6    discuss the fact that a defendant did not testify.  There are

7    many reasons why a defendant may elect not to testify,

8    including the advice of his attorney.  In any event, it is not

9    a matter to which you should give any consideration, except to

10   bear in mind that a defendant in a criminal case has no

11   obligation to prove his innocence, and it is the government

12   alone that has the burden of proving guilt beyond a reasonable

13   doubt.

14           You have heard the testimony of law enforcement

15   officers.  The mere fact that a witness is employed by the

16   government or as a law enforcement officer does not entitle

17   such witness's testimony to any special or exclusive sanctity.

18   A law enforcement officer who takes the stand subjects his or

19   her testimony to the same scrutiny and the same tests as you

20   give the testimony of any other witness.

21           You should recall the witness's demeanor on the

22   stand, the witness's manner of testifying, the witness's

23   association with one side of the case, and the substance of

24   the testimony.  You should weigh his or her testimony just as

25   carefully as you would the testimony of any other witness.

1          It is your decision, after reviewing all of the

2     evidence, whether to accept the testimony of a law enforcement

3     officer, and to give such testimony whatever weight, if any,

4     you find it deserves.

5          The government has offered evidence in the form of

6     recordings of phone calls between a defendant and others which

7     were obtained without knowledge of the parties to these

8     conversations, but with the consent and authorization of a

9     court.  These so-called wiretaps were lawfully obtained.  The

10    use of this procedure to gather evidence is lawful, and the

11    government is entitled to use such wiretaps in this case.

12         The government has been permitted to display typed

13    documents which it prepared containing the government's

14    transcriptions of what it states is contained in the phone and

15    video recordings that have been received as evidence.

16         With respect to the recordings in English, the

17    transcripts were displayed to you as an aid, or guide, to

18    assist you in listening to the phone or video recording.

19    However, the transcripts are not in and of themselves

20    evidence.

21         Therefore, when the recordings were played, I

22    advised you had to listen carefully to the recordings

23    themselves.  You alone should make your own interpretation of

24    what you heard on the recordings.  If you think you heard

25    something different than what appeared on the transcripts,

1    then what you heard is controlling.  It is up to you alone to

2    determine what, if any, weight to give the content of any

3    phone or video recording.

4          I instruct you, however, that you must treat the

5    Spanish language recordings slightly differently.  The English

6    translations of these recordings have been admitted as

7    exhibits since the recordings are in a foreign language.  The

8    English translations that are admitted are official

9    translations, and you must accept them as such for the

10   purposes of this case.  You may not rely in any way on the

11   knowledge that you might have of the Spanish language spoken

12   in the recordings.

13         In addition, all of the transcripts, whether from an

14   English or Spanish speaking recording, might have undergone

15   some minor, nonsubstantive editing.  You should accept the

16   transcripts that have been provided to you as the official

17   transcripts of the recordings, and not speculate about the

18   reason any such edits may have been made.

19         Again, as with all of the other evidence, you alone

20   must decide what weight, if any, to give the content of the

21   recordings and the corresponding transcripts.

22         You are not limited to the literal words on the

23   recordings any more than you are limited to the bald

24   statements of witnesses.  You are permitted to draw such

25   reasonable inferences from them as you feel are justified in

1    the light of your experience.

2         Similarly, and especially in the recordings in which

3    the speakers are only heard, you may consider, in addition to

4    the literal words spoken, the tone and tenor of the speakers,

5    just as you would consider the demeanor and manner of a

6    witness who testified at trial.

7         You are further instructed that there is no legal

8    requirement that the government must use any specific

9    investigative technique to prove its case.  Law enforcement

10   techniques are not your concern.

11        Nor is it your concern if and why certain persons

12   have not been arrested, or that persons who might have been

13   present at a time or place mentioned in the case, or who seem

14   to have some knowledge of the issues in this case, have not

15   been called as witnesses.  The law also does not require that

16   all things mentioned during the course of the trial be

17   produced as exhibits.

18        Your function is to determine whether or not, based

19   upon all the evidence in the case, the government has proved

20   beyond a reasonable doubt the guilt of a defendant as to the

21   charged crime.

22        However, you may consider the fact that the

23   government did not use other investigative techniques or

24   exhaustively pursue every piece of evidence in determining

25   whether or not the government has met its burden of proof.

1          As I have already stated, the fact that one party

2     called more witnesses and introduced more evidence than

3     another does not mean that you should necessarily find the

4     facts in favor of the side offering the greater number of

5     witnesses.

6          By the same token, you should not have to accept the

7     testimony of any witness who has not been contradicted or

8     impeached, if you find the witness not to be credible.  Again,

9     you, the jury, alone decide which witnesses to believe and

10    which facts are true.  To do this, you must look at all the

11    evidence, drawing upon your own common sense and personal

12    experience.

13         And again, keep in mind that the burden of proof is

14    always on the government, and that a defendant is not required

15    to call any witnesses or offer any evidence, because he is

16    presumed to be innocent.

17         You are also instructed that the question of

18    possible punishment of a defendant is of no concern to the

19    jury.  Possible punishment should not, in any sense, enter

20    into or influence your deliberations as to the guilt or

21    innocence of a defendant.  In the event of a conviction, the

22    duty of imposing sentence rests exclusively with the Court.

23         The function of the jury is to weigh the evidence in

24    the case and determine the guilt or innocence of a defendant

25    as to each charged offense, solely upon the basis of such

1    evidence.  You cannot allow consideration of the punishment

2    that might be imposed upon a defendant to influence your

3    verdict in any way.

4         I now specifically draw your attention to the

5    superseding indictment.  I remind you that the indictment

6    itself is not evidence.  It merely describes the charges

7    against a defendant.  It is an accusation.  It may not be

8    considered by you as any evidence of the guilt of a defendant.

9    None of the defendants is charged with committing any crime

10   other than the offenses, as applicable, contained in Count One

11   of the indictment.

12        First, I will discuss a few general matters with

13   regard to the indictment.  Second, I will give you detailed

14   instructions as to what the government must prove beyond a

15   reasonable doubt for the crimes alleged against each of the

16   defendants in this case.

17        As I just stated, the superseding indictment

18   contains one count against the defendants now on trial.  Count

19   One charges Richard Anderson, Philip Bryant, and Robert Santos

20   with conspiracy to distribute and to possess with intent to

21   distribute narcotics, namely cocaine, cocaine base, crack

22   cocaine, and heroin.  Although, as I will explain to you in

23   more detail shortly, the indictment does not charge each

24   defendant with conspiracy as to all of these narcotic

25   substances.

Each defendant has pleaded not guilty to the charge against him.  The defendants' pleas put in issue each of the essential elements of the charged crime of conspiracy; that is, the government's burden of proving the guilt of each defendant beyond a reasonable doubt extends to each essential element of the charged offense.

You must analyze the charge of conspiracy element by element, as I shall explain them to you, and you may not find a defendant guilty of an offense unless you conclude that the government has proved each element of that offense beyond a reasonable doubt.

In doing this, you must consider Count One separately as to each defendant, and return a separate verdict of guilty or not guilty for each defendant on each offense under that count for which he is charged.

As I have already told you, some of the evidence pertains only to one of the defendants, and thus you must consider any such evidence only as against that defendant. Similarly, whether you find one defendant guilty or not guilty should not affect your verdict as to the other defendants. Nor may you infer guilt merely from the fact that a defendant associated with another person engaged in wrong doing.

Again, in reaching your verdict as to each of the defendants, you must bear in mind that the government's burden of proving guilt beyond a reasonable doubt as to the charged

1    crime applies to each defendant individually, and so must be

2    determined separately, and solely on the evidence or lack of

3    evidence presented against that defendant without regard to

4    the guilt or innocence of any other defendant, or anyone else.

5         You will note that the indictment charges that the

6    acts constituting the charged offenses were committed on or

7    about certain dates.  The proof, however, need not establish

8    with certainty the exact dates of the alleged acts

9    constituting the charged offense of conspiracy.  The law only

10   requires a substantial similarity between the dates alleged in

11   the indictment and the dates established by the testimony or

12   exhibits.

13        It is sufficient if the evidence in the case

14   establishes beyond a reasonable doubt that the acts

15   constituting the charged conspiracy were committed on dates

16   reasonably near the dates alleged in the indictment.  The same

17   goes for the places where such acts were committed.  Thus, it

18   is not necessary for the government to prove the exact dates,

19   times, or locations specified in Count One of the indictment.

20        I will now instruct you as to the specific

21   conspiracy charged in the indictment, and the essential

22   elements of that crime.

23        In Count One of the superseding indictment, Richard

24   Anderson, Philip Bryant, and Robert Santos are charged with

25   conspiracy to distribute and to possess with intent to

1    distribute narcotics, namely cocaine, cocaine base, crack

2    cocaine, and heroin.

3              In pertinent part, Count One reads:

4              From approximately January 2011 through

5    approximately January 2012, the exact dates being unknown to

6    the grand jury, in the District of Connecticut and elsewhere,

7    the defendants Richard Anderson, a.k.a. Mayut and Porter;

8    Jeffrey Benton, a.k.a. Fresh; Choloe Bright, a.k.a. Chi-Chi

9    and Chello; Philip Bryant, a.k.a. Phat Phil and Phizzy; Daniel

10   Evans, a.k.a. D-Nice; Erick Evans, a.k.a. EJ and Hoov; Gilbert

11   Galan Jr., a.k.a. G and Skittles; Pierre Galan, a.k.a. PLO;

12   William Hines, a.k.a. Gunz; Emory James, a.k.a. Emmo; Lamar

13   Jones, a.k.a. Cream; Corey Maddox, a.k.a. CL; James Moore,

14   a.k.a. Coolie D; Christina Palluoto; Roy Reid, a.k.a. Jamma;

15   Nelson Rios, a.k.a. Pito; Michael Santana; Robert Santos,

16   a.k.a. Scoot; Alexis Sutton; Jose Torres, a.k.a. Lethal; and

17   Marcus Wylie, a.k.a. Wally Don, together with Kevin Wilson,

18   a.k.a. Nature and Nate; Lynwood Bacote, a.k.a. Max; Ezel

19   Buchanan, a.k.a. EZ; Raymond Carson, a.k.a. Dirt; Vincent

20   Clark, a.k.a. Nu-Nu and Duke; Fredrick Cox, a.k.a. Boot;

21   Frederick Cox Sr, a.k.a. Bama-Lama; Darrell Davis, a.k.a.

22   Baller; Johnny De Los Santos, a.k.a. Na-Na; Jose DeJesus,

23   a.k.a. Flaco; Joshuwa Diaz, a.k.a. Fot; Eric Durant, a.k.a.

24   5-8; Jermaine Galberth, a.k.a. Maine; Carl Hailey, a.k.a.

25   Squirt; Jesus Morales, a.k.a. Cano; Amaury P'Dilla, a.k.a.

1   Audi; Quiyon Reid, a.k.a. Gutter; Juan Vargas, a.k.a. Juan

2   Chiefy; Jacqueline Valentine; and Tyrice White, a.k.a. Ears,

3   who are not named as defendants herein but are charged by

4   separate indictment, and others known and unknown to the grand

5   jury, did knowingly and intentionally conspire to violate the

6   narcotics laws of the United States.

7        It was a part and an object of the conspiracy that

8   the defendants Anderson, Benton, Bright, Bryant, Daniel Evans,

9   Erick Evans, Gilbert Galan Jr., Pierre Galan, Hines, James,

10  Jones, Maddox, Moore, Palluoto, Reid, Rios, Santana, Santos,

11  Sutton, Torres, and Wylie, together with Wilson, Bacote,

12  Buchanan, Carson, Clark, Frederick Cox, Frederick Cox Sr,

13  Davis, De Los Santos, DeJesus, Diaz, Durant, Galberth, Hailey,

14  Morales, P'Dilla, Reid, Vargas, Valentine, and White, and

15  others known and unknown to the grand jury, would distribute

16  and possess with intent to distribute controlled substances,

17  in violation of Title 21, United States Code, Section

18  841(a)(1).

19        Defendants Benton, Rios, and Santos knew or

20  reasonably should have known -- excuse me, should have

21  foreseen from their own conduct and that of other members of

22  the conspiracy that the narcotics conspiracy charged in Count

23  One involved 100 grams or more of a mixture or substance

24  containing a detectable amount of heroin, a Schedule I

25  controlled substance, in violation of Title 21, United States

Code, sections 841(a)(1) and 841(b)(1)(B)(i).

Defendants Anderson, Bryant, Erick Evans and Jones knew or reasonably should have foreseen from their own conduct and that of other members of the conspiracy that the narcotics conspiracy charged in Count One involved 28 grams of a mixture or substance containing a detectable amount of cocaine base, crack cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, sections 841(a)(1) and 841(b)(1)(B)(iii).

Defendants Bright, Bryant, Daniel Evans, Hines, James, Maddox, Moore, Palluoto, Reid, Sutton, Torres, and Wylie knew or reasonably should have foreseen from their own conduct and that of other members of the conspiracy that the narcotics conspiracy charged in Count One involved a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, sections 841(a)(1) and 841(b)(1)(C); a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, sections 841(a)(1) and 841(b)(1)(C); and a mixture or substance containing a detectable amount of cocaine base, crack cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, sections 841(a)(1) and 841(b)(1)(C).

All in violation of Title 21, United States Code,

1    Section 846.

2         Section 841 of Title 21 of the United States Code

3    provides, in pertinent part, that, "It shall be unlawful for

4    any person knowingly or intentionally to distribute or possess

5    with intent to distribute a controlled substance."

6         Section 846 of Title 21 of the United States Code

7    also makes it unlawful to conspire to commit such an offense.

8    In pertinent part, it provides that, "Any person who conspires

9    to commit any offense defined in Title 21 of the United States

10   Code shall be guilty of a crime against the United States."

11        The essence of a crime of conspiracy as charged in

12   Count One is an agreement between two or more persons to

13   accomplish a criminal act.

14        In order for you to find a defendant guilty of the

15   drug conspiracy charged in Count One, the government must

16   prove, beyond a reasonable doubt, each of the following two

17   elements:

18        First, that two or more persons entered into the

19   unlawful agreement charged in Count One of the superseding

20   indictment.

21        The alleged unlawful agreement is that from sometime

22   in or about January 2011 through in or about January 2012, the

23   defendants conspired with others and with one another to

24   distribute and to possess with intent to distribute narcotics,

25   namely cocaine, cocaine base, crack cocaine, and heroin.

1          To satisfy this first element of Count One, you must

2     find that the government has proved beyond a reasonable doubt

3     that the conspiracy charged in Count One existed.

4          Second, that a defendant knowingly and willfully

5     entered into the unlawful agreement, that is the conspiracy

6     charged in Count One.

7          If you find beyond a reasonable doubt that the

8     government has proved the existence of the conspiracy alleged

9     in Count One, and that a defendant knowingly and willfully

10    became a member of that conspiracy, then the conspiracy as

11    charged against that defendant in Count One has been proved.

12         The first element which the government must prove

13    beyond a reasonable doubt to establish the crime of conspiracy

14    is that two or more persons entered into an unlawful

15    agreement, the unlawful agreement, charged in Count One.

16         A conspiracy is an agreement between two or more

17    persons to accomplish a criminal act.  The gist, or the

18    essence, of the crime of conspiracy is the unlawful agreement

19    to violate the law.

20         The success of the conspiracy, or the actual

21    commission of the criminal act which is the object of the

22    conspiracy, is not an essential element of the crime.

23         The conspiracy alleged here is the agreement to

24    distribute and to possess with intent to distribute narcotics,

25    namely cocaine, cocaine base -- that's crack cocaine -- and

```
1    heroin.  This is an entirely distinct and separate offense

2    from the actual distribution of these drugs.

3           In order to establish the existence of an agreement,

4    the government is not required to show that two or more people

5    met together and entered into any solemn oral or written

6    packet or formal agreement stating that they had formed a

7    conspiracy to violate the law and spelling out all the

8    details.

9           Common sense tells you that when people agree to

10   enter into a criminal conspiracy, much is left to the

11   unexpressed understanding of the parties.  In other words, you

12   do not need to find that the alleged conspirators stated, in

13   words or writing, what the scheme was, its object or purpose,

14   or every precise detail or means by which its object or

15   purpose was to be accomplished.

16          What the government must prove is that there was a

17   mutual understanding, either spoken or unspoken, between two

18   or more people to cooperate with each other to accomplish an

19   unlawful act.

20          You may find that the existence of an agreement to

21   disobey or disregard the law has been established by direct

22   proof.  However, since conspiracy is, by its very nature,

23   characterized by secrecy, you may infer the existence from the

24   circumstances of the case and the conduct of the parties

25   involved.
```

1              In a very real sense, then, in the context of

2      conspiracy, the old adage, "actions speak louder than words"

3      applies.   In this regard, you may, in determining whether an

4      agreement existed as charged by the government in Count One of

5      the indictment in this case, consider the actions and

6      statements of all of those you find to be participants in the

7      conspiracy that were done or made in order to carry out the

8      criminal purpose as proof that a common design existed to

9      accomplish an unlawful purpose.

10             Often the only evidence that is available with

11     respect to the existence of a conspiracy is that of

12     disconnected acts and conduct on the part of the alleged

13     individual co-conspirators.

14             When taken together and considered as a whole,

15     however, those acts and conduct may warrant the inference that

16     a conspiracy existed as conclusively as would direct proof.

17             Thus, in considering the first element, you should

18     consider all the evidence which has been admitted with respect

19     to the conduct and statements of each alleged co-conspirator,

20     and such inferences as may be reasonably drawn from them.

21             It is sufficient to establish the existence of the

22     conspiracy if, from the proof of all the relevant facts and

23     circumstances, you find beyond a reasonable doubt that the

24     minds of at least two alleged co-conspirators met in an

25     understanding way to accomplish, by the means alleged, the

1    objectives of the conspiracy.

2          The success of the conspiracy, or the actual

3    commission of the criminal act which is the object of the

4    conspiracy, is not an essential element of the crime of

5    conspiracy.  Thus, unless you find that the government has

6    proved beyond a reasonable doubt that, as alleged in Count

7    One, two or more persons came to an understanding, express or

8    implied, to violate the law and accomplish the unlawful plan,

9    then you cannot find any of the defendants guilty of the drug

10   conspiracy alleged in Count One.

11         Since a person cannot conspire with himself, you

12   cannot find a defendant guilty of the conspiracy alleged in

13   Count One unless you find beyond a reasonable doubt that he

14   participated in the conspiracy with at least one other person,

15   whether named in the indictment or not.

16         A conspirator need not know all of the conspirators

17   or be aware of all the details of the conspiracy, so long as

18   the evidence is sufficient to show that he knowingly

19   contributed to the furtherance of the conspiracy.

20         If you find that the government has proved beyond a

21   reasonable doubt that the conspiracy alleged in Count One

22   existed, you must next determine the second element, and that

23   is whether a defendant knowingly and intentionally became a

24   participant in, or a member of, the conspiracy with knowledge

25   of its unlawful purpose and in furtherance of its unlawful

1    objective.

2         The government must prove by evidence of a

3    defendant's own actions and conduct beyond a reasonable doubt

4    that he knowingly and willfully entered into the conspiracy by

5    agreeing with at least one of the other members of the

6    conspiracy alleged in Count One, and participated in it with

7    knowledge of its unlawful purpose and with a specific criminal

8    intent to promote its unlawful objectives.

9         As to this first element, the terms "unlawfully" and

10   "willfully" and "knowingly" mean that you must be satisfied

11   beyond a reasonable doubt that in joining the conspiracy, if

12   you find a defendant did join the conspiracy, he knew what he

13   was doing and he took the actions in question deliberately and

14   voluntarily.  That is, you must determine whether he joined

15   the conspiracy with the awareness of at least one of the basic

16   aims and purposes of the unlawful agreement.  Knowledge,

17   willfulness, and intent involve the state of a defendant's

18   mind.

19        "Unlawfully" means simply contrary to law.  A

20   defendant need not have known that he was breaking any

21   particular law or any particular rule.  He need only have been

22   aware of the generally unlawful nature of his acts.

23        An act is done knowingly and willfully if it is done

24   deliberately and purposefully; that is, a defendant's actions

25   must have been the product of his conscious, objective thought

1    rather than the product of a mistake or accident or mere

2    negligence or some other innocent reason.

3            A defendant's knowledge is a matter of inference

4    from the facts that are proved beyond a reasonable doubt.

5    Science has not yet developed a manner of looking into a

6    person's mind and knowing what he is thinking.  Rarely is

7    direct proof available to establish the state of one's mind,

8    but it may be inferred from what a person says or does:  The

9    person's words, actions and conduct at the time of the offense

10   of certain events.

11           You have before you the evidence of certain acts and

12   conversations alleged to have been made or taken place by or

13   with a defendant or in his presence.  Intent, willfulness, and

14   knowledge are usually established by the surrounding facts and

15   circumstances as of the time the acts occurred, or the events

16   took place, and the reasonable inferences that may be drawn

17   from them.

18           It is not necessary that a defendant be fully

19   informed as to all the details of the conspiracy in order to

20   justify an inference of knowledge on his part.  To have guilty

21   knowledge, a defendant need not have known the full extent of

22   the conspiracy, or all of its activities or its participants.

23           It is not even necessary that a defendant know every

24   other member of the conspiracy.  A defendant may know only one

25   other member of the conspiracy and still be a co-conspirator.

1          It is also not necessary for a defendant to receive

2     any monetary benefit from his participation in the conspiracy,

3     or have a financial stake in the outcome, so long as he in

4     fact participated in the conspiracy in the manner I've

5     explained.  Furthermore, a defendant need not have joined in

6     all of the conspiracy's unlawful objectives.

7          A defendant's mere presence at the scene of a

8     criminal act does not, by itself, make him a member of the

9     conspiracy.  Similarly, mere association with one or more

10    members of the conspiracy does not make him a member.  A

11    person may know, be associated with, or be friendly with a

12    criminal without being a conspirator.  Mere similarity of

13    conduct or the fact that they have assembled together or

14    communicated does not by itself prove the existence of or

15    membership in a conspiracy.

16         I point out to you that in our every day affairs, we

17    are called upon to decide from the actions of others what

18    their state of mind is.  Experience has taught us that actions

19    often speak louder than words.  Therefore, you may rely on

20    circumstantial evidence in determining the state of mind of a

21    defendant.

22         In addition, the duration and extent of a

23    defendant's participation in a conspiracy has no bearing on

24    the issue of his guilt.  He need not have joined the

25    conspiracy at the outset or be held responsible for all that

1    was done while he was a member -- to be held responsible for

2    all that was done while he was a member.

3         The joining of a new party in a conspiracy or the

4    dropping out of a party to the conspiracy once it has been

5    formed does not remove the guilt of the original conspiracy.

6    A new member of the conspiracy adopts the prior acts and

7    declarations of his co-conspirators which were made in

8    furtherance of the conspiracy.

9         Different persons may become members at different

10   times.  They may perform different parts of it.  They need not

11   be aware of all the ramifications of the conspiracy, nor know

12   all of the details concerning the unlawful agreement.

13        Each member of the conspiracy may perform separate

14   and distinct acts, and may perform them at different times.

15   Some conspirators play major roles while others play minor

16   parts in the scheme.  An equal role is not what the law

17   requires.  In fact, even a single act may be sufficient to

18   draw a defendant within the ambit of a conspiracy.

19        A conspirator's liability also is not measured by

20   the duration of his participation in the conspiracy.  To

21   convict a defendant of the charged conspiracy, it is not

22   necessary for you to find that he was a member of the

23   conspiracy from the beginning.

24        Accordingly, if, as alleged in this case, you find

25   that the conspiracy existed, and if you find that a defendant

knew of the conspiracy and purposely took some part, large or
small, in carrying it into effect, he became part of it and
may be found guilty of conspiracy.

However, I caution you that a defendant's mere
association, presence, knowledge, or acquiescence without
participation in the unlawful plan is not sufficient.  Also,
the fact that the acts of a defendant without knowledge merely
happen to further the purposes or objectives of the conspiracy
does not make a defendant a member of the conspiracy.  The law
requires more.

What is necessary is that a defendant participated
with knowledge of at least some of the purposes or objectives
of the conspiracy, and with the intention of aiding in the
accomplishment of those unlawful ends.

I also caution you that without more, the existence
of a buyer/seller relationship is insufficient to establish
membership in a conspiracy.

In deciding whether parties to a sale of narcotics
are merely a buyer and seller, or instead are co-conspirators,
you may properly consider a number of factors, including:
Whether the parties had a continuing relationship, whether
there was a common goal among the parties to advance the
conspiracy's interests, whether the parties had a common
understanding that the drugs would be resold, the established
method of payment, whether the parties had a standardized way

of doing business over time, the quantities of drugs involved,
whether there was mutual trust between the buyer and the
seller, and whether the seller had a financial stake in the
resale by the buyer.  None of these factors is dispositive,
nor is this listing intended to be exhaustive.

        In sum, a defendant, with an understanding of the
unlawful character of the conspiracy, must have intentionally
engaged, advised, or assisted in it for the purpose of
furthering its illegal undertaking.  In so doing, he thereby
becomes a knowing and willing participant in the unlawful
agreement -- that is to say, a conspirator.

        A conspiracy, once formed, is presumed to continue
until either its objective is accomplished or there is some
affirmative act of termination by its members.  So, too, once
a person is found to be a member of a conspiracy, he is
presumed to continue his membership in the conspiracy, in the
venture, until its termination, unless it is shown by some
affirmative proof that he withdrew and disassociated himself
from it.

        In this case, each of the defendants contends that
the government's proof fails to show that he was a member of
the conspiracy charged in Count One.  Each defendant claims
that there were actually several separate and independent
conspiracies, each comprised of different groups of members.

        Whether there existed a single unlawful agreement or

1   multiple agreements, or indeed no agreement at all, is a

2   question of fact for you, the jury, to determine in accordance

3   with the instructions I have given you regarding the elements

4   of the crime of conspiracy.

5          You may find that there was a single conspiracy,

6   despite the fact that there were changes in either personnel,

7   activities, or both, so long as you find that some of the

8   co-conspirators continued to act for the entire duration of

9   the conspiracy for the purposes charged in the indictment.

10          The fact that the members of a conspiracy are not

11   always identical does not necessarily imply that a separate

12   conspiracy existed.  Nor does the fact that different

13   narcotics were involved.  Remember that the conspiracy charged

14   here is one to distribute and to possess with intent to

15   distribute controlled substances.

16          On the other hand, if you find that the conspiracy

17   charged in the indictment did not exist, you cannot find any

18   defendant guilty of the single conspiracy charged in Count

19   One, even if you find they were members of some other

20   narcotics conspiracy comprised of overlapping members.

21          If you find that a particular defendant was a member

22   of another conspiracy, and not the conspiracy charged in the

23   indictment, then you must acquit that defendant of the

24   conspiracy charged in Count One.

25          But if you find that a defendant was a member of

1    another conspiracy and the conspiracy charged in Count One,

2    then you may convict that defendant of the conspiracy charged

3    in Count One.

4         Therefore, what you must do is determine whether the

5    conspiracy charged in the indictment existed.  If it did, you

6    must then determine the nature of the conspiracy, and who were

7    its members, as I have just explained it to you.

8         I have entered into evidence the acts and statements

9    of others who the government claims were confederates, or

10   co-conspirators, of one or more of the defendants now on

11   trial.  The reason for allowing this evidence against a

12   defendant has to do with the nature of the crime of

13   conspiracy.

14        A conspiracy is often referred to as a partnership

15   in crime.  Thus, as in other types of partnerships, when

16   people enter into a conspiracy to accomplish an unlawful end,

17   each and every member becomes an agent or partner of one

18   another in carrying out the conspiracy.

19        Accordingly, for purposes of evaluating whether the

20   charged conspiracy existed -- but not on the issue of a

21   defendant's membership therein or any drug quantity

22   attributable to him -- you may consider any declarations,

23   statements, and omissions of any member of the conspiracy in

24   furtherance of the common purpose of the conspiracy, even if

25   such acts or statements were not made in the presence of a

1    defendant, or were made without his knowledge.

2         However, before you may consider the statements or

3    acts of a co-conspirator in deciding whether a defendant is

4    guilty or not guilty, you must first determine that the acts

5    and statements of a co-conspirator were made during the

6    existence, and in furtherance, of the alleged conspiracy.

7         If the acts were done, or if the statements were

8    made, by someone whom you find was not a member of the

9    conspiracy, or if their acts or statements were not done or

10   said in furtherance of the conspiracy, then those acts and

11   statements may not be considered by you as evidence of the

12   guilt of a defendant as to the conspiracy charged in Count

13   One.

14        If, and only if, you find that the government has

15   proved beyond a reasonable doubt that a defendant is guilty of

16   participating in the conspiracy charged in Count One, you must

17   then determine the type and quantity of the controlled

18   substances attributable to that defendant.

19        The government has alleged that cocaine, crack

20   cocaine, and heroin were the controlled substances involved in

21   the conspiracy charged in Count One.

22        The government need not prove the purity of a

23   controlled substance.  Rather, any mixture and substance

24   containing a detectable amount of a controlled substance is

25   sufficient.

1         If you conclude unanimously that with regard to a

2    defendant, the government has failed to prove beyond a

3    reasonable doubt that the conspiracy alleged in Count One

4    involved a controlled substance, then you must find that

5    defendant not guilty.

6         If, on the other hand, you conclude, unanimously,

7    that the government has proved beyond a reasonable doubt that

8    the defendant was part of the conspiracy involving a

9    controlled substance as alleged in Count One, then you should

10   find that defendant guilty.

11        If you find a defendant guilty of the charged

12   conspiracy and that the conspiracy involved a controlled

13   substance, you must also determine the quantity or weight of

14   the controlled substance that the government has proved

15   attributable to that defendant's involvement in the charged

16   conspiracy.

17        Specifically, Count One charges that the drug

18   quantity attributable to Richard Anderson is 28 grams or more

19   of cocaine base, crack cocaine.

20        As to Philip Bryant, Count One charges that the drug

21   quantity attributable to him is 28 grams or more of cocaine

22   base, crack cocaine, and/or some quantity of cocaine and/or

23   heroin.

24        As to Robert Santos, Count One charges that the drug

25   quantity attributable to him is 100 grams or more of heroin.

During your deliberations, you will have a separate verdict form for each defendant.  Each verdict form will ask you to determine whether the government has proved beyond a reasonable doubt that these drug quantities pertain to that defendant's direct knowledge and involvement in the charged drug conspiracy.  I will explain the verdict forms to you in more detail in my concluding remarks.

Returning to the issue of drug quantity, I instruct you that the government need not prove the exact amount of controlled substances attributable to a defendant's involvement in the conspiracy.  You must determine whether the government has proved that a defendant's direct knowledge and involvement in the conspiracy involved the quantity of narcotics alleged as to that defendant, or some lesser amount.

A defendant has direct knowledge of and involvement in a quantity of narcotics if he took actions in furtherance of the conspiracy with respect to the particular quantity.

As I previously mentioned, you need not find the weight or quantity of pure narcotic; you need only find the quantity of a substance contained a detectable amount of that narcotic.

Furthermore, in making a determination concerning the weight or quantity of controlled substances attributable to each defendant, you may consider all the evidence in this case that aids your determination of that issue.  The

1    government may prove this element either through direct

2    evidence or through circumstantial evidence.  Whether the

3    government relies on direct or circumstantial evidence to

4    prove the quantity or weight of narcotics attributable to a

5    defendant, it must prove those facts beyond a reasonable

6    doubt.

7          As with any element of the charged conspiracy,

8    although you may draw reasonable inferences from the facts

9    presented concerning the quantity or weight of narcotics

10   attributable to a defendant, you may not engage in guesswork

11   or speculation.

12         And this completes my instructions on Count One.  I

13   remind you that you must determine whether the government has

14   proved each of the two elements of the charged crime of

15   conspiracy beyond a reasonable doubt as to each defendant

16   separately.

17         If you find that the government has failed to prove

18   one of the elements as to a defendant, then you must return a

19   verdict of not guilty as to him.  If you find the government

20   has proved both elements beyond a reasonable doubt as to a

21   defendant, then you should return a verdict of guilty as to

22   that defendant on Count One.

23         And now, ladies and gentlemen, in a few moments, you

24   will begin deliberations in this case.  You must apply the law

25   as I have given to you, the facts that you find exist beyond a

1   reasonable doubt based on the evidence presented.

2        Your verdict must be based solely on the evidence in

3   the case, and the law as I have instructed you.

4        In reaching your decision as to whether the

5   government sustained its burden of proof beyond a reasonable

6   doubt, it would be improper for you to consider any personal

7   feelings you have about race, religion, national origin, sex,

8   or age.  All persons criminally charged are entitled to the

9   presumption of innocence.

10       It would be equally improper for you to allow your

11  feelings about the nature of the offenses charged to interfere

12  with your decision-making process.  You must base your

13  decision exclusively on the evidence in the case.  Any other

14  considerations are improper.

15       During your deliberations, you must not communicate

16  with or provide any information to anyone by any means about

17  this case.  You may not use any electronic device or media,

18  such as a telephone, cell phone, smart phone, iPhone,

19  Blackberry, including all applications on those devices or any

20  computer, the internet, any internet service, or any text or

21  instant messaging service or any internet chat room, blog,

22  website such as Facebook, MySpace, LinkedIn, YouTube or

23  Twitter to communicate or receive any information related to

24  this case, or to conduct any research about this case.

25       Your verdict must not be influenced by sympathy.  It

1    must be clear to you that once you let fear or prejudice or

2    bias or sympathy interfere with your thinking, there is a risk

3    that you will not arrive at a true and just verdict.

4          Keep in mind that nothing I have said in these

5    instructions, indeed nothing I have said during the trial, is

6    intended to suggest to you in any way what I think your

7    verdict should be as to any of the defendants.

8          Again, the question of possible punishment or other

9    adverse consequences to a defendant is of no concern to the

10   jury, and should not in any sense enter into or influence your

11   deliberations.  The duty of sentencing rests exclusively upon

12   the Court.

13         Your function is to weigh the evidence in the case

14   and to determine whether or not a defendant is guilty beyond a

15   reasonable doubt of the crime charged, solely upon the basis

16   of such evidence.

17         Under your oath as jurors, you may not consider at

18   all what the course of events may be after you have reached a

19   verdict of either guilty or not guilty.

20         Your function is to follow my instructions on the

21   law and to deliberate on the evidence received in the course

22   of this trial.  And, solely on the basis of that evidence,

23   decide whether the government has proved a defendant guilty of

24   the charge against him beyond a reasonable doubt.

25         Each defendant justly relies upon you to take your

1    duties seriously.  In doing so, you must consider carefully

2    all the evidence, and you must find a defendant not guilty if

3    the government has failed to prove that defendant's guilt

4    beyond a reasonable doubt.  Each defendant rightly expects

5    fair and just treatment at your hands.  If you have a

6    reasonable doubt as to the guilt of a defendant as to the

7    charged crime of conspiracy in Count One, you should not

8    hesitate for any reason to render a verdict of not guilty as

9    to that defendant.

10         The government, on the other hand, also relies on

11   you to consider its claims carefully, to deal with this case

12   fairly, firmly, and honestly, and to render a verdict of

13   guilty if the facts and law require such a verdict.

14         If you should find that the government has met its

15   burden of proving beyond a reasonable doubt the guilt of a

16   defendant, you should not hesitate because of sympathy or any

17   other reason to render a verdict of guilty.

18         It is the sworn duty of courts and jurors to

19   safeguard the rights of persons charged with a crime by

20   respecting the presumption of innocence that the law imputes

21   to every person so charged.  If and when that presumption of

22   innocence has been overcome by evidence proving, beyond a

23   reasonable doubt, that a particular defendant is guilty of a

24   crime, then the jury should uphold the law and render a

25   verdict of guilty.

1          Each juror is entitled to his or her opinion.  Each

2   juror should, however, exchange his or her views with his or

3   her fellow jurors.  Indeed, it is your duty as jurors to

4   consult with one another and to deliberate in an effort to

5   reach agreement, if you can do so without violence to your

6   individual judgment.

7          Each of you must decide the case for yourself after

8   consideration with your fellow jurors, and all the evidence in

9   the case.  But you should not hesitate to change an opinion

10  which, after discussion with your fellow jurors, appears

11  erroneous.

12          However, if after carefully considering all the

13  evidence and the arguments of your fellow jurors, you

14  entertain a conscientious view that differs from others, you

15  are not to yield your conviction simply because you are

16  outnumbered, or for the mere purpose of returning a verdict.

17          Your final vote must reflect your individual

18  conscientious conviction as to how the issues should be

19  decided.  Remember at all times you are judges of the facts.

20  Your sole interest is to seek the truth from the evidence in

21  the case.  Your verdict, whether guilty or not guilty, must be

22  unanimous.

23          Now that concludes my charge as to the law.  In a

24  moment, I will request that you retire to the deliberation

25  room.

1          The exhibits and the corresponding index of the same

2    will be sent to you in the jury room.  You will also have a

3    copy of these instructions for review during the course of

4    your deliberations.

5          However, should you have any questions about the law

6    as I have instructed you, including any questions about the

7    written instructions, you should not hesitate to send me a

8    note, as I will set forth in a moment.

9          I am not sending a copy of the indictment into the

10   jury room, however, since all of the parts of the indictment

11   that pertain to your consideration of these defendants -- as I

12   read them to you earlier -- are reproduced in these

13   instructions.

14         Just the same, I will remind you again that an

15   indictment is merely an accusation and is not to be used by

16   you as any proof of the conduct charged.

17         It is the government's burden to prove beyond a

18   reasonable doubt each of the elements of the crime charged in

19   Count One as I have explained those elements to you, and to

20   the extent they apply to a defendant.

21         I have prepared three verdict forms -- one for each

22   defendant -- to assist you in your deliberations.  Each

23   verdict form contains a number of questions, and depending

24   upon your answers to those questions, you may not be required

25   to answer all of the questions.

1          For example, you will see that question 1 in each of

2     the verdict forms asks whether you find that the government

3     has proved the two elements of conspiracy beyond a reasonable

4     doubt as to the particular defendant named in the verdict

5     form.  If you find that the government has proved the

6     conspiracy as to that particular defendant, the next set of

7     questions asks you to determine whether the government has

8     proved that the conspiracy, as it pertained to that defendant,

9     involved the type and quantity of the controlled substance the

10    government alleges, or in some instances, some lesser quantity

11    than that.

12         When you get into the jury room, before you begin

13    your deliberations, you should elect a foreperson from among

14    your number who will be your spokesperson in the courtroom.

15    The foreperson will be responsible for signing all

16    communications to the Court and for handing them to the

17    marshal during your deliberations.

18         Any communication by the jury should be made to me

19    in writing, signed by the foreperson, and given to one of the

20    marshals.  I will respond to any questions or requests you

21    have as promptly as possible, either in writing or by having

22    you return to the courtroom so that I can speak with you in

23    person.

24         In any event, in any communication, do not tell me

25    the number of jurors who hold one view or another as to the

1    outcome.

2          Please do not begin your deliberations until you

3    have a copy of these instructions and all of the exhibits in

4    the jury room with you, and do not discuss your deliberations

5    with anyone outside of the jury room.

6          Once again, if, in the course of your deliberations,

7    you have a question that you would like to put to the Court,

8    or you desire to hear again any of the evidence, the

9    foreperson should write down that question or request and give

10   it to the marshal who will be outside the door of the jury

11   room.  Any such messages will be brought to me, and we shall

12   attempt to resolve the issue promptly.

13         And as I just explained, you have three verdict

14   forms in the jury room -- one for each defendant -- on which

15   to record your verdict as to Count One as it is charged

16   against each defendant.  At the conclusion of your

17   deliberations, when you have arrived at a verdict, the

18   foreperson should fill in each verdict form and sign and date

19   it.  He or she should then advise the marshal that a verdict

20   has been reached as to each defendant, and you will be

21   escorted back to the courtroom.  Do not give the verdict form

22   to the marshal or the court clerk until I instruct you to do

23   so.

24         And, ladies and gentlemen, you may now retire to the

25   deliberation room.

```
 1              MR. VATTI:  Your Honor, can we approach for one
 2   moment?
 3              THE COURT:  Yes.
 4              (At the side bar.)
 5              MR. SILVERMAN:  So it's on the record, there's
 6   nothing in the instructions right now about the alternates.
 7   It's our understanding --
 8              THE COURT:  I'm going to tell them they're excused
 9   now, but to hold themselves available in the event they are
10   needed.
11              MR. SILVERMAN:  Perfect.
12              THE COURT:  I will do that, okay?
13              MR. REEVE:  The rest of the issues I think we should
14   bring up -- nothing right immediately.  Thank you.
15              MR. SILVERMAN:  Thank you.
16              (In open court.)
17              THE COURT:  Ladies and gentlemen, some of you were
18   selected as alternates in this case.  We are at the end of the
19   road there for the alternates.  You will apparently not be
20   needed for deliberations.
21              However, I ask you please to keep yourselves
22   available if at any point during the course of the
23   deliberations your presence is needed.  If you would let the
24   clerk know how you could be reached, we'd appreciate that, and
25   I very much appreciate also your attendance here and your
```

1    attention to everything that's gone on in the courtroom.

2           Even if you're not called upon to deliberate, I hope

3    that you feel your experience has been worthwhile.  I like to

4    think that people should know what's going on in courtrooms

5    that are theirs, and how matters are handled.

6           Thank you very much, ladies and gentlemen.  Just

7    hold yourself available, if you would.

8           MR. SILVERMAN:  Just to be clear, there are only

9    three alternates remaining in the case.

10           THE COURT:  Three?  I'm sorry, I thought the four

11    people on the end.

12           MR. SILVERMAN:  We chose four but we now have 15.

13           THE COURT:  Three alternates then are excused, and

14    as I said, please give your telephone number to the clerk so

15    that if we need your services for any reason, we can call you.

16    And I do very much appreciate your having been here and your

17    close attention you paid to all of the evidence.  Thank you

18    very much.

19           MR. REEVE:  Judge, I'm sorry, there's one other

20    matter that the clerk reminded me of that I forgot to say when

21    Attorney Silverman talked about exhibits, and that's this:

22    There is, there were, two defense exhibits, one was marked P,

23    one was marked Q.  It turns out they were exactly the same

24    exhibits, and so we have removed I think it's Q, we've

25    removed, but one of them has been removed because it was a

```
 1    duplicate, and I just wanted to state that on the record.

 2           THE COURT:  The exhibits going in are all authentic

 3    exhibits that should be going in to them, is that it?

 4           MR. REEVE:  Yes, your Honor.

 5           May I just have one moment?

 6           THE COURT:  Yes.

 7           (Mr. Reeve conferring with Mr. Vatti.)

 8           MR. REEVE:  Judge, the other thing on consent of the

 9    parties that we wanted to tell the jury is that there are no

10    listening devices in the jury room.

11           So you are going to have to let us know if you want

12    to listen or observe an audiotape, you are going to have to

13    let us know with a written note, as the Court has instructed,

14    and then we will get that ready for you and you'll be brought

15    back into the courtroom.

16           Thank you, Judge.

17           THE COURT:  Thank you, Mr. Reeve.

18           Okay, ladies and gentlemen.

19           (In the absence of the jury:  3:38 o'clock p.m.)

20           THE COURT:  Any exceptions to the charge?

21           MR. SILVERMAN:  Your Honor, I think there are, but

22    can we go through the exhibits before they're sent back?  I

23    think it will take ten minutes, and then we can take up any

24    objections to the charge.

25           MR. REEVE:  We were working all during the recess to
```

1    get all the exhibits together, but it does make sense to do a

2    double-check.

3            THE COURT:  Very good.

4            MR. SILVERMAN:  It should take ten minutes,

5    hopefully not more.

6            THE COURT:  Okay, I'm going to stay here.

7            (Recess:  3:39 o'clock p.m. to 3:52, in the absence

8    of the jury.)

9            THE COURT:  Gentlemen, is there any objection to the

10   charge?

11           MR. SILVERMAN:  Yes, your Honor.

12           MR. REEVE:  There are.

13           MR. SILVERMAN:  Let's do them.  Your Honor --

14           THE COURT:  Where is Mr. Santos?

15           MR. REEVE:  Your Honor, my associate, Mr.

16   Balakrishnan, is downstairs trying to bring him up.  I think

17   he's outside smoking a cigarette.  I've asked to get him.

18           We can begin.  It's a legal argument.  He's not

19   required to be here for the legal argument.  And to the degree

20   there's any issue about that at all, I waive his presence, for

21   purposes of beginning these arguments, so we don't delay

22   things.

23           MR. VATTI:  The government has no objections to the

24   charge, your Honor.

25           THE COURT:  Thank you.

1          MR. REEVE:  Okay.  Judge, I have a lot of

2    objections, but I want to do is as simply and quickly as I

3    can, okay?

4          So first of all, your Honor reads a charge amazingly

5    well.  I mean, you know --

6          THE COURT:  Such flattery, Mr. Reeve.

7          MR. REEVE:  It was almost word for word.  One area

8    concerned me, the bottom of page 5, and on line -- you started

9    out "this presumption of innocence alone," do you see where I

10   am?  Line 23/24 at the bottom of page 5?

11         THE COURT:  Yes.

12         MR. REEVE:  Then you went on to say, I think this is

13   what you said, "alone is sufficient to acquit each defendant

14   unless you as jurors are reasonably satisfied," and --

15         THE COURT:  "Convinced beyond a reasonable doubt,"

16   is what I said.

17         MR. REEVE:  The problem, Judge, is I distinctly

18   remember you threw in the phrase "reasonably satisfied" in the

19   context of beyond a reasonable doubt.  I would ask -- we can

20   check with the reporter if we need to.  We have to do that.  I

21   believe I read it exactly as it was.

22         MR. MORAGHAN:  Join in Mr. Reeve's comments on that.

23   I did hear the word "reasonably satisfied."

24         MR. PALMIERI:  I think she said "unanimously

25   convinced."

1           MR. REEVE:  Right, that is, it was "unanimously

2     convinced" became "reasonably satisfied," and I think the

3     phrase "reasonably satisfied beyond a reasonable doubt" is

4     just awkward at best.  I don't think it's what your Honor

5     intended to do.

6           So I would ask your Honor to reread that paragraph,

7     starting at page 5, and the next three lines.  It will take 20

8     seconds to do it.

9           THE COURT:  We have to bring the jury back in then.

10          MR. REEVE:  But let's finish.

11          THE COURT:  Yes, let's see if there are any other

12    objections.

13          MR. VATTI:  Maybe the court reporter can look at it.

14          Can you look at that?

15          MR. SILVERMAN:  Let's all pause for a moment to give

16    our court reporter a chance to check.

17          MR. REEVE:  I understand, it was the first time this

18    part was discussed.

19          MR. SILVERMAN:  Why don't we all stop talking so our

20    court reporter can check?

21          THE COURT:  Yes.

22          (The above-described portion of the record was read

23    by the reporter.)

24          THE COURT:  Where did I get that from?

25          MR. REEVE:  It was just a slip, but it's an

1    important one.  I would ask that you read that paragraph.

2            Can we go through all the objections, in the event

3    there's anything else?

4            THE COURT:  Yes.

5            MR. REEVE:  First of all, Judge, this is just for

6    the record, first of all, I want the record to reflect we've

7    had two in-chambers off the record conferences where we have

8    extensively discussed the charge, and one of the agreements

9    last night was that your Honor's law clerk is going to copy

10   all of the e-mail communications about the charge by all

11   parties, and they will then be submitted as a court exhibit

12   under seal.

13           THE COURT:  Okay.

14           MR. REEVE:  And so I think that's going to be done.

15   I just wanted to renew that request.  I'm relying on all of

16   the exceptions, to the degree that the charge was not changed.

17   I'm not going to repeat them.

18           THE COURT:  Yes.

19           MR. REEVE:  Because many of them were changed, some

20   were not.  To the degree there were any requests in any of the

21   e-mails that I submitted on behalf of Mr. Santos and I think

22   I'm safe in saying that attorneys Moraghan and Rogan, we are

23   preserving all of those issues.

24           THE COURT:  Right.  Have we got those?

25           MR. PALMIERI:  I'm going to bring them in.

1           MR. REEVE:  I'm also going to try to shorthand, I

2     made some legal arguments in terms of the motion for judgment

3     of acquittal.  Your Honor took those under --

4           THE COURT:  Reserved decision.

5           MR. REEVE:  Reserved decision.  Implicit in that,

6     given that the claims I made are inconsistent with the charge

7     is it's a tacit denial of my claims.  I don't want to re-raise

8     the issues.  I preserved all those issues on the record

9     yesterday, at the time of the MJOA.  There were five separate

10    arguments.  One of them was a fact-based MJOA; four of them

11    were legal.  I want to preserve all four of those legal claims

12    and, unless the government thinks I need to say something else

13    more about them, I will not.

14          THE COURT:  They're on the record.

15          MR. VATTI:  They are, I agree.

16          MR. REEVE:  All right, thank you.

17          Then just so that again, this goes beyond the

18    e-mails, your Honor, we submitted three proposed requests to

19    charge that were filed.  They're part of the record.  I don't

20    have the docket number in front of me.

21          To the degree that the Court did not give those

22    instructions as requested, I am renewing my request, and I am

23    excepting to the Court's -- refusal is too strong a word, to

24    the fact that they're not in the charge.  I'll leave it there.

25          THE COURT:  I think my law clerk has them and we

```
 1    will submit them as a court exhibit.
 2              MR. REEVE:  No, those are the notes, your Honor.
 3    Now I'm moving on to a proposed request to charge, and there
 4    were three specific requests in one filing on behalf of Mr.
 5    Santos.
 6              THE COURT:  Okay.
 7              MR. REEVE:  And then recently, Saturday, I guess it
 8    was maybe it was Sunday morning around 1:00 o'clock in the
 9    morning, I submitted the theory of defense charge.  So those
10    four are not contained in e-mails.  Those were in court
11    filings.  To the degree that the charge is different from
12    those, I preserve all of those issues.
13              THE COURT:  Okay.
14              MR. REEVE:  All right.  Now we're done with that.
15              I'm sorry, your Honor.
16              (Mr. Reeve conferring with Mr. Vatti.)
17              THE COURT:  Should we also preserve your plea on
18    your knees?
19              MR. SILVERMAN:  Your Honor, before Attorney Reeve
20    answers that --
21              MR. REEVE:  That's a tough one, Judge.
22              MR. SILVERMAN:  -- on the note of the theory of
23    defense charge that was submitted, and that was the subject of
24    much discussion at our second charge conference in chambers, I
25    said I was going to do this, I'm going to ask the Court to do
```

```
 1    it now, the Court denied the request to offer the theory of

 2    defense charge, and my understanding was it was on the ground

 3    that the Court saw no foundation in the evidence for the

 4    charge.

 5               THE COURT:  Correct.

 6               MR. SILVERMAN:  I just want that to be clear on the

 7    record.

 8               THE COURT:  Yes, I didn't see any foundation for

 9    giving a charge of that kind.

10               MR. SILVERMAN:  Thank you, your Honor.

11               MR. REEVE:  Right, and I renew my request that I

12    made earlier today, both for the theory of defense request

13    and, in the alternative, the language taken directly out of

14    the Second Circuit case, or as modified by me in my

15    proposed -- that sets up the legal standard, that is one who

16    merely pretends cannot, is not, entering into an agreement

17    with another person.

18               So on both of those -- actually, three, one is my

19    theory of defense; the second is the language, I think it

20    might be the second sentence that sets forth what I believe is

21    the applicable or correct legal language; but even if your

22    Honor didn't want that, the language that's cited in my memo

23    that was filed early Sunday morning that is directly from a

24    Second Circuit case, and I want to preserve all those as well.

25               The other issue, Judge, and let me back up.
```

```
 1    Attorney Vatti is right.  The three earlier requests to
 2    charge, if my memory serves, are on three discrete subjects:
 3    Number one, a definition of agreement; number two was --  I'm
 4    sorry, your Honor, I just had a brain lock.  I had all three
 5    in my head, now I only have two.  One was all on the quantity
 6    instructions.  And the third is, what the third is, it's on
 7    the record, it speaks for itself.  I don't have a copy in
 8    front of me, but I don't want to belabor the point.
 9            The other, and this might have been part of that,
10    was I object to the buyer/seller instruction as given.  We've
11    talked about this in chambers.  I think that the Second
12    Circuit is wrong in giving the factors, and I think it should
13    have been elaborated, just as we did.  And I think that might
14    have been the third request, formal request, that I made.
15            THE COURT:  Maybe on your appeal, you can get the
16    Second Circuit to reverse its opinion.
17            MR. REEVE:  Perhaps.  Perhaps.  I think we're now in
18    Alleyne territory again, your Honor.
19            The other issue that I raise, and I didn't think
20    about it, to be honest, before the charge was given, is the
21    reading of the indictment and the language in the indictment
22    has the "reasonable foreseeability" language that we took
23    painstaking efforts to remove from the charge, and now the
24    language of the indictment is inconsistent -- I think none of
25    us really focused on that.
```

1              MR. PALMIERI:  The indictment, that it was staying

2    in there, you didn't disagree with that.

3              MR. REEVE:  You know what, Arthur, I accept what

4    you're saying.

5              MR. PALMIERI:  I understand.

6              MR. REEVE:  I don't mean to minimize.  It was in one

7    ear and out the other.  I didn't pick up on it, my fault for

8    not hearing Arthur, my fault for not bringing it up.  I think

9    there's an inconsistency now in the charge.

10             So I think maybe what we should do, Judge, is just

11   say:  "There's language in the indictment about reasonable

12   foreseeability, the parties agree that has no applicability in

13   this case," and we just instruct it out, without doing

14   anything more than that.

15             And I think those are all the exceptions that I

16   have, and I think that attorneys Rogan and Moraghan adopt all

17   of my arguments, but I will not speak for them.

18             MR. ROGAN:  I do, your Honor.  I have one additional

19   exception, which we did discuss in chambers informally, just

20   preserve it, and it goes to the issue of the verdict forms,

21   and it had been my request that the verdict form as to Count

22   One required the jury to answer an individual question as to

23   each element, each essential element, of the crime of

24   conspiracy as charged in Count One of the indictment.  I think

25   your Honor's made clear what her position on that, but I'm

1    just preserving that exception --

2              THE COURT:  Yes, of course.

3              MR. ROGAN:  -- for the record.  And to the extent,

4    on the reasonable foreseeability thing, I specifically adopt

5    that charge, and Arthur did approach -- and Arthur did advise

6    us just before, when he gave us the last charge, the operative

7    charge, that that language was in there, but I think it can be

8    fixed by just, you know, instructing it out from the jury.

9    Other than that, I have nothing else, your Honor.

10             MR. MORAGHAN:  Your Honor, I have adopted Mr.

11   Reeve's motion, and so I don't have to illuminate on that.

12             With respect to the elements of the offense, we

13   discussed this last night.  It's our position under the

14   existing law now that there are three elements in a

15   conspiracy, not two.  We discussed this, your Honor charged

16   two elements, and if you reach a decision, then go to the

17   third element.  We believe there are three elements involved,

18   so that would be my objection as far as the charge.  I know

19   Mr. Reeve and Mr. Rogan both join in on that.

20             MR. ROGAN:  I do.

21             MR. REEVE:  And, Judge, I need to credit my client

22   on this, which again I missed, I think there's a problem with

23   the verdict form, and I'm referencing Mr. Santos, which says,

24   No. 1, as to the charge in Count One of conspiracy to

25   distribute and to possess with intent to distribute narcotics,

 1    which arguably would allow the jury to convict him on the

 2    basis of substances which are not the subject of the evidence

 3    against him.  I think it needs to say heroin for him, and I

 4    think it has to specify the substances for the other

 5    individuals, because otherwise it's broad and we're going to

 6    get a general verdict, and there's going to be a problem.

 7                THE COURT:  Well, we can revise the verdict forms,

 8    if you think it's appropriate.

 9                Does the government believe that's appropriate?

10                MR. VATTI:  I don't believe that makes any

11    difference whatsoever, your Honor.  Count One, the conspiracy

12    count, is charged as a conspiracy to distribute, whether you

13    want to call it controlled substances or narcotics.  That was

14    the allegation in the indictment.

15                So if they find that there was the existence of a

16    conspiracy and that he was a member of the conspiracy, they're

17    going to return a guilty verdict, and then they have to go to

18    quantity and to make those quantity findings.

19                The only quantity findings on the verdict form as to

20    Mr. Santos is heroin, either 100 grams or more or 100 grams or

21    less.  So there's no possibility of the jury returning a

22    verdict of anything other than heroin.

23                MR. REEVE:  Well, the problem is with a general,

24    this question, we don't know what the jury's doing.  We really

25    don't.  Because what Attorney Vatti's saying is as a practical

1    matter, it's very unlikely they'll do that but that's exactly

2    what we try to avoid by using precise things.

3         I claim that the government was left to proving a

4    conspiracy to distribute all three on, for, Mr. Santos.  The

5    Court's rejected that.  The government's argued the only part

6    of the conspiracy he's involved in is heroin.  So all the

7    other evidence about crack and about powder is entirely

8    irrelevant to him.

9         So now why are we opening it up to say narcotics in

10   general?  It's not narcotics in general.  The way it's been

11   charged here, it's heroin, and heroin only.

12        MR. PALMIERI:  Can I just say, I think we had

13   resolved this in the first charge conference because the

14   government pointed out that the charge is actually exactly

15   what it states in question 1, and what you're saying were to

16   occur guilty or not, guilty and not, to question 3.

17        MR. REEVE:  I don't agree, respectfully, and the

18   reason I don't agree is because you don't know if the guilty

19   verdict means X plus Y, and the only questions they're asked

20   in the form are about Y.  So you can't get to the place where

21   you are.  You know, that's why I think it's a problem.

22        MR. VATTI:  I'm not following this at all.

23        THE COURT:  I'm not either.

24        MR. VATTI:  I don't see how the jury can come back

25   with a guilty and a yes/yes on the two heroin questions and at

```
 1   that point, I think the charge has been proved.  I'm not

 2   following his argument at all.

 3            MR. SILVERMAN:  So if I may.

 4            MR. REEVE:  Yes.

 5            MR. SILVERMAN:  As I understand it, Attorney Reeve

 6   is concerned that the jury may find guilt on the conspiracy

 7   offense, question 1, having nothing to do with heroin for

 8   Robert Santos.  But I think as Attorney Vatti points out, if

 9   they answer yes to either questions 2 or 3, then they have

10   clearly found heroin to be at issue.

11            MR. VATTI:  Correct.

12            MR. SILVERMAN:  If they answer no to questions 2 and

13   3 as your law clerk has pointed out, then we know there is a

14   problem.

15            MR. VATTI:  Then I will stipulate to a judgment of

16   acquittal for Mr. Santos.

17            MR. REEVE:  But I appreciate Attorney Silverman's

18   effort to clarify what I said, but that's not my issue.  My

19   issue is, on question No. 1, hypothetically the way it's

20   phrased now, the jury could say:  "Well, we think he's

21   involved with both crack and heroin and so our guilty verdict

22   is going to be based on both."  That would be an improper

23   verdict.

24            The fact that they come back and say this is the

25   quantity of heroin, says yes, they necessarily found heroin.
```

But it doesn't say that they didn't necessarily rely on heroin plus, and all that evidence is irrelevant. That's what my concern is.

MR. SILVERMAN: So I think it might help to consider this in the example of Mr. Anderson, who is charged only with crack cocaine but for whom evidence was introduced that he was involved in a heroin aspect of the conspiracy. Were the jury to find him guilty of the conspiracy on the basis of his involvement in cocaine base and heroin, that would be a proper finding for the jury to make. That would be totally appropriate, even though he had no charge, specific charge, related to heroin and they're not asked to make any heroin quantity attributions with respect to him. It would be completely appropriate for them to do so.

In the same vein, if they decide for whatever reason that the evidence supports a finding that Mr. Santos was involved not only in heroin but in some other controlled substance, that's okay, that's a proper finding by them to make. They'll find him guilty of the conspiracy and then we'll have confirmation of the heroin aspect of it based on questions 2 and 3.

MR. REEVE: If that's the government's position, then I'm moving for a judgment of acquittal on the claim that that would be proper for a jury to base any part of its determination on evidence which is not related to him, because

1    that's what the government is saying the jury can do.  So I

2    move for a judgment of acquittal, to the degree I haven't been

3    clear before, I'm moving for judgment of acquittal with

4    respect to any conspiracy alleged against Mr. Santos which

5    includes cocaine, powder, or crack, cocaine base.  There's no

6    evidence to support that in this record whatsoever.

7         THE COURT:  Well, to avoid any appellate issues, why

8    don't we get that particular verdict form with respect to this

9    defendant back?

10        MR. VATTI:  Because I think, your Honor, that's

11   going to create a problem for the other two defendants whose

12   verdict forms read -- this was charged as a conspiracy to

13   distribute controlled substances.

14        THE COURT:  That's what they were charged with.

15        MR. VATTI:  Then there are quantity findings for

16   *Apprendi* purposes.  If we then change his verdict form to

17   heroin, that wasn't the charge in the indictment.  The charged

18   conspiracy was to distribute and to possess with the intent to

19   distribute narcotics, and for *Apprendi*, they are each charged

20   with a different type and quantity.

21        There is simply no way that the jury can make any

22   finding here on crack.  Even if they think for some reason he

23   was involved in crack, it's of no relevance whatsoever.  They

24   can't reach a verdict on it.

25        MR. REEVE:  Yes, they can, on the first question.

1          MR. VATTI:  If the jury here finds that for whatever

2    reason, even though the government did not mention crack

3    cocaine or cocaine in connection with Mr. Santos, that he was

4    somehow involved in those two substances but also 100 grams or

5    more of heroin, they're going to make that finding on the

6    verdict form, and it's entirely appropriate, he was charged as

7    a controlled substances conspiracy.

8          MR. REEVE:  Your Honor, we could go around in a

9    circle, but I'm asking the Court to rule on my motion for

10   judgment of acquittal with respect to crack and cocaine, and

11   it seems to me the government should be joining in that motion

12   because that's what they've specifically been telling the

13   Court from day one.  This conspiracy in no way involves crack

14   or cocaine with respect to Robert Santos.  Simple, easy.  So

15   let's remove him.  I would like your Honor to rule on my

16   motion.

17         THE COURT:  Do you object to that, Mr. Vatti?

18         MR. VATTI:  I object to the motion for judgment of

19   acquittal.  I think this is a verdict form that is very common

20   in this district in these cases.  I think Mr. Santos is

21   adequately protected that the verdict can only come back on

22   either, if it comes back guilty it can only come back on 100

23   grams or more of heroin or a hundred grams or less.

24         THE COURT:  Okay.  Mr. Reeve's objection is noted

25   for the record.

1          Now I want to know, shall I have the jury come back

2   so I can -- apparently I misspoke during the charge with

3   respect to the last sentence on page 5.  Shall I have them

4   come back so that I can reread that?  I don't know what I said

5   that's different.

6          MR. REEVE:  It would be my request that your Honor

7   just read the last two lines on the bottom of page 5 and the

8   first three on page 6, just that paragraph, that's all.

9          THE COURT:  Okay.

10          MR. SILVERMAN:  Your Honor, while the clerk of court

11   goes to get the jury, I can't remember now if the Court made

12   the *Geaney* findings.

13          THE COURT:  Yes.

14          MR. SILVERMAN:  You did?  Thank you, your Honor.

15          THE COURT:  We did that earlier today.

16          MR. SILVERMAN:  Thank you.

17          (In the presence of the jury:  4:18 o'clock p.m.)

18          THE COURT:  Ladies and gentlemen, it appears that in

19   the process of my reading the charge, I misspoke on a very

20   important issue, when I was discussing the presumption of

21   innocence, so I would like to clarify this particular

22   paragraph:

23          Each of the defendants begins the trial here with a

24   clean slate.  This presumption of innocence alone is

25   sufficient to acquit each defendant unless you, as jurors, are

1   unanimously convinced beyond a reasonable doubt of a

2   defendant's guilt as to a charged crime, after a careful and

3   impartial consideration of all of the evidence in this case.

4   If the government fails to sustain its burden, you must return

5   a verdict of not guilty.

6           So I wanted to correct that misreading, which was

7   brought to my attention by counsel.  Okay?  You all

8   understand?

9           Thank you very much.  Would you resume your

10  deliberations, please?

11          (In the absence of the jury:  4:20 o'clock p.m.)

12          THE COURT:  In anticipation of the storm, we

13  inquired of the jurors.  They would prefer, I gather, to stay

14  here and deliberate as long as they have to tonight.

15  Hopefully that won't be all night.

16          But at any rate, I think under the circumstances, I

17  guess that forecast still remains in effect, doesn't it, about

18  the storm tomorrow?

19          MR. MORAGHAN:  I haven't checked this afternoon,

20  your Honor.

21          THE COURT:  To avoid any possibility, in fact one or

22  two of them have canceled appointments that they otherwise had

23  this evening.  Just be prepared.  We're going to stay.

24          MR. REEVE:  Your Honor, I wonder if I can inquire of

25  the Court, I know speaking for myself, I haven't left the

1    courtroom except a bathroom break about an hour ago.  Would it

2    be okay if I left, just got a little something to eat?  I can

3    give the clerk my cell phone number, we can all give cell

4    phone numbers, so that we're available almost immediately.

5           THE COURT:  Sure.  You're all free to do whatever

6    you want, as long as you're available.  That would be fine.

7           MR. REEVE:  Thank you, Judge.

8           MR. ROGAN:  Just one more thing.  I do join in Mr.

9    Reeve's renewed motion for judgment of acquittal, now

10   understanding, looking closely at the verdict form as it

11   relates, for example, to Mr. Anderson, there was testimony, in

12   fact in your charge, what you say is just the mere fact that

13   someone has knowledge, for instance, about heroin doesn't

14   necessarily put him into the middle of the conspiracy to

15   distribute narcotics.

16          The specific charge as it relates to Mr. Anderson is

17   only crack cocaine.  So I agree with what Mr. Reeve is saying,

18   it's just left that broadly, they could misinterpret the law

19   to mean just because, for example, if there was a discussion

20   between Mr. Anderson and the cooperating witness, Wilson,

21   where Wilson is just discussing his heroin business which

22   there's no suggestion on the government's side that Mr.

23   Anderson was involved in any way, they didn't charge him with

24   that, that would be confusing.

25          I think on that basis, I would join with Mr. Reeve

```
 1    in the motion for judgment of acquittal, which I assume the
 2    Court will then deny.
 3               THE COURT:  Yes.
 4               MR. ROGAN:  And you do.  Thank you, your Honor.
 5               THE COURT:  Please give Kathleen your cell phone
 6    numbers.  We'll call you if we need you.
 7               (Recess:  4:23 o'clock p.m. to 5:07 o'clock p.m., in
 8    the absence of the jury.)
 9               THE COURT:  Please be seated.  The jury has asked to
10    hear a number of the recordings.  Quite a few of them, as a
11    matter of fact.  So maybe, Mr. Silverman, you can help us out
12    with this.
13               MR. SILVERMAN:  Yes, your Honor.  Do you want to
14    provide a copy of their note to counsel?
15               MR. REEVE:  Perhaps we should have that marked as a
16    Court exhibit.
17               THE CLERK:  It is, it's marked.
18               THE COURT:  But there are about 20.
19               MR. REEVE:  With your Honor's permission, can I hand
20    this to government's counsel and we can all look at it, to
21    help us?
22               THE COURT:  Please.
23               (Counsel conferring.)
24               MR. REEVE:  Your Honor, should we go on the record?
25    Your Honor, the record should reflect that all counsel have
```

1    reviewed, and I have read out loud to all counsel, and they'll

2    share with me their list, of all the calls that are listed

3    here.

4              One of the questions that we I think jointly would

5    ask the Court to inquire is, do they want all of these in

6    their entirety or do they want a section of them, because they

7    haven't specified that, and whatever they say, obviously

8    that's what we're going to do.

9              Did you want this note?

10             MR. VATTI:  I would suggest we just ask them that

11   when they come into the courtroom.

12             MR. REEVE:  We agree with that.  If your Honor could

13   just say, do you want to hear these in their entirety or

14   portions?  We want to be responsive.  And let's see what they

15   say.

16             It seems to me if they say they want parts of some,

17   they might have to go back out and give us a new note.  I

18   don't.  Know, we'll have to see how that goes.

19             MR. VATTI:  They're all pretty short calls.

20             MR. REEVE:  All right.

21             Your Honor, I think what's going to happen, with the

22   agreement of counsel, is that they will be played by

23   government counsel, it's on their system, they're their

24   exhibits, and the transcripts which are an aid to the jury

25   will appear just as they did when they first heard them.  I

```
 1    don't think anyone has an objection to that proceeding, or

 2    that procedure, to follow in this situation.

 3             THE COURT:  The question that was raised, I think by

 4    you, sir, was whether or not they want to hear the whole call

 5    or just a portion of it.

 6             MR. SILVERMAN:  I think it makes sense for the Court

 7    to make that inquiry of the jury.

 8             (In the presence of the jury:  5:15 o'clock p.m.)

 9             THE COURT:  Ladies and gentlemen, you've given us a

10    list of calls you want to hear, and we're going to provide

11    them for you.  The only question we have is do you want to

12    hear the entire call or are you zeroing in on a portion of it?

13             JURORS:  The entire call.

14             THE COURT:  Okay, that makes it easier.

15             MR. SILVERMAN:  May I, your Honor?

16             THE COURT:  Yes, please.

17             MR. SILVERMAN:  Thank you.

18             This is Government's Exhibit 56.1.

19             (Government's Exhibit 56.1, an audio recording,

20    played.)

21             MR. SILVERMAN:  This is Government's Exhibit 57.

22             (Government's Exhibit 57, an audio recording,

23    played.)

24             MR. SILVERMAN:  This is Government's Exhibit 57.1.

25             (Government's Exhibit 57.1, an audio recording,
```

```
1   played.)
2            MR. SILVERMAN:  That's not Government's Exhibit
3   57.1, I'll have to get back to that.  I'm going to turn to
4   57.2.
5            THE COURT:  57.2?
6            MR. SILVERMAN:  That was supposed to be 57.1, it was
7   not.
8            MR. REEVE:  Can we do them in the order they wanted
9   it?
10           MR. SILVERMAN:  Can I have the disk that they were
11  provided?
12           THE CLERK:  The disk is in their room.
13           MR. REEVE:  Thank you.
14           (Government's Exhibit 57.1, an audio recording,
15  played.)
16           MR. SILVERMAN:  That was Government's Exhibit 57.1,
17  which is a call on October 18, 2011, at 5:39 p.m.  Because of
18  a technical difficulty, I put the transcript on the projector
19  so they could view that as opposed to the transcript rolling
20  on the screen.
21           This is 57.2.
22           (Government's Exhibit 57.2, an audio recording,
23  played.)
24           MR. SILVERMAN:  I'm going to start that over again.
25  October 18th, 7:47 p.m.
```

```
 1              (Government's Exhibit 57.2, an audio recording,
 2   played.)
 3              MR. SILVERMAN:   Next on the list is 57.3, same date,
 4   October 18th at 7:49 p.m.
 5              (Government's Exhibit 57.3, an audio recording,
 6   played.)
 7              MR. SILVERMAN:   The next call is Government's
 8   Exhibit 58, October 19th at 9:23 a.m.
 9              (Government's Exhibit 58, an audio recording,
10   played.)
11              MR. SILVERMAN:   The next call is Government's
12   Exhibit 59, on October 19th at 6:45 p.m.
13              (Government's Exhibit 59, an audio recording,
14   played.)
15              MR. SILVERMAN:   The next call is Government's
16   Exhibit 60, on October 21st at 10:15 a.m.
17              (Government's Exhibit 60, an audio recording,
18   played.)
19              MR. SILVERMAN:   The next call is Government's
20   Exhibit 62, on October 23rd at 10:05 p.m.
21              (Government's Exhibit 62, an audio recording,
22   played.)
23              MR. SILVERMAN:   The next call is Government's
24   Exhibit 63, on October 24th at 2:27 p.m.
25              (Government's Exhibit 63, an audio recording,
```

```
1    played.)

2              MR. SILVERMAN:  The next call that's been requested

3    is Government's Exhibit 65.1.  It's on October 25th at 5:34

4    p.m.

5              (Government's Exhibit 65.1, an audio recording,

6    played.)

7              MR. SILVERMAN:  The next call is Government's

8    Exhibit 65.2, on October 26th at 9:16 a.m.

9              (Government's Exhibit 65.2, an audio recording,

10   played.)

11             MR. SILVERMAN:  The next call is Government's

12   Exhibit 65.3, October 26th at 5:21 p.m.

13             (Government's Exhibit 65.3, an audio recording,

14   played.)

15             A JUROR:  What time was that?

16             MR. SILVERMAN:  65.3 is 5:21 p.m.

17             Your Honor, I wonder if the Court might inquire

18   whether this would save us time, there are two additional

19   calls on October 26, 2011, that appear at government exhibits

20   144 and 145 that are in this series of calls but not on this

21   number.

22             MR. REEVE:  I think we need to stick with what the

23   jury's asked for.  If they want something else -- I think we

24   should respond to the jury's note.  They can ask for something

25   else if they want it.  Let's go with what they asked for.
```

1          MR. SILVERMAN:  I'm happy either way.  My proposal

2     was just going to be that there are two other calls in this

3     series that they requested to listen to.

4          Unless, ladies and gentlemen, do you want to hear

5     those?

6          A JUROR:  We didn't know about them.

7          ANOTHER JUROR:  Yes, we would.

8          MR. SILVERMAN:  Okay.  They are at a different time,

9     so I don't know whether the jury would like me to put them in

10    where they belong and continue the series.

11         A JUROR:  Yes, please.

12         MR. REEVE:  I have no objection.  I just want to

13    make sure it's what people want, that's all.

14         THE COURT:  Yes.

15         MR. SILVERMAN:  Okay.  So stepping back, we're going

16    to retrace a couple of these calls then.  On 65.2, which we

17    already heard, was at 9:16 a.m., and 65.3 which we just

18    listened to is at 5:21 p.m.  In between are government

19    exhibits 144 and 145.

20         So I'm going to play 65.2 again, 144, 145, and

21    continue at 65.3.  This is 65.2.  It's October 26th at 9:16

22    a.m.

23         (Government's Exhibit 65.2, an audio recording,

24    played.)

25         MR. SILVERMAN:  Government's Exhibit 144, October

1    26th at 10:22 a.m.

2            (Government's Exhibit 144, an audio recording,

3    played.)

4            MR. SILVERMAN:  Government's Exhibit 145 is on

5    October 26th at 10:54 a.m.

6            (Government's Exhibit 145, an audio recording,

7    played.)

8            MR. SILVERMAN:  All right, turning back to

9    Government's Exhibit 65.3, October 26 at 5:21 p.m.

10           (Government's Exhibit 65.3, an audio recording,

11   played.)

12           MR. SILVERMAN:  The next call is 65.4, 10/26/2011 at

13   7:33 p.m.

14           (Government's Exhibit 65.4, an audio recording,

15   played.)

16           MR. SILVERMAN:  The next call that was requested is

17   65.5, 10/26 at 7:36 p.m.

18           (Government's Exhibit 65.5, an audio recording,

19   played.)

20           MR. SILVERMAN:  And I think the last call that was

21   requested is Government's Exhibit 68, on October 31st at 8:42

22   p.m.

23           (Government's Exhibit 68, an audio recording,

24   played.)

25           MR. SILVERMAN:  Your Honor, I believe that was the

1    last call that the jury requested.

2              THE COURT:  Thank you.

3              Anything further, ladies and gentlemen?

4              A JUROR:  We want the transcripts where the defense

5    attorneys didn't object to the voices on the phone calls and

6    allowed the phone calls to be played into evidence.  Do we

7    have that?

8              MR. SILVERMAN:  I'm sorry, your Honor, I didn't hear

9    the question.

10             MR. REEVE:  I think I did.

11             THE COURT:  They wanted some transcripts.

12             MR. REEVE:  I think the request was for transcripts

13   of phone calls that were admitted by the defense, am I right?

14             A JUROR:  No, these transcripts, the confirmation

15   that you guys agreed that it was Robert Santos talking, that

16   there was no disagreement, that it was their voices.

17             MR. SILVERMAN:  You want the transcripts read back

18   from the court reporter?

19             Your Honor, I think we can stipulate that there's no

20   disagreement or dispute that those are the voices of Kevin

21   Wilson and Robert Santos in the calls that are Kevin Wilson

22   and Robert Santos.

23             A JUROR:  For all the calls?

24             MR. SILVERMAN:  Not for Kevin Wilson and Johnny De

25   Los Santos.

```
 1          Do you guys object that those are the voices?

 2          MR. ROGAN:  Not for the calls between Kevin Wilson

 3   and Richard Anderson.

 4          MR. SILVERMAN:  Your Honor, to be perfectly clear

 5   for the sake of the record and the jury, I think what we've

 6   all agreed just now is that the calls in which it's marked,

 7   which the jury has heard, between Kevin Wilson and either

 8   Robert Santos, Philip Bryant, or Richard Anderson, there's no

 9   dispute that the other participant in the call is Robert

10   Santos, Philip Bryant, or Richard Anderson, as marked.

11          MR. REEVE:  We agree with that representation, your

12   Honor.  There's no dispute.

13          JURORS:  Thank you.

14          (In the absence of the jury:  5:52 o'clock p.m.)

15          THE COURT:  Pizza was ordered for the jury, it just

16   arrived, so I don't know when we'll hear from them again.

17          MR. SILVERMAN:  Does the Court not authorize the

18   delivery of pizza for the parties and the attorneys?

19          THE COURT:  No, not for court staff, either.

20          (Recess:  5:53 o'clock p.m. to 7:13 o'clock p.m., in

21   the absence of the jury.)

22          THE COURT:  We have a jury inquiry, "Trap phone call

23   conversation with Philip Bryant."  Can you locate that, sir?

24          MR. SILVERMAN:  There are two of them, government

25   exhibits 109 and 114.
```

```
 1              THE COURT:  They don't say trap phone calls so
 2    perhaps you better respond by giving both.
 3              MR. SILVERMAN:  You said trap phone call, T-R-A-P?
 4              THE COURT:  Yes.
 5              MR. SILVERMAN:  Yes, your Honor.
 6              THE COURT:  Arresting police report of Richard
 7    Anderson, Officer Zannelli.
 8              MR. SILVERMAN:  The police report is not in
 9    evidence.
10              THE COURT:  No.
11              MR. ROGAN:  Just the testimony, your Honor.
12              THE COURT:  There is no report in evidence.
13              MR. SILVERMAN:  There is no police report in
14    evidence.
15              THE COURT:  Okay.  But we do have the ability to
16    play that phone call?
17              MR. SILVERMAN:  Would they like to hear it again?
18              THE COURT:  I don't know.  I've read exactly what it
19    says.
20              MR. MORAGHAN:  What numbers were those, your Honor?
21    109?
22              THE COURT:  I don't know.  It says, "Trap phone call
23    conversation with Philip Bryant."  And the other request is
24    arresting police report of Richard Anderson, Officer Zanelli.
25              MR. ROGAN:  Your Honor, can we clarify to the jury
```

```
 1    that the report is not in evidence, but they can hear the

 2    testimony if they want to hear it?

 3              THE COURT:  We don't have a report.

 4              MR. SILVERMAN:  Right.  Some of the report was read

 5    into evidence, either in the form of a question or the

 6    testimony.  So if they want to hear a readback of Officer

 7    Zanelli's testimony, I think that's entirely appropriate.

 8              MR. ROGAN:  I have no objection to that.  Obviously,

 9    there's something on their mind.  I just don't want them to go

10    away thinking, because it's not in evidence, they can't

11    consider it, the testimony.  They obviously got his name

12    right.

13              MR. SILVERMAN:  With respect to the trap phone,

14    there are two phone calls that relate to it.  If they would

15    like to hear them, I can queue them up and play both of them.

16              MR. REEVE:  What were the numbers?

17              MR. SILVERMAN:  109 and 114.

18              MR. ROGAN:  Your Honor, counsel, Mr. Reeve, just

19    reminded me, which I should have known, perhaps we can also

20    instruct the jury that as a general proposition, police

21    reports are generally not admissible, if the officer is here

22    to testify, which is what happened in the case of Officer

23    Zanelli.

24              THE COURT:  Yes.

25              MR. REEVE:  That note has been marked, your Honor?
```

```
 1                THE COURT:  It's Exhibit 4, Court Exhibit 4.

 2                MR. REEVE:  Thank you.

 3                (In the presence of the jury:  7:17 o'clock p.m.)

 4                THE COURT:  Ladies and gentlemen, you requested

 5      phone call conversation with Philip Bryant.

 6                I think there are two, am I correct, sir?

 7                MR. SILVERMAN:  Yes, your Honor.

 8                THE COURT:  And then arresting police report of

 9      Richard Anderson by Officer Zanelli.  There is no such report

10      in the record, right?

11                MR. SILVERMAN:  Yes, your Honor.  The police report

12      was not admitted into evidence; the testimony of Officer

13      Zanelli could be read back to the jury.

14                THE COURT:  Yes, if you would like that, ladies and

15      gentlemen.  We don't have the arresting report itself.

16                Let's address the trap phone call conversation.  Did

17      you tell me that there are two?

18                MR. SILVERMAN:  Yes, your Honor.  Given the guidance

19      from the jury's note, there are two phone calls, Government's

20      Exhibit 109 and 114.  I'd be happy to play them.

21                THE COURT:  I think the jury would like to hear it.

22                MR. SILVERMAN:  September 15, 2011, at 5:35 p.m.,

23      Government's Exhibit 109.

24                (Government's Exhibit 109, an audio recording,

25      played.)
```

```
 1              MR. SILVERMAN:  Government's Exhibit 114 is on

 2    December 21st, 6:29 p.m.

 3              (Government's Exhibit 114, an audio recording,

 4    played.)

 5              THE COURT:  I believe those are the calls you

 6    wanted, ladies and gentlemen.

 7              As to your other request for the arresting police

 8    officer's report, Mr. Anderson, Officer Zanelli, we don't have

 9    such report in evidence.

10              Is that correct, gentlemen?

11              MR. SILVERMAN:  Yes, your Honor, although Officer

12    Zanelli did testify.

13              THE COURT:  If you want to hear his testimony, we

14    can have that read back for you.  We don't have the arresting

15    report.

16              A JUROR:  There's another phone call.

17              MR. SILVERMAN:  You can direct any question the jury

18    has to the Court.

19              SAME JUROR:  Sorry.  I think there's another phone

20    call that's related to this with the trap phone.  Is there

21    another phone call?

22              THE COURT:  We'll check that.

23              MR. SILVERMAN:  There may be.  I would need more

24    direction as to a date.

25              SAME JUROR:  It should be right after that one.
```

```
 1              MR. REEVE:  Judge, could I make a suggestion?
 2   Perhaps the parties collectively can look for the call, and --
 3              A JUROR:  It's hard.  There's a lot of information.
 4              MR. REEVE:  I'm sorry?
 5              SAME JUROR:  It's hard, there's a lot of information
 6   that we have to go through.
 7              MR. REEVE:  Yes, ma'am.  Maybe we could look, and
 8   the court reporter could queue up the testimony if she hasn't
 9   already done that, and we could then bring the jury back in in
10   a few minutes and have everything prepared to go, if that's a
11   logical plan.  I just make a suggestion.
12              THE COURT:  Can't we do it while they're here?  You
13   want to find the phone call?
14              MR. REEVE:  Yes, if we can confer, the jury can
15   stay, if we can have a few moments.
16              THE COURT:  Please.  I would rather do that.
17              (Counsel conferring.)
18              MR. MORAGHAN:  I think 90 is what the jury's also
19   looking for.  They've heard two, this is the third one.
20              THE COURT:  All right.
21              MR. SILVERMAN:  All right, this is Government's
22   Exhibit 90.  This call takes place on September 13th at 4:42
23   p.m.
24              (Government's Exhibit 90, an audio recording,
25   played.)
```

```
 1              THE COURT:  Is that it, ladies and gentlemen, what
 2    you're looking for, or something else?
 3              A JUROR:  That's it, but they're saying it's more,
 4    it's more to the phone call.
 5              THE COURT:  I don't understand.  You think there's
 6    more than what is up there?
 7              SAME JUROR:  Yes.
 8              THE COURT:  Who's saying that?
 9              SAME JUROR:  A few.
10              MR. MORAGHAN:  May we approach, your Honor?
11              THE COURT:  Yes.
12              (At the side bar.)
13              MR. VATTI:  Your Honor, I don't think we should have
14    the jurors expressing the content of deliberations going on in
15    the room from the jury box.
16              THE COURT:  No.
17              MR. VATTI:  I would suggest that maybe we send them
18    back to the jury room, have them clarify what they're looking
19    for in a further note, and then before we bring them out, we
20    can look at the calls, collectively and see what it is that
21    might be responsive.
22              THE COURT:  Do you want me to do that?  Expand on
23    that?
24              MR. VATTI:  Maybe what you do on this request, your
25    Honor, is just tell them that we're going to read back the
```

```
 1   testimony of Officer Zanelli, and then as far as the trap

 2   phone issue, if they send us a further note clarifying what it

 3   is they want, the lawyers can collectively figure out what it

 4   is they're looking for.

 5            THE COURT:  Okay.

 6            (In open court.)

 7            THE COURT:  The court reporter is going to read the

 8   testimony in which you're interested, and then we need

 9   clarification on the phone call you're looking for.  Would you

10   do that?

11            What I was saying was we are going to have the court

12   reporter read back the testimony they're looking for, and then

13   we would like a clarification on the phone call.

14            MR. REEVE:  Thank you.

15            (Testimony of David Zannelli, January 31, 2014,

16   ninth day of trial, read by the reporter, and paused.)

17            MR. REEVE:  Judge, I don't mean to interrupt.

18            It might be helpful maybe if you turn around so

19   you're facing them.

20            JURORS:  We can hear.

21            MR. REEVE:  Great, thank you.

22            (Testimony of David Zannelli, January 31, 2014,

23   ninth day of trial, continued by the reporter.)

24            MR. SILVERMAN:  Your Honor, I've spoken with counsel

25   for Mr. Bryant, and I think we've identified the call that the
```

```
 1     jury might have in mind with respect to trap.  I'm going to
 2     start to play that call.  The term "trap" appears early on in
 3     the call, so if that's all the jury wants to hear, I would ask
 4     through the Court to the jury if it's sufficient.  Otherwise
 5     I'll play the entire call, in its entirety.
 6               THE COURT:  Do you want the entire call?
 7               JURORS:  Yes.
 8               THE COURT:  What exhibit is that?
 9               MR. MORAGHAN:  Your Honor, 95.
10               THE COURT:  Thank you.
11               MR. SILVERMAN:  Government's Exhibit 95 is October
12     23rd at 9:02 p.m.
13               (Government's Exhibit 95, an audio recording,
14     played.)
15               THE COURT:  Is that what you wanted, ladies and
16     gentlemen?
17               A JUROR:  Thank you very much, your Honor.  That's
18     not the call.  What we discussed was that we were going to go
19     home, if it's okay with you, and come back on Thursday because
20     of the storm.  And that wasn't the call that we were referring
21     to.
22               Am I correct, everyone?  Okay.
23               THE COURT:  Could you perhaps find another call that
24     might be what they're looking for?
25               SAME JUROR:  It was connected with the first one.
```

```
 1              MR. REEVE:  Judge, could we just confer with counsel

 2    for a moment?

 3              THE COURT:  Yes.

 4              MR. REEVE:  That's okay?

 5              THE COURT:  Yes.

 6              MR. SILVERMAN:  Your Honor, I think it might make

 7    sense, as the jury requested, they be excused for the evening

 8    and return whenever the Court thinks is appropriate.  We can

 9    talk among counsel as to what other call might be the one the

10    jury has in mind, and if they have any further direction they

11    can give us on Thursday that occurs to them, while they're

12    home or off for the next day, maybe they can provide that in a

13    note to the Court when they get started with their next round

14    of deliberations.

15              THE COURT:  Are you assuming the court will be

16    closed tomorrow?

17              A JUROR:  We're not sure.  There's a storm coming.

18    Whatever, later on -- Thursday, Friday -- it's fine with all

19    of us.  We're just not sure.

20              THE COURT:  I know we're all concerned about the

21    storm.  We don't know how much difficulty we're going to have

22    with it.

23              Gentlemen, should we have them come back on

24    Thursday?

25              MR. REEVE:  Judge, correct me if I'm wrong, I think
```

 1    there might be a number that the jurors could call.

 2              THE CLERK:  No, I'm going to take care of that.

 3              MR. REEVE:  Counsel, I think, are ready to leave it

 4    to Kathleen to tell the jury about how, what they should do

 5    tomorrow, and we don't need to be present for that discussion.

 6    I think Kathleen can advise the jurors so they know what they

 7    need to do, and we'll play it by ear because nobody knows what

 8    the weather's going to be like tomorrow.

 9              MR. MORAGHAN:  Your Honor, may we approach for a

10    minute?

11              (A discussion was held off the record at the side

12    bar.)

13              THE COURT:  All right, ladies and gentlemen, what

14    we're going to do is ask you to return tomorrow at 11:00

15    o'clock.  We're hopeful that will accommodate everyone's

16    needs.  If there's a real problem tomorrow, the court clerk

17    has your telephone numbers and we'll call you if the court

18    isn't going to be open.  At the moment, we think it will be

19    and we're asking you to please come at 11:00 o'clock.  Is that

20    all right?

21              MR. REEVE:  But, Judge, I have to say that there are

22    some people, I think, who are unhappy with that.  The jury

23    wants to meet and come -- I just want to leave it up -- I

24    think we all want to be sensitive to the needs of the jury.

25    Maybe they want to talk for a minute in the jury box and

```
 1    communicate with us.

 2              THE COURT:  If you're concerned, let us know what

 3    your wishes are, ladies and gentlemen.

 4              A JUROR:  I think it depends on the weather.  Let's

 5    put it that way, guys, if the weather's good, we're all gung

 6    ho but if the weather's bad, we're hearing that it's supposed

 7    to be a nor'easter, which means 11:00 o'clock is a little

 8    generous on your part to think we're going to get here by

 9    11:00 o'clock.

10              THE COURT:  You think we should make it Thursday

11    then?

12              A JUROR:  No.

13              MR. REEVE:  1:00 o'clock, for example?

14              JURORS:  1:00 o'clock is great.

15              THE COURT:  1:00 o'clock?

16              MR. REEVE:  With the understanding, your Honor, that

17    Kathleen will let them know, depending on the weather.

18    Nobody's going to ask the jury to come in if it's not safe, we

19    all agree.

20              THE CLERK:  If I get a word in the morning that the

21    court has closed, if I get that word at 6:00 o'clock, I will

22    call you at 6:00 o'clock.  If I don't get that word until

23    10:00.

24              SAME JUROR:  Then we change the time.

25              A JUROR:  1:00 o'clock.
```

```
 1              ANOTHER JUROR:  1:00 o'clock no matter what.

 2              ANOTHER JUROR:  If the court's closed, it's closed.

 3              ANOTHER JUROR:  If it's fine, 1:00 o'clock.

 4              THE COURT:  Okay.  All right.  We'll adjourn for the

 5    evening then.  And ladies and gentlemen, please don't discuss

 6    the case while you're enjoying your evening.

 7              (7:49 o'clock p.m.)
```

```
 8                   INDEX OF WITNESSES              PAGE

 9    Closing Argument by Mr. Moraghan               587

10    Closing Argument by Mr. Reeve                  1613

11    Rebuttal Closing Argument by Mr. Vatti         1660

12    Judge's Charge to the Jury                     1692
```

```
13

14

15

16

17

18         COURT REPORTER'S TRANSCRIPT CERTIFICATE

19         I hereby certify that the within

20      and foregoing is a true and correct

21      transcript taken from the proceedings

22      in the above-entitled matter.

23

24              /s/ Thea Finkelstein
                Official Court Reporter

25
      Dated: _____
```